IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHALLENGER REALTY GROUP LLC,<br><br>Plaintiff,<br><br>v.<br><br>BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 4:26-cv-00231 |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Challenger Realty Group LLC ("Plaintiff" or "Challenger" or "Purchaser") files this Original Complaint against Defendants Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "Smelley Estate"), Cresson Moon Properties, LP ("CMPLP"), Richard David Smelley and Amy Elizabeth Smelley (collectively, "Smelley"), Tammy Marie Graham and Gregory Scott Graham (collectively, "Graham"), Deborah Ruth Davis and David Glenn Davis (collectively, "Davis") (the Smelley Estate, CMPLP, Smelley, Graham, and Davis are collectively, "Defendants" or "Seller").

**Parties**

1. Plaintiff is a Delaware limited liability company. None of Plaintiff's three (3) members reside in Texas. For added clarity, each member's residence follows: John Contrevo resides at 7 Foal Tr., Sewell, New Jersey 08080; Edwin Esposito resides at 1304 Heidelberg Dr., Williamstown, New Jersey 08094; and Charles Gallub resides at 18 Neptune Dr., Somers Point, New Jersey 08244.

2. The Smelley Estate may be served by serving its Independent Executor, Bill Sanders, at 804 Flagstone Drive, Burleson, Texas 76028 or wherever he may be found.

3. CMPLP is a Texas limited partnership that may be served by serving its Registered Agent, Richard Smelley at 4750 Cattlebaron Drive, Fort Worth, Texas 76108 or wherever he may be found.

4. The Smelley's are individuals that may be served by serving them at their residence located at 4750 Cattlebaron Drive, Fort Worth, Texas 76108 or wherever they may be found.

5. The Graham's are individuals that may be served by serving them at their residence located at 6651 Weiland Road, Weatherford, Texas 76088 or wherever they may be found.

6. The Davis's are individuals that may be served by serving them at their residence located at 12601 Cleburne Hwy, Cresson, Texas 76035 or wherever they may be found.

## Jurisdiction and Venue

7. Jurisdiction is proper in this Court pursuant to 28 U.S. Code § 1332(a) because Defendants are Texas residents, Plaintiff is a resident of Delaware, and the amount in controversy exceeds $75,000.

8. Venue is proper in this Court pursuant to 28 U.S. Code § 1391(b) because all Defendants are residents of Texas and located in Fort Worth and/or Burleson, a substantial part of the events and omissions giving rise to the claim occurred here, and the real property that is the subject o the action is stated here.

## Facts

9. On May 26, 2023, Plaintiff, as Purchaser, and Defendants, as Seller, entered into a Standard Contract of Sale (the "Contract")[1] in connection with the purchase and sale of approximately

[1] All capitalized terms used and not defined in this Plaintiff's Original Complaint shall have the meaning ascribed in the Contract.

1,674 gross contiguous acres with an address of 7700 Old Granbury Road, Cresson, Texas located in Hood County, Texas (the "Property"). *See* Exhibit 1.

10. Purchaser agreed to buy and Seller agreed to sell the Property in accordance with the terms of the Contract at a purchase price of approximately $32,643,000.00. *See id.* at Section 2.

11. Significant to this Complaint, Seller contractually agreed to do the following:

- deliver all Due Diligence Items (as defined in the Contract) to Purchaser within 10 days following the Contract Effective Date [*see id.* at Section 4(a)];

- remove all tires and parts thereof situated on the Property (collectively, the "Tires") from the Property within 30 days after the Contract Effective Date [*see id.* at Section 7(d)]; and

- not less than 15 days prior to Closing, (a) remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and (b) provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "Required Environmental Report") [*see id.* at Section 7(c)].

12. Seller represented and warranted to Purchaser that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property." *See id.* at Section 6(i).

13. In addition, it is an express condition precedent to Closing that Seller's representations and warranties be true and correct as of Closing, and that Seller's representations and warranties under Section 6 be true and correct in all material respects. *See id.* at Section 8(b).

14. Each of the following is an express condition precedent to Closing:

- That Seller shall have removed all Tires from the Property [*see id.* at Section 8(d)];

- That all covenants and other obligations of Seller set forth in the Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects [*see id.* at Section 8(e)]; and

- That Seller shall have delivered to Purchaser the Due Diligence Items[2] and all updates thereof required pursuant to Section 4(a) of the Contract [*see id.* at Section 8(f)].

