IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**FILED**
**April 1, 2026**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

| | | |
|---|---|---|
| CHALLENGER CRESSON I, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 4:26-CV-00231-P |

## PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

Plaintiff Challenger Cresson I, LLC[1] ("Plaintiff" or "Challenger" or "Purchaser") files this First Amended Original Complaint against Defendants Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "Smelley Estate"), Cresson Moon Properties, LP ("CMPLP"), Richard David Smelley and Amy Elizabeth Smelley (collectively, "Smelley"), Tammy Marie Graham and Gregory Scott Graham (collectively, "Graham"), Deborah Ruth Davis and David Glenn Davis (collectively, "Davis") (the Smelley Estate, CMPLP, Smelley, Graham, and Davis are collectively, "Defendants" or "Seller").

## Parties

1. Plaintiff is a Delaware limited liability company. None of Plaintiff's three (3) members reside in Texas. For added clarity, each member's residence follows: John Contrevo resides at 7 Foal

[1] Challenger Realty Group LLC entered into the *Assignment and Assumption of Standard Contract of Sale* assigning its interests in the Property at issue in this lawsuit on June 19, 2025 to Challenger Cresson I, LLC.

Tr., Sewell, New Jersey 08080; Edwin Esposito resides at 1304 Heidelberg Dr., Williamstown, New Jersey 08094; and Charles Gallub resides at 18 Neptune Dr., Somers Point, New Jersey 08244.

2. The Smelley Estate may be served by serving its Independent Executor, Bill Sanders, at 804 Flagstone Drive, Burleson, Texas 76028 or wherever he may be found.

3. CMPLP is a Texas limited partnership that may be served by serving its Registered Agent, Richard Smelley at 4750 Cattlebaron Drive, Fort Worth, Texas 76108 or wherever he may be found.

4. The Smelley's are individuals that may be served by serving them at their residence located at 4750 Cattlebaron Drive, Fort Worth, Texas 76108 or wherever they may be found.

5. The Graham's are individuals that may be served by serving them at their residence located at 6651 Weiland Road, Weatherford, Texas 76088 or wherever they may be found.

6. The Davis's are individuals that may be served by serving them at their residence located at 12601 Cleburne Hwy, Cresson, Texas 76035 or wherever they may be found.

## Jurisdiction and Venue

7. Jurisdiction is proper in this Court pursuant to 28 U.S. Code § 1332(a) because Defendants are Texas residents, Plaintiff is a resident of Delaware, and the amount in controversy exceeds $75,000.

8. Venue is proper in this Court pursuant to 28 U.S. Code § 1391(b) because all Defendants are residents of Texas and located in Fort Worth and/or Burleson, a substantial part of the events and omissions giving rise to the claim occurred here, and the real property that is the subject o the action is stated here.

**Facts**

9. On May 26, 2023, Plaintiff, as Purchaser, and Defendants, as Seller, entered into a Standard Contract of Sale (the "Contract")[2] in connection with the purchase and sale of approximately 1,674 gross contiguous acres with an address of 7700 Old Granbury Road, Cresson, Texas located in Hood County, Texas (the "Property"). *See* Exhibit 1.

10. Purchaser agreed to buy and Seller agreed to sell the Property in accordance with the terms of the Contract at a purchase price of approximately $32,643,000.00. *See id.* at Section 2.

11. Significant to this Complaint, Seller contractually agreed to do the following:

- deliver all Due Diligence Items (as defined in the Contract) to Purchaser within 10 days following the Contract Effective Date [*see id.* at Section 4(a)];
- remove all tires and parts thereof situated on the Property (collectively, the "Tires") from the Property within 30 days after the Contract Effective Date [*see id.* at Section 7(d)]; and
- not less than 15 days prior to Closing, (a) remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and (b) provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "Required Environmental Report") [*see id.* at Section 7(c)].

12. Seller represented and warranted to Purchaser that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property." *See id.* at Section 6(i).

[2] All capitalized terms used and not defined in this Plaintiff's Original Complaint shall have the meaning ascribed in the Contract.

13. In addition, it is an express condition precedent to Closing that Seller's representations and warranties be true and correct as of Closing, and that Seller's representations and warranties under Section 6 be true and correct in all material respects. *See id.* at Section 8(b).

14. Each of the following is an express condition precedent to Closing:

- That Seller shall have removed all Tires from the Property [*see id.* at Section 8(d)];
- That all covenants and other obligations of Seller set forth in the Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects [*see id.* at Section 8(e)]; and
- That Seller shall have delivered to Purchaser the Due Diligence Items[3] and all updates thereof required pursuant to Section 4(a) of the Contract [*see id.* at Section 8(f)].

15. If all of the conditions precedent are not fully satisfied or waived by Purchaser as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate the Contract; provided, however, that nothing contained in Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Purchaser's rights under Section 11(b) of the Contract if Seller defaults under the Contract. *See id.* at *infra* Section 8(g).

16. The Contract also provides that the inspection period ("IP") would commence on May 26, 2023 (the Contract Effective Date) and continue through the 180th day after the later to occur of (a) the date upon which all of the Tires had been removed from the Property and Seller had notified Purchaser thereof and (b) the date upon which Seller had delivered all of the Due Diligence Items to Purchaser (collectively, the "IP Expiration Conditions"). *See id.* at Section 5(a).

17. Finally, the Contract expressly provided that "time is of the essence" with respect to all provisions therein. *See id.* at Section 13(k).

---

[3] There is a typographical error in the Contract here that refers to those items as "Due Diligence Materials" instead of "Due Diligence Items" per the defined term.

18. Shortly after May 26, 2023, Seller delivered certain of the Due Diligence Items to Purchaser.

19. On June 8, 2023, the parties filed a Memorandum of Agreement ("MOA") with the Hood County Clerk and made a part of the Real Records, Document Number 2023-0007320. *See* Exhibit 2. This MOA specifically states the parties' intent that "Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract." *Id.*

20. On June 21, 2023, Seller notified Purchaser's agent, Jake Wilkinson, that all Tires had been removed from the Property. *See* Exhibit 3.

21. However, Purchaser subsequently discovered that numerous Tires remained on the Property.

22. On December 15, 2023, Purchaser sent a letter to Seller notifying Purchaser, among other things, that Seller had failed to satisfy its obligation to remove all Tires from the Property, making demand upon Seller to remove all of the Tires from the Property, and clarifying that the IP would not expire until the IP Expiration Conditions had been satisfied. *See* Exhibit 4.

23. The parties thereafter agreed to reset the 180-day IP.

24. On January 11, 2024, Seller again notified Purchaser's agent, Jake Wilkinson, that all Tires had been removed from the Property. *See* Exhibit 5.

25. However, Purchaser subsequently discovered that (a) there were **more** Tires situated on the Property, and (b) Seller had not delivered to Purchaser all of the Due Diligence Items in Seller's control.

26. On July 1, 2024, Purchaser delivered written notice to Seller notifying Seller of, among other things, Purchaser's discovery that (a) Seller had again failed to remove all of the Tires from the

Property, and (b) Seller had failed to deliver to Purchaser all of the Due Diligence Items. *See* Exhibit 6.

27. On December 4, 2024 (the "First Amendment Effective Date"), the parties entered into the First Amendment to Standard Contract of Sale (the "First Contract Amendment") in which the parties agreed, among other things, to extend IP through April 7, 2025 and set an outside closing date of December 31, 2025 (the "Outside Closing Date"). *See* Exhibit 7.

28. Seller agreed in the First Contract Amendment to provide Purchaser, within five business days following the First Amendment Effective Date, with evidence of shut-in payments and shut-in payment supporting documentation received by the Seller for (a) 2024 and (b) the applicable years prior to 2024. *See* Exhibit 7 at Section 4(b).

29. Seller failed to provide all of the required evidence of shut-in payments and shut-in payment supporting documentation.

30. Seller also completely failed to (a) remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and (b) provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (as required by Section 7(c) of the Contract) by December 16, 2025, the 15th day prior to the Outside Closing Date.

31. On December 31, 2025 (the "Second Amendment Effective Date"), the parties entered into the Second Amendment to Standard Contract of Sale (the "Second Contract Amendment"), which, among other things:

- Contained language regarding the parties' express desire to extend the closing date for a period of time in order to allow Seller to fully comply with the requirements under Section 7(c) of the Contract [see Exhibit 8 at Recitals]; and

- Extended the Outside Closing Date to January 10, 2026 (the "First Extended Closing Date").

32. On January 26, 2026, Seller delivered to Purchaser the results of that certain Limited Phase II Investigation prepared by Whitehead Environmental Solutions, LLC ("Whitehead") (the "January 26 ESA"). *See* Exhibit 9.

33. The January 26 ESA confirms at least the following four independent breaches of the Contract's environmental provisions, each of which is material and precludes Closing under the express terms negotiated by the parties.

34. *First*, the January 26 ESA indicates that Seller's environmental representation in Section 6(i) of the Contract was inaccurate when made and remains inaccurate.

35. Section 6(i) provides that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property." *See* Exhibit 1.

36. The January 26 ESA indicates that Hazardous Substances are present at the Property. *See* Exhibit 8.

37. Accordingly, Seller is in breach of Section 6(i) of the Contract. *See* Exhibit 1 at Section 6(i).

38. *Second*, under Section 8(b) of the Contract, it is a condition precedent to Closing that Seller's representations and warranties be true and correct as of the Closing Date.

39. Accordingly, Seller is in breach of Section 8(b) of the Contract. *See* Exhibit 1 at Section 8(b).

40. *Third*, Section 7(c) of the Contract requires that Seller remove from the Property, no later than 15 days prior to Closing, "all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property." *See* Exhibit 1 at Section 7(c).

41. Based on the January 26 ESA, the required removal of environmental contamination and hazardous materials has not occurred. *See* Exhibit 9.

42. In addition, Seller has not provided satisfactory evidence that all underground equipment or piping associated with the above-ground storage tanks has been removed from the Property. *See* Exhibit 9.

43. Accordingly, Seller is in breach of Section 7(c) of the Contract. *See* Exhibit 1 at Section 7(c).

44. *Fourth*, Seller specifically required, and the parties specifically agreed in Section 7(c) of the Contract, that Seller's environmental engineer would specifically certify in the Required Environmental Report that "[N]o environmental contamination exists on or with respect to the Property" (the "Required Certification").

45. The January 26 ESA does not include the Required Certification.

46. Accordingly, Seller is in breach of Section 7(c) of the Contract. *See* Exhibit 1 at Section 7(c).

47. Based on the foregoing, neither Section 6(i) or Section 7(c) of the Contract has been satisfied and the applicable conditions precedent to Closing have not been met.

48. The requirements and language of Sections 6(i) and 7(c) of the Contract were drafted by Purchaser and specifically agreed to by Seller to address environmental contamination and Hazardous Substances at the Property.

49. These requirements were and remain material to the transaction, particularly in light of the approximate $32,643,000.00 purchase price to be paid at Closing.

50. Section 11(b) of the Contract, entitled "Seller's Default", states:

> **In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract**, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date

> subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third party out of pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 **or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder**; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

*See* Exhibit 1 at Section 11(b) (emphasis added).

51. On February 12, 2026, counsel for Purchaser sent an email to Seller's counsel containing, among other things, the following:

> From Purchaser's perspective, it would be premature to discuss a closing date until the environmental matters outlined above are fully and clearly resolved. In addition to revising the ESA Report to include the contractually required confirmation, Purchaser also requires - and we understand Seller's engineer has agreed to provide - the following:
>
> An express right for Purchaser to rely on the ESA Report (whether by reliance letter or by naming Purchaser as an intended recipient in the report). The ESA Report expressly prohibits anyone other than Seller from relying upon the ESA Report; and
>
> Purchaser to be named as an additional insured on the environmental engineer's and drilling contractor's CGL and Contractors Pollution Liability policies, with limits appropriate for a $33 million transaction. Additionally, those policies must be "occurrence-based policies" and not "claims-made policies." The policies and insurance must survive into the future for obvious reasons.

*See* Exhibit 10.

52. Shortly thereafter, during the week of February 16, 2026, Seller's counsel informed Purchaser's counsel that she had spoken with Whitehead and confirmed that they had agreed to allow Purchaser to rely on the Required Environmental Report and provide the requested insurance, and she thought that Whitehead had already "taken care of that."

53. Purchaser has never communicated, to Seller or anyone else, that Purchaser does not intend to purchase the Property and, in fact, Purchaser has always communicated to Seller that Purchaser desires to purchase the Property.

54. Despite Purchaser's clear communications of Purchaser's desire to purchase the Property, and the overwhelming patience exercised by Purchaser to date, it has come to Purchaser's attention that Seller, through its agent, is representing to unrelated third parties that "…after all this time, [the Property] is going to be coming back on the market." *See* Exhibit 11.

55. Purchaser believes such unsolicited offers to sell the Property to third parties demonstrates Seller's intent to rescind the Contract and put the Property back on the market.

56. As stated above, Purchaser is entitled to seek specific performance under Section 11(b) of the Contract upon Seller's default. *See* Exhibit 1 at Section 11(b) ("Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder.").

57. While Seller attempts to now circumvent its contractual duties by marketing the Property to third parties, Purchaser remains stalwart in demanding enforcement of Section 11(b) and the equitable remedy of specific performance to which it is entitled.

58. The damages to Plaintiff were compounded because Plaintiff has already incurred over $1,500,000.00 in due diligence costs including but not limited to payments to and/or for:

a. Alta survey;

b. Topographical studies;

c. Environmental assessments;

d. Geotechnical studies;

e. Civil engineering fees;

f. Legal fees;

g. Utilities;

h. Water/hydrology analyses;

i. Water engineering fees;

j. Rail engineering fees;

k. Sewage engineering fees;

l. Permit matrix study;

m. Feasibility study;

n. Cultural Resources Desktop Evaluation;

o. Governmental Affairs and Approvals Consultant's fees;

p. Energy consultant's fees; and

q. Architectural Site Planning.

59. Note that the above a. through q. does not include the value of Plaintiff's representatives' time to any of the above.

60. Without specific performance, Plaintiff's damages will only continue to accrue for the foreseeable future.

61. Because Seller has committed multiple breaches under the Contract, refused to cooperate with Seller, and is now actively marketing the Property to third parties, this lawsuit ensued.

**Count 1: Breach of Contract**

62. Purchaser incorporates the foregoing paragraphs as though fully set forth herein.

63. The Contract is a valid and enforceable contract.

64. Purchaser performed, tendered performance of, or was excused from performing its contractual obligations to Seller.

65. By the wrongful conduct described above, Seller materially breached the Contract by, among other things:

(a) breaching Section 6(i) of the Contract by making and maintaining a false representation that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property," when the January 26 ESA confirms the presence of Hazardous Substances;

(b) breaching Section 7(c) of the Contract by failing, not less than fifteen (15) days prior to Closing, to remove "any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property," and by failing to provide a report prepared by a licensed environmental engineer confirming that "no environmental contamination exists on or with respect to the Property";

(c) breaching Section 8(b), 8(d), 8(e), and 8(f) of the Contract by failing to satisfy express conditions precedent to Closing, including the removal of all Tires, the full and timely performance of Seller's covenants, and the delivery of all Due Diligence Items;

(d) breaching Section 4(a) of the Contract by failing to deliver all Due Diligence Items within the time required;

(e) breaching Section 7(d) by repeatedly failing to remove all Tires from the Property as required;

(f) breaching Section 4(b) of the First Contract Amendment by failing to provide evidence of shut-in payments and supporting documentation within five business days of the First Amendment Effective Date; and

(g) repudiating their contractual obligations by declaring their intent to rescind the Contract and market the Property to third parties despite Purchaser's continued readiness, willingness, and ability to perform.

66. Each of the foregoing breaches is material, goes to the essence of the Contract—particularly given the approximately $32,643,000.00 purchase price—and constitutes a default under

Section 11(b), entitling Purchaser to seek specific performance and all other remedies available at law or in equity.

67. As a direct and proximate result of Seller's material breaches and defaults, Purchaser has suffered damages, including but not limited to substantial third-party out-of-pocket costs incurred in connection with the transaction.

68. Pursuant to Section 11(b) of the Contract, Purchaser seeks specific performance of Seller's obligations.

69. The Property that is the subject of the Contract is unique and irreplaceable.

70. It consists of approximately 1,674 contiguous acres located at 7700 Old Granbury Road in the extraterritorial jurisdiction of Cresson, Texas, positioned approximately 30 miles from downtown Fort Worth, with approximately 1,300 feet of road frontage and more than two miles of Atchison, Topeka and Santa Fe rail frontage.

71. The size, contiguity, location in a rapidly growing corridor, dual transportation access (highway and rail), rolling terrain, scattered hardwoods, water features, and absence of restrictions collectively create a rare mixed-use development opportunity that cannot be duplicated by the purchase of other land.

72. Comparable parcels of similar scale, configuration, accessibility, and development potential are not readily available in the market.

73. As a result, the Property possesses special and unique characteristics, and monetary damages would not adequately compensate Purchaser for the loss of the benefit of its bargain.

74. In the alternative, if specific performance is determined to be unavailable for any reason, Purchaser seeks recovery of its actual damages as permitted under Section 11(b), together with reasonable and necessary attorneys' fees, pre- and post-judgment interest, and costs of suit.

**Count 2: Declaratory Judgment Action**

75. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

76. Pursuant to § 37.004(a) and (b) of the TEX. CIV. PRAC. & REM. CODE, Purchaser asks the Court to enter a declaratory judgment establishing the parties' respective rights, duties, and obligations under several key provisions of the Contract.

77. As established by the facts set forth above, there is an actual, present and practical need for declaratory relief because there is a justifiable controversy about the rights and obligations of the parties that is real and substantial and involves a genuine conflict of tangible interests.

78. An actual and substantial controversy exists between Purchaser and Seller concerning whether the January 26 ESA satisfies Seller's obligations under Section 7(c) of the Contract and whether the conditions precedent to Closing have been met.

79. Seller contends that its January 26 ESA complies with the Contract and that it is entitled to proceed toward Closing or rescind the Contract.

80. Purchaser disputes that contention.

81. Section 7(c) of the Contract requires that, not less than fifteen (15) days prior to Closing, Seller shall (i) remove "any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property," and (ii) provide to Purchaser a report prepared by a licensed environmental engineer confirming that "no environmental contamination exists on or with respect to the Property." *See* Exhibit 1.

82. The parties further agreed that the required engineer's certification would expressly state that "[n]o environmental contamination exists on or with respect to the Property."

83. The January 26 ESA does not include the Required Certification and does not confirm that no environmental contamination exists on or with respect to the Property. *See* Exhibit 9.

84. The January 26 ESA therefore fails to satisfy the express requirements of Section 7(c) of the Contract. *Compare* Exhibit 1 *with* Exhibit 9.

85. Because Section 7(c) and Section 8(b) establish conditions precedent to Closing, the dispute regarding the sufficiency of the January 26 ESA directly affects the parties' present rights and obligations under the Contract.

86. Accordingly, Purchaser seeks a declaratory judgment that:

(a) Section 7(c) requires an express certification that no environmental contamination exists on or with respect to the Property;

(b) the January 26 ESA does not satisfy Section 7(c);

(c) Seller has not satisfied the applicable conditions precedent to Closing; and

(d) Purchaser has not breached or defaulted under the Contract and is entitled to enforce its rights thereunder.

**<u>Attorneys' Fees</u>**

87. Pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE §§ 37.001 and 38.001 *et seq*., the Contract, and other applicable law, Plaintiff is entitled to recover its reasonable and necessary attorneys' fees incurred in connection with this action through trial and any appeal.

**<u>Conditions Precedent</u>**

88. All conditions precedent to the recovery sought herein have been met or waived.

**<u>Relief Requested</u>**

Plaintiff requests that Defendants be cited to appear and answer this case and, upon final trial, Plaintiff have judgment in its favor and against Defendants for actual damages, including benefit of the bargain and out of pocket damages, special damages including lost profits, attorneys' fees, costs

of court, pre- and post-judgment interest as allowed by law, and any further legal or equitable relief to which Plaintiff may be justly entitled.

Respectfully submitted,

*/s/ Blake J. Brownshadel*
Blake J. Brownshadel
State Bar No. 24073969
bbrownshadel@cbsattorneys.com
Christopher A. John
State Bar No. 24110053
cjohn@cbsattorneys.com
CALHOUN BHELLA & SECHREST LLP
325 N. Saint Paul St., Suite 2900
Dallas, Texas 75201
Telephone: (214) 981-9200

**COUNSEL FOR PLAINTIFF**

# Exhibit 1

# STANDARD CONTRACT OF SALE

THIS STANDARD CONTRACT OF SALE (the "**Contract**") is made and entered into by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Additionally, Seller and Purchaser are sometimes collectively referred to herein as the "**Parties**" and each of the Parties is sometimes singularly referred to herein as a "**Party**". For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. Contract of Purchase and Sale.

(a) Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and indefeasible title to that certain tract of land containing approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction ("**ETJ**") of the City of Cresson (the "**City**"), Hood County, Texas, an approximate description and/or depiction of which is set forth on **Exhibit "A"** attached hereto and incorporated herein by this reference for all purposes (the "**Land**"), together with, all and singular, (i) a 100% undivided interest in the Mineral Estate (for purposes of this Contract, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Seller in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Seller which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**"). The Parties acknowledge and agree that the Property is part of a larger tract owned by Seller (the "**Parent Tract**") and that Seller is retaining the portion of the Parent Tract that does not include the Property ("**Seller's Retained Tract**"). Even though the Property has not yet been separately surveyed, the Parties agree that (A) they are experienced in transactions of this nature, (B) they are familiar with the location of the Property, (C) the description of the Property attached to this Contract identifies the Property with reasonable certainty, (D) it is the Parties' intention that the description of the Property attached to this Contract be construed, to the maximum extent allowed by law, as sufficient to identify the Property with reasonable certainty, (E) each Party hereby waives any and all claims of an insufficient legal description, including,

without limitation, any and all claims under the statute of frauds, and (F) upon the completion of the final Survey (defined below) of the Property, the Parties agree to replace **Exhibit "A"** of this Contract with the legal description of the Property in such survey and to use such legal description in all documents that require a legal description of the Property and are used in connection with the Closing.

(b) The "Property" also includes all right, title and, interest of Seller in any and all development rights relating to, associated with and/or appurtenant to the Land, including, but not limited to, all right, title and interest of Seller in and to (i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the Land and improvements now or hereafter constructed thereon; (ii) all surveys, engineering, soils, seismic, geological and environmental reports, studies, certificates and other technical descriptions; (iii) warranties, guaranties, indemnities, and any claims and causes of action (other than those against the Title Company, Brokers, Purchaser or Purchaser's representatives, agents, successors or assigns), including, without limitation, all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land; (iv) licenses, permits, governmental approvals, utility commitments, utility rights, reimbursement rights, development rights or other similar rights, (v) rights to credits, refunds, and reimbursements including without limitation any credits against, or right to pay reduced, application fees, permit fees, inspection fees or impact fees, (vi) rights under zoning cases, preliminary plans, plats, and other development applications and approvals, (vii) rights in and to engineering and architectural plans and specifications, (viii) awards or proceeds relating to the Property that are unpaid as of the Closing Date; (ix) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant, and (x) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Land.

(c) The Property shall be conveyed subject to the following matters (collectively the "**Permitted Exceptions**"):

(i) those matters deemed to be Permitted Exceptions pursuant to Section 4(d) hereof;

(ii) building restrictions and zoning regulations previously or hereafter adopted by any municipal or other public authority relating to the Property, which individually or in the aggregate do not have a material, adverse effect on Purchaser's ownership, operation, use, enjoyment, development or redevelopment of the Property; and

(iii) real property taxes for the year of Closing (as such term is defined in Section 9(a) hereof) (if such taxes are not yet due and payable) and subsequent years, which taxes shall be prorated at Closing.

2. **Purchase Price**. The purchase price (the "**Purchase Price**") for the Property shall be the sum of (a) the Land Purchase Price plus (b) the Mineral Estate Purchase Price. The "**Land Purchase Price**" shall be the product of EIGHTEEN THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($18,500.00) multiplied by the total number of gross acres of Land contained

within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The "**Mineral Estate Purchase Price**" shall be the product of ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) multiplied by the total number of gross acres of Land contained within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The Purchase Price shall be payable by Purchaser in cash at Closing (hereinafter defined).

**3.** **Earnest Money**. Within five (5) business days after the Effective Date (hereinafter defined), Purchaser shall deposit with McKnight Title, Attn: Jennifer Stapleton, 155 East BB Fielder Rd. Suite 200 Weatherford, TX 76087; Phone: 817-345-0101 Email: jennifer@mcknighttitle.com (hereinafter referred to as the "**Title Company**"), earnest money in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Earnest Money**"). If Purchaser fails to timely deposit the Earnest Money with the Title Company, Seller shall be entitled, as Seller's sole and exclusive remedy, to terminate this Contract by written notice to Purchaser at any time before the Earnest Money is delivered to the Title Company, in which event, Purchaser and Seller shall have no further liability hereunder. If Purchaser delivers the Earnest Money to the Title Company before Purchaser's receipt of Seller's termination notice, Purchaser shall be deemed to have timely delivered the Earnest Money and Seller shall not thereafter be entitled to terminate the Contract as a result of any delay in delivering the Earnest Money. All Earnest Money shall be deposited by the Title Company into an interest-bearing account. All interest earned on the Earnest Money shall be added to and become a part of the Earnest Money. Notwithstanding any provisions of this Contract to the contrary, TEN THOUSAND AND NO/100 DOLLARS ($10,000.00) out of the Earnest Money shall in all respects be non-refundable to Purchaser and shall be paid to Seller as independent consideration for Seller's execution of this Contract (the "**Independent Consideration**"). The Earnest Money shall be applied to the Purchase Price at the Closing. If, pursuant to any provision of this Contract, Purchaser is entitled to obtain a refund of the Earnest Money, (a) such provision shall be interpreted to mean a refund of the Earnest Money less the Independent Consideration, and (b) the Title Company shall, without further authorization or instruction from Seller or Purchaser, return the Earnest Money (less the Independent Consideration) to Purchaser.

**4.** **Due Diligence Information, Title Commitment and Survey**.

(a) Delivery of Documents. Within ten (10) days following the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, at Seller's sole cost and expense, copies of all of the items in Seller's possession or control listed on **Exhibit "B"** attached hereto and incorporated herein by this reference for all purposes (the "**Due Diligence Items**"). Following the Effective Date, Seller agrees to deliver to Purchaser within five (5) days following receipt thereof by Seller, copies of all other information received by Seller in connection with the Property.

(b) Title Commitment. Within twenty (20) days following the Effective Date, Seller shall cause to be delivered to Purchaser, at Seller's expense, a current Commitment for a Texas Form T-1 Owner's Policy of Title Insurance (hereinafter referred to as the "**Title Commitment**") showing all matters affecting title to the Property and binding the Title Company to issue to Purchaser at Closing an Owner Policy of Title Insurance issued by the Title Company on behalf of an underwriter acceptable to Purchaser, in the amount of the Purchase Price written in accordance with this Contract (the "**Owner's Policy**"). Seller and Purchaser further instruct the

Title Company to deliver to Seller, Purchaser and the Surveyor legible copies of all instruments referred to on Schedules B and C of the Title Commitment (the "**Exception Documents**"). The Title Commitment shall describe the Property; shall list Purchaser as the prospective named insured; shall show as the policy amount the Purchase Price; shall contain the commitment of the Title Company to insure Purchaser's fee simple interest in the Property upon the Closing; and the survey exception shall be deleted except as to "shortages in area". The Title Commitment shall show the status of the title of the Property and all exceptions which would appear in an Owner's Policy, if issued. Purchaser, at Purchaser's option, may purchase title insurance in an amount in excess of the Purchase Price from the Title Company or another escrow agent or title insurance company acceptable to Purchaser, in which event (i) Purchaser shall pay for the incremental increase in the aggregate premium charged for the Owner's Policy attributable to such increased coverage, and (ii) if Purchaser elects to purchase such excess coverage from an escrow agent or title insurance company other than the Title Company, the Title Company shall cooperate with the escrow agent or title insurance company designated by Purchaser for such excess coverage and shall remit to such designated escrow agent or title insurance company the portion of any premium payments received by the Title Company which is attributable to any such excess coverage.

(c) Survey. Seller shall deliver to Purchaser copies of the most recent surveys for the **"Parent Tract"** and the **"Retained Tract"** in Seller's possession or control within ten (10) days following the Effective Date. Purchaser shall obtain a new or recertified survey of the Land (the "**Survey**").

(d) Title and Survey Review. Purchaser shall have thirty (30) days after the receipt of the last of the Title Commitment, legible copies of all instruments referred to on Schedules B or C of the Title Commitment, and the Survey (the "**Title Review Period**") to provide Seller with written notice (the "**Title Objection Letter**") of such objections as Purchaser may have to anything contained in the Title Commitment or the Survey (collectively "**Title Objections**"). Any item contained in the Title Commitment or the Survey to which Purchaser does not object pursuant to the Title Objection Letter shall be deemed a Permitted Exception. If Purchaser delivers to Seller a Title Objection Letter, Seller shall have twenty (20) days, or such greater period of time as may be agreed upon in writing by Seller and Purchaser (the "**Cure Period**"), during which Seller shall have the right, but not the obligation, to cure or remove the Title Objections and deliver to Purchaser a revised Title Commitment or survey evidencing such cure or removal; provided, however, that Purchaser shall be deemed to have objected to and Seller shall have the absolute obligation to cure or remove all liens of any kind against the Property (the same to automatically be considered Title Objections regardless of whether or not Purchaser delivers to Seller a Title Objection Letter), including, without limitation, (i) mortgage liens, (ii) security interests, (iii) tax liens, (iv) abstracts of judgment, (v) environmental liens, and (vi) materialmen's and mechanic's liens (collectively "**Liens**"). Seller shall, prior to the expiration of the Cure Period, provide Purchaser with written notice (the "**Title Response Letter**") setting forth those Title Objections that Seller has cured or removed and those Title Objections which Seller is not required to cure or remove and is unable or unwilling to cure or remove. If Seller fails to either cure or remove all Title Objections to the reasonable satisfaction of Purchaser and the Title Company, Purchaser may, at its sole option which may be exercised at any time within the Inspection Period, either terminate this Contract by written notice to Seller, in which event the Earnest Money shall be immediately returned to Purchaser, or waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that such election shall

have no effect on Seller's obligation to cure or remove all Liens. Purchaser's failure to terminate this Contract prior the expiration of the Inspection Period shall be deemed an election by Purchaser to waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that (A) such election shall have no effect on Seller's obligation to cure or remove all Liens, and (B) Seller shall be obligated, prior to Closing, to cure all Title Objections which Seller agrees in the Title Response Letter or otherwise in writing to cure.

(e) Additional Exceptions. In the event that at any time following delivery of the Title Commitment, Exception Documents or Survey described above, but prior to Closing, any changes (other than the deletion or elimination of any item as to which Purchaser has made an objection) shall occur in the Title Commitment, Exception Documents or Survey, in addition to other remedies permitted pursuant to this Contract, Purchaser shall have the right to review and approve or disapprove of any such matters, and to terminate this Contract and obtain a refund of the Earnest Money in the event that any such exceptions are not acceptable to Purchaser.

(f) Owner's Policy. At Closing, Seller shall cause the Title Company to furnish to Purchaser, at Seller's sole cost and expense, the Owner's Policy, which shall be in the customary form prescribed by the Texas State Board of Insurance. The Owner's Policy may contain as exceptions the standard printed exceptions and the Permitted Exceptions; provided, however, (i) the standard exception for restrictions shall be deleted except for any restrictions that are Permitted Exceptions, (ii) the exception for rights of parties in possession shall be deleted, (iii) the standard exception for taxes shall be limited to the year in which Closing occurs (if such taxes are not yet due and payable), (iv) all arbitration provisions shall be deleted, (v) all matters set forth on Schedule C of the Title Commitment shall be deleted, (vi) if requested by Purchaser, Purchaser may require modification or additional title endorsements and Purchaser shall be liable for all fees and additional premiums charged by the Title Company in connection with such modifications or additional title endorsements.

**5. Inspection Period.**

(a) Commencing on the Effective Date and continuing through the one hundred eightieth (180th) day following the later to occur of (i) the date upon which all of the Tires (defined below) have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser (the "**Inspection Period**"), Purchaser shall be entitled to enter onto the Property for any purpose, including, without limitation, conducting such audits, inspections, or investigations thereon as Purchaser may deem appropriate, including, without limitation, any "Phase II" type testing or investigation. During the Inspection Period and, unless Purchaser terminates this Contract prior to the expiration of the Inspection Period, prior to Closing, Purchaser and Purchaser's representatives shall have the right to use the private roadway, a portion of which is located on Seller's Retained Tract (the "**Private Roadway**"), for purposes of ingress and egress to and from the Property, and Purchaser shall be liable for any physical damages to the Private Roadway caused by Purchaser or Purchaser's representatives. The Parties understand and agree that, upon Closing, Purchaser's right to use the portion of the Private Roadway located on Seller's Retained Tract shall terminate and Purchaser shall have no easement, express or implied, to use the portion of the Private Roadway that is located on Seller's Retained Tract. Notwithstanding any provision in this Contract to the contrary,

Purchaser shall be entitled to extend the Inspection Period two (2) times, each time for up to ninety (90) days, by delivering, at any time prior to the then-scheduled expiration of the Inspection Period, (i) written notice thereof to Seller and (ii) ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) of additional Earnest Money to the Title Company, which additional Earnest Money shall be added to and become a part of the Earnest Money, shall be applicable to the Purchase Price at Closing but shall be non-refundable to Purchaser except as set forth in Sections 4(d), 4(e), 8, 10 and 11(b). The cost of the inspections undertaken by Purchaser pursuant to this Contract shall be borne solely by Purchaser. Purchaser agrees to (A) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (B) repair any and all physical damage done to the Property or Seller's Retained Tract by Purchaser or its agents, employees or contractors during such inspection and examination. Purchaser shall have no liability with respect to any diminution in value or other losses suffered or incurred by Seller as a result of the discovery of any pre-existing conditions on, in, under or about the Property by Purchaser or its agents, employees or contractors during or in connection with such inspection and examination. Purchaser shall be entitled, for any reason in Purchaser's sole discretion, to terminate this Contract by written notice delivered to Seller at any time prior to the expiration of the Inspection Period. If Purchaser notifies Seller prior to the expiration of the Inspection Period that Purchaser has elected to terminate this Contract, this Contract shall terminate, the Earnest Money shall be returned to Purchaser and the Parties shall have no further obligations hereunder. Purchaser agrees to keep the Property free and clear of any mechanic's or materialmen's liens resulting from Purchaser's activities on the Property. After the expiration of the Inspection Period, Purchaser shall have the right to continue to conduct physical inspections and assessments of the Property, including, without limitation, taking soil samples, ground water samples and other intrusive testing, so long as Purchaser (1) indemnifies and holds Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (2) repairs any and all physical damage done to the Property by Purchaser or its agents, employees or contractors during such inspection and assessment.

(b) Annexation and City Development Agreement. Seller hereby authorizes Purchaser, at all times prior to Closing, to negotiate a pre-annexation development agreement or its equivalent with the City that addresses the annexation of the Property by the City and the terms, conditions, development rights and obligations affecting the development of Property (the "**City Development Agreement**"). Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to negotiate the terms and conditions of the City Development Agreement.

(c) Zoning Approval. Seller hereby authorizes Purchaser to seek and obtain final, unappealable approval from the City of the zoning designations desired by Purchaser that will permit Purchaser to develop the Property for the Intended Use (defined below) ("**Zoning Approval**"). Seller agrees to cooperate with Purchaser reasonably and in good faith in Purchaser's efforts to obtain the Zoning Approval. The Zoning Approval shall not be considered to have been achieved unless all of the following are true: (i) the zoning application is approved by the City without condition or exception, and (ii) all periods for appeal or protest have expired without the filing of any appeal or protest or, if an appeal or protest is filed, the same has been denied and there is no further administrative process available for appeal or protest.

(d) Platting. Purchaser may, at Purchaser's sole expense, seek to obtain a preliminary plat of the Property (the "**Preliminary Plat**"). Seller hereby authorizes Purchaser to seek to obtain final, unappealable approval from the City or Hood County, in Purchaser's sole determination, of the Preliminary Plat ("**Preliminary Plat Approval**") prior to Closing. Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to prepare the application for Preliminary Plat Approval and all supporting documentation in connection therewith (collectively, the "**Preliminary Plat Application**"), and Seller shall cooperate reasonably and in good faith with Purchaser in connection with Purchaser's efforts to obtain the Preliminary Plat Approval. Seller agrees to work with Purchaser's engineer to ensure that, to the best extent practicable, all plats of the Property contain all easements, rights-of-way and other matters reasonably required by Purchaser in connection with Purchaser's development of the Property for the Intended Use (defined below) (the "**Easements Benefitting the Property**"), and, to the extent any such Easements Benefiting the Property are not contained on such plats, Seller agrees to grant Purchaser any and all Easements Benefiting the Property over and across any land adjacent to the Property that is owned by Seller or any affiliate of Seller ("**Seller's Adjacent Property**") in a location that does not adversely impact Seller's or its affiliate's intended use of Seller's Adjacent Property.

