# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHALLENGER CRESSON I, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 4:26-cv-00231-P |

EXPERT REPORT OF MICHAEL WHITEHEAD

I, Michael Whitehead, M.S., have been retained by Defendants to provide opinion testimony in connection with Case No. 4:26-cv-00231-P, now pending in the United States District Court for the Northern District of Texas, Fort Worth Division. My opinions are based on my education, training, and experience in environmental remediation; my first-hand knowledge of facts regarding this matter; and my review of the documents, data, and materials identified in this report.

## I. Opinion Statements, Bases, and Reasons:

**Opinion 1:** The on-site and off-site RECs identified in the ESE and Whitehead E. S. Phase I ESAs were adequately addressed by the Limited Phase II Investigation conducted by Whitehead E. S. The basis for this opinion is that historical aerial photographs, LiDAR imagery, Google Earth satellite imagery, and the approved work plan were used to identify the former reserve pits, former

AST areas, the two on-site well pads, and the adjacent off-site well pad for targeted investigation. Whitehead E. S. utilized historical aerial photographs to identify the locations of the former reserve pits and ASTs on the well pads so that sampling locations correlated to these potential environmental concerns. Soil boring/temporary monitoring well SB-01/TMW-01 was advanced on the south side of the north well pad in the footprint of the former reserve pit. Soil boring SB-02 was advanced to the east of the north well pad, and soil boring SB-03 was advanced northwest of the north well pad near the former AST locations. Soil boring/temporary monitoring well SB-04/TMW-02 was advanced north of an off-site natural gas well pad. Soil boring/temporary monitoring well SB-05/TMW-03 and soil boring SB-06 were advanced near the south well pad in the footprint of the former reserve pit and near the former AST locations. Cresson Moon Property, LLC and ESE approved the proposed work plan and sampling locations, and ESE provided third-party oversight during the investigation.

**Opinion 2:** The field observations from the Limited Phase II Investigation did not show field indicators of potential COCs. The basis for this opinion is that the soil samples and borings showed no dark staining or odors, and PID readings were low, ranging from 0.0 to 9.2 ppm. Soil samples from the six soil-boring locations were placed onto clean, dedicated plastic sheeting and screened in the field for potential COCs, including observations for dark staining and/or fill materials, odors, pH, and measurements of organic vapors using a MiniRae Lite PID. No dark staining was observed in any of the soil samples or borings. Soil borings SB-01, SB-02, SB-05, and SB-06 had very low PID readings of 0.0 to 0.6 ppm, which are considered background readings potentially from the drill rig or surrounding equipment and not indicative of an environmental impact. Soil borings SB-03 and SB-04 had maximum PID readings of only 2.9 ppm and 9.2 ppm,

respectively. These PID readings were considered low and not indicative of a release. The pH ranges of the soil were reported between 7.1 and 9.0.

**Opinion 3:** The soil analytical data did not identify COCs associated with historical oil and gas activities above applicable TRRP Residential PCLs, TSBCs, or RRC Regulatory Protection Limits. The basis for this opinion is that TPH fractions, VOCs/BTEX, barium, chloride, and PAHs were either not detected or detected at low concentrations below the applicable regulatory criteria discussed in this report. The concentrations of all potential COCs, including TPH fractions, VOCs/BTEX, barium, and chloride, were either not detected below their sample detection limits or were detected at low concentrations well below their TRRP RALs or RRC Regulatory Protection Limits. For the TPH fractions, TPH in the diesel range (C12-C28) was detected in only one sample, SB-01 (3-4'), at a low concentration of 35.5J mg/kg. This concentration is well below the TRRP Tier 1 Default PCL/RAL of 200 mg/kg. This sample was further analyzed for PAHs, and all analytes were below their laboratory SDLs. No other TPH fractions were detected in any of the samples analyzed.

The only VOCs/BTEX compounds detected in four soil samples were low concentrations of ethylbenzene and total xylenes in samples SB-01 (3–4'), SB-02 (3-4'), SB-03 (5-6'), and SB-04 (3-4'). These concentrations of ethylbenzene and total xylenes were well below their respective RALs. Ethylbenzene was detected in three samples, SB-02, SB-03, and SB-04, at very low concentrations ranging from 0.000545J mg/kg to 0.00169J mg/kg, all well below the TRRP PCL of 7.6 mg/kg. Total xylenes were detected at four locations, SB-01, SB-02, SB-03, and SB-04, at low concentrations ranging from 0.000657J mg/kg to 0.0129 mg/kg, all well below the TRRP PCL of 120 mg/kg. No other VOCs were detected above their respective SDLs. Barium was detected in all six samples analyzed with concentrations ranging from 16.7 mg/kg to 148 mg/kg, all below

the TRRP PCL of 440 mg/kg. Chloride was detected in four samples, SB-01, SB-03, SB-04, and SB-06, with concentrations between 5.71J mg/kg and 250 mg/kg, well below the RRC Regulatory Protection Limit of 3,000 mg/kg. All other analytes were below their laboratory SDLs.

