# Exhibit A

**EXPERT REPORT**

*For:*

**Civil Action No. 4:26-cv-00231-P**

**In The United States District Court, For the Northern District of Texas**
**Fort Worth Division**

**Challenger Cresson I, LLC,** Plaintiff
**v.**
**BILL SANDERS, INDEPENDENT, EXECUTOR OF THE ESTATE OF PEARL SMELLEY;**
**CRESSON MOON PROPERTIES, LP;**
**RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY;**
**TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM;**
**AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,** Defendants

*Regarding:*

**Contract Claim**
**1,674 Gross Contiguous Acres**
**7700 Old Granbury Road**
**Cresson, Hood County, Texas 76035**

*Prepared for:*

**Calhoun Bhella Sechrest**
**325 N. St. Paul Street, Suite 2900**
**Dallas, TX 75201**

*Prepared By:*




**R. Steven George, P.G**
**August 10, 2026**

**Green Star Environmental Project No. 26-1851**

**Green Star Environmental**
**P.O. Box 13482**
**Arlington, Texas 76094-0482**

**TABLE OF CONTENTS**
**EXPERT REPORT**

**Contract Claim**
**1,674 Gross Contiguous Acres**
**7700 Old Granbury Road**
**Cresson, Hood County, Texas 76035**

**Green Star Environmental Project No. 26-1851**

Page
1.0 Expert ........ 1
2.0 Legal Claim ........ 1
3.0 Work Reviewed ........ 2
4.0 Due Diligence Timeframes ........ 3
5.0 ESA Reports Scope Compared to Contract Requirement ........ 4
6.0 Seller's Consultant Work Compared to Contract Requirements ........ 6
7.0 Summary ........ 8
8.0 References ........ 8

**LIST OF FIGURES**

Figure 1 ESE, Site Location Map (2023)
Figure 2 ESE, Site Map (2023)
Figure 3 ESE, Site Map (2025)
Figure 4 Whitehead, Limited Phase II, Site Layout (2026)

**LIST OF APPENDICES**

Appendix A Curriculum Vitae of R. Steven George
Appendix B Standard Contract of Sale
Appendix C ESE, Phase I Environmental Site Assessment Report 10/13/2023
Appendix D ESE, Phase I Environmental Site Assessment Report 12/18/2023
Appendix E ESE, Phase I Environmental Site Assessment Report 12/11/2025
Appendix F Certificate of Liability Insurance, ESE to Challenger, 12/29/2025
Appendix G Whitehead, Phase I Environmental Site Assessment Report 12/12/2025
Appendix H Whitehead, Work Order for Professional Services 01/05/2026
Appendix I Whitehead, Limited Phase II Investigation Report 01/26/2026

# EXPERT REPORT

**Contract Claim**
**1,674 Gross Contiguous Acres**
**7700 Old Granbury Road**
**Cresson, Hood County, Texas 76035**

**Green Star Environmental Project No. 26-1851**

## 1.0 Expert

This Expert Report ("Report") contains the work product and opinions of R. Steven George, PG. Mr. George was retained by the law firm of Calhoun Bhella Sechrest on behalf of their client to provide technical expertise to them and the Plaintiff in the lawsuit styled as: Challenger Cresson I, LLC the ("Purchaser" or "Challenger") versus Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "Smelley Estate"), Cresson Moon Properties, LP, a Texas limited partnership ("CMPLP"), and the following people for their respective portion of the mineral estate to Purchaser as described in the Contract: Richard David Smelley and Amy Elizabeth Smelley (Collectively, "Smelley"), Tammy Marie Graham and Gregory Scott Graham (collectively, "Graham"), and Deborah Ruth Davis and David Glenn Davis (collectively, "Davis") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as ("Seller").The Cause Action No. 4:26-cv-00231-P is in the United States District Court, for the Northern District of Texas, Fort Worth Division thereafter called "Challenger v. Smelley".

Mr. George is a geologist and environmental scientist by training and has over 42 years of professional experience. Mr. George spent 5.5 years as a petroleum exploration and exploitation geologist and spent 37 years as an environmental consultant. Mr. George started Leigh Engineering (now Rone Engineering) environmental consulting practice in June of 1992 and founded Green Star Environmental in January 2000. Mr. George is currently a Principal at Green Star Environmental ("Green Star"). A copy of Mr. George's curriculum vitae is included with this report as Appendix A. Mr. George observed and managed performance of Phase I Environmental Site Assessments, Phase II Investigations, and Remediations since 1989. While in the petroleum business, Mr. George installed and observed completions of oil and gas producing wells in Kansas, Oklahoma and Texas. Mr. George has also identified, delineated, sampled, and remediated produced water, crude oil, and drilling mud releases in North and West Texas as an environmental consultant.

