# EXHIBIT A

# FIRST SUPPLEMENTAL EXPERT REPORT OF MICHAEL WHITEHEAD

## I. INTRODUCTION

I, Michael Whitehead, M.S., submit this Supplemental Expert Report ("Supplemental Report") in connection with my designation as Defendants' rebuttal expert witness in *Challenger Cresson I, LLC v. Bill Sanders, Independent Executor of the Estate of Pearl Smelley, et al.*, Cause No. 4:26-cv-00231-P, pending in the United States District Court for the Northern District of Texas, Fort Worth Division.

This Supplemental Report supplements my initial Expert Report, which was previously submitted as Exhibit A to Defendants' Designation of Expert Witnesses, dated August 7, 2026. This Supplemental Report does not replace my initial Expert Report but rather provides additional opinions responsive to the Expert Report of R. Steven George, P.G. of Green Star Environmental ("George Report"), submitted on behalf of Plaintiff and dated August 10, 2026.

## II. SCOPE OF SUPPLEMENTAL REPORT

This Supplemental Report is prepared to respond to the Expert Report of R. Steven George, P.G. of Green Star Environmental, dated and submitted on behalf of Plaintiff ("George Report"). My opinions herein are based on my education, training, experience, first-hand knowledge, and my review of the George Report and its supporting materials. Mr. George's report raises several criticisms of the Phase II Investigation conducted by Whitehead ES and makes a number of assertions regarding the environmental condition of the Property at 7700 Old Granbury Road, Cresson, Hood County, Texas (the "Property" or "Site"). I address each of his principal contentions below.

## III. REBUTTAL TO CLAIM THAT THE PHASE II INVESTIGATION WAS INSUFFICIENT IN SCOPE

Mr. George states that the Phase II Investigation involved "a limited and insufficient number of soil samples" and did not meet the requirements of Sections 6(i) and 7(c) of the Contract. I disagree with this characterization.

Whitehead ES worked directly with Aaron Munsart of ESE Partners, LLC (“ESE”), the Purchaser’s Environmental Professional, to develop the scope of the Phase II Investigation. ESE reviewed and agreed upon the scope to specifically address the Recognized Environmental Conditions (“RECs”) identified in the Phase I ESAs. It is my opinion that this collaborative scope development was consistent with the standard of care for environmental investigations of this nature.

ESE reviewed and commented on the proposed scope of work, and ESE's recommended additions — including barium and chloride analysis — were incorporated into the final work plan. The number of samples, locations, and analyses were based on the scope of work agreed upon by ESE. In my professional opinion, this final scope reflected a reasonable and professionally appropriate approach for addressing the identified RECs and was consistent with standard environmental investigation practices for sites of this type.

ESE conducted third-party oversight during the field investigation on January 9, 2026, to ensure that the agreed-upon scope of work was rigorously followed. In my professional opinion, the fact that the Purchaser's own Environmental Professional reviewed, approved, and physically oversaw the investigation is strong evidence that the investigation met the applicable standard of care. Mr. George's after-the-fact criticism that the scope was insufficient is inconsistent with the contemporaneous professional judgment of the Purchaser's own consultant.

## IV. REBUTTAL TO CRITICISM OF SAMPLING LOCATIONS

Mr. George criticizes the placement of soil borings, asserting that they were installed "at a distance from [the] actual well pad" rather than directly on the well pads. This criticism is unfounded.

Sampling locations were identified using high-quality aerial photographs obtained from Texas Database LLC for 2007 and 2011, which clearly depicted the well pads, former aboveground storage tanks ("ASTs"), and associated reserve pits — the key areas of concern ("AOCs"). These photographs provided superior resolution compared to the Google Earth historical aerials cited by Mr. George. In my professional opinion, this approach — using the best available imagery to target known AOCs — represents sound professional judgment and is consistent with the standard of care for Phase II investigations.

Soil borings SB-01 and SB-02 at the north well pad were installed in the location of the former pond area at the edge of the pad, which was a key AOC, while SB-03 was installed near the ASTs. Soil boring SB-05 was installed in the former pond, and SB-06 was installed adjacent to the ASTs of the south well pad. It is my professional opinion that these boring locations were placed in the most critical areas to assess potential environmental impacts from historical oil and gas operations, and that this targeted approach was more likely to detect contamination, if present, than a random or grid-based approach.

