In the United States District Court
for the Northern District of Texas
Fort Worth Division

| | | |
|---|---|---|
| Challenger Cresson I, LLC, Plaintiff, | § § § | |
| v. | § | No. 4:26-CV-00231-P |
| Bill Sanders, et al., Defendants. | § § § | |

---

# Plaintiff Challenger Cresson I, LLC's Second Amended Complaint


I. Parties ..... 2

II. Jurisdiction and Venue ..... 3

III. Facts ..... 3

A. Seller promised *pre-closing* cleanup and development cooperation. ..... 3

B. Seller failed to complete the cleanup, provide a compliant report, and deliver required materials. ..... 9

C. Seller obstructed permitting efforts and denied Property access. ..... 12

D. Seller's delay and obstruction diminished the development. ..... 14

E. Seller repudiated the Contract. ..... 16

IV. Causes of Action ..... 19

A. Count 1—Breach of Contract ..... 19

1. Challenger seeks specific performance of the sale and pre-closing obligations. ..... 20

2. If specific performance is unavailable, Challenger seeks damages ..... 22

B. Count 2—Declaratory Judgment ..... 22

C. Attorney's Fees, Interest, and Costs ..... 23

V. Prayer ..... 24

Plaintiff Challenger Cresson I, LLC ("Plaintiff" or "Challenger" or "Purchaser") files this Second Amended Complaint against Defendants Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, Richard David Smelley and Amy Elizabeth Smelley, Tammy Marie Graham and Gregory Scott Graham, Deborah Ruth Davis and David Glenn Davis (collectively, "Defendants" or "Seller").

## I. Parties

1. Plaintiff Challenger Cresson I, LLC ("Plaintiff" or "Challenger" or "Purchaser") is a Delaware limited liability company. None of its members reside in Texas. Challenger Realty Group LLC assigned its interests in the Property to Challenger Cresson I, LLC on June 19, 2025.

2. Defendant Bill Sanders is the Independent Executor of the Estate of Pearl Smelley. Pearl Smelley was a citizen of Texas at the time of her death. The Smelley Estate is therefore a citizen of Texas. It has appeared and answered.

3. Defendant Cresson Moon Properties, LP is a Texas limited partnership. Each of its general and limited partners is a citizen of Texas. It is therefore a citizen of Texas. It has appeared and answered.

4. Defendants Richard David Smelley and Amy Elizabeth Smelley are citizens of Texas. They have appeared and answered.

5. Defendants Tammy Marie Graham and Gregory Scott Graham are citizens of Texas. They have appeared and answered.

6. Defendants Deborah Ruth Davis and David Glenn Davis are citizens of Texas. They have appeared and answered.

## II. Jurisdiction and Venue

7. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue is proper under 28 U.S.C. § 1391(b) because all Defendants reside in Texas and the real property at issue is located in this District.

## III. Facts

### A. Seller promised *pre-closing* cleanup and development cooperation.

9. On May 26, 2023, Challenger Realty Group LLC and Seller entered into a Standard Contract of Sale for approximately 1,674 gross contiguous acres at 7700 Old Granbury Road, Cresson, Hood County, Texas (the "Property"), at a purchase price of approximately $32,643,000. Challenger later acquired the purchaser's interest by assignment. The agreement, as amended, is referred to below as the "Contract." Exhibit 1 is the May 26, 2023 Standard Contract of Sale.

10. Contract Section 13(e) makes the parties signing as Seller jointly and severally liable for Seller's obligations. It provides: "All parties signing this Contract as Seller shall be jointly and severally liable for all obligations of Seller."

11. On June 8, 2023, the parties recorded a Memorandum of Agreement in Hood County reflecting their agreement for the purchase and sale of the Property. Exhibit 2 is that memorandum.

12. Contract Section 5(e) defines the industrial development for which Purchaser is acquiring the Property. Section 5(e) provides that "'Intended Use' shall mean a master planned industrial complex served by rail."

13. Contract Section 1(b) includes in the Property being sold Seller's interests in development rights, water capacity, utilities, permits, and governmental approvals. It provides that

the Property includes Seller's interests in "any and all development rights relating to, associated with and/or appurtenant to the Land," including "water capacity" and "licenses, permits, governmental approvals, utility commitments, utility rights."

14. Contract Section 5(e) authorizes Purchaser to pursue development approvals, easements, and utilities before Closing. Section 5(e) entitles Purchaser to endeavor to "obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use," including the City Development Agreement, Preliminary Plat Approval, Zoning Approval, and other necessary approvals (the "Entitlements"). It also authorizes Purchaser to obtain Easements Benefitting the Property and cause the utilities needed for development and operation (the "Required Utilities") "to be brought to the boundary of the Property and/or created on the Property." The Contract reinforces these rights in Sections 5(b), 5(c), and 5(d), addressing the City Development Agreement, zoning, and platting.

15. Contract Section 5(e) obligates Seller to cooperate in Purchaser's development efforts and timely execute reasonable or necessary documents. Section 5(e) provides that "Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities." It expressly includes "executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller." The Contract further bolsters these cooperation obligations in Sections 5(b), 5(c), and 5(d).

16. Contract Section 7(e) prohibits Seller from opposing or interfering with Purchaser's entitlement, easement, and utility efforts. Section 7(e) provides that, "[n]otwithstanding anything to the contrary in this Contract, Seller shall not oppose, and Seller shall not interfere with,

Purchaser's applications for, or efforts to obtain, any and all Entitlements, Easements Benefitting the Property and the Required Utilities." The Contract provides additional support for this prohibition in Section 5(e)'s affirmative cooperation requirements.

17. Contract Section 7(b) restricts competing transactions and encumbrances before Closing. Subject to its specified exceptions, it provides that Seller "shall not execute or create any contract or option to purchase, easement, covenant, condition, restriction, lien or encumbrance with respect to the Property or any portion thereof." Section 5(e) also restricts agreements affecting the Property without Purchaser's prior written approval.

18. Contract Section 5(a) grants Purchaser inspection and assessment rights both during and after the Inspection Period. During that period, Section 5(a) provides that Purchaser "shall be entitled to enter onto the Property for any purpose," including audits, inspections, and investigations Purchaser deems appropriate. Afterward, it provides that Purchaser "shall have the right to continue to conduct physical inspections and assessments of the Property, including, without limitation, taking soil samples, ground water samples and other intrusive testing," subject to the specified indemnity and repair obligations. The Contract provides additional support for development-related access in Sections 5(e) and 7(e).

19. Contract Section 4(a) obligates Seller to deliver the specified Due Diligence Items within ten days after the Effective Date and subsequently provide newly received Property information. Section 4(a) requires delivery of "copies of all of the items in Seller's possession or control listed on Exhibit 'B'" within that ten-day period. It also requires delivery, within five days after Seller receives it, of "all other information received by Seller in connection with the Property." The Contract provides additional support for these duties in Sections 5(a) and 8(f).

20. Contract Section 7(d) obligates Seller to remove all Tires within thirty days after the Effective Date and to address Tires subsequently identified. Section 7(d) requires Seller to "remove from the Land all tires and parts thereof situated on the Land." It also requires Seller, before Closing, to remove remaining Tires "within five (5) business days after the date Purchaser delivers notice thereof to Seller." The Contract provides additional support for complete tire removal in Sections 5(a) and 8(d).

21. Contract Section 7(c) obligates Seller to complete environmental removal and provide a specified engineer's report at least fifteen days before Closing. Section 7(c) requires Seller to remove "any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property." It also requires "a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith." The Contract reinforces these requirements in Sections 6(i), 8(b), and 8(e).

22. Contract Section 6(i) represents that Hazardous Substances have not been used, stored, disposed of, or otherwise introduced on the Property. Section 6(i) provides that "[n]o Hazardous Substances … have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property." Section 6 provides that Seller's representations and warranties are deemed restated at Closing and survive Closing.

23. Contract Section 13(k) makes timely performance essential throughout the Contract. Section 13(k) provides: "With respect to all provisions of this Contract, time is of the essence."

24. Contract Section 13(k) extends contractual deadlines when Seller delays delivery of required documents or information. Section 13(k) provides that, if Seller fails to timely deliver "the Title Commitment, Exception Documents or any other document or information required to be delivered by Seller to Purchaser hereunder," the Inspection Period, Closing Date, and other contractual periods "shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser."

25. Contract Section 11(b) authorizes Purchaser to seek specific performance of Seller's obligations and damages if that remedy is unavailable. Section 11(b) provides that Purchaser "shall be entitled to seek to enforce specific performance of Seller's obligations hereunder," and that "if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach." It separately preserves "all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages)" for breaches of obligations surviving Closing or termination.

26. Contract Section 8 makes satisfaction or proper waiver of the specified conditions a prerequisite to Purchaser's closing obligations. Section 8(e) requires that Seller's covenants and obligations whose nonperformance would materially adversely affect Purchaser's contractual rights "shall have been fully and timely performed in all material respects." Section 8 also requires the material accuracy of Seller's representations and warranties, removal of all Tires, and delivery of the required due-diligence materials under Sections 8(b), 8(d), and 8(f).

27. Contract Section 8(a) makes the specified entitlements, easements, and utilities conditions to Purchaser's closing obligations. It requires Purchaser to have received the

Entitlements and Easements Benefitting the Property required by Purchaser and requires the Required Utilities to be provided as specified or supported by "unconditional agreements" for their provision. Section 8(g) further requires that there have been "no material adverse change to the Property or any part thereof" between the Effective Date and Closing.

28. Contract Section 8 specifies how Purchaser may waive its closing conditions. A waiver must be in writing, be executed by an authorized officer of Purchaser, expressly waive the particular condition, and expressly refer to Section 8. Purchaser's continued pursuit of the transaction does not constitute the waiver prescribed by that provision.

29. Contract Section 8 permits Purchaser to terminate for unsatisfied closing conditions without making termination its exclusive remedy for Seller's default. Section 8's concluding paragraph provides that Purchaser "shall have the right, but not the obligation, to terminate this Contract" if the specified conditions are not satisfied or waived by the Closing Date. It further provides that "nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract."

30. Contract Section 11(a) conditions Seller's termination remedy on an uncured Purchaser default and Seller's own absence of default. Section 11(a) requires that Purchaser's default remain uncured "for a period of ten (10) days following written notice thereof from Seller to Purchaser," and permits termination only "provided that Seller has not defaulted in the performance of any of Seller's obligations hereunder."

31. The parties entered a First Amendment dated December 4, 2024, and a Second Amendment effective December 31, 2025. The First Amendment extended the Inspection Period through April 7, 2025, preserved the specified extension options, and established December 31,

2025 as the outside Closing Date unless otherwise agreed in writing. The Second Amendment later extended that Closing Date as described below. Exhibit 7 is that First Amendment. Exhibit 8 is that Second Amendment.

**B. Seller failed to complete the cleanup, provide a compliant report, and deliver required materials.**

32. Seller breached the Contract by leaving Tires on the Property beyond the removal deadline, with that nonperformance continuing in December 2023. Contract Section 7(d) required removal of all Tires within thirty days after the Effective Date and removal of subsequently identified Tires within five business days after Purchaser's notice before Closing. Seller failed to complete that removal despite its June 21, 2023 representation that all Tires had been removed and Purchaser's December 15, 2023 notice identifying remaining Tires and demanding their removal. Exhibit 3 is the June 21, 2023 email communicating that representation. Exhibit 4 is Purchaser's December 15, 2023 letter identifying remaining Tires and demanding their removal.

33. Seller continued to breach the Contract in January and July 2024 by failing to complete tire removal. Contract Section 7(d) required complete removal and timely action on Purchaser's notices identifying remaining Tires. Seller again represented on January 11, 2024 that removal was complete, but Tires remained, prompting Purchaser's July 1, 2024 notice of continued nonperformance. Exhibit 5 is the January 11, 2024 email communicating that representation. Exhibit 6 is Purchaser's July 1, 2024 letter identifying continued tire-removal and due-diligence failures, together with the accompanying photographs.

34. Seller breached the Contract by withholding required Due Diligence Items. Contract Section 4(a) required delivery of the specified items in Seller's possession or control within ten days after the Effective Date, together with later-received Property information within

the prescribed period. Seller had not delivered all required items when Purchaser's July 1, 2024 notice identified that continuing failure.

35. Seller breached the Contract in December 2024 by failing timely to provide the required shut-in-payment materials. Section 4(b) of the First Amendment required delivery, within five business days after its effective date and to the extent not already provided, of the shut-in payments and supporting documentation Seller had received for 2024 and applicable earlier years. Seller failed to provide all materials required by that provision within the prescribed period.

36. Second Amendment Section 2 expressly conditions Purchaser's closing obligation on receipt of a satisfactory final Environmental Report and extends the Closing Date to January 10, 2026. Section 2 provides that "Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract" and establishes January 10, 2026 as the "First Extended Closing Date."

37. Second Amendment Section 1 incorporates recitals acknowledging that the required environmental investigations and report could not be completed by the existing outside Closing Date. The incorporated recitals state that "the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to December 31, 2025" and that "the Environmental Report cannot be delivered to Purchaser by the outside Closing Date set forth in the Contract."

38. Second Amendment Section 4 preserves the Contract except as expressly modified and confirms each Seller Party's adoption of its terms. Section 4 provides that, "[e]xcept as modified hereby, the Contract shall remain in full effect." It also provides that "[e]ach Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended)."

39. On January 26, 2026, Seller delivered a Limited Phase II Investigation by Whitehead Environmental Solutions, LLC (the "January 26 ESA"). Exhibit 9 is that environmental investigation.

40. Seller breached the Contract in January 2026 and thereafter by failing timely to deliver the required environmental report. Contract Section 7(c) required a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property, and Second Amendment Section 2 conditioned Purchaser's closing obligation on receipt of a final Environmental Report satisfactory to Purchaser. The January 26 ESA did not provide the required report: none of its identified signatories was identified as the required licensed environmental engineer; it restricted reliance to Cresson Moon Property LLC; and its limited investigation and conclusions did not supply the required confirmation. Its deficiencies include inadequate characterization of former reserve-pit and tank areas, incomplete investigation of relevant substances, and failure adequately to investigate and sample groundwater.

41. Compliance with regulatory concentration limits alone does not satisfy the Contract's environmental obligations. Alternatively, even if residential protective concentration levels govern the relevant concentration benchmark, the January 26 ESA does not adequately establish compliance with that benchmark throughout the areas and environmental media requiring investigation. Results from the sampled soils do not establish the condition of inadequately investigated areas or unsampled groundwater, and application of that benchmark does not cure the report's separate professional, reliance, and reporting deficiencies.

42. Seller breached the Contract in January 2026 and thereafter by failing to complete the required environmental removal. Contract Section 7(c) required removal of environmental contamination, hazardous materials, and storage tanks, while Section 6(i) represented that

Hazardous Substances had not been introduced on the Property. Seller failed to complete that removal, and the January 26 ESA reflected Hazardous Substances inconsistent with the contractual representation. Those failures, together with the reporting breach alleged above, leave the corresponding closing conditions under Sections 8(b) and 8(e) unsatisfied; Purchaser's obligation to close has therefore not arisen.

43. On February 12, 2026, Purchaser's counsel emailed Seller's counsel concerning the outstanding environmental matters and the requirements for an acceptable environmental report. Exhibit 10 is that email.

44. Purchaser has incurred over $1,500,000 in due-diligence costs, including surveys, environmental, geotechnical, civil, water/hydrology, water engineering, rail engineering, permitting, feasibility, and governmental-approvals work.

45. Seller breached the Contract in February 2026 by engaging in efforts to remarket the Property. Contract Section 1(a) obligates Seller to sell and convey the Property to Purchaser on the agreed terms, and Section 11(b) permits Purchaser to enforce that obligation. Seller acted inconsistently with that obligation by representing to third parties that the Property was "going to be coming back on the market" and remarketing it despite Purchaser's continuing demand for performance. Exhibit 11 is the February 25, 2026 email and accompanying marketing brochure concerning the Property's remarketing.

**C. Seller obstructed permitting efforts and denied Property access.**

46. Seller breached the Contract in August 2026 by directing Purchaser to stop its authorized pre-closing development efforts. Contract Sections 5(e) and 7(e) require Seller to cooperate with Purchaser's entitlement efforts and prohibit opposition or interference. Seller breached those duties through counsel's instruction that Purchaser and its counsel take no action concerning the Property other than scheduling a closing.

47. Seller breached the Contract in August 2026 by refusing the execution and cooperation required to advance Purchaser's groundwater-permitting efforts. Contract Section 5(e) requires good-faith cooperation using best efforts and execution of reasonable or necessary documents within three business days after delivery. Purchaser delivered twenty-two well-permit applications and one operating-permit application with its August 19 demand and explained the urgency created by the approaching groundwater-rule hearing. Seller did not execute the applications. Its August 23 response disputed a present execution obligation, raised certification and procedural objections, and offered limited authorization and possible later consideration of documents after specified prerequisites. Seller's refusal to execute reasonable or necessary documents and provide the required cooperation breached Section 5(e); its objections did not justify the categorical prohibition on entitlement activity described above. Exhibit 12 is Purchaser's August 19, 2026 demand letter and accompanying applications. Exhibit 13 is Seller's August 23, 2026 response letter.

48. Purchaser's development work — including its water, utility, and entitlement planning — requires periodic access to the Property.

49. On September 30, 2026, Purchaser requested access for Jarrod Reynolds, P.E., of Core Management Group to conduct a non-invasive, water-planning inspection of the Property. Seller did not respond.

50. On October 7, 2026, Purchaser, through counsel, renewed and formalized the request in writing. The requested access is limited and non-invasive: observation of the Property's geology and topography, creeks and impoundments, vegetation, potential water-storage locations, and potential waters of the United States. Exhibit 14 is Purchaser's October 7, 2026 letter requesting that access.

51. Seller breached the Contract in October 2026 by denying Purchaser's consultant access for a non-invasive water-planning inspection. Contract Section 5(a) preserves Purchaser's right to conduct physical inspections and assessments after the Inspection Period, subject to the specified indemnity and repair obligations, while Sections 5(e) and 7(e) require cooperation and prohibit interference with development efforts. Seller denied the requested inspection, preventing Purchaser's consultant from performing the identified water-planning work and continuing to obstruct Purchaser's development efforts.

**D. Seller's delay and obstruction diminished the development.**

52. Purchaser's Intended Use for the Property is development of a master planned industrial complex served by rail. Purchaser intended to develop the Property to the full extent of the development rights, entitlements, and permitted intensity available for that use.

53. Contract Sections 5(e), 7(e), and 13(k) structure the transaction around timely performance and pre-closing development work. Section 13(k) provides that "time is of the essence," while Section 5(e) requires Seller's "good faith and best efforts" and Section 7(e) prohibits interference with Purchaser's entitlement efforts. When contracting, Seller knew that Purchaser would undertake that work for the defined Intended Use and that delay could expose the project to less favorable regulatory, economic, and development conditions. The entitlement losses and reduced development capacity alleged below are manifestations of that foreseeable risk.

54. Had Seller timely performed, Purchaser would have proceeded with acquisition and development work under the conditions then available. Seller's environmental and reporting failures delayed acquisition. Its separate cooperation and access breaches obstructed development work that Purchaser was expressly authorized to pursue before Closing. Those distinct failures impaired Purchaser's ability to advance the transaction and preserve the Property's development opportunity within the available regulatory and development windows.

55. Seller's refusal to execute the permit applications injured an identifiable set of development rights. The applications were complete and ready for filing. Section 5(e) obligated Seller to execute them within three business days. Seller did not execute them within that period or at all. Applications filed before the targeted hearing date would have been governed by the rules then in effect, before new rules took effect. Because Seller refused, the groundwater capacity those applications would have secured is no longer available to the Property on those conditions.

56. The regulatory environment governing development of the Property also moved against Purchaser over the same period. Hood County has since revised the development requirements and approval standards applicable to projects of the kind the Intended Use contemplates. Had Seller performed when the Contract required, Purchaser would have filed its concept plan and site development plan applications, and advanced its approvals, under the requirements in effect when Seller's performance came due. Because Seller did not perform, those applications were not filed then, and whether the Property's development is governed by the earlier requirements or the current ones is unresolved.

57. Seller's refusals and delay diminished the Property's value and the value of Purchaser's bargain by impairing the opportunity to acquire and advance the Property for its Intended Use under the conditions all contracting parties understood when executing the Contract. The injury includes the loss of development opportunities and regulatory positions that timely performance would have enabled Purchaser to pursue and secure. The cumulative consequences became materially more substantial and apparent as Seller's nonperformance continued through the second half of 2026. This loss was a foreseeable consequence of breaching a Contract expressly structured to facilitate timely industrial development and making time of the essence.

**E. Seller repudiated the Contract.**

58. On October 26, 2026, Seller's counsel sent a letter purporting to "confirm" the "expiration and termination" of the Contract. The Contract has neither expired nor been terminated and remains in full force and effect. Exhibit 15 is that October 26, 2026 letter.

59. Second Amendment Sections 2 and 3 establish January 10, 2026 as the First Extended Closing Date, subject to the parties' agreement to further amend the deadlines. Section 2 provides that "the Closing Date is hereby extended until January 10, 2026," and Section 3 states that the parties "agree to further amend the Contract on or before the First Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date." No Third Amendment was executed. Seller's October 26 assertion that a Third Amendment established January 23, 2026 as the closing deadline therefore rests on an agreement that does not exist.

60. The passage of an initially defined Closing Date does not automatically extinguish the Contract. Contract Section 13(k) extends the Closing Date for Seller's delayed delivery of required documents or information. Section 13(k) provides that the deadline "shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser." Seller did not timely deliver the report required by Section 7(c), and the January 26 ESA did not cure that failure. The Closing Date therefore was and still is being extended because of noncompliance. Second Amendment Section 4's reaffirmation of the Contract provides additional support for its continuing force.

61. Contract Section 11(a) makes Seller's absence of default a prerequisite to its termination remedy. Section 11(a) permits termination by Seller "provided that Seller has not defaulted in the performance of any of Seller's obligations hereunder." Seller's environmental-removal and reporting defaults preceded the default it attributes to Purchaser and remained uncured when it purported to terminate. For that reason alone, its attempted exercise of that remedy did not

terminate the Contract. In addition, Seller's April 2026 Notice of Default was itself ineffective to trigger any valid default or cure period: there was no Purchaser default to cure because Seller's own unperformed obligations left the closing conditions unsatisfied and excused Purchaser's performance, and Section 11(a)'s notice-and-cure mechanism cannot convert Seller's own nonperformance into a Purchaser default while Seller itself remained in default.

62. Seller breached the Contract in October 2026 by categorically rejecting any continuing obligation to perform. Contract Sections 1(a), 5(e), 7(c), and 7(e) require the agreed conveyance, environmental performance, and cooperation with Purchaser's development efforts, subject to the Contract's terms. Seller repudiated those obligations through its October 26 declaration that the Contract was "no longer in force or effect." Seller's repudiation supplies another ground excusing tender, beyond its existing nonperformance and the unsatisfied closing conditions.

63. Purchaser is, and has at all material times been, ready, willing, and able to perform, including having the financial capacity to pay the Purchase Price at the relevant times and now. Purchaser remains committed to performing its obligations when required by the Contract. Its obligation to close has not arisen because applicable closing conditions remain unsatisfied and unwaived. Seller's prior material breaches and categorical rejection of the Contract also excuse tender where tender would be futile.

64. All conditions precedent to the relief Purchaser seeks have been performed, have occurred, or have been waived or excused.

65. Exhibit 1 to this complaint is the May 26, 2023 Standard Contract of Sale.

66. Exhibit 2 to this complaint is the June 8, 2023 Memorandum of Agreement recorded in Hood County.

67. Exhibit 3 to this complaint is the June 21, 2023 email from Seller's broker concerning tire removal.

68. Exhibit 4 to this complaint is the December 15, 2023 letter from Purchaser's counsel concerning the Inspection Period.

69. Exhibit 5 to this complaint is the January 2024 email from Seller's broker concerning tire cleanup.

70. Exhibit 6 to this complaint is the July 1, 2024 letter from Purchaser's counsel concerning tires and Due Diligence Items, together with the accompanying tire photographs.

71. Exhibit 7 to this complaint is the December 4, 2024 First Amendment to the Contract of Sale.

72. Exhibit 8 to this complaint is the December 31, 2025 Second Amendment to the Contract of Sale.

73. Exhibit 9 to this complaint is the January 26, 2026 Limited Phase II Environmental Investigation prepared by Whitehead Environmental Solutions.

74. Exhibit 10 to this complaint is the February 12, 2026 email from Purchaser's counsel concerning environmental matters.

75. Exhibit 11 to this complaint is the February 25, 2026 property-remarketing email and accompanying marketing brochure.

76. Exhibit 12 to this complaint is the August 19, 2026 letter from Purchaser demanding Seller's cooperation with groundwater-permit applications.

77. Exhibit 13 to this complaint is the August 23, 2026 letter from Seller responding to that demand.

78. Exhibit 14 to this complaint is the October 7, 2026 letter from Purchaser requesting access to the Property.

79. Exhibit 15 to this complaint is the October 26, 2026 letter from Seller asserting expiration and termination of the Contract.

## IV. Causes of Action

### A. Count 1—Breach of Contract

80. Purchaser incorporates the foregoing paragraphs as though fully set forth herein.

81. The Contract is a valid and enforceable contract. Purchaser performed, tendered performance of, or was excused from performing its contractual obligations, including by Seller's breach and repudiation.

82. Seller materially breached the Contract by, among other things:

(a) making the inaccurate representation concerning Hazardous Substances described above, in violation of Section 6(i);

(b) failing timely to complete the environmental removal required by Section 7(c);

(c) failing timely to provide the licensed environmental engineer's report required by Section 7(c), with the substantive confirmation and adequate investigation described above;

(d) failing timely to deliver the Due Diligence Items required by Section 4(a), as alleged concerning the historical failures;

(e) failing timely to complete tire removal under Section 7(d), as alleged concerning the historical failures;

(f) failing timely to provide the shut-in-payment materials required by Section 4(b) of the First Amendment;

(g) directing Purchaser in August 2026 to cease authorized entitlement activity, contrary to Sections 5(e) and 7(e);

(h) refusing the reasonable or necessary document execution and cooperation required by Section 5(e) in connection with the groundwater-permitting efforts described above;

(i) denying the contractually authorized inspection and thereby violating Section 5(a) and the applicable cooperation and noninterference duties in Sections 5(e) and 7(e); and

(j) categorically repudiating both the obligation to sell and convey the Property and its continuing contractual obligations in its October 26, 2026 letter, following the earlier remarketing conduct described above.

**1. Challenger seeks specific performance of the sale and pre-closing obligations.**

83. Seller's material breaches constitute defaults under Section 11(b), which authorizes specific performance. Purchaser seeks specific performance of the Contract. The requested specific performance entails a decree requiring Seller, on enforceable deadlines, to complete the required environmental removal and reporting; permit authorized inspections; cooperate in good faith and use best efforts to obtain Entitlements and Required Utilities; execute reasonable or necessary documents within the contractual periods; and refrain from prohibited interference. The requested specific performance then entails a decree requiring Seller to convey the Property upon satisfaction or proper waiver of the applicable closing conditions, with the required contractual credits and adjustments.

84. The Property's characteristics warrant specific performance and all parties to the Contract knew it at the time of contracting. Its 1,674 contiguous acres near Fort Worth, highway

access, and more than two miles of rail frontage provide a unique combination necessary for the Intended Use, and no comparable parcel is available to Purchaser. A competing disposition would threaten the contracted conveyance, while continued obstruction would jeopardize remaining time-sensitive development opportunities. A monetary award cannot deliver the Property or preserve those opportunities. Purchaser therefore lacks an adequate remedy at law for the performance and protection requested.

85. To preserve and implement that performance, Purchaser seeks permanent injunctive relief enforcing the Contract's restrictions on competing transactions and encumbrances, preventing transfer or marketing for sale in derogation of Purchaser's rights, preventing premature release of the recorded Memorandum, and prohibiting interference with authorized access and entitlement efforts, both before and after closing.

86. Purchaser seeks equitable monetary relief accompanying specific performance because delayed conveyance alone will not restore the position timely performance would have provided. That compensation includes a monetary award or adjustment of the Purchase Price for development value lost through Seller's delayed performance and obstruction of entitlement work. The injury warranting equitable compensation includes the loss of the more favorable development window described above for securing entitlements, groundwater capacity, and permitted development intensity; it is not confined to the effects of any single regulatory change.

87. Purchaser has incurred more than $1,500,000 in third-party due-diligence and development expenditures, all of which are foreseeable, commercially reasonable, Property-related expenses directly traceable to Seller's delay. As part of the equitable monetary relief accompanying specific performance, Purchaser seeks reimbursement of these expenses.

88. Contract Section 11(b) independently preserves legal and equitable remedies for breaches of surviving representations, warranties, indemnities, and agreements, subject to that provision's exclusions. Sections 6, 7(f), and 13(d) preserve the applicable obligations after Closing. Purchaser invokes those remedies and seeks enforcement of the reimbursement and indemnity obligations in Sections 6(i) and 7(d) for losses within their terms.

**2. If specific performance is unavailable, Challenger seeks damages.**

89. Alternatively, if and to the extent specific performance is unavailable, Purchaser seeks actual damages under Section 11(b), including the recoverable loss of its contractual bargain and recoverable expenditures caused or rendered wasted by Seller's breaches.

**B. Count 2—Declaratory Judgment**

90. Purchaser incorporates the foregoing paragraphs as though fully set forth herein.

91. Under 28 U.S.C. §§ 2201–2202, Purchaser seeks a declaration of the parties' continuing rights and obligations under the Contract. An actual controversy exists because Seller asserts that the Contract has expired or been terminated and denies continuing performance obligations, while Purchaser maintains that the Contract remains enforceable and requires the outstanding performance alleged above.

92. Purchaser seeks a declaratory judgment that:

(a) the Contract remains enforceable and has neither expired nor been validly terminated;

(b) no Third Amendment was executed, and the Closing Date established by the Second Amendment remained subject to the applicable provisions of Section 13(k);

(c) Section 7(c) requires the environmental performance and licensed environmental engineer's report described above, and the January 26 ESA does not satisfy that

obligation, including under the alternative residential-benchmark theory pleaded above;

(d) Sections 5(a), 5(e), and 7(e) require the authorized access, good-faith and best-efforts cooperation, timely execution of reasonable or necessary documents, and noninterference described above;

(e) Purchaser's closing obligations remain subject to satisfaction or proper waiver of the applicable Section 8 conditions, including the entitlement, easement, and utility requirements of Section 8(a), and the environmental-report condition in Second Amendment Section 2; and

(f) Purchaser's failure to close while applicable conditions remained unsatisfied and unwaived did not constitute the alleged default or authorize Seller to retain the Earnest Money under Section 11(a).

**C. Attorney's Fees, Interest, and Costs**

93. Purchaser seeks all recoverable attorneys' fees, interest, and costs. Purchaser seeks its reasonable and necessary attorneys' fees through trial and appeal under Texas Civil Practice and Remedies Code Chapter 38 upon satisfaction of its requirements and under the Contract's applicable indemnity provisions for claims and losses within their coverage.

## V. Prayer

94. Plaintiff Challenger Cresson I, LLC requests a judgment in its favor against the Defendants jointly and severally to the extent provided by Contract Section 13(e), granting all requested forms of relief, including:

(a) Specific performance of all outstanding Contract obligations, including timely environmental removal and reporting, authorized access, entitlement and utility cooperation and document execution, noninterference, and conveyance upon satisfaction of the closing conditions and Purchaser's corresponding performance;

(b) A permanent injunction preserving and implementing that performance, including protection against competing dispositions and unauthorized encumbrances, premature release of the recorded Memorandum, and continued obstruction of authorized access and entitlement efforts;

(c) Equitable compensation accompanying specific performance, including a monetary award for development value lost through Seller's delay and reimbursement of qualifying expenses directly attributable to that delay;

(d) Alternatively, if and to the extent specific performance is unavailable, actual damages, including recoverable expenditures and loss of the contractual bargain;

(e) The declarations requested in Count 2;

(f) Reasonable and necessary attorneys' fees, costs, and interest; and

(g) All other relief to which Purchaser is entitled.

Respectfully submitted,

Chad Flores
Texas Bar No. 24059759
chad@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
P: (713) 364-6640
F: (832) 645-2496

Michael A. Cancienne
Texas Bar No. 24055256
mcancienne@jlcfirm.com
Joseph "Jeb" Golinkin
Texas Bar No. 24087596
jgolinkin@jlcfirm.com
Carolina Herrera
Texas Bar No. 24126398
cherrera@jlcfirm.com
Jordan, Lynch & Cancienne
1980 Post Oak Boulevard, Suite 2300
Houston, Texas 77056
P: (713) 955-4020

Counsel for Plaintiff

# STANDARD CONTRACT OF SALE

THIS STANDARD CONTRACT OF SALE (the "**Contract**") is made and entered into by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Additionally, Seller and Purchaser are sometimes collectively referred to herein as the "**Parties**" and each of the Parties is sometimes singularly referred to herein as a "**Party**". For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Contract of Purchase and Sale.**

(a) Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and indefeasible title to that certain tract of land containing approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction ("**ETJ**") of the City of Cresson (the "**City**"), Hood County, Texas, an approximate description and/or depiction of which is set forth on **Exhibit "A"** attached hereto and incorporated herein by this reference for all purposes (the "**Land**"), together with, all and singular, (i) a 100% undivided interest in the Mineral Estate (for purposes of this Contract, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Seller in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Seller which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**"). The Parties acknowledge and agree that the Property is part of a larger tract owned by Seller (the "**Parent Tract**") and that Seller is retaining the portion of the Parent Tract that does not include the Property ("**Seller's Retained Tract**"). Even though the Property has not yet been separately surveyed, the Parties agree that (A) they are experienced in transactions of this nature, (B) they are familiar with the location of the Property, (C) the description of the Property attached to this Contract identifies the Property with reasonable certainty, (D) it is the Parties' intention that the description of the Property attached to this Contract be construed, to the maximum extent allowed by law, as sufficient to identify the Property with reasonable certainty, (E) each Party hereby waives any and all claims of an insufficient legal description, including,



Ex. 1

without limitation, any and all claims under the statute of frauds, and (F) upon the completion of the final Survey (defined below) of the Property, the Parties agree to replace **Exhibit "A"** of this Contract with the legal description of the Property in such survey and to use such legal description in all documents that require a legal description of the Property and are used in connection with the Closing.

(b) The "Property" also includes all right, title and, interest of Seller in any and all development rights relating to, associated with and/or appurtenant to the Land, including, but not limited to, all right, title and interest of Seller in and to (i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the Land and improvements now or hereafter constructed thereon; (ii) all surveys, engineering, soils, seismic, geological and environmental reports, studies, certificates and other technical descriptions; (iii) warranties, guaranties, indemnities, and any claims and causes of action (other than those against the Title Company, Brokers, Purchaser or Purchaser's representatives, agents, successors or assigns), including, without limitation, all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land; (iv) licenses, permits, governmental approvals, utility commitments, utility rights, reimbursement rights, development rights or other similar rights, (v) rights to credits, refunds, and reimbursements including without limitation any credits against, or right to pay reduced, application fees, permit fees, inspection fees or impact fees, (vi) rights under zoning cases, preliminary plans, plats, and other development applications and approvals, (vii) rights in and to engineering and architectural plans and specifications, (viii) awards or proceeds relating to the Property that are unpaid as of the Closing Date; (ix) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant, and (x) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Land.

(c) The Property shall be conveyed subject to the following matters (collectively the "**Permitted Exceptions**"):

(i) those matters deemed to be Permitted Exceptions pursuant to Section 4(d) hereof;

(ii) building restrictions and zoning regulations previously or hereafter adopted by any municipal or other public authority relating to the Property, which individually or in the aggregate do not have a material, adverse effect on Purchaser's ownership, operation, use, enjoyment, development or redevelopment of the Property; and

(iii) real property taxes for the year of Closing (as such term is defined in Section 9(a) hereof) (if such taxes are not yet due and payable) and subsequent years, which taxes shall be prorated at Closing.

**2. Purchase Price**. The purchase price (the "**Purchase Price**") for the Property shall be the sum of (a) the Land Purchase Price plus (b) the Mineral Estate Purchase Price. The "**Land Purchase Price**" shall be the product of EIGHTEEN THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($18,500.00) multiplied by the total number of gross acres of Land contained



Ex. 1

within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The "**Mineral Estate Purchase Price**" shall be the product of ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) multiplied by the total number of gross acres of Land contained within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The Purchase Price shall be payable by Purchaser in cash at Closing (hereinafter defined).

**3.** **Earnest Money**. Within five (5) business days after the Effective Date (hereinafter defined), Purchaser shall deposit with McKnight Title, Attn: Jennifer Stapleton, 155 East BB Fielder Rd. Suite 200 Weatherford, TX 76087; Phone: 817-345-0101 Email: jennifer@mcknighttitle.com (hereinafter referred to as the "**Title Company**"), earnest money in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Earnest Money**"). If Purchaser fails to timely deposit the Earnest Money with the Title Company, Seller shall be entitled, as Seller's sole and exclusive remedy, to terminate this Contract by written notice to Purchaser at any time before the Earnest Money is delivered to the Title Company, in which event, Purchaser and Seller shall have no further liability hereunder. If Purchaser delivers the Earnest Money to the Title Company before Purchaser's receipt of Seller's termination notice, Purchaser shall be deemed to have timely delivered the Earnest Money and Seller shall not thereafter be entitled to terminate the Contract as a result of any delay in delivering the Earnest Money. All Earnest Money shall be deposited by the Title Company into an interest-bearing account. All interest earned on the Earnest Money shall be added to and become a part of the Earnest Money. Notwithstanding any provisions of this Contract to the contrary, TEN THOUSAND AND NO/100 DOLLARS ($10,000.00) out of the Earnest Money shall in all respects be non-refundable to Purchaser and shall be paid to Seller as independent consideration for Seller's execution of this Contract (the "**Independent Consideration**"). The Earnest Money shall be applied to the Purchase Price at the Closing. If, pursuant to any provision of this Contract, Purchaser is entitled to obtain a refund of the Earnest Money, (a) such provision shall be interpreted to mean a refund of the Earnest Money less the Independent Consideration, and (b) the Title Company shall, without further authorization or instruction from Seller or Purchaser, return the Earnest Money (less the Independent Consideration) to Purchaser.

**4.** **Due Diligence Information, Title Commitment and Survey**.

(a) Delivery of Documents. Within ten (10) days following the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, at Seller's sole cost and expense, copies of all of the items in Seller's possession or control listed on **Exhibit "B"** attached hereto and incorporated herein by this reference for all purposes (the "**Due Diligence Items**"). Following the Effective Date, Seller agrees to deliver to Purchaser within five (5) days following receipt thereof by Seller, copies of all other information received by Seller in connection with the Property.

(b) Title Commitment. Within twenty (20) days following the Effective Date, Seller shall cause to be delivered to Purchaser, at Seller's expense, a current Commitment for a Texas Form T-1 Owner's Policy of Title Insurance (hereinafter referred to as the "**Title Commitment**") showing all matters affecting title to the Property and binding the Title Company to issue to Purchaser at Closing an Owner Policy of Title Insurance issued by the Title Company on behalf of an underwriter acceptable to Purchaser, in the amount of the Purchase Price written in accordance with this Contract (the "**Owner's Policy**"). Seller and Purchaser further instruct the



Ex. 1

Title Company to deliver to Seller, Purchaser and the Surveyor legible copies of all instruments referred to on Schedules B and C of the Title Commitment (the "**Exception Documents**"). The Title Commitment shall describe the Property; shall list Purchaser as the prospective named insured; shall show as the policy amount the Purchase Price; shall contain the commitment of the Title Company to insure Purchaser's fee simple interest in the Property upon the Closing; and the survey exception shall be deleted except as to "shortages in area". The Title Commitment shall show the status of the title of the Property and all exceptions which would appear in an Owner's Policy, if issued. Purchaser, at Purchaser's option, may purchase title insurance in an amount in excess of the Purchase Price from the Title Company or another escrow agent or title insurance company acceptable to Purchaser, in which event (i) Purchaser shall pay for the incremental increase in the aggregate premium charged for the Owner's Policy attributable to such increased coverage, and (ii) if Purchaser elects to purchase such excess coverage from an escrow agent or title insurance company other than the Title Company, the Title Company shall cooperate with the escrow agent or title insurance company designated by Purchaser for such excess coverage and shall remit to such designated escrow agent or title insurance company the portion of any premium payments received by the Title Company which is attributable to any such excess coverage.

(c) Survey. Seller shall deliver to Purchaser copies of the most recent surveys for the **"Parent Tract"** and the **"Retained Tract"** in Seller's possession or control within ten (10) days following the Effective Date. Purchaser shall obtain a new or recertified survey of the Land (the "**Survey**").

(d) Title and Survey Review. Purchaser shall have thirty (30) days after the receipt of the last of the Title Commitment, legible copies of all instruments referred to on Schedules B or C of the Title Commitment, and the Survey (the "**Title Review Period**") to provide Seller with written notice (the "**Title Objection Letter**") of such objections as Purchaser may have to anything contained in the Title Commitment or the Survey (collectively "**Title Objections**"). Any item contained in the Title Commitment or the Survey to which Purchaser does not object pursuant to the Title Objection Letter shall be deemed a Permitted Exception. If Purchaser delivers to Seller a Title Objection Letter, Seller shall have twenty (20) days, or such greater period of time as may be agreed upon in writing by Seller and Purchaser (the "**Cure Period**"), during which Seller shall have the right, but not the obligation, to cure or remove the Title Objections and deliver to Purchaser a revised Title Commitment or survey evidencing such cure or removal; provided, however, that Purchaser shall be deemed to have objected to and Seller shall have the absolute obligation to cure or remove all liens of any kind against the Property (the same to automatically be considered Title Objections regardless of whether or not Purchaser delivers to Seller a Title Objection Letter), including, without limitation, (i) mortgage liens, (ii) security interests, (iii) tax liens, (iv) abstracts of judgment, (v) environmental liens, and (vi) materialmen's and mechanic's liens (collectively "**Liens**"). Seller shall, prior to the expiration of the Cure Period, provide Purchaser with written notice (the "**Title Response Letter**") setting forth those Title Objections that Seller has cured or removed and those Title Objections which Seller is not required to cure or remove and is unable or unwilling to cure or remove. If Seller fails to either cure or remove all Title Objections to the reasonable satisfaction of Purchaser and the Title Company, Purchaser may, at its sole option which may be exercised at any time within the Inspection Period, either terminate this Contract by written notice to Seller, in which event the Earnest Money shall be immediately returned to Purchaser, or waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that such election shall



Ex. 1

have no effect on Seller's obligation to cure or remove all Liens. Purchaser's failure to terminate this Contract prior the expiration of the Inspection Period shall be deemed an election by Purchaser to waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that (A) such election shall have no effect on Seller's obligation to cure or remove all Liens, and (B) Seller shall be obligated, prior to Closing, to cure all Title Objections which Seller agrees in the Title Response Letter or otherwise in writing to cure.

(e) Additional Exceptions. In the event that at any time following delivery of the Title Commitment, Exception Documents or Survey described above, but prior to Closing, any changes (other than the deletion or elimination of any item as to which Purchaser has made an objection) shall occur in the Title Commitment, Exception Documents or Survey, in addition to other remedies permitted pursuant to this Contract, Purchaser shall have the right to review and approve or disapprove of any such matters, and to terminate this Contract and obtain a refund of the Earnest Money in the event that any such exceptions are not acceptable to Purchaser.

(f) Owner's Policy. At Closing, Seller shall cause the Title Company to furnish to Purchaser, at Seller's sole cost and expense, the Owner's Policy, which shall be in the customary form prescribed by the Texas State Board of Insurance. The Owner's Policy may contain as exceptions the standard printed exceptions and the Permitted Exceptions; provided, however, (i) the standard exception for restrictions shall be deleted except for any restrictions that are Permitted Exceptions, (ii) the exception for rights of parties in possession shall be deleted, (iii) the standard exception for taxes shall be limited to the year in which Closing occurs (if such taxes are not yet due and payable), (iv) all arbitration provisions shall be deleted, (v) all matters set forth on Schedule C of the Title Commitment shall be deleted, (vi) if requested by Purchaser, Purchaser may require modification or additional title endorsements and Purchaser shall be liable for all fees and additional premiums charged by the Title Company in connection with such modifications or additional title endorsements.

**5. Inspection Period.**

(a) Commencing on the Effective Date and continuing through the one hundred eightieth (180th) day following the later to occur of (i) the date upon which all of the Tires (defined below) have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser (the "**Inspection Period**"), Purchaser shall be entitled to enter onto the Property for any purpose, including, without limitation, conducting such audits, inspections, or investigations thereon as Purchaser may deem appropriate, including, without limitation, any "Phase II" type testing or investigation. During the Inspection Period and, unless Purchaser terminates this Contract prior to the expiration of the Inspection Period, prior to Closing, Purchaser and Purchaser's representatives shall have the right to use the private roadway, a portion of which is located on Seller's Retained Tract (the "**Private Roadway**"), for purposes of ingress and egress to and from the Property, and Purchaser shall be liable for any physical damages to the Private Roadway caused by Purchaser or Purchaser's representatives. The Parties understand and agree that, upon Closing, Purchaser's right to use the portion of the Private Roadway located on Seller's Retained Tract shall terminate and Purchaser shall have no easement, express or implied, to use the portion of the Private Roadway that is located on Seller's Retained Tract. Notwithstanding any provision in this Contract to the contrary,



Ex. 1

Purchaser shall be entitled to extend the Inspection Period two (2) times, each time for up to ninety (90) days, by delivering, at any time prior to the then-scheduled expiration of the Inspection Period, (i) written notice thereof to Seller and (ii) ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) of additional Earnest Money to the Title Company, which additional Earnest Money shall be added to and become a part of the Earnest Money, shall be applicable to the Purchase Price at Closing but shall be non-refundable to Purchaser except as set forth in Sections 4(d), 4(e), 8, 10 and 11(b). The cost of the inspections undertaken by Purchaser pursuant to this Contract shall be borne solely by Purchaser. Purchaser agrees to (A) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (B) repair any and all physical damage done to the Property or Seller's Retained Tract by Purchaser or its agents, employees or contractors during such inspection and examination. Purchaser shall have no liability with respect to any diminution in value or other losses suffered or incurred by Seller as a result of the discovery of any pre-existing conditions on, in, under or about the Property by Purchaser or its agents, employees or contractors during or in connection with such inspection and examination. Purchaser shall be entitled, for any reason in Purchaser's sole discretion, to terminate this Contract by written notice delivered to Seller at any time prior to the expiration of the Inspection Period. If Purchaser notifies Seller prior to the expiration of the Inspection Period that Purchaser has elected to terminate this Contract, this Contract shall terminate, the Earnest Money shall be returned to Purchaser and the Parties shall have no further obligations hereunder. Purchaser agrees to keep the Property free and clear of any mechanic's or materialmen's liens resulting from Purchaser's activities on the Property. After the expiration of the Inspection Period, Purchaser shall have the right to continue to conduct physical inspections and assessments of the Property, including, without limitation, taking soil samples, ground water samples and other intrusive testing, so long as Purchaser (1) indemnifies and holds Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (2) repairs any and all physical damage done to the Property by Purchaser or its agents, employees or contractors during such inspection and assessment.

(b) Annexation and City Development Agreement. Seller hereby authorizes Purchaser, at all times prior to Closing, to negotiate a pre-annexation development agreement or its equivalent with the City that addresses the annexation of the Property by the City and the terms, conditions, development rights and obligations affecting the development of Property (the "**City Development Agreement**"). Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to negotiate the terms and conditions of the City Development Agreement.

(c) Zoning Approval. Seller hereby authorizes Purchaser to seek and obtain final, unappealable approval from the City of the zoning designations desired by Purchaser that will permit Purchaser to develop the Property for the Intended Use (defined below) ("**Zoning Approval**"). Seller agrees to cooperate with Purchaser reasonably and in good faith in Purchaser's efforts to obtain the Zoning Approval. The Zoning Approval shall not be considered to have been achieved unless all of the following are true: (i) the zoning application is approved by the City without condition or exception, and (ii) all periods for appeal or protest have expired without the filing of any appeal or protest or, if an appeal or protest is filed, the same has been denied and there is no further administrative process available for appeal or protest.



Ex. 1

(d) Platting. Purchaser may, at Purchaser's sole expense, seek to obtain a preliminary plat of the Property (the "**Preliminary Plat**"). Seller hereby authorizes Purchaser to seek to obtain final, unappealable approval from the City or Hood County, in Purchaser's sole determination, of the Preliminary Plat ("**Preliminary Plat Approval**") prior to Closing. Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to prepare the application for Preliminary Plat Approval and all supporting documentation in connection therewith (collectively, the "**Preliminary Plat Application**"), and Seller shall cooperate reasonably and in good faith with Purchaser in connection with Purchaser's efforts to obtain the Preliminary Plat Approval. Seller agrees to work with Purchaser's engineer to ensure that, to the best extent practicable, all plats of the Property contain all easements, rights-of-way and other matters reasonably required by Purchaser in connection with Purchaser's development of the Property for the Intended Use (defined below) (the "**Easements Benefitting the Property**"), and, to the extent any such Easements Benefiting the Property are not contained on such plats, Seller agrees to grant Purchaser any and all Easements Benefiting the Property over and across any land adjacent to the Property that is owned by Seller or any affiliate of Seller ("**Seller's Adjacent Property**") in a location that does not adversely impact Seller's or its affiliate's intended use of Seller's Adjacent Property.

(e) Entitlements, Utilities and Easements. During the period commencing on the Effective Date and ending upon Closing or the earlier termination of this Contract, Purchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use (defined below), including, without limitation the City Development Agreement, the Preliminary Plat Approval, the Zoning Approval, and any and all other approvals needed for the development and operation of the Property for the Intended Use (collectively, the "**Entitlements**"), and (ii) obtain all Easements Benefitting the Property, and (iii) cause all utilities needed for the development and operation of the Property for the Intended Use (collectively, the "**Required Utilities**") to be brought to the boundary of the Property and/or created on the Property. Purchaser agrees to use commercially reasonable, diligent and good-faith efforts to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller. Seller further agrees that, commencing on the Effective Date and continuing until the Closing Date, that Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval. As used herein, "**Intended Use**" shall mean a master planned industrial complex served by rail.

**6.** **Representations and Warranties**. Seller hereby represents and warrants to Purchaser, which representations and warranties shall be deemed to be restated at Closing and shall survive Closing, that:

(a) Seller is comprised of individuals and a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has complete and unrestricted power and authority to enter into this Contract and all other agreements to be executed and delivered by Seller pursuant to the terms and provisions



Ex. 1

hereof, to perform its obligations hereunder and thereunder, and to consummate the transaction contemplated hereby;

(b) This Contract has been duly executed and delivered by Seller. All other agreements contemplated hereby to be executed and delivered by Seller will be, prior to Closing, duly authorized, executed and ready in all respects to be delivered by Seller. This Contract and all other agreements contemplated hereby constitute legal, valid and binding obligations of Seller enforceable in accordance with their respective terms;

(c) The execution, delivery and performance of this Contract and any other agreement contemplated hereby and the consummation of the transaction contemplated hereby or thereby do not, with or without the passage of time and/or the giving of notice, (i) conflict with, constitute a breach, violation or termination of any provision of any contract or other agreement to which Seller is a party or to which all or any part of the Property is bound, (ii) result in an acceleration or increase of any amounts due from Seller to any person or entity, (iii) conflict with or violate the organizational documents of Seller, (iv) result in the creation or imposition of any lien on all or any part of the Property, or (v) violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Seller or all or any part of the Property;

(d) Seller now has and shall have at Closing good and indefeasible title to the Property in fee simple absolute, free and clear of all Liens (other than any Liens that will be released at or prior to Closing). No party other than Seller and the lessees under oil and gas leases that are of record in the official public records of Hood County, Texas has any material rights in or to occupy all or any part of the Property. No party other than Purchaser has any agreement to purchase, right of first refusal, option to purchase or any other right to acquire all or any part of the Property;

(e) One hundred percent (100%) of the Mineral Estate is owned on the Effective Date by the following: (i) the Smelley Estate, which owns fifty percent (50%) of the Mineral Estate, (ii) Richard David Smelley, who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate, (iii) Amy Elizabeth Smelley who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Tammy Elizabeth Graham, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate; (v) Gregory Graham who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Deborah Davis who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; and (iv) David Davis, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate. Deborah Davis and David Davis shall either (A) prior to the Closing Date, convey all of their respective interests in the Mineral Estate in equal shares to Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, and Gregory Graham, or (B) on the Closing Date, convey all of their respective interests in the Mineral Estate to Purchaser. At Closing, Seller shall convey to Purchaser an undivided interest in one hundred percent (100%) of the Mineral Estate.

(f) There are no actions, suits, claims, assessments, or proceedings pending or, to the best of Seller's knowledge, threatened that could materially adversely affect the



Ex. 1

ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform hereunder;

(g) Seller has no information of and to the best of Seller's knowledge, there is not (i) any change contemplated in any applicable law, statute, ordinance, rule, regulation, order, or determination of any governmental authority or any board of fire underwriters (or other body exercising similar functions), (ii) any law, ordinance, regulation, administrative ruling, restrictive covenant or deed restriction affecting all or any part of the Property, including without limitation, any applicable zoning ordinances, building codes, flood disaster laws, wetlands regulation, health law or environmental law, (iii) any judicial or administrative action, (iv) any action by adjacent landowners, (v) any administrative action, (vi) any natural or artificial condition on or about the Property, or (vii) any significant adverse fact or condition relating to the Property or its use, that would prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property;

(h) The Property is not within an area designated by the United States Secretary of Housing and Urban Development, the United States Army Corp of Engineers or any other local, state or federal organization or entity as having an increased likelihood of flooding;

(i) No Hazardous Substances (as such term is hereinafter defined) have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property and there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to the use, generation, manufacture, storage or disposal of any Hazardous Substances in, on, under or about the Property. As used in this Contract, the term "***Hazardous Substances***" means any and all substances, materials and wastes which are or become regulated under applicable local, state or federal Environmental Laws or that are classified as hazardous or toxic under local, state or federal Environmental Laws or regulations, including, without limitation, (i) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "solid waste," "pollutant" "contaminant" or words of similar import as such terms are defined by or listed in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("***CERCLA***"), as amended by Superfund Amendments and Reauthorization Act of 1986 ("***SARA***"), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.) ("***EPCRA***"), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("***RCRA***"), as amended by the Hazardous and Solid Waste Amendments of 1984, the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide and Rodenticide Control Act (7 U.S.C. § 136 et seq.), the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), the Federal Clean Air Act (42 U.S.C. § 7401 et seq.), and in the regulations promulgated pursuant to such laws, all as amended, (ii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101) or 40 CFR Part 302, both as amended, (iii) any material, waste or substance which is (A) oil, gas or any petroleum or petroleum by-product, (B) asbestos, in any form, (C) polychlorinated biphenyls, (D) designated as a



Ex. 1

"hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1251 et seq.), as amended, (E) flammable explosives, or (F) radioactive materials, and (iv) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," "hazardous waste," "industrial solid waste," "solid waste," "radioactive waste" or "special waste from health care facility" in the Texas Solid Waste Disposal Act (Tex. Health & Safety Code Ann ch. 361), the Texas Clean Air Act (Tex. Health & Safety Code ch. 282), the Texas Pesticide Control Act (Tex. Agric. Code Ann. § 76.001 et seq.) and those substances included within the definitions of "hazardous substances," "regulated substances" or "petroleum products" in Subchapter I of the Texas Water Code (Tex. Water Code Ann ch. 26, subch. I) and in the regulations promulgated pursuant to any of such laws, all as the same may be amended from time to time (collectively "***Environmental Laws***"). Further, Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of Hazardous Substances in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of Environmental Laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of Environmental Laws, and (d) claims for contribution, cost recovery, remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code;

(j) The Land has direct and unencumbered access to and from one or more publicly dedicated streets or highways accepted for maintenance and maintained by Hood County and/or the State of Texas;

(k) Any and all underground storage tanks previously removed from the Property by Seller were removed in accordance with all applicable laws, ordinances, regulations and administrative rulings and no underground storage tanks are presently situated in, on, under or about the Property;

(l) The Property includes all sewer and wastewater discharge capacity, potable water capacity, other utility rights and development rights which were originally obtained with the Property by Seller, and no such capacity or rights have been previously conveyed or transferred by Seller;

(m) As a result of the sale of the Property from Seller to Purchaser as contemplated by this Contract, there will be no taxes or assessments assessed against the Property by any taxing authority for the year of Closing or prior years based on change in use or ownership; and

(n) The Due Diligence Materials are true, accurate and complete in all material respects.

7. **Covenants and Agreements of Seller**. Seller covenants and agrees with Purchaser as follows:

(a) Seller and Purchaser each shall, simultaneously with its execution of this Agreement, execute and deliver to the Title Company, a Memorandum of Agreement in the form attached hereto as **Exhibit "E"** (the "**Memorandum**") and Seller and Purchaser hereby instruct the Title Company to record, at Purchaser's expense, the fully executed Memorandum in the official public records of Hood County, Texas (the "**Public Records**") within three (3) business days following the full execution of this Agreement. The Parties agree not to terminate or release the Memorandum, or otherwise cause or permit the Memorandum to be terminated or released, from the Public Records unless and until Closing or the earlier appropriate termination of this Agreement has occurred. At Closing or promptly following the earlier appropriate termination of this Agreement, the Parties shall execute all commercially reasonable documents required by the Title Company to terminate and release the Memorandum from the Public Records (collectively, the "**Memorandum Release Documents**").

(b) Prior to Closing, Seller shall not execute or create any contract or option to purchase, easement, covenant, condition, restriction, lien or encumbrance with respect to the Property or any portion thereof with the exception of (i) the conveyance by Deborah Davis and David Davis of their interests in the Mineral Estate as referenced in Section 6(e) above and (ii) the recordation of the Memorandum as described in Section 7(a) above. To the extent that the Property, or any portion of the Property, is entitled to a tax exemption, Seller shall maintain such exemption and reasonably cooperate with Purchaser in assisting Purchaser to maintain and continue such tax exemption.

(c) Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

(d) Seller shall, within thirty (30) day period after the Effective Date (the "**Tire Removal Period**"), remove from the Land all tires and parts thereof situated on the Land (collectively, the "**Tires**"). Seller shall be liable for all costs to remove any and all Tires that Seller fails to remove during the Tire Removal Period and Seller shall (i) prior to Closing, remove such Tires from the Land within five (5) business days after the date Purchaser delivers notice thereof to Seller, (ii) after Closing, reimburse Purchaser for all costs incurred by Purchaser in connection with removing any Tires from the Land, and (iii) indemnify, defend and hold harmless all Indemnities from and against any and all Claims arising in connection with the Tires.

(e) Notwithstanding anything to the contrary in this Contract, Seller shall not oppose, and Seller shall not interfere with, Purchaser's applications for, or efforts to obtain, any and all Entitlements, Easements Benefitting the Property and the Required Utilities.



Ex. 1

(f) The obligations in this Section 7 shall survive Closing.

8. **Conditions Precedent to Closing**. In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:

(a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or unconditional agreements to bring all the Required Utilities to the boundary line of the Property or create the Required Utilities on the Property have been received by Purchaser;

(b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and correct in all material respects as of the specified date or as limited by the specified date, and (ii) Seller's representations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be performed and observed by such Party prior to and on the Closing Date;

(c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;

(d) Tires. Seller shall have removed all Tires from the Land;

(e) Covenants. All covenants and other obligations of Seller set forth in this Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however,



Ex. 1

that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract.

**9. Closing.**

(a) Date. The closing of the sale of the Property from Seller to Purchaser (the "**Closing**") shall be coordinated through the offices of the Title Company on, or at Purchaser's option, before, the ninetieth (90th) day following the expiration of the Inspection Period (the "**Closing Date**").

(b) Seller to Deliver. At the Closing, Seller shall furnish and deliver to the Title Company for delivery to Purchaser, at Seller's expense (except as provided in Section 9(e) below), the following:

(i) A Special Warranty Deed, in the form of **Exhibit "C-1"** attached hereto, duly executed and acknowledged by Seller, dated as of the Closing, conveying good and indefeasible title to the Property to Purchaser, subject only to the Permitted Exceptions.

(ii) A Mineral Deed, in the form of **Exhibit "C-2"** attached hereto, duly executed and acknowledged by the applicable Seller, dated as of the Closing, conveying to Purchaser the applicable Seller's interest in and to the Mineral Estate.

(iii) A general assignment to Purchaser, in the form of **Exhibit "D"** attached hereto, which, among other things, assigns Seller's interest in and to (A) any lease agreement that Purchaser has expressly agreed to assume, (B) any and all permits, approvals, licenses, water and sewer capacity commitments and other rights and interests owned or held by Seller in connection with the Property, and (C) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land.

(iv) All Memorandum Release Documents.

(v) Any and all agreements assigning or granting to Purchaser easements owned by Seller which are used or needed in connection with the development of the Land.

(vi) An Owner's Policy covering the Property issued by the Title Company in accordance with the terms of the Title Commitment described in Section 4(b) above, containing no exceptions other than the Permitted Exceptions. The Owner's Policy shall be amended to delete the survey exception except as to "shortages in area".

(vii) A Non-Foreign Certification signed by Seller under penalties of perjury.

(viii) Possession of the Property.



Ex. 1

(ix) Such instruments or documents as are necessary, or reasonably required by Purchaser or the Title Company to evidence the status and capacity of Seller and the authority of the person or persons who are executing the various documents on behalf of Seller in connection with the purchase and sale transaction contemplated hereby.

(c) Purchaser to Deliver. At the Closing, Purchaser shall deliver to the Title Company for delivery to Seller, at Purchaser's expense, the following:

(i) The Purchase Price in immediately available funds.

(ii) All Memorandum Release Documents.

(iii) Such instruments or documents as are necessary, or reasonably required by Seller or the Title Company to evidence the authority of Purchaser to consummate the purchase and sale transaction contemplated hereby and to execute and deliver the closing documents to be delivered by Purchaser.

(d) Adjustments.

(i) Seller shall be responsible for payment of all taxes and assessments levied or assessed, including, without limitation, real and personal property taxes, prior to the Closing ("**Taxes**"). Taxes for the calendar year in which the Closing takes place shall be prorated at the Closing between Purchaser and Seller through the Closing Date, based on the current year's tax with due allowance made for the maximum discount allowable for prompt payment (if allowed for such year). If the Closing occurs on a day when the current year's tax rate is not fixed and the current year's assessment is available, Taxes will be prorated based upon such assessments and the prior year's rate. If the current assessment is not available at the time of Closing, then Taxes will be prorated on the basis of the latest available tax rate and assessment and subsequently re-prorated and promptly paid to the Party entitled thereto.

(ii) If the Land is assessed and taxed as a part of a larger parcel of real estate, then, for purposes of computing tax prorations hereunder: (A) Seller shall be solely responsible for payment of the portion of the taxes allocable to any other land and/or improvements located within the larger tract, and shall escrow the estimated amount of such taxes with the Title Company at Closing pursuant to an escrow agreement which will obligate the Title Company to release such funds to the applicable taxing authority upon receipt of a tax bill therefore and will obligate Seller to pay any deficiency between the amount of the escrowed funds and the actual amount of taxes within ten (10) days after receipt of notice thereof; and (B) a proportionate part of the real estate taxes attributable to such larger parcel shall be allocated to the Land on the basis of either of the following at Purchaser's discretion: (1) the ratio that the value of the Land bears to the value of the larger tract or parcel of land, or (2) the ratio that the area of land contained within the Land bears to the area of land contained within the larger parcel of real estate.

(iii) Seller represents and warrants to Purchaser that, as of the Effective Date, the Land is receiving special tax assessment rates (agricultural use) and Seller agrees, until



Ex. 1

the Closing or the earlier termination of this Contract, to comply with the requirements that entitle the Land to receive such special tax assessment rates. Subject to the foregoing, the Parties acknowledge and agree that Purchaser's intended use of the Property after Closing will result in the assessment of rollback taxes for periods prior to Closing, and Purchaser shall be responsible for paying such assessments of rollback taxes triggered by Purchaser's change of use of the Land or loss of special taxing assessment rates based upon the acts of Purchaser; provided, however, that if rollback taxes are triggered for periods prior to Closing by (A) a change in use of the Land prior to Closing, (B) denial of a special use valuation on any portion of the Land claimed by Seller, or (C) any other act not caused by Purchaser, such rollback taxes shall be the obligation of Seller and shall be paid by Seller at Closing. If the amount of the taxes described in this paragraph is not ascertainable at Closing, such amount shall be estimated by Purchaser's tax consultant and 110% of the estimated amount of any amount owed by Seller shall be escrowed by Seller with the Title Company at Closing pursuant to a commercially reasonable form of escrow agreement between Seller, Purchaser and the Title Company which will authorize and instruct the Title Company to pay the rollback taxes due upon receipt of an invoice therefor and will obligate Seller to pay any deficiency.

(iv) Any tax proration based upon an estimate may, upon demand of either Party to the transaction, be subsequently readjusted upon receipt of the actual tax bill for the Property for the year in which the Closing occurs, and any Party owing the other Party monies as a result of such readjustment shall pay the same upon demand.

The provisions of this Section 9(d) shall survive the Closing.

(e) Expenses of Closing.

(i) Seller shall pay: (A) all title examination fees and the base premiums for the Owner's Policy; (B) its proportionate share of the prorations set forth in Section 9(d); (C) its own attorneys' fees; (D) other charges required to be paid by Seller pursuant to this Contract; (E) any local, county or state transfer, recording or documentary tax assessed in connection with the transfer to Purchaser; (F) the cost of the Survey (which payment shall be in the form of a credit to Purchaser against the Purchase Price); (G) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties, and (H) other charges typically paid by sellers in transactions of this nature in the county in which the Property is located.

(ii) Purchaser shall pay: (A) the cost of any endorsements to the Owner's Policy requested by Purchaser or Purchaser's lender; (B) its proportionate share of the prorations set forth in Section 9(d); (C) its own attorneys' fees; (D) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties; and (E) other charges required to be paid by Purchaser pursuant to this Contract.

**10. Casualty or Condemnation Prior to Closing.** If at any time prior to the Closing any portion of the Property is destroyed or damaged by fire or any other casualty, or in the event a taking by condemnation, eminent domain or similar proceedings or a conveyance in lieu thereof is commenced or threatened with respect to any portion of the Property, Seller shall give notice



Ex. 1

thereof to Purchaser and Purchaser shall thereupon have the option to terminate this Contract upon written notice to Seller prior to Closing, in which event the Earnest Money shall be promptly refunded to Purchaser, whereupon this Contract shall be rendered null and void and the Parties shall have no further obligations or liabilities hereunder. If Purchaser does not exercise its option under this Section 10 to terminate this Contract, this Contract shall remain in full force and effect and Seller shall assign or pay to Purchaser at Closing Seller's interest in and to any and all insurance proceeds and condemnation awards.

11. **Default and Remedies**.

(a) Purchaser's Default. In the event Purchaser defaults under this Contract or fails to perform any obligation of Purchaser under this Contract, and such default and failure shall remain uncured for a period of ten (10) days following written notice thereof from Seller to Purchaser, provided that Seller has not defaulted in the performance of any of Seller's obligations hereunder, Seller may, as Seller's sole and exclusive remedy, terminate this Contract by written notice to Purchaser at any time before such default by Purchaser is cured, in which event, Seller shall be entitled to retain the portion of the Earnest Money which has then been deposited by Purchaser as liquidated damages for Purchaser's default and Purchaser shall thereby be released from further obligations under this Contract. Such amount is agreed upon by and between Seller and Purchaser as liquidated damages, due to the difficulty and inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof; and no other damages, rights or remedies shall in any case be collectible, enforceable or available to Seller other than in this Section 11(a), but Seller shall accept said cash payment as Seller's total damages and relief. If this Contract is terminated as a result of Purchaser's default, Purchaser's liability shall be limited to the portion of the Earnest Money which has previously been deposited by Purchaser hereunder, and in no event shall Purchaser be responsible or liable for any portion of the Earnest Money which has not then been deposited by Purchaser hereunder, whether or not such amount is then due. Notwithstanding any provision herein and without limiting Seller's rights in the preceding sentence, Seller shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Purchaser's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

(b) Seller's Default. In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third party out of pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any

representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

12. **Real Estate Brokerage; Consulting Fees**.

(a) Real Estate Brokerage. At Closing, Seller agrees to pay a real estate brokerage commission to M&W Real Estate, LLC ("**Purchaser's Broker**") in the amount of three percent (3%) of the Purchase Price and to Williams Trew Real Estate (Stephen Reich) ("**Seller's Broker**") in the amount of three percent (3%) of the Purchase Price. Purchaser's Broker and Seller's Broker are sometimes collectively referred to in this Contract as "**Brokers**". At Closing and upon funding, Seller shall be responsible for the payment of the real estate brokerage commissions becoming due to Brokers. Each Party represents and warrants to the other there has been no broker, finder, real estate agent or similar agent engaged in connection with the transaction contemplated hereby other than Brokers and each Party agrees that should any claim be made for brokerage commissions or finder's fees by any other broker, finder or agent by, through or on account of any acts of the indemnifying Party or its agents, employees or representatives, the indemnifying Party will hold the other Party free and harmless from and against any and all loss, liability, cost, damage and expense (including, without limitation, attorneys' fees, accountants' fees, court costs and interest) in connection therewith. The provisions of this paragraph shall survive the Closing of this Contract.

(b) **Disclosure. Purchaser advises Seller and Seller acknowledges that each of the following is a principal of Purchaser and is a licensed real estate broker or sales agent acting on his or her own behalf: None.**

13. **Miscellaneous**.

(a) Notices. All notices, requests and other communications under this Contract shall be in writing and shall be delivered in person by hand delivery or overnight delivery service, by electronic mail, or sent by certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If intended for Seller: | Bill Sanders, Independent Executor of<br>the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028<br>Telephone No.: (817) 266-1283<br>Email: bsanders@flash.net |
| With a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092<br>Telephone No.: (817) 410-4012<br>Email: todd.2@verizon.net |

| | |
|---|---|
| with a copy to: | Cresson Moon Properties, LP<br>c/o Cresson Moon Management, LLC, General Partner<br>Attn Richard D Smelley, Deborah R. Davis, and Tammy M. Graham, Managers<br>750 Cattlebaron Drive<br>Fort Wort, Texas 76108<br>Telephone No: (817) 300-4350<br>Email: sgd@flash.net |
| with a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108<br>Telephone Number: (817) 300-4355<br>Email: amy.smelley@icloud.com |
| with a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035<br>Telephone No: (817) 300-4352<br>Email: davidgdavis1@yahoo.com |
| with a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088<br>Telephone No: (817) 300-0780<br>Email: tammy@locationsphotography.com |
| If intended for Purchaser: | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031<br>Telephone No: (856) 498-4412<br>Email: John@challengerrealtygroup.com |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225<br>Telephone No: (214) 390-3264<br>Email: jlibby@LibbySparks.com |

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided. All such notices, requests and other communications, if sent to the address set forth herein above or to such other address as a Party may provide to the other Party in writing, shall be deemed to have been delivered upon receipt at such address if delivered in person, upon deposit with an overnight courier if delivered by overnight delivery, upon deposit in a post office



Ex. 1

or official depository of the United States Postal Service if mailed, and upon transmission if by electronic mail.

(b) Assignment. Purchaser may assign or transfer its rights and obligations under this Contract at any time to any entity owned and/or controlled, in whole or in part, directly or indirectly, by one or more of the principals of Purchaser (a "**Purchaser Affiliate**") without the consent of Seller, and this Contract shall inure to the benefit of and be binding on the Parties hereto and their respective successors and assigns. Except as set forth above, Purchaser may not assign or transfer its rights or obligations under this Contract without the prior, written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned. If Purchaser assigns its rights and obligations under this Contract to a Purchaser Affiliate that fully assumes Purchaser's obligations and liabilities under this Contract, Purchaser shall be automatically fully released from all of its obligations and liabilities hereunder. In such event, Seller agrees to and shall immediately upon request by Purchaser execute a written instrument in a form satisfactory to Purchaser evidencing and confirming such full release.

(c) Force Majeure. A Party shall not be deemed to be in breach or in violation of this Contract if it is prevented from performing any of its obligations hereunder by reason of acts of the other Party, acts of God, riots, strikes, fires, weather, public disturbances, and/or any regulation of any governmental authority including, without limitation, a moratorium or government shut-down (each, a "**Force Majeure Event**"); provided, however, that the Party wishing to rely on such Force Majeure Event shall notify the other Party in writing within ten (10) business days of the commencement and ending of the Force Majeure Event in order to be entitled to the benefit of the delays in performance caused by such Force Majeure Event. No Force Majeure Event(s) singularly or in the aggregate shall exceed sixty (60) days.

(d) Survival. Except as otherwise provided herein, the provisions of this Contract shall survive the Closing and shall not merge into the conveyance documents executed and delivered at Closing.

(e) Joint and Several Liability. All parties signing this Contract as Seller shall be jointly and severally liable for all obligations of Seller.

(f) Entire Agreement; Modifications. This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the Party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

(g) Partial Invalidity. If any clause or provision of this Contract is or should ever be held to be illegal, invalid, or unenforceable under any present or future law applicable to the terms hereof, then it is the intention of the parties hereto that the remainder of this Contract shall not be affected thereby, and that in lieu of each such clause or provision of this Contract that is illegal, invalid, or unenforceable, there be added as a part of this Contract a clause or provision as similar

in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(h) Applicable Law. THIS CONTRACT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(i) Captions. The captions in this Contract are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

(j) Binding Effect. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns. This Contract and Purchaser's rights hereunder may be assigned by Purchaser without the consent of Seller to an entity that is owned and/or controlled, in whole or in part, by one or more of the members of Purchaser. Otherwise, Purchaser must obtain Seller's prior written consent.

(k) Time is of the Essence. With respect to all provisions of this Contract, time is of the essence. However, if the Closing or the final date of any period which is set out in any provision of this Contract falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Texas, then, and in such event, the Closing or such period shall be extended so that the Closing or the last day of such period falls on the next day which is not a Saturday, Sunday or legal holiday. If Seller fails to timely deliver to Purchaser the Title Commitment, Exception Documents or any other document or information required to be delivered by Seller to Purchaser hereunder, the date of expiration of the Inspection Period, the Closing Date and the expiration date of all other time periods hereunder shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser.

(i) Independent Counsel; Interpretation. Purchaser and Seller each acknowledge that: (a) they have had the opportunity to be and/or have been represented by independent counsel in connection with this Contract; (b) they have executed this Contract with the advice of such counsel; and (c) this Contract is the result of arm's length negotiations between the parties hereto and the advice and assistance of their respective counsel. Notwithstanding any rule of law to the contrary: (i) the fact that this Contract was prepared by Purchaser's counsel as a matter of convenience shall have no import or significance, and any uncertainty or ambiguity in this Contract shall not be construed against Purchaser because Purchaser's counsel prepared this Contract; and (ii) no deletions from prior drafts of this Contract shall be construed to create the opposite intent of the deleted provisions.

(j) Counterpart Execution. This Contract may be executed in multiple counterparts. An electronic copy of this Contract bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Contract.

**14.** **Effective Date**. The "**Effective Date**" or any other reference to the date of this Contract shall mean the date on which this Contract is signed by Seller, Purchaser and the Title Company, as indicated by their signatures below.

*[Signature pages follow this page.]*

EXECUTED by Seller this 26 day of MAY, 2023.

**SELLER**:

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ______________________
Richard Smelley, Manager

By: ______________________
Tammy Graham, Manager

By: ______________________
Deborah Davis, Manager

**SELLER**:

DEBORAH RUTH DAVIS

DAVID GLENN DAVIS

**SELLER:**

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*



Ex. 1

EXECUTED by Purchaser this 26 day of May, 2023.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________
John Contrevo, Manager

*[Signature pages continue on following page.]*



Ex. 1

The undersigned Title Company acknowledges receipt of a fully executed copy of this Contract this 26 day of May 2023, 2023, and agrees to comply with the provisions of this Contract, including the provisions hereof governing disposition of the Earnest Money.

**TITLE COMPANY:**

**MCKNIGHT TITLE**

By: [signature]
Name: Jennifer Stapleton
Title: Escrow Officer



Ex. 1

**Escrow Receipt:**

The title company acknowledges receipt of:

√ A. the contract on this day May 26. 2023 (effective date);

√ B. earnest money in the amount of $ 100,000.00 in the form of WIRE

On May 30. 2023.

Title Company: McKnight Title

By: Jennifer Stapleton. [signature]

Address: 4916 Camp Bowie Blvd. 100

Fort Worth - TX 76107

Phone/Fax: 8175290776

Assigned file number (GF#): CB.8280.JS

**EXHIBIT "A"**

**DESCRIPTION OF THE LAND**

Approximately 1,674 gross contiguous acres as more particularly described in this Contract, which approximately 1,674 gross contiguous acres is part of the following described Parent Tract:

**2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:**

**Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and**

**Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;**

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit "A" and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT "A"

## Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)



Ex. 1

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line,
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT "B"**

**DUE DILIGENCE DOCUMENTS**

1. Any and all leases affecting the Property and amendments thereto, as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases;

2. All outstanding third-party service contracts and other agreements affecting the Property;

3. Disclosure of any legal matters affecting the Property;

4. Any notices, correspondence, approvals, permits, and/or licenses or any agreements (including, without limitation subdivision and similar agreements) with, to or from any governmental or quasi-governmental authority having jurisdiction over the Property;

5. Plans, specifications, certificates, inspection reports, notices, correspondence and all other documents prepared, transmitted or received by Seller, if any, in connection with any existing subdivision of or improvements constructed or to be constructed upon the Property;

6. Any letters in existence from utility companies stating whether appropriate facilities have been installed and are available to the boundaries of the Property;

7. Any and all additional data, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, existing surveys, platting and other materials (including a copy of Seller's most current existing survey of the Property), and all other information and agreements, relating to the Property or any portion thereof which is in the possession of Seller or its agents;

8. Any and all tax statements for three calendar years prior to the date of this Contract;

9. All licenses and permits affecting the Property;

10. Any other agreements or documents not referenced above relating to or affecting the Property; and

11. Any and all reports, tests, evaluations, notices, documentation and correspondence relating to (a) the availability of utilities and/or utility capacity including, without limitation, water, sewer, gas, and electricity, at or near the Property, (b) all bodies of water and waterways in, on or under the Property, and (c) rail lines and railways on or across the Property and on land adjacent to the Property.

**EXHIBIT "C-1"**

**FORM OF SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF ________________ | § | |

THAT, ____________________________________________ ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by ________________, a ________________ ("**Grantee**"), whose address is ______________________________, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee, that certain real property situated in ____________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with, all and singular, (i) a one hundred percent (100%) undivided interest in the Mineral Estate (for purposes of this deed, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Grantor in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Grantor which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**").

This conveyance is made by Grantor and accepted by Grantee subject to any easements, restrictions and other matters described in Exhibit B attached hereto and incorporated herein by reference (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property, together with, all and singular, the rights and appurtenances thereto in anywise belonging, to Grantee and Grantee's successors and assigns forever; and subject only to the Permitted Exceptions, Grantor does hereby bind Grantor and Grantor's successors and assigns to warrant and forever defend, all and singular, the Property unto



Ex. 1

the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise.

EXECUTED to be effective the ____ day of ____________, 20_____.

GRANTOR:

_________________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on _______________, 20___, by ______________ ______, the _______________ of ________________, on behalf of said ________________.

_________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225



Ex. 1

EXHIBIT A TO SPECIAL WARRANTY DEED

Description of Property

[*insert description of Property per this Contract*]

---

EXHIBIT B TO SPECIAL WARRANTY DEED

Permitted Exceptions

[*insert Permitted Exceptions per this Contract*]

**EXHIBIT "C-2"**

**FORM OF MINERAL DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**MINERAL DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF ________________ | § | |

THAT, __________________________________________, a ____________ (if an individual, insert "*a [single]/[married] [woman]/[man]*") ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by __________________, a ____________________ ("**Grantee**"), whose address is ______________________________, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD, ASSIGNED, CONVEYED and DELIVERED, and by these presents does GRANT, BARGAIN, SELL, ASSIGN, CONVEY and DELIVER unto Grantee, an undivided 1/*****th interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in __________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said land for oil, gas and other minerals, and removing the same therefrom.

Said Land being now subject to those certain oil and gas leases described on Exhibit B attached hereto and made a part hereof for all purposes (the "**Leases**") executed in favor of record owner, it is understood and agreed that this sale is made subject to the terms of said Leases, but covers and includes 1/*****th of all of the oil royalty and gas rental or royalty due and to be paid under the terms of said Leases, in so far as it covers the above described Land.

It is understood and agreed that 1/*****th of the money rentals, which may be paid, on the above described Land, to extend the term within which a well may be begun under the terms of any said Leases, is to be paid to the said Grantee; and, in event that any of the above described Leases for any reason becomes canceled or forfeited, then and in that event, Grantee shall own 1/*****th of all oil, gas and other minerals in and under said Lands, together with a like 1/*****th interest in all bonuses paid, and all royalties and rentals provided for in future oil, gas and mineral leases covering the above described Lands.

TO HAVE AND TO HOLD the above described property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee herein, and



Ex. 1

Grantee's successors, heirs and assigns forever; and Grantor does hereby bind itself and its successors, heirs, executors and administrators, to warrant and forever defend all and singular the said property unto the said Grantee herein, and Grantee's successors, heirs and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof.

EXECUTED to be effective the ____ day of ____________, 20_____.

**GRANTOR:**

______________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on _______________, 20___, by __________________________, the __________________ of _____________, on behalf of said ___________________.

____________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

## EXHIBIT A TO MINERAL DEED

Description of the Land

[*insert description of the Land per this Contract*]

---

## EXHIBIT B TO MINERAL DEED

Description of Existing Oil and Gas Leases

[*insert description below*]

**EXHIBIT "D"**

**GENERAL ASSIGNMENT**

THIS GENERAL ASSIGNMENT (this "**Assignment**") is made as of the ____ day of __________, 20___, by ____________________, a ____________________ ("**Seller**"), to ______________________________, a ______________________ ("**Purchaser**").

WHEREAS, of even date herewith, Seller has conveyed to Purchaser the real property described in Exhibit A attached hereto ("**Land**"), together with all improvements (the "**Improvements**") located thereon (the Land and Improvements are referred to herein collectively as the "**Property**"); and

WHEREAS, Seller and Purchaser intend that Seller also convey to Purchaser all of the Conveyed Development Rights (as hereinafter defined).

NOW, THEREFORE, Seller, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, hereby agrees as follows:

1. Seller has GRANTED, BARGAINED, SOLD, CONVEYED and ASSIGNED, and by these present does hereby GRANT, BARGAIN, SELL, CONVEY and ASSIGN to Purchaser all of Seller's right, title and interest in and to the following, but only to the extent same pertain to the Property ("**Conveyed Development Rights**"):

(a) all surveys, engineering, soils, seismic, geological and environmental reports, studies and certificates and other technical descriptions;

(b) all warranties, guaranties and indemnities received from third parties, and all claims, demands and causes of action against third parties, but only to the extent they are for the benefit of, and applicable to, the Property or the owner thereof, including, without limitation, (i) any warranties, guaranties, indemnities, contractual rights, claims, demands and causes of action pertaining to the development, construction, design or completion of the Property and/or the common areas, streets, utilities or other subdivision infrastructure, and (ii) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land;

(c) all licenses, permits, governmental approvals, utility commitments, utility rights (including rights to capacity or service), drainage and detention rights, or right to pay reduced application fees, permit fees, inspection fees, impact fees, development rights or other similar rights;



Ex. 1

(d) rights to credits, refunds and reimbursements, including, without limitation, any credits against, or right to pay reduced application fees, permit fees, inspection fees, impact fees, or other similar development credits;

(e) all rights under any zoning cases, preliminary plans, plats (preliminary or final) of any portion of the Property or any rights-of-way abutting the Property or any portion thereof, including any boundary plats and any right-of-way plats, submitted, approved or recorded;

(f) all unpaid awards or proceeds, including awards in connection with insurance and any eminent domain taking;

(g) rights in and to engineering and architectural plans and specifications;

(h) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant;

(i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the land and improvements now or hereafter constructed thereon; and

(j) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Property.

TO HAVE AND TO HOLD the Conveyed Development Rights unto Purchaser and Purchaser's successors and assigns forever.

2. This Assignment will be binding on Seller, its successors and assigns, and will inure to the benefit of Purchaser, its successors and assigns.

3. This Assignment does not constitute an assumption of any liability or obligation by Purchaser, nor will it be deemed to impose on Purchaser any liability or obligation.

4. Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of any and all substances, materials and wastes which are or become regulated under applicable local, state or federal environmental laws or that are classified as hazardous or toxic under local, state or federal environmental laws or regulations in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of environmental laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of environmental laws, and (d) claims for contribution, cost recovery,

remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code.

5. Seller and Purchaser will each cooperate with each other, their employees, and agents to facilitate the purpose and intent of this Assignment including, without limitation, the providing of information and documentation that may be reasonably required for the enforcement of the rights and interests assigned hereby.

6. This Assignment may be executed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument.

*[Remainder of page is intentionally left blank]*

EXECUTED as of the date first written above.

______________________________,
a _____ ____________

By: ______________________
Name: ______________________
Title: ______________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on ______________, 20___, by ____________________, ______________________ of ______________________, a _______ _________________, on behalf of said ____________.

______________________________
Notary Public, State of Texas

[Official Notary Stamp]

---

Exhibit A to General Assignment

Legal Description of Property

[Insert land description]

**EXHIBIT "E"**

**FORM OF MEMORANDUM OF AGREEMENT**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**MEMORANDUM OF AGREEMENT**

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** ____________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ____________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*



Ex. 1

EXECUTED by Seller this ______ day of __________________, 2023.

**SELLER:**

[signature] Indep Ex.
**BILL SANDERS, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

(seal) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*



Ex. 1

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: [signature]
Richard Smelley, Manager

By: [signature]
Tammy Graham, Manager

By: [signature]
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

[signature]
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

[signature]
Notary Public, State of Texas



Ex. 1

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]* *[Signature pages continue on following page.]*

**SELLER**:

Richard David Smelley

**RICHARD DAVID SMELLEY**

Amy Elizabeth Smelley

**AMY ELIZABETH SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*



**Ex. 1**

**SELLER**:

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

Deborah Ruth Davis

**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

Linda Coffey Jessup
Notary Public Signature

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**Property Description**

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.



Ex. 1

**APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**Legal Description of Parent Tract**

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)



Ex. 1

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.



Ex. 1

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** __________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated __________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*



Ex. 1

EXECUTED by Seller this ______ day of __________________, 2023.

**SELLER**:

Bill Sanders IND EX.

**BILL SANDERS, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

Linda Coffey Jessup
Notary Public Signature

(seal) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

**SELLER:**

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: Richard Smelley
Richard Smelley, Manager

By: [signature]
Tammy Graham, Manager

By: Deborah Davis
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]*

**SELLER**:

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(seal)

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(seal)

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

Tammy Marie Graham
TAMMY MARIE GRAHAM

Gregory Scott Graham
GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

Deborah Ruth Davis
**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________________
John Contrevo, Manager

STATE OF New Jersey §
§
COUNTY OF Camden §

This instrument was acknowledged before me on the 18 day of May 2023, by John Contrevo, Manager of Challenger Realty Group, LLC, a Delaware limited liability company, for and on behalf of said limited liability company, for the purposes stated in said instrument.

(SEAL)

______________________________
Notary Public, ~~State of Texas~~
State of New Jersey SE
May 18, 2023

SHAMAYNE R EVERITT
Commission # 50208874
Notary Public, State of New Jersey
My Commission Expires
April 11, 2028

## EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Property Description

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lune Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.



Ex. 1

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt, J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degreas West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)



Ex. 1

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.



Ex. 1

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP,<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |



Ex. 1

**Hood County Clerk**
**201 W Bridge Street**
**PO BOX 339**
**Granbury, Texas 76048**
**Phone: 817-579-3222**

Document Number: 2023-0007320 -
Filed and Recorded - Real Records

MEMORANDUM OF AGREEMENT

Grantor: SANDERS BILL EXE

Pages: 12

Recorded On: 06/08/2023 01:46 PM

**This page is a permanent part of the document.**
**Do Not Destroy**

| | | |
|---|---|---|
| **Recorded On:** | 06/08/2023 01:46 PM | **Notes:** |
| **Document Number:** | 2023-0007320 | |
| **Receipt Number:** | R238102 | |
| **Amount:** | $61.00 | |
| **Recorded By:** | Simplifile | |

Any provision herein which restricts the Sale, Rental, or use of the described REAL PROPERTY because of color or race is invalid and unenforceable under federal law.

**I hereby certify that this instrument was filed and duly recorded in the Official Records of Hood County, Texas**

Katie Lang
County Clerk
Hood County, Texas

**Return To:**

MCKNIGHT TITLE

279 W HIDDEN CREEK PKWY STE 1
BURLESON, TX 76028-6077

Ex. 2

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** May 26, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated May 26, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*



Ex. 2

EXECUTED by Seller this 26 day of MAY, 2023.

**SELLER:**

Bill Sanders IND EX.

**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

Linda Coffey Jessup
Notary Public Signature

(seal)

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*



Ex. 2

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]*

**SELLER**:

Richard David Smelley
**RICHARD DAVID SMELLEY**

Amy Elizabeth Smelley
**AMY ELIZABETH SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347
(Seal)

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*



Ex. 2

**SELLER**:

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

Deborah Ruth Davis

**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*



Ex. 2

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By:________________________
John Contrevo, Manager

STATE OF New Jersey §
COUNTY OF Camden §
§

This instrument was acknowledged before me on the 18 day of May 2023, by John Contrevo, Manager of Challenger Realty Group, LLC, a Delaware limited liability company, for and on behalf of said limited liability company, for the purposes stated in said instrument.

(SEAL)

________________________
Notary Public, ~~State of Texas~~ State of New Jersey SE May 18, 2023

SHAMAYNE R EVERITT
Commission # 50208874
Notary Public, State of New Jersey
My Commission Expires
April 11, 2028



Ex. 2

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**Property Description**

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nasbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt, J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas: South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varis measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degreas West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)



Ex. 2

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.



Ex. 2

# EXHIBIT B TO MEMORANDUM OF AGREEMENT

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP,<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |



Ex. 2

**From:** Stephen Reich <stephen.reich@williamstrew.com>
**Sent:** Wednesday, June 21, 2023 1:38 PM
**To:** Jennifer Stapleton <jennifer@mcknighttitle.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** Cresson - Challenger 1674 Acres

Good afternoon:
Please use this email as written notification that all tires have been removed from the property. It is my understanding that our initial 180 feasibility starts today. Please confirm receipt, and acknowledge that this starts our feasibility.

--

LIBBY//SPARKS
LIBBY · SPARKS · WILLIS · STARNES

JEFFREY T LIBBY
Direct: (214) 390-3264
JLibby@LibbySparks.com

December 15, 2023

Bill Sanders, Independent Executor of
The Estate of Pearl Smelley
804 Flagstone Drive
Burleson, Texas 76028

*Via Email: BSanders@flash.net*

Estate of Pearl Smelley
Attn: Todd Tew
566 North Kimball Avenue, Suite 130
Southlake, Texas 76092

*Via Email: Todd.2@Verizon.net*

Re: Notice regarding Inspection Period and other matters; Standard Contract of Sale dated effective as of May 26, 2023 (the "**Contract**"), by and between Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "**Smelley Estate**"), Cresson Moon Properties, LP, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract solely for the purposes of agreeing to grant, sell and coney their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: Richard David Smelley and Amy Elizabeth Smelley (collectively, "**Smelley**"), Tammy Marie Graham and Gregory Scott Graham (collectively, "**Graham**"), and Deborah Ruth Davis and David Glenn Davis (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham, and Davis, are collectively, jointly and severally referred to in the Contract and in this Letter as ("**Seller**"), and Challenger Realty Group, LLC, a Delaware limited liability company, and/or its assigns, ("**Purchaser**"), regarding that certain approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, as more particularly described in the Contract (the "**Property**").

Ladies and Gentlemen:

As you are aware, the undersigned and this law firm represent Purchaser in connection with the referenced Contract. Section 5(a) of the Contract provides that the Inspection Period commences on the Effective Date and continues through the 180th day following the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser. Section 7(d) of the Contract defines Tires as "all tires and parts thereof situated on the Land." Section 1(a) of the Contract defines the Land as that certain tract of land in Hood County, Texas, described and/or depicted on Exhibit "A" to the Contract. Section 7(d) also obligates Seller to remove all Tires from the Land within 30 days after the Effective Date. All defined terms used in this letter that are not defined in this letter are intended to have the meaning ascribed in the Contract.



Ex. 4

Seller notified Purchaser on or about June 21, 2023 that Seller had removed all the Tires from the Land. However, Seller has not removed all the Tires from the Land and, as of the date of this letter, numerous Tires remain on the Land in various locations, including, without limitation, outside the single family residence on the Land, near the area where the previous pile of Tires was located, and attached to multiple apparently abandoned vehicles located throughout the Land.

Based on the fact that all of the Tires have not been removed from the Land, the Inspection Period will not expire on December 18, 2023 and, assuming that Seller has delivered all of the Due Diligence Items to Purchaser, the Inspection Period will not expire until the 180th day after all of the Tires have been removed from the Land and Seller has notified Purchaser thereof. Purchaser hereby makes demand upon Seller to remove all of the remaining Tires from the Land as soon as possible and notify Purchaser immediately thereafter that all of the remaining Tires on the Land have been removed. In order to avoid this issue in the future, Purchaser requests that Seller notify Purchaser regarding the date that Seller will remove all of the remaining Tires from the Land so that Purchaser may accompany Seller during Seller's removal of all the remaining Tires from the Land.

Additionally, as we have previously discussed, the survey obtained by Purchaser shows two gas pipelines traversing the entire width of the Property which, according to the surveyor's note, are not located in an easement. It is our understanding that Seller was aware of those gas pipelines prior to the Effective Date and that no documentation or information regarding those gas pipelines was provided to Purchaser in the Due Diligence Items. Obviously, the existence of those gas pipelines presents a significant artificial condition on the Property that would or could prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property. Purchaser intends to continue its efforts to identify the owners of those gas pipelines and discover the relevant information regarding those gas pipelines, including their current operating status, the respective rights and obligations of Seller and the owners of those gas pipelines and, if abandoned, what may be entailed in their removal. Purchaser requests Seller's cooperation in its efforts regarding those gas pipelines.

Finally, Purchaser's environmental engineer has discovered approximately thirty (30) 55 gallon steel drums of oil-based products throughout the Property (five of which were located around the residential structure and barn on the southern portion of the Property), as well as one 500 gallon petroleum oil aboveground storage tank located on the western portion of the Property in association with a tank battery located on the Property. It appears that at least one of those drums was on its side and had leaked a dark-colored liquid out onto the soil and some black oily staining was observed under a few of the 55 gallon steel drums on the western portion of the Property. Purchaser requests that Seller immediately advise Purchaser regarding any and all Hazardous Substances that are currently located on the Property or which have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property. Additionally, Purchaser requests that Seller promptly and properly remove all of the steel drums located on the Property, as well as all containers that contain any Hazardous Substances. Purchaser requests that Seller notify Purchaser regarding the date that Seller will

Ex. 4

remove all of the steel drums and other containers from the Property so that Purchaser may accompany Seller during Seller's removal of such items from the Property.

Please be advised that this letter is not intended to and does not constitute a waiver of any rights or remedies that Purchaser may have under the Contract. Any potential defaults by Seller now existing or later occurring will not be deemed waived or otherwise accepted by Purchaser. The description in this letter of the specific rights of Purchaser will not be deemed to limit or exclude any other rights to which Purchaser may be or become entitled to under the Contract, at law, in equity, or otherwise. Purchaser reserves all rights and remedies granted under the Contract and available at law or in equity, all of which will be cumulative and may be pursued separately, successively, or concurrently at the sole discretion of Purchaser. No failure to exercise or delay in exercising any rights by Purchaser will operate as a waiver of any rights that Purchaser may have under the Contract.

We request that you indicate Seller's acknowledgment that the Inspection Period will not expire on December 18, 2023 and, assuming that Seller has delivered all of the Due Diligence Items to Purchaser, the Inspection Period will not expire until the 180th day after all of the Tires have been removed from the Land and Seller has notified Purchaser thereof, by returning an executed copy of this letter with the appropriate signatures below, but your returned acknowledgment will not be required to enforce the clear requirements described in Section 5(a) of the Contract.

Very truly yours,

Jeffrey T. Libby

*[Seller's Acknowledgment on the Following Page]*

**SELLER'S ACKNOWLEDGEMENT**

**SELLER**:

________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________________
Richard Smelley, Manager

By:____________________________
Tammy Graham, Manager

By:____________________________
Deborah Davis, Manager

**SELLER**:

________________________________
RICHARD DAVID SMELLEY

________________________________
AMY ELIZABETH SMELLEY

**SELLER**:

________________________________
DEBORAH RUTH DAVIS

________________________________
DAVID GLENN DAVIS

**SELLER:**

________________________________
TAMMY MARIE GRAHAM

________________________________
GREGORY SCOTT GRAHAM

Ex. 4

/jl

cc: Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC *(via email: sgd@flash.net)*
Richard Smelley and Amy Smelley *(via email: Amy.Smelley@icloud.com)*
Deborah Davis and David Davis *(via email: DavidGDavis1@yahoo.com)*
Lacy Kimball, Lacy Kimball Law *(via email: info@LacyKimballLaw.com)*
Tammy Graham and Gregory Graham *(via email: Tammy@LocationsPhotography.com)*

Ex. 4

**Blake Brownshadel**

**From:** Jake Wilkinson <jake@mwrealestate.com>
**Sent:** Thursday, January 11, 2024 11:20 AM
**To:** charles@challengerrealtygroup.com; john@challengerrealtygroup.com; ed@challengerrealtygroup.com; Patricia Herrera
**Cc:** Jeff Libby
**Subject:** FW: Tires on Smelley Ranch, 7700 Old Granbury

CAUTION: This email originated from outside of the firm.

Please see below from the seller's broker.

**Jake Wilkinson**
President & Managing Broker
jake@mwrealestate.com

**M&W Real Estate**
8737 King George Drive, Suite B200
Dallas, Texas 75235

Office +1 214 926 9361
Mobile +1 325 721 2353

M&W REAL ESTATE

Website | LinkedIn | Facebook

Texas Real Estate Commission: Consumer Protection Notice
Texas Real Estate Commission: Information About Brokerage Services

This message contains information which may be confidential and/or legally privileged. Unless you are the addressee (or authorized to receive e-mail for the addressee), you may not use, copy or disclose to anyone the message or any other information contained in the message or any attachment. If you have received this message in error, please advise the sender by reply e-mail and delete the message and any attachments and destroy all hard copies of same. Thank you.

---

**From:** Stephen Reich
**Sent:** Thursday, January 11, 2024 11:16 AM
**To:** Jake Wilkinson ; Jennifer Stapleton
**Subject:** Tires on Smelley Ranch, 7700 Old Granbury

Good morning all.



Ex. 5

Please use this as written notice that the tires have been finally cleaned up on this property. Can we get a new critical dates letter produced?

To help p otect you p vacy M c osoft Off ce p evented automat c download of th s pictu e f om the Inte net



Ex. 5

LIBBY//SPARKS
LIBBY · SPARKS · WILLIS · STARNES

JEFFREY T LIBBY
Direct: (214) 390-3264
JLibby@LibbySparks.com

July 1, 2024

Bill Sanders, Independent Executor of
The Estate of Pearl Smelley
804 Flagstone Drive
Burleson, Texas 76028

*Via Email: BSanders@flash.net*

*Via Email: Todd.2@Verizon.net*

Estate of Pearl Smelley
Attn: Todd Tew
566 North Kimball Avenue, Suite 130
Southlake, Texas 76092

Re: Standard Contract of Sale dated effective as of May 26, 2023 (the "**Contract**"), by and between Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "**Smelley Estate**"), Cresson Moon Properties, LP, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract solely for the purposes of agreeing to grant, sell and coney their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: Richard David Smelley and Amy Elizabeth Smelley (collectively, "**Smelley**"), Tammy Marie Graham and Gregory Scott Graham (collectively, "**Graham**"), and Deborah Ruth Davis and David Glenn Davis (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham, and Davis, are collectively, jointly and severally referred to in the Contract and in this Letter as ("**Seller**"), and Challenger Realty Group, LLC, a Delaware limited liability company, and/or its assigns, ("**Purchaser**"), regarding that certain approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, as more particularly described in the Contract (the "**Property**").

Ladies and Gentlemen:

We are starting this letter with the most important message that we wish to convey: our client sincerely wants to work with you to resolve the issues affecting the Property. Purchaser has invested a significant amount of time and a large sum of money conducting its due diligence and Purchaser remains not only very interested in purchasing the Property but also very hopeful that Seller and Purchaser can cooperate with each other in good faith to address the matters outlined below and successfully arrive at the closing table. All defined terms used in this letter that are not defined in this letter are intended to have the meaning ascribed in the Contract.

**Oil and Gas Lease**.

As you know, there is an oil and gas lease of record (the "**Smelley Lease**") that, if active, could potentially affect as much as 120 acres of the surface of the Property – acreage that is situated in the middle of the Property – and could significantly and adversely impact the use and



Ex. 6

development of the Property. As part of Purchaser's due diligence activities, Purchaser hired special counsel Kelly Roach, who specializes in oil and gas law, to help assess the mineral estate, as well as a separate petroleum engineer for purposes of assessing the condition and functionality of the wells situated on the Property. Mr. Roach has been requesting documentation from Seller in his attempt to help Purchaser assess Seller's mineral estate and determine, among other things, to what extent the Smelley Lease remains in effect. In response to Mr. Roach's numerous and repeated requests, Seller finally turned over Seller's copies of checks apparently evidencing shut-in royalty payments made to Seller by the lessee under the Smelley Lease (each, a "**Shut-In Royalty Check**"). As you know, a shut-in royalty payment is a payment made by a lessee to a lessor under an oil and gas lease when the lessee stops production from a well, or "shuts it in", and a shut-in royalty clause in an oil and gas lease usually allows for the shut-in royalty payment to replace the regular royalty payments the lessee would normally make while the well is producing and, by making shut-in payments on a well capable of producing oil or gas in paying quantities, typically allows the lessee to maintain the lease.

Purchaser's Request: Purchaser recognizes that the Property has been in the Smelley family for generations and that documents may have been distributed among and/or stored by the various Seller parties. Purchaser requests that the Seller parties perform a thorough search of areas over which each maintains possession and/or control and deliver to Purchaser all of the Due Diligence Items that Seller has in its possession or control which Seller has not yet delivered to Purchaser, including, without limitation, all information relating to (a) the mineral estate, including items and information relating to the Smelley Lease, any and all other oil and gas leases affecting the Property, and any and all wells and related equipment situated on the Property, and (b) any and all pipelines on the Property, including the two gas pipelines about which Purchaser previously inquired which are shown on the survey of the Property as not being located within any recorded easement agreement and traversing from the eastern property line across the Property to the western property line in a northeast to southwest direction. Purchaser also requests Seller to request a Release of Oil and Gas Lease covering the Smelley Lease and all of the lands and depths covered by the Smelley Lease.

**Environmental Matters**.

As you recall, Purchaser's environmental engineer discovered approximately thirty (30) 55-gallon steel drums of oil-based products throughout the Property, as well as one 500-gallon petroleum oil aboveground storage tank located on the western portion of the Property in association with a tank battery located on the Property. It appeared that at least one of those drums was on its side and had leaked a dark-colored liquid out onto the soil and some black oily staining was observed under a few of the 55-gallon steel drums on the western portion of the Property. In its December 15, 2023 letter to Seller, Purchaser requested that Seller immediately advise Purchaser regarding any and all Hazardous Substances that are currently located on the Property or which have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property. Additionally, Purchaser requested that Seller promptly and properly remove all of the steel drums located on the Property,

Ex. 6

as well as all containers that contain any Hazardous Substances. Finally, Purchaser requested that Seller notify Purchaser regarding the date that Seller would remove all of the steel drums and other containers from the Property so that Purchaser could accompany Seller during Seller's removal of such items from the Property. It is our understanding that Seller did not advise Purchaser regarding any Hazardous Substances or notify Purchaser regarding the date that Seller would remove the steel drums and other containers from the Property. However, we understand that Seller has removed certain steel drums from the Land. Section 7(c) of the Contract requires Seller, not less than fifteen (15) days prior to Closing, to remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and to provide Purchaser with a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

Purchaser's Request: Purchaser understands that the Property has been subject to oil and gas leases for decades and that there has been a lot of activity on the Property by the oil and gas lessees over the years. Purchaser also recognizes that the approximately 2,000 acres that have been collectively owned by the Smelley family is a lot of land to oversee and maintain. Purchaser requests Seller to cooperate with, and provide current and ongoing information to, Purchaser regarding Seller's prior removal of the steel drums and other containers from the Property and whether Seller engaged an environmental engineer to remove those steel drums and other containers, as well as any and all other activities of Seller in connection with environmental conditions, contamination or presence of hazardous substances in, on, above or below the Property.

**Inspection Period**.

Section 5(a) of the Contract provides that the Inspection Period commences on the Effective Date and continues through the 180th day following the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser.

Tire Removal. Section 7(d) of the Contract defines Tires as "all tires and parts thereof situated on the Land" and obligates Seller to remove all Tires from the Land within thirty (30) days after the Effective Date. As you recall, after Seller originally notified Purchaser that Seller had removed all the Tires from the Land, Purchaser discovered Tires on the Property and notified Seller of that fact on December 15, 2023. Seller notified Purchaser on or about January 11, 2024 that all Tires had been removed from the Land and Purchaser relied on Seller's notification and continued its due diligence efforts, spending a significant amount of money in the process. However, Purchaser just discovered more Tires situated on the Property (see photos of those Tires attached to this letter as Exhibit "A"). Therefore, as of the date of this letter, Seller still has not removed all the Tires from the Land.

Purchaser requests that Seller contract with one or more companies that can properly inspect the entire Property, identify where all the Tires are located, and then remove all the Tires

Ex. 6

from the Property so that all the Tires are fully and finally removed from the Property and none are missed.

Due Diligence Items. Section 4(a) of the Contract requires Seller to deliver or cause to be delivered to Purchaser copies of all of the Due Diligence Items in Seller's possession or control listed on Exhibit "B" to the Contract within ten (10) days following the Effective Date. The list of Due Diligence Items includes, among other items, (i) any and all leases affecting the Property and amendments thereto, ***as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases*** (emphasis added); (ii) any and all additional data, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, existing surveys, platting and other materials (including a copy of Seller's most current existing survey of the Property), ***and all other information and agreements, relating to the Property or any portion thereof which is in the possession of Seller or its agents*** (emphasis added); and (iii) ***any other agreements or documents not referenced above relating to or affecting the Property*** (emphasis added). Seller's copies of the Shut-In Royalty Checks that Seller recently delivered to Purchaser clearly constitute (i) incident or related documents which affect the obligations of Seller or the Property with respect to a lease that affects the Property, (ii) information relating to the Property which was in the possession of Seller or its agents, and (iii) other documents relating to or affecting the Property that are not referenced in the list of Due Diligence Items. Therefore, Seller did not previously deliver to Seller copies of all of the Due Diligence Items in Seller's possession or control.

Purchaser requests, as mentioned above, that the Seller parties diligently search all areas in which each maintains possession and/or control and deliver to Purchaser all of the Due Diligence Items that Seller has in its possession or control which Seller has not yet delivered to Purchaser.

Based on the facts that (a) all of the Tires have not been removed from the Land and (b) Seller did not previously deliver all of the Due Diligence Items to Purchaser, the Inspection Period will not expire on July 9, 2024; the Inspection Period will not expire until the 180th day after (1) all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (2) Seller has delivered all of the Due Diligence Items to Purchaser. Purchaser again makes demand upon Seller to (A) deliver all of the Due Diligence Items to Purchaser (including, without limitation, all Due Diligence Items relating to the mineral estate, all oil and gas leases to which the Property is subject, and all pipelines on and under the Property), and (B) remove all of the remaining Tires from the Land as soon as possible and notify Purchaser immediately thereafter that all of the remaining Tires on the Land have been removed. In order to avoid further delays in the future, Purchaser again requests that Seller notify Purchaser regarding the date that Seller will remove all of the remaining Tires from the Land so that Purchaser may accompany Seller during Seller's removal of all the remaining Tires from the Land.

Please be advised that this letter is not intended to and does not constitute a waiver of any rights or remedies that Purchaser may have under the Contract. Any potential defaults by Seller now existing or later occurring will not be deemed waived or otherwise accepted by Purchaser.

Ex. 6

The description in this letter of the specific rights of Purchaser are not intended to, and will not be deemed to, limit or exclude any other rights to which Purchaser may be or become entitled to under the Contract, at law, in equity, or otherwise. Purchaser reserves all rights and remedies granted under the Contract and available at law or in equity, all of which will be cumulative and may be pursued separately, successively, or concurrently at the sole discretion of Purchaser. No failure to exercise or delay in exercising any rights by Purchaser will operate as a waiver of any rights that Purchaser may have under the Contract.

We request that you indicate Seller's acknowledgment that the Inspection Period will not expire on July 9, 2024 and that the Inspection Period will not expire until the 180th day after the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser, by returning an executed copy of this letter with the appropriate signatures below, but your returned acknowledgment will <u>not</u> be required to enforce the clear requirements described in Section 5(a) of the Contract.

We want to end this letter the way we began, expressing Purchaser's genuine desire to cooperate with Seller in a good faith effort to address and resolve each of the issues listed above in this letter. Please feel free to contact me at your convenience to discuss the best way(s) to successfully achieve that outcome.

Very truly yours,

Jeffrey T. Libby

*[Seller's Acknowledgment on the Following Page]*

Ex. 6

**SELLER'S ACKNOWLEDGEMENT**

**SELLER**:

__________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________________
Richard Smelley, Manager

By:____________________________
Tammy Graham, Manager

By:____________________________
Deborah Davis, Manager

**SELLER**:

__________________________________
RICHARD DAVID SMELLEY

__________________________________
AMY ELIZABETH SMELLEY

**SELLER**:

__________________________________
DEBORAH RUTH DAVIS

__________________________________
DAVID GLENN DAVIS

**SELLER:**

__________________________________
TAMMY MARIE GRAHAM

__________________________________
GREGORY SCOTT GRAHAM

Ex. 6

/jl

cc: John Contrevo *(via email)*
Charles Gallub *(via email)*
Edwin Esposito *(via email)*
Patricia Herrera *(via email)*
Jake Wilkinson *(via email)*
Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC *(via email: sgd@flash.net)*
Lacy Kimball, Esq. *(via email: info@LacyKimballLaw.com)*
Richard Smelley and Amy Smelley *(via email: Amy.Smelley@icloud.com)*
Deborah Davis and David Davis *(via email: DavidGDavis1@yahoo.com)*
Tammy Graham and Gregory Graham *(via email: Tammy@LocationsPhotography.com)*
Stephen Reich *(via email: stephen.reich@williamstrew.com)*
Kelly Roach, Esq. *(via email)*

**EXHIBIT "A"**

**PHOTOS OF TIRES ON THE LAND**





Ex. 6


Lowe

# FIRST AMENDMENT TO STANDARD CONTRACT OF SALE

This **FIRST AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is executed on this 4th day of December, 2024 (the "**First Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Inspection Period. The Inspection Period is hereby extended to continue through April 7, 2025 (the 180th day after October 7, 2024). For the avoidance of doubt, by signing this Amendment, the Parties acknowledge and agree that (a) the Parties' intention is to extend the Inspection Period as described above, and (b) preserve both of Purchaser's two (2) options to extend the Inspection Period as described in Section 5(a) of the Contract.

3. Purchaser hereby instructs the Title Company to (a) continue to maintain the initial Earnest Money in escrow and (b) hold in escrow solely for the benefit of Purchaser the $100,000 deposit of additional Earnest Money that Purchaser delivered to the Title Company on or about July 8, 2024 (the "**Prepaid Deposit**"). The Parties acknowledge and agree that, unless and until



Ex. 7

Purchaser elects to exercise its first option to extend the Inspection Period as described in Section 5(a) of the Contract, (y) the Prepaid Deposit is not intended to be, and is not, part of the Earnest Money, and (z) Seller has no claim to, or right to receive, the Prepaid Deposit.

4. Oil and Gas Leases.

(a) Seller hereby authorizes Purchaser to contact and communicate with each and every lessee (each, an "**O&G Lessee**") under the oil and gas lease agreements to which all or a portion of the Property is subject (each, an "**O&G Lease**"), including, without limitation, that certain O&G Lease pursuant to which that certain oil and gas well commonly referred to as "Smelley 1H" (RRC Lease ID No. 211620) (the "**Smelley 1H Lease**") exists on the Property, on Seller's behalf in order to negotiate modifications of the O&G Leases that are satisfactory to Purchaser; provided, however, that Purchaser shall not be entitled to enter into an agreement with any O&G Lessee that is enforceable against Seller without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Such modifications may include, without limitation, early termination or revocation of the applicable O&G Lease or the lessee's waiver or restriction of its rights to access and use the surface of the Property for oil and gas development. Purchaser shall be authorized to contact, communicate and negotiate with the O&G Lessees through Purchaser's representatives, including, without limitation, Purchaser's legal counsel and environmental engineers. Seller shall not be liable to Purchaser for any of Purchaser's fees, costs or other expenses incurred by Purchaser in seeking a modification, early termination or revocation of an O&G Lease. Further, within thirty (30) days following delivery of Purchaser's written request, Seller will initiate and diligently pursue litigation to modify or terminate the O&G Lease and consult and cooperate with Purchaser in connection with such litigation.

(b) All Seller Parties agree to provide to Purchaser the following within five (5) business days after First Amendment Effective Date to the extent not already provided to Purchaser: shut-in payments and shut-in payment supporting documentation received by Seller Parties for (i) 2024 and (ii) the applicable years prior to 2024.

(c) Seller agrees to cooperate with Purchaser in Purchaser's efforts to modify the O&G Leases, including, without limitation, Seller shall, within five (5) business days following Purchaser's delivery to Seller of the applicable request, (a) execute and deliver to Purchaser and any O&G Lessee any written documentation requested by Purchaser or any O&G Lessee to evidence Purchaser's authority to communicate and negotiate on Seller's behalf, and (b) execute and deliver to Purchaser any documentation approved by Purchaser in writing that modifies an O&G Lease. Additionally, within five (5) business days after the First Amendment Effective Date, Seller will deliver a written request to the O&G Lessee under the Smelley 1H Lease to deliver to Seller a full accounting of all shut-in payments made under the Smelley 1H Lease and Seller will diligently thereafter pursue receipt of such accounting and deliver copies of all communications and documentation that Seller receives from the O&G Lessee under the Smelley 1H Lease within five (5) business days following receipt of same.



Ex. 7

(d) Seller agrees that Seller will not accept, deposit or cash any shut-in consideration in any form, including, without limitation, any cash, checks, money orders or wire transfers, on or after the First Amendment Effective Date in connection with any O&G Lease.

(e) Seller and Purchaser acknowledge and agree that negotiations or litigation regarding the Smelley 1H Lease are additional agreements to the Contract. Nothing in the provisions and authorizations for the O&G Lease shall constitute grounds for an extension or contingency to close.

4. Closing Date. Notwithstanding anything contained in the Contract or the Amendment to the contrary, unless otherwise agreed in writing by Seller and Purchaser, the Closing Date shall not extend beyond December 31, 2025.

5. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

6. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*



Ex. 7

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

[signature] IND EX.

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY 11/7/2024

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By:__________________________
Richard Smelley, Manager

By:__________________________
Tammy Graham, Manager

By:__________________________
Deborah Davis, Manager

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER:**

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*



Ex. 7

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ______________________________
Richard Smelley, Manager

By: ______________________________
Tammy Graham, Manager

By: ______________________________
Deborah Davis, Manager

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER**:

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*



Ex. 7

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

_______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

_______________________________
RICHARD DAVID SMELLEY

_______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

Deborah Ruth Davis
DEBORAH RUTH DAVIS

[signature]
DAVID GLENN DAVIS

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:_______________________________
Richard Smelley, Manager

By:_______________________________
Tammy Graham, Manager

By: Deborah Davis
Deborah Davis, Manager

**SELLER**:

_______________________________
TAMMY MARIE GRAHAM

_______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*



Ex. 7

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By: ______________________________
Richard Smelley, Manager

By: [signature]
Tammy Graham, Manager

By: ______________________________
Deborah Davis, Manager

**SELLER:**

[signature]
TAMMY MARIE GRAHAM

[signature]
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*



Ex. 7

EXECUTED by Purchaser as of the First Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: John Contrevo
John Contrevo, Manager

# SECOND AMENDMENT TO STANDARD CONTRACT OF SALE

This **SECOND AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of December 31, 2025 (the "**Second Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to December 31, 2025, the outside Closing Date set forth in the Contract, and (c) the Environmental Report cannot be delivered to Purchaser by the outside Closing Date set forth in the Contract; and

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract prior to the Second Amendment Effective Date to finalize new extended deadlines for the requirements for sale as per the Standard Contract for Sale.; however, the Parties desire to enter into this Amendment to extend the Closing Date for a period of time in order to allow Seller's to fully comply with the requirements of Standard Contract for Sale section 7(c) and to allow Seller and Purchaser to enter into subsequent amendment to the Contract; and



Ex. 8

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Closing Condition and Closing Date. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in Section 3 of this Amendment below, the Closing Date is hereby extended until January 10, 2026 (the "**First Extended Closing Date**").

3. Further Amendment to the Contract. The Parties hereby agree to further amend the Contract on or before the First Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date.

4. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*



Ex. 8

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the Second Amendment Effective Date.

**SELLER**:

ID GwazBhJ35oa47kuyCasyBmQV
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

ID eZhryQn2Gr99j7fMso6rN8PB
RICHARD DAVID SMELLEY

ID 28wgymSsAnj7FTc4FcYzFyrs
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ID eZhryQn2Gr99j7fMso6rN8PB
Richard Smelley, Manager

By: ID 3pE98KhWW988UohRp68xUxCg
Tammy Graham, Manager

By: ID 9PNAG9ooaHKb1JSruwL4HGJg
Deborah Davis, Manager

**SELLER**:

ID 9PNAG9ooaHKb1JSruwL4HGJg
DEBORAH RUTH DAVIS

ID kcsS9Gz52QsKSrD8gzTPnqfq
DAVID GLENN DAVIS

**SELLER**:

ID 3pE98KhWW988UohRp68xUxCg
TAMMY MARIE GRAHAM

ID wH2qWdHHhrNBWbdMmH5GPP2h
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*



Ex. 8

EXECUTED by Purchaser as of the Second Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ID 6fnyo9U8nNyRaFcvSqRuTxWU
John Contrevo, Manager



Ex. 8

# eSignature Details

**Signer ID:** **6fnyo9U8nNyRaFcvSqRuTxWU**
Signed by: John Contrevo
Sent to email: john@challengerrealtygroup.com
IP Address: 73.194.171.232
Signed at: Dec 31 2025, 2:07 pm CST

**Signer ID:** **GwazBhJ35oa47kuyCasyBmQV**
Signed by: Bill Sanders, Executor of the Estate of Pearl Sanders Smelley
Sent to email: bsanders@flash.net
IP Address: 108.220.14.20
Signed at: Dec 31 2025, 2:23 pm CST

**Signer ID:** **eZhryQn2Gr99j7fMso6rN8PB**
Signed by: David Smelley
Sent to email: sgd@flash.net
IP Address: 132.147.159.94
Signed at: Dec 31 2025, 4:21 pm CST

**Signer ID:** **9PNAG9ooaHKb1JSruwL4HGJg**
Signed by: Deborah Davis
Sent to email: debbierdavis77@gmail.com
IP Address: 174.244.19.199
Signed at: Dec 31 2025, 4:26 pm CST

**Signer ID:** **kcsS9Gz52QsKSrD8gzTPnqfq**
Signed by: David Davis
Sent to email: davidgdavis1@yahoo.com
IP Address: 108.161.8.130
Signed at: Dec 31 2025, 4:27 pm CST

**Signer ID:** **3pE98KhWW988UohRp68xUxCg**
Signed by: Tammy Graham
Sent to email: tammy@locationsphotography.com
IP Address: 74.221.111.141
Signed at: Dec 31 2025, 6:09 pm CST

**Signer ID:** **wH2qWdHHhrNBWbdMmH5GPP2h**
Signed by: Gregory Graham
Sent to email: ggraham.greg@gmail.com
IP Address: 74.221.111.141
Signed at: Dec 31 2025, 6:09 pm CST

**Signer ID:** **28wgymSsAnj7FTc4FcYzFyrs**
Signed by: Amy Smelley
Sent to email: amy.smelley@icloud.com
IP Address: 132.147.159.73
Signed at: Dec 31 2025, 6:25 pm CST

Ex. 8

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

January 26, 2026

Mr. Greg Graham
Cresson Moon Property LLC
12601 Cleburne Highway
Cresson, Texas 76035

Re: Limited Phase II Investigation
7700 Old Granbury Road
Cresson, Texas
Whitehead E. S. Project: 379.001

Dear Mr. Graham:

Whitehead Environmental Solutions, LLC (Whitehead E. S.) conducted a Limited Phase II Investigation (soil only since groundwater not encountered) of the property located at 7700 Old Granbury Road in Cresson, Hood County, Texas (Site). The Site is 1,674-acres consisting of a private residence with two gas well pads in a primarily undeveloped area of Cresson. The Site location is provided in **Figure 1**, and the Site layout is provided in **Figure 2**.

## SITE BACKGROUND

Whitehead E. S. conducted a Phase I Environmental Site Assessment (ESA) of the Site on December 12, 2025, and reviewed a Phase I ESA conducted by Environmental Science and Engineering (ESE) Partners on December 18, 2023.

According to aerial photographs and Railroad Commission of Texas (RRC) records, two gas wells were installed on-Site in 2006 and were plugged in 2025. A former pit associated with each well was observed from aerial photographs along the southern side of the northern well pad and the south side of the southern well pad by 2010 and both appeared to be dry by 2018. The presence of pits associated with the wells were identified as recognized environmental conditions (RECs) in the Phase I ESA conducted by Whitehead E. S. Additionally, aboveground storage tanks (ASTs) associated with the wells were observed by ESE Partners during their Site reconnaissance, as well as in historical aerial photographs. At the time of the Whitehead E. S. Site reconnaissance in 2025, the ASTs were no longer on the Site. Lastly, an off-Site well pad was identified near the southwestern portion of the Site.

Based on the identified RECs, Whitehead E. S. proposed a Phase II Investigation to assess the potential environmental concerns, namely the historical oil & gas activities on the Site including the two gas well pads (north and south) along with the one off-Site well pad to the southwest (adjacent to property).

## SUBSURFACE INVESTIGATION

On January 9th, 2026, Whitehead E. S. mobilized to the Site to conduct soil and groundwater sampling. The purpose of the investigation was to evaluate potential chemicals of concern (COCs) in the soil and groundwater related to the former on-Site gas wells and associated pits/ASTs and the off-Site presence of natural gas wells. Potential COCs were identified as non-specific total petroleum hydrocarbon (TPH) fractions, volatile organic compounds (VOCs), barium, and chloride.

Ex. 9

Six soil borings were advanced on the Site and three were converted to temporary monitoring wells. Soil samples were collected and analyzed for TPH fractions by Texas Method TX 1005, benzene, toluene, ethylbenzene, and xylenes (BTEX)/methyl tert-butyl ether (MTBE) or the full suite of VOCs by U. S. Environmental Protection Agency (EPA) Method 8260. Additionally, selected samples were analyzed for barium by EPA Method 6020, chloride via EPA Method 300.0, and pH by EPA Method 9045D. A single sample was analyzed for polyaromatic hydrocarbons (PAHs) by EPA Method 8270 due to the diesel range TPH fractions that were detected at low concentrations. Photographs of the field investigation are presented in **Attachment A.**

**Soil Sampling and Analysis**

Soil borings SB-01 through SB-06 were advanced using a track-mounted Geoprobe rig utilizing a combination of direct-push technology and solid stem augers with a five-foot probe rod and core samplers. Borings were installed using direct-push sampling system until refusal was encountered or the desired depths were reached. Refusal using direct push was encountered at the Site between 5.5 and 10.0 feet below ground surface (bgs) due to the shallow limestone. Solid stem augers were used to reach deeper depths for temporary monitoring wells. Depths of the soil borings and/or temporary monitoring wells ranged from 7.0 to 24.0 feet bgs. Soil boring SB-01/TMW-01 was advanced on the south side of the north well pad in the footprint of the former pit. Soil boring SB-02 was advanced to the east of the north well pad and SB-03 was advanced northwest of the north well pad near the former AST locations. Soil boring SB-04/TMW-02 was advanced to the north of an off-Site natural gas well pad. Soil boring/temporary monitoring well SB-05/TMW-03 and SB-06 were advanced near the south well pad in the footprint of the former pit and near the former AST locations. The lithology encountered generally consisted of a mix of medium stiff, moist, reddish yellowish brown silty clay and dry, loose, chalky white weathered limestone with some sand lenses.

Soil samples were screened in the field for potential COCs including observations for dark staining and/or fill materials, odors, pH, and measurements of organic vapors using a photoionization detector (PID). No dark staining was observed in any of the soil borings. Soil borings SB-01, SB-02, SB-05 and SB-06 had very low PID readings (0.0 to 0.6 parts per million [ppm]) which are considered background readings not indicative of an environmental impact. Soil borings SB-03 and SB-04 had maximum PID readings of 2.9 ppm and 9.2 ppm, respectively. Furthermore, pH ranges were reported between 7.1 and 9.0.

A total of 13 soil samples were collected from the borings in accordance with EPA Method 5035 (plunger that directly inserts into volatile organic analysis [VOA] vials). Samples were collected in laboratory-supplied containers, immediately placed on wet ice in insulated coolers, and delivered to Eurofins Environment Testing (Eurofins) in Dallas, Texas, for analysis of non-specific TPH fractions, VOCs, barium, chloride, and/or pH. Additionally, one sample [SB-01 (3-4')] was analyzed for PAHs due to the detection of diesel range TPH fractions ($C_{12}$-$C_{28}$).

**Groundwater Sampling and Analysis**

Soil borings SB-01, SB-04, and SB-05 were converted to temporary monitoring wells TMW-01, TMW-02, and TMW-03 respectively, and were installed to total depths of 19.0 feet, 24.0 feet, and 11.0 feet bgs, respectively. Each monitoring well was constructed using a one-inch diameter Schedule 40 PVC. Blank (unslotted) PVC extended from the ground surface to depths of 3.5 feet (TMW-01), 8.5 feet (TMW-02), and 0.5 feet (TMW-03) feet bgs, and machine-slotted PVC screen extended from the base of the riser to the bottom of the borehole. None of the temporary monitoring wells produced groundwater within the timeframe of the investigation therefore could not be sampled.

The corresponding boring logs and monitoring well diagrams are provided in **Attachment B**.

**Soil Sampling Results**

Whitehead E. S. compared the soil analytical data to their respective default TCEQ Texas Risk Reduction Program (TRRP) Tier 1 Residential Protective Concentration Levels (PCLs). Samples analyzed for barium were additionally compared to their Texas-Specific Soil Background Concentration (TSBC), with the lower of the PCL or TSBC used as the assessment level. Samples analyzed for chloride were compared to the RRC Regulatory Protection Limit. Soil sampling results are presented in **Table 1A** and **Table 1B**, with the complete laboratory analytical data package provided in **Attachment C**.

Diesel range ($C_{12}$-$C_{28}$) TPH fractions were detected at one location, SB-01 (3-4'), with a low concentration of $35.5^{J}$ mg/kg, below the TRRP PCL of 200 mg/kg. A "J" qualifier indicated an estimated concentration above adjusted method detection limit and below the adjusted reporting limit. Due to the presence of diesel range TPH fractions, PAHs were analyzed, and all analytes were below laboratory sample detection limits (SDLs).

Ethylbenzene was detected in three samples (SB-02, SB-03, and SB-04) at very low concentrations ranging from $0.000545^{J}$ mg/kg to $0.00169^{J}$ mg/kg, all well below the TRRP PCL of 7.6 mg/kg. Total xylenes were detected at four locations (SB-01, SB-02, SB-03, and SB-04) at low concentrations ranging from $0.000657^{J}$ mg/kg to 0.0129 mg/kg, all well below the TRRP PCL of 120 mg/kg. Barium was detected at all sample locations analyzed with a maximum detection of 148 mg/kg at SB-05, all below the TRRP PCL of 440 mg/kg. Lastly, chloride was detected at four sample locations (SB-01, SB-03, SB-04, and SB-06) with values between $5.71^{J}$ mg/kg and 250 mg/kg, well below the RRC Regulatory Protection Limit of 3,000 mg/kg. All other analytes were detected below laboratory SDLs.

**Quality Assurance/Quality Control (QA/QC)**

Whitehead E. S. reviewed the QA/QC data provided with the laboratory report and case narrative. A Trip Blank was included on the chain of custody (C-O-C) for the laboratory and put on hold. Soil samples were received by the laboratory at 0.1 degrees Centigrade (within proper temperature range). There were no other data qualifiers from the laboratory. Overall, the laboratory data appears to be accurate, reproducible, and acceptable for use in evaluating potential impacts to the Site.

**FINDINGS AND CONCLUSIONS**

Whitehead E. S. conducted a Limited Phase II Investigation at the Site. The assessment was considered "limited" since groundwater was not encountered. A summary of our findings and conclusions is presented below:

- Previous Phase I ESAs conducted in 2023 and 2025 indicated the presence of two on-Site well pads with associated pits and ASTs. The two gas wells were installed on-Site in 2006 and were plugged in 2025. The associated pits appeared by 2010 and were both dry by 2018. Soil sampling was performed to determine if soil was impacted by potential COCs including TPH fractions, VOCs, barium, and chloride. Groundwater was not encountered at the Site for sample analysis.

- Six soil borings were installed on the Site. The lithology encountered generally consisted of a mix of medium stiff, moist, reddish yellowish brown silty clay and dry, loose, chalky white weathered limestone with some sand lenses. No dark staining was observed in any of the soil cores. Soil borings SB-03 and SB-04 had low PID reading of 2.9 and 9.2 ppm, respectively. Three of the six soil borings were converted into temporary monitoring wells that did not produce any groundwater within the timeframe of the field investigation and were subsequently plugged.



Ex. 9

- Soil analytical results identified only low concentrations of diesel range TPH in one sample and ethylbenzene and total xylenes in four of the nine samples. The concentrations of TPH, ethylbenzene, and total xylenes were well below their applicable TRRP Residential PCLs.

- Barium was detected above laboratory its SDL in all soil samples analyzed ranging from 16.7 mg/kg to 148 mg/kg with all samples well below its TRRP PCL of 440 mg/kg. Chloride was detected above laboratory SDLs in four soil samples below applicable RRC screening levels.

In conclusion, Whitehead E. S. conducted a Phase II Investigation to evaluate potential COCs in the soil and groundwater from the former on-Site well pads and off-Site active natural gas pad. The sampling did not indicate any COCs associated with oil & gas activities above their respective TRRP Residential PCLs and/or RRC Limits for soil. Groundwater was not encountered in the temporary monitoring wells on the Site and was not subsequently sampled. Soil sampling data did not identify any COCs in the Areas of Concern on the Site noted in the previous Phase I ESAs. Based on the Whitehead E. S. Phase II Investigation, there is no evidence of any impact to the Site, and no further investigation is warranted at this time.

**QUALIFICATIONS**

This technical report was prepared for the sole use of Cresson Moon Property LLC and shall not be relied upon by any other party without the express prior written consent of Cresson Moon Property LLC and Whitehead E. S. This document was developed by employing generally accepted methods and customary practices of the environmental profession.

Whitehead E. S. appreciates the opportunity to be of service to you on this project. If you have any questions or need additional information regarding the assessment, please contact Michael at (214) 335-3246.

Sincerely,

**WHITEHEAD E. S., LLC**

Michael Whitehead
Senior Consultant

Catherine Kobylinski
Environmental Scientist

Amanda Pechacek, P.G.
Professional Geoscientist

**FIGURES**




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

Approximate Site Boundary

STATE OF TEXAS
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

APPROXIMATE SCALE
(in feet)
0 2000 4000

## Figure 1
## Site Location

**Cresson Moon Property, LLC**
**7700 Old Granbury Road**
**Cresson, Texas**

| | |
|---|---|
| SOURCE: U.S.G.S. Topographic Map Series, Chapin, Texas (2022) | |
| DRAFTED BY: EM | CHECKED BY: AP |
| PROJECT NUMBER: 379.001 | DATE: 01/2026 |

Ex. 9




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

## LEGEND

- Approximate Site Boundary
- Pipeline
- Horizontal Well
- Gas Well
- Soil Boring
- Temporary Monitoring Well

STATE OF TEXAS
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

NOTES:
Figure is not to scale.

## Figure 2
## Site Layout

Cresson Moon Property, LLC
7700 Old Granbury Road
Cresson, Texas

SOURCE:
Google Earth Mapping Service, Imagery Date: 11/20/2024

| | |
|---|---|
| DRAFTED BY: DG | CHECKED BY: AP |
| PROJECT NUMBER: 379.001 | DATE: 01/2026 |

Ex. 9

# TABLES

**TABLE 1A**
**SOIL ANALYTICAL SUMMARY - TPH, VOCs, BARIUM, CHLORIDE**

***Cresson Moon Property LLC***
***7700 Old Granbury Road***
***Cresson, Texas***

| Sample ID[1] | Sample Date | Total Petroleum Hydrocarbons[2] (mg/kg) | | | Volatile Organic Compounds[3] (mg/kg) | | | | Barium | Chloride |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $C_6$ - $C_{12}$ | $C_{12}$ - $C_{28}$ | $C_{28}$ - $C_{35}$ | Benzene | Toluene | Ethylbenzene | Total Xylenes | | |
| SB-01 (3-4') | 1/9/2026 | <21.6 | **35.5[J]** | <21.6 | <0.000459 | <0.000512 | <0.000354 | **0.000657[J]** | **36.8** | **5.71[J]** |
| SB-02 (3-4') | 1/9/2026 | <25.7 | <25.7 | <25.7 | <0.000641 | <0.000715 | **0.00127[J]** | **0.0104** | **24.0** | <5.98 |
| SB-03 (3-4') | 1/9/2026 | <21.5 | <21.5 | <21.5 | <0.000397 | <0.000443 | <0.000306 | <0.000316 | **30.0** | **250** |
| SB-03 (5-6') | 1/9/2026 | <23.2 | <23.2 | <23.2 | <0.000413 | <0.000460 | **0.000545[J]** | **0.00379** | — | — |
| SB-04 (3-4') | 1/9/2026 | <22.2 | <22.2 | <22.2 | <0.000438 | <0.000489 | **0.00169[J]** | **0.0129** | **31.1** | **5.74[J]** |
| SB-05 (2-3') | 1/9/2026 | <18.4 | <18.4 | <18.4 | <0.000559 | <0.000624 | <0.000431 | <0.000445 | **148** | <5.82 |
| SB-05 (8-9') | 1/9/2026 | <21.5 | <21.5 | <21.5 | <0.000577 | <0.000644 | <0.000445 | <0.000460 | — | — |
| SB-06 (2-3') | 1/9/2026 | <20.0 | <20.0 | <20.0 | <0.000555 | <0.000620 | <0.000428 | <0.000443 | — | — |
| SB-06 (6-7') | 1/9/2026 | <26.8 | <26.8 | <26.8 | <0.000495 | <0.000553 | <0.000382 | <0.000395 | **16.7** | **184** |
| **TRRP Tier 1 Residential $^{GW}Soil_{Ing}$ PCL[4] (mg/kg)** | | **65** | **200** | **200** | **0.026** | **8.2** | **7.6** | **120** | **440** | — |
| **Texas-Specific Soil Background Conentrations[5] (mg/kg)** | | — | — | — | — | — | — | — | **300** | — |
| **RRC Regulatory Protection Limits[6]** | | **10,000** | | | **0.026** | **8.2** | **7.6** | **120** | — | **3,000** |

<u>Notes:</u>
[1]Samples collected by Whitehead E. S. and analyzed by Eurofins Environment Testing in Dallas, Texas.
[2]Total Petroleum Hydrocarbons (TPH) analyzed by Texas Method TX1005.
[3]Volatile organic compounds (VOCs) analyzed by U.S. Environmental Protection Agency (EPA) Method 8260.
[4]Texas Risk Reduction Program (TRRP) Residential Soil to Groundwater Ingestion Protective Concentration Levels (PCLs).
[5]Texas Commission on Environmental Quality (TCEQ) Texas-Specific Soil Background Concentrations (TSBCs).
[6] Railroad Commision of Texas (RRC) Class 1 and Class 2 Soil-to-Groundwater Regulatory Protection Limits.
**Bold values indicate that chemical of concern (COC) was detected above the sample detection limit (SDL).**
**Bold and shaded values indicate applicable action level for each COC.**
**Bold and highlighted values indicate the COC exceeds the lowest applicable action level.**
(<) Indicates the value was not detected above the laboratory SDL.
[J]Estimated concentration above the adjusted method detection limit and below the adjusted reporting limit.
— Not analyzed or not applicable
Only select analytes are presented in this table. All other analytes remaining are below their applicable PCLs.

Ex. 9

**TABLE 1B**
**SOIL ANALYTICAL SUMMARY - PAHs**

*Cresson Moon Property LLC*
*7700 Old Granbury Road*
*Cresson, Texas*

| Sample ID[1] | | SB-01 (3-4') | TRRP Tier 1 Residential $^{GW}Soil_{Ing}$ PCL[3] (mg/kg) | TRRP Tier 1 Residential $^{Tot}Soil_{Comb}$ PCL[4] (mg/kg) |
|---|---|---|---|---|
| Sample Date | | 1/9/2026 | | |
| PAHs[2] | Acenaphthene | <0.00222 | 240 | 3,000 |
| | Acenaphthylene | <0.00154 | 410 | 3,800 |
| | Anthracene | <0.00214 | 6,900 | 18,000 |
| | Benzo[a]anthracene | <0.00163 | 130 | 41 |
| | Benzo[a]pyrene | <0.00210 | 7.6 | 4.1 |
| | Benzo[b]fluoranthene | <0.00230 | 440 | 42 |
| | Benzo[g,h,i]perylene | <0.00205 | 46,000 | 1,800 |
| | Benzo[k]fluoranthene | <0.00209 | 4,500 | 420 |
| | Chrysene | <0.00195 | 11,000 | 4,100 |
| | Dibenz(a,h)anthracene | <0.00217 | 15 | 4 |
| | Fluoranthene | <0.00267 | 1,900 | 2,300 |
| | Fluorene | <0.00205 | 300 | 2,300 |
| | Indeno[1,2,3-cd]pyrene | <0.00297 | 1,300 | 42 |
| | Naphthalene | <0.00308 | 31 | 220 |
| | Phenanthrene | <0.00332 | 420 | 1,700 |
| | Pyrene | <0.00239 | 1,100 | 1,700 |

**Notes:**

[1]Samples collected by Whitehead E. S. and analyzed by Eurofins Environment Testing in Dallas, Texas.

[2]Polycyclic aromatic hydrocarbons (PAHs) analyzed by U. S. Environmental Protection Agency (EPA) Method 8270.

[3]Texas Risk Reduction Program (TRRP) Residential Soil to Groundwater Ingestion Protective Concentration Levels (PCLs).

[3]TRRP Residential Total Soil Combined PCLs.

**Bold values indicate that chemical of concern (COC) was detected above the sample detection limit (SDL).**

**Bold and shaded values indicate applicable action level for each COC.**

**Bold and highlighted values indicate the COC exceeds the lowest applicable action level.**

(<) Indicates the value was not detected above the laboratory SDL.

Ex. 9

**PHOTOGRAPHIC LOG**

**ATTACHMENT A**

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 1.**View of installation of SB-01/TMW-01 south of northern well pad. Photo taken facing southeast.



**Photograph 2.** Soil representative of lithology of 0.0’ to 5.5’ in SB-01/TMW-01.

Ex. 9

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 3.** View of installation of SB-02 located east of northern well pad. Photo taken facing east.



**Photograph 4.** View of installation of SB-03 located northwest of northern well pad. Photo taken facing north.

Ex. 9

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 5.** Soil representative of lithology of 0.0' to 6.0' in SB-03.



**Photograph 6.** View of installation of SB-04/TMW-02 located north of an off-Site well pad. Photo taken facing south.

Ex. 9

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 7.** View of completed temporary monitoring well SB-04/TMW-02. Photo taken facing southeast.



**Photograph 8.** View of remnants of pit liner located near SB-05/TMW-03 southeast of the southern well pad.

Ex. 9

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 9.** Soil representative of lithology of 0.0' to 10.0' in SB-05/TMW-03.



**Photograph 10.** View of installation of SB-06 located northwest of the southern well pad. Photo taken facing east.

Ex. 9

**BORING LOGS/WELL DIAGRAMS**

**ATTACHMENT B**

# Boring Log: SB-01/TMW-01

| | | | | | |
|---|---|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1098 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.537023° |
| | Sampling Method: | PVC Liners | Longitude: | -97.659090° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0–3 | Casing (0–3.5) | 0 (1), 0 (2), 0 (3) | 3.5/5.0 (0–5) | | CL | SILTY CLAY: stiff, moist, gray with yellow to reddish yellow brown mottling. 0.25 to 1 inch limestone pieces throughout. |
| 3–5.5 | Screen (3.5–18.5) | 0 (4), 0 (5) | | SB-01 (3-4') | LS | VERY WEATHERED LIMESTONE: stiff but friable, dry, light yellowish brown. DPT refusal @ ~5.5', switched to SSA and cutting observed |
| 5.5–19 | Screen; End Cap (18.5–19.0) | | 0.5/0.5 (5–5.5); 0.0/0.0 (5.5–19) | | LS | WEATHERED LIMESTONE: stiff but friable, dry, light yellowish brown. |





WHITEHEAD E. S.

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080


**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

**Annular Materials**
N/A

**Well Materials**
(0.0 - 3.5) Casing 1" Sch 40 PVC Riser
(3.5 - 18.5) Screen, 1" Sch 40 PVC 0.010" slot
(18.5 - 19.0) End Cap

**Initial Well Details**
Total Depth (ft): 19
Initial Water Level (ft.): DRY
Date Measured: 1/9/2026

Ex. 9

# Boring Log: SB-02

| Project Name: | Completion Date: | 1/9/2026 | Refusal? | Yes |
|---|---|---|---|---|
| Cresson Moon Property | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 4" |
| 7700 Old Granbury Road, Cresson, Texas | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1097 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.536822° |
| | Sampling Method: | PVC Liners | Longitude: | -97.658318° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | | | | | VERY WEATHERED LIMESTONE: stiff but friable, moist, tan to yellow brown. Few 0.25 to 1 inch limestone pieces throughout |
| 1 | 0.6 | | | | |
| 2 | 0.6 | | | | |
| | | 3.5/5.0 | | LS | |
| 3 | 0 | | SB-02 (3-4') | | |
| 4 | 0.4 | | | | |
| | | | | | DPT refusal @ ~7', switched to SSA and cutting observed |
| 5 | 0 | | | | VERY WEATHERED LIMESTONE: stiff , moist, gray with yellow-brown mottling with few 0.25 to 1 inch limestone pieces throughout, compentency increasing with depth |
| 6 | 0.1 | 2.0/2.0 | | LS | |
| 7 | | | | | WEATHERED LIMESTONE: dry, loose, chalky white with few 0.25 to 0.5 inch limestone pieces throughout |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| | | 0.0/0.0 | | | |
| 11 | | | | LS | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |




Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

Notes
Total Depth (ft): 15
Soil boring completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers.
Soil boring plugged the same day as installation with bentonite chips.

Ex. 9

# Boring Log: SB-03

| | | | |
|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: 1/9/2026 | Refusal? | Yes |
| | Drilling Company: Savage Drilling | Borehole Diameter (in): | 4" |
| | Driller Name: Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: 59562 | Ground Elevation (ft): | 1098 |
| Whitehead E.S. Project No. 379.001 | Logged By: CK/EM | Latitude: | 32.536727° |
| | Sampling Method: PVC Liners | Longitude: | -97.658720° |
| | Drilling Method: DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | | 4.0/5.0 | | LS | VERY WEATHERED LIMESTONE: stiff, moist, yellow-brown with few 0.25 to 1 inch limestone pieces throughout, compentency increasing with depth |
| 1 | 0 | | | | |
| 2 | 0 | | | | |
| 3 | 2.9 | | SB-03 (3-4') | | |
| 4 | 0.1 | | | | |
| 5 | 2.3 | 1.5/1.5 | SB-03 (5-6') | CL | SILTY CLAY: stiff, moist, gray with yellow-brown to reddish yellowish-brown mottling with frequent 0.25 to 1 inch limestone pieces throughout<br><br>DPT refusal @ ~6.5', switched to SSA and cutting observed |
| 6 | 1.3 | | | | |
| 6.5–15 | | 0.0/8.5 | | LS | WEATHERED LIMESTONE: loose, dry, chalky white 0.25 to 0.5 inch limestone pieces |
| 15 | | | | | |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S.
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

Notes
Total Depth (ft): 15
Soil boring completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers.
Soil boring plugged the same day as installation with bentonite chips.

Ex. 9

# Boring Log: SB-04/TMW-02

**Project Name:**
Cresson Moon Property
7700 Old Granbury Road, Cresson, Texas

Whitehead E.S. Project No. 379.001

| | | | |
|---|---|---|---|
| Completion Date: | 1/9/2026 | Refusal? | Yes |
| Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| Driller's License: | 59562 | Ground Elevation (ft): | 1076 |
| Logged By: | CK/EM | Latitude: | 32.518527° |
| Sampling Method: | PVC Liners | Longitude: | -97.673633° |
| Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0–5 | | 6.7, 9.2, 1.1, 0.1, 0.5 | 4.0/5.0 | SB-04 (3-4') | CL | SILTY CLAY: very stiff, dry to moist, reddish yellowish-brown with gray mottling with frequent 0.25 to 1 inch limestone pieces throughout |
| 5–6.5 | | 0.5 | 1.5/1.5 | | CL | SILTY CLAY: stiff, moist, reddish yellowish-brown with gray mottling, with few 0.25 to 1 inch limestone pieces throughout |
| 6.5–20 | | | 0.0/0.0 | | CL | SILTY CLAY TO CLAY: moist, reddish yellowish-brown with few 0.25 to 0.5 inch limestone pieces throughout<br>DPT refusal @ ~6.5', switched to SSA and cuttings observed |
| 20–24 | | | | | CL | SILTY CLAY TO CLAY: moist, dark gray with few limestone pieces throughout |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S.
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

**Annular Materials**
N/A

**Well Materials**
(0.0 - 8.5) Casing 1" Sch 40 PVC Riser
(8.5 - 23.5) Screen, 1" Sch 40 PVC 0.010" slot
(23.5 - 24.0) End Cap

**Initial Well Details**
Total Depth (ft): 24
Initial Water Level (ft.): DRY
Date Measured: 1/9/2026

Ex. 9

# Boring Log: SB-05/TMW-03

| Project Name: | Completion Date: | 1/9/2026 | Refusal? | Yes |
|---|---|---|---|---|
| Cresson Moon Property | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| 7700 Old Granbury Road, Cresson, Texas | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 982 |
| | Logged By: | CK/EM | Latitude: | 32.516597° |
| Whitehead E.S. Project No. 379.001 | Sampling Method: | PVC Liners | Longitude: | -97.657512° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | | | 4.0/5.0 | SB-05 (2-3') | CL | SILTY CLAY: stiff, moist, dark brown with few 0.25 to 1 inch limestone pieces and pea-sized gravels throughout |
| 1 | | 0 | | | | |
| 2 | | 0 | | | | |
| 3 | | 0 | | | | |
| 4 | | 0 | | | | |
| 5 | | 0 | 3.5/5.0 | SB-05 (8-9') | CL | SILTY CLAY: stiff, moist, gray with reddish yellowish-brown mottling grading to predominately orange-brown with gray mottling |
| 6 | | 0 | | | | |
| 7 | | 0 | | | SP | GRAVELLY SAND TO SAND: dense, moist, reddish yellowish-brown with gray mottling, with small pea-sized gravels at 8.5 feet |
| 8 | | 0 | | | | |
| 9 | | 0 | | | | DPT refusal @ ~10', switched to SSA and cuttings observed |
| 10 | | 0 | 0.0/0.0 | | LS | WEATHERED LIMESTONE: dry, loose, chalky white limestone pieces throughout |
| 11 | | | | | | |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

| Annular Materials | Well Materials | Initial Well Details |
|---|---|---|
| N/A | (0.0 - 0.5) Casing 1" Sch 40 PVC Riser<br>(0.5 - 10.5) Screen, 1" Sch 40 PVC 0.010" slot<br>(10.5 - 11.0) End Cap | Total Depth (ft): 11<br>Initial Water Level (ft.): DRY<br>Date Measured: 1/9/2026 |

Ex. 9

# Boring Log: SB-06

| | | | |
|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | |
| | Drilling Company: | Savage Drilling | |
| | Driller Name: | Eric Hutton | |
| | Driller's License: | 59562 | |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | |
| | Sampling Method: | PVC Liners | |
| | Drilling Method: | DPT | |

| | |
|---|---|
| Refusal? | Yes |
| Borehole Diameter (in): | 2" |
| TOC Elevation (ft): | N/A |
| Ground Elevation (ft): | 990 |
| Latitude: | 32.516610° |
| Longitude: | -97.658474° |
| Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | 0 | | | CL | SILTY CLAY: stiff, moist, red-brown to dark brown |
| 0.4 | | | | | |
| 0.8 | | | | | |
| | 0 | | | | |
| 1.2 | | | | | |
| 1.6 | | | | | |
| 2 | 0 | | | | |
| 2.4 | | 4.0/5.0 | SB-06 (2-3') | | |
| 2.8 | | | | | |
| | 0 | | | | |
| 3.2 | | | | SP | GRAVELLY SAND TO SAND: loose, moist, red-brown to reddish yellowish-brown |
| 3.6 | | | | | |
| 4 | 0 | | | | |
| 4.4 | | | | | |
| 4.8 | | | | | |
| | 0 | | | | |
| 5.2 | | | | | |
| 5.6 | | | | | |
| 6 | 0.5 | 2.0/2.0 | | | |
| 6.4 | | | SB-06 (6-7') | | |
| 6.8 | | | | | |
| | 0.2 | | | | |

STATE OF TEXAS — 1.26.2026 — AMANDA PECHACEK — GEOLOGY 15423 — LICENSED — PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S.

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**

Total Depth (ft): 7

Soil boring completed via track-mounted Geoprobe utilizing direct push technology.

Soil boring plugged the same day as installation with bentonite chips.

Ex. 9

**LABORATORY ANALYTICAL DATA PACKAGES**

**ATTACHMENT C**

eurofins | Environment Testing

1

# ANALYTICAL REPORT

## PREPARED FOR

Attn: Danielle Fehrenback
Whitehead ES LLC
906 18th St
Plano, Texas 75074
Generated 1/21/2026 4:10:11 PM

## JOB DESCRIPTION

Cresson Moon Props
379.001

## JOB NUMBER

870-43022-1

Eurofins Dallas
9701 Harry Hines Blvd
Dallas TX 75220

See page two for job notes and contact information.



Ex. 9

# Eurofins Dallas

1

## Job Notes

This report may not be reproduced except in full, and with written approval from the laboratory. The results relate only to the samples tested. For questions please contact the Project Manager at the e-mail address or telephone number listed on this page.

Analytical test results meet all requirements of the associated regulatory program (i.e., NELAC (TNI), DoD, and ISO 17025) unless otherwise noted under the individual analysis.

## Authorization

Generated
1/21/2026 4:10:11 PM

Authorized for release by
Mike Kimmel, Project Manager
Mike.Kimmel@et.eurofinsus.com
(214)902-0300

# Table of Contents

Cover Page . . . . . 1
Table of Contents . . . . . 3
Definitions/Glossary . . . . . 4
Case Narrative . . . . . 6
Client Sample Results . . . . . 7
Surrogate Summary . . . . . 22
QC Sample Results . . . . . 24
QC Association Summary . . . . . 36
Lab Chronicle . . . . . 40
Certification Summary . . . . . 45
Method Summary . . . . . 46
Sample Summary . . . . . 47
Chain of Custody . . . . . 48
Receipt Checklists . . . . . 51
State Forms . . . . . 53
DCS Report . . . . . 53
TRRP Checklist . . . . . 55




Ex. 9

# Definitions/Glossary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Qualifiers

### GC/MS VOA

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| N1 | MS, MSD: Spike recovery exceeds upper or lower control limits. |
| U | Analyte was not detected at or above the SDL. |

### GC/MS Semi VOA

| Qualifier | Qualifier Description |
|---|---|
| U | Analyte was not detected at or above the SDL. |

### GC Semi VOA

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| U | Analyte was not detected at or above the SDL. |
| X | Surrogate recovery exceeds control limits |

### HPLC/IC

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| U | Analyte was not detected at or above the SDL. |

### Metals

| Qualifier | Qualifier Description |
|---|---|
| U | Analyte was not detected at or above the SDL. |

## Glossary

| Abbreviation | These commonly used abbreviations may or may not be present in this report. |
|---|---|
| ☼ | Listed under the "D" column to designate that the result is reported on a dry weight basis |
| %R | Percent Recovery |
| CFL | Contains Free Liquid |
| CFU | Colony Forming Unit |
| CNF | Contains No Free Liquid |
| DER | Duplicate Error Ratio (normalized absolute difference) |
| Dil Fac | Dilution Factor |
| DL | Detection Limit (DoD/DOE) |
| DL, RA, RE, IN | Indicates a Dilution, Re-analysis, Re-extraction, or additional Initial metals/anion analysis of the sample |
| DLC | Decision Level Concentration (Radiochemistry) |
| EDL | Estimated Detection Limit (Dioxin) |
| LOD | Limit of Detection (DoD/DOE) |
| LOQ | Limit of Quantitation (DoD/DOE) |
| MCL | EPA recommended "Maximum Contaminant Level" |
| MDA | Minimum Detectable Activity (Radiochemistry) |
| MDC | Minimum Detectable Concentration (Radiochemistry) |
| MDL | Method Detection Limit |
| ML | Minimum Level (Dioxin) |
| MPN | Most Probable Number |
| MQL | Method Quantitation Limit |
| NC | Not Calculated |
| ND | Not Detected at the reporting limit (or MDL or EDL if shown) |
| NEG | Negative / Absent |
| POS | Positive / Present |
| PQL | Practical Quantitation Limit |
| PRES | Presumptive |
| QC | Quality Control |
| RER | Relative Error Ratio (Radiochemistry) |
| RL | Reporting Limit or Requested Limit (Radiochemistry) |
| RPD | Relative Percent Difference, a measure of the relative difference between two points |



Ex. 9

# Definitions/Glossary



## Glossary (Continued)

| Abbreviation | These commonly used abbreviations may or may not be present in this report. |
|---|---|
| SDL | Sample Detection Limit |
| TEF | Toxicity Equivalent Factor (Dioxin) |
| TEQ | Toxicity Equivalent Quotient (Dioxin) |
| TNTC | Too Numerous To Count |

# Case Narrative





**Job Narrative**
**870-43022-1**

The analytical test results presented in this report meet all requirements of the associated regulatory program listed on the Accreditation/Certification Summary Page, unless otherwise noted. Data qualifiers and/or narrative comments are included to explain any exceptions, if applicable. Regulated compliance samples (e.g. SDWA, NPDES) must comply with associated agency requirements/permits.

- Matrix-specific batch QC (e.g., MS, MSD, SD) may not be reported when insufficient sample volume is available or when site-specific QC samples are not submitted. In such cases, a Laboratory Control Sample Duplicate (LCSD) may be analyzed to provide precision data for the batch.
- For samples analyzed using surrogate and/or isotope dilution analytes, any recoveries falling outside of established acceptance criteria are re-prepared and/or re-analyzed to confirm results, unless the deviation is due to sample dilution or otherwise explained in the case narrative.

**Receipt**
The samples were received on 1/10/2026 9:15 AM. Unless otherwise noted below, the samples arrived in good condition, and, where required, properly preserved and on ice.

**Receipt Exceptions**

**GC/MS VOA**
Method 8260C: The matrix spike (MS) recoveries for preparation batch 870-34798 and analytical batch 870-34789 were outside control limits. Non-homogeneity is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Hydrocarbons**
Method TX_1005: Surrogate recovery for the following sample was outside the upper control limit: SB-05 (8'-9') (870-43022-11). This sample did not contain any target analytes; therefore, re-extraction and/or re-analysis was not performed.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**HPLC/IC**
No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Metals**
Method 6020B: The matrix spike / matrix spike duplicate (MS/MSD) recoveries for preparation batch 860-287918 and analytical batch 860-288184 were outside control limits. Sample matrix interference is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**General Chemistry**
No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-01 (3'-4')

**Lab Sample ID: 870-43022-1**

**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 89.5**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000459 | U | 0.00183 | 0.000459 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromobenzene | <0.000737 | U | 0.00183 | 0.000737 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromochloromethane | <0.000578 | U | 0.00183 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromodichloromethane | <0.000598 | U | 0.00183 | 0.000598 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromoform | <0.000820 | U | 0.00183 | 0.000820 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromomethane | <0.00107 | U | 0.00458 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2-Butanone | <0.00706 | U | 0.0458 | 0.00706 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| n-Butylbenzene | <0.000307 | U | 0.00183 | 0.000307 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| sec-Butylbenzene | <0.000490 | U | 0.00183 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| tert-Butylbenzene | <0.000469 | U | 0.00183 | 0.000469 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Carbon tetrachloride | <0.000405 | U | 0.00183 | 0.000405 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chlorobenzene | <0.000464 | U | 0.00183 | 0.000464 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloroethane | <0.000415 | U | 0.00183 | 0.000415 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloroform | <0.000434 | U | 0.00183 | 0.000434 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloromethane | <0.000502 | U | 0.00183 | 0.000502 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2-Chlorotoluene | <0.000249 | U | 0.00183 | 0.000249 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 4-Chlorotoluene | <0.000556 | U | 0.00183 | 0.000556 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00128 | U | 0.00458 | 0.00128 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dibromochloromethane | <0.000159 | U | 0.00183 | 0.000159 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000996 | U | 0.00458 | 0.000996 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dibromoethane | <0.000566 | U | 0.00183 | 0.000566 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dibromomethane | <0.000287 | U | 0.00183 | 0.000287 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichlorobenzene | <0.000361 | U | 0.00183 | 0.000361 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3-Dichlorobenzene | <0.000457 | U | 0.00183 | 0.000457 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,4-Dichlorobenzene | <0.000454 | U | 0.00183 | 0.000454 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dichlorodifluoromethane | <0.000498 | U | 0.00183 | 0.000498 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloroethane | <0.000519 | U | 0.00183 | 0.000519 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichloroethane | <0.000336 | U | 0.00183 | 0.000336 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloroethene | <0.000417 | U | 0.00183 | 0.000417 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| cis-1,2-Dichloroethene | <0.000463 | U | 0.00183 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| trans-1,2-Dichloroethene | <0.000423 | U | 0.00183 | 0.000423 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichloropropane | <0.000536 | U | 0.00183 | 0.000536 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3-Dichloropropane | <0.000306 | U | 0.00183 | 0.000306 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2,2-Dichloropropane | <0.000542 | U | 0.00183 | 0.000542 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloropropene | <0.000282 | U | 0.00183 | 0.000282 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| cis-1,3-Dichloropropene | <0.000566 | U | 0.00183 | 0.000566 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| trans-1,3-Dichloropropene | <0.000467 | U | 0.00183 | 0.000467 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Ethylbenzene | <0.000354 | U | 0.00183 | 0.000354 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Hexachlorobutadiene | <0.000504 | U | 0.00183 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Isopropylbenzene | <0.000345 | U | 0.00183 | 0.000345 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Methylene Chloride | <0.00121 | U | 0.00458 | 0.00121 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| MTBE | <0.000536 | U | 0.00183 | 0.000536 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Naphthalene | <0.000613 | U | 0.00183 | 0.000613 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| N-Propylbenzene | <0.000472 | U | 0.00183 | 0.000472 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Styrene | <0.000473 | U | 0.00183 | 0.000473 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000421 | U | 0.00183 | 0.000421 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000626 | U | 0.00183 | 0.000626 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Tetrachloroethylene | <0.000416 | U | 0.00183 | 0.000416 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Toluene | <0.000512 | U | 0.00183 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-01 (3'-4')**
**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-1**
**Matrix: Solid**
**Percent Solids: 89.5**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000414 | U | 0.00183 | 0.000414 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,4-Trichlorobenzene | <0.000660 | U | 0.00183 | 0.000660 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,1-Trichloroethane | <0.000458 | U | 0.00183 | 0.000458 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,2-Trichloroethane | <0.000619 | U | 0.00183 | 0.000619 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Trichloroethene | <0.000422 | U | 0.00183 | 0.000422 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Trichlorofluoromethane | <0.000770 | U | 0.00183 | 0.000770 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,3-Trichloropropane | <0.000535 | U | 0.00183 | 0.000535 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,4-Trimethylbenzene | <0.000513 | U | 0.00183 | 0.000513 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3,5-Trimethylbenzene | <0.000507 | U | 0.00183 | 0.000507 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| **m,p-Xylenes** | **0.000657** | **J** | 0.00183 | 0.000209 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| o-Xylene | <0.000366 | U | 0.00183 | 0.000366 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| **Xylenes, Total** | **0.000657** | **J** | 0.00183 | 0.000366 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Vinyl chloride | <0.00175 | U | 0.00458 | 0.00175 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *106* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *4-Bromofluorobenzene (Surr)* | *109* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *Dibromofluoromethane (Surr)* | *99* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *Toluene-d8 (Surr)* | *106* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |

### Method: SW846 8270E - Semivolatile Organic Compounds (GC-MS/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | <0.00222 | U | 0.0107 | 0.00222 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Acenaphthylene | <0.00154 | U | 0.0107 | 0.00154 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Anthracene | <0.00214 | U | 0.0107 | 0.00214 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[a]anthracene | <0.00163 | U | 0.00537 | 0.00163 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[a]pyrene | <0.00210 | U | 0.00537 | 0.00210 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[b]fluoranthene | <0.00230 | U | 0.0107 | 0.00230 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[g,h,i]perylene | <0.00205 | U | 0.0107 | 0.00205 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[k]fluoranthene | <0.00209 | U | 0.0107 | 0.00209 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Chrysene | <0.00195 | U | 0.0107 | 0.00195 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Dibenz(a,h)anthracene | <0.00217 | U | 0.00537 | 0.00217 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Fluoranthene | <0.00267 | U | 0.0107 | 0.00267 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Fluorene | <0.00205 | U | 0.0107 | 0.00205 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Indeno[1,2,3-cd]pyrene | <0.00297 | U | 0.0107 | 0.00297 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Naphthalene | <0.00308 | U | 0.0107 | 0.00308 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Phenanthrene | <0.00332 | U | 0.0107 | 0.00332 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Pyrene | <0.00239 | U | 0.0107 | 0.00239 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *2-Fluorobiphenyl* | *73* | | *37 - 130* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |
| *Nitrobenzene-d5 (Surr)* | *58* | | *36 - 131* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |
| *p-Terphenyl-d14 (Surr)* | *93* | | *40 - 130* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| **>C12-C28 Range Hydrocarbons** | **35.5** | **J** | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| >C28-C35 Range Hydrocarbons | <21.6 | U | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| **Total Petroleum Hydrocarbons (C6-C35)** | **35.5** | **J** | 43.2 | 21.6 | mg/Kg | | | 01/14/26 00:04 | 1 |

Eurofins Dallas





Ex. 9

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-01 (3'-4')

**Lab Sample ID: 870-43022-1**

**Date Collected: 01/09/26 10:05**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 89.5**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *117* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 00:04* | *1* |
| *o-Terphenyl (Surr)* | *120* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 00:04* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **5.71** | **J** | 11.2 | 5.58 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 20:57 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **36.8** | | 2.15 | 0.736 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:47 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.1** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.3** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-02 (3'-4')

**Lab Sample ID: 870-43022-3**

**Date Collected: 01/09/26 11:00**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 82.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000641 | U | 0.00255 | 0.000641 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromobenzene | <0.00103 | U | 0.00255 | 0.00103 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromochloromethane | <0.000806 | U | 0.00255 | 0.000806 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromodichloromethane | <0.000833 | U | 0.00255 | 0.000833 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromoform | <0.00114 | U | 0.00255 | 0.00114 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromomethane | <0.00150 | U | 0.00638 | 0.00150 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2-Butanone | <0.00985 | U | 0.0638 | 0.00985 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| n-Butylbenzene | <0.000427 | U | 0.00255 | 0.000427 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| sec-Butylbenzene | <0.000683 | U | 0.00255 | 0.000683 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| tert-Butylbenzene | <0.000655 | U | 0.00255 | 0.000655 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Carbon tetrachloride | <0.000565 | U | 0.00255 | 0.000565 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chlorobenzene | <0.000647 | U | 0.00255 | 0.000647 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloroethane | <0.000578 | U | 0.00255 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloroform | <0.000605 | U | 0.00255 | 0.000605 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloromethane | <0.000700 | U | 0.00255 | 0.000700 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2-Chlorotoluene | <0.000347 | U | 0.00255 | 0.000347 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 4-Chlorotoluene | <0.000776 | U | 0.00255 | 0.000776 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00178 | U | 0.00638 | 0.00178 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dibromochloromethane | <0.000222 | U | 0.00255 | 0.000222 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00139 | U | 0.00638 | 0.00139 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dibromoethane | <0.000789 | U | 0.00255 | 0.000789 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dibromomethane | <0.000401 | U | 0.00255 | 0.000401 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichlorobenzene | <0.000504 | U | 0.00255 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3-Dichlorobenzene | <0.000637 | U | 0.00255 | 0.000637 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,4-Dichlorobenzene | <0.000633 | U | 0.00255 | 0.000633 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dichlorodifluoromethane | <0.000694 | U | 0.00255 | 0.000694 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1-Dichloroethane | <0.000723 | U | 0.00255 | 0.000723 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichloroethane | <0.000468 | U | 0.00255 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |

## Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-02 (3'-4')**
**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-3**
**Matrix: Solid**
**Percent Solids: 82.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,1-Dichloroethene | <0.000582 | U | 0.00255 | 0.000582 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| cis-1,2-Dichloroethene | <0.000646 | U | 0.00255 | 0.000646 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| trans-1,2-Dichloroethene | <0.000589 | U | 0.00255 | 0.000589 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichloropropane | <0.000748 | U | 0.00255 | 0.000748 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3-Dichloropropane | <0.000426 | U | 0.00255 | 0.000426 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2,2-Dichloropropane | <0.000755 | U | 0.00255 | 0.000755 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1-Dichloropropene | <0.000393 | U | 0.00255 | 0.000393 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| cis-1,3-Dichloropropene | <0.000789 | U | 0.00255 | 0.000789 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| trans-1,3-Dichloropropene | <0.000651 | U | 0.00255 | 0.000651 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **Ethylbenzene** | **0.00127** | **J** | 0.00255 | 0.000494 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Hexachlorobutadiene | <0.000703 | U | 0.00255 | 0.000703 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Isopropylbenzene | <0.000481 | U | 0.00255 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Methylene Chloride | <0.00169 | U | 0.00638 | 0.00169 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| MTBE | <0.000748 | U | 0.00255 | 0.000748 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Naphthalene | <0.000855 | U | 0.00255 | 0.000855 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| N-Propylbenzene | <0.000658 | U | 0.00255 | 0.000658 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Styrene | <0.000660 | U | 0.00255 | 0.000660 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000587 | U | 0.00255 | 0.000587 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000873 | U | 0.00255 | 0.000873 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Tetrachloroethylene | <0.000581 | U | 0.00255 | 0.000581 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Toluene | <0.000715 | U | 0.00255 | 0.000715 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,3-Trichlorobenzene | <0.000577 | U | 0.00255 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,4-Trichlorobenzene | <0.000920 | U | 0.00255 | 0.000920 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,1-Trichloroethane | <0.000638 | U | 0.00255 | 0.000638 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,2-Trichloroethane | <0.000863 | U | 0.00255 | 0.000863 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Trichloroethene | <0.000588 | U | 0.00255 | 0.000588 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Trichlorofluoromethane | <0.00107 | U | 0.00255 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,3-Trichloropropane | <0.000746 | U | 0.00255 | 0.000746 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,4-Trimethylbenzene | <0.000716 | U | 0.00255 | 0.000716 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3,5-Trimethylbenzene | <0.000707 | U | 0.00255 | 0.000707 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **m,p-Xylenes** | **0.00748** | | 0.00255 | 0.000291 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **o-Xylene** | **0.00295** | | 0.00255 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **Xylenes, Total** | **0.0104** | | 0.00255 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Vinyl chloride | <0.00244 | U | 0.00638 | 0.00244 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *111* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *4-Bromofluorobenzene (Surr)* | *101* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| >C12-C28 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| >C28-C35 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <25.7 | U | 51.4 | 25.7 | mg/Kg | | | 01/14/26 01:30 | 1 |

## Client Sample ID: SB-02 (3'-4')

**Lab Sample ID: 870-43022-3**

**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 82.8**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *119* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:30* | *1* |
| *o-Terphenyl (Surr)* | *114* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:30* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.98 | U | 12.0 | 5.98 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:06 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **24.0** | | 2.32 | 0.795 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:43 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.6** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.9** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 88.9**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000397 | U | 0.00158 | 0.000397 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromobenzene | <0.000637 | U | 0.00158 | 0.000637 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromochloromethane | <0.000500 | U | 0.00158 | 0.000500 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromodichloromethane | <0.000516 | U | 0.00158 | 0.000516 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromoform | <0.000709 | U | 0.00158 | 0.000709 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromomethane | <0.000928 | U | 0.00395 | 0.000928 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2-Butanone | <0.00611 | U | 0.0395 | 0.00611 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| n-Butylbenzene | <0.000265 | U | 0.00158 | 0.000265 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| sec-Butylbenzene | <0.000423 | U | 0.00158 | 0.000423 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| tert-Butylbenzene | <0.000406 | U | 0.00158 | 0.000406 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Carbon tetrachloride | <0.000350 | U | 0.00158 | 0.000350 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chlorobenzene | <0.000401 | U | 0.00158 | 0.000401 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloroethane | <0.000358 | U | 0.00158 | 0.000358 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloroform | <0.000375 | U | 0.00158 | 0.000375 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloromethane | <0.000434 | U | 0.00158 | 0.000434 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2-Chlorotoluene | <0.000215 | U | 0.00158 | 0.000215 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 4-Chlorotoluene | <0.000481 | U | 0.00158 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00111 | U | 0.00395 | 0.00111 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dibromochloromethane | <0.000138 | U | 0.00158 | 0.000138 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000860 | U | 0.00395 | 0.000860 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dibromoethane | <0.000489 | U | 0.00158 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dibromomethane | <0.000248 | U | 0.00158 | 0.000248 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichlorobenzene | <0.000312 | U | 0.00158 | 0.000312 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3-Dichlorobenzene | <0.000395 | U | 0.00158 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,4-Dichlorobenzene | <0.000392 | U | 0.00158 | 0.000392 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dichlorodifluoromethane | <0.000430 | U | 0.00158 | 0.000430 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1-Dichloroethane | <0.000448 | U | 0.00158 | 0.000448 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichloroethane | <0.000290 | U | 0.00158 | 0.000290 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |



Ex. 9

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-5

**Matrix: Solid**
**Percent Solids: 88.9**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,1-Dichloroethene | <0.000361 | U | 0.00158 | 0.000361 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| cis-1,2-Dichloroethene | <0.000400 | U | 0.00158 | 0.000400 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| trans-1,2-Dichloroethene | <0.000365 | U | 0.00158 | 0.000365 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichloropropane | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3-Dichloropropane | <0.000264 | U | 0.00158 | 0.000264 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2,2-Dichloropropane | <0.000468 | U | 0.00158 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1-Dichloropropene | <0.000244 | U | 0.00158 | 0.000244 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| cis-1,3-Dichloropropene | <0.000489 | U | 0.00158 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| trans-1,3-Dichloropropene | <0.000403 | U | 0.00158 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Ethylbenzene | <0.000306 | U | 0.00158 | 0.000306 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Hexachlorobutadiene | <0.000436 | U | 0.00158 | 0.000436 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Isopropylbenzene | <0.000298 | U | 0.00158 | 0.000298 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Methylene Chloride | <0.00105 | U | 0.00395 | 0.00105 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| MTBE | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Naphthalene | <0.000530 | U | 0.00158 | 0.000530 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| N-Propylbenzene | <0.000408 | U | 0.00158 | 0.000408 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Styrene | <0.000409 | U | 0.00158 | 0.000409 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000364 | U | 0.00158 | 0.000364 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000541 | U | 0.00158 | 0.000541 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Tetrachloroethylene | <0.000360 | U | 0.00158 | 0.000360 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Toluene | <0.000443 | U | 0.00158 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,3-Trichlorobenzene | <0.000357 | U | 0.00158 | 0.000357 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,4-Trichlorobenzene | <0.000570 | U | 0.00158 | 0.000570 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,1-Trichloroethane | <0.000395 | U | 0.00158 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,2-Trichloroethane | <0.000535 | U | 0.00158 | 0.000535 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Trichloroethene | <0.000365 | U | 0.00158 | 0.000365 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Trichlorofluoromethane | <0.000666 | U | 0.00158 | 0.000666 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,3-Trichloropropane | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,4-Trimethylbenzene | <0.000444 | U | 0.00158 | 0.000444 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3,5-Trimethylbenzene | <0.000438 | U | 0.00158 | 0.000438 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| m,p-Xylenes | <0.000180 | U | 0.00158 | 0.000180 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| o-Xylene | <0.000316 | U | 0.00158 | 0.000316 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Xylenes, Total | <0.000316 | U | 0.00158 | 0.000316 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Vinyl chloride | <0.00151 | U | 0.00395 | 0.00151 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *114* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *Toluene-d8 (Surr)* | *98* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| >C12-C28 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| >C28-C35 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <21.5 | U | 43.0 | 21.5 | mg/Kg | | | 01/14/26 01:51 | 1 |

Eurofins Dallas



1/21/2026

Ex. 9

# Client Sample Results



## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 88.9**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *108* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:51* | *1* |
| *o-Terphenyl (Surr)* | *105* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:51* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 250 | | 11.2 | 5.58 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:15 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Barium | 30.0 | | 2.16 | 0.741 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:40 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| soil pH measured in water at deg C (SW846 9045D) | 7.3 | | | | S.U. | | | 01/13/26 14:00 | 1 |
| Temperature (SW846 9045D) | 20.6 | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-03 (5'-6')

**Lab Sample ID: 870-43022-6**

**Date Collected: 01/09/26 11:30**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 91.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000413 | U | 0.00164 | 0.000413 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| Toluene | <0.000460 | U | 0.00164 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| Ethylbenzene | 0.000545 | J | 0.00164 | 0.000318 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| m,p-Xylenes | 0.00268 | | 0.00164 | 0.000187 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| o-Xylene | 0.00111 | J | 0.00164 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| Xylenes, Total | 0.00379 | | 0.00164 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| MTBE | <0.000482 | U | 0.00164 | 0.000482 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *111* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *4-Bromofluorobenzene (Surr)* | *98* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| >C12-C28 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| >C28-C35 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <23.2 | U | 46.3 | 23.2 | mg/Kg | | | 01/14/26 02:12 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *110* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:12* | *1* |
| *o-Terphenyl (Surr)* | *107* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:12* | *1* |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-04 (3'-4')

Lab Sample ID: 870-43022-8

Date Collected: 01/09/26 12:20
Date Received: 01/10/26 09:15

Matrix: Solid
Percent Solids: 95.2

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000438 | U | 0.00175 | 0.000438 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromobenzene | <0.000703 | U | 0.00175 | 0.000703 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromochloromethane | <0.000552 | U | 0.00175 | 0.000552 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromodichloromethane | <0.000570 | U | 0.00175 | 0.000570 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromoform | <0.000783 | U | 0.00175 | 0.000783 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromomethane | <0.00103 | U | 0.00437 | 0.00103 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2-Butanone | <0.00674 | U | 0.0437 | 0.00674 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| n-Butylbenzene | <0.000293 | U | 0.00175 | 0.000293 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| sec-Butylbenzene | <0.000467 | U | 0.00175 | 0.000467 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| tert-Butylbenzene | <0.000448 | U | 0.00175 | 0.000448 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Carbon tetrachloride | <0.000387 | U | 0.00175 | 0.000387 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chlorobenzene | <0.000443 | U | 0.00175 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloroethane | <0.000396 | U | 0.00175 | 0.000396 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloroform | <0.000414 | U | 0.00175 | 0.000414 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloromethane | <0.000479 | U | 0.00175 | 0.000479 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2-Chlorotoluene | <0.000238 | U | 0.00175 | 0.000238 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 4-Chlorotoluene | <0.000531 | U | 0.00175 | 0.000531 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00122 | U | 0.00437 | 0.00122 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dibromochloromethane | <0.000152 | U | 0.00175 | 0.000152 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000950 | U | 0.00437 | 0.000950 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dibromoethane | <0.000540 | U | 0.00175 | 0.000540 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dibromomethane | <0.000274 | U | 0.00175 | 0.000274 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichlorobenzene | <0.000345 | U | 0.00175 | 0.000345 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3-Dichlorobenzene | <0.000436 | U | 0.00175 | 0.000436 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,4-Dichlorobenzene | <0.000433 | U | 0.00175 | 0.000433 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dichlorodifluoromethane | <0.000475 | U | 0.00175 | 0.000475 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloroethane | <0.000495 | U | 0.00175 | 0.000495 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichloroethane | <0.000321 | U | 0.00175 | 0.000321 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloroethene | <0.000398 | U | 0.00175 | 0.000398 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| cis-1,2-Dichloroethene | <0.000442 | U | 0.00175 | 0.000442 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| trans-1,2-Dichloroethene | <0.000403 | U | 0.00175 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichloropropane | <0.000512 | U | 0.00175 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3-Dichloropropane | <0.000292 | U | 0.00175 | 0.000292 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2,2-Dichloropropane | <0.000517 | U | 0.00175 | 0.000517 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloropropene | <0.000269 | U | 0.00175 | 0.000269 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| cis-1,3-Dichloropropene | <0.000540 | U | 0.00175 | 0.000540 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| trans-1,3-Dichloropropene | <0.000445 | U | 0.00175 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **Ethylbenzene** | **0.00169** | **J** | 0.00175 | 0.000338 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Hexachlorobutadiene | <0.000481 | U | 0.00175 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Isopropylbenzene | <0.000329 | U | 0.00175 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Methylene Chloride | <0.00115 | U | 0.00437 | 0.00115 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| MTBE | <0.000512 | U | 0.00175 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Naphthalene | <0.000585 | U | 0.00175 | 0.000585 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| N-Propylbenzene | <0.000451 | U | 0.00175 | 0.000451 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Styrene | <0.000452 | U | 0.00175 | 0.000452 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000402 | U | 0.00175 | 0.000402 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000597 | U | 0.00175 | 0.000597 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Tetrachloroethylene | <0.000397 | U | 0.00175 | 0.000397 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Toluene | <0.000489 | U | 0.00175 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-04 (3'-4')**
**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-8**
**Matrix: Solid**
**Percent Solids: 95.2**

## Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000395 | U | 0.00175 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,4-Trichlorobenzene | <0.000630 | U | 0.00175 | 0.000630 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,1-Trichloroethane | <0.000437 | U | 0.00175 | 0.000437 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,2-Trichloroethane | <0.000590 | U | 0.00175 | 0.000590 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Trichloroethene | <0.000403 | U | 0.00175 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Trichlorofluoromethane | <0.000735 | U | 0.00175 | 0.000735 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,3-Trichloropropane | <0.000511 | U | 0.00175 | 0.000511 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,4-Trimethylbenzene | <0.000490 | U | 0.00175 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3,5-Trimethylbenzene | <0.000484 | U | 0.00175 | 0.000484 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **m,p-Xylenes** | **0.00907** | | 0.00175 | 0.000199 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **o-Xylene** | **0.00383** | | 0.00175 | 0.000349 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **Xylenes, Total** | **0.0129** | | 0.00175 | 0.000349 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Vinyl chloride | <0.00167 | U | 0.00437 | 0.00167 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *114* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *Toluene-d8 (Surr)* | *100* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |

## Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| >C12-C28 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| >C28-C35 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <22.2 | U | 44.3 | 22.2 | mg/Kg | | | 01/14/26 02:34 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *127* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:34* | *1* |
| *o-Terphenyl (Surr)* | *121* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:34* | *1* |

## Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | 5.74 | J | 10.4 | 5.22 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:24 | 1 |

## Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **31.1** | | 1.91 | 0.654 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:36 | 5 |

## General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.7** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.4** | | | | Celsius | | | 01/13/26 14:00 | 1 |

Eurofins Dallas



1/21/2026

Ex. 9

## Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-05 (2'-3')**
**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-10**
**Matrix: Solid**
**Percent Solids: 86.0**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000559 | U | 0.00223 | 0.000559 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromobenzene | <0.000896 | U | 0.00223 | 0.000896 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromochloromethane | <0.000704 | U | 0.00223 | 0.000704 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromodichloromethane | <0.000727 | U | 0.00223 | 0.000727 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromoform | <0.000998 | U | 0.00223 | 0.000998 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromomethane | <0.00131 | U | 0.00557 | 0.00131 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2-Butanone | <0.00860 | U | 0.0557 | 0.00860 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| n-Butylbenzene | <0.000373 | U | 0.00223 | 0.000373 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| sec-Butylbenzene | <0.000596 | U | 0.00223 | 0.000596 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| tert-Butylbenzene | <0.000571 | U | 0.00223 | 0.000571 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Carbon tetrachloride | <0.000493 | U | 0.00223 | 0.000493 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chlorobenzene | <0.000565 | U | 0.00223 | 0.000565 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloroethane | <0.000504 | U | 0.00223 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloroform | <0.000528 | U | 0.00223 | 0.000528 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloromethane | <0.000611 | U | 0.00223 | 0.000611 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2-Chlorotoluene | <0.000303 | U | 0.00223 | 0.000303 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 4-Chlorotoluene | <0.000677 | U | 0.00223 | 0.000677 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00156 | U | 0.00557 | 0.00156 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dibromochloromethane | <0.000194 | U | 0.00223 | 0.000194 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00121 | U | 0.00557 | 0.00121 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dibromoethane | <0.000688 | U | 0.00223 | 0.000688 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dibromomethane | <0.000350 | U | 0.00223 | 0.000350 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichlorobenzene | <0.000440 | U | 0.00223 | 0.000440 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3-Dichlorobenzene | <0.000556 | U | 0.00223 | 0.000556 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,4-Dichlorobenzene | <0.000552 | U | 0.00223 | 0.000552 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dichlorodifluoromethane | <0.000606 | U | 0.00223 | 0.000606 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloroethane | <0.000631 | U | 0.00223 | 0.000631 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichloroethane | <0.000409 | U | 0.00223 | 0.000409 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloroethene | <0.000508 | U | 0.00223 | 0.000508 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| cis-1,2-Dichloroethene | <0.000563 | U | 0.00223 | 0.000563 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| trans-1,2-Dichloroethene | <0.000514 | U | 0.00223 | 0.000514 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichloropropane | <0.000652 | U | 0.00223 | 0.000652 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3-Dichloropropane | <0.000372 | U | 0.00223 | 0.000372 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2,2-Dichloropropane | <0.000659 | U | 0.00223 | 0.000659 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloropropene | <0.000343 | U | 0.00223 | 0.000343 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| cis-1,3-Dichloropropene | <0.000688 | U | 0.00223 | 0.000688 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| trans-1,3-Dichloropropene | <0.000568 | U | 0.00223 | 0.000568 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Ethylbenzene | <0.000431 | U | 0.00223 | 0.000431 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Hexachlorobutadiene | <0.000614 | U | 0.00223 | 0.000614 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Isopropylbenzene | <0.000420 | U | 0.00223 | 0.000420 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Methylene Chloride | <0.00147 | U | 0.00557 | 0.00147 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| MTBE | <0.000652 | U | 0.00223 | 0.000652 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Naphthalene | <0.000746 | U | 0.00223 | 0.000746 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| N-Propylbenzene | <0.000575 | U | 0.00223 | 0.000575 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Styrene | <0.000576 | U | 0.00223 | 0.000576 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000512 | U | 0.00223 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000762 | U | 0.00223 | 0.000762 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Tetrachloroethylene | <0.000507 | U | 0.00223 | 0.000507 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Toluene | <0.000624 | U | 0.00223 | 0.000624 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |

Eurofins Dallas



Ex. 9

## Client Sample ID: SB-05 (2'-3')

**Lab Sample ID: 870-43022-10**

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.0**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000503 | U | 0.00223 | 0.000503 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,4-Trichlorobenzene | <0.000803 | U | 0.00223 | 0.000803 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,1-Trichloroethane | <0.000557 | U | 0.00223 | 0.000557 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,2-Trichloroethane | <0.000753 | U | 0.00223 | 0.000753 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Trichloroethene | <0.000513 | U | 0.00223 | 0.000513 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Trichlorofluoromethane | <0.000938 | U | 0.00223 | 0.000938 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,3-Trichloropropane | <0.000651 | U | 0.00223 | 0.000651 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,4-Trimethylbenzene | <0.000625 | U | 0.00223 | 0.000625 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3,5-Trimethylbenzene | <0.000617 | U | 0.00223 | 0.000617 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| m,p-Xylenes | <0.000254 | U | 0.00223 | 0.000254 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| o-Xylene | <0.000445 | U | 0.00223 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Xylenes, Total | <0.000445 | U | 0.00223 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Vinyl chloride | <0.00213 | U | 0.00557 | 0.00213 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *112* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *4-Bromofluorobenzene (Surr)* | *107* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *Toluene-d8 (Surr)* | *102* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| >C12-C28 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| >C28-C35 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <18.4 | U | 36.9 | 18.4 | mg/Kg | | | 01/14/26 03:16 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *111* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:16* | *1* |
| *o-Terphenyl (Surr)* | *111* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:16* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.82 | U | 11.6 | 5.82 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:33 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **148** | | 2.12 | 0.724 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:33 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.6** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.4** | | | | Celsius | | | 01/13/26 14:00 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (8'-9')

**Lab Sample ID: 870-43022-11**

**Date Collected: 01/09/26 13:55**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000577 | U | 0.00230 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Toluene | <0.000644 | U | 0.00230 | 0.000644 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Ethylbenzene | <0.000445 | U | 0.00230 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| m,p-Xylenes | <0.000262 | U | 0.00230 | 0.000262 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| o-Xylene | <0.000460 | U | 0.00230 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Xylenes, Total | <0.000460 | U | 0.00230 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| MTBE | <0.000674 | U | 0.00230 | 0.000674 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *119* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *Dibromofluoromethane (Surr)* | *104* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *Toluene-d8 (Surr)* | *97* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| >C12-C28 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| >C28-C35 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <21.5 | U | 43.0 | 21.5 | mg/Kg | | | 01/14/26 03:38 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *132* | *X* | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:38* | *1* |
| *o-Terphenyl (Surr)* | *129* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:38* | *1* |

## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**

**Date Collected: 01/09/26 14:10**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000555 | U | 0.00221 | 0.000555 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Toluene | <0.000620 | U | 0.00221 | 0.000620 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Ethylbenzene | <0.000428 | U | 0.00221 | 0.000428 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| m,p-Xylenes | <0.000252 | U | 0.00221 | 0.000252 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| o-Xylene | <0.000443 | U | 0.00221 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Xylenes, Total | <0.000443 | U | 0.00221 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| MTBE | <0.000648 | U | 0.00221 | 0.000648 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *117* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *4-Bromofluorobenzene (Surr)* | *98* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *Toluene-d8 (Surr)* | *97* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |
| >C12-C28 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |
| >C28-C35 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |



Ex. 9

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-06 (2'-3')

Lab Sample ID: 870-43022-12
Date Collected: 01/09/26 14:10
Date Received: 01/10/26 09:15
Matrix: Solid
Percent Solids: 86.2

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Total Petroleum Hydrocarbons (C6-C35) | <20.0 | U | 39.9 | 20.0 | mg/Kg | | | 01/14/26 03:59 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *105* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:59* | *1* |
| *o-Terphenyl (Surr)* | *107* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:59* | *1* |

## Client Sample ID: SB-06 (6'-7')

Lab Sample ID: 870-43022-13
Date Collected: 01/09/26 14:20
Date Received: 01/10/26 09:15
Matrix: Solid
Percent Solids: 90.2

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000495 | U | 0.00197 | 0.000495 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromobenzene | <0.000794 | U | 0.00197 | 0.000794 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromochloromethane | <0.000624 | U | 0.00197 | 0.000624 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromodichloromethane | <0.000644 | U | 0.00197 | 0.000644 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromoform | <0.000884 | U | 0.00197 | 0.000884 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromomethane | <0.00116 | U | 0.00493 | 0.00116 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2-Butanone | <0.00762 | U | 0.0493 | 0.00762 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| n-Butylbenzene | <0.000331 | U | 0.00197 | 0.000331 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| sec-Butylbenzene | <0.000528 | U | 0.00197 | 0.000528 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| tert-Butylbenzene | <0.000506 | U | 0.00197 | 0.000506 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Carbon tetrachloride | <0.000437 | U | 0.00197 | 0.000437 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chlorobenzene | <0.000500 | U | 0.00197 | 0.000500 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloroethane | <0.000447 | U | 0.00197 | 0.000447 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloroform | <0.000468 | U | 0.00197 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloromethane | <0.000542 | U | 0.00197 | 0.000542 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2-Chlorotoluene | <0.000268 | U | 0.00197 | 0.000268 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 4-Chlorotoluene | <0.000600 | U | 0.00197 | 0.000600 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00138 | U | 0.00493 | 0.00138 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dibromochloromethane | <0.000172 | U | 0.00197 | 0.000172 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00107 | U | 0.00493 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dibromoethane | <0.000610 | U | 0.00197 | 0.000610 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dibromomethane | <0.000310 | U | 0.00197 | 0.000310 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichlorobenzene | <0.000390 | U | 0.00197 | 0.000390 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3-Dichlorobenzene | <0.000492 | U | 0.00197 | 0.000492 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,4-Dichlorobenzene | <0.000490 | U | 0.00197 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dichlorodifluoromethane | <0.000537 | U | 0.00197 | 0.000537 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloroethane | <0.000560 | U | 0.00197 | 0.000560 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichloroethane | <0.000362 | U | 0.00197 | 0.000362 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloroethene | <0.000450 | U | 0.00197 | 0.000450 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| cis-1,2-Dichloroethene | <0.000499 | U | 0.00197 | 0.000499 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| trans-1,2-Dichloroethene | <0.000456 | U | 0.00197 | 0.000456 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichloropropane | <0.000578 | U | 0.00197 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3-Dichloropropane | <0.000330 | U | 0.00197 | 0.000330 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2,2-Dichloropropane | <0.000584 | U | 0.00197 | 0.000584 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloropropene | <0.000304 | U | 0.00197 | 0.000304 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| cis-1,3-Dichloropropene | <0.000610 | U | 0.00197 | 0.000610 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| trans-1,3-Dichloropropene | <0.000503 | U | 0.00197 | 0.000503 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-06 (6'-7')

Lab Sample ID: 870-43022-13

Date Collected: 01/09/26 14:20
Date Received: 01/10/26 09:15

Matrix: Solid
Percent Solids: 90.2

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Ethylbenzene | <0.000382 | U | 0.00197 | 0.000382 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Hexachlorobutadiene | <0.000544 | U | 0.00197 | 0.000544 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Isopropylbenzene | <0.000372 | U | 0.00197 | 0.000372 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Methylene Chloride | <0.00130 | U | 0.00493 | 0.00130 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| MTBE | <0.000578 | U | 0.00197 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Naphthalene | <0.000661 | U | 0.00197 | 0.000661 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| N-Propylbenzene | <0.000509 | U | 0.00197 | 0.000509 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Styrene | <0.000510 | U | 0.00197 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000454 | U | 0.00197 | 0.000454 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000675 | U | 0.00197 | 0.000675 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Tetrachloroethylene | <0.000449 | U | 0.00197 | 0.000449 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Toluene | <0.000553 | U | 0.00197 | 0.000553 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,3-Trichlorobenzene | <0.000446 | U | 0.00197 | 0.000446 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,4-Trichlorobenzene | <0.000712 | U | 0.00197 | 0.000712 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,1-Trichloroethane | <0.000493 | U | 0.00197 | 0.000493 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,2-Trichloroethane | <0.000667 | U | 0.00197 | 0.000667 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Trichloroethene | <0.000455 | U | 0.00197 | 0.000455 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Trichlorofluoromethane | <0.000831 | U | 0.00197 | 0.000831 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,3-Trichloropropane | <0.000577 | U | 0.00197 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,4-Trimethylbenzene | <0.000554 | U | 0.00197 | 0.000554 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3,5-Trimethylbenzene | <0.000547 | U | 0.00197 | 0.000547 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| m,p-Xylenes | <0.000225 | U | 0.00197 | 0.000225 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| o-Xylene | <0.000395 | U | 0.00197 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Xylenes, Total | <0.000395 | U | 0.00197 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Vinyl chloride | <0.00189 | U | 0.00493 | 0.00189 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *115* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *Dibromofluoromethane (Surr)* | *101* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| >C12-C28 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| >C28-C35 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <26.8 | U | 53.6 | 26.8 | mg/Kg | | | 01/14/26 04:20 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *129* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 04:20* | *1* |
| *o-Terphenyl (Surr)* | *123* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 04:20* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **184** | | 11.0 | 5.50 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:42 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **16.7** | | 2.01 | 0.690 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:30 | 5 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-06 (6'-7')

**Lab Sample ID: 870-43022-13**

**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 90.2**

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| soil pH measured in water at deg C (SW846 9045D) | 9.0 | | | | S.U. | | | 01/13/26 14:00 | 1 |
| Temperature (SW846 9045D) | 20.6 | | | | Celsius | | | 01/13/26 14:00 | 1 |



Ex. 9

5

# Surrogate Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | | | |
|---|---|---|---|---|---|
| | | DCA | BFB | DBFM | TOL |
| **Lab Sample ID** | **Client Sample ID** | (73-131) | (75-132) | (65-135) | (78-138) |
| 870-43022-1 | SB-01 (3'-4') | 106 | 109 | 99 | 106 |
| 870-43022-1 MS | SB-01 (3'-4') | 115 | 100 | 106 | 98 |
| 870-43022-3 | SB-02 (3'-4') | 111 | 101 | 103 | 99 |
| 870-43022-5 | SB-03 (3'-4') | 114 | 99 | 102 | 98 |
| 870-43022-6 | SB-03 (5'-6') | 111 | 98 | 102 | 99 |
| 870-43022-8 | SB-04 (3'-4') | 114 | 99 | 102 | 100 |
| 870-43022-10 | SB-05 (2'-3') | 112 | 107 | 102 | 102 |
| 870-43022-11 | SB-05 (8'-9') | 119 | 99 | 104 | 97 |
| 870-43022-12 | SB-06 (2'-3') | 117 | 98 | 103 | 97 |
| 870-43022-13 | SB-06 (6'-7') | 115 | 99 | 101 | 99 |
| LCS 870-34798/1-A | Lab Control Sample | 103 | 101 | 102 | 99 |
| LCSD 870-34798/2-A | Lab Control Sample Dup | 103 | 100 | 103 | 99 |
| MB 870-34798/3-A | Method Blank | 99 | 100 | 97 | 102 |

**Surrogate Legend**

DCA = 1,2-Dichloroethane-d4 (Surr)
BFB = 4-Bromofluorobenzene (Surr)
DBFM = Dibromofluoromethane (Surr)
TOL = Toluene-d8 (Surr)

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | | |
|---|---|---|---|---|
| | | FBP | NBZ | TPHd14 |
| **Lab Sample ID** | **Client Sample ID** | (37-130) | (36-131) | (40-130) |
| 860-122968-J-3-B MS | Matrix Spike | 68 | 75 | 77 |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | 71 | 78 | 80 |
| 870-43022-1 | SB-01 (3'-4') | 73 | 58 | 93 |
| LCS 860-288981/2-A | Lab Control Sample | 82 | 93 | 78 |
| LCSD 860-288981/3-A | Lab Control Sample Dup | 84 | 88 | 80 |
| LCSD 860-288981/5-A | Lab Control Sample Dup | 82 | 88 | 76 |
| MB 860-288981/1-A | Method Blank | 73 | 59 | 72 |

**Surrogate Legend**

FBP = 2-Fluorobiphenyl
NBZ = Nitrobenzene-d5 (Surr)
TPHd14 = p-Terphenyl-d14 (Surr)

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | |
|---|---|---|---|
| | | 1CO | OTPH |
| **Lab Sample ID** | **Client Sample ID** | (70-130) | (70-130) |
| 870-43022-1 | SB-01 (3'-4') | 117 | 120 |
| 870-43022-1 MS | SB-01 (3'-4') | 106 | 101 |
| 870-43022-1 MSD | SB-01 (3'-4') | 102 | 100 |
| 870-43022-3 | SB-02 (3'-4') | 119 | 114 |
| 870-43022-5 | SB-03 (3'-4') | 108 | 105 |
| 870-43022-6 | SB-03 (5'-6') | 110 | 107 |



Ex. 9

# Surrogate Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | |
|---|---|---|---|
| Lab Sample ID | Client Sample ID | 1CO (70-130) | OTPH (70-130) |
| 870-43022-8 | SB-04 (3'-4') | 127 | 121 |
| 870-43022-10 | SB-05 (2'-3') | 111 | 111 |
| 870-43022-11 | SB-05 (8'-9') | 132 X | 129 |
| 870-43022-12 | SB-06 (2'-3') | 105 | 107 |
| 870-43022-13 | SB-06 (6'-7') | 129 | 123 |
| LCS 870-34808/1-A | Lab Control Sample | 103 | 101 |
| LCSD 870-34808/2-A | Lab Control Sample Dup | 104 | 101 |
| MB 870-34808/3-A | Method Blank | 106 | 103 |

**Surrogate Legend**

1CO = 1-Chlorooctane (Surr)
OTPH = o-Terphenyl (Surr)

Eurofins Dallas



1/21/2026

Ex. 9

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Lab Sample ID: MB 870-34798/3-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000500 | U | 0.00199 | 0.000500 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromobenzene | <0.000802 | U | 0.00199 | 0.000802 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromochloromethane | <0.000629 | U | 0.00199 | 0.000629 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromodichloromethane | <0.000650 | U | 0.00199 | 0.000650 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromoform | <0.000892 | U | 0.00199 | 0.000892 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromomethane | <0.00117 | U | 0.00498 | 0.00117 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2-Butanone | <0.00769 | U | 0.0498 | 0.00769 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| n-Butylbenzene | <0.000334 | U | 0.00199 | 0.000334 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| sec-Butylbenzene | <0.000533 | U | 0.00199 | 0.000533 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| tert-Butylbenzene | <0.000511 | U | 0.00199 | 0.000511 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Carbon tetrachloride | <0.000441 | U | 0.00199 | 0.000441 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chlorobenzene | <0.000505 | U | 0.00199 | 0.000505 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloroethane | <0.000451 | U | 0.00199 | 0.000451 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloroform | <0.000472 | U | 0.00199 | 0.000472 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloromethane | <0.000547 | U | 0.00199 | 0.000547 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2-Chlorotoluene | <0.000271 | U | 0.00199 | 0.000271 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 4-Chlorotoluene | <0.000606 | U | 0.00199 | 0.000606 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00139 | U | 0.00498 | 0.00139 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dibromochloromethane | <0.000173 | U | 0.00199 | 0.000173 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00108 | U | 0.00498 | 0.00108 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dibromoethane | <0.000616 | U | 0.00199 | 0.000616 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dibromomethane | <0.000313 | U | 0.00199 | 0.000313 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichlorobenzene | <0.000393 | U | 0.00199 | 0.000393 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3-Dichlorobenzene | <0.000497 | U | 0.00199 | 0.000497 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,4-Dichlorobenzene | <0.000494 | U | 0.00199 | 0.000494 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dichlorodifluoromethane | <0.000542 | U | 0.00199 | 0.000542 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloroethane | <0.000565 | U | 0.00199 | 0.000565 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichloroethane | <0.000366 | U | 0.00199 | 0.000366 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloroethene | <0.000454 | U | 0.00199 | 0.000454 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| cis-1,2-Dichloroethene | <0.000504 | U | 0.00199 | 0.000504 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| trans-1,2-Dichloroethene | <0.000460 | U | 0.00199 | 0.000460 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichloropropane | <0.000584 | U | 0.00199 | 0.000584 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3-Dichloropropane | <0.000333 | U | 0.00199 | 0.000333 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2,2-Dichloropropane | <0.000590 | U | 0.00199 | 0.000590 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloropropene | <0.000307 | U | 0.00199 | 0.000307 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| cis-1,3-Dichloropropene | <0.000616 | U | 0.00199 | 0.000616 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| trans-1,3-Dichloropropene | <0.000508 | U | 0.00199 | 0.000508 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Ethylbenzene | <0.000385 | U | 0.00199 | 0.000385 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Hexachlorobutadiene | <0.000549 | U | 0.00199 | 0.000549 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Isopropylbenzene | <0.000375 | U | 0.00199 | 0.000375 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Methylene Chloride | <0.00132 | U | 0.00498 | 0.00132 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| MTBE | <0.000584 | U | 0.00199 | 0.000584 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Naphthalene | <0.000667 | U | 0.00199 | 0.000667 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| N-Propylbenzene | <0.000514 | U | 0.00199 | 0.000514 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Styrene | <0.000515 | U | 0.00199 | 0.000515 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000458 | U | 0.00199 | 0.000458 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000681 | U | 0.00199 | 0.000681 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Tetrachloroethylene | <0.000453 | U | 0.00199 | 0.000453 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |

Eurofins Dallas

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: MB 870-34798/3-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Toluene | <0.000558 | U | 0.00199 | 0.000558 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,3-Trichlorobenzene | <0.000450 | U | 0.00199 | 0.000450 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,4-Trichlorobenzene | <0.000718 | U | 0.00199 | 0.000718 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,1-Trichloroethane | <0.000498 | U | 0.00199 | 0.000498 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,2-Trichloroethane | <0.000673 | U | 0.00199 | 0.000673 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Trichloroethene | <0.000459 | U | 0.00199 | 0.000459 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Trichlorofluoromethane | <0.000839 | U | 0.00199 | 0.000839 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,3-Trichloropropane | <0.000583 | U | 0.00199 | 0.000583 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,4-Trimethylbenzene | <0.000559 | U | 0.00199 | 0.000559 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3,5-Trimethylbenzene | <0.000552 | U | 0.00199 | 0.000552 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| m,p-Xylenes | <0.000227 | U | 0.00199 | 0.000227 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| o-Xylene | <0.000398 | U | 0.00199 | 0.000398 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Xylenes, Total | <0.000398 | U | 0.00199 | 0.000398 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Vinyl chloride | <0.00190 | U | 0.00498 | 0.00190 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |

| *Surrogate* | *MB %Recovery* | *MB Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *99* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *Dibromofluoromethane (Surr)* | *97* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *Toluene-d8 (Surr)* | *102* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |

**Lab Sample ID: LCS 870-34798/1-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Benzene | 0.0506 | 0.05131 | | mg/Kg | | 101 | 70 - 130 |
| Bromobenzene | 0.0506 | 0.05362 | | mg/Kg | | 106 | 70 - 130 |
| Bromochloromethane | 0.0505 | 0.05170 | | mg/Kg | | 102 | 70 - 130 |
| Bromodichloromethane | 0.0507 | 0.05642 | | mg/Kg | | 111 | 70 - 130 |
| Bromoform | 0.0507 | 0.05641 | | mg/Kg | | 111 | 70 - 130 |
| Bromomethane | 0.0504 | 0.05173 | | mg/Kg | | 103 | 70 - 130 |
| 2-Butanone | 0.503 | 0.4996 | | mg/Kg | | 99 | 70 - 130 |
| n-Butylbenzene | 0.0507 | 0.05645 | | mg/Kg | | 111 | 70 - 130 |
| sec-Butylbenzene | 0.0506 | 0.05618 | | mg/Kg | | 111 | 70 - 130 |
| tert-Butylbenzene | 0.0506 | 0.05529 | | mg/Kg | | 109 | 70 - 130 |
| Carbon tetrachloride | 0.0506 | 0.06290 | | mg/Kg | | 124 | 70 - 130 |
| Chlorobenzene | 0.0505 | 0.05230 | | mg/Kg | | 104 | 70 - 130 |
| Chloroethane | 0.0503 | 0.04873 | | mg/Kg | | 97 | 70 - 130 |
| Chloroform | 0.0504 | 0.05908 | | mg/Kg | | 117 | 70 - 130 |
| Chloromethane | 0.0505 | 0.04426 | | mg/Kg | | 88 | 70 - 130 |
| 2-Chlorotoluene | 0.0505 | 0.05379 | | mg/Kg | | 106 | 70 - 130 |
| 4-Chlorotoluene | 0.0506 | 0.05495 | | mg/Kg | | 109 | 70 - 130 |
| p-Cymene (p-Isopropyltoluene) | 0.0506 | 0.05566 | | mg/Kg | | 110 | 70 - 130 |
| Dibromochloromethane | 0.0506 | 0.05804 | | mg/Kg | | 115 | 70 - 130 |
| 1,2-Dibromo-3-Chloropropane | 0.0506 | 0.05935 | | mg/Kg | | 117 | 70 - 130 |
| 1,2-Dibromoethane | 0.0506 | 0.05368 | | mg/Kg | | 106 | 70 - 130 |
| Dibromomethane | 0.0505 | 0.05279 | | mg/Kg | | 104 | 70 - 130 |



Ex. 9

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCS 870-34798/1-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| 1,2-Dichlorobenzene | 0.0504 | 0.05274 | | mg/Kg | | 105 | 70 - 130 |
| 1,3-Dichlorobenzene | 0.0505 | 0.05319 | | mg/Kg | | 105 | 70 - 130 |
| 1,4-Dichlorobenzene | 0.0507 | 0.05240 | | mg/Kg | | 103 | 70 - 130 |
| Dichlorodifluoromethane | 0.0502 | 0.06062 | | mg/Kg | | 121 | 70 - 130 |
| 1,1-Dichloroethane | 0.0505 | 0.05018 | | mg/Kg | | 99 | 70 - 130 |
| 1,2-Dichloroethane | 0.0506 | 0.05261 | | mg/Kg | | 104 | 70 - 130 |
| 1,1-Dichloroethene | 0.0507 | 0.05466 | | mg/Kg | | 108 | 70 - 130 |
| cis-1,2-Dichloroethene | 0.0505 | 0.05215 | | mg/Kg | | 103 | 70 - 130 |
| trans-1,2-Dichloroethene | 0.0507 | 0.05371 | | mg/Kg | | 106 | 70 - 130 |
| 1,2-Dichloropropane | 0.0505 | 0.04908 | | mg/Kg | | 97 | 70 - 130 |
| 1,3-Dichloropropane | 0.0506 | 0.05134 | | mg/Kg | | 101 | 70 - 130 |
| 2,2-Dichloropropane | 0.0506 | 0.05739 | | mg/Kg | | 113 | 70 - 130 |
| 1,1-Dichloropropene | 0.0506 | 0.05363 | | mg/Kg | | 106 | 70 - 130 |
| cis-1,3-Dichloropropene | 0.0503 | 0.05351 | | mg/Kg | | 106 | 70 - 130 |
| trans-1,3-Dichloropropene | 0.0505 | 0.05370 | | mg/Kg | | 106 | 70 - 130 |
| Ethylbenzene | 0.0506 | 0.05490 | | mg/Kg | | 109 | 70 - 130 |
| Hexachlorobutadiene | 0.0506 | 0.05429 | | mg/Kg | | 107 | 70 - 130 |
| Isopropylbenzene | 0.0505 | 0.05517 | | mg/Kg | | 109 | 70 - 130 |
| Methylene Chloride | 0.0505 | 0.05444 | | mg/Kg | | 108 | 70 - 130 |
| MTBE | 0.0505 | 0.04943 | | mg/Kg | | 98 | 70 - 130 |
| Naphthalene | 0.0506 | 0.05515 | | mg/Kg | | 109 | 70 - 130 |
| N-Propylbenzene | 0.0506 | 0.05523 | | mg/Kg | | 109 | 70 - 130 |
| Styrene | 0.0506 | 0.05450 | | mg/Kg | | 108 | 70 - 130 |
| 1,1,1,2-Tetrachloroethane | 0.0506 | 0.05612 | | mg/Kg | | 111 | 70 - 130 |
| 1,1,2,2-Tetrachloroethane | 0.0507 | 0.05229 | | mg/Kg | | 103 | 70 - 130 |
| Tetrachloroethylene | 0.0506 | 0.05756 | | mg/Kg | | 114 | 70 - 130 |
| Toluene | 0.0506 | 0.05130 | | mg/Kg | | 101 | 70 - 130 |
| 1,2,3-Trichlorobenzene | 0.0506 | 0.05395 | | mg/Kg | | 107 | 70 - 130 |
| 1,2,4-Trichlorobenzene | 0.0505 | 0.05678 | | mg/Kg | | 112 | 70 - 130 |
| 1,1,1-Trichloroethane | 0.0503 | 0.05650 | | mg/Kg | | 112 | 70 - 130 |
| 1,1,2-Trichloroethane | 0.0504 | 0.05062 | | mg/Kg | | 100 | 70 - 130 |
| Trichloroethene | 0.0507 | 0.05453 | | mg/Kg | | 108 | 70 - 130 |
| Trichlorofluoromethane | 0.0502 | 0.05976 | | mg/Kg | | 119 | 70 - 130 |
| 1,2,3-Trichloropropane | 0.0506 | 0.05262 | | mg/Kg | | 104 | 70 - 130 |
| 1,2,4-Trimethylbenzene | 0.0505 | 0.05634 | | mg/Kg | | 111 | 70 - 130 |
| 1,3,5-Trimethylbenzene | 0.0505 | 0.05532 | | mg/Kg | | 110 | 70 - 130 |
| m,p-Xylenes | 0.0502 | 0.05368 | | mg/Kg | | 107 | 70 - 130 |
| o-Xylene | 0.0505 | 0.05446 | | mg/Kg | | 108 | 70 - 130 |
| Vinyl chloride | 0.0505 | 0.05166 | | mg/Kg | | 102 | 70 - 130 |

| *Surrogate* | *LCS %Recovery* | *LCS Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *103* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *101* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* |



Ex. 9

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCSD 870-34798/2-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | 0.0503 | 0.04450 | | mg/Kg | | 89 | 70 - 130 | 14 | 25 |
| Bromobenzene | 0.0503 | 0.04558 | | mg/Kg | | 91 | 70 - 130 | 16 | 25 |
| Bromochloromethane | 0.0502 | 0.04490 | | mg/Kg | | 89 | 70 - 130 | 14 | 25 |
| Bromodichloromethane | 0.0504 | 0.04818 | | mg/Kg | | 96 | 70 - 130 | 16 | 25 |
| Bromoform | 0.0503 | 0.04781 | | mg/Kg | | 95 | 70 - 130 | 16 | 25 |
| Bromomethane | 0.0501 | 0.05369 | | mg/Kg | | 107 | 70 - 130 | 4 | 25 |
| 2-Butanone | 0.500 | 0.4066 | | mg/Kg | | 81 | 70 - 130 | 21 | 25 |
| n-Butylbenzene | 0.0504 | 0.04839 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| sec-Butylbenzene | 0.0503 | 0.04816 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| tert-Butylbenzene | 0.0503 | 0.04757 | | mg/Kg | | 94 | 70 - 130 | 15 | 25 |
| Carbon tetrachloride | 0.0503 | 0.05382 | | mg/Kg | | 107 | 70 - 130 | 16 | 25 |
| Chlorobenzene | 0.0502 | 0.04512 | | mg/Kg | | 90 | 70 - 130 | 15 | 25 |
| Chloroethane | 0.0500 | 0.05358 | | mg/Kg | | 107 | 70 - 130 | 9 | 25 |
| Chloroform | 0.0501 | 0.05216 | | mg/Kg | | 104 | 70 - 130 | 12 | 25 |
| Chloromethane | 0.0502 | 0.04900 | | mg/Kg | | 98 | 70 - 130 | 10 | 25 |
| 2-Chlorotoluene | 0.0502 | 0.04604 | | mg/Kg | | 92 | 70 - 130 | 16 | 25 |
| 4-Chlorotoluene | 0.0503 | 0.04655 | | mg/Kg | | 93 | 70 - 130 | 17 | 25 |
| p-Cymene (p-Isopropyltoluene) | 0.0503 | 0.04806 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| Dibromochloromethane | 0.0502 | 0.04853 | | mg/Kg | | 97 | 70 - 130 | 18 | 25 |
| 1,2-Dibromo-3-Chloropropane | 0.0503 | 0.04775 | | mg/Kg | | 95 | 70 - 130 | 22 | 25 |
| 1,2-Dibromoethane | 0.0503 | 0.04522 | | mg/Kg | | 90 | 70 - 130 | 17 | 25 |
| Dibromomethane | 0.0502 | 0.04500 | | mg/Kg | | 90 | 70 - 130 | 16 | 25 |
| 1,2-Dichlorobenzene | 0.0501 | 0.04463 | | mg/Kg | | 89 | 70 - 130 | 17 | 25 |
| 1,3-Dichlorobenzene | 0.0502 | 0.04566 | | mg/Kg | | 91 | 70 - 130 | 15 | 25 |
| 1,4-Dichlorobenzene | 0.0503 | 0.04463 | | mg/Kg | | 89 | 70 - 130 | 16 | 25 |
| Dichlorodifluoromethane | 0.0499 | 0.06346 | | mg/Kg | | 127 | 70 - 130 | 5 | 25 |
| 1,1-Dichloroethane | 0.0502 | 0.04414 | | mg/Kg | | 88 | 70 - 130 | 13 | 25 |
| 1,2-Dichloroethane | 0.0503 | 0.04584 | | mg/Kg | | 91 | 70 - 130 | 14 | 25 |
| 1,1-Dichloroethene | 0.0504 | 0.04747 | | mg/Kg | | 94 | 70 - 130 | 14 | 25 |
| cis-1,2-Dichloroethene | 0.0502 | 0.04518 | | mg/Kg | | 90 | 70 - 130 | 14 | 25 |
| trans-1,2-Dichloroethene | 0.0504 | 0.04726 | | mg/Kg | | 94 | 70 - 130 | 13 | 25 |
| 1,2-Dichloropropane | 0.0502 | 0.04290 | | mg/Kg | | 85 | 70 - 130 | 13 | 25 |
| 1,3-Dichloropropane | 0.0503 | 0.04388 | | mg/Kg | | 87 | 70 - 130 | 16 | 25 |
| 2,2-Dichloropropane | 0.0503 | 0.05013 | | mg/Kg | | 100 | 70 - 130 | 13 | 25 |
| 1,1-Dichloropropene | 0.0503 | 0.04663 | | mg/Kg | | 93 | 70 - 130 | 14 | 25 |
| cis-1,3-Dichloropropene | 0.0500 | 0.04530 | | mg/Kg | | 91 | 70 - 130 | 17 | 25 |
| trans-1,3-Dichloropropene | 0.0502 | 0.04601 | | mg/Kg | | 92 | 70 - 130 | 15 | 25 |
| Ethylbenzene | 0.0503 | 0.04731 | | mg/Kg | | 94 | 70 - 130 | 15 | 25 |
| Hexachlorobutadiene | 0.0503 | 0.04640 | | mg/Kg | | 92 | 70 - 130 | 16 | 25 |
| Isopropylbenzene | 0.0502 | 0.04777 | | mg/Kg | | 95 | 70 - 130 | 14 | 25 |
| Methylene Chloride | 0.0502 | 0.04777 | | mg/Kg | | 95 | 70 - 130 | 13 | 25 |
| MTBE | 0.0502 | 0.04231 | | mg/Kg | | 84 | 70 - 130 | 16 | 25 |
| Naphthalene | 0.0503 | 0.04478 | | mg/Kg | | 89 | 70 - 130 | 21 | 25 |
| N-Propylbenzene | 0.0503 | 0.04701 | | mg/Kg | | 93 | 70 - 130 | 16 | 25 |
| Styrene | 0.0503 | 0.04674 | | mg/Kg | | 93 | 70 - 130 | 15 | 25 |
| 1,1,1,2-Tetrachloroethane | 0.0502 | 0.04809 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| 1,1,2,2-Tetrachloroethane | 0.0504 | 0.04302 | | mg/Kg | | 85 | 70 - 130 | 19 | 25 |
| Tetrachloroethylene | 0.0503 | 0.04900 | | mg/Kg | | 97 | 70 - 130 | 16 | 25 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCSD 870-34798/2-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Toluene | 0.0503 | 0.04377 | | mg/Kg | | 87 | 70 - 130 | 16 | 25 |
| 1,2,3-Trichlorobenzene | 0.0503 | 0.04458 | | mg/Kg | | 89 | 70 - 130 | 19 | 25 |
| 1,2,4-Trichlorobenzene | 0.0502 | 0.04815 | | mg/Kg | | 96 | 70 - 130 | 16 | 25 |
| 1,1,1-Trichloroethane | 0.0500 | 0.04909 | | mg/Kg | | 98 | 70 - 130 | 14 | 25 |
| 1,1,2-Trichloroethane | 0.0501 | 0.04336 | | mg/Kg | | 86 | 70 - 130 | 15 | 25 |
| Trichloroethene | 0.0504 | 0.04709 | | mg/Kg | | 93 | 70 - 130 | 15 | 25 |
| Trichlorofluoromethane | 0.0499 | 0.06317 | | mg/Kg | | 127 | 70 - 130 | 6 | 25 |
| 1,2,3-Trichloropropane | 0.0503 | 0.04330 | | mg/Kg | | 86 | 70 - 130 | 19 | 25 |
| 1,2,4-Trimethylbenzene | 0.0502 | 0.04772 | | mg/Kg | | 95 | 70 - 130 | 17 | 25 |
| 1,3,5-Trimethylbenzene | 0.0502 | 0.04698 | | mg/Kg | | 94 | 70 - 130 | 16 | 25 |
| m,p-Xylenes | 0.0499 | 0.04602 | | mg/Kg | | 92 | 70 - 130 | 15 | 25 |
| o-Xylene | 0.0502 | 0.04652 | | mg/Kg | | 93 | 70 - 130 | 16 | 25 |
| Vinyl chloride | 0.0502 | 0.05723 | | mg/Kg | | 114 | 70 - 130 | 10 | 25 |

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *103* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* |

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000459 | U | 0.0501 | 0.05164 | | mg/Kg | ☼ | 103 | 70 - 130 |
| Bromobenzene | <0.000737 | U | 0.0501 | 0.05252 | | mg/Kg | ☼ | 105 | 70 - 130 |
| Bromochloromethane | <0.000578 | U | 0.0501 | 0.05894 | | mg/Kg | ☼ | 118 | 70 - 130 |
| Bromodichloromethane | <0.000598 | U | 0.0503 | 0.05945 | | mg/Kg | ☼ | 118 | 70 - 130 |
| Bromoform | <0.000820 | U | 0.0502 | 0.06468 | | mg/Kg | ☼ | 129 | 70 - 130 |
| Bromomethane | <0.00107 | U | 0.0500 | 0.05398 | | mg/Kg | ☼ | 108 | 70 - 130 |
| 2-Butanone | <0.00706 | U | 0.498 | 0.5915 | | mg/Kg | ☼ | 119 | 70 - 130 |
| n-Butylbenzene | <0.000307 | U | 0.0502 | 0.04366 | | mg/Kg | ☼ | 87 | 70 - 130 |
| sec-Butylbenzene | <0.000490 | U | 0.0502 | 0.04813 | | mg/Kg | ☼ | 96 | 70 - 130 |
| tert-Butylbenzene | <0.000469 | U | 0.0502 | 0.04981 | | mg/Kg | ☼ | 99 | 70 - 130 |
| Carbon tetrachloride | <0.000405 | U | 0.0502 | 0.06029 | | mg/Kg | ☼ | 120 | 70 - 130 |
| Chlorobenzene | <0.000464 | U | 0.0501 | 0.05175 | | mg/Kg | ☼ | 103 | 70 - 130 |
| Chloroethane | <0.000415 | U | 0.0498 | 0.04536 | | mg/Kg | ☼ | 91 | 70 - 130 |
| Chloroform | <0.000434 | U | 0.0500 | 0.06164 | | mg/Kg | ☼ | 123 | 70 - 130 |
| Chloromethane | <0.000502 | U | 0.0501 | 0.04151 | | mg/Kg | ☼ | 83 | 70 - 130 |
| 2-Chlorotoluene | <0.000249 | U | 0.0501 | 0.04971 | | mg/Kg | ☼ | 99 | 70 - 130 |
| 4-Chlorotoluene | <0.000556 | U | 0.0501 | 0.04924 | | mg/Kg | ☼ | 98 | 70 - 130 |
| p-Cymene (p-Isopropyltoluene) | <0.00128 | U | 0.0501 | 0.04728 | | mg/Kg | ☼ | 94 | 70 - 130 |
| Dibromochloromethane | <0.000159 | U | 0.0501 | 0.06310 | | mg/Kg | ☼ | 126 | 70 - 130 |
| 1,2-Dibromo-3-Chloropropane | <0.000996 | U | 0.0501 | 0.07196 | N1 | mg/Kg | ☼ | 144 | 70 - 130 |
| 1,2-Dibromoethane | <0.000566 | U | 0.0501 | 0.06191 | | mg/Kg | ☼ | 123 | 70 - 130 |
| Dibromomethane | <0.000287 | U | 0.0501 | 0.06090 | | mg/Kg | ☼ | 122 | 70 - 130 |
| 1,2-Dichlorobenzene | <0.000361 | U | 0.0500 | 0.04916 | | mg/Kg | ☼ | 98 | 70 - 130 |

Eurofins Dallas





Ex. 9

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| 1,3-Dichlorobenzene | <0.000457 | U | 0.0501 | 0.04701 | | mg/Kg | ☼ | 94 | 70 - 130 |
| 1,4-Dichlorobenzene | <0.000454 | U | 0.0502 | 0.04622 | | mg/Kg | ☼ | 92 | 70 - 130 |
| Dichlorodifluoromethane | <0.000498 | U | 0.0498 | 0.04997 | | mg/Kg | ☼ | 100 | 70 - 130 |
| 1,1-Dichloroethane | <0.000519 | U | 0.0500 | 0.05242 | | mg/Kg | ☼ | 105 | 70 - 130 |
| 1,2-Dichloroethane | <0.000336 | U | 0.0502 | 0.05978 | | mg/Kg | ☼ | 119 | 70 - 130 |
| 1,1-Dichloroethene | <0.000417 | U | 0.0503 | 0.05498 | | mg/Kg | ☼ | 109 | 70 - 130 |
| cis-1,2-Dichloroethene | <0.000463 | U | 0.0501 | 0.05484 | | mg/Kg | ☼ | 110 | 70 - 130 |
| trans-1,2-Dichloroethene | <0.000423 | U | 0.0503 | 0.05424 | | mg/Kg | ☼ | 108 | 70 - 130 |
| 1,2-Dichloropropane | <0.000536 | U | 0.0501 | 0.05176 | | mg/Kg | ☼ | 103 | 70 - 130 |
| 1,3-Dichloropropane | <0.000306 | U | 0.0502 | 0.05877 | | mg/Kg | ☼ | 117 | 70 - 130 |
| 2,2-Dichloropropane | <0.000542 | U | 0.0502 | 0.05600 | | mg/Kg | ☼ | 112 | 70 - 130 |
| 1,1-Dichloropropene | <0.000282 | U | 0.0502 | 0.05382 | | mg/Kg | ☼ | 107 | 70 - 130 |
| cis-1,3-Dichloropropene | <0.000566 | U | 0.0498 | 0.05614 | | mg/Kg | ☼ | 113 | 70 - 130 |
| trans-1,3-Dichloropropene | <0.000467 | U | 0.0501 | 0.05729 | | mg/Kg | ☼ | 114 | 70 - 130 |
| Ethylbenzene | <0.000354 | U | 0.0501 | 0.05322 | | mg/Kg | ☼ | 106 | 70 - 130 |
| Hexachlorobutadiene | <0.000504 | U | 0.0502 | 0.03236 | N1 | mg/Kg | ☼ | 64 | 70 - 130 |
| Isopropylbenzene | <0.000345 | U | 0.0501 | 0.05254 | | mg/Kg | ☼ | 105 | 70 - 130 |
| Methylene Chloride | <0.00121 | U | 0.0501 | 0.05932 | | mg/Kg | ☼ | 118 | 70 - 130 |
| MTBE | <0.000536 | U | 0.0501 | 0.05975 | | mg/Kg | ☼ | 119 | 70 - 130 |
| Naphthalene | <0.000613 | U | 0.0502 | 0.05327 | | mg/Kg | ☼ | 106 | 70 - 130 |
| N-Propylbenzene | <0.000472 | U | 0.0501 | 0.04956 | | mg/Kg | ☼ | 99 | 70 - 130 |
| Styrene | <0.000473 | U | 0.0502 | 0.05384 | | mg/Kg | ☼ | 107 | 70 - 130 |
| 1,1,1,2-Tetrachloroethane | <0.000421 | U | 0.0501 | 0.05805 | | mg/Kg | ☼ | 116 | 70 - 130 |
| 1,1,2,2-Tetrachloroethane | <0.000626 | U | 0.0502 | 0.05970 | | mg/Kg | ☼ | 119 | 70 - 130 |
| Tetrachloroethylene | <0.000416 | U | 0.0502 | 0.05358 | | mg/Kg | ☼ | 107 | 70 - 130 |
| Toluene | <0.000512 | U | 0.0502 | 0.04981 | | mg/Kg | ☼ | 99 | 70 - 130 |
| 1,2,3-Trichlorobenzene | <0.000414 | U | 0.0501 | 0.03724 | | mg/Kg | ☼ | 74 | 70 - 130 |
| 1,2,4-Trichlorobenzene | <0.000660 | U | 0.0501 | 0.03890 | | mg/Kg | ☼ | 78 | 70 - 130 |
| 1,1,1-Trichloroethane | <0.000458 | U | 0.0499 | 0.05708 | | mg/Kg | ☼ | 114 | 70 - 130 |
| 1,1,2-Trichloroethane | <0.000619 | U | 0.0500 | 0.05792 | | mg/Kg | ☼ | 116 | 70 - 130 |
| Trichloroethene | <0.000422 | U | 0.0503 | 0.05469 | | mg/Kg | ☼ | 109 | 70 - 130 |
| Trichlorofluoromethane | <0.000770 | U | 0.0498 | 0.05611 | | mg/Kg | ☼ | 113 | 70 - 130 |
| 1,2,3-Trichloropropane | <0.000535 | U | 0.0502 | 0.06113 | | mg/Kg | ☼ | 122 | 70 - 130 |
| 1,2,4-Trimethylbenzene | <0.000513 | U | 0.0501 | 0.05004 | | mg/Kg | ☼ | 100 | 70 - 130 |
| 1,3,5-Trimethylbenzene | <0.000507 | U | 0.0501 | 0.04923 | | mg/Kg | ☼ | 98 | 70 - 130 |
| m,p-Xylenes | 0.000657 | J | 0.0498 | 0.05115 | | mg/Kg | ☼ | 101 | 70 - 130 |
| o-Xylene | <0.000366 | U | 0.0501 | 0.05314 | | mg/Kg | ☼ | 106 | 70 - 130 |
| Vinyl chloride | <0.00175 | U | 0.0500 | 0.04658 | | mg/Kg | ☼ | 93 | 70 - 130 |

| *Surrogate* | *MS %Recovery* | *MS Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *115* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *106* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *98* | | *78 - 138* |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Lab Sample ID: MB 860-288981/1-A**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | <0.00207 | U | 0.0100 | 0.00207 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Acenaphthylene | <0.00143 | U | 0.0100 | 0.00143 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Anthracene | <0.00199 | U | 0.0100 | 0.00199 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[a]anthracene | <0.00151 | U | 0.00500 | 0.00151 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[a]pyrene | <0.00195 | U | 0.00500 | 0.00195 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[b]fluoranthene | <0.00214 | U | 0.0100 | 0.00214 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[g,h,i]perylene | <0.00191 | U | 0.0100 | 0.00191 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[k]fluoranthene | <0.00195 | U | 0.0100 | 0.00195 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Chrysene | <0.00182 | U | 0.0100 | 0.00182 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Dibenz(a,h)anthracene | <0.00202 | U | 0.00500 | 0.00202 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Fluoranthene | <0.00248 | U | 0.0100 | 0.00248 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Fluorene | <0.00191 | U | 0.0100 | 0.00191 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Indeno[1,2,3-cd]pyrene | <0.00276 | U | 0.0100 | 0.00276 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Naphthalene | <0.00286 | U | 0.0100 | 0.00286 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Phenanthrene | <0.00309 | U | 0.0100 | 0.00309 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Pyrene | <0.00223 | U | 0.0100 | 0.00223 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |

| *Surrogate* | *MB %Recovery* | *MB Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *2-Fluorobiphenyl* | *73* | | *37 - 130* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |
| *Nitrobenzene-d5 (Surr)* | *59* | | *36 - 131* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |
| *p-Terphenyl-d14 (Surr)* | *72* | | *40 - 130* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |

**Lab Sample ID: LCS 860-288981/2-A**
**Matrix: Solid**
**Analysis Batch: 289133**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.100 | 0.08470 | | mg/Kg | | 85 | 60 - 130 |
| Acenaphthylene | 0.100 | 0.07639 | | mg/Kg | | 76 | 41 - 130 |
| Anthracene | 0.100 | 0.08005 | | mg/Kg | | 80 | 45 - 130 |
| Benzo[a]anthracene | 0.100 | 0.08655 | | mg/Kg | | 87 | 42 - 130 |
| Benzo[a]pyrene | 0.100 | 0.08098 | | mg/Kg | | 81 | 42 - 130 |
| Benzo[b]fluoranthene | 0.100 | 0.09297 | | mg/Kg | | 93 | 50 - 130 |
| Benzo[g,h,i]perylene | 0.100 | 0.09717 | | mg/Kg | | 97 | 40 - 130 |
| Benzo[k]fluoranthene | 0.100 | 0.1021 | | mg/Kg | | 102 | 40 - 130 |
| Chrysene | 0.100 | 0.08728 | | mg/Kg | | 87 | 43 - 130 |
| Dibenz(a,h)anthracene | 0.100 | 0.1002 | | mg/Kg | | 100 | 44 - 130 |
| Fluoranthene | 0.100 | 0.08295 | | mg/Kg | | 83 | 55 - 130 |
| Fluorene | 0.100 | 0.08243 | | mg/Kg | | 82 | 50 - 130 |
| Indeno[1,2,3-cd]pyrene | 0.100 | 0.08565 | | mg/Kg | | 86 | 43 - 130 |
| Naphthalene | 0.100 | 0.07984 | | mg/Kg | | 80 | 49 - 130 |
| Phenanthrene | 0.100 | 0.07969 | | mg/Kg | | 80 | 50 - 130 |
| Pyrene | 0.100 | 0.08562 | | mg/Kg | | 86 | 55 - 130 |

| *Surrogate* | *LCS %Recovery* | *LCS Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *82* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *93* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *78* | | *40 - 130* |

Eurofins Dallas





Ex. 9

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Lab Sample ID: LCSD 860-288981/3-A**
**Matrix: Solid**
**Analysis Batch: 289133**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | | | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | | | 0.100 | 0.08790 | | mg/Kg | | 88 | 60 - 130 | 4 | 30 |
| Acenaphthylene | | | 0.100 | 0.07510 | | mg/Kg | | 75 | 41 - 130 | 2 | 30 |
| Anthracene | | | 0.100 | 0.08511 | | mg/Kg | | 85 | 45 - 130 | 6 | 30 |
| Benzo[a]anthracene | | | 0.100 | 0.08742 | | mg/Kg | | 87 | 42 - 130 | 1 | 30 |
| Benzo[a]pyrene | | | 0.100 | 0.07672 | | mg/Kg | | 77 | 42 - 130 | 5 | 30 |
| Benzo[b]fluoranthene | | | 0.100 | 0.08811 | | mg/Kg | | 88 | 50 - 130 | 5 | 30 |
| Benzo[g,h,i]perylene | | | 0.100 | 0.09383 | | mg/Kg | | 94 | 40 - 130 | 3 | 30 |
| Benzo[k]fluoranthene | | | 0.100 | 0.09826 | | mg/Kg | | 98 | 40 - 130 | 4 | 30 |
| Chrysene | | | 0.100 | 0.08778 | | mg/Kg | | 88 | 43 - 130 | 1 | 30 |
| Dibenz(a,h)anthracene | | | 0.100 | 0.09688 | | mg/Kg | | 97 | 44 - 130 | 3 | 30 |
| Fluoranthene | | | 0.100 | 0.08415 | | mg/Kg | | 84 | 55 - 130 | 1 | 30 |
| Fluorene | | | 0.100 | 0.08286 | | mg/Kg | | 83 | 50 - 130 | 1 | 30 |
| Indeno[1,2,3-cd]pyrene | | | 0.100 | 0.08840 | | mg/Kg | | 88 | 43 - 130 | 3 | 30 |
| Naphthalene | | | 0.100 | 0.07892 | | mg/Kg | | 79 | 49 - 130 | 1 | 30 |
| Phenanthrene | | | 0.100 | 0.08269 | | mg/Kg | | 83 | 50 - 130 | 4 | 30 |
| Pyrene | | | 0.100 | 0.08551 | | mg/Kg | | 86 | 55 - 130 | 0 | 30 |

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *84* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *88* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *80* | | *40 - 130* |

**Lab Sample ID: LCSD 860-288981/5-A**
**Matrix: Solid**
**Analysis Batch: 289133**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *82* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *88* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *76* | | *40 - 130* |

**Lab Sample ID: 860-122968-J-3-B MS**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.00539 | J | 0.106 | 0.09342 | | mg/Kg | ☼ | 83 | 60 - 130 |
| Acenaphthylene | 0.00230 | J | 0.106 | 0.09518 | | mg/Kg | ☼ | 88 | 41 - 130 |
| Anthracene | 0.0102 | J | 0.106 | 0.09541 | | mg/Kg | ☼ | 81 | 45 - 130 |
| Benzo[a]anthracene | 0.0249 | | 0.106 | 0.1151 | | mg/Kg | ☼ | 85 | 42 - 130 |
| Benzo[a]pyrene | 0.0149 | | 0.106 | 0.1010 | | mg/Kg | ☼ | 82 | 42 - 130 |
| Benzo[b]fluoranthene | 0.0129 | | 0.106 | 0.1045 | | mg/Kg | ☼ | 87 | 50 - 130 |
| Benzo[g,h,i]perylene | 0.00987 | J | 0.106 | 0.1027 | | mg/Kg | ☼ | 88 | 40 - 130 |
| Benzo[k]fluoranthene | 0.00394 | J | 0.106 | 0.09868 | | mg/Kg | ☼ | 90 | 40 - 130 |
| Chrysene | 0.0418 | | 0.106 | 0.09997 | | mg/Kg | ☼ | 55 | 43 - 130 |
| Dibenz(a,h)anthracene | 0.00384 | J | 0.106 | 0.1015 | | mg/Kg | ☼ | 93 | 44 - 130 |
| Fluoranthene | 0.0215 | | 0.106 | 0.1110 | | mg/Kg | ☼ | 85 | 55 - 130 |
| Fluorene | 0.00934 | J | 0.106 | 0.09117 | | mg/Kg | ☼ | 78 | 50 - 130 |

Eurofins Dallas



1/21/2026

Ex. 9

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS) (Continued)

**Lab Sample ID: 860-122968-J-3-B MS**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Indeno[1,2,3-cd]pyrene | 0.00580 | J | 0.106 | 0.1078 | | mg/Kg | ☼ | 97 | 43 - 130 |
| Naphthalene | 0.00426 | J | 0.106 | 0.07767 | | mg/Kg | ☼ | 70 | 49 - 130 |
| Phenanthrene | 0.0215 | | 0.106 | 0.09516 | | mg/Kg | ☼ | 70 | 50 - 130 |
| Pyrene | 0.0470 | | 0.106 | 0.1183 | | mg/Kg | ☼ | 68 | 55 - 130 |

| *Surrogate* | *MS %Recovery* | *MS Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *68* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *75* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *77* | | *40 - 130* |

**Lab Sample ID: 860-122968-J-3-C MSD**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike Duplicate**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.00539 | J | 0.106 | 0.09650 | | mg/Kg | ☼ | 86 | 60 - 130 | 3 | 30 |
| Acenaphthylene | 0.00230 | J | 0.106 | 0.09869 | | mg/Kg | ☼ | 91 | 41 - 130 | 4 | 30 |
| Anthracene | 0.0102 | J | 0.106 | 0.09815 | | mg/Kg | ☼ | 83 | 45 - 130 | 3 | 30 |
| Benzo[a]anthracene | 0.0249 | | 0.106 | 0.1180 | | mg/Kg | ☼ | 88 | 42 - 130 | 2 | 30 |
| Benzo[a]pyrene | 0.0149 | | 0.106 | 0.1029 | | mg/Kg | ☼ | 83 | 42 - 130 | 2 | 30 |
| Benzo[b]fluoranthene | 0.0129 | | 0.106 | 0.1065 | | mg/Kg | ☼ | 89 | 50 - 130 | 2 | 30 |
| Benzo[g,h,i]perylene | 0.00987 | J | 0.106 | 0.1066 | | mg/Kg | ☼ | 92 | 40 - 130 | 4 | 30 |
| Benzo[k]fluoranthene | 0.00394 | J | 0.106 | 0.1007 | | mg/Kg | ☼ | 92 | 40 - 130 | 2 | 30 |
| Chrysene | 0.0418 | | 0.106 | 0.09983 | | mg/Kg | ☼ | 55 | 43 - 130 | 0 | 30 |
| Dibenz(a,h)anthracene | 0.00384 | J | 0.106 | 0.1051 | | mg/Kg | ☼ | 96 | 44 - 130 | 3 | 30 |
| Fluoranthene | 0.0215 | | 0.106 | 0.1125 | | mg/Kg | ☼ | 86 | 55 - 130 | 1 | 30 |
| Fluorene | 0.00934 | J | 0.106 | 0.09159 | | mg/Kg | ☼ | 78 | 50 - 130 | 0 | 30 |
| Indeno[1,2,3-cd]pyrene | 0.00580 | J | 0.106 | 0.1111 | | mg/Kg | ☼ | 100 | 43 - 130 | 3 | 30 |
| Naphthalene | 0.00426 | J | 0.106 | 0.07896 | | mg/Kg | ☼ | 71 | 49 - 130 | 2 | 30 |
| Phenanthrene | 0.0215 | | 0.106 | 0.09655 | | mg/Kg | ☼ | 71 | 50 - 130 | 1 | 30 |
| Pyrene | 0.0470 | | 0.106 | 0.1186 | | mg/Kg | ☼ | 68 | 55 - 130 | 0 | 30 |

| *Surrogate* | *MSD %Recovery* | *MSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *71* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *78* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *80* | | *40 - 130* |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Lab Sample ID: MB 870-34808/3-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| >C12-C28 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| >C28-C35 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Lab Sample ID: MB 870-34808/3-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Surrogate | MB %Recovery | MB Qualifier | Limits | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *106* | | *70 - 130* | *01/12/26 15:58* | *01/13/26 23:42* | *1* |
| *o-Terphenyl (Surr)* | *103* | | *70 - 130* | *01/12/26 15:58* | *01/13/26 23:42* | *1* |

**Lab Sample ID: LCS 870-34808/1-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 967 | 977.5 | | mg/Kg | | 101 | 75 - 125 |
| >C12-C28 Range Hydrocarbons | 970 | 968.9 | | mg/Kg | | 100 | 75 - 125 |

| Surrogate | LCS %Recovery | LCS Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *103* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: LCSD 870-34808/2-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 953 | 1003 | | mg/Kg | | 105 | 75 - 125 | 3 | 20 |
| >C12-C28 Range Hydrocarbons | 956 | 977.2 | | mg/Kg | | 102 | 75 - 125 | 1 | 20 |

| Surrogate | LCSD %Recovery | LCSD Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *104* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 831 | 889.9 | | mg/Kg | ☼ | 107 | 75 - 125 |
| >C12-C28 Range Hydrocarbons | 35.5 | J | 833 | 858.9 | | mg/Kg | ☼ | 99 | 75 - 125 |

| Surrogate | MS %Recovery | MS Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *106* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: 870-43022-1 MSD**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 831 | 851.2 | | mg/Kg | ☼ | 102 | 75 - 125 | 4 | 20 |
| >C12-C28 Range Hydrocarbons | 35.5 | J | 833 | 850.2 | | mg/Kg | ☼ | 98 | 75 - 125 | 1 | 20 |

Eurofins Dallas



1/21/2026

Ex. 9

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Lab Sample ID: 870-43022-1 MSD**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Surrogate | MSD %Recovery | MSD Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *102* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *100* | | *70 - 130* |

## Method: 300.0 - Anions, Ion Chromatography

**Lab Sample ID: MB 860-287869/1-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.00 | U | 10.0 | 5.00 | mg/Kg | | 01/13/26 15:44 | 01/13/26 18:59 | 1 |

**Lab Sample ID: LCS 860-287869/2-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Chloride | 100 | 100.7 | | mg/Kg | | 101 | 90 - 110 |

**Lab Sample ID: LCSD 860-287869/3-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 100 | 102.3 | | mg/Kg | | 102 | 90 - 110 | 2 | 20 |

**Lab Sample ID: 820-22982-D-1-B MS**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 528 | J | 9900 | 10930 | | mg/Kg | | 105 | 90 - 110 |

**Lab Sample ID: 820-22982-D-1-C MSD**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Matrix Spike Duplicate**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chloride | 528 | J | 9900 | 10840 | | mg/Kg | | 104 | 90 - 110 | 1 | 15 |

## Method: 6020B - Metals (ICP/MS)

**Lab Sample ID: MB 860-287918/1-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Barium | <0.137 | U | 0.400 | 0.137 | mg/Kg | | 01/13/26 17:28 | 01/14/26 12:40 | 1 |

Eurofins Dallas



Ex. 9

# QC Sample Results



## Method: 6020B - Metals (ICP/MS) (Continued)

**Lab Sample ID: LCS 860-287918/2-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Barium | 10.0 | 10.02 | | mg/Kg | | 100 | 80 - 120 |

**Lab Sample ID: LCSD 860-287918/3-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Barium | 10.0 | 10.10 | | mg/Kg | | 101 | 80 - 120 | 1 | 20 |

## Method: 9045D - pH

**Lab Sample ID: 870-43022-13 DU**
**Matrix: Solid**
**Analysis Batch: 34848**

**Client Sample ID: SB-06 (6'-7')**
**Prep Type: Soluble**

| Analyte | Sample Result | Sample Qualifier | DU Result | DU Qualifier | Unit | D | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|
| soil pH measured in water at deg C | 9.0 | | 9.1 | | S.U. | | 1 | 20 |
| Temperature | 20.6 | | 20.5 | | Celsius | | 0.5 | 20 |



Ex. 9

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## GC/MS VOA

### Analysis Batch: 34789

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 8260C | 34798 |
| MB 870-34798/3-A | Method Blank | Total/NA | Solid | 8260C | 34798 |
| LCS 870-34798/1-A | Lab Control Sample | Total/NA | Solid | 8260C | 34798 |
| LCSD 870-34798/2-A | Lab Control Sample Dup | Total/NA | Solid | 8260C | 34798 |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | 8260C | 34798 |

### Prep Batch: 34798

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | 5035 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 5035 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | 5035 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | 5035 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 5035 | |
| MB 870-34798/3-A | Method Blank | Total/NA | Solid | 5035 | |
| LCS 870-34798/1-A | Lab Control Sample | Total/NA | Solid | 5035 | |
| LCSD 870-34798/2-A | Lab Control Sample Dup | Total/NA | Solid | 5035 | |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | 5035 | |

## GC/MS Semi VOA

### Analysis Batch: 288963

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 8270E | 288981 |

### Prep Batch: 288981

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 3546 | |
| MB 860-288981/1-A | Method Blank | Total/NA | Solid | 3546 | |
| LCS 860-288981/2-A | Lab Control Sample | Total/NA | Solid | 3546 | |
| LCSD 860-288981/3-A | Lab Control Sample Dup | Total/NA | Solid | 3546 | |
| LCSD 860-288981/5-A | Lab Control Sample Dup | Total/NA | Solid | 3546 | |
| 860-122968-J-3-B MS | Matrix Spike | Total/NA | Solid | 3546 | |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 3546 | |

### Analysis Batch: 289133

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| LCS 860-288981/2-A | Lab Control Sample | Total/NA | Solid | 8270E | 288981 |
| LCSD 860-288981/3-A | Lab Control Sample Dup | Total/NA | Solid | 8270E | 288981 |
| LCSD 860-288981/5-A | Lab Control Sample Dup | Total/NA | Solid | 8270E | 288981 |

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## GC/MS Semi VOA

### Analysis Batch: 289497

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| MB 860-288981/1-A | Method Blank | Total/NA | Solid | 8270E | 288981 |
| 860-122968-J-3-B MS | Matrix Spike | Total/NA | Solid | 8270E | 288981 |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 8270E | 288981 |

## GC Semi VOA

### Prep Batch: 34808

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX_1005_S_Prep | |
| MB 870-34808/3-A | Method Blank | Total/NA | Solid | TX_1005_S_Prep | |
| LCS 870-34808/1-A | Lab Control Sample | Total/NA | Solid | TX_1005_S_Prep | |
| LCSD 870-34808/2-A | Lab Control Sample Dup | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-1 MSD | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |

### Analysis Batch: 34830

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX 1005 | 34808 |
| MB 870-34808/3-A | Method Blank | Total/NA | Solid | TX 1005 | 34808 |
| LCS 870-34808/1-A | Lab Control Sample | Total/NA | Solid | TX 1005 | 34808 |
| LCSD 870-34808/2-A | Lab Control Sample Dup | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-1 MSD | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |

Eurofins Dallas



1/21/2026

Ex. 9

# QC Association Summary



## GC Semi VOA

### Analysis Batch: 34876

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX 1005 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX 1005 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX 1005 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX 1005 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX 1005 | |

## HPLC/IC

### Analysis Batch: 287702

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 300.0 | 287869 |
| MB 860-287869/1-A | Method Blank | Total/NA | Solid | 300.0 | 287869 |
| LCS 860-287869/2-A | Lab Control Sample | Total/NA | Solid | 300.0 | 287869 |
| LCSD 860-287869/3-A | Lab Control Sample Dup | Total/NA | Solid | 300.0 | 287869 |
| 820-22982-D-1-B MS | Matrix Spike | Total/NA | Solid | 300.0 | 287869 |
| 820-22982-D-1-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 300.0 | 287869 |

### Prep Batch: 287869

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 300_Prep | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 300_Prep | |
| MB 860-287869/1-A | Method Blank | Total/NA | Solid | 300_Prep | |
| LCS 860-287869/2-A | Lab Control Sample | Total/NA | Solid | 300_Prep | |
| LCSD 860-287869/3-A | Lab Control Sample Dup | Total/NA | Solid | 300_Prep | |
| 820-22982-D-1-B MS | Matrix Spike | Total/NA | Solid | 300_Prep | |
| 820-22982-D-1-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 300_Prep | |

## Metals

### Prep Batch: 287918

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 3051A | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 3051A | |
| MB 860-287918/1-A | Method Blank | Total/NA | Solid | 3051A | |
| LCS 860-287918/2-A | Lab Control Sample | Total/NA | Solid | 3051A | |

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Metals (Continued)

### Prep Batch: 287918 (Continued)

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| LCSD 860-287918/3-A | Lab Control Sample Dup | Total/NA | Solid | 3051A | |

### Analysis Batch: 288184

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 6020B | 287918 |
| MB 860-287918/1-A | Method Blank | Total/NA | Solid | 6020B | 287918 |
| LCS 860-287918/2-A | Lab Control Sample | Total/NA | Solid | 6020B | 287918 |
| LCSD 860-287918/3-A | Lab Control Sample Dup | Total/NA | Solid | 6020B | 287918 |

## General Chemistry

### Analysis Batch: 34815

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | Moisture - 2540 | |
| MB 870-34815/1 | Method Blank | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-13 DU | SB-06 (6'-7') | Total/NA | Solid | Moisture - 2540 | |

### Leach Batch: 34843

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-3 | SB-02 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-5 | SB-03 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-8 | SB-04 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-10 | SB-05 (2'-3') | Soluble | Solid | DI Leach | |
| 870-43022-13 | SB-06 (6'-7') | Soluble | Solid | DI Leach | |
| 870-43022-13 DU | SB-06 (6'-7') | Soluble | Solid | DI Leach | |

### Analysis Batch: 34848

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-3 | SB-02 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-5 | SB-03 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-8 | SB-04 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-10 | SB-05 (2'-3') | Soluble | Solid | 9045D | 34843 |
| 870-43022-13 | SB-06 (6'-7') | Soluble | Solid | 9045D | 34843 |
| 870-43022-13 DU | SB-06 (6'-7') | Soluble | Solid | 9045D | 34843 |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-01 (3'-4')**
**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-1**
**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 00:04 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.03 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.03 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

**Client Sample ID: SB-01 (3'-4')**
**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-1**
**Matrix: Solid**
**Percent Solids: 89.5**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.107 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/12/26 22:16 | MC | EET DAL |
| Total/NA | Prep | 3546 | | | 5.2 g | 5 mL | 288981 | 01/19/26 04:51 | TH | EET HOU |
| Total/NA | Analysis | 8270E | | 1 | 1 mL | 1 mL | 288963 | 01/19/26 15:39 | DB | EET HOU |
| Total/NA | Prep | TX_1005_S_Prep | | | 12.948 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 00:04 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.01 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 20:57 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:47 | DP | EET HOU |

**Client Sample ID: SB-02 (3'-4')**
**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-3**
**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 01:30 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.02 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.02 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

**Client Sample ID: SB-02 (3'-4')**
**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-3**
**Matrix: Solid**
**Percent Solids: 82.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 4.731 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/12/26 23:20 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.733 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 01:30 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.05 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:06 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:43 | DP | EET HOU |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

Lab Sample ID: 870-43022-5
Date Collected: 01/09/26 11:20
Matrix: Solid
Date Received: 01/10/26 09:15

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 01:51 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.06 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.06 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-03 (3'-4')

Lab Sample ID: 870-43022-5
Date Collected: 01/09/26 11:20
Matrix: Solid
Date Received: 01/10/26 09:15
Percent Solids: 88.9

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 7.113 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 00:02 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 13.068 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 01:51 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.04 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:15 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:40 | DP | EET HOU |

## Client Sample ID: SB-03 (5'-6')

Lab Sample ID: 870-43022-6
Date Collected: 01/09/26 11:30
Matrix: Solid
Date Received: 01/10/26 09:15

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 02:12 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-03 (5'-6')

Lab Sample ID: 870-43022-6
Date Collected: 01/09/26 11:30
Matrix: Solid
Date Received: 01/10/26 09:15
Percent Solids: 91.8

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.627 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 00:23 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.76 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 02:12 | AGB | EET DAL |

## Client Sample ID: SB-04 (3'-4')

Lab Sample ID: 870-43022-8
Date Collected: 01/09/26 12:20
Matrix: Solid
Date Received: 01/10/26 09:15

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 02:34 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.08 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.08 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-04 (3'-4')** — **Lab Sample ID: 870-43022-8**
**Date Collected: 01/09/26 12:20** — **Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

**Client Sample ID: SB-04 (3'-4')** — **Lab Sample ID: 870-43022-8**
**Date Collected: 01/09/26 12:20** — **Matrix: Solid**
**Date Received: 01/10/26 09:15** — **Percent Solids: 95.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.015 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 01:06 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.85 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 02:34 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.03 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:24 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:36 | DP | EET HOU |

**Client Sample ID: SB-05 (2'-3')** — **Lab Sample ID: 870-43022-10**
**Date Collected: 01/09/26 13:50** — **Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:16 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.08 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.08 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

**Client Sample ID: SB-05 (2'-3')** — **Lab Sample ID: 870-43022-10**
**Date Collected: 01/09/26 13:50** — **Matrix: Solid**
**Date Received: 01/10/26 09:15** — **Percent Solids: 86.0**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.224 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 01:48 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 15.774 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:16 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.00 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:33 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:33 | DP | EET HOU |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (8'-9')

**Lab Sample ID: 870-43022-11**
**Date Collected: 01/09/26 13:55**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:38 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-05 (8'-9')

**Lab Sample ID: 870-43022-11**
**Date Collected: 01/09/26 13:55**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.01 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:09 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 13.38 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:38 | AGB | EET DAL |

## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:59 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.241 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:31 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 14.521 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:59 | AGB | EET DAL |

## Client Sample ID: SB-06 (6'-7')

**Lab Sample ID: 870-43022-13**
**Date Collected: 01/09/26 14:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 04:20 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.04 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.04 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-06 (6'-7')**
**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-13**
**Matrix: Solid**
**Percent Solids: 90.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.614 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:52 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 10.339 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 04:20 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.041 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:42 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:30 | DP | EET HOU |

**Laboratory References:**

EET DAL = Eurofins Dallas, 9701 Harry Hines Blvd, Dallas, TX 75220, TEL (214)902-0300
EET HOU = Eurofins Houston, 4145 Greenbriar Dr, Stafford, TX 77477, TEL (281)240-4200



Ex. 9

# Accreditation/Certification Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Laboratory: Eurofins Dallas

Unless otherwise noted, all analytes for this laboratory were covered under each accreditation/certification below.

| Authority | Program | Identification Number | Expiration Date |
| --- | --- | --- | --- |
| Texas | NELAP | T104704295 | 06-30-26 |

The following analytes are included in this report, but the laboratory is not certified by the governing authority. This list may include analytes for which the agency does not offer certification.

| Analysis Method | Prep Method | Matrix | Analyte |
| --- | --- | --- | --- |
| 9045D | | Solid | Temperature |
| Moisture - 2540 | | Solid | Percent Moisture |

## Laboratory: Eurofins Houston

The accreditations/certifications listed below are applicable to this report.

| Authority | Program | Identification Number | Expiration Date |
| --- | --- | --- | --- |
| Texas | NELAP | T104704215 | 06-30-26 |

# Method Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

| Method | Method Description | Protocol | Laboratory |
|---|---|---|---|
| 8260C | Volatile Organic Compounds by GC/MS | SW846 | EET DAL |
| 8270E | Semivolatile Organic Compounds (GC-MS/MS) | SW846 | EET HOU |
| TX 1005 | Texas - Total Petroleum Hydrocarbon (GC) | TCEQ | EET DAL |
| 300.0 | Anions, Ion Chromatography | EPA | EET HOU |
| 6020B | Metals (ICP/MS) | SW846 | EET HOU |
| 9045D | pH | SW846 | EET DAL |
| Moisture - 2540 | Percent Moisture | SM | EET DAL |
| 300_Prep | Anions, Ion Chromatography, 10% Wt/Vol | EPA | EET HOU |
| 3051A | Preparation, Metals, Microwave Assisted | SW846 | EET HOU |
| 3546 | Microwave Extraction | SW846 | EET HOU |
| 5035 | Closed System Purge and Trap | SW846 | EET DAL |
| DI Leach | Deionized Water Leaching Procedure | ASTM | EET DAL |
| TX_1005_S_Prep | Extraction - Texas Total petroleum Hyrdocarbons | TCEQ | EET DAL |

**Protocol References:**

ASTM = ASTM International
EPA = US Environmental Protection Agency
SM = "Standard Methods For The Examination Of Water And Wastewater"
SW846 = "Test Methods For Evaluating Solid Waste, Physical/Chemical Methods", Third Edition, November 1986 And Its Updates.
TCEQ = Texas Commission of Environmental Quality

**Laboratory References:**

EET DAL = Eurofins Dallas, 9701 Harry Hines Blvd, Dallas, TX 75220, TEL (214)902-0300
EET HOU = Eurofins Houston, 4145 Greenbriar Dr, Stafford, TX 77477, TEL (281)240-4200

# Sample Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

| Lab Sample ID | Client Sample ID | Matrix | Collected | Received | Sample Origin |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Solid | 01/09/26 10:05 | 01/10/26 09:15 | Texas |
| 870-43022-3 | SB-02 (3'-4') | Solid | 01/09/26 11:00 | 01/10/26 09:15 | Texas |
| 870-43022-5 | SB-03 (3'-4') | Solid | 01/09/26 11:20 | 01/10/26 09:15 | Texas |
| 870-43022-6 | SB-03 (5'-6') | Solid | 01/09/26 11:30 | 01/10/26 09:15 | Texas |
| 870-43022-8 | SB-04 (3'-4') | Solid | 01/09/26 12:20 | 01/10/26 09:15 | Texas |
| 870-43022-10 | SB-05 (2'-3') | Solid | 01/09/26 13:50 | 01/10/26 09:15 | Texas |
| 870-43022-11 | SB-05 (8'-9') | Solid | 01/09/26 13:55 | 01/10/26 09:15 | Texas |
| 870-43022-12 | SB-06 (2'-3') | Solid | 01/09/26 14:10 | 01/10/26 09:15 | Texas |
| 870-43022-13 | SB-06 (6'-7') | Solid | 01/09/26 14:20 | 01/10/26 09:15 | Texas |

eurofins | Environment Testing

# Chain of Custody

Houston, TX (281) 240-4200, Dallas, TX (214) 902-0300
Midland, TX (432) 704-5440, San Antonio, TX (210) 509-3334
EL Paso, TX (915) 585-3443, Lubbock, TX (806) 794-1296
Hobbs, NM (575) 392-7550, Carlsbad, NM (575) 988-3199
Little Rock, AR (501) 224-5060

Work Order No: ______

Page 1 of 2

| | | | |
|---|---|---|---|
| Project Manager: | Danielle Fehrenbach | Bill to: (if different) | Tera Burns |
| Company Name: | Whitehead ES | Company Name: | → |
| Address: | 906 E 18th St, Ste 100 | Address: | → |
| City, State ZIP: | Plano, TX 75074 | City, State ZIP: | → |
| Phone: | (469) 609-8080 | Email: | tburns@whiteheades.com |

**Work Order Comments**

Program: UST/PST ☐ PRP ☐ Brownfields ☐ RRC ☐ Superfund ☐
State of Project:
Reporting: Level II ☐ Level III ☐ PST/UST ☐ TRRP ☒ Level IV ☐
Deliverables: EDD ☒ ADaPT ☐ Other:

| | | | |
|---|---|---|---|
| Project Name: | Cresson Moon Props | Turn Around | ☐ Routine ☑ Rush |
| Project Number: | 379.001 | | |
| Project Location: | Cresson, TX | Due Date: | 1/14/26 |
| Sampler's Name: | CK/EM | TAT starts the day received by the lab, if received by 4:30pm | |
| PO #: | | | |

| SAMPLE RECEIPT | Temp Blank: | Yes No | Wet Ice: | Yes No |
|---|---|---|---|---|
| Samples Received Intact: | Yes No | Thermometer ID: | | |
| Cooler Custody Seals: | Yes No N/A | Correction Factor: | | |
| Sample Custody Seals: | Yes No N/A | Temperature Reading: | | |
| Total Containers: | | Corrected Temperature: | | |

ANALYSIS REQUEST — Pres. Code: Me+Ct+Di →

870-43022 Chain of Custody

**Preservative Codes**
None: NO  DI Water: $H_2O$
Zn Acetate+NaOH: Zn
NaOH+Ascorbic Acid: SAPC

| Sample Identification | Matrix | Date Sampled | Time Sampled | Depth | Grab/Comp | # of Cont | TPH TX1005 | VOCs 8260 | BTEX 8260 | PAH 8270 | Ba 6010/6020 | Cl 300.0 | pH 9045D | Sample Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SB-01 (3'-4') | S | 1/9 | 10:05 | 3-4 | G | 8 | X | X | | Hold | X | X | X | Hold trip blank |
| SB-01 (19') | ↓ | ↓ | 10:35 | 14' | ↓ | 8 | Hold → | | | | | | | Hold all samples |
| SB-02 (3'-4') | | | 11:00 | 3-4' | | 8 | X | X | | | X | X | X | for PAH |
| SB-02 (8-9') | | | 11:10 | 8-9' | | 8 | Hold → | | | | | | | Hold SB-01 (19'), |
| SB-03 (3-4') | | | 11:20 | 3-4' | | 8 | X | X | | | X | X | X | SB-03 (15'), |
| SB-03 (5-6') | | | 11:30 | 5-6' | | 7 | X | X | X | | | | | SB-02 (8-9'), |
| SB-05 (15') | | | 11:40 | 15' | | 7 | Hold → | | | | | | | SB-04 (24') |
| SB-04 (3-4') | | | 12:20 | 3-4' | | 8 | X | X | | | X | X | X | SB-03 (5-6') run |
| SB-04 (24') | | | 13:00 | 24' | | 7 | Hold → | | | | | | | for BTEX, not full suite |
| SB-05 (2-3') | ↓ | ↓ | 13:50 | 2-3' | ↓ | 8 | X | X | | ↓ | X | X | X | |

EM NFE 1/9/26

Total 200.7 / 6010 200.8 / 6020: 8RCRA 13PPM Texas 11 Al Sb As Ba Be B Cd Ca Cr Co Cu Fe Pb Mg Mn Mo Ni K Se Ag $SiO_2$ Na Sr Tl Sn U V Zn
Circle Method(s) and Metal(s) to be analyzed TCLP / SPLP 6010: 8RCRA Sb As Ba Be Cd Cr Co Cu Pb Mn Mo Ni Se Ag Tl U Hg: 1631 / 245.1 / 7470 / 7471

**Notice: Signature of this document and relinquishment of samples constitutes a valid purchase order from client company to Eurofins Xenco, its affiliates and subcontractors. It assigns standard terms and conditions of service. Eurofins Xenco will be liable only for the cost of samples and shall not assume any responsibility for any losses or expenses incurred by the client if such losses are due to circumstances beyond the control of Eurofins Xenco. A minimum charge of $85.00 will be applied to each project and a charge of $5 for each sample submitted to Eurofins Xenco, but not analyzed. These terms will be enforced unless previously negotiated.**

| Relinquished by: (Signature) | Received by: (Signature) | Date/Time | Relinquished by: (Signature) | Received by: (Signature) | Date/Time |
|---|---|---|---|---|---|
| 1 Elena Muir | Michael Whitney | 1/10/26 8:15 | 2 [signature] | [signature] | 1/10/26 9:15 |
| 3 | | | 4 | | |
| 5 | | | 6 | | |

THM-035 c/f -0.1 4.8/4.7

Revised Date: 08/25/2020 Rev. 2020.2



1/21/2026 Ex. 9

eurofins | Environment Testing

# Chain of Custody

Houston, TX (281) 240-4200, Dallas, TX (214) 902-0300
Midland, TX (432) 704-5440, San Antonio, TX (210) 509-3334
EL Paso, TX (915) 585-3443, Lubbock, TX (806) 794-1296
Hobbs, NM (575) 392-7550, Carlsbad, NM (575) 988-3199
Little Rock, AR (501) 224-5060

Work Order No: ______

Page 2 of 2

| | | | |
|---|---|---|---|
| Project Manager: | D. Fehrenbach | Bill to: (if different) | Tera Burns |
| Company Name: | Whitehead ES → | Company Name: | → |
| Address: | 900 E 18th St, Ste 100 → | Address: | → |
| City, State ZIP: | Plano, TX 75074 → | City, State ZIP: | → |
| Phone: | (469) 609-8080 | Email: | tburns@whiteheades.com |

**Work Order Comments**

Program: UST/PST ☐ PRP ☐ Brownfields ☐ RRC ☐ Superfund ☐
State of Project:
Reporting: Level II ☐ Level III ☐ PST/UST ☐ TRRP ☒ Level IV ☐
Deliverables: EDD ☒ ADaPT ☐ Other:

| | | | |
|---|---|---|---|
| Project Name: | Cresson Moon Prop | Turn Around | ☐ Routine ☒ Rush |
| Project Number: | 379.001 | Due Date: | 1/14/26 |
| Project Location: | Cresson, TX | TAT starts the day received by the lab, if received by 4:30pm | |
| Sampler's Name: | CK/EM | | |
| PO #: | | | |

| SAMPLE RECEIPT | Temp Blank: Yes No | Wet Ice: Yes No |
|---|---|---|
| Samples Received Intact: | Yes No | Thermometer ID: |
| Cooler Custody Seals: | Yes No N/A | Correction Factor: |
| Sample Custody Seals: | Yes No N/A | Temperature Reading: |
| Total Containers: | | Corrected Temperature: |

Pres. Code: MeOH+Cool+DI →

ANALYSIS REQUEST (Parameters)

| Sample Identification | Matrix | Date Sampled | Time Sampled | Depth | Grab/Comp | # of Cont | TPH TX 1005 | VOCs 8260 | BTEX 8260 | PAH 8270 | Ba 6010/6020 | Cl 300.0 | pH 9045D | Sample Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SB-05 (8-9') | S | 1/9 | 13:55 | 8-9' | G | 7 | X | | X | Hold | | | | |
| SB-06 (2-3') | ↓ | ↓ | 14:10 | 2-3' | ↓ | 8 | X | | X | | | | | Hold trip blank |
| SB-06 (6-7') | ↓ | ↓ | 14:20 | 6-7' | ↓ | 7 | X | X | | ↓ | X | X | X | Hold all samples for PAH |
| Trip Blank | L | — | — | — | — | 2 | Hold → | | | | | | | |

NFE EM 1/9/26

**Preservative Codes**

None: NO — DI Water: $H_2O$
Cool: Cool — MeOH: Me
HCL: HC — $HNO_3$
$H_2SO_4$: $H_2$ — NaOH: Na
$H_3PO_4$: HP
$NaHSO_4$: NABIS
$Na_2S_2O_3$: $NaSO_3$
Zn Acetate+NaOH: Zn
NaOH+Ascorbic Acid: SAPC

Total 200.7 / 6010 200.8 / 6020: 8RCRA 13PPM Texas 11 Al Sb As Ba Be B Cd Ca Cr Co Cu Fe Pb Mg Mn Mo Ni K Se Ag $SiO_2$ Na Sr Tl Sn U V Zn

Circle Method(s) and Metal(s) to be analyzed TCLP / SPLP 6010: 8RCRA Sb As Ba Be Cd Cr Co Cu Pb Mn Mo Ni Se Ag Tl U Hg: 1631 / 245.1 / 7470 / 7471

**Notice: Signature of this document and relinquishment of samples constitutes a valid purchase order from client company to Eurofins Xenco, its affiliates and subcontractors. It assigns standard terms and conditions of service. Eurofins Xenco will be liable only for the cost of samples and shall not assume any responsibility for any losses or expenses incurred by the client if such losses are due to circumstances beyond the control of Eurofins Xenco. A minimum charge of $85.00 will be applied to each project and a charge of $5 for each sample submitted to Eurofins Xenco, but not analyzed. These terms will be enforced unless previously negotiated.**

| Relinquished by: (Signature) | Received by: (Signature) | Date/Time | Relinquished by: (Signature) | Received by: (Signature) | Date/Time |
|---|---|---|---|---|---|
| 1 Elena Muir | [signature] | 1/10; 09:15 | 2 | [signature] | 1/10/26 9:15 |
| 3 | | | 4 | | |
| 5 | | | 6 | | |

Revised Date: 08/25/2020 Rev. 2020.2



1/21/2026 Ex. 9

**Eurofins Dallas**
9701 Harry Hines Blvd
Dallas, TX 75220
Phone: 214-902-0300

# Chain of Custody Record

eurofins | Environment Testing

| Client Information (Sub Contract Lab) | Sampler: N/A | Lab PM: Kimmel, Mike M | Carrier Tracking No(s): N/A | COC No: 870-9754.1 |
|---|---|---|---|---|
| Client Contact: Shipping/Receiving | Phone: N/A | E-Mail: Mike.Kimmel@et.eurofinsus.com | State of Origin: Texas | Page: Page 1 of 2 |
| Company: Eurofins Environment Testing South Centr | | Accreditations Required (See note): NELAP Texas | | Job #: 870-43022-1 |
| Address: 4145 Greenbriar Dr | Due Date Requested: 1/14/2026 | | | Preservation Codes: |
| City: Stafford | TAT Requested (days): N/A | | | |
| State, Zip: TX, 77477 | | | | |
| Phone: 281-240-4200(Tel) | PO #: N/A | | | |
| Email: N/A | WO #: N/A | | | |
| Project Name: Cresson Moon Props | Project #: 87000328 | | | Other N/A |
| Site: N/A | SSOW#: N/A | | | |

**Analysis Requested**

| Sample Identification Client ID (Lab ID) | Sample Date | Sample Time | Sample Type (C=Comp, G=grab) | Matrix (W=water, S=solid, O=waste/oil, BT=Tissue, A=Air) | Field Filtered Sample (Yes or No) | Perform MS/MSD (Yes or No) | 8270E_QQQ/3546(MOD) Polycyclic Aromatic Hydrocarbons (Hold) | 6020B/3051A(MOD) 6020- Pb | 300_ORGFM_28D/300_PrepChloride-E300 | 6020B/3051A(MOD) 6020- Pb (Hold) | 300_ORGFM_28D/300_PrepChloride-E300 (Hold) | Total Number of containers | Special Instructions/Note: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Preservation Code: | | | | | | | | | | |
| SB-01 (3'-4') (870-43022-1) | 1/9/26 | 10:05 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-01 (19') (870-43022-2) | 1/9/26 | 10:35 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-02 (3'-4') (870-43022-3) | 1/9/26 | 11:00 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-02 (8'-9') (870-43022-4) | 1/9/26 | 11 10 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-03 (3'-4') (870-43022-5) | 1/9/26 | 11:20 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-03 (5'-6') (870-43022-6) | 1/9/26 | 11:30 Central | G | Solid | | | X | | | | | 1 | |
| SB-03 (15') (870-43022-7) | 1/9/26 | 11:40 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-04 (3'-4') (870-43022-8) | 1/9/26 | 12:20 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-04 (24') (870-43022-9) | 1/9/26 | 13:00 Central | G | Solid | | | X | | | X | X | 1 | |

Note: Since laboratory accreditations are subject to change, Eurofins Environment Testing South Central, LLC places the ownership of method, analyte & accreditation compliance upon our subcontract laboratories. This sample shipment is forwarded under chain-of-custody. If the laboratory does not currently maintain accreditation in the State of Origin listed above for analysis/tests/matrix being analyzed, the samples must be shipped back to the Eurofins Environment Testing South Central, LLC laboratory or other instructions will be provided. Any changes to accreditation status should be brought to Eurofins Environment Testing South Central, LLC attention immediately. If all requested accreditations are current to date, return the signed Chain of Custody attesting to said compliance to Eurofins Environment Testing South Central, LLC.

*Possible Hazard Identification*
Unconfirmed

*Sample Disposal ( A fee may be assessed if samples are retained longer than 1 month)*
☐ Return To Client ☐ Disposal By Lab ☐ Archive For ____ Months

Deliverable Requested: I, II, III, IV, Other (specify) | Primary Deliverable Rank: 2 | Special Instructions/QC Requirements:

| | | | | | |
|---|---|---|---|---|---|
| Empty Kit Relinquished by: | | Date: | Time: | Method of Shipment: | |
| Relinquished by: [signature] | Date/Time: | Company | Received by: DS | Date/Time: 1/13 | Company |
| Relinquished by: | Date/Time: | Company | Received by: | Date/Time: | Company |
| Relinquished by: | Date/Time: 01/12/26 - 1710 | Company | Received by: | Date/Time: | Company |
| Custody Seals Intact: Δ Yes Δ No | Custody Seal No.: | | Cooler Temperature(s) °C and Other Remarks: HOU368 2.0 | | |

Ver: 10/10/2024



Ex. 9
13

# Login Sample Receipt Checklist

Client: Whitehead ES LLC

Job Number: 870-43022-1
SDG Number: 379.001

**Login Number: 43022**
**List Number: 1**
**Creator: Virani, Tycho L**

**List Source: Eurofins Dallas**

| Question | Answer | Comment |
|---|---|---|
| The cooler's custody seal, if present, is intact. | N/A | |
| Sample custody seals, if present, are intact. | N/A | |
| The cooler or samples do not appear to have been compromised or tampered with. | True | |
| Samples were received on ice. | True | |
| Cooler Temperature is acceptable. | True | |
| Cooler Temperature is recorded. | True | |
| COC is present. | True | |
| COC is filled out in ink and legible. | True | |
| COC is filled out with all pertinent information. | True | |
| Is the Field Sampler's name present on COC? | True | |
| There are no discrepancies between the containers received and the COC. | True | |
| Samples are received within Holding Time (excluding tests with immediate HTs) | False | Refer to Job Narrative for details. |
| Sample containers have legible labels. | True | |
| Containers are not broken or leaking. | True | |
| Sample collection date/times are provided. | True | |
| Appropriate sample containers are used. | True | |
| Sample bottles are completely filled. | True | |
| Sample Preservation Verified. | True | |
| There is sufficient vol. for all requested analyses, incl. any requested MS/MSDs | True | |
| Containers requiring zero headspace have no headspace or bubble is <6mm (1/4"). | True | |



Ex. 9

# Login Sample Receipt Checklist

Client: Whitehead ES LLC

Job Number: 870-43022-1
SDG Number: 379.001

**Login Number: 43022**
**List Number: 2**
**Creator: Silva, Daniel**

**List Source: Eurofins Houston**
**List Creation: 01/13/26 09:27 AM**

| Question | Answer | Comment |
|---|---|---|
| The cooler's custody seal, if present, is intact. | True | |
| Sample custody seals, if present, are intact. | N/A | |
| The cooler or samples do not appear to have been compromised or tampered with. | True | |
| Samples were received on ice. | True | |
| Cooler Temperature is acceptable. | True | |
| Cooler Temperature is recorded. | True | |
| COC is present. | True | |
| COC is filled out in ink and legible. | True | |
| COC is filled out with all pertinent information. | True | |
| Is the Field Sampler's name present on COC? | True | |
| There are no discrepancies between the containers received and the COC. | True | |
| Samples are received within Holding Time (excluding tests with immediate HTs) | True | |
| Sample containers have legible labels. | True | |
| Containers are not broken or leaking. | True | |
| Sample collection date/times are provided. | True | |
| Appropriate sample containers are used. | True | |
| Sample bottles are completely filled. | True | |
| Sample Preservation Verified. | True | |
| There is sufficient vol. for all requested analyses, incl. any requested MS/MSDs | True | |
| Containers requiring zero headspace have no headspace or bubble is <6mm (1/4"). | True | |



Ex. 9

# Detection Check Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Matrix: Solid** | **Prep Type: Total/NA**
**Prep Method: 5035-Closed System Purge and Trap**
**Instrument: A375** | **Detector: MSD/0** | **Column: DB-624-20m**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Benzene | 0.00101 | 0.000991 | J | mg/Kg | 0.00200 | 0.000502 | 09/11/2025 | 870-31690 |
| tert-Butylbenzene | 0.00101 | 0.000912 | J | mg/Kg | 0.00200 | 0.000513 | 09/11/2025 | 870-31690 |
| Carbon tetrachloride | 0.00101 | 0.000718 | J | mg/Kg | 0.00200 | 0.000443 | 09/11/2025 | 870-31690 |
| MTBE | 0.00101 | 0.00108 | J | mg/Kg | 0.00200 | 0.000586 | 09/11/2025 | 870-31690 |
| Chlorobenzene | 0.00101 | 0.000937 | J | mg/Kg | 0.00200 | 0.000507 | 09/11/2025 | 870-31690 |
| Chloroethane | 0.00100 | 0.000780 | J | mg/Kg | 0.00200 | 0.000453 | 09/11/2025 | 870-31690 |
| Chloroform | 0.00100 | <0.000474 | U | mg/Kg | 0.00200 | 0.000474 | 07/21/2025 | 870-30229 |
| Chloromethane | 0.00100 | 0.000940 | J | mg/Kg | 0.00200 | 0.000549 | 09/11/2025 | 870-31690 |
| 2-Chlorotoluene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000272 | 09/11/2025 | 870-31690 |
| 4-Chlorotoluene | 0.00101 | 0.000982 | J | mg/Kg | 0.00200 | 0.000608 | 09/11/2025 | 870-31690 |
| p-Cymene (p-Isopropyltoluene) | 0.00101 | <0.00140 | U | mg/Kg | 0.00500 | 0.00140 | 09/11/2025 | 870-31690 |
| Dibromochloromethane | 0.00101 | 0.000861 | J | mg/Kg | 0.00200 | 0.000174 | 09/11/2025 | 870-31690 |
| Bromobenzene | 0.00101 | 0.000870 | J | mg/Kg | 0.00200 | 0.000805 | 09/11/2025 | 870-31690 |
| Toluene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000560 | 09/11/2025 | 870-31690 |
| 1,2-Dibromo-3-Chloropropane | 0.00101 | <0.00109 | U | mg/Kg | 0.00500 | 0.00109 | 09/11/2025 | 870-31690 |
| 1,2-Dibromoethane | 0.00101 | 0.00106 | J | mg/Kg | 0.00200 | 0.000618 | 09/11/2025 | 870-31690 |
| Dibromomethane | 0.00101 | 0.00113 | J | mg/Kg | 0.00200 | 0.000314 | 09/11/2025 | 870-31690 |
| 1,2-Dichlorobenzene | 0.00100 | 0.000997 | J | mg/Kg | 0.00200 | 0.000395 | 09/11/2025 | 870-31690 |
| 1,3-Dichlorobenzene | 0.00101 | 0.000997 | J | mg/Kg | 0.00200 | 0.000499 | 09/11/2025 | 870-31690 |
| 1,4-Dichlorobenzene | 0.00101 | 0.00110 | J | mg/Kg | 0.00200 | 0.000496 | 09/11/2025 | 870-31690 |
| Dichlorodifluoromethane | 0.00101 | <0.000544 | U | mg/Kg | 0.00200 | 0.000544 | 09/11/2025 | 870-31690 |
| 1,1-Dichloroethane | 0.00101 | 0.000895 | J | mg/Kg | 0.00200 | 0.000567 | 09/11/2025 | 870-31690 |
| 1,2-Dichloroethane | 0.00101 | 0.00104 | J | mg/Kg | 0.00200 | 0.000367 | 09/11/2025 | 870-31690 |
| 1,1-Dichloroethene | 0.00101 | 0.000640 | J | mg/Kg | 0.00200 | 0.000456 | 09/11/2025 | 870-31690 |
| Bromochloromethane | 0.00101 | 0.000886 | J | mg/Kg | 0.00200 | 0.000632 | 09/11/2025 | 870-31690 |
| Ethylbenzene | 0.00101 | 0.00104 | J | mg/Kg | 0.00200 | 0.000387 | 09/11/2025 | 870-31690 |
| cis-1,2-Dichloroethene | 0.00101 | <0.000506 | U | mg/Kg | 0.00200 | 0.000506 | 09/11/2025 | 870-31690 |
| trans-1,2-Dichloroethene | 0.00101 | 0.000862 | J | mg/Kg | 0.00200 | 0.000462 | 09/11/2025 | 870-31690 |
| 1,2-Dichloropropane | 0.00101 | 0.000956 | J | mg/Kg | 0.00200 | 0.000586 | 09/11/2025 | 870-31690 |
| 1,3-Dichloropropane | 0.00101 | 0.000994 | J | mg/Kg | 0.00200 | 0.000334 | 09/11/2025 | 870-31690 |
| 2,2-Dichloropropane | 0.00101 | 0.000880 | J | mg/Kg | 0.00200 | 0.000592 | 09/11/2025 | 870-31690 |
| 1,1-Dichloropropene | 0.00101 | 0.000863 | J | mg/Kg | 0.00200 | 0.000308 | 09/11/2025 | 870-31690 |
| cis-1,3-Dichloropropene | 0.00100 | 0.000974 | J | mg/Kg | 0.00200 | 0.000618 | 09/11/2025 | 870-31690 |
| trans-1,3-Dichloropropene | 0.00101 | 0.000843 | J | mg/Kg | 0.00200 | 0.000510 | 09/11/2025 | 870-31690 |
| Hexachlorobutadiene | 0.00101 | 0.000632 | J | mg/Kg | 0.00200 | 0.000551 | 09/11/2025 | 870-31690 |
| Bromodichloromethane | 0.00101 | 0.000813 | J | mg/Kg | 0.00200 | 0.000653 | 09/11/2025 | 870-31690 |
| m,p-Xylenes | 0.00100 | 0.000539 | J | mg/Kg | 0.00200 | 0.000228 | 09/11/2025 | 870-31690 |
| Isopropylbenzene | 0.00101 | 0.000902 | J | mg/Kg | 0.00200 | 0.000377 | 09/11/2025 | 870-31690 |
| Methylene Chloride | 0.00101 | 0.00141 | J | mg/Kg | 0.00500 | 0.00132 | 07/21/2025 | 870-30229 |
| Naphthalene | 0.00101 | 0.00115 | J | mg/Kg | 0.00200 | 0.000670 | 09/11/2025 | 870-31690 |
| N-Propylbenzene | 0.00101 | 0.000860 | J | mg/Kg | 0.00200 | 0.000516 | 09/11/2025 | 870-31690 |
| Styrene | 0.00101 | 0.00114 | J | mg/Kg | 0.00200 | 0.000517 | 09/11/2025 | 870-31690 |
| 1,1,1,2-Tetrachloroethane | 0.00101 | 0.000933 | J | mg/Kg | 0.00200 | 0.000460 | 09/11/2025 | 870-31690 |
| 1,1,2,2-Tetrachloroethane | 0.00101 | 0.00106 | J | mg/Kg | 0.00200 | 0.000684 | 09/11/2025 | 870-31690 |
| Tetrachloroethylene | 0.00101 | <0.000455 | U | mg/Kg | 0.00200 | 0.000455 | 09/11/2025 | 870-31690 |
| Bromoform | 0.00101 | <0.000896 | U | mg/Kg | 0.00200 | 0.000896 | 09/11/2025 | 870-31690 |
| o-Xylene | 0.00101 | 0.000872 | J | mg/Kg | 0.00200 | 0.000400 | 09/11/2025 | 870-31690 |
| 1,2,3-Trichlorobenzene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000452 | 09/11/2025 | 870-31690 |





Ex. 9

# Detection Check Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 5035-Closed System Purge and Trap**
**Instrument: A375** **Detector: MSD/0** **Column: DB-624-20m**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| 1,2,4-Trichlorobenzene | 0.00101 | 0.000974 | J | mg/Kg | 0.00200 | 0.000721 | 09/11/2025 | 870-31690 |
| 1,1,1-Trichloroethane | 0.00100 | 0.000881 | J | mg/Kg | 0.00200 | 0.000500 | 09/11/2025 | 870-31690 |
| 1,1,2-Trichloroethane | 0.00100 | 0.00109 | J | mg/Kg | 0.00200 | 0.000676 | 09/11/2025 | 870-31690 |
| Trichloroethene | 0.00101 | 0.000877 | J | mg/Kg | 0.00200 | 0.000461 | 09/11/2025 | 870-31690 |
| Trichlorofluoromethane | 0.00100 | <0.000842 | U | mg/Kg | 0.00200 | 0.000842 | 09/11/2025 | 870-31690 |
| 1,2,3-Trichloropropane | 0.00101 | 0.000956 | J | mg/Kg | 0.00200 | 0.000585 | 09/11/2025 | 870-31690 |
| 1,2,4-Trimethylbenzene | 0.00101 | <0.000561 | U | mg/Kg | 0.00200 | 0.000561 | 09/11/2025 | 870-31690 |
| 1,3,5-Trimethylbenzene | 0.00101 | 0.000912 | J | mg/Kg | 0.00200 | 0.000554 | 09/11/2025 | 870-31690 |
| Bromomethane | 0.00101 | <0.00117 | U | mg/Kg | 0.00500 | 0.00117 | 09/11/2025 | 870-31690 |
| Xylenes, Total | 0.00201 | 0.00141 | J | mg/Kg | 0.00200 | 0.000400 | 09/11/2025 | 870-31690 |
| Vinyl chloride | 0.00101 | <0.00191 | U | mg/Kg | 0.00500 | 0.00191 | 09/11/2025 | 870-31690 |
| 2-Butanone | 0.0101 | 0.00802 | J | mg/Kg | 0.0500 | 0.00772 | 09/11/2025 | 870-31690 |
| n-Butylbenzene | 0.00101 | 0.000804 | J | mg/Kg | 0.00200 | 0.000335 | 09/11/2025 | 870-31690 |
| sec-Butylbenzene | 0.00101 | 0.000802 | J | mg/Kg | 0.00200 | 0.000535 | 09/11/2025 | 870-31690 |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: TX_1005_S_Prep-Extraction - Texas Total petroleum Hyrdocarbons**
**Instrument: A305** **Detector: FID/0** **Column: RXI1-MS**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 25.1 | <25.0 | U | mg/Kg | 50.0 | 25.0 | 09/12/2025 | 870-31693 |
| >C12-C28 Range Hydrocarbons | 25.1 | <25.0 | U | mg/Kg | 50.0 | 25.0 | 09/12/2025 | 870-31693 |

## Method: 300.0 - Anions, Ion Chromatography

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 300_Prep-Anions, Ion Chromatography, 10% Wt/Vol**
**Instrument: A263** **Detector: IC/0** **Column: AS-18**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Chloride | 5.00 | 5.19 | J | mg/Kg | 10.0 | 5.00 | 09/25/2025 | 860-264099 |

## Method: 6020B - Metals (ICP/MS)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 3051A-Preparation, Metals, Microwave Assisted**
**Instrument: A364** **Detector: MSD/0**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Barium | 0.300 | 0.28 | J | mg/Kg | 0.40 | 0.14 | 09/25/2025 | 860-264482 |

Eurofins Dallas





Ex. 9

# Appendix A
# Laboratory Data Package Cover Page - Page 1 of 4

This data package is for Eurofins Dallas job number 870-43022-1 and consists of:

☑ R1 - Field chain-of-custody documentation;

☑ R2 - Sample identification cross-reference;

☑ R3 - Test reports (analytical data sheets) for each environmental sample that includes:
   a. Items consistent with NELAC Chapter 5,
   b. dilution factors,
   c. preparation methods,
   d. cleanup methods, and
   e. if required for the project, tentatively identified compounds (TICs).

☑ R4 - Surrogate recovery data including:
   a. Calculated recovery (%R), and
   b. The laboratory's surrogate QC limits.

☑ R5 - Test reports/summary forms for blank samples;

☑ R6 - Test reports/summary forms for laboratory control samples (LCSs) including:
   a. LCS spiking amounts,
   b. Calculated %R for each analyte, and
   c. The laboratory's LCS QC limits.

☑ R7 - Test reports for project matrix spike/matrix spike duplicates (MS/MSDs) including:
   a. Samples associated with the MS/MSD clearly identified,
   b. MS/MSD spiking amounts,
   c. Concentration of each MS/MSD analyte measured in the parent and spiked samples,
   d. Calculated %Rs and relative percent differences (RPDs), and
   e. The laboratory's MS/MSD QC limits

☑ R8 - Laboratory analytical duplicate (if applicable) recovery and precision:
   a. The amount of analyte measured in the duplicate,
   b. The calculated RPD, and
   c. The laboratory's QC limits for analytical duplicates.

☑ R9 - List of method quantitation limits (MQLs) and detectability check sample results for each analyte for each method and matrix.

☑ R10 - Other problems or anomalies.

The Exception Report for each "No" or "Not Reviewed (NR)" item in Laboratory Review Checklist and for each analyte, matrix, and method for which the laboratory does not hold NELAC accreditation under the Texas Laboratory Accreditation Program.

**Release Statement:** I am responsible for the release of this laboratory data package. This laboratory is NELAC accredited under the Texas Laboratory Accreditation Program for all the methods, analytes, and matrices reported in this data package except as noted in the Exception Reports. The data have been reviewed and are technically compliant with the requirements of the methods used, except where noted by the laboratory in the Exception Reports. By my signature below, I affirm to the best of my knowledge all problems/anomalies observed by the laboratory have been identified in the Laboratory Review Checklist, and no information affecting the quality of the data has been knowingly withheld.

| Mike Kimmel | [signature] | 1/21/2026 |
| --- | --- | --- |
| Name (printed) | Signature | Date |

Project Manager
Official Title (printed)



Ex. 9

# Laboratory Review Checklist: Reportable Data - Page 2 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| #[1] | A[2] | Description | Yes | No | NA[3] | NR[4] | ER#[5] |
|---|---|---|---|---|---|---|---|
| R1 | OI | **Chain-of-custody (C-O-C)** | | | | | |
| | | Did samples meet the laboratory's standard conditions of sample acceptability upon receipt? | X | | | | |
| | | Were all departures from standard conditions described in an exception report? | X | | | | |
| R2 | OI | **Sample and quality control (QC) identification** | | | | | |
| | | Are all field sample ID numbers cross-referenced to the laboratory ID numbers? | X | | | | |
| | | Are all laboratory ID numbers cross-referenced to the corresponding QC data? | X | | | | |
| R3 | OI | **Test reports** | | | | | |
| | | Were all samples prepared and analyzed within holding times? | | X | | | R03A |
| | | Other than those results < MQL, were all other raw values bracketed by calibration standards? | X | | | | |
| | | Were calculations checked by a peer or supervisor? | X | | | | |
| | | Were all analyte identifications checked by a peer or supervisor? | X | | | | |
| | | Were sample detection limits reported for all analytes not detected? | X | | | | |
| | | Were all results for soil and sediment samples reported on a dry weight basis? | X | | | | |
| | | Were % moisture (or solids) reported for all soil and sediment samples? | X | | | | |
| | | Were bulk soils/solids samples for volatile analysis extracted with methanol per SW846 Method 5035? | X | | | | |
| | | If required for the project, are TICs reported? | | | X | | |
| R4 | O | **Surrogate recovery data** | | | | | |
| | | Were surrogates added prior to extraction? | X | | | | |
| | | Were surrogate percent recoveries in all samples within the laboratory QC limits? | | X | | | R04B |
| R5 | OI | **Test reports/summary forms for blank samples** | | | | | |
| | | Were appropriate type(s) of blanks analyzed? | X | | | | |
| | | Were blanks analyzed at the appropriate frequency? | X | | | | |
| | | Were method blanks taken through the entire analytical process, including preparation and, if applicable, cleanup procedures? | X | | | | |
| | | Were blank concentrations < MQL? | X | | | | |
| R6 | OI | **Laboratory control samples (LCS):** | | | | | |
| | | Were all COCs included in the LCS? | X | | | | |
| | | Was each LCS taken through the entire analytical procedure, including prep and cleanup steps? | X | | | | |
| | | Were LCSs analyzed at the required frequency? | X | | | | |
| | | Were LCS (and LCSD, if applicable) %Rs within the laboratory QC limits? | X | | | | |
| | | Does the detectability check sample data document the laboratory's capability to detect the COCs at the MDL used to calculate the SDLs? | X | | | | |
| | | Was the LCSD RPD within QC limits? | X | | | | |
| R7 | OI | **Matrix spike (MS) and matrix spike duplicate (MSD) data** | | | | | |
| | | Were the project/method specified analytes included in the MS and MSD? | X | | | | |
| | | Were MS/MSD analyzed at the appropriate frequency? | X | | | | |
| | | Were MS (and MSD, if applicable) %Rs within the laboratory QC limits? | | X | | | R07C |
| | | Were MS/MSD RPDs within laboratory QC limits? | X | | | | |
| R8 | OI | **Analytical duplicate data** | | | | | |
| | | Were appropriate analytical duplicates analyzed for each matrix? | X | | | | |
| | | Were analytical duplicates analyzed at the appropriate frequency? | X | | | | |
| | | Were RPDs or relative standard deviations within the laboratory QC limits? | X | | | | |
| R9 | OI | **Method quantitation limits (MQLs):** | | | | | |
| | | Are the MQLs for each method analyte included in the laboratory data package? | X | | | | |
| | | Do the MQLs correspond to the concentration of the lowest non-zero calibration standard? | X | | | | |
| | | Are unadjusted MQLs and DCSs included in the laboratory data package? | X | | | | |
| R10 | OI | **Other problems/anomalies** | | | | | |
| | | Are all known problems/anomalies/special conditions noted in this LRC and ER? | X | | | | |
| | | Was applicable and available technology used to lower the SDL to minimize the matrix interference effects on the sample results? | X | | | | |
| | | Is the laboratory NELAC-accredited under the Texas Laboratory Accreditation Program for the analytes, matrices and methods associated with this laboratory data package? | X | | | | |

1. Items identified by the letter "R" must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter "S" should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if "NR" or "No" is checked).



Ex. 9

# Laboratory Review checklist: Supporting Data - Page 3 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| #[1] | A[2] | Description | Yes | No | NA[3] | NR[4] | ER#[5] |
|---|---|---|---|---|---|---|---|
| **S1** | OI | **Initial calibration (ICAL)** | | | | | |
| | | Were response factors and/or relative response factors for each analyte within QC limits? | X | | | | |
| | | Were percent RSDs or correlation coefficient criteria met? | X | | | | |
| | | Was the number of standards recommended in the method used for all analytes? | X | | | | |
| | | Were all points generated between the lowest and highest standard used to calculate the curve? | X | | | | |
| | | Are ICAL data available for all instruments used? | X | | | | |
| | | Has the initial calibration curve been verified using an appropriate second source standard? | X | | | | |
| **S2** | OI | **Initial and continuing calibration verification (ICV and CCV) and continuing calibration blank (CCB):** | | | | | |
| | | Was the CCV analyzed at the method-required frequency? | X | | | | |
| | | Were percent differences for each analyte within the method-required QC limits? | X | | | | |
| | | Was the ICAL curve verified for each analyte? | X | | | | |
| | | Was the absolute value of the analyte concentration in the inorganic CCB < MDL? | X | | | | |
| **S3** | O | **Mass spectral tuning** | | | | | |
| | | Was the appropriate compound for the method used for tuning? | X | | | | |
| | | Were ion abundance data within the method-required QC limits? | X | | | | |
| **S4** | O | **Internal standards (IS)** | | | | | |
| | | Were IS area counts and retention times within the method-required QC limits? | X | | | | |
| **S5** | OI | **Raw data (NELAC Section 5.5.10)** | | | | | |
| | | Were the raw data (for example, chromatograms, spectral data) reviewed by an analyst? | X | | | | |
| | | Were data associated with manual integrations flagged on the raw data? | X | | | | |
| **S6** | O | **Dual column confirmation** | | | | | |
| | | Did dual column confirmation results meet the method-required QC? | | | X | | |
| **S7** | O | **Tentatively identified compounds (TICs)** | | | | | |
| | | If TICs were requested, were the mass spectra and TIC data subject to appropriate checks? | | | X | | |
| **S8** | I | **Interference Check Sample (ICS) results** | | | | | |
| | | Were percent recoveries within method QC limits? | X | | | | |
| **S9** | I | **Serial dilutions, post digestion spikes, and method of standard additions** | | | | | |
| | | Were percent differences, recoveries, and the linearity within the QC limits specified in the method? | X | | | | |
| **S10** | OI | **Method detection limit (MDL) studies** | | | | | |
| | | Was a MDL study performed for each reported analyte? | X | | | | |
| | | Is the MDL either adjusted or supported by the analysis of DCSs? | X | | | | |
| **S11** | OI | **Proficiency test reports** | | | | | |
| | | Was the laboratory's performance acceptable on the applicable proficiency tests or evaluation studies? | X | | | | |
| **S12** | OI | **Standards documentation** | | | | | |
| | | Are all standards used in the analyses NIST-traceable or obtained from other appropriate sources? | X | | | | |
| **S13** | OI | **Compound/analyte identification procedures** | | | | | |
| | | Are the procedures for compound/analyte identification documented? | X | | | | |
| **S14** | OI | **Demonstration of analyst competency (DOC)** | | | | | |
| | | Was DOC conducted consistent with NELAC Chapter 5? | X | | | | |
| | | Is documentation of the analyst's competency up-to-date and on file? | X | | | | |
| **S15** | OI | **Verification/validation documentation for methods (NELAC Chapter 5)** | | | | | |
| | | Are all the methods used to generate the data documented, verified, and validated, where applicable? | X | | | | |
| **S16** | OI | **Laboratory standard operating procedures (SOPs)** | | | | | |
| | | Are laboratory SOPs current and on file for each method performed? | X | | | | |

1. Items identified by the letter "R" must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter "S" should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if "NR" or "No" is checked).



Ex. 9

# Laboratory Review Checklist: Exception Reports - Page 4 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| ER #[1] | Description |
|---|---|
| R03A | The following sample(s) was received with insufficient time remaining to freeze within 48 hours, as required for samples collected in water preserved TerraCores: all samples. The sample(s) was collected on 1/9/26. The sample(s) was received on Saturday 1/10/26 at 9:15 and placed in the freezer on 1/12/26 at 11:15 . |
| R04B | Method TX 1005: Surrogate recovery for the following sample was outside the upper control limit: SB-05 (8'-9') (870-43022-11). This sample did not contain any target analytes; therefore, re-extraction and/or re-analysis was not performed. |
| R07C | Method 6020B: The matrix spike / matrix spike duplicate (MS/MSD) recoveries for preparation batch 860-287918 and analytical batch 860-288184 were outside control limits. Sample matrix interference is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.<br><br>Method 8260C: The matrix spike (MS) recoveries for preparation batch 870-34798 and analytical batch 870-34789 were outside control limits. Non-homogeneity is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits. |

1. Items identified by the letter "R" must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter "S" should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if "NR" or "No" is checked).



Ex. 9

1 2 3 4 5 6 7 8 9 10 12 13 14 15

**Blake Brownshadel**

**Subject:** FW: Environmental matters; Smelley Tract

**Importance:** High

**From:** Jeffrey Libby
**Sent:** Thursday, February 12, 2026 1:27 PM
**To:** Lacy Kimball (info@LacyKimballLaw.com) <info@LacyKimballLaw.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Scott Deatherage (scott@sdeatheragelaw.com) <scott@sdeatheragelaw.com>; david@spillerlaw.net; Todd W Tew <todd.2@verizon.net>
**Subject:** Environmental matters; Smelley Tract
**Importance:** High

Lacy,

Seller delivered the Phase II ESA Report (the **ESA Report**) on or about January 26, 2026, which we appreciate. However, the ESA Report indicates that multiple requirements of the PSA have not been satisfied.

In light of the fact that this transaction involves a significant amount of money and land (approximately $33 million and over 1,600 acres), Purchaser has retained Texas environmental counsel to advise Purchaser regarding environmental matters pertaining to the Property, including a review of the ESA Report, and the following comments and questions are, in large part, a result of such consultation.

First, the ESA Report indicates that Seller's environmental representation in Section 6(i) of the PSA was inaccurate when made and remains inaccurate. Accordingly, Seller is in breach of Section 6(i). Section 6(i) provides that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property." The ESA Report indicates that Hazardous Substances are present at the Property. In addition, under Section 8(b) of the PSA, it is a condition precedent to Closing that Seller's representations and warranties be true and correct as of Closing.

Second, Section 7(c) of the PSA requires that Seller remove from the Property, no later than fifteen (15) days prior to Closing, "all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property." Based on the ESA Report, the required removal of environmental contamination and hazardous materials has not occurred. In addition, Seller has not provided satisfactory evidence that all underground equipment or piping associated with the above-ground storage tanks has been removed from the Property.

Third, the ESA Report does not include the specific confirmation required by the PSA. Section 7(c) requires that Seller provide an environmental report "by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property." Based on our review, the ESA Report does not include this confirmation and therefore does not satisfy Section 7(c).

The requirements and language of Sections 6(i) and 7(c) were specifically drafted by Purchaser and agreed to by Seller to address environmental contamination and Hazardous Substances at the Property. These requirements were and remain material to the transaction, particularly in light of the purchase price to be paid at Closing.



Ex. 10

Based on the foregoing, Purchaser does not believe Section 6(i) or Section 7(c) have been satisfied or that the applicable conditions precedent to Closing have been met.

From Purchaser's perspective, it would be premature to discuss a closing date until the environmental matters outlined above are fully and clearly resolved. In addition to revising the ESA Report to include the contractually required confirmation, Purchaser also requires - and we understand Seller's engineer has agreed to provide - the following:

- An express right for Purchaser to rely on the ESA Report (whether by reliance letter or by naming Purchaser as an intended recipient in the report). The ESA Report expressly prohibits anyone other than Seller from relying upon the ESA Report; and
- Purchaser to be named as an additional insured on the environmental engineer's and drilling contractor's CGL and Contractors Pollution Liability policies, with limits appropriate for a $33 million transaction. Additionally, those policies must be "occurrence-based policies" and not "claims-made policies." The policies and insurance must survive into the future for obvious reasons.

Finally, all environmental contamination at the Property must be removed in accordance with the PSA.

Purchaser remains committed to working cooperatively to finalize these items. Once Sections 6(i) and 7(c) have been fully satisfied, Purchaser will be in a much better position to have a constructive discussion about next steps, including Closing timing.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

NEW ADDRESS:
325 N. St. Paul Street,
Suite 2900
Dallas, Texas 75201
www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230



Ex. 10

**Blake Brownshadel**

**Subject:** FW: 7700 Old Granbury Hwy
**Attachments:** Old Granbury Rd 7700.pdf

**Importance:** High

**From:** Al Paniagua <alp@prostarcre.com>
**Sent:** Wednesday, February 25, 2026 3:48 PM
**To:** Patricia Herrera <patty@challengerrealtygroup.com>
**Subject:** FW: 7700 Old Granbury Hwy

**AL PANIAGUA**
Executive Vice President

**ProStar Commercial Real Estate, LLC**
One Cowboys Way, Suite 300
Frisco, Texas 75034
214.773.8479
alp@prostarcre.com
prostarcre.com

---

**From:** Stephen Reich <stephen.reich@williamstrew.com>
**Sent:** Friday, February 13, 2026 6:03 AM
**To:** Al Paniagua <alp@prostarcre.com>
**Subject:** 7700 Old Granbury Hwy

Good morning:
You had previously reached out on my listing at 7700 Old Granbury. Looks like after all this time, this is going to be coming back on the market.
Please let me know if your client has an interest. Marketing Packet is attached.

CONFIDENTIALITY NOTICE: The information contained in this email communication (including any attachment(s)) is strictly confidential and intended solely for the person or entity named above. If you are

not the intended recipient of this email, you are hereby notified that any disclosure, distribution, reproduction, or other use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return email and permanently delete this communication (including any attachment(s)) from your system.
CONFIDENTIALITY NOTICE: The information contained in this email communication (including any attachment(s)) is strictly confidential and intended solely for the person or entity named above. If you are not the intended recipient of this email, you are hereby notified that any disclosure, distribution, reproduction, or other use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return email and permanently delete this communication (including any attachment(s)) from your system.



Ex. 11




# TREMENDOUS DEVELOPMENT OPPORTUNITY - 1,674+/- ACRES

7700 Old Granbury Rd. – Cresson, TX

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE

WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

LISTED BY **STEPHEN REICH GROUP** OF WILLIAMS TREW REAL ESTATE

Ex. 11

# PROPERTY SUMMARY

## DESCRIPTION

Tremendous development opportunity located in the heart of the westward movement. This hard to find 1,674 plus or minus acre parcel is prime for a mixed use development and is located only 30 miles from downtown Fort Worth, Texas. Cresson is a rapidly growing area due to its convenient location to Fort Worth via Highway 377, a new loop and ease of railroad accessibility. This tract features rolling terrain and scattered hardwoods providing perfect settings for residential development. 1,300 feet of road frontage and being located less than 1.5 miles from the new loop makes accessibility extremely easy. Over two miles of Atchison, Topeka and Santa Fe rail frontage make the industrial opportunities endless.

## LOCATION

| | |
|---|---|
| CITY | Cresson |
| County | Hood |
| Schools | Granbury ISD |

## OFFER SUMMARY

| | |
|---|---|
| List Price | $30,976,807 |
| Lot Size | 1,674.422 acres |
| Utilities | Electric Available, Private Sewer, Septic, Well |

Driving Directions: From Hwy 171, go west on Hwy 377. Right on Old Granbury Rd.

## HIGHLIGHTS

- MIXED USE DEVELOPMENT
- 1,300 FT OF ROAD FRONTAGE
- 30 MILES FROM DOWNTOWN FT. WORTH
- RAILROAD ACCESSIBILITY
- NO RESTRICTIONS
- AG EXEMPT

## LISTING PRESENTED BY:

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE

WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.



**PROPERTY WEBSITE LINK:**
**stephenreichgroup.com/20123229**



STEPHEN REICH
817-597-8884
stephen.reich@williamstrew.com

TAMMY ROKUS
817-694-8019
tammy.rokus@williamstrew.com

PARKER COUNTY OFFICE
400 Shops Boulevard, Ste. 200
Willow Park, TX 76087

FARM & RANCH • RESIDENTIAL • COMMERCIAL-DEVELOPMENT • LAND

Ex. 11

# PROPERTY PHOTOS








STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

SR STEPHEN REICH GROUP WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

Ex. 11

# PROPERTY PHOTOS








# AERIAL MAP




STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

Ex. 11

# CONTOUR LINES & FLOODPLAIN



# STATE OF TEXAS WELL REPORT

**WELL REPORT**
#188548

**DRILLING START DATE**
8/29/2006

**BOREHOLE:**
Depth 30 ft.
Diameter 11 in.

**WATER LEVEL BELLOW SURFACE**
620 ft.

**WELL TESTS**
Yield: 60 GPM

**COMPANY INFORMATION**
Associated Services

STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

CALHOUN BHELLA

AUSTIN, TX
DALLAS, TX
FRISCO, TX
NEW YORK, NY
ORANGE COUNTY, CA
RALEIGH, NC
SAN ANTONIO, TX
ST. LOUIS, MO
WASHINGTON, DC

August 19, 2026

JACKSON WALKER LLP
Scott A. Wheatley
Lee B. Hunt
Trevor J. Paul
777 Main Street, Suite 2100
Fort Worth, Texas 76102

VIA EMAIL:
swheatley@jw.com
lhunt@jw.com
tpaul@jw.com

Re: *Challenger Cresson I, LLC v. Bill Sanders, Independent Executor of the Estate of Pearl Smelley, et al.*, Civil Action No. 4:26-cv-00231-P (N.D. Tex.)

**FORMAL DEMAND PURSUANT TO SECTION 5(e) OF THE STANDARD CONTRACT OF SALE — EXECUTION OF WELL PERMIT APPLICATIONS**

Dear Counsel:

As you know, we represent Challenger Cresson I, LLC ("Purchaser") in the above-referenced matter. This letter constitutes formal written demand, pursuant to Section 5(e) of the Standard Contract of Sale dated effective May 26, 2023, as amended (the "Contract"), that the Estate of Pearl Smelley and Cresson Moon Properties, LP, as the fee owners of the Property, execute and return the twenty-two (22) enclosed well permit applications to the Upper Trinity Groundwater Conservation District (the "District") (the "Well Permit Applications") and one (1) operating permit application to the District (the "Operating Permit Application" and, together with the Well Permit Applications, the "Applications") within three (3) business days of Seller's receipt of this letter - i.e., no later than 5:00 p.m. CDT on Monday, August 24, 2026. As explained below, Seller's failure to timely execute and return such applications will cause significant and irreparable harm, not only to Purchaser, but to the Property itself, and ultimately to any party who owns it. It will also constitute a separate, additional material breach of the Contract.

## I. Contractual Basis for This Demand

Section 5(e) of the Contract provides, in relevant part:

*"[P]urchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use . . . and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements . . . including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller."*

In addition, Section 7(e) of the Contract provides:

> *"Notwithstanding anything to the contrary in this Contract, Seller shall not oppose, and Seller shall not interfere with, Purchaser's applications for, or efforts to obtain, any and all Entitlements, Easements Benefitting the Property and the Required Utilities."*

These obligations remain in full force and effect.

**II. The Enclosed Documents**

Enclosed with this letter are twenty-two (22) Well Permit Applications and one (1) Operating Permit Application. Each Application requires the signature of the property owner as applicant or co-applicant. The Contract defines "Entitlements" to include "all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use." Groundwater permits from the District are plainly within this definition. Accordingly, the Applications constitute "reasonable or necessary documents in connection with Purchaser's efforts" to obtain Entitlements within the meaning of Section 5(e). It is your duty and obligation to execute the attached with urgency. See below.

**III. Urgency and Irreparable Harm**

As you are aware, the District has scheduled a public hearing on August 27, 2026 at which it will consider proposed amendments to its rules that will significantly decrease the groundwater production allocation applicable to the Property. Filing the Applications prior to the adoption of the proposed rule change may preserve claims to the current, pre-rule-change groundwater allocation. A decrease in the groundwater allocation will permanently and substantially diminish the value of the Property.

Although Purchaser does not yet hold legal title to the Property, Purchaser holds an equitable interest in the Property under the Contract and is entitled to specific performance of Seller's obligations. The harm from failing to file the Applications before August 27 is therefore not just harm to the Property, but also direct harm to Purchaser's contractual rights. Groundwater rights run with the land. If Seller prevents Purchaser from filing the Applications before the District reduces the allocation, the Property's development capacity will be diminished resulting in the diminution of value of the Property below the value for which Purchaser bargained. Once the August 27 deadline passes, the window closes for all fee and equitable owners of the Property.

**IV. Seller's Prior Refusal**

On August 17, 2026, Mr. Hunt responded to my request for Seller's cooperation in connection with the prompt filing of the Applications by stating: "Calhoun Bhella and Challenger Cresson I should take no action regarding our client's Property in Hood County, unless that action is scheduling a closing date. Our clients reserve all rights." This blanket refusal to cooperate is directly contrary to Seller's express obligations under Sections 5(e) and 7(e) of the Contract. Purchaser does not accept this position and hereby reiterates its demand for Seller's cooperation.

**V. Consequences of Non-Compliance**

If Seller fails to execute and return the enclosed Applications within the three (3) business day period prescribed by Section 5(e) (i.e., by no later than **5:00 p.m. CDT on Monday, August 24, 2026**), Purchaser will consider such failure to be a separate, additional material breach of the Contract. Purchaser intends to pursue all available remedies, including but not limited to immediately seeking appropriate injunctive relief from the Court and amending its pleadings to assert additional claims for damages arising from Seller's refusal to cooperate. Purchaser expressly reserves all rights and remedies available under the Contract, at law, and in equity.

**VI. Reservation of Rights**

This letter is not intended to, and does not, constitute a waiver of any rights or remedies that Purchaser may have under the Contract, at law, in equity, or otherwise. Any potential defaults by Seller now existing or later occurring will not be deemed waived or otherwise accepted by Purchaser. Purchaser reserves all rights and remedies granted under the Contract and available at law or in equity, all of which shall be cumulative and may be pursued separately, successively, or concurrently at the sole discretion of Purchaser.

Please confirm receipt of this letter and the enclosed Applications at your earliest convenience. Executed originals should be returned to my attention at the address above or via email to jlibby@calhounbhella.com.

Respectfully,

Jeffrey T. Libby

cc: Blake J. Brownshadel (via email)

Enclosures: Twenty-Two (22) Well Permit Applications; One (1) Operating Permit Application

Ex. 12

**District Use Only:**

Permit ID: ____

System ID: ____

Admin. Complete: ____

GM Initial: ____

Permit Term: ____

Permit Expiration: ____

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 W. Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR OPERATING PERMIT

***Required fields. An application will not be deemed administratively complete unless all required fields are completed.**

## Part I – Applicant Information

*Applicant Name: The Estate of Pearl Smelley & Cresson Moon Properties, LP *Phone: (817) 266-1283 / (817) 300-4350

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive

*City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

*E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____

Contact (if applicable): ____ Phone: ____

E-Mail: ____ Fax: ____

**If the applicant is someone other than the owner of the property, please attach documentation establishing the applicable authority to file the application, hold the permit in lieu of the property owner, and operate a well for the proposed use.**

## Part II – Description of Request

*Please provide a short, plain statement explaining the nature and purpose of the proposed use, and whether the well has been used for any other purpose. *(Examples: "The well will be used for public water supply, and has always been used for that purpose." Or "The well will be used for golf course irrigation, but was used from 2005-2013 to supply water for oil and gas drilling and fracking.")*

Industrial Cooling and Power Generation

## Part III – Well(s) Information

Is this permit request related to a ☒ New well system ☐ Existing well system

*If this application is related to an existing well system, please list all other wells in the system and any current permitted volumes for the system:*

Well(s) in system: : ____

Historic Use Permit ID: ____

Historic Use Permit Volume*: ____

** If still waiting for Board approval of HUP, state volume designated as Maximum Historic Use in your HUP application*

Operating Permit ID: ____

Operating Permit Volume: ____



Ex. 12

**Part IV: Permit Volume:**

**Annual Permit Volume Requested:** 650,000,000 gallons**.** This is the total amount of groundwater you are requesting to be authorized by your permit to pump each year, which cannot be more than the maximum amount authorized under the District Rules based on the thickness of the aquifer and your contiguous controlled acreage. If this Application is related to an existing Operating Permit and you are seeking to amend that permit to increase the permitted volume, please identify the requested amended total volume in the space above. If you identified more than one purpose of use in Part II, describe the permit volume you are requesting for each purpose of use. If you also have a Historic Use Permit associated with this acreage or have applied for one and are awaiting District board action, any groundwater production authorized by those affects the maximum amount of water you may pump under this Operating Permit. **In filling in the blank above, ALL applicants should coordinate with the District staff for assistance in determining the maximum volume that can be authorized under an Operating Permit.**

**Part V – Additional Information:** Because of your previous or accompanying well registration and Well ID number, the District has or has access to additional information in the District's and the county's records and databases related to your well and property, such as location, acreage you own at the well site, the particular aquifer in which your well is drilled, a digital map or plat of the land where the well is located and of any applicable political subdivision or CCN boundaries, and other wells that are part of a well system if applicable. Some of this information has been provided to you by the District with this application. If the information provided to you by the District or any past information you have provided the District on these items in a well registration application or otherwise is incorrect or has changed, or if you believe such information related to your well or property in the District's or the County's records and databases is incorrect or has changed, please supplement this application with the correct information, as that information is otherwise incorporated by reference into this application.

***For applicants that are required by law to have a drought contingency plan, please include a copy of that plan with this application**.

**Part VI – Certification:** ***I hereby certify and declare that the information given herewith is true and accurate to the best of my knowledge and belief, that the groundwater withdrawn under the permit will be put to a beneficial use at all times, that I will comply with the District's Management Plan and rules, and that I will follow well plugging guidelines if I close the well.***

______________________________ ______________________

Applicant Name Date

______________________________

Applicant Signature

**DISTRICT USE ONLY**

Hearing Date: ____________ Authorization: ______________ Permit Volume: ____________________

Ex. 12

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No


**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**

Serving Hood, Montague, Parker and Wise Counties

1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082

Phone: (817) 523-5200 | Fax: (817) 523-7687

www.uppertrinitygcd.com


# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: ___________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ ___________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______

Driller: ______

Approved: ______

By: ______

Invoice No.: ______

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______ Phone: ______

Contact Email: ______ Fax: ______

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________________

*Office Mailing Address: ______________________________________*State: ___ *Zip: ___________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ ___________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________ ______________________

Owner Name Date

______________________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________________

*Office Mailing Address: ______________________________________ *State: ___ *Zip: ___________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ ___________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________ ______________________

Owner Name Date

______________________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____

Driller: ____

Approved: ____

By: ____

Invoice No.: ____

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____ Phone: ____

Contact Email: ____ Fax: ____

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________ *Phone: ______________

*Driller: ______________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________

*Office Mailing Address: ______________________ *State: ___ *Zip: ____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ____________________ *Phone: __________________

*Driller: ______________________________ *License #: __________________ *Expiration Date: ___________

Fax: __________________________ *E-mail: ______________________________________________

*Office Mailing Address: ______________________________________ *State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_______________________________________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________________ Longitude: ______________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

_______________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

_______________________________________________ ______________________________

Owner Name Date

_______________________________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ______

Driller: ______

Approved: ______

By: ______

Invoice No.: ______

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______ Phone: ______

Contact Email: ______ Fax: ______

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______________ Longitude: ______________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________ *Phone: __________

*Driller: ______________________ *License #: __________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________

*Office Mailing Address: ______________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________ ______________________

Owner Name Date

______________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ____________

Contact Email: ______________________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____

Driller: ____

Approved: ____

By: ____

Invoice No.: ____

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: TX *Zip: 76028 / 76108

Contact (If different than owner) ____ Phone: ____

Contact Email: ____ Fax: ____

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________ ______________________

Owner Name Date

______________________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ______

Driller: ______

Approved: ______

By: ______

Invoice No.: ______

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**
Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______ Phone: ______

Contact Email: ______ Fax: ______

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________________

Owner Name Date

______________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" )

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________*State: ___ *Zip: ____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________________

Owner Name Date

______________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ______

Driller: ______

Approved: ______

By: ______

Invoice No.: ______

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______ Phone: ______

Contact Email: ______ Fax: ______

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ____________________ *Phone: ____________

*Driller: ____________________ *License #: ____________ *Expiration Date: ________

Fax: ____________________ *E-mail: ____________________

*Office Mailing Address: ____________________ *State: ___ *Zip: ________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

____________________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ____________________ Longitude: ____________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

____________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

____________________________________ ____________________

Owner Name Date

____________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**
Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________ *Phone: __________________

*Driller: ______________________ *License #: __________________ *Expiration Date: ___________

Fax: ______________________ *E-mail: ______________________

*Office Mailing Address: ______________________ *State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________ ______________________________________

Owner Name Date

______________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________________ Phone: ____________

Contact Email: ____________________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ________________

*Driller: ______________________________ *License #: ________________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________________

*Office Mailing Address: ______________________________________ *State: ___ *Zip: ___________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ ___________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

____________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

____________________________________ ______________________

Owner Name Date

____________________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____________________

Driller: ____________________

Approved: ____________________

By: ____________________

Invoice No.: ____________________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**
Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: TX *Zip: 76028 / 76108

Contact (If different than owner) ______________________________ Phone: ____________________

Contact Email: ______________________________ Fax: ____________________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ____________________ *Phone: __________________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ________________________ *E-mail: ________________________________________

*Office Mailing Address: ________________________________________ *State: ___ *Zip: ____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

____________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

____________________________________ ______________________

Owner Name Date

____________________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ________

Driller: ________

Approved: ________

By: ________

Invoice No.: ________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ________ Phone: ________

Contact Email: ________ Fax: ________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______________ Longitude: ______________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature



Ex. 12

| District Use Only: |
| --- |
| Well Reg. ID: ______ |
| Driller: ______ |
| Approved: ______ |
| By: ______ |
| Invoice No.: ______ |
| ☐ Exempt |
| ☐ Non-exempt |
| Meets minimum tract size? |
| ☐ Yes ☐ No |
| Meets property line spacing? |
| ☐ Yes ☐ No |
| Meets spacing from other wells? |
| ☐ Yes ☐ No |

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**
Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
# --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______ Phone: ______

Contact Email: ______ Fax: ______

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________________

*Office Mailing Address: ______________________________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

____________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

____________________________________ ______________________

Owner Name Date

____________________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ________________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ________________________ *E-mail: __________________________________________

*Office Mailing Address: ______________________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

__________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________ ______________________

Owner Name Date

______________________________________

Owner Signature



Ex. 12

**District Use Only:**

Well Reg. ID: ____

Driller: ____

Approved: ____

By: ____

Invoice No.: ____

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No


**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**

Serving Hood, Montague, Parker and Wise Counties

1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082

Phone: (817) 523-5200 | Fax: (817) 523-7687

www.uppertrinitygcd.com


# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____ Phone: ____

Contact Email: ____ Fax: ____

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ________________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________*State: ___ *Zip: ___________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**

Serving Hood, Montague, Parker and Wise Counties

1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082

Phone: (817) 523-5200 | Fax: (817) 523-7687

www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***



Ex. 12

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" )

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ■ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

■ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ■ Yes. Name of person/entity using water: TBD



Ex. 12

**Part IV – Driller Information**

*Drilling Company: TBD ______________________ *Phone: ______________

*Driller: ______________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________

*Office Mailing Address: ______________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________ ______________________

Owner Name Date

______________________________________

Owner Signature

# SPILLER & SPILLER

JAMES M. SPILLER (1932-2011)
DAVID SPILLER
SCOTT A. SPILLER (1968-2014)
MASON SPILLER
REID SPILLER

ATTORNEYS AND COUNSELORS AT LAW
P. O. DRAWER 447
JACKSBORO, TEXAS 76458

TELEPHONE: (940) 567-6644
FACSIMILE: (940) 567-3999
EMAIL: LAWINFO@SPILLERLAW.NET
PHYSICAL ADDRESS:
122 E. BELKNAP STREET

August 23, 2026

Jeffrey T. Libby, Esq.
CALHOUN BHELLA
325 N. Saint Paul Street, Suite 2900
Dallas, Texas 75201
jlibby@calhounbhella.com

Re: Challenger Cresson I, LLC v. Bill Sanders, Independent Executor of the Estate of Pearl Smelley, et al., Civil Action No. 4:26-cv-00231-P (N.D. Tex.)

Dear Jeff:

As you know, our firm serves as General Counsel for Cresson Moon Properties, LP ("Cresson Moon"). I write in response to your August 19, 2026, demand concerning the twenty-two proposed well registration/permit applications and operating permit application submitted with your letter.

Cresson Moon disputes your characterization of the parties' respective contractual rights and obligations and expressly reserves all claims, defenses, and positions asserted in the pending litigation, including its position concerning Challenger's prior breaches and repudiation of the Contract. Nothing in this letter, and no cooperation offered below, constitutes an admission that the Contract presently requires the action demanded, a waiver of any existing breach or default by Challenger, or an acknowledgment that Challenger is entitled to specific performance or any other relief.

Nevertheless, in an effort to avoid any contention that Cresson Moon has failed to reasonably mitigate damages or has improperly interfered with Challenger's efforts regarding groundwater permitting, I have conferred with Doug Shaw, General Manager of the Upper Trinity Groundwater Conservation District ("the District"). Based upon that discussion and our review of the District's existing rules, the applications cannot simply be completed and submitted in the manner suggested by your letter. Among other things, District procedures require a pre-application meeting; the proposed groundwater demand must be reasonable and non-speculative; and the contemplated high-volume permit is subject to hydrogeologic investigation and reporting requirements before the application can be administratively complete.

Moreover, the applications you provided require the property owner to certify the truth and accuracy of substantive information supplied by Challenger. Cresson Moon is not presently in a



Ex. 13

position to make those certifications, and it will not certify facts, proposed uses, well specifications, groundwater demands, or other information that it has not independently determined to be true and accurate.

That said, without waiving any rights or positions in this litigation, Cresson Moon is willing to authorize Challenger and its consultants, at Challenger's sole cost and expense, to pursue with the District such groundwater applications relating to the Property as the District will lawfully accept and process, including payment by Challenger of all application, engineering, hydrogeologic, consultant, well-drilling, if Challenger elects and is lawfully authorized to proceed with drilling, and other costs associated with that effort. If, after compliance with the District's applicable prerequisites, the District advises that Cresson Moon's signature is required on a particular application or other document, please provide that document and the supporting information to us, and Cresson Moon will promptly consider execution of an appropriate document consistent with the facts and the District's requirements.

If Challenger wishes to proceed on that basis, please confirm and provide whatever limited authorization the District requires for Cresson Moon to execute. This offer is made solely to facilitate Challenger's requested permitting efforts and to avoid any contention that Cresson Moon is causing or contributing to the damages alleged in your August 19 letter. It does not authorize Challenger to bind Cresson Moon to any financial obligation, drilling obligation, permit condition, groundwater production commitment, or other contractual or regulatory obligation without Cresson Moon's further express written consent.

All rights, claims, defenses, and remedies are expressly reserved.

Sincerely,

*/s/ David Spiller*

David Spiller

DS
Cc: Scott A. Wheatley, Esq.
Lee B. Hunt, Esq.
Trevor J. Paul, Esq.
JACKSON WALKER, LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102
*swheatley@jw.com*
*lhunt@jw.com*
*tpaul@jw.com*

Cresson Moon Properties, LP



Ex. 13

**Subject:** Challenger v. Sanders (N.D. Tex.) - Property access request
**Date:** Wednesday, October 7, 2026 at 3:35:56 PM Central Daylight Time
**From:** Flores Law Administration
**To:** Wheatley, Scott, Hunt, Lee, Wright, Leah, Paul, Trevor
**CC:** Chad Flores
**Attachments:** 2026-10-07 - Letter.pdf

Counsel,

Please see the attached correspondence from Chad Flores regarding *Challenger Cresson I, LLC v. Sanders*, et al., No. 4:26-CV-00231-P (N.D. Tex.).

Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640
administration@chadflores.law



Ex. 14

**Flores Law PLLC**
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

October 7, 2026

Scott A. Wheatley
Lee B. Hunt
Trevor J. Paul
Jackson Walker LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102

Re: *Challenger Cresson I, LLC v. Sanders*, et al., No. 4:26-CV-00231-P (N.D. Tex.)

Dear Counsel,

I write again as lead counsel for Challenger Cresson I, LLC in the matter indicated above. Please share this correspondence with any other representative of your side that is an appropriate recipient. We will do our best to include anyone you indicate in any further correspondence of this kind.

We have not received a response to our September 30 correspondence requesting property access for Jarrod Reynolds, P.E., of Core Management Group. So we write to renew and formalize it. We appreciate the parties' ongoing efforts to resolve the broader dispute amicably, and hope this limited access issue can be handled in the same cooperative spirit.

The requested access is straightforward. Mr. Reynolds would conduct a non-invasive inspection relating to water planning, including observing the Property's geology and topography, creeks and impoundments, vegetation, potential water-storage locations, and potential waters of the United States.

The request thus falls comfortably within the access contemplated by the parties' Contract. Section 5(a) provides that Purchaser may enter the Property to conduct inspections and investigations and, even after expiration of the Inspection Period, "shall have the right to continue to conduct physical inspections and assessments of the Property," including soil samples, groundwater samples, and other intrusive testing, subject to the specified indemnity and repair obligations. Mr. Reynolds's proposed visit is substantially less invasive than the activities that provision expressly permits. The visit also bears directly on Challenger's ongoing water, utility, and entitlement work. Section 5(e) requires Seller to cooperate with Purchaser, using "good faith and best efforts," in Purchaser's efforts to obtain the relevant Entitlements and Required Utilities. And Section 7(e) provides that Seller "shall not oppose" or "interfere with" those efforts. *Id.* §§ 5(e), 7(e). We hope this makes clear that the requested visit is both modest in scope and well within the parties' existing contractual framework, and that it can therefore be accommodated without complicating the parties' broader discussions.

Please confirm within three business days that Seller will accommodate Mr. Reynolds's access, and we can then coordinate a mutually workable date during the following two weeks. We are happy to work through any reasonable access logistics with you. If Seller believes there is some contractual basis for withholding the requested access, please identify it in your response.

Ex. 14

Sincerely,

Chad Flores

# SPILLER & SPILLER

JAMES M. SPILLER (1932-2011)
DAVID SPILLER
SCOTT A. SPILLER (1968-2014)
MASON SPILLER
REID SPILLER

ATTORNEYS AND COUNSELORS AT LAW
P. O. DRAWER 447
JACKSBORO, TEXAS 76458

TELEPHONE: (940) 567-6644
FACSIMILE: (940) 567-3999
EMAIL: LAWINFO@SPILLERLAW.NET
PHYSICAL ADDRESS:
122 E. BELKNAP STREET

October 26, 2026

**CONFIRMATION OF EXPIRATION AND TERMINATION OF CONTRACT**

Chad Flores, Esq.
Flores Law, PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
*chad@chadflores.law*
*AND CM #9589 0710 5270 3676 6904 73, RRR*

RE: Confirmation of Expiration and Termination of the Standard Contract of Sale dated May 26, 2023, as amended (the "Contract"), by and between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, Richard David Smelley and Amy Elizabeth Smelley, Tammy Marie Graham and Gregory Scott Graham, and Deborah Ruth Davis and David Glenn Davis (collectively, "Seller") and Challenger Cresson I, LLC ("Purchaser"), concerning the property located at approximately 7700 Old Granbury Road, Cresson, Hood County, Texas (the "Property")

Dear Mr. Flores:

As you know, our firm serves as General Counsel for Cresson Moon Properties, LP ("Cresson Moon"). This letter is sent to you and your firm as counsel for Purchaser, Challenger Cresson I, LLC.

The Third Amendment to the Contract extended the Closing Date through January 23, 2026 (the "Second Extended Closing Date") and contemplated that the parties would enter into a further amendment on or before that date to establish additional deadlines under the Contract. No such further amendment was ever executed, and Seller did not agree to any further extension of the Closing Date. Accordingly, Seller's position is that the Contract expired by its own terms no later than January 23, 2026. Nothing Seller did or did not do thereafter constituted an agreement to revive or extend the Contract or a waiver of its expiration.

Separately and alternatively, in April 2026, Seller provided Purchaser formal written notice of Purchaser's default (the "Notice of Default") under the Contract pursuant to Section 11(a) thereof. As set forth in the Notice of Default, Seller performed and satisfied its obligations under



Ex. 15

the Contract, and Purchaser failed and refused to proceed to Closing in accordance with the Contract's terms, conditioning Closing instead on new demands that are not conditions precedent under the Contract. The Notice of Default afforded Purchaser ten (10) days from its receipt to cure its default by proceeding to close the transaction, and advised that, absent a timely cure, Seller would exercise all rights and remedies available under the Contract and Texas law.

Purchaser did not cure its default within the ten-day cure period, and has not cured it since. Purchaser did not proceed to Closing, and it has not tendered the Purchase Price.

Accordingly, and without limiting Seller's position that the Contract previously expired by its own terms, Seller further terminated the Contract based upon Purchaser's uncured default. With Seller's counterclaims in *Challenger Cresson I, LLC v. Sanders, et al.*, Civil Action No. 4:26-cv-00231-P, pending in the United States District Court for the Northern District of Texas, Fort Worth Division, I am sending this letter simply to confirm Seller's position that the Contract is no longer in force or effect, whether by expiration, termination based upon Purchaser's uncured default, or both.

This letter is not intended to and does not constitute a waiver, election, or limitation of any rights, claims, defenses, positions, or remedies that Seller may have under the Contract, at law, or in equity, including Seller's claims and defenses asserted in the pending litigation and Seller's rights with respect to the Earnest Money. Seller expressly preserves all positions concerning the expiration, termination, enforceability, breach, repudiation, and effect of the Contract and its amendments. No act, omission, failure to exercise, or delay in exercising any right by Seller shall operate as a waiver of any right, claim, defense, position, or remedy Seller may have.

Sincerely,

*/s/ David Spiller*

David Spiller

DS
Cc: Scott A. Wheatley, Esq.
Lee B. Hunt, Esq.
Trevor J. Paul, Esq.
JACKSON WALKER, LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102
*swheatley@jw.com*
*lhunt@jw.com*
*tpaul@jw.com*

Cresson Moon Properties, LP



Ex. 15

In the United States District Court
for the Northern District of Texas
Fort Worth Division

| | | |
|---|---|---|
| Challenger Cresson I, LLC, Plaintiff, | § § § | |
| v. | § | No. 4:26-CV-00231-P |
| Bill Sanders, et al., Defendants. | § § § § | |

---

**Declaration of Blake J. Brownshadel**

I, Blake J. Brownshadel, declare as follows:

1. I am an attorney who has represented Plaintiff Challenger Cresson I, LLC ("Challenger") in this action. In that capacity, I am familiar with the documents concerning Challenger's acquisition of the real property at issue in this action (the "Property") under the Standard Contract of Sale and its amendments, and with the parties' correspondence concerning that transaction, including through my review of Challenger's records and the documents assembled in connection with this litigation.

2. I make this declaration based on my personal knowledge, including my familiarity, as counsel for Challenger, with documents created, sent, received, or maintained by Challenger in the ordinary course of its business and with the records of this litigation. I have reviewed each of the exhibits identified below and compared it against Challenger's records. If called to testify, I could and would testify competently to the matters stated here.

3. I submit this declaration to authenticate the documents described below so that they may be considered as part of the record. Each exhibit identified below to Challenger's instant filing is a true and correct copy of the document it purports to be.

4. Attached as **Exhibit 1** to Plaintiff's instant filing is a true and correct copy of the May 26, 2023 Standard Contract of Sale between Challenger, as Purchaser, and the Seller, concerning the Property (the "Contract"). I am familiar with the Contract, to which Challenger is a party, and Challenger maintains a copy of it in its records.

5. Attached as **Exhibit 2** to Plaintiff's instant filing is a true and correct copy of the June 8, 2023 Memorandum of Agreement concerning the Property, recorded in the real property records of Hood County, Texas. I am familiar with this instrument, which memorializes the parties' agreement concerning the Property and is maintained in Challenger's records.

6. Attached as **Exhibit 3** to Plaintiff's instant filing is a true and correct copy of a June 21, 2023 email from the Seller's broker concerning removal of tires from the Property. This

Ex. 16

email was received by Challenger and its representatives in the ordinary course and is maintained in Challenger's records.

7. Attached as **Exhibit 4** to Plaintiff's instant filing is a true and correct copy of a December 15, 2023 letter from Challenger's counsel concerning the Inspection Period under the Contract. This letter was sent on Challenger's behalf and is maintained in Challenger's records.

8. Attached as **Exhibit 5** to Plaintiff's instant filing is a true and correct copy of a January 2024 email from the Seller's broker concerning cleanup of tires on the Property. This email was received by Challenger and its representatives in the ordinary course and is maintained in Challenger's records.

9. Attached as **Exhibit 6** to Plaintiff's instant filing is a true and correct copy of a July 1, 2024 letter from Challenger's counsel concerning tires and Due Diligence Items, together with the accompanying tire photographs referenced in and transmitted with that letter. This letter was sent on Challenger's behalf, and the photographs were taken and compiled on Challenger's behalf; both are maintained in Challenger's records.

10. Attached as **Exhibit 7** to Plaintiff's instant filing is a true and correct copy of the December 4, 2024 First Amendment to the Contract of Sale. I am familiar with this amendment, to which Challenger is a party, and Challenger maintains a copy of it in its records.

11. Attached as **Exhibit 8** to Plaintiff's instant filing is a true and correct copy of the December 31, 2025 Second Amendment to the Contract of Sale. I am familiar with this amendment, to which Challenger is a party, and Challenger maintains a copy of it in its records.

12. Attached as **Exhibit 9** to Plaintiff's instant filing is a true and correct copy of the January 26, 2026 Limited Phase II Environmental Investigation prepared by Whitehead Environmental Solutions concerning the Property. Challenger obtained this report in connection with its due diligence concerning the Property, and it is maintained in Challenger's records; I am familiar with the report in that capacity.

13. Attached as **Exhibit 10** to Plaintiff's instant filing is a true and correct copy of a February 12, 2026 email from Challenger's counsel concerning environmental matters relating to the Property. This email was sent on Challenger's behalf and is maintained in Challenger's records.

14. Attached as **Exhibit 11** to Plaintiff's instant filing is a true and correct copy of a February 25, 2026 property-remarketing email and the accompanying marketing brochure concerning the Property. This email and brochure were received by Challenger and are maintained in Challenger's records.

15. Attached as **Exhibit 12** is a true and correct copy of an August 19, 2026 letter from Challenger demanding the Seller's cooperation with groundwater-permit applications concerning the Property, together with its enclosures. This letter was sent on Challenger's behalf and is maintained in Challenger's records.

16. Attached as **Exhibit 13** is a true and correct copy of an August 23, 2026 letter from the Seller responding to Challenger's August 19, 2026 demand. This letter was received by Challenger and is maintained in Challenger's records.

17. Attached as **Exhibit 14** to Plaintiff's instant filing is a true and correct copy of an October 7, 2026 letter from Challenger requesting access to the Property. This letter was sent on Challenger's behalf and is maintained in Challenger's records.

18. Attached as **Exhibit 15** to Plaintiff's instant filing is a true and correct copy of an October 26, 2026 letter from the Seller asserting expiration and termination of the Contract. This letter was received by Challenger and is maintained in Challenger's records.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2026

Signed by:

Blake Brownshadel

976C12BAA1394E3...

Blake J. Brownshadel