# STANDARD CONTRACT OF SALE

THIS STANDARD CONTRACT OF SALE (the "**Contract**") is made and entered into by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Additionally, Seller and Purchaser are sometimes collectively referred to herein as the "**Parties**" and each of the Parties is sometimes singularly referred to herein as a "**Party**". For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Contract of Purchase and Sale.**

(a) Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and indefeasible title to that certain tract of land containing approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction ("**ETJ**") of the City of Cresson (the "**City**"), Hood County, Texas, an approximate description and/or depiction of which is set forth on **Exhibit "A"** attached hereto and incorporated herein by this reference for all purposes (the "**Land**"), together with, all and singular, (i) a 100% undivided interest in the Mineral Estate (for purposes of this Contract, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Seller in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Seller which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**"). The Parties acknowledge and agree that the Property is part of a larger tract owned by Seller (the "**Parent Tract**") and that Seller is retaining the portion of the Parent Tract that does not include the Property ("**Seller's Retained Tract**"). Even though the Property has not yet been separately surveyed, the Parties agree that (A) they are experienced in transactions of this nature, (B) they are familiar with the location of the Property, (C) the description of the Property attached to this Contract identifies the Property with reasonable certainty, (D) it is the Parties' intention that the description of the Property attached to this Contract be construed, to the maximum extent allowed by law, as sufficient to identify the Property with reasonable certainty, (E) each Party hereby waives any and all claims of an insufficient legal description, including,

without limitation, any and all claims under the statute of frauds, and (F) upon the completion of the final Survey (defined below) of the Property, the Parties agree to replace **Exhibit "A"** of this Contract with the legal description of the Property in such survey and to use such legal description in all documents that require a legal description of the Property and are used in connection with the Closing.

(b) The "Property" also includes all right, title and, interest of Seller in any and all development rights relating to, associated with and/or appurtenant to the Land, including, but not limited to, all right, title and interest of Seller in and to (i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the Land and improvements now or hereafter constructed thereon; (ii) all surveys, engineering, soils, seismic, geological and environmental reports, studies, certificates and other technical descriptions; (iii) warranties, guaranties, indemnities, and any claims and causes of action (other than those against the Title Company, Brokers, Purchaser or Purchaser's representatives, agents, successors or assigns), including, without limitation, all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land; (iv) licenses, permits, governmental approvals, utility commitments, utility rights, reimbursement rights, development rights or other similar rights, (v) rights to credits, refunds, and reimbursements including without limitation any credits against, or right to pay reduced, application fees, permit fees, inspection fees or impact fees, (vi) rights under zoning cases, preliminary plans, plats, and other development applications and approvals, (vii) rights in and to engineering and architectural plans and specifications, (viii) awards or proceeds relating to the Property that are unpaid as of the Closing Date; (ix) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant, and (x) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Land.

(c) The Property shall be conveyed subject to the following matters (collectively the "**Permitted Exceptions**"):

(i) those matters deemed to be Permitted Exceptions pursuant to Section 4(d) hereof;

(ii) building restrictions and zoning regulations previously or hereafter adopted by any municipal or other public authority relating to the Property, which individually or in the aggregate do not have a material, adverse effect on Purchaser's ownership, operation, use, enjoyment, development or redevelopment of the Property; and

(iii) real property taxes for the year of Closing (as such term is defined in Section 9(a) hereof) (if such taxes are not yet due and payable) and subsequent years, which taxes shall be prorated at Closing.

**2. Purchase Price**. The purchase price (the "**Purchase Price**") for the Property shall be the sum of (a) the Land Purchase Price plus (b) the Mineral Estate Purchase Price. The "**Land Purchase Price**" shall be the product of EIGHTEEN THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($18,500.00) multiplied by the total number of gross acres of Land contained

within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The "**Mineral Estate Purchase Price**" shall be the product of ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) multiplied by the total number of gross acres of Land contained within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The Purchase Price shall be payable by Purchaser in cash at Closing (hereinafter defined).

3. **Earnest Money**. Within five (5) business days after the Effective Date (hereinafter defined), Purchaser shall deposit with McKnight Title, Attn: Jennifer Stapleton, 155 East BB Fielder Rd. Suite 200 Weatherford, TX 76087; Phone: 817-345-0101 Email: jennifer@mcknighttitle.com (hereinafter referred to as the "**Title Company**"), earnest money in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Earnest Money**"). If Purchaser fails to timely deposit the Earnest Money with the Title Company, Seller shall be entitled, as Seller's sole and exclusive remedy, to terminate this Contract by written notice to Purchaser at any time before the Earnest Money is delivered to the Title Company, in which event, Purchaser and Seller shall have no further liability hereunder. If Purchaser delivers the Earnest Money to the Title Company before Purchaser's receipt of Seller's termination notice, Purchaser shall be deemed to have timely delivered the Earnest Money and Seller shall not thereafter be entitled to terminate the Contract as a result of any delay in delivering the Earnest Money. All Earnest Money shall be deposited by the Title Company into an interest-bearing account. All interest earned on the Earnest Money shall be added to and become a part of the Earnest Money. Notwithstanding any provisions of this Contract to the contrary, TEN THOUSAND AND NO/100 DOLLARS ($10,000.00) out of the Earnest Money shall in all respects be non-refundable to Purchaser and shall be paid to Seller as independent consideration for Seller's execution of this Contract (the "**Independent Consideration**"). The Earnest Money shall be applied to the Purchase Price at the Closing. If, pursuant to any provision of this Contract, Purchaser is entitled to obtain a refund of the Earnest Money, (a) such provision shall be interpreted to mean a refund of the Earnest Money less the Independent Consideration, and (b) the Title Company shall, without further authorization or instruction from Seller or Purchaser, return the Earnest Money (less the Independent Consideration) to Purchaser.

4. **Due Diligence Information, Title Commitment and Survey**.

(a) Delivery of Documents. Within ten (10) days following the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, at Seller's sole cost and expense, copies of all of the items in Seller's possession or control listed on **Exhibit "B"** attached hereto and incorporated herein by this reference for all purposes (the "**Due Diligence Items**"). Following the Effective Date, Seller agrees to deliver to Purchaser within five (5) days following receipt thereof by Seller, copies of all other information received by Seller in connection with the Property.

(b) Title Commitment. Within twenty (20) days following the Effective Date, Seller shall cause to be delivered to Purchaser, at Seller's expense, a current Commitment for a Texas Form T-1 Owner's Policy of Title Insurance (hereinafter referred to as the "**Title Commitment**") showing all matters affecting title to the Property and binding the Title Company to issue to Purchaser at Closing an Owner Policy of Title Insurance issued by the Title Company on behalf of an underwriter acceptable to Purchaser, in the amount of the Purchase Price written in accordance with this Contract (the "**Owner's Policy**"). Seller and Purchaser further instruct the

Title Company to deliver to Seller, Purchaser and the Surveyor legible copies of all instruments referred to on Schedules B and C of the Title Commitment (the "**Exception Documents**"). The Title Commitment shall describe the Property; shall list Purchaser as the prospective named insured; shall show as the policy amount the Purchase Price; shall contain the commitment of the Title Company to insure Purchaser's fee simple interest in the Property upon the Closing; and the survey exception shall be deleted except as to "shortages in area". The Title Commitment shall show the status of the title of the Property and all exceptions which would appear in an Owner's Policy, if issued. Purchaser, at Purchaser's option, may purchase title insurance in an amount in excess of the Purchase Price from the Title Company or another escrow agent or title insurance company acceptable to Purchaser, in which event (i) Purchaser shall pay for the incremental increase in the aggregate premium charged for the Owner's Policy attributable to such increased coverage, and (ii) if Purchaser elects to purchase such excess coverage from an escrow agent or title insurance company other than the Title Company, the Title Company shall cooperate with the escrow agent or title insurance company designated by Purchaser for such excess coverage and shall remit to such designated escrow agent or title insurance company the portion of any premium payments received by the Title Company which is attributable to any such excess coverage.

