# STANDARD CONTRACT OF SALE

THIS STANDARD CONTRACT OF SALE (the "**Contract**") is made and entered into by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Additionally, Seller and Purchaser are sometimes collectively referred to herein as the "**Parties**" and each of the Parties is sometimes singularly referred to herein as a "**Party**". For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Contract of Purchase and Sale**.

(a) Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and indefeasible title to that certain tract of land containing approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction ("**ETJ**") of the City of Cresson (the "**City**"), Hood County, Texas, an approximate description and/or depiction of which is set forth on **Exhibit "A"** attached hereto and incorporated herein by this reference for all purposes (the "**Land**"), together with, all and singular, (i) a 100% undivided interest in the Mineral Estate (for purposes of this Contract, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Seller in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Seller which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**"). The Parties acknowledge and agree that the Property is part of a larger tract owned by Seller (the "**Parent Tract**") and that Seller is retaining the portion of the Parent Tract that does not include the Property ("**Seller's Retained Tract**"). Even though the Property has not yet been separately surveyed, the Parties agree that (A) they are experienced in transactions of this nature, (B) they are familiar with the location of the Property, (C) the description of the Property attached to this Contract identifies the Property with reasonable certainty, (D) it is the Parties' intention that the description of the Property attached to this Contract be construed, to the maximum extent allowed by law, as sufficient to identify the Property with reasonable certainty, (E) each Party hereby waives any and all claims of an insufficient legal description, including,

without limitation, any and all claims under the statute of frauds, and (F) upon the completion of the final Survey (defined below) of the Property, the Parties agree to replace **Exhibit "A"** of this Contract with the legal description of the Property in such survey and to use such legal description in all documents that require a legal description of the Property and are used in connection with the Closing.

(b) The "Property" also includes all right, title and, interest of Seller in any and all development rights relating to, associated with and/or appurtenant to the Land, including, but not limited to, all right, title and interest of Seller in and to (i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the Land and improvements now or hereafter constructed thereon; (ii) all surveys, engineering, soils, seismic, geological and environmental reports, studies, certificates and other technical descriptions; (iii) warranties, guaranties, indemnities, and any claims and causes of action (other than those against the Title Company, Brokers, Purchaser or Purchaser's representatives, agents, successors or assigns), including, without limitation, all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land; (iv) licenses, permits, governmental approvals, utility commitments, utility rights, reimbursement rights, development rights or other similar rights, (v) rights to credits, refunds, and reimbursements including without limitation any credits against, or right to pay reduced, application fees, permit fees, inspection fees or impact fees, (vi) rights under zoning cases, preliminary plans, plats, and other development applications and approvals, (vii) rights in and to engineering and architectural plans and specifications, (viii) awards or proceeds relating to the Property that are unpaid as of the Closing Date; (ix) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant, and (x) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Land.

(c) The Property shall be conveyed subject to the following matters (collectively the "**Permitted Exceptions**"):

(i) those matters deemed to be Permitted Exceptions pursuant to Section 4(d) hereof;

(ii) building restrictions and zoning regulations previously or hereafter adopted by any municipal or other public authority relating to the Property, which individually or in the aggregate do not have a material, adverse effect on Purchaser's ownership, operation, use, enjoyment, development or redevelopment of the Property; and

(iii) real property taxes for the year of Closing (as such term is defined in Section 9(a) hereof) (if such taxes are not yet due and payable) and subsequent years, which taxes shall be prorated at Closing.

2. **Purchase Price**. The purchase price (the "**Purchase Price**") for the Property shall be the sum of (a) the Land Purchase Price plus (b) the Mineral Estate Purchase Price. The "**Land Purchase Price**" shall be the product of EIGHTEEN THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($18,500.00) multiplied by the total number of gross acres of Land contained

within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The "**Mineral Estate Purchase Price**" shall be the product of ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) multiplied by the total number of gross acres of Land contained within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The Purchase Price shall be payable by Purchaser in cash at Closing (hereinafter defined).

**3.** **Earnest Money**. Within five (5) business days after the Effective Date (hereinafter defined), Purchaser shall deposit with McKnight Title, Attn: Jennifer Stapleton, 155 East BB Fielder Rd. Suite 200 Weatherford, TX 76087; Phone: 817-345-0101 Email: jennifer@mcknighttitle.com (hereinafter referred to as the "**Title Company**"), earnest money in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Earnest Money**"). If Purchaser fails to timely deposit the Earnest Money with the Title Company, Seller shall be entitled, as Seller's sole and exclusive remedy, to terminate this Contract by written notice to Purchaser at any time before the Earnest Money is delivered to the Title Company, in which event, Purchaser and Seller shall have no further liability hereunder. If Purchaser delivers the Earnest Money to the Title Company before Purchaser's receipt of Seller's termination notice, Purchaser shall be deemed to have timely delivered the Earnest Money and Seller shall not thereafter be entitled to terminate the Contract as a result of any delay in delivering the Earnest Money. All Earnest Money shall be deposited by the Title Company into an interest-bearing account. All interest earned on the Earnest Money shall be added to and become a part of the Earnest Money. Notwithstanding any provisions of this Contract to the contrary, TEN THOUSAND AND NO/100 DOLLARS ($10,000.00) out of the Earnest Money shall in all respects be non-refundable to Purchaser and shall be paid to Seller as independent consideration for Seller's execution of this Contract (the "**Independent Consideration**"). The Earnest Money shall be applied to the Purchase Price at the Closing. If, pursuant to any provision of this Contract, Purchaser is entitled to obtain a refund of the Earnest Money, (a) such provision shall be interpreted to mean a refund of the Earnest Money less the Independent Consideration, and (b) the Title Company shall, without further authorization or instruction from Seller or Purchaser, return the Earnest Money (less the Independent Consideration) to Purchaser.

**4.** **Due Diligence Information, Title Commitment and Survey**.

(a) Delivery of Documents. Within ten (10) days following the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, at Seller's sole cost and expense, copies of all of the items in Seller's possession or control listed on **Exhibit "B"** attached hereto and incorporated herein by this reference for all purposes (the "**Due Diligence Items**"). Following the Effective Date, Seller agrees to deliver to Purchaser within five (5) days following receipt thereof by Seller, copies of all other information received by Seller in connection with the Property.

(b) Title Commitment. Within twenty (20) days following the Effective Date, Seller shall cause to be delivered to Purchaser, at Seller's expense, a current Commitment for a Texas Form T-1 Owner's Policy of Title Insurance (hereinafter referred to as the "**Title Commitment**") showing all matters affecting title to the Property and binding the Title Company to issue to Purchaser at Closing an Owner Policy of Title Insurance issued by the Title Company on behalf of an underwriter acceptable to Purchaser, in the amount of the Purchase Price written in accordance with this Contract (the "**Owner's Policy**"). Seller and Purchaser further instruct the

Title Company to deliver to Seller, Purchaser and the Surveyor legible copies of all instruments referred to on Schedules B and C of the Title Commitment (the "**Exception Documents**"). The Title Commitment shall describe the Property; shall list Purchaser as the prospective named insured; shall show as the policy amount the Purchase Price; shall contain the commitment of the Title Company to insure Purchaser's fee simple interest in the Property upon the Closing; and the survey exception shall be deleted except as to "shortages in area". The Title Commitment shall show the status of the title of the Property and all exceptions which would appear in an Owner's Policy, if issued. Purchaser, at Purchaser's option, may purchase title insurance in an amount in excess of the Purchase Price from the Title Company or another escrow agent or title insurance company acceptable to Purchaser, in which event (i) Purchaser shall pay for the incremental increase in the aggregate premium charged for the Owner's Policy attributable to such increased coverage, and (ii) if Purchaser elects to purchase such excess coverage from an escrow agent or title insurance company other than the Title Company, the Title Company shall cooperate with the escrow agent or title insurance company designated by Purchaser for such excess coverage and shall remit to such designated escrow agent or title insurance company the portion of any premium payments received by the Title Company which is attributable to any such excess coverage.

(c) Survey. Seller shall deliver to Purchaser copies of the most recent surveys for the **"Parent Tract"** and the **"Retained Tract"** in Seller's possession or control within ten (10) days following the Effective Date. Purchaser shall obtain a new or recertified survey of the Land (the "**Survey**").

(d) Title and Survey Review. Purchaser shall have thirty (30) days after the receipt of the last of the Title Commitment, legible copies of all instruments referred to on Schedules B or C of the Title Commitment, and the Survey (the "**Title Review Period**") to provide Seller with written notice (the "**Title Objection Letter**") of such objections as Purchaser may have to anything contained in the Title Commitment or the Survey (collectively "**Title Objections**"). Any item contained in the Title Commitment or the Survey to which Purchaser does not object pursuant to the Title Objection Letter shall be deemed a Permitted Exception. If Purchaser delivers to Seller a Title Objection Letter, Seller shall have twenty (20) days, or such greater period of time as may be agreed upon in writing by Seller and Purchaser (the "**Cure Period**"), during which Seller shall have the right, but not the obligation, to cure or remove the Title Objections and deliver to Purchaser a revised Title Commitment or survey evidencing such cure or removal; provided, however, that Purchaser shall be deemed to have objected to and Seller shall have the absolute obligation to cure or remove all liens of any kind against the Property (the same to automatically be considered Title Objections regardless of whether or not Purchaser delivers to Seller a Title Objection Letter), including, without limitation, (i) mortgage liens, (ii) security interests, (iii) tax liens, (iv) abstracts of judgment, (v) environmental liens, and (vi) materialmen's and mechanic's liens (collectively "**Liens**"). Seller shall, prior to the expiration of the Cure Period, provide Purchaser with written notice (the "**Title Response Letter**") setting forth those Title Objections that Seller has cured or removed and those Title Objections which Seller is not required to cure or remove and is unable or unwilling to cure or remove. If Seller fails to either cure or remove all Title Objections to the reasonable satisfaction of Purchaser and the Title Company, Purchaser may, at its sole option which may be exercised at any time within the Inspection Period, either terminate this Contract by written notice to Seller, in which event the Earnest Money shall be immediately returned to Purchaser, or waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that such election shall

have no effect on Seller's obligation to cure or remove all Liens. Purchaser's failure to terminate this Contract prior the expiration of the Inspection Period shall be deemed an election by Purchaser to waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that (A) such election shall have no effect on Seller's obligation to cure or remove all Liens, and (B) Seller shall be obligated, prior to Closing, to cure all Title Objections which Seller agrees in the Title Response Letter or otherwise in writing to cure.

(e) Additional Exceptions. In the event that at any time following delivery of the Title Commitment, Exception Documents or Survey described above, but prior to Closing, any changes (other than the deletion or elimination of any item as to which Purchaser has made an objection) shall occur in the Title Commitment, Exception Documents or Survey, in addition to other remedies permitted pursuant to this Contract, Purchaser shall have the right to review and approve or disapprove of any such matters, and to terminate this Contract and obtain a refund of the Earnest Money in the event that any such exceptions are not acceptable to Purchaser.

(f) Owner's Policy. At Closing, Seller shall cause the Title Company to furnish to Purchaser, at Seller's sole cost and expense, the Owner's Policy, which shall be in the customary form prescribed by the Texas State Board of Insurance. The Owner's Policy may contain as exceptions the standard printed exceptions and the Permitted Exceptions; provided, however, (i) the standard exception for restrictions shall be deleted except for any restrictions that are Permitted Exceptions, (ii) the exception for rights of parties in possession shall be deleted, (iii) the standard exception for taxes shall be limited to the year in which Closing occurs (if such taxes are not yet due and payable), (iv) all arbitration provisions shall be deleted, (v) all matters set forth on Schedule C of the Title Commitment shall be deleted, (vi) if requested by Purchaser, Purchaser may require modification or additional title endorsements and Purchaser shall be liable for all fees and additional premiums charged by the Title Company in connection with such modifications or additional title endorsements.

5. **Inspection Period.**

(a) Commencing on the Effective Date and continuing through the one hundred eightieth (180th) day following the later to occur of (i) the date upon which all of the Tires (defined below) have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser (the "**Inspection Period**"), Purchaser shall be entitled to enter onto the Property for any purpose, including, without limitation, conducting such audits, inspections, or investigations thereon as Purchaser may deem appropriate, including, without limitation, any "Phase II" type testing or investigation. During the Inspection Period and, unless Purchaser terminates this Contract prior to the expiration of the Inspection Period, prior to Closing, Purchaser and Purchaser's representatives shall have the right to use the private roadway, a portion of which is located on Seller's Retained Tract (the "**Private Roadway**"), for purposes of ingress and egress to and from the Property, and Purchaser shall be liable for any physical damages to the Private Roadway caused by Purchaser or Purchaser's representatives. The Parties understand and agree that, upon Closing, Purchaser's right to use the portion of the Private Roadway located on Seller's Retained Tract shall terminate and Purchaser shall have no easement, express or implied, to use the portion of the Private Roadway that is located on Seller's Retained Tract. Notwithstanding any provision in this Contract to the contrary,

Purchaser shall be entitled to extend the Inspection Period two (2) times, each time for up to ninety (90) days, by delivering, at any time prior to the then-scheduled expiration of the Inspection Period, (i) written notice thereof to Seller and (ii) ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) of additional Earnest Money to the Title Company, which additional Earnest Money shall be added to and become a part of the Earnest Money, shall be applicable to the Purchase Price at Closing but shall be non-refundable to Purchaser except as set forth in Sections 4(d), 4(e), 8, 10 and 11(b). The cost of the inspections undertaken by Purchaser pursuant to this Contract shall be borne solely by Purchaser. Purchaser agrees to (A) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (B) repair any and all physical damage done to the Property or Seller's Retained Tract by Purchaser or its agents, employees or contractors during such inspection and examination. Purchaser shall have no liability with respect to any diminution in value or other losses suffered or incurred by Seller as a result of the discovery of any pre-existing conditions on, in, under or about the Property by Purchaser or its agents, employees or contractors during or in connection with such inspection and examination. Purchaser shall be entitled, for any reason in Purchaser's sole discretion, to terminate this Contract by written notice delivered to Seller at any time prior to the expiration of the Inspection Period. If Purchaser notifies Seller prior to the expiration of the Inspection Period that Purchaser has elected to terminate this Contract, this Contract shall terminate, the Earnest Money shall be returned to Purchaser and the Parties shall have no further obligations hereunder. Purchaser agrees to keep the Property free and clear of any mechanic's or materialmen's liens resulting from Purchaser's activities on the Property. After the expiration of the Inspection Period, Purchaser shall have the right to continue to conduct physical inspections and assessments of the Property, including, without limitation, taking soil samples, ground water samples and other intrusive testing, so long as Purchaser (1) indemnifies and holds Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (2) repairs any and all physical damage done to the Property by Purchaser or its agents, employees or contractors during such inspection and assessment.

(b) Annexation and City Development Agreement. Seller hereby authorizes Purchaser, at all times prior to Closing, to negotiate a pre-annexation development agreement or its equivalent with the City that addresses the annexation of the Property by the City and the terms, conditions, development rights and obligations affecting the development of Property (the "**City Development Agreement**"). Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to negotiate the terms and conditions of the City Development Agreement.

(c) Zoning Approval. Seller hereby authorizes Purchaser to seek and obtain final, unappealable approval from the City of the zoning designations desired by Purchaser that will permit Purchaser to develop the Property for the Intended Use (defined below) ("**Zoning Approval**"). Seller agrees to cooperate with Purchaser reasonably and in good faith in Purchaser's efforts to obtain the Zoning Approval. The Zoning Approval shall not be considered to have been achieved unless all of the following are true: (i) the zoning application is approved by the City without condition or exception, and (ii) all periods for appeal or protest have expired without the filing of any appeal or protest or, if an appeal or protest is filed, the same has been denied and there is no further administrative process available for appeal or protest.

(d) Platting. Purchaser may, at Purchaser's sole expense, seek to obtain a preliminary plat of the Property (the "**Preliminary Plat**"). Seller hereby authorizes Purchaser to seek to obtain final, unappealable approval from the City or Hood County, in Purchaser's sole determination, of the Preliminary Plat ("**Preliminary Plat Approval**") prior to Closing. Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to prepare the application for Preliminary Plat Approval and all supporting documentation in connection therewith (collectively, the "**Preliminary Plat Application**"), and Seller shall cooperate reasonably and in good faith with Purchaser in connection with Purchaser's efforts to obtain the Preliminary Plat Approval. Seller agrees to work with Purchaser's engineer to ensure that, to the best extent practicable, all plats of the Property contain all easements, rights-of-way and other matters reasonably required by Purchaser in connection with Purchaser's development of the Property for the Intended Use (defined below) (the "**Easements Benefitting the Property**"), and, to the extent any such Easements Benefiting the Property are not contained on such plats, Seller agrees to grant Purchaser any and all Easements Benefiting the Property over and across any land adjacent to the Property that is owned by Seller or any affiliate of Seller ("**Seller's Adjacent Property**") in a location that does not adversely impact Seller's or its affiliate's intended use of Seller's Adjacent Property.

(e) Entitlements, Utilities and Easements. During the period commencing on the Effective Date and ending upon Closing or the earlier termination of this Contract, Purchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use (defined below), including, without limitation the City Development Agreement, the Preliminary Plat Approval, the Zoning Approval, and any and all other approvals needed for the development and operation of the Property for the Intended Use (collectively, the "**Entitlements**"), and (ii) obtain all Easements Benefitting the Property, and (iii) cause all utilities needed for the development and operation of the Property for the Intended Use (collectively, the "**Required Utilities**") to be brought to the boundary of the Property and/or created on the Property. Purchaser agrees to use commercially reasonable, diligent and good-faith efforts to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller. Seller further agrees that, commencing on the Effective Date and continuing until the Closing Date, that Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval. As used herein, "**Intended Use**" shall mean a master planned industrial complex served by rail.

**6. Representations and Warranties**. Seller hereby represents and warrants to Purchaser, which representations and warranties shall be deemed to be restated at Closing and shall survive Closing, that:

(a) Seller is comprised of individuals and a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has complete and unrestricted power and authority to enter into this Contract and all other agreements to be executed and delivered by Seller pursuant to the terms and provisions

hereof, to perform its obligations hereunder and thereunder, and to consummate the transaction contemplated hereby;

(b) This Contract has been duly executed and delivered by Seller. All other agreements contemplated hereby to be executed and delivered by Seller will be, prior to Closing, duly authorized, executed and ready in all respects to be delivered by Seller. This Contract and all other agreements contemplated hereby constitute legal, valid and binding obligations of Seller enforceable in accordance with their respective terms;

(c) The execution, delivery and performance of this Contract and any other agreement contemplated hereby and the consummation of the transaction contemplated hereby or thereby do not, with or without the passage of time and/or the giving of notice, (i) conflict with, constitute a breach, violation or termination of any provision of any contract or other agreement to which Seller is a party or to which all or any part of the Property is bound, (ii) result in an acceleration or increase of any amounts due from Seller to any person or entity, (iii) conflict with or violate the organizational documents of Seller, (iv) result in the creation or imposition of any lien on all or any part of the Property, or (v) violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Seller or all or any part of the Property;

(d) Seller now has and shall have at Closing good and indefeasible title to the Property in fee simple absolute, free and clear of all Liens (other than any Liens that will be released at or prior to Closing). No party other than Seller and the lessees under oil and gas leases that are of record in the official public records of Hood County, Texas has any material rights in or to occupy all or any part of the Property. No party other than Purchaser has any agreement to purchase, right of first refusal, option to purchase or any other right to acquire all or any part of the Property;

(e) One hundred percent (100%) of the Mineral Estate is owned on the Effective Date by the following: (i) the Smelley Estate, which owns fifty percent (50%) of the Mineral Estate, (ii) Richard David Smelley, who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate, (iii) Amy Elizabeth Smelley who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Tammy Elizabeth Graham, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate; (v) Gregory Graham who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Deborah Davis who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; and (iv) David Davis, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate. Deborah Davis and David Davis shall either (A) prior to the Closing Date, convey all of their respective interests in the Mineral Estate in equal shares to Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, and Gregory Graham, or (B) on the Closing Date, convey all of their respective interests in the Mineral Estate to Purchaser. At Closing, Seller shall convey to Purchaser an undivided interest in one hundred percent (100%) of the Mineral Estate.

(f) There are no actions, suits, claims, assessments, or proceedings pending or, to the best of Seller's knowledge, threatened that could materially adversely affect the

ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform hereunder;

(g) Seller has no information of and to the best of Seller's knowledge, there is not (i) any change contemplated in any applicable law, statute, ordinance, rule, regulation, order, or determination of any governmental authority or any board of fire underwriters (or other body exercising similar functions), (ii) any law, ordinance, regulation, administrative ruling, restrictive covenant or deed restriction affecting all or any part of the Property, including without limitation, any applicable zoning ordinances, building codes, flood disaster laws, wetlands regulation, health law or environmental law, (iii) any judicial or administrative action, (iv) any action by adjacent landowners, (v) any administrative action, (vi) any natural or artificial condition on or about the Property, or (vii) any significant adverse fact or condition relating to the Property or its use, that would prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property;

(h) The Property is not within an area designated by the United States Secretary of Housing and Urban Development, the United States Army Corp of Engineers or any other local, state or federal organization or entity as having an increased likelihood of flooding;

(i) No Hazardous Substances (as such term is hereinafter defined) have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property and there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to the use, generation, manufacture, storage or disposal of any Hazardous Substances in, on, under or about the Property. As used in this Contract, the term "***Hazardous Substances***" means any and all substances, materials and wastes which are or become regulated under applicable local, state or federal Environmental Laws or that are classified as hazardous or toxic under local, state or federal Environmental Laws or regulations, including, without limitation, (i) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "solid waste," "pollutant" "contaminant" or words of similar import as such terms are defined by or listed in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("***CERCLA***"), as amended by Superfund Amendments and Reauthorization Act of 1986 ("***SARA***"), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.) ("***EPCRA***"), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("***RCRA***"), as amended by the Hazardous and Solid Waste Amendments of 1984, the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide and Rodenticide Control Act (7 U.S.C. § 136 et seq.), the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), the Federal Clean Air Act (42 U.S.C. § 7401 et seq.), and in the regulations promulgated pursuant to such laws, all as amended, (ii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101) or 40 CFR Part 302, both as amended, (iii) any material, waste or substance which is (A) oil, gas or any petroleum or petroleum by-product, (B) asbestos, in any form, (C) polychlorinated biphenyls, (D) designated as a

"hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1251 et seq.), as amended, (E) flammable explosives, or (F) radioactive materials, and (iv) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," "hazardous waste," "industrial solid waste," "solid waste," "radioactive waste" or "special waste from health care facility" in the Texas Solid Waste Disposal Act (Tex. Health & Safety Code Ann ch. 361), the Texas Clean Air Act (Tex. Health & Safety Code ch. 282), the Texas Pesticide Control Act (Tex. Agric. Code Ann. § 76.001 et seq.) and those substances included within the definitions of "hazardous substances," "regulated substances" or "petroleum products" in Subchapter I of the Texas Water Code (Tex. Water Code Ann ch. 26, subch. I) and in the regulations promulgated pursuant to any of such laws, all as the same may be amended from time to time (collectively "***Environmental Laws***"). Further, Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of Hazardous Substances in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of Environmental Laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of Environmental Laws, and (d) claims for contribution, cost recovery, remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code;

(j) The Land has direct and unencumbered access to and from one or more publicly dedicated streets or highways accepted for maintenance and maintained by Hood County and/or the State of Texas;

(k) Any and all underground storage tanks previously removed from the Property by Seller were removed in accordance with all applicable laws, ordinances, regulations and administrative rulings and no underground storage tanks are presently situated in, on, under or about the Property;

(l) The Property includes all sewer and wastewater discharge capacity, potable water capacity, other utility rights and development rights which were originally obtained with the Property by Seller, and no such capacity or rights have been previously conveyed or transferred by Seller;

(m) As a result of the sale of the Property from Seller to Purchaser as contemplated by this Contract, there will be no taxes or assessments assessed against the Property by any taxing authority for the year of Closing or prior years based on change in use or ownership; and

(n) The Due Diligence Materials are true, accurate and complete in all material respects.

7. **Covenants and Agreements of Seller**. Seller covenants and agrees with Purchaser as follows:

(a) Seller and Purchaser each shall, simultaneously with its execution of this Agreement, execute and deliver to the Title Company, a Memorandum of Agreement in the form attached hereto as **Exhibit "E"** (the "**Memorandum**") and Seller and Purchaser hereby instruct the Title Company to record, at Purchaser's expense, the fully executed Memorandum in the official public records of Hood County, Texas (the "**Public Records**") within three (3) business days following the full execution of this Agreement. The Parties agree not to terminate or release the Memorandum, or otherwise cause or permit the Memorandum to be terminated or released, from the Public Records unless and until Closing or the earlier appropriate termination of this Agreement has occurred. At Closing or promptly following the earlier appropriate termination of this Agreement, the Parties shall execute all commercially reasonable documents required by the Title Company to terminate and release the Memorandum from the Public Records (collectively, the "**Memorandum Release Documents**").

(b) Prior to Closing, Seller shall not execute or create any contract or option to purchase, easement, covenant, condition, restriction, lien or encumbrance with respect to the Property or any portion thereof with the exception of (i) the conveyance by Deborah Davis and David Davis of their interests in the Mineral Estate as referenced in Section 6(e) above and (ii) the recordation of the Memorandum as described in Section 7(a) above. To the extent that the Property, or any portion of the Property, is entitled to a tax exemption, Seller shall maintain such exemption and reasonably cooperate with Purchaser in assisting Purchaser to maintain and continue such tax exemption.

(c) Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

(d) Seller shall, within thirty (30) day period after the Effective Date (the "**Tire Removal Period**"), remove from the Land all tires and parts thereof situated on the Land (collectively, the "**Tires**"). Seller shall be liable for all costs to remove any and all Tires that Seller fails to remove during the Tire Removal Period and Seller shall (i) prior to Closing, remove such Tires from the Land within five (5) business days after the date Purchaser delivers notice thereof to Seller, (ii) after Closing, reimburse Purchaser for all costs incurred by Purchaser in connection with removing any Tires from the Land, and (iii) indemnify, defend and hold harmless all Indemnities from and against any and all Claims arising in connection with the Tires.

(e) Notwithstanding anything to the contrary in this Contract, Seller shall not oppose, and Seller shall not interfere with, Purchaser's applications for, or efforts to obtain, any and all Entitlements, Easements Benefitting the Property and the Required Utilities.

(f) The obligations in this Section 7 shall survive Closing.

8. **Conditions Precedent to Closing**. In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:

(a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or unconditional agreements to bring all the Required Utilities to the boundary line of the Property or create the Required Utilities on the Property have been received by Purchaser;

(b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and correct in all material respects as of the specified date or as limited by the specified date, and (ii) Seller's representations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be performed and observed by such Party prior to and on the Closing Date;

(c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;

(d) Tires. Seller shall have removed all Tires from the Land;

(e) Covenants. All covenants and other obligations of Seller set forth in this Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however,

that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract.

9. **Closing**.

(a) Date. The closing of the sale of the Property from Seller to Purchaser (the "**Closing**") shall be coordinated through the offices of the Title Company on, or at Purchaser's option, before, the ninetieth (90th) day following the expiration of the Inspection Period (the "**Closing Date**").

(b) Seller to Deliver. At the Closing, Seller shall furnish and deliver to the Title Company for delivery to Purchaser, at Seller's expense (except as provided in Section 9(e) below), the following:

(i) A Special Warranty Deed, in the form of **Exhibit "C-1"** attached hereto, duly executed and acknowledged by Seller, dated as of the Closing, conveying good and indefeasible title to the Property to Purchaser, subject only to the Permitted Exceptions.

(ii) A Mineral Deed, in the form of **Exhibit "C-2"** attached hereto, duly executed and acknowledged by the applicable Seller, dated as of the Closing, conveying to Purchaser the applicable Seller's interest in and to the Mineral Estate.

(iii) A general assignment to Purchaser, in the form of **Exhibit "D"** attached hereto, which, among other things, assigns Seller's interest in and to (A) any lease agreement that Purchaser has expressly agreed to assume, (B) any and all permits, approvals, licenses, water and sewer capacity commitments and other rights and interests owned or held by Seller in connection with the Property, and (C) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land.

(iv) All Memorandum Release Documents.

(v) Any and all agreements assigning or granting to Purchaser easements owned by Seller which are used or needed in connection with the development of the Land.

(vi) An Owner's Policy covering the Property issued by the Title Company in accordance with the terms of the Title Commitment described in Section 4(b) above, containing no exceptions other than the Permitted Exceptions. The Owner's Policy shall be amended to delete the survey exception except as to "shortages in area".

(vii) A Non-Foreign Certification signed by Seller under penalties of perjury.

(viii) Possession of the Property.

(ix) Such instruments or documents as are necessary, or reasonably required by Purchaser or the Title Company to evidence the status and capacity of Seller and the authority of the person or persons who are executing the various documents on behalf of Seller in connection with the purchase and sale transaction contemplated hereby.

(c) Purchaser to Deliver. At the Closing, Purchaser shall deliver to the Title Company for delivery to Seller, at Purchaser's expense, the following:

(i) The Purchase Price in immediately available funds.

(ii) All Memorandum Release Documents.

(iii) Such instruments or documents as are necessary, or reasonably required by Seller or the Title Company to evidence the authority of Purchaser to consummate the purchase and sale transaction contemplated hereby and to execute and deliver the closing documents to be delivered by Purchaser.

(d) Adjustments.

(i) Seller shall be responsible for payment of all taxes and assessments levied or assessed, including, without limitation, real and personal property taxes, prior to the Closing ("**Taxes**"). Taxes for the calendar year in which the Closing takes place shall be prorated at the Closing between Purchaser and Seller through the Closing Date, based on the current year's tax with due allowance made for the maximum discount allowable for prompt payment (if allowed for such year). If the Closing occurs on a day when the current year's tax rate is not fixed and the current year's assessment is available, Taxes will be prorated based upon such assessments and the prior year's rate. If the current assessment is not available at the time of Closing, then Taxes will be prorated on the basis of the latest available tax rate and assessment and subsequently re-prorated and promptly paid to the Party entitled thereto.

(ii) If the Land is assessed and taxed as a part of a larger parcel of real estate, then, for purposes of computing tax prorations hereunder: (A) Seller shall be solely responsible for payment of the portion of the taxes allocable to any other land and/or improvements located within the larger tract, and shall escrow the estimated amount of such taxes with the Title Company at Closing pursuant to an escrow agreement which will obligate the Title Company to release such funds to the applicable taxing authority upon receipt of a tax bill therefore and will obligate Seller to pay any deficiency between the amount of the escrowed funds and the actual amount of taxes within ten (10) days after receipt of notice thereof; and (B) a proportionate part of the real estate taxes attributable to such larger parcel shall be allocated to the Land on the basis of either of the following at Purchaser's discretion: (1) the ratio that the value of the Land bears to the value of the larger tract or parcel of land, or (2) the ratio that the area of land contained within the Land bears to the area of land contained within the larger parcel of real estate.

(iii) Seller represents and warrants to Purchaser that, as of the Effective Date, the Land is receiving special tax assessment rates (agricultural use) and Seller agrees, until

the Closing or the earlier termination of this Contract, to comply with the requirements that entitle the Land to receive such special tax assessment rates. Subject to the foregoing, the Parties acknowledge and agree that Purchaser's intended use of the Property after Closing will result in the assessment of rollback taxes for periods prior to Closing, and Purchaser shall be responsible for paying such assessments of rollback taxes triggered by Purchaser's change of use of the Land or loss of special taxing assessment rates based upon the acts of Purchaser; provided, however, that if rollback taxes are triggered for periods prior to Closing by (A) a change in use of the Land prior to Closing, (B) denial of a special use valuation on any portion of the Land claimed by Seller, or (C) any other act not caused by Purchaser, such rollback taxes shall be the obligation of Seller and shall be paid by Seller at Closing. If the amount of the taxes described in this paragraph is not ascertainable at Closing, such amount shall be estimated by Purchaser's tax consultant and 110% of the estimated amount of any amount owed by Seller shall be escrowed by Seller with the Title Company at Closing pursuant to a commercially reasonable form of escrow agreement between Seller, Purchaser and the Title Company which will authorize and instruct the Title Company to pay the rollback taxes due upon receipt of an invoice therefor and will obligate Seller to pay any deficiency.

(iv) Any tax proration based upon an estimate may, upon demand of either Party to the transaction, be subsequently readjusted upon receipt of the actual tax bill for the Property for the year in which the Closing occurs, and any Party owing the other Party monies as a result of such readjustment shall pay the same upon demand.

The provisions of this <u>Section 9(d)</u> shall survive the Closing.

(e) <u>Expenses of Closing</u>.

(i) Seller shall pay: (A) all title examination fees and the base premiums for the Owner's Policy; (B) its proportionate share of the prorations set forth in <u>Section 9(d)</u>; (C) its own attorneys' fees; (D) other charges required to be paid by Seller pursuant to this Contract; (E) any local, county or state transfer, recording or documentary tax assessed in connection with the transfer to Purchaser; (F) the cost of the Survey (which payment shall be in the form of a credit to Purchaser against the Purchase Price); (G) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties, and (H) other charges typically paid by sellers in transactions of this nature in the county in which the Property is located.

(ii) Purchaser shall pay: (A) the cost of any endorsements to the Owner's Policy requested by Purchaser or Purchaser's lender; (B) its proportionate share of the prorations set forth in <u>Section 9(d)</u>; (C) its own attorneys' fees; (D) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties; and (E) other charges required to be paid by Purchaser pursuant to this Contract.

**10. <u>Casualty or Condemnation Prior to Closing</u>.** If at any time prior to the Closing any portion of the Property is destroyed or damaged by fire or any other casualty, or in the event a taking by condemnation, eminent domain or similar proceedings or a conveyance in lieu thereof is commenced or threatened with respect to any portion of the Property, Seller shall give notice

thereof to Purchaser and Purchaser shall thereupon have the option to terminate this Contract upon written notice to Seller prior to Closing, in which event the Earnest Money shall be promptly refunded to Purchaser, whereupon this Contract shall be rendered null and void and the Parties shall have no further obligations or liabilities hereunder. If Purchaser does not exercise its option under this Section 10 to terminate this Contract, this Contract shall remain in full force and effect and Seller shall assign or pay to Purchaser at Closing Seller's interest in and to any and all insurance proceeds and condemnation awards.

**11. Default and Remedies.**

(a) Purchaser's Default. In the event Purchaser defaults under this Contract or fails to perform any obligation of Purchaser under this Contract, and such default and failure shall remain uncured for a period of ten (10) days following written notice thereof from Seller to Purchaser, provided that Seller has not defaulted in the performance of any of Seller's obligations hereunder, Seller may, as Seller's sole and exclusive remedy, terminate this Contract by written notice to Purchaser at any time before such default by Purchaser is cured, in which event, Seller shall be entitled to retain the portion of the Earnest Money which has then been deposited by Purchaser as liquidated damages for Purchaser's default and Purchaser shall thereby be released from further obligations under this Contract. Such amount is agreed upon by and between Seller and Purchaser as liquidated damages, due to the difficulty and inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof; and no other damages, rights or remedies shall in any case be collectible, enforceable or available to Seller other than in this Section 11(a), but Seller shall accept said cash payment as Seller's total damages and relief. If this Contract is terminated as a result of Purchaser's default, Purchaser's liability shall be limited to the portion of the Earnest Money which has previously been deposited by Purchaser hereunder, and in no event shall Purchaser be responsible or liable for any portion of the Earnest Money which has not then been deposited by Purchaser hereunder, whether or not such amount is then due. Notwithstanding any provision herein and without limiting Seller's rights in the preceding sentence, Seller shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Purchaser's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

(b) Seller's Default. In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third party out of pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any

representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

**12. Real Estate Brokerage; Consulting Fees.**

(a) Real Estate Brokerage. At Closing, Seller agrees to pay a real estate brokerage commission to M&W Real Estate, LLC ("**Purchaser's Broker**") in the amount of three percent (3%) of the Purchase Price and to Williams Trew Real Estate (Stephen Reich) ("**Seller's Broker**") in the amount of three percent (3%) of the Purchase Price. Purchaser's Broker and Seller's Broker are sometimes collectively referred to in this Contract as "**Brokers**". At Closing and upon funding, Seller shall be responsible for the payment of the real estate brokerage commissions becoming due to Brokers. Each Party represents and warrants to the other there has been no broker, finder, real estate agent or similar agent engaged in connection with the transaction contemplated hereby other than Brokers and each Party agrees that should any claim be made for brokerage commissions or finder's fees by any other broker, finder or agent by, through or on account of any acts of the indemnifying Party or its agents, employees or representatives, the indemnifying Party will hold the other Party free and harmless from and against any and all loss, liability, cost, damage and expense (including, without limitation, attorneys' fees, accountants' fees, court costs and interest) in connection therewith. The provisions of this paragraph shall survive the Closing of this Contract.

(b) **Disclosure. Purchaser advises Seller and Seller acknowledges that each of the following is a principal of Purchaser and is a licensed real estate broker or sales agent acting on his or her own behalf: None.**

**13. Miscellaneous.**

(a) Notices. All notices, requests and other communications under this Contract shall be in writing and shall be delivered in person by hand delivery or overnight delivery service, by electronic mail, or sent by certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If intended for Seller: | Bill Sanders, Independent Executor of<br>the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028<br>Telephone No.: (817) 266-1283<br>Email: bsanders@flash.net |
| With a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092<br>Telephone No.: (817) 410-4012<br>Email: todd.2@verizon.net |

| | |
|---|---|
| with a copy to: | Cresson Moon Properties, LP<br>c/o Cresson Moon Management, LLC, General Partner<br>Attn Richard D Smelley, Deborah R. Davis, and Tammy M. Graham, Managers<br>750 Cattlebaron Drive<br>Fort Wort, Texas 76108<br>Telephone No: (817) 300-4350<br>Email: sgd@flash.net |
| with a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108<br>Telephone Number: (817) 300-4355<br>Email: amy.smelley@icloud.com |
| with a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035<br>Telephone No: (817) 300-4352<br>Email: davidgdavis1@yahoo.com |
| with a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088<br>Telephone No: (817) 300-0780<br>Email: tammy@locationsphotography.com |
| If intended for Purchaser: | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031<br>Telephone No: (856) 498-4412<br>Email: John@challengerrealtygroup.com |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225<br>Telephone No: (214) 390-3264<br>Email: jlibby@LibbySparks.com |

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided. All such notices, requests and other communications, if sent to the address set forth herein above or to such other address as a Party may provide to the other Party in writing, shall be deemed to have been delivered upon receipt at such address if delivered in person, upon deposit with an overnight courier if delivered by overnight delivery, upon deposit in a post office

or official depository of the United States Postal Service if mailed, and upon transmission if by electronic mail.

(b) Assignment. Purchaser may assign or transfer its rights and obligations under this Contract at any time to any entity owned and/or controlled, in whole or in part, directly or indirectly, by one or more of the principals of Purchaser (a "**Purchaser Affiliate**") without the consent of Seller, and this Contract shall inure to the benefit of and be binding on the Parties hereto and their respective successors and assigns. Except as set forth above, Purchaser may not assign or transfer its rights or obligations under this Contract without the prior, written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned. If Purchaser assigns its rights and obligations under this Contract to a Purchaser Affiliate that fully assumes Purchaser's obligations and liabilities under this Contract, Purchaser shall be automatically fully released from all of its obligations and liabilities hereunder. In such event, Seller agrees to and shall immediately upon request by Purchaser execute a written instrument in a form satisfactory to Purchaser evidencing and confirming such full release.

(c) Force Majeure. A Party shall not be deemed to be in breach or in violation of this Contract if it is prevented from performing any of its obligations hereunder by reason of acts of the other Party, acts of God, riots, strikes, fires, weather, public disturbances, and/or any regulation of any governmental authority including, without limitation, a moratorium or government shut-down (each, a "**Force Majeure Event**"); provided, however, that the Party wishing to rely on such Force Majeure Event shall notify the other Party in writing within ten (10) business days of the commencement and ending of the Force Majeure Event in order to be entitled to the benefit of the delays in performance caused by such Force Majeure Event. No Force Majeure Event(s) singularly or in the aggregate shall exceed sixty (60) days.

(d) Survival. Except as otherwise provided herein, the provisions of this Contract shall survive the Closing and shall not merge into the conveyance documents executed and delivered at Closing.

(e) Joint and Several Liability. All parties signing this Contract as Seller shall be jointly and severally liable for all obligations of Seller.

(f) Entire Agreement; Modifications. This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the Party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

(g) Partial Invalidity. If any clause or provision of this Contract is or should ever be held to be illegal, invalid, or unenforceable under any present or future law applicable to the terms hereof, then it is the intention of the parties hereto that the remainder of this Contract shall not be affected thereby, and that in lieu of each such clause or provision of this Contract that is illegal, invalid, or unenforceable, there be added as a part of this Contract a clause or provision as similar

in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(h) Applicable Law. THIS CONTRACT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(i) Captions. The captions in this Contract are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

(j) Binding Effect. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns. This Contract and Purchaser's rights hereunder may be assigned by Purchaser without the consent of Seller to an entity that is owned and/or controlled, in whole or in part, by one or more of the members of Purchaser. Otherwise, Purchaser must obtain Seller's prior written consent.

(k) Time is of the Essence. With respect to all provisions of this Contract, time is of the essence. However, if the Closing or the final date of any period which is set out in any provision of this Contract falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Texas, then, and in such event, the Closing or such period shall be extended so that the Closing or the last day of such period falls on the next day which is not a Saturday, Sunday or legal holiday. If Seller fails to timely deliver to Purchaser the Title Commitment, Exception Documents or any other document or information required to be delivered by Seller to Purchaser hereunder, the date of expiration of the Inspection Period, the Closing Date and the expiration date of all other time periods hereunder shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser.

(i) Independent Counsel; Interpretation. Purchaser and Seller each acknowledge that: (a) they have had the opportunity to be and/or have been represented by independent counsel in connection with this Contract; (b) they have executed this Contract with the advice of such counsel; and (c) this Contract is the result of arm's length negotiations between the parties hereto and the advice and assistance of their respective counsel. Notwithstanding any rule of law to the contrary: (i) the fact that this Contract was prepared by Purchaser's counsel as a matter of convenience shall have no import or significance, and any uncertainty or ambiguity in this Contract shall not be construed against Purchaser because Purchaser's counsel prepared this Contract; and (ii) no deletions from prior drafts of this Contract shall be construed to create the opposite intent of the deleted provisions.

(j) Counterpart Execution. This Contract may be executed in multiple counterparts. An electronic copy of this Contract bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Contract.

**14.** **Effective Date**. The "**Effective Date**" or any other reference to the date of this Contract shall mean the date on which this Contract is signed by Seller, Purchaser and the Title Company, as indicated by their signatures below.

*[Signature pages follow this page.]*

EXECUTED by Seller this 26 day of MAY, 2023.

**SELLER**:

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ______________________
Richard Smelley, Manager

By: ______________________
Tammy Graham, Manager

By: ______________________
Deborah Davis, Manager

**SELLER**:

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

**SELLER**:

DEBORAH RUTH DAVIS

DAVID GLENN DAVIS

**SELLER:**

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser this 26 day of May, 2023.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________________
John Contrevo, Manager

*[Signature pages continue on following page.]*

The undersigned Title Company acknowledges receipt of a fully executed copy of this Contract this 26 day of May 2023, 2023, and agrees to comply with the provisions of this Contract, including the provisions hereof governing disposition of the Earnest Money.

**TITLE COMPANY:**

**MCKNIGHT TITLE**

By: [signature]

Name: Jennifer Stapleton

Title: Escrow Officer

**Escrow Receipt:**

The title company acknowledges receipt of:

√ A. the contract on this day May 26. 2023 (effective date);

√ B. earnest money in the amount of $ 100,000.00 in the form of WIRE

On May 30. 2023.

Title Company: Mid-night Title

By: Jennifer Stapleton. Jennifer

Address: 4916 camp bowie Blvd. 100

Fort Worth. TX 76107

Phone/Fax: 8175290776

Assigned file number (GF#): CB.8280.JS

# EXHIBIT "A"

## DESCRIPTION OF THE LAND

Approximately 1,674 gross contiguous acres as more particularly described in this Contract, which approximately 1,674 gross contiguous acres is part of the following described Parent Tract:

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit "A" and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT "A"

## Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line,
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

# EXHIBIT "B"

## DUE DILIGENCE DOCUMENTS

1. Any and all leases affecting the Property and amendments thereto, as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases;

2. All outstanding third-party service contracts and other agreements affecting the Property;

3. Disclosure of any legal matters affecting the Property;

4. Any notices, correspondence, approvals, permits, and/or licenses or any agreements (including, without limitation subdivision and similar agreements) with, to or from any governmental or quasi-governmental authority having jurisdiction over the Property;

5. Plans, specifications, certificates, inspection reports, notices, correspondence and all other documents prepared, transmitted or received by Seller, if any, in connection with any existing subdivision of or improvements constructed or to be constructed upon the Property;

6. Any letters in existence from utility companies stating whether appropriate facilities have been installed and are available to the boundaries of the Property;

7. Any and all additional data, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, existing surveys, platting and other materials (including a copy of Seller's most current existing survey of the Property), and all other information and agreements, relating to the Property or any portion thereof which is in the possession of Seller or its agents;

8. Any and all tax statements for three calendar years prior to the date of this Contract;

9. All licenses and permits affecting the Property;

10. Any other agreements or documents not referenced above relating to or affecting the Property; and

11. Any and all reports, tests, evaluations, notices, documentation and correspondence relating to (a) the availability of utilities and/or utility capacity including, without limitation, water, sewer, gas, and electricity, at or near the Property, (b) all bodies of water and waterways in, on or under the Property, and (c) rail lines and railways on or across the Property and on land adjacent to the Property.

**EXHIBIT "C-1"**

**FORM OF SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

THE STATE OF TEXAS §
§ KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF ________________ §

THAT, ________________________________________ ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by ________________, a ________________ ("**Grantee**"), whose address is ____________________________, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee, that certain real property situated in ____________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with, all and singular, (i) a one hundred percent (100%) undivided interest in the Mineral Estate (for purposes of this deed, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Grantor in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Grantor which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**").

This conveyance is made by Grantor and accepted by Grantee subject to any easements, restrictions and other matters described in Exhibit B attached hereto and incorporated herein by reference (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property, together with, all and singular, the rights and appurtenances thereto in anywise belonging, to Grantee and Grantee's successors and assigns forever; and subject only to the Permitted Exceptions, Grantor does hereby bind Grantor and Grantor's successors and assigns to warrant and forever defend, all and singular, the Property unto

the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise.

EXECUTED to be effective the ____ day of ____________, 20_____.

GRANTOR:

_______________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on _______________, 20___, by _____________ ______, the ______________ of _______________, on behalf of said _______________.

_________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

## EXHIBIT A TO SPECIAL WARRANTY DEED

Description of Property

[*insert description of Property per this Contract*]

---

## EXHIBIT B TO SPECIAL WARRANTY DEED

Permitted Exceptions

[*insert Permitted Exceptions per this Contract*]

**EXHIBIT "C-2"**

**FORM OF MINERAL DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**MINERAL DEED**

THE STATE OF TEXAS §
§ KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF ________________ §

THAT, ________________________________________, a ____________ (if an individual, insert "*a [single]/[married] [woman]/[man]*") ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by __________________, a ____________________ ("**Grantee**"), whose address is ______________________________, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD, ASSIGNED, CONVEYED and DELIVERED, and by these presents does GRANT, BARGAIN, SELL, ASSIGN, CONVEY and DELIVER unto Grantee, an undivided 1/*****th interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in __________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said land for oil, gas and other minerals, and removing the same therefrom.

Said Land being now subject to those certain oil and gas leases described on Exhibit B attached hereto and made a part hereof for all purposes (the "**Leases**") executed in favor of record owner, it is understood and agreed that this sale is made subject to the terms of said Leases, but covers and includes 1/*****th of all of the oil royalty and gas rental or royalty due and to be paid under the terms of said Leases, in so far as it covers the above described Land.

It is understood and agreed that 1/*****th of the money rentals, which may be paid, on the above described Land, to extend the term within which a well may be begun under the terms of any said Leases, is to be paid to the said Grantee; and, in event that any of the above described Leases for any reason becomes canceled or forfeited, then and in that event, Grantee shall own 1/*****th of all oil, gas and other minerals in and under said Lands, together with a like 1/*****th interest in all bonuses paid, and all royalties and rentals provided for in future oil, gas and mineral leases covering the above described Lands.

TO HAVE AND TO HOLD the above described property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee herein, and

Grantee's successors, heirs and assigns forever; and Grantor does hereby bind itself and its successors, heirs, executors and administrators, to warrant and forever defend all and singular the said property unto the said Grantee herein, and Grantee's successors, heirs and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof.

---

EXECUTED to be effective the ____ day of ____________, 20_____.

**GRANTOR:**

_________________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on _______________, 20___, by _________________________, the _________________ of _____________, on behalf of said ___________________.

_________________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

EXHIBIT A TO MINERAL DEED

Description of the Land

[*insert description of the Land per this Contract*]

---

EXHIBIT B TO MINERAL DEED

Description of Existing Oil and Gas Leases

[*insert description below*]

**EXHIBIT "D"**

**GENERAL ASSIGNMENT**

THIS GENERAL ASSIGNMENT (this "**Assignment**") is made as of the ____ day of __________, 20___, by ____________________, a ____________________ ("**Seller**"), to ______________________________, a ______________________ ("**Purchaser**").

WHEREAS, of even date herewith, Seller has conveyed to Purchaser the real property described in Exhibit A attached hereto ("**Land**"), together with all improvements (the "**Improvements**") located thereon (the Land and Improvements are referred to herein collectively as the "**Property**"); and

WHEREAS, Seller and Purchaser intend that Seller also convey to Purchaser all of the Conveyed Development Rights (as hereinafter defined).

NOW, THEREFORE, Seller, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, hereby agrees as follows:

1. Seller has GRANTED, BARGAINED, SOLD, CONVEYED and ASSIGNED, and by these present does hereby GRANT, BARGAIN, SELL, CONVEY and ASSIGN to Purchaser all of Seller's right, title and interest in and to the following, but only to the extent same pertain to the Property ("**Conveyed Development Rights**"):

(a) all surveys, engineering, soils, seismic, geological and environmental reports, studies and certificates and other technical descriptions;

(b) all warranties, guaranties and indemnities received from third parties, and all claims, demands and causes of action against third parties, but only to the extent they are for the benefit of, and applicable to, the Property or the owner thereof, including, without limitation, (i) any warranties, guaranties, indemnities, contractual rights, claims, demands and causes of action pertaining to the development, construction, design or completion of the Property and/or the common areas, streets, utilities or other subdivision infrastructure, and (ii) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land;

(c) all licenses, permits, governmental approvals, utility commitments, utility rights (including rights to capacity or service), drainage and detention rights, or right to pay reduced application fees, permit fees, inspection fees, impact fees, development rights or other similar rights;

(d) rights to credits, refunds and reimbursements, including, without limitation, any credits against, or right to pay reduced application fees, permit fees, inspection fees, impact fees, or other similar development credits;

(e) all rights under any zoning cases, preliminary plans, plats (preliminary or final) of any portion of the Property or any rights-of-way abutting the Property or any portion thereof, including any boundary plats and any right-of-way plats, submitted, approved or recorded;

(f) all unpaid awards or proceeds, including awards in connection with insurance and any eminent domain taking;

(g) rights in and to engineering and architectural plans and specifications;

(h) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant;

(i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the land and improvements now or hereafter constructed thereon; and

(j) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Property.

TO HAVE AND TO HOLD the Conveyed Development Rights unto Purchaser and Purchaser's successors and assigns forever.

2. This Assignment will be binding on Seller, its successors and assigns, and will inure to the benefit of Purchaser, its successors and assigns.

3. This Assignment does not constitute an assumption of any liability or obligation by Purchaser, nor will it be deemed to impose on Purchaser any liability or obligation.

4. Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of any and all substances, materials and wastes which are or become regulated under applicable local, state or federal environmental laws or that are classified as hazardous or toxic under local, state or federal environmental laws or regulations in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of environmental laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of environmental laws, and (d) claims for contribution, cost recovery,

remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code.

5. Seller and Purchaser will each cooperate with each other, their employees, and agents to facilitate the purpose and intent of this Assignment including, without limitation, the providing of information and documentation that may be reasonably required for the enforcement of the rights and interests assigned hereby.

6. This Assignment may be executed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument.

*[Remainder of page is intentionally left blank]*

EXECUTED as of the date first written above.

______________________________________,
a ______ ________________

By: ______________________________
Name: ______________________________
Title: ______________________________

THE STATE OF TEXAS §
§
COUNTY OF ____________ §

This instrument was acknowledged before me on ________________, 20___, by ______________________, ________________________ of _________________________, a _______ __________________, on behalf of said _____________.

______________________________________
Notary Public, State of Texas

[Official Notary Stamp]

---

Exhibit A to General Assignment

Legal Description of Property

[Insert land description]

**EXHIBIT "E"**

**FORM OF MEMORANDUM OF AGREEMENT**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**MEMORANDUM OF AGREEMENT**

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** ____________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ____________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this ______ day of __________________, 2023.

**SELLER**:

[signature]
**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

(seal) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

[signature]
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: Richard Smelley
Richard Smelley, Manager

By: Tammy Graham
Tammy Graham, Manager

By: Deborah Davis
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

Linda Coffey Jessup
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

Linda Coffey Jessup
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.] [Signature pages continue on following page.]*

**SELLER:**

Richard David Smelley

**RICHARD DAVID SMELLEY**

Amy Elizabeth Smelley

**AMY ELIZABETH SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**<u>SELLER</u>:**

Deborah Ruth Davis

**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

Linda Coffey Jessup
Notary Public Signature

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**Property Description**

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

# APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

## Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese, John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing ell of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** ____________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ____________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this ______ day of ____________________, 2023.

**SELLER**:

Bill Sanders IND EX.

**BILL SANDERS, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

Linda Coffey Jessup
Notary Public Signature

(seal) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

**SELLER:**

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ______________________
Richard Smelley, Manager

By: ______________________
Tammy Graham, Manager

By: ______________________
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

______________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

______________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]*

**SELLER:**

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

(seal)

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

(seal)

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

Deborah Ruth Davis

**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________
John Contrevo, Manager

STATE OF New Jersey §
§
COUNTY OF Camden §

This instrument was acknowledged before me on the 18 day of May 2023, by John Contrevo, Manager of Challenger Realty Group, LLC, a Delaware limited liability company, for and on behalf of said limited liability company, for the purposes stated in said instrument.

(SEAL)

______________________
Notary Public, ~~State of Texas~~ State of New Jersey SE May 18, 2023

SHAMAYNE R EVERITT
Commission # 50208874
Notary Public, State of New Jersey
My Commission Expires
April 11, 2028

## EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Property Description

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

# APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

## Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt, J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degreas West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP,<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

Hood County Clerk
201 W Bridge Street
PO BOX 339
Granbury, Texas 76048
Phone: 817-579-3222

Document Number: 2023-0007320 -
Filed and Recorded - Real Records

MEMORANDUM OF AGREEMENT

Grantor: SANDERS BILL EXE

Pages: 12

Recorded On: 06/08/2023 01:46 PM

**This page is a permanent part of the document.**
**Do Not Destroy**

| | | |
|---|---|---|
| **Recorded On:** | 06/08/2023 01:46 PM | **Notes:** |
| **Document Number:** | 2023-0007320 | |
| **Receipt Number:** | R238102 | |
| **Amount:** | $61.00 | |
| **Recorded By:** | Simplifile | |

Any provision herein which restricts the Sale, Rental, or use of the described REAL PROPERTY because of color or race is invalid and unenforceable under federal law.

**I hereby certify that this instrument was filed and duly recorded in the Official Records of Hood County, Texas**

Katie Lang
County Clerk
Hood County, Texas

**Return To:**

MCKNIGHT TITLE

279 W HIDDEN CREEK PKWY STE 1
BURLESON, TX 76028-6077

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** May 26, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated May 26, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this 26 day of May, 2023.

**SELLER:**

**BILL SANDERS, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

Notary Public Signature

(seal) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

*[Signature pages continue on following page.]*

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL)

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]*

**SELLER**:

Richard David Smelley
**RICHARD DAVID SMELLEY**

Amy Elizabeth Smelley
**AMY ELIZABETH SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347
(Seal)

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347
(Seal)

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: [signature]
John Contrevo, Manager

STATE OF New Jersey §
§
COUNTY OF Camden §

This instrument was acknowledged before me on the 18 day of May 2023, by John Contrevo, Manager of Challenger Realty Group, LLC, a Delaware limited liability company, for and on behalf of said limited liability company, for the purposes stated in said instrument.

(SEAL)

[signature]
Notary Public, ~~State of Texas~~ State of New Jersey SE May 18, 2023

SHAMAYNE R EVERITT
Commission # 50208874
Notary Public, State of New Jersey
My Commission Expires
April 11, 2028

## EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Property Description

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt, J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degreas West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing ell of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

## EXHIBIT B TO MEMORANDUM OF AGREEMENT

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP,<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

**From:** Stephen Reich <stephen.reich@williamstrew.com>
**Sent:** Wednesday, June 21, 2023 1:38 PM
**To:** Jennifer Stapleton <jennifer@mcknighttitle.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** Cresson - Challenger 1674 Acres

Good afternoon:
Please use this email as written notification that all tires have been removed from the property. It is my understanding that our initial 180 feasibility starts today. Please confirm receipt, and acknowledge that this starts our feasibility.

--

LIBBY//SPARKS
LIBBY · SPARKS · WILLIS · STARNES

JEFFREY T LIBBY
Direct: (214) 390-3264
JLibby@LibbySparks.com

December 15, 2023

Bill Sanders, Independent Executor of
The Estate of Pearl Smelley
804 Flagstone Drive
Burleson, Texas 76028

*Via Email: BSanders@flash.net*

Estate of Pearl Smelley
Attn: Todd Tew
566 North Kimball Avenue, Suite 130
Southlake, Texas 76092

*Via Email: Todd.2@Verizon.net*

Re: Notice regarding Inspection Period and other matters; Standard Contract of Sale dated effective as of May 26, 2023 (the "**Contract**"), by and between Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "**Smelley Estate**"), Cresson Moon Properties, LP, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract solely for the purposes of agreeing to grant, sell and coney their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: Richard David Smelley and Amy Elizabeth Smelley (collectively, "**Smelley**"), Tammy Marie Graham and Gregory Scott Graham (collectively, "**Graham**"), and Deborah Ruth Davis and David Glenn Davis (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham, and Davis, are collectively, jointly and severally referred to in the Contract and in this Letter as ("**Seller**"), and Challenger Realty Group, LLC, a Delaware limited liability company, and/or its assigns, ("**Purchaser**"), regarding that certain approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, as more particularly described in the Contract (the "**Property**").

Ladies and Gentlemen:

As you are aware, the undersigned and this law firm represent Purchaser in connection with the referenced Contract. Section 5(a) of the Contract provides that the Inspection Period commences on the Effective Date and continues through the 180th day following the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser. Section 7(d) of the Contract defines Tires as "all tires and parts thereof situated on the Land." Section 1(a) of the Contract defines the Land as that certain tract of land in Hood County, Texas, described and/or depicted on Exhibit "A" to the Contract. Section 7(d) also obligates Seller to remove all Tires from the Land within 30 days after the Effective Date. All defined terms used in this letter that are not defined in this letter are intended to have the meaning ascribed in the Contract.

Seller notified Purchaser on or about June 21, 2023 that Seller had removed all the Tires from the Land. However, Seller has not removed all the Tires from the Land and, as of the date of this letter, numerous Tires remain on the Land in various locations, including, without limitation, outside the single family residence on the Land, near the area where the previous pile of Tires was located, and attached to multiple apparently abandoned vehicles located throughout the Land.

Based on the fact that all of the Tires have not been removed from the Land, the Inspection Period will not expire on December 18, 2023 and, assuming that Seller has delivered all of the Due Diligence Items to Purchaser, the Inspection Period will not expire until the 180th day after all of the Tires have been removed from the Land and Seller has notified Purchaser thereof. Purchaser hereby makes demand upon Seller to remove all of the remaining Tires from the Land as soon as possible and notify Purchaser immediately thereafter that all of the remaining Tires on the Land have been removed. In order to avoid this issue in the future, Purchaser requests that Seller notify Purchaser regarding the date that Seller will remove all of the remaining Tires from the Land so that Purchaser may accompany Seller during Seller's removal of all the remaining Tires from the Land.

Additionally, as we have previously discussed, the survey obtained by Purchaser shows two gas pipelines traversing the entire width of the Property which, according to the surveyor's note, are not located in an easement. It is our understanding that Seller was aware of those gas pipelines prior to the Effective Date and that no documentation or information regarding those gas pipelines was provided to Purchaser in the Due Diligence Items. Obviously, the existence of those gas pipelines presents a significant artificial condition on the Property that would or could prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property. Purchaser intends to continue its efforts to identify the owners of those gas pipelines and discover the relevant information regarding those gas pipelines, including their current operating status, the respective rights and obligations of Seller and the owners of those gas pipelines and, if abandoned, what may be entailed in their removal. Purchaser requests Seller's cooperation in its efforts regarding those gas pipelines.

Finally, Purchaser's environmental engineer has discovered approximately thirty (30) 55 gallon steel drums of oil-based products throughout the Property (five of which were located around the residential structure and barn on the southern portion of the Property), as well as one 500 gallon petroleum oil aboveground storage tank located on the western portion of the Property in association with a tank battery located on the Property. It appears that at least one of those drums was on its side and had leaked a dark-colored liquid out onto the soil and some black oily staining was observed under a few of the 55 gallon steel drums on the western portion of the Property. Purchaser requests that Seller immediately advise Purchaser regarding any and all Hazardous Substances that are currently located on the Property or which have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property. Additionally, Purchaser requests that Seller promptly and properly remove all of the steel drums located on the Property, as well as all containers that contain any Hazardous Substances. Purchaser requests that Seller notify Purchaser regarding the date that Seller will

remove all of the steel drums and other containers from the Property so that Purchaser may accompany Seller during Seller's removal of such items from the Property.

Please be advised that this letter is not intended to and does not constitute a waiver of any rights or remedies that Purchaser may have under the Contract. Any potential defaults by Seller now existing or later occurring will not be deemed waived or otherwise accepted by Purchaser. The description in this letter of the specific rights of Purchaser will not be deemed to limit or exclude any other rights to which Purchaser may be or become entitled to under the Contract, at law, in equity, or otherwise. Purchaser reserves all rights and remedies granted under the Contract and available at law or in equity, all of which will be cumulative and may be pursued separately, successively, or concurrently at the sole discretion of Purchaser. No failure to exercise or delay in exercising any rights by Purchaser will operate as a waiver of any rights that Purchaser may have under the Contract.

We request that you indicate Seller's acknowledgment that the Inspection Period will not expire on December 18, 2023 and, assuming that Seller has delivered all of the Due Diligence Items to Purchaser, the Inspection Period will not expire until the 180th day after all of the Tires have been removed from the Land and Seller has notified Purchaser thereof, by returning an executed copy of this letter with the appropriate signatures below, but your returned acknowledgment will <u>not</u> be required to enforce the clear requirements described in Section 5(a) of the Contract.

Very truly yours,

Jeffrey T. Libby

*[Seller's Acknowledgment on the Following Page]*

**SELLER'S ACKNOWLEDGEMENT**

**SELLER**:

________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

________________________________
RICHARD DAVID SMELLEY

________________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________________
Richard Smelley, Manager

By:____________________________
Tammy Graham, Manager

By:____________________________
Deborah Davis, Manager

**SELLER**:

________________________________
DEBORAH RUTH DAVIS

________________________________
DAVID GLENN DAVIS

**SELLER:**

________________________________
TAMMY MARIE GRAHAM

________________________________
GREGORY SCOTT GRAHAM

/jl

cc: Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC *(via email: sgd@flash.net)*
Richard Smelley and Amy Smelley *(via email: Amy.Smelley@icloud.com)*
Deborah Davis and David Davis *(via email: DavidGDavis1@yahoo.com)*
Lacy Kimball, Lacy Kimball Law *(via email: info@LacyKimballLaw.com)*
Tammy Graham and Gregory Graham *(via email: Tammy@LocationsPhotography.com)*

**Blake Brownshadel**

**From:** Jake Wilkinson <jake@mwrealestate.com>
**Sent:** Thursday, January 11, 2024 11:20 AM
**To:** charles@challengerrealtygroup.com; john@challengerrealtygroup.com; ed@challengerrealtygroup.com; Patricia Herrera
**Cc:** Jeff Libby
**Subject:** FW: Tires on Smelley Ranch, 7700 Old Granbury

CAUTION: This email originated from outside of the firm.

Please see below from the seller's broker.

**Jake Wilkinson**
President & Managing Broker
jake@mwrealestate.com

**M&W Real Estate**
8737 King George Drive, Suite B200
Dallas, Texas 75235

Office +1 214 926 9361
Mobile +1 325 721 2353

Website | LinkedIn | Facebook

Texas Real Estate Commission: Consumer Protection Notice
Texas Real Estate Commission: Information About Brokerage Services

This message contains information which may be confidential and/or legally privileged. Unless you are the addressee (or authorized to receive e-mail for the addressee), you may not use, copy or disclose to anyone the message or any other information contained in the message or any attachment. If you have received this message in error, please advise the sender by reply e-mail and delete the message and any attachments and destroy all hard copies of same. Thank you.

---

**From:** Stephen Reich
**Sent:** Thursday, January 11, 2024 11:16 AM
**To:** Jake Wilkinson ; Jennifer Stapleton
**Subject:** Tires on Smelley Ranch, 7700 Old Granbury

Good morning all.

Please use this as written notice that the tires have been finally cleaned up on this property. Can we get a new critical dates letter produced?



LIBBY//SPARKS
LIBBY · SPARKS · WILLIS · STARNES

JEFFREY T LIBBY
Direct: (214) 390-3264
JLibby@LibbySparks.com

July 1, 2024

Bill Sanders, Independent Executor of
The Estate of Pearl Smelley
804 Flagstone Drive
Burleson, Texas 76028

*Via Email: BSanders@flash.net*

Estate of Pearl Smelley
Attn: Todd Tew
566 North Kimball Avenue, Suite 130
Southlake, Texas 76092

*Via Email: Todd.2@Verizon.net*

Re: Standard Contract of Sale dated effective as of May 26, 2023 (the "**Contract**"), by and between Bill Sanders, Independent Executor of the Estate of Pearl Smelley (the "**Smelley Estate**"), Cresson Moon Properties, LP, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract solely for the purposes of agreeing to grant, sell and coney their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: Richard David Smelley and Amy Elizabeth Smelley (collectively, "**Smelley**"), Tammy Marie Graham and Gregory Scott Graham (collectively, "**Graham**"), and Deborah Ruth Davis and David Glenn Davis (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham, and Davis, are collectively, jointly and severally referred to in the Contract and in this Letter as ("**Seller**"), and Challenger Realty Group, LLC, a Delaware limited liability company, and/or its assigns, ("**Purchaser**"), regarding that certain approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, as more particularly described in the Contract (the "**Property**").

Ladies and Gentlemen:

We are starting this letter with the most important message that we wish to convey: our client sincerely wants to work with you to resolve the issues affecting the Property. Purchaser has invested a significant amount of time and a large sum of money conducting its due diligence and Purchaser remains not only very interested in purchasing the Property but also very hopeful that Seller and Purchaser can cooperate with each other in good faith to address the matters outlined below and successfully arrive at the closing table. All defined terms used in this letter that are not defined in this letter are intended to have the meaning ascribed in the Contract.

**Oil and Gas Lease**.

As you know, there is an oil and gas lease of record (the "**Smelley Lease**") that, if active, could potentially affect as much as 120 acres of the surface of the Property – acreage that is situated in the middle of the Property – and could significantly and adversely impact the use and

development of the Property. As part of Purchaser's due diligence activities, Purchaser hired special counsel Kelly Roach, who specializes in oil and gas law, to help assess the mineral estate, as well as a separate petroleum engineer for purposes of assessing the condition and functionality of the wells situated on the Property. Mr. Roach has been requesting documentation from Seller in his attempt to help Purchaser assess Seller's mineral estate and determine, among other things, to what extent the Smelley Lease remains in effect. In response to Mr. Roach's numerous and repeated requests, Seller finally turned over Seller's copies of checks apparently evidencing shut-in royalty payments made to Seller by the lessee under the Smelley Lease (each, a "**Shut-In Royalty Check**"). As you know, a shut-in royalty payment is a payment made by a lessee to a lessor under an oil and gas lease when the lessee stops production from a well, or "shuts it in", and a shut-in royalty clause in an oil and gas lease usually allows for the shut-in royalty payment to replace the regular royalty payments the lessee would normally make while the well is producing and, by making shut-in payments on a well capable of producing oil or gas in paying quantities, typically allows the lessee to maintain the lease.

Purchaser's Request: Purchaser recognizes that the Property has been in the Smelley family for generations and that documents may have been distributed among and/or stored by the various Seller parties. Purchaser requests that the Seller parties perform a thorough search of areas over which each maintains possession and/or control and deliver to Purchaser all of the Due Diligence Items that Seller has in its possession or control which Seller has not yet delivered to Purchaser, including, without limitation, all information relating to (a) the mineral estate, including items and information relating to the Smelley Lease, any and all other oil and gas leases affecting the Property, and any and all wells and related equipment situated on the Property, and (b) any and all pipelines on the Property, including the two gas pipelines about which Purchaser previously inquired which are shown on the survey of the Property as not being located within any recorded easement agreement and traversing from the eastern property line across the Property to the western property line in a northeast to southwest direction. Purchaser also requests Seller to request a Release of Oil and Gas Lease covering the Smelley Lease and all of the lands and depths covered by the Smelley Lease.

**Environmental Matters**.

As you recall, Purchaser's environmental engineer discovered approximately thirty (30) 55-gallon steel drums of oil-based products throughout the Property, as well as one 500-gallon petroleum oil aboveground storage tank located on the western portion of the Property in association with a tank battery located on the Property. It appeared that at least one of those drums was on its side and had leaked a dark-colored liquid out onto the soil and some black oily staining was observed under a few of the 55-gallon steel drums on the western portion of the Property. In its December 15, 2023 letter to Seller, Purchaser requested that Seller immediately advise Purchaser regarding any and all Hazardous Substances that are currently located on the Property or which have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property. Additionally, Purchaser requested that Seller promptly and properly remove all of the steel drums located on the Property,

as well as all containers that contain any Hazardous Substances. Finally, Purchaser requested that Seller notify Purchaser regarding the date that Seller would remove all of the steel drums and other containers from the Property so that Purchaser could accompany Seller during Seller's removal of such items from the Property. It is our understanding that Seller did not advise Purchaser regarding any Hazardous Substances or notify Purchaser regarding the date that Seller would remove the steel drums and other containers from the Property. However, we understand that Seller has removed certain steel drums from the Land. Section 7(c) of the Contract requires Seller, not less than fifteen (15) days prior to Closing, to remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and to provide Purchaser with a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

Purchaser's Request: Purchaser understands that the Property has been subject to oil and gas leases for decades and that there has been a lot of activity on the Property by the oil and gas lessees over the years. Purchaser also recognizes that the approximately 2,000 acres that have been collectively owned by the Smelley family is a lot of land to oversee and maintain. Purchaser requests Seller to cooperate with, and provide current and ongoing information to, Purchaser regarding Seller's prior removal of the steel drums and other containers from the Property and whether Seller engaged an environmental engineer to remove those steel drums and other containers, as well as any and all other activities of Seller in connection with environmental conditions, contamination or presence of hazardous substances in, on, above or below the Property.

**Inspection Period**.

Section 5(a) of the Contract provides that the Inspection Period commences on the Effective Date and continues through the 180th day following the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser.

Tire Removal. Section 7(d) of the Contract defines Tires as "all tires and parts thereof situated on the Land" and obligates Seller to remove all Tires from the Land within thirty (30) days after the Effective Date. As you recall, after Seller originally notified Purchaser that Seller had removed all the Tires from the Land, Purchaser discovered Tires on the Property and notified Seller of that fact on December 15, 2023. Seller notified Purchaser on or about January 11, 2024 that all Tires had been removed from the Land and Purchaser relied on Seller's notification and continued its due diligence efforts, spending a significant amount of money in the process. However, Purchaser just discovered more Tires situated on the Property (see photos of those Tires attached to this letter as Exhibit "A"). Therefore, as of the date of this letter, Seller still has not removed all the Tires from the Land.

Purchaser requests that Seller contract with one or more companies that can properly inspect the entire Property, identify where all the Tires are located, and then remove all the Tires

from the Property so that all the Tires are fully and finally removed from the Property and none are missed.

Due Diligence Items. Section 4(a) of the Contract requires Seller to deliver or cause to be delivered to Purchaser copies of all of the Due Diligence Items in Seller's possession or control listed on Exhibit "B" to the Contract within ten (10) days following the Effective Date. The list of Due Diligence Items includes, among other items, (i) any and all leases affecting the Property and amendments thereto, ***as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases*** (emphasis added); (ii) any and all additional data, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, existing surveys, platting and other materials (including a copy of Seller's most current existing survey of the Property), ***and all other information and agreements, relating to the Property or any portion thereof which is in the possession of Seller or its agents*** (emphasis added); and (iii) ***any other agreements or documents not referenced above relating to or affecting the Property*** (emphasis added). Seller's copies of the Shut-In Royalty Checks that Seller recently delivered to Purchaser clearly constitute (i) incident or related documents which affect the obligations of Seller or the Property with respect to a lease that affects the Property, (ii) information relating to the Property which was in the possession of Seller or its agents, and (iii) other documents relating to or affecting the Property that are not referenced in the list of Due Diligence Items. Therefore, Seller did not previously deliver to Seller copies of all of the Due Diligence Items in Seller's possession or control.

Purchaser requests, as mentioned above, that the Seller parties diligently search all areas in which each maintains possession and/or control and deliver to Purchaser all of the Due Diligence Items that Seller has in its possession or control which Seller has not yet delivered to Purchaser.

Based on the facts that (a) all of the Tires have not been removed from the Land and (b) Seller did not previously deliver all of the Due Diligence Items to Purchaser, the Inspection Period will not expire on July 9, 2024; the Inspection Period will not expire until the 180th day after (1) all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (2) Seller has delivered all of the Due Diligence Items to Purchaser. Purchaser again makes demand upon Seller to (A) deliver all of the Due Diligence Items to Purchaser (including, without limitation, all Due Diligence Items relating to the mineral estate, all oil and gas leases to which the Property is subject, and all pipelines on and under the Property), and (B) remove all of the remaining Tires from the Land as soon as possible and notify Purchaser immediately thereafter that all of the remaining Tires on the Land have been removed. In order to avoid further delays in the future, Purchaser again requests that Seller notify Purchaser regarding the date that Seller will remove all of the remaining Tires from the Land so that Purchaser may accompany Seller during Seller's removal of all the remaining Tires from the Land.

Please be advised that this letter is not intended to and does not constitute a waiver of any rights or remedies that Purchaser may have under the Contract. Any potential defaults by Seller now existing or later occurring will not be deemed waived or otherwise accepted by Purchaser.

The description in this letter of the specific rights of Purchaser are not intended to, and will not be deemed to, limit or exclude any other rights to which Purchaser may be or become entitled to under the Contract, at law, in equity, or otherwise. Purchaser reserves all rights and remedies granted under the Contract and available at law or in equity, all of which will be cumulative and may be pursued separately, successively, or concurrently at the sole discretion of Purchaser. No failure to exercise or delay in exercising any rights by Purchaser will operate as a waiver of any rights that Purchaser may have under the Contract.

We request that you indicate Seller's acknowledgment that the Inspection Period will not expire on July 9, 2024 and that the Inspection Period will not expire until the 180th day after the later to occur of (i) the date upon which all of the Tires have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser, by returning an executed copy of this letter with the appropriate signatures below, but your returned acknowledgment will not be required to enforce the clear requirements described in Section 5(a) of the Contract.

We want to end this letter the way we began, expressing Purchaser's genuine desire to cooperate with Seller in a good faith effort to address and resolve each of the issues listed above in this letter. Please feel free to contact me at your convenience to discuss the best way(s) to successfully achieve that outcome.

Very truly yours,

Jeffrey T. Libby

*[Seller's Acknowledgment on the Following Page]*

**SELLER'S ACKNOWLEDGEMENT**

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT
EXECUTOR OF THE ESTATE OF
PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:______________________________
Richard Smelley, Manager

By:______________________________
Tammy Graham, Manager

By:______________________________
Deborah Davis, Manager

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER:**

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

/jl

cc: John Contrevo *(via email)*
Charles Gallub *(via email)*
Edwin Esposito *(via email)*
Patricia Herrera *(via email)*
Jake Wilkinson *(via email)*
Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC *(via email: sgd@flash.net)*
Lacy Kimball, Esq. *(via email: info@LacyKimballLaw.com)*
Richard Smelley and Amy Smelley *(via email: Amy.Smelley@icloud.com)*
Deborah Davis and David Davis *(via email: DavidGDavis1@yahoo.com)*
Tammy Graham and Gregory Graham *(via email: Tammy@LocationsPhotography.com)*
Stephen Reich *(via email: stephen.reich@williamstrew.com)*
Kelly Roach, Esq. *(via email)*

# EXHIBIT "A"

## PHOTOS OF TIRES ON THE LAND




LOWE

# FIRST AMENDMENT TO STANDARD CONTRACT OF SALE

This **FIRST AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is executed on this 4th day of December, 2024 (the "**First Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

## RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

## AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Inspection Period. The Inspection Period is hereby extended to continue through April 7, 2025 (the 180th day after October 7, 2024). For the avoidance of doubt, by signing this Amendment, the Parties acknowledge and agree that (a) the Parties' intention is to extend the Inspection Period as described above, and (b) preserve both of Purchaser's two (2) options to extend the Inspection Period as described in Section 5(a) of the Contract.

3. Purchaser hereby instructs the Title Company to (a) continue to maintain the initial Earnest Money in escrow and (b) hold in escrow solely for the benefit of Purchaser the $100,000 deposit of additional Earnest Money that Purchaser delivered to the Title Company on or about July 8, 2024 (the "**Prepaid Deposit**"). The Parties acknowledge and agree that, unless and until

Purchaser elects to exercise its first option to extend the Inspection Period as described in Section 5(a) of the Contract, (y) the Prepaid Deposit is not intended to be, and is not, part of the Earnest Money, and (z) Seller has no claim to, or right to receive, the Prepaid Deposit.

4. Oil and Gas Leases.

(a) Seller hereby authorizes Purchaser to contact and communicate with each and every lessee (each, an "**O&G Lessee**") under the oil and gas lease agreements to which all or a portion of the Property is subject (each, an "**O&G Lease**"), including, without limitation, that certain O&G Lease pursuant to which that certain oil and gas well commonly referred to as "Smelley 1H" (RRC Lease ID No. 211620) (the "**Smelley 1H Lease**") exists on the Property, on Seller's behalf in order to negotiate modifications of the O&G Leases that are satisfactory to Purchaser; provided, however, that Purchaser shall not be entitled to enter into an agreement with any O&G Lessee that is enforceable against Seller without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Such modifications may include, without limitation, early termination or revocation of the applicable O&G Lease or the lessee's waiver or restriction of its rights to access and use the surface of the Property for oil and gas development. Purchaser shall be authorized to contact, communicate and negotiate with the O&G Lessees through Purchaser's representatives, including, without limitation, Purchaser's legal counsel and environmental engineers. Seller shall not be liable to Purchaser for any of Purchaser's fees, costs or other expenses incurred by Purchaser in seeking a modification, early termination or revocation of an O&G Lease. Further, within thirty (30) days following delivery of Purchaser's written request, Seller will initiate and diligently pursue litigation to modify or terminate the O&G Lease and consult and cooperate with Purchaser in connection with such litigation.

(b) All Seller Parties agree to provide to Purchaser the following within five (5) business days after First Amendment Effective Date to the extent not already provided to Purchaser: shut-in payments and shut-in payment supporting documentation received by Seller Parties for (i) 2024 and (ii) the applicable years prior to 2024.

(c) Seller agrees to cooperate with Purchaser in Purchaser's efforts to modify the O&G Leases, including, without limitation, Seller shall, within five (5) business days following Purchaser's delivery to Seller of the applicable request, (a) execute and deliver to Purchaser and any O&G Lessee any written documentation requested by Purchaser or any O&G Lessee to evidence Purchaser's authority to communicate and negotiate on Seller's behalf, and (b) execute and deliver to Purchaser any documentation approved by Purchaser in writing that modifies an O&G Lease. Additionally, within five (5) business days after the First Amendment Effective Date, Seller will deliver a written request to the O&G Lessee under the Smelley 1H Lease to deliver to Seller a full accounting of all shut-in payments made under the Smelley 1H Lease and Seller will diligently thereafter pursue receipt of such accounting and deliver copies of all communications and documentation that Seller receives from the O&G Lessee under the Smelley 1H Lease within five (5) business days following receipt of same.

(d) Seller agrees that Seller will not accept, deposit or cash any shut-in consideration in any form, including, without limitation, any cash, checks, money orders or wire transfers, on or after the First Amendment Effective Date in connection with any O&G Lease.

(e) Seller and Purchaser acknowledge and agree that negotiations or litigation regarding the Smelley 1H Lease are additional agreements to the Contract. Nothing in the provisions and authorizations for the O&G Lease shall constitute grounds for an extension or contingency to close.

4. Closing Date. Notwithstanding anything contained in the Contract or the Amendment to the contrary, unless otherwise agreed in writing by Seller and Purchaser, the Closing Date shall not extend beyond December 31, 2025.

5. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

6. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

Bill Sanders Ind Ex.

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY 11/7/2024

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:________________________
Richard Smelley, Manager

By:________________________
Tammy Graham, Manager

By:________________________
Deborah Davis, Manager

**SELLER**:

________________________
RICHARD DAVID SMELLEY

________________________
AMY ELIZABETH SMELLEY

**SELLER**:

________________________
DEBORAH RUTH DAVIS

________________________
DAVID GLENN DAVIS

**SELLER**:

________________________
TAMMY MARIE GRAHAM

________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

*Richard David Smelley*
RICHARD DAVID SMELLEY

*Amy E. Smelley*
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By: *Richard S Smelley*
Richard Smelley, Manager

By: ______________________________
Tammy Graham, Manager

By: ______________________________
Deborah Davis, Manager

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER**:

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:________________________
Richard Smelley, Manager

By:________________________
Tammy Graham, Manager

By: Deborah Davis
Deborah Davis, Manager

**SELLER**:

Deborah Ruth Davis
DEBORAH RUTH DAVIS

[signature]
DAVID GLENN DAVIS

**SELLER:**

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ______________________________
Richard Smelley, Manager

By: ______________________________
Tammy Graham, Manager

By: ______________________________
Deborah Davis, Manager

**SELLER**:

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the First Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: *John Contrevo*
John Contrevo, Manager

# SECOND AMENDMENT TO STANDARD CONTRACT OF SALE

This **SECOND AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of December 31, 2025 (the "**Second Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to December 31, 2025, the outside Closing Date set forth in the Contract, and (c) the Environmental Report cannot be delivered to Purchaser by the outside Closing Date set forth in the Contract; and

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract prior to the Second Amendment Effective Date to finalize new extended deadlines for the requirements for sale as per the Standard Contract for Sale.; however, the Parties desire to enter into this Amendment to extend the Closing Date for a period of time in order to allow Seller's to fully comply with the requirements of Standard Contract for Sale section 7(c) and to allow Seller and Purchaser to enter into subsequent amendment to the Contract; and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Closing Condition and Closing Date. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in Section 3 of this Amendment below, the Closing Date is hereby extended until January 10, 2026 (the "**First Extended Closing Date**").

3. Further Amendment to the Contract. The Parties hereby agree to further amend the Contract on or before the First Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date.

4. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the Second Amendment Effective Date.

**SELLER**:

ID GwazBhJ35oa47kuyCasyBmQV

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

ID eZhryQn2Gr99j7fMso6rN8PB

RICHARD DAVID SMELLEY

ID 28wgymSsAnj7FTc4FcYzFyrs

AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By: ID eZhryQn2Gr99j7fMso6rN8PB
Richard Smelley, Manager

By: ID 3pE98KhWW988UohRp68xUxCg
Tammy Graham, Manager

By: ID 9PNAG9ooaHKb1JSruwL4HGJg
Deborah Davis, Manager

**SELLER**:

ID 9PNAG9ooaHKb1JSruwL4HGJg

DEBORAH RUTH DAVIS

ID kcsS9Gz52QsKSrD8gzTPnqfq

DAVID GLENN DAVIS

**SELLER:**

ID 3pE98KhWW988UohRp68xUxCg

TAMMY MARIE GRAHAM

ID wH2qWdHHhrNBWbdMmH5GPP2h

GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the Second Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: John Contrevo
ID 6fnyo9U8nNyRaFcvSqRuTxWU
John Contrevo, Manager

# eSignature Details

---

**Signer ID:** **6fnyo9U8nNyRaFcvSqRuTxWU**
Signed by: John Contrevo
Sent to email: john@challengerrealtygroup.com
IP Address: 73.194.171.232
Signed at: Dec 31 2025, 2:07 pm CST

**Signer ID:** **GwazBhJ35oa47kuyCasyBmQV**
Signed by: Bill Sanders, Executor of the Estate of Pearl Sanders Smelley
Sent to email: bsanders@flash.net
IP Address: 108.220.14.20
Signed at: Dec 31 2025, 2:23 pm CST

**Signer ID:** **eZhryQn2Gr99j7fMso6rN8PB**
Signed by: David Smelley
Sent to email: sgd@flash.net
IP Address: 132.147.159.94
Signed at: Dec 31 2025, 4:21 pm CST

**Signer ID:** **9PNAG9ooaHKb1JSruwL4HGJg**
Signed by: Deborah Davis
Sent to email: debbierdavis77@gmail.com
IP Address: 174.244.19.199
Signed at: Dec 31 2025, 4:26 pm CST

**Signer ID:** **kcsS9Gz52QsKSrD8gzTPnqfq**
Signed by: David Davis
Sent to email: davidgdavis1@yahoo.com
IP Address: 108.161.8.130
Signed at: Dec 31 2025, 4:27 pm CST

**Signer ID:** **3pE98KhWW988UohRp68xUxCg**
Signed by: Tammy Graham
Sent to email: tammy@locationsphotography.com
IP Address: 74.221.111.141
Signed at: Dec 31 2025, 6:09 pm CST

**Signer ID:** **wH2qWdHHhrNBWbdMmH5GPP2h**
Signed by: Gregory Graham
Sent to email: ggraham.greg@gmail.com
IP Address: 74.221.111.141
Signed at: Dec 31 2025, 6:09 pm CST

**Signer ID:** **28wgymSsAnj7FTc4FcYzFyrs**
Signed by: Amy Smelley
Sent to email: amy.smelley@icloud.com
IP Address: 132.147.159.73
Signed at: Dec 31 2025, 6:25 pm CST

January 26, 2026

Mr. Greg Graham
Cresson Moon Property LLC
12601 Cleburne Highway
Cresson, Texas 76035

Re: Limited Phase II Investigation
7700 Old Granbury Road
Cresson, Texas
Whitehead E. S. Project: 379.001

Dear Mr. Graham:

Whitehead Environmental Solutions, LLC (Whitehead E. S.) conducted a Limited Phase II Investigation (soil only since groundwater not encountered) of the property located at 7700 Old Granbury Road in Cresson, Hood County, Texas (Site). The Site is 1,674-acres consisting of a private residence with two gas well pads in a primarily undeveloped area of Cresson. The Site location is provided in **Figure 1**, and the Site layout is provided in **Figure 2**.

## SITE BACKGROUND

Whitehead E. S. conducted a Phase I Environmental Site Assessment (ESA) of the Site on December 12, 2025, and reviewed a Phase I ESA conducted by Environmental Science and Engineering (ESE) Partners on December 18, 2023.

According to aerial photographs and Railroad Commission of Texas (RRC) records, two gas wells were installed on-Site in 2006 and were plugged in 2025. A former pit associated with each well was observed from aerial photographs along the southern side of the northern well pad and the south side of the southern well pad by 2010 and both appeared to be dry by 2018. The presence of pits associated with the wells were identified as recognized environmental conditions (RECs) in the Phase I ESA conducted by Whitehead E. S. Additionally, aboveground storage tanks (ASTs) associated with the wells were observed by ESE Partners during their Site reconnaissance, as well as in historical aerial photographs. At the time of the Whitehead E. S. Site reconnaissance in 2025, the ASTs were no longer on the Site. Lastly, an off-Site well pad was identified near the southwestern portion of the Site.

Based on the identified RECs, Whitehead E. S. proposed a Phase II Investigation to assess the potential environmental concerns, namely the historical oil & gas activities on the Site including the two gas well pads (north and south) along with the one off-Site well pad to the southwest (adjacent to property).

## SUBSURFACE INVESTIGATION

On January 9th, 2026, Whitehead E. S. mobilized to the Site to conduct soil and groundwater sampling. The purpose of the investigation was to evaluate potential chemicals of concern (COCs) in the soil and groundwater related to the former on-Site gas wells and associated pits/ASTs and the off-Site presence of natural gas wells. Potential COCs were identified as non-specific total petroleum hydrocarbon (TPH) fractions, volatile organic compounds (VOCs), barium, and chloride.

Six soil borings were advanced on the Site and three were converted to temporary monitoring wells. Soil samples were collected and analyzed for TPH fractions by Texas Method TX 1005, benzene, toluene, ethylbenzene, and xylenes (BTEX)/methyl tert-butyl ether (MTBE) or the full suite of VOCs by U. S. Environmental Protection Agency (EPA) Method 8260. Additionally, selected samples were analyzed for barium by EPA Method 6020, chloride via EPA Method 300.0, and pH by EPA Method 9045D. A single sample was analyzed for polyaromatic hydrocarbons (PAHs) by EPA Method 8270 due to the diesel range TPH fractions that were detected at low concentrations. Photographs of the field investigation are presented in **Attachment A.**

**Soil Sampling and Analysis**

Soil borings SB-01 through SB-06 were advanced using a track-mounted Geoprobe rig utilizing a combination of direct-push technology and solid stem augers with a five-foot probe rod and core samplers. Borings were installed using direct-push sampling system until refusal was encountered or the desired depths were reached. Refusal using direct push was encountered at the Site between 5.5 and 10.0 feet below ground surface (bgs) due to the shallow limestone. Solid stem augers were used to reach deeper depths for temporary monitoring wells. Depths of the soil borings and/or temporary monitoring wells ranged from 7.0 to 24.0 feet bgs. Soil boring SB-01/TMW-01 was advanced on the south side of the north well pad in the footprint of the former pit. Soil boring SB-02 was advanced to the east of the north well pad and SB-03 was advanced northwest of the north well pad near the former AST locations. Soil boring SB-04/TMW-02 was advanced to the north of an off-Site natural gas well pad. Soil boring/temporary monitoring well SB-05/TMW-03 and SB-06 were advanced near the south well pad in the footprint of the former pit and near the former AST locations. The lithology encountered generally consisted of a mix of medium stiff, moist, reddish yellowish brown silty clay and dry, loose, chalky white weathered limestone with some sand lenses.

Soil samples were screened in the field for potential COCs including observations for dark staining and/or fill materials, odors, pH, and measurements of organic vapors using a photoionization detector (PID). No dark staining was observed in any of the soil borings. Soil borings SB-01, SB-02, SB-05 and SB-06 had very low PID readings (0.0 to 0.6 parts per million [ppm]) which are considered background readings not indicative of an environmental impact. Soil borings SB-03 and SB-04 had maximum PID readings of 2.9 ppm and 9.2 ppm, respectively. Furthermore, pH ranges were reported between 7.1 and 9.0.

A total of 13 soil samples were collected from the borings in accordance with EPA Method 5035 (plunger that directly inserts into volatile organic analysis [VOA] vials). Samples were collected in laboratory-supplied containers, immediately placed on wet ice in insulated coolers, and delivered to Eurofins Environment Testing (Eurofins) in Dallas, Texas, for analysis of non-specific TPH fractions, VOCs, barium, chloride, and/or pH. Additionally, one sample [SB-01 (3-4')] was analyzed for PAHs due to the detection of diesel range TPH fractions ($C_{12}$-$C_{28}$).

**Groundwater Sampling and Analysis**

Soil borings SB-01, SB-04, and SB-05 were converted to temporary monitoring wells TMW-01, TMW-02, and TMW-03 respectively, and were installed to total depths of 19.0 feet, 24.0 feet, and 11.0 feet bgs, respectively. Each monitoring well was constructed using a one-inch diameter Schedule 40 PVC. Blank (unslotted) PVC extended from the ground surface to depths of 3.5 feet (TMW-01), 8.5 feet (TMW-02), and 0.5 feet (TMW-03) feet bgs, and machine-slotted PVC screen extended from the base of the riser to the bottom of the borehole. None of the temporary monitoring wells produced groundwater within the timeframe of the investigation therefore could not be sampled.

The corresponding boring logs and monitoring well diagrams are provided in **Attachment B**.

**Soil Sampling Results**

Whitehead E. S. compared the soil analytical data to their respective default TCEQ Texas Risk Reduction Program (TRRP) Tier 1 Residential Protective Concentration Levels (PCLs). Samples analyzed for barium were additionally compared to their Texas-Specific Soil Background Concentration (TSBC), with the lower of the PCL or TSBC used as the assessment level. Samples analyzed for chloride were compared to the RRC Regulatory Protection Limit. Soil sampling results are presented in **Table 1A** and **Table 1B**, with the complete laboratory analytical data package provided in **Attachment C**.

Diesel range ($C_{12}$-$C_{28}$) TPH fractions were detected at one location, SB-01 (3-4'), with a low concentration of 35.5[J] mg/kg, below the TRRP PCL of 200 mg/kg. A "J" qualifier indicated an estimated concentration above adjusted method detection limit and below the adjusted reporting limit. Due to the presence of diesel range TPH fractions, PAHs were analyzed, and all analytes were below laboratory sample detection limits (SDLs).

Ethylbenzene was detected in three samples (SB-02, SB-03, and SB-04) at very low concentrations ranging from 0.000545[J] mg/kg to 0.00169[J] mg/kg, all well below the TRRP PCL of 7.6 mg/kg. Total xylenes were detected at four locations (SB-01, SB-02, SB-03, and SB-04) at low concentrations ranging from 0.000657[J] mg/kg to 0.0129 mg/kg, all well below the TRRP PCL of 120 mg/kg. Barium was detected at all sample locations analyzed with a maximum detection of 148 mg/kg at SB-05, all below the TRRP PCL of 440 mg/kg. Lastly, chloride was detected at four sample locations (SB-01, SB-03, SB-04, and SB-06) with values between 5.71[J] mg/kg and 250 mg/kg, well below the RRC Regulatory Protection Limit of 3,000 mg/kg. All other analytes were detected below laboratory SDLs.

**Quality Assurance/Quality Control (QA/QC)**

Whitehead E. S. reviewed the QA/QC data provided with the laboratory report and case narrative. A Trip Blank was included on the chain of custody (C-O-C) for the laboratory and put on hold. Soil samples were received by the laboratory at 0.1 degrees Centigrade (within proper temperature range). There were no other data qualifiers from the laboratory. Overall, the laboratory data appears to be accurate, reproducible, and acceptable for use in evaluating potential impacts to the Site.

**FINDINGS AND CONCLUSIONS**

Whitehead E. S. conducted a Limited Phase II Investigation at the Site. The assessment was considered "limited" since groundwater was not encountered. A summary of our findings and conclusions is presented below:

- Previous Phase I ESAs conducted in 2023 and 2025 indicated the presence of two on-Site well pads with associated pits and ASTs. The two gas wells were installed on-Site in 2006 and were plugged in 2025. The associated pits appeared by 2010 and were both dry by 2018. Soil sampling was performed to determine if soil was impacted by potential COCs including TPH fractions, VOCs, barium, and chloride. Groundwater was not encountered at the Site for sample analysis.

- Six soil borings were installed on the Site. The lithology encountered generally consisted of a mix of medium stiff, moist, reddish yellowish brown silty clay and dry, loose, chalky white weathered limestone with some sand lenses. No dark staining was observed in any of the soil cores. Soil borings SB-03 and SB-04 had low PID reading of 2.9 and 9.2 ppm, respectively. Three of the six soil borings were converted into temporary monitoring wells that did not produce any groundwater within the timeframe of the field investigation and were subsequently plugged.

- Soil analytical results identified only low concentrations of diesel range TPH in one sample and ethylbenzene and total xylenes in four of the nine samples. The concentrations of TPH, ethylbenzene, and total xylenes were well below their applicable TRRP Residential PCLs.

- Barium was detected above laboratory its SDL in all soil samples analyzed ranging from 16.7 mg/kg to 148 mg/kg with all samples well below its TRRP PCL of 440 mg/kg. Chloride was detected above laboratory SDLs in four soil samples below applicable RRC screening levels.

In conclusion, Whitehead E. S. conducted a Phase II Investigation to evaluate potential COCs in the soil and groundwater from the former on-Site well pads and off-Site active natural gas pad. The sampling did not indicate any COCs associated with oil & gas activities above their respective TRRP Residential PCLs and/or RRC Limits for soil. Groundwater was not encountered in the temporary monitoring wells on the Site and was not subsequently sampled. Soil sampling data did not identify any COCs in the Areas of Concern on the Site noted in the previous Phase I ESAs. Based on the Whitehead E. S. Phase II Investigation, there is no evidence of any impact to the Site, and no further investigation is warranted at this time.

**QUALIFICATIONS**

This technical report was prepared for the sole use of Cresson Moon Property LLC and shall not be relied upon by any other party without the express prior written consent of Cresson Moon Property LLC and Whitehead E. S. This document was developed by employing generally accepted methods and customary practices of the environmental profession.

Whitehead E. S. appreciates the opportunity to be of service to you on this project. If you have any questions or need additional information regarding the assessment, please contact Michael at (214) 335-3246.

Sincerely,

**WHITEHEAD E. S., LLC**

Michael Whitehead
Senior Consultant

Catherine Kobylinski
Environmental Scientist

Amanda Pechacek, P.G.
Professional Geoscientist

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

**FIGURES**




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

Approximate Site Boundary

STATE OF TEXAS
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST
1.26.2026

APPROXIMATE SCALE
(in feet)
0 2000 4000

## Figure 1
## Site Location

**Cresson Moon Property, LLC**
**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
U.S.G.S. Topographic Map Series,
Chapin, Texas (2022)

| | |
|---|---|
| DRAFTED BY: EM | CHECKED BY: AP |
| PROJECT NUMBER: 379.001 | DATE: 01/2026 |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

- Approximate Site Boundary
- Pipeline
- Horizontal Well
- Gas Well
- Soil Boring
- Temporary Monitoring Well

STATE OF TEXAS
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST
1.26.2026

NOTES:

Figure is not to scale.

## Figure 2
## Site Layout

**Cresson Moon Property, LLC**
**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
Google Earth Mapping Service, Imagery Date: 11/20/2024

| | |
|---|---|
| DRAFTED BY: DG | CHECKED BY: AP |
| PROJECT NUMBER: 379.001 | DATE: 01/2026 |

Ex. 9
App.112

**TABLES**

**TABLE 1A**
**SOIL ANALYTICAL SUMMARY - TPH, VOCs, BARIUM, CHLORIDE**

***Cresson Moon Property LLC***
***7700 Old Granbury Road***
***Cresson, Texas***

| Sample ID[1] | Sample Date | Total Petroleum Hydrocarbons[2] (mg/kg) | | | Volatile Organic Compounds[3] (mg/kg) | | | | Barium | Chloride |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $C_6$ - $C_{12}$ | $C_{12}$ - $C_{28}$ | $C_{28}$ - $C_{35}$ | Benzene | Toluene | Ethylbenzene | Total Xylenes | | |
| **SB-01 (3-4')** | 1/9/2026 | <21.6 | **35.5[J]** | <21.6 | <0.000459 | <0.000512 | <0.000354 | **0.000657[J]** | **36.8** | **5.71[J]** |
| **SB-02 (3-4')** | 1/9/2026 | <25.7 | <25.7 | <25.7 | <0.000641 | <0.000715 | **0.00127[J]** | **0.0104** | **24.0** | <5.98 |
| **SB-03 (3-4')** | 1/9/2026 | <21.5 | <21.5 | <21.5 | <0.000397 | <0.000443 | <0.000306 | <0.000316 | **30.0** | **250** |
| **SB-03 (5-6')** | 1/9/2026 | <23.2 | <23.2 | <23.2 | <0.000413 | <0.000460 | **0.000545[J]** | **0.00379** | --- | --- |
| **SB-04 (3-4')** | 1/9/2026 | <22.2 | <22.2 | <22.2 | <0.000438 | <0.000489 | **0.00169[J]** | **0.0129** | **31.1** | **5.74[J]** |
| **SB-05 (2-3')** | 1/9/2026 | <18.4 | <18.4 | <18.4 | <0.000559 | <0.000624 | <0.000431 | <0.000445 | **148** | <5.82 |
| **SB-05 (8-9')** | 1/9/2026 | <21.5 | <21.5 | <21.5 | <0.000577 | <0.000644 | <0.000445 | <0.000460 | --- | --- |
| **SB-06 (2-3')** | 1/9/2026 | <20.0 | <20.0 | <20.0 | <0.000555 | <0.000620 | <0.000428 | <0.000443 | --- | --- |
| **SB-06 (6-7')** | 1/9/2026 | <26.8 | <26.8 | <26.8 | <0.000495 | <0.000553 | <0.000382 | <0.000395 | **16.7** | **184** |
| **TRRP Tier 1 Residential $^{GW}Soil_{Ing}$ PCL[4] (mg/kg)** | | **65** | **200** | **200** | **0.026** | **8.2** | **7.6** | **120** | **440** | --- |
| **Texas-Specific Soil Background Conentrations[5] (mg/kg)** | | --- | --- | --- | --- | --- | --- | --- | **300** | --- |
| **RRC Regulatory Protection Limits[6]** | | **10,000** | | | **0.026** | **8.2** | **7.6** | **120** | --- | **3,000** |

**Notes:**
[1]Samples collected by Whitehead E. S. and analyzed by Eurofins Environment Testing in Dallas, Texas.
[2]Total Petroleum Hydrocarbons (TPH) analyzed by Texas Method TX1005.
[3]Volatile organic compounds (VOCs) analyzed by U.S. Environmental Protection Agency (EPA) Method 8260.
[4]Texas Risk Reduction Program (TRRP) Residential Soil to Groundwater Ingestion Protective Concentration Levels (PCLs).
[5]Texas Commission on Environmental Quality (TCEQ) Texas-Specific Soil Background Concentrations (TSBCs).
[6] Railroad Commision of Texas (RRC) Class 1 and Class 2 Soil-to-Groundwater Regulatory Protection Limits.
**Bold values indicate that chemical of concern (COC) was detected above the sample detection limit (SDL).**
**Bold and shaded values indicate applicable action level for each COC.**
**Bold and highlighted values indicate the COC exceeds the lowest applicable action level.**
(<) Indicates the value was not detected above the laboratory SDL.
[J]Estimated concentration above the adjusted method detection limit and below the adjusted reporting limit.
--- Not analyzed or not applicable
Only select analytes are presented in this table. All other analytes remaining are below their applicable PCLs.

# TABLE 1B
# SOIL ANALYTICAL SUMMARY - PAHs

***Cresson Moon Property LLC***
***7700 Old Granbury Road***
***Cresson, Texas***

| Sample ID[1] | | SB-01 (3-4') | TRRP Tier 1 Residential $^{GW}Soil_{Ing}$ PCL[3] (mg/kg) | TRRP Tier 1 Residential $^{Tot}Soil_{Comb}$ PCL[4] (mg/kg) |
|---|---|---|---|---|
| Sample Date | | 1/9/2026 | | |
| PAHs[2] | Acenaphthene | <0.00222 | **240** | **3,000** |
| | Acenaphthylene | <0.00154 | **410** | **3,800** |
| | Anthracene | <0.00214 | **6,900** | **18,000** |
| | Benzo[a]anthracene | <0.00163 | **130** | **41** |
| | Benzo[a]pyrene | <0.00210 | **7.6** | **4.1** |
| | Benzo[b]fluoranthene | <0.00230 | **440** | **42** |
| | Benzo[g,h,i]perylene | <0.00205 | **46,000** | **1,800** |
| | Benzo[k]fluoranthene | <0.00209 | **4,500** | **420** |
| | Chrysene | <0.00195 | **11,000** | **4,100** |
| | Dibenz(a,h)anthracene | <0.00217 | **15** | **4** |
| | Fluoranthene | <0.00267 | **1,900** | **2,300** |
| | Fluorene | <0.00205 | **300** | **2,300** |
| | Indeno[1,2,3-cd]pyrene | <0.00297 | **1,300** | **42** |
| | Naphthalene | <0.00308 | **31** | **220** |
| | Phenanthrene | <0.00332 | **420** | **1,700** |
| | Pyrene | <0.00239 | **1,100** | **1,700** |

**Notes:**

[1]Samples collected by Whitehead E. S. and analyzed by Eurofins Environment Testing in Dallas, Texas.

[2]Polycyclic aromatic hydrocarbons (PAHs) analyzed by U. S. Environmental Protection Agency (EPA) Method 8270.

[3]Texas Risk Reduction Program (TRRP) Residential Soil to Groundwater Ingestion Protective Concentration Levels (PCLs).

[3]TRRP Residential Total Soil Combined PCLs.

**Bold values indicate that chemical of concern (COC) was detected above the sample detection limit (SDL).**

**Bold and shaded values indicate applicable action level for each COC.**

**Bold and highlighted values indicate the COC exceeds the lowest applicable action level.**

(<) Indicates the value was not detected above the laboratory SDL.

**PHOTOGRAPHIC LOG**

**ATTACHMENT A**

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 1.** View of installation of SB-01/TMW-01 south of northern well pad. Photo taken facing southeast.



**Photograph 2.** Soil representative of lithology of 0.0’ to 5.5’ in SB-01/TMW-01.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 3.**View of installation of SB-02 located east of northern well pad. Photo taken facing east.



**Photograph 4.**View of installation of SB-03 located northwest of northern well pad. Photo taken facing north.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 5.** Soil representative of lithology of 0.0’ to 6.0’ in SB-03.



**Photograph 6.** View of installation of SB-04/TMW-02 located north of an off-Site well pad. Photo taken facing south.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE



**Photograph 7.** View of completed temporary monitoring well SB-04/TMW-02. Photo taken facing southeast.



**Photograph 8.** View of remnants of pit liner located near SB-05/TMW-03 southeast of the southern well pad.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 9.** Soil representative of lithology of 0.0' to 10.0' in SB-05/TMW-03.



**Photograph 10.** View of installation of SB-06 located northwest of the southern well pad. Photo taken facing east.

**BORING LOGS/WELL DIAGRAMS**

**ATTACHMENT B**

# Boring Log: SB-01/TMW-01

| | | | | | |
|---|---|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1098 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.537023° |
| | Sampling Method: | PVC Liners | Longitude: | -97.659090° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | Casing | | | | CL | SILTY CLAY: stiff, moist, gray with yellow to reddish yellow brown mottling. 0.25 to 1 inch limestone pieces throughout. |
| 1 | Casing | 0 | 3.5/5.0 | | CL | |
| 2 | Casing | 0 | | | CL | |
| 3 | Casing | 0 | | SB-01 (3-4') | LS | VERY WEATHERED LIMESTONE: stiff but friable, dry, light yellowish brown. |
| 4 | Screen | 0 | | | LS | |
| 5 | Screen | 0 | 0.5/0.5 | | LS | DPT refusal @ ~5.5', switched to SSA and cutting observed |
| 6 | Screen | | 0.0/0.0 | | LS | WEATHERED LIMESTONE: stiff but friable, dry, light yellowish brown. |
| 7–18 | Screen | | | | LS | |
| 19 | End Cap | | | | LS | |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

**Annular Materials**
N/A

**Well Materials**
(0.0 - 3.5) Casing 1" Sch 40 PVC Riser
(3.5 - 18.5) Screen, 1" Sch 40 PVC 0.010" slot
(18.5 - 19.0) End Cap

**Initial Well Details**
Total Depth (ft): 19
Initial Water Level (ft.): DRY
Date Measured: 1/9/2026

# Boring Log: SB-02

| | | | | | |
|---|---|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 4" |
| | | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | | Driller's License: | 59562 | Ground Elevation (ft): | 1097 |
| Whitehead E.S. Project No. 379.001 | | Logged By: | CK/EM | Latitude: | 32.536822° |
| | | Sampling Method: | PVC Liners | Longitude: | -97.658318° |
| | | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | | | | | VERY WEATHERED LIMESTONE: stiff but friable, moist, tan to yellow brown. Few 0.25 to 1 inch limestone pieces throughout |
| 1 | 0.6 | | | | |
| 2 | 0.6 | | | | |
| | | 3.5/5.0 | | LS | |
| 3 | 0 | | | | |
| | | | SB-02 (3-4') | | |
| 4 | 0.4 | | | | |
| | | | | | DPT refusal @ ~7', switched to SSA and cutting observed |
| 5 | 0 | | | | VERY WEATHERED LIMESTONE: stiff , moist, gray with yellow-brown mottling with few 0.25 to 1 inch limestone pieces throughout, compentency increasing with depth |
| 6 | 0.1 | 2.0/2.0 | | LS | |
| 7 | | | | | WEATHERED LIMESTONE: dry, loose, chalky white with few 0.25 to 0.5 inch limestone pieces throughout |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| | | 0.0/0.0 | | | |
| 11 | | | | LS | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |

STATE OF TEXAS
1-26-2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**

Total Depth (ft): 15

Soil boring completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers.

Soil boring plugged the same day as installation with bentonite chips.

Ex. 9
App.124

# Boring Log: SB-03

| | | | |
|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: 1/9/2026 | Refusal? | Yes |
| | Drilling Company: Savage Drilling | Borehole Diameter (in): | 4" |
| | Driller Name: Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: 59562 | Ground Elevation (ft): | 1098 |
| Whitehead E.S. Project No. 379.001 | Logged By: CK/EM | Latitude: | 32.536727° |
| | Sampling Method: PVC Liners | Longitude: | -97.658720° |
| | Drilling Method: DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | | | | | VERY WEATHERED LIMESTONE: stiff, moist, yellow-brown with few 0.25 to 1 inch limestone pieces throughout, compentency increasing with depth |
| 1 | 0 | | | | |
| 2 | 0 | 4.0/5.0 | | LS | |
| 3 | 2.9 | | SB-03 (3-4') | | |
| 4 | 0.1 | | | | |
| 5 | 2.3 | 1.5/1.5 | SB-03 (5-6') | CL | SILTY CLAY: stiff, moist, gray with yellow-brown to reddish yellowish-brown mottling with frequent 0.25 to 1 inch limestone pieces throughout<br>DPT refusal @ ~6.5', switched to SSA and cutting observed |
| 6 | 1.3 | | | | |
| 7 | | 0.0/8.5 | | LS | WEATHERED LIMESTONE: loose, dry, chalky white 0.25 to 0.5 inch limestone pieces |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**

Total Depth (ft): 15

Soil boring completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers.

Soil boring plugged the same day as installation with bentonite chips.

# Boring Log: SB-04/TMW-02

| | | | | | |
|---|---|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1076 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.518527° |
| | Sampling Method: | PVC Liners | Longitude: | -97.673633° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0–5 | Casing (0.0–8.5) | 6.7 (1), 9.2 (2), 1.1 (3), 0.1 (4), 0.5 (5) | 4.0/5.0 | SB-04 (3-4') | CL | SILTY CLAY: very stiff, dry to moist, reddish yellowish-brown with gray mottling with frequent 0.25 to 1 inch limestone pieces throughout |
| 5–6.5 | | 0.5 (6) | 1.5/1.5 | | CL | SILTY CLAY: stiff, moist, reddish yellowish-brown with gray mottling, with few 0.25 to 1 inch limestone pieces throughout |
| 6.5–20 | Screen (8.5–23.5) | | 0.0/0.0 | | CL | SILTY CLAY TO CLAY: moist, reddish yellowish-brown with few 0.25 to 0.5 inch limestone pieces throughout<br>DPT refusal @ ~6.5', switched to SSA and cuttings observed |
| 20–24 | End Cap (23.5–24.0) | | | | CL | SILTY CLAY TO CLAY: moist, dark gray with few limestone pieces throughout |

STATE OF TEXAS · 1.26.2026 · AMANDA PECHACEK · GEOLOGY 15423 · LICENSED · PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

| Annular Materials | Well Materials | Initial Well Details |
|---|---|---|
| N/A | (0.0 - 8.5) Casing 1" Sch 40 PVC Riser | Total Depth (ft): 24 |
| | (8.5 - 23.5) Screen, 1" Sch 40 PVC 0.010" slot | Initial Water Level (ft.): DRY |
| | (23.5 - 24.0) End Cap | Date Measured: 1/9/2026 |

# Boring Log: SB-05/TMW-03

| | | | | | |
|---|---|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 982 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.516597° |
| | Sampling Method: | PVC Liners | Longitude: | -97.657512° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | | | | | CL | SILTY CLAY: stiff, moist, dark brown with few 0.25 to 1 inch limestone pieces and pea-sized gravels throughout |
| 1 | | 0 | | | | |
| 2 | | 0 | 4.0/5.0 | SB-05 (2-3') | | |
| 3 | | 0 | | | | |
| 4 | | 0 | | | | |
| 5 | | 0 | | | CL | SILTY CLAY: stiff, moist, gray with reddish yellowish-brown mottling grading to predominately orange-brown with gray mottling |
| 6 | | 0 | | | | |
| 7 | | 0 | 3.5/5.0 | | SP | GRAVELLY SAND TO SAND: dense, moist, reddish yellowish-brown with gray mottling, with small pea-sized gravels at 8.5 feet |
| 8 | | 0 | | SB-05 (8-9') | | |
| 9 | | 0 | | | | DPT refusal @ ~10', switched to SSA and cuttings observed |
| 10 | | 0 | 0.0/0.0 | | LS | WEATHERED LIMESTONE: dry, loose, chalky white limestone pieces throughout |
| 11 | | | | | | |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

| Annular Materials | Well Materials | Initial Well Details |
|---|---|---|
| N/A | (0.0 - 0.5) Casing 1" Sch 40 PVC Riser<br>(0.5 - 10.5) Screen, 1" Sch 40 PVC 0.010" slot<br>(10.5 - 11.0) End Cap | Total Depth (ft): 11<br>Initial Water Level (ft.): DRY<br>Date Measured: 1/9/2026 |

# Boring Log: SB-06

| | | | |
|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | | | |
| Whitehead E.S. Project No. 379.001 | | | |
| Completion Date: | 1/9/2026 | Refusal? | Yes |
| Drilling Company: | Savage Drilling | Borehole Diameter (in): | 2" |
| Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| Driller's License: | 59562 | Ground Elevation (ft): | 990 |
| Logged By: | CK/EM | Latitude: | 32.516610° |
| Sampling Method: | PVC Liners | Longitude: | -97.658474° |
| Drilling Method: | DPT | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | 0 | 4.0/5.0 | | CL | SILTY CLAY: stiff, moist, red-brown to dark brown |
| 0.4 | | | | | |
| 0.8 | | | | | |
| 1.2 | 0 | | | | |
| 1.6 | | | | | |
| 2 | 0 | | | | |
| 2.4 | | | SB-06 (2-3') | | |
| 2.8 | | | | | |
| 3.2 | 0 | | | SP | GRAVELLY SAND TO SAND: loose, moist, red-brown to reddish yellowish-brown |
| 3.6 | | | | | |
| 4 | 0 | | | | |
| 4.4 | | | | | |
| 4.8 | | | | | |
| 5.2 | 0 | 2.0/2.0 | | | |
| 5.6 | | | | | |
| 6 | 0.5 | | | | |
| 6.4 | | | SB-06 (6-7') | | |
| 6.8 | 0.2 | | | | |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**

Total Depth (ft): 7

Soil boring completed via track-mounted Geoprobe utilizing direct push technology.

Soil boring plugged the same day as installation with bentonite chips.

**LABORATORY ANALYTICAL DATA PACKAGES**

**ATTACHMENT C**

eurofins | Environment Testing

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

# ANALYTICAL REPORT

## PREPARED FOR

Attn: Danielle Fehrenback
Whitehead ES LLC
906 18th St
Plano, Texas 75074

Generated 1/21/2026 4:10:11 PM

## JOB DESCRIPTION

Cresson Moon Props
379.001

## JOB NUMBER

870-43022-1

Eurofins Dallas
9701 Harry Hines Blvd
Dallas TX 75220

See page two for job notes and contact information.



Ex. 9
App.130

# Eurofins Dallas



## Job Notes

This report may not be reproduced except in full, and with written approval from the laboratory. The results relate only to the samples tested. For questions please contact the Project Manager at the e-mail address or telephone number listed on this page.

Analytical test results meet all requirements of the associated regulatory program (i.e., NELAC (TNI), DoD, and ISO 17025) unless otherwise noted under the individual analysis.

## Authorization

Generated
1/21/2026 4:10:11 PM

Authorized for release by
Mike Kimmel, Project Manager
Mike.Kimmel@et.eurofinsus.com
(214)902-0300

# Table of Contents

Cover Page . . . . . 1
Table of Contents . . . . . 3
Definitions/Glossary . . . . . 4
Case Narrative . . . . . 6
Client Sample Results . . . . . 7
Surrogate Summary . . . . . 22
QC Sample Results . . . . . 24
QC Association Summary . . . . . 36
Lab Chronicle . . . . . 40
Certification Summary . . . . . 45
Method Summary . . . . . 46
Sample Summary . . . . . 47
Chain of Custody . . . . . 48
Receipt Checklists . . . . . 51
State Forms . . . . . 53
  DCS Report . . . . . 53
  TRRP Checklist . . . . . 55

# Definitions/Glossary





## Qualifiers

### GC/MS VOA

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| N1 | MS, MSD: Spike recovery exceeds upper or lower control limits. |
| U | Analyte was not detected at or above the SDL. |

### GC/MS Semi VOA

| Qualifier | Qualifier Description |
|---|---|
| U | Analyte was not detected at or above the SDL. |

### GC Semi VOA

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| U | Analyte was not detected at or above the SDL. |
| X | Surrogate recovery exceeds control limits |

### HPLC/IC

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| U | Analyte was not detected at or above the SDL. |

### Metals

| Qualifier | Qualifier Description |
|---|---|
| U | Analyte was not detected at or above the SDL. |

## Glossary

| Abbreviation | These commonly used abbreviations may or may not be present in this report. |
|---|---|
| ☼ | Listed under the "D" column to designate that the result is reported on a dry weight basis |
| %R | Percent Recovery |
| CFL | Contains Free Liquid |
| CFU | Colony Forming Unit |
| CNF | Contains No Free Liquid |
| DER | Duplicate Error Ratio (normalized absolute difference) |
| Dil Fac | Dilution Factor |
| DL | Detection Limit (DoD/DOE) |
| DL, RA, RE, IN | Indicates a Dilution, Re-analysis, Re-extraction, or additional Initial metals/anion analysis of the sample |
| DLC | Decision Level Concentration (Radiochemistry) |
| EDL | Estimated Detection Limit (Dioxin) |
| LOD | Limit of Detection (DoD/DOE) |
| LOQ | Limit of Quantitation (DoD/DOE) |
| MCL | EPA recommended "Maximum Contaminant Level" |
| MDA | Minimum Detectable Activity (Radiochemistry) |
| MDC | Minimum Detectable Concentration (Radiochemistry) |
| MDL | Method Detection Limit |
| ML | Minimum Level (Dioxin) |
| MPN | Most Probable Number |
| MQL | Method Quantitation Limit |
| NC | Not Calculated |
| ND | Not Detected at the reporting limit (or MDL or EDL if shown) |
| NEG | Negative / Absent |
| POS | Positive / Present |
| PQL | Practical Quantitation Limit |
| PRES | Presumptive |
| QC | Quality Control |
| RER | Relative Error Ratio (Radiochemistry) |
| RL | Reporting Limit or Requested Limit (Radiochemistry) |
| RPD | Relative Percent Difference, a measure of the relative difference between two points |

## Glossary (Continued)

| Abbreviation | These commonly used abbreviations may or may not be present in this report. |
|---|---|
| SDL | Sample Detection Limit |
| TEF | Toxicity Equivalent Factor (Dioxin) |
| TEQ | Toxicity Equivalent Quotient (Dioxin) |
| TNTC | Too Numerous To Count |

# Case Narrative



## Job ID: 870-43022-1 Eurofins Dallas

**Job Narrative**
**870-43022-1**

The analytical test results presented in this report meet all requirements of the associated regulatory program listed on the Accreditation/Certification Summary Page, unless otherwise noted. Data qualifiers and/or narrative comments are included to explain any exceptions, if applicable. Regulated compliance samples (e.g. SDWA, NPDES) must comply with associated agency requirements/permits.

- Matrix-specific batch QC (e.g., MS, MSD, SD) may not be reported when insufficient sample volume is available or when site-specific QC samples are not submitted. In such cases, a Laboratory Control Sample Duplicate (LCSD) may be analyzed to provide precision data for the batch.
- For samples analyzed using surrogate and/or isotope dilution analytes, any recoveries falling outside of established acceptance criteria are re-prepared and/or re-analyzed to confirm results, unless the deviation is due to sample dilution or otherwise explained in the case narrative.

**Receipt**
The samples were received on 1/10/2026 9:15 AM. Unless otherwise noted below, the samples arrived in good condition, and, where required, properly preserved and on ice.

**Receipt Exceptions**

**GC/MS VOA**
Method 8260C: The matrix spike (MS) recoveries for preparation batch 870-34798 and analytical batch 870-34789 were outside control limits. Non-homogeneity is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Hydrocarbons**
Method TX_1005: Surrogate recovery for the following sample was outside the upper control limit: SB-05 (8'-9') (870-43022-11). This sample did not contain any target analytes; therefore, re-extraction and/or re-analysis was not performed.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**HPLC/IC**
No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Metals**
Method 6020B: The matrix spike / matrix spike duplicate (MS/MSD) recoveries for preparation batch 860-287918 and analytical batch 860-288184 were outside control limits. Sample matrix interference is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**General Chemistry**
No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-01 (3'-4')

**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-1

**Matrix: Solid**
**Percent Solids: 89.5**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000459 | U | 0.00183 | 0.000459 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromobenzene | <0.000737 | U | 0.00183 | 0.000737 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromochloromethane | <0.000578 | U | 0.00183 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromodichloromethane | <0.000598 | U | 0.00183 | 0.000598 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromoform | <0.000820 | U | 0.00183 | 0.000820 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromomethane | <0.00107 | U | 0.00458 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2-Butanone | <0.00706 | U | 0.0458 | 0.00706 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| n-Butylbenzene | <0.000307 | U | 0.00183 | 0.000307 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| sec-Butylbenzene | <0.000490 | U | 0.00183 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| tert-Butylbenzene | <0.000469 | U | 0.00183 | 0.000469 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Carbon tetrachloride | <0.000405 | U | 0.00183 | 0.000405 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chlorobenzene | <0.000464 | U | 0.00183 | 0.000464 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloroethane | <0.000415 | U | 0.00183 | 0.000415 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloroform | <0.000434 | U | 0.00183 | 0.000434 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloromethane | <0.000502 | U | 0.00183 | 0.000502 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2-Chlorotoluene | <0.000249 | U | 0.00183 | 0.000249 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 4-Chlorotoluene | <0.000556 | U | 0.00183 | 0.000556 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00128 | U | 0.00458 | 0.00128 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dibromochloromethane | <0.000159 | U | 0.00183 | 0.000159 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000996 | U | 0.00458 | 0.000996 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dibromoethane | <0.000566 | U | 0.00183 | 0.000566 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dibromomethane | <0.000287 | U | 0.00183 | 0.000287 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichlorobenzene | <0.000361 | U | 0.00183 | 0.000361 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3-Dichlorobenzene | <0.000457 | U | 0.00183 | 0.000457 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,4-Dichlorobenzene | <0.000454 | U | 0.00183 | 0.000454 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dichlorodifluoromethane | <0.000498 | U | 0.00183 | 0.000498 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloroethane | <0.000519 | U | 0.00183 | 0.000519 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichloroethane | <0.000336 | U | 0.00183 | 0.000336 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloroethene | <0.000417 | U | 0.00183 | 0.000417 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| cis-1,2-Dichloroethene | <0.000463 | U | 0.00183 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| trans-1,2-Dichloroethene | <0.000423 | U | 0.00183 | 0.000423 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichloropropane | <0.000536 | U | 0.00183 | 0.000536 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3-Dichloropropane | <0.000306 | U | 0.00183 | 0.000306 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2,2-Dichloropropane | <0.000542 | U | 0.00183 | 0.000542 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloropropene | <0.000282 | U | 0.00183 | 0.000282 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| cis-1,3-Dichloropropene | <0.000566 | U | 0.00183 | 0.000566 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| trans-1,3-Dichloropropene | <0.000467 | U | 0.00183 | 0.000467 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Ethylbenzene | <0.000354 | U | 0.00183 | 0.000354 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Hexachlorobutadiene | <0.000504 | U | 0.00183 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Isopropylbenzene | <0.000345 | U | 0.00183 | 0.000345 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Methylene Chloride | <0.00121 | U | 0.00458 | 0.00121 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| MTBE | <0.000536 | U | 0.00183 | 0.000536 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Naphthalene | <0.000613 | U | 0.00183 | 0.000613 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| N-Propylbenzene | <0.000472 | U | 0.00183 | 0.000472 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Styrene | <0.000473 | U | 0.00183 | 0.000473 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000421 | U | 0.00183 | 0.000421 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000626 | U | 0.00183 | 0.000626 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Tetrachloroethylene | <0.000416 | U | 0.00183 | 0.000416 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Toluene | <0.000512 | U | 0.00183 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |

**Client Sample ID: SB-01 (3'-4')**
**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-1**
**Matrix: Solid**
**Percent Solids: 89.5**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000414 | U | 0.00183 | 0.000414 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,4-Trichlorobenzene | <0.000660 | U | 0.00183 | 0.000660 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,1-Trichloroethane | <0.000458 | U | 0.00183 | 0.000458 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,2-Trichloroethane | <0.000619 | U | 0.00183 | 0.000619 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Trichloroethene | <0.000422 | U | 0.00183 | 0.000422 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Trichlorofluoromethane | <0.000770 | U | 0.00183 | 0.000770 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,3-Trichloropropane | <0.000535 | U | 0.00183 | 0.000535 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,4-Trimethylbenzene | <0.000513 | U | 0.00183 | 0.000513 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3,5-Trimethylbenzene | <0.000507 | U | 0.00183 | 0.000507 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| **m,p-Xylenes** | **0.000657** | **J** | 0.00183 | 0.000209 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| o-Xylene | <0.000366 | U | 0.00183 | 0.000366 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| **Xylenes, Total** | **0.000657** | **J** | 0.00183 | 0.000366 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Vinyl chloride | <0.00175 | U | 0.00458 | 0.00175 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *106* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *4-Bromofluorobenzene (Surr)* | *109* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *Dibromofluoromethane (Surr)* | *99* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *Toluene-d8 (Surr)* | *106* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |

### Method: SW846 8270E - Semivolatile Organic Compounds (GC-MS/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | <0.00222 | U | 0.0107 | 0.00222 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Acenaphthylene | <0.00154 | U | 0.0107 | 0.00154 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Anthracene | <0.00214 | U | 0.0107 | 0.00214 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[a]anthracene | <0.00163 | U | 0.00537 | 0.00163 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[a]pyrene | <0.00210 | U | 0.00537 | 0.00210 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[b]fluoranthene | <0.00230 | U | 0.0107 | 0.00230 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[g,h,i]perylene | <0.00205 | U | 0.0107 | 0.00205 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[k]fluoranthene | <0.00209 | U | 0.0107 | 0.00209 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Chrysene | <0.00195 | U | 0.0107 | 0.00195 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Dibenz(a,h)anthracene | <0.00217 | U | 0.00537 | 0.00217 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Fluoranthene | <0.00267 | U | 0.0107 | 0.00267 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Fluorene | <0.00205 | U | 0.0107 | 0.00205 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Indeno[1,2,3-cd]pyrene | <0.00297 | U | 0.0107 | 0.00297 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Naphthalene | <0.00308 | U | 0.0107 | 0.00308 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Phenanthrene | <0.00332 | U | 0.0107 | 0.00332 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Pyrene | <0.00239 | U | 0.0107 | 0.00239 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *2-Fluorobiphenyl* | *73* | | *37 - 130* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |
| *Nitrobenzene-d5 (Surr)* | *58* | | *36 - 131* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |
| *p-Terphenyl-d14 (Surr)* | *93* | | *40 - 130* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| **>C12-C28 Range Hydrocarbons** | **35.5** | **J** | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| >C28-C35 Range Hydrocarbons | <21.6 | U | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| **Total Petroleum Hydrocarbons (C6-C35)** | **35.5** | **J** | 43.2 | 21.6 | mg/Kg | | | 01/14/26 00:04 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-01 (3'-4')

Lab Sample ID: 870-43022-1

**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 89.5**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *117* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 00:04* | *1* |
| *o-Terphenyl (Surr)* | *120* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 00:04* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **5.71** | **J** | 11.2 | 5.58 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 20:57 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **36.8** | | 2.15 | 0.736 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:47 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.1** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.3** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-02 (3'-4')

Lab Sample ID: 870-43022-3

**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 82.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000641 | U | 0.00255 | 0.000641 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromobenzene | <0.00103 | U | 0.00255 | 0.00103 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromochloromethane | <0.000806 | U | 0.00255 | 0.000806 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromodichloromethane | <0.000833 | U | 0.00255 | 0.000833 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromoform | <0.00114 | U | 0.00255 | 0.00114 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromomethane | <0.00150 | U | 0.00638 | 0.00150 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2-Butanone | <0.00985 | U | 0.0638 | 0.00985 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| n-Butylbenzene | <0.000427 | U | 0.00255 | 0.000427 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| sec-Butylbenzene | <0.000683 | U | 0.00255 | 0.000683 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| tert-Butylbenzene | <0.000655 | U | 0.00255 | 0.000655 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Carbon tetrachloride | <0.000565 | U | 0.00255 | 0.000565 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chlorobenzene | <0.000647 | U | 0.00255 | 0.000647 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloroethane | <0.000578 | U | 0.00255 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloroform | <0.000605 | U | 0.00255 | 0.000605 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloromethane | <0.000700 | U | 0.00255 | 0.000700 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2-Chlorotoluene | <0.000347 | U | 0.00255 | 0.000347 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 4-Chlorotoluene | <0.000776 | U | 0.00255 | 0.000776 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00178 | U | 0.00638 | 0.00178 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dibromochloromethane | <0.000222 | U | 0.00255 | 0.000222 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00139 | U | 0.00638 | 0.00139 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dibromoethane | <0.000789 | U | 0.00255 | 0.000789 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dibromomethane | <0.000401 | U | 0.00255 | 0.000401 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichlorobenzene | <0.000504 | U | 0.00255 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3-Dichlorobenzene | <0.000637 | U | 0.00255 | 0.000637 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,4-Dichlorobenzene | <0.000633 | U | 0.00255 | 0.000633 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dichlorodifluoromethane | <0.000694 | U | 0.00255 | 0.000694 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1-Dichloroethane | <0.000723 | U | 0.00255 | 0.000723 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichloroethane | <0.000468 | U | 0.00255 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Client Sample ID: SB-02 (3'-4')

**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-3

**Matrix: Solid**
**Percent Solids: 82.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,1-Dichloroethene | <0.000582 | U | 0.00255 | 0.000582 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| cis-1,2-Dichloroethene | <0.000646 | U | 0.00255 | 0.000646 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| trans-1,2-Dichloroethene | <0.000589 | U | 0.00255 | 0.000589 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichloropropane | <0.000748 | U | 0.00255 | 0.000748 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3-Dichloropropane | <0.000426 | U | 0.00255 | 0.000426 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2,2-Dichloropropane | <0.000755 | U | 0.00255 | 0.000755 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1-Dichloropropene | <0.000393 | U | 0.00255 | 0.000393 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| cis-1,3-Dichloropropene | <0.000789 | U | 0.00255 | 0.000789 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| trans-1,3-Dichloropropene | <0.000651 | U | 0.00255 | 0.000651 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **Ethylbenzene** | **0.00127** | **J** | 0.00255 | 0.000494 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Hexachlorobutadiene | <0.000703 | U | 0.00255 | 0.000703 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Isopropylbenzene | <0.000481 | U | 0.00255 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Methylene Chloride | <0.00169 | U | 0.00638 | 0.00169 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| MTBE | <0.000748 | U | 0.00255 | 0.000748 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Naphthalene | <0.000855 | U | 0.00255 | 0.000855 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| N-Propylbenzene | <0.000658 | U | 0.00255 | 0.000658 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Styrene | <0.000660 | U | 0.00255 | 0.000660 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000587 | U | 0.00255 | 0.000587 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000873 | U | 0.00255 | 0.000873 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Tetrachloroethylene | <0.000581 | U | 0.00255 | 0.000581 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Toluene | <0.000715 | U | 0.00255 | 0.000715 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,3-Trichlorobenzene | <0.000577 | U | 0.00255 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,4-Trichlorobenzene | <0.000920 | U | 0.00255 | 0.000920 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,1-Trichloroethane | <0.000638 | U | 0.00255 | 0.000638 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,2-Trichloroethane | <0.000863 | U | 0.00255 | 0.000863 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Trichloroethene | <0.000588 | U | 0.00255 | 0.000588 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Trichlorofluoromethane | <0.00107 | U | 0.00255 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,3-Trichloropropane | <0.000746 | U | 0.00255 | 0.000746 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,4-Trimethylbenzene | <0.000716 | U | 0.00255 | 0.000716 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3,5-Trimethylbenzene | <0.000707 | U | 0.00255 | 0.000707 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **m,p-Xylenes** | **0.00748** | | 0.00255 | 0.000291 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **o-Xylene** | **0.00295** | | 0.00255 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **Xylenes, Total** | **0.0104** | | 0.00255 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Vinyl chloride | <0.00244 | U | 0.00638 | 0.00244 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *111* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *4-Bromofluorobenzene (Surr)* | *101* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| >C12-C28 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| >C28-C35 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <25.7 | U | 51.4 | 25.7 | mg/Kg | | | 01/14/26 01:30 | 1 |

Eurofins Dallas

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

## Client Sample ID: SB-02 (3'-4')

**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-3**
**Matrix: Solid**
**Percent Solids: 82.8**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *119* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:30* | *1* |
| *o-Terphenyl (Surr)* | *114* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:30* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.98 | U | 12.0 | 5.98 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:06 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **24.0** | | 2.32 | 0.795 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:43 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.6** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.9** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-03 (3'-4')

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-5**
**Matrix: Solid**
**Percent Solids: 88.9**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000397 | U | 0.00158 | 0.000397 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromobenzene | <0.000637 | U | 0.00158 | 0.000637 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromochloromethane | <0.000500 | U | 0.00158 | 0.000500 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromodichloromethane | <0.000516 | U | 0.00158 | 0.000516 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromoform | <0.000709 | U | 0.00158 | 0.000709 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromomethane | <0.000928 | U | 0.00395 | 0.000928 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2-Butanone | <0.00611 | U | 0.0395 | 0.00611 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| n-Butylbenzene | <0.000265 | U | 0.00158 | 0.000265 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| sec-Butylbenzene | <0.000423 | U | 0.00158 | 0.000423 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| tert-Butylbenzene | <0.000406 | U | 0.00158 | 0.000406 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Carbon tetrachloride | <0.000350 | U | 0.00158 | 0.000350 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chlorobenzene | <0.000401 | U | 0.00158 | 0.000401 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloroethane | <0.000358 | U | 0.00158 | 0.000358 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloroform | <0.000375 | U | 0.00158 | 0.000375 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloromethane | <0.000434 | U | 0.00158 | 0.000434 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2-Chlorotoluene | <0.000215 | U | 0.00158 | 0.000215 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 4-Chlorotoluene | <0.000481 | U | 0.00158 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00111 | U | 0.00395 | 0.00111 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dibromochloromethane | <0.000138 | U | 0.00158 | 0.000138 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000860 | U | 0.00395 | 0.000860 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dibromoethane | <0.000489 | U | 0.00158 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dibromomethane | <0.000248 | U | 0.00158 | 0.000248 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichlorobenzene | <0.000312 | U | 0.00158 | 0.000312 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3-Dichlorobenzene | <0.000395 | U | 0.00158 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,4-Dichlorobenzene | <0.000392 | U | 0.00158 | 0.000392 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dichlorodifluoromethane | <0.000430 | U | 0.00158 | 0.000430 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1-Dichloroethane | <0.000448 | U | 0.00158 | 0.000448 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichloroethane | <0.000290 | U | 0.00158 | 0.000290 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

Date Collected: 01/09/26 11:20
Date Received: 01/10/26 09:15

Lab Sample ID: 870-43022-5
Matrix: Solid
Percent Solids: 88.9

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,1-Dichloroethene | <0.000361 | U | 0.00158 | 0.000361 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| cis-1,2-Dichloroethene | <0.000400 | U | 0.00158 | 0.000400 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| trans-1,2-Dichloroethene | <0.000365 | U | 0.00158 | 0.000365 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichloropropane | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3-Dichloropropane | <0.000264 | U | 0.00158 | 0.000264 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2,2-Dichloropropane | <0.000468 | U | 0.00158 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1-Dichloropropene | <0.000244 | U | 0.00158 | 0.000244 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| cis-1,3-Dichloropropene | <0.000489 | U | 0.00158 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| trans-1,3-Dichloropropene | <0.000403 | U | 0.00158 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Ethylbenzene | <0.000306 | U | 0.00158 | 0.000306 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Hexachlorobutadiene | <0.000436 | U | 0.00158 | 0.000436 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Isopropylbenzene | <0.000298 | U | 0.00158 | 0.000298 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Methylene Chloride | <0.00105 | U | 0.00395 | 0.00105 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| MTBE | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Naphthalene | <0.000530 | U | 0.00158 | 0.000530 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| N-Propylbenzene | <0.000408 | U | 0.00158 | 0.000408 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Styrene | <0.000409 | U | 0.00158 | 0.000409 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000364 | U | 0.00158 | 0.000364 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000541 | U | 0.00158 | 0.000541 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Tetrachloroethylene | <0.000360 | U | 0.00158 | 0.000360 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Toluene | <0.000443 | U | 0.00158 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,3-Trichlorobenzene | <0.000357 | U | 0.00158 | 0.000357 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,4-Trichlorobenzene | <0.000570 | U | 0.00158 | 0.000570 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,1-Trichloroethane | <0.000395 | U | 0.00158 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,2-Trichloroethane | <0.000535 | U | 0.00158 | 0.000535 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Trichloroethene | <0.000365 | U | 0.00158 | 0.000365 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Trichlorofluoromethane | <0.000666 | U | 0.00158 | 0.000666 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,3-Trichloropropane | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,4-Trimethylbenzene | <0.000444 | U | 0.00158 | 0.000444 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3,5-Trimethylbenzene | <0.000438 | U | 0.00158 | 0.000438 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| m,p-Xylenes | <0.000180 | U | 0.00158 | 0.000180 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| o-Xylene | <0.000316 | U | 0.00158 | 0.000316 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Xylenes, Total | <0.000316 | U | 0.00158 | 0.000316 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Vinyl chloride | <0.00151 | U | 0.00395 | 0.00151 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *114* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *Toluene-d8 (Surr)* | *98* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| >C12-C28 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| >C28-C35 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <21.5 | U | 43.0 | 21.5 | mg/Kg | | | 01/14/26 01:51 | 1 |

Eurofins Dallas

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 88.9**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *108* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:51* | *1* |
| *o-Terphenyl (Surr)* | *105* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:51* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **250** | | 11.2 | 5.58 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:15 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **30.0** | | 2.16 | 0.741 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:40 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.3** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.6** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-03 (5'-6')

**Lab Sample ID: 870-43022-6**

**Date Collected: 01/09/26 11:30**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 91.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000413 | U | 0.00164 | 0.000413 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| Toluene | <0.000460 | U | 0.00164 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **Ethylbenzene** | **0.000545** | **J** | 0.00164 | 0.000318 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **m,p-Xylenes** | **0.00268** | | 0.00164 | 0.000187 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **o-Xylene** | **0.00111** | **J** | 0.00164 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **Xylenes, Total** | **0.00379** | | 0.00164 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| MTBE | <0.000482 | U | 0.00164 | 0.000482 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *111* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *4-Bromofluorobenzene (Surr)* | *98* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| >C12-C28 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| >C28-C35 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <23.2 | U | 46.3 | 23.2 | mg/Kg | | | 01/14/26 02:12 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *110* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:12* | *1* |
| *o-Terphenyl (Surr)* | *107* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:12* | *1* |

# Client Sample Results

Client: Whitehead ES LLC — Job ID: 870-43022-1
Project/Site: Cresson Moon Props — SDG: 379.001

## Client Sample ID: SB-04 (3'-4') — Lab Sample ID: 870-43022-8

**Date Collected: 01/09/26 12:20** — **Matrix: Solid**
**Date Received: 01/10/26 09:15** — **Percent Solids: 95.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000438 | U | 0.00175 | 0.000438 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromobenzene | <0.000703 | U | 0.00175 | 0.000703 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromochloromethane | <0.000552 | U | 0.00175 | 0.000552 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromodichloromethane | <0.000570 | U | 0.00175 | 0.000570 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromoform | <0.000783 | U | 0.00175 | 0.000783 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromomethane | <0.00103 | U | 0.00437 | 0.00103 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2-Butanone | <0.00674 | U | 0.0437 | 0.00674 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| n-Butylbenzene | <0.000293 | U | 0.00175 | 0.000293 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| sec-Butylbenzene | <0.000467 | U | 0.00175 | 0.000467 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| tert-Butylbenzene | <0.000448 | U | 0.00175 | 0.000448 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Carbon tetrachloride | <0.000387 | U | 0.00175 | 0.000387 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chlorobenzene | <0.000443 | U | 0.00175 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloroethane | <0.000396 | U | 0.00175 | 0.000396 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloroform | <0.000414 | U | 0.00175 | 0.000414 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloromethane | <0.000479 | U | 0.00175 | 0.000479 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2-Chlorotoluene | <0.000238 | U | 0.00175 | 0.000238 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 4-Chlorotoluene | <0.000531 | U | 0.00175 | 0.000531 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00122 | U | 0.00437 | 0.00122 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dibromochloromethane | <0.000152 | U | 0.00175 | 0.000152 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000950 | U | 0.00437 | 0.000950 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dibromoethane | <0.000540 | U | 0.00175 | 0.000540 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dibromomethane | <0.000274 | U | 0.00175 | 0.000274 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichlorobenzene | <0.000345 | U | 0.00175 | 0.000345 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3-Dichlorobenzene | <0.000436 | U | 0.00175 | 0.000436 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,4-Dichlorobenzene | <0.000433 | U | 0.00175 | 0.000433 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dichlorodifluoromethane | <0.000475 | U | 0.00175 | 0.000475 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloroethane | <0.000495 | U | 0.00175 | 0.000495 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichloroethane | <0.000321 | U | 0.00175 | 0.000321 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloroethene | <0.000398 | U | 0.00175 | 0.000398 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| cis-1,2-Dichloroethene | <0.000442 | U | 0.00175 | 0.000442 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| trans-1,2-Dichloroethene | <0.000403 | U | 0.00175 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichloropropane | <0.000512 | U | 0.00175 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3-Dichloropropane | <0.000292 | U | 0.00175 | 0.000292 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2,2-Dichloropropane | <0.000517 | U | 0.00175 | 0.000517 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloropropene | <0.000269 | U | 0.00175 | 0.000269 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| cis-1,3-Dichloropropene | <0.000540 | U | 0.00175 | 0.000540 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| trans-1,3-Dichloropropene | <0.000445 | U | 0.00175 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **Ethylbenzene** | **0.00169** | **J** | 0.00175 | 0.000338 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Hexachlorobutadiene | <0.000481 | U | 0.00175 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Isopropylbenzene | <0.000329 | U | 0.00175 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Methylene Chloride | <0.00115 | U | 0.00437 | 0.00115 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| MTBE | <0.000512 | U | 0.00175 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Naphthalene | <0.000585 | U | 0.00175 | 0.000585 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| N-Propylbenzene | <0.000451 | U | 0.00175 | 0.000451 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Styrene | <0.000452 | U | 0.00175 | 0.000452 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000402 | U | 0.00175 | 0.000402 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000597 | U | 0.00175 | 0.000597 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Tetrachloroethylene | <0.000397 | U | 0.00175 | 0.000397 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Toluene | <0.000489 | U | 0.00175 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-04 (3'-4')

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-8

**Matrix: Solid**
**Percent Solids: 95.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000395 | U | 0.00175 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,4-Trichlorobenzene | <0.000630 | U | 0.00175 | 0.000630 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,1-Trichloroethane | <0.000437 | U | 0.00175 | 0.000437 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,2-Trichloroethane | <0.000590 | U | 0.00175 | 0.000590 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Trichloroethene | <0.000403 | U | 0.00175 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Trichlorofluoromethane | <0.000735 | U | 0.00175 | 0.000735 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,3-Trichloropropane | <0.000511 | U | 0.00175 | 0.000511 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,4-Trimethylbenzene | <0.000490 | U | 0.00175 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3,5-Trimethylbenzene | <0.000484 | U | 0.00175 | 0.000484 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **m,p-Xylenes** | **0.00907** | | 0.00175 | 0.000199 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **o-Xylene** | **0.00383** | | 0.00175 | 0.000349 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **Xylenes, Total** | **0.0129** | | 0.00175 | 0.000349 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Vinyl chloride | <0.00167 | U | 0.00437 | 0.00167 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *114* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *Toluene-d8 (Surr)* | *100* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| >C12-C28 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| >C28-C35 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <22.2 | U | 44.3 | 22.2 | mg/Kg | | | 01/14/26 02:34 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *127* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:34* | *1* |
| *o-Terphenyl (Surr)* | *121* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:34* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **5.74** | **J** | 10.4 | 5.22 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:24 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **31.1** | | 1.91 | 0.654 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:36 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.7** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.4** | | | | Celsius | | | 01/13/26 14:00 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (2'-3')

**Lab Sample ID: 870-43022-10**

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.0**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000559 | U | 0.00223 | 0.000559 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromobenzene | <0.000896 | U | 0.00223 | 0.000896 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromochloromethane | <0.000704 | U | 0.00223 | 0.000704 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromodichloromethane | <0.000727 | U | 0.00223 | 0.000727 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromoform | <0.000998 | U | 0.00223 | 0.000998 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromomethane | <0.00131 | U | 0.00557 | 0.00131 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2-Butanone | <0.00860 | U | 0.0557 | 0.00860 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| n-Butylbenzene | <0.000373 | U | 0.00223 | 0.000373 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| sec-Butylbenzene | <0.000596 | U | 0.00223 | 0.000596 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| tert-Butylbenzene | <0.000571 | U | 0.00223 | 0.000571 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Carbon tetrachloride | <0.000493 | U | 0.00223 | 0.000493 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chlorobenzene | <0.000565 | U | 0.00223 | 0.000565 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloroethane | <0.000504 | U | 0.00223 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloroform | <0.000528 | U | 0.00223 | 0.000528 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloromethane | <0.000611 | U | 0.00223 | 0.000611 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2-Chlorotoluene | <0.000303 | U | 0.00223 | 0.000303 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 4-Chlorotoluene | <0.000677 | U | 0.00223 | 0.000677 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00156 | U | 0.00557 | 0.00156 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dibromochloromethane | <0.000194 | U | 0.00223 | 0.000194 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00121 | U | 0.00557 | 0.00121 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dibromoethane | <0.000688 | U | 0.00223 | 0.000688 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dibromomethane | <0.000350 | U | 0.00223 | 0.000350 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichlorobenzene | <0.000440 | U | 0.00223 | 0.000440 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3-Dichlorobenzene | <0.000556 | U | 0.00223 | 0.000556 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,4-Dichlorobenzene | <0.000552 | U | 0.00223 | 0.000552 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dichlorodifluoromethane | <0.000606 | U | 0.00223 | 0.000606 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloroethane | <0.000631 | U | 0.00223 | 0.000631 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichloroethane | <0.000409 | U | 0.00223 | 0.000409 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloroethene | <0.000508 | U | 0.00223 | 0.000508 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| cis-1,2-Dichloroethene | <0.000563 | U | 0.00223 | 0.000563 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| trans-1,2-Dichloroethene | <0.000514 | U | 0.00223 | 0.000514 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichloropropane | <0.000652 | U | 0.00223 | 0.000652 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3-Dichloropropane | <0.000372 | U | 0.00223 | 0.000372 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2,2-Dichloropropane | <0.000659 | U | 0.00223 | 0.000659 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloropropene | <0.000343 | U | 0.00223 | 0.000343 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| cis-1,3-Dichloropropene | <0.000688 | U | 0.00223 | 0.000688 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| trans-1,3-Dichloropropene | <0.000568 | U | 0.00223 | 0.000568 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Ethylbenzene | <0.000431 | U | 0.00223 | 0.000431 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Hexachlorobutadiene | <0.000614 | U | 0.00223 | 0.000614 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Isopropylbenzene | <0.000420 | U | 0.00223 | 0.000420 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Methylene Chloride | <0.00147 | U | 0.00557 | 0.00147 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| MTBE | <0.000652 | U | 0.00223 | 0.000652 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Naphthalene | <0.000746 | U | 0.00223 | 0.000746 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| N-Propylbenzene | <0.000575 | U | 0.00223 | 0.000575 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Styrene | <0.000576 | U | 0.00223 | 0.000576 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000512 | U | 0.00223 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000762 | U | 0.00223 | 0.000762 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Tetrachloroethylene | <0.000507 | U | 0.00223 | 0.000507 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Toluene | <0.000624 | U | 0.00223 | 0.000624 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (2'-3')

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-10

**Matrix: Solid**
**Percent Solids: 86.0**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000503 | U | 0.00223 | 0.000503 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,4-Trichlorobenzene | <0.000803 | U | 0.00223 | 0.000803 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,1-Trichloroethane | <0.000557 | U | 0.00223 | 0.000557 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,2-Trichloroethane | <0.000753 | U | 0.00223 | 0.000753 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Trichloroethene | <0.000513 | U | 0.00223 | 0.000513 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Trichlorofluoromethane | <0.000938 | U | 0.00223 | 0.000938 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,3-Trichloropropane | <0.000651 | U | 0.00223 | 0.000651 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,4-Trimethylbenzene | <0.000625 | U | 0.00223 | 0.000625 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3,5-Trimethylbenzene | <0.000617 | U | 0.00223 | 0.000617 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| m,p-Xylenes | <0.000254 | U | 0.00223 | 0.000254 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| o-Xylene | <0.000445 | U | 0.00223 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Xylenes, Total | <0.000445 | U | 0.00223 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Vinyl chloride | <0.00213 | U | 0.00557 | 0.00213 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *112* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *4-Bromofluorobenzene (Surr)* | *107* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *Toluene-d8 (Surr)* | *102* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| >C12-C28 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| >C28-C35 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <18.4 | U | 36.9 | 18.4 | mg/Kg | | | 01/14/26 03:16 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *111* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:16* | *1* |
| *o-Terphenyl (Surr)* | *111* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:16* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.82 | U | 11.6 | 5.82 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:33 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **148** | | 2.12 | 0.724 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:33 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.6** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.4** | | | | Celsius | | | 01/13/26 14:00 | 1 |

Eurofins Dallas

# Client Sample Results



## Client Sample ID: SB-05 (8'-9')

**Lab Sample ID: 870-43022-11**

**Date Collected: 01/09/26 13:55**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000577 | U | 0.00230 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Toluene | <0.000644 | U | 0.00230 | 0.000644 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Ethylbenzene | <0.000445 | U | 0.00230 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| m,p-Xylenes | <0.000262 | U | 0.00230 | 0.000262 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| o-Xylene | <0.000460 | U | 0.00230 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Xylenes, Total | <0.000460 | U | 0.00230 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| MTBE | <0.000674 | U | 0.00230 | 0.000674 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *119* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *Dibromofluoromethane (Surr)* | *104* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *Toluene-d8 (Surr)* | *97* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| >C12-C28 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| >C28-C35 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <21.5 | U | 43.0 | 21.5 | mg/Kg | | | 01/14/26 03:38 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *132* | *X* | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:38* | *1* |
| *o-Terphenyl (Surr)* | *129* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:38* | *1* |

## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**

**Date Collected: 01/09/26 14:10**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000555 | U | 0.00221 | 0.000555 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Toluene | <0.000620 | U | 0.00221 | 0.000620 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Ethylbenzene | <0.000428 | U | 0.00221 | 0.000428 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| m,p-Xylenes | <0.000252 | U | 0.00221 | 0.000252 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| o-Xylene | <0.000443 | U | 0.00221 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Xylenes, Total | <0.000443 | U | 0.00221 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| MTBE | <0.000648 | U | 0.00221 | 0.000648 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *117* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *4-Bromofluorobenzene (Surr)* | *98* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *Toluene-d8 (Surr)* | *97* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |
| >C12-C28 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |
| >C28-C35 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |

## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**

**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.2**

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Total Petroleum Hydrocarbons (C6-C35) | <20.0 | U | 39.9 | 20.0 | mg/Kg | | | 01/14/26 03:59 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *105* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:59* | *1* |
| *o-Terphenyl (Surr)* | *107* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:59* | *1* |

## Client Sample ID: SB-06 (6'-7')

**Lab Sample ID: 870-43022-13**

**Date Collected: 01/09/26 14:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 90.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000495 | U | 0.00197 | 0.000495 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromobenzene | <0.000794 | U | 0.00197 | 0.000794 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromochloromethane | <0.000624 | U | 0.00197 | 0.000624 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromodichloromethane | <0.000644 | U | 0.00197 | 0.000644 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromoform | <0.000884 | U | 0.00197 | 0.000884 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromomethane | <0.00116 | U | 0.00493 | 0.00116 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2-Butanone | <0.00762 | U | 0.0493 | 0.00762 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| n-Butylbenzene | <0.000331 | U | 0.00197 | 0.000331 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| sec-Butylbenzene | <0.000528 | U | 0.00197 | 0.000528 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| tert-Butylbenzene | <0.000506 | U | 0.00197 | 0.000506 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Carbon tetrachloride | <0.000437 | U | 0.00197 | 0.000437 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chlorobenzene | <0.000500 | U | 0.00197 | 0.000500 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloroethane | <0.000447 | U | 0.00197 | 0.000447 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloroform | <0.000468 | U | 0.00197 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloromethane | <0.000542 | U | 0.00197 | 0.000542 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2-Chlorotoluene | <0.000268 | U | 0.00197 | 0.000268 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 4-Chlorotoluene | <0.000600 | U | 0.00197 | 0.000600 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00138 | U | 0.00493 | 0.00138 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dibromochloromethane | <0.000172 | U | 0.00197 | 0.000172 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00107 | U | 0.00493 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dibromoethane | <0.000610 | U | 0.00197 | 0.000610 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dibromomethane | <0.000310 | U | 0.00197 | 0.000310 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichlorobenzene | <0.000390 | U | 0.00197 | 0.000390 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3-Dichlorobenzene | <0.000492 | U | 0.00197 | 0.000492 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,4-Dichlorobenzene | <0.000490 | U | 0.00197 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dichlorodifluoromethane | <0.000537 | U | 0.00197 | 0.000537 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloroethane | <0.000560 | U | 0.00197 | 0.000560 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichloroethane | <0.000362 | U | 0.00197 | 0.000362 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloroethene | <0.000450 | U | 0.00197 | 0.000450 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| cis-1,2-Dichloroethene | <0.000499 | U | 0.00197 | 0.000499 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| trans-1,2-Dichloroethene | <0.000456 | U | 0.00197 | 0.000456 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichloropropane | <0.000578 | U | 0.00197 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3-Dichloropropane | <0.000330 | U | 0.00197 | 0.000330 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2,2-Dichloropropane | <0.000584 | U | 0.00197 | 0.000584 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloropropene | <0.000304 | U | 0.00197 | 0.000304 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| cis-1,3-Dichloropropene | <0.000610 | U | 0.00197 | 0.000610 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| trans-1,3-Dichloropropene | <0.000503 | U | 0.00197 | 0.000503 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |

# Client Sample Results





**Client Sample ID: SB-06 (6'-7')**
**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-13**
**Matrix: Solid**
**Percent Solids: 90.2**

## Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Ethylbenzene | <0.000382 | U | 0.00197 | 0.000382 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Hexachlorobutadiene | <0.000544 | U | 0.00197 | 0.000544 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Isopropylbenzene | <0.000372 | U | 0.00197 | 0.000372 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Methylene Chloride | <0.00130 | U | 0.00493 | 0.00130 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| MTBE | <0.000578 | U | 0.00197 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Naphthalene | <0.000661 | U | 0.00197 | 0.000661 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| N-Propylbenzene | <0.000509 | U | 0.00197 | 0.000509 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Styrene | <0.000510 | U | 0.00197 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000454 | U | 0.00197 | 0.000454 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000675 | U | 0.00197 | 0.000675 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Tetrachloroethylene | <0.000449 | U | 0.00197 | 0.000449 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Toluene | <0.000553 | U | 0.00197 | 0.000553 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,3-Trichlorobenzene | <0.000446 | U | 0.00197 | 0.000446 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,4-Trichlorobenzene | <0.000712 | U | 0.00197 | 0.000712 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,1-Trichloroethane | <0.000493 | U | 0.00197 | 0.000493 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,2-Trichloroethane | <0.000667 | U | 0.00197 | 0.000667 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Trichloroethene | <0.000455 | U | 0.00197 | 0.000455 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Trichlorofluoromethane | <0.000831 | U | 0.00197 | 0.000831 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,3-Trichloropropane | <0.000577 | U | 0.00197 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,4-Trimethylbenzene | <0.000554 | U | 0.00197 | 0.000554 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3,5-Trimethylbenzene | <0.000547 | U | 0.00197 | 0.000547 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| m,p-Xylenes | <0.000225 | U | 0.00197 | 0.000225 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| o-Xylene | <0.000395 | U | 0.00197 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Xylenes, Total | <0.000395 | U | 0.00197 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Vinyl chloride | <0.00189 | U | 0.00493 | 0.00189 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *115* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *Dibromofluoromethane (Surr)* | *101* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |

## Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| >C12-C28 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| >C28-C35 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <26.8 | U | 53.6 | 26.8 | mg/Kg | | | 01/14/26 04:20 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *129* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 04:20* | *1* |
| *o-Terphenyl (Surr)* | *123* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 04:20* | *1* |

## Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **184** | | 11.0 | 5.50 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:42 | 1 |

## Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **16.7** | | 2.01 | 0.690 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:30 | 5 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-06 (6'-7')

**Lab Sample ID: 870-43022-13**

**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 90.2**

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| soil pH measured in water at deg C (SW846 9045D) | 9.0 | | | | S.U. | | | 01/13/26 14:00 | 1 |
| Temperature (SW846 9045D) | 20.6 | | | | Celsius | | | 01/13/26 14:00 | 1 |

# Surrogate Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Method: 8260C - Volatile Organic Compounds by GC/MS

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | | | |
|---|---|---|---|---|---|
| | | DCA | BFB | DBFM | TOL |
| Lab Sample ID | Client Sample ID | (73-131) | (75-132) | (65-135) | (78-138) |
| 870-43022-1 | SB-01 (3'-4') | 106 | 109 | 99 | 106 |
| 870-43022-1 MS | SB-01 (3'-4') | 115 | 100 | 106 | 98 |
| 870-43022-3 | SB-02 (3'-4') | 111 | 101 | 103 | 99 |
| 870-43022-5 | SB-03 (3'-4') | 114 | 99 | 102 | 98 |
| 870-43022-6 | SB-03 (5'-6') | 111 | 98 | 102 | 99 |
| 870-43022-8 | SB-04 (3'-4') | 114 | 99 | 102 | 100 |
| 870-43022-10 | SB-05 (2'-3') | 112 | 107 | 102 | 102 |
| 870-43022-11 | SB-05 (8'-9') | 119 | 99 | 104 | 97 |
| 870-43022-12 | SB-06 (2'-3') | 117 | 98 | 103 | 97 |
| 870-43022-13 | SB-06 (6'-7') | 115 | 99 | 101 | 99 |
| LCS 870-34798/1-A | Lab Control Sample | 103 | 101 | 102 | 99 |
| LCSD 870-34798/2-A | Lab Control Sample Dup | 103 | 100 | 103 | 99 |
| MB 870-34798/3-A | Method Blank | 99 | 100 | 97 | 102 |

**Surrogate Legend**

DCA = 1,2-Dichloroethane-d4 (Surr)
BFB = 4-Bromofluorobenzene (Surr)
DBFM = Dibromofluoromethane (Surr)
TOL = Toluene-d8 (Surr)

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | | |
|---|---|---|---|---|
| | | FBP | NBZ | TPHd14 |
| Lab Sample ID | Client Sample ID | (37-130) | (36-131) | (40-130) |
| 860-122968-J-3-B MS | Matrix Spike | 68 | 75 | 77 |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | 71 | 78 | 80 |
| 870-43022-1 | SB-01 (3'-4') | 73 | 58 | 93 |
| LCS 860-288981/2-A | Lab Control Sample | 82 | 93 | 78 |
| LCSD 860-288981/3-A | Lab Control Sample Dup | 84 | 88 | 80 |
| LCSD 860-288981/5-A | Lab Control Sample Dup | 82 | 88 | 76 |
| MB 860-288981/1-A | Method Blank | 73 | 59 | 72 |

**Surrogate Legend**

FBP = 2-Fluorobiphenyl
NBZ = Nitrobenzene-d5 (Surr)
TPHd14 = p-Terphenyl-d14 (Surr)

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | |
|---|---|---|---|
| | | 1CO | OTPH |
| Lab Sample ID | Client Sample ID | (70-130) | (70-130) |
| 870-43022-1 | SB-01 (3'-4') | 117 | 120 |
| 870-43022-1 MS | SB-01 (3'-4') | 106 | 101 |
| 870-43022-1 MSD | SB-01 (3'-4') | 102 | 100 |
| 870-43022-3 | SB-02 (3'-4') | 119 | 114 |
| 870-43022-5 | SB-03 (3'-4') | 108 | 105 |
| 870-43022-6 | SB-03 (5'-6') | 110 | 107 |

# Surrogate Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | |
|---|---|---|---|
| | | 1CO | OTPH |
| Lab Sample ID | Client Sample ID | (70-130) | (70-130) |
| 870-43022-8 | SB-04 (3'-4') | 127 | 121 |
| 870-43022-10 | SB-05 (2'-3') | 111 | 111 |
| 870-43022-11 | SB-05 (8'-9') | 132 X | 129 |
| 870-43022-12 | SB-06 (2'-3') | 105 | 107 |
| 870-43022-13 | SB-06 (6'-7') | 129 | 123 |
| LCS 870-34808/1-A | Lab Control Sample | 103 | 101 |
| LCSD 870-34808/2-A | Lab Control Sample Dup | 104 | 101 |
| MB 870-34808/3-A | Method Blank | 106 | 103 |

**Surrogate Legend**

1CO = 1-Chlorooctane (Surr)
OTPH = o-Terphenyl (Surr)

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Lab Sample ID: MB 870-34798/3-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000500 | U | 0.00199 | 0.000500 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromobenzene | <0.000802 | U | 0.00199 | 0.000802 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromochloromethane | <0.000629 | U | 0.00199 | 0.000629 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromodichloromethane | <0.000650 | U | 0.00199 | 0.000650 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromoform | <0.000892 | U | 0.00199 | 0.000892 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromomethane | <0.00117 | U | 0.00498 | 0.00117 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2-Butanone | <0.00769 | U | 0.0498 | 0.00769 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| n-Butylbenzene | <0.000334 | U | 0.00199 | 0.000334 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| sec-Butylbenzene | <0.000533 | U | 0.00199 | 0.000533 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| tert-Butylbenzene | <0.000511 | U | 0.00199 | 0.000511 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Carbon tetrachloride | <0.000441 | U | 0.00199 | 0.000441 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chlorobenzene | <0.000505 | U | 0.00199 | 0.000505 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloroethane | <0.000451 | U | 0.00199 | 0.000451 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloroform | <0.000472 | U | 0.00199 | 0.000472 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloromethane | <0.000547 | U | 0.00199 | 0.000547 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2-Chlorotoluene | <0.000271 | U | 0.00199 | 0.000271 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 4-Chlorotoluene | <0.000606 | U | 0.00199 | 0.000606 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00139 | U | 0.00498 | 0.00139 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dibromochloromethane | <0.000173 | U | 0.00199 | 0.000173 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00108 | U | 0.00498 | 0.00108 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dibromoethane | <0.000616 | U | 0.00199 | 0.000616 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dibromomethane | <0.000313 | U | 0.00199 | 0.000313 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichlorobenzene | <0.000393 | U | 0.00199 | 0.000393 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3-Dichlorobenzene | <0.000497 | U | 0.00199 | 0.000497 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,4-Dichlorobenzene | <0.000494 | U | 0.00199 | 0.000494 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dichlorodifluoromethane | <0.000542 | U | 0.00199 | 0.000542 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloroethane | <0.000565 | U | 0.00199 | 0.000565 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichloroethane | <0.000366 | U | 0.00199 | 0.000366 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloroethene | <0.000454 | U | 0.00199 | 0.000454 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| cis-1,2-Dichloroethene | <0.000504 | U | 0.00199 | 0.000504 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| trans-1,2-Dichloroethene | <0.000460 | U | 0.00199 | 0.000460 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichloropropane | <0.000584 | U | 0.00199 | 0.000584 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3-Dichloropropane | <0.000333 | U | 0.00199 | 0.000333 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2,2-Dichloropropane | <0.000590 | U | 0.00199 | 0.000590 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloropropene | <0.000307 | U | 0.00199 | 0.000307 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| cis-1,3-Dichloropropene | <0.000616 | U | 0.00199 | 0.000616 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| trans-1,3-Dichloropropene | <0.000508 | U | 0.00199 | 0.000508 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Ethylbenzene | <0.000385 | U | 0.00199 | 0.000385 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Hexachlorobutadiene | <0.000549 | U | 0.00199 | 0.000549 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Isopropylbenzene | <0.000375 | U | 0.00199 | 0.000375 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Methylene Chloride | <0.00132 | U | 0.00498 | 0.00132 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| MTBE | <0.000584 | U | 0.00199 | 0.000584 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Naphthalene | <0.000667 | U | 0.00199 | 0.000667 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| N-Propylbenzene | <0.000514 | U | 0.00199 | 0.000514 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Styrene | <0.000515 | U | 0.00199 | 0.000515 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000458 | U | 0.00199 | 0.000458 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000681 | U | 0.00199 | 0.000681 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Tetrachloroethylene | <0.000453 | U | 0.00199 | 0.000453 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: MB 870-34798/3-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Toluene | <0.000558 | U | 0.00199 | 0.000558 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,3-Trichlorobenzene | <0.000450 | U | 0.00199 | 0.000450 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,4-Trichlorobenzene | <0.000718 | U | 0.00199 | 0.000718 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,1-Trichloroethane | <0.000498 | U | 0.00199 | 0.000498 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,2-Trichloroethane | <0.000673 | U | 0.00199 | 0.000673 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Trichloroethene | <0.000459 | U | 0.00199 | 0.000459 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Trichlorofluoromethane | <0.000839 | U | 0.00199 | 0.000839 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,3-Trichloropropane | <0.000583 | U | 0.00199 | 0.000583 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,4-Trimethylbenzene | <0.000559 | U | 0.00199 | 0.000559 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3,5-Trimethylbenzene | <0.000552 | U | 0.00199 | 0.000552 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| m,p-Xylenes | <0.000227 | U | 0.00199 | 0.000227 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| o-Xylene | <0.000398 | U | 0.00199 | 0.000398 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Xylenes, Total | <0.000398 | U | 0.00199 | 0.000398 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Vinyl chloride | <0.00190 | U | 0.00498 | 0.00190 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |

| *Surrogate* | *MB %Recovery* | *MB Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *99* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *Dibromofluoromethane (Surr)* | *97* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *Toluene-d8 (Surr)* | *102* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |

**Lab Sample ID: LCS 870-34798/1-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Benzene | 0.0506 | 0.05131 | | mg/Kg | | 101 | 70 - 130 |
| Bromobenzene | 0.0506 | 0.05362 | | mg/Kg | | 106 | 70 - 130 |
| Bromochloromethane | 0.0505 | 0.05170 | | mg/Kg | | 102 | 70 - 130 |
| Bromodichloromethane | 0.0507 | 0.05642 | | mg/Kg | | 111 | 70 - 130 |
| Bromoform | 0.0507 | 0.05641 | | mg/Kg | | 111 | 70 - 130 |
| Bromomethane | 0.0504 | 0.05173 | | mg/Kg | | 103 | 70 - 130 |
| 2-Butanone | 0.503 | 0.4996 | | mg/Kg | | 99 | 70 - 130 |
| n-Butylbenzene | 0.0507 | 0.05645 | | mg/Kg | | 111 | 70 - 130 |
| sec-Butylbenzene | 0.0506 | 0.05618 | | mg/Kg | | 111 | 70 - 130 |
| tert-Butylbenzene | 0.0506 | 0.05529 | | mg/Kg | | 109 | 70 - 130 |
| Carbon tetrachloride | 0.0506 | 0.06290 | | mg/Kg | | 124 | 70 - 130 |
| Chlorobenzene | 0.0505 | 0.05230 | | mg/Kg | | 104 | 70 - 130 |
| Chloroethane | 0.0503 | 0.04873 | | mg/Kg | | 97 | 70 - 130 |
| Chloroform | 0.0504 | 0.05908 | | mg/Kg | | 117 | 70 - 130 |
| Chloromethane | 0.0505 | 0.04426 | | mg/Kg | | 88 | 70 - 130 |
| 2-Chlorotoluene | 0.0505 | 0.05379 | | mg/Kg | | 106 | 70 - 130 |
| 4-Chlorotoluene | 0.0506 | 0.05495 | | mg/Kg | | 109 | 70 - 130 |
| p-Cymene (p-Isopropyltoluene) | 0.0506 | 0.05566 | | mg/Kg | | 110 | 70 - 130 |
| Dibromochloromethane | 0.0506 | 0.05804 | | mg/Kg | | 115 | 70 - 130 |
| 1,2-Dibromo-3-Chloropropane | 0.0506 | 0.05935 | | mg/Kg | | 117 | 70 - 130 |
| 1,2-Dibromoethane | 0.0506 | 0.05368 | | mg/Kg | | 106 | 70 - 130 |
| Dibromomethane | 0.0505 | 0.05279 | | mg/Kg | | 104 | 70 - 130 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCS 870-34798/1-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| 1,2-Dichlorobenzene | 0.0504 | 0.05274 | | mg/Kg | | 105 | 70 - 130 |
| 1,3-Dichlorobenzene | 0.0505 | 0.05319 | | mg/Kg | | 105 | 70 - 130 |
| 1,4-Dichlorobenzene | 0.0507 | 0.05240 | | mg/Kg | | 103 | 70 - 130 |
| Dichlorodifluoromethane | 0.0502 | 0.06062 | | mg/Kg | | 121 | 70 - 130 |
| 1,1-Dichloroethane | 0.0505 | 0.05018 | | mg/Kg | | 99 | 70 - 130 |
| 1,2-Dichloroethane | 0.0506 | 0.05261 | | mg/Kg | | 104 | 70 - 130 |
| 1,1-Dichloroethene | 0.0507 | 0.05466 | | mg/Kg | | 108 | 70 - 130 |
| cis-1,2-Dichloroethene | 0.0505 | 0.05215 | | mg/Kg | | 103 | 70 - 130 |
| trans-1,2-Dichloroethene | 0.0507 | 0.05371 | | mg/Kg | | 106 | 70 - 130 |
| 1,2-Dichloropropane | 0.0505 | 0.04908 | | mg/Kg | | 97 | 70 - 130 |
| 1,3-Dichloropropane | 0.0506 | 0.05134 | | mg/Kg | | 101 | 70 - 130 |
| 2,2-Dichloropropane | 0.0506 | 0.05739 | | mg/Kg | | 113 | 70 - 130 |
| 1,1-Dichloropropene | 0.0506 | 0.05363 | | mg/Kg | | 106 | 70 - 130 |
| cis-1,3-Dichloropropene | 0.0503 | 0.05351 | | mg/Kg | | 106 | 70 - 130 |
| trans-1,3-Dichloropropene | 0.0505 | 0.05370 | | mg/Kg | | 106 | 70 - 130 |
| Ethylbenzene | 0.0506 | 0.05490 | | mg/Kg | | 109 | 70 - 130 |
| Hexachlorobutadiene | 0.0506 | 0.05429 | | mg/Kg | | 107 | 70 - 130 |
| Isopropylbenzene | 0.0505 | 0.05517 | | mg/Kg | | 109 | 70 - 130 |
| Methylene Chloride | 0.0505 | 0.05444 | | mg/Kg | | 108 | 70 - 130 |
| MTBE | 0.0505 | 0.04943 | | mg/Kg | | 98 | 70 - 130 |
| Naphthalene | 0.0506 | 0.05515 | | mg/Kg | | 109 | 70 - 130 |
| N-Propylbenzene | 0.0506 | 0.05523 | | mg/Kg | | 109 | 70 - 130 |
| Styrene | 0.0506 | 0.05450 | | mg/Kg | | 108 | 70 - 130 |
| 1,1,1,2-Tetrachloroethane | 0.0506 | 0.05612 | | mg/Kg | | 111 | 70 - 130 |
| 1,1,2,2-Tetrachloroethane | 0.0507 | 0.05229 | | mg/Kg | | 103 | 70 - 130 |
| Tetrachloroethylene | 0.0506 | 0.05756 | | mg/Kg | | 114 | 70 - 130 |
| Toluene | 0.0506 | 0.05130 | | mg/Kg | | 101 | 70 - 130 |
| 1,2,3-Trichlorobenzene | 0.0506 | 0.05395 | | mg/Kg | | 107 | 70 - 130 |
| 1,2,4-Trichlorobenzene | 0.0505 | 0.05678 | | mg/Kg | | 112 | 70 - 130 |
| 1,1,1-Trichloroethane | 0.0503 | 0.05650 | | mg/Kg | | 112 | 70 - 130 |
| 1,1,2-Trichloroethane | 0.0504 | 0.05062 | | mg/Kg | | 100 | 70 - 130 |
| Trichloroethene | 0.0507 | 0.05453 | | mg/Kg | | 108 | 70 - 130 |
| Trichlorofluoromethane | 0.0502 | 0.05976 | | mg/Kg | | 119 | 70 - 130 |
| 1,2,3-Trichloropropane | 0.0506 | 0.05262 | | mg/Kg | | 104 | 70 - 130 |
| 1,2,4-Trimethylbenzene | 0.0505 | 0.05634 | | mg/Kg | | 111 | 70 - 130 |
| 1,3,5-Trimethylbenzene | 0.0505 | 0.05532 | | mg/Kg | | 110 | 70 - 130 |
| m,p-Xylenes | 0.0502 | 0.05368 | | mg/Kg | | 107 | 70 - 130 |
| o-Xylene | 0.0505 | 0.05446 | | mg/Kg | | 108 | 70 - 130 |
| Vinyl chloride | 0.0505 | 0.05166 | | mg/Kg | | 102 | 70 - 130 |

| *Surrogate* | *LCS %Recovery* | *LCS Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *103* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *101* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCSD 870-34798/2-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | 0.0503 | 0.04450 | | mg/Kg | | 89 | 70 - 130 | 14 | 25 |
| Bromobenzene | 0.0503 | 0.04558 | | mg/Kg | | 91 | 70 - 130 | 16 | 25 |
| Bromochloromethane | 0.0502 | 0.04490 | | mg/Kg | | 89 | 70 - 130 | 14 | 25 |
| Bromodichloromethane | 0.0504 | 0.04818 | | mg/Kg | | 96 | 70 - 130 | 16 | 25 |
| Bromoform | 0.0503 | 0.04781 | | mg/Kg | | 95 | 70 - 130 | 16 | 25 |
| Bromomethane | 0.0501 | 0.05369 | | mg/Kg | | 107 | 70 - 130 | 4 | 25 |
| 2-Butanone | 0.500 | 0.4066 | | mg/Kg | | 81 | 70 - 130 | 21 | 25 |
| n-Butylbenzene | 0.0504 | 0.04839 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| sec-Butylbenzene | 0.0503 | 0.04816 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| tert-Butylbenzene | 0.0503 | 0.04757 | | mg/Kg | | 94 | 70 - 130 | 15 | 25 |
| Carbon tetrachloride | 0.0503 | 0.05382 | | mg/Kg | | 107 | 70 - 130 | 16 | 25 |
| Chlorobenzene | 0.0502 | 0.04512 | | mg/Kg | | 90 | 70 - 130 | 15 | 25 |
| Chloroethane | 0.0500 | 0.05358 | | mg/Kg | | 107 | 70 - 130 | 9 | 25 |
| Chloroform | 0.0501 | 0.05216 | | mg/Kg | | 104 | 70 - 130 | 12 | 25 |
| Chloromethane | 0.0502 | 0.04900 | | mg/Kg | | 98 | 70 - 130 | 10 | 25 |
| 2-Chlorotoluene | 0.0502 | 0.04604 | | mg/Kg | | 92 | 70 - 130 | 16 | 25 |
| 4-Chlorotoluene | 0.0503 | 0.04655 | | mg/Kg | | 93 | 70 - 130 | 17 | 25 |
| p-Cymene (p-Isopropyltoluene) | 0.0503 | 0.04806 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| Dibromochloromethane | 0.0502 | 0.04853 | | mg/Kg | | 97 | 70 - 130 | 18 | 25 |
| 1,2-Dibromo-3-Chloropropane | 0.0503 | 0.04775 | | mg/Kg | | 95 | 70 - 130 | 22 | 25 |
| 1,2-Dibromoethane | 0.0503 | 0.04522 | | mg/Kg | | 90 | 70 - 130 | 17 | 25 |
| Dibromomethane | 0.0502 | 0.04500 | | mg/Kg | | 90 | 70 - 130 | 16 | 25 |
| 1,2-Dichlorobenzene | 0.0501 | 0.04463 | | mg/Kg | | 89 | 70 - 130 | 17 | 25 |
| 1,3-Dichlorobenzene | 0.0502 | 0.04566 | | mg/Kg | | 91 | 70 - 130 | 15 | 25 |
| 1,4-Dichlorobenzene | 0.0503 | 0.04463 | | mg/Kg | | 89 | 70 - 130 | 16 | 25 |
| Dichlorodifluoromethane | 0.0499 | 0.06346 | | mg/Kg | | 127 | 70 - 130 | 5 | 25 |
| 1,1-Dichloroethane | 0.0502 | 0.04414 | | mg/Kg | | 88 | 70 - 130 | 13 | 25 |
| 1,2-Dichloroethane | 0.0503 | 0.04584 | | mg/Kg | | 91 | 70 - 130 | 14 | 25 |
| 1,1-Dichloroethene | 0.0504 | 0.04747 | | mg/Kg | | 94 | 70 - 130 | 14 | 25 |
| cis-1,2-Dichloroethene | 0.0502 | 0.04518 | | mg/Kg | | 90 | 70 - 130 | 14 | 25 |
| trans-1,2-Dichloroethene | 0.0504 | 0.04726 | | mg/Kg | | 94 | 70 - 130 | 13 | 25 |
| 1,2-Dichloropropane | 0.0502 | 0.04290 | | mg/Kg | | 85 | 70 - 130 | 13 | 25 |
| 1,3-Dichloropropane | 0.0503 | 0.04388 | | mg/Kg | | 87 | 70 - 130 | 16 | 25 |
| 2,2-Dichloropropane | 0.0503 | 0.05013 | | mg/Kg | | 100 | 70 - 130 | 13 | 25 |
| 1,1-Dichloropropene | 0.0503 | 0.04663 | | mg/Kg | | 93 | 70 - 130 | 14 | 25 |
| cis-1,3-Dichloropropene | 0.0500 | 0.04530 | | mg/Kg | | 91 | 70 - 130 | 17 | 25 |
| trans-1,3-Dichloropropene | 0.0502 | 0.04601 | | mg/Kg | | 92 | 70 - 130 | 15 | 25 |
| Ethylbenzene | 0.0503 | 0.04731 | | mg/Kg | | 94 | 70 - 130 | 15 | 25 |
| Hexachlorobutadiene | 0.0503 | 0.04640 | | mg/Kg | | 92 | 70 - 130 | 16 | 25 |
| Isopropylbenzene | 0.0502 | 0.04777 | | mg/Kg | | 95 | 70 - 130 | 14 | 25 |
| Methylene Chloride | 0.0502 | 0.04777 | | mg/Kg | | 95 | 70 - 130 | 13 | 25 |
| MTBE | 0.0502 | 0.04231 | | mg/Kg | | 84 | 70 - 130 | 16 | 25 |
| Naphthalene | 0.0503 | 0.04478 | | mg/Kg | | 89 | 70 - 130 | 21 | 25 |
| N-Propylbenzene | 0.0503 | 0.04701 | | mg/Kg | | 93 | 70 - 130 | 16 | 25 |
| Styrene | 0.0503 | 0.04674 | | mg/Kg | | 93 | 70 - 130 | 15 | 25 |
| 1,1,1,2-Tetrachloroethane | 0.0502 | 0.04809 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| 1,1,2,2-Tetrachloroethane | 0.0504 | 0.04302 | | mg/Kg | | 85 | 70 - 130 | 19 | 25 |
| Tetrachloroethylene | 0.0503 | 0.04900 | | mg/Kg | | 97 | 70 - 130 | 16 | 25 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCSD 870-34798/2-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | | | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Toluene | | | 0.0503 | 0.04377 | | mg/Kg | | 87 | 70 - 130 | 16 | 25 |
| 1,2,3-Trichlorobenzene | | | 0.0503 | 0.04458 | | mg/Kg | | 89 | 70 - 130 | 19 | 25 |
| 1,2,4-Trichlorobenzene | | | 0.0502 | 0.04815 | | mg/Kg | | 96 | 70 - 130 | 16 | 25 |
| 1,1,1-Trichloroethane | | | 0.0500 | 0.04909 | | mg/Kg | | 98 | 70 - 130 | 14 | 25 |
| 1,1,2-Trichloroethane | | | 0.0501 | 0.04336 | | mg/Kg | | 86 | 70 - 130 | 15 | 25 |
| Trichloroethene | | | 0.0504 | 0.04709 | | mg/Kg | | 93 | 70 - 130 | 15 | 25 |
| Trichlorofluoromethane | | | 0.0499 | 0.06317 | | mg/Kg | | 127 | 70 - 130 | 6 | 25 |
| 1,2,3-Trichloropropane | | | 0.0503 | 0.04330 | | mg/Kg | | 86 | 70 - 130 | 19 | 25 |
| 1,2,4-Trimethylbenzene | | | 0.0502 | 0.04772 | | mg/Kg | | 95 | 70 - 130 | 17 | 25 |
| 1,3,5-Trimethylbenzene | | | 0.0502 | 0.04698 | | mg/Kg | | 94 | 70 - 130 | 16 | 25 |
| m,p-Xylenes | | | 0.0499 | 0.04602 | | mg/Kg | | 92 | 70 - 130 | 15 | 25 |
| o-Xylene | | | 0.0502 | 0.04652 | | mg/Kg | | 93 | 70 - 130 | 16 | 25 |
| Vinyl chloride | | | 0.0502 | 0.05723 | | mg/Kg | | 114 | 70 - 130 | 10 | 25 |

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *103* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* |

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000459 | U | 0.0501 | 0.05164 | | mg/Kg | ☼ | 103 | 70 - 130 |
| Bromobenzene | <0.000737 | U | 0.0501 | 0.05252 | | mg/Kg | ☼ | 105 | 70 - 130 |
| Bromochloromethane | <0.000578 | U | 0.0501 | 0.05894 | | mg/Kg | ☼ | 118 | 70 - 130 |
| Bromodichloromethane | <0.000598 | U | 0.0503 | 0.05945 | | mg/Kg | ☼ | 118 | 70 - 130 |
| Bromoform | <0.000820 | U | 0.0502 | 0.06468 | | mg/Kg | ☼ | 129 | 70 - 130 |
| Bromomethane | <0.00107 | U | 0.0500 | 0.05398 | | mg/Kg | ☼ | 108 | 70 - 130 |
| 2-Butanone | <0.00706 | U | 0.498 | 0.5915 | | mg/Kg | ☼ | 119 | 70 - 130 |
| n-Butylbenzene | <0.000307 | U | 0.0502 | 0.04366 | | mg/Kg | ☼ | 87 | 70 - 130 |
| sec-Butylbenzene | <0.000490 | U | 0.0502 | 0.04813 | | mg/Kg | ☼ | 96 | 70 - 130 |
| tert-Butylbenzene | <0.000469 | U | 0.0502 | 0.04981 | | mg/Kg | ☼ | 99 | 70 - 130 |
| Carbon tetrachloride | <0.000405 | U | 0.0502 | 0.06029 | | mg/Kg | ☼ | 120 | 70 - 130 |
| Chlorobenzene | <0.000464 | U | 0.0501 | 0.05175 | | mg/Kg | ☼ | 103 | 70 - 130 |
| Chloroethane | <0.000415 | U | 0.0498 | 0.04536 | | mg/Kg | ☼ | 91 | 70 - 130 |
| Chloroform | <0.000434 | U | 0.0500 | 0.06164 | | mg/Kg | ☼ | 123 | 70 - 130 |
| Chloromethane | <0.000502 | U | 0.0501 | 0.04151 | | mg/Kg | ☼ | 83 | 70 - 130 |
| 2-Chlorotoluene | <0.000249 | U | 0.0501 | 0.04971 | | mg/Kg | ☼ | 99 | 70 - 130 |
| 4-Chlorotoluene | <0.000556 | U | 0.0501 | 0.04924 | | mg/Kg | ☼ | 98 | 70 - 130 |
| p-Cymene (p-Isopropyltoluene) | <0.00128 | U | 0.0501 | 0.04728 | | mg/Kg | ☼ | 94 | 70 - 130 |
| Dibromochloromethane | <0.000159 | U | 0.0501 | 0.06310 | | mg/Kg | ☼ | 126 | 70 - 130 |
| 1,2-Dibromo-3-Chloropropane | <0.000996 | U | 0.0501 | 0.07196 | N1 | mg/Kg | ☼ | 144 | 70 - 130 |
| 1,2-Dibromoethane | <0.000566 | U | 0.0501 | 0.06191 | | mg/Kg | ☼ | 123 | 70 - 130 |
| Dibromomethane | <0.000287 | U | 0.0501 | 0.06090 | | mg/Kg | ☼ | 122 | 70 - 130 |
| 1,2-Dichlorobenzene | <0.000361 | U | 0.0500 | 0.04916 | | mg/Kg | ☼ | 98 | 70 - 130 |



Ex. 9
App.157

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| 1,3-Dichlorobenzene | <0.000457 | U | 0.0501 | 0.04701 | | mg/Kg | ☼ | 94 | 70 - 130 |
| 1,4-Dichlorobenzene | <0.000454 | U | 0.0502 | 0.04622 | | mg/Kg | ☼ | 92 | 70 - 130 |
| Dichlorodifluoromethane | <0.000498 | U | 0.0498 | 0.04997 | | mg/Kg | ☼ | 100 | 70 - 130 |
| 1,1-Dichloroethane | <0.000519 | U | 0.0500 | 0.05242 | | mg/Kg | ☼ | 105 | 70 - 130 |
| 1,2-Dichloroethane | <0.000336 | U | 0.0502 | 0.05978 | | mg/Kg | ☼ | 119 | 70 - 130 |
| 1,1-Dichloroethene | <0.000417 | U | 0.0503 | 0.05498 | | mg/Kg | ☼ | 109 | 70 - 130 |
| cis-1,2-Dichloroethene | <0.000463 | U | 0.0501 | 0.05484 | | mg/Kg | ☼ | 110 | 70 - 130 |
| trans-1,2-Dichloroethene | <0.000423 | U | 0.0503 | 0.05424 | | mg/Kg | ☼ | 108 | 70 - 130 |
| 1,2-Dichloropropane | <0.000536 | U | 0.0501 | 0.05176 | | mg/Kg | ☼ | 103 | 70 - 130 |
| 1,3-Dichloropropane | <0.000306 | U | 0.0502 | 0.05877 | | mg/Kg | ☼ | 117 | 70 - 130 |
| 2,2-Dichloropropane | <0.000542 | U | 0.0502 | 0.05600 | | mg/Kg | ☼ | 112 | 70 - 130 |
| 1,1-Dichloropropene | <0.000282 | U | 0.0502 | 0.05382 | | mg/Kg | ☼ | 107 | 70 - 130 |
| cis-1,3-Dichloropropene | <0.000566 | U | 0.0498 | 0.05614 | | mg/Kg | ☼ | 113 | 70 - 130 |
| trans-1,3-Dichloropropene | <0.000467 | U | 0.0501 | 0.05729 | | mg/Kg | ☼ | 114 | 70 - 130 |
| Ethylbenzene | <0.000354 | U | 0.0501 | 0.05322 | | mg/Kg | ☼ | 106 | 70 - 130 |
| Hexachlorobutadiene | <0.000504 | U | 0.0502 | 0.03236 | N1 | mg/Kg | ☼ | 64 | 70 - 130 |
| Isopropylbenzene | <0.000345 | U | 0.0501 | 0.05254 | | mg/Kg | ☼ | 105 | 70 - 130 |
| Methylene Chloride | <0.00121 | U | 0.0501 | 0.05932 | | mg/Kg | ☼ | 118 | 70 - 130 |
| MTBE | <0.000536 | U | 0.0501 | 0.05975 | | mg/Kg | ☼ | 119 | 70 - 130 |
| Naphthalene | <0.000613 | U | 0.0502 | 0.05327 | | mg/Kg | ☼ | 106 | 70 - 130 |
| N-Propylbenzene | <0.000472 | U | 0.0501 | 0.04956 | | mg/Kg | ☼ | 99 | 70 - 130 |
| Styrene | <0.000473 | U | 0.0502 | 0.05384 | | mg/Kg | ☼ | 107 | 70 - 130 |
| 1,1,1,2-Tetrachloroethane | <0.000421 | U | 0.0501 | 0.05805 | | mg/Kg | ☼ | 116 | 70 - 130 |
| 1,1,2,2-Tetrachloroethane | <0.000626 | U | 0.0502 | 0.05970 | | mg/Kg | ☼ | 119 | 70 - 130 |
| Tetrachloroethylene | <0.000416 | U | 0.0502 | 0.05358 | | mg/Kg | ☼ | 107 | 70 - 130 |
| Toluene | <0.000512 | U | 0.0502 | 0.04981 | | mg/Kg | ☼ | 99 | 70 - 130 |
| 1,2,3-Trichlorobenzene | <0.000414 | U | 0.0501 | 0.03724 | | mg/Kg | ☼ | 74 | 70 - 130 |
| 1,2,4-Trichlorobenzene | <0.000660 | U | 0.0501 | 0.03890 | | mg/Kg | ☼ | 78 | 70 - 130 |
| 1,1,1-Trichloroethane | <0.000458 | U | 0.0499 | 0.05708 | | mg/Kg | ☼ | 114 | 70 - 130 |
| 1,1,2-Trichloroethane | <0.000619 | U | 0.0500 | 0.05792 | | mg/Kg | ☼ | 116 | 70 - 130 |
| Trichloroethene | <0.000422 | U | 0.0503 | 0.05469 | | mg/Kg | ☼ | 109 | 70 - 130 |
| Trichlorofluoromethane | <0.000770 | U | 0.0498 | 0.05611 | | mg/Kg | ☼ | 113 | 70 - 130 |
| 1,2,3-Trichloropropane | <0.000535 | U | 0.0502 | 0.06113 | | mg/Kg | ☼ | 122 | 70 - 130 |
| 1,2,4-Trimethylbenzene | <0.000513 | U | 0.0501 | 0.05004 | | mg/Kg | ☼ | 100 | 70 - 130 |
| 1,3,5-Trimethylbenzene | <0.000507 | U | 0.0501 | 0.04923 | | mg/Kg | ☼ | 98 | 70 - 130 |
| m,p-Xylenes | 0.000657 | J | 0.0498 | 0.05115 | | mg/Kg | ☼ | 101 | 70 - 130 |
| o-Xylene | <0.000366 | U | 0.0501 | 0.05314 | | mg/Kg | ☼ | 106 | 70 - 130 |
| Vinyl chloride | <0.00175 | U | 0.0500 | 0.04658 | | mg/Kg | ☼ | 93 | 70 - 130 |

| *Surrogate* | *MS %Recovery* | *MS Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *115* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *106* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *98* | | *78 - 138* |

Eurofins Dallas

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Lab Sample ID: MB 860-288981/1-A**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | <0.00207 | U | 0.0100 | 0.00207 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Acenaphthylene | <0.00143 | U | 0.0100 | 0.00143 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Anthracene | <0.00199 | U | 0.0100 | 0.00199 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[a]anthracene | <0.00151 | U | 0.00500 | 0.00151 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[a]pyrene | <0.00195 | U | 0.00500 | 0.00195 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[b]fluoranthene | <0.00214 | U | 0.0100 | 0.00214 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[g,h,i]perylene | <0.00191 | U | 0.0100 | 0.00191 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[k]fluoranthene | <0.00195 | U | 0.0100 | 0.00195 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Chrysene | <0.00182 | U | 0.0100 | 0.00182 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Dibenz(a,h)anthracene | <0.00202 | U | 0.00500 | 0.00202 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Fluoranthene | <0.00248 | U | 0.0100 | 0.00248 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Fluorene | <0.00191 | U | 0.0100 | 0.00191 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Indeno[1,2,3-cd]pyrene | <0.00276 | U | 0.0100 | 0.00276 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Naphthalene | <0.00286 | U | 0.0100 | 0.00286 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Phenanthrene | <0.00309 | U | 0.0100 | 0.00309 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Pyrene | <0.00223 | U | 0.0100 | 0.00223 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |

| *Surrogate* | *MB %Recovery* | *MB Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *2-Fluorobiphenyl* | *73* | | *37 - 130* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |
| *Nitrobenzene-d5 (Surr)* | *59* | | *36 - 131* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |
| *p-Terphenyl-d14 (Surr)* | *72* | | *40 - 130* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |

**Lab Sample ID: LCS 860-288981/2-A**
**Matrix: Solid**
**Analysis Batch: 289133**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.100 | 0.08470 | | mg/Kg | | 85 | 60 - 130 |
| Acenaphthylene | 0.100 | 0.07639 | | mg/Kg | | 76 | 41 - 130 |
| Anthracene | 0.100 | 0.08005 | | mg/Kg | | 80 | 45 - 130 |
| Benzo[a]anthracene | 0.100 | 0.08655 | | mg/Kg | | 87 | 42 - 130 |
| Benzo[a]pyrene | 0.100 | 0.08098 | | mg/Kg | | 81 | 42 - 130 |
| Benzo[b]fluoranthene | 0.100 | 0.09297 | | mg/Kg | | 93 | 50 - 130 |
| Benzo[g,h,i]perylene | 0.100 | 0.09717 | | mg/Kg | | 97 | 40 - 130 |
| Benzo[k]fluoranthene | 0.100 | 0.1021 | | mg/Kg | | 102 | 40 - 130 |
| Chrysene | 0.100 | 0.08728 | | mg/Kg | | 87 | 43 - 130 |
| Dibenz(a,h)anthracene | 0.100 | 0.1002 | | mg/Kg | | 100 | 44 - 130 |
| Fluoranthene | 0.100 | 0.08295 | | mg/Kg | | 83 | 55 - 130 |
| Fluorene | 0.100 | 0.08243 | | mg/Kg | | 82 | 50 - 130 |
| Indeno[1,2,3-cd]pyrene | 0.100 | 0.08565 | | mg/Kg | | 86 | 43 - 130 |
| Naphthalene | 0.100 | 0.07984 | | mg/Kg | | 80 | 49 - 130 |
| Phenanthrene | 0.100 | 0.07969 | | mg/Kg | | 80 | 50 - 130 |
| Pyrene | 0.100 | 0.08562 | | mg/Kg | | 86 | 55 - 130 |

| *Surrogate* | *LCS %Recovery* | *LCS Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *82* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *93* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *78* | | *40 - 130* |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Lab Sample ID: LCSD 860-288981/3-A**
**Matrix: Solid**
**Analysis Batch: 289133**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.100 | 0.08790 | | mg/Kg | | 88 | 60 - 130 | 4 | 30 |
| Acenaphthylene | 0.100 | 0.07510 | | mg/Kg | | 75 | 41 - 130 | 2 | 30 |
| Anthracene | 0.100 | 0.08511 | | mg/Kg | | 85 | 45 - 130 | 6 | 30 |
| Benzo[a]anthracene | 0.100 | 0.08742 | | mg/Kg | | 87 | 42 - 130 | 1 | 30 |
| Benzo[a]pyrene | 0.100 | 0.07672 | | mg/Kg | | 77 | 42 - 130 | 5 | 30 |
| Benzo[b]fluoranthene | 0.100 | 0.08811 | | mg/Kg | | 88 | 50 - 130 | 5 | 30 |
| Benzo[g,h,i]perylene | 0.100 | 0.09383 | | mg/Kg | | 94 | 40 - 130 | 3 | 30 |
| Benzo[k]fluoranthene | 0.100 | 0.09826 | | mg/Kg | | 98 | 40 - 130 | 4 | 30 |
| Chrysene | 0.100 | 0.08778 | | mg/Kg | | 88 | 43 - 130 | 1 | 30 |
| Dibenz(a,h)anthracene | 0.100 | 0.09688 | | mg/Kg | | 97 | 44 - 130 | 3 | 30 |
| Fluoranthene | 0.100 | 0.08415 | | mg/Kg | | 84 | 55 - 130 | 1 | 30 |
| Fluorene | 0.100 | 0.08286 | | mg/Kg | | 83 | 50 - 130 | 1 | 30 |
| Indeno[1,2,3-cd]pyrene | 0.100 | 0.08840 | | mg/Kg | | 88 | 43 - 130 | 3 | 30 |
| Naphthalene | 0.100 | 0.07892 | | mg/Kg | | 79 | 49 - 130 | 1 | 30 |
| Phenanthrene | 0.100 | 0.08269 | | mg/Kg | | 83 | 50 - 130 | 4 | 30 |
| Pyrene | 0.100 | 0.08551 | | mg/Kg | | 86 | 55 - 130 | 0 | 30 |

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *84* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *88* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *80* | | *40 - 130* |

**Lab Sample ID: LCSD 860-288981/5-A**
**Matrix: Solid**
**Analysis Batch: 289133**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *82* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *88* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *76* | | *40 - 130* |

**Lab Sample ID: 860-122968-J-3-B MS**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.00539 | J | 0.106 | 0.09342 | | mg/Kg | ☼ | 83 | 60 - 130 |
| Acenaphthylene | 0.00230 | J | 0.106 | 0.09518 | | mg/Kg | ☼ | 88 | 41 - 130 |
| Anthracene | 0.0102 | J | 0.106 | 0.09541 | | mg/Kg | ☼ | 81 | 45 - 130 |
| Benzo[a]anthracene | 0.0249 | | 0.106 | 0.1151 | | mg/Kg | ☼ | 85 | 42 - 130 |
| Benzo[a]pyrene | 0.0149 | | 0.106 | 0.1010 | | mg/Kg | ☼ | 82 | 42 - 130 |
| Benzo[b]fluoranthene | 0.0129 | | 0.106 | 0.1045 | | mg/Kg | ☼ | 87 | 50 - 130 |
| Benzo[g,h,i]perylene | 0.00987 | J | 0.106 | 0.1027 | | mg/Kg | ☼ | 88 | 40 - 130 |
| Benzo[k]fluoranthene | 0.00394 | J | 0.106 | 0.09868 | | mg/Kg | ☼ | 90 | 40 - 130 |
| Chrysene | 0.0418 | | 0.106 | 0.09997 | | mg/Kg | ☼ | 55 | 43 - 130 |
| Dibenz(a,h)anthracene | 0.00384 | J | 0.106 | 0.1015 | | mg/Kg | ☼ | 93 | 44 - 130 |
| Fluoranthene | 0.0215 | | 0.106 | 0.1110 | | mg/Kg | ☼ | 85 | 55 - 130 |
| Fluorene | 0.00934 | J | 0.106 | 0.09117 | | mg/Kg | ☼ | 78 | 50 - 130 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS) (Continued)

**Lab Sample ID: 860-122968-J-3-B MS**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Indeno[1,2,3-cd]pyrene | 0.00580 | J | 0.106 | 0.1078 | | mg/Kg | ☼ | 97 | 43 - 130 |
| Naphthalene | 0.00426 | J | 0.106 | 0.07767 | | mg/Kg | ☼ | 70 | 49 - 130 |
| Phenanthrene | 0.0215 | | 0.106 | 0.09516 | | mg/Kg | ☼ | 70 | 50 - 130 |
| Pyrene | 0.0470 | | 0.106 | 0.1183 | | mg/Kg | ☼ | 68 | 55 - 130 |

| *Surrogate* | *MS %Recovery* | *MS Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *68* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *75* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *77* | | *40 - 130* |

**Lab Sample ID: 860-122968-J-3-C MSD**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike Duplicate**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.00539 | J | 0.106 | 0.09650 | | mg/Kg | ☼ | 86 | 60 - 130 | 3 | 30 |
| Acenaphthylene | 0.00230 | J | 0.106 | 0.09869 | | mg/Kg | ☼ | 91 | 41 - 130 | 4 | 30 |
| Anthracene | 0.0102 | J | 0.106 | 0.09815 | | mg/Kg | ☼ | 83 | 45 - 130 | 3 | 30 |
| Benzo[a]anthracene | 0.0249 | | 0.106 | 0.1180 | | mg/Kg | ☼ | 88 | 42 - 130 | 2 | 30 |
| Benzo[a]pyrene | 0.0149 | | 0.106 | 0.1029 | | mg/Kg | ☼ | 83 | 42 - 130 | 2 | 30 |
| Benzo[b]fluoranthene | 0.0129 | | 0.106 | 0.1065 | | mg/Kg | ☼ | 89 | 50 - 130 | 2 | 30 |
| Benzo[g,h,i]perylene | 0.00987 | J | 0.106 | 0.1066 | | mg/Kg | ☼ | 92 | 40 - 130 | 4 | 30 |
| Benzo[k]fluoranthene | 0.00394 | J | 0.106 | 0.1007 | | mg/Kg | ☼ | 92 | 40 - 130 | 2 | 30 |
| Chrysene | 0.0418 | | 0.106 | 0.09983 | | mg/Kg | ☼ | 55 | 43 - 130 | 0 | 30 |
| Dibenz(a,h)anthracene | 0.00384 | J | 0.106 | 0.1051 | | mg/Kg | ☼ | 96 | 44 - 130 | 3 | 30 |
| Fluoranthene | 0.0215 | | 0.106 | 0.1125 | | mg/Kg | ☼ | 86 | 55 - 130 | 1 | 30 |
| Fluorene | 0.00934 | J | 0.106 | 0.09159 | | mg/Kg | ☼ | 78 | 50 - 130 | 0 | 30 |
| Indeno[1,2,3-cd]pyrene | 0.00580 | J | 0.106 | 0.1111 | | mg/Kg | ☼ | 100 | 43 - 130 | 3 | 30 |
| Naphthalene | 0.00426 | J | 0.106 | 0.07896 | | mg/Kg | ☼ | 71 | 49 - 130 | 2 | 30 |
| Phenanthrene | 0.0215 | | 0.106 | 0.09655 | | mg/Kg | ☼ | 71 | 50 - 130 | 1 | 30 |
| Pyrene | 0.0470 | | 0.106 | 0.1186 | | mg/Kg | ☼ | 68 | 55 - 130 | 0 | 30 |

| *Surrogate* | *MSD %Recovery* | *MSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *71* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *78* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *80* | | *40 - 130* |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Lab Sample ID: MB 870-34808/3-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| >C12-C28 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| >C28-C35 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Lab Sample ID: MB 870-34808/3-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Surrogate | MB %Recovery | MB Qualifier | Limits | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *106* | | *70 - 130* | *01/12/26 15:58* | *01/13/26 23:42* | *1* |
| *o-Terphenyl (Surr)* | *103* | | *70 - 130* | *01/12/26 15:58* | *01/13/26 23:42* | *1* |

**Lab Sample ID: LCS 870-34808/1-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 967 | 977.5 | | mg/Kg | | 101 | 75 - 125 |
| >C12-C28 Range Hydrocarbons | 970 | 968.9 | | mg/Kg | | 100 | 75 - 125 |

| Surrogate | LCS %Recovery | LCS Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *103* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: LCSD 870-34808/2-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 953 | 1003 | | mg/Kg | | 105 | 75 - 125 | 3 | 20 |
| >C12-C28 Range Hydrocarbons | 956 | 977.2 | | mg/Kg | | 102 | 75 - 125 | 1 | 20 |

| Surrogate | LCSD %Recovery | LCSD Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *104* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 831 | 889.9 | | mg/Kg | ☼ | 107 | 75 - 125 |
| >C12-C28 Range Hydrocarbons | 35.5 | J | 833 | 858.9 | | mg/Kg | ☼ | 99 | 75 - 125 |

| Surrogate | MS %Recovery | MS Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *106* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: 870-43022-1 MSD**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 831 | 851.2 | | mg/Kg | ☼ | 102 | 75 - 125 | 4 | 20 |
| >C12-C28 Range Hydrocarbons | 35.5 | J | 833 | 850.2 | | mg/Kg | ☼ | 98 | 75 - 125 | 1 | 20 |

Eurofins Dallas

# QC Sample Results



## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Lab Sample ID: 870-43022-1 MSD**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| *Surrogate* | *MSD %Recovery* | *MSD Qualifier* | *Limits* |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *102* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *100* | | *70 - 130* |

## Method: 300.0 - Anions, Ion Chromatography

**Lab Sample ID: MB 860-287869/1-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.00 | U | 10.0 | 5.00 | mg/Kg | | 01/13/26 15:44 | 01/13/26 18:59 | 1 |

**Lab Sample ID: LCS 860-287869/2-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Chloride | 100 | 100.7 | | mg/Kg | | 101 | 90 - 110 |

**Lab Sample ID: LCSD 860-287869/3-A**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 100 | 102.3 | | mg/Kg | | 102 | 90 - 110 | 2 | 20 |

**Lab Sample ID: 820-22982-D-1-B MS**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 528 | J | 9900 | 10930 | | mg/Kg | | 105 | 90 - 110 |

**Lab Sample ID: 820-22982-D-1-C MSD**
**Matrix: Solid**
**Analysis Batch: 287702**

**Client Sample ID: Matrix Spike Duplicate**
**Prep Type: Total/NA**
**Prep Batch: 287869**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chloride | 528 | J | 9900 | 10840 | | mg/Kg | | 104 | 90 - 110 | 1 | 15 |

## Method: 6020B - Metals (ICP/MS)

**Lab Sample ID: MB 860-287918/1-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Barium | <0.137 | U | 0.400 | 0.137 | mg/Kg | | 01/13/26 17:28 | 01/14/26 12:40 | 1 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 6020B - Metals (ICP/MS) (Continued)

**Lab Sample ID: LCS 860-287918/2-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Barium | 10.0 | 10.02 | | mg/Kg | | 100 | 80 - 120 |

**Lab Sample ID: LCSD 860-287918/3-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Barium | 10.0 | 10.10 | | mg/Kg | | 101 | 80 - 120 | 1 | 20 |

## Method: 9045D - pH

**Lab Sample ID: 870-43022-13 DU**
**Matrix: Solid**
**Analysis Batch: 34848**

**Client Sample ID: SB-06 (6'-7')**
**Prep Type: Soluble**

| Analyte | Sample Result | Sample Qualifier | DU Result | DU Qualifier | Unit | D | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|
| soil pH measured in water at deg C | 9.0 | | 9.1 | | S.U. | | 1 | 20 |
| Temperature | 20.6 | | 20.5 | | Celsius | | 0.5 | 20 |

Eurofins Dallas



1/21/2026

Ex. 9
App.164

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## GC/MS VOA

### Analysis Batch: 34789

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 8260C | 34798 |
| MB 870-34798/3-A | Method Blank | Total/NA | Solid | 8260C | 34798 |
| LCS 870-34798/1-A | Lab Control Sample | Total/NA | Solid | 8260C | 34798 |
| LCSD 870-34798/2-A | Lab Control Sample Dup | Total/NA | Solid | 8260C | 34798 |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | 8260C | 34798 |

### Prep Batch: 34798

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | 5035 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 5035 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | 5035 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | 5035 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 5035 | |
| MB 870-34798/3-A | Method Blank | Total/NA | Solid | 5035 | |
| LCS 870-34798/1-A | Lab Control Sample | Total/NA | Solid | 5035 | |
| LCSD 870-34798/2-A | Lab Control Sample Dup | Total/NA | Solid | 5035 | |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | 5035 | |

## GC/MS Semi VOA

### Analysis Batch: 288963

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 8270E | 288981 |

### Prep Batch: 288981

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 3546 | |
| MB 860-288981/1-A | Method Blank | Total/NA | Solid | 3546 | |
| LCS 860-288981/2-A | Lab Control Sample | Total/NA | Solid | 3546 | |
| LCSD 860-288981/3-A | Lab Control Sample Dup | Total/NA | Solid | 3546 | |
| LCSD 860-288981/5-A | Lab Control Sample Dup | Total/NA | Solid | 3546 | |
| 860-122968-J-3-B MS | Matrix Spike | Total/NA | Solid | 3546 | |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 3546 | |

### Analysis Batch: 289133

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| LCS 860-288981/2-A | Lab Control Sample | Total/NA | Solid | 8270E | 288981 |
| LCSD 860-288981/3-A | Lab Control Sample Dup | Total/NA | Solid | 8270E | 288981 |
| LCSD 860-288981/5-A | Lab Control Sample Dup | Total/NA | Solid | 8270E | 288981 |

# QC Association Summary



## GC/MS Semi VOA

### Analysis Batch: 289497

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| MB 860-288981/1-A | Method Blank | Total/NA | Solid | 8270E | 288981 |
| 860-122968-J-3-B MS | Matrix Spike | Total/NA | Solid | 8270E | 288981 |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 8270E | 288981 |

## GC Semi VOA

### Prep Batch: 34808

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX_1005_S_Prep | |
| MB 870-34808/3-A | Method Blank | Total/NA | Solid | TX_1005_S_Prep | |
| LCS 870-34808/1-A | Lab Control Sample | Total/NA | Solid | TX_1005_S_Prep | |
| LCSD 870-34808/2-A | Lab Control Sample Dup | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-1 MSD | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |

### Analysis Batch: 34830

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX 1005 | 34808 |
| MB 870-34808/3-A | Method Blank | Total/NA | Solid | TX 1005 | 34808 |
| LCS 870-34808/1-A | Lab Control Sample | Total/NA | Solid | TX 1005 | 34808 |
| LCSD 870-34808/2-A | Lab Control Sample Dup | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-1 MSD | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |

# QC Association Summary





## GC Semi VOA

### Analysis Batch: 34876

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX 1005 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX 1005 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX 1005 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX 1005 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX 1005 | |

## HPLC/IC

### Analysis Batch: 287702

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 300.0 | 287869 |
| MB 860-287869/1-A | Method Blank | Total/NA | Solid | 300.0 | 287869 |
| LCS 860-287869/2-A | Lab Control Sample | Total/NA | Solid | 300.0 | 287869 |
| LCSD 860-287869/3-A | Lab Control Sample Dup | Total/NA | Solid | 300.0 | 287869 |
| 820-22982-D-1-B MS | Matrix Spike | Total/NA | Solid | 300.0 | 287869 |
| 820-22982-D-1-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 300.0 | 287869 |

### Prep Batch: 287869

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 300_Prep | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 300_Prep | |
| MB 860-287869/1-A | Method Blank | Total/NA | Solid | 300_Prep | |
| LCS 860-287869/2-A | Lab Control Sample | Total/NA | Solid | 300_Prep | |
| LCSD 860-287869/3-A | Lab Control Sample Dup | Total/NA | Solid | 300_Prep | |
| 820-22982-D-1-B MS | Matrix Spike | Total/NA | Solid | 300_Prep | |
| 820-22982-D-1-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 300_Prep | |

## Metals

### Prep Batch: 287918

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 3051A | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 3051A | |
| MB 860-287918/1-A | Method Blank | Total/NA | Solid | 3051A | |
| LCS 860-287918/2-A | Lab Control Sample | Total/NA | Solid | 3051A | |

# QC Association Summary





## Metals (Continued)

### Prep Batch: 287918 (Continued)

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| LCSD 860-287918/3-A | Lab Control Sample Dup | Total/NA | Solid | 3051A | |

### Analysis Batch: 288184

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 6020B | 287918 |
| MB 860-287918/1-A | Method Blank | Total/NA | Solid | 6020B | 287918 |
| LCS 860-287918/2-A | Lab Control Sample | Total/NA | Solid | 6020B | 287918 |
| LCSD 860-287918/3-A | Lab Control Sample Dup | Total/NA | Solid | 6020B | 287918 |

## General Chemistry

### Analysis Batch: 34815

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | Moisture - 2540 | |
| MB 870-34815/1 | Method Blank | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-13 DU | SB-06 (6'-7') | Total/NA | Solid | Moisture - 2540 | |

### Leach Batch: 34843

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-3 | SB-02 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-5 | SB-03 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-8 | SB-04 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-10 | SB-05 (2'-3') | Soluble | Solid | DI Leach | |
| 870-43022-13 | SB-06 (6'-7') | Soluble | Solid | DI Leach | |
| 870-43022-13 DU | SB-06 (6'-7') | Soluble | Solid | DI Leach | |

### Analysis Batch: 34848

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-3 | SB-02 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-5 | SB-03 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-8 | SB-04 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-10 | SB-05 (2'-3') | Soluble | Solid | 9045D | 34843 |
| 870-43022-13 | SB-06 (6'-7') | Soluble | Solid | 9045D | 34843 |
| 870-43022-13 DU | SB-06 (6'-7') | Soluble | Solid | 9045D | 34843 |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Client Sample ID: SB-01 (3'-4')

**Lab Sample ID: 870-43022-1**
**Date Collected: 01/09/26 10:05**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 00:04 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.03 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.03 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-01 (3'-4')

**Lab Sample ID: 870-43022-1**
**Date Collected: 01/09/26 10:05**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 89.5**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.107 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/12/26 22:16 | MC | EET DAL |
| Total/NA | Prep | 3546 | | | 5.2 g | 5 mL | 288981 | 01/19/26 04:51 | TH | EET HOU |
| Total/NA | Analysis | 8270E | | 1 | 1 mL | 1 mL | 288963 | 01/19/26 15:39 | DB | EET HOU |
| Total/NA | Prep | TX_1005_S_Prep | | | 12.948 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 00:04 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.01 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 20:57 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:47 | DP | EET HOU |

## Client Sample ID: SB-02 (3'-4')

**Lab Sample ID: 870-43022-3**
**Date Collected: 01/09/26 11:00**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 01:30 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.02 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.02 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-02 (3'-4')

**Lab Sample ID: 870-43022-3**
**Date Collected: 01/09/26 11:00**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 82.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 4.731 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/12/26 23:20 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.733 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 01:30 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.05 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:06 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:43 | DP | EET HOU |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-5**
**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 01:51 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.06 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.06 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-03 (3'-4')

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-5**
**Matrix: Solid**
**Percent Solids: 88.9**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 7.113 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 00:02 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 13.068 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 01:51 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.04 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:15 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:40 | DP | EET HOU |

## Client Sample ID: SB-03 (5'-6')

**Date Collected: 01/09/26 11:30**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-6**
**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 02:12 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-03 (5'-6')

**Date Collected: 01/09/26 11:30**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-6**
**Matrix: Solid**
**Percent Solids: 91.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.627 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 00:23 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.76 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 02:12 | AGB | EET DAL |

## Client Sample ID: SB-04 (3'-4')

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-8**
**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 02:34 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.08 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.08 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-04 (3'-4')

**Lab Sample ID: 870-43022-8**

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-04 (3'-4')

**Lab Sample ID: 870-43022-8**

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 95.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.015 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 01:06 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.85 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 02:34 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.03 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:24 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:36 | DP | EET HOU |

## Client Sample ID: SB-05 (2'-3')

**Lab Sample ID: 870-43022-10**

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:16 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.08 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.08 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-05 (2'-3')

**Lab Sample ID: 870-43022-10**

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 86.0**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.224 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 01:48 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 15.774 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:16 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.00 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:33 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:33 | DP | EET HOU |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (8'-9')
**Lab Sample ID: 870-43022-11**
**Date Collected: 01/09/26 13:55**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:38 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-05 (8'-9')
**Lab Sample ID: 870-43022-11**
**Date Collected: 01/09/26 13:55**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.01 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:09 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 13.38 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:38 | AGB | EET DAL |

## Client Sample ID: SB-06 (2'-3')
**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:59 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-06 (2'-3')
**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.241 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:31 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 14.521 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:59 | AGB | EET DAL |

## Client Sample ID: SB-06 (6'-7')
**Lab Sample ID: 870-43022-13**
**Date Collected: 01/09/26 14:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 04:20 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.04 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.04 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-06 (6'-7')

**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-13

**Matrix: Solid**
**Percent Solids: 90.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.614 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:52 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 10.339 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 04:20 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.041 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:42 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:30 | DP | EET HOU |

**Laboratory References:**

EET DAL = Eurofins Dallas, 9701 Harry Hines Blvd, Dallas, TX 75220, TEL (214)902-0300
EET HOU = Eurofins Houston, 4145 Greenbriar Dr, Stafford, TX 77477, TEL (281)240-4200

# Accreditation/Certification Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Laboratory: Eurofins Dallas

Unless otherwise noted, all analytes for this laboratory were covered under each accreditation/certification below.

| Authority | Program | Identification Number | Expiration Date |
|---|---|---|---|
| Texas | NELAP | T104704295 | 06-30-26 |

The following analytes are included in this report, but the laboratory is not certified by the governing authority. This list may include analytes for which the agency does not offer certification.

| Analysis Method | Prep Method | Matrix | Analyte |
|---|---|---|---|
| 9045D | | Solid | Temperature |
| Moisture - 2540 | | Solid | Percent Moisture |

## Laboratory: Eurofins Houston

The accreditations/certifications listed below are applicable to this report.

| Authority | Program | Identification Number | Expiration Date |
|---|---|---|---|
| Texas | NELAP | T104704215 | 06-30-26 |

# Method Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

| Method | Method Description | Protocol | Laboratory |
|---|---|---|---|
| 8260C | Volatile Organic Compounds by GC/MS | SW846 | EET DAL |
| 8270E | Semivolatile Organic Compounds (GC-MS/MS) | SW846 | EET HOU |
| TX 1005 | Texas - Total Petroleum Hydrocarbon (GC) | TCEQ | EET DAL |
| 300.0 | Anions, Ion Chromatography | EPA | EET HOU |
| 6020B | Metals (ICP/MS) | SW846 | EET HOU |
| 9045D | pH | SW846 | EET DAL |
| Moisture - 2540 | Percent Moisture | SM | EET DAL |
| 300_Prep | Anions, Ion Chromatography, 10% Wt/Vol | EPA | EET HOU |
| 3051A | Preparation, Metals, Microwave Assisted | SW846 | EET HOU |
| 3546 | Microwave Extraction | SW846 | EET HOU |
| 5035 | Closed System Purge and Trap | SW846 | EET DAL |
| DI Leach | Deionized Water Leaching Procedure | ASTM | EET DAL |
| TX_1005_S_Prep | Extraction - Texas Total petroleum Hyrdocarbons | TCEQ | EET DAL |

**Protocol References:**

ASTM = ASTM International
EPA = US Environmental Protection Agency
SM = "Standard Methods For The Examination Of Water And Wastewater"
SW846 = "Test Methods For Evaluating Solid Waste, Physical/Chemical Methods", Third Edition, November 1986 And Its Updates.
TCEQ = Texas Commission of Environmental Quality

**Laboratory References:**

EET DAL = Eurofins Dallas, 9701 Harry Hines Blvd, Dallas, TX 75220, TEL (214)902-0300
EET HOU = Eurofins Houston, 4145 Greenbriar Dr, Stafford, TX 77477, TEL (281)240-4200

# Sample Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

| Lab Sample ID | Client Sample ID | Matrix | Collected | Received | Sample Origin |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Solid | 01/09/26 10:05 | 01/10/26 09:15 | Texas |
| 870-43022-3 | SB-02 (3'-4') | Solid | 01/09/26 11:00 | 01/10/26 09:15 | Texas |
| 870-43022-5 | SB-03 (3'-4') | Solid | 01/09/26 11:20 | 01/10/26 09:15 | Texas |
| 870-43022-6 | SB-03 (5'-6') | Solid | 01/09/26 11:30 | 01/10/26 09:15 | Texas |
| 870-43022-8 | SB-04 (3'-4') | Solid | 01/09/26 12:20 | 01/10/26 09:15 | Texas |
| 870-43022-10 | SB-05 (2'-3') | Solid | 01/09/26 13:50 | 01/10/26 09:15 | Texas |
| 870-43022-11 | SB-05 (8'-9') | Solid | 01/09/26 13:55 | 01/10/26 09:15 | Texas |
| 870-43022-12 | SB-06 (2'-3') | Solid | 01/09/26 14:10 | 01/10/26 09:15 | Texas |
| 870-43022-13 | SB-06 (6'-7') | Solid | 01/09/26 14:20 | 01/10/26 09:15 | Texas |

eurofins | Environment Testing

# Chain of Custody

Houston, TX (281) 240-4200, Dallas, TX (214) 902-0300
Midland, TX (432) 704-5440, San Antonio, TX (210) 509-3334
EL Paso, TX (915) 585-3443, Lubbock, TX (806) 794-1296
Hobbs, NM (575) 392-7550, Carlsbad, NM (575) 988-3199
Little Rock, AR (501) 224-5060

Work Order No: ______

Page 1 of 2

| | | | |
|---|---|---|---|
| Project Manager: | Danielle Fehrenbach | Bill to: (if different) | Tera Burns |
| Company Name: | Whitehead ES | Company Name: | → |
| Address: | 906 E 18th St, Ste 100 | Address: | → |
| City, State ZIP: | Plano, TX 75074 | City, State ZIP: | → |
| Phone: | (469) 609-8080 | Email: | tburns@whiteheades.com |

**Work Order Comments**

Program: UST/PST ☐ PRP ☐ Brownfields ☐ RRC ☐ Superfund ☐
State of Project:
Reporting: Level II ☐ Level III ☐ PST/UST ☐ TRRP ☒ Level IV ☐
Deliverables: EDD ☒ ADaPT ☐ Other:

| | | | |
|---|---|---|---|
| Project Name: | Cresson Moon Props | Turn Around | ☐ Routine ☒ Rush |
| Project Number: | 379.001 | Due Date: | 1/14/26 |
| Project Location: | Cresson, TX | TAT starts the day received by the lab, if received by 4:30pm | |
| Sampler's Name: | CK/EM | | |
| PO #: | | | |

| SAMPLE RECEIPT | Temp Blank: | Yes No | Wet Ice: | Yes No |
|---|---|---|---|---|
| Samples Received Intact: | Yes No | | Thermometer ID: | |
| Cooler Custody Seals: | Yes No N/A | | Correction Factor: | |
| Sample Custody Seals: | Yes No N/A | | Temperature Reading: | |
| Total Containers: | | | Corrected Temperature: | |

**ANALYSIS REQUEST** — Pres. Code: Me+Ct Di →

| Sample Identification | Matrix | Date Sampled | Time Sampled | Depth | Grab/Comp | # of Cont | TPH TX1005 | VOCs 8260 | BTEX 8260 | PAH 8270 | Ba 6010/6020 | Cl 300.0 | pH 9045D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SB-01 (3'-4') | S | 1/9 | 10:05 | 3-4 | G | 8 | X | X | | Hold | X | X | X |
| SB-01 (19') | ↓ | ↓ | 10:35 | 14' | ↓ | 8 | Hold → | | | | | | |
| SB-02 (3'-4') | | | 11:00 | 3-4' | | 8 | X | X | | | X | X | X |
| SB-02 (8-9') | | | 11:10 | 8-9' | | 8 | Hold → | | | | | | |
| SB-03 (3-4') | | | 11:20 | 3-4' | | 8 | X | X | | | X | X | X |
| SB-03 (5-6') | | | 11:30 | 5-6' | | 7 | X | ~~X~~ | X | | | | |
| SB-03 (15') | | | 11:40 | 15' | | 7 | Hold → | | | | | | |
| SB-04 (3-4') | | | 12:20 | 3-4' | | 8 | X | X | | | X | X | X |
| SB-04 (24') | | | 13:00 | 24' | | 7 | Hold → | | | | | | |
| SB-05 (2-3') | | | 13:50 | 2-3' | | 8 | X | X | | ↓ | X | X | X |

EM NFE 1/9/26

**Preservative Codes**
None: NO  DI Water: $H_2O$
Zn Acetate+NaOH: Zn
NaOH+Ascorbic Acid: SAPC

870-43022 Chain of Custody

**Sample Comments**
Hold trip blank
Hold all samples for PAH
Hold SB-01 (19'), SB-03 (15'), SB-02 (8-9'), SB-04 (24')
SB-03 (5-6') run for BTEX, not full suite

Total 200.7 / 6010 200.8 / 6020: 8RCRA 13PPM Texas 11 Al Sb As Ba Be B Cd Ca Cr Co Cu Fe Pb Mg Mn Mo Ni K Se Ag $SiO_2$ Na Sr Tl Sn U V Zn
Circle Method(s) and Metal(s) to be analyzed TCLP / SPLP 6010: 8RCRA Sb As Ba Be Cd Cr Co Cu Pb Mn Mo Ni Se Ag Tl U Hg: 1631 / 245.1 / 7470 / 7471

Notice: Signature of this document and relinquishment of samples constitutes a valid purchase order from client company to Eurofins Xenco, its affiliates and subcontractors. It assigns standard terms and conditions of service. Eurofins Xenco will be liable only for the cost of samples and shall not assume any responsibility for any losses or expenses incurred by the client if such losses are due to circumstances beyond the control of Eurofins Xenco. A minimum charge of $85.00 will be applied to each project and a charge of $5 for each sample submitted to Eurofins Xenco, but not analyzed. These terms will be enforced unless previously negotiated.

| Relinquished by: (Signature) | Received by: (Signature) | Date/Time | Relinquished by: (Signature) | Received by: (Signature) | Date/Time |
|---|---|---|---|---|---|
| 1 [signature] | [signature] | 1/10/26 0915 | 2 [signature] | [signature] | 1/10/26 915 |
| 3 | | | 4 | | |
| 5 | | | 6 | | |

THM-035 c/f -0.1 4.8/4.7

Revised Date: 08/25/2020 Rev. 2020.2

eurofins | Environment Testing

# Chain of Custody

Houston, TX (281) 240-4200, Dallas, TX (214) 902-0300
Midland, TX (432) 704-5440, San Antonio, TX (210) 509-3334
EL Paso, TX (915) 585-3443, Lubbock, TX (806) 794-1296
Hobbs, NM (575) 392-7550, Carlsbad, NM (575) 988-3199
Little Rock, AR (501) 224-5060

Work Order No: ____________

Page 2 of 2

| | | | |
|---|---|---|---|
| Project Manager: | D. Fehrenbach | Bill to: (if different) | Tera Burns |
| Company Name: | Whitehead ES → | Company Name: | → |
| Address: | 9006 E 18th St, Ste 100 → | Address: | → |
| City, State ZIP: | Plano, TX 75074 → | City, State ZIP: | → |
| Phone: | (469) 609-8080 | Email: | tburns@whiteheades.com |

**Work Order Comments**

Program: UST/PST ☐ PRP ☐ Brownfields ☐ RRC ☐ Superfund ☐
State of Project:
Reporting: Level II ☐ Level III ☐ PST/UST ☐ TRRP ☒ Level IV ☐
Deliverables: EDD ☒ ADaPT ☐ Other:

| | | | |
|---|---|---|---|
| Project Name: | Cresson Moon Prop | Turn Around | |
| Project Number: | 379.001 | ☐ Routine | ☑ Rush |
| Project Location: | Cresson, TX | Due Date: | 1/14/26 |
| Sampler's Name: | CK/EM | TAT starts the day received by the lab, if received by 4:30pm | |
| PO #: | | | |

| SAMPLE RECEIPT | Temp Blank: | Yes No | Wet Ice: | Yes No |
|---|---|---|---|---|
| Samples Received Intact: | Yes No | | Thermometer ID: | |
| Cooler Custody Seals: | Yes No N/A | | Correction Factor: | |
| Sample Custody Seals: | Yes No N/A | | Temperature Reading: | |
| Total Containers: | | | Corrected Temperature: | |

**ANALYSIS REQUEST** — Pres. Code: Me+C+Di →

| Sample Identification | Matrix | Date Sampled | Time Sampled | Depth | Grab/Comp | # of Cont | TPH TX 1005 | VOCs 8260 | BTEX 8260 | PAH 8270 | Ba 6010/6020 | Cl 300.0 | pH 9045D | Sample Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SB-05 (8-9') | S | 1/9 | 13:55 | 8-9' | G | 7 | X | | X | Hold | | | | |
| SB-06 (2-3') | ↓ | ↓ | 14:10 | 2-3' | ↓ | 8 | X | | X | ↓ | | | | Hold trip blank |
| SB-06 (6-7') | ↓ | ↓ | 14:20 | 6-7' | ↓ | 7 | X | X | | ↓ | X | X | X | Hold all samples for PAH |
| Trip Blank | L | — | — | — | — | 2 | Hold → | | | | | | | |

NFE EM 1/9/26

**Preservative Codes**

None: NO — DI Water: $H_2O$
Cool: Cool — MeOH: Me
HCL: HC — $HNO_3$
$H_2SO_4$: $H_2$ — NaOH: Na
$H_3PO_4$: HP
$NaHSO_4$: NABIS
$Na_2S_2O_3$: $NaSO_3$
Zn Acetate+NaOH: Zn
NaOH+Ascorbic Acid: SAPC

**Total 200.7 / 6010 200.8 / 6020:** 8RCRA 13PPM Texas 11 Al Sb As Ba Be B Cd Ca Cr Co Cu Fe Pb Mg Mn Mo Ni K Se Ag $SiO_2$ Na Sr Tl Sn U V Zn

Circle Method(s) and Metal(s) to be analyzed **TCLP / SPLP 6010:** 8RCRA Sb As Ba Be Cd Cr Co Cu Pb Mn Mo Ni Se Ag Tl U Hg: 1631 / 245.1 / 7470 / 7471

**Notice: Signature of this document and relinquishment of samples constitutes a valid purchase order from client company to Eurofins Xenco, its affiliates and subcontractors. It assigns standard terms and conditions of service. Eurofins Xenco will be liable only for the cost of samples and shall not assume any responsibility for any losses or expenses incurred by the client if such losses are due to circumstances beyond the control of Eurofins Xenco. A minimum charge of $85.00 will be applied to each project and a charge of $5 for each sample submitted to Eurofins Xenco, but not analyzed. These terms will be enforced unless previously negotiated.**

| Relinquished by: (Signature) | Received by: (Signature) | Date/Time | Relinquished by: (Signature) | Received by: (Signature) | Date/Time |
|---|---|---|---|---|---|
| 1 Elena Muir | [signature] | 1/10; 09:15 | 2 | [signature] | 1/10/26 9:15 |
| 3 | | | 4 | | |
| 5 | | | 6 | | |

Revised Date: 08/25/2020 Rev. 2020.2



Ex. 9
App.178

Eurofins Dallas
9701 Harry Hines Blvd
Dallas, TX 75220
Phone: 214-902-0300

# Chain of Custody Record

eurofins | Environment Testing

| | | | | |
|---|---|---|---|---|
| **Client Information (Sub Contract Lab)** | Sampler: N/A | Lab PM: Kimmel, Mike M | Carrier Tracking No(s): N/A | COC No: 870-9754.1 |
| Client Contact: Shipping/Receiving | Phone: N/A | E-Mail: Mike.Kimmel@et.eurofinsus.com | State of Origin: Texas | Page: Page 1 of 2 |
| Company: Eurofins Environment Testing South Centr | | Accreditations Required (See note): NELAP Texas | | Job #: 870-43022-1 |
| Address: 4145 Greenbriar Dr | Due Date Requested: 1/14/2026 | **Analysis Requested** | | Preservation Codes: |
| City: Stafford | TAT Requested (days): N/A | | | |
| State, Zip: TX, 77477 | | | | |
| Phone: 281-240-4200(Tel) | PO #: N/A | | | |
| Email: N/A | WO #: N/A | | | |
| Project Name: Cresson Moon Props | Project #: 87000328 | | | Other: N/A |
| Site: N/A | SSOW#: N/A | | | |

| Sample Identification Client ID (Lab ID) | Sample Date | Sample Time | Sample Type (C=Comp, G=grab) | Matrix (W=water, S=solid, O=waste/oil, BT=Tissue, A=Air) | Field Filtered Sample (Yes or No) | Perform MS/MSD (Yes or No) | 8270E_QQQ/3546(MOD) Polycyclic Aromatic Hydrocarbons ( (Hold) | 6020B/3051A(MOD) 6020- Pb | 300_ORGFM_28D/300_PrepChloride-E300 | 6020B/3051A(MOD) 6020- Pb (Hold) | 300_ORGFM_28D/300_PrepChloride-E300 (Hold) | Total Number of containers | Special Instructions/Note: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Preservation Code: | | X | X | | | | | | X | |
| SB-01 (3'-4') (870-43022-1) | 1/9/26 | 10:05 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-01 (19') (870-43022-2) | 1/9/26 | 10:35 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-02 (3'-4') (870-43022-3) | 1/9/26 | 11:00 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-02 (8'-9') (870-43022-4) | 1/9/26 | 11 10 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-03 (3'-4') (870-43022-5) | 1/9/26 | 11:20 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-03 (5'-6') (870-43022-6) | 1/9/26 | 11:30 Central | G | Solid | | | X | | | | | 1 | |
| SB-03 (15') (870-43022-7) | 1/9/26 | 11:40 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-04 (3'-4') (870-43022-8) | 1/9/26 | 12:20 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-04 (24') (870-43022-9) | 1/9/26 | 13:00 Central | G | Solid | | | X | | | X | X | 1 | |

Note: Since laboratory accreditations are subject to change, Eurofins Environment Testing South Central, LLC places the ownership of method, analyte & accreditation compliance upon our subcontract laboratories. This sample shipment is forwarded under chain-of-custody. If the laboratory does not currently maintain accreditation in the State of Origin listed above for analysis/tests/matrix being analyzed, the samples must be shipped back to the Eurofins Environment Testing South Central, LLC laboratory or other instructions will be provided. Any changes to accreditation status should be brought to Eurofins Environment Testing South Central, LLC attention immediately. If all requested accreditations are current to date, return the signed Chain of Custody attesting to said compliance to Eurofins Environment Testing South Central, LLC.

| | | | | | |
|---|---|---|---|---|---|
| *Possible Hazard Identification* Unconfirmed | | *Sample Disposal ( A fee may be assessed if samples are retained longer than 1 month)* ☐ Return To Client ☐ Disposal By Lab ☐ Archive For ____ Months | | | |
| Deliverable Requested: I, II III, IV Other (specify) | Primary Deliverable Rank: 2 | Special Instructions/QC Requirements: | | | |
| Empty Kit Relinquished by: [signature] | Date: | Time: | | Method of Shipment: | |
| Relinquished by: | Date/Time: | Company | Received by: DS | Date/Time: 1/13 | Company |
| Relinquished by: | Date/Time: | Company | Received by: | Date/Time: | Company |
| Relinquished by: | Date/Time: 01/12/26 - 1710 | Company | Received by: | Date/Time: | Company |
| Custody Seals Intact: Δ Yes Δ No | Custody Seal No. | | Cooler Temperature(s) °C and Other Remarks: HOU369 2.0 | | |

Ver: 10/10/2024

# Login Sample Receipt Checklist

Client: Whitehead ES LLC

Job Number: 870-43022-1
SDG Number: 379.001

**Login Number: 43022**
**List Number: 1**
**Creator: Virani, Tycho L**

**List Source: Eurofins Dallas**

| Question | Answer | Comment |
|---|---|---|
| The cooler's custody seal, if present, is intact. | N/A | |
| Sample custody seals, if present, are intact. | N/A | |
| The cooler or samples do not appear to have been compromised or tampered with. | True | |
| Samples were received on ice. | True | |
| Cooler Temperature is acceptable. | True | |
| Cooler Temperature is recorded. | True | |
| COC is present. | True | |
| COC is filled out in ink and legible. | True | |
| COC is filled out with all pertinent information. | True | |
| Is the Field Sampler's name present on COC? | True | |
| There are no discrepancies between the containers received and the COC. | True | |
| Samples are received within Holding Time (excluding tests with immediate HTs) | False | Refer to Job Narrative for details. |
| Sample containers have legible labels. | True | |
| Containers are not broken or leaking. | True | |
| Sample collection date/times are provided. | True | |
| Appropriate sample containers are used. | True | |
| Sample bottles are completely filled. | True | |
| Sample Preservation Verified. | True | |
| There is sufficient vol. for all requested analyses, incl. any requested MS/MSDs | True | |
| Containers requiring zero headspace have no headspace or bubble is <6mm (1/4"). | True | |

# Login Sample Receipt Checklist

Client: Whitehead ES LLC

Job Number: 870-43022-1
SDG Number: 379.001

**Login Number: 43022**
**List Number: 2**
**Creator: Silva, Daniel**

**List Source: Eurofins Houston**
**List Creation: 01/13/26 09:27 AM**

| Question | Answer | Comment |
|---|---|---|
| The cooler's custody seal, if present, is intact. | True | |
| Sample custody seals, if present, are intact. | N/A | |
| The cooler or samples do not appear to have been compromised or tampered with. | True | |
| Samples were received on ice. | True | |
| Cooler Temperature is acceptable. | True | |
| Cooler Temperature is recorded. | True | |
| COC is present. | True | |
| COC is filled out in ink and legible. | True | |
| COC is filled out with all pertinent information. | True | |
| Is the Field Sampler's name present on COC? | True | |
| There are no discrepancies between the containers received and the COC. | True | |
| Samples are received within Holding Time (excluding tests with immediate HTs) | True | |
| Sample containers have legible labels. | True | |
| Containers are not broken or leaking. | True | |
| Sample collection date/times are provided. | True | |
| Appropriate sample containers are used. | True | |
| Sample bottles are completely filled. | True | |
| Sample Preservation Verified. | True | |
| There is sufficient vol. for all requested analyses, incl. any requested MS/MSDs | True | |
| Containers requiring zero headspace have no headspace or bubble is <6mm (1/4"). | True | |

# Detection Check Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 5035-Closed System Purge and Trap**
**Instrument: A375** **Detector: MSD/0** **Column: DB-624-20m**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Benzene | 0.00101 | 0.000991 | J | mg/Kg | 0.00200 | 0.000502 | 09/11/2025 | 870-31690 |
| tert-Butylbenzene | 0.00101 | 0.000912 | J | mg/Kg | 0.00200 | 0.000513 | 09/11/2025 | 870-31690 |
| Carbon tetrachloride | 0.00101 | 0.000718 | J | mg/Kg | 0.00200 | 0.000443 | 09/11/2025 | 870-31690 |
| MTBE | 0.00101 | 0.00108 | J | mg/Kg | 0.00200 | 0.000586 | 09/11/2025 | 870-31690 |
| Chlorobenzene | 0.00101 | 0.000937 | J | mg/Kg | 0.00200 | 0.000507 | 09/11/2025 | 870-31690 |
| Chloroethane | 0.00100 | 0.000780 | J | mg/Kg | 0.00200 | 0.000453 | 09/11/2025 | 870-31690 |
| Chloroform | 0.00100 | <0.000474 | U | mg/Kg | 0.00200 | 0.000474 | 07/21/2025 | 870-30229 |
| Chloromethane | 0.00100 | 0.000940 | J | mg/Kg | 0.00200 | 0.000549 | 09/11/2025 | 870-31690 |
| 2-Chlorotoluene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000272 | 09/11/2025 | 870-31690 |
| 4-Chlorotoluene | 0.00101 | 0.000982 | J | mg/Kg | 0.00200 | 0.000608 | 09/11/2025 | 870-31690 |
| p-Cymene (p-Isopropyltoluene) | 0.00101 | <0.00140 | U | mg/Kg | 0.00500 | 0.00140 | 09/11/2025 | 870-31690 |
| Dibromochloromethane | 0.00101 | 0.000861 | J | mg/Kg | 0.00200 | 0.000174 | 09/11/2025 | 870-31690 |
| Bromobenzene | 0.00101 | 0.000870 | J | mg/Kg | 0.00200 | 0.000805 | 09/11/2025 | 870-31690 |
| Toluene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000560 | 09/11/2025 | 870-31690 |
| 1,2-Dibromo-3-Chloropropane | 0.00101 | <0.00109 | U | mg/Kg | 0.00500 | 0.00109 | 09/11/2025 | 870-31690 |
| 1,2-Dibromoethane | 0.00101 | 0.00106 | J | mg/Kg | 0.00200 | 0.000618 | 09/11/2025 | 870-31690 |
| Dibromomethane | 0.00101 | 0.00113 | J | mg/Kg | 0.00200 | 0.000314 | 09/11/2025 | 870-31690 |
| 1,2-Dichlorobenzene | 0.00100 | 0.000997 | J | mg/Kg | 0.00200 | 0.000395 | 09/11/2025 | 870-31690 |
| 1,3-Dichlorobenzene | 0.00101 | 0.000997 | J | mg/Kg | 0.00200 | 0.000499 | 09/11/2025 | 870-31690 |
| 1,4-Dichlorobenzene | 0.00101 | 0.00110 | J | mg/Kg | 0.00200 | 0.000496 | 09/11/2025 | 870-31690 |
| Dichlorodifluoromethane | 0.00101 | <0.000544 | U | mg/Kg | 0.00200 | 0.000544 | 09/11/2025 | 870-31690 |
| 1,1-Dichloroethane | 0.00101 | 0.000895 | J | mg/Kg | 0.00200 | 0.000567 | 09/11/2025 | 870-31690 |
| 1,2-Dichloroethane | 0.00101 | 0.00104 | J | mg/Kg | 0.00200 | 0.000367 | 09/11/2025 | 870-31690 |
| 1,1-Dichloroethene | 0.00101 | 0.000640 | J | mg/Kg | 0.00200 | 0.000456 | 09/11/2025 | 870-31690 |
| Bromochloromethane | 0.00101 | 0.000886 | J | mg/Kg | 0.00200 | 0.000632 | 09/11/2025 | 870-31690 |
| Ethylbenzene | 0.00101 | 0.00104 | J | mg/Kg | 0.00200 | 0.000387 | 09/11/2025 | 870-31690 |
| cis-1,2-Dichloroethene | 0.00101 | <0.000506 | U | mg/Kg | 0.00200 | 0.000506 | 09/11/2025 | 870-31690 |
| trans-1,2-Dichloroethene | 0.00101 | 0.000862 | J | mg/Kg | 0.00200 | 0.000462 | 09/11/2025 | 870-31690 |
| 1,2-Dichloropropane | 0.00101 | 0.000956 | J | mg/Kg | 0.00200 | 0.000586 | 09/11/2025 | 870-31690 |
| 1,3-Dichloropropane | 0.00101 | 0.000994 | J | mg/Kg | 0.00200 | 0.000334 | 09/11/2025 | 870-31690 |
| 2,2-Dichloropropane | 0.00101 | 0.000880 | J | mg/Kg | 0.00200 | 0.000592 | 09/11/2025 | 870-31690 |
| 1,1-Dichloropropene | 0.00101 | 0.000863 | J | mg/Kg | 0.00200 | 0.000308 | 09/11/2025 | 870-31690 |
| cis-1,3-Dichloropropene | 0.00100 | 0.000974 | J | mg/Kg | 0.00200 | 0.000618 | 09/11/2025 | 870-31690 |
| trans-1,3-Dichloropropene | 0.00101 | 0.000843 | J | mg/Kg | 0.00200 | 0.000510 | 09/11/2025 | 870-31690 |
| Hexachlorobutadiene | 0.00101 | 0.000632 | J | mg/Kg | 0.00200 | 0.000551 | 09/11/2025 | 870-31690 |
| Bromodichloromethane | 0.00101 | 0.000813 | J | mg/Kg | 0.00200 | 0.000653 | 09/11/2025 | 870-31690 |
| m,p-Xylenes | 0.00100 | 0.000539 | J | mg/Kg | 0.00200 | 0.000228 | 09/11/2025 | 870-31690 |
| Isopropylbenzene | 0.00101 | 0.000902 | J | mg/Kg | 0.00200 | 0.000377 | 09/11/2025 | 870-31690 |
| Methylene Chloride | 0.00101 | 0.00141 | J | mg/Kg | 0.00500 | 0.00132 | 07/21/2025 | 870-30229 |
| Naphthalene | 0.00101 | 0.00115 | J | mg/Kg | 0.00200 | 0.000670 | 09/11/2025 | 870-31690 |
| N-Propylbenzene | 0.00101 | 0.000860 | J | mg/Kg | 0.00200 | 0.000516 | 09/11/2025 | 870-31690 |
| Styrene | 0.00101 | 0.00114 | J | mg/Kg | 0.00200 | 0.000517 | 09/11/2025 | 870-31690 |
| 1,1,1,2-Tetrachloroethane | 0.00101 | 0.000933 | J | mg/Kg | 0.00200 | 0.000460 | 09/11/2025 | 870-31690 |
| 1,1,2,2-Tetrachloroethane | 0.00101 | 0.00106 | J | mg/Kg | 0.00200 | 0.000684 | 09/11/2025 | 870-31690 |
| Tetrachloroethylene | 0.00101 | <0.000455 | U | mg/Kg | 0.00200 | 0.000455 | 09/11/2025 | 870-31690 |
| Bromoform | 0.00101 | <0.000896 | U | mg/Kg | 0.00200 | 0.000896 | 09/11/2025 | 870-31690 |
| o-Xylene | 0.00101 | 0.000872 | J | mg/Kg | 0.00200 | 0.000400 | 09/11/2025 | 870-31690 |
| 1,2,3-Trichlorobenzene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000452 | 09/11/2025 | 870-31690 |

# Detection Check Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 5035-Closed System Purge and Trap**
**Instrument: A375** **Detector: MSD/0** **Column: DB-624-20m**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| 1,2,4-Trichlorobenzene | 0.00101 | 0.000974 | J | mg/Kg | 0.00200 | 0.000721 | 09/11/2025 | 870-31690 |
| 1,1,1-Trichloroethane | 0.00100 | 0.000881 | J | mg/Kg | 0.00200 | 0.000500 | 09/11/2025 | 870-31690 |
| 1,1,2-Trichloroethane | 0.00100 | 0.00109 | J | mg/Kg | 0.00200 | 0.000676 | 09/11/2025 | 870-31690 |
| Trichloroethene | 0.00101 | 0.000877 | J | mg/Kg | 0.00200 | 0.000461 | 09/11/2025 | 870-31690 |
| Trichlorofluoromethane | 0.00100 | <0.000842 | U | mg/Kg | 0.00200 | 0.000842 | 09/11/2025 | 870-31690 |
| 1,2,3-Trichloropropane | 0.00101 | 0.000956 | J | mg/Kg | 0.00200 | 0.000585 | 09/11/2025 | 870-31690 |
| 1,2,4-Trimethylbenzene | 0.00101 | <0.000561 | U | mg/Kg | 0.00200 | 0.000561 | 09/11/2025 | 870-31690 |
| 1,3,5-Trimethylbenzene | 0.00101 | 0.000912 | J | mg/Kg | 0.00200 | 0.000554 | 09/11/2025 | 870-31690 |
| Bromomethane | 0.00101 | <0.00117 | U | mg/Kg | 0.00500 | 0.00117 | 09/11/2025 | 870-31690 |
| Xylenes, Total | 0.00201 | 0.00141 | J | mg/Kg | 0.00200 | 0.000400 | 09/11/2025 | 870-31690 |
| Vinyl chloride | 0.00101 | <0.00191 | U | mg/Kg | 0.00500 | 0.00191 | 09/11/2025 | 870-31690 |
| 2-Butanone | 0.0101 | 0.00802 | J | mg/Kg | 0.0500 | 0.00772 | 09/11/2025 | 870-31690 |
| n-Butylbenzene | 0.00101 | 0.000804 | J | mg/Kg | 0.00200 | 0.000335 | 09/11/2025 | 870-31690 |
| sec-Butylbenzene | 0.00101 | 0.000802 | J | mg/Kg | 0.00200 | 0.000535 | 09/11/2025 | 870-31690 |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: TX_1005_S_Prep-Extraction - Texas Total petroleum Hyrdocarbons**
**Instrument: A305** **Detector: FID/0** **Column: RXI1-MS**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 25.1 | <25.0 | U | mg/Kg | 50.0 | 25.0 | 09/12/2025 | 870-31693 |
| >C12-C28 Range Hydrocarbons | 25.1 | <25.0 | U | mg/Kg | 50.0 | 25.0 | 09/12/2025 | 870-31693 |

## Method: 300.0 - Anions, Ion Chromatography

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 300_Prep-Anions, Ion Chromatography, 10% Wt/Vol**
**Instrument: A263** **Detector: IC/0** **Column: AS-18**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Chloride | 5.00 | 5.19 | J | mg/Kg | 10.0 | 5.00 | 09/25/2025 | 860-264099 |

## Method: 6020B - Metals (ICP/MS)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 3051A-Preparation, Metals, Microwave Assisted**
**Instrument: A364** **Detector: MSD/0**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Barium | 0.300 | 0.28 | J | mg/Kg | 0.40 | 0.14 | 09/25/2025 | 860-264482 |

# Appendix A
# Laboratory Data Package Cover Page - Page 1 of 4

This data package is for Eurofins Dallas job number 870-43022-1 and consists of:

☑ R1 - Field chain-of-custody documentation;
☑ R2 - Sample identification cross-reference;
☑ R3 - Test reports (analytical data sheets) for each environmental sample that includes:
- a. Items consistent with NELAC Chapter 5,
- b. dilution factors,
- c. preparation methods,
- d. cleanup methods, and
- e. if required for the project, tentatively identified compounds (TICs).

☑ R4 - Surrogate recovery data including:
- a. Calculated recovery (%R), and
- b. The laboratory's surrogate QC limits.

☑ R5 - Test reports/summary forms for blank samples;
☑ R6 - Test reports/summary forms for laboratory control samples (LCSs) including:
- a. LCS spiking amounts,
- b. Calculated %R for each analyte, and
- c. The laboratory's LCS QC limits.

☑ R7 - Test reports for project matrix spike/matrix spike duplicates (MS/MSDs) including:
- a. Samples associated with the MS/MSD clearly identified,
- b. MS/MSD spiking amounts,
- c. Concentration of each MS/MSD analyte measured in the parent and spiked samples,
- d. Calculated %Rs and relative percent differences (RPDs), and
- e. The laboratory's MS/MSD QC limits

☑ R8 - Laboratory analytical duplicate (if applicable) recovery and precision:
- a. The amount of analyte measured in the duplicate,
- b. The calculated RPD, and
- c. The laboratory's QC limits for analytical duplicates.

☑ R9 - List of method quantitation limits (MQLs) and detectability check sample results for each analyte for each method and matrix.
☑ R10 - Other problems or anomalies.

The Exception Report for each "No" or "Not Reviewed (NR)" item in Laboratory Review Checklist and for each analyte, matrix, and method for which the laboratory does not hold NELAC accreditation under the Texas Laboratory Accreditation Program.

**Release Statement:** I am responsible for the release of this laboratory data package. This laboratory is NELAC accredited under the Texas Laboratory Accreditation Program for all the methods, analytes, and matrices reported in this data package except as noted in the Exception Reports. The data have been reviewed and are technically compliant with the requirements of the methods used, except where noted by the laboratory in the Exception Reports. By my signature below, I affirm to the best of my knowledge all problems/anomalies observed by the laboratory have been identified in the Laboratory Review Checklist, and no information affecting the quality of the data has been knowingly withheld.

| Mike Kimmel | | 1/21/2026 |
|---|---|---|
| Name (printed) | Signature | Date |

Project Manager
Official Title (printed)

# Laboratory Review Checklist: Reportable Data - Page 2 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| #[1] | A[2] | Description | Yes | No | NA[3] | NR[4] | ER#[5] |
|---|---|---|---|---|---|---|---|
| R1 | OI | **Chain-of-custody (C-O-C)** | | | | | |
| | | Did samples meet the laboratory's standard conditions of sample acceptability upon receipt? | X | | | | |
| | | Were all departures from standard conditions described in an exception report? | X | | | | |
| R2 | OI | **Sample and quality control (QC) identification** | | | | | |
| | | Are all field sample ID numbers cross-referenced to the laboratory ID numbers? | X | | | | |
| | | Are all laboratory ID numbers cross-referenced to the corresponding QC data? | X | | | | |
| R3 | OI | **Test reports** | | | | | |
| | | Were all samples prepared and analyzed within holding times? | | X | | | R03A |
| | | Other than those results < MQL, were all other raw values bracketed by calibration standards? | X | | | | |
| | | Were calculations checked by a peer or supervisor? | X | | | | |
| | | Were all analyte identifications checked by a peer or supervisor? | X | | | | |
| | | Were sample detection limits reported for all analytes not detected? | X | | | | |
| | | Were all results for soil and sediment samples reported on a dry weight basis? | X | | | | |
| | | Were % moisture (or solids) reported for all soil and sediment samples? | X | | | | |
| | | Were bulk soils/solids samples for volatile analysis extracted with methanol per SW846 Method 5035? | X | | | | |
| | | If required for the project, are TICs reported? | | | X | | |
| R4 | O | **Surrogate recovery data** | | | | | |
| | | Were surrogates added prior to extraction? | X | | | | |
| | | Were surrogate percent recoveries in all samples within the laboratory QC limits? | | X | | | R04B |
| R5 | OI | **Test reports/summary forms for blank samples** | | | | | |
| | | Were appropriate type(s) of blanks analyzed? | X | | | | |
| | | Were blanks analyzed at the appropriate frequency? | X | | | | |
| | | Were method blanks taken through the entire analytical process, including preparation and, if applicable, cleanup procedures? | X | | | | |
| | | Were blank concentrations < MQL? | X | | | | |
| R6 | OI | **Laboratory control samples (LCS):** | | | | | |
| | | Were all COCs included in the LCS? | X | | | | |
| | | Was each LCS taken through the entire analytical procedure, including prep and cleanup steps? | X | | | | |
| | | Were LCSs analyzed at the required frequency? | X | | | | |
| | | Were LCS (and LCSD, if applicable) %Rs within the laboratory QC limits? | X | | | | |
| | | Does the detectability check sample data document the laboratory's capability to detect the COCs at the MDL used to calculate the SDLs? | X | | | | |
| | | Was the LCSD RPD within QC limits? | X | | | | |
| R7 | OI | **Matrix spike (MS) and matrix spike duplicate (MSD) data** | | | | | |
| | | Were the project/method specified analytes included in the MS and MSD? | X | | | | |
| | | Were MS/MSD analyzed at the appropriate frequency? | X | | | | |
| | | Were MS (and MSD, if applicable) %Rs within the laboratory QC limits? | | X | | | R07C |
| | | Were MS/MSD RPDs within laboratory QC limits? | X | | | | |
| R8 | OI | **Analytical duplicate data** | | | | | |
| | | Were appropriate analytical duplicates analyzed for each matrix? | X | | | | |
| | | Were analytical duplicates analyzed at the appropriate frequency? | X | | | | |
| | | Were RPDs or relative standard deviations within the laboratory QC limits? | X | | | | |
| R9 | OI | **Method quantitation limits (MQLs):** | | | | | |
| | | Are the MQLs for each method analyte included in the laboratory data package? | X | | | | |
| | | Do the MQLs correspond to the concentration of the lowest non-zero calibration standard? | X | | | | |
| | | Are unadjusted MQLs and DCSs included in the laboratory data package? | X | | | | |
| R10 | OI | **Other problems/anomalies** | | | | | |
| | | Are all known problems/anomalies/special conditions noted in this LRC and ER? | X | | | | |
| | | Was applicable and available technology used to lower the SDL to minimize the matrix interference effects on the sample results? | X | | | | |
| | | Is the laboratory NELAC-accredited under the Texas Laboratory Accreditation Program for the analytes, matrices and methods associated with this laboratory data package? | X | | | | |

1. Items identified by the letter "R" must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter "S" should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if "NR" or "No" is checked).

# Laboratory Review Checklist: Supporting Data - Page 3 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| #[1] | A[2] | Description | Yes | No | NA[3] | NR[4] | ER#[5] |
|---|---|---|---|---|---|---|---|
| **S1** | OI | **Initial calibration (ICAL)** | | | | | |
| | | Were response factors and/or relative response factors for each analyte within QC limits? | X | | | | |
| | | Were percent RSDs or correlation coefficient criteria met? | X | | | | |
| | | Was the number of standards recommended in the method used for all analytes? | X | | | | |
| | | Were all points generated between the lowest and highest standard used to calculate the curve? | X | | | | |
| | | Are ICAL data available for all instruments used? | X | | | | |
| | | Has the initial calibration curve been verified using an appropriate second source standard? | X | | | | |
| **S2** | OI | **Initial and continuing calibration verification (ICV and CCV) and continuing calibration blank (CCB):** | | | | | |
| | | Was the CCV analyzed at the method-required frequency? | X | | | | |
| | | Were percent differences for each analyte within the method-required QC limits? | X | | | | |
| | | Was the ICAL curve verified for each analyte? | X | | | | |
| | | Was the absolute value of the analyte concentration in the inorganic CCB < MDL? | X | | | | |
| **S3** | O | **Mass spectral tuning** | | | | | |
| | | Was the appropriate compound for the method used for tuning? | X | | | | |
| | | Were ion abundance data within the method-required QC limits? | X | | | | |
| **S4** | O | **Internal standards (IS)** | | | | | |
| | | Were IS area counts and retention times within the method-required QC limits? | X | | | | |
| **S5** | OI | **Raw data (NELAC Section 5.5.10)** | | | | | |
| | | Were the raw data (for example, chromatograms, spectral data) reviewed by an analyst? | X | | | | |
| | | Were data associated with manual integrations flagged on the raw data? | X | | | | |
| **S6** | O | **Dual column confirmation** | | | | | |
| | | Did dual column confirmation results meet the method-required QC? | | | X | | |
| **S7** | O | **Tentatively identified compounds (TICs)** | | | | | |
| | | If TICs were requested, were the mass spectra and TIC data subject to appropriate checks? | | | X | | |
| **S8** | I | **Interference Check Sample (ICS) results** | | | | | |
| | | Were percent recoveries within method QC limits? | X | | | | |
| **S9** | I | **Serial dilutions, post digestion spikes, and method of standard additions** | | | | | |
| | | Were percent differences, recoveries, and the linearity within the QC limits specified in the method? | X | | | | |
| **S10** | OI | **Method detection limit (MDL) studies** | | | | | |
| | | Was a MDL study performed for each reported analyte? | X | | | | |
| | | Is the MDL either adjusted or supported by the analysis of DCSs? | X | | | | |
| **S11** | OI | **Proficiency test reports** | | | | | |
| | | Was the laboratory's performance acceptable on the applicable proficiency tests or evaluation studies? | X | | | | |
| **S12** | OI | **Standards documentation** | | | | | |
| | | Are all standards used in the analyses NIST-traceable or obtained from other appropriate sources? | X | | | | |
| **S13** | OI | **Compound/analyte identification procedures** | | | | | |
| | | Are the procedures for compound/analyte identification documented? | X | | | | |
| **S14** | OI | **Demonstration of analyst competency (DOC)** | | | | | |
| | | Was DOC conducted consistent with NELAC Chapter 5? | X | | | | |
| | | Is documentation of the analyst's competency up-to-date and on file? | X | | | | |
| **S15** | OI | **Verification/validation documentation for methods (NELAC Chapter 5)** | | | | | |
| | | Are all the methods used to generate the data documented, verified, and validated, where applicable? | X | | | | |
| **S16** | OI | **Laboratory standard operating procedures (SOPs)** | | | | | |
| | | Are laboratory SOPs current and on file for each method performed? | X | | | | |

1. Items identified by the letter “R” must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter “S” should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if “NR” or “No” is checked).



Ex. 9
App.186

# Laboratory Review Checklist: Exception Reports - Page 4 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| ER #[1] | Description |
|---|---|
| R03A | The following sample(s) was received with insufficient time remaining to freeze within 48 hours, as required for samples collected in water preserved TerraCores: all samples. The sample(s) was collected on 1/9/26. The sample(s) was received on Saturday 1/10/26 at 9:15 and placed in the freezer on 1/12/26 at 11:15 . |
| R04B | Method TX 1005: Surrogate recovery for the following sample was outside the upper control limit: SB-05 (8'-9') (870-43022-11). This sample did not contain any target analytes; therefore, re-extraction and/or re-analysis was not performed. |
| R07C | Method 6020B: The matrix spike / matrix spike duplicate (MS/MSD) recoveries for preparation batch 860-287918 and analytical batch 860-288184 were outside control limits. Sample matrix interference is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.<br><br>Method 8260C: The matrix spike (MS) recoveries for preparation batch 870-34798 and analytical batch 870-34789 were outside control limits. Non-homogeneity is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits. |

1. Items identified by the letter “R” must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter “S” should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if “NR” or “No” is checked).



Ex. 9
App.187

**Blake Brownshadel**

**Subject:** FW: Environmental matters; Smelley Tract

**Importance:** High

**From:** Jeffrey Libby
**Sent:** Thursday, February 12, 2026 1:27 PM
**To:** Lacy Kimball (info@LacyKimballLaw.com) <info@LacyKimballLaw.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Scott Deatherage (scott@sdeatheragelaw.com) <scott@sdeatheragelaw.com>; david@spillerlaw.net; Todd W Tew <todd.2@verizon.net>
**Subject:** Environmental matters; Smelley Tract
**Importance:** High

Lacy,

Seller delivered the Phase II ESA Report (the **ESA Report**) on or about January 26, 2026, which we appreciate. However, the ESA Report indicates that multiple requirements of the PSA have not been satisfied.

In light of the fact that this transaction involves a significant amount of money and land (approximately $33 million and over 1,600 acres), Purchaser has retained Texas environmental counsel to advise Purchaser regarding environmental matters pertaining to the Property, including a review of the ESA Report, and the following comments and questions are, in large part, a result of such consultation.

First, the ESA Report indicates that Seller's environmental representation in Section 6(i) of the PSA was inaccurate when made and remains inaccurate. Accordingly, Seller is in breach of Section 6(i). Section 6(i) provides that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property." The ESA Report indicates that Hazardous Substances are present at the Property. In addition, under Section 8(b) of the PSA, it is a condition precedent to Closing that Seller's representations and warranties be true and correct as of Closing.

Second, Section 7(c) of the PSA requires that Seller remove from the Property, no later than fifteen (15) days prior to Closing, "all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property." Based on the ESA Report, the required removal of environmental contamination and hazardous materials has not occurred. In addition, Seller has not provided satisfactory evidence that all underground equipment or piping associated with the above-ground storage tanks has been removed from the Property.

Third, the ESA Report does not include the specific confirmation required by the PSA. Section 7(c) requires that Seller provide an environmental report "by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property." Based on our review, the ESA Report does not include this confirmation and therefore does not satisfy Section 7(c).

The requirements and language of Sections 6(i) and 7(c) were specifically drafted by Purchaser and agreed to by Seller to address environmental contamination and Hazardous Substances at the Property. These requirements were and remain material to the transaction, particularly in light of the purchase price to be paid at Closing.

Based on the foregoing, Purchaser does not believe Section 6(i) or Section 7(c) have been satisfied or that the applicable conditions precedent to Closing have been met.

From Purchaser's perspective, it would be premature to discuss a closing date until the environmental matters outlined above are fully and clearly resolved. In addition to revising the ESA Report to include the contractually required confirmation, Purchaser also requires - and we understand Seller's engineer has agreed to provide - the following:

- An express right for Purchaser to rely on the ESA Report (whether by reliance letter or by naming Purchaser as an intended recipient in the report). The ESA Report expressly prohibits anyone other than Seller from relying upon the ESA Report; and
- Purchaser to be named as an additional insured on the environmental engineer's and drilling contractor's CGL and Contractors Pollution Liability policies, with limits appropriate for a $33 million transaction. Additionally, those policies must be "occurrence-based policies" and not "claims-made policies." The policies and insurance must survive into the future for obvious reasons.

Finally, all environmental contamination at the Property must be removed in accordance with the PSA.

Purchaser remains committed to working cooperatively to finalize these items. Once Sections 6(i) and 7(c) have been fully satisfied, Purchaser will be in a much better position to have a constructive discussion about next steps, including Closing timing.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2025

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201
www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230

**Blake Brownshadel**

**Subject:** FW: 7700 Old Granbury Hwy
**Attachments:** Old Granbury Rd 7700.pdf

**Importance:** High

**From:** Al Paniagua <alp@prostarcre.com>
**Sent:** Wednesday, February 25, 2026 3:48 PM
**To:** Patricia Herrera <patty@challengerrealtygroup.com>
**Subject:** FW: 7700 Old Granbury Hwy

**AL PANIAGUA**
Executive Vice President

**ProStar Commercial Real Estate, LLC**
One Cowboys Way, Suite 300
Frisco, Texas 75034
214.773.8479
alp@prostarcre.com
prostarcre.com

**From:** Stephen Reich <stephen.reich@williamstrew.com>
**Sent:** Friday, February 13, 2026 6:03 AM
**To:** Al Paniagua <alp@prostarcre.com>
**Subject:** 7700 Old Granbury Hwy

Good morning:
You had previously reached out on my listing at 7700 Old Granbury. Looks like after all this time, this is going to be coming back on the market.
Please let me know if your client has an interest. Marketing Packet is attached.

CONFIDENTIALITY NOTICE: The information contained in this email communication (including any attachment(s)) is strictly confidential and intended solely for the person or entity named above. If you are

not the intended recipient of this email, you are hereby notified that any disclosure, distribution, reproduction, or other use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return email and permanently delete this communication (including any attachment(s)) from your system.
CONFIDENTIALITY NOTICE: The information contained in this email communication (including any attachment(s)) is strictly confidential and intended solely for the person or entity named above. If you are not the intended recipient of this email, you are hereby notified that any disclosure, distribution, reproduction, or other use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return email and permanently delete this communication (including any attachment(s)) from your system.




# TREMENDOUS DEVELOPMENT OPPORTUNITY - 1,674+/- ACRES

## 7700 Old Granbury Rd. – Cresson, TX

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE

WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

LISTED BY **STEPHEN REICH GROUP** OF WILLIAMS TREW REAL ESTATE

# PROPERTY SUMMARY

## DESCRIPTION

Tremendous development opportunity located in the heart of the westward movement. This hard to find 1,674 plus or minus acre parcel is prime for a mixed use development and is located only 30 miles from downtown Fort Worth, Texas. Cresson is a rapidly growing area due to its convenient location to Fort Worth via Highway 377, a new loop and ease of railroad accessibility. This tract features rolling terrain and scattered hardwoods providing perfect settings for residential development. 1,300 feet of road frontage and being located less than 1.5 miles from the new loop makes accessibility extremely easy. Over two miles of Atchison, Topeka and Santa Fe rail frontage make the industrial opportunities endless.

## LOCATION

| | |
|---|---|
| CITY | Cresson |
| County | Hood |
| Schools | Granbury ISD |

## OFFER SUMMARY

| | |
|---|---|
| List Price | $30,976,807 |
| Lot Size | 1,674.422 acres |
| Utilities | Electric Available, Private Sewer, Septic, Well |

Driving Directions From Hwy 171, go west on Hwy 377. Right on Old Granbury Rd.

## HIGHLIGHTS

- MIXED USE DEVELOPMENT
- 1,300 FT OF ROAD FRONTAGE
- 30 MILES FROM DOWNTOWN FT. WORTH
- RAILROAD ACCESSIBILITY
- NO RESTRICTIONS
- AG EXEMPT

## LISTING PRESENTED BY:

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE

WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.



**PROPERTY WEBSITE LINK:**
**stephenreichgroup.com/20123229**

STEPHEN REICH
817-597-8884
stephen.reich@williamstrew.com

TAMMY ROKUS
817-694-8019
tammy.rokus@williamstrew.com



PARKER COUNTY OFFICE
400 Shops Boulevard, Ste. 200
Willow Park, TX 76087

FARM & RANCH • RESIDENTIAL • COMMERCIAL-DEVELOPMENT • LAND

# PROPERTY PHOTOS













STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

# PROPERTY PHOTOS













STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE

WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

# AERIAL MAP




STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

# CONTOUR LINES & FLOODPLAIN




STEPHEN REICH – 817.597.8884
TAMMY ROKUS – 817.694.8019

STEPHEN REICH GROUP
WILLIAMS TREW REAL ESTATE
WilliamsTrew
A DIVISION OF EBBY HALLIDAY REAL ESTATE, INC.

# STATE OF TEXAS WELL REPORT

**WELL REPORT**
#188548

**DRILLING START DATE**
8/29/2006

**BOREHOLE:**
Depth 30 ft.
Diameter 11 in.

**WATER LEVEL BELLOW SURFACE**
620 ft.

**WELL TESTS**
Yield: 60 GPM

**COMPANY INFORMATION**
Associated Services

CALHOUN BHELLA

AUSTIN, TX
DALLAS, TX
FRISCO, TX
NEW YORK, NY
ORANGE COUNTY, CA
RALEIGH, NC
SAN ANTONIO, TX
ST. LOUIS, MO
WASHINGTON, DC

August 19, 2026

JACKSON WALKER LLP
Scott A. Wheatley
Lee B. Hunt
Trevor J. Paul
777 Main Street, Suite 2100
Fort Worth, Texas 76102

VIA EMAIL:
swheatley@jw.com
lhunt@jw.com
tpaul@jw.com

Re: *Challenger Cresson I, LLC v. Bill Sanders, Independent Executor of the Estate of Pearl Smelley, et al.*, Civil Action No. 4:26-cv-00231-P (N.D. Tex.)

**FORMAL DEMAND PURSUANT TO SECTION 5(e) OF THE STANDARD CONTRACT OF SALE — EXECUTION OF WELL PERMIT APPLICATIONS**

Dear Counsel:

As you know, we represent Challenger Cresson I, LLC ("Purchaser") in the above-referenced matter. This letter constitutes formal written demand, pursuant to Section 5(e) of the Standard Contract of Sale dated effective May 26, 2023, as amended (the "Contract"), that the Estate of Pearl Smelley and Cresson Moon Properties, LP, as the fee owners of the Property, execute and return the twenty-two (22) enclosed well permit applications to the Upper Trinity Groundwater Conservation District (the "District") (the "Well Permit Applications") and one (1) operating permit application to the District (the "Operating Permit Application" and, together with the Well Permit Applications, the "Applications") within three (3) business days of Seller's receipt of this letter - i.e., no later than 5:00 p.m. CDT on Monday, August 24, 2026. As explained below, Seller's failure to timely execute and return such applications will cause significant and irreparable harm, not only to Purchaser, but to the Property itself, and ultimately to any party who owns it. It will also constitute a separate, additional material breach of the Contract.

## I. Contractual Basis for This Demand

Section 5(e) of the Contract provides, in relevant part:

*"[P]urchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use . . . and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements . . . including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller."*

In addition, Section 7(e) of the Contract provides:

JEFFREY T. LIBBY
PARTNER
jlibby@calhounbhella.com
calhounbhella.com
214-833-2187 (Direct)
214-981-9200 (Main)
325 N. Saint Paul Street, Suite 2900
Dallas, TX 75201

*"Notwithstanding anything to the contrary in this Contract, Seller shall not oppose, and Seller shall not interfere with, Purchaser's applications for, or efforts to obtain, any and all Entitlements, Easements Benefitting the Property and the Required Utilities."*

These obligations remain in full force and effect.

**II. The Enclosed Documents**

Enclosed with this letter are twenty-two (22) Well Permit Applications and one (1) Operating Permit Application. Each Application requires the signature of the property owner as applicant or co-applicant. The Contract defines "Entitlements" to include "all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use." Groundwater permits from the District are plainly within this definition. Accordingly, the Applications constitute "reasonable or necessary documents in connection with Purchaser's efforts" to obtain Entitlements within the meaning of Section 5(e). It is your duty and obligation to execute the attached with urgency. See below.

**III. Urgency and Irreparable Harm**

As you are aware, the District has scheduled a public hearing on August 27, 2026 at which it will consider proposed amendments to its rules that will significantly decrease the groundwater production allocation applicable to the Property. Filing the Applications prior to the adoption of the proposed rule change may preserve claims to the current, pre-rule-change groundwater allocation. A decrease in the groundwater allocation will permanently and substantially diminish the value of the Property.

Although Purchaser does not yet hold legal title to the Property, Purchaser holds an equitable interest in the Property under the Contract and is entitled to specific performance of Seller's obligations. The harm from failing to file the Applications before August 27 is therefore not just harm to the Property, but also direct harm to Purchaser's contractual rights. Groundwater rights run with the land. If Seller prevents Purchaser from filing the Applications before the District reduces the allocation, the Property's development capacity will be diminished resulting in the diminution of value of the Property below the value for which Purchaser bargained. Once the August 27 deadline passes, the window closes for all fee and equitable owners of the Property.

**IV. Seller's Prior Refusal**

On August 17, 2026, Mr. Hunt responded to my request for Seller's cooperation in connection with the prompt filing of the Applications by stating: "Calhoun Bhella and Challenger Cresson I should take no action regarding our client's Property in Hood County, unless that action is scheduling a closing date. Our clients reserve all rights." This blanket refusal to cooperate is directly contrary to Seller's express obligations under Sections 5(e) and 7(e) of the Contract. Purchaser does not accept this position and hereby reiterates its demand for Seller's cooperation.

### V. Consequences of Non-Compliance

If Seller fails to execute and return the enclosed Applications within the three (3) business day period prescribed by Section 5(e) (i.e., by no later than **5:00 p.m. CDT on Monday, August 24, 2026**), Purchaser will consider such failure to be a separate, additional material breach of the Contract. Purchaser intends to pursue all available remedies, including but not limited to immediately seeking appropriate injunctive relief from the Court and amending its pleadings to assert additional claims for damages arising from Seller's refusal to cooperate. Purchaser expressly reserves all rights and remedies available under the Contract, at law, and in equity.

### VI. Reservation of Rights

This letter is not intended to, and does not, constitute a waiver of any rights or remedies that Purchaser may have under the Contract, at law, in equity, or otherwise. Any potential defaults by Seller now existing or later occurring will not be deemed waived or otherwise accepted by Purchaser. Purchaser reserves all rights and remedies granted under the Contract and available at law or in equity, all of which shall be cumulative and may be pursued separately, successively, or concurrently at the sole discretion of Purchaser.

Please confirm receipt of this letter and the enclosed Applications at your earliest convenience. Executed originals should be returned to my attention at the address above or via email to jlibby@calhounbhella.com.

Respectfully,

Jeffrey T. Libby

cc: Blake J. Brownshadel (via email)

Enclosures: Twenty-Two (22) Well Permit Applications; One (1) Operating Permit Application

**District Use Only:**

Permit ID: ___

System ID: ___

Admin. Complete: ___

GM Initial: ___

Permit Term: ___

Permit Expiration: ___

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**
Serving Hood, Montague, Parker and Wise Counties
1859 W. Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR OPERATING PERMIT

***Required fields. An application will not be deemed administratively complete unless all required fields are completed.**

## Part I – Applicant Information

*Applicant Name: The Estate of Pearl Smelley & Cresson Moon Properties, LP *Phone: (817) 266-1283 / (817) 300-4350

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive

*City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

*E-Mail: bsanders@flash.net / sgd@flash.net Fax: ___

Contact (if applicable): ___ Phone: ___

E-Mail: ___ Fax: ___

**If the applicant is someone other than the owner of the property, please attach documentation establishing the applicable authority to file the application, hold the permit in lieu of the property owner, and operate a well for the proposed use.**

## Part II – Description of Request

*Please provide a short, plain statement explaining the nature and purpose of the proposed use, and whether the well has been used for any other purpose. *(Examples: "The well will be used for public water supply, and has always been used for that purpose." Or "The well will be used for golf course irrigation, but was used from 2005-2013 to supply water for oil and gas drilling and fracking.")*

Industrial Cooling and Power Generation

## Part III – Well(s) Information

Is this permit request related to a ☒ New well system ☐ Existing well system

*If this application is related to an existing well system, please list all other wells in the system and any current permitted volumes for the system:*

Well(s) in system: : ___

Historic Use Permit ID: ___

Historic Use Permit Volume*: ___
** If still waiting for Board approval of HUP, state volume designated as Maximum Historic Use in your HUP application*

Operating Permit ID: ___

Operating Permit Volume: ___

**Part IV: Permit Volume:**

**Annual Permit Volume Requested:** 650,000,000 gallons**.** This is the total amount of groundwater you are requesting to be authorized by your permit to pump each year, which cannot be more than the maximum amount authorized under the District Rules based on the thickness of the aquifer and your contiguous controlled acreage. If this Application is related to an existing Operating Permit and you are seeking to amend that permit to increase the permitted volume, please identify the requested amended total volume in the space above. If you identified more than one purpose of use in Part II, describe the permit volume you are requesting for each purpose of use. If you also have a Historic Use Permit associated with this acreage or have applied for one and are awaiting District board action, any groundwater production authorized by those affects the maximum amount of water you may pump under this Operating Permit. **In filling in the blank above, ALL applicants should coordinate with the District staff for assistance in determining the maximum volume that can be authorized under an Operating Permit.**

**Part V – Additional Information:** Because of your previous or accompanying well registration and Well ID number, the District has or has access to additional information in the District's and the county's records and databases related to your well and property, such as location, acreage you own at the well site, the particular aquifer in which your well is drilled, a digital map or plat of the land where the well is located and of any applicable political subdivision or CCN boundaries, and other wells that are part of a well system if applicable. Some of this information has been provided to you by the District with this application. If the information provided to you by the District or any past information you have provided the District on these items in a well registration application or otherwise is incorrect or has changed, or if you believe such information related to your well or property in the District's or the County's records and databases is incorrect or has changed, please supplement this application with the correct information, as that information is otherwise incorporated by reference into this application.

***For applicants that are required by law to have a drought contingency plan, please include a copy of that plan with this application**.

**Part VI – Certification:** ***I hereby certify and declare that the information given herewith is true and accurate to the best of my knowledge and belief, that the groundwater withdrawn under the permit will be put to a beneficial use at all times, that I will comply with the District's Management Plan and rules, and that I will follow well plugging guidelines if I close the well.***

________________________________________ ________________________

Applicant Name Date

________________________________________

Applicant Signature

**DISTRICT USE ONLY**

Hearing Date: ____________ Authorization: _______________ Permit Volume: ____________________

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**
Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

*__Required fields. An application will not be deemed complete unless all required fields are completed.__*

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________ Phone: ______________

Contact Email: ______________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ________ Longitude: ________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: __________________

*Driller: ______________________________ *License #: ___________________ *Expiration Date: ___________

Fax: ___________________________ *E-mail: ______________________________________________

*Office Mailing Address: ____________________________________________*State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ________________________________ Longitude: ________________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

____________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

____________________________________________ ________________________________

Owner Name Date

____________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

## UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

*__Required fields. An application will not be deemed complete unless all required fields are completed.__*

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

*Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ________________ Longitude: ________________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ________________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ________________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD _______________________________________________ *Phone: ______________

*Driller: ________________________________ *License #: ______________ *Expiration Date: __________

Fax: ___________________________ *E-mail: _____________________________________________

*Office Mailing Address: ___________________________________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

__________________________________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ________________________ Longitude: ________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

________________________________________ ________________________

Owner Name Date

________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____

Driller: ____

Approved: ____

By: ____

Invoice No.: ____

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at: www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____ Phone: ____

Contact Email: ____ Fax: ____

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5")*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: __________________

*Driller: ____________________________ *License #: ___________________ *Expiration Date: ___________

Fax: ___________________________ *E-mail: ___________________________________________

*Office Mailing Address: ___________________________________________*State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

________________________________________________ ______________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ________________________________ Longitude: ________________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

____________________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

____________________________________________ ____________________________

Owner Name Date

____________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No


# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com


## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________________ Phone: ______________

Contact Email: ______________________________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD _______________ *Phone: __________________

*Driller: ___________________________ *License #: __________________ *Expiration Date: ___________

Fax: ___________________________ *E-mail: _________________________________________

*Office Mailing Address: _________________________________________*State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_____________________________________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: _________________________ Longitude: _________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

_____________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

_____________________________________________ _________________________

Owner Name Date

_____________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No


**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**

Serving Hood, Montague, Parker and Wise Counties

1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082

Phone: (817) 523-5200 | Fax: (817) 523-7687

www.uppertrinitygcd.com


# APPLICATION FOR WELL REGISTRATION
# --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ______________

Contact Email: ______________________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________ Phone: ______________

Contact Email: ______________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ____________________ *Phone: ____________

*Driller: ____________________ *License #: ____________ *Expiration Date: ________

Fax: ____________________ *E-mail: ____________________

*Office Mailing Address: ____________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

____________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ____________________ Longitude: ____________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

____________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

____________________ ____________________

Owner Name Date

____________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No


## UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com


# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD _______________ *Phone: _______________

*Driller: _______________ *License #: _______________ *Expiration Date: ___________

Fax: _______________ *E-mail: _______________

*Office Mailing Address: _______________*State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_______________ _______________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: _______________ Longitude: _______________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

_______________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

_______________ _______________

Owner Name Date

_______________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**
Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

*__Required fields. An application will not be deemed complete unless all required fields are completed.__

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ____________________________________________ *Phone: ________________

*Driller: ______________________________________ *License #: _________________ *Expiration Date: __________

Fax: _______________________________ *E-mail: ___________________________________________________

*Office Mailing Address: __________________________________________________*State: ___ *Zip: ____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_________________________________________________________ ___________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ____________________________ Longitude: ____________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________________ ____________________________

Owner Name Date

______________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________ Phone: ______________

Contact Email: ______________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD _______________________________________________ *Phone: ________________

*Driller: _______________________________ *License #: ______________ *Expiration Date: __________

Fax: _________________________ *E-mail: ___________________________________________

*Office Mailing Address: _________________________________________*State: ___ *Zip: ___________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_______________________________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ________________________ Longitude: ________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________ ________________________

Owner Name Date

______________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**

Serving Hood, Montague, Parker and Wise Counties

1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082

Phone: (817) 523-5200 | Fax: (817) 523-7687

www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION

## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ______________

Contact Email: ______________________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ______________

Contact Email: ______________________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No


**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**

Serving Hood, Montague, Parker and Wise Counties

1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082

Phone: (817) 523-5200 | Fax: (817) 523-7687

www.uppertrinitygcd.com


# APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ______________

Contact Email: ______________________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________ *Phone: __________________

*Driller: ______________________ *License #: __________________ *Expiration Date: ___________

Fax: ______________________ *E-mail: ______________________

*Office Mailing Address: ______________________*State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________ ______________________

Owner Name Date

______________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No



# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com


## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD



Ex. 12
App.244

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: __________________

*Driller: ______________________________ *License #: ___________________ *Expiration Date: ___________

Fax: ___________________________ *E-mail: ______________________________________________

*Office Mailing Address: ____________________________________________*State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_____________________________________________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________________ Longitude: ______________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

__________________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

__________________________________________________ ______________________________

Owner Name Date

__________________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

*__Required fields. An application will not be deemed complete unless all required fields are completed.__*

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________________ Phone: ____________

Contact Email: ______________________________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________ *Phone: ______________

*Driller: ______________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________

*Office Mailing Address: ______________________*State: ___ *Zip: ____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________ ______________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________ ______________________

Owner Name Date

______________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ______________

Contact Email: ______________________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ____________________________ *Phone: __________________

*Driller: ______________________________ *License #: __________________ *Expiration Date: ___________

Fax: ___________________________ *E-mail: ___________________________________________

*Office Mailing Address: _______________________________________*State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_____________________________________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________________ Longitude: ______________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

_____________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

_____________________________________________ ______________________________

Owner Name Date

_____________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ____________

Contact Email: ______________________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______________ Longitude: ______________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______ *Phone: ______

*Driller: ______ *License #: ______ *Expiration Date: ______

Fax: ______ *E-mail: ______

*Office Mailing Address: ______ *State: ___ *Zip: ______

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______ ______

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______ Longitude: ______

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______ ______

Owner Name Date

______

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

**UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT**

Serving Hood, Montague, Parker and Wise Counties

1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082

Phone: (817) 523-5200 | Fax: (817) 523-7687

www.uppertrinitygcd.com

# APPLICATION FOR WELL REGISTRATION
# --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ____________

Contact Email: ______________________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________________

*Office Mailing Address: ______________________________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________________________ ____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________________ ______________________

Owner Name Date

______________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

*__Required fields. An application will not be deemed complete unless all required fields are completed.__*

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**
(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____ Longitude: ____

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" *(*inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**
*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: __________________

*Driller: ______________________________ *License #: __________________ *Expiration Date: ___________

Fax: ___________________________ *E-mail: ____________________________________________

*Office Mailing Address: ______________________________________________*State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_______________________________________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ________________________________ Longitude: ________________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

_____________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes
___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

_____________________________________________ ______________________________

Owner Name Date

_____________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

*__Required fields. An application will not be deemed complete unless all required fields are completed.__*

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________ Phone: ______________

Contact Email: ______________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ____________ Longitude: ____________

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ____________

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5")

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ____________

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: __________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________*State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ____________

Driller: ____________

Approved: ____________

By: ____________

Invoice No.: ____________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐Yes ☐No

*Is water from a public water system available to the property?

☐Yes ☐No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ____________

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ____________ Phone: ____________

Contact Email: ____________ Fax: ____________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5"*)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ____________________ *Phone: __________________

*Driller: ______________________________ *License #: ___________________ *Expiration Date: ___________

Fax: ___________________________ *E-mail: ______________________________________________

*Office Mailing Address: ____________________________________________ *State: ___ *Zip: _____________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

_______________________________________________ _____________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ________________________________ Longitude: ________________________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

_______________________________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

_______________________________________________ ______________________________

Owner Name Date

_______________________________________________

Owner Signature

**District Use Only:**

Well Reg. ID: ______________

Driller: ______________

Approved: ______________

By: ______________

Invoice No.: ______________

☐ Exempt

☐ Non-exempt

Meets minimum tract size?

☐ Yes ☐ No

Meets property line spacing?

☐ Yes ☐ No

Meets spacing from other wells?

☐ Yes ☐ No

# UPPER TRINITY GROUNDWATER CONSERVATION DISTRICT

Serving Hood, Montague, Parker and Wise Counties
1859 West Hwy. 199/P.O. Box 1749, Springtown, Texas 76082
Phone: (817) 523-5200 | Fax: (817) 523-7687
www.uppertrinitygcd.com

## APPLICATION FOR WELL REGISTRATION
## --NEW WELL--

*A well for which drilling commenced on or after January 1, 2009, or an existing well which is undergoing substantial changes in production capability.*

**Please answer the following questions**

*Does the proposed well location require an exception to District rules?

☐ Yes ☐ No

*Is water from a public water system available to the property?

☐ Yes ☐ No

*Is a local permit required for a water well?

☐ Yes ☐ No

By answering "no" to the above questions, the applicant understands that the District will process the application, at which time the registration application fee becomes non-refundable.

*Applicants are urged to read all of the Rules for Water Wells in Hood, Montague, Parker, and Wise Counties, Texas. Rules can be found at:www.uppertrinitygcd.com*

***Required fields. An application will not be deemed complete unless all required fields are completed.**

**Part I – Well Owner Information**

*Well Owner: The Estate of Pearl Smelley & Cresson Moon Properties, LP

*Phone: (817) 266-1283 / (817) 300-4350 *E-Mail: bsanders@flash.net / sgd@flash.net Fax: ______

*Mailing address: 804 Flagstone Drive / 750 Cattlebaron Drive *City: Burleson / Ft Worth *State: Tx *Zip: 76028 / 76108

Contact (If different than owner) ______________________ Phone: ______________

Contact Email: ______________________ Fax: ______________

***If the Applicant is someone other than the owner of the property of the proposed well-site, please attach all necessary documentation that demonstrates your authorization to submit this application on behalf of the proposed well owner (property owner).***

**Part II – Well Information**

(District staff encourages applicants to submit all GPS coordinates in decimal degree format. Please contact District staff if there are questions regarding the format.)

*Latitude: 32.544358 *Longitude: -97.670503 *Elevation: 1088

(If amended) Latitude: ______ Longitude: ______

*Well Site Address: 7700 Old Granbury Road

Legal Description of property (If applicable): ______

*City: Cresson *County: Hood *State: TX *Zip: 76035

GPS manufacturer and model used to measure latitude and longitude: Mapping Software

*Size of Well casing: 4-1/2" **(inside diameter of the pump [discharge] column pipe* 1.5" *)*

*Estimated depth of well: 300 feet *Maximum designed production capacity: 50 gpm

*Method of withdrawal (submersible pump, windmill, etc.): Submersible Pump

*Pump motor size: 5 * Estimated depth to first screen: 200 feet

*Number of service connections: 0 *Well will service approximately 0 *individuals for 0 days out of the year.

**Part III – Purpose for Water Use**

*Check all appropriate spaces describing the use of water from this well:

☐ Poultry ☐ Livestock ☐ Agriculture ☐ Domestic

☐ Retail Public Utility ☐ Public Water System ☒ Commercial ☐ Oil/Gas Exploration and/or Production

*Will the groundwater produced be transported out of Hood, Montague, Parker, or Wise counties or anywhere other than the property where the groundwater was produced?

☒ No ☐ Yes. Location of water use: ______

*Will the groundwater withdrawn from the well be used by anyone other than well owner?

☐ No ☒ Yes. Name of person/entity using water: TBD

**Part IV – Driller Information**

*Drilling Company: TBD ______________________________ *Phone: ______________

*Driller: ______________________________ *License #: ______________ *Expiration Date: ________

Fax: ______________________ *E-mail: ______________________________

*Office Mailing Address: ______________________________ *State: ___ *Zip: __________

Driller agrees to abide by all requirements set forth in District Rules and to submit to the District a state well report prescribed by TDLR or State of Texas Well Report Tracking Number within 60 days of completing the well.

______________________________ __________

*Driller's Signature *Date

*Is this a replacement well? ☐ No ☐ Yes

If yes, please provide GPS coordinates of well being replaced:

Latitude: ______________________ Longitude: ______________________

If yes, will driller plug original well?

☐ Yes. Driller will sign below and will submit the proper plugging report upon completion.

☐ No. If not, owner will sign below as a declaration that they will comply with state and District well plugging rules and report closure to District within 90 days (16 Tex. Admin. Code Ch. 76). After production of the new well commences, failure to plug the original well constitutes a violation of District Rules:

______________________________ *(Owner or driller signature if applicable)*

**Part V – Certification**

Applicant agrees to abide by the rules of the District and that water produced/withdrawn from this well will be put to a beneficial use at all times:

___ Yes

___ No

***I hereby certify that the information given herewith is true and accurate to the best of my knowledge and belief. Furthermore, I understand that there is no guarantee that adequate water exists at the proposed well-site to meet the required demands.***

______________________________ ______________________

Owner Name Date

______________________________

Owner Signature

# SPILLER & SPILLER

JAMES M. SPILLER (1932-2011)
DAVID SPILLER
SCOTT A. SPILLER (1968-2014)
MASON SPILLER
REID SPILLER

ATTORNEYS AND COUNSELORS AT LAW
P. O. DRAWER 447
JACKSBORO, TEXAS 76458

TELEPHONE: (940) 567-6644
FACSIMILE: (940) 567-3999
EMAIL: LAWINFO@SPILLERLAW.NET
PHYSICAL ADDRESS:
122 E. BELKNAP STREET

August 23, 2026

Jeffrey T. Libby, Esq.
CALHOUN BHELLA
325 N. Saint Paul Street, Suite 2900
Dallas, Texas 75201
jlibby@calhounbhella.com

Re: Challenger Cresson I, LLC v. Bill Sanders, Independent Executor of the Estate of Pearl Smelley, et al., Civil Action No. 4:26-cv-00231-P (N.D. Tex.)

Dear Jeff:

As you know, our firm serves as General Counsel for Cresson Moon Properties, LP ("Cresson Moon"). I write in response to your August 19, 2026, demand concerning the twenty-two proposed well registration/permit applications and operating permit application submitted with your letter.

Cresson Moon disputes your characterization of the parties' respective contractual rights and obligations and expressly reserves all claims, defenses, and positions asserted in the pending litigation, including its position concerning Challenger's prior breaches and repudiation of the Contract. Nothing in this letter, and no cooperation offered below, constitutes an admission that the Contract presently requires the action demanded, a waiver of any existing breach or default by Challenger, or an acknowledgment that Challenger is entitled to specific performance or any other relief.

Nevertheless, in an effort to avoid any contention that Cresson Moon has failed to reasonably mitigate damages or has improperly interfered with Challenger's efforts regarding groundwater permitting, I have conferred with Doug Shaw, General Manager of the Upper Trinity Groundwater Conservation District ("the District"). Based upon that discussion and our review of the District's existing rules, the applications cannot simply be completed and submitted in the manner suggested by your letter. Among other things, District procedures require a pre-application meeting; the proposed groundwater demand must be reasonable and non-speculative; and the contemplated high-volume permit is subject to hydrogeologic investigation and reporting requirements before the application can be administratively complete.

Moreover, the applications you provided require the property owner to certify the truth and accuracy of substantive information supplied by Challenger. Cresson Moon is not presently in a



Ex. 13
App.270

position to make those certifications, and it will not certify facts, proposed uses, well specifications, groundwater demands, or other information that it has not independently determined to be true and accurate.

That said, without waiving any rights or positions in this litigation, Cresson Moon is willing to authorize Challenger and its consultants, at Challenger's sole cost and expense, to pursue with the District such groundwater applications relating to the Property as the District will lawfully accept and process, including payment by Challenger of all application, engineering, hydrogeologic, consultant, well-drilling, if Challenger elects and is lawfully authorized to proceed with drilling, and other costs associated with that effort. If, after compliance with the District's applicable prerequisites, the District advises that Cresson Moon's signature is required on a particular application or other document, please provide that document and the supporting information to us, and Cresson Moon will promptly consider execution of an appropriate document consistent with the facts and the District's requirements.

If Challenger wishes to proceed on that basis, please confirm and provide whatever limited authorization the District requires for Cresson Moon to execute. This offer is made solely to facilitate Challenger's requested permitting efforts and to avoid any contention that Cresson Moon is causing or contributing to the damages alleged in your August 19 letter. It does not authorize Challenger to bind Cresson Moon to any financial obligation, drilling obligation, permit condition, groundwater production commitment, or other contractual or regulatory obligation without Cresson Moon's further express written consent.

All rights, claims, defenses, and remedies are expressly reserved.

Sincerely,

*/s/ David Spiller*

David Spiller

DS
Cc: Scott A. Wheatley, Esq.
Lee B. Hunt, Esq.
Trevor J. Paul, Esq.
JACKSON WALKER, LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102
swheatley@jw.com
lhunt@jw.com
tpaul@jw.com

Cresson Moon Properties, LP

**Subject:** Challenger v. Sanders (N.D. Tex.) - Property access request
**Date:** Wednesday, October 7, 2026 at 3:35:56 PM Central Daylight Time
**From:** Flores Law Administration
**To:** Wheatley, Scott, Hunt, Lee, Wright, Leah, Paul, Trevor
**CC:** Chad Flores
**Attachments:** 2026-10-07 - Letter.pdf

Counsel,

Please see the attached correspondence from Chad Flores regarding *Challenger Cresson I, LLC v. Sanders*, et al., No. 4:26-CV-00231-P (N.D. Tex.).

Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640
administration@chadflores.law

**Flores Law PLLC**
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

October 7, 2026

Scott A. Wheatley
Lee B. Hunt
Trevor J. Paul
Jackson Walker LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102

Re: *Challenger Cresson I, LLC v. Sanders*, et al., No. 4:26-CV-00231-P (N.D. Tex.)

Dear Counsel,

I write again as lead counsel for Challenger Cresson I, LLC in the matter indicated above. Please share this correspondence with any other representative of your side that is an appropriate recipient. We will do our best to include anyone you indicate in any further correspondence of this kind.

We have not received a response to our September 30 correspondence requesting property access for Jarrod Reynolds, P.E., of Core Management Group. So we write to renew and formalize it. We appreciate the parties' ongoing efforts to resolve the broader dispute amicably, and hope this limited access issue can be handled in the same cooperative spirit.

The requested access is straightforward. Mr. Reynolds would conduct a non-invasive inspection relating to water planning, including observing the Property's geology and topography, creeks and impoundments, vegetation, potential water-storage locations, and potential waters of the United States.

The request thus falls comfortably within the access contemplated by the parties' Contract. Section 5(a) provides that Purchaser may enter the Property to conduct inspections and investigations and, even after expiration of the Inspection Period, "shall have the right to continue to conduct physical inspections and assessments of the Property," including soil samples, groundwater samples, and other intrusive testing, subject to the specified indemnity and repair obligations. Mr. Reynolds's proposed visit is substantially less invasive than the activities that provision expressly permits. The visit also bears directly on Challenger's ongoing water, utility, and entitlement work. Section 5(e) requires Seller to cooperate with Purchaser, using "good faith and best efforts," in Purchaser's efforts to obtain the relevant Entitlements and Required Utilities. And Section 7(e) provides that Seller "shall not oppose" or "interfere with" those efforts. *Id.* §§ 5(e), 7(e). We hope this makes clear that the requested visit is both modest in scope and well within the parties' existing contractual framework, and that it can therefore be accommodated without complicating the parties' broader discussions.

Please confirm within three business days that Seller will accommodate Mr. Reynolds's access, and we can then coordinate a mutually workable date during the following two weeks. We are happy to work through any reasonable access logistics with you. If Seller believes there is some contractual basis for withholding the requested access, please identify it in your response.

Sincerely,

Chad Flores

# SPILLER & SPILLER

JAMES M. SPILLER (1932-2011)
DAVID SPILLER
SCOTT A. SPILLER (1968-2014)
MASON SPILLER
REID SPILLER

ATTORNEYS AND COUNSELORS AT LAW
P. O. DRAWER 447
JACKSBORO, TEXAS 76458

TELEPHONE: (940) 567-6644
FACSIMILE: (940) 567-3999
EMAIL: LAWINFO@SPILLERLAW.NET
PHYSICAL ADDRESS:
122 E. BELKNAP STREET

October 26, 2026

**CONFIRMATION OF EXPIRATION AND TERMINATION OF CONTRACT**

Chad Flores, Esq.
Flores Law, PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
*chad@chadflores.law*
*AND CM #9589 0710 5270 3676 6904 73, RRR*

RE: Confirmation of Expiration and Termination of the Standard Contract of Sale dated May 26, 2023, as amended (the "Contract"), by and between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, Richard David Smelley and Amy Elizabeth Smelley, Tammy Marie Graham and Gregory Scott Graham, and Deborah Ruth Davis and David Glenn Davis (collectively, "Seller") and Challenger Cresson I, LLC ("Purchaser"), concerning the property located at approximately 7700 Old Granbury Road, Cresson, Hood County, Texas (the "Property")

Dear Mr. Flores:

As you know, our firm serves as General Counsel for Cresson Moon Properties, LP ("Cresson Moon"). This letter is sent to you and your firm as counsel for Purchaser, Challenger Cresson I, LLC.

The Third Amendment to the Contract extended the Closing Date through January 23, 2026 (the "Second Extended Closing Date") and contemplated that the parties would enter into a further amendment on or before that date to establish additional deadlines under the Contract. No such further amendment was ever executed, and Seller did not agree to any further extension of the Closing Date. Accordingly, Seller's position is that the Contract expired by its own terms no later than January 23, 2026. Nothing Seller did or did not do thereafter constituted an agreement to revive or extend the Contract or a waiver of its expiration.

Separately and alternatively, in April 2026, Seller provided Purchaser formal written notice of Purchaser's default (the "Notice of Default") under the Contract pursuant to Section 11(a) thereof. As set forth in the Notice of Default, Seller performed and satisfied its obligations under

the Contract, and Purchaser failed and refused to proceed to Closing in accordance with the Contract's terms, conditioning Closing instead on new demands that are not conditions precedent under the Contract. The Notice of Default afforded Purchaser ten (10) days from its receipt to cure its default by proceeding to close the transaction, and advised that, absent a timely cure, Seller would exercise all rights and remedies available under the Contract and Texas law.

Purchaser did not cure its default within the ten-day cure period, and has not cured it since. Purchaser did not proceed to Closing, and it has not tendered the Purchase Price.

Accordingly, and without limiting Seller's position that the Contract previously expired by its own terms, Seller further terminated the Contract based upon Purchaser's uncured default. With Seller's counterclaims in *Challenger Cresson I, LLC v. Sanders, et al.*, Civil Action No. 4:26-cv-00231-P, pending in the United States District Court for the Northern District of Texas, Fort Worth Division, I am sending this letter simply to confirm Seller's position that the Contract is no longer in force or effect, whether by expiration, termination based upon Purchaser's uncured default, or both.

This letter is not intended to and does not constitute a waiver, election, or limitation of any rights, claims, defenses, positions, or remedies that Seller may have under the Contract, at law, or in equity, including Seller's claims and defenses asserted in the pending litigation and Seller's rights with respect to the Earnest Money. Seller expressly preserves all positions concerning the expiration, termination, enforceability, breach, repudiation, and effect of the Contract and its amendments. No act, omission, failure to exercise, or delay in exercising any right by Seller shall operate as a waiver of any right, claim, defense, position, or remedy Seller may have.

Sincerely,

*/s/ David Spiller*

David Spiller

DS

Cc: Scott A. Wheatley, Esq.
Lee B. Hunt, Esq.
Trevor J. Paul, Esq.
JACKSON WALKER, LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102
*swheatley@jw.com*
*lhunt@jw.com*
*tpaul@jw.com*

Cresson Moon Properties, LP

In the United States District Court
for the Northern District of Texas
Fort Worth Division

| | | |
|---|---|---|
| Challenger Cresson I, LLC, Plaintiff, | § § § | |
| v. | § | No. 4:26-CV-00231-P |
| Bill Sanders, et al., Defendants. | § § § § | |

**Declaration of Blake J. Brownshadel**

I, Blake J. Brownshadel, declare as follows:

1. I am an attorney who has represented Plaintiff Challenger Cresson I, LLC ("Challenger") in this action. In that capacity, I am familiar with the documents concerning Challenger's acquisition of the real property at issue in this action (the "Property") under the Standard Contract of Sale and its amendments, and with the parties' correspondence concerning that transaction, including through my review of Challenger's records and the documents assembled in connection with this litigation.

2. I make this declaration based on my personal knowledge, including my familiarity, as counsel for Challenger, with documents created, sent, received, or maintained by Challenger in the ordinary course of its business and with the records of this litigation. I have reviewed each of the exhibits identified below and compared it against Challenger's records. If called to testify, I could and would testify competently to the matters stated here.

3. I submit this declaration to authenticate the documents described below so that they may be considered as part of the record. Each exhibit identified below to Challenger's instant filing is a true and correct copy of the document it purports to be.

4. Attached as **Exhibit 1** to Plaintiff's instant filing is a true and correct copy of the May 26, 2023 Standard Contract of Sale between Challenger, as Purchaser, and the Seller, concerning the Property (the "Contract"). I am familiar with the Contract, to which Challenger is a party, and Challenger maintains a copy of it in its records.

5. Attached as **Exhibit 2** to Plaintiff's instant filing is a true and correct copy of the June 8, 2023 Memorandum of Agreement concerning the Property, recorded in the real property records of Hood County, Texas. I am familiar with this instrument, which memorializes the parties' agreement concerning the Property and is maintained in Challenger's records.

6. Attached as **Exhibit 3** to Plaintiff's instant filing is a true and correct copy of a June 21, 2023 email from the Seller's broker concerning removal of tires from the Property. This

email was received by Challenger and its representatives in the ordinary course and is maintained in Challenger's records.

7. Attached as **Exhibit 4** to Plaintiff's instant filing is a true and correct copy of a December 15, 2023 letter from Challenger's counsel concerning the Inspection Period under the Contract. This letter was sent on Challenger's behalf and is maintained in Challenger's records.

8. Attached as **Exhibit 5** to Plaintiff's instant filing is a true and correct copy of a January 2024 email from the Seller's broker concerning cleanup of tires on the Property. This email was received by Challenger and its representatives in the ordinary course and is maintained in Challenger's records.

9. Attached as **Exhibit 6** to Plaintiff's instant filing is a true and correct copy of a July 1, 2024 letter from Challenger's counsel concerning tires and Due Diligence Items, together with the accompanying tire photographs referenced in and transmitted with that letter. This letter was sent on Challenger's behalf, and the photographs were taken and compiled on Challenger's behalf; both are maintained in Challenger's records.

10. Attached as **Exhibit 7** to Plaintiff's instant filing is a true and correct copy of the December 4, 2024 First Amendment to the Contract of Sale. I am familiar with this amendment, to which Challenger is a party, and Challenger maintains a copy of it in its records.

11. Attached as **Exhibit 8** to Plaintiff's instant filing is a true and correct copy of the December 31, 2025 Second Amendment to the Contract of Sale. I am familiar with this amendment, to which Challenger is a party, and Challenger maintains a copy of it in its records.

12. Attached as **Exhibit 9** to Plaintiff's instant filing is a true and correct copy of the January 26, 2026 Limited Phase II Environmental Investigation prepared by Whitehead Environmental Solutions concerning the Property. Challenger obtained this report in connection with its due diligence concerning the Property, and it is maintained in Challenger's records; I am familiar with the report in that capacity.

13. Attached as **Exhibit 10** to Plaintiff's instant filing is a true and correct copy of a February 12, 2026 email from Challenger's counsel concerning environmental matters relating to the Property. This email was sent on Challenger's behalf and is maintained in Challenger's records.

14. Attached as **Exhibit 11** to Plaintiff's instant filing is a true and correct copy of a February 25, 2026 property-remarketing email and the accompanying marketing brochure concerning the Property. This email and brochure were received by Challenger and are maintained in Challenger's records.

15. Attached as **Exhibit 12** is a true and correct copy of an August 19, 2026 letter from Challenger demanding the Seller's cooperation with groundwater-permit applications concerning the Property, together with its enclosures. This letter was sent on Challenger's behalf and is maintained in Challenger's records.

16. Attached as **Exhibit 13** is a true and correct copy of an August 23, 2026 letter from the Seller responding to Challenger's August 19, 2026 demand. This letter was received by Challenger and is maintained in Challenger's records.

17. Attached as **Exhibit 14** to Plaintiff's instant filing is a true and correct copy of an October 7, 2026 letter from Challenger requesting access to the Property. This letter was sent on Challenger's behalf and is maintained in Challenger's records.

18. Attached as **Exhibit 15** to Plaintiff's instant filing is a true and correct copy of an October 26, 2026 letter from the Seller asserting expiration and termination of the Contract. This letter was received by Challenger and is maintained in Challenger's records.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 30, 2026

Signed by:
Blake Brownshadel
976C12BAA1394E3...

Blake J. Brownshadel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:26-CV-00231-P** |
| | § | |
| **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S OBJECTIONS AND VERIFIED RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

TO: Defendants Bill Sanders, Independent Executor of the Estate of Pearl Smelley; Cresson Moon Properties, LP; Richard David Smelley and Amy Elizabeth Smelley; Tammy Marie Graham and Gregory Scott Graham; and Deborah Ruth Davis and David Glenn Davis, by and through their attorneys of record, Jackson Walker LLP, 777 Main Street, Suite 2100, Fort Worth, Texas 76102.

Plaintiff Challenger Cresson I, LLC, by and through its undersigned counsel, Calhoun Bhella & Sechrest, LLP, hereby submits the following Objections and Verified Responses to Defendants' First Set of Interrogatories. These responses are made in accordance with Federal Rule of Civil Procedure 33. Discovery and investigation are continuing, and Plaintiff reserves the right to supplement, amend, or correct these responses as additional information becomes available.

## GENERAL OBJECTIONS

1. Plaintiff objects to the Definitions and Instructions to the extent they purport to impose obligations beyond those required by the Federal Rules of Civil Procedure or the Court's Scheduling Order.

2. Plaintiff objects to each interrogatory to the extent it seeks information or documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity from discovery. No inadvertent disclosure of privileged or protected material shall constitute a waiver of any privilege or protection.

3. Plaintiff objects to each interrogatory to the extent it calls for the disclosure of confidential, proprietary, or commercially sensitive information including, without limitation, trade secrets, non-public financial data, business strategies, proprietary development plans, and personal identifying information. Plaintiff asserts that such information is entitled to protection from unrestricted dissemination pursuant to Federal Rule of Civil Procedure 26(c)(1)(G). Plaintiff will produce responsive documents and information containing such confidential or proprietary material after the entry of an appropriate protective order—whether stipulated by the parties or ordered by the Court—that adequately governs the use, handling, and disclosure of such information and restricts access to designated individuals. Pending entry of such an order, Plaintiff reserves the right to withhold or redact confidential responsive materials without prejudice to its production obligations.

4. Plaintiff objects to each interrogatory to the extent it is not relevant to any party's claim or defense and not proportional to the needs of the case, considering the importance of the issues at stake, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

5. Plaintiff objects to each interrogatory to the extent it is vague, ambiguous, overly broad, unduly burdensome, or otherwise susceptible to multiple reasonable interpretations such that Plaintiff cannot reasonably determine the information or documents sought.

6. Plaintiff objects to any interrogatory that contains discrete sub-parts and constitutes a compound interrogatory in violation of Federal Rule of Civil Procedure 33(a)(1).

7. Plaintiff objects to each interrogatory to the extent it seeks information equally available to Defendants or within Defendants' own possession, custody, or control.

8. Plaintiff reserves the right to supplement, amend, or correct any response herein as additional information becomes available through the course of discovery and investigation.

## SPECIFIC OBJECTIONS AND VERIFIED RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify and describe the role of each and every Person who was involved in the Contract on behalf of Plaintiff, including the negotiation, drafting, or execution of or any amendment thereto.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine, including communications with legal counsel involved in negotiating or drafting the Contract. Plaintiff further objects that the phrase "involved in the Contract" is vague and overbroad to the extent it seeks information about every person who may have had any tangential involvement.

Subject to and without waiving the foregoing general and specific objections, the following individuals were involved in the Contract on behalf of Plaintiff: Charles Gallub, Edwin Esposito, and John Contrevo (each, a principal of Challenger); Patricia Herrera (employee of Challenger); Jake Wilkinson (Challenger's commercial real estate broker); and Jeff Libby (Challenger's attorney).

**<u>INTERROGATORY NO. 2</u>:** Identify all information and the source thereof that Plaintiff had Regarding the Property before entering into the Contract, including its previous uses and environmental conditions.

**ANSWER:** Plaintiff objects to this Interrogatory as overly broad and unduly burdensome to the extent it seeks "all information" without reasonable limitation as to subject matter or time period. Plaintiff further objects to the extent this Interrogatory seeks information protected by the attorney-client privilege or work product doctrine. Plaintiff further objects that this Interrogatory is compound in that it contains multiple discrete sub-parts (information regarding previous uses, environmental conditions, and sources thereof). Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Prior to entering into the Contract, Plaintiff will supplement this interrogatory with information that it was aware of regarding the Property.

**<u>INTERROGATORY NO. 3</u>:** Identify the contractual provisions Plaintiff contends require each condition, requirement, or demand that Plaintiff communicated to Seller or Seller's agents as a

precondition to Closing that is not expressly stated as a condition precedent in the Contract, including, but not limited to, Plaintiff's insurance requirements and ESA reliance demands.

**ANSWER:** Plaintiff objects to this Interrogatory as argumentative and based on a characterization of events and communications that Plaintiff does not accept. Plaintiff denies that it imposed any conditions, requirements, or demands as "preconditions to Closing" that were not supported by the Contract. Plaintiff further objects that this Interrogatory is compound, containing multiple discrete sub-parts regarding different alleged conditions and demands. Plaintiff further objects to the extent this Interrogatory calls for a legal conclusion regarding the interpretation of contractual provisions. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Plaintiff denies the premise of this Interrogatory and specifically denies that it communicated or imposed any condition, requirement, or demand as a "precondition to Closing" that is not expressly stated in, or reasonably implied from, the Contract. The conditions precedent to Closing are those set forth in Section 8 of the Contract, including that Seller's representations and warranties be true and correct in all material respects as of Closing (Section 8(b)); that all covenants and other obligations of Seller be fully and timely performed in all material respects (Section 8(e)); that Seller have removed all Tires from the Property (Section 8(d)); and that Seller have delivered all Due Diligence Items (Section 8(f)).

With respect to ESA reliance, Plaintiff's position is supported by Section 7(c) of the Contract, which requires Seller to "Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous

materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith." A report that, by its own terms, prohibits Purchaser from relying upon it is not a report "provide[d] to Purchaser" within the meaning of Section 7(c); Plaintiff's request for an express right of reliance therefore sought nothing more than the benefit of the report Section 7(c) already obligated Seller to deliver. With respect to insurance, Plaintiff did not impose any additional condition to Closing; rather, in the course of good-faith efforts to resolve the deficiencies in Seller's non-conforming environmental report, Plaintiff requested—and Seller's own environmental engineer agreed to provide—that Purchaser be named as an additional insured on the environmental engineer's and drilling contractor's commercial general liability and contractors pollution liability policies. That request was directed at preserving the integrity and reliability of the Section 7(c) report and the benefit of Seller's environmental representations and indemnities under Section 6(i) and the Contract's environmental indemnity provisions, commensurate with the approximately $32,643,000 purchase price. To the extent Defendants characterize any of these communications as extra-contractual "preconditions," Plaintiff disputes that characterization and states that each was supported by or reasonably implied from the Contract.

**INTERROGATORY NO. 4:** State Plaintiff's basis for its contention that the delivered ESA are deficient or otherwise fail to satisfy Seller's obligations under the Contract.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature before the close of fact discovery and expert disclosures. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff

further objects to the extent this Interrogatory seeks information protected by the work product doctrine or expert opinions not yet disclosed. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Subject to the foregoing objections, and based on information presently available prior to the close of fact discovery and expert disclosures, Plaintiff contends that the environmental report delivered by Seller—the Limited Phase II Environmental Site Assessment prepared by Whitehead Environmental Solutions, LLC and delivered on or about January 26, 2026 (the "January 26 ESA")—is deficient and fails to satisfy Seller's obligations under Section 7(c) of the Contract in at least the following respects: (a) the January 26 ESA does not include the certification required by Section 7(c)—namely, a report "prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith"; (b) the January 26 ESA reflects that environmental contamination and hazardous materials have not been removed from the Property, contrary to Section 7(c)'s requirement that Seller remove "any and all environmental contamination, hazardous materials and above and/or underground storage tanks" not less than fifteen (15) days prior to Closing; (c) Seller has not provided satisfactory evidence that all underground equipment or piping associated with the above-ground storage tanks has been removed from the Property; and (d) the January 26 ESA, by its own terms, prohibits any party other than Seller from relying upon it, and therefore does not constitute a report "provide[d] to Purchaser" within the meaning of Section 7(c) of the Contract. The January 26 ESA further confirms that Hazardous Substances are present at the Property, rendering Seller's representation in Section 6(i) of the Contract inaccurate. *See also* Plaintiff's First Amended Complaint at paragraphs 33–46 and 81–86. Plaintiff's contentions regarding the deficiencies of

Seller's environmental investigation and report are also the subject of expert analysis, and Plaintiff reserves the right to supplement this response following the completion of fact and expert discovery.

**INTERROGATORY NO. 5:** Identify all the circumstances surrounding each instance in which Plaintiff sought to reset the Inspection Period, including the reason for any delay in notifying Seller after initial discovery.

**ANSWER:** Plaintiff objects to this Interrogatory as compound in that it seeks information regarding multiple separate instances and multiple categories of information (circumstances, reasons, and delays) for each. Plaintiff further objects to the characterization that Plaintiff "delayed" notifying Seller, which assumes facts not in evidence. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Subject to the foregoing objections, Plaintiff responds as follows: Section 5(a) of the Contract provides that the Inspection Period commences on the Effective Date and continues through the 180th day following the later to occur of (i) the date on which all Tires have been removed from the Property and Seller has notified Purchaser thereof, and (ii) the date on which Seller has delivered all Due Diligence Items to Purchaser (the "IP Commencement Conditions"). Because Seller never satisfied the IP Commencement Conditions, the Inspection Period did not commence. Seller's repeated failures to fulfill these contractual prerequisites—and Seller's pattern of making false representations that it had done so—necessitated the following resets or extensions: (a) On or about June 21, 2023, Seller falsely represented to Purchaser that all Tires had been removed

from the Property. Seller's representation was untrue—numerous Tires in fact remained on the Property. Upon discovering through its continuing due diligence that Seller's representation was false, Purchaser notified Seller by letter dated December 15, 2023, and the parties agreed that the 180-day Inspection Period had not yet begun. (b) On or about January 11, 2024, Seller again falsely represented to Purchaser that all Tires had been removed. Once again, Seller's representation was untrue—Tires still remained on the Property and were unremoved from the Property, and Seller had still failed to deliver required Due Diligence Items. Upon discovering through its continuing due diligence that Seller had again misrepresented the status of its contractual obligations, Purchaser notified Seller by letter dated July 1, 2024. (c) In the First Amendment to Standard Contract of Sale dated December 4, 2024, the parties agreed to extend the Inspection Period through April 7, 2025—further reflecting Seller's ongoing unwillingness to satisfy its obligations. Plaintiff categorically denies that it "delayed" in notifying Seller. To the contrary, Plaintiff acted diligently in each instance: Seller's false representations required Purchaser to independently verify site conditions through its own due diligence efforts before it could identify and document Seller's failures, and Purchaser notified Seller upon confirming that Seller had not, in fact, performed. Any passage of time between Seller's false notifications and Purchaser's responses is attributable solely to the time reasonably required to discover and document Seller's repeated misrepresentations.

**INTERROGATORY NO. 6:** State the complete basis for Plaintiff's contention that Seller failed to satisfy all its required obligations under the Contract, including any covenants, conditions precedent, and representations Plaintiff alleges Seller did not satisfy.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature prior to the completion of discovery. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is overly broad, unduly burdensome, and compound in that it encompasses all of Seller's obligations, covenants, conditions precedent, and representations. *See Lopez v. Don Herring Ltd.*, 327 F.R.D. 567 (N.D. Tex. 2018). Plaintiff further objects to the extent a complete response would require disclosure of attorney work product and mental impressions regarding legal theories. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Seller failed and refused to satisfy its obligations under the Contract in at least the following respects: (a) Seller failed to timely deliver all Due Diligence Items required by Section 4(a) of the Contract and, to this date, has failed and refused to deliver all Due Diligence Items required by the Contract; (b) Seller failed to remove all Tires from the Property as required by Section 7(d); (c) Seller made and maintained a false representation regarding environmental conditions in violation of Section 6(i), in that Hazardous Substances are present at the Property; (d) Seller failed, not less than fifteen (15) days prior to Closing, to remove any and all environmental contamination, hazardous materials, and above and/or underground storage tanks, and failed to deliver a licensed environmental engineer's report certifying that no environmental contamination exists on or with respect to the Property, as required by Section 7(c); (e) Seller failed to satisfy the conditions precedent to Closing set forth in Sections 8(b), 8(d), 8(e), and 8(f); and (f) Seller failed to provide evidence of shut-in payments and supporting documentation within five business days of the First Amendment Effective Date as required by Section 4(b) of the First Amendment. Plaintiff further contends that Seller has repudiated its contractual obligations by declaring not only an intent to

rescind the Contract and market the Property to third parties, but in fact, soliciting and marketing the Property to potential buyers and third parties. Indeed, as recently as February 13, 2026, Seller's broker wrote, "…after all this time, [the Property] is going to be coming back on the market." Plaintiff reserves the right to supplement this response as discovery continues.

**INTERROGATORY NO. 7:** Describe in detail each Due Diligence Item that Plaintiff contends Seller failed to deliver.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent it calls for information that is equally within Defendants' possession, custody, or control, as Defendants are aware of what they did and did not deliver. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Plaintiff contends Seller failed to deliver, within the time required by Section 4(a) of the Contract, Due Diligence Items in Seller's possession or control, including without limitation: (a) documents and information relating to the mineral estate, including the oil and gas lease of record affecting the Property (the "Smelley Lease") and any other oil and gas leases affecting the Property; (b) documents and information relating to the wells and related equipment situated on the Property; (c) documents and information relating to the two gas pipelines traversing the Property that are shown on Purchaser's survey as not located within any recorded easement; (d) evidence of shut-in payments and shut-in payment supporting documentation, including the shut-in royalty checks; and (e) environmental studies, reports, and other materials relating to the Property in Seller's possession or control. Because the identity of Due Diligence Items withheld or not delivered is

uniquely within Defendants' knowledge, Plaintiff reserves the right to supplement this response as discovery continues.

**<u>INTERROGATORY NO. 8</u>:** State the complete factual basis for Plaintiff's contention that it has performed, tendered performance, or was excused from performing each and every one of its contractual obligations under the Contract.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature prior to the close of discovery. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is compound and overly broad in that it encompasses "each and every" contractual obligation. Plaintiff further objects to the extent a complete response would require disclosure of attorney work product. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Plaintiff performed or tendered performance of all obligations required of it (and exercised certain of its rights) under the Contract, or was excused from performance by Seller's material breaches or Seller's failure to satisfy express conditions precedent to Plaintiff's performance of its obligations. Plaintiff's performance included, but is not limited to: (a) timely depositing the Earnest Money; (b) conducting extensive due diligence in accordance with the Contract and expending in excess of $1,500,000 in connection therewith; (c) communicating in good faith with Seller regarding Contract performance and repeatedly affording Seller the opportunity to cure; (d) offering to assist Defendant in obtaining the release of an oil and gas lease on the Property (that was unenforceable) and obtaining such release; and (e) expressing and maintaining its readiness,

willingness, and ability to close. To the extent any performance by Plaintiff was excused or rendered impossible, such excuse was the direct and proximate result of Seller's material breaches, including Seller's failure to satisfy the environmental obligations and conditions precedent in Sections 6(i), 7(c), and 8 of the Contract, Seller's failure to remove all Tires under Section 7(d), and Seller's failure to deliver all Due Diligence Items under Section 4(a). Plaintiff reserves the right to supplement this response as discovery continues.

**INTERROGATORY NO. 9:** State the complete factual basis for Plaintiff's contention that it was ready, willing, and able to close the transaction contemplated by the Contract, or if Plaintiff contends it was, at any time, unable to close, describe the circumstances that prevented Plaintiff from being ready, willing, and able to close.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature prior to the close of discovery. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is compound in that it contains alternative sub-parts. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

At all relevant times, Plaintiff was ready, willing, and able to close the transaction contemplated by the Contract. Plaintiff was prepared to tender the purchase price of approximately $32,643,000 at Closing, subject to Seller completing all of its contractual obligations, including the removal of all environmental contamination and the delivery of a compliant Required Environmental Report under Section 7(c), the truth of Seller's representations and warranties under Section 6(i), the removal of all Tires under Section 7(d), and the delivery of all Due Diligence Items under Section

4(a). Plaintiff does not contend that it was, at any time, unable to close; rather, Closing did not occur solely because of Seller's material breaches and Seller's failure to satisfy the conditions precedent to Closing. Indeed, Section 8 of the Contract explicitly provided, "In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8 Plaintiff had undertaken substantial preparations for Closing."

**INTERROGATORY NO. 10:** Describe in detail Plaintiff's efforts to prepare the Property for its Intended Use, including zoning, utilities, and business efforts, and the status of those efforts.

**ANSWER:** Plaintiff objects to this Interrogatory as overly broad and unduly burdensome to the extent it seeks detailed information regarding all efforts, without temporal limitation. Plaintiff further objects to the extent this Interrogatory seeks proprietary business information or trade secrets.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff undertook substantial efforts, and expended in excess of $1,500,000, to investigate and prepare the Property for its Intended Use. Those efforts included, without limitation: (a) obtaining an ALTA survey, topographical studies, and existing-conditions assessments; (b) commissioning environmental assessments, geotechnical studies, and civil, water, rail, and sewage engineering analyses; (c) investigating all necessary entitlements and utilities; (d)

commissioning feasibility, permit-matrix, cultural-resources, governmental-affairs, energy-consulting, water/hydrology, and architectural site-planning work; and (e) engaging in discussions and negotiations with potential users. The current status of these efforts is that they have been suspended, impaired, or held in abeyance as a result of Seller's breaches and refusal to close.

**<u>INTERROGATORY NO. 11</u>:** Identify and describe Plaintiff's basis for all damages and remedies it seeks, including its claim of $1.5M in costs, and the unique nature of the Property for purposes of specific performance.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature prior to the close of discovery and expert disclosures. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is compound in that it asks about both damages and the basis for specific performance.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: <u>Plaintiff seeks specific performance of the Contract</u> and, in the alternative, damages, as set forth in its First Amended Complaint. Plaintiff seeks specific performance under Section 11(b) of the Contract because the Property is unique and monetary damages would not adequately compensate Plaintiff for the loss of the benefit of its bargain. The Property is unique in that: (a) it consists of approximately 1,674 gross contiguous acres located at 7700 Old Granbury Road in the extraterritorial jurisdiction of Cresson, Hood County, Texas, approximately 30 miles from downtown Fort Worth; (b) it offers dual transportation access, with approximately 1,300 feet of road frontage and more than two miles of Atchison, Topeka and Santa Fe rail frontage; and (c) its

size, contiguity, location in a rapidly growing corridor, rolling terrain, water features, and absence of restrictions create a rare mixed-use development opportunity that cannot be duplicated by the purchase of other land. There is no adequate substitute property available. In the alternative, and only to the extent specific performance is determined to be unavailable, Plaintiff seeks its actual damages under Section 11(b), including third-party out-of-pocket costs exceeding $1,500,000 incurred in connection with the transaction (consisting of, among other categories, survey, environmental, geotechnical, civil, water, rail, and sewage engineering, feasibility, permitting, and consulting costs, and legal fees directly related to the transaction), together with reasonable and necessary attorneys' fees, pre- and post-judgment interest, and costs of suit. Plaintiff reserves the right to supplement this response following expert disclosures.

**INTERROGATORY NO. 12:** Identify and describe any efforts by Plaintiff to list or resell the Property, including efforts to market or advertise the Property, and Communications to brokers, real estate agents, or potential buyers.

**ANSWER:** Plaintiff objects to this Interrogatory as premature and irrelevant to the extent it assumes Plaintiff has an obligation to mitigate damages by listing or reselling property it does not own and seeks specific performance to acquire. Plaintiff further objects to the extent this Interrogatory seeks information not proportional to the needs of the case.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff seeks specific performance of the Contract and does not currently own the Property. Plaintiff has not listed or attempted to resell the Property because Plaintiff does not own

the Property and continues to seek specific performance of the Contract requiring Seller to convey the Property to Plaintiff. To the contrary, it is Seller—not Plaintiff—who, upon information and belief, has represented through its agent to third parties that the Property would be "coming back on the market." Plaintiff further provides that, upon information and belief, Jake Wilkinson's marketing efforts for potential JV partners/developers and users include posting on social media, sending emails, attending trade shows (SWARS), and making numerous conference calls.

**INTERROGATORY NO. 13:** Identify any other real property that Plaintiff has sought to acquire, or has acquired, at any time since the Effective Date of the Contract, and the circumstances and status of that acquisition.

**ANSWER:** Plaintiff objects to this Interrogatory as irrelevant and not proportional to the needs of the case. Other real property acquisitions by Plaintiff are not relevant to whether Defendants breached the Contract or Plaintiff's entitlement to specific performance of this particular Contract for this particular Property. *See* Fed. R. Civ. P. 26(b)(1). Plaintiff further objects that this Interrogatory is overly broad in seeking information about "any" real property acquisition since May 2023 without limitation as to geographic location, size, or type of property. Plaintiff further objects to the extent this Interrogatory seeks confidential and proprietary business information.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff's acquisition or attempted acquisition of other real property, if any, is irrelevant to whether Defendants breached the Contract and to Plaintiff's entitlement to specific performance of this particular Contract for this particular, unique Property. Without waiving its

objections, Plaintiff states that its other real property activities, if any, do not diminish the unique nature of the Property at issue or Plaintiff's entitlement to specific performance.

**INTERROGATORY NO. 14:** Apart from the information provided in response to Interrogatory No. 12, identify all steps or actions Plaintiff has taken to mitigate its alleged damages.

**ANSWER:** Plaintiff objects to this Interrogatory as premature to the extent it assumes Plaintiff's damages are final or that mitigation is currently at issue given Plaintiff's claim for specific performance. Plaintiff further objects to the characterization of Plaintiff's damages as merely "alleged."

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff primarily seeks specific performance of the Contract, and the obligation to mitigate does not require Plaintiff to abandon its contractual rights or to acquire substitute property in place of the unique Property it bargained to purchase. Without waiving its objections, and to the extent any duty to mitigate applies, Plaintiff has acted reasonably to limit its losses, including by continuing to seek conveyance of the Property, affording Seller repeated opportunities to cure its breaches, and refraining from incurring unnecessary additional transaction costs pending resolution of this dispute.

**INTERROGATORY NO. 15:** Identify any other litigation or dispute involving a real property purchase contract to which Plaintiff has ever been a party.

**ANSWER:** Plaintiff objects to this Interrogatory as irrelevant and not proportional to the needs of the case. Prior litigation involving Plaintiff is not relevant to the claims or defenses in this action. *See* Fed. R. Civ. P. 26(b)(1); *Zenith Ins. Co. v. Tex. Inst. for Surgery, L.L.P.*, 328 F.R.D. 153 (N.D. Tex. 2018). Plaintiff further objects that this Interrogatory is overly broad and unduly burdensome in seeking information about any dispute "ever" without temporal limitation. Plaintiff further objects to the extent this Interrogatory seeks information that is publicly available and equally accessible to Defendants.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Upon information and belief, Plaintiff has not been a party to other litigation involving a real property purchase contract that is relevant to the claims or defenses in this action. To the extent any such matter exists, it is a matter of public record equally available to Defendants.

**INTERROGATORY NO. 16:** Describe the role and involvement of Jeff Libby in connection with the Property, Contract, and this lawsuit.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Jeff Libby served as legal counsel to Plaintiff in connection with the Contract and this lawsuit, and communications with Mr. Libby are protected from disclosure. *See* Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495 (1947). Plaintiff further objects that this Interrogatory is compound in that it asks about Mr. Libby's role in three separate contexts: the Property, the Contract, and this lawsuit.

Subject to and without waiving the foregoing General and Specific Objections, and specifically without waiving any attorney-client privilege or work product protection, Plaintiff responds as follows: Jeff Libby is an attorney who represented Plaintiff in connection with the negotiation, drafting, and performance of the Contract and who continues to represent Plaintiff in connection with this lawsuit. In a non-privileged capacity, Mr. Libby's involvement included communications and correspondence transmitted to Seller and Seller's representatives on Plaintiff's behalf, including demand and notice letters regarding Seller's obligations under the Contract (such as the letters dated December 15, 2023 and July 1, 2024), and communications with Seller's counsel regarding environmental matters and the parties' performance under the Contract. To the extent this Interrogatory seeks the substance of privileged communications between Plaintiff and its counsel, or counsel's mental impressions, Plaintiff declines to respond on the grounds of attorney-client privilege and work product protection, and will produce a privilege log identifying any documents withheld on such basis.

Respectfully submitted,

*/s/ Blake J. Brownshadel*
Blake J. Brownshadel
State Bar No. 24073969
bbrownshadel@cbsattorneys.com
Christopher A. John
State Bar No. 24110053
cjohn@cbsattorneys.com
Emma C. Jenevein
State Bar No. 24136916
ejenevein@cbsattorneys.com
**CALHOUN BHELLA & SECHREST LLP**
325 N. Saint Paul St., Suite 2900
Dallas, Texas 75201
Telephone: (214) 981-9200

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 6, 2026, the foregoing document was served on all counsel of record in accordance with the Federal Rules of Civil Procedure:

Scott A. Wheatley
swheatley@jw.com
Lee B. Hunt
lhunt@jw.com
Trevor J. Paul
tpaul@jw.com
JACKSON WALKER LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102

*/s/ Blake J. Brownshadel*

Blake J. Brownshadel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | **Civil Action No. 4:26-CV-00231-P** |
| **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,** | § § § § § § § § § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**<u>VERIFICATION OF PATRICIA HERRERA</u>**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **HUNT COUNTY** | § |

Before me, the undersigned notary, on this day personally appeared Patricia Herrera, the authorized agent for Challenger Cresson I, LLC, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Patricia Herrera, an authorized agent for Challenger Cresson I, LLC. I am capable of making this verification on its behalf. I have read the foregoing Objections and Verified Responses to Defendants' First Set of Interrogatories. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief."

Patricia Herrera, on behalf of
CHALLENGER CRESSON I, LLC

SUBSCRIBED AND SWORN TO before me on this 8th day of July, 2026.

NOTARY PUBLIC, STATE OF TEXAS

GLORIA JORDAN
Notary Public 1123821
STATE OF TEXAS
My Commission Expires 02/28/2029

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

**DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF CHALLENGER CRESSON I, LLC'S FIRST SET OF REQUESTS FOR ADMISSION**

Under Federal Rules of Civil Procedure 36, Defendants Bill Sanders, as Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, Richard David Smelley and Amy Elizabeth Smelley, Tammy Marie Graham and Gregory Scott Graham, and Deborah Ruth Davis and David Glenn Davis (collectively, "Defendants"), hereby serve the following Responses and Objections to Plaintiff Challenger Cresson I, LLC's ("Plaintiff" or "Purchaser") First Set of Requests for Admission.

## I. OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Defendants object to the definition of "Purchaser" or "Plaintiff" (Definition No. 8) to the extent it purports to treat Challenger Cresson I, LLC and its predecessor-in-interest, Challenger Realty Group, LLC, as a single, undifferentiated entity for all purposes, including knowledge, intent, and conduct, when the entities are legally distinct.

2. Defendants object to the definition of "Seller" or "Defendants" (Definition No. 7) to the extent it purports to require a single collective response on behalf of all named Defendants, notwithstanding that certain individual Defendants joined the Contract solely for the limited purpose of conveying their respective interests in the Mineral Estate and may lack personal knowledge of certain matters addressed in these Requests.

3. Defendants object to the Requests generally to the extent any Request calls for a legal conclusion or an interpretation or characterization of the Contract, the First Amendment, or the Second Amendment. Defendants state that these documents speak for themselves, and any admission of the existence or content of a provision is not, and should not be construed as, an admission regarding the legal effect, interpretation, or application of that provision to the facts of this case.

4. Defendants incorporate each of the above objections as though fully set forth in each response and objection below.

## II. OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:** Admit that on or about May 26, 2023, Seller and Purchaser's predecessor-in-interest, Challenger Realty Group, LLC, executed the Standard Contract of Sale for the Property.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 2:** Admit that the Contract provides for the purchase and sale of the Property for approximately $32,643,000.00.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that the Contract's Purchase Price formula set forth in Section 2, when applied to the acreage of the Property, yields a Purchase Price of approximately $32,643,000.00.

**REQUEST FOR ADMISSION NO. 3:** Admit that the Memorandum of Agreement attached as Exhibit 2 to Plaintiff's First Amended Complaint is a true and correct copy of the Memorandum of Agreement filed with the Hood County Clerk on or about June 8, 2023.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 4:** Admit that the Contract provides that "time is of the essence" with respect to all provisions therein, pursuant to Section 13(k) of the Contract.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 13(k) of the Contract states the following:

(k) Time is of the Essence. With respect to all provisions of this Contract, time is of the essence. However, if the Closing or the final date of any period which is set out in any provision of this Contract falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Texas, then, and in such event, the Closing or such period shall he extended so that the Closing or the last day of such period falls on the next day which is not a Saturday, Sunday or legal holiday. If Seller fails to timely deliver to Purchaser the Title Commitment, Exception Documents or any other document or information required to be delivered by Seller to Purchaser hereunder, the date of expiration of the Inspection Period, the Closing Date and the expiration date of all other time periods hereunder shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser.

**REQUEST FOR ADMISSION NO. 5:** Admit that on or about December 4, 2024, the parties executed the First Amendment to Standard Contract of Sale.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 6:** Admit that the First Amendment extended the Inspection Period through April 7, 2025, and established an Outside Closing Date of December 31, 2025.

**RESPONSE**: The First Amendment speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that the First Amendment extended the Inspection Period through April 7, 2025, and established an Outside Closing Date of December 31, 2025.

**REQUEST FOR ADMISSION NO. 7:** Admit that on or about December 31, 2025, the parties executed the Second Amendment to Standard Contract of Sale, which extended the Outside Closing Date to January 10, 2026.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 8:** Admit that Section 4(a) of the Contract obligates Seller to deliver Due Diligence Items to Purchaser within ten (10) days of the Effective Date.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 4(a) of the Contract states the following:

(a) Delivery of Documents. Within ten (10) days following the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, at Seller's sole cost and expense, copies of all of the items in Seller's possession or control listed on **Exhibit "B"** attached hereto and incorporated herein by this reference for all purposes (the **"Due Diligence Items").** Following the

Effective Date, Seller agrees to deliver to Purchaser within five (5) days following receipt thereof by Seller, copies of all other information received by Seller in connection with the Property.

**REQUEST FOR ADMISSION NO. 9:** Admit that the Inspection Period under the Contract would commence on the Effective Date and continue through the 180th day after the later to occur of (a) the date upon which all of the Tires had been removed from the Property and Seller had notified Purchaser thereof, and (b) the date upon which Seller had delivered all of the Due Diligence Items to Purchaser.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 5 of the Contract states the following regarding Inspection Period:

Inspection **Period.**
(a) Commencing on the Effective Date and continuing through the one hundred eightieth ( 180th) day following the later to occur of (i) the date upon which all of the Tires (defined below) have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser (the **"Inspection Period"),** Purchaser shall be entitled to enter onto the Property for any purpose, including, witl1out limitation, conducting such audits, inspections, or investigations thereon as Purchaser may deem appropriate, including, without limitation, any "Phase II" type testing or investigation. During the Inspection Period and, unless Purchaser terminates this Contract prior to the expiration of the Inspection Period, prior to Closing, Purchaser and Purchaser's representatives shall have the right to use the private roadway, a portion of which is located on Seller's Retained Tract (the **"Private Roadway"),** for purposes of ingress and egress to and from the Property, and Purchaser shall be liable for any physical damages to the Private Roadway caused by Purchaser or Purchaser's representatives. The Parties understand and agree that, upon Closing, Purchaser's right to use the portion of the Private Roadway located on Seller's Retained Tract shall terminate and Purchaser shall have no easement, express or implied, to use the portion of the Private Roadway that is located on Seller's Retained Tract. Notwithstanding any provision in this Contract to the contrary, Purchaser shall be entitled to extend the Inspection Period two (2) times, each time for up to ninety (90) days, by delivering, at any time prior to the then-scheduled expiration of the Inspection Period, (i) written notice thereof to Seller and (ii) ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) of additional Earnest Money to the Title Company, which additional Earnest Money shall be added to and become a part of the Earnest Money, shall be applicable to the Purchase Price at Closing but shall be non-refundable to Purchaser except as set forth in Sections 4(d), 4(e), 8, 10 and 1l(b). The cost of the inspections undertaken by Purchaser pursuant to this Contract shall be borne solely by Purchaser. Purchaser agrees to (A) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (B) repair any and all physical damage done to the Property or Seller's Retained Tract by Purchaser or its agents, employees or contractors during such inspection and examination. Purchaser shall have no liability with respect to any diminution in value or other losses suffered or incurred by Seller as a result of the discovery of any pre-existing conditions on, in, under or about the Property by Purchaser or its agents, employees or contractors during or in connection with such inspection and examination. Purchaser shall be entitled, for any

reason in Purchaser's sole discretion, to terminate this Contract by written notice delivered to Seller at any time prior to the expiration of the Inspection Period. If Purchaser notifies Seller prior to the expiration of the Inspection Period that Purchaser has elected to terminate this Contract, this Contract shall terminate, the Earnest Money shall be returned to Purchaser and the Parties shall have no further obligations hereunder. Purchaser agrees to keep the Property free and clear of any mechanic's or materialmen's liens resulting from Purchaser's activities on the Property. After the expiration of the Inspection Period, Purchaser shall have the right to continue to conduct physical inspections and assessments of the Property, including, without limitation, taking soil samples, ground water samples and other intrusive testing, so long as Purchaser (I) indemnifies and holds Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (2) repairs any and all physical damage done to the Property by Purchaser or its agents, employees or contractors during such inspection and assessment.

**REQUEST FOR ADMISSION NO. 10:** Admit that pursuant to Section 1(a) of the Contract, the Property consists of approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted.

**REQUEST FOR ADMISSION NO. 11:** Admit that pursuant to Section 1(a) of the Contract, the Property to be conveyed includes a 100% undivided interest in the Mineral Estate.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted, but only as Mineral Estate and other terms are defined in the Contract.

**REQUEST FOR ADMISSION NO. 12:** Admit that Section 6(e) of the Contract represents and warrants that 100% of the Mineral Estate is owned by Seller.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 6(e) of the Contract states the following:

(e) One hundred percent (100%) of the Mineral Estate is owned on the Effective Date by the following: (i) the Smelley Estate, which owns fifty percent (50%) of the Mineral Estate, (ii) Richard David Smelley, who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate, (iii) Amy Elizabeth Smelley who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Tammy Elizabeth Graham, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate; (v) Gregory Graham who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Deborah Davis who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; and (iv) David Davis, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate. Deborah Davis and David Davis shall either (A) prior to the Closing Date, convey all of their respective interests in the Mineral Estate in equal shares to Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, and Gregory Graham, or (B) on the Closing Date, convey all of their

respective interests in the Mineral Estate to Purchaser. At Closing, Seller shall convey to Purchaser an undivided interest in one hundred percent (100%) of the Mineral Estate.

**REQUEST FOR ADMISSION NO. 13:** Admit that under Section 6(e) of the Contract, Seller agreed to convey to Purchaser an undivided interest in 100% of the Mineral Estate at Closing.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 6(e) of the Contract states the following:

(e) One hundred percent (100%) of the Mineral Estate is owned on the Effective Date by the following: (i) the Smelley Estate, which owns fifty percent (50%) of the Mineral Estate, (ii) Richard David Smelley, who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate, (iii) Amy Elizabeth Smelley who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Tammy Elizabeth Graham, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate; (v) Gregory Graham who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Deborah Davis who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; and (iv) David Davis, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate. Deborah Davis and David Davis shall either (A) prior to the Closing Date, convey all of their respective interests in the Mineral Estate in equal shares to Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, and Gregory Graham, or (B) on the Closing Date, convey all of their respective interests in the Mineral Estate to Purchaser. At Closing, Seller shall convey to Purchaser an undivided interest in one hundred percent (100%) of the Mineral Estate.

**REQUEST FOR ADMISSION NO. 14:** Admit that the Property is subject to one or more oil and gas leases, including the Smelley 1H Lease (RRC Lease ID No. 211620).

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 15:** Admit that Section 4(b) of the First Amendment requires Seller to provide evidence of shut-in payments within five (5) business days following the First Amendment Effective Date.

**RESPONSE**: The First Amendment speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 4(b) of the First Amendment states the following:

(b) All Seller Parties agree to provide to Purchaser the following within five (5) business days after First Amendment Effective Date to the extent not already provided to Purchaser: shut-in payments and shut-in payment supporting documentation received by Seller Parties for (i) 2024 and (ii) the applicable years prior to 2024.

**REQUEST FOR ADMISSION NO. 16:** Admit that Seller did not provide evidence of shut-in payments within the timeframe required by Section 4(b) of the First Amendment.

**RESPONSE**: Denied.

**<u>REQUEST FOR ADMISSION NO. 17:</u>** Admit that Section 4(c) of the First Amendment required Seller to deliver a written request to the O&G Lessee under the Smelley 1H Lease to deliver to Seller a full accounting of all shut-in payments made under the Smelley 1H Lease within five (5) business days after the First Amendment Effective Date.

**RESPONSE**: The First Amendment speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 4(c) of the First Amendment states the following:

(c) Seller agrees to cooperate with Purchaser in Purchaser's efforts to modify the O&G Leases, including, without limitation, Seller shall, within five (5) business days following Purchaser's delivery to Seller of the applicable request, (a) execute and deliver to Purchaser and any O&G Lessee any written documentation requested by Purchaser or any O&G Lessee to evidence Purchaser's authority to communicate and negotiate on Seller's behalf, and (b) execute and deliver to Purchaser any documentation approved by Purchaser in writing that modifies an O&G Lease. Additionally, within five (5) business days after the First Amendment Effective Date, Seller will deliver a written request to the O&G Lessee under the Smelley 1H Lease to deliver to Seller a full accounting of all shut-in payments made under the Smelley lH Lease and Seller will diligently thereafter pursue receipt of such accounting and deliver copies of all communications and documentation that Seller receives from the O&G Lessee under the Smelley lH Lease within five (5) business days following receipt of same.

**<u>REQUEST FOR ADMISSION NO. 18:</u>** Admit that Section 4(a) of the First Amendment authorizes Purchaser to contact and communicate with each O&G Lessee on Seller's behalf to negotiate modifications of the O&G Leases.

**RESPONSE**: The First Amendment speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 4(a) states the following:

Seller hereby authorizes Purchaser to contact and communicate with each and every lessee ( each, an "O&G Lessee") under the oil and gas lease agreements to which all or a portion of the Property is subject ( each, an "O&G Lease"), including, without limitation, that certain O&G Lease pursuant to which that certain oil and gas well commonly referred to as "Smelley lH" (RRC Lease ID No. 211620) (the "Smelley lH Lease") exists on the Property, on Seller's behalf in order to negotiate modifications of the O&G Leases that are satisfactory to Purchaser; provided, however, that Purchaser shall not be entitled to enter into an agreement with any O&G Lessee that is enforceable against Seller without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Such modifications may include, without limitation, early termination or revocation of the applicable O&G Lease or the lessee's waiver or restriction of its rights to access and use the surface of the Property for oil and gas development. Purchaser shall be authorized to contact, communicate and negotiate with the O&G Lessees through Purchaser's representatives, including, without limitation, Purchaser's legal counsel and environmental engineers. Seller shall not be liable to Purchaser for any of Purchaser's fees, costs or other expenses incurred by Purchaser in seeking a modification, early termination or revocation of an O&G Lease.

Further, within thirty (30) days following delivery of Purchaser's written request, Seller will initiate and diligently pursue litigation to modify or terminate the O&G Lease and consult and cooperate with Purchaser in connection with such litigation.

**REQUEST FOR ADMISSION NO. 19:** Admit that Section 4(a) of the First Amendment obligates Seller to initiate and diligently pursue litigation to modify or terminate the O&G Lease within thirty (30) days following delivery of Purchaser's written request.

**RESPONSE**: The First Amendment speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 4(a) states the following:

Seller hereby authorizes Purchaser to contact and communicate with each and every lessee ( each, an "O&G Lessee") under the oil and gas lease agreements to which all or a portion of the Property is subject ( each, an "O&G Lease"), including, without limitation, that certain O&G Lease pursuant to which that certain oil and gas well commonly referred to as "Smelley lH" (RRC Lease ID No. 211620) (the "Smelley lH Lease") exists on the Property, on Seller's behalf in order to negotiate modifications of the O&G Leases that are satisfactory to Purchaser; provided, however, that Purchaser shall not be entitled to enter into an agreement with any O&G Lessee that is enforceable against Seller without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Such modifications may include, without limitation, early termination or revocation of the applicable O&G Lease or the lessee's waiver or restriction of its rights to access and use the surface of the Property for oil and gas development. Purchaser shall be authorized to contact, communicate and negotiate with the O&G Lessees through Purchaser's representatives, including, without limitation, Purchaser's legal counsel and environmental engineers. Seller shall not be liable to Purchaser for any of Purchaser's fees, costs or other expenses incurred by Purchaser in seeking a modification, early termination or revocation of an O&G Lease. Further, within thirty (30) days following delivery of Purchaser's written request, Seller will initiate and diligently pursue litigation to modify or terminate the O&G Lease and consult and cooperate with Purchaser in connection with such litigation.

**REQUEST FOR ADMISSION NO. 20:** Admit that Section 4(d) of the First Amendment provides that Seller will not accept, deposit, or cash any shut-in consideration in any form on or after the First Amendment Effective Date in connection with any O&G Lease.

**RESPONSE**: The First Amendment speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted.

**REQUEST FOR ADMISSION NO. 21:** Admit that Section 5(e) of the Contract obligates Seller to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property, and the Required Utilities.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 5(e) of the Contract states the following:

( e) Entitlements, Utilities and Easements. During the period commencing on the
Effective Date and ending upon Closing or the earlier termination of this Contract, Purchaser shall

be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use (defined below), including, without limitation the City Development Agreement, the Preliminary Plat Approval, the Zoning Approval, and any and all other approvals needed for the development and operation of the Property for the Intended Use (collectively, the **"Entitlements"),** and (ii) obtain all Easements Benefitting the Property, and (iii) cause all utilities needed for the development and operation of the Property for the Intended Use (collectively, the "**Required Utilities")** to be brought to the boundary of the Property and/or created on the Property. Purchaser agrees to use commercially reasonable, diligent and good-faith efforts to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller. Seller further agrees that, commencing on the Effective Date and continuing until the Closing Date, that Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval. As used herein, **"Intended Use"** shall mean a master planned industrial complex served by rail.

**REQUEST FOR ADMISSION NO. 22:** Admit that Section 5(e) of the Contract requires Seller to execute any and all reasonable or necessary documents in connection with Purchaser's efforts to obtain the Entitlements, Easements Benefitting the Property, and the Required Utilities within three (3) business days following Purchaser's delivery of such documentation to Seller.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 5(e) of the Contract states the following:

( e) Entitlements, Utilities and Easements. During the period commencing on the Effective Date and ending upon Closing or the earlier termination of this Contract, Purchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use (defined below), including, without limitation the City Development Agreement, the Preliminary Plat Approval, the Zoning Approval, and any and all other approvals needed for the development and operation of the Property for the Intended Use (collectively, the **"Entitlements"),** and (ii) obtain all Easements Benefitting the Property, and (iii) cause all utilities needed for the development and operation of the Property for the Intended Use (collectively, the "**Required Utilities")** to be brought to the boundary of the Property and/or created on the Property. Purchaser agrees to use commercially reasonable, diligent and good-faith efforts to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller. Seller further agrees that, commencing on the Effective Date and continuing until the Closing Date, that Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval. As used herein, **"Intended Use"** shall mean a master

planned industrial complex served by rail.

**REQUEST FOR ADMISSION NO. 23:** Admit that Section 5(e) of the Contract provides that Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 5(e) of the Contract states the following:

( e) Entitlements, Utilities and Easements. During the period commencing on the Effective Date and ending upon Closing or the earlier termination of this Contract, Purchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use (defined below), including, without limitation the City Development Agreement, the Preliminary Plat Approval, the Zoning Approval, and any and all other approvals needed for the development and operation of the Property for the Intended Use (collectively, the **"Entitlements"),** and (ii) obtain all Easements Benefitting the Property, and (iii) cause all utilities needed for the development and operation of the Property for the Intended Use (collectively, the "**Required Utilities")** to be brought to the boundary of the Property and/or created on the Property. Purchaser agrees to use commercially reasonable, diligent and good-faith efforts to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller. Seller further agrees that, commencing on the Effective Date and continuing until the Closing Date, Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval. As used herein, **"Intended Use"** shall mean a master planned industrial complex served by rail.

**REQUEST FOR ADMISSION NO. 24:** Admit that Section 5(b) of the Contract obligates Seller to cooperate with Purchaser in connection with Purchaser's efforts to negotiate the terms and conditions of the City Development Agreement.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 5(b) of the Contract states the following:

(b) Annexation and City Development Agreement. Seller hereby authorizes Purchaser, at all times prior to Closing, to negotiate a pre-annexation development agreement or its equivalent with the City that addresses the annexation of the Property by the City and the terms, conditions, development rights and obligations affecting the development of the Property (the **"City Development Agreement").** Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to negotiate the terms and conditions of the City Development Agreement.

**REQUEST FOR ADMISSION NO. 25:** Admit that Section 5(c) of the Contract obligates Seller to cooperate with Purchaser reasonably and in good faith in Purchaser's efforts to obtain the Zoning Approval.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 5(c) of the Contract states the following:

(c) Zoning Approval. Seller hereby authorizes Purchaser to seek and obtain final, unappealable approval from the City of the zoning designations desired by Purchaser that will permit Purchaser to develop the Property for the Intended Use (defined below) ("Zoning Approval"). Seller agrees to cooperate with Purchaser reasonably and in good faith in Purchaser's efforts to obtain the Zoning Approval. The Zoning Approval shall not be considered to have been achieved unless all of the following are true: (i) the zoning application is approved by the City without condition or exception, and (ii) all periods for appeal or protest have expired without the filing of any appeal or protest or, if an appeal or protest is filed, the same has been denied and there is no further administrative process available for appeal or protest.

**REQUEST FOR ADMISSION NO. 26:** Admit that Section 5(d) of the Contract obligates Seller to cooperate reasonably and in good faith with Purchaser in connection with Purchaser's efforts to obtain the Preliminary Plat Approval.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 5(d) of the Contract states the following:

(d) Platting. Purchaser may, at Purchaser's sole expense, seek to obtain a preliminary plat of the Property (the **"Preliminary Plat").** Seller hereby authorizes Purchaser to seek to obtain final, unappealable approval from the City or Hood County, in Purchaser's sole determination, of the Preliminary Plat **("Preliminary Plat Approval")** prior to Closing. Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to prepare the application for .Preliminary Plat Approval and all supporting documentation in connection therewith (collectively, the **"Preliminary Plat Application"),** and Seller shall cooperate reasonably and in good faith with Purchaser in connection with Purchaser's efforts to obtain the Preliminary Plat Approval. Seller agrees to work with Purchaser's engineer to ensure that, to the best extent practicable, all plats of the Property contain all easements, rights-of-way and other matters reasonably required by Purchaser in connection with Purchaser's development of the Property for the Intended Use (defined below) (the **"Easements Benefitting the Property"),** and, to the extent any such Easements Benefiting the Property are not contained on such plats, Seller agrees to grant Purchaser any and all Easements Benefiting the Property over and across any land adjacent to the Property that is owned by Seller or any affiliate of Seller **("Seller's Adjacent Property")** in a location that does not adversely impact Seller's or its affiliate's intended use of Seller's Adjacent Property.

**REQUEST FOR ADMISSION NO. 27:** Admit that under the Contract, the "Intended Use" of the Property is defined as a master planned industrial complex served by rail.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 28:** Admit that Section 7(c) of the Contract obligates Seller to remove all environmental contamination, hazardous materials, and aboveground and underground storage tanks from the Property not less than fifteen (15) days before Closing.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 7(c) of the Contract states the following:

(c) Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

**REQUEST FOR ADMISSION NO. 29:** Admit that Section 7(c) of the Contract requires Seller to deliver to Purchaser an environmental report prepared by a licensed environmental engineer, reasonably approved by Purchaser, confirming that no environmental contamination exists on or with respect to the Property.

**RESPONSE**: Denied. Defendants deny that Section 7(c) requires that the environmental engineer be "reasonably approved by Purchaser"; no such approval requirement appears in the express text of Section 7(c) or elsewhere in the Contract. Admitted that Section 7(c) of the Contract states the following:

(c) Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

**REQUEST FOR ADMISSION NO. 30:** Admit that the January 26 Phase II ESA Report was prepared by Whitehead and delivered to Purchaser on or about January 26, 2026.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 31:** Admit that Seller did not obtain Purchaser's reasonable approval of Whitehead as the licensed environmental engineer prior to retaining Whitehead Environmental Solutions, LLC.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 32:** Admit that the January 26 Phase II ESA Report confirms the presence of Hazardous Substances on, under, or about the Property.

**RESPONSE**: Denied. While the January 26 Phase II ESA Report reports detections of certain constituents, including low concentrations of diesel-range total petroleum hydrocarbons, ethylbenzene, total xylenes, barium, and chloride in certain soil samples, the Report concludes that all detected concentrations were well below the applicable TRRP Protective Concentration Limits and RRC Regulatory Protection Limits.

**REQUEST FOR ADMISSION NO. 33:** Admit that the January 26 Phase II ESA Report contains a disclaimer of third-party reliance.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 34:** Admit that as of December 16, 2025 (fifteen days before the Outside Closing Date of December 31, 2025), Seller had not removed all environmental contamination from the Property and had not provided the environmental engineer's report required by Section 7(c) of the Contract.

**RESPONSE**: Admitted that the environmental report required by Section 7(c) had not been delivered to Purchaser as of December 16, 2025. Defendants deny that any environmental contamination requiring removal under Section 7(c) existed on the Property, and state that the report ultimately delivered on January 26, 2026 concluded there was no evidence of environmental impact to the Property. Defendants deny the remaining allegations in this Request.

**REQUEST FOR ADMISSION NO. 35:** Admit that the environmental testing conducted for the January 26 Phase II ESA Report consisted of approximately six (6) soil samples across the approximately 1,674-acre Property and did not include groundwater testing.

**RESPONSE**: Denied. In concert with Plaintiff's agent, Whitehead installed six soil borings on the Property, three of which were converted to temporary monitoring wells, and analyzed a total of thirteen (13) soil samples across those borings (reflecting samples from multiple depths and multiple analyte panels), not six samples. Defendants admit that no groundwater testing was performed, because the temporary monitoring wells did not encounter groundwater.

**REQUEST FOR ADMISSION NO. 36:** Admit that Seller did not retain an environmental engineer to conduct environmental assessments on the Property until approximately fifteen (15) days before the Outside Closing Date of December 31, 2025.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 37:** Admit that the January 26 Phase II ESA Report was delivered sixteen (16) days after the extended Outside Closing Date of January 10, 2026.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 38:** Admit that the January 26 Phase II ESA Report does not confirm that no environmental contamination exists on or with respect to the Property.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 39:** Admit that Purchaser has not approved or agreed to rely upon the January 26 Phase II ESA Report as the environmental report required by Section 7(c) of the Contract.

**RESPONSE**: Denied. Purchaser and its agents approved of the process employed by Whitehead in conducting testing and preparing the January 26 Phase II ESA Report.

**REQUEST FOR ADMISSION NO. 40:** Admit that as of January 10, 2026, Seller had not removed all environmental contamination, hazardous materials, and aboveground and underground storage tanks from the Property as required by Section 7(c) of the Contract.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 41:** Admit that Section 7(d) of the Contract required Seller to remove all Tires from the Property within thirty (30) days after the Effective Date.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted.

**REQUEST FOR ADMISSION NO. 42:** Admit that on or about June 21, 2023, Seller or Seller's agent notified Purchaser's agent, Jake Wilkinson, that tires had been removed from the Property.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 43:** Admit that after June 21, 2023, tires and/or tire fragments remained on the Property notwithstanding Seller's notification that they had been removed.

**RESPONSE**: Defendants admit that Seller provided notice pursuant to Section 7(d) of the Contract and state further that Seller has fully complied with Section 7(d) of the Contract. Purchaser informed Seller that it had located one or more tires or tire fragments on portions of the approximately 1,674-acre Property, including a tire fragment obstructed by grass and a tire mounted on a boat trailer that was present on the Property with Purchaser's permission, which have been removed.

**REQUEST FOR ADMISSION NO. 44:** Admit that on or about January 11, 2024, Seller again notified Purchaser that tires had been removed from the Property.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 45:** Admit that after January 11, 2024, tires and/or tire fragments remained on the Property notwithstanding Seller's second notification that they had been removed.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 46:** Admit that Seller did not remove all Tires from the Property within thirty (30) days after the Effective Date of May 26, 2023.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 47:** Admit that as of January 10, 2026, Seller had not satisfied all of the conditions precedent to closing set forth in Section 8 of the Contract.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 48:** Admit that Section 8(d) of the Contract provides that, as a condition precedent to Purchaser's obligations, Seller shall have removed all Tires from the Property.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted.

**REQUEST FOR ADMISSION NO. 49:** Admit that Section 8(e) of the Contract provides that, as a condition precedent to Purchaser's obligations, all covenants and other obligations of Seller which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under the Contract shall have been fully and timely performed in all material respects.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 8 states the following:

> **Conditions Precedent to Closing.** In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:
>
> (a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or unconditional agreements to bring all the Required Utilities to the bolmdary line ofthe Property or create the Required Utilities on the Property have been received by Purchaser;
>
> (b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and conect in all material respects as of the specified date or a,; limited by the specified date, and (ii) Seller'srepresentations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be perfom1ed and observed by such Party prior to and on the Closing Date;



Ex. 18
App.316

(c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;

(d) Tires. Seller shall have removed all Tires from the Land;

(e) Covenants. All covenants and other obligations of Seller set forth in this Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however, that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract.

**REQUEST FOR ADMISSION NO. 50:** Admit that Section 8(f) of the Contract provides that, as a condition precedent to Purchaser's obligations, Seller shall have delivered to Purchaser the Due Diligence Items and all updates thereof required pursuant to Section 4(a) of the Contract.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 8 of the Contract states the following:

> **Conditions Precedent to Closing.** In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:
>
> (a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or

unconditional agreements to bring all the Required Utilities to the bolmdary line ofthe Property or create the Required Utilities on the Property have been received by Purchaser;

(b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and conect in all material respects as of the specified date or a,; limited by the specified date, and (ii) Seller'srepresentations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be perfom1ed and observed by such Party prior to and on the Closing Date;

(c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;

(d) Tires. Seller shall have removed all Tires from the Land;

(e) Covenants. All covenants and other obligations of Seller set forth in this Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however, that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract.

**REQUEST FOR ADMISSION NO. 51:** Admit that Seller did not deliver all of the Due Diligence Items to Purchaser within ten (10) days following the Effective Date as required by Section 4(a) of the Contract.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 52:** Admit that Purchaser did not waive any of the conditions precedent to closing set forth in Section 8 of the Contract.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 53:** Admit that pursuant to Section 8(g) of the Contract, if all of the conditions precedent are not fully satisfied or waived by Purchaser as of the Closing Date, Purchaser has the right, but not the obligation, to terminate the Contract.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 8 of the Contract states the following:

> **Conditions Precedent to Closing.** In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:
>
> (a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or unconditional agreements to bring all the Required Utilities to the bolmdary line ofthe Property or create the Required Utilities on the Property have been received by Purchaser;
>
> (b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and conect in all material respects as of the specified date or a,; limited by the specified date, and (ii) Seller'srepresentations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be perfom1ed and observed by such Party prior to and on the Closing Date;
>
> (c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;
>
> (d) Tires. Seller shall have removed all Tires from the Land;
>
> (e) Covenants. All covenants and other obligations of Seller set forth in this Contract

which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however, that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract.

**REQUEST FOR ADMISSION NO. 54:** Admit that Purchaser has at all relevant times been ready, willing, and able to close the transaction contemplated by the Contract upon Seller's satisfaction of its contractual obligations.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 55:** Admit that on or about February 12, 2026, Purchaser's counsel communicated Purchaser's readiness to close upon satisfaction of Seller's contractual obligations.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 56:** Admit that Seller or Seller's agent represented to one or more third parties that the Property "is going to be coming back on the market."

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 57:** Admit that Section 8(g) of the Contract provides that nothing contained in Section 8 is intended to limit any remedies available to Purchaser pursuant to Section 11(b) of the Contract if Seller defaults.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 8 of the Contract states the following:

> **Conditions Precedent to Closing.** In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized

officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:

(a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or unconditional agreements to bring all the Required Utilities to the bolmdary line ofthe Property or create the Required Utilities on the Property have been received by Purchaser;

(b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and conect in all material respects as of the specified date or a,; limited by the specified date, and (ii) Seller'srepresentations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be perfom1ed and observed by such Party prior to and on the Closing Date;

(c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;

(d) Tires. Seller shall have removed all Tires from the Land;

(e) Covenants. All covenants and other obligations of Seller set forth in this Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however, that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this

Contract.

**REQUEST FOR ADMISSION NO. 58:** Admit that Section 11(b) of the Contract provides that if Seller defaults under the Contract, Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 11(b) of the Contract states the following:

(b) Seller's Default. In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third-party out-of-pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

**REQUEST FOR ADMISSION NO. 59:** Admit that Section 11(b) of the Contract provides that if the remedy of specific performance is not available for any reason, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 11(b) of the Contract states the following:

(b) Seller's Default. In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third-party out-of-pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or

exemplary or punitive damages) for Seller's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

**REQUEST FOR ADMISSION NO. 60:** Admit that Section 11(b) of the Contract provides that if Seller defaults, Purchaser may terminate the Contract and Seller shall reimburse Purchaser for Purchaser's third-party out-of-pocket costs and expenses incurred by Purchaser in connection with the transaction not to exceed $200,000.00.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 11(b) of the Contract states the following:

(b) Seller's Default. In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third-party out-of-pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

**REQUEST FOR ADMISSION NO. 61:** Admit that Purchaser incurred more than $1,500,000.00 in due diligence and development costs in connection with its efforts to purchase the Property.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 62:** Admit that Purchaser deposited Earnest Money in accordance with the Contract.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 63:** Admit that Purchaser never communicated to Seller that Purchaser does not intend to purchase the Property.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 64:** Admit that Defendants have not and did not contract with any party to conduct any testing of samples of soil, groundwater, or other environmental

media or waste at, on, in, under, or about the Property at any time other than what is reported in the January 26 Phase II ESA Report.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 65:** Admit that no provision of the Contract requires Purchaser to accept an environmental report that does not include the confirmation required by Section 7(c).

**RESPONSE**: Denied. The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms.

**REQUEST FOR ADMISSION NO. 66:** Admit that Seller made no less than two (2) notifications that tires had been removed from the Property that proved to be inaccurate.

**RESPONSE**: Denied. Seller fully complied with Section 7(d). Seller notified Purchaser on June 21, 2023, and January 11, 2024, that Tires had been removed from the Property, and Purchaser thereafter identified isolated tires or tire fragments on portions of the Property, including one affixed to a boat trailer that had been parked on the Property. Defendants deny that such notifications were inaccurate in any material respect or that they constituted a breach of Section 7(d) of the Contract, given Defendants' good-faith investigation and removal efforts across the nearly three-square-mile Property.

**REQUEST FOR ADMISSION NO. 67:** Admit that the Contract's remedies provision (Section 11(a)) limits Seller's sole and exclusive remedy for Purchaser's default to retention of Earnest Money deposited.

**RESPONSE**: The Contract speaks for itself, and Defendants deny any characterization inconsistent with its express terms. Admitted that Section 11(a) of the Contract states the following:

(a) Purchaser's Default. In the event Purchaser defaults under this Contract or fails to perform any obligation of Purchaser under this Contract, and such default and failure shall remain uncured for a period of ten (10) days following written notice thereof from Seller to Purchaser, provided that Seller has not defaulted in the performance of any of Seller's obligations hereunder, Seller may, as Seller's sole and exclusive remedy, terminate this Contract by written notice to Purchaser at any time before such default by Purchaser is cured, in which event, Seller shall be entitled to retain the portion of the Earnest Money which has then been deposited by Purchaser as liquidated damages for Purchaser's default and Purchaser shall thereby be released from further obligations under this Contract. Such amount is agreed upon by and between Seller and Purchaser as liquidated damages, due to the difficulty and inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof; and no other damages, rights or remedies shall in any case be collectible, enforceable or available to Seller other than in this Section 11 (a). but Seller shall accept said cash payment as Seller's total damages and relief. If this Contract is terminated as a result of Purchaser's default, Purchaser's liability shall be limited to the portion of the Earnest Money which has previously been deposited by Purchaser hereunder, and in no event shall

Purchaser be responsible or liable for any portion of the Earnest Money which has not then been deposited by Purchaser hereunder, whether or not such an1ount is then due. Notwithstanding any provision herein and without limiting Seller's rights in the preceding sentence, Seller shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Purchaser's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

**REQUEST FOR ADMISSION NO. 68:** Admit that Cresson Moon Properties, LP has an ownership interest in the Property.

**RESPONSE**: Admitted.

**REQUEST FOR ADMISSION NO. 69:** Admit that from December 15, 2025 to January 26, 2026, Purchaser responded to each of Seller's written proposals to establish a closing date.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 70:** Admit that no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed by Whitehead, or any other party acting on behalf of Defendants, at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report, related to household waste or other waste disposed of, placed, buried, or located on the Property.

**RESPONSE**: Defendants object to the phrasing of this request on the grounds that the phrase "no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed" "related to household waste or other waste disposed of, placed, buried, or located on the Property" is vague. Subject to this objection, denied.

**REQUEST FOR ADMISSION NO. 71:** Admit that no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed by Whitehead or any other party acting on behalf of Defendants, at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report, related to any potential environmental contamination from electrical equipment or transformers currently or formerly located on the Property.

**RESPONSE**: Defendants object to the phrasing of this request on the grounds that the phrase "no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed" "related to any potential environmental contamination from electrical equipment or transformers currently or formerly located on the Property" is vague. Subject to this objection, denied.

**REQUEST FOR ADMISSION NO. 72:** Admit that no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed by Whitehead or any other party acting on behalf of Defendants, at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report, related to any potential environmental contamination from operations of grain silos or other agricultural product storage currently or formerly located on the Property.

**RESPONSE**: Defendants object to the phrasing of this request on the grounds that the phrase "no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed" "related to any potential environmental contamination from operations of grain silos or other agricultural product storage currently or formerly located on the Property" is vague. Subject to this objection, denied.

**<u>REQUEST FOR ADMISSION NO. 73:</u>** Admit that no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed by Whitehead or any other party acting on behalf of Defendants, at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report, related to any potential environmental contamination from farming or any other agricultural activity currently or formerly conducted on the Property.

**RESPONSE**: Defendants object to the phrasing of this request on the grounds that the phrase "no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed" "related to any potential environmental contamination from farming or any other agricultural activity currently or formerly conducted on the Property" is vague. Subject to this objection, denied.

**<u>REQUEST FOR ADMISSION NO. 74:</u>** Admit that no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed by Whitehead or any other party acting on behalf of Defendants, at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report, related to naturally occurring radioactive material or for any other radioactivity on the Property.

**RESPONSE**: Defendants object to the phrasing of this request on the grounds that the phrase "no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed" "related to naturally occurring radioactive material or for any other radioactivity on the Property" is vague. Subject to this objection, denied.

**<u>REQUEST FOR ADMISSION NO. 75:</u>** Admit that no radiation detection devices or equipment were used by Whitehead or any other party acting on behalf of Defendants to test for or detect naturally occurring radioactive material or for any other radioactivity on the Property at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report.

**RESPONSE**: Defendants object to this request on the grounds that the phrases "radiation detection devices or equipment" and "naturally occurring radioactive material or for any other radioactivity" are vague. Subject to this objection, denied. Admitted that no radiation detection devices or equipment were used in connection with the environmental assessment reported in the January 26 Phase II ESA Report. Defendants state that the scope of the assessment was reasonable and sufficient to support the Report's conclusions.

**<u>REQUEST FOR ADMISSION NO. 76:</u>** Admit that no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed by Whitehead or any other party acting on behalf of Defendants, at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report, related to any potential environmental contamination from

pipelines or pipeline facilities currently or formerly located on the Property.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 77:** Admit that no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed by Whitehead or any other party acting on behalf of Defendants, at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report, related to any potential environmental contamination from any steel or other drums or containers currently or formerly located on the Property.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 78:** Admit that no samples of water from any water wells on the Property were collected, tested, or analyzed by Whitehead or any other party acting on behalf of Defendants at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 79:** Admit that no samples of soil, groundwater, or any other environmental media were collected, tested, or analyzed by Whitehead or any other party acting on behalf of Defendants, at any time from the Effective Date of the Contract through the January 26 Phase II ESA Report, related to any potential environmental contamination from any septic systems or other sewage management systems currently or formerly located on the Property.

**RESPONSE**: Denied.

**REQUEST FOR ADMISSION NO. 80:** Admit that Whitehead did not conduct its own Phase I Environmental Site Assessment of the Property prior to conducting the work reported in the January 26 Phase II ESA Report.

**RESPONSE**: Denied.

Dated: August 13, 2026

Respectfully submitted,

By: */s/ Scott A. Wheatley*

Scott A. Wheatley
State Bar No. 24013737
swheatley@jw.com
Lee B. Hunt
State Bar No. 24082257
lhunt@jw.com
Trevor J. Paul
State Bar No. 24133388
tpaul@jw.com

JACKSON WALKER LLP
777 Main Street, Suite 2100
Fort Worth, TX 76102
817.334.7200 –Phone
817.334.7290—Fax

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, a true and correct copy of the foregoing document was electronically served on Plaintiff Challenger Cresson I, LLC, via its counsel of record, by electronic mail.

*/s/ Scott A. Wheatley*
Scott A. Wheatley

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

**DEFENDANT CRESSON MOON PROPERTIES, LP'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Under Federal Rules of Civil Procedure 33, Defendant Cresson Moon Properties, LP ("CMPLP"), hereby serves the following Responses and Objections to Plaintiff Challenger Cresson I, LLC's ("Plaintiff" or "Purchaser") First Set of Interrogatories.

## I. OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. CMPLP objects to Plaintiff's Definitions and Instructions to the extent they purport to impose obligations broader than, or inconsistent with, those set forth in the Federal Rules of Civil Procedure or the Local Rules of this Court, including any instruction purporting to require the disclosure of information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity. The inadvertent disclosure of any such information shall not constitute a waiver of any applicable privilege or protection.

2. CMPLP objects to each Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity from discovery. No inadvertent disclosure of privileged or protected material shall constitute a waiver of any privilege or protection.

3. CMPLP objects to Plaintiff's Interrogatories to the extent they are vague, ambiguous, overly

broad, or fail to identify the information sought with reasonable particularity, including undefined terms such as "efforts," "involved," "basis," and "Relating to."

4. CMPLP objects to Plaintiff's Interrogatories to the extent they seek information not reasonably limited in time or scope, or that are not proportional to the needs of the case in light of the burden and expense of the requested discovery relative to its likely benefit.

5. CMPLP objects to Interrogatory Nos. 2, 3, 9, 10, and 11, and any other Interrogatory to the extent it calls for a legal conclusion or constitutes a premature contention interrogatory under Federal Rule of Civil Procedure 33(a)(2), as fact and expert discovery in this action remain ongoing. CMPLP will supplement its responses as required by Federal Rule of Civil Procedure 26(e).

6. CMPLP objects that several of Plaintiff's Interrogatories are unreasonably cumulative or duplicative of other Interrogatories within this same set, in violation of Federal Rule of Civil Procedure 26(b)(2)(C)(i). In particular, Interrogatory No. 5 (tire removal, remediation, and storage tank decommissioning) overlaps substantially with Interrogatory No. 21 (representations regarding Tire removal) and with Interrogatory Nos. 6, 7, 16, 17, 18, 19, 20, 23, 24, and 25 (each separately probing the same environmental assessment, contamination, and storage-tank subject matter); Interrogatory No. 2 (factual basis for Affirmative Defenses) overlaps with Interrogatory No. 14 (satisfaction of conditions precedent); and Interrogatory No. 3 (factual and legal basis for Counterclaims) overlaps with Interrogatory No. 12 (extra-contractual conditions or demands). Where an Interrogatory duplicates another Interrogatory within this set, CMPLP incorporates its response to the corresponding Interrogatory rather than repeating identical narrative responses.

7. CMPLP incorporates each of the above objections as though fully set forth in each response and objection below.

## II. <u>RESPONSES AND OBJECTIONS TO INTERROGATORIES</u>

**<u>INTERROGATORY NO. 1</u>:** Identify and describe the role of each and every person who has knowledge of any facts relevant to this action or who was involved in the Contract on Your behalf, including the negotiation, drafting, execution, performance, or any amendment thereto.

**RESPONSE:** CMPLP objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work-product doctrine, and further objects that the phrase "involved in the Contract" is vague and overbroad to the extent it seeks information about every person who may have had any tangential involvement. Subject to and without waiving the foregoing objections and the General Objections set forth above, CMPLP states that, based on Defendants' documents and the information made available to them upon which they rely, CMPLP identifies the following persons believed to have knowledge of facts relevant to this action and/or involvement in the negotiation, drafting, execution, performance, or amendment of the Contract:

Bill Sanders, Independent Executor of the Estate of Pearl Smelley: Communicated through counsel regarding Agreement; tendered payment for contract services associated with obligations of the Agreement; signed the Agreement.

Cresson Moon Properties, LP: Executed the Agreement.

Richard David Smelley: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; assisted in the removal of trash, Tires, and metal from the Property.

Amy Elizabeth Smelley: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; spoke with Jake Wilkinson in the summer of 2021. The family collectively entered into a listing agreement with Stephen Reich of Williams Trew Realty, with all family members and spouses signing on with Stephen Reich to sell individually the minerals and for the company to sell the surface.

Tammy Marie Graham: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; coordinated and oversaw the removal of tires from the Property.

Gregory Scott Graham: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; coordinated and oversaw the removal of tires from the Property.

Deborah Ruth Davis: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement.

David Glenn Davis: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement.

Whitehead Environmental Solutions, LLC and its personnel, who performed environmental assessment work on the Property;

Stephen Reich of Williams Trew Realty: Seller's broker.

Plaintiff's representatives and agents, including Jake Wilkinson and Plaintiff's counsel.

Lacy Kimball of Lacy Kimball Law: Seller's counsel who handled the contract negotiations primarily with Jeffrey T. Libby, Esq., including communications, amendments, and related correspondence.

**INTERROGATORY NO. 2:** State the complete factual basis for each and every Affirmative Defense asserted by You, including the identity of all persons with knowledge and all Documents supporting each defense.

**RESPONSE:** CMPLP objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work-product doctrine, and further objects that this Interrogatory is compound and contains multiple discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1). Subject to and without waiving the foregoing objections, CMPLP states that, based on Defendants' documents and the information made available to them upon which they rely:

**Affirmative Defense No. 1 (Failure to State a Claim):** Plaintiff's First Amended Original

Complaint fails to state a claim upon which relief can be granted. This defense rests on the pleading itself, which affirmatively demonstrates that Plaintiff was not ready, willing, and able to close and that Plaintiff's own conduct prevented the conditions to Closing from being satisfied, defeating Plaintiff's claims for specific performance and damages as pled.

**Affirmative Defense No. 2 (Performance, Tender, Readiness to Perform, or Excuse):** Seller performed, tendered performance, was ready to perform, or was excused from further performance by Plaintiff's own conduct. With respect to the tire-removal obligation under Section 7(d) of the Contract specifically, Seller undertook two documented, systematic efforts to remove all tires and parts thereof from the approximately 1,674-acre Property: the first culminating in Seller's notification to Purchaser on or about June 21, 2023 that all tires had been removed, and the second, prompted by Purchaser's December 15, 2023 letter (sent after more than 98% of the original Inspection Period had already run), culminating in Seller's notification to Purchaser on or about January 11, 2024 that all tires had again been removed following a further sweep of the Property. Seller contends these two systematic removal efforts, conducted across a tract of nearly three square miles with decades of prior agricultural, residential, and oil-and-gas use, constitute substantial performance of the Section 7(d) obligation, and that Section 7(d) itself contemplates that isolated Tires may be discovered after a good-faith removal effort by providing Seller a five-business-day cure period, cost-reimbursement obligation, and indemnity for any Tires not removed during the initial Tire Removal Period, rather than treating every residual item as a wholesale failure of performance. Seller further contends the isolated tire remnants identified in Purchaser's July 1, 2024 letter -- a photograph of a fragment obstructed by grass and a photograph of a tire mounted on a boat trailer that was in active use and parked on the Property on a temporary basis with Purchaser's own permission -- are immaterial because: (a) such de minimis items deprived Purchaser of no meaningful benefit of its bargain; (b) Section 7(d)'s cure-and-reimbursement mechanism already provides Purchaser adequate compensation for any residual Tires; (c) treating such trivial nonconformities as a basis to reset the 180-day Inspection Period for a third time would impose a disproportionate forfeiture on Seller after two completed, good-faith removal efforts; (d) Seller has a demonstrated history of prompt cure upon notice; and (e) Seller's conduct throughout was in good faith, in contrast to the timing of Purchaser's objections. Seller further contends that Sections 5(a), 7(d), and 8(d) of the Contract must be read together, such that Section 7(d)'s notice-and-cure mechanism -- not an open-ended, repeatable reset of the Inspection Period -- governs any Tires discovered after Seller's good-faith removal efforts and completion notices.

**Affirmative Defense No. 3 (Plaintiff's Own Prior Material Breach):** Plaintiff materially breached the Contract before any alleged default by Seller by, among other things, refusing to establish or proceed to a closing date despite Seller's no less than five written attempts to do so between December 15, 2025 and January 26, 2026, each of which Plaintiff declined; by conditioning Closing on extra-contractual demands not required by the Contract, including an express contractual right to rely on the January 26, 2026 Phase II Environmental Site Assessment prepared by Whitehead Environmental Solutions, LLC, additional-insured status on the environmental engineer's and drilling contractor's insurance policies, insurance policy limits Plaintiff characterized as appropriate for a $33 million transaction, occurrence-based rather than claims-made policies, and future-surviving insurance obligations; and by refusing to accept the January 26, 2026 ESA and instead retaining ESE Partners (Aaron Munsart, P.G. and William Day, P.G.) to attempt to refute its findings.

**Affirmative Defense No. 4 (Repudiation and Anticipatory Breach):** Plaintiff repudiated the

Contract by absolutely and unequivocally refusing to proceed to Closing unless Seller first satisfied conditions that are not conditions precedent under the Contract, by delaying closing indefinitely notwithstanding Seller's repeated written attempts to schedule a closing date, and by engaging in a pattern of strategic delay -- including repeatedly raising tire-related objections in the final days of the Inspection Period despite having been aware of such issues for extended periods -- calculated to reset the Inspection Period and postpone Closing indefinitely.

**Affirmative Defense No. 5 (Failure to Satisfy Conditions Precedent -- Readiness, Willingness, and Ability to Perform):** Plaintiff failed to satisfy the conditions precedent to any relief it seeks, including that it be ready, willing, and able to perform its own obligations under the Contract's existing terms, because Plaintiff never tendered the Purchase Price of approximately $32,643,000.00 in immediately available funds to the Title Company or to Seller, never appeared at, attended, or set a Closing, and instead conditioned any closing discussion on Seller's satisfaction of extra-contractual demands.

**Affirmative Defense No. 6 (Unclean Hands, Laches, and Estoppel):** Plaintiff's claims are barred, in whole or in part, by the doctrines of unclean hands, laches, and estoppel because Plaintiff accepted the benefit of Seller's January 11, 2024 notification that all Tires had been removed and continued its due diligence efforts, spending, as it contends, significant sums in reliance on that notification, before later attempting to treat isolated tire remnants as a basis to re-toll the Inspection Period for a third time; because Plaintiff's own delay and shifting positions -- including reversing its January and February 2026 assurances that it was ready to close -- prejudiced Seller's ability to timely close the transaction; and because Plaintiff seeks equitable relief while itself having failed to tender performance or set a closing.

**Affirmative Defense No. 7 (Waiver):** Plaintiff waived, in whole or in part, the claims and remedies it now asserts through its own conduct, delay, and course of performance, including by accepting Seller's January 11, 2024 notification of completed tire removal without further objection at that time, by continuing to perform due diligence and incur costs after that notification, and by repeatedly extending the Inspection Period and Outside Closing Date via the First Amendment (extending the Inspection Period through April 7, 2025) and the Second Amendment (extending the Outside Closing Date to January 10, 2026) rather than treating any earlier alleged nonconformity as terminating the Contract.

**Affirmative Defense No. 8 (Inequitable Conduct Bars Equitable Relief):** Plaintiff is not entitled to the equitable relief it seeks, including specific performance, because such relief is barred by Plaintiff's own inequitable conduct, including its pattern of raising tire-related objections in the final days of successive Inspection Period deadlines based on de minimis evidence, its imposition of extra-contractual demands as a precondition to discussing a closing date, and its failure to tender performance or appear at a closing.

**Affirmative Defense No. 9 (Remedies Barred or Limited by the Contract's Express Remedial Provisions):** Plaintiff's remedies, if any, are barred or limited by Section 11(b) of the Contract, which conditions Purchaser's right to specific performance on a Seller default, caps Purchaser's recoverable out-of-pocket costs upon termination at $200,000.00, and expressly excludes lost profits and exemplary or punitive damages; Plaintiff's prayer for broad benefit-of-the-bargain damages and lost profits is inconsistent with the Contract's express remedies.

**Affirmative Defense No. 10 (No Damages / Failure to Mitigate):** Plaintiff has suffered no recoverable damages and/or has failed to mitigate any damages it claims to have incurred, including by declining to pursue alternative development or acquisition opportunities during the pendency of this dispute and by incurring substantial claimed due diligence and development costs after it was on notice of the disputes underlying this litigation.

**Affirmative Defense No. 11 (Offsets, Credits, and Setoffs):** Any recovery by Plaintiff must be reduced by offsets, credits, setoffs, the Earnest Money deposited by Plaintiff (currently held in escrow by McKnight Title, consisting of the initial $100,000.00 Earnest Money deposit, of which $10,000.00 constitutes non-refundable Independent Consideration payable to Seller, together with the additional $100,000.00 Prepaid Deposit delivered by Purchaser on or about July 8, 2024), or other amounts to which Defendants are entitled under Section 11(a) of the Contract.

**Affirmative Defense No. 12 (Specific Performance Unavailable):** Plaintiff is not entitled to specific performance because it cannot satisfy the threshold prerequisites for that equitable remedy. Plaintiff never tendered the approximately $32,643,000.00 Purchase Price, never appeared at or set a Closing despite Seller's five written attempts to schedule one between December 15, 2025 and January 26, 2026, allowed the time-of-the-essence Outside Closing Date of January 10, 2026 to lapse, and then, by February 12, 2026, conditioned any closing on demands found nowhere in the Contract — including an express reliance right on the environmental report, additional-insured insurance status, specified policy limits, occurrence-based coverage, and future-surviving insurance obligations — none of which Section 8's conditions precedent (which give Plaintiff only a right to terminate, not an excuse to hold the Contract open indefinitely) required Seller to provide. This result is confirmed by Section 11(b) of the Contract, which expressly provides that if specific performance is "for any reason not available," Plaintiff's remedy is limited to damages (excluding lost profits and punitive damages) — language that is unqualified and therefore encompasses unavailability arising from Plaintiff's own failure to satisfy these prerequisites. Plaintiff's allegations that the Property is "unique and irreplaceable" do not cure these defects, because uniqueness supports the availability of specific performance in general but does not excuse the independent, threshold requirement of readiness, willingness, and ability to perform.

**Affirmative Defense No. 13 (Reservation of Rights):** This defense is a reservation of Defendants' right to amend their Answer and assert additional defenses as discovery proceeds under the Federal Rules of Civil Procedure; it is not, itself, a substantive defense requiring a separate factual basis, and this response will be supplemented pursuant to Federal Rule of Civil Procedure 26(e) if and when additional defenses are asserted.

**Knowledgeable Persons:** Bill Sanders; the other Seller parties (Cresson Moon Properties, LP, Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, Gregory Scott Graham, Deborah Ruth Davis, and David Glenn Davis); David Spiller, Esq. (Seller's transactional counsel); Jeffrey T. Libby, Esq. (Purchaser's counsel); Jake Wilkinson (Seller's real estate broker, MW Real Estate); Purchaser's principals John Contrevo, Charles Gallub, Edwin Esposito, and Patty Herrera; Michael Whitehead (Whitehead Environmental Solutions, LLC); Aaron Munsart, P.G. and William Day, P.G. (ESE Partners); and Jennifer Stapleton and Kassie Dunlap (McKnight Title, the Title Company).

**Supporting Documents:** The Contract, including without limitation Sections 3, 5(a), 7(c), 7(d), 8(d), 8(e), 11(a), and 11(b) thereof; the First Amendment; the Second Amendment; Plaintiff's First Amended Original Complaint, including its prayer for relief; Seller's June 21, 2023 and January 11, 2024 notifications of tire removal; Purchaser's December 15, 2023 and July 1, 2024 letters, including the photographs attached to the July 1, 2024 letter; David Spiller's July 8, 2024 responsive letter to Jeffrey Libby; the correspondence exchanged between David Spiller and Jeffrey Libby from December 2025 through February 2026; Jeffrey Libby's January and early February 2026 correspondence and his February 12, 2026 email; the January 26, 2026 Phase II Environmental Site Assessment; the parties' correspondence concerning proposed closing dates from December 2025 through February 2026; Purchaser's due diligence correspondence following the January 11, 2024 notification; the parties' course-of-dealing correspondence from 2023 through early 2026; the Title Company's escrow records; and Plaintiff's damages-related discovery responses and documents reflecting Plaintiff's due diligence and development expenditures. CMPLP also directs Plaintiff to Defendants' documents, under FRCP 33(b).

**<u>INTERROGATORY NO. 3</u>:** State the complete factual and legal basis for each and every Counterclaim asserted by You, including all damages sought, each act or omission by Plaintiff that You contend constitutes a breach, repudiation, or other basis for relief, and the method of calculation for each category of damages.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, CMPLP states that, based on Defendants' documents and the information made available to them upon which they rely:

**Count One -- Breach of Contract:** A valid and enforceable contract existed between Defendants and Plaintiff, evidenced by the Contract executed May 26, 2023, the First Amendment executed December 4, 2024, and the Second Amendment executed December 31, 2025. Defendants performed, tendered performance, were ready to perform, or were excused from further performance by Plaintiff's own conduct, including Seller's timely delivery of the Due Diligence Items, Seller's two documented tire-removal efforts and notifications of completion on June 21, 2023 and January 11, 2024, Seller's delivery of the January 26, 2026 Phase II Environmental Site Assessment, and Seller's no less than five written attempts between December 15, 2025 and January 26, 2026 to establish a closing date. Plaintiff materially breached the Contract by: (a) failing to close in accordance with the Contract's agreed terms notwithstanding Seller's repeated attempts to schedule a closing; (b) failing to remain ready, willing, and able to perform, including by never tendering the Purchase Price or appearing at a closing; (c) conditioning closing on new and extra-contractual demands communicated in Jeffrey Libby's February 12, 2026 email; (d) preventing or hindering consummation of the sale by refusing to accept the January 26, 2026 ESA and retaining ESE Partners to attempt to refute its findings rather than proceeding toward Closing; and (e) repeatedly asserting, in the final days of successive Inspection Period deadlines (December 15, 2023, approximately 98% into the original Inspection Period, and July 1, 2024, eight days before the anticipated expiration), that de minimis tire remnants required resetting the Inspection Period, notwithstanding Seller's two prior systematic removal efforts across the nearly 1,674-acre Property, which Defendants contend constituted substantial performance of Section 7(d) and rendered any residual nonconformity immaterial under the Mustang Pipeline/Restatement Section 241 factors. Plaintiff's breach was material because it defeated the central purpose of the transaction -- the sale of the Property at the agreed price of approximately $32,643,000.00. As a direct and proximate

result of Plaintiff's breach, Defendants have suffered actual damages as set forth below.

**Count Two -- Anticipatory Repudiation:** Plaintiff has delayed Closing indefinitely and refused to proceed unless Defendants meet Plaintiff's extra-contractual demands, as reflected in Jeffrey Libby's February 12, 2026 email reversing Plaintiff's own January and early February 2026 assurances that it was ready to paper up one last amendment and move toward closing. Plaintiff engaged in a pattern of strategic delay to reset and postpone the Inspection Period and Closing, including by repeatedly identifying alleged tire issues at or near the expiration of applicable contractual deadlines despite having been aware of the underlying tire-removal history for extended periods, and by imposing new, extra-contractual insurance and reliance-letter conditions not found in Section 7(c) or elsewhere in the Contract. By this conduct, Plaintiff has absolutely and unequivocally refused to perform its obligations under the Contract without justification, constituting anticipatory repudiation. As a direct and proximate result, Defendants have suffered actual damages as set forth below.

**Count Three -- Declaratory Judgment:** An actual and justiciable controversy exists between the parties regarding their respective rights and obligations under the Contract and its amendments, including whether Defendants satisfied the conditions precedent to Closing set forth in Section 8 of the Contract (including Section 8(d)'s tire-removal condition, which Defendants contend was satisfied through substantial performance and/or rendered immaterial by any residual nonconformity, and which Defendants further contend must be read together with Section 7(d)'s notice-and-cure mechanism rather than as licensing repeated, open-ended resets of the Inspection Period), whether Plaintiff was entitled to impose the extra-contractual conditions reflected in the February 12, 2026 email, whether Plaintiff's conduct constitutes breach, anticipatory breach, repudiation, and/or default, and whether Plaintiff's remedies (if any) are limited by Section 11(b) of the Contract. Defendants seek a declaration resolving each of these disputed issues in Defendants' favor pursuant to Texas Civil Practice and Remedies Code Sections 37.001 et seq.

**Damages and Methodology:** Defendants seek, as a result of Plaintiff's breach, repudiation, and prevention of performance: (a) the difference between the Contract price of approximately $32,643,000.00 and the Property's fair market value as of the relevant breach date, to be quantified through appraisal and/or broker-opinion-of-value evidence and supplemented pursuant to Federal Rule of Civil Procedure 26(e) upon completion of Defendants' damages expert's analysis; (b) carrying costs incurred as a result of Plaintiff's delay, including property taxes, insurance premiums, maintenance expenses, security costs, and financing-related expenses, the specific amounts of which will be calculated from Defendants' financial and tax records and supplemented as that accounting is finalized; (c) additional marketing, brokerage, diligence, legal, and transaction expenses incurred in connection with Plaintiff's prolonged delay, to be itemized from invoices and records maintained by Defendants and their advisors, including Stephen Reich/Williams Trew Realty, David Spiller, Esq., Lacy Kimball of Lacy Kimball Law, and Whitehead Environmental Solutions, LLC; (d) pre-judgment and post-judgment interest at the maximum rate allowed by law; and (e) attorneys' fees and costs recoverable under the Contract and Texas Civil Practice and Remedies Code Sections 37.009 and 38.001 et seq. In the alternative, Defendants seek retention of all Earnest Money deposited by Plaintiff (consisting of the $100,000.00 initial Earnest Money deposit, of which $10,000.00 is non-refundable Independent Consideration, together with the $100,000.00 Prepaid Deposit delivered on or about July 8, 2024) as liquidated damages under Section 11(a) of the Contract.

**Knowledgeable Persons:** Bill Sanders, the other Seller parties, David Spiller, Esq., Stephen Reich, Lacy Kimball of Lacy Kimball Law (attorney's fees incurred in contract negotiations and amendments), and any damages or valuation expert retained by Defendants. Supporting documents include Section 11(a) and Section 11(b) of the Contract, McKnight Title's escrow records, Defendants' property tax, insurance, and maintenance records, and invoices from Defendants' brokers, counsel, and environmental consultants, all of which will be produced or supplemented in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 4:** Identify and describe all Due Diligence Items that were delivered to Plaintiff, the date of delivery for each, and all Due Diligence Items that You failed to deliver, if any, including the reason for non-delivery. Additionally, describe all shut-in payments received by You Relating to the Property.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records, the statements of others upon which it relies, and its own knowledge, CMPLP timely delivered the Due Diligence Items within its possession or control in accordance with Section 4(a) of the Contract. CMPLP is not aware of any Due Diligence Item within its possession or control that it failed to deliver. To the extent Plaintiff contends any particular item was not produced, CMPLP is without sufficient information to identify such item absent further specification by Plaintiff and will supplement this response if any such deficiency is identified. With respect to shut-in payments, pursuant to Fed. R. Civ. P. 33(d) CMPLP directs Plaintiff to the payment records maintained by the operator(s) under the applicable oil and gas leases, including the Smelley 1H Lease, which CMPLP has requested and will produce or supplement as they become available in accordance with Sections 4(b) and 4(c) of the First Amendment. CMPLP further states that good faith efforts have been made to deliver the Due Diligence Items, including shut-in documentation, multiple times.

**INTERROGATORY NO. 5:** Describe Your efforts to remove Tires, remediate environmental contamination, remove hazardous materials, and remove or decommission any above-ground and/or underground storage tanks located in, on, under, or about the Property, including all efforts to remove or cause to be removed any such items and the remediation, removal, or treatment of any environmental contamination or hazardous materials, and including the dates, persons or companies involved, scope of work, and results.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP participated in efforts to remove Tires from the Property beginning shortly after the Effective Date. On or about June 21, 2023, Seller notified Plaintiff that all Tires had been removed from the Property. After additional tires and/or tire fragments were discovered, Seller undertook further removal efforts and, on or about January 11, 2024, again notified Plaintiff that the Tires had been removed. With respect to environmental contamination and hazardous materials, CMPLP retained Whitehead Environmental Solutions, LLC, a licensed environmental engineering firm, which conducted a Limited Phase II Investigation of the Property in concert with Plaintiff's agents, the results of which are set forth in the January 26 Phase II ESA Report delivered to Plaintiff on or about January 26, 2026. CMPLP is not aware of any above-ground or underground storage tanks presently located on the Property requiring removal or decommissioning beyond those addressed in

that process. CMPLP will supplement this response as additional information becomes available through the parties' ongoing environmental investigation and discovery.

**<u>INTERROGATORY NO. 6</u>:** Identify all environmental engineers, consultants, or firms retained by You in connection with the Property, and describe the scope, methodology, limitations, and findings of each and every ESA conducted on the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP retained Whitehead Environmental Solutions, LLC to conduct environmental assessment work on the Property. Whitehead's Limited Phase II Investigation involved the collection and analysis of soil samples across the Property in concert with Plaintiff's agent and is described in the January 26 Phase II ESA Report, which speaks for itself as to scope, methodology, limitations, and findings. CMPLP is not aware of any other environmental engineers, consultants, or firms retained in connection with the Property.

**<u>INTERROGATORY NO. 7</u>:** State the basis for Your contention that any ESA satisfies Seller's obligations under the Contract, and describe Your efforts to provide a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, the January 26 Phase II ESA Report, prepared by a licensed environmental engineer, reflects CMPLP's good-faith efforts to satisfy its obligations under Section 7(c) of the Contract. CMPLP disputes Plaintiff's characterization of the Report as insufficient and refers Plaintiff to the Report itself, which speaks for its own contents and conclusions. CMPLP's efforts to provide the required report are further described in CMPLP's response to Interrogatory No. 5.

**<u>INTERROGATORY NO. 8</u>:** Identify all oil and gas wells, above-ground storage tanks, underground storage tanks, and any other structures or equipment Relating to oil, gas, or hazardous materials located on the Property, and describe the status, contents, and regulatory compliance history of each.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP identifies the Smelley 1H Lease (RRC Lease ID No. 211620) as an oil and gas lease affecting the Property. CMPLP is aware of three old water storage tanks on the Property (one located in a tree line, one at the rental property, and one in the feed lot area). These tanks were used for potable water storage. CMPLP is not presently aware of any other above-ground or underground storage tanks located on the Property requiring removal or decommissioning beyond those addressed in the January 26 Phase II ESA Report and the removal efforts described in CMPLP's response to Interrogatory No. 5.

**<u>INTERROGATORY NO. 9</u>:** Identify all Communications by You or Your agents to any third

parties regarding the potential sale, marketing, listing, or availability of the Property from May 26, 2023 to the present, including the date, manner, content, and identity of each third party.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, following Plaintiff's repeated delays and refusal to set a closing date, Seller's agents engaged in preliminary discussions with third parties regarding the Property's potential availability, consistent with Seller's contractual and legal rights given Plaintiff's failure to close. Pursuant to Fed. R. Civ. P. 33(d), CMPLP directs Plaintiff to any documents produced or that may be produced to the extent they are responsive to this Interrogatory.

**INTERROGATORY NO. 10:** Describe Your readiness, willingness, and ability to close the transaction contemplated by the Contract, including all efforts to establish a closing date and all circumstances affecting Your ability to close, and identify any liens, encumbrances, or title defects affecting the Property.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP was at all relevant times ready, willing, and able to close the transaction, having removed substantially all the Tires, removed tenants, delivered the Due Diligence Items, and engaged a licensed environmental engineer to complete an environmental assessment of the Property. It was Plaintiff, not CMPLP, that repeatedly refused to establish a closing date and instead imposed extra-contractual conditions, including demands for reliance letters, additional-insured status, and specific insurance terms not required by the Contract. CMPLP is not aware of any liens, encumbrances, or title defects affecting the Property that would have prevented Closing.

**INTERROGATORY NO. 11:** Identify and describe all efforts You have undertaken to mitigate Your alleged damages.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP has sought to mitigate its damages by, among other things, continuing to maintain and secure the Property, engaging with Plaintiff in an effort to bring the transaction to Closing, and, following Plaintiff's continued refusal to close, exploring the Property's marketability to third parties. CMPLP will supplement this response as its mitigation efforts continue and additional information becomes available.

**INTERROGATORY NO. 12:** Identify all conditions, requirements, or demands that You allege Plaintiff communicated to Seller or Seller's agents as a precondition to Closing that are not expressly stated as conditions precedent in the Contract.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 3 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP identifies the following extra-contractual conditions communicated by Plaintiff as prerequisites to Closing that are not expressly required by the Contract: (a) an express right for Plaintiff to rely on the January 26 Phase II ESA Report; (b) additional-insured status for Plaintiff on the environmental engineer's and drilling contractor's insurance policies; (c) insurance

policy limits Plaintiff deemed "appropriate for a $33 million transaction"; (d) occurrence-based, rather than claims-made, insurance policies; and (e) future-surviving insurance obligations beyond Closing.

**INTERROGATORY NO. 13:** Describe Your role and involvement in the performance of all obligations under the Contract.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP, as one of the Seller entities under the Contract, performed and participated in the performance of Seller's obligations under the Contract, including removal of Tires, delivery of Due Diligence Items, and engagement of an environmental engineer to conduct the assessments required under Section 7(c), acting through its general partner, Cresson Moon Management, LLC, and its members.

**INTERROGATORY NO. 14:** State the basis for Your contention that Seller satisfied each and every condition precedent, covenant, representation, and warranty under the Contract, and identify the date and manner of satisfaction for each.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 2 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, it satisfied or substantially satisfied the conditions precedent to Closing set forth in Section 8 of the Contract, including removal of Tires (Section 8(d)), delivery of Due Diligence Items (Section 8(f)), and material performance of its other covenants and obligations (Section 8(e)), through the efforts described in CMPLP's response to Interrogatory No. 5. To the extent any condition precedent was not fully satisfied, CMPLP contends any such shortfall did not excuse Plaintiff's own obligation to close and tender the Purchase Price, or was waived by Plaintiff's continued performance and negotiation under the Contract and its amendments.

**INTERROGATORY NO. 15:** Identify all insurance policies (including environmental, general liability, and property insurance) You maintained with respect to the Property from May 26, 2023 to the present, including the insurer, policy number, coverage limits, and effective dates.

**RESPONSE**: Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP believes that general liability and property insurance policies were maintained with respect to the Property. CMPLP is continuing to investigate and will supplement this response with the insurer, policy number, coverage limits, and effective dates as that information is identified. Pursuant to Fed. R. Civ. P. 33(d), CMPLP further directs Plaintiff to Defendants' produced documents to the extent they are responsive to this Interrogatory.

**INTERROGATORY NO. 16:** State any knowledge or information You have regarding the presence, disposal, placement, or release in, under, on, or about the Property of any and all environmental contamination, hazardous materials, Hazardous Substances, above-ground and/or underground storage tanks, Tires, waste, garbage, or trash.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above;

CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP's knowledge regarding the presence of environmental contamination, hazardous materials, storage tanks, Tires, waste, or trash on the Property is reflected in the January 26 Phase II ESA Report and the tire-removal efforts described in CMPLP's response to Interrogatory No. 5. CMPLP further states that trash, Tires, and metal were removed from the Property by the individuals identified in the Response to Interrogatory No. 1. CMPLP is aware of one metal tank, three grain silos, one feed lot water tank, and three old water storage tanks (one in a tree line, one at the rental property, and one in the feed lot area) that were used for potable water storage currently on the Property.

**INTERROGATORY NO. 17:** With respect to the engagement of Whitehead Environmental Solutions, LLC (or any other environmental consultant or engineer retained in connection with the Property), state any instructions You provided related to the assessment, investigation, testing, study, or analysis of the Property or any soil, groundwater, or other environmental media; any information such consultant provided to You; the rationale or technical basis for such assessment, investigation, testing, study, or analysis; and identify any written documents or reports relied upon in determining what assessment, investigation, testing, study, or analysis was conducted.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP engaged Whitehead Environmental Solutions, LLC to perform an environmental assessment of the Property sufficient to satisfy Seller's obligations under Section 7(c) of the Contract. Whitehead Environmental Solutions, LLC determined the scope and methodology in concert with Plaintiff's agent, and the results of that engagement are set forth in the January 26 Phase II ESA Report, which speaks for itself. In addition, pursuant to Fed. R. Civ. P. 33(d), CMPLP refers Plaintiff to the non-privileged documents relating to the engagement of Whitehead being produced in its document production.

**INTERROGATORY NO. 18:** State why no groundwater samples were collected at the Property by Whitehead Environmental.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, it understands that Whitehead's Limited Phase II Investigation was scoped as a soil-sampling assessment consistent with the methodology Whitehead determined appropriate for the Property in concert with Plaintiff's agent, and that groundwater sampling was not included within that scope.

**INTERROGATORY NO. 19:** State the basis for Your representation that no Hazardous Substances (as such term is defined in the Agreement) have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property, and that there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to the use, generation, manufacture, storage, or disposal of any Hazardous Substances in, on, under, or about the Property.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP's representations regarding Hazardous Substances were based on CMPLP's knowledge of the Property's history and use at the time such representations were made, together with the results of the environmental assessment subsequently performed by Whitehead. CMPLP is not aware of any claims, litigation, administrative or other proceedings, judgments, or orders relating to the use, generation, manufacture, storage, or disposal of Hazardous Substances on the Property, other than as may be disclosed in the January 26 Phase II ESA Report and this litigation.

**INTERROGATORY NO. 20**: State the basis for Your representation that any and all underground storage tanks previously removed from the Property by Seller were removed in accordance with all applicable laws, ordinances, regulations, and administrative rulings and no underground storage tanks are presently situated in, on, under, or about the Property.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, its representations regarding removal of underground storage tanks were based on CMPLP's knowledge and the removal efforts undertaken with respect to the Property, as described in CMPLP's response to Interrogatory No. 5. CMPLP is not presently aware of any underground storage tanks remaining on the Property.

**INTERROGATORY NO. 21**: State the basis for Your representations or any statements that any and all Tires have been removed from the Property.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP's representations that Tires had been removed from the Property were based on inspections conducted prior to each of Seller's notifications to Plaintiff, including the June 21, 2023 and January 11, 2024 notifications described in CMPLP's response to Interrogatory No. 5. CMPLP acknowledges that additional tires or tire fragments were subsequently discovered on the approximately 1,674-acre Property and that Seller undertook further removal efforts in response.

**INTERROGATORY NO. 22**: Identify or state any violations of any Environmental Laws at any time that have occurred in, on, under, or about the Property, and any conditions or circumstances in, on, under, or about the Property that could reasonably be anticipated to result in any remediation, cleanup, removal, or corrective action liability or responsibility under any Environmental Laws.

**RESPONSE**: Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, it is not aware of any violations of Environmental Laws that have occurred on the Property, nor is CMPLP aware of any conditions or circumstances that could reasonably be anticipated to result in remediation,

cleanup, removal, or corrective-action liability under Environmental Laws, other than as may be reflected in the January 26 Phase II ESA Report. CMPLP will supplement this response if it becomes aware of any conditions that may be responsive to this Interrogatory.

**INTERROGATORY NO. 23:** Describe or state any knowledge or information You have regarding any agricultural activities on the Property; the use of any pesticides, insecticides, rodenticides, fungicides, or similar chemicals or substances on the Property; and any grain silos or other agricultural product storage currently or formerly located on the Property, including any sampling, testing, or other analysis of soil, groundwater, or other environmental media in, under, on, or about such facilities, and any agricultural chemicals used on the Property at any time, including organochlorine pesticides (e.g., DDT, chlordane, aldrin, lindane, and carbon tetrachloride), arsenic, and any other pesticides, insecticides, fungicides, rodenticides, and other agricultural chemicals and Hazardous Substances related to agricultural activities.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, it is not aware of any agricultural chemical use or other agricultural product storage on the Property giving rise to environmental contamination, beyond the Property's historical agricultural and ranching use consistent with its rural character. CMPLP further states that three grain silos currently exist on the Property. CMPLP is not aware of any sampling, testing, or analysis conducted with respect to such matters other than as reflected in the January 26 Phase II ESA Report.

**INTERROGATORY NO. 24:** Describe or state any knowledge or information You have regarding the presence of any groundwater wells and any groundwater monitoring wells located or drilled on the Property, including any sampling, testing, or other analysis of the water from such wells, and explain the rationale or basis for the selection of the depth of the groundwater monitoring wells installed on the Property by Whitehead Environmental or by any other party.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP believes that monitoring wells were installed (converted from three of the six soil borings) but did not produce groundwater within the investigation timeframe, as referenced in the January 26 Phase II ESA Report. Regarding the rationale or basis for the selection of the depth of the groundwater monitoring wells, CMPLP further states that these determinations were made by Whitehead Environmental Solutions based on analysis and review of the Property in cooperation with and as agreed upon by Plaintiff's expert, who provided third-party oversight during the investigation.

**INTERROGATORY NO. 25:** Describe or state any knowledge or information You have regarding the presence in, under, on, or about the Property of: (a) any household waste or other waste disposed of, placed, buried, or located on the Property, including any paints, solvents, pesticides, automotive fluids, batteries, or asbestos; (b) any electrical equipment or transformers currently or formerly located on the Property, including any polychlorinated biphenyls or other chemicals or Hazardous Substances; (c) any naturally occurring radioactive material or other radioactivity; (d) any pipelines and related facilities currently or formerly located on the Property;

and (e) any steel drums currently or formerly located on the Property; including in each case any sampling, testing, or other analysis of soil, groundwater, or other environmental media in, under, on, or about such items or facilities; and describe any testing of samples of soil, groundwater, or other environmental media or wastes at, on, in, under, or about the Property at any time other than what is reported in the January 26 Phase II ESA Report.

**RESPONSE**: This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; CMPLP incorporates that response herein. Subject to and without waiving the General Objections set forth above, CMPLP states that, based upon Defendants' records and the statements of others upon which it relies, CMPLP is not presently aware of any household waste, electrical equipment or transformers containing polychlorinated biphenyls, naturally occurring radioactive material, pipelines, or steel drums located in, on, under, or about the Property beyond what may be reflected in the January 26 Phase II ESA Report. CMPLP is not aware of any testing of soil, groundwater, or other environmental media at the Property other than the testing reported in that Report.

Dated: August 13, 2026

Respectfully submitted,

By: */s/ Scott A. Wheatley*

Scott A. Wheatley
State Bar No. 24013737
swheatley@jw.com
Lee B. Hunt
State Bar No. 24082257
lhunt@jw.com
Trevor J. Paul
State Bar No. 24133388
tpaul@jw.com

JACKSON WALKER LLP
777 Main Street, Suite 2100
Fort Worth, TX 76102
817.334.7200 –Phone
817.334.7290—Fax

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, a true and correct copy of the foregoing document was electronically served on Plaintiff Challenger Cresson I, LLC, via its counsel of record, by electronic mail, accompanied by the requisite declaration.

*/s/ Scott A. Wheatley*
Scott A. Wheatley

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Cause No. 4:26-cv-00231-P** |
| **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,** | § § § § § § § | |
| | | |
| **Defendants.** | | |

---

## DECLARATION OF CRESSON MOON PROPERTIES, LP

---

I, David G. Davis, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

1. My name is David G. Davis. I am designated as agent of the partner of Cresson Moon Properties, LP, for purposes of answering and verifying the foregoing discovery responses on behalf of Cresson Moon Properties, LP. I am over the age of eighteen (18) years and am competent to make this Declaration.

2. I have personal knowledge of the facts set forth in this Declaration and in the foregoing Cresson Moon Properties, LP's Responses and Objections to Plaintiff's First Set of Interrogatories (the "Responses"), or such knowledge is based on documents made available to me, information provided to me, and reasonable inquiry.

3. I have reviewed the Responses. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief formed after reasonable inquiry and based on documents made available to me and statements from others upon which I have relied.

4. In preparing the Responses, I reviewed documents and records made available to me on behalf of Cresson Moon Properties, LP, and consulted with attorneys of record regarding the applicable objections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: ______________________________

Executed on August 13, 2026, in Parker County, Texas.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

**DEFENDANT BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Under Federal Rules of Civil Procedure 33, Defendant Bill Sanders, Independent Executor of the Estate of Pearl Smelley ("Defendant Sanders") hereby serves the following Responses and Objections to Plaintiff Challenger Cresson I, LLC's ("Plaintiff" or "Purchaser") First Set of Interrogatories.

## I. OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Defendant Sanders objects to Plaintiff's Definitions and Instructions to the extent they purport to impose obligations broader than, or inconsistent with, those set forth in the Federal Rules of Civil Procedure or the Local Rules of this Court, including any instruction purporting to require the disclosure of information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity. The inadvertent disclosure of any such information shall not constitute a waiver of any applicable privilege or protection.

2. Defendant Sanders objects to each Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity from discovery. No inadvertent disclosure of privileged or protected material shall constitute a waiver of any privilege or protection.

3. Defendant Sanders objects to each Interrogatory to the extent it calls for the disclosure of confidential, proprietary, or personal information, including personal identifying information regarding non-party individuals, absent entry of an appropriate protective order governing the use and disclosure of such information.

4. Defendant Sanders objects to each Interrogatory to the extent it is vague, ambiguous, overly broad, unduly burdensome, seeks information that is neither relevant to any party's claim or defense nor proportional to the needs of the case, or purports to require identification of "each and every" fact, person, or document relating to broad categories of information.

5. Defendant Sanders objects that several of Plaintiff's Interrogatories are unreasonably cumulative or duplicative of other Interrogatories within this same set, in violation of Federal Rule of Civil Procedure 26(b)(2)(C)(i). In particular, Interrogatory No. 5 (tire removal, remediation, and storage tank decommissioning) overlaps substantially with Interrogatory No. 21 (representations regarding Tire removal) and with Interrogatory Nos. 6, 7, 16, 17, 18, 19, 20, 23, 24, and 25 (each separately probing the same environmental assessment, contamination, and storage-tank subject matter); Interrogatory No. 2 (factual basis for Affirmative Defenses) overlaps with Interrogatory No. 14 (satisfaction of conditions precedent); and Interrogatory No. 3 (factual and legal basis for Counterclaims) overlaps with Interrogatory No. 12 (extra-contractual conditions or demands). Where an Interrogatory duplicates another Interrogatory within this set, Defendant Sanders incorporates his response to the corresponding Interrogatory rather than repeating identical narrative responses.

6. Defendant Sanders incorporates each of the above objections as though fully set forth in each response and objection below.

## II. RESPONSES AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify and describe the role of each and every person who has knowledge of any facts relevant to this action or who was involved in the Contract on Your behalf, including the negotiation, drafting, execution, performance, or any amendment thereto.

**RESPONSE:** Defendant Sanders objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work-product doctrine, and further objects that the phrase "involved in the Contract" is vague and overbroad to the extent it seeks information about every person who may have had any tangential involvement. Subject to and without waiving the foregoing objections and the General Objections set forth above:

Defendant Sanders states that, based upon Defendants' documents and the information made available to them upon which they rely, Defendant Sanders identifies the following persons believed to have knowledge of facts relevant to this action and/or involvement in the negotiation, drafting, execution, performance, or amendment of the Contract:

Bill Sanders, Independent Executor of the Estate of Pearl Smelley: Communicated through counsel regarding Agreement; tendered payment for contract services associated with obligations of the Agreement; signed the Agreement.

Cresson Moon Properties, LP: Executed the Agreement.

Richard David Smelley: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; assisted in the removal of trash, Tires, and metal from the Property.

Amy Elizabeth Smelley: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; spoke with Jake Wilkinson in the summer of 2021. The family collectively entered into a listing agreement with Stephen Reich of Williams Trew Realty, with all family members and spouses signing on with Stephen Reich to sell individually the minerals and for the company to sell the surface.

Tammy Marie Graham: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; coordinated and oversaw the removal of tires from the Property.

Gregory Scott Graham: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; coordinated and oversaw the removal of tires from the Property.

Deborah Ruth Davis: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement.

David Glenn Davis: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement.

Whitehead Environmental Solutions, LLC and its personnel, who performed environmental assessment work on the Property;

Stephen Reich of Williams Trew Realty: Seller's broker.

Plaintiff's representatives and agents, including Jake Wilkinson and Plaintiff's counsel.
**Lacy Kimball of Lacy Kimball Law: Seller's counsel who handled the contract negotiations primarily with Jeffrey T. Libby, Esq., including communications, amendments, and related correspondence.**

**INTERROGATORY NO. 2:** State the complete factual basis for each and every Affirmative Defense asserted by You, including the identity of all persons with knowledge and all Documents supporting each defense.

**RESPONSE:** Defendant Sanders objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work-product doctrine, and further objects that this Interrogatory is compound and contains multiple discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1). Subject to and without waiving the foregoing objections, Defendant Sanders states that, based **on Defendants' documents** and the **information made available to him** upon which **he relies**:

**Affirmative Defense No. 1 (Failure to State a Claim):** Plaintiff's First Amended Original Complaint fails to state a claim upon which relief can be granted. This defense rests on the pleading itself, which affirmatively demonstrates that Plaintiff was not ready, willing, and able to close and that Plaintiff's own conduct prevented the conditions to Closing from being satisfied, defeating Plaintiff's claims for specific performance and damages as pled.

**Affirmative Defense No. 2 (Performance, Tender, Readiness to Perform, or Excuse):** Seller performed, tendered performance, was ready to perform, or was excused from further performance by Plaintiff's own conduct. With respect to the tire-removal obligation under Section 7(d) of the Contract specifically, Seller undertook two documented, systematic efforts to remove all tires and parts thereof from the approximately 1,674-acre Property: the first culminating in Seller's notification to Purchaser on or about June 21, 2023 that all tires had been removed, and the second, prompted by Purchaser's December 15, 2023 letter (sent after more than 98% of the original Inspection Period had already run), culminating in Seller's notification to Purchaser on or about January 11, 2024 that all tires had again been removed following a further sweep of the Property. Seller contends these two systematic removal efforts, conducted across a tract of nearly three square miles with decades of prior agricultural, residential, and oil-and-gas use, constitute substantial performance of the Section 7(d) obligation, and that Section 7(d) itself contemplates that isolated Tires may be discovered after a good-faith removal effort by providing Seller a five-business-day cure period, cost-reimbursement obligation, and indemnity for any Tires not removed during the initial Tire Removal Period, rather than treating every residual item as a wholesale failure of performance. Seller further contends the isolated tire remnants identified in Purchaser's July 1, 2024 letter -- a photograph of a fragment obstructed by grass and a photograph of a tire mounted on a boat trailer that was in active use and parked on the Property on a temporary basis with Purchaser's own permission -- are immaterial because: (a) such de minimis items deprived Purchaser of no meaningful benefit of its bargain; (b) Section 7(d)'s cure-and-reimbursement mechanism already provides Purchaser adequate compensation for any residual Tires; (c) treating such trivial nonconformities as a basis to reset the 180-day Inspection Period for a third time would impose a disproportionate forfeiture on Seller after two completed, good-faith removal efforts; (d) Seller has a demonstrated history of prompt cure upon notice; and (e) Seller's conduct throughout was in good faith, in contrast to the timing of Purchaser's objections. Seller further contends that Sections 5(a), 7(d), and 8(d) of the Contract must be read together, such that Section 7(d)'s notice-and-cure mechanism -- not an open-ended, repeatable reset of the Inspection Period -- governs any Tires discovered after Seller's good-faith removal efforts and completion notices.

**Affirmative Defense No. 3 (Plaintiff's Own Prior Material Breach):** Plaintiff materially breached the Contract before any alleged default by Seller by, among other things, refusing to establish or proceed to a closing date despite Seller's no less than five written attempts to do so between December 15, 2025 and January 26, 2026, each of which Plaintiff declined; by conditioning Closing on extra-contractual demands not required by the Contract, including an express contractual right to rely on the January 26, 2026 Phase II Environmental Site Assessment prepared by Whitehead Environmental Solutions, LLC, additional-insured status on the environmental engineer's and drilling contractor's insurance policies, insurance policy limits Plaintiff characterized as appropriate for a $33 million transaction, occurrence-based rather than claims-made policies, and future-surviving insurance obligations; and by refusing to accept the January 26, 2026 ESA and instead retaining ESE Partners (Aaron Munsart, P.G. and William Day, P.G.) to attempt to refute its findings.

**Affirmative Defense No. 4 (Repudiation and Anticipatory Breach):** Plaintiff repudiated the Contract by absolutely and unequivocally refusing to proceed to Closing unless Seller first satisfied conditions that are not conditions precedent under the Contract, by delaying closing indefinitely notwithstanding Seller's repeated written attempts to schedule a closing date, and by engaging in a pattern of strategic delay -- including repeatedly raising tire-related objections in the final days of the Inspection Period despite having been aware of such issues for extended periods -- calculated to reset the Inspection Period and postpone Closing indefinitely.

**Affirmative Defense No. 5 (Failure to Satisfy Conditions Precedent -- Readiness, Willingness, and Ability to Perform):** Plaintiff failed to satisfy the conditions precedent to any relief it seeks, including that it be ready, willing, and able to perform its own obligations under the Contract's existing terms, because Plaintiff never tendered the Purchase Price of approximately $32,643,000.00 in immediately available funds to the Title Company or to Seller, never appeared at, attended, or set a Closing, and instead conditioned any closing discussion on Seller's satisfaction of extra-contractual demands.

**Affirmative Defense No. 6 (Unclean Hands, Laches, and Estoppel):** Plaintiff's claims are barred, in whole or in part, by the doctrines of unclean hands, laches, and estoppel because Plaintiff accepted the benefit of Seller's January 11, 2024 notification that all Tires had been removed and continued its due diligence efforts, spending, as it contends, significant sums in reliance on that notification, before later attempting to treat isolated tire remnants as a basis to re-toll the Inspection Period for a third time; because Plaintiff's own delay and shifting positions -- including reversing its January and February 2026 assurances that it was ready to close -- prejudiced Seller's ability to timely close the transaction; and because Plaintiff seeks equitable relief while itself having failed to tender performance or set a closing.

**Affirmative Defense No. 7 (Waiver):** Plaintiff waived, in whole or in part, the claims and remedies it now asserts through its own conduct, delay, and course of performance, including by accepting Seller's January 11, 2024 notification of completed tire removal without further objection at that time, by continuing to perform due diligence and incur costs after that notification, and by repeatedly extending the Inspection Period and Outside Closing Date via the First Amendment (extending the Inspection Period through April 7, 2025) and the Second Amendment (extending the Outside Closing Date to January 10, 2026) rather than treating any earlier alleged nonconformity as terminating the Contract.

**Affirmative Defense No. 8 (Inequitable Conduct Bars Equitable Relief):** Plaintiff is not entitled to the equitable relief it seeks, including specific performance, because such relief is barred by Plaintiff's own inequitable conduct, including its pattern of raising tire-related objections in the final days of successive Inspection Period deadlines based on de minimis evidence, its imposition of extra-contractual demands as a precondition to discussing a closing date, and its failure to tender performance or appear at a closing.

**Affirmative Defense No. 9 (Remedies Barred or Limited by the Contract's Express Remedial Provisions):** Plaintiff's remedies, if any, are barred or limited by Section 11(b) of the Contract, which conditions Purchaser's right to specific performance on a Seller default, caps Purchaser's recoverable out-of-pocket costs upon termination at $200,000.00, and expressly excludes lost profits and exemplary or punitive damages; Plaintiff's prayer for broad benefit-of-the-bargain damages and

lost profits is inconsistent with the Contract's express remedies.

**Affirmative Defense No. 10 (No Damages / Failure to Mitigate):** Plaintiff has suffered no recoverable damages and/or has failed to mitigate any damages it claims to have incurred, including by declining to pursue alternative development or acquisition opportunities during the pendency of this dispute and by incurring substantial claimed due diligence and development costs after it was on notice of the disputes underlying this litigation.

**Affirmative Defense No. 11 (Offsets, Credits, and Setoffs):** Any recovery by Plaintiff must be reduced by offsets, credits, setoffs, the Earnest Money deposited by Plaintiff (currently held in escrow by McKnight Title, consisting of the initial $100,000.00 Earnest Money deposit, of which $10,000.00 constitutes non-refundable Independent Consideration payable to Seller, together with the additional $100,000.00 Prepaid Deposit delivered by Purchaser on or about July 8, 2024), or other amounts to which Defendants are entitled under Section 11(a) of the Contract.

**Affirmative Defense No. 12 (Specific Performance Unavailable):** Plaintiff is not entitled to specific performance because it cannot satisfy the threshold prerequisites for that equitable remedy. Plaintiff never tendered the approximately $32,643,000.00 Purchase Price, never appeared at or set a Closing despite Seller's five written attempts to schedule one between December 15, 2025 and January 26, 2026, allowed the time-of-the-essence Outside Closing Date of January 10, 2026 to lapse, and then, by February 12, 2026, conditioned any closing on demands found nowhere in the Contract — including an express reliance right on the environmental report, additional-insured insurance status, specified policy limits, occurrence-based coverage, and future-surviving insurance obligations — none of which Section 8's conditions precedent (which give Plaintiff only a right to terminate, not an excuse to hold the Contract open indefinitely) required Seller to provide. This result is confirmed by Section 11(b) of the Contract, which expressly provides that if specific performance is "for any reason not available," Plaintiff's remedy is limited to damages (excluding lost profits and punitive damages) — language that is unqualified and therefore encompasses unavailability arising from Plaintiff's own failure to satisfy these prerequisites. Plaintiff's allegations that the Property is "unique and irreplaceable" do not cure these defects, because uniqueness supports the availability of specific performance in general but does not excuse the independent, threshold requirement of readiness, willingness, and ability to perform.

**Affirmative Defense No. 13 (Reservation of Rights):** This defense is a reservation of Defendants' right to amend their Answer and assert additional defenses as discovery proceeds under the Federal Rules of Civil Procedure; it is not, itself, a substantive defense requiring a separate factual basis, and this response will be supplemented pursuant to Federal Rule of Civil Procedure 26(e) if and when additional defenses are asserted.

**Knowledgeable Persons:** Bill Sanders; the other Seller parties (Cresson Moon Properties, LP, Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, Gregory Scott Graham, Deborah Ruth Davis, and David Glenn Davis); David Spiller, Esq. (Seller's transactional counsel); Jeffrey T. Libby, Esq. (Purchaser's counsel); Jake Wilkinson (Seller's real estate broker, MW Real Estate); Purchaser's principals John Contrevo, Charles Gallub, Edwin Esposito, and Patty Herrera; Michael Whitehead (Whitehead Environmental Solutions, LLC); Aaron Munsart, P.G. and William Day, P.G. (ESE Partners); and Jennifer Stapleton and Kassie Dunlap (McKnight Title, the Title Company).

**Supporting Documents:** The Contract, including without limitation Sections 3, 5(a), 7(c), 7(d), 8(d), 8(e), 11(a), and 11(b) thereof; the First Amendment; the Second Amendment; Plaintiff's First Amended Original Complaint, including its prayer for relief; Seller's June 21, 2023 and January 11, 2024 notifications of tire removal; Purchaser's December 15, 2023 and July 1, 2024 letters, including the photographs attached to the July 1, 2024 letter; David Spiller's July 8, 2024 responsive letter to Jeffrey Libby; the correspondence exchanged between David Spiller and Jeffrey Libby from December 2025 through February 2026; Jeffrey Libby's January and early February 2026 correspondence and his February 12, 2026 email; the January 26, 2026 Phase II Environmental Site Assessment; the parties' correspondence concerning proposed closing dates from December 2025 through February 2026; Purchaser's due diligence correspondence following the January 11, 2024 notification; the parties' course-of-dealing correspondence from 2023 through early 2026; the Title Company's escrow records; and Plaintiff's damages-related discovery responses and documents reflecting Plaintiff's due diligence and development expenditures. Defendant Sanders further directs Plaintiff to Defendants' documents, under FRCP 33(b).

**<u>INTERROGATORY NO. 3</u>:** State the complete factual and legal basis for each and every Counterclaim asserted by You, including all damages sought, each act or omission by Plaintiff that You contend constitutes a breach, repudiation, or other basis for relief, and the method of calculation for each category of damages.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based on Defendants' documents and the information made available to him upon which he relies:

**Count One -- Breach of Contract:** A valid and enforceable contract existed between Defendants and Plaintiff, evidenced by the Contract executed May 26, 2023, the First Amendment executed December 4, 2024, and the Second Amendment executed December 31, 2025. Defendants performed, tendered performance, were ready to perform, or were excused from further performance by Plaintiff's own conduct, including Seller's timely delivery of the Due Diligence Items, Seller's two documented tire-removal efforts and notifications of completion on June 21, 2023 and January 11, 2024, Seller's delivery of the January 26, 2026 Phase II Environmental Site Assessment, and Seller's no less than five written attempts between December 15, 2025 and January 26, 2026 to establish a closing date. Plaintiff materially breached the Contract by: (a) failing to close in accordance with the Contract's agreed terms notwithstanding Seller's repeated attempts to schedule a closing; (b) failing to remain ready, willing, and able to perform, including by never tendering the Purchase Price or appearing at a closing; (c) conditioning closing on new and extra-contractual demands communicated in Jeffrey Libby's February 12, 2026 email; (d) preventing or hindering consummation of the sale by refusing to accept the January 26, 2026 ESA and retaining ESE Partners to attempt to refute its findings rather than proceeding toward Closing; and (e) repeatedly asserting, in the final days of successive Inspection Period deadlines (December 15, 2023, approximately 98% into the original Inspection Period, and July 1, 2024, eight days before the anticipated expiration), that de minimis tire remnants required resetting the Inspection Period, notwithstanding Seller's two prior systematic removal efforts across the nearly 1,674-acre Property, which Defendants contend constituted substantial performance of Section 7(d) and rendered any residual nonconformity immaterial under the Mustang Pipeline/Restatement Section 241 factors. Plaintiff's breach was material because it defeated the central purpose of the transaction -- the sale

of the Property at the agreed price of approximately $32,643,000.00. As a direct and proximate result of Plaintiff's breach, Defendants have suffered actual damages as set forth below.

**Count Two -- Anticipatory Repudiation:** Plaintiff has delayed Closing indefinitely and refused to proceed unless Defendants meet Plaintiff's extra-contractual demands, as reflected in Jeffrey Libby's February 12, 2026 email reversing Plaintiff's own January and early February 2026 assurances that it was ready to paper up one last amendment and move toward closing. Plaintiff engaged in a pattern of strategic delay to reset and postpone the Inspection Period and Closing, including by repeatedly identifying alleged tire issues at or near the expiration of applicable contractual deadlines despite having been aware of the underlying tire-removal history for extended periods, and by imposing new, extra-contractual insurance and reliance-letter conditions not found in Section 7(c) or elsewhere in the Contract. By this conduct, Plaintiff has absolutely and unequivocally refused to perform its obligations under the Contract without justification, constituting anticipatory repudiation. As a direct and proximate result, Defendants have suffered actual damages as set forth below.

**Count Three -- Declaratory Judgment:** An actual and justiciable controversy exists between the parties regarding their respective rights and obligations under the Contract and its amendments, including whether Defendants satisfied the conditions precedent to Closing set forth in Section 8 of the Contract (including Section 8(d)'s tire-removal condition, which Defendants contend was satisfied through substantial performance and/or rendered immaterial by any residual nonconformity, and which Defendants further contend must be read together with Section 7(d)'s notice-and-cure mechanism rather than as licensing repeated, open-ended resets of the Inspection Period), whether Plaintiff was entitled to impose the extra-contractual conditions reflected in the February 12, 2026 email, whether Plaintiff's conduct constitutes breach, anticipatory breach, repudiation, and/or default, and whether Plaintiff's remedies (if any) are limited by Section 11(b) of the Contract. Defendants seek a declaration resolving each of these disputed issues in Defendants' favor pursuant to Texas Civil Practice and Remedies Code Sections 37.001 et seq.

**Damages and Methodology:** Defendants seek, as a result of Plaintiff's breach, repudiation, and prevention of performance: (a) the difference between the Contract price of approximately $32,643,000.00 and the Property's fair market value as of the relevant breach date, to be quantified through appraisal and/or broker-opinion-of-value evidence and supplemented pursuant to Federal Rule of Civil Procedure 26(e) upon completion of Defendants' damages expert's analysis; (b) carrying costs incurred as a result of Plaintiff's delay, including property taxes, insurance premiums, maintenance expenses, security costs, and financing-related expenses, the specific amounts of which will be calculated from Defendants' financial and tax records and supplemented as that accounting is finalized; (c) additional marketing, brokerage, diligence, legal, and transaction expenses incurred in connection with Plaintiff's prolonged delay, to be itemized from invoices and records maintained by Defendants and their advisors, including Stephen Reich/Williams Trew Realty, David Spiller, Esq., Lacy Kimball of Lacy Kimball Law, and Whitehead Environmental Solutions, LLC; (d) pre-judgment and post-judgment interest at the maximum rate allowed by law; and (e) attorneys' fees and costs recoverable under the Contract and Texas Civil Practice and Remedies Code Sections 37.009 and 38.001 et seq. In the alternative, Defendants seek retention of all Earnest Money deposited by Plaintiff (consisting of the $100,000.00 initial Earnest Money deposit, of which $10,000.00 is non-refundable Independent Consideration, together with the $100,000.00 Prepaid Deposit delivered on or about July 8, 2024) as liquidated damages under Section 11(a) of the

Contract.

**Knowledgeable Persons:** Bill Sanders, the other Seller parties, David Spiller, Esq., Stephen Reich, Lacy Kimball of Lacy Kimball Law, and any damages or valuation expert retained by Defendants. Supporting documents include Section 11(a) and Section 11(b) of the Contract, McKnight Title's escrow records, Defendants' property tax, insurance, and maintenance records, and invoices from Defendants' brokers, counsel, and environmental consultants, all of which will be produced or supplemented in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 4:** Identify and describe all Due Diligence Items that were delivered to Plaintiff, the date of delivery for each, and all Due Diligence Items that You failed to deliver, if any, including the reason for non-delivery. Additionally, describe all shut-in payments received by You Relating to the Property.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' documents, the statements of others upon which he relies, and his own knowledge, he timely delivered the Due Diligence Items within his possession or control in accordance with Section 4(a) of the Contract. Defendant Sanders is not aware of any Due Diligence Item within his possession or control that he failed to deliver. To the extent Plaintiff contends any particular item was not produced, Defendant Sanders is without sufficient information to identify such item absent further specification by Plaintiff and will supplement this response if any such deficiency is identified. With respect to shut-in payments, pursuant to Fed. R. Civ. P. 33(d) Defendant Sanders directs Plaintiff to the payment records maintained by the operator(s) under the applicable oil and gas leases, including the Smelley 1H Lease, which Defendants have requested and will produce or supplement as they become available in accordance with Sections 4(b) and 4(c) of the First Amendment. Defendant Sanders further states that good faith efforts have been made to deliver the Due Diligence Items, including shut-in documentation, multiple times.

**INTERROGATORY NO. 5:** Describe Your efforts to remove Tires, remediate environmental contamination, remove hazardous materials, and remove or decommission any above-ground and underground storage tanks from the Property, including the dates, persons or companies involved, scope of work, and results.

**RESPONSE:** Subject to and without waiving the General Objections, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, that Defendant Sanders participated in efforts to remove Tires from the Property beginning shortly after the Effective Date. On or about June 21, 2023, Seller notified Plaintiff that all Tires had been removed from the Property. After additional tires and/or tire fragments were discovered, Seller undertook further removal efforts and, on or about January 11, 2024, again notified Plaintiff that the Tires had been removed. With respect to environmental contamination and hazardous materials, Defendant Sanders, in concert with Cresson Moon Properties, LP ("CMPLP"), retained Whitehead Environmental Solutions, LLC, a licensed environmental engineering firm, which conducted a Limited Phase II Investigation of the Property in concert with Plaintiff's agents, the results of which are set forth in the January 26 Phase II ESA Report delivered to Plaintiff on or about January 26, 2026. Defendant Sanders is not aware of any above-ground or underground storage tanks presently located on the Property requiring removal or decommissioning beyond those addressed in that process. Defendant Sanders will supplement this response as additional information becomes

available through the parties' ongoing environmental investigation and discovery.

**INTERROGATORY NO. 6:** Identify all environmental engineers, consultants, or firms retained by You in connection with the Property, and describe the scope, methodology, limitations, and findings of each and every ESA conducted on the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, he, in concert with CMPLP, retained Whitehead Environmental Solutions, LLC to conduct environmental assessment work on the Property. Whitehead's Limited Phase II Investigation involved the collection and analysis of soil samples across the Property in concert with Plaintiff's agent and is described in the January 26 Phase II ESA Report, which speaks for itself as to scope, methodology, limitations, and findings.

**INTERROGATORY NO. 7:** State the basis for Your contention that any ESA conducted on the Property satisfies Seller's obligations under the Contract, and describe Your efforts to provide a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, the January 26 Phase II ESA Report, prepared by a licensed environmental engineer, reflects Defendant Sanders's good-faith efforts to satisfy his obligations under Section 7(c) of the Contract. Defendant Sanders will produce the January 26 Phase II ESA Report as is sufficient and refers Plaintiff to the Report itself, which speaks for its own contents and conclusions. Defendant Sanders's efforts to provide the required report are further described in Defendant Sanders's response to Interrogatory No. 5.

**INTERROGATORY NO. 8:** Identify all oil and gas wells, above-ground storage tanks, underground storage tanks, and any other structures or equipment Relating to oil, gas, or hazardous materials located on the Property, and describe the status, contents, and regulatory compliance history of each.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, the Property may be subject to the Smelley 1H Lease (RRC Lease ID No. 211620) as an oil and gas lease affecting the Property. Defendant Sanders is not aware of the specific terms of this lease, nor is he aware of any others. Defendant Sanders is aware of three old water storage tanks on the Property (one located in a tree line, one at the rental property, and one in the feed lot area) that were used for potable water storage, in addition to those addressed in the January 26 Phase II ESA Report and the removal efforts described in Defendant Sanders's response to Interrogatory No. 5. Defendant is not aware of any active oil and gas wells presently located on the Property other than those addressed in the January 26 Phase II ESA Report and the removal efforts described in Defendant Sanders's response to Interrogatory No. 5.

**INTERROGATORY NO. 9**: Identify all Communications by You or Your agents to any third parties regarding the potential sale, marketing, listing, or availability of the Property from May 26, 2023 to the present, including the date, manner, content, and identity of each third party.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, following Plaintiff's repeated delays and refusal to set a closing date, Seller's agents engaged in preliminary discussions with third parties regarding the Property's potential availability, consistent with Seller's contractual and legal rights given Plaintiff's failure to close. Pursuant to Fed. R. Civ. P. 33(d), Defendant Sanders directs Plaintiff to any documents produced or that may be produced to the extent they are responsive to this Interrogatory.

**INTERROGATORY NO. 10**: Describe Your readiness, willingness, and ability to close the transaction contemplated by the Contract, including all efforts to establish a closing date and all circumstances affecting Your ability to close, and identify any liens, encumbrances, or title defects affecting the Property.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Seller was at all relevant times ready, willing, and able to close the transaction, having removed substantially all the Tires, removed tenants, delivered the Due Diligence Items, and engaged a licensed environmental engineer to complete an environmental assessment of the Property. It was Plaintiff, not Seller, that repeatedly refused to establish a closing date and instead imposed extra-contractual conditions, including demands for reliance letters, additional-insured status, and specific insurance terms not required by the Contract. Defendant Sanders is not aware of any liens, encumbrances, or title defects affecting the Property that would have prevented Closing.

**INTERROGATORY NO. 11**: Identify and describe all efforts You have undertaken to mitigate Your alleged damages.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the information made available to him and upon which he relies, Defendants sought to mitigate damages by, among other things, continuing to maintain and secure the Property, engaging with Plaintiff in an effort to bring the transaction to Closing, and, following Plaintiff's continued refusal to close, exploring the Property's marketability to third parties. Defendant Sanders will supplement this response as his mitigation efforts continue and additional information becomes available.

**INTERROGATORY NO. 12**: Identify all conditions, requirements, or demands that You allege Plaintiff communicated to Seller or Seller's agents as a precondition to Closing that are not expressly stated as conditions precedent in the Contract.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 3 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders further states that, based upon Defendants' records and the statements of others upon which he relies, the following conditions were communicated by Plaintiff as prerequisites to Closing that are not expressly required by the Contract: (a) an express right for Plaintiff to rely on the January 26 Phase II ESA Report; (b) additional-insured status for

Plaintiff on the environmental engineer's and drilling contractor's insurance policies; (c) insurance policy limits Plaintiff deemed "appropriate for a $33 million transaction"; (d) occurrence-based, rather than claims-made, insurance policies; and (e) future-surviving insurance obligations beyond Closing.

**<u>INTERROGATORY NO. 13</u>:** Describe Your role and involvement in the performance of all obligations under the Contract.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Defendant Sanders, as one of the Seller entities under the Contract, performed and participated in the performance of Seller's obligations under the Contract, including removal of Tires, delivery of Due Diligence Items, and engagement of an environmental engineer to conduct the assessments required under Section 7(c), acting through Cresson Moon Properties, LP's general partner, Cresson Moon Management, LLC, and its members.

**<u>INTERROGATORY NO. 14</u>:** State the basis for Your contention that Seller satisfied each and every condition precedent, covenant, representation, and warranty under the Contract, and identify the date and manner of satisfaction for each.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 2 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, he satisfied or substantially satisfied the conditions precedent to Closing set forth in Section 8 of the Contract, including removal of Tires (Section 8(d)), delivery of Due Diligence Items (Section 8(f)), and material performance of its other covenants and obligations (Section 8(e)), through the efforts described in Defendant Sanders's response to Interrogatory No. 5. To the extent any condition precedent was not fully satisfied, Defendant Sanders contends any such shortfall did not excuse Plaintiff's own obligation to close and tender the Purchase Price, or was waived by Plaintiff's continued performance and negotiation under the Contract and its amendments.

**<u>INTERROGATORY NO. 15</u>:** Identify all insurance policies (including environmental, general liability, and property insurance) You maintained with respect to the Property from May 26, 2023 to the present, including the insurer, policy number, coverage limits, and effective dates.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Defendant Sanders believes that general liability and property insurance policies were maintained with respect to the Property, and that he is continuing to investigate and will supplement this response with the insurer, policy number, coverage limits, and effective dates as that information is identified. Pursuant to Fed. R. Civ. P. 33(d), Defendant Sanders further directs Plaintiff to Defendants' produced documents to the extent they are responsive to this Interrogatory.

**<u>INTERROGATORY NO. 16</u>:** State all knowledge or information You have regarding the presence, disposal, placement, or release of any environmental contamination, hazardous materials, Hazardous Substances, Tires, above-ground and/or underground storage tanks, waste,

garbage, or trash in, on, under, or about the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Defendant Sanders's knowledge regarding the presence of environmental contamination, hazardous materials, storage tanks, Tires, waste, or trash on the Property is reflected in the January 26 Phase II ESA Report and the tire-removal efforts described in Defendant Sanders's response to Interrogatory No. 5. Defendant Sanders further states that trash, Tires, and metal were removed from the Property by the individuals identified in the Response to Interrogatory No. 1. Defendant Sanders is aware of one metal tank, three grain silos, one feed lot water tank, and three old water storage tanks (one in a tree line, one at the rental property, and one in the feed lot area) that were used for potable water storage currently on the Property.

**<u>INTERROGATORY NO. 17</u>:** State any instructions You provided to Whitehead Environmental Solutions, LLC (or any other environmental consultant or engineer retained in connection with the Property) related to the assessment, investigation, testing, study, or analysis of the Property or any soil, groundwater, or other environmental media located in, under, on, or about the Property; any information Whitehead Environmental Solutions, LLC (or any other such consultant or engineer) provided to You related to such assessment, investigation, testing, study, or analysis; the rationale or technical basis for such assessment, investigation, testing, study, or analysis; and any written documents or reports that Whitehead Environmental relied upon for determining what assessment, investigation, testing, study, or analysis was conducted.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Defendant Sanders, in concert with CMPLP, engaged Whitehead Environmental Solutions, LLC to perform an environmental Assessment of the Property sufficient to satisfy Seller's obligations under Section 7(c) of the Contract. Whitehead Environmental Solutions, LLC determined the scope and methodology in concert with Plaintiff's agent, and the results of that engagement are set forth in the January 26 Phase II ESA Report, which speaks for itself. In addition, pursuant to Fed. R. Civ. P. 33(d), Defendant Sanders refers Plaintiff to the non-privileged documents relating to the engagement of Whitehead being produced in its document production.

**<u>INTERROGATORY NO. 18</u>:** State why no groundwater samples were collected at the Property by Whitehead Environmental.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, he understands that Whitehead's Limited Phase II Investigation was scoped as a soil-sampling assessment consistent with the methodology Whitehead determined appropriate for the Property in concert with Plaintiff's agent, and that groundwater sampling was not included within that scope.

**<u>INTERROGATORY NO. 19</u>:** State the basis for Your representation that no Hazardous Substances (as such term is defined in the Agreement) have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property, and that there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to the use, generation, manufacture, storage, or disposal of any Hazardous Substances in, on, under, or about the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Defendant Sanders's representations regarding Hazardous Substances were based on Defendant Sanders's knowledge of the Property's history and use at the time such representations were made, together with the results of the environmental assessment subsequently performed by Whitehead. Defendant Sanders is not aware of any claims, litigation, administrative or other proceedings, judgments, or orders relating to the use, generation, manufacture, storage, or disposal of Hazardous Substances on the Property, other than as may be disclosed in the January 26 Phase II ESA Report and this litigation.

**<u>INTERROGATORY NO. 20</u>:** State the basis for Your representation that any and all underground storage tanks previously removed from the Property by Seller were removed in accordance with all applicable laws, ordinances, regulations, and administrative rulings and no underground storage tanks are presently situated in, on, under, or about the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, his representations regarding removal of underground storage tanks were based on Defendant Sanders's knowledge and the removal efforts undertaken with respect to the Property, as described in Defendant Sanders's response to Interrogatory No. 5. Defendant Sanders is not presently aware of any underground storage tanks remaining on the Property.

**<u>INTERROGATORY NO. 21</u>:** State the basis for Your representations or any statements that any and all Tires have been removed from the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Defendant Sanders's representations that Tires had been removed from the Property were based on inspections conducted prior to each of Seller's notifications to Plaintiff, including the June 21, 2023 and January 11, 2024 notifications described in Defendant Sanders's response to Interrogatory No. 5. Defendant Sanders acknowledges that additional tires or tire fragments were subsequently discovered on the approximately 1,674-acre Property and that Seller undertook further removal efforts in response.

**<u>INTERROGATORY NO. 22</u>:** Identify or state any violations of any Environmental Laws at any time that have occurred in, on, under, or about the Property, and any conditions or circumstances

in, on, under, or about the Property that could reasonably be anticipated to result in any remediation, cleanup, removal, or corrective action liability or responsibility under any Environmental Laws.

**RESPONSE:** Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, he is not aware of any violations of Environmental Laws that have occurred on the Property, nor is Defendant Sanders aware of any conditions or circumstances that could reasonably be anticipated to result in remediation, cleanup, removal, or corrective-action liability under Environmental Laws, other than as may be reflected in the January 26 Phase II ESA Report. Defendant Sanders will supplement this response if he becomes aware of any conditions that may be responsive to this Interrogatory.

**INTERROGATORY NO. 23:** Describe or state any knowledge or information You have regarding any agricultural activities on the Property and the use of any pesticides, insecticides, rodenticides, fungicides, or similar chemicals or substances on the Property, including organochlorine pesticides (e.g., DDT, chlordane, aldrin, lindane, and carbon tetrachloride), arsenic, and any other agricultural chemicals and Hazardous Substances related to agricultural activities; and any grain silos or other agricultural product storage currently or formerly located on the Property, including any sampling, testing, or other analysis of soil, groundwater, or other environmental media in, under, on, or about such facilities.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, he is not aware of any agricultural chemical use or other agricultural product storage on the Property giving rise to environmental contamination, beyond the Property's historical agricultural and ranching use consistent with its rural character. Defendant Sanders further states that three grain silos currently exist on the Property. Defendant Sanders is not aware of any sampling, testing, or analysis conducted with respect to such matters other than as reflected in the January 26 Phase II ESA Report.

**INTERROGATORY NO. 24:** Describe or state any knowledge or information You have regarding the presence of any groundwater wells and any groundwater monitoring wells located or drilled on the Property, including any sampling, testing, or other analysis of the water from such wells, and explain the rationale or basis for the selection of the depth of the groundwater monitoring wells installed on the Property by Whitehead Environmental or by any other party.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Defendant Sanders believes that monitoring wells were installed (converted from three of the six soil borings) but did not produce groundwater within the investigation timeframe, as referenced in the January 26 Phase II ESA Report. Regarding the rationale or basis for the selection of the depth of the groundwater monitoring wells, Defendant Sanders further states that these determinations were made by Whitehead Environmental Solutions based on analysis and review of the Property in cooperation with and as agreed upon by Plaintiff's

expert, who provided third-party oversight during the investigation.

**INTERROGATORY NO. 25:** Describe or state any knowledge or information You have regarding: any household waste or other waste disposed of, placed, buried, or located on the Property (including any paints, solvents, pesticides, automotive fluids, batteries, or asbestos); any electrical equipment or transformers currently or formerly located on the Property (including any sampling, testing, or other analysis of such equipment, any materials or fluids contained in or part of such equipment, and any soil, groundwater, or other environmental media on or around such equipment, for polychlorinated biphenyls or other chemicals or Hazardous Substances); any naturally occurring radioactive material or other radioactivity currently or formerly located on the Property; any pipelines and related facilities currently or formerly located on the Property; any steel drums currently or formerly located on the Property; and any testing of samples of soil, groundwater, or other environmental media or wastes at, on, in, under, or about the Property at any time other than what is reported in the January 26 Phase II ESA Report, in each case including any sampling, testing, or other analysis of soil, groundwater, or other environmental media in, under, on, or about such items or the Property.

**RESPONSE:** This Interrogatory is duplicative of, and overlaps with, Interrogatory No. 5 above; Defendant Sanders incorporates that response herein. Subject to and without waiving the General Objections set forth above, Defendant Sanders states that, based upon Defendants' records and the statements of others upon which he relies, Defendant Sanders is not presently aware of any household waste, electrical equipment or transformers containing polychlorinated biphenyls, naturally occurring radioactive material, pipelines, or steel drums located in, on, under, or about the Property beyond what may be reflected in the January 26 Phase II ESA Report. Defendant Sanders is not aware of any testing of soil, groundwater, or other environmental media at the Property other than the testing reported in that Report.

Dated: August 13, 2026

Respectfully submitted,

By: */s/ Scott A. Wheatley*

Scott A. Wheatley
State Bar No. 24013737
swheatley@jw.com
Lee B. Hunt
State Bar No. 24082257
lhunt@jw.com
Trevor J. Paul
State Bar No. 24133388
tpaul@jw.com

JACKSON WALKER LLP
777 Main Street, Suite 2100
Fort Worth, TX 76102
817.334.7200 –Phone
817.334.7290—Fax

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, a true and correct copy of the foregoing document was electronically served on Plaintiff Challenger Cresson I, LLC, via its counsel of record, by electronic mail, accompanied by the requisite declaration.

*/s/ Scott A. Wheatley*
Scott A. Wheatley

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

## DECLARATION OF BILL SANDERS

I, Bill Sanders, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

1. My name is Bill Sanders. I am the Independent Executor of the Estate of Pearl Smelley, and I am a Defendant in the above-captioned action. I am over the age of eighteen (18) years and am competent to make this Declaration.

2. I have personal knowledge of the facts set forth in this Declaration and in the foregoing Defendant Bill Sanders, Independent Executor of the Estate of Pearl Smelley's Responses and Objections to Plaintiff's First Set of Interrogatories (the "Responses").

3. I have reviewed the Responses. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief formed after reasonable inquiry and based on documents made available to me and statements from others upon which I have relied.

4. In preparing the Responses, I reviewed documents and records in my possession, custody, or control as Independent Executor of the Estate of Pearl Smelley and consulted with my attorneys of record regarding the applicable objections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: [signature] IND EX

Executed on August 13, 2026, in BURLESON, Texas.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

**DEFENDANTS' RICHARD DAVID SMELLEY, AMY ELIZABETH SMELLEY, TAMMY MARIE GRAHAM, GREGORY SCOTT GRAHAM, DEBORAH RUTH DAVIS, AND DAVID GLENN DAVIS ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Under Federal Rules of Civil Procedure 33, Defendants Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, Gregory Scott Graham, Deborah Ruth Davis, and David Glenn Davis (collectively, the "GDS Parties") hereby serve the following Answers and Objections to Plaintiff Challenger Cresson I, LLC's ("Plaintiff" or "Purchaser") First Set of Interrogatories.

## I. OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. GDS Parties object to the Definitions and Instructions to the extent they purport to impose obligations on GDS Parties broader than, or inconsistent with, those imposed by the Federal Rules of Civil Procedure or the Court's Scheduling Order in this action.

2. GDS Parties object to the definition of "You" or "Your" as overly broad and unduly burdensome to the extent it purports to encompass agents, representatives, and consultants not within GDS Parties' possession, custody, or control, and to the extent it seeks to impose on GDS Parties an obligation to investigate or account for the knowledge of third parties. In addition, GDS Parties further object because it is not reasonably possible to determine which individual is being referenced in such definitions.

3. GDS Parties object to each Interrogatory to the extent it seeks information or documents protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or immunity from discovery. No inadvertent disclosure of privileged or protected material shall constitute a waiver of any privilege or protection.

4. GDS Parties further object to each Interrogatory to the extent it is vague, ambiguous, overly broad, unduly burdensome, or seeks information that is not relevant to any party's claim or defense and not proportional to the needs of the case, or that is equally available to Plaintiff or within Plaintiff's own possession, custody, or control.

5. GDS Parties further object to any Interrogatory to the extent it is unreasonably cumulative or duplicative of another discovery request served in this matter, in violation of Federal Rule of Civil Procedure 26(b)(2)(C)(i), including to the extent any Interrogatory duplicates interrogatories or requests for production served on co-Defendants seeking the same categories of information.

6. GDS Parties incorporate each of the above objections as though fully set forth in each answer and objection below.

## II. ANSWERS AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify and describe the role of each and every person who has knowledge of any facts relevant to this action or who was involved in the Contract on Your behalf, including the negotiation, drafting, execution, performance, or any amendment thereto.

**ANSWER:** GDS Parties object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work-product doctrine, and further object that the phrase "involved in the Contract" is vague and overbroad to the extent it seeks information about every person who may have had any tangential involvement. Subject to and without waiving the foregoing objections:

GDS Parties state that, based on Defendants' documents and the information made available to them upon which they rely, GDS Parties identify the following individuals as having knowledge of facts relevant to this action or involvement in the negotiation, drafting, execution, performance, or amendment of the Contract:

Bill Sanders, Independent Executor of the Estate of Pearl Smelley: Communicated through counsel regarding Agreement; tendered payment for contract services associated with obligations of the Agreement; signed the Agreement.

Cresson Moon Properties, LP: Executed the Agreement.

Richard David Smelley: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; assisted in the removal of trash, Tires, and metal from the Property.

Amy Elizabeth Smelley: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; spoke with Jake Wilkerson in the summer

of 2021; identified tanks on the Property. The family collectively entered into a listing agreement with Stephen Reich of Williams Trew Realty, with all family members and spouses signing on with Stephen Reich to sell individually the minerals and for the company to sell the surface.

Tammy Marie Graham: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; coordinated and oversaw the removal of tires from the Property.

Gregory Scott Graham: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement; coordinated and oversaw the removal of tires from the Property.

Deborah Ruth Davis: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement.

David Glenn Davis: Listed the Property; reviewed and executed the Agreement; communicated with counsel to perform obligations under the Agreement.

Whitehead Environmental Solutions, LLC and its personnel, who performed environmental assessment work on the Property;

Stephen Reich of Williams Trew Realty: Seller's broker.

Plaintiff’s representatives and agents, including Jake Wilkinson and Plaintiff’s counsel.

Lacy Kimball of Lacy Kimball Law: Seller’s counsel who handled the contract negotiations primarily with Jeffrey T. Libby, Esq., including communications, amendments, and related correspondence.

GDS Parties’ investigation is continuing, and GDS Parties reserve the right to supplement this answer pursuant to Federal Rule of Civil Procedure 26(e).

**INTERROGATORY NO. 2:** State the complete factual basis for each and every Affirmative Defense asserted by You, including the identity of all persons with knowledge and all Documents supporting each defense.

**ANSWER:** GDS Parties object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work-product doctrine, and further object that this Interrogatory is compound and contains multiple discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1). Subject to and without waiving the foregoing objections, GDS Parties state that, based on Defendants' documents and the information made available to them upon which they rely:

**Affirmative Defense No. 1 (Failure to State a Claim):** Plaintiff’s First Amended Original Complaint fails to state a claim upon which relief can be granted rests on the pleading itself, which affirmatively demonstrates that Plaintiff was not ready, willing, and able to close and that Plaintiff’s own conduct prevented the conditions to Closing from being satisfied, defeating Plaintiff’s claims for specific performance and damages as pled.

**Affirmative Defense No. 2 (Performance, Tender, Readiness to Perform, or Excuse):** Seller performed, tendered performance, was ready to perform, or was excused from further performance by Plaintiff's own conduct. With respect to the tire-removal obligation under Section 7(d) of the Contract specifically, Seller undertook two documented, systematic efforts to remove all tires and parts thereof from the approximately 1,674-acre Property: the first culminating in Seller's notification to Purchaser on or about June 21, 2023 that all tires had been removed, and the second, prompted by Purchaser's December 15, 2023 letter (sent after more than 98% of the original Inspection Period had already run), culminating in Seller's notification to Purchaser on or about January 11, 2024 that all tires had again been removed following a further sweep of the Property. Seller contends these two systematic removal efforts, conducted across a tract of nearly three square miles with decades of prior agricultural, residential, and oil-and-gas use, constitute substantial performance of the Section 7(d) obligation, and that Section 7(d) itself contemplates that isolated Tires may be discovered after a good-faith removal effort by providing Seller a five-business-day cure period, cost-reimbursement obligation, and indemnity for any Tires not removed during the initial Tire Removal Period, rather than treating every residual item as a wholesale failure of performance. Seller further contends the isolated tire remnants identified in Purchaser's July 1, 2024 letter -- a photograph of a fragment obstructed by grass and a photograph of a tire mounted on a boat trailer that was in active use and parked on the Property on a temporary basis with Purchaser's own permission -- are immaterial because: (a) such de minimis items deprived Purchaser of no meaningful benefit of its bargain; (b) Section 7(d)'s cure-and-reimbursement mechanism already provides Purchaser adequate compensation for any residual Tires; (c) treating such trivial nonconformities as a basis to reset the 180-day Inspection Period for a third time would impose a disproportionate forfeiture on Seller after two completed, good-faith removal efforts; (d) Seller has a demonstrated history of prompt cure upon notice; and (e) Seller's conduct throughout was in good faith, in contrast to the timing of Purchaser's objections. Seller further contends that Sections 5(a), 7(d), and 8(d) of the Contract must be read together, such that Section 7(d)'s notice-and-cure mechanism -- not an open-ended, repeatable reset of the Inspection Period -- governs any Tires discovered after Seller's good-faith removal efforts and completion notices.

**Affirmative Defense No. 3 (Plaintiff's Own Prior Material Breach):** Plaintiff materially breached the Contract before any alleged default by Seller by, among other things, refusing to establish or proceed to a closing date despite Seller's no less than five written attempts to do so between December 15, 2025 and January 26, 2026, each of which Plaintiff declined; by conditioning Closing on extra-contractual demands not required by the Contract, including an express contractual right to rely on the January 26, 2026 Phase II Environmental Site Assessment prepared by Whitehead Environmental Solutions, LLC, additional-insured status on the environmental engineer's and drilling contractor's insurance policies, insurance policy limits Plaintiff characterized as appropriate for a $33 million transaction, occurrence-based rather than claims-made policies, and future-surviving insurance obligations; and by refusing to accept the January 26, 2026 ESA and instead retaining ESE Partners (Aaron Munsart, P.G. and William Day, P.G.) to attempt to refute its findings.

**Affirmative Defense No. 4 (Repudiation and Anticipatory Breach):** Plaintiff repudiated the Contract by absolutely and unequivocally refusing to proceed to Closing unless Seller first satisfied conditions that are not conditions precedent under the Contract, by delaying closing indefinitely notwithstanding Seller's repeated written attempts to schedule a closing date, and by engaging in a pattern of strategic delay -- including repeatedly raising tire-related objections in the final days of

the Inspection Period despite having been aware of such issues for extended periods -- calculated to reset the Inspection Period and postpone Closing indefinitely.

**Affirmative Defense No. 5 (Failure to Satisfy Conditions Precedent -- Readiness, Willingness, and Ability to Perform):** Plaintiff failed to satisfy the conditions precedent to any relief it seeks, including that it be ready, willing, and able to perform its own obligations under the Contract's existing terms, because Plaintiff never tendered the Purchase Price of approximately $32,643,000.00 in immediately available funds to the Title Company or to Seller, never appeared at, attended, or set a Closing, and instead conditioned any closing discussion on Seller's satisfaction of extra-contractual demands.

**Affirmative Defense No. 6 (Unclean Hands, Laches, and Estoppel):** Plaintiff's claims are barred, in whole or in part, by the doctrines of unclean hands, laches, and estoppel because Plaintiff accepted the benefit of Seller's January 11, 2024 notification that all Tires had been removed and continued its due diligence efforts, spending, as it contends, significant sums in reliance on that notification, before later attempting to treat isolated tire remnants as a basis to re-toll the Inspection Period for a third time; because Plaintiff's own delay and shifting positions -- including reversing its January and February 2026 assurances that it was ready to close -- prejudiced Seller's ability to timely close the transaction; and because Plaintiff seeks equitable relief while itself having failed to tender performance or set a closing.

**Affirmative Defense No. 7 (Waiver):** Plaintiff waived, in whole or in part, the claims and remedies it now asserts through its own conduct, delay, and course of performance, including by accepting Seller's January 11, 2024 notification of completed tire removal without further objection at that time, by continuing to perform due diligence and incur costs after that notification, and by repeatedly extending the Inspection Period and Outside Closing Date via the First Amendment (extending the Inspection Period through April 7, 2025) and the Second Amendment (extending the Outside Closing Date to January 10, 2026) rather than treating any earlier alleged nonconformity as terminating the Contract.

**Affirmative Defense No. 8 (Inequitable Conduct Bars Equitable Relief):** Plaintiff is not entitled to the equitable relief it seeks, including specific performance, because such relief is barred by Plaintiff's own inequitable conduct, including its pattern of raising tire-related objections in the final days of successive Inspection Period deadlines based on de minimis evidence, its imposition of extra-contractual demands as a precondition to discussing a closing date, and its failure to tender performance or appear at a closing.

**Affirmative Defense No. 9 (Remedies Barred or Limited by the Contract's Express Remedial Provisions):** Plaintiff's remedies, if any, are barred or limited by Section 11(b) of the Contract, which conditions Purchaser's right to specific performance on a Seller default, caps Purchaser's recoverable out-of-pocket costs upon termination at $200,000.00, and expressly excludes lost profits and exemplary or punitive damages; Plaintiff's prayer for broad benefit-of-the-bargain damages and lost profits is inconsistent with the Contract's express remedies.

**Affirmative Defense No. 10 (No Damages / Failure to Mitigate):** Plaintiff has suffered no recoverable damages and/or has failed to mitigate any damages it claims to have incurred, including by declining to pursue alternative development or acquisition opportunities during the pendency of

this dispute and by incurring substantial claimed due diligence and development costs after it was on notice of the disputes underlying this litigation.

**Affirmative Defense No. 11 (Offsets, Credits, and Setoffs):** Any recovery by Plaintiff must be reduced by offsets, credits, setoffs, the Earnest Money deposited by Plaintiff (currently held in escrow by McKnight Title, consisting of the initial $100,000.00 Earnest Money deposit, of which $10,000.00 constitutes non-refundable Independent Consideration payable to Seller, together with the additional $100,000.00 Prepaid Deposit delivered by Purchaser on or about July 8, 2024), or other amounts to which Defendants are entitled under Section 11(a) of the Contract.

**Affirmative Defense No. 12 (Specific Performance Unavailable):** Plaintiff is not entitled to specific performance because it cannot satisfy the threshold prerequisites for that equitable remedy. Plaintiff never tendered the approximately $32,643,000.00 Purchase Price, never appeared at or set a Closing despite Seller's five written attempts to schedule one between December 15, 2025 and January 26, 2026, allowed the time-of-the-essence Outside Closing Date of January 10, 2026 to lapse, and then, by February 12, 2026, conditioned any closing on demands found nowhere in the Contract — including an express reliance right on the environmental report, additional-insured insurance status, specified policy limits, occurrence-based coverage, and future-surviving insurance obligations — none of which Section 8's conditions precedent (which give Plaintiff only a right to terminate, not an excuse to hold the Contract open indefinitely) required Seller to provide. This result is confirmed by Section 11(b) of the Contract, which expressly provides that if specific performance is "for any reason not available," Plaintiff's remedy is limited to damages (excluding lost profits and punitive damages) — language that is unqualified and therefore encompasses unavailability arising from Plaintiff's own failure to satisfy these prerequisites. Plaintiff's allegations that the Property is "unique and irreplaceable" do not cure these defects, because uniqueness supports the availability of specific performance in general but does not excuse the independent, threshold requirement of readiness, willingness, and ability to perform.

**Affirmative Defense No. 13 (Reservation of Rights):** This defense is a reservation of Defendants' right to amend their Answer and assert additional defenses as discovery proceeds under the Federal Rules of Civil Procedure; it is not, itself, a substantive defense requiring a separate factual basis, and this answer will be supplemented pursuant to Federal Rule of Civil Procedure 26(e) if and when additional defenses are asserted.

**Knowledgeable Persons:** Bill Sanders; the other Seller parties (Cresson Moon Properties, LP, Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, Gregory Scott Graham, Deborah Ruth Davis, and David Glenn Davis); David Spiller, Esq. (Seller's transactional counsel); Jeffrey T. Libby, Esq. (Purchaser's counsel); Jake Wilkinson (Seller's real estate broker, MW Real Estate); Purchaser's principals John Contrevo, Charles Gallub, Edwin Esposito, and Patty Herrera; Michael Whitehead (Whitehead Environmental Solutions, LLC); Aaron Munsart, P.G. and William Day, P.G. (ESE Partners); and Jennifer Stapleton and Kassie Dunlap (McKnight Title, the Title Company).

**Supporting Documents:** The Contract, including without limitation Sections 3, 5(a), 7(c), 7(d), 8(d), 8(e), 11(a), and 11(b) thereof; the First Amendment; the Second Amendment; Plaintiff's First Amended Original Complaint, including its prayer for relief; Seller's June 21, 2023 and January 11, 2024 notifications of tire removal; Purchaser's December 15, 2023 and July 1, 2024 letters, including

the photographs attached to the July 1, 2024 letter; David Spiller's July 8, 2024 responsive letter to Jeffrey Libby; the correspondence exchanged between David Spiller and Jeffrey Libby from December 2025 through February 2026; Jeffrey Libby's January and early February 2026 correspondence and his February 12, 2026 email; the January 26, 2026 Phase II Environmental Site Assessment; the parties' correspondence concerning proposed closing dates from December 2025 through February 2026; Purchaser's due diligence correspondence following the January 11, 2024 notification; the parties' course-of-dealing correspondence from 2023 through early 2026; the Title Company's escrow records; and Plaintiff's damages-related discovery answers and documents reflecting Plaintiff's due diligence and development expenditures. GDS Parties further direct Plaintiff to Defendants' documents, under FRCP 33(b).

**INTERROGATORY NO. 3:** State the complete factual and legal basis for each and every Counterclaim asserted by You, including all damages sought, each act or omission by Plaintiff that You contend constitutes a breach, repudiation, or other basis for relief, and the method of calculation for each category of damages.

**ANSWER:** GDS Parties object to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work-product doctrine, and further object that this Interrogatory is compound and contains multiple discrete subparts in violation of Federal Rule of Civil Procedure 33(a)(1). Subject to and without waiving the foregoing objections, GDS Parties state that, based on Defendants' documents and the information made available to them upon which they rely:

**Count One -- Breach of Contract:** A valid and enforceable contract existed between Defendants and Plaintiff, evidenced by the Contract executed May 26, 2023, the First Amendment executed December 4, 2024, and the Second Amendment executed December 31, 2025. Defendants performed, tendered performance, were ready to perform, or were excused from further performance by Plaintiff's own conduct, including Seller's timely delivery of the Due Diligence Items, Seller's two documented tire-removal efforts and notifications of completion on June 21, 2023 and January 11, 2024, Seller's delivery of the January 26, 2026 Phase II Environmental Site Assessment, and Seller's no less than five written attempts between December 15, 2025 and January 26, 2026 to establish a closing date. Plaintiff materially breached the Contract by: (a) failing to close in accordance with the Contract's agreed terms notwithstanding Seller's repeated attempts to schedule a closing; (b) failing to remain ready, willing, and able to perform, including by never tendering the Purchase Price or appearing at a closing; (c) conditioning closing on new and extra-contractual demands communicated in Jeffrey Libby's February 12, 2026 email; (d) preventing or hindering consummation of the sale by refusing to accept the January 26, 2026 ESA and retaining ESE Partners to attempt to refute its findings rather than proceeding toward Closing; and (e) repeatedly asserting, in the final days of successive Inspection Period deadlines (December 15, 2023, approximately 98% into the original Inspection Period, and July 1, 2024, eight days before the anticipated expiration), that de minimis tire remnants required resetting the Inspection Period, notwithstanding Seller's two prior systematic removal efforts across the nearly 1,674-acre Property, which Defendants contend constituted substantial performance of Section 7(d) and rendered any residual nonconformity immaterial under the Mustang Pipeline/Restatement Section 241 factors. Plaintiff's breach was material because it defeated the central purpose of the transaction -- the sale of the Property at the agreed price of approximately $32,643,000.00. As a direct and proximate result of Plaintiff's breach, Defendants have suffered actual damages as set forth below.

**Count Two -- Anticipatory Repudiation:** Plaintiff has delayed Closing indefinitely and refused to proceed unless Defendants meet Plaintiff's extra-contractual demands, as reflected in Jeffrey Libby's February 12, 2026 email reversing Plaintiff's own January and early February 2026 assurances that it was ready to paper up one last amendment and move toward closing. Plaintiff engaged in a pattern of strategic delay to reset and postpone the Inspection Period and Closing, including by repeatedly identifying alleged tire issues at or near the expiration of applicable contractual deadlines despite having been aware of the underlying tire-removal history for extended periods, and by imposing new, extra-contractual insurance and reliance-letter conditions not found in Section 7(c) or elsewhere in the Contract. By this conduct, Plaintiff has absolutely and unequivocally refused to perform its obligations under the Contract without justification, constituting anticipatory repudiation. As a direct and proximate result, Defendants have suffered actual damages as set forth below.

**Count Three -- Declaratory Judgment:** An actual and justiciable controversy exists between the parties regarding their respective rights and obligations under the Contract and its amendments, including whether Defendants satisfied the conditions precedent to Closing set forth in Section 8 of the Contract (including Section 8(d)'s tire-removal condition, which Defendants contend was satisfied through substantial performance and/or rendered immaterial by any residual nonconformity, and which Defendants further contend must be read together with Section 7(d)'s notice-and-cure mechanism rather than as licensing repeated, open-ended resets of the Inspection Period), whether Plaintiff was entitled to impose the extra-contractual conditions reflected in the February 12, 2026 email, whether Plaintiff's conduct constitutes breach, anticipatory breach, repudiation, and/or default, and whether Plaintiff's remedies (if any) are limited by Section 11(b) of the Contract. Defendants seek a declaration resolving each of these disputed issues in Defendants' favor pursuant to Texas Civil Practice and Remedies Code Sections 37.001 et seq.

**Damages and Methodology:** Defendants seek, as a result of Plaintiff's breach, repudiation, and prevention of performance: (a) the difference between the Contract price of approximately $32,643,000.00 and the Property's fair market value as of the relevant breach date, to be quantified through appraisal and/or broker-opinion-of-value evidence and supplemented pursuant to Federal Rule of Civil Procedure 26(e) upon completion of Defendants' damages expert's analysis; (b) carrying costs incurred as a result of Plaintiff's delay, including property taxes, insurance premiums, maintenance expenses, security costs, and financing-related expenses, the specific amounts of which will be calculated from Defendants' financial and tax records and supplemented as that accounting is finalized; (c) additional marketing, brokerage, diligence, legal, and transaction expenses incurred in connection with Plaintiff's prolonged delay, to be itemized from invoices and records maintained by Defendants and their advisors, including Stephen Reich/Williams Trew Realty, David Spiller, Esq., Lacy Kimball of Lacy Kimball Law, and Whitehead Environmental Solutions, LLC; (d) pre-judgment and post-judgment interest at the maximum rate allowed by law; and (e) attorneys' fees and costs recoverable under the Contract and Texas Civil Practice and Remedies Code Sections 37.009 and 38.001 et seq. In the alternative, Defendants seek retention of all Earnest Money deposited by Plaintiff (consisting of the $100,000.00 initial Earnest Money deposit, of which $10,000.00 is non-refundable Independent Consideration, together with the $100,000.00 Prepaid Deposit delivered on or about July 8, 2024) as liquidated damages under Section 11(a) of the Contract.

**Knowledgeable Persons:** Bill Sanders, the other Seller parties, David Spiller, Esq., Stephen Reich,

Lacy Kimball of Lacy Kimball Law, and any damages or valuation expert retained by Defendants. Supporting documents include Section 11(a) and Section 11(b) of the Contract, McKnight Title's escrow records, Defendants' property tax, insurance, and maintenance records, and invoices from Defendants' brokers, counsel, and environmental consultants, all of which will be produced or supplemented in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 4:** Describe Your role and involvement, including in Your capacity as a manager of Cresson Moon Management, LLC, if applicable, in the performance of all obligations under the Contract.

**ANSWER:** Subject to and without waiving the foregoing objections, based on Defendants' documents and the information made available to them upon which they rely, GDS Parties state the following:

Richard David Smelley, Tammy Marie Graham, and Deborah Ruth Davis each served as a Manager of Cresson Moon Management, LLC, the general partner of Cresson Moon Properties, LP, and in that capacity executed the Contract and the First and Second Amendments thereto on behalf of Cresson Moon Properties, LP. Amy Elizabeth Smelley, Gregory Scott Graham, and David Glenn Davis did not serve as Managers of Cresson Moon Management, LLC and joined the Contract solely in their individual capacities for the purpose of conveying their respective interests in the Mineral Estate. GDS Parties' investigation is continuing, and GDS Parties reserve the right to supplement this answer.

**INTERROGATORY NO. 5:** Identify all Communications by You or Your agents to any third parties regarding the potential sale, marketing, listing, or availability of the Property from May 26, 2023 to the present, including the date, manner, content, and identity of each third party.

**ANSWER:** GDS Parties object to this Interrogatory as overly broad and unduly burdensome in scope and time period, and to the extent it seeks information protected by the attorney-client privilege or work-product doctrine. Moreover, GDS Parties object on relevancy grounds, as this Interrogatory is not relevant, nor is it reasonably calculated to lead to admissible evidence to support a claim or defense currently alleged by either party. Subject to these objections and without waiver thereof, DGS Parties state that Seller directed agents to advise any parties interested in the purchase of the Property to state that the Property was under contract and that agents may be in touch if that changed. Following Plaintiff's repeated delays and refusal to set a closing date, Seller's agents engaged in preliminary discussions with third parties regarding the Property's potential availability, consistent with Seller's rights under law and contract and its obligations to mitigate damages caused by Plaintiff's delay. GDS Parties' investigation into any responsive Communications is continuing. GDS Parties will supplement this answer pursuant to Federal Rule of Civil Procedure 26(e) if relevant and responsive information is identified. GDS Parties also direct Plaintiff to Defendants' documents under FRCP 33(d).

**INTERROGATORY NO. 6:** State all knowledge or information You personally have regarding the presence of any environmental contamination, Hazardous Substances, hazardous materials, Tires, or above-ground and/or underground storage tanks in, on, under, or about the Property.

**ANSWER:** GDS Parties object to this Interrogatory to the extent it seeks information protected by

the attorney-client privilege or work-product doctrine. Subject to and without waiving the foregoing objections:

GDS Parties state that, based on Defendants' documents and the information made available to them upon which they rely, they are not aware of any environmental contamination, Hazardous Substances, hazardous materials, in, on, under, or about the Property, other than the Tires that were the subject of the parties' Contract and the findings reported in the January 26 Phase II ESA referenced in Plaintiff's discovery requests. GDS Parties are aware of one metal tank, three grain silos, one feed lot water tank, and three old water storage tanks (one in a tree line, one at the rental property, and one in the feed lot area) that were used for potable water storage currently on the Property; GDS Parties' investigation is continuing, and GDS Parties reserve the right to supplement this answer pursuant to Federal Rule of Civil Procedure 26(e)

Dated: August 13, 2026

Respectfully submitted,

By: */s/ Scott A. Wheatley*

Scott A. Wheatley
State Bar No. 24013737
swheatley@jw.com
Lee B. Hunt
State Bar No. 24082257
lhunt@jw.com
Trevor J. Paul
State Bar No. 24133388
tpaul@jw.com

JACKSON WALKER LLP
777 Main Street, Suite 2100
Fort Worth, TX 76102
817.334.7200 –Phone
817.334.7290—Fax

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, a true and correct copy of the foregoing document was electronically served on Plaintiff Challenger Cresson I, LLC, via its counsel of record, by electronic mail, accompanied by the requisite declarations.

*/s/ Scott A. Wheatley*
Scott A. Wheatley

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

## DECLARATION OF RICHARD DAVID SMELLEY

I, Richard David Smelley, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

1. My name is Richard David Smelley. I am a Defendant in the above-captioned action. I am over the age of eighteen (18) years and am competent to make this Declaration.
2. I have personal knowledge of the facts set forth in this Declaration and in my answers to the foregoing DEFENDANTS' RICHARD DAVID SMELLEY, AMY ELIZABETH SMELLEY, TAMMY MARIE GRAHAM, GREGORY SCOTT GRAHAM, DEBORAH RUTH DAVIS, AND DAVID GLENN DAVIS ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (the "Responses").

3. I have reviewed the Responses. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief formed after reasonable inquiry and based on documents made available to me and statements from others upon which I have relied.

4. In preparing the Responses, I reviewed documents and records in my possession, custody, or control and consulted with my attorneys of record regarding the applicable objections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: ________________________________________________

Executed on August ___, 2026, in __________________, Texas.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

## DECLARATION OF AMY ELIZABETH SMELLEY

I, Amy Elizabeth Smelley, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

1. My name is Amy Elizabeth Smelley. I am a Defendant in the above-captioned action. I am over the age of eighteen (18) years and am competent to make this Declaration.
2. I have personal knowledge of the facts set forth in this Declaration and in my answers to the foregoing DEFENDANTS' RICHARD DAVID SMELLEY, AMY ELIZABETH SMELLEY, TAMMY MARIE GRAHAM, GREGORY SCOTT GRAHAM, DEBORAH RUTH DAVIS, AND DAVID GLENN DAVIS ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (the "Responses").

3. I have reviewed the Responses. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief formed after reasonable inquiry and based on documents made available to me and statements from others upon which I have relied.

4. In preparing the Responses, I reviewed documents and records in my possession, custody, or control and consulted with my attorneys of record regarding the applicable objections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: ________________________________________

Executed on August ___, 2026, in ________________, Texas.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

# DECLARATION OF TAMMY MARIE GRAHAM

I, Tammy Marie Graham, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

1. My name is Tammy Marie Graham. I am a Defendant in the above-captioned action. I am over the age of eighteen (18) years and am competent to make this Declaration.
2. I have personal knowledge of the facts set forth in this Declaration and in my answers to the foregoing DEFENDANTS' RICHARD DAVID SMELLEY, AMY ELIZABETH SMELLEY, TAMMY MARIE GRAHAM, GREGORY SCOTT GRAHAM, DEBORAH RUTH DAVIS, AND DAVID GLENN DAVIS ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (the "Responses").

3. I have reviewed the Responses. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief formed after reasonable inquiry and based on documents made available to me and statements from others upon which I have relied.

4. In preparing the Responses, I reviewed documents and records in my possession, custody, or control and consulted with my attorneys of record regarding the applicable objections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: [signature]

Executed on August 13, 2026, in Tarrant, Texas.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

# DECLARATION OF GREGORY SCOTT GRAHAM

I, Gregory Scott Graham, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

1. My name is Gregory Scott Graham. I am a Defendant in the above-captioned action. I am over the age of eighteen (18) years and am competent to make this Declaration.
2. I have personal knowledge of the facts set forth in this Declaration and in my answers to the foregoing DEFENDANTS' RICHARD DAVID SMELLEY, AMY ELIZABETH SMELLEY, TAMMY MARIE GRAHAM, GREGORY SCOTT GRAHAM, DEBORAH RUTH DAVIS, AND DAVID GLENN DAVIS ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (the "Responses").

3. I have reviewed the Responses. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief formed after reasonable inquiry and based on documents made available to me and statements from others upon which I have relied.

4. In preparing the Responses, I reviewed documents and records in my possession, custody, or control and consulted with my attorneys of record regarding the applicable objections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: [signature]

Executed on August 13, 2026, in Parker, Texas.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Cause No. 4:26-cv-00231-P** |

---

## DECLARATION OF DEBORAH RUTH DAVIS

---

I, Deborah Ruth Davis, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

1. My name is Deborah Ruth Davis. I am a Defendant in the above-captioned action. I am over the age of eighteen (18) years and am competent to make this Declaration.

2. I have personal knowledge of the facts set forth in this Declaration and in my answers to the foregoing DEFENDANTS' RICHARD DAVID SMELLEY, AMY ELIZABETH SMELLEY, TAMMY MARIE GRAHAM, GREGORY SCOTT GRAHAM, DEBORAH RUTH DAVIS, AND DAVID GLENN DAVIS ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (the "Responses").

3. I have reviewed the Responses. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief formed after reasonable inquiry and based on documents made available to me and statements from others upon which I have relied.

4. In preparing the Responses, I reviewed documents and records in my possession, custody, or control and consulted with my attorneys of record regarding the applicable objections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: Deborah Davis

Executed on August 13, 2026, in Parker County, Texas.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Cause No. 4:26-cv-00231-P** |
| **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,** | § § § § § § § | |
| | | |
| **Defendants.** | | |

## DECLARATION OF DAVID GLENN DAVIS

I, David Glenn Davis, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

1. My name is David Glenn Davis. I am a Defendant in the above-captioned action. I am over the age of eighteen (18) years and am competent to make this Declaration.

2. I have personal knowledge of the facts set forth in this Declaration and in my answers to the foregoing DEFENDANTS' RICHARD DAVID SMELLEY, AMY ELIZABETH SMELLEY, TAMMY MARIE GRAHAM, GREGORY SCOTT GRAHAM, DEBORAH RUTH DAVIS, AND DAVID GLENN DAVIS ANSWERS AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (the "Responses").

3. I have reviewed the Responses. The factual statements contained therein are true and correct to the best of my knowledge, information, and belief formed after reasonable

inquiry and based on documents made available to me and statements from others upon which I have relied.

4. In preparing the Responses, I reviewed documents and records in my possession, custody, or control and consulted with my attorneys of record regarding the applicable objections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signature: ______________________________

Executed on August 13, 2026, in Parker County, Texas.