In the United States District Court
for the Northern District of Texas
Fort Worth Division

| | | |
|---|---|---|
| Challenger Cresson I, LLC,<br>Plaintiff, | §<br>§<br>§ | |
| v. | § | No. 4:26-CV-00231-P |
| Bill Sanders, et al.,<br><br>Defendants. | §<br>§<br>§<br>§ | |

**Plaintiff's Brief in Support of**
**Plaintiff's Motion for Partial Summary Judgment**

## Table of Contents


Table of Authorities ........ 3

Summary of the Argument ........ 5

Statement of Facts ........ 8

A. The Contract conditions closing on Seller's environmental performance. ........ 9

B. Seller's own notices reset the Inspection Period, by agreement. ........ 10

C. Seller's Section 7(c) investigation ran past the outside Closing Date. ........ 12

D. The January 26 ESA did not supply what Section 7(c) requires. ........ 13

E. Purchaser identified the deficiencies and sued to enforce the Contract. ........ 15

F. Seller put the Property back on the market. ........ 16

G. Seller treated the Contract as live until October 26, 2026. ........ 17

Argument ........ 19

I. Seller's counterclaims fail. ........ 20

A. Seller's Count One—Breach of contract ........ 20

B. Seller's Count Two—Anticipatory repudiation ........ 28

C. Seller's Count Three—Declaratory judgment ........ 29

II. Seller's mirroring affirmative defenses fail. ........ 30

A. Seller's Affirmative Defense 2—Failure to perform ........ 31

B. Seller's Affirmative Defense 3—Prior material breach ........ 31

C. Seller's Affirmative Defense 4—Repudiation or anticipatory breach ........ 32

D. Seller's Affirmative Defense 7—Waiver ........ 32

Conclusion ........ 34


## Use of Generative Artificial Intelligence

Under Local Rule 7.2(f)(1), this brief was prepared using generative artificial intelligence.

# Table of Authorities

## Cases

*Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*,
518 S.W.3d 432 (Tex. 2017) (per curiam) ........................................................................ 31

*Conn Credit I, L.P. v. TF LoanCo III, L.L.C.*,
903 F.3d 493 (5th Cir. 2018) .......................................................................................... 20

*Fahey v. Taylor Bang Cattle Sales, LLC*,
No. 4:26-cv-00038-P, 2026 WL 2608991 (N.D. Tex. Sept. 3, 2026) .............................. 29

*Hanks v. GAB Bus. Servs., Inc.*,
644 S.W.2d 707 (Tex. 1982) ........................................................................................... 29

*Harris Cnty. v. MERSCORP Inc.*,
791 F.3d 545 (5th Cir. 2015) .......................................................................................... 28

*In re Windmill Run Assocs., Ltd.*,
566 B.R. 396 (Bankr. S.D. Tex. 2017) ........................................................................... 27

*Long Trusts v. Griffin*,
222 S.W.3d 412 (Tex. 2006) (per curiam) ........................................................................ 29

*Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*,
574 S.W.3d 882 (Tex. 2019) ........................................................................................... 20

*Penthol, L.L.C. v. Vertex Energy Operating, L.L.C.*,
149 F.4th 504 (5th Cir. 2025) .................................................................................... 27, 31

*Shields Ltd. P'ship v. Bradberry*,
526 S.W.3d 471 (Tex. 2017) ...................................................................................... 31, 32

*White Knight Dev., LLC v. Simmons*,
718 S.W.3d 203 (Tex. 2025) ........................................................................................... 19

## Rules

Fed. R. Civ. P. 56 ........................................................................................................ 4, 18

N.D. Tex. Local Rule 7.2(f)(1) ............................................................................................... 2

N.D. Tex. Local Rule 56.3 ...................................................................................................... 4

N.D. Tex. Local Rule 56.5 ...................................................................................................... 4

**Secondary Authorities**

10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (4th ed. 2026)
§ 2727.1 .......... 18
§ 2727.2 .......... 18

## Summary of the Argument

This commercial contract action concerns a $32.6 million agreement to sell approximately 1,674 acres for development as a master-planned industrial complex. Plaintiff Challenger is the "Purchaser"; Defendants are the "Seller." Purchaser seeks to enforce the bargain: Seller must convey the Property *after* completing the required environmental cleanup and certification, and must cooperate with Purchaser's pre-closing development efforts. But Seller demanded closing without completing those obligations, obstructed Purchaser's development efforts, and ultimately declared the Contract terminated. Seller also counterclaimed, alleging that Purchaser breached or repudiated the very Contract it seeks to enforce.

This motion for partial summary judgment seeks to resolve Seller's counterclaims and affirmative excuses without prematurely adjudicating Purchaser's own claims. The distinction matters. Seller bears the burden of proving its counterclaims and affirmative defenses, and its failure to establish their essential elements warrants judgment now, regardless of whether Purchaser has yet established every element of its own claims. The Contract and undisputed record also independently defeat Seller's theories. Eliminating them will narrow the litigation to its proper focus: Seller's liability and the nature and extent of Purchaser's relief, including specific performance and monetary recovery for delay. Those questions warrant adjudication on a complete record; Seller's unsupported claims and excuses do not.

Consistent with Local Rules 56.3(a)(1), 56.3(b), and 56.5(a), Purchaser now moves under Rule 56 for partial summary judgment on Seller's counterclaims and key affirmative defenses. *See* Doc. 37 (motion); Doc. 38 (appendix). The following summary identifies the specific elements on which Seller bears the burden of proof but lacks legally sufficient evidence, as well as the grounds independently defeated by the undisputed record.

**Seller's Count One—Breach of contract.** Seller cannot establish that Purchaser breached any contractual duty. Its failure-to-close theory fails because Seller cannot establish satisfaction or excuse of the conditions precedent to Purchaser's closing obligation, including timely delivery of an environmental report from a licensed environmental engineer, the required confirmation of environmental conditions, compliance with environmental warranties, tire removal, and delivery of due-diligence materials. Seller likewise cannot establish an independent duty of continuous financial readiness, a failure to pay when payment became due, an actual refusal to perform without extra-contractual protections, or any wrongful conduct in Purchaser's enforcement of contractual requirements. The extensions Seller challenges were expressly agreed upon. Seller's catchall allegation identifies no additional duty or breach.

**Seller's Count Two—Anticipatory repudiation.** Seller cannot establish that Purchaser absolutely and unconditionally refused to perform without just excuse. It identifies neither an express refusal to purchase the Property nor a definite statement that Purchaser would withhold performance unless Seller accepted extra-contractual demands. The undisputed record instead establishes that Purchaser sought performance of the Contract, while the challenged delays and extensions establish no repudiation.