15. If all of the conditions precedent are not fully satisfied or waived by Purchaser as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate the Contract; provided, however, that nothing contained in Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Purchaser's rights under Section 11(b) of the Contract if Seller defaults under the Contract. *See id.* at *infra* Section 8(g).

16. The Contract also provides that the inspection period ("IP") would commence on May 26, 2023 (the Contract Effective Date) and continue through the 180th day after the later to occur of (a) the date upon which all of the Tires had been removed from the Property and Seller had notified Purchaser thereof and (b) the date upon which Seller had delivered all of the Due Diligence Items to Purchaser (collectively, the "IP Expiration Conditions"). *See id.* at Section 5(a).

17. Finally, the Contract expressly provided that "time is of the essence" with respect to all provisions therein. *See id.* at Section 13(k).

18. Shortly after May 26, 2023, Seller delivered certain of the Due Diligence Items to Purchaser.

[2] There is a typographical error in the Contract here that refers to those items as "Due Diligence Materials" instead of "Due Diligence Items" per the defined term.

19. On June 8, 2023, the parties filed a Memorandum of Agreement ("MOA") with the Hood County Clerk and made a part of the Real Records, Document Number 2023-0007320. *See* Exhibit 2. This MOA specifically states the parties' intent that "Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract." *Id.*

20. On June 21, 2023, Seller notified Purchaser's agent, Jake Wilkinson, that all Tires had been removed from the Property. *See* Exhibit 3.

21. However, Purchaser subsequently discovered that numerous Tires remained on the Property.

22. On December 15, 2023, Purchaser sent a letter to Seller notifying Purchaser, among other things, that Seller had failed to satisfy its obligation to remove all Tires from the Property, making demand upon Seller to remove all of the Tires from the Property, and clarifying that the IP would not expire until the IP Expiration Conditions had been satisfied. *See* Exhibit 4.

23. The parties thereafter agreed to reset the 180-day IP.

24. On January 11, 2024, Seller again notified Purchaser's agent, Jake Wilkinson, that all Tires had been removed from the Property. *See* Exhibit 5.

25. However, Purchaser subsequently discovered that (a) there were **more** Tires situated on the Property, and (b) Seller had not delivered to Purchaser all of the Due Diligence Items in Seller's control.

26. On July 1, 2024, Purchaser delivered written notice to Seller notifying Seller of, among other things, Purchaser's discovery that (a) Seller had again failed to remove all of the Tires from the Property, and (b) Seller had failed to deliver to Purchaser all of the Due Diligence Items. *See* Exhibit 6.

27. On December 4, 2024 (the "First Amendment Effective Date"), the parties entered into the First Amendment to Standard Contract of Sale (the "First Contract Amendment") in which the parties agreed, among other things, to extend IP through April 7, 2025 and set an outside closing date of December 31, 2025 (the "Outside Closing Date"). *See* Exhibit 7.

28. Seller agreed in the First Contract Amendment to provide Purchaser, within five business days following the First Amendment Effective Date, with evidence of shut-in payments and shut-in payment supporting documentation received by the Seller for (a) 2024 and (b) the applicable years prior to 2024. *See* Exhibit 7 at Section 4(b).

29. Seller failed to provide all of the required evidence of shut-in payments and shut-in payment supporting documentation.

30. Seller also completely failed to (a) remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and (b) provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (as required by Section 7(c) of the Contract) by December 16, 2025, the 15th day prior to the Outside Closing Date.

31. On December 31, 2025 (the "Second Amendment Effective Date"), the parties entered into the Second Amendment to Standard Contract of Sale (the "Second Contract Amendment"), which, among other things:

- Contained language regarding the parties' express desire to extend the closing date for a period of time in order to allow Seller to fully comply with the requirements under Section 7(c) of the Contract [see Exhibit 8 at Recitals]; and

- Extended the Outside Closing Date to January 10, 2026 (the "First Extended Closing Date").