(e) Entitlements, Utilities and Easements. During the period commencing on the Effective Date and ending upon Closing or the earlier termination of this Contract, Purchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use (defined below), including, without limitation the City Development Agreement, the Preliminary Plat Approval, the Zoning Approval, and any and all other approvals needed for the development and operation of the Property for the Intended Use (collectively, the "**Entitlements**"), and (ii) obtain all Easements Benefitting the Property, and (iii) cause all utilities needed for the development and operation of the Property for the Intended Use (collectively, the "**Required Utilities**") to be brought to the boundary of the Property and/or created on the Property. Purchaser agrees to use commercially reasonable, diligent and good-faith efforts to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller. Seller further agrees that, commencing on the Effective Date and continuing until the Closing Date, that Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval. As used herein, "**Intended Use**" shall mean a master planned industrial complex served by rail.

**6.** **Representations and Warranties**. Seller hereby represents and warrants to Purchaser, which representations and warranties shall be deemed to be restated at Closing and shall survive Closing, that:

(a) Seller is comprised of individuals and a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has complete and unrestricted power and authority to enter into this Contract and all other agreements to be executed and delivered by Seller pursuant to the terms and provisions

hereof, to perform its obligations hereunder and thereunder, and to consummate the transaction contemplated hereby;

(b) This Contract has been duly executed and delivered by Seller. All other agreements contemplated hereby to be executed and delivered by Seller will be, prior to Closing, duly authorized, executed and ready in all respects to be delivered by Seller. This Contract and all other agreements contemplated hereby constitute legal, valid and binding obligations of Seller enforceable in accordance with their respective terms;

(c) The execution, delivery and performance of this Contract and any other agreement contemplated hereby and the consummation of the transaction contemplated hereby or thereby do not, with or without the passage of time and/or the giving of notice, (i) conflict with, constitute a breach, violation or termination of any provision of any contract or other agreement to which Seller is a party or to which all or any part of the Property is bound, (ii) result in an acceleration or increase of any amounts due from Seller to any person or entity, (iii) conflict with or violate the organizational documents of Seller, (iv) result in the creation or imposition of any lien on all or any part of the Property, or (v) violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Seller or all or any part of the Property;

(d) Seller now has and shall have at Closing good and indefeasible title to the Property in fee simple absolute, free and clear of all Liens (other than any Liens that will be released at or prior to Closing). No party other than Seller and the lessees under oil and gas leases that are of record in the official public records of Hood County, Texas has any material rights in or to occupy all or any part of the Property. No party other than Purchaser has any agreement to purchase, right of first refusal, option to purchase or any other right to acquire all or any part of the Property;

(e) One hundred percent (100%) of the Mineral Estate is owned on the Effective Date by the following: (i) the Smelley Estate, which owns fifty percent (50%) of the Mineral Estate, (ii) Richard David Smelley, who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate, (iii) Amy Elizabeth Smelley who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Tammy Elizabeth Graham, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate; (v) Gregory Graham who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Deborah Davis who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; and (iv) David Davis, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate. Deborah Davis and David Davis shall either (A) prior to the Closing Date, convey all of their respective interests in the Mineral Estate in equal shares to Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, and Gregory Graham, or (B) on the Closing Date, convey all of their respective interests in the Mineral Estate to Purchaser. At Closing, Seller shall convey to Purchaser an undivided interest in one hundred percent (100%) of the Mineral Estate.

(f) There are no actions, suits, claims, assessments, or proceedings pending or, to the best of Seller's knowledge, threatened that could materially adversely affect the

ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform hereunder;

(g) Seller has no information of and to the best of Seller's knowledge, there is not (i) any change contemplated in any applicable law, statute, ordinance, rule, regulation, order, or determination of any governmental authority or any board of fire underwriters (or other body exercising similar functions), (ii) any law, ordinance, regulation, administrative ruling, restrictive covenant or deed restriction affecting all or any part of the Property, including without limitation, any applicable zoning ordinances, building codes, flood disaster laws, wetlands regulation, health law or environmental law, (iii) any judicial or administrative action, (iv) any action by adjacent landowners, (v) any administrative action, (vi) any natural or artificial condition on or about the Property, or (vii) any significant adverse fact or condition relating to the Property or its use, that would prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property;

(h) The Property is not within an area designated by the United States Secretary of Housing and Urban Development, the United States Army Corp of Engineers or any other local, state or federal organization or entity as having an increased likelihood of flooding;

(i) No Hazardous Substances (as such term is hereinafter defined) have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property and there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to the use, generation, manufacture, storage or disposal of any Hazardous Substances in, on, under or about the Property. As used in this Contract, the term "***Hazardous Substances***" means any and all substances, materials and wastes which are or become regulated under applicable local, state or federal Environmental Laws or that are classified as hazardous or toxic under local, state or federal Environmental Laws or regulations, including, without limitation, (i) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "solid waste," "pollutant" "contaminant" or words of similar import as such terms are defined by or listed in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("***CERCLA***"), as amended by Superfund Amendments and Reauthorization Act of 1986 ("***SARA***"), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.) ("***EPCRA***"), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("***RCRA***"), as amended by the Hazardous and Solid Waste Amendments of 1984, the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide and Rodenticide Control Act (7 U.S.C. § 136 et seq.), the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), the Federal Clean Air Act (42 U.S.C. § 7401 et seq.), and in the regulations promulgated pursuant to such laws, all as amended, (ii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101) or 40 CFR Part 302, both as amended, (iii) any material, waste or substance which is (A) oil, gas or any petroleum or petroleum by-product, (B) asbestos, in any form, (C) polychlorinated biphenyls, (D) designated as a

"hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1251 et seq.), as amended, (E) flammable explosives, or (F) radioactive materials, and (iv) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," "hazardous waste," "industrial solid waste," "solid waste," "radioactive waste" or "special waste from health care facility" in the Texas Solid Waste Disposal Act (Tex. Health & Safety Code Ann ch. 361), the Texas Clean Air Act (Tex. Health & Safety Code ch. 282), the Texas Pesticide Control Act (Tex. Agric. Code Ann. § 76.001 et seq.) and those substances included within the definitions of "hazardous substances," "regulated substances" or "petroleum products" in Subchapter I of the Texas Water Code (Tex. Water Code Ann ch. 26, subch. I) and in the regulations promulgated pursuant to any of such laws, all as the same may be amended from time to time (collectively "***Environmental Laws***"). Further, Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of Hazardous Substances in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of Environmental Laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of Environmental Laws, and (d) claims for contribution, cost recovery, remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code;

(j) The Land has direct and unencumbered access to and from one or more publicly dedicated streets or highways accepted for maintenance and maintained by Hood County and/or the State of Texas;

(k) Any and all underground storage tanks previously removed from the Property by Seller were removed in accordance with all applicable laws, ordinances, regulations and administrative rulings and no underground storage tanks are presently situated in, on, under or about the Property;

(l) The Property includes all sewer and wastewater discharge capacity, potable water capacity, other utility rights and development rights which were originally obtained with the Property by Seller, and no such capacity or rights have been previously conveyed or transferred by Seller;

(m) As a result of the sale of the Property from Seller to Purchaser as contemplated by this Contract, there will be no taxes or assessments assessed against the Property by any taxing authority for the year of Closing or prior years based on change in use or ownership; and

(n) The Due Diligence Materials are true, accurate and complete in all material respects.

7. **Covenants and Agreements of Seller**. Seller covenants and agrees with Purchaser as follows:

(a) Seller and Purchaser each shall, simultaneously with its execution of this Agreement, execute and deliver to the Title Company, a Memorandum of Agreement in the form attached hereto as **Exhibit "E"** (the "**Memorandum**") and Seller and Purchaser hereby instruct the Title Company to record, at Purchaser's expense, the fully executed Memorandum in the official public records of Hood County, Texas (the "**Public Records**") within three (3) business days following the full execution of this Agreement. The Parties agree not to terminate or release the Memorandum, or otherwise cause or permit the Memorandum to be terminated or released, from the Public Records unless and until Closing or the earlier appropriate termination of this Agreement has occurred. At Closing or promptly following the earlier appropriate termination of this Agreement, the Parties shall execute all commercially reasonable documents required by the Title Company to terminate and release the Memorandum from the Public Records (collectively, the "**Memorandum Release Documents**").

(b) Prior to Closing, Seller shall not execute or create any contract or option to purchase, easement, covenant, condition, restriction, lien or encumbrance with respect to the Property or any portion thereof with the exception of (i) the conveyance by Deborah Davis and David Davis of their interests in the Mineral Estate as referenced in Section 6(e) above and (ii) the recordation of the Memorandum as described in Section 7(a) above. To the extent that the Property, or any portion of the Property, is entitled to a tax exemption, Seller shall maintain such exemption and reasonably cooperate with Purchaser in assisting Purchaser to maintain and continue such tax exemption.

(c) Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

(d) Seller shall, within thirty (30) day period after the Effective Date (the "**Tire Removal Period**"), remove from the Land all tires and parts thereof situated on the Land (collectively, the "**Tires**"). Seller shall be liable for all costs to remove any and all Tires that Seller fails to remove during the Tire Removal Period and Seller shall (i) prior to Closing, remove such Tires from the Land within five (5) business days after the date Purchaser delivers notice thereof to Seller, (ii) after Closing, reimburse Purchaser for all costs incurred by Purchaser in connection with removing any Tires from the Land, and (iii) indemnify, defend and hold harmless all Indemnities from and against any and all Claims arising in connection with the Tires.

(e) Notwithstanding anything to the contrary in this Contract, Seller shall not oppose, and Seller shall not interfere with, Purchaser's applications for, or efforts to obtain, any and all Entitlements, Easements Benefitting the Property and the Required Utilities.

(f) The obligations in this Section 7 shall survive Closing.

8. **Conditions Precedent to Closing**. In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:

(a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or unconditional agreements to bring all the Required Utilities to the boundary line of the Property or create the Required Utilities on the Property have been received by Purchaser;

(b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and correct in all material respects as of the specified date or as limited by the specified date, and (ii) Seller's representations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be performed and observed by such Party prior to and on the Closing Date;

(c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;

(d) Tires. Seller shall have removed all Tires from the Land;

(e) Covenants. All covenants and other obligations of Seller set forth in this Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however,

that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract.

**9. Closing.**

(a) Date. The closing of the sale of the Property from Seller to Purchaser (the "**Closing**") shall be coordinated through the offices of the Title Company on, or at Purchaser's option, before, the ninetieth (90th) day following the expiration of the Inspection Period (the "**Closing Date**").

(b) Seller to Deliver. At the Closing, Seller shall furnish and deliver to the Title Company for delivery to Purchaser, at Seller's expense (except as provided in Section 9(e) below), the following:

(i) A Special Warranty Deed, in the form of **Exhibit "C-1"** attached hereto, duly executed and acknowledged by Seller, dated as of the Closing, conveying good and indefeasible title to the Property to Purchaser, subject only to the Permitted Exceptions.

(ii) A Mineral Deed, in the form of **Exhibit "C-2"** attached hereto, duly executed and acknowledged by the applicable Seller, dated as of the Closing, conveying to Purchaser the applicable Seller's interest in and to the Mineral Estate.

(iii) A general assignment to Purchaser, in the form of **Exhibit "D"** attached hereto, which, among other things, assigns Seller's interest in and to (A) any lease agreement that Purchaser has expressly agreed to assume, (B) any and all permits, approvals, licenses, water and sewer capacity commitments and other rights and interests owned or held by Seller in connection with the Property, and (C) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land.

(iv) All Memorandum Release Documents.

(v) Any and all agreements assigning or granting to Purchaser easements owned by Seller which are used or needed in connection with the development of the Land.

(vi) An Owner's Policy covering the Property issued by the Title Company in accordance with the terms of the Title Commitment described in Section 4(b) above, containing no exceptions other than the Permitted Exceptions. The Owner's Policy shall be amended to delete the survey exception except as to "shortages in area".

(vii) A Non-Foreign Certification signed by Seller under penalties of perjury.

(viii) Possession of the Property.

(ix) Such instruments or documents as are necessary, or reasonably required by Purchaser or the Title Company to evidence the status and capacity of Seller and the authority of the person or persons who are executing the various documents on behalf of Seller in connection with the purchase and sale transaction contemplated hereby.

(c) Purchaser to Deliver. At the Closing, Purchaser shall deliver to the Title Company for delivery to Seller, at Purchaser's expense, the following:

(i) The Purchase Price in immediately available funds.

(ii) All Memorandum Release Documents.

(iii) Such instruments or documents as are necessary, or reasonably required by Seller or the Title Company to evidence the authority of Purchaser to consummate the purchase and sale transaction contemplated hereby and to execute and deliver the closing documents to be delivered by Purchaser.

(d) Adjustments.

(i) Seller shall be responsible for payment of all taxes and assessments levied or assessed, including, without limitation, real and personal property taxes, prior to the Closing ("**Taxes**"). Taxes for the calendar year in which the Closing takes place shall be prorated at the Closing between Purchaser and Seller through the Closing Date, based on the current year's tax with due allowance made for the maximum discount allowable for prompt payment (if allowed for such year). If the Closing occurs on a day when the current year's tax rate is not fixed and the current year's assessment is available, Taxes will be prorated based upon such assessments and the prior year's rate. If the current assessment is not available at the time of Closing, then Taxes will be prorated on the basis of the latest available tax rate and assessment and subsequently re-prorated and promptly paid to the Party entitled thereto.

(ii) If the Land is assessed and taxed as a part of a larger parcel of real estate, then, for purposes of computing tax prorations hereunder: (A) Seller shall be solely responsible for payment of the portion of the taxes allocable to any other land and/or improvements located within the larger tract, and shall escrow the estimated amount of such taxes with the Title Company at Closing pursuant to an escrow agreement which will obligate the Title Company to release such funds to the applicable taxing authority upon receipt of a tax bill therefore and will obligate Seller to pay any deficiency between the amount of the escrowed funds and the actual amount of taxes within ten (10) days after receipt of notice thereof; and (B) a proportionate part of the real estate taxes attributable to such larger parcel shall be allocated to the Land on the basis of either of the following at Purchaser's discretion: (1) the ratio that the value of the Land bears to the value of the larger tract or parcel of land, or (2) the ratio that the area of land contained within the Land bears to the area of land contained within the larger parcel of real estate.

(iii) Seller represents and warrants to Purchaser that, as of the Effective Date, the Land is receiving special tax assessment rates (agricultural use) and Seller agrees, until

the Closing or the earlier termination of this Contract, to comply with the requirements that entitle the Land to receive such special tax assessment rates. Subject to the foregoing, the Parties acknowledge and agree that Purchaser's intended use of the Property after Closing will result in the assessment of rollback taxes for periods prior to Closing, and Purchaser shall be responsible for paying such assessments of rollback taxes triggered by Purchaser's change of use of the Land or loss of special taxing assessment rates based upon the acts of Purchaser; provided, however, that if rollback taxes are triggered for periods prior to Closing by (A) a change in use of the Land prior to Closing, (B) denial of a special use valuation on any portion of the Land claimed by Seller, or (C) any other act not caused by Purchaser, such rollback taxes shall be the obligation of Seller and shall be paid by Seller at Closing. If the amount of the taxes described in this paragraph is not ascertainable at Closing, such amount shall be estimated by Purchaser's tax consultant and 110% of the estimated amount of any amount owed by Seller shall be escrowed by Seller with the Title Company at Closing pursuant to a commercially reasonable form of escrow agreement between Seller, Purchaser and the Title Company which will authorize and instruct the Title Company to pay the rollback taxes due upon receipt of an invoice therefor and will obligate Seller to pay any deficiency.

(iv) Any tax proration based upon an estimate may, upon demand of either Party to the transaction, be subsequently readjusted upon receipt of the actual tax bill for the Property for the year in which the Closing occurs, and any Party owing the other Party monies as a result of such readjustment shall pay the same upon demand.

The provisions of this Section 9(d) shall survive the Closing.

(e) Expenses of Closing.

(i) Seller shall pay: (A) all title examination fees and the base premiums for the Owner's Policy; (B) its proportionate share of the prorations set forth in Section 9(d); (C) its own attorneys' fees; (D) other charges required to be paid by Seller pursuant to this Contract; (E) any local, county or state transfer, recording or documentary tax assessed in connection with the transfer to Purchaser; (F) the cost of the Survey (which payment shall be in the form of a credit to Purchaser against the Purchase Price); (G) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties, and (H) other charges typically paid by sellers in transactions of this nature in the county in which the Property is located.

(ii) Purchaser shall pay: (A) the cost of any endorsements to the Owner's Policy requested by Purchaser or Purchaser's lender; (B) its proportionate share of the prorations set forth in Section 9(d); (C) its own attorneys' fees; (D) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties; and (E) other charges required to be paid by Purchaser pursuant to this Contract.

**10. Casualty or Condemnation Prior to Closing**. If at any time prior to the Closing any portion of the Property is destroyed or damaged by fire or any other casualty, or in the event a taking by condemnation, eminent domain or similar proceedings or a conveyance in lieu thereof is commenced or threatened with respect to any portion of the Property, Seller shall give notice

thereof to Purchaser and Purchaser shall thereupon have the option to terminate this Contract upon written notice to Seller prior to Closing, in which event the Earnest Money shall be promptly refunded to Purchaser, whereupon this Contract shall be rendered null and void and the Parties shall have no further obligations or liabilities hereunder. If Purchaser does not exercise its option under this Section 10 to terminate this Contract, this Contract shall remain in full force and effect and Seller shall assign or pay to Purchaser at Closing Seller's interest in and to any and all insurance proceeds and condemnation awards.

**11. Default and Remedies.**

(a) Purchaser's Default. In the event Purchaser defaults under this Contract or fails to perform any obligation of Purchaser under this Contract, and such default and failure shall remain uncured for a period of ten (10) days following written notice thereof from Seller to Purchaser, provided that Seller has not defaulted in the performance of any of Seller's obligations hereunder, Seller may, as Seller's sole and exclusive remedy, terminate this Contract by written notice to Purchaser at any time before such default by Purchaser is cured, in which event, Seller shall be entitled to retain the portion of the Earnest Money which has then been deposited by Purchaser as liquidated damages for Purchaser's default and Purchaser shall thereby be released from further obligations under this Contract. Such amount is agreed upon by and between Seller and Purchaser as liquidated damages, due to the difficulty and inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof; and no other damages, rights or remedies shall in any case be collectible, enforceable or available to Seller other than in this Section 11(a), but Seller shall accept said cash payment as Seller's total damages and relief. If this Contract is terminated as a result of Purchaser's default, Purchaser's liability shall be limited to the portion of the Earnest Money which has previously been deposited by Purchaser hereunder, and in no event shall Purchaser be responsible or liable for any portion of the Earnest Money which has not then been deposited by Purchaser hereunder, whether or not such amount is then due. Notwithstanding any provision herein and without limiting Seller's rights in the preceding sentence, Seller shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Purchaser's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

(b) Seller's Default. In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third party out of pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any

representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

**12. Real Estate Brokerage; Consulting Fees.**

(a) Real Estate Brokerage. At Closing, Seller agrees to pay a real estate brokerage commission to M&W Real Estate, LLC ("**Purchaser's Broker**") in the amount of three percent (3%) of the Purchase Price and to Williams Trew Real Estate (Stephen Reich) ("**Seller's Broker**") in the amount of three percent (3%) of the Purchase Price. Purchaser's Broker and Seller's Broker are sometimes collectively referred to in this Contract as "**Brokers**". At Closing and upon funding, Seller shall be responsible for the payment of the real estate brokerage commissions becoming due to Brokers. Each Party represents and warrants to the other there has been no broker, finder, real estate agent or similar agent engaged in connection with the transaction contemplated hereby other than Brokers and each Party agrees that should any claim be made for brokerage commissions or finder's fees by any other broker, finder or agent by, through or on account of any acts of the indemnifying Party or its agents, employees or representatives, the indemnifying Party will hold the other Party free and harmless from and against any and all loss, liability, cost, damage and expense (including, without limitation, attorneys' fees, accountants' fees, court costs and interest) in connection therewith. The provisions of this paragraph shall survive the Closing of this Contract.

(b) **Disclosure. Purchaser advises Seller and Seller acknowledges that each of the following is a principal of Purchaser and is a licensed real estate broker or sales agent acting on his or her own behalf: None.**

**13. Miscellaneous.**

(a) Notices. All notices, requests and other communications under this Contract shall be in writing and shall be delivered in person by hand delivery or overnight delivery service, by electronic mail, or sent by certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If intended for Seller: | Bill Sanders, Independent Executor of<br>the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028<br>Telephone No.: (817) 266-1283<br>Email: bsanders@flash.net |
| With a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092<br>Telephone No.: (817) 410-4012<br>Email: todd.2@verizon.net |

with a copy to:

Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC, General Partner
Attn Richard D Smelley, Deborah R. Davis, and Tammy M. Graham, Managers
750 Cattlebaron Drive
Fort Wort, Texas 76108
Telephone No: (817) 300-4350
Email: sgd@flash.net

with a copy to:

Richard Smelley and Amy Smelley
4750 Cattlebaron Drive
Fort Worth, Texas 76108
Telephone Number: (817) 300-4355
Email: amy.smelley@icloud.com

with a copy to:

Deborah Davis and David Davis
12601 Cleburne Hwy
Cresson, Texas 76035
Telephone No: (817) 300-4352
Email: davidgdavis1@yahoo.com

with a copy to:

Tammy Graham and Gregory Graham
6651 Weiland Road
Weatherford, Texas 76088
Telephone No: (817) 300-0780
Email: tammy@locationsphotography.com

If intended for Purchaser:

Challenger Realty Group, LLC
Attn: John Contrevo
100 Essex Avenue
Bellmawr, New Jersey 08031
Telephone No: (856) 498-4412
Email: John@challengerrealtygroup.com

with a copy to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225
Telephone No: (214) 390-3264
Email: jlibby@LibbySparks.com

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided. All such notices, requests and other communications, if sent to the address set forth herein above or to such other address as a Party may provide to the other Party in writing, shall be deemed to have been delivered upon receipt at such address if delivered in person, upon deposit with an overnight courier if delivered by overnight delivery, upon deposit in a post office

or official depository of the United States Postal Service if mailed, and upon transmission if by electronic mail.

(b) Assignment. Purchaser may assign or transfer its rights and obligations under this Contract at any time to any entity owned and/or controlled, in whole or in part, directly or indirectly, by one or more of the principals of Purchaser (a "**Purchaser Affiliate**") without the consent of Seller, and this Contract shall inure to the benefit of and be binding on the Parties hereto and their respective successors and assigns. Except as set forth above, Purchaser may not assign or transfer its rights or obligations under this Contract without the prior, written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned. If Purchaser assigns its rights and obligations under this Contract to a Purchaser Affiliate that fully assumes Purchaser's obligations and liabilities under this Contract, Purchaser shall be automatically fully released from all of its obligations and liabilities hereunder. In such event, Seller agrees to and shall immediately upon request by Purchaser execute a written instrument in a form satisfactory to Purchaser evidencing and confirming such full release.

(c) Force Majeure. A Party shall not be deemed to be in breach or in violation of this Contract if it is prevented from performing any of its obligations hereunder by reason of acts of the other Party, acts of God, riots, strikes, fires, weather, public disturbances, and/or any regulation of any governmental authority including, without limitation, a moratorium or government shut-down (each, a "**Force Majeure Event**"); provided, however, that the Party wishing to rely on such Force Majeure Event shall notify the other Party in writing within ten (10) business days of the commencement and ending of the Force Majeure Event in order to be entitled to the benefit of the delays in performance caused by such Force Majeure Event. No Force Majeure Event(s) singularly or in the aggregate shall exceed sixty (60) days.

(d) Survival. Except as otherwise provided herein, the provisions of this Contract shall survive the Closing and shall not merge into the conveyance documents executed and delivered at Closing.

(e) Joint and Several Liability. All parties signing this Contract as Seller shall be jointly and severally liable for all obligations of Seller.

(f) Entire Agreement; Modifications. This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the Party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

(g) Partial Invalidity. If any clause or provision of this Contract is or should ever be held to be illegal, invalid, or unenforceable under any present or future law applicable to the terms hereof, then it is the intention of the parties hereto that the remainder of this Contract shall not be affected thereby, and that in lieu of each such clause or provision of this Contract that is illegal, invalid, or unenforceable, there be added as a part of this Contract a clause or provision as similar

in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(h) Applicable Law. THIS CONTRACT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(i) Captions. The captions in this Contract are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

(j) Binding Effect. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns. This Contract and Purchaser's rights hereunder may be assigned by Purchaser without the consent of Seller to an entity that is owned and/or controlled, in whole or in part, by one or more of the members of Purchaser. Otherwise, Purchaser must obtain Seller's prior written consent.

(k) Time is of the Essence. With respect to all provisions of this Contract, time is of the essence. However, if the Closing or the final date of any period which is set out in any provision of this Contract falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Texas, then, and in such event, the Closing or such period shall be extended so that the Closing or the last day of such period falls on the next day which is not a Saturday, Sunday or legal holiday. If Seller fails to timely deliver to Purchaser the Title Commitment, Exception Documents or any other document or information required to be delivered by Seller to Purchaser hereunder, the date of expiration of the Inspection Period, the Closing Date and the expiration date of all other time periods hereunder shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser.

(i) Independent Counsel; Interpretation. Purchaser and Seller each acknowledge that: (a) they have had the opportunity to be and/or have been represented by independent counsel in connection with this Contract; (b) they have executed this Contract with the advice of such counsel; and (c) this Contract is the result of arm's length negotiations between the parties hereto and the advice and assistance of their respective counsel. Notwithstanding any rule of law to the contrary: (i) the fact that this Contract was prepared by Purchaser's counsel as a matter of convenience shall have no import or significance, and any uncertainty or ambiguity in this Contract shall not be construed against Purchaser because Purchaser's counsel prepared this Contract; and (ii) no deletions from prior drafts of this Contract shall be construed to create the opposite intent of the deleted provisions.

(j) Counterpart Execution. This Contract may be executed in multiple counterparts. An electronic copy of this Contract bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Contract.

**14.** **Effective Date**. The "**Effective Date**" or any other reference to the date of this Contract shall mean the date on which this Contract is signed by Seller, Purchaser and the Title Company, as indicated by their signatures below.

*[Signature pages follow this page.]*

EXECUTED by Seller this 26 day of May, 2023.

**SELLER**:

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By: ______________________
Richard Smelley, Manager

By: ______________________
Tammy Graham, Manager

By: ______________________
Deborah Davis, Manager

**SELLER**:

DEBORAH RUTH DAVIS

DAVID GLENN DAVIS

**SELLER:**

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser this 26 day of May, 2023.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________________
John Contrevo, Manager

*[Signature pages continue on following page.]*

The undersigned Title Company acknowledges receipt of a fully executed copy of this Contract this 26 day of May 2023, 2023, and agrees to comply with the provisions of this Contract, including the provisions hereof governing disposition of the Earnest Money.

**TITLE COMPANY:**

**MCKNIGHT TITLE**

By: [signature]
Name: Jennifer Stapleton
Title: Escrow Officer

**Escrow Receipt:**

The title company acknowledges receipt of:

√ A. the contract on this day May 26. 2023 (effective date);

√ B. earnest money in the amount of $ 100,000.00 in the form of WIRE

On May 30. 2023.

Title Company: McKnight Title

By: Jennifer Stapleton. [signature]

Address: 4916 Camp Bowie Blvd. 100

Fort Worth - TX 76107

Phone/Fax: 8175290776

Assigned file number (GF#): CB.8280.JS

**EXHIBIT "A"**

**DESCRIPTION OF THE LAND**

Approximately 1,674 gross contiguous acres as more particularly described in this Contract, which approximately 1,674 gross contiguous acres is part of the following described Parent Tract:

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit "A" and incorporated herein by reference.

**APPENDIX 1 TO EXHIBIT "A"**

**Legal Description of Parent Tract**

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line,
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT "B"**

**DUE DILIGENCE DOCUMENTS**

1. Any and all leases affecting the Property and amendments thereto, as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases;

2. All outstanding third-party service contracts and other agreements affecting the Property;

3. Disclosure of any legal matters affecting the Property;

4. Any notices, correspondence, approvals, permits, and/or licenses or any agreements (including, without limitation subdivision and similar agreements) with, to or from any governmental or quasi-governmental authority having jurisdiction over the Property;

5. Plans, specifications, certificates, inspection reports, notices, correspondence and all other documents prepared, transmitted or received by Seller, if any, in connection with any existing subdivision of or improvements constructed or to be constructed upon the Property;

6. Any letters in existence from utility companies stating whether appropriate facilities have been installed and are available to the boundaries of the Property;

7. Any and all additional data, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, existing surveys, platting and other materials (including a copy of Seller's most current existing survey of the Property), and all other information and agreements, relating to the Property or any portion thereof which is in the possession of Seller or its agents;

8. Any and all tax statements for three calendar years prior to the date of this Contract;

9. All licenses and permits affecting the Property;

10. Any other agreements or documents not referenced above relating to or affecting the Property; and

11. Any and all reports, tests, evaluations, notices, documentation and correspondence relating to (a) the availability of utilities and/or utility capacity including, without limitation, water, sewer, gas, and electricity, at or near the Property, (b) all bodies of water and waterways in, on or under the Property, and (c) rail lines and railways on or across the Property and on land adjacent to the Property.

**EXHIBIT "C-1"**

**FORM OF SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF __________________ | § | |

THAT, ____________________________________________ ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by __________________, a __________________ ("**Grantee**"), whose address is ________________________________, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee, that certain real property situated in _____________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with, all and singular, (i) a one hundred percent (100%) undivided interest in the Mineral Estate (for purposes of this deed, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Grantor in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Grantor which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**").

This conveyance is made by Grantor and accepted by Grantee subject to any easements, restrictions and other matters described in Exhibit B attached hereto and incorporated herein by reference (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property, together with, all and singular, the rights and appurtenances thereto in anywise belonging, to Grantee and Grantee's successors and assigns forever; and subject only to the Permitted Exceptions, Grantor does hereby bind Grantor and Grantor's successors and assigns to warrant and forever defend, all and singular, the Property unto

the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise.

EXECUTED to be effective the ____ day of ___________, 20_____.

GRANTOR:

_____________________________________

THE STATE OF TEXAS §
§
COUNTY OF __________ §

This instrument was acknowledged before me on ______________, 20___, by _____________ ______, the _____________ of ______________, on behalf of said ______________.

_______________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

EXHIBIT A TO SPECIAL WARRANTY DEED

Description of Property

[*insert description of Property per this Contract*]

---

EXHIBIT B TO SPECIAL WARRANTY DEED

Permitted Exceptions

[*insert Permitted Exceptions per this Contract*]

**EXHIBIT "C-2"**

**FORM OF MINERAL DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**MINERAL DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF ________________ | § | |

THAT, ________________________________________, a ____________ (if an individual, insert "*a [single]/[married] [woman]/[man]*") ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by ___________________, a ____________________ ("**Grantee**"), whose address is ______________________________, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD, ASSIGNED, CONVEYED and DELIVERED, and by these presents does GRANT, BARGAIN, SELL, ASSIGN, CONVEY and DELIVER unto Grantee, an undivided 1/*****th interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in __________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said land for oil, gas and other minerals, and removing the same therefrom.

Said Land being now subject to those certain oil and gas leases described on Exhibit B attached hereto and made a part hereof for all purposes (the "**Leases**") executed in favor of record owner, it is understood and agreed that this sale is made subject to the terms of said Leases, but covers and includes 1/*****th of all of the oil royalty and gas rental or royalty due and to be paid under the terms of said Leases, in so far as it covers the above described Land.

It is understood and agreed that 1/*****th of the money rentals, which may be paid, on the above described Land, to extend the term within which a well may be begun under the terms of any said Leases, is to be paid to the said Grantee; and, in event that any of the above described Leases for any reason becomes canceled or forfeited, then and in that event, Grantee shall own 1/*****th of all oil, gas and other minerals in and under said Lands, together with a like 1/*****th interest in all bonuses paid, and all royalties and rentals provided for in future oil, gas and mineral leases covering the above described Lands.

TO HAVE AND TO HOLD the above described property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee herein, and

Grantee's successors, heirs and assigns forever; and Grantor does hereby bind itself and its successors, heirs, executors and administrators, to warrant and forever defend all and singular the said property unto the said Grantee herein, and Grantee's successors, heirs and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof.

EXECUTED to be effective the ____ day of ____________, 20_____.

**GRANTOR:**

_________________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on ______________, 20___, by _________________________, the _________________ of _____________, on behalf of said __________________.

_________________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

EXHIBIT A TO MINERAL DEED

Description of the Land

[*insert description of the Land per this Contract*]

---

EXHIBIT B TO MINERAL DEED

Description of Existing Oil and Gas Leases

[*insert description below*]

**EXHIBIT "D"**

**GENERAL ASSIGNMENT**

THIS GENERAL ASSIGNMENT (this "**Assignment**") is made as of the ____ day of __________, 20___, by __________________, a __________________ ("**Seller**"), to ____________________________, a ____________________ ("**Purchaser**").

WHEREAS, of even date herewith, Seller has conveyed to Purchaser the real property described in Exhibit A attached hereto ("**Land**"), together with all improvements (the "**Improvements**") located thereon (the Land and Improvements are referred to herein collectively as the "**Property**"); and

WHEREAS, Seller and Purchaser intend that Seller also convey to Purchaser all of the Conveyed Development Rights (as hereinafter defined).

NOW, THEREFORE, Seller, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, hereby agrees as follows:

1. Seller has GRANTED, BARGAINED, SOLD, CONVEYED and ASSIGNED, and by these present does hereby GRANT, BARGAIN, SELL, CONVEY and ASSIGN to Purchaser all of Seller's right, title and interest in and to the following, but only to the extent same pertain to the Property ("**Conveyed Development Rights**"):

(a) all surveys, engineering, soils, seismic, geological and environmental reports, studies and certificates and other technical descriptions;

(b) all warranties, guaranties and indemnities received from third parties, and all claims, demands and causes of action against third parties, but only to the extent they are for the benefit of, and applicable to, the Property or the owner thereof, including, without limitation, (i) any warranties, guaranties, indemnities, contractual rights, claims, demands and causes of action pertaining to the development, construction, design or completion of the Property and/or the common areas, streets, utilities or other subdivision infrastructure, and (ii) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land;

(c) all licenses, permits, governmental approvals, utility commitments, utility rights (including rights to capacity or service), drainage and detention rights, or right to pay reduced application fees, permit fees, inspection fees, impact fees, development rights or other similar rights;

(d) rights to credits, refunds and reimbursements, including, without limitation, any credits against, or right to pay reduced application fees, permit fees, inspection fees, impact fees, or other similar development credits;

(e) all rights under any zoning cases, preliminary plans, plats (preliminary or final) of any portion of the Property or any rights-of-way abutting the Property or any portion thereof, including any boundary plats and any right-of-way plats, submitted, approved or recorded;

(f) all unpaid awards or proceeds, including awards in connection with insurance and any eminent domain taking;

(g) rights in and to engineering and architectural plans and specifications;

(h) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant;

(i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the land and improvements now or hereafter constructed thereon; and

(j) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Property.

TO HAVE AND TO HOLD the Conveyed Development Rights unto Purchaser and Purchaser's successors and assigns forever.

2. This Assignment will be binding on Seller, its successors and assigns, and will inure to the benefit of Purchaser, its successors and assigns.

3. This Assignment does not constitute an assumption of any liability or obligation by Purchaser, nor will it be deemed to impose on Purchaser any liability or obligation.

4. Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of any and all substances, materials and wastes which are or become regulated under applicable local, state or federal environmental laws or that are classified as hazardous or toxic under local, state or federal environmental laws or regulations in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of environmental laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of environmental laws, and (d) claims for contribution, cost recovery,

remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code.

5. Seller and Purchaser will each cooperate with each other, their employees, and agents to facilitate the purpose and intent of this Assignment including, without limitation, the providing of information and documentation that may be reasonably required for the enforcement of the rights and interests assigned hereby.

6. This Assignment may be executed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument.

*[Remainder of page is intentionally left blank]*

EXECUTED as of the date first written above.