**Opinion 4:** Groundwater was not encountered in the three temporary monitoring wells, and therefore no groundwater samples were collected or analyzed. The basis for this opinion is that the boreholes and temporary monitoring wells were dry at completion and at the end of the workday, and the wells were plugged and abandoned the same day as drilling. Three temporary monitoring wells were installed on the subject property in locations agreed to by both parties. The temporary monitoring wells were installed to depths of approximately 19.0 feet, 24.0 feet, and 11.0 feet bgs. The boreholes were dry at completion, and the temporary monitoring wells were dry at completion and at the end of the workday. No groundwater samples were therefore collected or analyzed.

**Opinion 5:** Based on the Limited Phase II Investigation, there is no evidence of impact to the Site, and no further assessment is recommended at this time. The basis for this opinion is the targeted sampling of the AOCs, absence of field indicators, analytical results below the applicable regulatory criteria, absence of PAH detections in the follow-up PAH analysis, and absence of shallow groundwater encountered in the temporary monitoring wells.

In conclusion, Whitehead E. S. conducted a Limited Phase II Investigation to evaluate potential COCs in soil and to assess whether groundwater would be encountered for sampling from the former on-site well pads and off-site active natural gas well pad. Sampling included only soil samples because the three temporary monitoring wells were dry and did not yield any groundwater. Based on observations during the sampling, including visual inspection for dark staining, odor, and PID readings, there were no field indicators of potential COCs. Analysis of soil samples did

not indicate any COCs associated with oil and gas activities, including TPH fractions, BTEX, barium, and/or chloride, because their concentrations were either not detected or were well below their respective TRRP Residential PCLs and/or RRC Limits for soil. Soil sampling data did not identify any COCs in the Areas of Concern (AOCs) on the Site noted in the previous Phase I ESAs and agreed to for the Phase II Investigation. Based on the Whitehead E. S. Phase II Investigation, there is no evidence of any impact to the Site, and no further investigation is warranted at this time. The Phase II Investigation conducted by Whitehead E. S. with oversight provided by ESE indicated that the soil was not impacted by any of the suspected COCs associated with historical oil and gas activities and that there was no evidence of shallow groundwater in the three AOCs on the Site. The AOCs included two well pads on the subject property, the north and south pads, and one off-site well pad along the southwest property boundary that were identified as potential RECs in the Phase I ESAs. The sampling locations were based on aerial photographs that clearly showed the locations of former reserve pits and ASTs. The low diesel range TPH fractions in only one sample, 35.5J mg/kg, the absence of any PAHs, and the absence of any VOCs, including BTEX components above their TRRP RALs, indicated that the soils in the three AOCs were not impacted. The only hazardous substances detected at the Site were ethylbenzene, total xylenes, and barium. The concentrations of ethylbenzene, total xylenes, and barium were low and well below their criteria under TRRP to be considered COCs to the subject property, as discussed in RG-649, Determining Which Releases are Subject to TRRP. Based on my assessment, it is my professional opinion that the subject property is not impacted and no further assessment is recommended.

## II. Facts or Data Considered in Forming Opinions:

### A. Assignment and Scope

I prepared a summary assessment/evaluation of the environmental assessments conducted at the 1,674-acre undeveloped property located at 7700 Old Granbury Road in Cresson, Hood County, Texas, referred to in this report as the subject property or Site, related to the historical use of oil/gas operations on-Site. The assessment included a summary of the Phase I Environmental Site Assessment conducted by ESE dated December 18, 2023, a complete Phase I ESA from ESE Partners, LLC dated December 11, 2025, a Phase I ESA conducted by Whitehead E. S. dated December 12, 2025, and a Limited Phase II Investigation conducted by Whitehead E. S. dated January 26, 2026. The Phase II Investigation was identified as "limited" based on the use of temporary versus permanent monitoring wells as agreed to by both parties.