Mr. George's opinions for this Report are based upon review of available documents and references cited in Section 8 of this Report, and his 37 years of experience as an environmental consultant conducting assessment, investigation and remediation activities at sites similar to the Property. Mr. George's opinions are based upon readily available site data including historical and current information. However, his opinions are subject to change based upon new information should it become available. Information reviewed for this Report is documented in Section 8.0, References, with copies of the same attached as Appendices.

## 2.0 Legal Claim

The legal claim in this matter is a breach of contract. One of the primary issues is the enforcement of the environmental sections of the Standard Contract and Sale ("Contract") between the parties,

which is included as Appendix B of this Report involving the sale of 1,674 gross contiguous acres of land addressed as 7700 Old Granbury Road, Cresson, Hood County, Texas, ("the Property").

Section 6(i) of the Contract included a representation and warranty that there are no Hazardous Substances at the Property. It also included a comprehensive definition of Hazardous Waste from several significant Federal environmental laws and their resulting regulatory programs as well as environmental laws and their resulting programs in the State of Texas. Section 6(k) of the Contract also contains a representation and warranty that there are no underground storage tanks ("USTs"), and those that were previously removed, were lawfully removed.

Section 7(c) of the Contract includes an express obligation and covenant that the "Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials, and/or USTs located and in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith."

**3.0 Work Reviewed**

The purpose of this Report is to summarize my opinions regarding five environmental work reports I reviewed that were generated as part of the due diligence for the sale as specified in Exhibit B (7) of the Contract. My review allowed for comparison of the results of the five finalized environmental reports to the requirements of the Contract. Four of these documents are Phase I Environmental Site Assessments ("ESAs") reports conducted by Environmental Science and Engineering Partners, LLC, ("ESE") and Whitehead E. S. ("Whitehead"). Each of these reports was signed by the environmental professional who conducted the work. The fifth environmental work product was a Whitehead Limited Phase II Investigation report ("Limited Phase II")

Two other related documents were also reviewed. The first document was a work order for professional services for the Whitehead Limited Phase II of the Property. This document was not executed, but I understand an executed copy may be provided by Defendants during discovery in the near term. The second document was a Certificate of Liability Insurance ("COI") provided to Challenger Realty Group, by ESE on December 29, 2025.

Environmental consulting firms are commonly required to carry insurance to protect their clients from potential damage, accident, and professional errors that might occur during the performance of environmental work. The insurance provided is commonly Commercial General Liability (primary and an umbrella), Workers Compensation and Employee Liability, and Pollution Liability/ Professional Liability. Each of these insurances are based upon the policy being carried at the time the claim occurred, except for the Pollution Liability/ Professional Liability which is based upon the date the claim is made. These policies are and have been required throughout my environmental practice and the COI for Challenger covering the December 2025 Phase I ESA work is included as an example. In my opinion it is common for both buyers and sellers of property to request and receive letters of reliance from one another for environmental work products which cover property transactions. Once reliance is granted, the insurance carriers will add the requesting party as an additional insured on the policy and modify the COI accordingly. This specific COI also has several common modifications which can usually be added if requested by those seeking coverage. Environmental insurance companies have modified to some extent numerous policies of my company insurance coverage at the request of my client during my practice with no additional expense.

The environmental documents provided for my review are listed here and attached to the Appendices of this Report:

- ESE, Phase I ESA Report, dated 10/13/2023 (Appendix C);
- ESE, Phase I ESA Report, dated 12/18/2023 (Appendix D);
- ESE Phase I ESA Report, dated 12/11/2025 (Appendix E);
- ESE, COI, ESE to Challenger, dated 12/29/25 (Appendix F).
- Whitehead, Phase I ESA Report, dated 12/12/2025 (Appendix G);
- Whitehead Work Order for Professional Services, dated 01/07/2026 (Appendix H); and
- Whitehead Limited Phase II Report, dated January 26, 2026 (Appendix I).

The four ESE Phase I ESA reports were conducted for Buyer's informational purposes and not part of the work needed to be completed to meet Contract requirements. The fifth environmental work product was the Whitehead Limited Phase II report. The Whitehead Limited Phase II was conducted by behalf of the Seller. This work involved collection of a limited and insufficient number of soil samples to investigate potential release of chemicals from the natural gas well operation as further discussed below. In my opinion, each one of the work product reports reviewed as listed above, individually and collectively, would not meet the requirements as stated in Sections 6(i) and 7(c) of the Contract. In my opinion, each of the reports falls short of the requirements for various reasons. The remainder of this Report will specifically address the reasons that each report, individually and taken together, did not meet the requirements in the Contract.