It is my professional opinion that these boring locations were in the most critical positions to detect COCs from the historical oil and gas operations identified by both ESE and Whitehead ES in their respective Phase I ESAs.

## V. REBUTTAL TO CHARACTERIZATION OF ANALYTICAL RESULTS AS "CONTAMINATION"

Mr. George asserts that seven of nine soil samples "appeared to have soil that had been impacted by oil and gas operations" and that the detected concentrations "[e]ach represents environmental contamination." He further opines that "this investigation could only be considered a confirmation of oil and gas operations environmental contamination at the Property." These characterizations are scientifically inaccurate and misleading.

None of the soil samples collected during the Phase II Investigation contained COCs exceeding any regulatory limits under the TCEQ Texas Risk Reduction Program ("TRRP"), including the most conservative Residential Assessment Levels ("RALs"), or under the RRC Regulatory Protection Limits. The Phase II Investigation did not identify any release subject to TRRP, which is the regulatory standard currently used by both the TCEQ and the RRC for evaluating potential contamination from oil and gas operations. In my professional opinion, applying these regulatory frameworks, none of the detected concentrations constitute environmental contamination.

The specific analytical data demonstrate the absence of contamination:

Ethylbenzene was detected at concentrations as low as 0.00127 mg/kg with a J qualifier, which is well below the Residential Assessment Level of 7.6 mg/kg. The J qualifier indicates that the analyte was detected below the laboratory equipment calibration level, meaning the detection is an estimated value at trace concentrations. This is not a concentration of concern by any regulatory standard.

Total xylenes were detected at concentrations ranging from 0.000657J mg/kg to 0.0129 mg/kg --- well below the TRRP Protective Concentration Level ("PCL") of 120 mg/kg. These concentrations are orders of magnitude below any level of regulatory concern.

Total Petroleum Hydrocarbons ("TPH") diesel range was detected in only one sample, SB-01 at 3-4 feet below ground surface, at 35.5J mg/kg --- well below the TRRP PCL of 200 mg/kg. Follow-up Polynuclear Aromatic Hydrocarbon ("PAH") analysis on this sample detected no PAHs, further confirming the absence of significant petroleum impacts.

Barium was detected in all six samples at concentrations ranging from 16.7 to 148 mg/kg --- all below the TRRP PCL of 440 mg/kg.

Chloride was detected in four samples at concentrations ranging from 5.71J to 250 mg/kg --- well below the RRC Regulatory Protection Limit of 3,000 mg/kg.

Field observations during the investigation were consistent with these analytical findings: no dark staining or odors were observed, and PID readings were low, ranging from 0.0 to 9.2 ppm. In my professional opinion, these PID readings are consistent with background conditions and are not indicative of an environmental release. It is scientifically more appropriate to characterize the analytical results as low concentrations of specific analytes detected at levels below their

applicable RALs or Tier 1 Default Protective Concentration Levels — not as “environmental contamination” as Mr. George contends.

I do not concur with Mr. George's opinion that the investigation "could only be considered a confirmation of oil and gas operations environmental contamination at the Property." Our findings did not indicate any evidence of environmental contamination.

## VI. REBUTTAL TO ASSERTION THAT ADDITIONAL CHEMICALS SHOULD HAVE BEEN ANALYZED

Mr. George opines that the Phase II Investigation did not analyze a "sufficient suite of chemicals of concern," citing boron, antifreeze/coolant, and Naturally Occurring Radioactive Material ("NORM") as analytes that should have been included.

The analytical parameters for the Phase II Investigation were developed in coordination with ESE, the Purchaser’s consultant. ESE reviewed, commented upon, and approved the scope of work, and ESE’s representative conducted physical oversight during sampling to ensure the approved scope was properly implemented. In my professional opinion, this suite of COCs was sufficient to characterize potential impacts from the identified RECs, and this level of coordination and oversight reflects best practices in the environmental consulting industry.