(c) Survey. Seller shall deliver to Purchaser copies of the most recent surveys for the **"Parent Tract"** and the **"Retained Tract"** in Seller's possession or control within ten (10) days following the Effective Date. Purchaser shall obtain a new or recertified survey of the Land (the "**Survey**").

(d) Title and Survey Review. Purchaser shall have thirty (30) days after the receipt of the last of the Title Commitment, legible copies of all instruments referred to on Schedules B or C of the Title Commitment, and the Survey (the "**Title Review Period**") to provide Seller with written notice (the "**Title Objection Letter**") of such objections as Purchaser may have to anything contained in the Title Commitment or the Survey (collectively "**Title Objections**"). Any item contained in the Title Commitment or the Survey to which Purchaser does not object pursuant to the Title Objection Letter shall be deemed a Permitted Exception. If Purchaser delivers to Seller a Title Objection Letter, Seller shall have twenty (20) days, or such greater period of time as may be agreed upon in writing by Seller and Purchaser (the "**Cure Period**"), during which Seller shall have the right, but not the obligation, to cure or remove the Title Objections and deliver to Purchaser a revised Title Commitment or survey evidencing such cure or removal; provided, however, that Purchaser shall be deemed to have objected to and Seller shall have the absolute obligation to cure or remove all liens of any kind against the Property (the same to automatically be considered Title Objections regardless of whether or not Purchaser delivers to Seller a Title Objection Letter), including, without limitation, (i) mortgage liens, (ii) security interests, (iii) tax liens, (iv) abstracts of judgment, (v) environmental liens, and (vi) materialmen's and mechanic's liens (collectively "**Liens**"). Seller shall, prior to the expiration of the Cure Period, provide Purchaser with written notice (the "**Title Response Letter**") setting forth those Title Objections that Seller has cured or removed and those Title Objections which Seller is not required to cure or remove and is unable or unwilling to cure or remove. If Seller fails to either cure or remove all Title Objections to the reasonable satisfaction of Purchaser and the Title Company, Purchaser may, at its sole option which may be exercised at any time within the Inspection Period, either terminate this Contract by written notice to Seller, in which event the Earnest Money shall be immediately returned to Purchaser, or waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that such election shall

have no effect on Seller's obligation to cure or remove all Liens. Purchaser's failure to terminate this Contract prior the expiration of the Inspection Period shall be deemed an election by Purchaser to waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that (A) such election shall have no effect on Seller's obligation to cure or remove all Liens, and (B) Seller shall be obligated, prior to Closing, to cure all Title Objections which Seller agrees in the Title Response Letter or otherwise in writing to cure.

(e) Additional Exceptions. In the event that at any time following delivery of the Title Commitment, Exception Documents or Survey described above, but prior to Closing, any changes (other than the deletion or elimination of any item as to which Purchaser has made an objection) shall occur in the Title Commitment, Exception Documents or Survey, in addition to other remedies permitted pursuant to this Contract, Purchaser shall have the right to review and approve or disapprove of any such matters, and to terminate this Contract and obtain a refund of the Earnest Money in the event that any such exceptions are not acceptable to Purchaser.

(f) Owner's Policy. At Closing, Seller shall cause the Title Company to furnish to Purchaser, at Seller's sole cost and expense, the Owner's Policy, which shall be in the customary form prescribed by the Texas State Board of Insurance. The Owner's Policy may contain as exceptions the standard printed exceptions and the Permitted Exceptions; provided, however, (i) the standard exception for restrictions shall be deleted except for any restrictions that are Permitted Exceptions, (ii) the exception for rights of parties in possession shall be deleted, (iii) the standard exception for taxes shall be limited to the year in which Closing occurs (if such taxes are not yet due and payable), (iv) all arbitration provisions shall be deleted, (v) all matters set forth on Schedule C of the Title Commitment shall be deleted, (vi) if requested by Purchaser, Purchaser may require modification or additional title endorsements and Purchaser shall be liable for all fees and additional premiums charged by the Title Company in connection with such modifications or additional title endorsements.

5. **Inspection Period.**

(a) Commencing on the Effective Date and continuing through the one hundred eightieth (180th) day following the later to occur of (i) the date upon which all of the Tires (defined below) have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser (the "**Inspection Period**"), Purchaser shall be entitled to enter onto the Property for any purpose, including, without limitation, conducting such audits, inspections, or investigations thereon as Purchaser may deem appropriate, including, without limitation, any "Phase II" type testing or investigation. During the Inspection Period and, unless Purchaser terminates this Contract prior to the expiration of the Inspection Period, prior to Closing, Purchaser and Purchaser's representatives shall have the right to use the private roadway, a portion of which is located on Seller's Retained Tract (the "**Private Roadway**"), for purposes of ingress and egress to and from the Property, and Purchaser shall be liable for any physical damages to the Private Roadway caused by Purchaser or Purchaser's representatives. The Parties understand and agree that, upon Closing, Purchaser's right to use the portion of the Private Roadway located on Seller's Retained Tract shall terminate and Purchaser shall have no easement, express or implied, to use the portion of the Private Roadway that is located on Seller's Retained Tract. Notwithstanding any provision in this Contract to the contrary,

Purchaser shall be entitled to extend the Inspection Period two (2) times, each time for up to ninety (90) days, by delivering, at any time prior to the then-scheduled expiration of the Inspection Period, (i) written notice thereof to Seller and (ii) ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) of additional Earnest Money to the Title Company, which additional Earnest Money shall be added to and become a part of the Earnest Money, shall be applicable to the Purchase Price at Closing but shall be non-refundable to Purchaser except as set forth in Sections 4(d), 4(e), 8, 10 and 11(b). The cost of the inspections undertaken by Purchaser pursuant to this Contract shall be borne solely by Purchaser. Purchaser agrees to (A) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (B) repair any and all physical damage done to the Property or Seller's Retained Tract by Purchaser or its agents, employees or contractors during such inspection and examination. Purchaser shall have no liability with respect to any diminution in value or other losses suffered or incurred by Seller as a result of the discovery of any pre-existing conditions on, in, under or about the Property by Purchaser or its agents, employees or contractors during or in connection with such inspection and examination. Purchaser shall be entitled, for any reason in Purchaser's sole discretion, to terminate this Contract by written notice delivered to Seller at any time prior to the expiration of the Inspection Period. If Purchaser notifies Seller prior to the expiration of the Inspection Period that Purchaser has elected to terminate this Contract, this Contract shall terminate, the Earnest Money shall be returned to Purchaser and the Parties shall have no further obligations hereunder. Purchaser agrees to keep the Property free and clear of any mechanic's or materialmen's liens resulting from Purchaser's activities on the Property. After the expiration of the Inspection Period, Purchaser shall have the right to continue to conduct physical inspections and assessments of the Property, including, without limitation, taking soil samples, ground water samples and other intrusive testing, so long as Purchaser (1) indemnifies and holds Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (2) repairs any and all physical damage done to the Property by Purchaser or its agents, employees or contractors during such inspection and assessment.