**Seller's Count Three—Declaratory judgment.** Seller cannot establish the substantive contractual predicates for its requested declarations that Seller satisfied all closing conditions, Purchaser defaulted, or Seller is entitled to resulting damages. Those requests depend on the failed breach and repudiation theories. Its remaining requests concerning extra-contractual conditions and limitations on Purchaser's remedies merely duplicate issues presented by the existing claims and defenses and warrant no independent declaration.

**Seller's Affirmative Defense 2—Failure to perform.** To the extent Seller asserts an affirmative excuse rather than merely disputing the merits of Purchaser's claims, it cannot establish that Purchaser failed to perform an enforceable contractual duty or that any such failure excused Seller's performance. The closing conditions remained unsatisfied, and Seller identifies no other breach by Purchaser. Seller's election to continue the Contract independently defeats the asserted excuse.

**Seller's Affirmative Defense 3—Prior material breach.** Seller cannot establish a breach by Purchaser, its materiality, or its occurrence before the Seller performance allegedly excused. The challenged conduct either complied with the Contract or occurred after Seller's own nonperformance. Seller's subsequent election to continue the Contract independently defeats the defense.

**Seller's Affirmative Defense 4—Repudiation or anticipatory breach.** Seller cannot establish an absolute and unconditional refusal by Purchaser to perform without just excuse. Purchaser instead demanded contractual compliance and sought specific performance. Seller also cannot establish that any purported repudiation excused its obligations, particularly after electing to continue the Contract.

**Seller's Affirmative Defense 7—Waiver.** Seller cannot establish that Purchaser intentionally relinquished any identified contractual right or remedy, much less through the qualifying signed writing that the Contract requires. The conduct Seller invokes cannot satisfy those requirements, and Purchaser expressly reserved its rights. The only written amendments Seller identifies reaffirmed the Contract and preserved or strengthened Purchaser's protections rather than waiving them.

**Statement of Facts**

This motion rests on a relatively straightforward documentary record. The decisive evidence consists of the Contract and its amendments, Seller's environmental report, contemporaneous correspondence, and Seller's own admissions. No deposition testimony is needed. Seller's pleadings and discovery responses establish the central chronology—including the January 10 closing date and Seller's January 26 delivery of the required environmental report. Doc. 11 at 13; App. 313–314. The motion thus turns on the legal consequences of largely undisputed documents and historical facts, not competing witness accounts.

Nor does the motion depend on the precise state of Purchaser's pleadings. Seller's counterclaims and affirmative excuses fail on their own terms, regardless of whether Purchaser proceeds under its existing complaint or its proposed Second Amended Complaint. *See* Doc. 33. The Court therefore need not decide Purchaser's affirmative entitlement to relief, including specific performance and monetary recovery, to resolve the issues presented here. *Cf.* Doc. 34.

The facts follow a clear progression, with a recurring theme: whenever difficulties arose, Purchaser insisted on enforcing the Contract, while Seller sought to escape its obligations. The Contract established Seller's duties and made their performance a condition of Closing. When Seller struggled to satisfy those duties, Purchaser agreed to extensions rather than abandon the bargain. When Seller eventually delivered a late and deficient environmental report, Purchaser again insisted on contractual compliance rather than walk away. Seller took the opposite course: it demanded Closing without completing its obligations, began remarketing the Property, and ultimately purported to terminate the Contract. This chronology explains the parties' fundamentally different positions throughout the dispute: Purchaser has consistently sought performance of the bargain; Seller has increasingly sought a way out of it.

### A. The Contract conditions closing on Seller's environmental performance.

The Contract's structure is central to this dispute. It did not require Purchaser to close merely because a deadline arrived or Seller demanded payment. Instead, it imposed specific obligations on Seller—including environmental cleanup, certification, tire removal, and delivery of due-diligence materials—and expressly conditioned Purchaser's duty to close on their satisfaction. Those provisions define the bargain Purchaser seeks to enforce and explain why Seller's subsequent demands for Closing were premature.

#### 1. The parties agreed to a $32.6 million land sale.

The parties agreed to the sale of approximately 1,674 acres in Hood County for $32.6 million under a May 26, 2023 Contract executed through Purchaser's predecessor-in-interest. App. 1–3 / Ex. 1 at 1–3 (§§ 1(a), 2); App. 303 / Ex. 18 at 2 (RFA 1). The Property was intended for "a master planned industrial complex served by rail." App. 7 / Ex. 1 at 7 (§ 5(e)); App. 312 / Ex. 18 at 11 (RFA 27). The parties recorded a memorandum in Hood County, and every Seller signatory is jointly and severally liable. App. 19, 64 / Exs. 1–2; Doc. 11 at 4 (Answer ¶ 19).

#### 2. Seller undertook specific environmental obligations.

Seller undertook specific environmental obligations. Section 7(c) required environmental cleanup and delivery, at least fifteen days before Closing, of a licensed environmental engineer's report confirming that no environmental contamination exists on or with respect to the Property:

> (c) Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

App. 11 / Ex. 1 at 11 (§ 7(c)) (emphasis added). Section 7(d) separately required removal of all Tires within thirty days after the Effective Date. *Id.* (§ 7(d)). Seller also warranted that no

Hazardous Substances had been used, stored, or disposed of on the Property—a warranty repeated at Closing and expressly encompassing petroleum products. App. 7, 9–10 / Ex. 1 (§ 6(i)).

**3. Seller's performance was a condition of Closing.**

Section 8 made Seller's performance an "express condition precedent to Purchaser's obligations under this Contract." App. 12 / Ex. 1 at 12 (§ 8). Its conditions include performance of material covenants, accuracy of warranties, complete tire removal, and delivery of Due Diligence Items. *Id.* (§ 8(b), (d)–(f)). Purchaser could waive a condition only through a writing executed by its authorized officer that expressly identified the waived condition and referenced Section 8. *Id.* Unsatisfied conditions gave Purchaser the right, but not the obligation, to terminate, without impairing its Section 11(b) remedies. App. 12–13.

**4. The Contract governs payment, default, and extensions.**

The Contract required Purchaser to pay the purchase price at Closing. App. 14 / Ex. 1 at 14 (§ 9(c)). Section 11(a) permitted Seller to terminate for Purchaser's default only after written notice and a ten-day opportunity to cure, and only if Seller itself had not defaulted. App. 16 / Ex. 1 at 16. Seller's "sole and exclusive remedy" was retention of the Earnest Money then deposited; Section 11(b) permitted Purchaser to seek specific performance for Seller's default. *Id.* Sections 13(f) and 13(k) respectively required signed writings for contractual modifications and extended the Closing Date day for day when Seller delivered a required document late. App. 19–20 / Ex. 1.