32. On January 26, 2026, Seller delivered to Purchaser the results of that certain Limited Phase II Investigation prepared by Whitehead Environmental Solutions, LLC ("Whitehead") (the "January 26 ESA"). *See* Exhibit 9.

33. The January 26 ESA confirms at least the following four independent breaches of the Contract's environmental provisions, each of which is material and precludes Closing under the express terms negotiated by the parties.

34. *First*, the January 26 ESA indicates that Seller's environmental representation in Section 6(i) of the Contract was inaccurate when made and remains inaccurate.

35. Section 6(i) provides that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property." *See* Exhibit 1.

36. The January 26 ESA indicates that Hazardous Substances are present at the Property. *See* Exhibit 8.

37. Accordingly, Seller is in breach of Section 6(i) of the Contract. *See* Exhibit 1 at Section 6(i).

38. *Second*, under Section 8(b) of the Contract, it is a condition precedent to Closing that Seller's representations and warranties be true and correct as of the Closing Date.

39. Accordingly, Seller is in breach of Section 8(b) of the Contract. *See* Exhibit 1 at Section 8(b).

40. *Third*, Section 7(c) of the Contract requires that Seller remove from the Property, no later than 15 days prior to Closing, "all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property." *See* Exhibit 1 at Section 7(c).

41. Based on the January 26 ESA, the required removal of environmental contamination and hazardous materials has not occurred. *See* Exhibit 9.

42. In addition, Seller has not provided satisfactory evidence that all underground equipment or piping associated with the above-ground storage tanks has been removed from the Property. *See* Exhibit 9.

43. Accordingly, Seller is in breach of Section 7(c) of the Contract. *See* Exhibit 1 at Section 7(c).

44. *Fourth*, Seller <u>specifically</u> required, and the parties <u>specifically</u> agreed in Section 7(c) of the Contract, that Seller's environmental engineer would <u>specifically</u> certify in the Required Environmental Report that "[N]o environmental contamination exists on or with respect to the Property" (the "Required Certification").

45. The January 26 ESA does not include the Required Certification.

46. Accordingly, Seller is in breach of Section 7(c) of the Contract. *See* Exhibit 1 at Section 7(c).

47. Based on the foregoing, neither Section 6(i) or Section 7(c) of the Contract has been satisfied and the applicable conditions precedent to Closing have not been met.

48. The requirements and language of Sections 6(i) and 7(c) of the Contract were drafted by Purchaser and specifically agreed to by Seller to address environmental contamination and Hazardous Substances at the Property.

49. These requirements were and remain material to the transaction, particularly in light of the approximate $32,643,000.00 purchase price to be paid at Closing.

50. Section 11(b) of the Contract, entitled "Seller's Default", states:

> **In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract**, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third party out of pocket costs and expenses incurred by Purchaser in

> connection with the transaction contemplated herein not to exceed $200,000.00 **or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder**; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

*See* Exhibit 1 at Section 11(b) (emphasis added).

51. On February 12, 2026, counsel for Purchaser sent an email to Seller's counsel containing, among other things, the following:

> From Purchaser's perspective, it would be premature to discuss a closing date until the environmental matters outlined above are fully and clearly resolved. In addition to revising the ESA Report to include the contractually required confirmation, Purchaser also requires - and we understand Seller's engineer has agreed to provide - the following:
>
> An express right for Purchaser to rely on the ESA Report (whether by reliance letter or by naming Purchaser as an intended recipient in the report). The ESA Report expressly prohibits anyone other than Seller from relying upon the ESA Report; and
>
> Purchaser to be named as an additional insured on the environmental engineer's and drilling contractor's CGL and Contractors Pollution Liability policies, with limits appropriate for a $33 million transaction. Additionally, those policies must be "occurrence-based policies" and not "claims-made policies." The policies and insurance must survive into the future for obvious reasons.

*See* Exhibit 10.

52. Shortly thereafter, during the week of February 16, 2026, Seller's counsel informed Purchaser's counsel that she had spoken with Whitehead and confirmed that they had agreed to allow Purchaser to rely on the Required Environmental Report and provide the requested insurance, and she thought that Whitehead had already "taken care of that."

53. Purchaser has never communicated, to Seller or anyone else, that Purchaser does not intend to purchase the Property and, in fact, Purchaser has always communicated to Seller that Purchaser desires to purchase the Property.