______________________________,
**a** _____ __________

By: ______________________
Name: ______________________
Title: ______________________

THE STATE OF TEXAS §
§
COUNTY OF __________ §

This instrument was acknowledged before me on ______________, 20___, by ____________________, ____________________ of ____________________, a ______ ______________, on behalf of said __________.

______________________________
Notary Public, State of Texas

[Official Notary Stamp]

---

Exhibit A to General Assignment

Legal Description of Property

[Insert land description]

**EXHIBIT "E"**

**FORM OF MEMORANDUM OF AGREEMENT**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**MEMORANDUM OF AGREEMENT**

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** ____________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ____________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this ______ day of ___________________, 2023.

**SELLER**:

**BILL SANDERS, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

(seal) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ____________________
Richard Smelley, Manager

By: ____________________
Tammy Graham, Manager

By: ____________________
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

____________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

____________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]* *[Signature pages continue on following page.]*

**SELLER:**

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

Deborah Ruth Davis
**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

Linda Coffey Jessup
Notary Public Signature

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**Property Description**

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** ________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this ______ day of __________________, 2023.

**SELLER**:

Bill Sanders Ind Ex.

**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

Linda Coffey Jessup
Notary Public Signature

(seal) LINDA COFFEY JESSUP Notary Public, State of Texas Comm. Expires 11-01-2024 Notary ID 2157347

*[Signature pages continue on following page.]*

**SELLER:**

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: [signature]
Richard Smelley, Manager

By: [signature]
Tammy Graham, Manager

By: [signature]
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

[signature]
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

[signature]
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]*

**SELLER**:

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(seal)

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(seal)

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

[signature]
TAMMY MARIE GRAHAM

[signature]
GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

[signature]
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

[signature]
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

Deborah Ruth Davis

**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________
John Contrevo, Manager

STATE OF New Jersey §
§
COUNTY OF Camden §

This instrument was acknowledged before me on the 18 day of May 2023, by John Contrevo, Manager of Challenger Realty Group, LLC, a Delaware limited liability company, for and on behalf of said limited liability company, for the purposes stated in said instrument.

(SEAL)

______________________
Notary Public, ~~State of Texas~~ State of New Jersey SE May 18, 2023

SHAMAYNE R EVERITT
Commission # 50208874
Notary Public, State of New Jersey
My Commission Expires
April 11, 2028

# EXHIBIT A TO MEMORANDUM OF AGREEMENT

## Property Description

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt, J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degreas West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing ell of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP,<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

# Exhibit 2

**Hood County Clerk**
**201 W Bridge Street**
**PO BOX 339**
**Granbury, Texas 76048**
**Phone: 817-579-3222**

Document Number: 2023-0007320 -
Filed and Recorded - Real Records

MEMORANDUM OF AGREEMENT

Grantor: SANDERS BILL EXE

Pages: 12

Recorded On: 06/08/2023 01:46 PM

**This page is a permanent part of the document.**
**Do Not Destroy**

| | | |
|---|---|---|
| **Recorded On:** | 06/08/2023 01:46 PM | **Notes:** |
| **Document Number:** | 2023-0007320 | |
| **Receipt Number:** | R238102 | |
| **Amount:** | $61.00 | |
| **Recorded By:** | Simplifile | |

Any provision herein which restricts the Sale, Rental, or use of the described REAL PROPERTY because of color or race is invalid and unenforceable under federal law.

**I hereby certify that this instrument was filed and duly recorded in the Official Records of Hood County, Texas**

Katie Lang
County Clerk
Hood County, Texas

**Return To:**

MCKNIGHT TITLE

279 W HIDDEN CREEK PKWY STE 1
BURLESON, TX 76028-6077

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** May 26, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated May 26, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this 16 day of May, 2023.

**SELLER:**

[signature] Ind Ex.

**BILL SANDERS, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

[signature: Linda Coffey Jessup]
Notary Public Signature

(seal) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]*

**SELLER**:

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
(Seal)
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, , 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25 , 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

Deborah Ruth Davis
**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________
John Contrevo, Manager

STATE OF New Jersey §
§
COUNTY OF Camden §

This instrument was acknowledged before me on the 18 day of May 2023, by John Contrevo, Manager of Challenger Realty Group, LLC, a Delaware limited liability company, for and on behalf of said limited liability company, for the purposes stated in said instrument.

(SEAL)

______________________
Notary Public, ~~State of Texas~~ State of New Jersey SE May 18, 2023

SHAMAYNE R EVERITT
Commission # 50208874
Notary Public, State of New Jersey
My Commission Expires
April 11, 2028

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**Property Description**

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt, J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degreas West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hocc and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP,<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

# Exhibit 3

**From:** Stephen Reich <stephen.reich@williamstrew.com>
**Sent:** Wednesday, June 21, 2023 1:38 PM
**To:** Jennifer Stapleton <jennifer@mcknighttitle.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** Cresson - Challenger 1674 Acres

Good afternoon:
Please use this email as written notification that all tires have been removed from the property. It is my understanding that our initial 180 feasibility starts today. Please confirm receipt, and acknowledge that this starts our feasibility.

--



# Exhibit 4

LIBBY//SPARKS
LIBBY · SPARKS · WILLIS · STARNES

JEFFREY T LIBBY
Direct: (214) 390-3264
JLibby@LibbySparks.com

December 15, 2023

Bill Sanders, Independent Executor of
The Estate of Pearl Smelley
804 Flagstone Drive
Burleson, Texas 76028

*Via Email: BSanders@flash.net*

*Via Email: Todd.2@Verizon.net*

Estate of Pearl Smelley
Attn: Todd Tew
566 North Kimball Avenue, Suite 130
Southlake, Texas 76092

Re: Notice regarding Inspection Period and other matters; Standard Contract of Sale dated effective as of May 26, 2023 (the "**Contract**"), by and between Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "**Smelley Estate**"), Cresson Moon Properties, LP, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract solely for the purposes of agreeing to grant, sell and coney their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: Richard David Smelley and Amy Elizabeth Smelley (collectively, "**Smelley**"), Tammy Marie Graham and Gregory Scott Graham (collectively, "**Graham**"), and Deborah Ruth Davis and David Glenn Davis (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham, and Davis, are collectively, jointly and severally referred to in the Contract and in this Letter as ("**Seller**"), and Challenger Realty Group, LLC, a Delaware limited liability company, and/or its assigns, ("**Purchaser**"), regarding that certain approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, as more particularly described in the Contract (the "**Property**").

Ladies and Gentlemen:

As you are aware, the undersigned and this law firm represent Purchaser in connection with the referenced Contract. Section 5(a) of the Contract provides that the Inspection Period commences on the Effective Date and continues through the 180th day following the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser. Section 7(d) of the Contract defines Tires as "all tires and parts thereof situated on the Land." Section 1(a) of the Contract defines the Land as that certain tract of land in Hood County, Texas, described and/or depicted on Exhibit "A" to the Contract. Section 7(d) also obligates Seller to remove all Tires from the Land within 30 days after the Effective Date. All defined terms used in this letter that are not defined in this letter are intended to have the meaning ascribed in the Contract.

Seller notified Purchaser on or about June 21, 2023 that Seller had removed all the Tires from the Land. However, Seller has not removed all the Tires from the Land and, as of the date of this letter, numerous Tires remain on the Land in various locations, including, without limitation, outside the single family residence on the Land, near the area where the previous pile of Tires was located, and attached to multiple apparently abandoned vehicles located throughout the Land.

Based on the fact that all of the Tires have not been removed from the Land, the Inspection Period will not expire on December 18, 2023 and, assuming that Seller has delivered all of the Due Diligence Items to Purchaser, the Inspection Period will not expire until the 180th day after all of the Tires have been removed from the Land and Seller has notified Purchaser thereof. Purchaser hereby makes demand upon Seller to remove all of the remaining Tires from the Land as soon as possible and notify Purchaser immediately thereafter that all of the remaining Tires on the Land have been removed. In order to avoid this issue in the future, Purchaser requests that Seller notify Purchaser regarding the date that Seller will remove all of the remaining Tires from the Land so that Purchaser may accompany Seller during Seller's removal of all the remaining Tires from the Land.

Additionally, as we have previously discussed, the survey obtained by Purchaser shows two gas pipelines traversing the entire width of the Property which, according to the surveyor's note, are not located in an easement. It is our understanding that Seller was aware of those gas pipelines prior to the Effective Date and that no documentation or information regarding those gas pipelines was provided to Purchaser in the Due Diligence Items. Obviously, the existence of those gas pipelines presents a significant artificial condition on the Property that would or could prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property. Purchaser intends to continue its efforts to identify the owners of those gas pipelines and discover the relevant information regarding those gas pipelines, including their current operating status, the respective rights and obligations of Seller and the owners of those gas pipelines and, if abandoned, what may be entailed in their removal. Purchaser requests Seller's cooperation in its efforts regarding those gas pipelines.

Finally, Purchaser's environmental engineer has discovered approximately thirty (30) 55 gallon steel drums of oil-based products throughout the Property (five of which were located around the residential structure and barn on the southern portion of the Property), as well as one 500 gallon petroleum oil aboveground storage tank located on the western portion of the Property in association with a tank battery located on the Property. It appears that at least one of those drums was on its side and had leaked a dark-colored liquid out onto the soil and some black oily staining was observed under a few of the 55 gallon steel drums on the western portion of the Property. Purchaser requests that Seller immediately advise Purchaser regarding any and all Hazardous Substances that are currently located on the Property or which have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property. Additionally, Purchaser requests that Seller promptly and properly remove all of the steel drums located on the Property, as well as all containers that contain any Hazardous Substances. Purchaser requests that Seller notify Purchaser regarding the date that Seller will

remove all of the steel drums and other containers from the Property so that Purchaser may accompany Seller during Seller's removal of such items from the Property.

Please be advised that this letter is not intended to and does not constitute a waiver of any rights or remedies that Purchaser may have under the Contract. Any potential defaults by Seller now existing or later occurring will not be deemed waived or otherwise accepted by Purchaser. The description in this letter of the specific rights of Purchaser will not be deemed to limit or exclude any other rights to which Purchaser may be or become entitled to under the Contract, at law, in equity, or otherwise. Purchaser reserves all rights and remedies granted under the Contract and available at law or in equity, all of which will be cumulative and may be pursued separately, successively, or concurrently at the sole discretion of Purchaser. No failure to exercise or delay in exercising any rights by Purchaser will operate as a waiver of any rights that Purchaser may have under the Contract.

We request that you indicate Seller's acknowledgment that the Inspection Period will not expire on December 18, 2023 and, assuming that Seller has delivered all of the Due Diligence Items to Purchaser, the Inspection Period will not expire until the 180th day after all of the Tires have been removed from the Land and Seller has notified Purchaser thereof, by returning an executed copy of this letter with the appropriate signatures below, but your returned acknowledgment will not be required to enforce the clear requirements described in Section 5(a) of the Contract.

Very truly yours,

Jeffrey T. Libby

*[Seller's Acknowledgment on the Following Page]*

**SELLER'S ACKNOWLEDGEMENT**

**SELLER**:

__________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

__________________________________
RICHARD DAVID SMELLEY

__________________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________________
Richard Smelley, Manager

By:____________________________
Tammy Graham, Manager

By:____________________________
Deborah Davis, Manager

**SELLER**:

__________________________________
DEBORAH RUTH DAVIS

__________________________________
DAVID GLENN DAVIS

**SELLER:**

__________________________________
TAMMY MARIE GRAHAM

__________________________________
GREGORY SCOTT GRAHAM

/jl

cc: Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC *(via email: sgd@flash.net)*
Richard Smelley and Amy Smelley *(via email: Amy.Smelley@icloud.com)*
Deborah Davis and David Davis *(via email: DavidGDavis1@yahoo.com)*
Lacy Kimball, Lacy Kimball Law *(via email: info@LacyKimballLaw.com)*
Tammy Graham and Gregory Graham *(via email: Tammy@LocationsPhotography.com)*

# Exhibit 5

**Blake Brownshadel**

**From:** Jake Wilkinson <jake@mwrealestate.com>
**Sent:** Thursday, January 11, 2024 11:20 AM
**To:** charles@challengerrealtygroup.com; john@challengerrealtygroup.com; ed@challengerrealtygroup.com; Patricia Herrera
**Cc:** Jeff Libby
**Subject:** FW: Tires on Smelley Ranch, 7700 Old Granbury

CAUTION: This email originated from outside of the firm.

Please see below from the seller's broker.

**Jake Wilkinson**
President & Managing Broker
jake@mwrealestate.com

**M&W Real Estate**
8737 King George Drive, Suite B200
Dallas, Texas 75235

Office +1 214 926 9361
Mobile +1 325 721 2353

M&W REAL ESTATE

Website | LinkedIn | Facebook

Texas Real Estate Commission: Consumer Protection Notice
Texas Real Estate Commission: Information About Brokerage Services

This message contains information which may be confidential and/or legally privileged. Unless you are the addressee (or authorized to receive e-mail for the addressee), you may not use, copy or disclose to anyone the message or any other information contained in the message or any attachment. If you have received this message in error, please advise the sender by reply e-mail and delete the message and any attachments and destroy all hard copies of same. Thank you.

---

**From:** Stephen Reich
**Sent:** Thursday, January 11, 2024 11:16 AM
**To:** Jake Wilkinson ; Jennifer Stapleton
**Subject:** Tires on Smelley Ranch, 7700 Old Granbury

Good morning all.

Please use this as written notice that the tires have been finally cleaned up on this property. Can we get a new critical dates letter produced?



# Exhibit 6

LIBBY//SPARKS
LIBBY · SPARKS · WILLIS · STARNES

JEFFREY T LIBBY
Direct: (214) 390-3264
JLibby@LibbySparks.com

July 1, 2024

Bill Sanders, Independent Executor of
The Estate of Pearl Smelley
804 Flagstone Drive
Burleson, Texas 76028

*Via Email: BSanders@flash.net*

*Via Email: Todd.2@Verizon.net*

Estate of Pearl Smelley
Attn: Todd Tew
566 North Kimball Avenue, Suite 130
Southlake, Texas 76092

Re: Standard Contract of Sale dated effective as of May 26, 2023 (the "**Contract**"), by and between Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "**Smelley Estate**"), Cresson Moon Properties, LP, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract solely for the purposes of agreeing to grant, sell and coney their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: Richard David Smelley and Amy Elizabeth Smelley (collectively, "**Smelley**"), Tammy Marie Graham and Gregory Scott Graham (collectively, "**Graham**"), and Deborah Ruth Davis and David Glenn Davis (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham, and Davis, are collectively, jointly and severally referred to in the Contract and in this Letter as ("**Seller**"), and Challenger Realty Group, LLC, a Delaware limited liability company, and/or its assigns, ("**Purchaser**"), regarding that certain approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, as more particularly described in the Contract (the "**Property**").

Ladies and Gentlemen:

We are starting this letter with the most important message that we wish to convey: our client sincerely wants to work with you to resolve the issues affecting the Property. Purchaser has invested a significant amount of time and a large sum of money conducting its due diligence and Purchaser remains not only very interested in purchasing the Property but also very hopeful that Seller and Purchaser can cooperate with each other in good faith to address the matters outlined below and successfully arrive at the closing table. All defined terms used in this letter that are not defined in this letter are intended to have the meaning ascribed in the Contract.

**Oil and Gas Lease**.

As you know, there is an oil and gas lease of record (the "**Smelley Lease**") that, if active, could potentially affect as much as 120 acres of the surface of the Property – acreage that is situated in the middle of the Property – and could significantly and adversely impact the use and

development of the Property. As part of Purchaser's due diligence activities, Purchaser hired special counsel Kelly Roach, who specializes in oil and gas law, to help assess the mineral estate, as well as a separate petroleum engineer for purposes of assessing the condition and functionality of the wells situated on the Property. Mr. Roach has been requesting documentation from Seller in his attempt to help Purchaser assess Seller's mineral estate and determine, among other things, to what extent the Smelley Lease remains in effect. In response to Mr. Roach's numerous and repeated requests, Seller finally turned over Seller's copies of checks apparently evidencing shut-in royalty payments made to Seller by the lessee under the Smelley Lease (each, a "**Shut-In Royalty Check**"). As you know, a shut-in royalty payment is a payment made by a lessee to a lessor under an oil and gas lease when the lessee stops production from a well, or "shuts it in", and a shut-in royalty clause in an oil and gas lease usually allows for the shut-in royalty payment to replace the regular royalty payments the lessee would normally make while the well is producing and, by making shut-in payments on a well capable of producing oil or gas in paying quantities, typically allows the lessee to maintain the lease.

Purchaser's Request: Purchaser recognizes that the Property has been in the Smelley family for generations and that documents may have been distributed among and/or stored by the various Seller parties. Purchaser requests that the Seller parties perform a thorough search of areas over which each maintains possession and/or control and deliver to Purchaser all of the Due Diligence Items that Seller has in its possession or control which Seller has not yet delivered to Purchaser, including, without limitation, all information relating to (a) the mineral estate, including items and information relating to the Smelley Lease, any and all other oil and gas leases affecting the Property, and any and all wells and related equipment situated on the Property, and (b) any and all pipelines on the Property, including the two gas pipelines about which Purchaser previously inquired which are shown on the survey of the Property as not being located within any recorded easement agreement and traversing from the eastern property line across the Property to the western property line in a northeast to southwest direction. Purchaser also requests Seller to request a Release of Oil and Gas Lease covering the Smelley Lease and all of the lands and depths covered by the Smelley Lease.

**Environmental Matters**.

As you recall, Purchaser's environmental engineer discovered approximately thirty (30) 55-gallon steel drums of oil-based products throughout the Property, as well as one 500-gallon petroleum oil aboveground storage tank located on the western portion of the Property in association with a tank battery located on the Property. It appeared that at least one of those drums was on its side and had leaked a dark-colored liquid out onto the soil and some black oily staining was observed under a few of the 55-gallon steel drums on the western portion of the Property. In its December 15, 2023 letter to Seller, Purchaser requested that Seller immediately advise Purchaser regarding any and all Hazardous Substances that are currently located on the Property or which have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property. Additionally, Purchaser requested that Seller promptly and properly remove all of the steel drums located on the Property,

as well as all containers that contain any Hazardous Substances. Finally, Purchaser requested that Seller notify Purchaser regarding the date that Seller would remove all of the steel drums and other containers from the Property so that Purchaser could accompany Seller during Seller's removal of such items from the Property. It is our understanding that Seller did not advise Purchaser regarding any Hazardous Substances or notify Purchaser regarding the date that Seller would remove the steel drums and other containers from the Property. However, we understand that Seller has removed certain steel drums from the Land. Section 7(c) of the Contract requires Seller, not less than fifteen (15) days prior to Closing, to remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and to provide Purchaser with a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

Purchaser's Request: Purchaser understands that the Property has been subject to oil and gas leases for decades and that there has been a lot of activity on the Property by the oil and gas lessees over the years. Purchaser also recognizes that the approximately 2,000 acres that have been collectively owned by the Smelley family is a lot of land to oversee and maintain. Purchaser requests Seller to cooperate with, and provide current and ongoing information to, Purchaser regarding Seller's prior removal of the steel drums and other containers from the Property and whether Seller engaged an environmental engineer to remove those steel drums and other containers, as well as any and all other activities of Seller in connection with environmental conditions, contamination or presence of hazardous substances in, on, above or below the Property.

**Inspection Period**.

Section 5(a) of the Contract provides that the Inspection Period commences on the Effective Date and continues through the 180th day following the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser.

Tire Removal. Section 7(d) of the Contract defines Tires as "all tires and parts thereof situated on the Land" and obligates Seller to remove all Tires from the Land within thirty (30) days after the Effective Date. As you recall, after Seller originally notified Purchaser that Seller had removed all the Tires from the Land, Purchaser discovered Tires on the Property and notified Seller of that fact on December 15, 2023. Seller notified Purchaser on or about January 11, 2024 that all Tires had been removed from the Land and Purchaser relied on Seller's notification and continued its due diligence efforts, spending a significant amount of money in the process. However, Purchaser just discovered more Tires situated on the Property (see photos of those Tires attached to this letter as Exhibit "A"). Therefore, as of the date of this letter, Seller still has not removed all the Tires from the Land.

Purchaser requests that Seller contract with one or more companies that can properly inspect the entire Property, identify where all the Tires are located, and then remove all the Tires

from the Property so that all the Tires are fully and finally removed from the Property and none are missed.

Due Diligence Items. Section 4(a) of the Contract requires Seller to deliver or cause to be delivered to Purchaser copies of all of the Due Diligence Items in Seller's possession or control listed on Exhibit "B" to the Contract within ten (10) days following the Effective Date. The list of Due Diligence Items includes, among other items, (i) any and all leases affecting the Property and amendments thereto, ***as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases*** (emphasis added); (ii) any and all additional data, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, existing surveys, platting and other materials (including a copy of Seller's most current existing survey of the Property), ***and all other information and agreements, relating to the Property or any portion thereof which is in the possession of Seller or its agents*** (emphasis added); and (iii) ***any other agreements or documents not referenced above relating to or affecting the Property*** (emphasis added). Seller's copies of the Shut-In Royalty Checks that Seller recently delivered to Purchaser clearly constitute (i) incident or related documents which affect the obligations of Seller or the Property with respect to a lease that affects the Property, (ii) information relating to the Property which was in the possession of Seller or its agents, and (iii) other documents relating to or affecting the Property that are not referenced in the list of Due Diligence Items. Therefore, Seller did not previously deliver to Seller copies of all of the Due Diligence Items in Seller's possession or control.

Purchaser requests, as mentioned above, that the Seller parties diligently search all areas in which each maintains possession and/or control and deliver to Purchaser all of the Due Diligence Items that Seller has in its possession or control which Seller has not yet delivered to Purchaser.

Based on the facts that (a) all of the Tires have not been removed from the Land and (b) Seller did not previously deliver all of the Due Diligence Items to Purchaser, the Inspection Period will not expire on July 9, 2024; the Inspection Period will not expire until the 180th day after (1) all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (2) Seller has delivered all of the Due Diligence Items to Purchaser. Purchaser again makes demand upon Seller to (A) deliver all of the Due Diligence Items to Purchaser (including, without limitation, all Due Diligence Items relating to the mineral estate, all oil and gas leases to which the Property is subject, and all pipelines on and under the Property), and (B) remove all of the remaining Tires from the Land as soon as possible and notify Purchaser immediately thereafter that all of the remaining Tires on the Land have been removed. In order to avoid further delays in the future, Purchaser again requests that Seller notify Purchaser regarding the date that Seller will remove all of the remaining Tires from the Land so that Purchaser may accompany Seller during Seller's removal of all the remaining Tires from the Land.

Please be advised that this letter is not intended to and does not constitute a waiver of any rights or remedies that Purchaser may have under the Contract. Any potential defaults by Seller now existing or later occurring will not be deemed waived or otherwise accepted by Purchaser.

The description in this letter of the specific rights of Purchaser are not intended to, and will not be deemed to, limit or exclude any other rights to which Purchaser may be or become entitled to under the Contract, at law, in equity, or otherwise. Purchaser reserves all rights and remedies granted under the Contract and available at law or in equity, all of which will be cumulative and may be pursued separately, successively, or concurrently at the sole discretion of Purchaser. No failure to exercise or delay in exercising any rights by Purchaser will operate as a waiver of any rights that Purchaser may have under the Contract.

We request that you indicate Seller's acknowledgment that the Inspection Period will not expire on July 9, 2024 and that the Inspection Period will not expire until the 180th day after the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser, by returning an executed copy of this letter with the appropriate signatures below, but your returned acknowledgment will not be required to enforce the clear requirements described in Section 5(a) of the Contract.

We want to end this letter the way we began, expressing Purchaser's genuine desire to cooperate with Seller in a good faith effort to address and resolve each of the issues listed above in this letter. Please feel free to contact me at your convenience to discuss the best way(s) to successfully achieve that outcome.

Very truly yours,

Jeffrey T. Libby

*[Seller's Acknowledgment on the Following Page]*

**SELLER'S ACKNOWLEDGEMENT**

**SELLER**:

__________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

__________________________________
RICHARD DAVID SMELLEY

__________________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________________
Richard Smelley, Manager

By:____________________________
Tammy Graham, Manager

By:____________________________
Deborah Davis, Manager

**SELLER**:

__________________________________
DEBORAH RUTH DAVIS

__________________________________
DAVID GLENN DAVIS

**SELLER:**

__________________________________
TAMMY MARIE GRAHAM

__________________________________
GREGORY SCOTT GRAHAM

/jl

cc: John Contrevo *(via email)*
Charles Gallub *(via email)*
Edwin Esposito *(via email)*
Patricia Herrera *(via email)*
Jake Wilkinson *(via email)*
Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC *(via email: sgd@flash.net)*
Lacy Kimball, Esq. *(via email: info@LacyKimballLaw.com)*
Richard Smelley and Amy Smelley *(via email: Amy.Smelley@icloud.com)*
Deborah Davis and David Davis *(via email: DavidGDavis1@yahoo.com)*
Tammy Graham and Gregory Graham *(via email: Tammy@LocationsPhotography.com)*
Stephen Reich *(via email: stephen.reich@williamstrew.com)*
Kelly Roach, Esq. *(via email)*

**EXHIBIT "A"**

**PHOTOS OF TIRES ON THE LAND**




LOWE

# Exhibit 7

# FIRST AMENDMENT TO STANDARD CONTRACT OF SALE

This **FIRST AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is executed on this 4th day of December, 2024 (the "**First Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

## RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

## AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Inspection Period. The Inspection Period is hereby extended to continue through April 7, 2025 (the 180th day after October 7, 2024). For the avoidance of doubt, by signing this Amendment, the Parties acknowledge and agree that (a) the Parties' intention is to extend the Inspection Period as described above, and (b) preserve both of Purchaser's two (2) options to extend the Inspection Period as described in Section 5(a) of the Contract.

3. Purchaser hereby instructs the Title Company to (a) continue to maintain the initial Earnest Money in escrow and (b) hold in escrow solely for the benefit of Purchaser the $100,000 deposit of additional Earnest Money that Purchaser delivered to the Title Company on or about July 8, 2024 (the "**Prepaid Deposit**"). The Parties acknowledge and agree that, unless and until

Purchaser elects to exercise its first option to extend the Inspection Period as described in Section 5(a) of the Contract, (y) the Prepaid Deposit is not intended to be, and is not, part of the Earnest Money, and (z) Seller has no claim to, or right to receive, the Prepaid Deposit.

4. Oil and Gas Leases.

(a) Seller hereby authorizes Purchaser to contact and communicate with each and every lessee (each, an "**O&G Lessee**") under the oil and gas lease agreements to which all or a portion of the Property is subject (each, an "**O&G Lease**"), including, without limitation, that certain O&G Lease pursuant to which that certain oil and gas well commonly referred to as "Smelley 1H" (RRC Lease ID No. 211620) (the "**Smelley 1H Lease**") exists on the Property, on Seller's behalf in order to negotiate modifications of the O&G Leases that are satisfactory to Purchaser; provided, however, that Purchaser shall not be entitled to enter into an agreement with any O&G Lessee that is enforceable against Seller without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Such modifications may include, without limitation, early termination or revocation of the applicable O&G Lease or the lessee's waiver or restriction of its rights to access and use the surface of the Property for oil and gas development. Purchaser shall be authorized to contact, communicate and negotiate with the O&G Lessees through Purchaser's representatives, including, without limitation, Purchaser's legal counsel and environmental engineers. Seller shall not be liable to Purchaser for any of Purchaser's fees, costs or other expenses incurred by Purchaser in seeking a modification, early termination or revocation of an O&G Lease. Further, within thirty (30) days following delivery of Purchaser's written request, Seller will initiate and diligently pursue litigation to modify or terminate the O&G Lease and consult and cooperate with Purchaser in connection with such litigation.

(b) All Seller Parties agree to provide to Purchaser the following within five (5) business days after First Amendment Effective Date to the extent not already provided to Purchaser: shut-in payments and shut-in payment supporting documentation received by Seller Parties for (i) 2024 and (ii) the applicable years prior to 2024.

(c) Seller agrees to cooperate with Purchaser in Purchaser's efforts to modify the O&G Leases, including, without limitation, Seller shall, within five (5) business days following Purchaser's delivery to Seller of the applicable request, (a) execute and deliver to Purchaser and any O&G Lessee any written documentation requested by Purchaser or any O&G Lessee to evidence Purchaser's authority to communicate and negotiate on Seller's behalf, and (b) execute and deliver to Purchaser any documentation approved by Purchaser in writing that modifies an O&G Lease. Additionally, within five (5) business days after the First Amendment Effective Date, Seller will deliver a written request to the O&G Lessee under the Smelley 1H Lease to deliver to Seller a full accounting of all shut-in payments made under the Smelley 1H Lease and Seller will diligently thereafter pursue receipt of such accounting and deliver copies of all communications and documentation that Seller receives from the O&G Lessee under the Smelley 1H Lease within five (5) business days following receipt of same.

(d) Seller agrees that Seller will not accept, deposit or cash any shut-in consideration in any form, including, without limitation, any cash, checks, money orders or wire transfers, on or after the First Amendment Effective Date in connection with any O&G Lease.

(e) Seller and Purchaser acknowledge and agree that negotiations or litigation regarding the Smelley 1H Lease are additional agreements to the Contract. Nothing in the provisions and authorizations for the O&G Lease shall constitute grounds for an extension or contingency to close.

4. Closing Date. Notwithstanding anything contained in the Contract or the Amendment to the contrary, unless otherwise agreed in writing by Seller and Purchaser, the Closing Date shall not extend beyond December 31, 2025.

5. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

6. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

Bill Sanders Ind Ex.
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY 11/7/2024

**SELLER**:

CRESSON MOON PROPERTIES, LP, a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By:________________________
Richard Smelley, Manager

By:________________________
Tammy Graham, Manager

By:________________________
Deborah Davis, Manager

**SELLER**:

________________________
RICHARD DAVID SMELLEY

________________________
AMY ELIZABETH SMELLEY

**SELLER**:

________________________
DEBORAH RUTH DAVIS

________________________
DAVID GLENN DAVIS

**SELLER:**

________________________
TAMMY MARIE GRAHAM

________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

Richard David Smelley
RICHARD DAVID SMELLEY

Amy E. Smelley
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: Richard S Smelley
Richard Smelley, Manager

By: ________________________
Tammy Graham, Manager

By: ________________________
Deborah Davis, Manager

**SELLER**:

________________________________
DEBORAH RUTH DAVIS

________________________________
DAVID GLENN DAVIS

**SELLER**:

________________________________
TAMMY MARIE GRAHAM

________________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

__________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

__________________________________
RICHARD DAVID SMELLEY

__________________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:__________________________
Richard Smelley, Manager

By:__________________________
Tammy Graham, Manager

By: Deborah Davis
Deborah Davis, Manager

**SELLER**:

Deborah Ruth Davis
DEBORAH RUTH DAVIS

[signature]
DAVID GLENN DAVIS

**SELLER:**

__________________________________
TAMMY MARIE GRAHAM

__________________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By:______________________________
Richard Smelley, Manager

By:______________________________
Tammy Graham, Manager

By:______________________________
Deborah Davis, Manager

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER:**

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the First Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: John Contrevo
John Contrevo, Manager

# Exhibit 8

# SECOND AMENDMENT TO STANDARD CONTRACT OF SALE

This **SECOND AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of December 31, 2025 (the "**Second Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY (**the "**Smelley Estate**"**)**, **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to December 31, 2025, the outside Closing Date set forth in the Contract, and (c) the Environmental Report cannot be delivered to Purchaser by the outside Closing Date set forth in the Contract; and

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract prior to the Second Amendment Effective Date to finalize new extended deadlines for the requirements for sale as per the Standard Contract for Sale.; however, the Parties desire to enter into this Amendment to extend the Closing Date for a period of time in order to allow Seller's to fully comply with the requirements of Standard Contract for Sale section 7(c) and to allow Seller and Purchaser to enter into subsequent amendment to the Contract; and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Closing Condition and Closing Date. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in Section 3 of this Amendment below, the Closing Date is hereby extended until January 10, 2026 (the "**First Extended Closing Date**").

3. Further Amendment to the Contract. The Parties hereby agree to further amend the Contract on or before the First Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date.

4. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the Second Amendment Effective Date.

**SELLER**:

ID GwazBhJ35oa47kuyCasyBmQV

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

ID eZhryQn2Gr99j7fMso6rN8PB

RICHARD DAVID SMELLEY

ID 28wgymSsAnj7FTc4FcYzFyrs

AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ID eZhryQn2Gr99j7fMso6rN8PB
Richard Smelley, Manager

By: ID 3pE98KhWW988UohRp68xUxCg
Tammy Graham, Manager

By: ID 9PNAG9ooaHKb1JSruwL4HGJg
Deborah Davis, Manager

**SELLER**:

ID 9PNAG9ooaHKb1JSruwL4HGJg

DEBORAH RUTH DAVIS

ID kcsS9Gz52QsKSrD8gzTPnqfq

DAVID GLENN DAVIS

**SELLER:**

ID 3pE98KhWW988UohRp68xUxCg

TAMMY MARIE GRAHAM

ID wH2qWdHHhrNBWbdMmH5GPP2h

GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the Second Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: John Contrevo
ID 6fnyo9U8nNyRaFcvSqRuTxWU
John Contrevo, Manager

# eSignature Details

**Signer ID:** **6fnyo9U8nNyRaFcvSqRuTxWU**
Signed by: John Contrevo
Sent to email: john@challengerrealtygroup.com
IP Address: 73.194.171.232
Signed at: Dec 31 2025, 2:07 pm CST

**Signer ID:** **GwazBhJ35oa47kuyCasyBmQV**
Signed by: Bill Sanders, Executor of the Estate of Pearl Sanders Smelley
Sent to email: bsanders@flash.net
IP Address: 108.220.14.20
Signed at: Dec 31 2025, 2:23 pm CST

**Signer ID:** **eZhryQn2Gr99j7fMso6rN8PB**
Signed by: David Smelley
Sent to email: sgd@flash.net
IP Address: 132.147.159.94
Signed at: Dec 31 2025, 4:21 pm CST

**Signer ID:** **9PNAG9ooaHKb1JSruwL4HGJg**
Signed by: Deborah Davis
Sent to email: debbierdavis77@gmail.com
IP Address: 174.244.19.199
Signed at: Dec 31 2025, 4:26 pm CST

**Signer ID:** **kcsS9Gz52QsKSrD8gzTPnqfq**
Signed by: David Davis
Sent to email: davidgdavis1@yahoo.com
IP Address: 108.161.8.130
Signed at: Dec 31 2025, 4:27 pm CST

**Signer ID:** **3pE98KhWW988UohRp68xUxCg**
Signed by: Tammy Graham
Sent to email: tammy@locationsphotography.com
IP Address: 74.221.111.141
Signed at: Dec 31 2025, 6:09 pm CST

**Signer ID:** **wH2qWdHHhrNBWbdMmH5GPP2h**
Signed by: Gregory Graham
Sent to email: ggraham.greg@gmail.com
IP Address: 74.221.111.141
Signed at: Dec 31 2025, 6:09 pm CST

**Signer ID:** **28wgymSsAnj7FTc4FcYzFyrs**
Signed by: Amy Smelley
Sent to email: amy.smelley@icloud.com
IP Address: 132.147.159.73
Signed at: Dec 31 2025, 6:25 pm CST

# Exhibit 9

January 26, 2026

Mr. Greg Graham
Cresson Moon Property LLC
12601 Cleburne Highway
Cresson, Texas 76035

Re: Limited Phase II Investigation
7700 Old Granbury Road
Cresson, Texas
Whitehead E. S. Project: 379.001

Dear Mr. Graham:

Whitehead Environmental Solutions, LLC (Whitehead E. S.) conducted a Limited Phase II Investigation (soil only since groundwater not encountered) of the property located at 7700 Old Granbury Road in Cresson, Hood County, Texas (Site). The Site is 1,674-acres consisting of a private residence with two gas well pads in a primarily undeveloped area of Cresson. The Site location is provided in **Figure 1**, and the Site layout is provided in **Figure 2**.

**SITE BACKGROUND**

Whitehead E. S. conducted a Phase I Environmental Site Assessment (ESA) of the Site on December 12, 2025, and reviewed a Phase I ESA conducted by Environmental Science and Engineering (ESE) Partners on December 18, 2023.

According to aerial photographs and Railroad Commission of Texas (RRC) records, two gas wells were installed on-Site in 2006 and were plugged in 2025. A former pit associated with each well was observed from aerial photographs along the southern side of the northern well pad and the south side of the southern well pad by 2010 and both appeared to be dry by 2018. The presence of pits associated with the wells were identified as recognized environmental conditions (RECs) in the Phase I ESA conducted by Whitehead E. S. Additionally, aboveground storage tanks (ASTs) associated with the wells were observed by ESE Partners during their Site reconnaissance, as well as in historical aerial photographs. At the time of the Whitehead E. S. Site reconnaissance in 2025, the ASTs were no longer on the Site. Lastly, an off-Site well pad was identified near the southwestern portion of the Site.