My opinions are based on first-hand experience with the investigations, specifically those conducted by Whitehead E.S., as well as my professional review of the Phase I ESAs conducted by ESE. I was involved in discussions with ESE on findings from the Phase I ESAs, general Site information, scope for the Phase II sampling, data review, report development, and ultimately as Senior Reviewer and Environmental Professional for the Phase I ESA and Phase II Investigation completed by Whitehead E. S. The Professional Geoscientist for the Phase II Investigation was Amanda Pechacek, P.G. #15423, with Whitehead E.S.

Other resources used in forming these opinions included evaluation of the Texas Risk Reduction Program Protective Concentration Limits, revised February 6, 2025, and Texas-Specific Soil Background Concentrations presented in 30 TAC § 350.51(m), as used by TCEQ and RRC as Regulatory Action Levels or PCLs. I reviewed aerial photographs obtained from Texas Database LLC for the well pads on the Site from 2007 and 2011. These aerial photographs were

utilized to develop the scope of work and sampling locations for the Phase II Investigation because they more clearly showed the former aboveground storage tanks and suspected reserve pits noted as RECs.

**B. ESE Phase I ESA Information**

Whitehead E. S. initially received a Phase I ESA conducted by ESE dated December 18, 2023 for Challenger Cresson I, LLC. This Phase I ESA was limited to the Executive Summary, selected sub-sections, and Figure 2. It did not include the majority of the text report, appendices, or an evaluation of potential RECs, CRECs, HRECs, VECs, or BERs. The Phase I ESA did note five natural gas pipelines, three natural gas wells, two dry holes, and one abandoned well location. The three natural gas wells were in operation at the time of the reporting, and three of the natural gas pipelines were in service. During the Site reconnaissance conducted on December 10, 2025, approximately 30 drums of oil-based products, one 500-gallon AST, and 10 containers of oil were observed on the property by ESE.

At Whitehead E.S.'s request, ESE sent Whitehead E. S. the completed Phase I ESA on December 15, 2025, which was conducted in accordance with ASTM E1527-21. This ESA report was dated December 11, 2025. According to the report, five natural gas gathering pipeline easements were identified on-Site, three of which were in service. No visible evidence of a release was noted, such as discolored soil, stressed/stained vegetation, or unusual odors. Additionally, three gas wells, two dry holes, and one abandoned well location were reported in the Texas RRC Public Geographic Information System database.

ESE stated that no evidence of reserve pits, surface impoundments, or releases were visible during their Site reconnaissance on December 10, 2025, or in historical aerial photographs dated 1948, 1953, 1959, 1981, 1995, 2005, 2016, and 2022. The subject property was not listed in any

TCEQ or U.S. Environmental Protection Agency databases. Furthermore, two ponds were observed during the Site reconnaissance; however, the ponds appeared to be utilized as stock ponds for livestock, and there were no surface sheens or other evidence of hazardous substances noted. LiDAR and Google Earth satellite imagery identified ASTs and potential former reserve pits on the gas well pads. In review of the LiDAR imagery obtained from the USGS National Map 3D Elevation Program dated January 2, 2025, slight topographical changes could be observed at the locations of the potential reserve pits. It was the opinion of ESE that the former ASTs and the potential reserve pits associated with well pad stations constituted a REC to the subject property. ESE noted that further investigation would be required to confirm or deny the presence of COCs associated with the identified REC.

**C. Whitehead E. S. Phase I ESA Information**

Whitehead E. S. conducted a Phase I ESA of the subject property for Challenger Realty Group, LLC. The Phase I ESA Site reconnaissance was conducted on December 3, 2025, and the report was issued on December 12, 2025. According to my review, two natural gas wells, API #22131145 and #22131003, were installed on the subject property in 2005 and 2006 and were plugged in 2025.

According to aerial photographs obtained by the EDR report dated December 8, 2025, a potential reserve pit was identified south of the northern well pad, API #22131145, in 2010 and 2014 and appeared to be dry by 2018. Additionally, evidence of a potential reserve pit was observed associated with the southern well pad, API #22131003, in the 2010 and 2014 aerial photographs. Additional aerial photographs obtained from Texas Database for the two on-Site well pads dated 2007 and 2011 more clearly showed the former ASTs and reserve pits. Due to the

presence of the ASTs and reserve pits, Whitehead E. S. identified each area as a REC to the subject property.

One off-Site REC was identified due to the presence of a natural gas well pad southwest of the Site with oil and gas operations and a reserve pit observed in the 2010, 2014, 2018, and 2022 aerial photographs obtained from EDR. However, it was my professional opinion that any potential impacts from the off-Site source would be the responsibility of the off-Site property owner for future assessment and/or response actions, if needed.