**4.0 Due Diligence Timeframes**

Review of environmental work conducted at the Property indicates there was a very long delay by the Seller in conducting due diligence as compared to the industry standard I have observed for similar property sales. The Contract was executed on May 26, 2023. The Purchaser hired and had conducted the first environmental professional work at the property on October 11, 2023, approximately 4.5 months after execution of the Contract. The 4.5 months is similar to other work I have observed in my environmental consulting practice. There were no contractual obligations for the purchaser to conduct this environmental work.

The obligation in the Contract for environmental due diligence was on the Seller, who had the burden of providing a report signed by a licensed environmental engineer showing that the Property had no environmental contamination. This report was part of the due diligence items to be delivered to the Purchaser after an 180-day Inspection Period. In my opinion, to investigate a large 1,674-acre tract with previous land uses that possibly caused environmental contamination, would potentially require at least 180 days. Obviously, this would make the Seller need to retain an environmental professional promptly in order to meet the 180-day timeframe.

Based upon the environmental documents reviewed, the Seller did not hire an environmental professional until December 2025, approximately 2.5 years after executing the Contract. Based on this delay, my opinion is that the Seller appeared to have no intention of fulfilling its contracted obligation to conduct the required environmental due diligence.

I personally have completed similar studies in significantly shorter than 2.5 years. An example is a spill response in Texas under 30 TAC 327. This work requires demonstrations of cleanup of the release to background or at least residential assessment levels within 180 days and, in certain situations, another 180-day extension. The penalty for not addressing a spill response in the allotted timeframe is having to enter into a more extensive and lengthier regulatory program, such as the TCEQ Texas Risk Reduction Program ("TRRP"). My opinion is that timeframes of 180 days

to 360 days would be common industry practice for completion of environmental due diligence activities on properties similar to the Property, unless significant environmental impacts, such as a regulated petroleum spill or chemical impact was encountered.

### 5.0 ESA Reports Scope Compared to Contract Requirements

There have been four separate Phase I ESAs conducted at the Property. The first three were conducted by ESE. The first was published on October 13, 2023. The second was published on December 18, 2023. This appeared to be an update to the first report. The third was published on December 11, 2025. As both the second and third ESAs were conducted by the same company, ESE, the second report, the 2023 ESE Phase I ESA, is included as Appendix J in the 2025 Phase I ESA. The fourth Phase I ESA was published on December 12, 2025 by Whitehead. All four Phase I ESA reports were conducted by the Purchaser.

Currently a Phase I ESA report is defined by the American Standards and Testing ("ASTM") E1527-21 practice. In my opinion, the field inspections included in this practice are commonly conducted by the least experienced person in an environmental consulting firm. Because of the typically small budgets and short timeframes for Phase I ESA reports (even for large properties), their scopes are often limited to a single site visit. In addition, many consulting firms working on rural land have no experience with historical and current agricultural practices or oil and gas operations. Both of these land uses apply to the Property. As a result, the outcomes of Phase I ESAs are highly variable. Phase I ESA practices are very sensitive to professional judgment and experience of the environmental consultant who conducts the practice.

The second issue is that a Phase I ESA is a limited study. Sections 1.3 and 1.4 in each of the ESE Phase I ESA reports and 1.4 in the Whitehead Phase I ESA report list significant scopes of review and data gaps on items covered, many of which apply directly to this Property. A limited list of specific issues not included by these practices in the reviewed Phase I ESAs are as follows:

- <u>1.3 Detailed Scope-of-Services Not included in the Phase I ESAs conducted</u>:
    - Asbestos-containing building materials;
    - Lead-based paint;
    - Lead-in-drinking-water (historic plumbing is located at the Property);
    - Wetlands/flood plains (there are potential wetlands and flood plain issues at the Property);
    - Fill material;
    - Emerging contaminants (e.g. Per- and Polyfluoroalkyl Substances (PFAS)) and 6PPD-Q;
    - Vapor Intrusion (former termiticides in farmhouse and other structures);
    - Groundwater Conservation Districts (Hood County is located in the Upper Trinity Groundwater Conservation District and subject to its rules); and
    - Other substances not defined (or not yet defined) as hazardous substances

Section 6(i) of the Contract has a substantial list of federal and state programs in its definition of Hazardous Substances. Note that the last bullet point discussing only items included in CERCLA as hazardous substances is included in each of the three ESE ESAs' definition of hazardous substances. The Whitehead Phase I ESA had a broader definition of hazardous substances but still falls short. Both have an unacceptable limitation as compared to the dozen federal, and several state, environmental programs listed in Section 6(i) of the Contract. Therefore, that

limitation invalidated any representation that these Phase I ESAs will potentially meet the Contract requirements of Sections 6(i).