With respect to the specific analytes identified by Mr. George: boron has a Residential Assessment Level of 16,000 mg/kg — one of the highest thresholds under TRRP. Similarly, ethylene glycol (the active ingredient in antifreeze) has a Residential PCL of 9,400 mg/kg. Neither the Phase I ESA findings nor process knowledge identified a valid source for these analytes at this Site. In my professional opinion, without an identified source pathway, these analytes would not be included in a reasonably scoped investigation, and their exclusion was consistent with the standard of care for environmental investigations of this nature.

## VII. REBUTTAL TO CRITICISM OF DUE DILIGENCE TIMING

Mr. George opines that the Seller delayed environmental due diligence, noting that the Seller did not retain an environmental professional until December 2025, approximately 2.5 years after executing the Contract. Based on this delay, Mr. George concludes that "the Seller appeared to have no intention of fulfilling its contracted obligation to conduct the required environmental due diligence."

The Phase II Investigation at this Site was scoped, executed, and completed within its intended timeframe, and no COCs were detected above applicable Texas regulatory levels. It is my professional opinion that an investigation of this scope at a site with these characteristics could readily be completed in less than 180 days, and that the investigation was completed competently and thoroughly within a reasonable timeframe.

## VIII. REBUTTAL TO CLAIM REGARDING PROFESSIONAL CREDENTIALS

Mr. George asserts that reports were required to be prepared by a "licensed environmental engineer" pursuant to Section 7(c) of the Contract, and that Whitehead ES, as a P.G. firm, did not satisfy that requirement.

The Phase II Investigation was reviewed and sealed by a Professional Geoscientist of Whitehead ES, and it is the professional opinion of Whitehead ES that there is no environmental contamination on or with respect to the Property. In my professional opinion, the investigation was conducted in accordance with applicable professional standards. Under the relevant ASTM standards governing Phase I ESAs and Phase II Investigations, no additional licensure or review beyond Environmental Professional and Professional Geoscientist credentials is required.

## IX. REBUTTAL TO ASSERTIONS REGARDING ADDITIONAL POTENTIAL IMPACTS

Mr. George identifies a list of additional potential environmental impacts that he asserts require further investigation, including drum spills, buried tires, railroad impacts, agricultural pesticides and herbicides, saltwater impacts along pipelines, and water resource sampling.

The Phase II Investigation was scoped to address the RECs specifically identified in the Phase I ESAs conducted by both ESE and Whitehead ES, and the analytical results confirmed that no COCs were detected above applicable regulatory criteria. In my professional opinion, the investigation was appropriately scoped, and there is no scientific basis for Mr. George's assertion that additional investigation is necessary to evaluate these speculative potential impacts.

During the Whitehead ES Site reconnaissance conducted on December 3, 2025, no ASTs, drums, containers, dark staining, stressed vegetation, or odors were observed on the Property. In my professional opinion, these field observations are inconsistent with the presence of the widespread contamination Mr. George implies, and his speculative list of additional potential impacts does not undermine the conclusion that no environmental contamination was found on the Property.

## X. SUMMARY OF SUPPLEMENTAL OPINIONS

Based on my review of the materials in this case, including the George Report, I hold the following supplemental opinions:

1. The scope of the Phase II Investigation was proposed to, reviewed by, and agreed upon by ESE Partners, LLC, the Purchaser's own environmental consultant, and was sufficient to address the RECs identified in the Phase I ESAs.

2. Sampling locations were based on high-quality aerial photographs and were placed in critical locations --- including former reserve pits and adjacent to former AST locations --

- to determine if COCs were present from historical oil and gas operations. These locations were approved by ESE.

3. None of the soil samples collected during the Phase II Investigation contained COCs exceeding any regulatory limits under TCEQ TRRP, including the most conservative Residential Assessment Levels, or RRC Regulatory Protection Limits. The characterization of the analytical results as "environmental contamination" is scientifically inaccurate and misleading.

4. The Phase II Investigation did not identify any release subject to TRRP. Field observations, including the absence of dark staining, odors, and low PID readings, were consistent with the analytical findings.

5. The suite of chemicals analyzed was sufficient and was developed in coordination with and approved by ESE. The exclusion of boron, antifreeze, and NORM was professionally reasonable given the extremely high regulatory thresholds and absence of identified sources.

6. An investigation of this Site with this scope could readily be completed in less than 180 days, and the investigation was completed competently and thoroughly within the applicable timeframe.