(b) Annexation and City Development Agreement. Seller hereby authorizes Purchaser, at all times prior to Closing, to negotiate a pre-annexation development agreement or its equivalent with the City that addresses the annexation of the Property by the City and the terms, conditions, development rights and obligations affecting the development of Property (the "**City Development Agreement**"). Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to negotiate the terms and conditions of the City Development Agreement.

(c) Zoning Approval. Seller hereby authorizes Purchaser to seek and obtain final, unappealable approval from the City of the zoning designations desired by Purchaser that will permit Purchaser to develop the Property for the Intended Use (defined below) ("**Zoning Approval**"). Seller agrees to cooperate with Purchaser reasonably and in good faith in Purchaser's efforts to obtain the Zoning Approval. The Zoning Approval shall not be considered to have been achieved unless all of the following are true: (i) the zoning application is approved by the City without condition or exception, and (ii) all periods for appeal or protest have expired without the filing of any appeal or protest or, if an appeal or protest is filed, the same has been denied and there is no further administrative process available for appeal or protest.

(d) Platting. Purchaser may, at Purchaser's sole expense, seek to obtain a preliminary plat of the Property (the "**Preliminary Plat**"). Seller hereby authorizes Purchaser to seek to obtain final, unappealable approval from the City or Hood County, in Purchaser's sole determination, of the Preliminary Plat ("**Preliminary Plat Approval**") prior to Closing. Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to prepare the application for Preliminary Plat Approval and all supporting documentation in connection therewith (collectively, the "**Preliminary Plat Application**"), and Seller shall cooperate reasonably and in good faith with Purchaser in connection with Purchaser's efforts to obtain the Preliminary Plat Approval. Seller agrees to work with Purchaser's engineer to ensure that, to the best extent practicable, all plats of the Property contain all easements, rights-of-way and other matters reasonably required by Purchaser in connection with Purchaser's development of the Property for the Intended Use (defined below) (the "**Easements Benefitting the Property**"), and, to the extent any such Easements Benefiting the Property are not contained on such plats, Seller agrees to grant Purchaser any and all Easements Benefiting the Property over and across any land adjacent to the Property that is owned by Seller or any affiliate of Seller ("**Seller's Adjacent Property**") in a location that does not adversely impact Seller's or its affiliate's intended use of Seller's Adjacent Property.

(e) Entitlements, Utilities and Easements. During the period commencing on the Effective Date and ending upon Closing or the earlier termination of this Contract, Purchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use (defined below), including, without limitation the City Development Agreement, the Preliminary Plat Approval, the Zoning Approval, and any and all other approvals needed for the development and operation of the Property for the Intended Use (collectively, the "**Entitlements**"), and (ii) obtain all Easements Benefitting the Property, and (iii) cause all utilities needed for the development and operation of the Property for the Intended Use (collectively, the "**Required Utilities**") to be brought to the boundary of the Property and/or created on the Property. Purchaser agrees to use commercially reasonable, diligent and good-faith efforts to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller. Seller further agrees that, commencing on the Effective Date and continuing until the Closing Date, that Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval. As used herein, "**Intended Use**" shall mean a master planned industrial complex served by rail.

**6.** **Representations and Warranties**. Seller hereby represents and warrants to Purchaser, which representations and warranties shall be deemed to be restated at Closing and shall survive Closing, that:

(a) Seller is comprised of individuals and a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has complete and unrestricted power and authority to enter into this Contract and all other agreements to be executed and delivered by Seller pursuant to the terms and provisions

hereof, to perform its obligations hereunder and thereunder, and to consummate the transaction contemplated hereby;

(b) This Contract has been duly executed and delivered by Seller. All other agreements contemplated hereby to be executed and delivered by Seller will be, prior to Closing, duly authorized, executed and ready in all respects to be delivered by Seller. This Contract and all other agreements contemplated hereby constitute legal, valid and binding obligations of Seller enforceable in accordance with their respective terms;

(c) The execution, delivery and performance of this Contract and any other agreement contemplated hereby and the consummation of the transaction contemplated hereby or thereby do not, with or without the passage of time and/or the giving of notice, (i) conflict with, constitute a breach, violation or termination of any provision of any contract or other agreement to which Seller is a party or to which all or any part of the Property is bound, (ii) result in an acceleration or increase of any amounts due from Seller to any person or entity, (iii) conflict with or violate the organizational documents of Seller, (iv) result in the creation or imposition of any lien on all or any part of the Property, or (v) violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Seller or all or any part of the Property;

(d) Seller now has and shall have at Closing good and indefeasible title to the Property in fee simple absolute, free and clear of all Liens (other than any Liens that will be released at or prior to Closing). No party other than Seller and the lessees under oil and gas leases that are of record in the official public records of Hood County, Texas has any material rights in or to occupy all or any part of the Property. No party other than Purchaser has any agreement to purchase, right of first refusal, option to purchase or any other right to acquire all or any part of the Property;

(e) One hundred percent (100%) of the Mineral Estate is owned on the Effective Date by the following: (i) the Smelley Estate, which owns fifty percent (50%) of the Mineral Estate, (ii) Richard David Smelley, who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate, (iii) Amy Elizabeth Smelley who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Tammy Elizabeth Graham, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate; (v) Gregory Graham who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Deborah Davis who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; and (iv) David Davis, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate. Deborah Davis and David Davis shall either (A) prior to the Closing Date, convey all of their respective interests in the Mineral Estate in equal shares to Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, and Gregory Graham, or (B) on the Closing Date, convey all of their respective interests in the Mineral Estate to Purchaser. At Closing, Seller shall convey to Purchaser an undivided interest in one hundred percent (100%) of the Mineral Estate.