**B. Seller's own notices reset the Inspection Period, by agreement.**

The parties' early dealings show how Seller's incomplete performance affected the contractual schedule. When Purchaser discovered that tires and required documents remained outstanding, it insisted on compliance rather than abandon the transaction. Seller responded with new completion notices, and the parties agreed to reset and extend the Inspection Period. Those

agreements matter because Seller now seeks to blame Purchaser for delays Seller helped create and expressly accepted.

**1. Seller's performance controlled the initial schedule.**

The original schedule depended on Seller completing its preliminary obligations. Section 5(a) measured the 180-day Inspection Period from the later of Seller's notice that all Tires had been removed or its delivery of all Due Diligence Items. App. 5 / Ex. 1 at 5. Closing ordinarily followed ninety days later, subject to Purchaser's right to accelerate it. App. 13 / Ex. 1 at 13 (§ 9(a)). Seller had thirty days to remove Tires and ten days to provide Due Diligence Items. App. 3, 11 / Ex. 1 (§§ 4(a), 7(d)).

**2. Seller's incomplete performance prompted agreed resets.**

Seller's first tire-removal notice came from its broker on June 21, 2023. App. 76 / Ex. 3; App. 315 / Ex. 18 (RFA 42). Purchaser's December 15 letter documented "numerous Tires" remaining on the Property, missing pipeline information, approximately thirty drums of oil-based products, a petroleum tank, and oily staining. App. 78 / Ex. 4 at 2. The parties then "agreed to reset the 180-day Inspection Period," as Seller admits. Doc. 11 at 4 (Answer ¶ 23). Its broker issued another completion notice on January 11, 2024, requesting "a new critical dates letter." App. 83 / Ex. 5; App. 315 / Ex. 18 (RFA 44).

Further deficiencies remained. Purchaser's July 1, 2024 letter documented additional Tires with photographs and identified missing mineral-estate materials, including shut-in royalty checks. App. 85–87, 91–92 / Ex. 6. Seller characterizes the remaining Tires as a fragment and a tire mounted on a boat trailer, which it says were removed. App. 315 / Ex. 18 (RFA 43). Purchaser maintains that tire removal and delivery of the required materials were never completed; Seller disputes both points. App. 288–290 / Ex. 17 (ROGs 6–7); App. 307, 315–318 / Ex. 18 (RFAs 16, 45–46, 51). Purchaser's letters expressly reserved its rights. App. 79, 87 / Exs. 4, 6.

### 3. The First Amendment formalized the extensions.

The First Amendment formalized another extension. Executed December 4, 2024, it extended the Inspection Period to April 7, 2025, required delivery of outstanding shut-in payment materials within five business days, and established December 31, 2025, as the outside Closing Date unless otherwise agreed in writing. App. 93–95 / Ex. 7 (§§ 2, 4(b), 5). Every Seller party ratified the Contract. *Id.* The amendment also addressed Purchaser's previously delivered $100,000 Prepaid Deposit, specifying that it would not become Earnest Money unless Purchaser exercised its first Inspection Period extension option. App. 93–94 / Ex. 7 (§ 3).

## C. Seller's Section 7(c) investigation ran past the outside Closing Date.

Seller's environmental investigation illustrates the central problem with its demand for Closing: Seller had not completed the work that the Contract required before Purchaser could be obligated to close. The parties accommodated that delay through the Second Amendment, which expressly reaffirmed the environmental-report condition. Yet Seller missed even the extended deadline. The critical dates are admitted, leaving no factual dispute about the report's untimely delivery.

### 1. Seller missed the original environmental-report deadline.

Seller did not begin its consultant's assessment until December 12, 2025—more than two and a half years after the Effective Date and only nineteen days before the December 31 outside Closing Date. App. 106 / Ex. 9 at 1; App. 95 / Ex. 7 at 3. Seller admits that the required environmental report had not been delivered by December 16, the original fifteen-day advance deadline under Section 7(c). App. 314 / Ex. 18 (RFA 34).

### 2. The Second Amendment expressly conditioned Closing on the report.

The Second Amendment, executed December 31, acknowledged that Seller's engineer was still finalizing the investigation's scope and that the report could not be completed before year-

end. App. 101 / Ex. 8. Section 2 expressly provided that "Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations" and extended the Closing Date to January 10, 2026. App. 102 / Ex. 8 (§ 2). Section 3 contemplated a further amendment addressing Section 7(c) deadlines and Closing, and Section 4 preserved the rest of the Contract in full force. *Id.* All Seller parties again ratified it.

**3. Seller missed every proposed deadline.**

Seller nevertheless delivered the report on January 26, 2026—sixteen days after the extended Closing Date, as Seller expressly admits. App. 313–314 / Ex. 18 (RFAs 30, 37). Field sampling had not even begun until January 9. App. 106 / Ex. 9. This brief refers to the delivered document as the "January 26 ESA."

Seller repeatedly identified January 10 as the controlling date. Its Answer acknowledges that date, and each Seller group swore that Purchaser allowed the "time-of-the-essence Outside Closing Date of January 10, 2026" to pass. Doc. 11 at 5; App. 334, 353, 373 / Exs. 19–21. Yet the report was late under every date Seller has proposed. Section 7(c) required delivery fifteen days before Closing: December 16 under the original date, December 26 under January 10, and January 8 under the January 23 date asserted in Seller's October 26 letter. App. 11, 95, 102, 275. The record contains no Third Amendment establishing January 23. App. 93–105 / Exs. 7–8.

Seller's closing demands preceded or accompanied the report. Its sworn responses identify at least five written attempts to schedule Closing between December 15, 2025, and January 26, 2026. App. 332, 351, 371 / Exs. 19–21.

**D. The January 26 ESA did not supply what Section 7(c) requires.**

The report's eventual delivery did not cure the problem. The Contract required a particular professional to provide a particular environmental confirmation; yet Seller supplied a limited investigation that did neither on its face. The report also restricted Purchaser's ability to rely on it.

These deficiencies matter independently of timing because delivery of a document is not necessarily satisfaction of the contractual obligation to provide it.

**1. Seller conducted only limited environmental testing.**

The January 26 ESA calls itself a "Limited Phase II Investigation (soil only since groundwater not encountered)." App. 106 / Ex. 9 at 1. Whitehead Environmental Solutions, LLC prepared it for Greg Graham of Cresson Moon Property LLC (a Seller party). *Id.* The investigation relied on six soil borings across 1,674 acres, targeting two former on-site gas-well pads and one off-site pad. App. 106–107. Three borings became temporary wells, but none yielded groundwater for sampling. *Id.* Seller admits that no groundwater testing occurred and that it contracted for no other Property testing. App. 314, 323–324 / Ex. 18 (RFAs 35, 64).