54. Despite Purchaser's clear communications of Purchaser's desire to purchase the Property, and the overwhelming patience exercised by Purchaser to date, it has come to Purchaser's attention that Seller, through its agent, is representing to unrelated third parties that "…after all this time, [the Property] is going to be coming back on the market." *See* Exhibit 11.

55. Purchaser believes such unsolicited offers to sell the Property to third parties demonstrates Seller's intent to rescind the Contract and put the Property back on the market.

56. As stated above, Purchaser is entitled to seek specific performance under Section 11(b) of the Contract upon Seller's default. *See* Exhibit 1 at Section 11(b) ("Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder.").

57. While Seller attempts to now circumvent its contractual duties by marketing the Property to third parties, Purchaser remains stalwart in demanding enforcement of Section 11(b) and the equitable remedy of specific performance to which it is entitled.

58. The damages to Plaintiff were compounded because Plaintiff has already incurred over $1,500,000.00 in due diligence costs including but not limited to payments to and/or for:

a. Alta survey;

b. Topographical studies;

c. Environmental assessments;

d. Geotechnical studies;

e. Civil engineering fees;

f. Legal fees;

g. Utilities;

h. Water/hydrology analyses;

i. Water engineering fees;

j. Rail engineering fees;

k. Sewage engineering fees;

l. Permit matrix study;

m. Feasibility study;

n. Cultural Resources Desktop Evaluation;

o. Governmental Affairs and Approvals Consultant's fees;

p. Energy consultant's fees; and

q. Architectural Site Planning.

59. Note that the above a. through q. does not include the value of Plaintiff's representatives' time to any of the above.

60. Without specific performance, Plaintiff's damages will only continue to accrue for the foreseeable future.

61. Because Seller has committed multiple breaches under the Contract, refused to cooperate with Seller, and is now actively marketing the Property to third parties, this lawsuit ensued.

**Count 1: Breach of Contract**

62. Purchaser incorporates the foregoing paragraphs as though fully set forth herein.

63. The Contract is a valid and enforceable contract.

64. Purchaser performed, tendered performance of, or was excused from performing its contractual obligations to Seller.

65. By the wrongful conduct described above, Seller materially breached the Contract by, among other things:

(a) breaching Section 6(i) of the Contract by making and maintaining a false representation that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property," when the January 26 ESA confirms the presence of Hazardous Substances;

(b) breaching Section 7(c) of the Contract by failing, not less than fifteen (15) days prior to Closing, to remove "any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property," and by failing to provide a report prepared by a licensed environmental engineer confirming that "no environmental contamination exists on or with respect to the Property";

(c) breaching Section 8(b), 8(d), 8(e), and 8(f) of the Contract by failing to satisfy express conditions precedent to Closing, including the removal of all Tires, the full and timely performance of Seller's covenants, and the delivery of all Due Diligence Items;

(d) breaching Section 4(a) of the Contract by failing to deliver all Due Diligence Items within the time required;

(e) breaching Section 7(d) by repeatedly failing to remove all Tires from the Property as required;

(f) breaching Section 4(b) of the First Contract Amendment by failing to provide evidence of shut-in payments and supporting documentation within five business days of the First Amendment Effective Date; and

(g) repudiating their contractual obligations by declaring their intent to rescind the Contract and market the Property to third parties despite Purchaser's continued readiness, willingness, and ability to perform.

66. Each of the foregoing breaches is material, goes to the essence of the Contract—particularly given the approximately $32,643,000.00 purchase price—and constitutes a default under

Section 11(b), entitling Purchaser to seek specific performance and all other remedies available at law or in equity.

67. As a direct and proximate result of Seller's material breaches and defaults, Purchaser has suffered damages, including but not limited to substantial third-party out-of-pocket costs incurred in connection with the transaction.

68. Pursuant to Section 11(b) of the Contract, Purchaser seeks specific performance of Seller's obligations.

69. The Property that is the subject of the Contract is unique and irreplaceable.

70. It consists of approximately 1,674 contiguous acres located at 7700 Old Granbury Road in the extraterritorial jurisdiction of Cresson, Texas, positioned approximately 30 miles from downtown Fort Worth, with approximately 1,300 feet of road frontage and more than two miles of Atchison, Topeka and Santa Fe rail frontage.