Based on the identified RECs, Whitehead E. S. proposed a Phase II Investigation to assess the potential environmental concerns, namely the historical oil & gas activities on the Site including the two gas well pads (north and south) along with the one off-Site well pad to the southwest (adjacent to property).

**SUBSURFACE INVESTIGATION**

On January 9th, 2026, Whitehead E. S. mobilized to the Site to conduct soil and groundwater sampling. The purpose of the investigation was to evaluate potential chemicals of concern (COCs) in the soil and groundwater related to the former on-Site gas wells and associated pits/ASTs and the off-Site presence of natural gas wells. Potential COCs were identified as non-specific total petroleum hydrocarbon (TPH) fractions, volatile organic compounds (VOCs), barium, and chloride.

Six soil borings were advanced on the Site and three were converted to temporary monitoring wells. Soil samples were collected and analyzed for TPH fractions by Texas Method TX 1005, benzene, toluene, ethylbenzene, and xylenes (BTEX)/methyl tert-butyl ether (MTBE) or the full suite of VOCs by U. S. Environmental Protection Agency (EPA) Method 8260. Additionally, selected samples were analyzed for barium by EPA Method 6020, chloride via EPA Method 300.0, and pH by EPA Method 9045D. A single sample was analyzed for polyaromatic hydrocarbons (PAHs) by EPA Method 8270 due to the diesel range TPH fractions that were detected at low concentrations. Photographs of the field investigation are presented in **Attachment A.**

**Soil Sampling and Analysis**

Soil borings SB-01 through SB-06 were advanced using a track-mounted Geoprobe rig utilizing a combination of direct-push technology and solid stem augers with a five-foot probe rod and core samplers. Borings were installed using direct-push sampling system until refusal was encountered or the desired depths were reached. Refusal using direct push was encountered at the Site between 5.5 and 10.0 feet below ground surface (bgs) due to the shallow limestone. Solid stem augers were used to reach deeper depths for temporary monitoring wells. Depths of the soil borings and/or temporary monitoring wells ranged from 7.0 to 24.0 feet bgs. Soil boring SB-01/TMW-01 was advanced on the south side of the north well pad in the footprint of the former pit. Soil boring SB-02 was advanced to the east of the north well pad and SB-03 was advanced northwest of the north well pad near the former AST locations. Soil boring SB-04/TMW-02 was advanced to the north of an off-Site natural gas well pad. Soil boring/temporary monitoring well SB-05/TMW-03 and SB-06 were advanced near the south well pad in the footprint of the former pit and near the former AST locations. The lithology encountered generally consisted of a mix of medium stiff, moist, reddish yellowish brown silty clay and dry, loose, chalky white weathered limestone with some sand lenses.

Soil samples were screened in the field for potential COCs including observations for dark staining and/or fill materials, odors, pH, and measurements of organic vapors using a photoionization detector (PID). No dark staining was observed in any of the soil borings. Soil borings SB-01, SB-02, SB-05 and SB-06 had very low PID readings (0.0 to 0.6 parts per million [ppm]) which are considered background readings not indicative of an environmental impact. Soil borings SB-03 and SB-04 had maximum PID readings of 2.9 ppm and 9.2 ppm, respectively. Furthermore, pH ranges were reported between 7.1 and 9.0.

A total of 13 soil samples were collected from the borings in accordance with EPA Method 5035 (plunger that directly inserts into volatile organic analysis [VOA] vials). Samples were collected in laboratory-supplied containers, immediately placed on wet ice in insulated coolers, and delivered to Eurofins Environment Testing (Eurofins) in Dallas, Texas, for analysis of non-specific TPH fractions, VOCs, barium, chloride, and/or pH. Additionally, one sample [SB-01 (3-4')] was analyzed for PAHs due to the detection of diesel range TPH fractions ($C_{12}$-$C_{28}$).

**Groundwater Sampling and Analysis**

Soil borings SB-01, SB-04, and SB-05 were converted to temporary monitoring wells TMW-01, TMW-02, and TMW-03 respectively, and were installed to total depths of 19.0 feet, 24.0 feet, and 11.0 feet bgs, respectively. Each monitoring well was constructed using a one-inch diameter Schedule 40 PVC. Blank (unslotted) PVC extended from the ground surface to depths of 3.5 feet (TMW-01), 8.5 feet (TMW-02), and 0.5 feet (TMW-03) feet bgs, and machine-slotted PVC screen extended from the base of the riser to the bottom of the borehole. None of the temporary monitoring wells produced groundwater within the timeframe of the investigation therefore could not be sampled.

The corresponding boring logs and monitoring well diagrams are provided in **Attachment B**.

**Soil Sampling Results**

Whitehead E. S. compared the soil analytical data to their respective default TCEQ Texas Risk Reduction Program (TRRP) Tier 1 Residential Protective Concentration Levels (PCLs). Samples analyzed for barium were additionally compared to their Texas-Specific Soil Background Concentration (TSBC), with the lower of the PCL or TSBC used as the assessment level. Samples analyzed for chloride were compared to the RRC Regulatory Protection Limit. Soil sampling results are presented in **Table 1A** and **Table 1B**, with the complete laboratory analytical data package provided in **Attachment C**.

Diesel range ($C_{12}$-$C_{28}$) TPH fractions were detected at one location, SB-01 (3-4'), with a low concentration of 35.5$^J$ mg/kg, below the TRRP PCL of 200 mg/kg. A "J" qualifier indicated an estimated concentration above adjusted method detection limit and below the adjusted reporting limit. Due to the presence of diesel range TPH fractions, PAHs were analyzed, and all analytes were below laboratory sample detection limits (SDLs).

Ethylbenzene was detected in three samples (SB-02, SB-03, and SB-04) at very low concentrations ranging from 0.000545$^J$ mg/kg to 0.00169$^J$ mg/kg, all well below the TRRP PCL of 7.6 mg/kg. Total xylenes were detected at four locations (SB-01, SB-02, SB-03, and SB-04) at low concentrations ranging from 0.000657$^J$ mg/kg to 0.0129 mg/kg, all well below the TRRP PCL of 120 mg/kg. Barium was detected at all sample locations analyzed with a maximum detection of 148 mg/kg at SB-05, all below the TRRP PCL of 440 mg/kg. Lastly, chloride was detected at four sample locations (SB-01, SB-03, SB-04, and SB-06) with values between 5.71$^J$ mg/kg and 250 mg/kg, well below the RRC Regulatory Protection Limit of 3,000 mg/kg. All other analytes were detected below laboratory SDLs.

**Quality Assurance/Quality Control (QA/QC)**

Whitehead E. S. reviewed the QA/QC data provided with the laboratory report and case narrative. A Trip Blank was included on the chain of custody (C-O-C) for the laboratory and put on hold. Soil samples were received by the laboratory at 0.1 degrees Centigrade (within proper temperature range). There were no other data qualifiers from the laboratory. Overall, the laboratory data appears to be accurate, reproducible, and acceptable for use in evaluating potential impacts to the Site.

**FINDINGS AND CONCLUSIONS**

Whitehead E. S. conducted a Limited Phase II Investigation at the Site. The assessment was considered "limited" since groundwater was not encountered. A summary of our findings and conclusions is presented below:

- Previous Phase I ESAs conducted in 2023 and 2025 indicated the presence of two on-Site well pads with associated pits and ASTs. The two gas wells were installed on-Site in 2006 and were plugged in 2025. The associated pits appeared by 2010 and were both dry by 2018. Soil sampling was performed to determine if soil was impacted by potential COCs including TPH fractions, VOCs, barium, and chloride. Groundwater was not encountered at the Site for sample analysis.

- Six soil borings were installed on the Site. The lithology encountered generally consisted of a mix of medium stiff, moist, reddish yellowish brown silty clay and dry, loose, chalky white weathered limestone with some sand lenses. No dark staining was observed in any of the soil cores. Soil borings SB-03 and SB-04 had low PID reading of 2.9 and 9.2 ppm, respectively. Three of the six soil borings were converted into temporary monitoring wells that did not produce any groundwater within the timeframe of the field investigation and were subsequently plugged.

- Soil analytical results identified only low concentrations of diesel range TPH in one sample and ethylbenzene and total xylenes in four of the nine samples. The concentrations of TPH, ethylbenzene, and total xylenes were well below their applicable TRRP Residential PCLs.

- Barium was detected above laboratory its SDL in all soil samples analyzed ranging from 16.7 mg/kg to 148 mg/kg with all samples well below its TRRP PCL of 440 mg/kg. Chloride was detected above laboratory SDLs in four soil samples below applicable RRC screening levels.

In conclusion, Whitehead E. S. conducted a Phase II Investigation to evaluate potential COCs in the soil and groundwater from the former on-Site well pads and off-Site active natural gas pad. The sampling did not indicate any COCs associated with oil & gas activities above their respective TRRP Residential PCLs and/or RRC Limits for soil. Groundwater was not encountered in the temporary monitoring wells on the Site and was not subsequently sampled. Soil sampling data did not identify any COCs in the Areas of Concern on the Site noted in the previous Phase I ESAs. Based on the Whitehead E. S. Phase II Investigation, there is no evidence of any impact to the Site, and no further investigation is warranted at this time.

**QUALIFICATIONS**

This technical report was prepared for the sole use of Cresson Moon Property LLC and shall not be relied upon by any other party without the express prior written consent of Cresson Moon Property LLC and Whitehead E. S. This document was developed by employing generally accepted methods and customary practices of the environmental profession.

Whitehead E. S. appreciates the opportunity to be of service to you on this project. If you have any questions or need additional information regarding the assessment, please contact Michael at (214) 335-3246.

Sincerely,

**WHITEHEAD E. S., LLC**

Michael Whitehead
Senior Consultant

Catherine Kobylinski
Environmental Scientist

Amanda Pechacek, P.G.
Professional Geoscientist



**FIGURES**




Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

Approximate Site Boundary

STATE OF TEXAS
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST
1.26.2026

APPROXIMATE SCALE
(in feet)
0 2000 4000

# Figure 1
## Site Location

**Cresson Moon Property, LLC**
**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
U.S.G.S. Topographic Map Series,
Chapin, Texas (2022)

| DRAFTED BY: | CHECKED BY: |
| --- | --- |
| EM | AP |
| PROJECT NUMBER: | DATE: |
| 379.001 | 01/2026 |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

- Approximate Site Boundary
- Pipeline
- Horizontal Well
- Gas Well
- Soil Boring
- Temporary Monitoring Well

STATE OF TEXAS
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST
1.26.2026

NOTES:
Figure is not to scale.

## Figure 2
## Site Layout

**Cresson Moon Property, LLC**
**7700 Old Granbury Road**
**Cresson, Texas**

| | |
|---|---|
| SOURCE: Google Earth Mapping Service, Imagery Date: 11/20/2024 | |
| DRAFTED BY: DG | CHECKED BY: AP |
| PROJECT NUMBER: 379.001 | DATE: 01/2026 |

TABLES

## TABLE 1A
## SOIL ANALYTICAL SUMMARY - TPH, VOCs, BARIUM, CHLORIDE

*Cresson Moon Property LLC*
*7700 Old Granbury Road*
*Cresson, Texas*

| Sample ID[1] | Sample Date | Total Petroleum Hydrocarbons[2] (mg/kg) | | | Volatile Organic Compounds[3] (mg/kg) | | | | Barium | Chloride |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $C_6$ - $C_{12}$ | $C_{12}$ - $C_{28}$ | $C_{28}$ - $C_{35}$ | Benzene | Toluene | Ethylbenzene | Total Xylenes | | |
| **SB-01 (3-4')** | 1/9/2026 | <21.6 | **35.5[J]** | <21.6 | <0.000459 | <0.000512 | <0.000354 | **0.000657[J]** | **36.8** | **5.71[J]** |
| **SB-02 (3-4')** | 1/9/2026 | <25.7 | <25.7 | <25.7 | <0.000641 | <0.000715 | **0.00127[J]** | **0.0104** | **24.0** | <5.98 |
| **SB-03 (3-4')** | 1/9/2026 | <21.5 | <21.5 | <21.5 | <0.000397 | <0.000443 | <0.000306 | <0.000316 | **30.0** | **250** |
| **SB-03 (5-6')** | 1/9/2026 | <23.2 | <23.2 | <23.2 | <0.000413 | <0.000460 | **0.000545[J]** | **0.00379** | --- | --- |
| **SB-04 (3-4')** | 1/9/2026 | <22.2 | <22.2 | <22.2 | <0.000438 | <0.000489 | **0.00169[J]** | **0.0129** | **31.1** | **5.74[J]** |
| **SB-05 (2-3')** | 1/9/2026 | <18.4 | <18.4 | <18.4 | <0.000559 | <0.000624 | <0.000431 | <0.000445 | **148** | <5.82 |
| **SB-05 (8-9')** | 1/9/2026 | <21.5 | <21.5 | <21.5 | <0.000577 | <0.000644 | <0.000445 | <0.000460 | --- | --- |
| **SB-06 (2-3')** | 1/9/2026 | <20.0 | <20.0 | <20.0 | <0.000555 | <0.000620 | <0.000428 | <0.000443 | --- | --- |
| **SB-06 (6-7')** | 1/9/2026 | <26.8 | <26.8 | <26.8 | <0.000495 | <0.000553 | <0.000382 | <0.000395 | **16.7** | **184** |
| **TRRP Tier 1 Residential $^{GW}Soil_{Ing}$ PCL[4] (mg/kg)** | | **65** | **200** | **200** | **0.026** | **8.2** | **7.6** | **120** | **440** | --- |
| **Texas-Specific Soil Background Conentrations[5] (mg/kg)** | | --- | --- | --- | --- | --- | --- | --- | **300** | --- |
| **RRC Regulatory Protection Limits[6]** | | **10,000** | | | **0.026** | **8.2** | **7.6** | **120** | **---** | **3,000** |

**Notes:**

[1]Samples collected by Whitehead E. S. and analyzed by Eurofins Environment Testing in Dallas, Texas.

[2]Total Petroleum Hydrocarbons (TPH) analyzed by Texas Method TX1005.

[3]Volatile organic compounds (VOCs) analyzed by U.S. Environmental Protection Agency (EPA) Method 8260.

[4]Texas Risk Reduction Program (TRRP) Residential Soil to Groundwater Ingestion Protective Concentration Levels (PCLs).

[5]Texas Commission on Environmental Quality (TCEQ) Texas-Specific Soil Background Concentrations (TSBCs).

[6] Railroad Commision of Texas (RRC) Class 1 and Class 2 Soil-to-Groundwater Regulatory Protection Limits.

**Bold values indicate that chemical of concern (COC) was detected above the sample detection limit (SDL).**

**Bold and shaded values indicate applicable action level for each COC.**

**Bold and highlighted values indicate the COC exceeds the lowest applicable action level.**

(<) Indicates the value was not detected above the laboratory SDL.

[J]Estimated concentration above the adjusted method detection limit and below the adjusted reporting limit.

--- Not analyzed or not applicable

Only select analytes are presented in this table. All other analytes remaining are below their applicable PCLs.

**TABLE 1B**
**SOIL ANALYTICAL SUMMARY - PAHs**

***Cresson Moon Property LLC***
***7700 Old Granbury Road***
***Cresson, Texas***

| Sample ID[1] | | SB-01 (3-4') | TRRP Tier 1 Residential $^{GW}Soil_{Ing}$ PCL[3] (mg/kg) | TRRP Tier 1 Residential $^{Tot}Soil_{Comb}$ PCL[4] (mg/kg) |
|---|---|---|---|---|
| Sample Date | | 1/9/2026 | | |
| PAHs[2] | Acenaphthene | <0.00222 | **240** | **3,000** |
| | Acenaphthylene | <0.00154 | **410** | **3,800** |
| | Anthracene | <0.00214 | **6,900** | **18,000** |
| | Benzo[a]anthracene | <0.00163 | **130** | **41** |
| | Benzo[a]pyrene | <0.00210 | **7.6** | **4.1** |
| | Benzo[b]fluoranthene | <0.00230 | **440** | **42** |
| | Benzo[g,h,i]perylene | <0.00205 | **46,000** | **1,800** |
| | Benzo[k]fluoranthene | <0.00209 | **4,500** | **420** |
| | Chrysene | <0.00195 | **11,000** | **4,100** |
| | Dibenz(a,h)anthracene | <0.00217 | **15** | **4** |
| | Fluoranthene | <0.00267 | **1,900** | **2,300** |
| | Fluorene | <0.00205 | **300** | **2,300** |
| | Indeno[1,2,3-cd]pyrene | <0.00297 | **1,300** | **42** |
| | Naphthalene | <0.00308 | **31** | **220** |
| | Phenanthrene | <0.00332 | **420** | **1,700** |
| | Pyrene | <0.00239 | **1,100** | **1,700** |

**Notes:**

[1]Samples collected by Whitehead E. S. and analyzed by Eurofins Environment Testing in Dallas, Texas.

[2]Polycyclic aromatic hydrocarbons (PAHs) analyzed by U. S. Environmental Protection Agency (EPA) Method 8270.

[3]Texas Risk Reduction Program (TRRP) Residential Soil to Groundwater Ingestion Protective Concentration Levels (PCLs).

[3]TRRP Residential Total Soil Combined PCLs.

**Bold values indicate that chemical of concern (COC) was detected above the sample detection limit (SDL).**

**Bold and shaded values indicate applicable action level for each COC.**

**Bold and highlighted values indicate the COC exceeds the lowest applicable action level.**

(<) Indicates the value was not detected above the laboratory SDL.

**PHOTOGRAPHIC LOG**

**ATTACHMENT A**

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 1.**View of installation of SB-01/TMW-01 south of northern well pad. Photo taken facing southeast.



**Photograph 2.** Soil representative of lithology of 0.0' to 5.5' in SB-01/TMW-01.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 3.**View of installation of SB-02 located east of northern well pad. Photo taken facing east.



**Photograph 4.**View of installation of SB-03 located northwest of northern well pad. Photo taken facing north.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 5.** Soil representative of lithology of 0.0' to 6.0' in SB-03.



**Photograph 6.** View of installation of SB-04/TMW-02 located north of an off-Site well pad. Photo taken facing south.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 7.** View of completed temporary monitoring well SB-04/TMW-02. Photo taken facing southeast.



**Photograph 8.** View of remnants of pit liner located near SB-05/TMW-03 southeast of the southern well pad.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 9.** Soil representative of lithology of 0.0' to 10.0' in SB-05/TMW-03.



**Photograph 10.** View of installation of SB-06 located northwest of the southern well pad. Photo taken facing east.

**BORING LOGS/WELL DIAGRAMS**

**ATTACHMENT B**

# Boring Log: SB-01/TMW-01

| | | | | | |
|---|---|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| | | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | | Driller's License: | 59562 | Ground Elevation (ft): | 1098 |
| Whitehead E.S. Project No. 379.001 | | Logged By: | CK/EM | Latitude: | 32.537023° |
| | | Sampling Method: | PVC Liners | Longitude: | -97.659090° |
| | | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | Riser | | 3.5/5.0 | | CL | SILTY CLAY: stiff, moist, gray with yellow to reddish yellow brown mottling. 0.25 to 1 inch limestone pieces throughout. |
| 1 | Riser | 0 | | | CL | |
| 2 | Riser | 0 | | | CL | |
| 3 | Riser | 0 | | SB-01 (3-4') | LS | VERY WEATHERED LIMESTONE: stiff but friable, dry, light yellowish brown. |
| 4 | Screen | 0 | | | LS | |
| 5 | Screen | 0 | 0.5/0.5 | | LS | DPT refusal @ ~5.5', switched to SSA and cutting observed |
| 6 | Screen | | 0.0/0.0 | | LS | WEATHERED LIMESTONE: stiff but friable, dry, light yellowish brown. |
| 7 | Screen | | | | LS | |
| 8 | Screen | | | | LS | |
| 9 | Screen | | | | LS | |
| 10 | Screen | | | | LS | |
| 11 | Screen | | | | LS | |
| 12 | Screen | | | | LS | |
| 13 | Screen | | | | LS | |
| 14 | Screen | | | | LS | |
| 15 | Screen | | | | LS | |
| 16 | Screen | | | | LS | |
| 17 | Screen | | | | LS | |
| 18 | Screen | | | | LS | |
| 19 | End Cap | | | | LS | |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

**Annular Materials**
N/A

**Well Materials**
(0.0 - 3.5) Casing 1" Sch 40 PVC Riser
(3.5 - 18.5) Screen, 1" Sch 40 PVC 0.010" slot
(18.5 - 19.0) End Cap

**Initial Well Details**
Total Depth (ft): 19
Initial Water Level (ft.): DRY
Date Measured: 1/9/2026

# Boring Log: SB-02

| | | | | | |
|---|---|---|---|---|---|
| Project Name: Cresson Moon Property 7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1097 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.536822° |
| | Sampling Method: | PVC Liners | Longitude: | -97.658318° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | | | | | VERY WEATHERED LIMESTONE: stiff but friable, moist, tan to yellow brown. Few 0.25 to 1 inch limestone pieces throughout |
| 1 | 0.6 | | | | |
| 2 | 0.6 | | | | |
| | | 3.5/5.0 | | LS | |
| 3 | 0 | | SB-02 (3-4') | | |
| 4 | 0.4 | | | | |
| | | | | | DPT refusal @ ~7', switched to SSA and cutting observed |
| 5 | 0 | | | | VERY WEATHERED LIMESTONE: stiff , moist, gray with yellow-brown mottling with few 0.25 to 1 inch limestone pieces throughout, compentency increasing with depth |
| 6 | 0.1 | 2.0/2.0 | | LS | |
| 7 | | | | | WEATHERED LIMESTONE: dry, loose, chalky white with few 0.25 to 0.5 inch limestone pieces throughout |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | 0.0/0.0 | | LS | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |




Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

Notes
Total Depth (ft): 15
Soil boring completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers.
Soil boring plugged the same day as installation with bentonite chips.

# Boring Log: SB-03

| Project Name: | Completion Date: | 1/9/2026 | Refusal? | Yes |
|---|---|---|---|---|
| Cresson Moon Property<br>7700 Old Granbury Road, Cresson, Texas | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1098 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.536727° |
| | Sampling Method: | PVC Liners | Longitude: | -97.658720° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | | 4.0/5.0 | | LS | VERY WEATHERED LIMESTONE: stiff, moist, yellow-brown with few 0.25 to 1 inch limestone pieces throughout, compentency increasing with depth |
| 1 | 0 | | | | |
| 2 | 0 | | | | |
| 3 | 2.9 | | SB-03 (3-4') | | |
| 4 | 0.1 | | | | |
| 5 | 2.3 | 1.5/1.5 | SB-03 (5-6') | CL | SILTY CLAY: stiff, moist, gray with yellow-brown to reddish yellowish-brown mottling with frequent 0.25 to 1 inch limestone pieces throughout<br><br>DPT refusal @ ~6.5', switched to SSA and cutting observed |
| 6 | 1.3 | | | | |
| 7 | | 0.0/8.5 | | LS | WEATHERED LIMESTONE: loose, dry, chalky white 0.25 to 0.5 inch limestone pieces |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |




**Notes**

Total Depth (ft): 15

Soil boring completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers.

Soil boring plugged the same day as installation with bentonite chips.

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

# Boring Log: SB-04/TMW-02

| | | | | | |
|---|---|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1076 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.518527° |
| | Sampling Method: | PVC Liners | Longitude: | -97.673633° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | | | | | CL | SILTY CLAY: very stiff, dry to moist, reddish yellowish-brown with gray mottling with frequent 0.25 to 1 inch limestone pieces throughout |
| 1 | | 6.7 | 4.0/5.0 | SB-04 (3-4') | | |
| 2 | | 9.2 | | | | |
| 3 | | 1.1 | | | | |
| 4 | | 0.1 | | | | |
| 5 | | 0.5 | 1.5/1.5 | | CL | SILTY CLAY: stiff, moist, reddish yellowish-brown with gray mottling, with few 0.25 to 1 inch limestone pieces throughout |
| 6 | | 0.5 | | | | |
| 6.5 | | | 0.0/0.0 | | CL | SILTY CLAY TO CLAY: moist, reddish yellowish-brown with few 0.25 to 0.5 inch limestone pieces throughout. DPT refusal @ ~6.5', switched to SSA and cuttings observed |
| 8 | | | | | | |
| 10 | | | | | | |
| 12 | | | | | | |
| 14 | | | | | | |
| 16 | | | | | | |
| 18 | | | | | | |
| 20 | | | | | CL | SILTY CLAY TO CLAY: moist, dark gray with few limestone pieces throughout |
| 22 | | | | | | |
| 24 | | | | | | |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

| Annular Materials | Well Materials | Initial Well Details |
|---|---|---|
| N/A | (0.0 - 8.5) Casing 1" Sch 40 PVC Riser | Total Depth (ft): 24 |
| | (8.5 - 23.5) Screen, 1" Sch 40 PVC 0.010" slot | Initial Water Level (ft.): DRY |
| | (23.5 - 24.0) End Cap | Date Measured: 1/9/2026 |

# Boring Log: SB-05/TMW-03

| Project Name: | | | | |
|---|---|---|---|---|
| Cresson Moon Property<br>7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 982 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.516597° |
| | Sampling Method: | PVC Liners | Longitude: | -97.657512° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | | | | | | SILTY CLAY: stiff, moist, dark brown with few 0.25 to 1 inch limestone pieces and pea-sized gravels throughout |
| 1 | | 0 | | | | |
| 2 | | 0 | | | | |
| | | | 4.0/5.0 | SB-05 (2-3') | CL | |
| 3 | | 0 | | | | |
| 4 | | 0 | | | | |
| 5 | | 0 | | | | SILTY CLAY: stiff, moist, gray with reddish yellowish-brown mottling grading to predominately orange-brown with gray mottling |
| 6 | | 0 | | | CL | |
| 7 | | 0 | | | | GRAVELLY SAND TO SAND: dense, moist, reddish yellowish-brown with gray mottling, with small pea-sized gravels at 8.5 feet |
| | | | 3.5/5.0 | | | |
| 8 | | 0 | | | | |
| | | | | SB-05 (8-9') | SP | |
| 9 | | 0 | | | | |
| | | | | | | DPT refusal @ ~10', switched to SSA and cuttings observed |
| 10 | | 0 | | | | WEATHERED LIMESTONE: dry, loose, chalky white limestone pieces throughout |
| | | | 0.0/0.0 | | LS | |
| 11 | | | | | | |

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

Notes
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

Annular Materials
N/A

Well Materials
(0.0 - 0.5) Casing 1" Sch 40 PVC Riser
(0.5 - 10.5) Screen, 1" Sch 40 PVC 0.010" slot
(10.5 - 11.0) End Cap

Initial Well Details
Total Depth (ft): 11
Initial Water Level (ft.): DRY
Date Measured: 1/9/2026

# Boring Log: SB-06

| | |
|---|---|
| Project Name: | Cresson Moon Property<br>7700 Old Granbury Road, Cresson, Texas |
| Whitehead E.S. Project No. 379.001 | |

| | | | |
|---|---|---|---|
| Completion Date: | 1/9/2026 | Refusal? | Yes |
| Drilling Company: | Savage Drilling | Borehole Diameter (in): | 2" |
| Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| Driller's License: | 59562 | Ground Elevation (ft): | 990 |
| Logged By: | CK/EM | Latitude: | 32.516610° |
| Sampling Method: | PVC Liners | Longitude: | -97.658474° |
| Drilling Method: | DPT | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | 0 | | | CL | SILTY CLAY: stiff, moist, red-brown to dark brown |
| 0.4 | | | | | |
| 0.8 | | | | | |
| | 0 | | | | |
| 1.2 | | | | | |
| 1.6 | | | | | |
| 2 | 0 | | | | |
| 2.4 | | 4.0/5.0 | SB-06 (2-3') | | |
| 2.8 | | | | | |
| | 0 | | | SP | GRAVELLY SAND TO SAND: loose, moist, red-brown to reddish yellowish-brown |
| 3.2 | | | | | |
| 3.6 | | | | | |
| 4 | 0 | | | | |
| 4.4 | | | | | |
| 4.8 | | | | | |
| | 0 | | | | |
| 5.2 | | | | | |
| 5.6 | | | | | |
| 6 | 0.5 | 2.0/2.0 | | | |
| 6.4 | | | SB-06 (6-7') | | |
| 6.8 | | | | | |
| | 0.2 | | | | |

STATE OF TEXAS 1.26.2026 AMANDA PECHACEK GEOLOGY 15423 LICENSED PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S. ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**

Total Depth (ft): 7

Soil boring completed via track-mounted Geoprobe utilizing direct push technology.

Soil boring plugged the same day as installation with bentonite chips.

**LABORATORY ANALYTICAL DATA PACKAGES**

**ATTACHMENT C**

eurofins Environment Testing



# ANALYTICAL REPORT

## PREPARED FOR

Attn: Danielle Fehrenback
Whitehead ES LLC
906 18th St
Plano, Texas 75074

Generated 1/21/2026 4:10:11 PM

## JOB DESCRIPTION

Cresson Moon Props
379.001

## JOB NUMBER

870-43022-1

Eurofins Dallas
9701 Harry Hines Blvd
Dallas TX 75220

See page two for job notes and contact information.



myEOL

# Eurofins Dallas



## Job Notes

This report may not be reproduced except in full, and with written approval from the laboratory. The results relate only to the samples tested. For questions please contact the Project Manager at the e-mail address or telephone number listed on this page.

Analytical test results meet all requirements of the associated regulatory program (i.e., NELAC (TNI), DoD, and ISO 17025) unless otherwise noted under the individual analysis.

## Authorization

Generated
1/21/2026 4:10:11 PM

Authorized for release by
Mike Kimmel, Project Manager
Mike.Kimmel@et.eurofinsus.com
(214)902-0300

# Table of Contents

Cover Page . . . . . 1
Table of Contents . . . . . 3
Definitions/Glossary . . . . . 4
Case Narrative . . . . . 6
Client Sample Results . . . . . 7
Surrogate Summary . . . . . 22
QC Sample Results . . . . . 24
QC Association Summary . . . . . 36
Lab Chronicle . . . . . 40
Certification Summary . . . . . 45
Method Summary . . . . . 46
Sample Summary . . . . . 47
Chain of Custody . . . . . 48
Receipt Checklists . . . . . 51
State Forms . . . . . 53
  DCS Report . . . . . 53
  TRRP Checklist . . . . . 55

# Definitions/Glossary



## Qualifiers

### GC/MS VOA

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| N1 | MS, MSD: Spike recovery exceeds upper or lower control limits. |
| U | Analyte was not detected at or above the SDL. |

### GC/MS Semi VOA

| Qualifier | Qualifier Description |
|---|---|
| U | Analyte was not detected at or above the SDL. |

### GC Semi VOA

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| U | Analyte was not detected at or above the SDL. |
| X | Surrogate recovery exceeds control limits |

### HPLC/IC

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| U | Analyte was not detected at or above the SDL. |

### Metals

| Qualifier | Qualifier Description |
|---|---|
| U | Analyte was not detected at or above the SDL. |

## Glossary

| Abbreviation | These commonly used abbreviations may or may not be present in this report. |
|---|---|
| ☼ | Listed under the "D" column to designate that the result is reported on a dry weight basis |
| %R | Percent Recovery |
| CFL | Contains Free Liquid |
| CFU | Colony Forming Unit |
| CNF | Contains No Free Liquid |
| DER | Duplicate Error Ratio (normalized absolute difference) |
| Dil Fac | Dilution Factor |
| DL | Detection Limit (DoD/DOE) |
| DL, RA, RE, IN | Indicates a Dilution, Re-analysis, Re-extraction, or additional Initial metals/anion analysis of the sample |
| DLC | Decision Level Concentration (Radiochemistry) |
| EDL | Estimated Detection Limit (Dioxin) |
| LOD | Limit of Detection (DoD/DOE) |
| LOQ | Limit of Quantitation (DoD/DOE) |
| MCL | EPA recommended "Maximum Contaminant Level" |
| MDA | Minimum Detectable Activity (Radiochemistry) |
| MDC | Minimum Detectable Concentration (Radiochemistry) |
| MDL | Method Detection Limit |
| ML | Minimum Level (Dioxin) |
| MPN | Most Probable Number |
| MQL | Method Quantitation Limit |
| NC | Not Calculated |
| ND | Not Detected at the reporting limit (or MDL or EDL if shown) |
| NEG | Negative / Absent |
| POS | Positive / Present |
| PQL | Practical Quantitation Limit |
| PRES | Presumptive |
| QC | Quality Control |
| RER | Relative Error Ratio (Radiochemistry) |
| RL | Reporting Limit or Requested Limit (Radiochemistry) |
| RPD | Relative Percent Difference, a measure of the relative difference between two points |

# Definitions/Glossary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Glossary (Continued)

| Abbreviation | These commonly used abbreviations may or may not be present in this report. |
|---|---|
| SDL | Sample Detection Limit |
| TEF | Toxicity Equivalent Factor (Dioxin) |
| TEQ | Toxicity Equivalent Quotient (Dioxin) |
| TNTC | Too Numerous To Count |

# Case Narrative



**Job ID: 870-43022-1** **Eurofins Dallas**



**Job Narrative**
**870-43022-1**

The analytical test results presented in this report meet all requirements of the associated regulatory program listed on the Accreditation/Certification Summary Page, unless otherwise noted. Data qualifiers and/or narrative comments are included to explain any exceptions, if applicable. Regulated compliance samples (e.g. SDWA, NPDES) must comply with associated agency requirements/permits.

- Matrix-specific batch QC (e.g., MS, MSD, SD) may not be reported when insufficient sample volume is available or when site-specific QC samples are not submitted. In such cases, a Laboratory Control Sample Duplicate (LCSD) may be analyzed to provide precision data for the batch.
- For samples analyzed using surrogate and/or isotope dilution analytes, any recoveries falling outside of established acceptance criteria are re-prepared and/or re-analyzed to confirm results, unless the deviation is due to sample dilution or otherwise explained in the case narrative.

**Receipt**
The samples were received on 1/10/2026 9:15 AM. Unless otherwise noted below, the samples arrived in good condition, and, where required, properly preserved and on ice.