During the Site reconnaissance conducted by Whitehead E. S. on December 3, 2025, Whitehead E. S. did not observe any ASTs, drums, or containers during the Site reconnaissance, nor was there any evidence of dark staining, stressed vegetation, or odors within the vicinity of the reported ASTs and/or drums. Therefore, these items did not represent a REC in connection with the subject property in the Whitehead E. S. Phase I ESA.

According to the EDR database report dated December 8, 2025, the subject property was identified in the Tier 2, Air New Source Permits #111774 and #111777, and Compliance History RN106844418 and RN106844434 databases. Both on-Site well pads were listed in the Tier 2 database, which tracks hazardous chemicals at facilities, ensuring compliance with reporting requirements under the Emergency Planning and Community Right-to-Know Act database. The facility was listed several times between 2005 and 2013 for crude petroleum and natural gas extraction and reported 500 barrels of condensate stored in the northwest and southwest ASTs as the primary chemical stored on-Site in 2010, 2011, 2012, and 2013. Both ASTs were reportedly stored in secondary containment tank berms, and no violations were identified for these listings. The two on-Site well pads were also listed in the Air New Source Permits for active registrations. Both registrations, #111774 and #111777, were initially submitted in 2013 and updated in 2016

and 2020. No violations were identified with either registration. Both on-Site well pads were identified in the TCEQ Compliance History database, and both well pads were rated between 0 and 0.78 in September 2023, indicating they are high to satisfactory performers under 30 TAC § 60.2(g) and have good to excellent environmental compliance.

Whitehead E. S. obtained additional aerial photographs from Texas Database that were not included in the EDR data package due to poor quality and data gaps in the years. Aerial photographs from 2007 and 2011 of the northern and southern well pads were utilized for development of the Phase II Investigation and provided locations of the former reserve pits. For both the northern and southern well pads, a reserve pit on each well pad was more clearly observed in the 2007 aerial and was no longer observed by 2011.

**D. Summary and Evaluation of Phase I ESAs**

Both ESE and Whitehead E. S. identified the same two on-Site well pads as RECs to the subject property. Whitehead E. S. identified an additional REC for the off-Site well pad. The north well pad and the south well pad were considered on-Site RECs associated with the oil and gas operations on the subject property. ESE identified a REC associated with the potential presence of the reserve pits and the observed ASTs, using LiDAR imagery, in its Phase I ESA dated December 11, 2025. Whitehead E. S. identified two on-Site RECs associated with both well pads and the potential presence of reserve pits, as identified in the aerial images from EDR and Texas Database. Whitehead E. S. also identified one off-Site REC to the southwest of the Site due to a bordering well pad with a potential reserve pit.

Based on the aerial photographs obtained from EDR and Texas Database reviewed by Whitehead E. S. and the EDR aerials and LiDAR used by ESE, locations of the reserve pits and ASTs were identified at both well pads on the subject property. Aerial photographs obtained from

Texas Database by Whitehead E. S. showed the reserve pits being utilized in 2007 and dry by 2011. The clearer aerial photographs were used by Whitehead E. S. to determine sampling locations in the Phase II Investigation. A work order was provided to Cresson Moon Property, LLC and ESE for approval prior to the investigation.

**E. Limited Phase II Investigation Scope and Implementation**

Whitehead E. S. was retained by Cresson Moon Property, LLC to conduct a Limited Phase II Investigation of the Site. The purpose of the investigation was to identify potential environmental impacts to the Site based on the identified RECs in the Phase I ESAs conducted by ESE and Whitehead E. S. in December 2025. The on-Site RECs were limited to the two on-Site well pads referred to as the north pad and south pad. Additionally, ESE and Whitehead E. S. concurred that one soil boring would be installed on the Site just north of the off-Site and southwest adjacent well pad.

The scope of work for the Limited Phase II Investigation was developed to address the two on-Site RECs, the north and south well pads, and one southwest off-Site well pad. Whitehead E. S. developed an initial scope for soil and groundwater sampling to address these three RECs and used aerial photographs to identify the location of the reserve pits and the aerials from the ESE and Whitehead E. S. Phase I ESAs for locations of the ASTs. Whitehead E. S. discussed the scope of work and sampling locations with Aaron Munsart of ESE via multiple phone calls and email messages.