One simply needs to read each Phase I ESA report's section on scope and limitations of the practice to conclusively show that these limitations invalidate any representation that a Phase I ESA will meet the Contract requirements noted above. Please see the following language from each of the three ESE Phase I ESAs Section titled 1.3 Detailed Scope-of-Services and 1.4 Limiting Conditions:

- "Specific to this Phase I ESA, the lack of evidence of the presence of hazardous materials following completion of the tasks of a reasonable and mutually agreed-upon scope of work does not guarantee the absence of such materials; rather, it only indicates that none were found as a result of the services provided."
- "A warranty or guarantee regarding the presence or absence of hazardous materials that could potentially affect the subject property is not provided."

Please see the following Whitehead language from its Phase I ESA's Section 1.4 Limitations and Exceptions:

- "Information obtained from businesses or individuals is limited to that which is voluntarily disclosed. A complete evaluation of business environmental risk associated with a parcel of commercial real estate may necessitate investigation beyond that identified in this practice."

In summary, the language in ESE's Section 1.3, which limits the chemical to a single program and the language in Section 1.4 states that the ESAs contain no warranty or guarantee regarding the presence or absence of hazardous materials makes these reports unable to meet Section 6(i). Whitehead's limitation language is similar in scope and acknowledges the ESA cannot provide a warranty that the ESA will do a study as required by the contract. In both situations, this simply is the opposite of what the Contract requires in Section 7(c) with regard to providing a report that no environmental contamination exists on or with respect to the Property.

The final and third issue is data gaps. There were no responses from the Seller or its representative (Section 5.1) in the 2023 ESE Phase I ESA report. However, there was a brief interview in the ESE Phase I ESA 2025 report that indicated the onsite natural gas wells had been removed. There were no responses from Seller or its representatives to the All Appropriate Inquiry questions included in Appendix G, in either of the three ESE "Phase I ESA Owner/Operator Inquiry" forms in the three ESE Phase I ESA reports.

In the environmental practice of conducting Phase I ESA reports, it is not unusual to have a significant lack of communication regarding past land use and activities. When there is a significant data gap, common environmental practice is to take physical sampling at the subject site to make up for the lack of substantive historical information.
In the environmental due diligence industry, Phase I ESAs are often a limited review of a property as compared to what is required by the sales contract in this case. ESAs are often and in this case certainly are limited in scope, have data gaps, and cannot be represented as reports that will meet the required confirmation in Sections 6(i) and 7(c) of the Contract. The ESA approach should have been conducted specifically to meet that obligation.

## 6.0 Seller's Consultant Work Compared to Contract Requirements

The Seller hired Whitehead in December 2025. Whitehead conducted a Phase I ESA on the Property, which was completed on December 12, 2025.

On January 7, 2026, Whitehead, mobilized to the Property to conduct a Limited Phase II investigation based upon the findings of the December 12, 2025 Whitehead Phase I ESA. These findings identified the two onsite former natural gas well pad locations as Recognized Environmental Conditions ("RECs"). A third still active offsite well pad was also targeted for investigation at the adjacent onsite property boundary. The first well pad was located on the south-central portion of the Property and the second was located on the north central Property boundary. The third well pad was located directly adjacent but offsite on the southwest Property boundary. Each of the borings conducted was not placed upon the actual well pad but at a distance from its edge. Please refer to Figure 4 in the attachments for the boring locations.

The LSI consisted of six borings (SB-01 through SB-06), three of which were converted into temporary monitor wells (TMW-01/SB-1, TMW-02/SB-4 and TMW-03/SB-5). Nine soil samples were collected for analytical analysis. Analytes were total petroleum hydrocarbons (TPH TX 1005), petroleum fuel fractions compounds benzene, toluene, ethyl benzene and total xylenes (BTEX) by (EPA 8260C) or full volatile organic (VOCs) and methyl tert-butyl ether (MTBE) (EPA 8260C), barium (EPA Method 9045D), chloride (EPA Method 300.0), and pH (General Chemistry). Five of the six borings hit probe refusal at limestone bedrock at each boring from 5.5 to 10 feet below surface grade ("bgs") except for SB-06, which was terminated in gravelly sand at 7.0 feet bgs.

One-inch diameter temporary monitoring wells were installed in SB-01, SB-04, and SB-05 and named TMW-01, TMW-02 and TMW-03 respectively. Wells TMW-01, TMW-02 and TMW-03 were installed at a total depth of 19 feet, 24 feet, and 11 feet respectively, with each having a blank rise of 3.5 feet, 8.5 feet, and 0.5 feet, respectively. None of the temporary wells produced groundwater during the day of the investigation. Therefore, no groundwater samples were collected.

Of the nine soil samples collected, seven samples appeared to have soil that had been impacted by oil and gas operations. Two of the samples SB-03 (3-4′) and SB-06 (6-7′) had elevated chloride impacts. Four of the soil borings SB-01 (3-4′), SB-02 (3-4'), SB-03 (5-6′), SB-04 (3-4′) had TPH or BTEX fractions from petroleum. One of the soil samples SB-06 (6-7′) had increased barium impacts. Each represents environmental contamination.