7. The Phase II Investigation was reviewed and sealed by a Professional Geoscientist of Whitehead ES, and no additional licensure beyond E.P. and P.G. credentials is required to satisfy the relevant ASTM standards for Phase I ESAs and Phase II Investigations.

8. Mr. George's speculative list of additional potential environmental impacts does not change the conclusion that no environmental contamination was found on the Property. No ASTs, drums, containers, dark staining, stressed vegetation, or odors were observed during the Whitehead ES Site reconnaissance on December 3, 2025.

9. It is my professional opinion, to a reasonable degree of scientific certainty, that there is no environmental contamination on or with respect to the Property based on the results of the Phase II Investigation and the Phase I ESAs conducted at the Site.

## XI. DOCUMENTS, DATA, AND MATERIALS CONSIDERED

In forming the opinions expressed in this Supplemental Report, I reviewed and considered the following documents, data, and materials, in addition to the documents and materials identified in my initial Expert Report:

1. Expert Report of R. Steven George, P.G., Green Star Environmental, Project No. 26-1851, submitted on behalf of Plaintiff, and all appendices thereto;

2. ESE Partners, LLC, Phase I Environmental Site Assessment Report, dated October 13, 2023;
3. ESE Partners, LLC, Phase I Environmental Site Assessment Report, dated December 18, 2023;
4. ESE Partners, LLC, Phase I Environmental Site Assessment Report, dated December 11, 2025;
5. Whitehead Environmental Solutions, LLC, Phase I Environmental Site Assessment Report, dated December 12, 2025;
6. Whitehead Environmental Solutions, LLC, Work Order for Professional Services, dated January 5, 2026;
7. Whitehead Environmental Solutions, LLC, Limited Phase II Investigation Report, dated January 26, 2026;
8. Certificate of Liability Insurance, ESE to Challenger, dated December 29, 2025;
9. High-resolution aerial photographs obtained from Texas Database LLC (2007 and 2011);
10. TCEQ Texas Risk Reduction Program rules and guidance documents;
11. RRC regulations and Regulatory Protection Limits;
12. Relevant ASTM standards for Phase I ESAs (ASTM E1527-21) and Phase II Investigations;
13. Standard Contract of Sale between Plaintiff and Defendants;
14. Pleadings and discovery materials filed in this action; and
15. All other documents, data, and materials referenced in this Supplemental Report and in my initial Expert Report.

I reserve the right to supplement or amend the opinions expressed in this Supplemental Report based on additional information, documents, testimony, or other materials that may become available.

Respectfully submitted,

Michael Whitehead

**Michael Whitehead, M.S.**

Licensed Professional Geoscientist
Environmental Professional
Whitehead Environmental Solutions, LLC
Geoscience Firm Registration No. 50600
906 18th St., Plano, Texas 75074
(469) 609-8080

Date: September 9, 2026




Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

Approximate Site Boundary (red line)

APPROXIMATE SCALE
(in feet)
0 50 100

## Figure 1
## North Well 2007

**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
Texas Database LLC (2007)

| | |
|---|---|
| DRAFTED BY: EM | CHECKED BY: XX |
| PROJECT NUMBER: 392.001 | DATE: 07/07/2026 |




Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

Approximate Site Boundary (red line)

APPROXIMATE SCALE
(in feet)
0 45 90

**Figure 2**
**North Well 2011**

**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
Texas Database LLC (2011)

| DRAFTED BY: | CHECKED BY: |
|---|---|
| EM | XX |
| PROJECT NUMBER: | DATE: |
| 392.001 | 07/07/2026 |




Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

APPROXIMATE SCALE
(in feet)
0 55 110

## Figure 3
## South Well 2007

**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
Texas Database LLC (2007)

| DRAFTED BY: | CHECKED BY: |
|---|---|
| EM | XX |
| PROJECT NUMBER: | DATE: |
| 392.001 | 07/07/2026 |




Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

APPROXIMATE SCALE
(in feet)
0 50 100

# Figure 4
## South Well 2011

**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
Texas Database LLC (2007)

| DRAFTED BY: | CHECKED BY: |
|---|---|
| EM | XX |
| PROJECT NUMBER: 392.001 | DATE: 07/07/2026 |