(f) There are no actions, suits, claims, assessments, or proceedings pending or, to the best of Seller's knowledge, threatened that could materially adversely affect the

ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform hereunder;

(g) Seller has no information of and to the best of Seller's knowledge, there is not (i) any change contemplated in any applicable law, statute, ordinance, rule, regulation, order, or determination of any governmental authority or any board of fire underwriters (or other body exercising similar functions), (ii) any law, ordinance, regulation, administrative ruling, restrictive covenant or deed restriction affecting all or any part of the Property, including without limitation, any applicable zoning ordinances, building codes, flood disaster laws, wetlands regulation, health law or environmental law, (iii) any judicial or administrative action, (iv) any action by adjacent landowners, (v) any administrative action, (vi) any natural or artificial condition on or about the Property, or (vii) any significant adverse fact or condition relating to the Property or its use, that would prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property;

(h) The Property is not within an area designated by the United States Secretary of Housing and Urban Development, the United States Army Corp of Engineers or any other local, state or federal organization or entity as having an increased likelihood of flooding;

(i) No Hazardous Substances (as such term is hereinafter defined) have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property and there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to the use, generation, manufacture, storage or disposal of any Hazardous Substances in, on, under or about the Property. As used in this Contract, the term "***Hazardous Substances***" means any and all substances, materials and wastes which are or become regulated under applicable local, state or federal Environmental Laws or that are classified as hazardous or toxic under local, state or federal Environmental Laws or regulations, including, without limitation, (i) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "solid waste," "pollutant" "contaminant" or words of similar import as such terms are defined by or listed in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("***CERCLA***"), as amended by Superfund Amendments and Reauthorization Act of 1986 ("***SARA***"), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.) ("***EPCRA***"), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("***RCRA***"), as amended by the Hazardous and Solid Waste Amendments of 1984, the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide and Rodenticide Control Act (7 U.S.C. § 136 et seq.), the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), the Federal Clean Air Act (42 U.S.C. § 7401 et seq.), and in the regulations promulgated pursuant to such laws, all as amended, (ii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101) or 40 CFR Part 302, both as amended, (iii) any material, waste or substance which is (A) oil, gas or any petroleum or petroleum by-product, (B) asbestos, in any form, (C) polychlorinated biphenyls, (D) designated as a

"hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1251 et seq.), as amended, (E) flammable explosives, or (F) radioactive materials, and (iv) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," "hazardous waste," "industrial solid waste," "solid waste," "radioactive waste" or "special waste from health care facility" in the Texas Solid Waste Disposal Act (Tex. Health & Safety Code Ann ch. 361), the Texas Clean Air Act (Tex. Health & Safety Code ch. 282), the Texas Pesticide Control Act (Tex. Agric. Code Ann. § 76.001 et seq.) and those substances included within the definitions of "hazardous substances," "regulated substances" or "petroleum products" in Subchapter I of the Texas Water Code (Tex. Water Code Ann ch. 26, subch. I) and in the regulations promulgated pursuant to any of such laws, all as the same may be amended from time to time (collectively "***Environmental Laws***"). Further, Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of Hazardous Substances in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of Environmental Laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of Environmental Laws, and (d) claims for contribution, cost recovery, remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code;

(j) The Land has direct and unencumbered access to and from one or more publicly dedicated streets or highways accepted for maintenance and maintained by Hood County and/or the State of Texas;

(k) Any and all underground storage tanks previously removed from the Property by Seller were removed in accordance with all applicable laws, ordinances, regulations and administrative rulings and no underground storage tanks are presently situated in, on, under or about the Property;

(l) The Property includes all sewer and wastewater discharge capacity, potable water capacity, other utility rights and development rights which were originally obtained with the Property by Seller, and no such capacity or rights have been previously conveyed or transferred by Seller;

(m) As a result of the sale of the Property from Seller to Purchaser as contemplated by this Contract, there will be no taxes or assessments assessed against the Property by any taxing authority for the year of Closing or prior years based on change in use or ownership; and

(n) The Due Diligence Materials are true, accurate and complete in all material respects.

7. **Covenants and Agreements of Seller**. Seller covenants and agrees with Purchaser as follows:

(a) Seller and Purchaser each shall, simultaneously with its execution of this Agreement, execute and deliver to the Title Company, a Memorandum of Agreement in the form attached hereto as **Exhibit "E"** (the "**Memorandum**") and Seller and Purchaser hereby instruct the Title Company to record, at Purchaser's expense, the fully executed Memorandum in the official public records of Hood County, Texas (the "**Public Records**") within three (3) business days following the full execution of this Agreement. The Parties agree not to terminate or release the Memorandum, or otherwise cause or permit the Memorandum to be terminated or released, from the Public Records unless and until Closing or the earlier appropriate termination of this Agreement has occurred. At Closing or promptly following the earlier appropriate termination of this Agreement, the Parties shall execute all commercially reasonable documents required by the Title Company to terminate and release the Memorandum from the Public Records (collectively, the "**Memorandum Release Documents**").

(b) Prior to Closing, Seller shall not execute or create any contract or option to purchase, easement, covenant, condition, restriction, lien or encumbrance with respect to the Property or any portion thereof with the exception of (i) the conveyance by Deborah Davis and David Davis of their interests in the Mineral Estate as referenced in Section 6(e) above and (ii) the recordation of the Memorandum as described in Section 7(a) above. To the extent that the Property, or any portion of the Property, is entitled to a tax exemption, Seller shall maintain such exemption and reasonably cooperate with Purchaser in assisting Purchaser to maintain and continue such tax exemption.

(c) Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

(d) Seller shall, within thirty (30) day period after the Effective Date (the "**Tire Removal Period**"), remove from the Land all tires and parts thereof situated on the Land (collectively, the "**Tires**"). Seller shall be liable for all costs to remove any and all Tires that Seller fails to remove during the Tire Removal Period and Seller shall (i) prior to Closing, remove such Tires from the Land within five (5) business days after the date Purchaser delivers notice thereof to Seller, (ii) after Closing, reimburse Purchaser for all costs incurred by Purchaser in connection with removing any Tires from the Land, and (iii) indemnify, defend and hold harmless all Indemnities from and against any and all Claims arising in connection with the Tires.

(e) Notwithstanding anything to the contrary in this Contract, Seller shall not oppose, and Seller shall not interfere with, Purchaser's applications for, or efforts to obtain, any and all Entitlements, Easements Benefitting the Property and the Required Utilities.

(f) The obligations in this Section 7 shall survive Closing.

8. **Conditions Precedent to Closing**. In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:

(a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or unconditional agreements to bring all the Required Utilities to the boundary line of the Property or create the Required Utilities on the Property have been received by Purchaser;

(b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and correct in all material respects as of the specified date or as limited by the specified date, and (ii) Seller's representations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be performed and observed by such Party prior to and on the Closing Date;

(c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;

(d) Tires. Seller shall have removed all Tires from the Land;

(e) Covenants. All covenants and other obligations of Seller set forth in this Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however,

that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract.

**9. Closing.**

(a) Date. The closing of the sale of the Property from Seller to Purchaser (the "**Closing**") shall be coordinated through the offices of the Title Company on, or at Purchaser's option, before, the ninetieth (90th) day following the expiration of the Inspection Period (the "**Closing Date**").

(b) Seller to Deliver. At the Closing, Seller shall furnish and deliver to the Title Company for delivery to Purchaser, at Seller's expense (except as provided in Section 9(e) below), the following:

(i) A Special Warranty Deed, in the form of **Exhibit "C-1"** attached hereto, duly executed and acknowledged by Seller, dated as of the Closing, conveying good and indefeasible title to the Property to Purchaser, subject only to the Permitted Exceptions.

(ii) A Mineral Deed, in the form of **Exhibit "C-2"** attached hereto, duly executed and acknowledged by the applicable Seller, dated as of the Closing, conveying to Purchaser the applicable Seller's interest in and to the Mineral Estate.