**2. The report detected petroleum constituents.**

The sampling detected low concentrations of petroleum hydrocarbons, ethylbenzene, xylenes, barium, chloride, and other constituents. App. 108 / Ex. 9 at 3. The report compared results against Tier 1 Residential Protective Concentration Levels and Railroad Commission limits, concluding that "there is no evidence of any impact to the Site, and no further investigation is warranted at this time." App. 108–109.

**3. The report lacked three contractual requirements.**

Three facial deficiencies distinguish the report from Section 7(c)'s requirements. **First**, it was prepared for Cresson Moon's sole use and prohibited reliance by other parties without consent. App. 109 / Ex. 9; App. 314 / Ex. 18 (RFA 33). **Second**, none of its signatories was identified as a licensed environmental engineer; their titles were Senior Consultant, Environmental Scientist, and Professional Geoscientist. App. 109. **Third**, the report did not provide the required confirmation that no environmental contamination existed on or with respect to the Property. App. 108–109.

#### 4. The parties dispute the significance of the findings.

The parties dispute the environmental significance of the findings. Purchaser had previously reported oil-based drums and oily staining; the January 26 ESA later detected petroleum hydrocarbons, which fall within the Contract's definition of Hazardous Substances. App. 78 / Ex. 4; App. 108 / Ex. 9; App. 10 / Ex. 1. Seller nevertheless maintains that the report satisfies Section 7(c) and denies that it shows Hazardous Substances. Doc. 11 at 9; App. 313–314 / Ex. 18 (RFAs 32, 38).

### E. Purchaser identified the deficiencies and sued to enforce the Contract.

Purchaser's response to the deficient report confirms its consistent position: it wanted Seller to perform the bargain, not escape it. Purchaser identified the outstanding contractual requirements, requested corrective action, and expressly contemplated Closing once those requirements were satisfied. When the dispute persisted, Purchaser sued for specific performance. This sequence directly contradicts Seller's characterization of Purchaser's conduct as breach or repudiation.

#### 1. Purchaser demanded compliance, not new terms.

Purchaser's February 12, 2026 email identified three deficiencies in Seller's report: the inaccuracy of Seller's Section 6(i) warranty, incomplete removal under Section 7(d), and the absence of the required environmental confirmation. App. 188 / Ex. 10; Doc. 11 at 7. Counsel concluded that Sections 6(i) and 7(c) and the corresponding closing conditions remained unsatisfied. App. 189 / Ex. 10.

The same email proposed a path toward Closing. Purchaser requested a revised report containing the contractual confirmation, an express right to rely on it, and additional-insured status on the engineer's and driller's liability policies. App. 189. Counsel explained that discussing a

closing date was premature until the environmental issues were resolved, while emphasizing Purchaser's commitment to cooperation and expressly contemplating future "Closing timing." *Id.*

Purchaser's verified discovery responses distinguish those requests. The reliance restriction conflicted with the obligation to provide Purchaser a usable report under Section 7(c). App. 284–285 / Ex. 17 (ROG 3). The insurance request, by contrast, was not an additional condition of Closing; Seller's engineer had already agreed to provide the protection. *Id.* Purchaser denies imposing any closing condition absent from or not reasonably implied by the Contract. *Id.*

**2. Purchaser continued seeking Closing and specific performance.**

Purchaser never renounced the transaction. Seller expressly admits that Purchaser never communicated an intention not to buy the Property. App. 323 / Ex. 18 (RFA 63). Fifteen days after the February 12 email, Purchaser sued to enforce the Contract and seeks specific performance. Doc. 1; App. 294 / Ex. 17 (ROG 11). Purchaser's verified responses also confirm readiness to tender approximately $32.6 million at Closing, subject to Seller's performance. App. 292 / Ex. 17 (ROG 9). Seller admits that Purchaser deposited the required Earnest Money, and its sworn responses confirm that the escrow agent still held those funds and the $100,000 Prepaid Deposit. App. 323, 334.

**3. Purchaser never waived its contractual rights.**

No written waiver accompanied Purchaser's continued pursuit of the transaction. Its correspondence expressly reserved rights; neither amendment waived a Section 8 condition, and the Second Amendment added one. App. 79, 87, 93–95, 101–102, 201.

**F. Seller put the Property back on the market.**

Seller's response moved in the opposite direction. Rather than resolve the deficiencies Purchaser had identified, Seller's broker began soliciting interest from another prospective buyer. The timing is significant: the remarketing began the day after Purchaser demanded compliance

with the environmental requirements. It supplies further context for the parties' competing approaches to the Contract.

Remarketing began immediately after Purchaser's demand. On February 13, 2026, Seller's broker Stephen Reich told another broker that the Property "is going to be coming back on the market," attached marketing materials, and solicited interest from the broker's client. App. 190, 192 / Ex. 11. Seller admits that representation and acknowledges its agents' "preliminary discussions with third parties regarding the Property's potential availability." App. 320 / Ex. 18 (RFA 56); App. 339, 358, 376 / Exs. 19–21.

### G. Seller treated the Contract as live until October 26, 2026.

Seller's own conduct and litigation positions show that it continued treating the Contract as enforceable long after the supposed closing default. It demanded Closing, asserted contractual rights, and maintained that the transaction should proceed. Only on October 26 did Seller purport to terminate the Contract and advance new theories of expiration and default. That reversal matters both to the credibility of Seller's current position and to its contention that Purchaser's earlier conduct excused Seller's performance.

#### 1. Seller repeatedly asserted that the Contract remained enforceable.

Seller's April 9, 2026 Answer affirmatively maintained that its January 26 ESA complied with the Contract and that Seller remained "entitled to proceed toward Closing." Doc. 11 at 9 (Answer ¶ 79). Seller expressly denied any intent to rescind. *Id.* Its counterclaims sought damages or, alternatively, Earnest Money under Section 11(a), without alleging that the Contract had expired or been terminated. Doc. 11 at 11–17.

Seller maintained that position in its August 2026 sworn responses. It identified January 10 as the outside Closing Date, acknowledged that the deposits remained in escrow, and asserted no Third Amendment, January 23 closing date, notice of default, or termination. App. 329–390 /

Exs. 19–21. Counsel likewise instructed Purchaser on August 17 to take no action concerning the Property unless that action involved scheduling Closing. App. 200 / Ex. 12.

**2. Seller resisted Purchaser's pre-closing development efforts.**

Meanwhile, Seller resisted Purchaser's pre-closing development efforts. After Purchaser submitted twenty-two well-permit applications and an operating-permit application under Section 5(e), Cresson Moon declined to sign them as presented and offered only conditional authorization while reserving allegations of Purchaser's breach and repudiation. App. 199–201, 270–271 / Exs. 12–13. Purchaser subsequently requested a non-invasive water-planning inspection on October 7. App. 272–273 / Ex. 14.