71. The size, contiguity, location in a rapidly growing corridor, dual transportation access (highway and rail), rolling terrain, scattered hardwoods, water features, and absence of restrictions collectively create a rare mixed-use development opportunity that cannot be duplicated by the purchase of other land.

72. Comparable parcels of similar scale, configuration, accessibility, and development potential are not readily available in the market.

73. As a result, the Property possesses special and unique characteristics, and monetary damages would not adequately compensate Purchaser for the loss of the benefit of its bargain.

74. In the alternative, if specific performance is determined to be unavailable for any reason, Purchaser seeks recovery of its actual damages as permitted under Section 11(b), together with reasonable and necessary attorneys' fees, pre- and post-judgment interest, and costs of suit.

**<u>Count 2: Declaratory Judgment Action</u>**

75. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

76. Pursuant to § 37.004(a) and (b) of the TEX. CIV. PRAC. & REM. CODE, Purchaser asks the Court to enter a declaratory judgment establishing the parties' respective rights, duties, and obligations under several key provisions of the Contract.

77. As established by the facts set forth above, there is an actual, present and practical need for declaratory relief because there is a justifiable controversy about the rights and obligations of the parties that is real and substantial and involves a genuine conflict of tangible interests.

78. An actual and substantial controversy exists between Purchaser and Seller concerning whether the January 26 ESA satisfies Seller's obligations under Section 7(c) of the Contract and whether the conditions precedent to Closing have been met.

79. Seller contends that its January 26 ESA complies with the Contract and that it is entitled to proceed toward Closing or rescind the Contract.

80. Purchaser disputes that contention.

81. Section 7(c) of the Contract requires that, not less than fifteen (15) days prior to Closing, Seller shall (i) remove "any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property," and (ii) provide to Purchaser a report prepared by a licensed environmental engineer confirming that "no environmental contamination exists on or with respect to the Property." *See* Exhibit 1.

82. The parties further agreed that the required engineer's certification would expressly state that "[n]o environmental contamination exists on or with respect to the Property."

83. The January 26 ESA does not include the Required Certification and does not confirm that no environmental contamination exists on or with respect to the Property. *See* Exhibit 9.

84. The January 26 ESA therefore fails to satisfy the express requirements of Section 7(c) of the Contract. *Compare* Exhibit 1 *with* Exhibit 9.

85. Because Section 7(c) and Section 8(b) establish conditions precedent to Closing, the dispute regarding the sufficiency of the January 26 ESA directly affects the parties' present rights and obligations under the Contract.

86. Accordingly, Purchaser seeks a declaratory judgment that:

(a) Section 7(c) requires an express certification that no environmental contamination exists on or with respect to the Property;

(b) the January 26 ESA does not satisfy Section 7(c);

(c) Seller has not satisfied the applicable conditions precedent to Closing; and

(d) Purchaser has not breached or defaulted under the Contract and is entitled to enforce its rights thereunder.

**Attorneys' Fees**

87. Pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE §§ 37.001 and 38.001 *et seq.*, the Contract, and other applicable law, Plaintiff is entitled to recover its reasonable and necessary attorneys' fees incurred in connection with this action through trial and any appeal.

**Conditions Precedent**

88. All conditions precedent to the recovery sought herein have been met or waived.

**Relief Requested**

Plaintiff requests that Defendants be cited to appear and answer this case and, upon final trial, Plaintiff have judgment in its favor and against Defendants for actual damages, including benefit of the bargain and out of pocket damages, special damages including lost profits, attorneys' fees, costs

of court, pre- and post-judgment interest as allowed by law, and any further legal or equitable relief to which Plaintiff may be justly entitled.

Respectfully submitted,

*/s/ Blake J. Brownshadel*
Blake J. Brownshadel
State Bar No. 24073969
bbrownshadel@cbsattorneys.com
Christopher A. John
State Bar No. 24110053
cjohn@cbsattorneys.com
CALHOUN BHELLA & SECHREST LLP
325 N. Saint Paul St., Suite 2900
Dallas, Texas 75201
Telephone: (214) 981-9200

**COUNSEL FOR PLAINTIFF**