**Receipt Exceptions**

**GC/MS VOA**
Method 8260C: The matrix spike (MS) recoveries for preparation batch 870-34798 and analytical batch 870-34789 were outside control limits. Non-homogeneity is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Hydrocarbons**
Method TX_1005: Surrogate recovery for the following sample was outside the upper control limit: SB-05 (8'-9') (870-43022-11). This sample did not contain any target analytes; therefore, re-extraction and/or re-analysis was not performed.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**HPLC/IC**
No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Metals**
Method 6020B: The matrix spike / matrix spike duplicate (MS/MSD) recoveries for preparation batch 860-287918 and analytical batch 860-288184 were outside control limits. Sample matrix interference is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**General Chemistry**
No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Client Sample ID: SB-01 (3'-4')**
**Lab Sample ID: 870-43022-1**
**Date Collected: 01/09/26 10:05**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 89.5**

**Method: SW846 8260C - Volatile Organic Compounds by GC/MS**

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000459 | U | 0.00183 | 0.000459 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromobenzene | <0.000737 | U | 0.00183 | 0.000737 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromochloromethane | <0.000578 | U | 0.00183 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromodichloromethane | <0.000598 | U | 0.00183 | 0.000598 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromoform | <0.000820 | U | 0.00183 | 0.000820 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromomethane | <0.00107 | U | 0.00458 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2-Butanone | <0.00706 | U | 0.0458 | 0.00706 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| n-Butylbenzene | <0.000307 | U | 0.00183 | 0.000307 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| sec-Butylbenzene | <0.000490 | U | 0.00183 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| tert-Butylbenzene | <0.000469 | U | 0.00183 | 0.000469 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Carbon tetrachloride | <0.000405 | U | 0.00183 | 0.000405 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chlorobenzene | <0.000464 | U | 0.00183 | 0.000464 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloroethane | <0.000415 | U | 0.00183 | 0.000415 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloroform | <0.000434 | U | 0.00183 | 0.000434 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloromethane | <0.000502 | U | 0.00183 | 0.000502 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2-Chlorotoluene | <0.000249 | U | 0.00183 | 0.000249 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 4-Chlorotoluene | <0.000556 | U | 0.00183 | 0.000556 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00128 | U | 0.00458 | 0.00128 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dibromochloromethane | <0.000159 | U | 0.00183 | 0.000159 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000996 | U | 0.00458 | 0.000996 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dibromoethane | <0.000566 | U | 0.00183 | 0.000566 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dibromomethane | <0.000287 | U | 0.00183 | 0.000287 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichlorobenzene | <0.000361 | U | 0.00183 | 0.000361 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3-Dichlorobenzene | <0.000457 | U | 0.00183 | 0.000457 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,4-Dichlorobenzene | <0.000454 | U | 0.00183 | 0.000454 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dichlorodifluoromethane | <0.000498 | U | 0.00183 | 0.000498 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloroethane | <0.000519 | U | 0.00183 | 0.000519 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichloroethane | <0.000336 | U | 0.00183 | 0.000336 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloroethene | <0.000417 | U | 0.00183 | 0.000417 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| cis-1,2-Dichloroethene | <0.000463 | U | 0.00183 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| trans-1,2-Dichloroethene | <0.000423 | U | 0.00183 | 0.000423 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichloropropane | <0.000536 | U | 0.00183 | 0.000536 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3-Dichloropropane | <0.000306 | U | 0.00183 | 0.000306 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2,2-Dichloropropane | <0.000542 | U | 0.00183 | 0.000542 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloropropene | <0.000282 | U | 0.00183 | 0.000282 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| cis-1,3-Dichloropropene | <0.000566 | U | 0.00183 | 0.000566 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| trans-1,3-Dichloropropene | <0.000467 | U | 0.00183 | 0.000467 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Ethylbenzene | <0.000354 | U | 0.00183 | 0.000354 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Hexachlorobutadiene | <0.000504 | U | 0.00183 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Isopropylbenzene | <0.000345 | U | 0.00183 | 0.000345 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Methylene Chloride | <0.00121 | U | 0.00458 | 0.00121 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| MTBE | <0.000536 | U | 0.00183 | 0.000536 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Naphthalene | <0.000613 | U | 0.00183 | 0.000613 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| N-Propylbenzene | <0.000472 | U | 0.00183 | 0.000472 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Styrene | <0.000473 | U | 0.00183 | 0.000473 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000421 | U | 0.00183 | 0.000421 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000626 | U | 0.00183 | 0.000626 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Tetrachloroethylene | <0.000416 | U | 0.00183 | 0.000416 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Toluene | <0.000512 | U | 0.00183 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |

# Client Sample Results





## Client Sample ID: SB-01 (3'-4')

**Lab Sample ID: 870-43022-1**

**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 89.5**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000414 | U | 0.00183 | 0.000414 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,4-Trichlorobenzene | <0.000660 | U | 0.00183 | 0.000660 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,1-Trichloroethane | <0.000458 | U | 0.00183 | 0.000458 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,2-Trichloroethane | <0.000619 | U | 0.00183 | 0.000619 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Trichloroethene | <0.000422 | U | 0.00183 | 0.000422 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Trichlorofluoromethane | <0.000770 | U | 0.00183 | 0.000770 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,3-Trichloropropane | <0.000535 | U | 0.00183 | 0.000535 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,4-Trimethylbenzene | <0.000513 | U | 0.00183 | 0.000513 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3,5-Trimethylbenzene | <0.000507 | U | 0.00183 | 0.000507 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| **m,p-Xylenes** | **0.000657** | **J** | 0.00183 | 0.000209 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| o-Xylene | <0.000366 | U | 0.00183 | 0.000366 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| **Xylenes, Total** | **0.000657** | **J** | 0.00183 | 0.000366 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Vinyl chloride | <0.00175 | U | 0.00458 | 0.00175 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *106* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *4-Bromofluorobenzene (Surr)* | *109* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *Dibromofluoromethane (Surr)* | *99* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *Toluene-d8 (Surr)* | *106* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |

### Method: SW846 8270E - Semivolatile Organic Compounds (GC-MS/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | <0.00222 | U | 0.0107 | 0.00222 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Acenaphthylene | <0.00154 | U | 0.0107 | 0.00154 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Anthracene | <0.00214 | U | 0.0107 | 0.00214 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[a]anthracene | <0.00163 | U | 0.00537 | 0.00163 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[a]pyrene | <0.00210 | U | 0.00537 | 0.00210 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[b]fluoranthene | <0.00230 | U | 0.0107 | 0.00230 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[g,h,i]perylene | <0.00205 | U | 0.0107 | 0.00205 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[k]fluoranthene | <0.00209 | U | 0.0107 | 0.00209 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Chrysene | <0.00195 | U | 0.0107 | 0.00195 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Dibenz(a,h)anthracene | <0.00217 | U | 0.00537 | 0.00217 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Fluoranthene | <0.00267 | U | 0.0107 | 0.00267 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Fluorene | <0.00205 | U | 0.0107 | 0.00205 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Indeno[1,2,3-cd]pyrene | <0.00297 | U | 0.0107 | 0.00297 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Naphthalene | <0.00308 | U | 0.0107 | 0.00308 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Phenanthrene | <0.00332 | U | 0.0107 | 0.00332 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Pyrene | <0.00239 | U | 0.0107 | 0.00239 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *2-Fluorobiphenyl* | *73* | | *37 - 130* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |
| *Nitrobenzene-d5 (Surr)* | *58* | | *36 - 131* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |
| *p-Terphenyl-d14 (Surr)* | *93* | | *40 - 130* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| **>C12-C28 Range Hydrocarbons** | **35.5** | **J** | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| >C28-C35 Range Hydrocarbons | <21.6 | U | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| **Total Petroleum Hydrocarbons (C6-C35)** | **35.5** | **J** | 43.2 | 21.6 | mg/Kg | | | 01/14/26 00:04 | 1 |

# Client Sample Results



## Client Sample ID: SB-01 (3'-4')

**Lab Sample ID: 870-43022-1**
**Date Collected: 01/09/26 10:05** — **Matrix: Solid**
**Date Received: 01/10/26 09:15** — **Percent Solids: 89.5**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *117* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 00:04* | *1* |
| *o-Terphenyl (Surr)* | *120* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 00:04* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **5.71** | **J** | 11.2 | 5.58 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 20:57 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **36.8** | | 2.15 | 0.736 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:47 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.1** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.3** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-02 (3'-4')

**Lab Sample ID: 870-43022-3**
**Date Collected: 01/09/26 11:00** — **Matrix: Solid**
**Date Received: 01/10/26 09:15** — **Percent Solids: 82.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000641 | U | 0.00255 | 0.000641 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromobenzene | <0.00103 | U | 0.00255 | 0.00103 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromochloromethane | <0.000806 | U | 0.00255 | 0.000806 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromodichloromethane | <0.000833 | U | 0.00255 | 0.000833 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromoform | <0.00114 | U | 0.00255 | 0.00114 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromomethane | <0.00150 | U | 0.00638 | 0.00150 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2-Butanone | <0.00985 | U | 0.0638 | 0.00985 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| n-Butylbenzene | <0.000427 | U | 0.00255 | 0.000427 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| sec-Butylbenzene | <0.000683 | U | 0.00255 | 0.000683 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| tert-Butylbenzene | <0.000655 | U | 0.00255 | 0.000655 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Carbon tetrachloride | <0.000565 | U | 0.00255 | 0.000565 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chlorobenzene | <0.000647 | U | 0.00255 | 0.000647 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloroethane | <0.000578 | U | 0.00255 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloroform | <0.000605 | U | 0.00255 | 0.000605 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloromethane | <0.000700 | U | 0.00255 | 0.000700 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2-Chlorotoluene | <0.000347 | U | 0.00255 | 0.000347 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 4-Chlorotoluene | <0.000776 | U | 0.00255 | 0.000776 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00178 | U | 0.00638 | 0.00178 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dibromochloromethane | <0.000222 | U | 0.00255 | 0.000222 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00139 | U | 0.00638 | 0.00139 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dibromoethane | <0.000789 | U | 0.00255 | 0.000789 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dibromomethane | <0.000401 | U | 0.00255 | 0.000401 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichlorobenzene | <0.000504 | U | 0.00255 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3-Dichlorobenzene | <0.000637 | U | 0.00255 | 0.000637 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,4-Dichlorobenzene | <0.000633 | U | 0.00255 | 0.000633 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dichlorodifluoromethane | <0.000694 | U | 0.00255 | 0.000694 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1-Dichloroethane | <0.000723 | U | 0.00255 | 0.000723 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichloroethane | <0.000468 | U | 0.00255 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |

## Client Sample ID: SB-02 (3'-4')

**Lab Sample ID: 870-43022-3**

**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 82.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,1-Dichloroethene | <0.000582 | U | 0.00255 | 0.000582 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| cis-1,2-Dichloroethene | <0.000646 | U | 0.00255 | 0.000646 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| trans-1,2-Dichloroethene | <0.000589 | U | 0.00255 | 0.000589 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichloropropane | <0.000748 | U | 0.00255 | 0.000748 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3-Dichloropropane | <0.000426 | U | 0.00255 | 0.000426 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2,2-Dichloropropane | <0.000755 | U | 0.00255 | 0.000755 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1-Dichloropropene | <0.000393 | U | 0.00255 | 0.000393 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| cis-1,3-Dichloropropene | <0.000789 | U | 0.00255 | 0.000789 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| trans-1,3-Dichloropropene | <0.000651 | U | 0.00255 | 0.000651 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **Ethylbenzene** | **0.00127** | **J** | 0.00255 | 0.000494 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Hexachlorobutadiene | <0.000703 | U | 0.00255 | 0.000703 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Isopropylbenzene | <0.000481 | U | 0.00255 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Methylene Chloride | <0.00169 | U | 0.00638 | 0.00169 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| MTBE | <0.000748 | U | 0.00255 | 0.000748 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Naphthalene | <0.000855 | U | 0.00255 | 0.000855 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| N-Propylbenzene | <0.000658 | U | 0.00255 | 0.000658 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Styrene | <0.000660 | U | 0.00255 | 0.000660 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000587 | U | 0.00255 | 0.000587 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000873 | U | 0.00255 | 0.000873 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Tetrachloroethylene | <0.000581 | U | 0.00255 | 0.000581 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Toluene | <0.000715 | U | 0.00255 | 0.000715 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,3-Trichlorobenzene | <0.000577 | U | 0.00255 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,4-Trichlorobenzene | <0.000920 | U | 0.00255 | 0.000920 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,1-Trichloroethane | <0.000638 | U | 0.00255 | 0.000638 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,2-Trichloroethane | <0.000863 | U | 0.00255 | 0.000863 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Trichloroethene | <0.000588 | U | 0.00255 | 0.000588 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Trichlorofluoromethane | <0.00107 | U | 0.00255 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,3-Trichloropropane | <0.000746 | U | 0.00255 | 0.000746 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,4-Trimethylbenzene | <0.000716 | U | 0.00255 | 0.000716 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3,5-Trimethylbenzene | <0.000707 | U | 0.00255 | 0.000707 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **m,p-Xylenes** | **0.00748** | | 0.00255 | 0.000291 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **o-Xylene** | **0.00295** | | 0.00255 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **Xylenes, Total** | **0.0104** | | 0.00255 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Vinyl chloride | <0.00244 | U | 0.00638 | 0.00244 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *111* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *4-Bromofluorobenzene (Surr)* | *101* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| >C12-C28 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| >C28-C35 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <25.7 | U | 51.4 | 25.7 | mg/Kg | | | 01/14/26 01:30 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-02 (3'-4')

**Lab Sample ID: 870-43022-3**

**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 82.8**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *119* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:30* | *1* |
| *o-Terphenyl (Surr)* | *114* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:30* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.98 | U | 12.0 | 5.98 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:06 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **24.0** | | 2.32 | 0.795 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:43 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.6** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.9** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 88.9**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000397 | U | 0.00158 | 0.000397 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromobenzene | <0.000637 | U | 0.00158 | 0.000637 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromochloromethane | <0.000500 | U | 0.00158 | 0.000500 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromodichloromethane | <0.000516 | U | 0.00158 | 0.000516 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromoform | <0.000709 | U | 0.00158 | 0.000709 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromomethane | <0.000928 | U | 0.00395 | 0.000928 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2-Butanone | <0.00611 | U | 0.0395 | 0.00611 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| n-Butylbenzene | <0.000265 | U | 0.00158 | 0.000265 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| sec-Butylbenzene | <0.000423 | U | 0.00158 | 0.000423 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| tert-Butylbenzene | <0.000406 | U | 0.00158 | 0.000406 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Carbon tetrachloride | <0.000350 | U | 0.00158 | 0.000350 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chlorobenzene | <0.000401 | U | 0.00158 | 0.000401 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloroethane | <0.000358 | U | 0.00158 | 0.000358 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloroform | <0.000375 | U | 0.00158 | 0.000375 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloromethane | <0.000434 | U | 0.00158 | 0.000434 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2-Chlorotoluene | <0.000215 | U | 0.00158 | 0.000215 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 4-Chlorotoluene | <0.000481 | U | 0.00158 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00111 | U | 0.00395 | 0.00111 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dibromochloromethane | <0.000138 | U | 0.00158 | 0.000138 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000860 | U | 0.00395 | 0.000860 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dibromoethane | <0.000489 | U | 0.00158 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dibromomethane | <0.000248 | U | 0.00158 | 0.000248 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichlorobenzene | <0.000312 | U | 0.00158 | 0.000312 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3-Dichlorobenzene | <0.000395 | U | 0.00158 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,4-Dichlorobenzene | <0.000392 | U | 0.00158 | 0.000392 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dichlorodifluoromethane | <0.000430 | U | 0.00158 | 0.000430 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1-Dichloroethane | <0.000448 | U | 0.00158 | 0.000448 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichloroethane | <0.000290 | U | 0.00158 | 0.000290 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-5

**Matrix: Solid**
**Percent Solids: 88.9**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,1-Dichloroethene | <0.000361 | U | 0.00158 | 0.000361 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| cis-1,2-Dichloroethene | <0.000400 | U | 0.00158 | 0.000400 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| trans-1,2-Dichloroethene | <0.000365 | U | 0.00158 | 0.000365 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichloropropane | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3-Dichloropropane | <0.000264 | U | 0.00158 | 0.000264 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2,2-Dichloropropane | <0.000468 | U | 0.00158 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1-Dichloropropene | <0.000244 | U | 0.00158 | 0.000244 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| cis-1,3-Dichloropropene | <0.000489 | U | 0.00158 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| trans-1,3-Dichloropropene | <0.000403 | U | 0.00158 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Ethylbenzene | <0.000306 | U | 0.00158 | 0.000306 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Hexachlorobutadiene | <0.000436 | U | 0.00158 | 0.000436 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Isopropylbenzene | <0.000298 | U | 0.00158 | 0.000298 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Methylene Chloride | <0.00105 | U | 0.00395 | 0.00105 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| MTBE | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Naphthalene | <0.000530 | U | 0.00158 | 0.000530 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| N-Propylbenzene | <0.000408 | U | 0.00158 | 0.000408 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Styrene | <0.000409 | U | 0.00158 | 0.000409 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000364 | U | 0.00158 | 0.000364 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000541 | U | 0.00158 | 0.000541 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Tetrachloroethylene | <0.000360 | U | 0.00158 | 0.000360 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Toluene | <0.000443 | U | 0.00158 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,3-Trichlorobenzene | <0.000357 | U | 0.00158 | 0.000357 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,4-Trichlorobenzene | <0.000570 | U | 0.00158 | 0.000570 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,1-Trichloroethane | <0.000395 | U | 0.00158 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,2-Trichloroethane | <0.000535 | U | 0.00158 | 0.000535 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Trichloroethene | <0.000365 | U | 0.00158 | 0.000365 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Trichlorofluoromethane | <0.000666 | U | 0.00158 | 0.000666 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,3-Trichloropropane | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,4-Trimethylbenzene | <0.000444 | U | 0.00158 | 0.000444 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3,5-Trimethylbenzene | <0.000438 | U | 0.00158 | 0.000438 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| m,p-Xylenes | <0.000180 | U | 0.00158 | 0.000180 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| o-Xylene | <0.000316 | U | 0.00158 | 0.000316 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Xylenes, Total | <0.000316 | U | 0.00158 | 0.000316 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Vinyl chloride | <0.00151 | U | 0.00395 | 0.00151 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *114* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *Toluene-d8 (Surr)* | *98* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| >C12-C28 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| >C28-C35 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <21.5 | U | 43.0 | 21.5 | mg/Kg | | | 01/14/26 01:51 | 1 |

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 88.9**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *108* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:51* | *1* |
| *o-Terphenyl (Surr)* | *105* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:51* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **250** | | 11.2 | 5.58 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:15 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **30.0** | | 2.16 | 0.741 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:40 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.3** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.6** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-03 (5'-6')

**Lab Sample ID: 870-43022-6**

**Date Collected: 01/09/26 11:30**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 91.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000413 | U | 0.00164 | 0.000413 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| Toluene | <0.000460 | U | 0.00164 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **Ethylbenzene** | **0.000545** | **J** | 0.00164 | 0.000318 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **m,p-Xylenes** | **0.00268** | | 0.00164 | 0.000187 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **o-Xylene** | **0.00111** | **J** | 0.00164 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **Xylenes, Total** | **0.00379** | | 0.00164 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| MTBE | <0.000482 | U | 0.00164 | 0.000482 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *111* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *4-Bromofluorobenzene (Surr)* | *98* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| >C12-C28 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| >C28-C35 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <23.2 | U | 46.3 | 23.2 | mg/Kg | | | 01/14/26 02:12 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *110* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:12* | *1* |
| *o-Terphenyl (Surr)* | *107* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:12* | *1* |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-04 (3'-4')**
**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-8**
**Matrix: Solid**
**Percent Solids: 95.2**

## Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000438 | U | 0.00175 | 0.000438 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromobenzene | <0.000703 | U | 0.00175 | 0.000703 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromochloromethane | <0.000552 | U | 0.00175 | 0.000552 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromodichloromethane | <0.000570 | U | 0.00175 | 0.000570 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromoform | <0.000783 | U | 0.00175 | 0.000783 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromomethane | <0.00103 | U | 0.00437 | 0.00103 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2-Butanone | <0.00674 | U | 0.0437 | 0.00674 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| n-Butylbenzene | <0.000293 | U | 0.00175 | 0.000293 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| sec-Butylbenzene | <0.000467 | U | 0.00175 | 0.000467 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| tert-Butylbenzene | <0.000448 | U | 0.00175 | 0.000448 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Carbon tetrachloride | <0.000387 | U | 0.00175 | 0.000387 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chlorobenzene | <0.000443 | U | 0.00175 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloroethane | <0.000396 | U | 0.00175 | 0.000396 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloroform | <0.000414 | U | 0.00175 | 0.000414 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloromethane | <0.000479 | U | 0.00175 | 0.000479 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2-Chlorotoluene | <0.000238 | U | 0.00175 | 0.000238 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 4-Chlorotoluene | <0.000531 | U | 0.00175 | 0.000531 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00122 | U | 0.00437 | 0.00122 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dibromochloromethane | <0.000152 | U | 0.00175 | 0.000152 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000950 | U | 0.00437 | 0.000950 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dibromoethane | <0.000540 | U | 0.00175 | 0.000540 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dibromomethane | <0.000274 | U | 0.00175 | 0.000274 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichlorobenzene | <0.000345 | U | 0.00175 | 0.000345 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3-Dichlorobenzene | <0.000436 | U | 0.00175 | 0.000436 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,4-Dichlorobenzene | <0.000433 | U | 0.00175 | 0.000433 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dichlorodifluoromethane | <0.000475 | U | 0.00175 | 0.000475 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloroethane | <0.000495 | U | 0.00175 | 0.000495 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichloroethane | <0.000321 | U | 0.00175 | 0.000321 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloroethene | <0.000398 | U | 0.00175 | 0.000398 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| cis-1,2-Dichloroethene | <0.000442 | U | 0.00175 | 0.000442 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| trans-1,2-Dichloroethene | <0.000403 | U | 0.00175 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichloropropane | <0.000512 | U | 0.00175 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3-Dichloropropane | <0.000292 | U | 0.00175 | 0.000292 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2,2-Dichloropropane | <0.000517 | U | 0.00175 | 0.000517 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloropropene | <0.000269 | U | 0.00175 | 0.000269 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| cis-1,3-Dichloropropene | <0.000540 | U | 0.00175 | 0.000540 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| trans-1,3-Dichloropropene | <0.000445 | U | 0.00175 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **Ethylbenzene** | **0.00169** | **J** | 0.00175 | 0.000338 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Hexachlorobutadiene | <0.000481 | U | 0.00175 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Isopropylbenzene | <0.000329 | U | 0.00175 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Methylene Chloride | <0.00115 | U | 0.00437 | 0.00115 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| MTBE | <0.000512 | U | 0.00175 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Naphthalene | <0.000585 | U | 0.00175 | 0.000585 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| N-Propylbenzene | <0.000451 | U | 0.00175 | 0.000451 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Styrene | <0.000452 | U | 0.00175 | 0.000452 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000402 | U | 0.00175 | 0.000402 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000597 | U | 0.00175 | 0.000597 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Tetrachloroethylene | <0.000397 | U | 0.00175 | 0.000397 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Toluene | <0.000489 | U | 0.00175 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-04 (3'-4')

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-8**
**Matrix: Solid**
**Percent Solids: 95.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000395 | U | 0.00175 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,4-Trichlorobenzene | <0.000630 | U | 0.00175 | 0.000630 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,1-Trichloroethane | <0.000437 | U | 0.00175 | 0.000437 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,2-Trichloroethane | <0.000590 | U | 0.00175 | 0.000590 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Trichloroethene | <0.000403 | U | 0.00175 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Trichlorofluoromethane | <0.000735 | U | 0.00175 | 0.000735 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,3-Trichloropropane | <0.000511 | U | 0.00175 | 0.000511 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,4-Trimethylbenzene | <0.000490 | U | 0.00175 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3,5-Trimethylbenzene | <0.000484 | U | 0.00175 | 0.000484 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **m,p-Xylenes** | **0.00907** | | 0.00175 | 0.000199 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **o-Xylene** | **0.00383** | | 0.00175 | 0.000349 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **Xylenes, Total** | **0.0129** | | 0.00175 | 0.000349 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Vinyl chloride | <0.00167 | U | 0.00437 | 0.00167 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *114* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *Toluene-d8 (Surr)* | *100* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| >C12-C28 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| >C28-C35 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <22.2 | U | 44.3 | 22.2 | mg/Kg | | | 01/14/26 02:34 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *127* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:34* | *1* |
| *o-Terphenyl (Surr)* | *121* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:34* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **5.74** | **J** | 10.4 | 5.22 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:24 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **31.1** | | 1.91 | 0.654 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:36 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.7** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.4** | | | | Celsius | | | 01/13/26 14:00 | 1 |

# Client Sample Results





**Client Sample ID: SB-05 (2'-3')**
**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-10**
**Matrix: Solid**
**Percent Solids: 86.0**

## Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000559 | U | 0.00223 | 0.000559 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromobenzene | <0.000896 | U | 0.00223 | 0.000896 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromochloromethane | <0.000704 | U | 0.00223 | 0.000704 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromodichloromethane | <0.000727 | U | 0.00223 | 0.000727 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromoform | <0.000998 | U | 0.00223 | 0.000998 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromomethane | <0.00131 | U | 0.00557 | 0.00131 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2-Butanone | <0.00860 | U | 0.0557 | 0.00860 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| n-Butylbenzene | <0.000373 | U | 0.00223 | 0.000373 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| sec-Butylbenzene | <0.000596 | U | 0.00223 | 0.000596 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| tert-Butylbenzene | <0.000571 | U | 0.00223 | 0.000571 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Carbon tetrachloride | <0.000493 | U | 0.00223 | 0.000493 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chlorobenzene | <0.000565 | U | 0.00223 | 0.000565 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloroethane | <0.000504 | U | 0.00223 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloroform | <0.000528 | U | 0.00223 | 0.000528 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloromethane | <0.000611 | U | 0.00223 | 0.000611 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2-Chlorotoluene | <0.000303 | U | 0.00223 | 0.000303 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 4-Chlorotoluene | <0.000677 | U | 0.00223 | 0.000677 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00156 | U | 0.00557 | 0.00156 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dibromochloromethane | <0.000194 | U | 0.00223 | 0.000194 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00121 | U | 0.00557 | 0.00121 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dibromoethane | <0.000688 | U | 0.00223 | 0.000688 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dibromomethane | <0.000350 | U | 0.00223 | 0.000350 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichlorobenzene | <0.000440 | U | 0.00223 | 0.000440 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3-Dichlorobenzene | <0.000556 | U | 0.00223 | 0.000556 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,4-Dichlorobenzene | <0.000552 | U | 0.00223 | 0.000552 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dichlorodifluoromethane | <0.000606 | U | 0.00223 | 0.000606 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloroethane | <0.000631 | U | 0.00223 | 0.000631 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichloroethane | <0.000409 | U | 0.00223 | 0.000409 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloroethene | <0.000508 | U | 0.00223 | 0.000508 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| cis-1,2-Dichloroethene | <0.000563 | U | 0.00223 | 0.000563 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| trans-1,2-Dichloroethene | <0.000514 | U | 0.00223 | 0.000514 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichloropropane | <0.000652 | U | 0.00223 | 0.000652 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3-Dichloropropane | <0.000372 | U | 0.00223 | 0.000372 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2,2-Dichloropropane | <0.000659 | U | 0.00223 | 0.000659 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloropropene | <0.000343 | U | 0.00223 | 0.000343 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| cis-1,3-Dichloropropene | <0.000688 | U | 0.00223 | 0.000688 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| trans-1,3-Dichloropropene | <0.000568 | U | 0.00223 | 0.000568 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Ethylbenzene | <0.000431 | U | 0.00223 | 0.000431 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Hexachlorobutadiene | <0.000614 | U | 0.00223 | 0.000614 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Isopropylbenzene | <0.000420 | U | 0.00223 | 0.000420 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Methylene Chloride | <0.00147 | U | 0.00557 | 0.00147 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| MTBE | <0.000652 | U | 0.00223 | 0.000652 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Naphthalene | <0.000746 | U | 0.00223 | 0.000746 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| N-Propylbenzene | <0.000575 | U | 0.00223 | 0.000575 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Styrene | <0.000576 | U | 0.00223 | 0.000576 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000512 | U | 0.00223 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000762 | U | 0.00223 | 0.000762 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Tetrachloroethylene | <0.000507 | U | 0.00223 | 0.000507 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Toluene | <0.000624 | U | 0.00223 | 0.000624 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (2'-3')

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-10**
**Matrix: Solid**
**Percent Solids: 86.0**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000503 | U | 0.00223 | 0.000503 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,4-Trichlorobenzene | <0.000803 | U | 0.00223 | 0.000803 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,1-Trichloroethane | <0.000557 | U | 0.00223 | 0.000557 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,2-Trichloroethane | <0.000753 | U | 0.00223 | 0.000753 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Trichloroethene | <0.000513 | U | 0.00223 | 0.000513 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Trichlorofluoromethane | <0.000938 | U | 0.00223 | 0.000938 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,3-Trichloropropane | <0.000651 | U | 0.00223 | 0.000651 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,4-Trimethylbenzene | <0.000625 | U | 0.00223 | 0.000625 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3,5-Trimethylbenzene | <0.000617 | U | 0.00223 | 0.000617 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| m,p-Xylenes | <0.000254 | U | 0.00223 | 0.000254 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| o-Xylene | <0.000445 | U | 0.00223 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Xylenes, Total | <0.000445 | U | 0.00223 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Vinyl chloride | <0.00213 | U | 0.00557 | 0.00213 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *112* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *4-Bromofluorobenzene (Surr)* | *107* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *Toluene-d8 (Surr)* | *102* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| >C12-C28 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| >C28-C35 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <18.4 | U | 36.9 | 18.4 | mg/Kg | | | 01/14/26 03:16 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *111* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:16* | *1* |
| *o-Terphenyl (Surr)* | *111* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:16* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.82 | U | 11.6 | 5.82 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:33 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **148** | | 2.12 | 0.724 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:33 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.6** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.4** | | | | Celsius | | | 01/13/26 14:00 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Client Sample ID: SB-05 (8'-9')

**Lab Sample ID: 870-43022-11**

**Date Collected: 01/09/26 13:55**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000577 | U | 0.00230 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Toluene | <0.000644 | U | 0.00230 | 0.000644 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Ethylbenzene | <0.000445 | U | 0.00230 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| m,p-Xylenes | <0.000262 | U | 0.00230 | 0.000262 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| o-Xylene | <0.000460 | U | 0.00230 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Xylenes, Total | <0.000460 | U | 0.00230 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| MTBE | <0.000674 | U | 0.00230 | 0.000674 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *119* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *Dibromofluoromethane (Surr)* | *104* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *Toluene-d8 (Surr)* | *97* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| >C12-C28 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| >C28-C35 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <21.5 | U | 43.0 | 21.5 | mg/Kg | | | 01/14/26 03:38 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *132* | *X* | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:38* | *1* |
| *o-Terphenyl (Surr)* | *129* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:38* | *1* |

## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**

**Date Collected: 01/09/26 14:10**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000555 | U | 0.00221 | 0.000555 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Toluene | <0.000620 | U | 0.00221 | 0.000620 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Ethylbenzene | <0.000428 | U | 0.00221 | 0.000428 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| m,p-Xylenes | <0.000252 | U | 0.00221 | 0.000252 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| o-Xylene | <0.000443 | U | 0.00221 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Xylenes, Total | <0.000443 | U | 0.00221 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| MTBE | <0.000648 | U | 0.00221 | 0.000648 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *117* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *4-Bromofluorobenzene (Surr)* | *98* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *Toluene-d8 (Surr)* | *97* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |
| >C12-C28 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |
| >C28-C35 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**

**Date Collected: 01/09/26 14:10**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.2**

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Total Petroleum Hydrocarbons (C6-C35) | <20.0 | U | 39.9 | 20.0 | mg/Kg | | | 01/14/26 03:59 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *105* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:59* | *1* |
| *o-Terphenyl (Surr)* | *107* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:59* | *1* |

## Client Sample ID: SB-06 (6'-7')

**Lab Sample ID: 870-43022-13**

**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 90.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000495 | U | 0.00197 | 0.000495 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromobenzene | <0.000794 | U | 0.00197 | 0.000794 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromochloromethane | <0.000624 | U | 0.00197 | 0.000624 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromodichloromethane | <0.000644 | U | 0.00197 | 0.000644 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromoform | <0.000884 | U | 0.00197 | 0.000884 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromomethane | <0.00116 | U | 0.00493 | 0.00116 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2-Butanone | <0.00762 | U | 0.0493 | 0.00762 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| n-Butylbenzene | <0.000331 | U | 0.00197 | 0.000331 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| sec-Butylbenzene | <0.000528 | U | 0.00197 | 0.000528 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| tert-Butylbenzene | <0.000506 | U | 0.00197 | 0.000506 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Carbon tetrachloride | <0.000437 | U | 0.00197 | 0.000437 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chlorobenzene | <0.000500 | U | 0.00197 | 0.000500 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloroethane | <0.000447 | U | 0.00197 | 0.000447 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloroform | <0.000468 | U | 0.00197 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloromethane | <0.000542 | U | 0.00197 | 0.000542 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2-Chlorotoluene | <0.000268 | U | 0.00197 | 0.000268 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 4-Chlorotoluene | <0.000600 | U | 0.00197 | 0.000600 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00138 | U | 0.00493 | 0.00138 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dibromochloromethane | <0.000172 | U | 0.00197 | 0.000172 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00107 | U | 0.00493 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dibromoethane | <0.000610 | U | 0.00197 | 0.000610 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dibromomethane | <0.000310 | U | 0.00197 | 0.000310 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichlorobenzene | <0.000390 | U | 0.00197 | 0.000390 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3-Dichlorobenzene | <0.000492 | U | 0.00197 | 0.000492 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,4-Dichlorobenzene | <0.000490 | U | 0.00197 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dichlorodifluoromethane | <0.000537 | U | 0.00197 | 0.000537 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloroethane | <0.000560 | U | 0.00197 | 0.000560 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichloroethane | <0.000362 | U | 0.00197 | 0.000362 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloroethene | <0.000450 | U | 0.00197 | 0.000450 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| cis-1,2-Dichloroethene | <0.000499 | U | 0.00197 | 0.000499 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| trans-1,2-Dichloroethene | <0.000456 | U | 0.00197 | 0.000456 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichloropropane | <0.000578 | U | 0.00197 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3-Dichloropropane | <0.000330 | U | 0.00197 | 0.000330 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2,2-Dichloropropane | <0.000584 | U | 0.00197 | 0.000584 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloropropene | <0.000304 | U | 0.00197 | 0.000304 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| cis-1,3-Dichloropropene | <0.000610 | U | 0.00197 | 0.000610 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| trans-1,3-Dichloropropene | <0.000503 | U | 0.00197 | 0.000503 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |

Eurofins Dallas

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-06 (6'-7')**
**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-13**
**Matrix: Solid**
**Percent Solids: 90.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Ethylbenzene | <0.000382 | U | 0.00197 | 0.000382 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Hexachlorobutadiene | <0.000544 | U | 0.00197 | 0.000544 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Isopropylbenzene | <0.000372 | U | 0.00197 | 0.000372 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Methylene Chloride | <0.00130 | U | 0.00493 | 0.00130 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| MTBE | <0.000578 | U | 0.00197 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Naphthalene | <0.000661 | U | 0.00197 | 0.000661 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| N-Propylbenzene | <0.000509 | U | 0.00197 | 0.000509 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Styrene | <0.000510 | U | 0.00197 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000454 | U | 0.00197 | 0.000454 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000675 | U | 0.00197 | 0.000675 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Tetrachloroethylene | <0.000449 | U | 0.00197 | 0.000449 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Toluene | <0.000553 | U | 0.00197 | 0.000553 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,3-Trichlorobenzene | <0.000446 | U | 0.00197 | 0.000446 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,4-Trichlorobenzene | <0.000712 | U | 0.00197 | 0.000712 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,1-Trichloroethane | <0.000493 | U | 0.00197 | 0.000493 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,2-Trichloroethane | <0.000667 | U | 0.00197 | 0.000667 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Trichloroethene | <0.000455 | U | 0.00197 | 0.000455 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Trichlorofluoromethane | <0.000831 | U | 0.00197 | 0.000831 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,3-Trichloropropane | <0.000577 | U | 0.00197 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,4-Trimethylbenzene | <0.000554 | U | 0.00197 | 0.000554 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3,5-Trimethylbenzene | <0.000547 | U | 0.00197 | 0.000547 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| m,p-Xylenes | <0.000225 | U | 0.00197 | 0.000225 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| o-Xylene | <0.000395 | U | 0.00197 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Xylenes, Total | <0.000395 | U | 0.00197 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Vinyl chloride | <0.00189 | U | 0.00493 | 0.00189 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *115* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *Dibromofluoromethane (Surr)* | *101* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| >C12-C28 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| >C28-C35 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <26.8 | U | 53.6 | 26.8 | mg/Kg | | | 01/14/26 04:20 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *129* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 04:20* | *1* |
| *o-Terphenyl (Surr)* | *123* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 04:20* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **184** | | 11.0 | 5.50 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:42 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **16.7** | | 2.01 | 0.690 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:30 | 5 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-06 (6'-7')**
**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-13**
**Matrix: Solid**
**Percent Solids: 90.2**

## General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| soil pH measured in water at deg C (SW846 9045D) | 9.0 | | | | S.U. | | | 01/13/26 14:00 | 1 |
| Temperature (SW846 9045D) | 20.6 | | | | Celsius | | | 01/13/26 14:00 | 1 |

# Surrogate Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | | | |
|---|---|---|---|---|---|
| | | DCA | BFB | DBFM | TOL |
| Lab Sample ID | Client Sample ID | (73-131) | (75-132) | (65-135) | (78-138) |
| 870-43022-1 | SB-01 (3'-4') | 106 | 109 | 99 | 106 |
| 870-43022-1 MS | SB-01 (3'-4') | 115 | 100 | 106 | 98 |
| 870-43022-3 | SB-02 (3'-4') | 111 | 101 | 103 | 99 |
| 870-43022-5 | SB-03 (3'-4') | 114 | 99 | 102 | 98 |
| 870-43022-6 | SB-03 (5'-6') | 111 | 98 | 102 | 99 |
| 870-43022-8 | SB-04 (3'-4') | 114 | 99 | 102 | 100 |
| 870-43022-10 | SB-05 (2'-3') | 112 | 107 | 102 | 102 |
| 870-43022-11 | SB-05 (8'-9') | 119 | 99 | 104 | 97 |
| 870-43022-12 | SB-06 (2'-3') | 117 | 98 | 103 | 97 |
| 870-43022-13 | SB-06 (6'-7') | 115 | 99 | 101 | 99 |
| LCS 870-34798/1-A | Lab Control Sample | 103 | 101 | 102 | 99 |
| LCSD 870-34798/2-A | Lab Control Sample Dup | 103 | 100 | 103 | 99 |
| MB 870-34798/3-A | Method Blank | 99 | 100 | 97 | 102 |