The key issues in those discussions included sampling locations and depths, sample parameters for suspected COCs, use of temporary monitoring wells instead of permanent monitoring wells, and time frame to leave temporary monitoring wells on the Site for groundwater sampling. ESE recommended that Whitehead E. S. add barium and chloride in the soil sample

analyses, agreed to the use of temporary versus permanent monitoring wells, and stated that temporary monitoring wells should be plugged the same day of drilling. Temporary monitoring wells can be left on the Site for only 48 hours per 16 TAC § 76.100(f)(5). Subsequently, no groundwater accumulated in the three temporary monitoring wells, and they were plugged and abandoned by the driller on the same day as drilling as agreed upon by Aaron Munsart of ESE.

On January 9, 2026, Whitehead E. S. mobilized to the Site along with William Day of ESE for third-party oversight. ESE did not collect any samples during the investigation; however, the ESE representative suggested taking soil samples from the bottom of the soil borings in the soil cuttings generated from solid stem augers. Whitehead E. S. clarified with Aaron Munsart of ESE on a phone call that samples should not be taken from the soil cuttings or at the bottom of the boring if limestone was present and solid stem augers were used. This was agreed upon by both parties because the depth of a sample cannot be accurately confirmed from soil cutting sampling. Whitehead E. S. subsequently collected soil samples correlating with the highest PID readings and/or at arbitrary depths to assess COC distribution within the silty clay, sand, or very weathered limestone in the soil boring. Arbitrary depths were utilized if a soil boring did not have any PID readings above background levels. Additionally, the property owner, Mr. Greg Graham, filmed Whitehead E. S. during sampling procedures.

**F. Soil Borings, Temporary Monitoring Wells, and Lithology**

Six soil borings, SB-01 through SB-06, were advanced on the Site during the Phase II Investigation. Soil boring/temporary monitoring well SB-01/TMW-01 was advanced on the south side of the north well pad in the footprint of the former potential reserve pit. Soil boring SB-02 was advanced east of the north well pad, and SB-03 was advanced northwest of the north well pad near the former ASTs. Soil boring/temporary monitoring well SB-04/TMW-02 was advanced

north of an off-Site natural gas well pad located on the southwest boundary of the Site. Soil boring/temporary monitoring well SB-05/TMW-03 and soil boring SB-06 were advanced near the south well pad in the footprint of the former potential reserve pit and near the former ASTs.

Soil borings were advanced utilizing a track-mounted Geoprobe with direct push technology and clear acetate liners within a hollow stainless-steel drill rod by a hydraulic-driven hammer. DPT refusal of the soil borings was encountered at 5.5 to 10 feet due to shallow weathered limestone. In these locations, solid stem augers were used to drill to desired depths of 11 to 24 feet. Soil samples were collected from the acetate liners from the DPT and not loose soil cuttings generated from the solid stem augers.

Three of the soil borings, SB-01, SB-04, and SB-05, were converted into temporary monitoring wells, TMW-01, TMW-02, and TMW-03, respectively. Prior to temporary monitoring well installation, solid stem augers were utilized after direct push refusal to achieve the desired depth. Temporary monitoring wells were constructed utilizing one-inch schedule 40 PVC piping riser and one-inch schedule 40 PVC piping with 0.010-inch slots. No groundwater was encountered during the investigation. Furthermore, correspondence with ESE stated that the wells should be plugged the same day as drilling. Temporary monitoring wells were subsequently plugged and abandoned by the driller on the same day as installation with bentonite chips.

Soil boring logs are presented in Appendix 5. Soil boring SB-01, North Pad, south side, consisted of silty clay in the top 3.0 feet of SB-01 underlain by weathered limestone starting at 3.0 feet. The DPT rig encountered refusal at 5.5 feet, and weathered limestone was encountered from 5.5 feet to 19 feet using solid stem augers. Soil boring SB-02, North Pad, east side, consisted of weathered limestone throughout, switching from DPT to solid stem augers at 5.0 feet. Soil boring SB-03, North Pad, northwest area, consisted of weathered limestone at the surface with a clay

seam at 5.0 to 6.5 feet at the bottom of the DPT push. Drilling switched to solid stem augers, and weathered limestone was encountered to 15 feet. Soil boring/temporary monitoring well SB-04/TMW-02, north of the off-Site pad, consisted of silty clay down to 24 feet. DPT refusal was encountered at 6.5 feet, and solid stem augers were used to 24 feet. Soil boring/temporary monitoring well SB-05/TMW-03, South Pad, encountered silty clay down to 7.0 feet that was underlain by gravelly sand/sand to a depth of 10 feet using the DPT rig. Weathered limestone was encountered at 10 to 11 feet. Soil boring SB-06, South Pad, northwest of ASTs, encountered silty clay to approximately 3.0 feet that was underlain by gravelly sand/sand using the DPT rig. PID readings were low throughout all soil borings, ranging from 0.0 to 9.2 ppm. No dark staining or odor was noted in the samples.