My opinion is that because of the limited number of borings drilled, the size of the potentially impacted pad site areas, the distances of the sampling locations off of the actual pad sites away from the potential sources, and the finding of impacts in 77% of the soils sampled, this investigation could only be considered a confirmation of oil and gas operations environmental contamination at the Property. And ultimately, this work did not suffice to meet the requirements of Section 7(c) of the Contract.

The Whitehead investigation was also very limited by the number of boring locations. Based on Google Earth historical aerials of the gas well pads sites and well drilling pits, measurements indicated a size of 2.5 acres occupied by the oil and gas operations at the north onsite locations, and yet there were only three borings and three soil samples analyzed. The south onsite gas well pad was approximately 1.65 acres in area, and yet there were only two borings and four soil

samples analyzed. In my opinion, the number of borings and samples compared to the large area of the source being investigated was too few.

In addition, the work defined in the Whitehead Work Order for Professional Services limited the work product to only analyze the edges of former natural gas well pad sites for the limited chemicals listed: total petroleum hydrocarbons, volatile petroleum aromatics, volatile organic compounds, polyaromatic hydrocarbons, chloride and barium.

The Whitehead Limited Phase II report did not analyze a sufficient suite of chemicals of concern to fully determine the extent of contamination impacts. A limited example that was not included is the metal boron, which comes from additive chemistry. It also excluded antifreeze, coolant leaks, and natural/anthropogenic sources in produced water (brine saltwater coproduced with the natural gas). Another example excluded from the investigation was Naturally Occurring Radioactive Material ("NORM"), which is representative of certain radioactive substances found in produced water, oil, and natural gas that plate out into metal vessels and pipes and can be found at former oil and gas operation in the rusted scale from metal equipment and pipes.

In my opinion, impacts from oil and gas operations have been determined to exist at the Property. Therefore, a broader review of known chemicals from oil and gas operations should have been (and still should be) conducted to allow for an additional comprehensive investigation of the impacts. Additional wells need to be placed on the well pads under each significant source to allow for definition of the potential source term. Then appropriate delineation can be conducted and potential mitigation conducted if required.

None of the Whitehead work conducted at the Property mentions or discusses the actual obligations included in Sections 6(i) and 7(c) of the Contract. Mr. Whitehead and none of the other environmental professionals who prepared and signed the Whitehead Phase I ESA or Phase II reports were licensed environmental engineers as required in Section 7(c) of the Contract. The Whitehead work did not remediate or delineate the chemical impacts found by its studies, and that work will not support confirmation that no environmental contamination exists as required by Section 7(c) in the Contract. There is also the issue as to whether soil at the levels measured in the Whitehead report is potentially subject to regulation if they are removed from the Property to an offsite location.

Finally, the January 5, 2025 Whitehead Phase II work order limited the investigation of the Property to a single issue, i.e., oil and gas operations. There are several other unresolved issues that I have encountered at sites similar to the Property which need to be assessed. My list will not be comprehensive and might expand depending on future investigational information. A list of additional potential impacts would be as follows:

- Residual environmental impacts from observed drum spills and areas of stored drummed petroleum at the Property.
- Residual environmental impacts from chemical leaching from abandoned and partially buried tires at the Property.
- Residual environmental impacts along the Property boundary occupied by the Fort Worth Western Railroad (West Property Boundary) for nearly one hundred years.
- Residual arsenic, pesticides, and herbicides, at the northwest, southwest, and southeast portions of the Property which have had agricultural operations since the 1930s.
- Residual saltwater impacts along natural gas pipelines which cross the Property, with an emphasis on low areas where produced water commonly corrodes pipes and causes leaks.

- Sampling of water resources at the Property. This work would include a comprehensive investigation of surface water and water supply wells to ensure its quality had not been impacted by known, past property uses. Some of the work would also include lead in drinking water. This review would ensure each groundwater supply well at the Property is properly sealed, secured, and inspected every 180 days as required by Texas law. It would have been simple to have sampled both known groundwater wells at the Property when conducting the Whitehead Phase II. This would have not only confirmed the wells have good quality water, were secure and sealed, and visited as required by Texas law.
- Inspection and potential sampling of fill areas at the Property including the north-central natural gas pad, the Smelly Lake dam, and a former borrow pit near the onsite residence.

Significant additional environmental investigation work will need to be conducted to determine which of the potential former operational activities at the Property are actual sources of the impacts at the Property, if their impacts require regulatory actions, and what would be the costs of potential mitigation.

**7.0 Summary**

I have conducted my review of the Contract, five environmental reports, and two additional, related documents. These documents consisted of four Phase I ESA reports, one Limited Phase II report, an environmental work order, and an insurance certificate.