(iii) A general assignment to Purchaser, in the form of **Exhibit "D"** attached hereto, which, among other things, assigns Seller's interest in and to (A) any lease agreement that Purchaser has expressly agreed to assume, (B) any and all permits, approvals, licenses, water and sewer capacity commitments and other rights and interests owned or held by Seller in connection with the Property, and (C) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land.

(iv) All Memorandum Release Documents.

(v) Any and all agreements assigning or granting to Purchaser easements owned by Seller which are used or needed in connection with the development of the Land.

(vi) An Owner's Policy covering the Property issued by the Title Company in accordance with the terms of the Title Commitment described in Section 4(b) above, containing no exceptions other than the Permitted Exceptions. The Owner's Policy shall be amended to delete the survey exception except as to "shortages in area".

(vii) A Non-Foreign Certification signed by Seller under penalties of perjury.

(viii) Possession of the Property.

(ix) Such instruments or documents as are necessary, or reasonably required by Purchaser or the Title Company to evidence the status and capacity of Seller and the authority of the person or persons who are executing the various documents on behalf of Seller in connection with the purchase and sale transaction contemplated hereby.

(c) Purchaser to Deliver. At the Closing, Purchaser shall deliver to the Title Company for delivery to Seller, at Purchaser's expense, the following:

(i) The Purchase Price in immediately available funds.

(ii) All Memorandum Release Documents.

(iii) Such instruments or documents as are necessary, or reasonably required by Seller or the Title Company to evidence the authority of Purchaser to consummate the purchase and sale transaction contemplated hereby and to execute and deliver the closing documents to be delivered by Purchaser.

(d) Adjustments.

(i) Seller shall be responsible for payment of all taxes and assessments levied or assessed, including, without limitation, real and personal property taxes, prior to the Closing ("**Taxes**"). Taxes for the calendar year in which the Closing takes place shall be prorated at the Closing between Purchaser and Seller through the Closing Date, based on the current year's tax with due allowance made for the maximum discount allowable for prompt payment (if allowed for such year). If the Closing occurs on a day when the current year's tax rate is not fixed and the current year's assessment is available, Taxes will be prorated based upon such assessments and the prior year's rate. If the current assessment is not available at the time of Closing, then Taxes will be prorated on the basis of the latest available tax rate and assessment and subsequently re-prorated and promptly paid to the Party entitled thereto.

(ii) If the Land is assessed and taxed as a part of a larger parcel of real estate, then, for purposes of computing tax prorations hereunder: (A) Seller shall be solely responsible for payment of the portion of the taxes allocable to any other land and/or improvements located within the larger tract, and shall escrow the estimated amount of such taxes with the Title Company at Closing pursuant to an escrow agreement which will obligate the Title Company to release such funds to the applicable taxing authority upon receipt of a tax bill therefore and will obligate Seller to pay any deficiency between the amount of the escrowed funds and the actual amount of taxes within ten (10) days after receipt of notice thereof; and (B) a proportionate part of the real estate taxes attributable to such larger parcel shall be allocated to the Land on the basis of either of the following at Purchaser's discretion: (1) the ratio that the value of the Land bears to the value of the larger tract or parcel of land, or (2) the ratio that the area of land contained within the Land bears to the area of land contained within the larger parcel of real estate.

(iii) Seller represents and warrants to Purchaser that, as of the Effective Date, the Land is receiving special tax assessment rates (agricultural use) and Seller agrees, until

the Closing or the earlier termination of this Contract, to comply with the requirements that entitle the Land to receive such special tax assessment rates. Subject to the foregoing, the Parties acknowledge and agree that Purchaser's intended use of the Property after Closing will result in the assessment of rollback taxes for periods prior to Closing, and Purchaser shall be responsible for paying such assessments of rollback taxes triggered by Purchaser's change of use of the Land or loss of special taxing assessment rates based upon the acts of Purchaser; provided, however, that if rollback taxes are triggered for periods prior to Closing by (A) a change in use of the Land prior to Closing, (B) denial of a special use valuation on any portion of the Land claimed by Seller, or (C) any other act not caused by Purchaser, such rollback taxes shall be the obligation of Seller and shall be paid by Seller at Closing. If the amount of the taxes described in this paragraph is not ascertainable at Closing, such amount shall be estimated by Purchaser's tax consultant and 110% of the estimated amount of any amount owed by Seller shall be escrowed by Seller with the Title Company at Closing pursuant to a commercially reasonable form of escrow agreement between Seller, Purchaser and the Title Company which will authorize and instruct the Title Company to pay the rollback taxes due upon receipt of an invoice therefor and will obligate Seller to pay any deficiency.

(iv) Any tax proration based upon an estimate may, upon demand of either Party to the transaction, be subsequently readjusted upon receipt of the actual tax bill for the Property for the year in which the Closing occurs, and any Party owing the other Party monies as a result of such readjustment shall pay the same upon demand.

The provisions of this Section 9(d) shall survive the Closing.

(e) Expenses of Closing.

(i) Seller shall pay: (A) all title examination fees and the base premiums for the Owner's Policy; (B) its proportionate share of the prorations set forth in Section 9(d); (C) its own attorneys' fees; (D) other charges required to be paid by Seller pursuant to this Contract; (E) any local, county or state transfer, recording or documentary tax assessed in connection with the transfer to Purchaser; (F) the cost of the Survey (which payment shall be in the form of a credit to Purchaser against the Purchase Price); (G) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties, and (H) other charges typically paid by sellers in transactions of this nature in the county in which the Property is located.

(ii) Purchaser shall pay: (A) the cost of any endorsements to the Owner's Policy requested by Purchaser or Purchaser's lender; (B) its proportionate share of the prorations set forth in Section 9(d); (C) its own attorneys' fees; (D) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties; and (E) other charges required to be paid by Purchaser pursuant to this Contract.

**10. Casualty or Condemnation Prior to Closing.** If at any time prior to the Closing any portion of the Property is destroyed or damaged by fire or any other casualty, or in the event a taking by condemnation, eminent domain or similar proceedings or a conveyance in lieu thereof is commenced or threatened with respect to any portion of the Property, Seller shall give notice

thereof to Purchaser and Purchaser shall thereupon have the option to terminate this Contract upon written notice to Seller prior to Closing, in which event the Earnest Money shall be promptly refunded to Purchaser, whereupon this Contract shall be rendered null and void and the Parties shall have no further obligations or liabilities hereunder. If Purchaser does not exercise its option under this Section 10 to terminate this Contract, this Contract shall remain in full force and effect and Seller shall assign or pay to Purchaser at Closing Seller's interest in and to any and all insurance proceeds and condemnation awards.