**3. Seller reversed course and asserted expiration and termination.**

Seller finally changed positions on October 26, 2026, declaring the Contract "no longer in force or effect." App. 275–276 / Ex. 15. The letter advanced two theories absent from its pleadings and sworn responses. First, it claimed that a "Third Amendment" extended Closing to January 23 and that the Contract then expired. App. 275. No such amendment appears in the record, which contains only the First and Second Amendments. App. 93–105 / Exs. 7–8.

The letter alternatively claimed that Seller had issued an April 2026 notice of default, that Purchaser failed to cure by proceeding to Closing, and that Seller subsequently terminated the Contract. App. 275–276 / Ex. 15. It identified no termination date and attached no April notice. *Id.* These newly asserted grounds stand in contrast to Seller's earlier insistence that the Contract remained enforceable and that Purchaser was obligated to close.

**Argument**

Plaintiff Challenger Cresson I, LLC ("Purchaser") moves for an order granting summary judgment in its favor as to both Seller's counterclaims and Seller's keystone affirmative defenses. Doc. 37. The Court should enter an order holding that Seller take nothing on its counterclaims and that those affirmative defenses fail as a matter of law, leaving nothing to try but Purchaser's claims.

Normal summary-judgment standards apply. *See* Fed. R. Civ. P. 56(a). Where, as here, the opposing party bears the burden of proof at trial on the matters at issue, the movant may obtain judgment in either of two ways. *See generally* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 2727.1, 2727.2 (4th ed. 2026). First, it may identify the absence of evidence sufficient to establish an essential element of the opposing party's claim or defense, without affirmatively disproving that element. *Id.* Second, it may produce undisputed evidence that conclusively defeats an element or otherwise establishes its entitlement to judgment as a matter of law. *Id.* Once the movant makes either showing, the opposing party must identify competent evidence creating a genuine issue for trial. *Id.*

Both grounds independently support summary judgment. Seller bears the burden on its counterclaims and affirmative defenses but lacks evidence sufficient to establish essential elements of either. The undisputed record also affirmatively defeats those theories. Although this brief devotes more attention to the latter category of affirmative proof, Seller's fundamental failure of proof independently warrants judgment. The real dispute is not whether Seller breached the Contract, but what relief can best remedy those breaches. Those questions remain for another day. *Cf.* Doc. 34 (motion for preliminary injunction). Narrowing the case accordingly will streamline the remaining litigation and trial, focusing the controversy where it belongs: not on Seller's liability, but on the nature and extent of the relief Seller must provide.

## I. Seller's counterclaims fail.

Purchaser is likely to prevail on its own claims, and in due course it will. As its preliminary-injunction briefing begins to show, the record establishes both Seller's breaches and Purchaser's right to specific performance. *See* Docs. 34, 36. Those breaches already support substantial relief, and Seller's more recent conduct—including its October 26 purported termination of the Contract—has only deepened them. The remaining questions thus concern not only the scope of specific performance and monetary relief for delay under *White Knight Development, LLC v. Simmons*, 718 S.W.3d 203 (Tex. 2025), but also the consequences of Seller's continuing breaches. Those questions warrant a complete record, and this motion does not ask the Court to decide them.

Seller's counterclaims stand differently. They are mirror images of the same disputes: where Purchaser contends that Seller breached and repudiated the Contract, Seller contends that Purchaser did; and where Purchaser seeks declarations of its contractual rights, Seller seeks the converse. Critically, Seller bears the burden of proving each counterclaim at trial. Because Purchaser need only identify essential elements Seller lacks evidence to establish, no further record is necessary. Seller's failure of proof warrants judgment, and the decisive contractual provisions and undisputed chronology independently foreclose each counterclaim as a matter of law.

### A. Seller's Count One—Breach of contract

Seller's flagship counterclaim, and the centerpiece of its litigation position, is for breach of contract—the very same Contract on which Purchaser bases its own claims for relief. Doc. 11 at 15–16. Seller seeks to hold Purchaser liable for breaching the agreement that Purchaser seeks to enforce against Seller. But Seller bears the burden of proving its counterclaim, and the Court should grant summary judgment because Seller cannot establish that Purchaser committed any breach. There is only one contractual wrongdoer here, and it is not Purchaser.

A breach-of-contract claim requires proof that the defendant failed to perform an existing contractual obligation. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). Seller alleges five breaches: (1) failing to close, (2) failing to remain ready, willing, and able to perform, (3) imposing extra-contractual closing conditions, (4) hindering or delaying the sale, and (5) otherwise defaulting. Doc. 11 at 15. The fifth is merely a catchall allegation that identifies neither a distinct contractual duty nor any conduct constituting its breach. It therefore supplies no independent basis for liability and requires no separate response. The remaining four theories fare no better. Each fails independently for the reasons that follow.

**1. Purchaser's duty to close had not arisen.**

Seller's first breach theory is that Purchaser failed to close in accordance with the Contract's terms. Doc. 11 at 15. But the Contract prescribes an extensive, carefully structured sequence of obligations and conditions precedent that must be satisfied before Purchaser's duty to close arises. The clear contractual documents and undisputed chronology establish that Seller cannot prove those prerequisites were satisfied or excused. Purchaser's closing obligation therefore never arose, defeating Seller's claim as a matter of law.

A condition precedent must be satisfied or excused before the dependent obligation becomes enforceable. *See, e.g.*, *Conn Credit I, L.P. v. TF LoanCo III, L.L.C.*, 903 F.3d 493, 502–03 (5th Cir. 2018). The Contract imposed multiple express conditions precedent to Purchaser's duty to close, including requirements governing Seller's environmental performance, warranties, tire removal, and delivery of due-diligence materials. Seller cannot establish that all those conditions were satisfied or excused. Accordingly, Purchaser's closing obligation never arose.

First, Purchaser's duty to close did not arise because Seller failed to deliver the environmental report on time. Section 7(c) required delivery at least fifteen days before Closing, and the Second Amendment expressly conditioned Purchaser's closing obligation on receipt of the

final report. App. 11, 102. Seller identifies January 10, 2026, as the closing date but admits that it delivered the report on January 26—sixteen days afterward. Doc. 11 at 13; App. 313–314. Even under the January 23 date Seller asserted in its October 26 termination letter, the report was due January 8, eighteen days before Seller delivered it. App. 275. Thus, under even Seller's most generous proposed schedule, the report was indisputably late. Section 13(k) expressly extends the Closing Date when Seller delivers a required document late. App. 20. This undisputed chronology defeats Seller's claimed closing default regardless of the report's substantive adequacy.