**Surrogate Legend**

DCA = 1,2-Dichloroethane-d4 (Surr)
BFB = 4-Bromofluorobenzene (Surr)
DBFM = Dibromofluoromethane (Surr)
TOL = Toluene-d8 (Surr)

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | | |
|---|---|---|---|---|
| | | FBP | NBZ | TPHd14 |
| Lab Sample ID | Client Sample ID | (37-130) | (36-131) | (40-130) |
| 860-122968-J-3-B MS | Matrix Spike | 68 | 75 | 77 |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | 71 | 78 | 80 |
| 870-43022-1 | SB-01 (3'-4') | 73 | 58 | 93 |
| LCS 860-288981/2-A | Lab Control Sample | 82 | 93 | 78 |
| LCSD 860-288981/3-A | Lab Control Sample Dup | 84 | 88 | 80 |
| LCSD 860-288981/5-A | Lab Control Sample Dup | 82 | 88 | 76 |
| MB 860-288981/1-A | Method Blank | 73 | 59 | 72 |

**Surrogate Legend**

FBP = 2-Fluorobiphenyl
NBZ = Nitrobenzene-d5 (Surr)
TPHd14 = p-Terphenyl-d14 (Surr)

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | |
|---|---|---|---|
| | | 1CO | OTPH |
| Lab Sample ID | Client Sample ID | (70-130) | (70-130) |
| 870-43022-1 | SB-01 (3'-4') | 117 | 120 |
| 870-43022-1 MS | SB-01 (3'-4') | 106 | 101 |
| 870-43022-1 MSD | SB-01 (3'-4') | 102 | 100 |
| 870-43022-3 | SB-02 (3'-4') | 119 | 114 |
| 870-43022-5 | SB-03 (3'-4') | 108 | 105 |
| 870-43022-6 | SB-03 (5'-6') | 110 | 107 |

# Surrogate Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | |
|---|---|---|---|
| | | 1CO | OTPH |
| Lab Sample ID | Client Sample ID | (70-130) | (70-130) |
| 870-43022-8 | SB-04 (3'-4') | 127 | 121 |
| 870-43022-10 | SB-05 (2'-3') | 111 | 111 |
| 870-43022-11 | SB-05 (8'-9') | 132 X | 129 |
| 870-43022-12 | SB-06 (2'-3') | 105 | 107 |
| 870-43022-13 | SB-06 (6'-7') | 129 | 123 |
| LCS 870-34808/1-A | Lab Control Sample | 103 | 101 |
| LCSD 870-34808/2-A | Lab Control Sample Dup | 104 | 101 |
| MB 870-34808/3-A | Method Blank | 106 | 103 |

**Surrogate Legend**

1CO = 1-Chlorooctane (Surr)
OTPH = o-Terphenyl (Surr)

Eurofins Dallas



1/21/2026

# QC Sample Results



## Method: 8260C - Volatile Organic Compounds by GC/MS

**Lab Sample ID: MB 870-34798/3-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000500 | U | 0.00199 | 0.000500 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromobenzene | <0.000802 | U | 0.00199 | 0.000802 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromochloromethane | <0.000629 | U | 0.00199 | 0.000629 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromodichloromethane | <0.000650 | U | 0.00199 | 0.000650 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromoform | <0.000892 | U | 0.00199 | 0.000892 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromomethane | <0.00117 | U | 0.00498 | 0.00117 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2-Butanone | <0.00769 | U | 0.0498 | 0.00769 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| n-Butylbenzene | <0.000334 | U | 0.00199 | 0.000334 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| sec-Butylbenzene | <0.000533 | U | 0.00199 | 0.000533 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| tert-Butylbenzene | <0.000511 | U | 0.00199 | 0.000511 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Carbon tetrachloride | <0.000441 | U | 0.00199 | 0.000441 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chlorobenzene | <0.000505 | U | 0.00199 | 0.000505 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloroethane | <0.000451 | U | 0.00199 | 0.000451 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloroform | <0.000472 | U | 0.00199 | 0.000472 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloromethane | <0.000547 | U | 0.00199 | 0.000547 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2-Chlorotoluene | <0.000271 | U | 0.00199 | 0.000271 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 4-Chlorotoluene | <0.000606 | U | 0.00199 | 0.000606 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00139 | U | 0.00498 | 0.00139 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dibromochloromethane | <0.000173 | U | 0.00199 | 0.000173 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00108 | U | 0.00498 | 0.00108 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dibromoethane | <0.000616 | U | 0.00199 | 0.000616 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dibromomethane | <0.000313 | U | 0.00199 | 0.000313 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichlorobenzene | <0.000393 | U | 0.00199 | 0.000393 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3-Dichlorobenzene | <0.000497 | U | 0.00199 | 0.000497 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,4-Dichlorobenzene | <0.000494 | U | 0.00199 | 0.000494 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dichlorodifluoromethane | <0.000542 | U | 0.00199 | 0.000542 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloroethane | <0.000565 | U | 0.00199 | 0.000565 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichloroethane | <0.000366 | U | 0.00199 | 0.000366 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloroethene | <0.000454 | U | 0.00199 | 0.000454 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| cis-1,2-Dichloroethene | <0.000504 | U | 0.00199 | 0.000504 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| trans-1,2-Dichloroethene | <0.000460 | U | 0.00199 | 0.000460 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichloropropane | <0.000584 | U | 0.00199 | 0.000584 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3-Dichloropropane | <0.000333 | U | 0.00199 | 0.000333 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2,2-Dichloropropane | <0.000590 | U | 0.00199 | 0.000590 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloropropene | <0.000307 | U | 0.00199 | 0.000307 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| cis-1,3-Dichloropropene | <0.000616 | U | 0.00199 | 0.000616 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| trans-1,3-Dichloropropene | <0.000508 | U | 0.00199 | 0.000508 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Ethylbenzene | <0.000385 | U | 0.00199 | 0.000385 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Hexachlorobutadiene | <0.000549 | U | 0.00199 | 0.000549 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Isopropylbenzene | <0.000375 | U | 0.00199 | 0.000375 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Methylene Chloride | <0.00132 | U | 0.00498 | 0.00132 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| MTBE | <0.000584 | U | 0.00199 | 0.000584 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Naphthalene | <0.000667 | U | 0.00199 | 0.000667 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| N-Propylbenzene | <0.000514 | U | 0.00199 | 0.000514 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Styrene | <0.000515 | U | 0.00199 | 0.000515 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000458 | U | 0.00199 | 0.000458 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000681 | U | 0.00199 | 0.000681 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Tetrachloroethylene | <0.000453 | U | 0.00199 | 0.000453 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: MB 870-34798/3-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Toluene | <0.000558 | U | 0.00199 | 0.000558 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,3-Trichlorobenzene | <0.000450 | U | 0.00199 | 0.000450 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,4-Trichlorobenzene | <0.000718 | U | 0.00199 | 0.000718 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,1-Trichloroethane | <0.000498 | U | 0.00199 | 0.000498 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,2-Trichloroethane | <0.000673 | U | 0.00199 | 0.000673 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Trichloroethene | <0.000459 | U | 0.00199 | 0.000459 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Trichlorofluoromethane | <0.000839 | U | 0.00199 | 0.000839 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,3-Trichloropropane | <0.000583 | U | 0.00199 | 0.000583 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,4-Trimethylbenzene | <0.000559 | U | 0.00199 | 0.000559 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3,5-Trimethylbenzene | <0.000552 | U | 0.00199 | 0.000552 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| m,p-Xylenes | <0.000227 | U | 0.00199 | 0.000227 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| o-Xylene | <0.000398 | U | 0.00199 | 0.000398 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Xylenes, Total | <0.000398 | U | 0.00199 | 0.000398 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Vinyl chloride | <0.00190 | U | 0.00498 | 0.00190 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |

| *Surrogate* | *MB %Recovery* | *MB Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *99* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *Dibromofluoromethane (Surr)* | *97* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *Toluene-d8 (Surr)* | *102* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |

**Lab Sample ID: LCS 870-34798/1-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Benzene | 0.0506 | 0.05131 | | mg/Kg | | 101 | 70 - 130 |
| Bromobenzene | 0.0506 | 0.05362 | | mg/Kg | | 106 | 70 - 130 |
| Bromochloromethane | 0.0505 | 0.05170 | | mg/Kg | | 102 | 70 - 130 |
| Bromodichloromethane | 0.0507 | 0.05642 | | mg/Kg | | 111 | 70 - 130 |
| Bromoform | 0.0507 | 0.05641 | | mg/Kg | | 111 | 70 - 130 |
| Bromomethane | 0.0504 | 0.05173 | | mg/Kg | | 103 | 70 - 130 |
| 2-Butanone | 0.503 | 0.4996 | | mg/Kg | | 99 | 70 - 130 |
| n-Butylbenzene | 0.0507 | 0.05645 | | mg/Kg | | 111 | 70 - 130 |
| sec-Butylbenzene | 0.0506 | 0.05618 | | mg/Kg | | 111 | 70 - 130 |
| tert-Butylbenzene | 0.0506 | 0.05529 | | mg/Kg | | 109 | 70 - 130 |
| Carbon tetrachloride | 0.0506 | 0.06290 | | mg/Kg | | 124 | 70 - 130 |
| Chlorobenzene | 0.0505 | 0.05230 | | mg/Kg | | 104 | 70 - 130 |
| Chloroethane | 0.0503 | 0.04873 | | mg/Kg | | 97 | 70 - 130 |
| Chloroform | 0.0504 | 0.05908 | | mg/Kg | | 117 | 70 - 130 |
| Chloromethane | 0.0505 | 0.04426 | | mg/Kg | | 88 | 70 - 130 |
| 2-Chlorotoluene | 0.0505 | 0.05379 | | mg/Kg | | 106 | 70 - 130 |
| 4-Chlorotoluene | 0.0506 | 0.05495 | | mg/Kg | | 109 | 70 - 130 |
| p-Cymene (p-Isopropyltoluene) | 0.0506 | 0.05566 | | mg/Kg | | 110 | 70 - 130 |
| Dibromochloromethane | 0.0506 | 0.05804 | | mg/Kg | | 115 | 70 - 130 |
| 1,2-Dibromo-3-Chloropropane | 0.0506 | 0.05935 | | mg/Kg | | 117 | 70 - 130 |
| 1,2-Dibromoethane | 0.0506 | 0.05368 | | mg/Kg | | 106 | 70 - 130 |
| Dibromomethane | 0.0505 | 0.05279 | | mg/Kg | | 104 | 70 - 130 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCS 870-34798/1-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| 1,2-Dichlorobenzene | 0.0504 | 0.05274 | | mg/Kg | | 105 | 70 - 130 |
| 1,3-Dichlorobenzene | 0.0505 | 0.05319 | | mg/Kg | | 105 | 70 - 130 |
| 1,4-Dichlorobenzene | 0.0507 | 0.05240 | | mg/Kg | | 103 | 70 - 130 |
| Dichlorodifluoromethane | 0.0502 | 0.06062 | | mg/Kg | | 121 | 70 - 130 |
| 1,1-Dichloroethane | 0.0505 | 0.05018 | | mg/Kg | | 99 | 70 - 130 |
| 1,2-Dichloroethane | 0.0506 | 0.05261 | | mg/Kg | | 104 | 70 - 130 |
| 1,1-Dichloroethene | 0.0507 | 0.05466 | | mg/Kg | | 108 | 70 - 130 |
| cis-1,2-Dichloroethene | 0.0505 | 0.05215 | | mg/Kg | | 103 | 70 - 130 |
| trans-1,2-Dichloroethene | 0.0507 | 0.05371 | | mg/Kg | | 106 | 70 - 130 |
| 1,2-Dichloropropane | 0.0505 | 0.04908 | | mg/Kg | | 97 | 70 - 130 |
| 1,3-Dichloropropane | 0.0506 | 0.05134 | | mg/Kg | | 101 | 70 - 130 |
| 2,2-Dichloropropane | 0.0506 | 0.05739 | | mg/Kg | | 113 | 70 - 130 |
| 1,1-Dichloropropene | 0.0506 | 0.05363 | | mg/Kg | | 106 | 70 - 130 |
| cis-1,3-Dichloropropene | 0.0503 | 0.05351 | | mg/Kg | | 106 | 70 - 130 |
| trans-1,3-Dichloropropene | 0.0505 | 0.05370 | | mg/Kg | | 106 | 70 - 130 |
| Ethylbenzene | 0.0506 | 0.05490 | | mg/Kg | | 109 | 70 - 130 |
| Hexachlorobutadiene | 0.0506 | 0.05429 | | mg/Kg | | 107 | 70 - 130 |
| Isopropylbenzene | 0.0505 | 0.05517 | | mg/Kg | | 109 | 70 - 130 |
| Methylene Chloride | 0.0505 | 0.05444 | | mg/Kg | | 108 | 70 - 130 |
| MTBE | 0.0505 | 0.04943 | | mg/Kg | | 98 | 70 - 130 |
| Naphthalene | 0.0506 | 0.05515 | | mg/Kg | | 109 | 70 - 130 |
| N-Propylbenzene | 0.0506 | 0.05523 | | mg/Kg | | 109 | 70 - 130 |
| Styrene | 0.0506 | 0.05450 | | mg/Kg | | 108 | 70 - 130 |
| 1,1,1,2-Tetrachloroethane | 0.0506 | 0.05612 | | mg/Kg | | 111 | 70 - 130 |
| 1,1,2,2-Tetrachloroethane | 0.0507 | 0.05229 | | mg/Kg | | 103 | 70 - 130 |
| Tetrachloroethylene | 0.0506 | 0.05756 | | mg/Kg | | 114 | 70 - 130 |
| Toluene | 0.0506 | 0.05130 | | mg/Kg | | 101 | 70 - 130 |
| 1,2,3-Trichlorobenzene | 0.0506 | 0.05395 | | mg/Kg | | 107 | 70 - 130 |
| 1,2,4-Trichlorobenzene | 0.0505 | 0.05678 | | mg/Kg | | 112 | 70 - 130 |
| 1,1,1-Trichloroethane | 0.0503 | 0.05650 | | mg/Kg | | 112 | 70 - 130 |
| 1,1,2-Trichloroethane | 0.0504 | 0.05062 | | mg/Kg | | 100 | 70 - 130 |
| Trichloroethene | 0.0507 | 0.05453 | | mg/Kg | | 108 | 70 - 130 |
| Trichlorofluoromethane | 0.0502 | 0.05976 | | mg/Kg | | 119 | 70 - 130 |
| 1,2,3-Trichloropropane | 0.0506 | 0.05262 | | mg/Kg | | 104 | 70 - 130 |
| 1,2,4-Trimethylbenzene | 0.0505 | 0.05634 | | mg/Kg | | 111 | 70 - 130 |
| 1,3,5-Trimethylbenzene | 0.0505 | 0.05532 | | mg/Kg | | 110 | 70 - 130 |
| m,p-Xylenes | 0.0502 | 0.05368 | | mg/Kg | | 107 | 70 - 130 |
| o-Xylene | 0.0505 | 0.05446 | | mg/Kg | | 108 | 70 - 130 |
| Vinyl chloride | 0.0505 | 0.05166 | | mg/Kg | | 102 | 70 - 130 |

| *Surrogate* | *LCS %Recovery* | *LCS Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *103* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *101* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* |

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCSD 870-34798/2-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | 0.0503 | 0.04450 | | mg/Kg | | 89 | 70 - 130 | 14 | 25 |
| Bromobenzene | 0.0503 | 0.04558 | | mg/Kg | | 91 | 70 - 130 | 16 | 25 |
| Bromochloromethane | 0.0502 | 0.04490 | | mg/Kg | | 89 | 70 - 130 | 14 | 25 |
| Bromodichloromethane | 0.0504 | 0.04818 | | mg/Kg | | 96 | 70 - 130 | 16 | 25 |
| Bromoform | 0.0503 | 0.04781 | | mg/Kg | | 95 | 70 - 130 | 16 | 25 |
| Bromomethane | 0.0501 | 0.05369 | | mg/Kg | | 107 | 70 - 130 | 4 | 25 |
| 2-Butanone | 0.500 | 0.4066 | | mg/Kg | | 81 | 70 - 130 | 21 | 25 |
| n-Butylbenzene | 0.0504 | 0.04839 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| sec-Butylbenzene | 0.0503 | 0.04816 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| tert-Butylbenzene | 0.0503 | 0.04757 | | mg/Kg | | 94 | 70 - 130 | 15 | 25 |
| Carbon tetrachloride | 0.0503 | 0.05382 | | mg/Kg | | 107 | 70 - 130 | 16 | 25 |
| Chlorobenzene | 0.0502 | 0.04512 | | mg/Kg | | 90 | 70 - 130 | 15 | 25 |
| Chloroethane | 0.0500 | 0.05358 | | mg/Kg | | 107 | 70 - 130 | 9 | 25 |
| Chloroform | 0.0501 | 0.05216 | | mg/Kg | | 104 | 70 - 130 | 12 | 25 |
| Chloromethane | 0.0502 | 0.04900 | | mg/Kg | | 98 | 70 - 130 | 10 | 25 |
| 2-Chlorotoluene | 0.0502 | 0.04604 | | mg/Kg | | 92 | 70 - 130 | 16 | 25 |
| 4-Chlorotoluene | 0.0503 | 0.04655 | | mg/Kg | | 93 | 70 - 130 | 17 | 25 |
| p-Cymene (p-Isopropyltoluene) | 0.0503 | 0.04806 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| Dibromochloromethane | 0.0502 | 0.04853 | | mg/Kg | | 97 | 70 - 130 | 18 | 25 |
| 1,2-Dibromo-3-Chloropropane | 0.0503 | 0.04775 | | mg/Kg | | 95 | 70 - 130 | 22 | 25 |
| 1,2-Dibromoethane | 0.0503 | 0.04522 | | mg/Kg | | 90 | 70 - 130 | 17 | 25 |
| Dibromomethane | 0.0502 | 0.04500 | | mg/Kg | | 90 | 70 - 130 | 16 | 25 |
| 1,2-Dichlorobenzene | 0.0501 | 0.04463 | | mg/Kg | | 89 | 70 - 130 | 17 | 25 |
| 1,3-Dichlorobenzene | 0.0502 | 0.04566 | | mg/Kg | | 91 | 70 - 130 | 15 | 25 |
| 1,4-Dichlorobenzene | 0.0503 | 0.04463 | | mg/Kg | | 89 | 70 - 130 | 16 | 25 |
| Dichlorodifluoromethane | 0.0499 | 0.06346 | | mg/Kg | | 127 | 70 - 130 | 5 | 25 |
| 1,1-Dichloroethane | 0.0502 | 0.04414 | | mg/Kg | | 88 | 70 - 130 | 13 | 25 |
| 1,2-Dichloroethane | 0.0503 | 0.04584 | | mg/Kg | | 91 | 70 - 130 | 14 | 25 |
| 1,1-Dichloroethene | 0.0504 | 0.04747 | | mg/Kg | | 94 | 70 - 130 | 14 | 25 |
| cis-1,2-Dichloroethene | 0.0502 | 0.04518 | | mg/Kg | | 90 | 70 - 130 | 14 | 25 |
| trans-1,2-Dichloroethene | 0.0504 | 0.04726 | | mg/Kg | | 94 | 70 - 130 | 13 | 25 |
| 1,2-Dichloropropane | 0.0502 | 0.04290 | | mg/Kg | | 85 | 70 - 130 | 13 | 25 |
| 1,3-Dichloropropane | 0.0503 | 0.04388 | | mg/Kg | | 87 | 70 - 130 | 16 | 25 |
| 2,2-Dichloropropane | 0.0503 | 0.05013 | | mg/Kg | | 100 | 70 - 130 | 13 | 25 |
| 1,1-Dichloropropene | 0.0503 | 0.04663 | | mg/Kg | | 93 | 70 - 130 | 14 | 25 |
| cis-1,3-Dichloropropene | 0.0500 | 0.04530 | | mg/Kg | | 91 | 70 - 130 | 17 | 25 |
| trans-1,3-Dichloropropene | 0.0502 | 0.04601 | | mg/Kg | | 92 | 70 - 130 | 15 | 25 |
| Ethylbenzene | 0.0503 | 0.04731 | | mg/Kg | | 94 | 70 - 130 | 15 | 25 |
| Hexachlorobutadiene | 0.0503 | 0.04640 | | mg/Kg | | 92 | 70 - 130 | 16 | 25 |
| Isopropylbenzene | 0.0502 | 0.04777 | | mg/Kg | | 95 | 70 - 130 | 14 | 25 |
| Methylene Chloride | 0.0502 | 0.04777 | | mg/Kg | | 95 | 70 - 130 | 13 | 25 |
| MTBE | 0.0502 | 0.04231 | | mg/Kg | | 84 | 70 - 130 | 16 | 25 |
| Naphthalene | 0.0503 | 0.04478 | | mg/Kg | | 89 | 70 - 130 | 21 | 25 |
| N-Propylbenzene | 0.0503 | 0.04701 | | mg/Kg | | 93 | 70 - 130 | 16 | 25 |
| Styrene | 0.0503 | 0.04674 | | mg/Kg | | 93 | 70 - 130 | 15 | 25 |
| 1,1,1,2-Tetrachloroethane | 0.0502 | 0.04809 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| 1,1,2,2-Tetrachloroethane | 0.0504 | 0.04302 | | mg/Kg | | 85 | 70 - 130 | 19 | 25 |
| Tetrachloroethylene | 0.0503 | 0.04900 | | mg/Kg | | 97 | 70 - 130 | 16 | 25 |

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCSD 870-34798/2-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Toluene | 0.0503 | 0.04377 | | mg/Kg | | 87 | 70 - 130 | 16 | 25 |
| 1,2,3-Trichlorobenzene | 0.0503 | 0.04458 | | mg/Kg | | 89 | 70 - 130 | 19 | 25 |
| 1,2,4-Trichlorobenzene | 0.0502 | 0.04815 | | mg/Kg | | 96 | 70 - 130 | 16 | 25 |
| 1,1,1-Trichloroethane | 0.0500 | 0.04909 | | mg/Kg | | 98 | 70 - 130 | 14 | 25 |
| 1,1,2-Trichloroethane | 0.0501 | 0.04336 | | mg/Kg | | 86 | 70 - 130 | 15 | 25 |
| Trichloroethene | 0.0504 | 0.04709 | | mg/Kg | | 93 | 70 - 130 | 15 | 25 |
| Trichlorofluoromethane | 0.0499 | 0.06317 | | mg/Kg | | 127 | 70 - 130 | 6 | 25 |
| 1,2,3-Trichloropropane | 0.0503 | 0.04330 | | mg/Kg | | 86 | 70 - 130 | 19 | 25 |
| 1,2,4-Trimethylbenzene | 0.0502 | 0.04772 | | mg/Kg | | 95 | 70 - 130 | 17 | 25 |
| 1,3,5-Trimethylbenzene | 0.0502 | 0.04698 | | mg/Kg | | 94 | 70 - 130 | 16 | 25 |
| m,p-Xylenes | 0.0499 | 0.04602 | | mg/Kg | | 92 | 70 - 130 | 15 | 25 |
| o-Xylene | 0.0502 | 0.04652 | | mg/Kg | | 93 | 70 - 130 | 16 | 25 |
| Vinyl chloride | 0.0502 | 0.05723 | | mg/Kg | | 114 | 70 - 130 | 10 | 25 |

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *103* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* |

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000459 | U | 0.0501 | 0.05164 | | mg/Kg | ☼ | 103 | 70 - 130 |
| Bromobenzene | <0.000737 | U | 0.0501 | 0.05252 | | mg/Kg | ☼ | 105 | 70 - 130 |
| Bromochloromethane | <0.000578 | U | 0.0501 | 0.05894 | | mg/Kg | ☼ | 118 | 70 - 130 |
| Bromodichloromethane | <0.000598 | U | 0.0503 | 0.05945 | | mg/Kg | ☼ | 118 | 70 - 130 |
| Bromoform | <0.000820 | U | 0.0502 | 0.06468 | | mg/Kg | ☼ | 129 | 70 - 130 |
| Bromomethane | <0.00107 | U | 0.0500 | 0.05398 | | mg/Kg | ☼ | 108 | 70 - 130 |
| 2-Butanone | <0.00706 | U | 0.498 | 0.5915 | | mg/Kg | ☼ | 119 | 70 - 130 |
| n-Butylbenzene | <0.000307 | U | 0.0502 | 0.04366 | | mg/Kg | ☼ | 87 | 70 - 130 |
| sec-Butylbenzene | <0.000490 | U | 0.0502 | 0.04813 | | mg/Kg | ☼ | 96 | 70 - 130 |
| tert-Butylbenzene | <0.000469 | U | 0.0502 | 0.04981 | | mg/Kg | ☼ | 99 | 70 - 130 |
| Carbon tetrachloride | <0.000405 | U | 0.0502 | 0.06029 | | mg/Kg | ☼ | 120 | 70 - 130 |
| Chlorobenzene | <0.000464 | U | 0.0501 | 0.05175 | | mg/Kg | ☼ | 103 | 70 - 130 |
| Chloroethane | <0.000415 | U | 0.0498 | 0.04536 | | mg/Kg | ☼ | 91 | 70 - 130 |
| Chloroform | <0.000434 | U | 0.0500 | 0.06164 | | mg/Kg | ☼ | 123 | 70 - 130 |
| Chloromethane | <0.000502 | U | 0.0501 | 0.04151 | | mg/Kg | ☼ | 83 | 70 - 130 |
| 2-Chlorotoluene | <0.000249 | U | 0.0501 | 0.04971 | | mg/Kg | ☼ | 99 | 70 - 130 |
| 4-Chlorotoluene | <0.000556 | U | 0.0501 | 0.04924 | | mg/Kg | ☼ | 98 | 70 - 130 |
| p-Cymene (p-Isopropyltoluene) | <0.00128 | U | 0.0501 | 0.04728 | | mg/Kg | ☼ | 94 | 70 - 130 |
| Dibromochloromethane | <0.000159 | U | 0.0501 | 0.06310 | | mg/Kg | ☼ | 126 | 70 - 130 |
| 1,2-Dibromo-3-Chloropropane | <0.000996 | U | 0.0501 | 0.07196 | N1 | mg/Kg | ☼ | 144 | 70 - 130 |
| 1,2-Dibromoethane | <0.000566 | U | 0.0501 | 0.06191 | | mg/Kg | ☼ | 123 | 70 - 130 |
| Dibromomethane | <0.000287 | U | 0.0501 | 0.06090 | | mg/Kg | ☼ | 122 | 70 - 130 |
| 1,2-Dichlorobenzene | <0.000361 | U | 0.0500 | 0.04916 | | mg/Kg | ☼ | 98 | 70 - 130 |

# QC Sample Results



## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| 1,3-Dichlorobenzene | <0.000457 | U | 0.0501 | 0.04701 | | mg/Kg | ☼ | 94 | 70 - 130 |
| 1,4-Dichlorobenzene | <0.000454 | U | 0.0502 | 0.04622 | | mg/Kg | ☼ | 92 | 70 - 130 |
| Dichlorodifluoromethane | <0.000498 | U | 0.0498 | 0.04997 | | mg/Kg | ☼ | 100 | 70 - 130 |
| 1,1-Dichloroethane | <0.000519 | U | 0.0500 | 0.05242 | | mg/Kg | ☼ | 105 | 70 - 130 |
| 1,2-Dichloroethane | <0.000336 | U | 0.0502 | 0.05978 | | mg/Kg | ☼ | 119 | 70 - 130 |
| 1,1-Dichloroethene | <0.000417 | U | 0.0503 | 0.05498 | | mg/Kg | ☼ | 109 | 70 - 130 |
| cis-1,2-Dichloroethene | <0.000463 | U | 0.0501 | 0.05484 | | mg/Kg | ☼ | 110 | 70 - 130 |
| trans-1,2-Dichloroethene | <0.000423 | U | 0.0503 | 0.05424 | | mg/Kg | ☼ | 108 | 70 - 130 |
| 1,2-Dichloropropane | <0.000536 | U | 0.0501 | 0.05176 | | mg/Kg | ☼ | 103 | 70 - 130 |
| 1,3-Dichloropropane | <0.000306 | U | 0.0502 | 0.05877 | | mg/Kg | ☼ | 117 | 70 - 130 |
| 2,2-Dichloropropane | <0.000542 | U | 0.0502 | 0.05600 | | mg/Kg | ☼ | 112 | 70 - 130 |
| 1,1-Dichloropropene | <0.000282 | U | 0.0502 | 0.05382 | | mg/Kg | ☼ | 107 | 70 - 130 |
| cis-1,3-Dichloropropene | <0.000566 | U | 0.0498 | 0.05614 | | mg/Kg | ☼ | 113 | 70 - 130 |
| trans-1,3-Dichloropropene | <0.000467 | U | 0.0501 | 0.05729 | | mg/Kg | ☼ | 114 | 70 - 130 |
| Ethylbenzene | <0.000354 | U | 0.0501 | 0.05322 | | mg/Kg | ☼ | 106 | 70 - 130 |
| Hexachlorobutadiene | <0.000504 | U | 0.0502 | 0.03236 | N1 | mg/Kg | ☼ | 64 | 70 - 130 |
| Isopropylbenzene | <0.000345 | U | 0.0501 | 0.05254 | | mg/Kg | ☼ | 105 | 70 - 130 |
| Methylene Chloride | <0.00121 | U | 0.0501 | 0.05932 | | mg/Kg | ☼ | 118 | 70 - 130 |
| MTBE | <0.000536 | U | 0.0501 | 0.05975 | | mg/Kg | ☼ | 119 | 70 - 130 |
| Naphthalene | <0.000613 | U | 0.0502 | 0.05327 | | mg/Kg | ☼ | 106 | 70 - 130 |
| N-Propylbenzene | <0.000472 | U | 0.0501 | 0.04956 | | mg/Kg | ☼ | 99 | 70 - 130 |
| Styrene | <0.000473 | U | 0.0502 | 0.05384 | | mg/Kg | ☼ | 107 | 70 - 130 |
| 1,1,1,2-Tetrachloroethane | <0.000421 | U | 0.0501 | 0.05805 | | mg/Kg | ☼ | 116 | 70 - 130 |
| 1,1,2,2-Tetrachloroethane | <0.000626 | U | 0.0502 | 0.05970 | | mg/Kg | ☼ | 119 | 70 - 130 |
| Tetrachloroethylene | <0.000416 | U | 0.0502 | 0.05358 | | mg/Kg | ☼ | 107 | 70 - 130 |
| Toluene | <0.000512 | U | 0.0502 | 0.04981 | | mg/Kg | ☼ | 99 | 70 - 130 |
| 1,2,3-Trichlorobenzene | <0.000414 | U | 0.0501 | 0.03724 | | mg/Kg | ☼ | 74 | 70 - 130 |
| 1,2,4-Trichlorobenzene | <0.000660 | U | 0.0501 | 0.03890 | | mg/Kg | ☼ | 78 | 70 - 130 |
| 1,1,1-Trichloroethane | <0.000458 | U | 0.0499 | 0.05708 | | mg/Kg | ☼ | 114 | 70 - 130 |
| 1,1,2-Trichloroethane | <0.000619 | U | 0.0500 | 0.05792 | | mg/Kg | ☼ | 116 | 70 - 130 |
| Trichloroethene | <0.000422 | U | 0.0503 | 0.05469 | | mg/Kg | ☼ | 109 | 70 - 130 |
| Trichlorofluoromethane | <0.000770 | U | 0.0498 | 0.05611 | | mg/Kg | ☼ | 113 | 70 - 130 |
| 1,2,3-Trichloropropane | <0.000535 | U | 0.0502 | 0.06113 | | mg/Kg | ☼ | 122 | 70 - 130 |
| 1,2,4-Trimethylbenzene | <0.000513 | U | 0.0501 | 0.05004 | | mg/Kg | ☼ | 100 | 70 - 130 |
| 1,3,5-Trimethylbenzene | <0.000507 | U | 0.0501 | 0.04923 | | mg/Kg | ☼ | 98 | 70 - 130 |
| m,p-Xylenes | 0.000657 | J | 0.0498 | 0.05115 | | mg/Kg | ☼ | 101 | 70 - 130 |
| o-Xylene | <0.000366 | U | 0.0501 | 0.05314 | | mg/Kg | ☼ | 106 | 70 - 130 |
| Vinyl chloride | <0.00175 | U | 0.0500 | 0.04658 | | mg/Kg | ☼ | 93 | 70 - 130 |

| *Surrogate* | *MS %Recovery* | *MS Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *115* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *106* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *98* | | *78 - 138* |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Lab Sample ID: MB 860-288981/1-A**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | <0.00207 | U | 0.0100 | 0.00207 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Acenaphthylene | <0.00143 | U | 0.0100 | 0.00143 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Anthracene | <0.00199 | U | 0.0100 | 0.00199 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[a]anthracene | <0.00151 | U | 0.00500 | 0.00151 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[a]pyrene | <0.00195 | U | 0.00500 | 0.00195 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[b]fluoranthene | <0.00214 | U | 0.0100 | 0.00214 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[g,h,i]perylene | <0.00191 | U | 0.0100 | 0.00191 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[k]fluoranthene | <0.00195 | U | 0.0100 | 0.00195 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Chrysene | <0.00182 | U | 0.0100 | 0.00182 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Dibenz(a,h)anthracene | <0.00202 | U | 0.00500 | 0.00202 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Fluoranthene | <0.00248 | U | 0.0100 | 0.00248 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Fluorene | <0.00191 | U | 0.0100 | 0.00191 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Indeno[1,2,3-cd]pyrene | <0.00276 | U | 0.0100 | 0.00276 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Naphthalene | <0.00286 | U | 0.0100 | 0.00286 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Phenanthrene | <0.00309 | U | 0.0100 | 0.00309 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Pyrene | <0.00223 | U | 0.0100 | 0.00223 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |

| *Surrogate* | *MB %Recovery* | *MB Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *2-Fluorobiphenyl* | *73* | | *37 - 130* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |
| *Nitrobenzene-d5 (Surr)* | *59* | | *36 - 131* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |
| *p-Terphenyl-d14 (Surr)* | *72* | | *40 - 130* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |

**Lab Sample ID: LCS 860-288981/2-A**
**Matrix: Solid**
**Analysis Batch: 289133**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.100 | 0.08470 | | mg/Kg | | 85 | 60 - 130 |
| Acenaphthylene | 0.100 | 0.07639 | | mg/Kg | | 76 | 41 - 130 |
| Anthracene | 0.100 | 0.08005 | | mg/Kg | | 80 | 45 - 130 |
| Benzo[a]anthracene | 0.100 | 0.08655 | | mg/Kg | | 87 | 42 - 130 |
| Benzo[a]pyrene | 0.100 | 0.08098 | | mg/Kg | | 81 | 42 - 130 |
| Benzo[b]fluoranthene | 0.100 | 0.09297 | | mg/Kg | | 93 | 50 - 130 |
| Benzo[g,h,i]perylene | 0.100 | 0.09717 | | mg/Kg | | 97 | 40 - 130 |
| Benzo[k]fluoranthene | 0.100 | 0.1021 | | mg/Kg | | 102 | 40 - 130 |
| Chrysene | 0.100 | 0.08728 | | mg/Kg | | 87 | 43 - 130 |
| Dibenz(a,h)anthracene | 0.100 | 0.1002 | | mg/Kg | | 100 | 44 - 130 |
| Fluoranthene | 0.100 | 0.08295 | | mg/Kg | | 83 | 55 - 130 |
| Fluorene | 0.100 | 0.08243 | | mg/Kg | | 82 | 50 - 130 |
| Indeno[1,2,3-cd]pyrene | 0.100 | 0.08565 | | mg/Kg | | 86 | 43 - 130 |
| Naphthalene | 0.100 | 0.07984 | | mg/Kg | | 80 | 49 - 130 |
| Phenanthrene | 0.100 | 0.07969 | | mg/Kg | | 80 | 50 - 130 |
| Pyrene | 0.100 | 0.08562 | | mg/Kg | | 86 | 55 - 130 |

| *Surrogate* | *LCS %Recovery* | *LCS Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *82* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *93* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *78* | | *40 - 130* |