**G. Soil Sampling and Laboratory Analysis**

Soil samples selected from each soil boring were analyzed for TPH fractions by Texas Method TX 1005, benzene, toluene, ethylbenzene, and xylenes/methyl tert-butyl ether, or the full suite of VOCs by EPA Method 8260. Soil samples SB-01 (3'-4'), SB-02 (3'-4'), SB-03 (3'-4'), SB-04 (3'-4'), SB-05 (2'-3'), and SB-06 (6'-7') were analyzed for the full list/suite of VOCs, while samples SB-03 (5'-6'), SB-05 (8'-9'), and SB-06 (2'-3') were analyzed for only BTEX/MTBE. Additionally, selected samples were analyzed for barium by EPA Method 6020, chloride via EPA Method 300.0, and pH by EPA Method 9045D. A single sample, SB-01 at 3-4', was analyzed for PAHs by EPA Method 8270 due to the diesel range TPH (C12-C28) fractions that were detected at low concentrations.

A total of 13 soil samples were collected from the borings in accordance with EPA Method 5035. Before sample collection, personnel handling samples donned new gloves and ensured that the work area was clear of materials that could cause cross-contamination, including

decontamination equipment or supplies. Samples were collected in laboratory-supplied containers, cleaned of any residual soil potentially located on the exterior of the VOA, and immediately placed on wet ice in insulated coolers. Site work was completed at 3:30 PM, and the samples were transported to Whitehead E.S.'s office for storage in a clean, dedicated sampling fridge overnight. Samples were delivered to Eurofins Environment Testing in Dallas, Texas, for analysis on January 10, 2026 at 9:15 AM. Samples were preserved with methanol and hydrochloric acid for VOC analysis and maintained in a chilled environment less than six degrees Celsius. No QA/QC issues were identified.

Soil samples collected from the Limited Phase II Investigation were analyzed by Eurofins for TPH fractions, BTEX/MTBE or full suite VOCs, barium, and chloride in accordance with the approved work order agreed upon by the client and ESE. Since TPH in the diesel range was detected in one sample at 35.5 mg/kg with a J qualifier, Whitehead E. S. requested the laboratory to further analyze this sample for PAHs by EPA Method 8270. A "J" qualifier indicated that the concentration was estimated because it was above the adjusted method detection limit and below the adjusted reporting limit. The Eurofins analytical report, dated January 21, 2026, is presented in Appendix 8.

Soil sampling results are summarized in Table 1A, covering TPH, VOCs, barium, and chloride, and Table 1B, covering PAHs. The results were compared to their respective default TCEQ TRRP Tier 1 Residential Protective Concentration Levels, commonly referred to as Residential Assessment Levels (RALs). The Site is subject to RRC rules and regulations due to oil and gas operations at the Site; however, RRC utilizes TRRP PCLs, and therefore they were utilized for this assessment. Barium was additionally compared to its TSBC (300 mg/kg). Since the TSBC was lower, the TRRP PCL (440 mg/kg) was utilized as its default RAL as it was the higher of the

two in accordance with TRRP. Soil samples analyzed for chloride were compared to the RRC Regulatory Protection Limit.

**H. QA/QC and Revised Laboratory Information**

Whitehead E. S. reviewed the laboratory analytical data package dated January 21, 2026 for accuracy and usability of the data presented.

Upon review of the laboratory review checklist exception report, the laboratory noted: "The following sample(s) was [sic] received with insufficient time remaining to freeze within 48 hours, as required for samples collected in water preserved TerraCores: all samples. The sample(s) was collected on 1/9/26. The sample(s) was received on Saturday 1/10/26 at 9:15 and placed in the freezer on 1/12/26 at 11:15." Additionally, details on the temperature measured at the laboratory upon receipt were not documented.