In my opinion, each environmental report, individually and collectively, fails to meet the requirements in Section 6(i) and Section 7(c) of the Contract. Each of the Phase I reports fall short of the Contract requirements because of their limited scope, limitation in chemicals covered, and limitation on warranties and representations for the work. The Limited Phase II Investigation cannot meet the requirements of the Contract because the limited scope just included oil and gas operations, the sampling density as compared to the size of potential source areas, and the limited chemicals analyzed in the investigation. The Limited Phase II also confirmed actual environmental impacts from the former onsite oil and gas wells. There were no environmental reports prepared by a licensed environmental engineer. There will need to be extensive additional environmental investigation and sampling reports prepared by a licensed environmental engineer to meet the contractual obligations of Section 6 (i) and 7(c) of the Contract and supply a report that "no environmental contamination exists on or with respect to the Property in connection therewith."

**8.0 References**

In preparing this Report, I reviewed the documents attached:

Curriculum Vitae of Mr. R. Steven George, Appendix A, October 12, 2025.
Standard Contract and Sale ("Contract"), Appendix B, May 10, 2023.
ESE, Phase I Environmental Site Assessment Report, Appendix C, October 13, 2023.
ESE, Phase I Environmental Site Assessment Report, Appendix D, December 18, 2023.
ESE, Phase I Environmental Site Assessment Report, Appendix E, December 11, 2025.
ESE, Certificate of Liability Insurance, ESE to Challenger Appendix F, December 29, 2025
Whitehead, Phase I Environmental Site Assessment Report, Appendix G, December 12, 2025.
Whitehead, Work Order for Professional Services Appendix H, January 5, 2026
Whitehead, Limited Phase II Investigation Report, Appendix I, January 26, 2026

**FIGURES**

**Figures**


LEGEND
Approximate Property Boundary
Subject Property
Willow Park
Aledo
Annetta South
Benbrook
Crowley
Cresson
Godley
Joshua
Granbury
Decordova
Pecan Plantation
Parker
Tarrant
Hood
Johnson
CHALLENGER CRESSON I, LLC
APPROXIMATELY 1,675 ACRES
7700 OLD GRANBURY ROAD
CRESSON, HOOD COUNTY, TEXAS
SUBJECT PROPERTY LOCATION MAP
PROJECT NUMBER: 23-1094-1
FILE NAME: FIGURE_1
DATE: 9/26/2023
DRAWN BY: LS
APPROVED BY: KO
ese partners
Copyright © 2023
Projection: NAD 1983 StatePlane Texas North Central FIPS 4202 Feet
Sources: Esri, HERE, Garmin, USGS, Intermap, INCREMENT P, NRCan, Esri Japan, METI, Esri China (Hong Kong), Esri Korea, Esri (Thailand), NGCC, (c) OpenStreetMap contributors, and the GIS User Community
FIGURE 1
0
20,000'
N
1 inch = 20,000 feet


LEGEND
Photo Direction
Water Well
Fenceline
Railroad
Water Body
Wells
Approximate Property Boundary
Old Agricultural Structure
API Well #22131018
11
10
12
3
Drums
14
8
9
6
Silos
Conveyor Belt
5
7
Barns
4
2
Single-Family Residence
1
13
API Well #2213047 and 500-gallon Petroleum Oil AST
CHALLENGER CRESSON I, LLC
APPROXIMATELY 1,675 ACRES
7700 OLD GRANBURY ROAD
CRESSON, HOOD COUNTY, TEXAS
SITE MAP
PROJECT NUMBER: 23-1094-1
FILE NAME: FIGURE_2_LANDSCAPE
DATE: 10/13/2023
DRAWN BY: KC
APPROVED BY: KO
ese partners
Copyright © 2023
Projection: NAD 1983 StatePlane Texas North Central FIPS 4202 Feet
Source: Esri, Maxar, Earthstar Geographics, and the GIS User CommunitySource: Aerial Imagery Provided
FIGURE 2
0
2,000
N
1 inch = 2,000 feet


LEGEND
Permitted Location
Dry Hole
Gas
Plugged Gas
Canceled / Abandoned Location
Injection / Disposal
Approximate Pipeline Location
Water Body
Structure
REC
Approximate Property Boundary
Undeveloped Land
Undeveloped Land
Undeveloped Land
Undeveloped Land
REC: Former Well Pad
Silos
Graded Land
REC: Former Well Pad
Single-Family Residence
Single-Family Residences
CHALLENGER CRESSON I, LLC
APPROXIMATELY 1,631.22 ACRES
7700 OLD GRANBURY ROAD
CRESSON, HOOD COUNTY, TEXAS
SITE MAP
PROJECT NUMBER: 24-1090-02
FILE NAME: FIGURE 2
DATE: 12/11/2025
DRAWN BY: KC
APPROVED BY: KO
ese
FIGURE 3
0
2,250'
N
1 inch = 2,250 feet




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

## LEGEND

| | |
|---|---|
| Approximate Site Boundary | red line |
| Pipeline | green line |
| Horizontal Well | black line |
| Gas Well | ⊕ |
| Soil Boring | ⊕ (green) |
| Temporary Monitoring Well | ⊕ (cyan) |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

NOTES:

Figure is not to scale.