**11. Default and Remedies.**

(a) Purchaser's Default. In the event Purchaser defaults under this Contract or fails to perform any obligation of Purchaser under this Contract, and such default and failure shall remain uncured for a period of ten (10) days following written notice thereof from Seller to Purchaser, provided that Seller has not defaulted in the performance of any of Seller's obligations hereunder, Seller may, as Seller's sole and exclusive remedy, terminate this Contract by written notice to Purchaser at any time before such default by Purchaser is cured, in which event, Seller shall be entitled to retain the portion of the Earnest Money which has then been deposited by Purchaser as liquidated damages for Purchaser's default and Purchaser shall thereby be released from further obligations under this Contract. Such amount is agreed upon by and between Seller and Purchaser as liquidated damages, due to the difficulty and inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof; and no other damages, rights or remedies shall in any case be collectible, enforceable or available to Seller other than in this Section 11(a), but Seller shall accept said cash payment as Seller's total damages and relief. If this Contract is terminated as a result of Purchaser's default, Purchaser's liability shall be limited to the portion of the Earnest Money which has previously been deposited by Purchaser hereunder, and in no event shall Purchaser be responsible or liable for any portion of the Earnest Money which has not then been deposited by Purchaser hereunder, whether or not such amount is then due. Notwithstanding any provision herein and without limiting Seller's rights in the preceding sentence, Seller shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Purchaser's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

(b) Seller's Default. In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third party out of pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any

representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

**12. Real Estate Brokerage; Consulting Fees.**

(a) Real Estate Brokerage. At Closing, Seller agrees to pay a real estate brokerage commission to M&W Real Estate, LLC ("**Purchaser's Broker**") in the amount of three percent (3%) of the Purchase Price and to Williams Trew Real Estate (Stephen Reich) ("**Seller's Broker**") in the amount of three percent (3%) of the Purchase Price. Purchaser's Broker and Seller's Broker are sometimes collectively referred to in this Contract as "**Brokers**". At Closing and upon funding, Seller shall be responsible for the payment of the real estate brokerage commissions becoming due to Brokers. Each Party represents and warrants to the other there has been no broker, finder, real estate agent or similar agent engaged in connection with the transaction contemplated hereby other than Brokers and each Party agrees that should any claim be made for brokerage commissions or finder's fees by any other broker, finder or agent by, through or on account of any acts of the indemnifying Party or its agents, employees or representatives, the indemnifying Party will hold the other Party free and harmless from and against any and all loss, liability, cost, damage and expense (including, without limitation, attorneys' fees, accountants' fees, court costs and interest) in connection therewith. The provisions of this paragraph shall survive the Closing of this Contract.

(b) **Disclosure. Purchaser advises Seller and Seller acknowledges that each of the following is a principal of Purchaser and is a licensed real estate broker or sales agent acting on his or her own behalf: None.**

**13. Miscellaneous.**

(a) Notices. All notices, requests and other communications under this Contract shall be in writing and shall be delivered in person by hand delivery or overnight delivery service, by electronic mail, or sent by certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If intended for Seller: | Bill Sanders, Independent Executor of<br>the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028<br>Telephone No.: (817) 266-1283<br>Email: bsanders@flash.net |
| With a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092<br>Telephone No.: (817) 410-4012<br>Email: todd.2@verizon.net |

with a copy to:

Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC,
General Partner
Attn Richard D Smelley, Deborah R. Davis,
and Tammy M. Graham, Managers
750 Cattlebaron Drive
Fort Wort, Texas 76108
Telephone No: (817) 300-4350
Email: sgd@flash.net

with a copy to:

Richard Smelley and Amy Smelley
4750 Cattlebaron Drive
Fort Worth, Texas 76108
Telephone Number: (817) 300-4355
Email: amy.smelley@icloud.com

with a copy to:

Deborah Davis and David Davis
12601 Cleburne Hwy
Cresson, Texas 76035
Telephone No: (817) 300-4352
Email: davidgdavis1@yahoo.com

with a copy to:

Tammy Graham and Gregory Graham
6651 Weiland Road
Weatherford, Texas 76088
Telephone No: (817) 300-0780
Email: tammy@locationsphotography.com

If intended for Purchaser:

Challenger Realty Group, LLC
Attn: John Contrevo
100 Essex Avenue
Bellmawr, New Jersey 08031
Telephone No: (856) 498-4412
Email: John@challengerrealtygroup.com

with a copy to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225
Telephone No: (214) 390-3264
Email: jlibby@LibbySparks.com

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided. All such notices, requests and other communications, if sent to the address set forth herein above or to such other address as a Party may provide to the other Party in writing, shall be deemed to have been delivered upon receipt at such address if delivered in person, upon deposit with an overnight courier if delivered by overnight delivery, upon deposit in a post office

or official depository of the United States Postal Service if mailed, and upon transmission if by electronic mail.

(b) Assignment. Purchaser may assign or transfer its rights and obligations under this Contract at any time to any entity owned and/or controlled, in whole or in part, directly or indirectly, by one or more of the principals of Purchaser (a "**Purchaser Affiliate**") without the consent of Seller, and this Contract shall inure to the benefit of and be binding on the Parties hereto and their respective successors and assigns. Except as set forth above, Purchaser may not assign or transfer its rights or obligations under this Contract without the prior, written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned. If Purchaser assigns its rights and obligations under this Contract to a Purchaser Affiliate that fully assumes Purchaser's obligations and liabilities under this Contract, Purchaser shall be automatically fully released from all of its obligations and liabilities hereunder. In such event, Seller agrees to and shall immediately upon request by Purchaser execute a written instrument in a form satisfactory to Purchaser evidencing and confirming such full release.

(c) Force Majeure. A Party shall not be deemed to be in breach or in violation of this Contract if it is prevented from performing any of its obligations hereunder by reason of acts of the other Party, acts of God, riots, strikes, fires, weather, public disturbances, and/or any regulation of any governmental authority including, without limitation, a moratorium or government shut-down (each, a "**Force Majeure Event**"); provided, however, that the Party wishing to rely on such Force Majeure Event shall notify the other Party in writing within ten (10) business days of the commencement and ending of the Force Majeure Event in order to be entitled to the benefit of the delays in performance caused by such Force Majeure Event. No Force Majeure Event(s) singularly or in the aggregate shall exceed sixty (60) days.

(d) Survival. Except as otherwise provided herein, the provisions of this Contract shall survive the Closing and shall not merge into the conveyance documents executed and delivered at Closing.

(e) Joint and Several Liability. All parties signing this Contract as Seller shall be jointly and severally liable for all obligations of Seller.

(f) Entire Agreement; Modifications. This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the Party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

(g) Partial Invalidity. If any clause or provision of this Contract is or should ever be held to be illegal, invalid, or unenforceable under any present or future law applicable to the terms hereof, then it is the intention of the parties hereto that the remainder of this Contract shall not be affected thereby, and that in lieu of each such clause or provision of this Contract that is illegal, invalid, or unenforceable, there be added as a part of this Contract a clause or provision as similar

in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(h) Applicable Law. THIS CONTRACT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(i) Captions. The captions in this Contract are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

(j) Binding Effect. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns. This Contract and Purchaser's rights hereunder may be assigned by Purchaser without the consent of Seller to an entity that is owned and/or controlled, in whole or in part, by one or more of the members of Purchaser. Otherwise, Purchaser must obtain Seller's prior written consent.

(k) Time is of the Essence. With respect to all provisions of this Contract, time is of the essence. However, if the Closing or the final date of any period which is set out in any provision of this Contract falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Texas, then, and in such event, the Closing or such period shall be extended so that the Closing or the last day of such period falls on the next day which is not a Saturday, Sunday or legal holiday. If Seller fails to timely deliver to Purchaser the Title Commitment, Exception Documents or any other document or information required to be delivered by Seller to Purchaser hereunder, the date of expiration of the Inspection Period, the Closing Date and the expiration date of all other time periods hereunder shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser.