Second, Purchaser's duty to close independently did not arise because Seller failed to provide a report from the required professional. Section 7(c) expressly required a report from a *licensed environmental engineer*, and the Second Amendment made receipt of a satisfactory final report a condition of Purchaser's closing obligation. App. 11, 102. Seller instead delivered an investigation prepared by Whitehead Environmental Solutions, LLC, whose three signatories were identified as a Senior Consultant, an Environmental Scientist, and a Professional Geoscientist—not a licensed environmental engineer. App. 106–109. This failure alone leaves the express condition precedent unsatisfied, regardless of the report's substantive conclusions.

Third, Purchaser's duty to close independently did not arise because the report failed to provide the required environmental confirmation. Section 7(c) required a report confirming that no environmental contamination exists on or with respect to the Property, while the Second Amendment expressly required a final report satisfactory to Purchaser. App. 11, 102. Seller instead delivered a limited soil investigation that concluded only that no further investigation was warranted, without providing the contractual confirmation. App. 106–109. The report also expressly prohibited Purchaser from relying on it without additional consent. App. 109. These

deficiencies independently prevent Seller from establishing that it satisfied the environmental-report condition.

Fourth, Purchaser's duty to close did not arise because Seller cannot establish satisfaction of the environmental-warranty condition. Section 8(b) conditioned Purchaser's obligations on the truth of Seller's representations and warranties, including the Section 6(i) representation concerning Hazardous Substances. App. 9–12. Seller's own investigation detected petroleum hydrocarbons and other constituents in the soil, while its report expressly limited the scope of testing and reached no comprehensive conclusion about contamination across the Property. App. 106–109. Purchaser promptly identified the apparent inconsistency with Section 6(i) and demanded compliance. App. 188–189. At minimum, Seller cannot establish that its limited investigation conclusively satisfied the environmental representations required for Closing.

Fifth, Purchaser's duty to close was independently conditioned on Seller's removal of all Tires from the Property. Section 8(d) expressly made complete tire removal a condition precedent, while Section 7(d) required Seller to remove them within thirty days after the Effective Date. App. 11–12. Purchaser documented remaining Tires after Seller's initial removal notice, and its July 1, 2024 letter again identified Tires remaining on the Property, with accompanying photographs. App. 78, 86, 91–92. Although Seller maintains that those Tires were subsequently removed, the parties' dispute over completion supplies no basis to presume satisfaction of this independent condition. *See* App. 315–316.

Sixth, Purchaser's duty to close was conditioned on Seller's delivery of the required due-diligence materials and performance of its material covenants. Sections 8(e) and 8(f) expressly conditioned Purchaser's obligations on Seller's material performance and delivery of the Due Diligence Items and required updates. App. 12–13. Purchaser repeatedly identified missing

mineral-estate and pipeline information, including shut-in royalty materials, and the First Amendment imposed an additional deadline for delivering specified outstanding documents. App. 78–79, 85–87, 94. Purchaser's verified discovery responses maintain that Seller never completed the required deliveries, although Seller disputes that account. App. 288–290, 307, 315–318. These additional contractual requirements reinforce that the duty to close depended on Seller's completion of more than the passage of a calendar date.

The Court need not resolve every disputed condition. Seller's admitted late delivery and the facial deficiencies of its environmental report independently defeat the asserted January 10 closing default. The additional conditions confirm the Contract's broader structure: Purchaser promised to close upon satisfaction or excuse of specified prerequisites, not merely upon Seller's demand. Seller cannot establish that the obligation it accuses Purchaser of breaching had arisen.

**2. Purchaser owed no separate duty of financial readiness.**

Seller's second breach theory is that Purchaser failed to remain ready, willing, and able to purchase the Property. Doc. 11 at 14–15. With this position, Seller does not merely dispute Purchaser's entitlement to specific performance as a remedy for Purchaser's claims; it contends that failure to demonstrate financial readiness is itself a breach entitling Seller to affirmative relief. This theory fails as a matter of law because the Contract imposes no such duty: it requires payment at Closing, not continuous financial readiness beforehand. And even apart from this fundamental legal defect, the theory independently fails on the evidence.

First, this breach theory fails because the Contract never required Purchaser to constantly maintain and display its financial readiness *before closing*. Sections 2 and 9(c) make the purchase price payable at Closing. App. 3, 14. Seller identifies no provision requiring Purchaser to maintain, demonstrate, or tender those funds earlier. And because Seller had not satisfied the conditions to closing, payment was not due. *See* Part I.A.1. At most, Purchaser's readiness, willingness, and

ability to perform bears on its entitlement to specific performance—not on whether Seller has a claim for affirmative relief.

Second, the evidence supports Purchaser's readiness to perform in any event. Seller admits that Purchaser deposited the required Earnest Money, and its sworn responses confirm that the escrow agent still held those funds and Purchaser's $100,000 Prepaid Deposit. App. 323, 334. Purchaser's verified discovery responses further state that it was prepared to tender the approximately $32.6 million purchase price at Closing, subject to Seller's performance. App. 292. Seller has no contrary evidence establishing that Purchaser lacked the ability or willingness to pay, much less that it failed to make a payment when contractually required. But the more fundamental point remains: the Contract imposed no independent duty of continuous financial readiness, so Seller cannot establish a breach regardless.

**3. Purchaser imposed no extra-contractual closing conditions.**

Seller's third breach theory posits that Purchaser refused to close unless Seller provided report-reliance rights and insurance protections beyond those required by the Contract. Doc. 11 at 13–15. This theory fails as a matter of law for two independent reasons: Purchaser never conditioned its performance on receiving additional protections, and its demand for report-reliance rights enforced an existing contractual obligation.

First, Seller's theory fails because Purchaser never made the requested protections additional conditions of closing. Not everything sophisticated parties negotiate during a major transaction becomes a condition of contractual performance. No such presumption exists. Seller bears the burden of proving that Purchaser actually imposed such a condition, and the written record supplies no evidence of that critical fact. Purchaser's February 12 email identified Seller's outstanding obligations under Sections 6(i) and 7(c) and tied further closing discussions to satisfaction of those provisions. App. 188–189. The email also requested insurance protections,

but it did not state that Purchaser would refuse to close on a compliant report without them. Instead, Purchaser proposed working cooperatively to finalize the remaining items. App. 189. Its verified discovery responses expressly confirm that the insurance requests imposed no additional closing condition. App. 284–285. A request for additional protections is not a refusal to perform without them. Seller cannot establish the extra-contractual condition on which this theory depends.