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Lab Sample ID: LCSD 860-288981/3-A**
**Matrix: Solid**
**Analysis Batch: 289133**
**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.100 | 0.08790 | | mg/Kg | | 88 | 60 - 130 | 4 | 30 |
| Acenaphthylene | 0.100 | 0.07510 | | mg/Kg | | 75 | 41 - 130 | 2 | 30 |
| Anthracene | 0.100 | 0.08511 | | mg/Kg | | 85 | 45 - 130 | 6 | 30 |
| Benzo[a]anthracene | 0.100 | 0.08742 | | mg/Kg | | 87 | 42 - 130 | 1 | 30 |
| Benzo[a]pyrene | 0.100 | 0.07672 | | mg/Kg | | 77 | 42 - 130 | 5 | 30 |
| Benzo[b]fluoranthene | 0.100 | 0.08811 | | mg/Kg | | 88 | 50 - 130 | 5 | 30 |
| Benzo[g,h,i]perylene | 0.100 | 0.09383 | | mg/Kg | | 94 | 40 - 130 | 3 | 30 |
| Benzo[k]fluoranthene | 0.100 | 0.09826 | | mg/Kg | | 98 | 40 - 130 | 4 | 30 |
| Chrysene | 0.100 | 0.08778 | | mg/Kg | | 88 | 43 - 130 | 1 | 30 |
| Dibenz(a,h)anthracene | 0.100 | 0.09688 | | mg/Kg | | 97 | 44 - 130 | 3 | 30 |
| Fluoranthene | 0.100 | 0.08415 | | mg/Kg | | 84 | 55 - 130 | 1 | 30 |
| Fluorene | 0.100 | 0.08286 | | mg/Kg | | 83 | 50 - 130 | 1 | 30 |
| Indeno[1,2,3-cd]pyrene | 0.100 | 0.08840 | | mg/Kg | | 88 | 43 - 130 | 3 | 30 |
| Naphthalene | 0.100 | 0.07892 | | mg/Kg | | 79 | 49 - 130 | 1 | 30 |
| Phenanthrene | 0.100 | 0.08269 | | mg/Kg | | 83 | 50 - 130 | 4 | 30 |
| Pyrene | 0.100 | 0.08551 | | mg/Kg | | 86 | 55 - 130 | 0 | 30 |

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *84* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *88* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *80* | | *40 - 130* |

**Lab Sample ID: LCSD 860-288981/5-A**
**Matrix: Solid**
**Analysis Batch: 289133**
**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *82* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *88* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *76* | | *40 - 130* |

**Lab Sample ID: 860-122968-J-3-B MS**
**Matrix: Solid**
**Analysis Batch: 289497**
**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.00539 | J | 0.106 | 0.09342 | | mg/Kg | ☼ | 83 | 60 - 130 |
| Acenaphthylene | 0.00230 | J | 0.106 | 0.09518 | | mg/Kg | ☼ | 88 | 41 - 130 |
| Anthracene | 0.0102 | J | 0.106 | 0.09541 | | mg/Kg | ☼ | 81 | 45 - 130 |
| Benzo[a]anthracene | 0.0249 | | 0.106 | 0.1151 | | mg/Kg | ☼ | 85 | 42 - 130 |
| Benzo[a]pyrene | 0.0149 | | 0.106 | 0.1010 | | mg/Kg | ☼ | 82 | 42 - 130 |
| Benzo[b]fluoranthene | 0.0129 | | 0.106 | 0.1045 | | mg/Kg | ☼ | 87 | 50 - 130 |
| Benzo[g,h,i]perylene | 0.00987 | J | 0.106 | 0.1027 | | mg/Kg | ☼ | 88 | 40 - 130 |
| Benzo[k]fluoranthene | 0.00394 | J | 0.106 | 0.09868 | | mg/Kg | ☼ | 90 | 40 - 130 |
| Chrysene | 0.0418 | | 0.106 | 0.09997 | | mg/Kg | ☼ | 55 | 43 - 130 |
| Dibenz(a,h)anthracene | 0.00384 | J | 0.106 | 0.1015 | | mg/Kg | ☼ | 93 | 44 - 130 |
| Fluoranthene | 0.0215 | | 0.106 | 0.1110 | | mg/Kg | ☼ | 85 | 55 - 130 |
| Fluorene | 0.00934 | J | 0.106 | 0.09117 | | mg/Kg | ☼ | 78 | 50 - 130 |

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS) (Continued)

**Lab Sample ID: 860-122968-J-3-B MS**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Indeno[1,2,3-cd]pyrene | 0.00580 | J | 0.106 | 0.1078 | | mg/Kg | ☼ | 97 | 43 - 130 |
| Naphthalene | 0.00426 | J | 0.106 | 0.07767 | | mg/Kg | ☼ | 70 | 49 - 130 |
| Phenanthrene | 0.0215 | | 0.106 | 0.09516 | | mg/Kg | ☼ | 70 | 50 - 130 |
| Pyrene | 0.0470 | | 0.106 | 0.1183 | | mg/Kg | ☼ | 68 | 55 - 130 |

| *Surrogate* | *MS %Recovery* | *MS Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *68* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *75* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *77* | | *40 - 130* |

**Lab Sample ID: 860-122968-J-3-C MSD**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike Duplicate**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.00539 | J | 0.106 | 0.09650 | | mg/Kg | ☼ | 86 | 60 - 130 | 3 | 30 |
| Acenaphthylene | 0.00230 | J | 0.106 | 0.09869 | | mg/Kg | ☼ | 91 | 41 - 130 | 4 | 30 |
| Anthracene | 0.0102 | J | 0.106 | 0.09815 | | mg/Kg | ☼ | 83 | 45 - 130 | 3 | 30 |
| Benzo[a]anthracene | 0.0249 | | 0.106 | 0.1180 | | mg/Kg | ☼ | 88 | 42 - 130 | 2 | 30 |
| Benzo[a]pyrene | 0.0149 | | 0.106 | 0.1029 | | mg/Kg | ☼ | 83 | 42 - 130 | 2 | 30 |
| Benzo[b]fluoranthene | 0.0129 | | 0.106 | 0.1065 | | mg/Kg | ☼ | 89 | 50 - 130 | 2 | 30 |
| Benzo[g,h,i]perylene | 0.00987 | J | 0.106 | 0.1066 | | mg/Kg | ☼ | 92 | 40 - 130 | 4 | 30 |
| Benzo[k]fluoranthene | 0.00394 | J | 0.106 | 0.1007 | | mg/Kg | ☼ | 92 | 40 - 130 | 2 | 30 |
| Chrysene | 0.0418 | | 0.106 | 0.09983 | | mg/Kg | ☼ | 55 | 43 - 130 | 0 | 30 |
| Dibenz(a,h)anthracene | 0.00384 | J | 0.106 | 0.1051 | | mg/Kg | ☼ | 96 | 44 - 130 | 3 | 30 |
| Fluoranthene | 0.0215 | | 0.106 | 0.1125 | | mg/Kg | ☼ | 86 | 55 - 130 | 1 | 30 |
| Fluorene | 0.00934 | J | 0.106 | 0.09159 | | mg/Kg | ☼ | 78 | 50 - 130 | 0 | 30 |
| Indeno[1,2,3-cd]pyrene | 0.00580 | J | 0.106 | 0.1111 | | mg/Kg | ☼ | 100 | 43 - 130 | 3 | 30 |
| Naphthalene | 0.00426 | J | 0.106 | 0.07896 | | mg/Kg | ☼ | 71 | 49 - 130 | 2 | 30 |
| Phenanthrene | 0.0215 | | 0.106 | 0.09655 | | mg/Kg | ☼ | 71 | 50 - 130 | 1 | 30 |
| Pyrene | 0.0470 | | 0.106 | 0.1186 | | mg/Kg | ☼ | 68 | 55 - 130 | 0 | 30 |

| *Surrogate* | *MSD %Recovery* | *MSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *71* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *78* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *80* | | *40 - 130* |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Lab Sample ID: MB 870-34808/3-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| >C12-C28 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| >C28-C35 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Lab Sample ID: MB 870-34808/3-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Surrogate | MB %Recovery | MB Qualifier | Limits | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|
| 1-Chlorooctane (Surr) | 106 | | 70 - 130 | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| o-Terphenyl (Surr) | 103 | | 70 - 130 | 01/12/26 15:58 | 01/13/26 23:42 | 1 |

**Lab Sample ID: LCS 870-34808/1-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 967 | 977.5 | | mg/Kg | | 101 | 75 - 125 |
| >C12-C28 Range Hydrocarbons | 970 | 968.9 | | mg/Kg | | 100 | 75 - 125 |

| Surrogate | LCS %Recovery | LCS Qualifier | Limits |
|---|---|---|---|
| 1-Chlorooctane (Surr) | 103 | | 70 - 130 |
| o-Terphenyl (Surr) | 101 | | 70 - 130 |

**Lab Sample ID: LCSD 870-34808/2-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 953 | 1003 | | mg/Kg | | 105 | 75 - 125 | 3 | 20 |
| >C12-C28 Range Hydrocarbons | 956 | 977.2 | | mg/Kg | | 102 | 75 - 125 | 1 | 20 |

| Surrogate | LCSD %Recovery | LCSD Qualifier | Limits |
|---|---|---|---|
| 1-Chlorooctane (Surr) | 104 | | 70 - 130 |
| o-Terphenyl (Surr) | 101 | | 70 - 130 |

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 831 | 889.9 | | mg/Kg | ☼ | 107 | 75 - 125 |
| >C12-C28 Range Hydrocarbons | 35.5 | J | 833 | 858.9 | | mg/Kg | ☼ | 99 | 75 - 125 |

| Surrogate | MS %Recovery | MS Qualifier | Limits |
|---|---|---|---|
| 1-Chlorooctane (Surr) | 106 | | 70 - 130 |
| o-Terphenyl (Surr) | 101 | | 70 - 130 |

**Lab Sample ID: 870-43022-1 MSD**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 831 | 851.2 | | mg/Kg | ☼ | 102 | 75 - 125 | 4 | 20 |
| >C12-C28 Range Hydrocarbons | 35.5 | J | 833 | 850.2 | | mg/Kg | ☼ | 98 | 75 - 125 | 1 | 20 |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Lab Sample ID: 870-43022-1 MSD**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Surrogate | MSD %Recovery | MSD Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *102* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *100* | | *70 - 130* |

## Method: 300.0 - Anions, Ion Chromatography

**Lab Sample ID: MB 860-287869/1-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.00 | U | 10.0 | 5.00 | mg/Kg | | 01/13/26 15:44 | 01/13/26 18:59 | 1 |

**Lab Sample ID: LCS 860-287869/2-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Chloride | 100 | 100.7 | | mg/Kg | | 101 | 90 - 110 |

**Lab Sample ID: LCSD 860-287869/3-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 100 | 102.3 | | mg/Kg | | 102 | 90 - 110 | 2 | 20 |

**Lab Sample ID: 820-22982-D-1-B MS**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 528 | J | 9900 | 10930 | | mg/Kg | | 105 | 90 - 110 |

**Lab Sample ID: 820-22982-D-1-C MSD**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Matrix Spike Duplicate**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chloride | 528 | J | 9900 | 10840 | | mg/Kg | | 104 | 90 - 110 | 1 | 15 |

## Method: 6020B - Metals (ICP/MS)

**Lab Sample ID: MB 860-287918/1-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Barium | <0.137 | U | 0.400 | 0.137 | mg/Kg | | 01/13/26 17:28 | 01/14/26 12:40 | 1 |

# QC Sample Results



## Method: 6020B - Metals (ICP/MS) (Continued)

**Lab Sample ID: LCS 860-287918/2-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Barium | 10.0 | 10.02 | | mg/Kg | | 100 | 80 - 120 |

**Lab Sample ID: LCSD 860-287918/3-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Barium | 10.0 | 10.10 | | mg/Kg | | 101 | 80 - 120 | 1 | 20 |

## Method: 9045D - pH

**Lab Sample ID: 870-43022-13 DU**
**Matrix: Solid**
**Analysis Batch: 34848**

**Client Sample ID: SB-06 (6'-7')**
**Prep Type: Soluble**

| Analyte | Sample Result | Sample Qualifier | DU Result | DU Qualifier | Unit | D | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|
| soil pH measured in water at deg C | 9.0 | | 9.1 | | S.U. | | 1 | 20 |
| Temperature | 20.6 | | 20.5 | | Celsius | | 0.5 | 20 |

# QC Association Summary



## GC/MS VOA

### Analysis Batch: 34789

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 8260C | 34798 |
| MB 870-34798/3-A | Method Blank | Total/NA | Solid | 8260C | 34798 |
| LCS 870-34798/1-A | Lab Control Sample | Total/NA | Solid | 8260C | 34798 |
| LCSD 870-34798/2-A | Lab Control Sample Dup | Total/NA | Solid | 8260C | 34798 |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | 8260C | 34798 |

### Prep Batch: 34798

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | 5035 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 5035 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | 5035 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | 5035 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 5035 | |
| MB 870-34798/3-A | Method Blank | Total/NA | Solid | 5035 | |
| LCS 870-34798/1-A | Lab Control Sample | Total/NA | Solid | 5035 | |
| LCSD 870-34798/2-A | Lab Control Sample Dup | Total/NA | Solid | 5035 | |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | 5035 | |

## GC/MS Semi VOA

### Analysis Batch: 288963

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 8270E | 288981 |

### Prep Batch: 288981

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 3546 | |
| MB 860-288981/1-A | Method Blank | Total/NA | Solid | 3546 | |
| LCS 860-288981/2-A | Lab Control Sample | Total/NA | Solid | 3546 | |
| LCSD 860-288981/3-A | Lab Control Sample Dup | Total/NA | Solid | 3546 | |
| LCSD 860-288981/5-A | Lab Control Sample Dup | Total/NA | Solid | 3546 | |
| 860-122968-J-3-B MS | Matrix Spike | Total/NA | Solid | 3546 | |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 3546 | |

### Analysis Batch: 289133

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| LCS 860-288981/2-A | Lab Control Sample | Total/NA | Solid | 8270E | 288981 |
| LCSD 860-288981/3-A | Lab Control Sample Dup | Total/NA | Solid | 8270E | 288981 |
| LCSD 860-288981/5-A | Lab Control Sample Dup | Total/NA | Solid | 8270E | 288981 |

# QC Association Summary



## GC/MS Semi VOA

### Analysis Batch: 289497

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| MB 860-288981/1-A | Method Blank | Total/NA | Solid | 8270E | 288981 |
| 860-122968-J-3-B MS | Matrix Spike | Total/NA | Solid | 8270E | 288981 |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 8270E | 288981 |

## GC Semi VOA

### Prep Batch: 34808

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX_1005_S_Prep | |
| MB 870-34808/3-A | Method Blank | Total/NA | Solid | TX_1005_S_Prep | |
| LCS 870-34808/1-A | Lab Control Sample | Total/NA | Solid | TX_1005_S_Prep | |
| LCSD 870-34808/2-A | Lab Control Sample Dup | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-1 MSD | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |

### Analysis Batch: 34830

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX 1005 | 34808 |
| MB 870-34808/3-A | Method Blank | Total/NA | Solid | TX 1005 | 34808 |
| LCS 870-34808/1-A | Lab Control Sample | Total/NA | Solid | TX 1005 | 34808 |
| LCSD 870-34808/2-A | Lab Control Sample Dup | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-1 MSD | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## GC Semi VOA

### Analysis Batch: 34876

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX 1005 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX 1005 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX 1005 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX 1005 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX 1005 | |

## HPLC/IC

### Analysis Batch: 287702

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 300.0 | 287869 |
| MB 860-287869/1-A | Method Blank | Total/NA | Solid | 300.0 | 287869 |
| LCS 860-287869/2-A | Lab Control Sample | Total/NA | Solid | 300.0 | 287869 |
| LCSD 860-287869/3-A | Lab Control Sample Dup | Total/NA | Solid | 300.0 | 287869 |
| 820-22982-D-1-B MS | Matrix Spike | Total/NA | Solid | 300.0 | 287869 |
| 820-22982-D-1-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 300.0 | 287869 |

### Prep Batch: 287869

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 300_Prep | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 300_Prep | |
| MB 860-287869/1-A | Method Blank | Total/NA | Solid | 300_Prep | |
| LCS 860-287869/2-A | Lab Control Sample | Total/NA | Solid | 300_Prep | |
| LCSD 860-287869/3-A | Lab Control Sample Dup | Total/NA | Solid | 300_Prep | |
| 820-22982-D-1-B MS | Matrix Spike | Total/NA | Solid | 300_Prep | |
| 820-22982-D-1-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 300_Prep | |

## Metals

### Prep Batch: 287918

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 3051A | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 3051A | |
| MB 860-287918/1-A | Method Blank | Total/NA | Solid | 3051A | |
| LCS 860-287918/2-A | Lab Control Sample | Total/NA | Solid | 3051A | |

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Metals (Continued)

### Prep Batch: 287918 (Continued)

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| LCSD 860-287918/3-A | Lab Control Sample Dup | Total/NA | Solid | 3051A | |

### Analysis Batch: 288184

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 6020B | 287918 |
| MB 860-287918/1-A | Method Blank | Total/NA | Solid | 6020B | 287918 |
| LCS 860-287918/2-A | Lab Control Sample | Total/NA | Solid | 6020B | 287918 |
| LCSD 860-287918/3-A | Lab Control Sample Dup | Total/NA | Solid | 6020B | 287918 |

## General Chemistry

### Analysis Batch: 34815

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | Moisture - 2540 | |
| MB 870-34815/1 | Method Blank | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-13 DU | SB-06 (6'-7') | Total/NA | Solid | Moisture - 2540 | |

### Leach Batch: 34843

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-3 | SB-02 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-5 | SB-03 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-8 | SB-04 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-10 | SB-05 (2'-3') | Soluble | Solid | DI Leach | |
| 870-43022-13 | SB-06 (6'-7') | Soluble | Solid | DI Leach | |
| 870-43022-13 DU | SB-06 (6'-7') | Soluble | Solid | DI Leach | |

### Analysis Batch: 34848

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-3 | SB-02 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-5 | SB-03 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-8 | SB-04 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-10 | SB-05 (2'-3') | Soluble | Solid | 9045D | 34843 |
| 870-43022-13 | SB-06 (6'-7') | Soluble | Solid | 9045D | 34843 |
| 870-43022-13 DU | SB-06 (6'-7') | Soluble | Solid | 9045D | 34843 |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-01 (3'-4')**
**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-1**
**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 00:04 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.03 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.03 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

**Client Sample ID: SB-01 (3'-4')**
**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-1**
**Matrix: Solid**
**Percent Solids: 89.5**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.107 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/12/26 22:16 | MC | EET DAL |
| Total/NA | Prep | 3546 | | | 5.2 g | 5 mL | 288981 | 01/19/26 04:51 | TH | EET HOU |
| Total/NA | Analysis | 8270E | | 1 | 1 mL | 1 mL | 288963 | 01/19/26 15:39 | DB | EET HOU |
| Total/NA | Prep | TX_1005_S_Prep | | | 12.948 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 00:04 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.01 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 20:57 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:47 | DP | EET HOU |

**Client Sample ID: SB-02 (3'-4')**
**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-3**
**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 01:30 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.02 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.02 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

**Client Sample ID: SB-02 (3'-4')**
**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-3**
**Matrix: Solid**
**Percent Solids: 82.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 4.731 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/12/26 23:20 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.733 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 01:30 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.05 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:06 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:43 | DP | EET HOU |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**
**Date Collected: 01/09/26 11:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 01:51 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.06 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.06 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**
**Date Collected: 01/09/26 11:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 88.9**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 7.113 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 00:02 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 13.068 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 01:51 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.04 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:15 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:40 | DP | EET HOU |

## Client Sample ID: SB-03 (5'-6')

**Lab Sample ID: 870-43022-6**
**Date Collected: 01/09/26 11:30**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 02:12 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-03 (5'-6')

**Lab Sample ID: 870-43022-6**
**Date Collected: 01/09/26 11:30**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 91.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.627 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 00:23 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.76 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 02:12 | AGB | EET DAL |

## Client Sample ID: SB-04 (3'-4')

**Lab Sample ID: 870-43022-8**
**Date Collected: 01/09/26 12:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 02:34 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.08 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.08 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-04 (3'-4')

**Lab Sample ID: 870-43022-8**

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-04 (3'-4')

**Lab Sample ID: 870-43022-8**

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 95.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.015 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 01:06 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.85 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 02:34 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.03 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:24 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:36 | DP | EET HOU |

## Client Sample ID: SB-05 (2'-3')

**Lab Sample ID: 870-43022-10**

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:16 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.08 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.08 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-05 (2'-3')

**Lab Sample ID: 870-43022-10**

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.0**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.224 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 01:48 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 15.774 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:16 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.00 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:33 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:33 | DP | EET HOU |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (8'-9')

**Lab Sample ID: 870-43022-11**
**Date Collected: 01/09/26 13:55**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:38 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-05 (8'-9')

**Lab Sample ID: 870-43022-11**
**Date Collected: 01/09/26 13:55**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.01 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:09 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 13.38 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:38 | AGB | EET DAL |

## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:59 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.241 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:31 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 14.521 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:59 | AGB | EET DAL |

## Client Sample ID: SB-06 (6'-7')

**Lab Sample ID: 870-43022-13**
**Date Collected: 01/09/26 14:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 04:20 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.04 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.04 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-06 (6'-7')**
**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-13**
**Matrix: Solid**
**Percent Solids: 90.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.614 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:52 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 10.339 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 04:20 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.041 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:42 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:30 | DP | EET HOU |

**Laboratory References:**

EET DAL = Eurofins Dallas, 9701 Harry Hines Blvd, Dallas, TX 75220, TEL (214)902-0300
EET HOU = Eurofins Houston, 4145 Greenbriar Dr, Stafford, TX 77477, TEL (281)240-4200

# Accreditation/Certification Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Laboratory: Eurofins Dallas

Unless otherwise noted, all analytes for this laboratory were covered under each accreditation/certification below.

| Authority | Program | Identification Number | Expiration Date |
|---|---|---|---|
| Texas | NELAP | T104704295 | 06-30-26 |

The following analytes are included in this report, but the laboratory is not certified by the governing authority. This list may include analytes for which the agency does not offer certification.

| Analysis Method | Prep Method | Matrix | Analyte |
|---|---|---|---|
| 9045D | | Solid | Temperature |
| Moisture - 2540 | | Solid | Percent Moisture |

## Laboratory: Eurofins Houston

The accreditations/certifications listed below are applicable to this report.

| Authority | Program | Identification Number | Expiration Date |
|---|---|---|---|
| Texas | NELAP | T104704215 | 06-30-26 |

# Method Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

| Method | Method Description | Protocol | Laboratory |
|---|---|---|---|
| 8260C | Volatile Organic Compounds by GC/MS | SW846 | EET DAL |
| 8270E | Semivolatile Organic Compounds (GC-MS/MS) | SW846 | EET HOU |
| TX 1005 | Texas - Total Petroleum Hydrocarbon (GC) | TCEQ | EET DAL |
| 300.0 | Anions, Ion Chromatography | EPA | EET HOU |
| 6020B | Metals (ICP/MS) | SW846 | EET HOU |
| 9045D | pH | SW846 | EET DAL |
| Moisture - 2540 | Percent Moisture | SM | EET DAL |
| 300_Prep | Anions, Ion Chromatography, 10% Wt/Vol | EPA | EET HOU |
| 3051A | Preparation, Metals, Microwave Assisted | SW846 | EET HOU |
| 3546 | Microwave Extraction | SW846 | EET HOU |
| 5035 | Closed System Purge and Trap | SW846 | EET DAL |
| DI Leach | Deionized Water Leaching Procedure | ASTM | EET DAL |
| TX_1005_S_Prep | Extraction - Texas Total petroleum Hyrdocarbons | TCEQ | EET DAL |

**Protocol References:**

ASTM = ASTM International
EPA = US Environmental Protection Agency
SM = "Standard Methods For The Examination Of Water And Wastewater"
SW846 = "Test Methods For Evaluating Solid Waste, Physical/Chemical Methods", Third Edition, November 1986 And Its Updates.
TCEQ = Texas Commission of Environmental Quality

**Laboratory References:**

EET DAL = Eurofins Dallas, 9701 Harry Hines Blvd, Dallas, TX 75220, TEL (214)902-0300
EET HOU = Eurofins Houston, 4145 Greenbriar Dr, Stafford, TX 77477, TEL (281)240-4200

# Sample Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

| Lab Sample ID | Client Sample ID | Matrix | Collected | Received | Sample Origin |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Solid | 01/09/26 10:05 | 01/10/26 09:15 | Texas |
| 870-43022-3 | SB-02 (3'-4') | Solid | 01/09/26 11:00 | 01/10/26 09:15 | Texas |
| 870-43022-5 | SB-03 (3'-4') | Solid | 01/09/26 11:20 | 01/10/26 09:15 | Texas |
| 870-43022-6 | SB-03 (5'-6') | Solid | 01/09/26 11:30 | 01/10/26 09:15 | Texas |
| 870-43022-8 | SB-04 (3'-4') | Solid | 01/09/26 12:20 | 01/10/26 09:15 | Texas |
| 870-43022-10 | SB-05 (2'-3') | Solid | 01/09/26 13:50 | 01/10/26 09:15 | Texas |
| 870-43022-11 | SB-05 (8'-9') | Solid | 01/09/26 13:55 | 01/10/26 09:15 | Texas |
| 870-43022-12 | SB-06 (2'-3') | Solid | 01/09/26 14:10 | 01/10/26 09:15 | Texas |
| 870-43022-13 | SB-06 (6'-7') | Solid | 01/09/26 14:20 | 01/10/26 09:15 | Texas |

eurofins | Environment Testing

# Chain of Custody

Houston, TX (281) 240-4200, Dallas, TX (214) 902-0300
Midland, TX (432) 704-5440, San Antonio, TX (210) 509-3334
EL Paso, TX (915) 585-3443, Lubbock, TX (806) 794-1296
Hobbs, NM (575) 392-7550, Carlsbad, NM (575) 988-3199
Little Rock, AR (501) 224-5060

Work Order No: ______

Page 1 of 2

| | | | |
|---|---|---|---|
| Project Manager: | Danielle Fehrenbach | Bill to: (if different) | Tera Burns |
| Company Name: | Whitehead ES | Company Name: | → |
| Address: | 906 E 18th St, Ste 100 | Address: | → |
| City, State ZIP: | Plano, TX 75074 | City, State ZIP: | → |
| Phone: | (469) 609-8080 | Email: | tburns@whiteheades.com |

**Work Order Comments**

Program: UST/PST ☐ PRP ☐ Brownfields ☐ RRC ☐ Superfund ☐
State of Project:
Reporting: Level II ☐ Level III ☐ PST/UST ☐ TRRP ☒ Level IV ☐
Deliverables: EDD ☒ ADaPT ☐ Other:

| | | | |
|---|---|---|---|
| Project Name: | Cresson Moon Props | Turn Around | ☐ Routine ☒ Rush |
| Project Number: | 379.001 | | |
| Project Location: | Cresson, TX | Due Date: | 1/14/26 |
| Sampler's Name: | CK/EM | TAT starts the day received by the lab, if received by 4:30pm | |
| PO #: | | | |

| SAMPLE RECEIPT | Temp Blank: | Yes No | Wet Ice: | Yes No |
|---|---|---|---|---|
| Samples Received Intact: | Yes No | Thermometer ID: | | |
| Cooler Custody Seals: | Yes No N/A | Correction Factor: | | |
| Sample Custody Seals: | Yes No N/A | Temperature Reading: | | |
| Total Containers: | | Corrected Temperature: | | |

ANALYSIS REQUEST — Pres. Code: Me+Ct+Di →

Preservative Codes: None: NO; DI Water: $H_2O$; Zn Acetate+NaOH: Zn; NaOH+Ascorbic Acid: SAPC

870-43022 Chain of Custody

| Sample Identification | Matrix | Date Sampled | Time Sampled | Depth | Grab/Comp | # of Cont | TPH TX1005 | VOCs 8260 | BTEX 8260 | PAH 8270 | Ba 6010/6020 | Cl 300.0 | pH 9045D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SB-01 (3'-4') | S | 1/9 | 10:05 | 3-4 | G | 8 | X | X | | Hold | X | X | X |
| SB-01 (19') | ↓ | ↓ | 10:35 | 19' | ↓ | 8 | Hold → | | | | | | |
| SB-02 (3'-4') | ↓ | ↓ | 11:00 | 3-4' | ↓ | 8 | X | X | | | X | X | X |
| SB-02 (8-9') | ↓ | ↓ | 11:10 | 8-9' | ↓ | 8 | Hold → | | | | | | |
| SB-03 (3-4') | ↓ | ↓ | 11:20 | 3-4' | ↓ | 8 | X | X | | | X | X | X |
| SB-03 (5-6') | ↓ | ↓ | 11:30 | 5-6' | ↓ | 7 | X | [crossed out] | X | | | | |
| SB-03 (15') | ↓ | ↓ | 11:40 | 15' | ↓ | 7 | Hold → | | | | | | |
| SB-04 (3-4') | ↓ | ↓ | 12:20 | 3-4' | ↓ | 8 | X | X | | | X | X | X |
| SB-04 (24') | ↓ | ↓ | 13:00 | 24' | ↓ | 7 | Hold → | | | | | | |
| SB-05 (2-3') | ↓ | ↓ | 13:50 | 2-3' | ↓ | 8 | X | X | | ↓ | X | X | X |

EM NFE 1/9/26

Sample Comments: Hold trip blank. Hold all samples for PAH. Hold SB-01 (19'), SB-03 (15'), SB-02 (8-9'), SB-04 (24'). SB-03 (5-6') run for BTEX, not full suite.

Total 200.7 / 6010 200.8 / 6020: 8RCRA 13PPM Texas 11 Al Sb As Ba Be B Cd Ca Cr Co Cu Fe Pb Mg Mn Mo Ni K Se Ag $SiO_2$ Na Sr Tl Sn U V Zn
Circle Method(s) and Metal(s) to be analyzed TCLP / SPLP 6010: 8RCRA Sb As Ba Be Cd Cr Co Cu Pb Mn Mo Ni Se Ag Tl U Hg: 1631 / 245.1 / 7470 / 7471

**Notice: Signature of this document and relinquishment of samples constitutes a valid purchase order from client company to Eurofins Xenco, its affiliates and subcontractors. It assigns standard terms and conditions of service. Eurofins Xenco will be liable only for the cost of samples and shall not assume any responsibility for any losses or expenses incurred by the client if such losses are due to circumstances beyond the control of Eurofins Xenco. A minimum charge of $85.00 will be applied to each project and a charge of $5 for each sample submitted to Eurofins Xenco, but not analyzed. These terms will be enforced unless previously negotiated.**

| Relinquished by: (Signature) | Received by: (Signature) | Date/Time | Relinquished by: (Signature) | Received by: (Signature) | Date/Time |
|---|---|---|---|---|---|
| 1 [signature] | [signature] | 1/10 0915 | 2 [signature] | [signature] | 1/10/26 915 |
| 3 | | | 4 | | |
| 5 | | | 6 | | |

THM-035 C/F -0.1 4.8/4.7

Revised Date: 08/25/2020 Rev. 2020.2

eurofins | Environment Testing

# Chain of Custody

Houston, TX (281) 240-4200, Dallas, TX (214) 902-0300
Midland, TX (432) 704-5440, San Antonio, TX (210) 509-3334
EL Paso, TX (915) 585-3443, Lubbock, TX (806) 794-1296
Hobbs, NM (575) 392-7550, Carlsbad, NM (575) 988-3199
Little Rock, AR (501) 224-5060

Work Order No: ____________

Page 2 of 2

| | | | |
|---|---|---|---|
| Project Manager: | D. Fehrenbach | Bill to: (if different) | Tera Burns |
| Company Name: | Whitehead ES → | Company Name: | → |
| Address: | 9000 E 18th St, Ste 100 → | Address: | → |
| City, State ZIP: | Plano, TX 75074 → | City, State ZIP: | → |
| Phone: | (469) 609-8080 | Email: | tburns@whiteheades.com |

**Work Order Comments**

Program: UST/PST ☐ PRP ☐ Brownfields ☐ RRC ☐ Superfund ☐
State of Project:
Reporting: Level II ☐ Level III ☐ PST/UST ☐ TRRP ☒ Level IV ☐
Deliverables: EDD ☒ ADaPT ☐ Other:

| | | | |
|---|---|---|---|
| Project Name: | Cresson Moon Prop | Turn Around | |
| Project Number: | 379.001 | ☐ Routine ☑ Rush | Pres. Code |
| Project Location: | Cresson, TX | Due Date: 1/14/26 | |
| Sampler's Name: | CK/EM | TAT starts the day received by the lab, if received by 4:30pm | |
| PO #: | | | |

| SAMPLE RECEIPT | Temp Blank: | Yes No | Wet Ice: | Yes No |
|---|---|---|---|---|
| Samples Received Intact: | Yes No | Thermometer ID: | | |
| Cooler Custody Seals: | Yes No N/A | Correction Factor: | | |
| Sample Custody Seals: | Yes No N/A | Temperature Reading: | | |
| Total Containers: | | Corrected Temperature: | | |

**ANALYSIS REQUEST** (Pres. Code: Me+C+Di →)

| Sample Identification | Matrix | Date Sampled | Time Sampled | Depth | Grab/ Comp | # of Cont | TPH TX1005 | VOCs 8260 | BTEX 8260 | PAH 8270 | Ba 6010/6020 | Cl 300.0 | pH 9045D | Sample Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SB-05 (8-9') | S | 1/9 | 13:55 | 8-9' | G | 7 | X | | X | Hold | | | | Hold trip blank |
| SB-06 (2-3') | ↓ | ↓ | 14:10 | 2-3' | ↓ | 8 | X | | X | ↓ | | | | Hold all samples for PAH |
| SB-06 (6-7') | ↓ | ↓ | 14:20 | 6-7' | ↓ | 7 | X | X | | ↓ | X | X | X | |
| Trip Blank | ↓ | — | — | — | — | 2 | Hold → | | | | | | | |

NFE EM 1/9/26

**Preservative Codes**

None: NO — DI Water: $H_2O$
Cool: Cool — MeOH: Me
HCL: HC — $HNO_3$
$H_2SO_4$: $H_2$ — NaOH: Na
$H_3PO_4$: HP
$NaHSO_4$: NABIS
$Na_2S_2O_3$: $NaSO_3$
Zn Acetate+NaOH: Zn
NaOH+Ascorbic Acid: SAPC

**Total 200.7 / 6010 200.8 / 6020:** 8RCRA 13PPM Texas 11 Al Sb As Ba Be B Cd Ca Cr Co Cu Fe Pb Mg Mn Mo Ni K Se Ag $SiO_2$ Na Sr Tl Sn U V Zn

Circle Method(s) and Metal(s) to be analyzed **TCLP / SPLP 6010:** 8RCRA Sb As Ba Be Cd Cr Co Cu Pb Mn Mo Ni Se Ag Tl U Hg: 1631 / 245.1 / 7470 / 7471

**Notice: Signature of this document and relinquishment of samples constitutes a valid purchase order from client company to Eurofins Xenco, its affiliates and subcontractors. It assigns standard terms and conditions of service. Eurofins Xenco will be liable only for the cost of samples and shall not assume any responsibility for any losses or expenses incurred by the client if such losses are due to circumstances beyond the control of Eurofins Xenco. A minimum charge of $85.00 will be applied to each project and a charge of $5 for each sample submitted to Eurofins Xenco, but not analyzed. These terms will be enforced unless previously negotiated.**

| Relinquished by: (Signature) | Received by: (Signature) | Date/Time | Relinquished by: (Signature) | Received by: (Signature) | Date/Time |
|---|---|---|---|---|---|
| 1 Elena Muir | [signature] | 1/10; 09:15 | 2 | [signature] | 1/10/26 9:15 |
| 3 | | | 4 | | |
| 5 | | | 6 | | |