Whitehead E. S. spoke with Mr. Mike Kimmel, the project manager and laboratory review checklist reviewer for Eurofins, via phone on July 2, 2026 to clarify these notes. Mr. Kimmel reviewed internal documentation regarding this matter and confirmed the comment noted in the laboratory review checklist exception report was incorrectly stated and that the samples were chilled within the proper holding time of 48 hours. He also clarified that the temperature measured at the laboratory was documented but written in an incorrect spot, the bottom of the chain of custody, and was 4.7 degrees Celsius after a correction factor of -0.1 degrees Celsius was applied. With these explanations, there were no QA/QC issues identified. A revised laboratory analytical report was issued on July 2, 2026 with an explanation of the discrepancies and corrections listed within the case narrative.

Whitehead E. S. additionally reviewed the laboratory QA/QC sample results reported in the laboratory analytical reports for accuracy and usability of the data presented. Project criteria

were set at 60-140% recovery and 40% reproducibility for organics and 70-130% recovery and 30% reproducibility for inorganics. Surrogate percent recoveries were within project-defined criteria for TPH and VOC analysis. Surrogate percent recovery was below project-defined criteria for nitrobenzene-d5 in client sample SB-01 (3-4') and the method blank for PAH analysis. However, in accordance with TRRP-13, Review and Reporting of COC Concentration Data under TRRP, since the surrogate was outside the percent recovery criteria for one surrogate in a sample with multiple surrogate compounds, no qualification was warranted, and the results were considered acceptable. Analyte 1,2-dibromo-3-chloropropane was above project-defined criteria in the matrix spike for VOC analysis. However, this analyte was not detected in any of the client samples, and therefore there are no applicable qualifiers under TRRP-13.

**I. Documents, Data, and Materials Considered**

The documents, data, and materials considered include, at a minimum, the following:

1. ESE Phase I Environmental Site Assessment dated December 18, 2023.
2. ESE complete Phase I Environmental Site Assessment dated December 11, 2025.
3. Whitehead E. S. Phase I Environmental Site Assessment dated December 12, 2025.
4. Whitehead E. S. Limited Phase II Investigation dated January 26, 2026.
5. Work order provided to Cresson Moon Property, LLC and ESE for approval before the Phase II Investigation.
6. Communications with ESE regarding Phase II scope, sampling locations, sample parameters, and temporary monitoring wells.
7. ESE third-party oversight materials for the January 9, 2026 field investigation.
8. Eurofins analytical report dated January 21, 2026.
9. Revised Eurofins analytical report dated July 2, 2026.

10. EDR database report dated December 8, 2025.
11. Texas Database aerial photographs from 2007 and 2011.
12. LiDAR imagery obtained from USGS National Map 3D Elevation Program dated January 2, 2025.
13. Google Earth satellite imagery.
14. Texas Risk Reduction Program Protective Concentration Limits, revised February 6, 2025.
15. Texas-Specific Soil Background Concentrations presented in 30 TAC § 350.51(m).
16. RRC Regulatory Protection Limits.
17. TRRP-13, Review and Reporting of COC Concentration Data under TRRP.
18. RG-649, Determining Which Releases are Subject to TRRP.
19. Soil boring logs.
20. Field observations, PID readings, pH readings, and sampling records.
21. Table 1A, Soil Analytical Summary for TPH, VOCs, barium, and chloride.
22. Table 1B, Soil Analytical Summary for PAHs.
23. Whitehead E. S. Texas Board of Professional Geoscientists Geoscience Firm Registration

**III. Exhibits That Summarize or Support Opinions:**

The following exhibits, appendices, figures, and tables may be used to summarize or support my opinions:

**A. Figures**

1. **Figures 1 through 4** – Aerial photographs from Texas Database depicting the northern and southern well pads in 2007 and 2011.
2. **Figure 5** – LiDAR imagery identifying ASTs and potential former reserve pits on the gas well pads.

3. **Figure 6** – Soil boring and temporary monitoring well locations used for the Limited Phase II Investigation.

**B. Tables**

1. **Table 1A** – Soil analytical summary for TPH, VOCs, barium, and chloride.
2. **Table 1B** – Soil analytical summary for PAHs.

**C. Appendices**

1. **Appendix 1** – ESE Phase I Environmental Site Assessment dated December 18, 2023.
2. **Appendix 2** – ESE complete Phase I Environmental Site Assessment dated December 11, 2025.
3. **Appendix 3** – Whitehead E. S. Phase I Environmental Site Assessment dated December 12, 2025.
4. **Appendix 4** – Work order provided to Cresson Moon Property, LLC and ESE for approval before the Phase II Investigation.
5. **Appendix 5** – Whitehead E. S. Limited Phase II Investigation and soil boring logs.
6. **Appendix 6** – Communications with ESE regarding Phase II scope, sampling locations, sample parameters, and temporary monitoring wells.
7. **Appendix 7** – ESE third-party oversight materials for the January 9, 2026 field investigation.
8. **Appendix 8** – Eurofins analytical report dated January 21, 2026.
9. **Appendix 9** – Revised Eurofins analytical report dated July 2, 2026.
10. **Appendix 10** – Documents, Data, and Materials Considered.
11. **Appendix 11** – Exhibits and Appendices Schedule.