# Figure 4
# Site Layout

**Cresson Moon Property, LLC**
**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
Google Earth Mapping Service, Imagery Date: 11/20/2024

| | |
|---|---|
| DRAFTED BY: DG | CHECKED BY: AP |
| PROJECT NUMBER: 379.001 | DATE: 01/2026 |

**Appendix A**

**Curriculum Vitae of R. Steven George**

**RICHARD STEVEN GEORGE, P.G.**
*Principal/Manager*

## SUMMARY OF PROFESSIONAL EXPERIENCE

**Principal/Manager, Green Star Environmental, Arlington, Texas**
Founder of an established environmental consulting firm based upon providing excellence in technical and client service. Manage a team of nine environmental professionals with a focus on environmental consulting in remediation, closure services, risk assessment, litigation support, and training services. (01/2000 – Present)

**Industrial Division Manager, Leigh Engineering, Inc., Dallas, Texas**
Responsibility included managing the Leigh Engineering remediation and industrial services team. Supervised a staff of four senior project managers, two environmental engineers, and twelve staff scientists. Responsibilities included developing new services, new business, and client development. Technical responsibilities included development of remedial strategies, quality assurance/quality control, and staff development. Project experience included regulatory negotiation, litigation support, third-party negotiation, property transaction, risk assessment, groundwater modeling, site closure design, remedial system design and construction, remedial system installation, and remedial system operation and maintenance. (06/92 – 12/99)

**Project Manager, ATEC Associates, Inc., SW Regional Office, Dallas, Texas**
Responsibility included project management and service to clients totaling 40 percent of the Dallas office's environmental work. Responsibilities included client and business development. Managed projects and assessments for industrial, financial, and petroleum marketing facilities. Provided technical support for design, installation, and operation of remediation systems. (04/90 – 06/92)

**Senior Staff Geologist, ATEC Associates, Inc., NE Regional Office, Colombia, Maryland**
Responsibility included operation and maintenance of soil and groundwater remedial systems. Developed sampling programs for delineation of chemicals and petroleum hydrocarbon releases. Performed soil gas, soil, and groundwater investigations. Generated assessment reports for property transactions. Maintained and operated field instrumentation including portable gas chromatographs and flame-ionization detectors for the environmental division. (06/89 – 04/90)

**Retail Manager, The Wilderness Adventure, Tulsa and Oklahoma City, Oklahoma**
Responsibility included all operations of an outdoor specialty store. Responsibility included budgeting, scheduling, sales, staff hiring, staff training, ordering of merchandise, and security. Supervised a staff of twelve people. (07/86 – 04/88)

**Consultant Geologist, Independent, Oklahoma City, Oklahoma**
Developed prospects and provided technical support for drilling of oil and gas development and exploration wells. (12/85 – 07/86)

**RICHARD STEVEN GEORGE, P.G.**
*Principal/Manager*

**Exploration and Exploitation Geologist, Tuthill & Barbee, Oklahoma City, Oklahoma**
Generated and reviewed prospects for drilling of oil and gas production wells. Was involved in the drilling and completion of over 75 wells in a five-year period. Provided technical mapping, correlation, well-site logging, and geophysical interpretation. (01/81 – 12/85)

**Summary of Project Experience**

Designed and implemented a field investigation to assess the historical environmental impacts to a 14-acre site in downtown Baltimore, Maryland. The site involved numerous properties, historical uses, and potential chemical impacts that required historical research, soil gas sampling, soil sampling and groundwater sampling in an intertidal hydrogeologic setting.

Installed, operated, and maintained a large groundwater pump and treat project for a large retail distribution center in Washington, D.C. The system consisted of three separate systems at one site, operating in conjunction with a cut-off slurry wall at the site perimeter. Treated water was re-injected to provide additional hydraulic containment.

Provided the due diligence to support a successful transfer of an $89 million transaction involving seven industrial facilities in six states. The sales involved two buyers, several financing institutions, three environmental consultants, and numerous attorneys over a 17-month period. Several of the facilities had substantial environmental issues.

Responded to an emergency call at a major package delivery service business where a surface release of gasoline was underway. The emergency was abated and the site stabilized. The problem was investigated with the site being returned to service within 24 hours. Residual vapor problems inside the facility and phase-separated product in the subsurface utilities were investigated and abated within three months of the initial release. The site was subsequently investigated with subsurface soils and groundwater impacts being remediated and closure obtained in a two-year period.