(i) Independent Counsel; Interpretation. Purchaser and Seller each acknowledge that: (a) they have had the opportunity to be and/or have been represented by independent counsel in connection with this Contract; (b) they have executed this Contract with the advice of such counsel; and (c) this Contract is the result of arm's length negotiations between the parties hereto and the advice and assistance of their respective counsel. Notwithstanding any rule of law to the contrary: (i) the fact that this Contract was prepared by Purchaser's counsel as a matter of convenience shall have no import or significance, and any uncertainty or ambiguity in this Contract shall not be construed against Purchaser because Purchaser's counsel prepared this Contract; and (ii) no deletions from prior drafts of this Contract shall be construed to create the opposite intent of the deleted provisions.

(j) Counterpart Execution. This Contract may be executed in multiple counterparts. An electronic copy of this Contract bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Contract.

**14.** **Effective Date**. The "**Effective Date**" or any other reference to the date of this Contract shall mean the date on which this Contract is signed by Seller, Purchaser and the Title Company, as indicated by their signatures below.

*[Signature pages follow this page.]*

EXECUTED by Seller this 26 day of MAY, 2023.

**SELLER**:

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

**SELLER**:

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

By: ____________________
Richard Smelley, Manager

By: ____________________
Tammy Graham, Manager

By: ____________________
Deborah Davis, Manager

**SELLER**:

DEBORAH RUTH DAVIS

DAVID GLENN DAVIS

**SELLER**:

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser this 26 day of May, 2023.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: [signature]
John Contrevo, Manager

*[Signature pages continue on following page.]*

The undersigned Title Company acknowledges receipt of a fully executed copy of this Contract this 26 day of May 2023, 2023, and agrees to comply with the provisions of this Contract, including the provisions hereof governing disposition of the Earnest Money.

**TITLE COMPANY:**

**MCKNIGHT TITLE**

By: [signature]

Name: Jennifer Stapleton

Title: Escrow Officer

**Escrow Receipt:**

The title company acknowledges receipt of:

√ A. the contract on this day May 26, 2023 (effective date);

√ B. earnest money in the amount of $ 100,000.00 in the form of WIRE

On May 30, 2023.

Title Company: Midnight Title

By: Jennifer Stapleton. Jennifer

Address: 4916 Camp Bowie Blvd. 100

Fort Worth, TX 76107

Phone/Fax: 8175290776

Assigned file number (GF#): CB.8280.JS

**EXHIBIT "A"**

**<u>DESCRIPTION OF THE LAND</u>**

Approximately 1,674 gross contiguous acres as more particularly described in this Contract, which approximately 1,674 gross contiguous acres is part of the following described Parent Tract:

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

<u>Tract I:</u> 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

<u>Tract II:</u> 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **<u>Appendix 1</u>** to this Exhibit "A" and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT "A"

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or higiway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line,
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

# EXHIBIT "B"

## DUE DILIGENCE DOCUMENTS

1. Any and all leases affecting the Property and amendments thereto, as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases;

2. All outstanding third-party service contracts and other agreements affecting the Property;

3. Disclosure of any legal matters affecting the Property;

4. Any notices, correspondence, approvals, permits, and/or licenses or any agreements (including, without limitation subdivision and similar agreements) with, to or from any governmental or quasi-governmental authority having jurisdiction over the Property;

5. Plans, specifications, certificates, inspection reports, notices, correspondence and all other documents prepared, transmitted or received by Seller, if any, in connection with any existing subdivision of or improvements constructed or to be constructed upon the Property;

6. Any letters in existence from utility companies stating whether appropriate facilities have been installed and are available to the boundaries of the Property;

7. Any and all additional data, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, existing surveys, platting and other materials (including a copy of Seller's most current existing survey of the Property), and all other information and agreements, relating to the Property or any portion thereof which is in the possession of Seller or its agents;

8. Any and all tax statements for three calendar years prior to the date of this Contract;

9. All licenses and permits affecting the Property;

10. Any other agreements or documents not referenced above relating to or affecting the Property; and

11. Any and all reports, tests, evaluations, notices, documentation and correspondence relating to (a) the availability of utilities and/or utility capacity including, without limitation, water, sewer, gas, and electricity, at or near the Property, (b) all bodies of water and waterways in, on or under the Property, and (c) rail lines and railways on or across the Property and on land adjacent to the Property.

**EXHIBIT "C-1"**

**FORM OF SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF ________________ | § | |

THAT, ________________________________________ ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by ________________, a ________________ ("**Grantee**"), whose address is ____________________________, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee, that certain real property situated in ____________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with, all and singular, (i) a one hundred percent (100%) undivided interest in the Mineral Estate (for purposes of this deed, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Grantor in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Grantor which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**").

This conveyance is made by Grantor and accepted by Grantee subject to any easements, restrictions and other matters described in Exhibit B attached hereto and incorporated herein by reference (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property, together with, all and singular, the rights and appurtenances thereto in anywise belonging, to Grantee and Grantee's successors and assigns forever; and subject only to the Permitted Exceptions, Grantor does hereby bind Grantor and Grantor's successors and assigns to warrant and forever defend, all and singular, the Property unto

the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise.

EXECUTED to be effective the ____ day of ____________, 20_____.

GRANTOR:

________________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on _______________, 20___, by _______________ ______, the ______________ of _______________, on behalf of said _______________.

_________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

EXHIBIT A TO SPECIAL WARRANTY DEED

Description of Property

[*insert description of Property per this Contract*]

---

EXHIBIT B TO SPECIAL WARRANTY DEED

Permitted Exceptions

[*insert Permitted Exceptions per this Contract*]

**EXHIBIT "C-2"**

**FORM OF MINERAL DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**MINERAL DEED**

THE STATE OF TEXAS §
§ KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF ______________ §

THAT, ________________________________, a ____________ (if an individual, insert "*a [single]/[married] [woman]/[man]*") ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by ________________, a ________________ ("**Grantee**"), whose address is ____________________________, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD, ASSIGNED, CONVEYED and DELIVERED, and by these presents does GRANT, BARGAIN, SELL, ASSIGN, CONVEY and DELIVER unto Grantee, an undivided 1/*****th interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in __________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said land for oil, gas and other minerals, and removing the same therefrom.

Said Land being now subject to those certain oil and gas leases described on Exhibit B attached hereto and made a part hereof for all purposes (the "**Leases**") executed in favor of record owner, it is understood and agreed that this sale is made subject to the terms of said Leases, but covers and includes 1/*****th of all of the oil royalty and gas rental or royalty due and to be paid under the terms of said Leases, in so far as it covers the above described Land.

It is understood and agreed that 1/*****th of the money rentals, which may be paid, on the above described Land, to extend the term within which a well may be begun under the terms of any said Leases, is to be paid to the said Grantee; and, in event that any of the above described Leases for any reason becomes canceled or forfeited, then and in that event, Grantee shall own 1/*****th of all oil, gas and other minerals in and under said Lands, together with a like 1/*****th interest in all bonuses paid, and all royalties and rentals provided for in future oil, gas and mineral leases covering the above described Lands.