Second, Seller's theory independently fails because Purchaser's requests enforced the existing Contract rather than adding to it. Even if the requests at issue were conditions of performance, they were conditions that the Contract already entitled Purchaser to insist upon. Section 7(c) required Seller to provide Purchaser with an environmental report, and the Second Amendment required that report to be satisfactory to Purchaser. App. 11, 102. Seller instead delivered a report restricting Purchaser's right to rely on it without additional consent. App. 109. Purchaser's request to cure that restriction sought the benefit of Seller's existing promise, not a new contractual obligation. App. 284–285. The accompanying insurance requests addressed related environmental risks, and Purchaser's verified response states that Seller's engineer had already agreed to provide additional-insured status. App. 189, 285. Insisting on the report the Contract promised cannot constitute an extra-contractual breach.

**4. Purchaser's authorized conduct did not breach the Contract.**

Seller's fourth breach theory is particularly audacious. Seller alleges that Purchaser breached the Contract by identifying Seller's failures to comply with its tire-removal and environmental obligations, then insisting on compliance rather than proceeding to Closing. Doc. 11 at 12–15. In effect, Seller seeks to turn evidence of its own contractual violations into an affirmative claim against the party that exposed them. But identifying a breach and demanding performance are not themselves breaches. Seller's theory fails because it offers no evidence that

Purchaser acted outside its contractual rights, and because Seller expressly agreed to the extensions it now challenges.

First, Seller's theory fails because the evidence conclusively establishes contractual grounds for Purchaser's objections, not misconduct in making them. Sections 7(c) and 7(d) required Seller to satisfy environmental obligations and remove all Tires, while Section 8 made Seller's performance a condition of Purchaser's obligations. App. 11–12. Purchaser identified remaining Tires and deficiencies in Seller's environmental report, invoking precisely those contractual requirements. App. 78–79, 85–87, 188–189. Section 5(a) also preserved specified inspection rights after the Inspection Period. App. 5–6. To turn those objections into a breach, Seller would need affirmative evidence that Purchaser invoked its contractual rights for some improper purpose that violated a contractual duty. Seller identifies none. The law does not presume misconduct merely because one contracting party calls attention to the other's nonperformance. Without evidence of an independently wrongful act, Seller cannot transform Purchaser's insistence on compliance into a breach.

Second, Seller's theory independently fails because Seller expressly agreed to the extensions it now condemns. Seller admits that the parties agreed to reset the 180-day Inspection Period. Doc. 11 at 4. The First Amendment formalized a further extension, and the Second Amendment extended Closing because Seller could not complete its environmental investigation and report by the existing deadline. App. 93–95, 101–102. Both amendments expressly reaffirmed the Contract. App. 95, 102. Seller cannot agree to extend contractual deadlines and then characterize the agreed extensions themselves as Purchaser's breach. Whatever Seller now thinks about the transaction's duration, the extensions it accepted cannot establish wrongful delay.

Seller thus cannot establish breach under any of its four substantive theories. Count One fails as a matter of law.

**B. Seller's Count Two—Anticipatory repudiation**

Seller's second counterclaim says that Purchaser committed anticipatory repudiation. Doc. 11 at 16. The Court should grant summary judgment because Seller lacks legally sufficient proof of an essential element: an absolute and unconditional refusal by Purchaser to perform its contractual obligations without just excuse. *See, e.g.*, *Penthol, L.L.C. v. Vertex Energy Operating, L.L.C.*, 149 F.4th 504, 510 (5th Cir. 2025). Indeed, the undisputed evidence affirmatively establishes that Purchaser sought to enforce the Contract, not repudiate it.

A party that sues to compel performance of a contract has not renounced it. That fundamental distinction is apparent from the pleadings in this very action and confirmed by the undisputed evidence. Seller admits that "Purchaser never communicated to Seller that Purchaser does not intend to purchase the Property." App. 323 / Ex. 18 at 22 (RFA 63). Purchaser's February 12 email expressly anticipated "Closing timing" once Seller satisfied Sections 6(i) and 7(c). App. 189 / Ex. 10 at 2. Fifteen days later, Purchaser filed this action to enforce the Contract, seeking specific performance. Doc. 1; App. 294 / Ex. 17 at 15 (ROG 11). The record establishes no refusal to perform at all, much less one that was absolute and unconditional.

Seller's extra-contractual-demand theory fails the same test. A demand for additional terms constitutes repudiation only when the demanding party also "states definitely that unless his demand is complied with he will not render his promised performance." *Penthol*, 149 F.4th at 510 (quoting *In re Windmill Run Assocs., Ltd.*, 566 B.R. 396, 445–46 (Bankr. S.D. Tex. 2017)). Purchaser's February 12 email made no such statement. It insisted on Seller's compliance with Sections 6(i) and 7(c) and proposed working cooperatively to finalize the remaining items. App.

189 / Ex. 10 at 2; *see* Part I.A.3. Again, a party seeking to compel contractual performance is doing the opposite of repudiating the bargain.

Nor do Seller's remaining allegations—indefinite delay, strategic resets, and "additional hurdles"—establish repudiation. Doc. 11 at 16 (Countercl. ¶¶ 36, 38–39). The resets and extensions were agreed, and Purchaser had contractual grounds for declining to close before the conditions precedent were satisfied. *See* Parts I.A.1, I.A.4.

At most, Seller disputes whether Purchaser is entitled to the contractual relief it seeks. But even if Purchaser ultimately failed to establish its own claims, that would not transform its efforts to enforce the Contract into an affirmative repudiation. Seller cannot turn a disputed defense to Purchaser's claims into an independent cause of action without proving the elements of that cause of action. It has no evidence of an absolute and unconditional refusal to perform without just excuse. Count Two therefore fails as a matter of law.

### C. Seller's Count Three—Declaratory judgment

Seller's third and final counterclaim seeks declaratory relief. Doc. 11 at 16–17. Its placement is fitting: the claim has no independent foundation and merely repackages Seller's failed substantive theories as requests for declarations. This is not an additional basis for relief, but an attempt to multiply claims resting on the same defective premises. Once those premises fail, the declaratory counterclaim collapses with them.

The Declaratory Judgment Act does not create substantive rights or an independent cause of action. *See Harris Cnty. v. MERSCORP Inc.*, 791 F.3d 545, 552–53 (5th Cir. 2015). Seller requests declarations that it satisfied its contractual obligations, that Purchaser defaulted, and that Seller is entitled to resulting damages. Doc. 11 at 16–17 (Countercl. ¶¶ 45(a), (c)–(d), 46(f)). Each depends on the same allegations of performance, breach, and repudiation already defeated in Parts I.A and I.B. Those allegations cannot support declaratory relief when they cannot support Seller's

substantive counterclaims. Indeed, Seller's own admitted chronology independently defeats its requested declaration that it satisfied "any and all conditions precedent to closing": it delivered the required environmental report after the contractual deadline. *See* Part I.A.1.

Seller's remaining requests add nothing to the case. Its proposed declarations concerning extra-contractual closing conditions and contractual limitations on Purchaser's remedies merely duplicate issues already presented by the parties' claims and defenses. Doc. 11 at 11, 16–17 (Countercl. ¶¶ 45(b), 46(e)). Courts may dismiss declaratory requests that serve no independent purpose. *See Fahey v. Taylor Bang Cattle Sales, LLC*, No. 4:26-cv-00038-P, 2026 WL 2608991, at *2 (N.D. Tex. Sept. 3, 2026). The Court should grant summary judgment against the declarations dependent on Seller's failed substantive theories and dismiss the remaining, duplicative requests without prejudice.

**II. Seller's mirroring affirmative defenses fail.**

Just as summary judgment should eliminate Seller's baseless counterclaims, it should also clear away the affirmative defenses that purport to excuse Seller's breaches. These defenses serve much the same purpose as the counterclaims: to recast Purchaser's efforts to enforce the Contract as misconduct that somehow relieves Seller of its own obligations. But Seller bears the burden of establishing these affirmative excuses, and the record supplies neither the necessary proof nor a valid legal basis for them.

Separately, Seller's own election to treat the Contract as continuing independently forecloses each of these excuses. A party who elects to treat a contract as continuing "deprives himself of any excuse for ceasing performance on his own part." *Long Trusts v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006) (per curiam) (quoting *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982)). After every act it now invokes, Seller elected to keep the Contract in force:

it contended that it was "entitled to proceed toward Closing," denied any intent to rescind, and asserted no termination in its sworn responses. Doc. 11 at 9; App. 334 / Ex. 19 at 6.

Eliminating these defenses would materially narrow the litigation and clarify what remains. This is not a case of competing wrongs. It is a case about Seller's breaches, Purchaser's entitlement to relief, and the nature and extent of that relief—including specific performance and monetary recovery. Those questions warrant full adjudication. Seller's unsupported excuses do not.

**A. Seller's Affirmative Defense 2—Failure to perform**

Seller styles Purchaser's alleged nonperformance as an affirmative defense, although much of it is simply a denial of the merits of Purchaser's claims. Doc. 11 at 10. To the extent Seller actually asserts an affirmative excuse for its own nonperformance, the defense fails for the reasons established in Part I.A: Purchaser's duty to close never arose because the contractual conditions precedent remained unsatisfied, and Seller cannot establish that Purchaser otherwise breached the Contract. Seller thus lacks legally sufficient proof of any Purchaser default that could excuse its own performance.

Seller's separate contention that it substantially performed its tire-removal obligations concerns the merits of Purchaser's claims, not an affirmative excuse based on Purchaser's nonperformance. App. 332. That issue is reserved. Seller's election to continue the Contract independently forecloses its asserted excuse. *See* Part II.

**B. Seller's Affirmative Defense 3—Prior material breach**

Seller asserts that Purchaser committed a prior material breach excusing Seller's performance. Doc. 11 at 10. But this defense fails for the reasons established in Part I.A: Purchaser breached no contractual duty, much less one whose material breach could excuse Seller's obligations. Seller therefore lacks legally sufficient proof of the essential predicate for this defense.

The chronology independently defeats Seller's position. Seller relies on Purchaser's refusal to schedule Closing, its February 12 requests, and its retention of environmental consultants. App. 332. None establishes a breach, and the latter two occurred after Seller had already missed its environmental-report deadline. A later breach cannot excuse earlier nonperformance. *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436–37 (Tex. 2017) (per curiam). Seller's election to continue the Contract also forecloses its asserted excuse. *See* Part II.

**C. Seller's Affirmative Defense 4—Repudiation or anticipatory breach**

Seller next asserts that Purchaser repudiated the Contract, excusing Seller's further performance. Doc. 11 at 10. This defense fails for the reasons established in Part I.B: Seller cannot prove the absolute and unconditional refusal to perform without just excuse that repudiation requires. *See Penthol,* 149 F.4th at 510.

The undisputed record establishes the opposite. Purchaser demanded contractual compliance, expressly contemplated Closing, and sued to compel performance. *See* Part I.B. None constitutes repudiation. Seller's subsequent election to continue the Contract independently forecloses its asserted excuse. *See* Part II.

**D. Seller's Affirmative Defense 7—Waiver**

Seller contends that Purchaser waived its contractual rights through conduct, delay, and course of performance. Doc. 11 at 10. But waiver requires the intentional relinquishment of a known right, and conduct establishes waiver only when unequivocally inconsistent with asserting that right. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 485 (Tex. 2017). Seller has no evidence of such relinquishment. The Contract's express terms and the parties' written record independently defeat this defense.

First, the Contract permits waiver only by a qualifying writing, and Seller has none. Section 8 requires a writing executed by Purchaser's authorized officer that expressly waives an identified

condition and refers to Section 8. App. 12. Section 13(f) likewise prohibits waiver without a written instrument signed by the party against whom waiver is asserted. App. 19. Seller instead relies on Purchaser's response to a tire-removal notice, continued due diligence, and agreed extensions. App. 333, 352, 372. None establishes the required written waiver. Under the established rule recently seen in *Shields Limited Partnership v. Bradberry*, 526 S.W.3d 471 (Tex. 2017), waiver cannot rest on the very conduct the parties agreed would be insufficient. *Id.* at 481-85. Indeed, Purchaser's correspondence expressly reserved its rights. App. 79, 87–88, 201.

Second, the parties' actual written amendments confirm Purchaser's rights rather than surrender them. Neither amendment waives any condition or refers to Section 8. App. 93–95, 101–102. Instead, both preserve the Contract in full force and expressly ratify its terms. App. 95 (§ 5), 102 (§ 4). The Second Amendment goes further, expressly conditioning Purchaser's closing obligation on receipt of a satisfactory final environmental report. App. 102 (§ 2). Seller cannot turn agreements reaffirming and strengthening Purchaser's contractual protections into evidence that Purchaser abandoned them. The waiver defense fails as a matter of law.

## Conclusion

The motion should be granted.

Respectfully submitted,

Chad Flores
Texas Bar No. 24059759
chad@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
P: (713) 364-6640
F: (832) 645-2496

Michael A. Cancienne
Texas Bar No. 24055256
mcancienne@jlcfirm.com
Joseph "Jeb" Golinkin
Texas Bar No. 24087596
jgolinkin@jlcfirm.com
Carolina Herrera
Texas Bar No. 24126398
cherrera@jlcfirm.com
Jordan, Lynch & Cancienne
1980 Post Oak Boulevard, Suite 2300
Houston, Texas 77056
P: (713) 955-4020

Counsel for Plaintiff