Revised Date: 08/25/2020 Rev. 2020.2

Eurofins Dallas
9701 Harry Hines Blvd
Dallas, TX 75220
Phone: 214-902-0300

# Chain of Custody Record

eurofins | Environment Testing

| Client Information (Sub Contract Lab) | Sampler: N/A | Lab PM: Kimmel, Mike M | Carrier Tracking No(s): N/A | COC No: 870-9754.1 |
|---|---|---|---|---|
| Client Contact: Shipping/Receiving | Phone: N/A | E-Mail: Mike.Kimmel@et.eurofinsus.com | State of Origin: Texas | Page: Page 1 of 2 |
| Company: Eurofins Environment Testing South Centr | | Accreditations Required (See note): NELAP Texas | | Job #: 870-43022-1 |
| Address: 4145 Greenbriar Dr | Due Date Requested: 1/14/2026 | Analysis Requested | | Preservation Codes: |
| City: Stafford | TAT Requested (days): N/A | | | |
| State, Zip: TX, 77477 | | | | |
| Phone: 281-240-4200(Tel) | PO #: N/A | | | |
| Email: N/A | WO #: N/A | | | |
| Project Name: Cresson Moon Props | Project #: 87000328 | | | Other: N/A |
| Site: N/A | SSOW#: N/A | | | |

| Sample Identification Client ID (Lab ID) | Sample Date | Sample Time | Sample Type (C=Comp, G=grab) | Matrix (W=water S=solid, O=waste/oil, BT=Tissue, A=Air) | Field Filtered Sample (Yes or No) | Perform MS/MSD (Yes or No) | 8270E_QQQ/3546(MOD) Polycyclic Aromatic Hydrocarbons ( (Hold) | 6020B/3051A(MOD) 6020- Pb | 300_ORGFM_28D/300_PrepChloride-E300 | 6020B/3051A(MOD) 6020- Pb (Hold) | 300_ORGFM_28D/300_PrepChloride-E300 (Hold) | Total Number of containers | Special Instructions/Note: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Preservation Code: | | | | | | | | | | |
| SB-01 (3'-4') (870-43022-1) | 1/9/26 | 10:05 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-01 (19') (870-43022-2) | 1/9/26 | 10:35 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-02 (3'-4') (870-43022-3) | 1/9/26 | 11:00 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-02 (8'-9') (870-43022-4) | 1/9/26 | 11 10 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-03 (3'-4') (870-43022-5) | 1/9/26 | 11:20 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-03 (5'-6') (870-43022-6) | 1/9/26 | 11:30 Central | G | Solid | | | X | | | | | 1 | |
| SB-03 (15') (870-43022-7) | 1/9/26 | 11:40 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-04 (3'-4') (870-43022-8) | 1/9/26 | 12:20 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-04 (24') (870-43022-9) | 1/9/26 | 13:00 Central | G | Solid | | | X | | | X | X | 1 | |

Note: Since laboratory accreditations are subject to change, Eurofins Environment Testing South Central, LLC places the ownership of method, analyte & accreditation compliance upon our subcontract laboratories. This sample shipment is forwarded under chain-of-custody. If the laboratory does not currently maintain accreditation in the State of Origin listed above for analysis/tests/matrix being analyzed, the samples must be shipped back to the Eurofins Environment Testing South Central, LLC laboratory or other instructions will be provided. Any changes to accreditation status should be brought to Eurofins Environment Testing South Central, LLC attention immediately. If all requested accreditations are current to date, return the signed Chain of Custody attesting to said compliance to Eurofins Environment Testing South Central, LLC.

| | | | | | |
|---|---|---|---|---|---|
| *Possible Hazard Identification* Unconfirmed | | *Sample Disposal ( A fee may be assessed if samples are retained longer than 1 month)* ☐ *Return To Client* ☐ *Disposal By Lab* ☐ *Archive For ______ Months* | | | |
| Deliverable Requested: I, II III, IV Other (specify) | Primary Deliverable Rank: 2 | Special Instructions/QC Requirements: | | | |
| Empty Kit Relinquished by: | Date: | Time: | Method of Shipment: | | |
| Relinquished by: [signature] | Date/Time: | Company | Received by: DS | Date/Time: 1/13 | Company |
| Relinquished by: | Date/Time: | Company | Received by: | Date/Time: | Company |
| Relinquished by: | Date/Time: 01/12/26-1710 | Company | Received by: | Date/Time: | Company |
| Custody Seals Intact: Δ Yes Δ No | Custody Seal No. | | Cooler Temperature(s) °C and Other Remarks: HOU368 2.0 | | |

Ver: 10/10/2024

# Login Sample Receipt Checklist

Client: Whitehead ES LLC

Job Number: 870-43022-1
SDG Number: 379.001

**Login Number: 43022**
**List Number: 1**
**Creator: Virani, Tycho L**

**List Source: Eurofins Dallas**

| Question | Answer | Comment |
|---|---|---|
| The cooler's custody seal, if present, is intact. | N/A | |
| Sample custody seals, if present, are intact. | N/A | |
| The cooler or samples do not appear to have been compromised or tampered with. | True | |
| Samples were received on ice. | True | |
| Cooler Temperature is acceptable. | True | |
| Cooler Temperature is recorded. | True | |
| COC is present. | True | |
| COC is filled out in ink and legible. | True | |
| COC is filled out with all pertinent information. | True | |
| Is the Field Sampler's name present on COC? | True | |
| There are no discrepancies between the containers received and the COC. | True | |
| Samples are received within Holding Time (excluding tests with immediate HTs) | False | Refer to Job Narrative for details. |
| Sample containers have legible labels. | True | |
| Containers are not broken or leaking. | True | |
| Sample collection date/times are provided. | True | |
| Appropriate sample containers are used. | True | |
| Sample bottles are completely filled. | True | |
| Sample Preservation Verified. | True | |
| There is sufficient vol. for all requested analyses, incl. any requested MS/MSDs | True | |
| Containers requiring zero headspace have no headspace or bubble is <6mm (1/4"). | True | |

# Login Sample Receipt Checklist

Client: Whitehead ES LLC

Job Number: 870-43022-1
SDG Number: 379.001

**Login Number: 43022**
**List Number: 2**
**Creator: Silva, Daniel**

**List Source: Eurofins Houston**
**List Creation: 01/13/26 09:27 AM**

| Question | Answer | Comment |
|---|---|---|
| The cooler's custody seal, if present, is intact. | True | |
| Sample custody seals, if present, are intact. | N/A | |
| The cooler or samples do not appear to have been compromised or tampered with. | True | |
| Samples were received on ice. | True | |
| Cooler Temperature is acceptable. | True | |
| Cooler Temperature is recorded. | True | |
| COC is present. | True | |
| COC is filled out in ink and legible. | True | |
| COC is filled out with all pertinent information. | True | |
| Is the Field Sampler's name present on COC? | True | |
| There are no discrepancies between the containers received and the COC. | True | |
| Samples are received within Holding Time (excluding tests with immediate HTs) | True | |
| Sample containers have legible labels. | True | |
| Containers are not broken or leaking. | True | |
| Sample collection date/times are provided. | True | |
| Appropriate sample containers are used. | True | |
| Sample bottles are completely filled. | True | |
| Sample Preservation Verified. | True | |
| There is sufficient vol. for all requested analyses, incl. any requested MS/MSDs | True | |
| Containers requiring zero headspace have no headspace or bubble is <6mm (1/4"). | True | |

# Detection Check Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 5035-Closed System Purge and Trap**
**Instrument: A375** **Detector: MSD/0** **Column: DB-624-20m**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Benzene | 0.00101 | 0.000991 | J | mg/Kg | 0.00200 | 0.000502 | 09/11/2025 | 870-31690 |
| tert-Butylbenzene | 0.00101 | 0.000912 | J | mg/Kg | 0.00200 | 0.000513 | 09/11/2025 | 870-31690 |
| Carbon tetrachloride | 0.00101 | 0.000718 | J | mg/Kg | 0.00200 | 0.000443 | 09/11/2025 | 870-31690 |
| MTBE | 0.00101 | 0.00108 | J | mg/Kg | 0.00200 | 0.000586 | 09/11/2025 | 870-31690 |
| Chlorobenzene | 0.00101 | 0.000937 | J | mg/Kg | 0.00200 | 0.000507 | 09/11/2025 | 870-31690 |
| Chloroethane | 0.00100 | 0.000780 | J | mg/Kg | 0.00200 | 0.000453 | 09/11/2025 | 870-31690 |
| Chloroform | 0.00100 | <0.000474 | U | mg/Kg | 0.00200 | 0.000474 | 07/21/2025 | 870-30229 |
| Chloromethane | 0.00100 | 0.000940 | J | mg/Kg | 0.00200 | 0.000549 | 09/11/2025 | 870-31690 |
| 2-Chlorotoluene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000272 | 09/11/2025 | 870-31690 |
| 4-Chlorotoluene | 0.00101 | 0.000982 | J | mg/Kg | 0.00200 | 0.000608 | 09/11/2025 | 870-31690 |
| p-Cymene (p-Isopropyltoluene) | 0.00101 | <0.00140 | U | mg/Kg | 0.00500 | 0.00140 | 09/11/2025 | 870-31690 |
| Dibromochloromethane | 0.00101 | 0.000861 | J | mg/Kg | 0.00200 | 0.000174 | 09/11/2025 | 870-31690 |
| Bromobenzene | 0.00101 | 0.000870 | J | mg/Kg | 0.00200 | 0.000805 | 09/11/2025 | 870-31690 |
| Toluene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000560 | 09/11/2025 | 870-31690 |
| 1,2-Dibromo-3-Chloropropane | 0.00101 | <0.00109 | U | mg/Kg | 0.00500 | 0.00109 | 09/11/2025 | 870-31690 |
| 1,2-Dibromoethane | 0.00101 | 0.00106 | J | mg/Kg | 0.00200 | 0.000618 | 09/11/2025 | 870-31690 |
| Dibromomethane | 0.00101 | 0.00113 | J | mg/Kg | 0.00200 | 0.000314 | 09/11/2025 | 870-31690 |
| 1,2-Dichlorobenzene | 0.00100 | 0.000997 | J | mg/Kg | 0.00200 | 0.000395 | 09/11/2025 | 870-31690 |
| 1,3-Dichlorobenzene | 0.00101 | 0.000997 | J | mg/Kg | 0.00200 | 0.000499 | 09/11/2025 | 870-31690 |
| 1,4-Dichlorobenzene | 0.00101 | 0.00110 | J | mg/Kg | 0.00200 | 0.000496 | 09/11/2025 | 870-31690 |
| Dichlorodifluoromethane | 0.00101 | <0.000544 | U | mg/Kg | 0.00200 | 0.000544 | 09/11/2025 | 870-31690 |
| 1,1-Dichloroethane | 0.00101 | 0.000895 | J | mg/Kg | 0.00200 | 0.000567 | 09/11/2025 | 870-31690 |
| 1,2-Dichloroethane | 0.00101 | 0.00104 | J | mg/Kg | 0.00200 | 0.000367 | 09/11/2025 | 870-31690 |
| 1,1-Dichloroethene | 0.00101 | 0.000640 | J | mg/Kg | 0.00200 | 0.000456 | 09/11/2025 | 870-31690 |
| Bromochloromethane | 0.00101 | 0.000886 | J | mg/Kg | 0.00200 | 0.000632 | 09/11/2025 | 870-31690 |
| Ethylbenzene | 0.00101 | 0.00104 | J | mg/Kg | 0.00200 | 0.000387 | 09/11/2025 | 870-31690 |
| cis-1,2-Dichloroethene | 0.00101 | <0.000506 | U | mg/Kg | 0.00200 | 0.000506 | 09/11/2025 | 870-31690 |
| trans-1,2-Dichloroethene | 0.00101 | 0.000862 | J | mg/Kg | 0.00200 | 0.000462 | 09/11/2025 | 870-31690 |
| 1,2-Dichloropropane | 0.00101 | 0.000956 | J | mg/Kg | 0.00200 | 0.000586 | 09/11/2025 | 870-31690 |
| 1,3-Dichloropropane | 0.00101 | 0.000994 | J | mg/Kg | 0.00200 | 0.000334 | 09/11/2025 | 870-31690 |
| 2,2-Dichloropropane | 0.00101 | 0.000880 | J | mg/Kg | 0.00200 | 0.000592 | 09/11/2025 | 870-31690 |
| 1,1-Dichloropropene | 0.00101 | 0.000863 | J | mg/Kg | 0.00200 | 0.000308 | 09/11/2025 | 870-31690 |
| cis-1,3-Dichloropropene | 0.00100 | 0.000974 | J | mg/Kg | 0.00200 | 0.000618 | 09/11/2025 | 870-31690 |
| trans-1,3-Dichloropropene | 0.00101 | 0.000843 | J | mg/Kg | 0.00200 | 0.000510 | 09/11/2025 | 870-31690 |
| Hexachlorobutadiene | 0.00101 | 0.000632 | J | mg/Kg | 0.00200 | 0.000551 | 09/11/2025 | 870-31690 |
| Bromodichloromethane | 0.00101 | 0.000813 | J | mg/Kg | 0.00200 | 0.000653 | 09/11/2025 | 870-31690 |
| m,p-Xylenes | 0.00100 | 0.000539 | J | mg/Kg | 0.00200 | 0.000228 | 09/11/2025 | 870-31690 |
| Isopropylbenzene | 0.00101 | 0.000902 | J | mg/Kg | 0.00200 | 0.000377 | 09/11/2025 | 870-31690 |
| Methylene Chloride | 0.00101 | 0.00141 | J | mg/Kg | 0.00500 | 0.00132 | 07/21/2025 | 870-30229 |
| Naphthalene | 0.00101 | 0.00115 | J | mg/Kg | 0.00200 | 0.000670 | 09/11/2025 | 870-31690 |
| N-Propylbenzene | 0.00101 | 0.000860 | J | mg/Kg | 0.00200 | 0.000516 | 09/11/2025 | 870-31690 |
| Styrene | 0.00101 | 0.00114 | J | mg/Kg | 0.00200 | 0.000517 | 09/11/2025 | 870-31690 |
| 1,1,1,2-Tetrachloroethane | 0.00101 | 0.000933 | J | mg/Kg | 0.00200 | 0.000460 | 09/11/2025 | 870-31690 |
| 1,1,2,2-Tetrachloroethane | 0.00101 | 0.00106 | J | mg/Kg | 0.00200 | 0.000684 | 09/11/2025 | 870-31690 |
| Tetrachloroethylene | 0.00101 | <0.000455 | U | mg/Kg | 0.00200 | 0.000455 | 09/11/2025 | 870-31690 |
| Bromoform | 0.00101 | <0.000896 | U | mg/Kg | 0.00200 | 0.000896 | 09/11/2025 | 870-31690 |
| o-Xylene | 0.00101 | 0.000872 | J | mg/Kg | 0.00200 | 0.000400 | 09/11/2025 | 870-31690 |
| 1,2,3-Trichlorobenzene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000452 | 09/11/2025 | 870-31690 |

Eurofins Dallas

# Detection Check Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 5035-Closed System Purge and Trap**
**Instrument: A375** **Detector: MSD/0** **Column: DB-624-20m**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| 1,2,4-Trichlorobenzene | 0.00101 | 0.000974 | J | mg/Kg | 0.00200 | 0.000721 | 09/11/2025 | 870-31690 |
| 1,1,1-Trichloroethane | 0.00100 | 0.000881 | J | mg/Kg | 0.00200 | 0.000500 | 09/11/2025 | 870-31690 |
| 1,1,2-Trichloroethane | 0.00100 | 0.00109 | J | mg/Kg | 0.00200 | 0.000676 | 09/11/2025 | 870-31690 |
| Trichloroethene | 0.00101 | 0.000877 | J | mg/Kg | 0.00200 | 0.000461 | 09/11/2025 | 870-31690 |
| Trichlorofluoromethane | 0.00100 | <0.000842 | U | mg/Kg | 0.00200 | 0.000842 | 09/11/2025 | 870-31690 |
| 1,2,3-Trichloropropane | 0.00101 | 0.000956 | J | mg/Kg | 0.00200 | 0.000585 | 09/11/2025 | 870-31690 |
| 1,2,4-Trimethylbenzene | 0.00101 | <0.000561 | U | mg/Kg | 0.00200 | 0.000561 | 09/11/2025 | 870-31690 |
| 1,3,5-Trimethylbenzene | 0.00101 | 0.000912 | J | mg/Kg | 0.00200 | 0.000554 | 09/11/2025 | 870-31690 |
| Bromomethane | 0.00101 | <0.00117 | U | mg/Kg | 0.00500 | 0.00117 | 09/11/2025 | 870-31690 |
| Xylenes, Total | 0.00201 | 0.00141 | J | mg/Kg | 0.00200 | 0.000400 | 09/11/2025 | 870-31690 |
| Vinyl chloride | 0.00101 | <0.00191 | U | mg/Kg | 0.00500 | 0.00191 | 09/11/2025 | 870-31690 |
| 2-Butanone | 0.0101 | 0.00802 | J | mg/Kg | 0.0500 | 0.00772 | 09/11/2025 | 870-31690 |
| n-Butylbenzene | 0.00101 | 0.000804 | J | mg/Kg | 0.00200 | 0.000335 | 09/11/2025 | 870-31690 |
| sec-Butylbenzene | 0.00101 | 0.000802 | J | mg/Kg | 0.00200 | 0.000535 | 09/11/2025 | 870-31690 |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: TX_1005_S_Prep-Extraction - Texas Total petroleum Hyrdocarbons**
**Instrument: A305** **Detector: FID/0** **Column: RXI1-MS**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 25.1 | <25.0 | U | mg/Kg | 50.0 | 25.0 | 09/12/2025 | 870-31693 |
| >C12-C28 Range Hydrocarbons | 25.1 | <25.0 | U | mg/Kg | 50.0 | 25.0 | 09/12/2025 | 870-31693 |

## Method: 300.0 - Anions, Ion Chromatography

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 300_Prep-Anions, Ion Chromatography, 10% Wt/Vol**
**Instrument: A263** **Detector: IC/0** **Column: AS-18**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Chloride | 5.00 | 5.19 | J | mg/Kg | 10.0 | 5.00 | 09/25/2025 | 860-264099 |

## Method: 6020B - Metals (ICP/MS)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 3051A-Preparation, Metals, Microwave Assisted**
**Instrument: A364** **Detector: MSD/0**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Barium | 0.300 | 0.28 | J | mg/Kg | 0.40 | 0.14 | 09/25/2025 | 860-264482 |

# Appendix A
# Laboratory Data Package Cover Page - Page 1 of 4



This data package is for Eurofins Dallas job number 870-43022-1 and consists of:

☑ R1 - Field chain-of-custody documentation;
☑ R2 - Sample identification cross-reference;
☑ R3 - Test reports (analytical data sheets) for each environmental sample that includes:
  a. Items consistent with NELAC Chapter 5,
  b. dilution factors,
  c. preparation methods,
  d. cleanup methods, and
  e. if required for the project, tentatively identified compounds (TICs).
☑ R4 - Surrogate recovery data including:
  a. Calculated recovery (%R), and
  b. The laboratory's surrogate QC limits.
☑ R5 - Test reports/summary forms for blank samples;
☑ R6 - Test reports/summary forms for laboratory control samples (LCSs) including:
  a. LCS spiking amounts,
  b. Calculated %R for each analyte, and
  c. The laboratory's LCS QC limits.
☑ R7 - Test reports for project matrix spike/matrix spike duplicates (MS/MSDs) including:
  a. Samples associated with the MS/MSD clearly identified,
  b. MS/MSD spiking amounts,
  c. Concentration of each MS/MSD analyte measured in the parent and spiked samples,
  d. Calculated %Rs and relative percent differences (RPDs), and
  e. The laboratory's MS/MSD QC limits
☑ R8 - Laboratory analytical duplicate (if applicable) recovery and precision:
  a. The amount of analyte measured in the duplicate,
  b. The calculated RPD, and
  c. The laboratory's QC limits for analytical duplicates.
☑ R9 - List of method quantitation limits (MQLs) and detectability check sample results for each analyte for each method and matrix.
☑ R10 - Other problems or anomalies.

The Exception Report for each "No" or "Not Reviewed (NR)" item in Laboratory Review Checklist and for each analyte, matrix, and method for which the laboratory does not hold NELAC accreditation under the Texas Laboratory Accreditation Program.

**Release Statement:** I am responsible for the release of this laboratory data package. This laboratory is NELAC accredited under the Texas Laboratory Accreditation Program for all the methods, analytes, and matrices reported in this data package except as noted in the Exception Reports. The data have been reviewed and are technically compliant with the requirements of the methods used, except where noted by the laboratory in the Exception Reports. By my signature below, I affirm to the best of my knowledge all problems/anomalies observed by the laboratory have been identified in the Laboratory Review Checklist, and no information affecting the quality of the data has been knowingly withheld.

| Mike Kimmel | [signature] | 1/21/2026 |
|---|---|---|
| Name (printed) | Signature | Date |

Project Manager
Official Title (printed)

# Laboratory Review Checklist: Reportable Data - Page 2 of 4



| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| #[1] | A[2] | Description | Yes | No | NA[3] | NR[4] | ER#[5] |
|---|---|---|---|---|---|---|---|
| **R1** | OI | **Chain-of-custody (C-O-C)** | | | | | |
| | | Did samples meet the laboratory's standard conditions of sample acceptability upon receipt? | X | | | | |
| | | Were all departures from standard conditions described in an exception report? | X | | | | |
| **R2** | OI | **Sample and quality control (QC) identification** | | | | | |
| | | Are all field sample ID numbers cross-referenced to the laboratory ID numbers? | X | | | | |
| | | Are all laboratory ID numbers cross-referenced to the corresponding QC data? | X | | | | |
| **R3** | OI | **Test reports** | | | | | |
| | | Were all samples prepared and analyzed within holding times? | | X | | | R03A |
| | | Other than those results < MQL, were all other raw values bracketed by calibration standards? | X | | | | |
| | | Were calculations checked by a peer or supervisor? | X | | | | |
| | | Were all analyte identifications checked by a peer or supervisor? | X | | | | |
| | | Were sample detection limits reported for all analytes not detected? | X | | | | |
| | | Were all results for soil and sediment samples reported on a dry weight basis? | X | | | | |
| | | Were % moisture (or solids) reported for all soil and sediment samples? | X | | | | |
| | | Were bulk soils/solids samples for volatile analysis extracted with methanol per SW846 Method 5035? | X | | | | |
| | | If required for the project, are TICs reported? | | | X | | |
| **R4** | O | **Surrogate recovery data** | | | | | |
| | | Were surrogates added prior to extraction? | X | | | | |
| | | Were surrogate percent recoveries in all samples within the laboratory QC limits? | | X | | | R04B |
| **R5** | OI | **Test reports/summary forms for blank samples** | | | | | |
| | | Were appropriate type(s) of blanks analyzed? | X | | | | |
| | | Were blanks analyzed at the appropriate frequency? | X | | | | |
| | | Were method blanks taken through the entire analytical process, including preparation and, if applicable, cleanup procedures? | X | | | | |
| | | Were blank concentrations < MQL? | X | | | | |
| **R6** | OI | **Laboratory control samples (LCS):** | | | | | |
| | | Were all COCs included in the LCS? | X | | | | |
| | | Was each LCS taken through the entire analytical procedure, including prep and cleanup steps? | X | | | | |
| | | Were LCSs analyzed at the required frequency? | X | | | | |
| | | Were LCS (and LCSD, if applicable) %Rs within the laboratory QC limits? | X | | | | |
| | | Does the detectability check sample data document the laboratory's capability to detect the COCs at the MDL used to calculate the SDLs? | X | | | | |
| | | Was the LCSD RPD within QC limits? | X | | | | |
| **R7** | OI | **Matrix spike (MS) and matrix spike duplicate (MSD) data** | | | | | |
| | | Were the project/method specified analytes included in the MS and MSD? | X | | | | |
| | | Were MS/MSD analyzed at the appropriate frequency? | X | | | | |
| | | Were MS (and MSD, if applicable) %Rs within the laboratory QC limits? | | X | | | R07C |
| | | Were MS/MSD RPDs within laboratory QC limits? | X | | | | |
| **R8** | OI | **Analytical duplicate data** | | | | | |
| | | Were appropriate analytical duplicates analyzed for each matrix? | X | | | | |
| | | Were analytical duplicates analyzed at the appropriate frequency? | X | | | | |
| | | Were RPDs or relative standard deviations within the laboratory QC limits? | X | | | | |
| **R9** | OI | **Method quantitation limits (MQLs):** | | | | | |
| | | Are the MQLs for each method analyte included in the laboratory data package? | X | | | | |
| | | Do the MQLs correspond to the concentration of the lowest non-zero calibration standard? | X | | | | |
| | | Are unadjusted MQLs and DCSs included in the laboratory data package? | X | | | | |
| **R10** | OI | **Other problems/anomalies** | | | | | |
| | | Are all known problems/anomalies/special conditions noted in this LRC and ER? | X | | | | |
| | | Was applicable and available technology used to lower the SDL to minimize the matrix interference effects on the sample results? | X | | | | |
| | | Is the laboratory NELAC-accredited under the Texas Laboratory Accreditation Program for the analytes, matrices and methods associated with this laboratory data package? | X | | | | |

1. Items identified by the letter "R" must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter "S" should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if "NR" or "No" is checked).

# Laboratory Review checklist: Supporting Data - Page 3 of 4



| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| #[1] | A[2] | Description | Yes | No | NA[3] | NR[4] | ER#[5] |
|---|---|---|---|---|---|---|---|
| **S1** | OI | **Initial calibration (ICAL)** | | | | | |
| | | Were response factors and/or relative response factors for each analyte within QC limits? | X | | | | |
| | | Were percent RSDs or correlation coefficient criteria met? | X | | | | |
| | | Was the number of standards recommended in the method used for all analytes? | X | | | | |
| | | Were all points generated between the lowest and highest standard used to calculate the curve? | X | | | | |
| | | Are ICAL data available for all instruments used? | X | | | | |
| | | Has the initial calibration curve been verified using an appropriate second source standard? | X | | | | |
| **S2** | OI | **Initial and continuing calibration verification (ICV and CCV) and continuing calibration blank (CCB):** | | | | | |
| | | Was the CCV analyzed at the method-required frequency? | X | | | | |
| | | Were percent differences for each analyte within the method-required QC limits? | X | | | | |
| | | Was the ICAL curve verified for each analyte? | X | | | | |
| | | Was the absolute value of the analyte concentration in the inorganic CCB < MDL? | X | | | | |
| **S3** | O | **Mass spectral tuning** | | | | | |
| | | Was the appropriate compound for the method used for tuning? | X | | | | |
| | | Were ion abundance data within the method-required QC limits? | X | | | | |
| **S4** | O | **Internal standards (IS)** | | | | | |
| | | Were IS area counts and retention times within the method-required QC limits? | X | | | | |
| **S5** | OI | **Raw data (NELAC Section 5.5.10)** | | | | | |
| | | Were the raw data (for example, chromatograms, spectral data) reviewed by an analyst? | X | | | | |
| | | Were data associated with manual integrations flagged on the raw data? | X | | | | |
| **S6** | O | **Dual column confirmation** | | | | | |
| | | Did dual column confirmation results meet the method-required QC? | | | X | | |
| **S7** | O | **Tentatively identified compounds (TICs)** | | | | | |
| | | If TICs were requested, were the mass spectra and TIC data subject to appropriate checks? | | | X | | |
| **S8** | I | **Interference Check Sample (ICS) results** | | | | | |
| | | Were percent recoveries within method QC limits? | X | | | | |
| **S9** | I | **Serial dilutions, post digestion spikes, and method of standard additions** | | | | | |
| | | Were percent differences, recoveries, and the linearity within the QC limits specified in the method? | X | | | | |
| **S10** | OI | **Method detection limit (MDL) studies** | | | | | |
| | | Was a MDL study performed for each reported analyte? | X | | | | |
| | | Is the MDL either adjusted or supported by the analysis of DCSs? | X | | | | |
| **S11** | OI | **Proficiency test reports** | | | | | |
| | | Was the laboratory's performance acceptable on the applicable proficiency tests or evaluation studies? | X | | | | |
| **S12** | OI | **Standards documentation** | | | | | |
| | | Are all standards used in the analyses NIST-traceable or obtained from other appropriate sources? | X | | | | |
| **S13** | OI | **Compound/analyte identification procedures** | | | | | |
| | | Are the procedures for compound/analyte identification documented? | X | | | | |
| **S14** | OI | **Demonstration of analyst competency (DOC)** | | | | | |
| | | Was DOC conducted consistent with NELAC Chapter 5? | X | | | | |
| | | Is documentation of the analyst's competency up-to-date and on file? | X | | | | |
| **S15** | OI | **Verification/validation documentation for methods (NELAC Chapter 5)** | | | | | |
| | | Are all the methods used to generate the data documented, verified, and validated, where applicable? | X | | | | |
| **S16** | OI | **Laboratory standard operating procedures (SOPs)** | | | | | |
| | | Are laboratory SOPs current and on file for each method performed? | X | | | | |

1. Items identified by the letter "R" must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter "S" should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if "NR" or "No" is checked).

# Laboratory Review Checklist: Exception Reports - Page 4 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| ER #[1] | Description |
|---|---|
| R03A | The following sample(s) was received with insufficient time remaining to freeze within 48 hours, as required for samples collected in water preserved TerraCores: all samples. The sample(s) was collected on 1/9/26. The sample(s) was received on Saturday 1/10/26 at 9:15 and placed in the freezer on 1/12/26 at 11:15 . |
| R04B | Method TX 1005: Surrogate recovery for the following sample was outside the upper control limit: SB-05 (8'-9') (870-43022-11). This sample did not contain any target analytes; therefore, re-extraction and/or re-analysis was not performed. |
| R07C | Method 6020B: The matrix spike / matrix spike duplicate (MS/MSD) recoveries for preparation batch 860-287918 and analytical batch 860-288184 were outside control limits. Sample matrix interference is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.<br><br>Method 8260C: The matrix spike (MS) recoveries for preparation batch 870-34798 and analytical batch 870-34789 were outside control limits. Non-homogeneity is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits. |

1. Items identified by the letter “R” must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter “S” should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if “NR” or “No” is checked).

# Exhibit 10

**Blake Brownshadel**

**Subject:** FW: Environmental matters; Smelley Tract

**Importance:** High

**From:** Jeffrey Libby
**Sent:** Thursday, February 12, 2026 1:27 PM
**To:** Lacy Kimball (info@LacyKimballLaw.com) <info@LacyKimballLaw.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Scott Deatherage (scott@sdeatheragelaw.com) <scott@sdeatheragelaw.com>; david@spillerlaw.net; Todd W Tew <todd.2@verizon.net>
**Subject:** Environmental matters; Smelley Tract
**Importance:** High

Lacy,

Seller delivered the Phase II ESA Report (the **ESA Report**) on or about January 26, 2026, which we appreciate. However, the ESA Report indicates that multiple requirements of the PSA have not been satisfied.

In light of the fact that this transaction involves a significant amount of money and land (approximately $33 million and over 1,600 acres), Purchaser has retained Texas environmental counsel to advise Purchaser regarding environmental matters pertaining to the Property, including a review of the ESA Report, and the following comments and questions are, in large part, a result of such consultation.

First, the ESA Report indicates that Seller's environmental representation in Section 6(i) of the PSA was inaccurate when made and remains inaccurate. Accordingly, Seller is in breach of Section 6(i). Section 6(i) provides that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property." The ESA Report indicates that Hazardous Substances are present at the Property. In addition, under Section 8(b) of the PSA, it is a condition precedent to Closing that Seller's representations and warranties be true and correct as of Closing.

Second, Section 7(c) of the PSA requires that Seller remove from the Property, no later than fifteen (15) days prior to Closing, "all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property." Based on the ESA Report, the required removal of environmental contamination and hazardous materials has not occurred. In addition, Seller has not provided satisfactory evidence that all underground equipment or piping associated with the above-ground storage tanks has been removed from the Property.

Third, the ESA Report does not include the specific confirmation required by the PSA. Section 7(c) requires that Seller provide an environmental report "by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property." Based on our review, the ESA Report does not include this confirmation and therefore does not satisfy Section 7(c).

The requirements and language of Sections 6(i) and 7(c) were specifically drafted by Purchaser and agreed to by Seller to address environmental contamination and Hazardous Substances at the Property. These requirements were and remain material to the transaction, particularly in light of the purchase price to be paid at Closing.

Based on the foregoing, Purchaser does not believe Section 6(i) or Section 7(c) have been satisfied or that the applicable conditions precedent to Closing have been met.

From Purchaser's perspective, it would be premature to discuss a closing date until the environmental matters outlined above are fully and clearly resolved. In addition to revising the ESA Report to include the contractually required confirmation, Purchaser also requires - and we understand Seller's engineer has agreed to provide - the following:

- An express right for Purchaser to rely on the ESA Report (whether by reliance letter or by naming Purchaser as an intended recipient in the report). The ESA Report expressly prohibits anyone other than Seller from relying upon the ESA Report; and
- Purchaser to be named as an additional insured on the environmental engineer's and drilling contractor's CGL and Contractors Pollution Liability policies, with limits appropriate for a $33 million transaction. Additionally, those policies must be "occurrence-based policies" and not "claims-made policies." The policies and insurance must survive into the future for obvious reasons.

Finally, all environmental contamination at the Property must be removed in accordance with the PSA.

Purchaser remains committed to working cooperatively to finalize these items. Once Sections 6(i) and 7(c) have been fully satisfied, Purchaser will be in a much better position to have a constructive discussion about next steps, including Closing timing.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2025

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201
www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230

# Exhibit 11

**Blake Brownshadel**

**Subject:** FW: 7700 Old Granbury Hwy
**Attachments:** Old Granbury Rd 7700.pdf

**Importance:** High

**From:** Al Paniagua <alp@prostarcre.com>
**Sent:** Wednesday, February 25, 2026 3:48 PM
**To:** Patricia Herrera <patty@challengerrealtygroup.com>
**Subject:** FW: 7700 Old Granbury Hwy

**AL PANIAGUA**
Executive Vice President

**ProStar Commercial Real Estate, LLC**
One Cowboys Way, Suite 300
Frisco, Texas 75034
214.773.8479
alp@prostarcre.com
prostarcre.com

---

**From:** Stephen Reich <stephen.reich@williamstrew.com>
**Sent:** Friday, February 13, 2026 6:03 AM
**To:** Al Paniagua <alp@prostarcre.com>
**Subject:** 7700 Old Granbury Hwy

Good morning:
You had previously reached out on my listing at 7700 Old Granbury. Looks like after all this time, this is going to be coming back on the market.
Please let me know if your client has an interest. Marketing Packet is attached.

CONFIDENTIALITY NOTICE: The information contained in this email communication (including any attachment(s)) is strictly confidential and intended solely for the person or entity named above. If you are

not the intended recipient of this email, you are hereby notified that any disclosure, distribution, reproduction, or other use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return email and permanently delete this communication (including any attachment(s)) from your system.
CONFIDENTIALITY NOTICE: The information contained in this email communication (including any attachment(s)) is strictly confidential and intended solely for the person or entity named above. If you are not the intended recipient of this email, you are hereby notified that any disclosure, distribution, reproduction, or other use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return email and permanently delete this communication (including any attachment(s)) from your system.




# TREMENDOUS DEVELOPMENT OPPORTUNITY - 1,674+/- ACRES

## 7700 Old Granbury Rd. – Cresson, TX

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE

WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

LISTED BY **STEPHEN REICH GROUP** OF WILLIAMS TREW REAL ESTATE

# PROPERTY SUMMARY

## DESCRIPTION

Tremendous development opportunity located in the heart of the westward movement. This hard to find 1,674 plus or minus acre parcel is prime for a mixed use development and is located only 30 miles from downtown Fort Worth, Texas. Cresson is a rapidly growing area due to its convenient location to Fort Worth via Highway 377, a new loop and ease of railroad accessibility. This tract features rolling terrain and scattered hardwoods providing perfect settings for residential development. 1,300 feet of road frontage and being located less than 1.5 miles from the new loop makes accessibility extremely easy. Over two miles of Atchison, Topeka and Santa Fe rail frontage make the industrial opportunities endless.

## LOCATION

| | |
|---|---|
| CITY | Cresson |
| County | Hood |
| Schools | Granbury ISD |

## OFFER SUMMARY

| | |
|---|---|
| List Price | $30,976,807 |
| Lot Size | 1,674.422 acres |
| Utilities | Electric Available, Private Sewer, Septic, Well |

Driving Directions: From Hwy 171, go west on Hwy 377. Right on Old Granbury Rd.

## HIGHLIGHTS

- MIXED USE DEVELOPMENT
- 1,300 FT OF ROAD FRONTAGE
- 30 MILES FROM DOWNTOWN FT. WORTH
- RAILROAD ACCESSIBILITY
- NO RESTRICTIONS
- AG EXEMPT

## LISTING PRESENTED BY:

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE

WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.



**PROPERTY WEBSITE LINK:**
**stephenreichgroup.com/20123229**



STEPHEN REICH
817-597-8884
stephen.reich@williamstrew.com

TAMMY ROKUS
817-694-8019
tammy.rokus@williamstrew.com

PARKER COUNTY OFFICE
400 Shops Boulevard, Ste. 200
Willow Park, TX 76087

FARM & RANCH • RESIDENTIAL • COMMERCIAL-DEVELOPMENT • LAND

# PROPERTY PHOTOS








STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

# PROPERTY PHOTOS








STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

# AERIAL MAP




STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

# CONTOUR LINES & FLOODPLAIN




STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

# STATE OF TEXAS WELL REPORT

**WELL REPORT**
#188548

**DRILLING START DATE**
8/29/2006

**BOREHOLE:**
Depth 30 ft.
Diameter 11 in.

**WATER LEVEL BELLOW SURFACE**
620 ft.

**WELL TESTS**
Yield: 60 GPM

**COMPANY INFORMATION**
Associated Services