**IV. Qualifications, Including Authored Publications:**

I, Michael Whitehead, have a Master of Science in soil science and over 35 years of environmental and consulting experience for primarily private-sector clients. I have worked on and/or managed over 1,000 projects, including but not limited to Phase I ESAs, Phase II Investigations, Site remediation and removal of Petroleum Storage Tanks, EPA Superfund sites, RRC Voluntary Cleanup Program, TCEQ Voluntary Cleanup Program, Corrective Action, Innocent Owner/Operator Program, and Leaking Petroleum Storage Tank cases. I have worked on and closed many of these cases and worked hand-in-hand with TCEQ staff to do so.

**Professional Licensure:** The reports satisfy requirements by an Environmental Professional (E.P.) and Texas Licensed Professional Geoscientist (P.G.) and were reviewed, signed, and sealed by an E.P. and/or P.G. Additionally, Whitehead E. S. is a Texas Board of Professional Geoscientists registered Geoscience Firm (#50600). No additional licensure or review is required to satisfy requirements as set by ASTM standards.

My career started in Boston, working for CDM sampling Superfund sites in the northeast. I moved with CDM to Dallas to work on Superfund projects like West Dallas Lead for the Dallas Housing Authority and Leadville, Colorado, along with a wider range of projects including Exide Battery and Pemex Mexico sites. I have an excellent working knowledge of TRRP rules and regulations and extensive experience working with TCEQ staff and senior managers along with the RRC VCP.

I have extensive experience with all phases of Phase I ESAs and Phase II Investigations, including Site inspections, review of historical information and aerial photographs, media sampling, QA/QC, evaluation of RECs, CRECs, HRECs, VECs, and OECs. I also have working

knowledge of key environmental regulations, including CERCLA, SARA, RCRA, and the Texas Administrative Code.

I have served as Senior Consultant/Owner of Whitehead E. S. for the last eight years. I previously worked at and owned Whitehead & Mueller, Inc./W&M Environmental Group for 22 years. At Whitehead & Mueller, I worked on all phases of our projects, including site inspections, health and safety, sampling, data review, report writing, including APARs, RAPs, RACRs, and work plans, project management, and final review of ESAs and Phase II Investigations. I have conducted environmental sampling that included a wide range of COCs in soil, groundwater, surface water, sediment, indoor air, outdoor air, tap water, dust, and sub-slab vapor. My on-Site sampling experience has included many Transco/Pipeline compressor stations in Texas and the southeast, Exide Battery facilities, General Cable sites in Bonham and Plano, several Southwestern Bell/AT&T sites, Phelps Dodge, convenience stores, and shopping center/cleaners. I have been and continue to be actively engaged in all aspects of Phase II Investigations at Whitehead E.S., including field inspections, sampling, data review, report development, QA/QC, evaluation of RECs, and final reports.

**Curriculum Vitae:** Attached hereto.

**Publications Authored in the Previous 10 Years:** I have not authored a publication in the last ten (10) years.

## V. Prior Expert Testimony:

I have not testified as an expert at trial or by deposition in the last four (4) years.

## VI. Compensation for Study and Testimony

Study, review, consultation, report preparation, and deposition testimony are billed at $180.00 per hour. Trial testimony is billed at $360.00 per hour.

Respectfully submitted this 3rd day of July, 2026.

Michael Whitehead, M.S.

**Footnotes**

1. *Phase I Environmental Site Assessment Report, Approximately 1,675 Acres, 7700 Old Granbury Road, Cresson, Hood County, Texas, dated December 18, 2023, prepared by ESE Partners, LLC.*
2. *Phase I Environmental Site Assessment Report, Approximately 1,675 Acres, 7700 Old Granbury Road, Cresson, Hood County, Texas, dated December 11, 2025, prepared by ESE Partners, LLC.*
3. *Phase I Environmental Site Assessment Report, 1,674 Acres at 7700 Old Granbury Road, Cresson, TX, dated December 12, 2025, prepared by Whitehead E.S., LLC.*
4. *ASTM E1527-21, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, ASTM International, West Conshohocken, PA.*