Provided remedial strategies and closure services for a major industrial facility in operation for over four decades in central Dallas, Texas. The site had over thirty separate potential chemical and hydrocarbon source areas, including heavy metals, halogenated solvents and petroleum. Services provided a rapid identification of previously unidentified off-site contributors, and quantified the low risk of the site to potential receptors, allowing for successful regulatory negotiation of limited on-site remedial expenditure. Innovative application of environmental assessment and risk assessment methods have lead to the site closure and monitoring several years ahead of original estimates.

Provided remedial oversight for a large Texas based utility on a $4.5 million dollar remediation of a former Steam Electric Station in the heart of downtown Dallas. The project allowed for the cleanup of the site to residential standards. The remediation involved coordination

**RICHARD STEVEN GEORGE, P.G.**
*Principal/Manager*

**Summary of Project Experience (Cont.)**

of three consultants, two law firms, the state and the city regulatory authorities. The site was subsequently developed into a $325 million dollar sports arena for both basketball and hockey.

Provided consulting and litigation support services for litigation involving pesticide contamination in residential neighborhoods in the Rio Grande Valley of Texas. The project involved historical research of the residential development in the area, review and deposition of technical experts, and research of pesticide type, availability and use by the residents, city and agriculture at the project sites. Work resulted in the non-suiting of the represented parties from the litigation.

Responded to an emergency call from a large North Texas health care system. During the construction of a new clinic they had encountered unknown underground storage tanks and a trap with chemical odors. The tanks and soils around the trap were removed and impacts delineated on an expedited basis allowing for the construction to continue with a minimum of delay. Impacted soils were subsequently remediated at the project site preventing the soils from being generated as a hazardous waste, which lowered cost and future superfund liability. The site was subsequently developed into a $40 million dollar research facility.

Served as a technical resource during the writing of the procedural ordinances for municipal setting designations (MSDs) programs for the Cities of Dallas and Grapevine, Texas. Served as the lead consultant on a team of environmental professionals that completed the first multiple-property owner MSD in Dallas, Texas. Recently served as the lead consultant on a team of environmental professionals who simultaneously completed three actively contested MSDs in the City of Fort Worth. Currently working with several North Texas cities to develop area-wide applications of MSDs for redevelopment purposes.

Served as an environmental consultant to an individual in Jack County Texas whose ranch had been contaminated by an estimated 2,000-barrel release of produced water from a corroded steel surface pipe. The release contaminated over an acre of surface soil near the pipe release, thousands of yards of soils and sediment in the down gradient creek and stock tanks, as well as killing dozens of trees. The remediation required the draining of two of the Site stock tanks and disposal of an estimated 8,000 barrels of brine impacted water. Mr. George acted initially as technical advisor and then was retained in the legal claim as expert witness. After resolution of the legal claim, Mr. George managed delineation of the impacts, the disposal of the wastewater, and remediation of the soils on the Site. Mr. George then documented the cleanup work and closed the release with the Railroad Commission of Texas.

**RICHARD STEVEN GEORGE, P.G.**
*Principal/Manager*

Bachelor of Science, Geology, University of Oklahoma, Norman, Oklahoma, 1980
Oklahoma State University Hydrogeology Training, Metro Tech Vocational Training Center, Oklahoma City, Oklahoma, May 1989

**Education Professional Registrations, Certifications**

Hazardous Waste Operations and Emergency Response, 40-hour Training Course, OSHA 29 CFR 1910.120
Safety & Health at Hazardous Waste Sites
8 Hour Supervisor Course, OSHA 29 CFR 1910.120

State of Louisiana, Professional Geoscientist, License No. 1302
State of Louisiana, Response Action Contractor, AI No. 224379
State of Tennessee, Professional Geologist Registration No. TN-2178
State of Texas, Professional Geoscientist, Geology, License No. 5047
Texas Commission on Environmental Quality (TCEQ) Leaking Petroleum Storage Tank (LPST) Project Manager PM0000084

**Affiliations**

City of Dallas, Brownfields Forum (1995-2005)
City of Arlington Brownfields Advisory Committee (2008-2010)
National Ground Water Association, Association of Ground Water Scientist & Engineers
Dallas County Bar, Environmental Section
Tarrant County Bar, Environmental Section
North Texas Association of Environmental Professionals
Society of Texas Environmental Professionals

**Presentations**

Battelle Conference 2016, Alteon DFW Presentation
Remtech Conference 2016, Alteon DFW Presentation
Battelle Conference 2022, Session G6, Group 2, Lake Tawakoni Presentation
Battelle Conference 2024, Session D9, Group 2, Risk Abatement PSH