TO HAVE AND TO HOLD the above described property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee herein, and

Grantee's successors, heirs and assigns forever; and Grantor does hereby bind itself and its successors, heirs, executors and administrators, to warrant and forever defend all and singular the said property unto the said Grantee herein, and Grantee's successors, heirs and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof.

---

EXECUTED to be effective the ____ day of ____________, 20_____.

**GRANTOR:**

______________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on _______________, 20___, by __________________________, the __________________ of _____________, on behalf of said __________________.

______________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

EXHIBIT A TO MINERAL DEED

Description of the Land

[*insert description of the Land per this Contract*]

---

EXHIBIT B TO MINERAL DEED

Description of Existing Oil and Gas Leases

[*insert description below*]

**EXHIBIT "D"**

**GENERAL ASSIGNMENT**

THIS GENERAL ASSIGNMENT (this "**Assignment**") is made as of the ____ day of __________, 20___, by ___________________, a _________________ ("**Seller**"), to ______________________________, a ______________________ ("**Purchaser**").

WHEREAS, of even date herewith, Seller has conveyed to Purchaser the real property described in Exhibit A attached hereto ("**Land**"), together with all improvements (the "**Improvements**") located thereon (the Land and Improvements are referred to herein collectively as the "**Property**"); and

WHEREAS, Seller and Purchaser intend that Seller also convey to Purchaser all of the Conveyed Development Rights (as hereinafter defined).

NOW, THEREFORE, Seller, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, hereby agrees as follows:

1. Seller has GRANTED, BARGAINED, SOLD, CONVEYED and ASSIGNED, and by these present does hereby GRANT, BARGAIN, SELL, CONVEY and ASSIGN to Purchaser all of Seller's right, title and interest in and to the following, but only to the extent same pertain to the Property ("**Conveyed Development Rights**"):

(a) all surveys, engineering, soils, seismic, geological and environmental reports, studies and certificates and other technical descriptions;

(b) all warranties, guaranties and indemnities received from third parties, and all claims, demands and causes of action against third parties, but only to the extent they are for the benefit of, and applicable to, the Property or the owner thereof, including, without limitation, (i) any warranties, guaranties, indemnities, contractual rights, claims, demands and causes of action pertaining to the development, construction, design or completion of the Property and/or the common areas, streets, utilities or other subdivision infrastructure, and (ii) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land;

(c) all licenses, permits, governmental approvals, utility commitments, utility rights (including rights to capacity or service), drainage and detention rights, or right to pay reduced application fees, permit fees, inspection fees, impact fees, development rights or other similar rights;

(d) rights to credits, refunds and reimbursements, including, without limitation, any credits against, or right to pay reduced application fees, permit fees, inspection fees, impact fees, or other similar development credits;

(e) all rights under any zoning cases, preliminary plans, plats (preliminary or final) of any portion of the Property or any rights-of-way abutting the Property or any portion thereof, including any boundary plats and any right-of-way plats, submitted, approved or recorded;

(f) all unpaid awards or proceeds, including awards in connection with insurance and any eminent domain taking;

(g) rights in and to engineering and architectural plans and specifications;

(h) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant;

(i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the land and improvements now or hereafter constructed thereon; and

(j) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Property.

TO HAVE AND TO HOLD the Conveyed Development Rights unto Purchaser and Purchaser's successors and assigns forever.

2. This Assignment will be binding on Seller, its successors and assigns, and will inure to the benefit of Purchaser, its successors and assigns.

3. This Assignment does not constitute an assumption of any liability or obligation by Purchaser, nor will it be deemed to impose on Purchaser any liability or obligation.

4. Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of any and all substances, materials and wastes which are or become regulated under applicable local, state or federal environmental laws or that are classified as hazardous or toxic under local, state or federal environmental laws or regulations in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of environmental laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of environmental laws, and (d) claims for contribution, cost recovery,

remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code.

5. Seller and Purchaser will each cooperate with each other, their employees, and agents to facilitate the purpose and intent of this Assignment including, without limitation, the providing of information and documentation that may be reasonably required for the enforcement of the rights and interests assigned hereby.

6. This Assignment may be executed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument.

*[Remainder of page is intentionally left blank]*

EXECUTED as of the date first written above.

________________________________,
**a** ______ ______________

By: ____________________________
Name: ____________________________
Title: ____________________________

THE STATE OF TEXAS §
§
COUNTY OF __________ §

This instrument was acknowledged before me on _______________, 20___, by ____________________, ______________________ of ______________________, a _______ _______________, on behalf of said ___________.

________________________________
Notary Public, State of Texas

[Official Notary Stamp]

---

<u>Exhibit A to General Assignment</u>

<u>Legal Description of Property</u>

[Insert land description]

**EXHIBIT "E"**

**FORM OF MEMORANDUM OF AGREEMENT**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**MEMORANDUM OF AGREEMENT**

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** ____________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ____________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this ______ day of ____________________, 2023.

**SELLER**:

______________________________

**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

(seal) LINDA COFFEY JESSUP Notary Public, State of Texas Comm. Expires 11-01-2024 Notary ID 2157347

______________________________
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________
Richard Smelley, Manager

By:____________________
Tammy Graham, Manager

By:____________________
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

____________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

____________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.] [Signature pages continue on following page.]*

**SELLER:**

Richard David Smelley
**RICHARD DAVID SMELLEY**

Amy Elizabeth Smelley
**AMY ELIZABETH SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

[signature]
**TAMMY MARIE GRAHAM**

[signature]
**GREGORY SCOTT GRAHAM**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

[signature]
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

[signature]
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

Deborah Ruth Davis
______________________________
**DEBORAH RUTH DAVIS**

______________________________
**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

Linda Coffey Jessup
Notary Public Signature

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

## EXHIBIT A TO MEMORANDUM OF AGREEMENT

**Property Description**

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing ell of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** ____________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ____________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this ______ day of ____________________, 2023.

**SELLER:**

[signature] IND EX.

**BILL SANDERS, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

[signature: Linda Coffey Jessup]
Notary Public Signature

(seal) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

**SELLER:**

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: Richard Smelley
Richard Smelley, Manager

By: [signature]
Tammy Graham, Manager

By: Deborah Davis
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]*

**SELLER:**

Richard David Smelley
**RICHARD DAVID SMELLEY**

Amy Elizabeth Smelley
**AMY ELIZABETH SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347
(seal)

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347
(seal)

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

[signature]
**DEBORAH RUTH DAVIS**

[signature]
**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________
John Contrevo, Manager

STATE OF New Jersey §
§
COUNTY OF Camden §

This instrument was acknowledged before me on the 18 day of May 2023, by John Contrevo, Manager of Challenger Realty Group, LLC, a Delaware limited liability company, for and on behalf of said limited liability company, for the purposes stated in said instrument.

(SEAL)

______________________
Notary Public, ~~State of Texas~~
State of New Jersey SE
May 18, 2023

SHAMAYNE R EVERITT
Commission # 50208874
Notary Public, State of New Jersey
My Commission Expires
April 11, 2028

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**Property Description**

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

# APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

## Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt, J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degreas West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest comer of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP,<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |