**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Challenger Cresson I, LLC,** | § | |
| ***Plaintiff*,** | § | |
| **v.** | § | **Civil Action No. 4:26-cv-00231-P** |
| **Bill Sanders, et al.,** | § | |
| ***Defendants*.** | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Bill Sanders, Independent Executor of the Estate of Pearl Smelley; Cresson Moon Properties, LP; Richard David Smelley and Amy Elizabeth Smelley; Tammy Marie Graham and Gregory Scott Graham; and Deborah Ruth Davis and David Glenn Davis (collectively, "Defendants") submit this Appendix in Support of their Motion for Summary Judgment pursuant to Local Civil Rule 56.6, as follows:

| Ex. | Description | App. Pages |
|---|---|---|
| A | Declaration of David Glenn Davis | APP001-004 |
| A-1 | Standard Contract of Sale (May 26, 2023) | APP005-067 |
| A-2 | First Amendment to Standard Contract of Sale (December 4, 2024) | APP068-075 |
| A-3 | Second Amendment to Standard Contract of Sale (December 31, 2025) | APP076-080 |
| A-4 | Third Amendment to Standard Contract of Sale (January 9, 2026) | APP081-085 |
| B | Declaration of Lacy Kimball | APP086-088 |
| B-1 | Email Correspondence Between Counsel Regarding the Second Amendment (December 31, 2025) | APP089-136 |

| Ex. | Description | App. Pages |
|---|---|---|
| B-2 | Proposed Third Amendment to Standard Contract of Sale (January 9, 2026) | APP137-140 |
| B-3 | Email Correspondence Between Counsel Regarding Further Amendment and Closing (January 26, 2026) | APP141-165 |
| B-4 | Email from J. Libby to L. Kimball (February 12, 2026) | APP166-167 |
| C | Declaration of Michael Whitehead | APP168-171 |
| C-1 | Email Correspondence Regarding the Phase II Investigation (December 15, 2025 – January 26, 2026) | APP172-187 |
| C-2 | Whitehead E.S., LLC Limited Phase II Investigation (January 26, 2026) | APP188-269 |
| C-3 | Whitehead E.S., LLC Certificate of Geoscience Firm Registration | APP270 |
| C-4 | Expert Report of Michael Whitehead (July 3, 2026) | APP271-292 |
| C-5 | First Supplemental Expert Report of Michael Whitehead (September 9, 2026) | APP293-300 |
| D | Declaration of David Spiller | APP301-302 |
| E | Declaration of Scott A. Wheatley | APP303-304 |
| E-1 | Plaintiff's Objections and Verified Responses to Defendants' First Set of Interrogatories (July 6, 2026) | APP305-325 |
| E-2 | Plaintiff's Responsive Expert Designation & Report (September 8, 2026) | APP326-329 |
| E-3 | Rebuttal Expert Report of R. Steven George, P.G. (September 8, 2026) | APP330-343 |

Respectfully submitted,

By: */s/ Scott A. Wheatley*

Scott A. Wheatley
State Bar No. 24013737
swheatley@jw.com
Lee B. Hunt
State Bar No. 24082257
lhunt@jw.com
Trevor J. Paul
State Bar No. 24133388
tpaul@jw.com
Jackson Walker LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102
Phone: (817) 334-7200
Fax: (817) 334-7290

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

This is to certify that on November 9, 2026, a true and correct copy of the above document was served via the ECF Filing System on all counsel of record.

*/s/ Scott A. Wheatley*
Scott A. Wheatley

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| ***Plaintiff,*** | § | |
| **v.** | § | **Civil Action No. 4:26-cv-00231-P** |
| **BILL SANDERS, *et al.*,** | § | |
| ***Defendants.*** | § | |

**DECLARATION OF DAVID G. DAVIS**

I, David Glenn Davis, declare under penalty of perjury as follows:

1. My name is David Glenn Davis. I am a Defendant in this lawsuit. I am over the age of eighteen, and I am competent and authorized to make this declaration. The facts set forth in this declaration, all of which are true and correct, are based on my personal knowledge. My personal knowledge is derived from my personal involvement in the events giving rise to this lawsuit and my review of the documents discussed in this declaration.

2. I have read Defendants' Motion for Summary Judgment and Brief in Support. All factual assertions contained therein that are within my personal knowledge are true and correct.

3. Deborah Ruth Davis and I are parties to the Standard Contract of Sale dated May 26, 2023 (the "Contract"), between the Seller parties and Challenger Realty Group, LLC, the predecessor in interest to Plaintiff Challenger Cresson I, LLC (together, "Purchaser"). We joined in the Contract as Seller parties to convey our interest in the Mineral Estate. I signed the Contract. Attached hereto as Exhibit A-1 is a true and correct copy of the Contract.

4. I also signed the First Amendment to Standard Contract of Sale dated December 4, 2024 (the "First Amendment"), the Second Amendment to Standard Contract of Sale dated

December 31, 2025 (the "Second Amendment"), and the Third Amendment to Standard Contract of Sale dated effective as of January 9, 2026 (the "Third Amendment"). Attached hereto as Exhibits A-2, A-3, and A-4 are true and correct copies of the First Amendment, the Second Amendment, and the Third Amendment. The Second Amendment extended the Closing Date to January 10, 2026, and the Third Amendment extended the Closing Date to January 23, 2026.

5. I have not signed any amendment to the Contract after the Third Amendment, and I am not aware of any amendment to the Contract after the Third Amendment. I have not agreed in writing to extend the Closing Date beyond January 23, 2026.

6. Closing under the Contract has not occurred. No one has asked me to sign a deed, a conveyance of my interest in the Mineral Estate, or any other closing document. I have not received any part of the Purchase Price, and Purchaser has not tendered the Purchase Price to me.

7. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in __Parker_ County, Texas on this _9___ day of November 2026.

David Glenn Davis

# STANDARD CONTRACT OF SALE

THIS STANDARD CONTRACT OF SALE (the "**Contract**") is made and entered into by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Additionally, Seller and Purchaser are sometimes collectively referred to herein as the "**Parties**" and each of the Parties is sometimes singularly referred to herein as a "**Party**". For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Contract of Purchase and Sale**.

(a) Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and indefeasible title to that certain tract of land containing approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction ("**ETJ**") of the City of Cresson (the "**City**"), Hood County, Texas, an approximate description and/or depiction of which is set forth on **Exhibit "A"** attached hereto and incorporated herein by this reference for all purposes (the "**Land**"), together with, all and singular, (i) a 100% undivided interest in the Mineral Estate (for purposes of this Contract, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Seller in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Seller which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**"). The Parties acknowledge and agree that the Property is part of a larger tract owned by Seller (the "**Parent Tract**") and that Seller is retaining the portion of the Parent Tract that does not include the Property ("**Seller's Retained Tract**"). Even though the Property has not yet been separately surveyed, the Parties agree that (A) they are experienced in transactions of this nature, (B) they are familiar with the location of the Property, (C) the description of the Property attached to this Contract identifies the Property with reasonable certainty, (D) it is the Parties' intention that the description of the Property attached to this Contract be construed, to the maximum extent allowed by law, as sufficient to identify the Property with reasonable certainty, (E) each Party hereby waives any and all claims of an insufficient legal description, including,

without limitation, any and all claims under the statute of frauds, and (F) upon the completion of the final Survey (defined below) of the Property, the Parties agree to replace **Exhibit "A"** of this Contract with the legal description of the Property in such survey and to use such legal description in all documents that require a legal description of the Property and are used in connection with the Closing.

(b) The "Property" also includes all right, title and, interest of Seller in any and all development rights relating to, associated with and/or appurtenant to the Land, including, but not limited to, all right, title and interest of Seller in and to (i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the Land and improvements now or hereafter constructed thereon; (ii) all surveys, engineering, soils, seismic, geological and environmental reports, studies, certificates and other technical descriptions; (iii) warranties, guaranties, indemnities, and any claims and causes of action (other than those against the Title Company, Brokers, Purchaser or Purchaser's representatives, agents, successors or assigns), including, without limitation, all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land; (iv) licenses, permits, governmental approvals, utility commitments, utility rights, reimbursement rights, development rights or other similar rights, (v) rights to credits, refunds, and reimbursements including without limitation any credits against, or right to pay reduced, application fees, permit fees, inspection fees or impact fees, (vi) rights under zoning cases, preliminary plans, plats, and other development applications and approvals, (vii) rights in and to engineering and architectural plans and specifications, (viii) awards or proceeds relating to the Property that are unpaid as of the Closing Date; (ix) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant, and (x) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Land.

(c) The Property shall be conveyed subject to the following matters (collectively the "**Permitted Exceptions**"):

(i) those matters deemed to be Permitted Exceptions pursuant to Section 4(d) hereof;

(ii) building restrictions and zoning regulations previously or hereafter adopted by any municipal or other public authority relating to the Property, which individually or in the aggregate do not have a material, adverse effect on Purchaser's ownership, operation, use, enjoyment, development or redevelopment of the Property; and

(iii) real property taxes for the year of Closing (as such term is defined in Section 9(a) hereof) (if such taxes are not yet due and payable) and subsequent years, which taxes shall be prorated at Closing.

**2. Purchase Price**. The purchase price (the "**Purchase Price**") for the Property shall be the sum of (a) the Land Purchase Price plus (b) the Mineral Estate Purchase Price. The "**Land Purchase Price**" shall be the product of EIGHTEEN THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($18,500.00) multiplied by the total number of gross acres of Land contained

within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The "**Mineral Estate Purchase Price**" shall be the product of ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) multiplied by the total number of gross acres of Land contained within the Property, measured to the nearest 1/1000th of an acre, as shown on the Survey (defined below) and certified by the surveyor. The Purchase Price shall be payable by Purchaser in cash at Closing (hereinafter defined).

3. **Earnest Money**. Within five (5) business days after the Effective Date (hereinafter defined), Purchaser shall deposit with McKnight Title, Attn: Jennifer Stapleton, 155 East BB Fielder Rd. Suite 200 Weatherford, TX 76087; Phone: 817-345-0101 Email: jennifer@mcknighttitle.com (hereinafter referred to as the "**Title Company**"), earnest money in the amount of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "**Earnest Money**"). If Purchaser fails to timely deposit the Earnest Money with the Title Company, Seller shall be entitled, as Seller's sole and exclusive remedy, to terminate this Contract by written notice to Purchaser at any time before the Earnest Money is delivered to the Title Company, in which event, Purchaser and Seller shall have no further liability hereunder. If Purchaser delivers the Earnest Money to the Title Company before Purchaser's receipt of Seller's termination notice, Purchaser shall be deemed to have timely delivered the Earnest Money and Seller shall not thereafter be entitled to terminate the Contract as a result of any delay in delivering the Earnest Money. All Earnest Money shall be deposited by the Title Company into an interest-bearing account. All interest earned on the Earnest Money shall be added to and become a part of the Earnest Money. Notwithstanding any provisions of this Contract to the contrary, TEN THOUSAND AND NO/100 DOLLARS ($10,000.00) out of the Earnest Money shall in all respects be non-refundable to Purchaser and shall be paid to Seller as independent consideration for Seller's execution of this Contract (the "**Independent Consideration**"). The Earnest Money shall be applied to the Purchase Price at the Closing. If, pursuant to any provision of this Contract, Purchaser is entitled to obtain a refund of the Earnest Money, (a) such provision shall be interpreted to mean a refund of the Earnest Money less the Independent Consideration, and (b) the Title Company shall, without further authorization or instruction from Seller or Purchaser, return the Earnest Money (less the Independent Consideration) to Purchaser.

4. **Due Diligence Information, Title Commitment and Survey**.

(a) Delivery of Documents. Within ten (10) days following the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, at Seller's sole cost and expense, copies of all of the items in Seller's possession or control listed on **Exhibit "B"** attached hereto and incorporated herein by this reference for all purposes (the "**Due Diligence Items**"). Following the Effective Date, Seller agrees to deliver to Purchaser within five (5) days following receipt thereof by Seller, copies of all other information received by Seller in connection with the Property.

(b) Title Commitment. Within twenty (20) days following the Effective Date, Seller shall cause to be delivered to Purchaser, at Seller's expense, a current Commitment for a Texas Form T-1 Owner's Policy of Title Insurance (hereinafter referred to as the "**Title Commitment**") showing all matters affecting title to the Property and binding the Title Company to issue to Purchaser at Closing an Owner Policy of Title Insurance issued by the Title Company on behalf of an underwriter acceptable to Purchaser, in the amount of the Purchase Price written in accordance with this Contract (the "**Owner's Policy**"). Seller and Purchaser further instruct the

Title Company to deliver to Seller, Purchaser and the Surveyor legible copies of all instruments referred to on Schedules B and C of the Title Commitment (the "**Exception Documents**"). The Title Commitment shall describe the Property; shall list Purchaser as the prospective named insured; shall show as the policy amount the Purchase Price; shall contain the commitment of the Title Company to insure Purchaser's fee simple interest in the Property upon the Closing; and the survey exception shall be deleted except as to "shortages in area". The Title Commitment shall show the status of the title of the Property and all exceptions which would appear in an Owner's Policy, if issued. Purchaser, at Purchaser's option, may purchase title insurance in an amount in excess of the Purchase Price from the Title Company or another escrow agent or title insurance company acceptable to Purchaser, in which event (i) Purchaser shall pay for the incremental increase in the aggregate premium charged for the Owner's Policy attributable to such increased coverage, and (ii) if Purchaser elects to purchase such excess coverage from an escrow agent or title insurance company other than the Title Company, the Title Company shall cooperate with the escrow agent or title insurance company designated by Purchaser for such excess coverage and shall remit to such designated escrow agent or title insurance company the portion of any premium payments received by the Title Company which is attributable to any such excess coverage.

(c) Survey. Seller shall deliver to Purchaser copies of the most recent surveys for the **"Parent Tract"** and the **"Retained Tract"** in Seller's possession or control within ten (10) days following the Effective Date. Purchaser shall obtain a new or recertified survey of the Land (the "**Survey**").

(d) Title and Survey Review. Purchaser shall have thirty (30) days after the receipt of the last of the Title Commitment, legible copies of all instruments referred to on Schedules B or C of the Title Commitment, and the Survey (the "**Title Review Period**") to provide Seller with written notice (the "**Title Objection Letter**") of such objections as Purchaser may have to anything contained in the Title Commitment or the Survey (collectively "**Title Objections**"). Any item contained in the Title Commitment or the Survey to which Purchaser does not object pursuant to the Title Objection Letter shall be deemed a Permitted Exception. If Purchaser delivers to Seller a Title Objection Letter, Seller shall have twenty (20) days, or such greater period of time as may be agreed upon in writing by Seller and Purchaser (the "**Cure Period**"), during which Seller shall have the right, but not the obligation, to cure or remove the Title Objections and deliver to Purchaser a revised Title Commitment or survey evidencing such cure or removal; provided, however, that Purchaser shall be deemed to have objected to and Seller shall have the absolute obligation to cure or remove all liens of any kind against the Property (the same to automatically be considered Title Objections regardless of whether or not Purchaser delivers to Seller a Title Objection Letter), including, without limitation, (i) mortgage liens, (ii) security interests, (iii) tax liens, (iv) abstracts of judgment, (v) environmental liens, and (vi) materialmen's and mechanic's liens (collectively "**Liens**"). Seller shall, prior to the expiration of the Cure Period, provide Purchaser with written notice (the "**Title Response Letter**") setting forth those Title Objections that Seller has cured or removed and those Title Objections which Seller is not required to cure or remove and is unable or unwilling to cure or remove. If Seller fails to either cure or remove all Title Objections to the reasonable satisfaction of Purchaser and the Title Company, Purchaser may, at its sole option which may be exercised at any time within the Inspection Period, either terminate this Contract by written notice to Seller, in which event the Earnest Money shall be immediately returned to Purchaser, or waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that such election shall

have no effect on Seller's obligation to cure or remove all Liens. Purchaser's failure to terminate this Contract prior the expiration of the Inspection Period shall be deemed an election by Purchaser to waive all uncured Title Objections and accept such title as Seller is able to convey without any reduction in the Purchase Price; provided, however, that (A) such election shall have no effect on Seller's obligation to cure or remove all Liens, and (B) Seller shall be obligated, prior to Closing, to cure all Title Objections which Seller agrees in the Title Response Letter or otherwise in writing to cure.

(e) Additional Exceptions. In the event that at any time following delivery of the Title Commitment, Exception Documents or Survey described above, but prior to Closing, any changes (other than the deletion or elimination of any item as to which Purchaser has made an objection) shall occur in the Title Commitment, Exception Documents or Survey, in addition to other remedies permitted pursuant to this Contract, Purchaser shall have the right to review and approve or disapprove of any such matters, and to terminate this Contract and obtain a refund of the Earnest Money in the event that any such exceptions are not acceptable to Purchaser.

(f) Owner's Policy. At Closing, Seller shall cause the Title Company to furnish to Purchaser, at Seller's sole cost and expense, the Owner's Policy, which shall be in the customary form prescribed by the Texas State Board of Insurance. The Owner's Policy may contain as exceptions the standard printed exceptions and the Permitted Exceptions; provided, however, (i) the standard exception for restrictions shall be deleted except for any restrictions that are Permitted Exceptions, (ii) the exception for rights of parties in possession shall be deleted, (iii) the standard exception for taxes shall be limited to the year in which Closing occurs (if such taxes are not yet due and payable), (iv) all arbitration provisions shall be deleted, (v) all matters set forth on Schedule C of the Title Commitment shall be deleted, (vi) if requested by Purchaser, Purchaser may require modification or additional title endorsements and Purchaser shall be liable for all fees and additional premiums charged by the Title Company in connection with such modifications or additional title endorsements.

5. **Inspection Period**.

(a) Commencing on the Effective Date and continuing through the one hundred eightieth (180th) day following the later to occur of (i) the date upon which all of the Tires (defined below) have been removed from the Land and Seller has notified Purchaser thereof and (ii) the date upon which Seller delivers all of the Due Diligence Items to Purchaser (the "**Inspection Period**"), Purchaser shall be entitled to enter onto the Property for any purpose, including, without limitation, conducting such audits, inspections, or investigations thereon as Purchaser may deem appropriate, including, without limitation, any "Phase II" type testing or investigation. During the Inspection Period and, unless Purchaser terminates this Contract prior to the expiration of the Inspection Period, prior to Closing, Purchaser and Purchaser's representatives shall have the right to use the private roadway, a portion of which is located on Seller's Retained Tract (the "**Private Roadway**"), for purposes of ingress and egress to and from the Property, and Purchaser shall be liable for any physical damages to the Private Roadway caused by Purchaser or Purchaser's representatives. The Parties understand and agree that, upon Closing, Purchaser's right to use the portion of the Private Roadway located on Seller's Retained Tract shall terminate and Purchaser shall have no easement, express or implied, to use the portion of the Private Roadway that is located on Seller's Retained Tract. Notwithstanding any provision in this Contract to the contrary,

Purchaser shall be entitled to extend the Inspection Period two (2) times, each time for up to ninety (90) days, by delivering, at any time prior to the then-scheduled expiration of the Inspection Period, (i) written notice thereof to Seller and (ii) ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) of additional Earnest Money to the Title Company, which additional Earnest Money shall be added to and become a part of the Earnest Money, shall be applicable to the Purchase Price at Closing but shall be non-refundable to Purchaser except as set forth in Sections 4(d), 4(e), 8, 10 and 11(b). The cost of the inspections undertaken by Purchaser pursuant to this Contract shall be borne solely by Purchaser. Purchaser agrees to (A) indemnify and hold Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (B) repair any and all physical damage done to the Property or Seller's Retained Tract by Purchaser or its agents, employees or contractors during such inspection and examination. Purchaser shall have no liability with respect to any diminution in value or other losses suffered or incurred by Seller as a result of the discovery of any pre-existing conditions on, in, under or about the Property by Purchaser or its agents, employees or contractors during or in connection with such inspection and examination. Purchaser shall be entitled, for any reason in Purchaser's sole discretion, to terminate this Contract by written notice delivered to Seller at any time prior to the expiration of the Inspection Period. If Purchaser notifies Seller prior to the expiration of the Inspection Period that Purchaser has elected to terminate this Contract, this Contract shall terminate, the Earnest Money shall be returned to Purchaser and the Parties shall have no further obligations hereunder. Purchaser agrees to keep the Property free and clear of any mechanic's or materialmen's liens resulting from Purchaser's activities on the Property. After the expiration of the Inspection Period, Purchaser shall have the right to continue to conduct physical inspections and assessments of the Property, including, without limitation, taking soil samples, ground water samples and other intrusive testing, so long as Purchaser (1) indemnifies and holds Seller harmless from and against all loss, liability, cost, damage or expense to the extent caused by the negligence or willful misconduct of Purchaser or its agents, employees or contractors during such inspection and examination, and (2) repairs any and all physical damage done to the Property by Purchaser or its agents, employees or contractors during such inspection and assessment.

(b) Annexation and City Development Agreement. Seller hereby authorizes Purchaser, at all times prior to Closing, to negotiate a pre-annexation development agreement or its equivalent with the City that addresses the annexation of the Property by the City and the terms, conditions, development rights and obligations affecting the development of Property (the "**City Development Agreement**"). Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to negotiate the terms and conditions of the City Development Agreement.

(c) Zoning Approval. Seller hereby authorizes Purchaser to seek and obtain final, unappealable approval from the City of the zoning designations desired by Purchaser that will permit Purchaser to develop the Property for the Intended Use (defined below) ("**Zoning Approval**"). Seller agrees to cooperate with Purchaser reasonably and in good faith in Purchaser's efforts to obtain the Zoning Approval. The Zoning Approval shall not be considered to have been achieved unless all of the following are true: (i) the zoning application is approved by the City without condition or exception, and (ii) all periods for appeal or protest have expired without the filing of any appeal or protest or, if an appeal or protest is filed, the same has been denied and there is no further administrative process available for appeal or protest.

(d) Platting. Purchaser may, at Purchaser's sole expense, seek to obtain a preliminary plat of the Property (the "**Preliminary Plat**"). Seller hereby authorizes Purchaser to seek to obtain final, unappealable approval from the City or Hood County, in Purchaser's sole determination, of the Preliminary Plat ("**Preliminary Plat Approval**") prior to Closing. Seller agrees to cooperate with Purchaser in connection with Purchaser's efforts to prepare the application for Preliminary Plat Approval and all supporting documentation in connection therewith (collectively, the "**Preliminary Plat Application**"), and Seller shall cooperate reasonably and in good faith with Purchaser in connection with Purchaser's efforts to obtain the Preliminary Plat Approval. Seller agrees to work with Purchaser's engineer to ensure that, to the best extent practicable, all plats of the Property contain all easements, rights-of-way and other matters reasonably required by Purchaser in connection with Purchaser's development of the Property for the Intended Use (defined below) (the "**Easements Benefitting the Property**"), and, to the extent any such Easements Benefiting the Property are not contained on such plats, Seller agrees to grant Purchaser any and all Easements Benefiting the Property over and across any land adjacent to the Property that is owned by Seller or any affiliate of Seller ("**Seller's Adjacent Property**") in a location that does not adversely impact Seller's or its affiliate's intended use of Seller's Adjacent Property.

(e) Entitlements, Utilities and Easements. During the period commencing on the Effective Date and ending upon Closing or the earlier termination of this Contract, Purchaser shall be entitled to endeavor to (i) obtain all entitlements necessary, in the sole discretion of Purchaser, from all applicable governmental authorities and private bodies having regulatory authority over the Property for the Intended Use (defined below), including, without limitation the City Development Agreement, the Preliminary Plat Approval, the Zoning Approval, and any and all other approvals needed for the development and operation of the Property for the Intended Use (collectively, the "**Entitlements**"), and (ii) obtain all Easements Benefitting the Property, and (iii) cause all utilities needed for the development and operation of the Property for the Intended Use (collectively, the "**Required Utilities**") to be brought to the boundary of the Property and/or created on the Property. Purchaser agrees to use commercially reasonable, diligent and good-faith efforts to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities and Seller agrees to cooperate with Purchaser, using Seller's good faith and best efforts, to obtain the Entitlements, Easements Benefitting the Property and the Required Utilities, including executing any and all reasonable or necessary documents in connection with Purchaser's efforts within three (3) business days following Purchaser's delivery of such documentation to Seller. Seller further agrees that, commencing on the Effective Date and continuing until the Closing Date, that Seller shall not encumber the Property or enter into any agreement that affects the Property without Purchaser's prior written approval. As used herein, "**Intended Use**" shall mean a master planned industrial complex served by rail.

**6. Representations and Warranties**. Seller hereby represents and warrants to Purchaser, which representations and warranties shall be deemed to be restated at Closing and shall survive Closing, that:

(a) Seller is comprised of individuals and a limited partnership, duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has complete and unrestricted power and authority to enter into this Contract and all other agreements to be executed and delivered by Seller pursuant to the terms and provisions

hereof, to perform its obligations hereunder and thereunder, and to consummate the transaction contemplated hereby;

(b) This Contract has been duly executed and delivered by Seller. All other agreements contemplated hereby to be executed and delivered by Seller will be, prior to Closing, duly authorized, executed and ready in all respects to be delivered by Seller. This Contract and all other agreements contemplated hereby constitute legal, valid and binding obligations of Seller enforceable in accordance with their respective terms;

(c) The execution, delivery and performance of this Contract and any other agreement contemplated hereby and the consummation of the transaction contemplated hereby or thereby do not, with or without the passage of time and/or the giving of notice, (i) conflict with, constitute a breach, violation or termination of any provision of any contract or other agreement to which Seller is a party or to which all or any part of the Property is bound, (ii) result in an acceleration or increase of any amounts due from Seller to any person or entity, (iii) conflict with or violate the organizational documents of Seller, (iv) result in the creation or imposition of any lien on all or any part of the Property, or (v) violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Seller or all or any part of the Property;

(d) Seller now has and shall have at Closing good and indefeasible title to the Property in fee simple absolute, free and clear of all Liens (other than any Liens that will be released at or prior to Closing). No party other than Seller and the lessees under oil and gas leases that are of record in the official public records of Hood County, Texas has any material rights in or to occupy all or any part of the Property. No party other than Purchaser has any agreement to purchase, right of first refusal, option to purchase or any other right to acquire all or any part of the Property;

(e) One hundred percent (100%) of the Mineral Estate is owned on the Effective Date by the following: (i) the Smelley Estate, which owns fifty percent (50%) of the Mineral Estate, (ii) Richard David Smelley, who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate, (iii) Amy Elizabeth Smelley who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Tammy Elizabeth Graham, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate; (v) Gregory Graham who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; (iv) Deborah Davis who owns one sixth (1/6) of fifty percent (50%) of the Mineral Estate; and (iv) David Davis, who owns one-sixth (1/6) of fifty percent (50%) of the Mineral Estate. Deborah Davis and David Davis shall either (A) prior to the Closing Date, convey all of their respective interests in the Mineral Estate in equal shares to Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, and Gregory Graham, or (B) on the Closing Date, convey all of their respective interests in the Mineral Estate to Purchaser. At Closing, Seller shall convey to Purchaser an undivided interest in one hundred percent (100%) of the Mineral Estate.

(f) There are no actions, suits, claims, assessments, or proceedings pending or, to the best of Seller's knowledge, threatened that could materially adversely affect the

ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform hereunder;

(g) Seller has no information of and to the best of Seller's knowledge, there is not (i) any change contemplated in any applicable law, statute, ordinance, rule, regulation, order, or determination of any governmental authority or any board of fire underwriters (or other body exercising similar functions), (ii) any law, ordinance, regulation, administrative ruling, restrictive covenant or deed restriction affecting all or any part of the Property, including without limitation, any applicable zoning ordinances, building codes, flood disaster laws, wetlands regulation, health law or environmental law, (iii) any judicial or administrative action, (iv) any action by adjacent landowners, (v) any administrative action, (vi) any natural or artificial condition on or about the Property, or (vii) any significant adverse fact or condition relating to the Property or its use, that would prevent, limit, impede, or render more costly the ownership, operation, use, enjoyment, development or redevelopment of the Property;

(h) The Property is not within an area designated by the United States Secretary of Housing and Urban Development, the United States Army Corp of Engineers or any other local, state or federal organization or entity as having an increased likelihood of flooding;

(i) No Hazardous Substances (as such term is hereinafter defined) have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to or from the Property and there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to the use, generation, manufacture, storage or disposal of any Hazardous Substances in, on, under or about the Property. As used in this Contract, the term "***Hazardous Substances***" means any and all substances, materials and wastes which are or become regulated under applicable local, state or federal Environmental Laws or that are classified as hazardous or toxic under local, state or federal Environmental Laws or regulations, including, without limitation, (i) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "solid waste," "pollutant" "contaminant" or words of similar import as such terms are defined by or listed in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("***CERCLA***"), as amended by Superfund Amendments and Reauthorization Act of 1986 ("***SARA***"), the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.) ("***EPCRA***"), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("***RCRA***"), as amended by the Hazardous and Solid Waste Amendments of 1984, the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide and Rodenticide Control Act (7 U.S.C. § 136 et seq.), the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), the Federal Clean Air Act (42 U.S.C. § 7401 et seq.), and in the regulations promulgated pursuant to such laws, all as amended, (ii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101) or 40 CFR Part 302, both as amended, (iii) any material, waste or substance which is (A) oil, gas or any petroleum or petroleum by-product, (B) asbestos, in any form, (C) polychlorinated biphenyls, (D) designated as a

"hazardous substance" pursuant to Section 311 of the Clean Water Act (33 U.S.C. § 1251 et seq.), as amended, (E) flammable explosives, or (F) radioactive materials, and (iv) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "pollutant," "contaminant," "hazardous waste," "industrial solid waste," "solid waste," "radioactive waste" or "special waste from health care facility" in the Texas Solid Waste Disposal Act (Tex. Health & Safety Code Ann ch. 361), the Texas Clean Air Act (Tex. Health & Safety Code ch. 282), the Texas Pesticide Control Act (Tex. Agric. Code Ann. § 76.001 et seq.) and those substances included within the definitions of "hazardous substances," "regulated substances" or "petroleum products" in Subchapter I of the Texas Water Code (Tex. Water Code Ann ch. 26, subch. I) and in the regulations promulgated pursuant to any of such laws, all as the same may be amended from time to time (collectively "***Environmental Laws***"). Further, Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of Hazardous Substances in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of Environmental Laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of Environmental Laws, and (d) claims for contribution, cost recovery, remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code;

(j) The Land has direct and unencumbered access to and from one or more publicly dedicated streets or highways accepted for maintenance and maintained by Hood County and/or the State of Texas;

(k) Any and all underground storage tanks previously removed from the Property by Seller were removed in accordance with all applicable laws, ordinances, regulations and administrative rulings and no underground storage tanks are presently situated in, on, under or about the Property;

(l) The Property includes all sewer and wastewater discharge capacity, potable water capacity, other utility rights and development rights which were originally obtained with the Property by Seller, and no such capacity or rights have been previously conveyed or transferred by Seller;

(m) As a result of the sale of the Property from Seller to Purchaser as contemplated by this Contract, there will be no taxes or assessments assessed against the Property by any taxing authority for the year of Closing or prior years based on change in use or ownership; and

(n) The Due Diligence Materials are true, accurate and complete in all material respects.

7. **Covenants and Agreements of Seller**. Seller covenants and agrees with Purchaser as follows:

(a) Seller and Purchaser each shall, simultaneously with its execution of this Agreement, execute and deliver to the Title Company, a Memorandum of Agreement in the form attached hereto as **Exhibit "E"** (the "**Memorandum**") and Seller and Purchaser hereby instruct the Title Company to record, at Purchaser's expense, the fully executed Memorandum in the official public records of Hood County, Texas (the "**Public Records**") within three (3) business days following the full execution of this Agreement. The Parties agree not to terminate or release the Memorandum, or otherwise cause or permit the Memorandum to be terminated or released, from the Public Records unless and until Closing or the earlier appropriate termination of this Agreement has occurred. At Closing or promptly following the earlier appropriate termination of this Agreement, the Parties shall execute all commercially reasonable documents required by the Title Company to terminate and release the Memorandum from the Public Records (collectively, the "**Memorandum Release Documents**").

(b) Prior to Closing, Seller shall not execute or create any contract or option to purchase, easement, covenant, condition, restriction, lien or encumbrance with respect to the Property or any portion thereof with the exception of (i) the conveyance by Deborah Davis and David Davis of their interests in the Mineral Estate as referenced in Section 6(e) above and (ii) the recordation of the Memorandum as described in Section 7(a) above. To the extent that the Property, or any portion of the Property, is entitled to a tax exemption, Seller shall maintain such exemption and reasonably cooperate with Purchaser in assisting Purchaser to maintain and continue such tax exemption.

(c) Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith.

(d) Seller shall, within thirty (30) day period after the Effective Date (the "**Tire Removal Period**"), remove from the Land all tires and parts thereof situated on the Land (collectively, the "**Tires**"). Seller shall be liable for all costs to remove any and all Tires that Seller fails to remove during the Tire Removal Period and Seller shall (i) prior to Closing, remove such Tires from the Land within five (5) business days after the date Purchaser delivers notice thereof to Seller, (ii) after Closing, reimburse Purchaser for all costs incurred by Purchaser in connection with removing any Tires from the Land, and (iii) indemnify, defend and hold harmless all Indemnities from and against any and all Claims arising in connection with the Tires.

(e) Notwithstanding anything to the contrary in this Contract, Seller shall not oppose, and Seller shall not interfere with, Purchaser's applications for, or efforts to obtain, any and all Entitlements, Easements Benefitting the Property and the Required Utilities.

(f) The obligations in this Section 7 shall survive Closing.

8. **Conditions Precedent to Closing**. In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8:

(a) Entitlements, Easements and Utilities. Purchaser shall have (i) received all of the Entitlements and Easements Benefitting the Property required by Purchaser and (ii) all the Required Utilities have been brought to the boundary line of the Property and/or the Required Utilities have been created upon the Property and/or unconditional agreements to bring all the Required Utilities to the boundary line of the Property or create the Required Utilities on the Property have been received by Purchaser;

(b) Representations and Warranties; Covenants. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date, except for (i) representations and warranties made as of, or limited by, a specific date, which will be true and correct in all material respects as of the specified date or as limited by the specified date, and (ii) Seller's representations and warranties under Section 6, which will be true and correct in all material respects, and (iii) all covenants to be performed and observed by such Party prior to and on the Closing Date;

(c) Legal Proceedings. There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, against the other Party that would materially and adversely affect the operation or value of the Property or the Seller's ability to perform its obligations under this Contract;

(d) Tires. Seller shall have removed all Tires from the Land;

(e) Covenants. All covenants and other obligations of Seller set forth in this Contract which if not fully and timely performed would have a material, adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects;

(f) Due Diligence Materials. Seller shall have delivered to Purchaser the Due Diligence Materials and all updates thereof required pursuant to Section 4(a) hereof; and

(g) No Change. From the Effective Date until Closing, there shall have been no material adverse change to the Property or any part thereof.

If all of the above described conditions are not fully satisfied or waived by Purchaser in the manner specified above as of the Closing Date, Purchaser shall have the right, but not the obligation, to terminate this Contract by delivering notice to Seller, in which event neither Party shall have any further rights, duties or obligations hereunder and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser in full; provided, however,

that nothing contained in this Section 8 is intended to be or shall be construed as a limitation of any remedies available to Purchaser pursuant to Section 11(b) hereof if Seller defaults under this Contract.

**9. Closing.**

(a) Date. The closing of the sale of the Property from Seller to Purchaser (the "**Closing**") shall be coordinated through the offices of the Title Company on, or at Purchaser's option, before, the ninetieth (90th) day following the expiration of the Inspection Period (the "**Closing Date**").

(b) Seller to Deliver. At the Closing, Seller shall furnish and deliver to the Title Company for delivery to Purchaser, at Seller's expense (except as provided in Section 9(e) below), the following:

(i) A Special Warranty Deed, in the form of **Exhibit "C-1"** attached hereto, duly executed and acknowledged by Seller, dated as of the Closing, conveying good and indefeasible title to the Property to Purchaser, subject only to the Permitted Exceptions.

(ii) A Mineral Deed, in the form of **Exhibit "C-2"** attached hereto, duly executed and acknowledged by the applicable Seller, dated as of the Closing, conveying to Purchaser the applicable Seller's interest in and to the Mineral Estate.

(iii) A general assignment to Purchaser, in the form of **Exhibit "D"** attached hereto, which, among other things, assigns Seller's interest in and to (A) any lease agreement that Purchaser has expressly agreed to assume, (B) any and all permits, approvals, licenses, water and sewer capacity commitments and other rights and interests owned or held by Seller in connection with the Property, and (C) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land.

(iv) All Memorandum Release Documents.

(v) Any and all agreements assigning or granting to Purchaser easements owned by Seller which are used or needed in connection with the development of the Land.

(vi) An Owner's Policy covering the Property issued by the Title Company in accordance with the terms of the Title Commitment described in Section 4(b) above, containing no exceptions other than the Permitted Exceptions. The Owner's Policy shall be amended to delete the survey exception except as to "shortages in area".

(vii) A Non-Foreign Certification signed by Seller under penalties of perjury.

(viii) Possession of the Property.

(ix) Such instruments or documents as are necessary, or reasonably required by Purchaser or the Title Company to evidence the status and capacity of Seller and the authority of the person or persons who are executing the various documents on behalf of Seller in connection with the purchase and sale transaction contemplated hereby.

(c) Purchaser to Deliver. At the Closing, Purchaser shall deliver to the Title Company for delivery to Seller, at Purchaser's expense, the following:

(i) The Purchase Price in immediately available funds.

(ii) All Memorandum Release Documents.

(iii) Such instruments or documents as are necessary, or reasonably required by Seller or the Title Company to evidence the authority of Purchaser to consummate the purchase and sale transaction contemplated hereby and to execute and deliver the closing documents to be delivered by Purchaser.

(d) Adjustments.

(i) Seller shall be responsible for payment of all taxes and assessments levied or assessed, including, without limitation, real and personal property taxes, prior to the Closing ("**Taxes**"). Taxes for the calendar year in which the Closing takes place shall be prorated at the Closing between Purchaser and Seller through the Closing Date, based on the current year's tax with due allowance made for the maximum discount allowable for prompt payment (if allowed for such year). If the Closing occurs on a day when the current year's tax rate is not fixed and the current year's assessment is available, Taxes will be prorated based upon such assessments and the prior year's rate. If the current assessment is not available at the time of Closing, then Taxes will be prorated on the basis of the latest available tax rate and assessment and subsequently re-prorated and promptly paid to the Party entitled thereto.

(ii) If the Land is assessed and taxed as a part of a larger parcel of real estate, then, for purposes of computing tax prorations hereunder: (A) Seller shall be solely responsible for payment of the portion of the taxes allocable to any other land and/or improvements located within the larger tract, and shall escrow the estimated amount of such taxes with the Title Company at Closing pursuant to an escrow agreement which will obligate the Title Company to release such funds to the applicable taxing authority upon receipt of a tax bill therefore and will obligate Seller to pay any deficiency between the amount of the escrowed funds and the actual amount of taxes within ten (10) days after receipt of notice thereof; and (B) a proportionate part of the real estate taxes attributable to such larger parcel shall be allocated to the Land on the basis of either of the following at Purchaser's discretion: (1) the ratio that the value of the Land bears to the value of the larger tract or parcel of land, or (2) the ratio that the area of land contained within the Land bears to the area of land contained within the larger parcel of real estate.

(iii) Seller represents and warrants to Purchaser that, as of the Effective Date, the Land is receiving special tax assessment rates (agricultural use) and Seller agrees, until

the Closing or the earlier termination of this Contract, to comply with the requirements that entitle the Land to receive such special tax assessment rates. Subject to the foregoing, the Parties acknowledge and agree that Purchaser's intended use of the Property after Closing will result in the assessment of rollback taxes for periods prior to Closing, and Purchaser shall be responsible for paying such assessments of rollback taxes triggered by Purchaser's change of use of the Land or loss of special taxing assessment rates based upon the acts of Purchaser; provided, however, that if rollback taxes are triggered for periods prior to Closing by (A) a change in use of the Land prior to Closing, (B) denial of a special use valuation on any portion of the Land claimed by Seller, or (C) any other act not caused by Purchaser, such rollback taxes shall be the obligation of Seller and shall be paid by Seller at Closing. If the amount of the taxes described in this paragraph is not ascertainable at Closing, such amount shall be estimated by Purchaser's tax consultant and 110% of the estimated amount of any amount owed by Seller shall be escrowed by Seller with the Title Company at Closing pursuant to a commercially reasonable form of escrow agreement between Seller, Purchaser and the Title Company which will authorize and instruct the Title Company to pay the rollback taxes due upon receipt of an invoice therefor and will obligate Seller to pay any deficiency.

(iv) Any tax proration based upon an estimate may, upon demand of either Party to the transaction, be subsequently readjusted upon receipt of the actual tax bill for the Property for the year in which the Closing occurs, and any Party owing the other Party monies as a result of such readjustment shall pay the same upon demand.

The provisions of this Section 9(d) shall survive the Closing.

(e) Expenses of Closing.

(i) Seller shall pay: (A) all title examination fees and the base premiums for the Owner's Policy; (B) its proportionate share of the prorations set forth in Section 9(d); (C) its own attorneys' fees; (D) other charges required to be paid by Seller pursuant to this Contract; (E) any local, county or state transfer, recording or documentary tax assessed in connection with the transfer to Purchaser; (F) the cost of the Survey (which payment shall be in the form of a credit to Purchaser against the Purchase Price); (G) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties, and (H) other charges typically paid by sellers in transactions of this nature in the county in which the Property is located.

(ii) Purchaser shall pay: (A) the cost of any endorsements to the Owner's Policy requested by Purchaser or Purchaser's lender; (B) its proportionate share of the prorations set forth in Section 9(d); (C) its own attorneys' fees; (D) one half of any escrow fees except for any escrow fees in connection with any separate escrow agreement between the Parties; and (E) other charges required to be paid by Purchaser pursuant to this Contract.

**10. Casualty or Condemnation Prior to Closing**. If at any time prior to the Closing any portion of the Property is destroyed or damaged by fire or any other casualty, or in the event a taking by condemnation, eminent domain or similar proceedings or a conveyance in lieu thereof is commenced or threatened with respect to any portion of the Property, Seller shall give notice

thereof to Purchaser and Purchaser shall thereupon have the option to terminate this Contract upon written notice to Seller prior to Closing, in which event the Earnest Money shall be promptly refunded to Purchaser, whereupon this Contract shall be rendered null and void and the Parties shall have no further obligations or liabilities hereunder. If Purchaser does not exercise its option under this Section 10 to terminate this Contract, this Contract shall remain in full force and effect and Seller shall assign or pay to Purchaser at Closing Seller's interest in and to any and all insurance proceeds and condemnation awards.

**11. Default and Remedies.**

(a) Purchaser's Default. In the event Purchaser defaults under this Contract or fails to perform any obligation of Purchaser under this Contract, and such default and failure shall remain uncured for a period of ten (10) days following written notice thereof from Seller to Purchaser, provided that Seller has not defaulted in the performance of any of Seller's obligations hereunder, Seller may, as Seller's sole and exclusive remedy, terminate this Contract by written notice to Purchaser at any time before such default by Purchaser is cured, in which event, Seller shall be entitled to retain the portion of the Earnest Money which has then been deposited by Purchaser as liquidated damages for Purchaser's default and Purchaser shall thereby be released from further obligations under this Contract. Such amount is agreed upon by and between Seller and Purchaser as liquidated damages, due to the difficulty and inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof; and no other damages, rights or remedies shall in any case be collectible, enforceable or available to Seller other than in this Section 11(a), but Seller shall accept said cash payment as Seller's total damages and relief. If this Contract is terminated as a result of Purchaser's default, Purchaser's liability shall be limited to the portion of the Earnest Money which has previously been deposited by Purchaser hereunder, and in no event shall Purchaser be responsible or liable for any portion of the Earnest Money which has not then been deposited by Purchaser hereunder, whether or not such amount is then due. Notwithstanding any provision herein and without limiting Seller's rights in the preceding sentence, Seller shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Purchaser's breach of any representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

(b) Seller's Default. In the event Seller defaults under this Contract, or any representation or warranty of Seller is not true, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money shall be returned to Purchaser, and Seller shall reimburse Purchaser for Purchaser's third party out of pocket costs and expenses incurred by Purchaser in connection with the transaction contemplated herein not to exceed $200,000.00 or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to pursue the recovery of damages from Seller resulting from such breach. Notwithstanding any provision herein and without limiting Purchaser's rights in the preceding sentence, Purchaser shall be entitled to all rights and remedies available at law or in equity (but excluding lost profits or exemplary or punitive damages) for Seller's breach of any

representation, warranty, indemnity or other agreement which survives the Closing or the termination of this Contract.

12. **Real Estate Brokerage; Consulting Fees**.

(a) Real Estate Brokerage. At Closing, Seller agrees to pay a real estate brokerage commission to M&W Real Estate, LLC ("**Purchaser's Broker**") in the amount of three percent (3%) of the Purchase Price and to Williams Trew Real Estate (Stephen Reich) ("**Seller's Broker**") in the amount of three percent (3%) of the Purchase Price. Purchaser's Broker and Seller's Broker are sometimes collectively referred to in this Contract as "**Brokers**". At Closing and upon funding, Seller shall be responsible for the payment of the real estate brokerage commissions becoming due to Brokers. Each Party represents and warrants to the other there has been no broker, finder, real estate agent or similar agent engaged in connection with the transaction contemplated hereby other than Brokers and each Party agrees that should any claim be made for brokerage commissions or finder's fees by any other broker, finder or agent by, through or on account of any acts of the indemnifying Party or its agents, employees or representatives, the indemnifying Party will hold the other Party free and harmless from and against any and all loss, liability, cost, damage and expense (including, without limitation, attorneys' fees, accountants' fees, court costs and interest) in connection therewith. The provisions of this paragraph shall survive the Closing of this Contract.

(b) **Disclosure. Purchaser advises Seller and Seller acknowledges that each of the following is a principal of Purchaser and is a licensed real estate broker or sales agent acting on his or her own behalf: None.**

13. **Miscellaneous**.

(a) Notices. All notices, requests and other communications under this Contract shall be in writing and shall be delivered in person by hand delivery or overnight delivery service, by electronic mail, or sent by certified mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If intended for Seller: | Bill Sanders, Independent Executor of<br>the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028<br>Telephone No.: (817) 266-1283<br>Email: bsanders@flash.net |
| With a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092<br>Telephone No.: (817) 410-4012<br>Email: todd.2@verizon.net |

with a copy to:

Cresson Moon Properties, LP
c/o Cresson Moon Management, LLC,
General Partner
Attn Richard D Smelley, Deborah R. Davis,
and Tammy M. Graham, Managers
750 Cattlebaron Drive
Fort Wort, Texas 76108
Telephone No: (817) 300-4350
Email: sgd@flash.net

with a copy to:

Richard Smelley and Amy Smelley
4750 Cattlebaron Drive
Fort Worth, Texas 76108
Telephone Number: (817) 300-4355
Email: amy.smelley@icloud.com

with a copy to:

Deborah Davis and David Davis
12601 Cleburne Hwy
Cresson, Texas 76035
Telephone No: (817) 300-4352
Email: davidgdavis1@yahoo.com

with a copy to:

Tammy Graham and Gregory Graham
6651 Weiland Road
Weatherford, Texas 76088
Telephone No: (817) 300-0780
Email: tammy@locationsphotography.com

If intended for Purchaser:

Challenger Realty Group, LLC
Attn: John Contrevo
100 Essex Avenue
Bellmawr, New Jersey 08031
Telephone No: (856) 498-4412
Email: John@challengerrealtygroup.com

with a copy to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225
Telephone No: (214) 390-3264
Email: jlibby@LibbySparks.com

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided. All such notices, requests and other communications, if sent to the address set forth herein above or to such other address as a Party may provide to the other Party in writing, shall be deemed to have been delivered upon receipt at such address if delivered in person, upon deposit with an overnight courier if delivered by overnight delivery, upon deposit in a post office

or official depository of the United States Postal Service if mailed, and upon transmission if by electronic mail.

(b) Assignment. Purchaser may assign or transfer its rights and obligations under this Contract at any time to any entity owned and/or controlled, in whole or in part, directly or indirectly, by one or more of the principals of Purchaser (a "**Purchaser Affiliate**") without the consent of Seller, and this Contract shall inure to the benefit of and be binding on the Parties hereto and their respective successors and assigns. Except as set forth above, Purchaser may not assign or transfer its rights or obligations under this Contract without the prior, written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned. If Purchaser assigns its rights and obligations under this Contract to a Purchaser Affiliate that fully assumes Purchaser's obligations and liabilities under this Contract, Purchaser shall be automatically fully released from all of its obligations and liabilities hereunder. In such event, Seller agrees to and shall immediately upon request by Purchaser execute a written instrument in a form satisfactory to Purchaser evidencing and confirming such full release.

(c) Force Majeure. A Party shall not be deemed to be in breach or in violation of this Contract if it is prevented from performing any of its obligations hereunder by reason of acts of the other Party, acts of God, riots, strikes, fires, weather, public disturbances, and/or any regulation of any governmental authority including, without limitation, a moratorium or government shut-down (each, a "**Force Majeure Event**"); provided, however, that the Party wishing to rely on such Force Majeure Event shall notify the other Party in writing within ten (10) business days of the commencement and ending of the Force Majeure Event in order to be entitled to the benefit of the delays in performance caused by such Force Majeure Event. No Force Majeure Event(s) singularly or in the aggregate shall exceed sixty (60) days.

(d) Survival. Except as otherwise provided herein, the provisions of this Contract shall survive the Closing and shall not merge into the conveyance documents executed and delivered at Closing.

(e) Joint and Several Liability. All parties signing this Contract as Seller shall be jointly and severally liable for all obligations of Seller.

(f) Entire Agreement; Modifications. This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the Party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

(g) Partial Invalidity. If any clause or provision of this Contract is or should ever be held to be illegal, invalid, or unenforceable under any present or future law applicable to the terms hereof, then it is the intention of the parties hereto that the remainder of this Contract shall not be affected thereby, and that in lieu of each such clause or provision of this Contract that is illegal, invalid, or unenforceable, there be added as a part of this Contract a clause or provision as similar

in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(h) Applicable Law. THIS CONTRACT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

(i) Captions. The captions in this Contract are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

(j) Binding Effect. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns. This Contract and Purchaser's rights hereunder may be assigned by Purchaser without the consent of Seller to an entity that is owned and/or controlled, in whole or in part, by one or more of the members of Purchaser. Otherwise, Purchaser must obtain Seller's prior written consent.

(k) Time is of the Essence. With respect to all provisions of this Contract, time is of the essence. However, if the Closing or the final date of any period which is set out in any provision of this Contract falls on a Saturday, Sunday or legal holiday under the laws of the United States or the State of Texas, then, and in such event, the Closing or such period shall be extended so that the Closing or the last day of such period falls on the next day which is not a Saturday, Sunday or legal holiday. If Seller fails to timely deliver to Purchaser the Title Commitment, Exception Documents or any other document or information required to be delivered by Seller to Purchaser hereunder, the date of expiration of the Inspection Period, the Closing Date and the expiration date of all other time periods hereunder shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser.

(i) Independent Counsel; Interpretation. Purchaser and Seller each acknowledge that: (a) they have had the opportunity to be and/or have been represented by independent counsel in connection with this Contract; (b) they have executed this Contract with the advice of such counsel; and (c) this Contract is the result of arm's length negotiations between the parties hereto and the advice and assistance of their respective counsel. Notwithstanding any rule of law to the contrary: (i) the fact that this Contract was prepared by Purchaser's counsel as a matter of convenience shall have no import or significance, and any uncertainty or ambiguity in this Contract shall not be construed against Purchaser because Purchaser's counsel prepared this Contract; and (ii) no deletions from prior drafts of this Contract shall be construed to create the opposite intent of the deleted provisions.

(j) Counterpart Execution. This Contract may be executed in multiple counterparts. An electronic copy of this Contract bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Contract.

**14.** **<u>Effective Date</u>**. The "**<u>Effective Date</u>**" or any other reference to the date of this Contract shall mean the date on which this Contract is signed by Seller, Purchaser and the Title Company, as indicated by their signatures below.

*[Signature pages follow this page.]*

EXECUTED by Seller this 26 day of May, 2023.

**SELLER:**

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER:**

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By: ______________________________
Richard Smelley, Manager

By: ______________________________
Tammy Graham, Manager

By: ______________________________
Deborah Davis, Manager

**SELLER:**

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER:**

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER:**

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser this 26 day of May, 2023.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By:______________________________
John Contrevo, Manager

*[Signature pages continue on following page.]*

The undersigned Title Company acknowledges receipt of a fully executed copy of this Contract this 26 day of May 2023, 2023, and agrees to comply with the provisions of this Contract, including the provisions hereof governing disposition of the Earnest Money.

**TITLE COMPANY:**

**MCKNIGHT TITLE**

By: ____________________

Name: Jennifer Stapleton

Title: Escrow Officer

**Escrow Receipt:**

The title company acknowledges receipt of:

√ A. the contract on this day May 26, 2023 (effective date);

√ B. earnest money in the amount of $ 100,000.00 in the form of Wire

On May 30, 2023.

Title Company: Mockingbird Title

By: Jennifer Stapleton. Jennifer

Address: 4916 Camp Bowie Blvd. 100

Fort Worth, TX 76107

Phone/Fax: 8175290776

Assigned file number (GF#): CB.8280.JS

# EXHIBIT "A"

## DESCRIPTION OF THE LAND

Approximately 1,674 gross contiguous acres as more particularly described in this Contract, which approximately 1,674 gross contiguous acres is part of the following described Parent Tract:

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit "A" and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT "A"

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey'
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line,
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT "B"**

**DUE DILIGENCE DOCUMENTS**

1. Any and all leases affecting the Property and amendments thereto, as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases;

2. All outstanding third-party service contracts and other agreements affecting the Property;

3. Disclosure of any legal matters affecting the Property;

4. Any notices, correspondence, approvals, permits, and/or licenses or any agreements (including, without limitation subdivision and similar agreements) with, to or from any governmental or quasi-governmental authority having jurisdiction over the Property;

5. Plans, specifications, certificates, inspection reports, notices, correspondence and all other documents prepared, transmitted or received by Seller, if any, in connection with any existing subdivision of or improvements constructed or to be constructed upon the Property;

6. Any letters in existence from utility companies stating whether appropriate facilities have been installed and are available to the boundaries of the Property;

7. Any and all additional data, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, existing surveys, platting and other materials (including a copy of Seller's most current existing survey of the Property), and all other information and agreements, relating to the Property or any portion thereof which is in the possession of Seller or its agents;

8. Any and all tax statements for three calendar years prior to the date of this Contract;

9. All licenses and permits affecting the Property;

10. Any other agreements or documents not referenced above relating to or affecting the Property; and

11. Any and all reports, tests, evaluations, notices, documentation and correspondence relating to (a) the availability of utilities and/or utility capacity including, without limitation, water, sewer, gas, and electricity, at or near the Property, (b) all bodies of water and waterways in, on or under the Property, and (c) rail lines and railways on or across the Property and on land adjacent to the Property.

**EXHIBIT "C-1"**

**FORM OF SPECIAL WARRANTY DEED**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF ________________ | § | |

THAT, ________________________________________ ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by ________________, a ________________ ("**Grantee**"), whose address is ______________________________, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee, that certain real property situated in ____________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with, all and singular, (i) a one hundred percent (100%) undivided interest in the Mineral Estate (for purposes of this deed, the "**Mineral Estate**" means all rights and interests in and to the oil, gas and other minerals that are in and under and may be produced from the Land); (ii) any and all buildings, structures, fixtures, or other improvements, if any, located on the Land, (iii) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, including, without limitation, any right, title, and interest of Grantor in and to adjacent streets, alleys, or rights-of-way, whether open or proposed, to the center line of said streets, alleys or rights-of-way, and any strips or gores between the above-described Land and adjacent land, and any land lying in or under the bed of any creek, stream or waterway, in, or across, abutting or adjacent to the above-described Land (collectively the "**Appurtenances**"), and (iv) all easements owned by Grantor which are used or needed in connection with the development of the Land (the foregoing is collectively referred to herein as the "**Property**").

This conveyance is made by Grantor and accepted by Grantee subject to any easements, restrictions and other matters described in Exhibit B attached hereto and incorporated herein by reference (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property, together with, all and singular, the rights and appurtenances thereto in anywise belonging, to Grantee and Grantee's successors and assigns forever; and subject only to the Permitted Exceptions, Grantor does hereby bind Grantor and Grantor's successors and assigns to warrant and forever defend, all and singular, the Property unto

the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise.

EXECUTED to be effective the ____ day of ____________, 20_____.

GRANTOR:

________________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on _______________, 20___, by ______________ ______, the ______________ of _______________, on behalf of said _______________.

__________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

EXHIBIT A TO SPECIAL WARRANTY DEED

Description of Property

[*insert description of Property per this Contract*]

---

EXHIBIT B TO SPECIAL WARRANTY DEED

Permitted Exceptions

[*insert Permitted Exceptions per this Contract*]

## EXHIBIT "C-2"

## FORM OF MINERAL DEED

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## MINERAL DEED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF ________________ | § | |

THAT, ________________________________________, a ____________ (if an individual, insert "*a [single]/[married] [woman]/[man]*") ("**Grantor**"), for and in consideration of the sum of $10.00 cash in hand paid by __________________, a ___________________ ("**Grantee**"), whose address is ______________________________, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD, ASSIGNED, CONVEYED and DELIVERED, and by these presents does GRANT, BARGAIN, SELL, ASSIGN, CONVEY and DELIVER unto Grantee, an undivided 1/*****th interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in __________ County, Texas, and described in Exhibit A attached hereto and made a part hereof for all purposes (the "**Land**"), together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said land for oil, gas and other minerals, and removing the same therefrom.

Said Land being now subject to those certain oil and gas leases described on Exhibit B attached hereto and made a part hereof for all purposes (the "**Leases**") executed in favor of record owner, it is understood and agreed that this sale is made subject to the terms of said Leases, but covers and includes 1/*****th of all of the oil royalty and gas rental or royalty due and to be paid under the terms of said Leases, in so far as it covers the above described Land.

It is understood and agreed that 1/*****th of the money rentals, which may be paid, on the above described Land, to extend the term within which a well may be begun under the terms of any said Leases, is to be paid to the said Grantee; and, in event that any of the above described Leases for any reason becomes canceled or forfeited, then and in that event, Grantee shall own 1/*****th of all oil, gas and other minerals in and under said Lands, together with a like 1/*****th interest in all bonuses paid, and all royalties and rentals provided for in future oil, gas and mineral leases covering the above described Lands.

TO HAVE AND TO HOLD the above described property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee herein, and

Grantee's successors, heirs and assigns forever; and Grantor does hereby bind itself and its successors, heirs, executors and administrators, to warrant and forever defend all and singular the said property unto the said Grantee herein, and Grantee's successors, heirs and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof.

EXECUTED to be effective the ____ day of ____________, 20_____.

**GRANTOR:**

_______________________________________

THE STATE OF TEXAS §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on _______________, 20___, by __________________________, the __________________ of _____________, on behalf of said __________________.

_______________________________________
Notary Public, State of Texas

[Seal]

After Recording, Return to:

Libby Sparks Willis Starnes PLLC
Attn: Jeffrey T. Libby, Esq.
5950 Berkshire Lane, Suite 200
Dallas, Texas 75225

EXHIBIT A TO MINERAL DEED

Description of the Land

[*insert description of the Land per this Contract*]

---

EXHIBIT B TO MINERAL DEED

Description of Existing Oil and Gas Leases

[*insert description below*]

**EXHIBIT "D"**

**GENERAL ASSIGNMENT**

THIS GENERAL ASSIGNMENT (this "**Assignment**") is made as of the ____ day of __________, 20___, by ____________________, a ____________________ ("**Seller**"), to ______________________________, a ______________________ ("**Purchaser**").

WHEREAS, of even date herewith, Seller has conveyed to Purchaser the real property described in Exhibit A attached hereto ("**Land**"), together with all improvements (the "**Improvements**") located thereon (the Land and Improvements are referred to herein collectively as the "**Property**"); and

WHEREAS, Seller and Purchaser intend that Seller also convey to Purchaser all of the Conveyed Development Rights (as hereinafter defined).

NOW, THEREFORE, Seller, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, hereby agrees as follows:

1. Seller has GRANTED, BARGAINED, SOLD, CONVEYED and ASSIGNED, and by these present does hereby GRANT, BARGAIN, SELL, CONVEY and ASSIGN to Purchaser all of Seller's right, title and interest in and to the following, but only to the extent same pertain to the Property ("**Conveyed Development Rights**"):

(a) all surveys, engineering, soils, seismic, geological and environmental reports, studies and certificates and other technical descriptions;

(b) all warranties, guaranties and indemnities received from third parties, and all claims, demands and causes of action against third parties, but only to the extent they are for the benefit of, and applicable to, the Property or the owner thereof, including, without limitation, (i) any warranties, guaranties, indemnities, contractual rights, claims, demands and causes of action pertaining to the development, construction, design or completion of the Property and/or the common areas, streets, utilities or other subdivision infrastructure, and (ii) all of Seller's right, title, and interest in and to any and all claims, demands, actions, causes of action, liens and claims of lien which Seller has or may in the future have as a result of any hazardous substance or contaminant or any related damage or trespass to the Land;

(c) all licenses, permits, governmental approvals, utility commitments, utility rights (including rights to capacity or service), drainage and detention rights, or right to pay reduced application fees, permit fees, inspection fees, impact fees, development rights or other similar rights;

(d) rights to credits, refunds and reimbursements, including, without limitation, any credits against, or right to pay reduced application fees, permit fees, inspection fees, impact fees, or other similar development credits;

(e) all rights under any zoning cases, preliminary plans, plats (preliminary or final) of any portion of the Property or any rights-of-way abutting the Property or any portion thereof, including any boundary plats and any right-of-way plats, submitted, approved or recorded;

(f) all unpaid awards or proceeds, including awards in connection with insurance and any eminent domain taking;

(g) rights in and to engineering and architectural plans and specifications;

(h) rights under any declaration of covenants, conditions, and restrictions, including rights as declarant;

(i) utilities, sewage treatment capacity, water capacity, drainage and detention rights, if any, to serve or which will serve the land and improvements now or hereafter constructed thereon; and

(j) all other development rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Property.

TO HAVE AND TO HOLD the Conveyed Development Rights unto Purchaser and Purchaser's successors and assigns forever.

2. This Assignment will be binding on Seller, its successors and assigns, and will inure to the benefit of Purchaser, its successors and assigns.

3. This Assignment does not constitute an assumption of any liability or obligation by Purchaser, nor will it be deemed to impose on Purchaser any liability or obligation.

4. Seller hereby agrees to indemnify, defend and hold Purchaser and its successors and assigns harmless from and against any and all loss, liability, cost, damage or expense (including, without limitation, attorneys' fees, accountants' fees, consultants' fees, court costs and interest), suffered or incurred by Purchaser arising out of or resulting from the presence, alleged presence or introduction of any and all substances, materials and wastes which are or become regulated under applicable local, state or federal environmental laws or that are classified as hazardous or toxic under local, state or federal environmental laws or regulations in, on, under or about the Property on or prior to the date of Closing, including, without limitation, (a) any liability under or on account of environmental laws, including, without limitation, the assertion of any lien thereunder, (b) claims brought by third parties for loss or damage incurred or sustained, (c) liability with respect to any other matter relating to any actual or alleged violation by Seller or the operations on the Property of environmental laws, and (d) claims for contribution, cost recovery,

remediation, or similar actions arising under CERCLA chapter 361 of the Tex. Health and Safety Code Ann, or chapter 26 of the Texas Water Code.

5. Seller and Purchaser will each cooperate with each other, their employees, and agents to facilitate the purpose and intent of this Assignment including, without limitation, the providing of information and documentation that may be reasonably required for the enforcement of the rights and interests assigned hereby.

6. This Assignment may be executed in several counterparts, each of which will be fully effective as an original and all of which together will constitute one and the same instrument.

*[Remainder of page is intentionally left blank]*

EXECUTED as of the date first written above.

______________________________,
a _____ __________

By: ____________________
Name: ____________________
Title: ____________________

THE STATE OF TEXAS §
§
COUNTY OF __________ §

This instrument was acknowledged before me on ______________, 20___, by ____________________, ____________________ of ____________________, a ______ ______________, on behalf of said __________.

______________________________
Notary Public, State of Texas

[Official Notary Stamp]

---

Exhibit A to General Assignment

Legal Description of Property

[Insert land description]

# EXHIBIT "E"

## FORM OF MEMORANDUM OF AGREEMENT

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date**: ___________________, 2023

**Seller**: **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address**: See **Exhibit B** attached hereto and incorporated herein.

**Purchaser**: **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address**: See **Exhibit B** attached hereto and incorporated herein.

**Property**: Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ___________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this ______ day of ____________________, 2023.

**SELLER**:

BILL SANDERS, INDEPENDENT EXECUTOR
OF THE ESTATE OF PEARL SMELLEY

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

(seal)

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:_________________________
Richard Smelley, Manager

By:_________________________
Tammy Graham, Manager

By:_________________________
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

_________________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

_________________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

(SEAL) LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.] [Signature pages continue on following page.]*

**SELLER:**

______________________
**RICHARD DAVID SMELLEY**

______________________
**AMY ELIZABETH SMELLEY**

STATE OF TEXAS §
 §
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

______________________
Notary Public Signature

STATE OF TEXAS §
 §
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

______________________
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER**:

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

Deborah Ruth Davis

**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

## EXHIBIT A TO MEMORANDUM OF AGREEMENT

**Property Description**

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degrees West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest corner of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing all of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**EXHIBIT B TO MEMORANDUM OF AGREEMENT**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **If intended for Seller:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **If intended for Purchaser:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# MEMORANDUM OF AGREEMENT

**STATE OF TEXAS** §
§
**COUNTY OF HOOD** §

**Date:** ____________________, 2023

**Seller:** **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who joined in the Contract (defined below) solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate (as defined in the Contract) to Purchaser as described in the Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**"). The Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in the Contract and in this Memorandum of Agreement as "**Seller**".

**Seller's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Purchaser:** **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns

**Purchaser's Address:** See **Exhibit B** attached hereto and incorporated herein.

**Property:** Approximately 1,674 gross contiguous acres situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, an approximate description of which is set forth on **Exhibit A** attached hereto and incorporated herein.

Seller and Purchaser are parties to that certain Standard Contract of Sale dated ____________________, 2023 (the "**Contract**") in which Seller has agreed to sell the Property to Purchaser, and Purchaser has agreed to purchase the Property from Seller, in accordance with the terms and conditions set forth in the Contract.

*[SIGNATURE AND NOTARY PAGES FOLLOW THIS PAGE]*

EXECUTED by Seller this ______ day of ____________________, 2023.

**SELLER**:

Bill Sanders IND EX.

**BILL SANDERS, INDEPENDENT EXECUTOR**
**OF THE ESTATE OF PEARL SMELLEY**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 26, 2023 by Bill Sanders as Independent Executor of The Estate of Pearl Smelley.

Linda Coffey Jessup
Notary Public Signature

(seal) NOTARY PUBLIC STATE OF TEXAS LINDA COFFEY JESSUP Notary Public, State of Texas Comm. Expires 11-01-2024 Notary ID 2157347

*[Signature pages continue on following page.]*

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ____________________
Richard Smelley, Manager

By: ____________________
Tammy Graham, Manager

By: ____________________
Deborah Davis, Manager

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Richard Smelley, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

____________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Tammy Graham, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

(SEAL)

____________________
Notary Public, State of Texas

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on the 25th day of May 2023, by Deborah Davis, Manager of Cresson Moon Management, LLC, a Texas limited liability company, the general partner of Cresson Moon Properties, LP, a Texas limited partnership, for and on behalf of said limited partnership, for the purposes stated in said instrument.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public, State of Texas

*[Signature pages continue on following page.]*

**SELLER:**

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Richard David Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347
(seal)

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Amy Elizabeth Smelley.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347
(seal)

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

TAMMY MARIE GRAHAM

GREGORY SCOTT GRAHAM

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, , 2023 by Tammy Marie Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Gregory Scott Graham.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Notary Public Signature

*[Signature pages continue on following page.]*

**SELLER:**

Deborah Ruth Davis

**DEBORAH RUTH DAVIS**

**DAVID GLENN DAVIS**

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by Deborah Ruth Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

STATE OF TEXAS §
§
COUNTY OF Parker §

This instrument was acknowledged before me on May 25, 2023 by David Glenn Davis.

LINDA COFFEY JESSUP
Notary Public, State of Texas
Comm. Expires 11-01-2024
Notary ID 2157347

Linda Coffey Jessup
Notary Public Signature

*[Signature pages continue on following page.]*

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: [signature]
John Contrevo, Manager

STATE OF New Jersey §
COUNTY OF Camden §
§

This instrument was acknowledged before me on the 18 day of May 2023, by John Contrevo, Manager of Challenger Realty Group, LLC, a Delaware limited liability company, for and on behalf of said limited liability company, for the purposes stated in said instrument.

(SEAL)

[signature]
Notary Public, ~~State of Texas~~ State of New Jersey SE
May 18, 2023

SHAMAYNE R EVERITT
Commission # 50208874
Notary Public, State of New Jersey
My Commission Expires
April 11, 2028

# EXHIBIT A TO MEMORANDUM OF AGREEMENT

## Property Description

Approximately 1,674 gross contiguous acres as more particularly described in the Contract, which approximately 1,674 gross contiguous acres is part of the following described land (the "**Parent Tract**"):

2,024.8 acres, more or less, in Hood County, Texas, described in two tracts:

Tract I: 1805.9 acres, more of less, in the Thos Nesbitt; A. B. Anderson; J. M Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B.B.R.R. Co; J. M. Y'Barbo; D. C. Miller, E. D. Wyatt; J. C. Reese; John Sealey, and J. O. Lane Original Surveys; and

Tract II: 218.9 acres, more or less, in the North J. W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey; and the John Howard Survey;

as such Parent Tract is more particularly described in **Appendix 1** to this Exhibit A and incorporated herein by reference.

## APPENDIX 1 TO EXHIBIT A TO MEMORANDUM OF AGREEMENT

### Legal Description of Parent Tract

All that certain lot, tract or parcel of land, situated in the County of Hood, State of Texas, described as follows:

2,024.8 acres of land described in two tracts as follows:

TRACT I

All that certain tract or parcel of land lying and being about 10 miles Northeast from Granbury in Hood County, Texas and out of the Thos. Nesbitt; A. B. Anderson; J. M. Anderson; T. H. Rockwell; J. M. Warren; J. W. Wells; B.B. B. RR Co., J. M. Y'Barbo; D. C. Miller, E. D. Wyatt, J.C. Reese; John Sealey and J. O. Lane Original Surveys, more particularly described by metes and bounds as follows:

BEGINNING at a stone marked with a cross set in the boundary line between the Nancy Smith and J. M. Anderson Surveys and 103 varas North of the South east corner of said J. M. Anderson Survey;
THENCE North 12-2 varas a stone in line between the Nancy Smith and Thos. Nesbitt Surveys, the Northeast corner of Anderson Ranch;
THENCE West 2688 varas a stone in East boundary line of John Sealey Survey
THENCE North 1435 varas between Thos. Nesbitt and John Sealey Surveys a stone for corner in the South right-of-way fence of Santa Fe Ry. Co.;
THENCE South 70 degrees West 100 varas; South 58-1/4 degrees West 100 varas; SOUTH 48 degrees West 200 varas; South 45 degrees West 168 varas; South 42-1/2 degrees West 200 varas; South 37-1/2 degrees West 100 varas; South 29 degrees West 100 varas; South 21-1/2 degrees West 100 varas; South 17-1/4 degrees West 300 varas; South 8-1/4 degrees West 100 varas; South 4-3/4 degrees West 235 varas; South 4-3/4 degrees East 478 varas; South 4-1/2 degrees East 100 varas; South 20 degrees East 100 varas to off-set of 9 varas in right-of-way fence; South 20 degrees East 530 varas; Tangent; South 15 degrees East 40 varas; South 3 degrees Eat 70 varas measured by chords with curve of fence; South 40 varas; South 10 degrees West 40 varas; South 18 degrees West 40 varas; South 28 degrees West 40 varas; South 30 degreas West 100 varas jog West of 10 feet in fence;
THENCE South 30 degrees West 820 varas to stone on the South boundary line near Southwest corner of E. D. Wyatt Survey;
THENCE East following the line between the Wyatt and Miller Surveys, in all 935 varas to a stone;
THENCE South 37 degrees East 477 varas a stone on boundary line between Hooe and Y'Barbo Surveys;
THENCE North 60 degrees East 581 varas a stone the Northeast corner of N. Hooe Survey;
THENCE South 30 degrees East 1140 varas the Southwest corner of Y'Barbo Survey and Southwest comer of this ranch, a post and stone 11 varas South 30 degrees West from Fence corner;
THENCE North 60 degrees East 1480 varas with South boundary line of Y'Barbo and South boundary line of the Warren and BBB. Ry. Co. Surveys to fence corner, the Southeast corner

(Continued on following page)

20 varas South 60 degrees West from true corner, the Southeast corner of this ranch;
THENCE North 23 degrees West 207 varas an iron pipe;
THENCE North 30 degrees West 703 varas with West boundary line of the Warren Survey crossing ell of Warren Survey to Southeast corner of J. O. Lane Survey, Southwest corner of T. H. Rockwell Survey a stone;
THENCE North 60 degrees East 898 varas to Southeast corner of J. M. Anderson, Northeast corner of T. H. Rockwell and West boundary line of Nancy Smith Surveys;
THENCE North 102 varas to the point of beginning, and containing 1805.9 acres of land, more or less;
SAVE AND EXCEPT any portion thereof in the use or occupancy of any public road or highway.

TRACT II

All that certain tract or parcel of land lying and being situated in the County Of Hood, State of Texas and being out of and a part of the North J.W. Randle Survey; the South J. W. Randle Survey; the J. M. Hays Survey and the John Howard Survey, more particularly described by metes and bounds as follows:

BEGINNING at a point in the middle of Fall Creek in the South boundary line of Old Highway No. 10 which is the Southeast corner of this tract;
THENCE with the Southeast line of said Old Highway, with said line North 72-1/2 degrees East to North 50 East on a curve 120 varas to the point of tangency;
THENCE North 12-1/2 degrees East 810 varas to second Southeast corner;
THENCE North 18 degrees Wet 217 varas a post for corner;
THENCE South 34 degrees West 295 varas a cedar post;
THENCE North 80 degrees West 120 varas first Southwest corner of Slocum land;
THENCE North 32 degrees West 255 varas Northeast corner of this tract;
THENCE South 60 degrees West 1330 varas Northwest corner of this tract, post stone;
THENCE South 34 degrees East 627 varas Southwest corner a stone Burnett tract East boundary line;
THENCE North 72 degrees East 740 varas corner of North bank of Creek;
THENCE South 25 degrees East 90 varas to the North boundary line of a county road;
THENCE North 82 degrees East along the North boundary line of said county road to the point of beginning, and containing 218.9 acres of land, more or less;
SAVE AND EXCEPT any portion of the above described tract of land in the use or occupancy of any public road or highway.

**<u>EXHIBIT B TO MEMORANDUM OF AGREEMENT</u>**

(Addresses of Seller and Purchaser)

| | |
|---|---|
| **<u>If intended for Seller</u>:** | Bill Sanders, Independent Executor of the Estate of Pearl Smelley<br>804 Flagstone Drive<br>Burleson, Texas 76028 |
| with a copy to: | Estate of Pearl Smelley<br>Attn: Todd Tew<br>566 North Kimball Avenue, Suite 130<br>Southlake, Texas 76092 |
| and a copy to: | Cresson Moon Properties, LP,<br>c/o Cresson Moon Management, LLC<br>Attn: Richard Smelley, Deborah Davis, and Tammy Graham<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Richard Smelley and Amy Smelley<br>4750 Cattlebaron Drive<br>Fort Worth, Texas 76108 |
| and a copy to: | Deborah Davis and David Davis<br>12601 Cleburne Hwy<br>Cresson, Texas 76035 |
| and a copy to: | Tammy Graham and Gregory Graham<br>6651 Weiland Road<br>Weatherford, Texas 76088 |
| **<u>If intended for Purchaser</u>:** | Challenger Realty Group, LLC<br>Attn: John Contrevo<br>100 Essex Avenue<br>Bellmawr, New Jersey 08031 |
| with a copy to: | Libby Sparks Willis Starnes PLLC<br>Attn: Jeffrey T. Libby<br>5950 Berkshire Lane, Suite 200<br>Dallas, Texas 75225 |

# FIRST AMENDMENT TO STANDARD CONTRACT OF SALE

This **FIRST AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is executed on this 4th day of December, 2024 (the "**First Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Inspection Period. The Inspection Period is hereby extended to continue through April 7, 2025 (the 180th day after October 7, 2024). For the avoidance of doubt, by signing this Amendment, the Parties acknowledge and agree that (a) the Parties' intention is to extend the Inspection Period as described above, and (b) preserve both of Purchaser's two (2) options to extend the Inspection Period as described in Section 5(a) of the Contract.

3. Purchaser hereby instructs the Title Company to (a) continue to maintain the initial Earnest Money in escrow and (b) hold in escrow solely for the benefit of Purchaser the $100,000 deposit of additional Earnest Money that Purchaser delivered to the Title Company on or about July 8, 2024 (the "**Prepaid Deposit**"). The Parties acknowledge and agree that, unless and until

Purchaser elects to exercise its first option to extend the Inspection Period as described in Section 5(a) of the Contract, (y) the Prepaid Deposit is not intended to be, and is not, part of the Earnest Money, and (z) Seller has no claim to, or right to receive, the Prepaid Deposit.

4. Oil and Gas Leases.

(a) Seller hereby authorizes Purchaser to contact and communicate with each and every lessee (each, an "**O&G Lessee**") under the oil and gas lease agreements to which all or a portion of the Property is subject (each, an "**O&G Lease**"), including, without limitation, that certain O&G Lease pursuant to which that certain oil and gas well commonly referred to as "Smelley 1H" (RRC Lease ID No. 211620) (the "**Smelley 1H Lease**") exists on the Property, on Seller's behalf in order to negotiate modifications of the O&G Leases that are satisfactory to Purchaser; provided, however, that Purchaser shall not be entitled to enter into an agreement with any O&G Lessee that is enforceable against Seller without Seller's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Such modifications may include, without limitation, early termination or revocation of the applicable O&G Lease or the lessee's waiver or restriction of its rights to access and use the surface of the Property for oil and gas development. Purchaser shall be authorized to contact, communicate and negotiate with the O&G Lessees through Purchaser's representatives, including, without limitation, Purchaser's legal counsel and environmental engineers. Seller shall not be liable to Purchaser for any of Purchaser's fees, costs or other expenses incurred by Purchaser in seeking a modification, early termination or revocation of an O&G Lease. Further, within thirty (30) days following delivery of Purchaser's written request, Seller will initiate and diligently pursue litigation to modify or terminate the O&G Lease and consult and cooperate with Purchaser in connection with such litigation.

(b) All Seller Parties agree to provide to Purchaser the following within five (5) business days after First Amendment Effective Date to the extent not already provided to Purchaser: shut-in payments and shut-in payment supporting documentation received by Seller Parties for (i) 2024 and (ii) the applicable years prior to 2024.

(c) Seller agrees to cooperate with Purchaser in Purchaser's efforts to modify the O&G Leases, including, without limitation, Seller shall, within five (5) business days following Purchaser's delivery to Seller of the applicable request, (a) execute and deliver to Purchaser and any O&G Lessee any written documentation requested by Purchaser or any O&G Lessee to evidence Purchaser's authority to communicate and negotiate on Seller's behalf, and (b) execute and deliver to Purchaser any documentation approved by Purchaser in writing that modifies an O&G Lease. Additionally, within five (5) business days after the First Amendment Effective Date, Seller will deliver a written request to the O&G Lessee under the Smelley 1H Lease to deliver to Seller a full accounting of all shut-in payments made under the Smelley 1H Lease and Seller will diligently thereafter pursue receipt of such accounting and deliver copies of all communications and documentation that Seller receives from the O&G Lessee under the Smelley 1H Lease within five (5) business days following receipt of same.

(d) Seller agrees that Seller will not accept, deposit or cash any shut-in consideration in any form, including, without limitation, any cash, checks, money orders or wire transfers, on or after the First Amendment Effective Date in connection with any O&G Lease.

(e) Seller and Purchaser acknowledge and agree that negotiations or litigation regarding the Smelley 1H Lease are additional agreements to the Contract. Nothing in the provisions and authorizations for the O&G Lease shall constitute grounds for an extension or contingency to close.

4. Closing Date. Notwithstanding anything contained in the Contract or the Amendment to the contrary, unless otherwise agreed in writing by Seller and Purchaser, the Closing Date shall not extend beyond December 31, 2025.

5. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

6. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

Bill Sanders Ind Ex.
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY 11/7/2024

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By:____________________
Richard Smelley, Manager

By:____________________
Tammy Graham, Manager

By:____________________
Deborah Davis, Manager

**SELLER**:

____________________
RICHARD DAVID SMELLEY

____________________
AMY ELIZABETH SMELLEY

**SELLER**:

____________________
DEBORAH RUTH DAVIS

____________________
DAVID GLENN DAVIS

**SELLER:**

____________________
TAMMY MARIE GRAHAM

____________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: *Richard S Smelley*
Richard Smelley, Manager

By: ______________________________
Tammy Graham, Manager

By: ______________________________
Deborah Davis, Manager

**SELLER**:

*Richard David Smelley*
RICHARD DAVID SMELLEY

*Amy E. Smelley*
AMY ELIZABETH SMELLEY

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER**:

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:______________________________
Richard Smelley, Manager

By:______________________________
Tammy Graham, Manager

By:______________________________
Deborah Davis, Manager

**SELLER:**

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**IN WITNESS WHEREOF**, the parties have executed and delivered this Amendment as of the First Amendment Effective Date.

**SELLER**:

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

RICHARD DAVID SMELLEY

AMY ELIZABETH SMELLEY

**SELLER**:

DEBORAH RUTH DAVIS

DAVID GLENN DAVIS

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________
Richard Smelley, Manager

By: *[signature]*
Tammy Graham, Manager

By:____________________
Deborah Davis, Manager

**SELLER:**

*[signature]*
TAMMY MARIE GRAHAM

*[signature]*
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the First Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: John Contrevo
John Contrevo, Manager

## SECOND AMENDMENT TO STANDARD CONTRACT OF SALE

This **SECOND AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of December 31, 2025 (the "**Second Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to December 31, 2025, the outside Closing Date set forth in the Contract, and (c) the Environmental Report cannot be delivered to Purchaser by the outside Closing Date set forth in the Contract; and

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract prior to the Second Amendment Effective Date to finalize new extended deadlines for the requirements for sale as per the Standard Contract for Sale.; however, the Parties desire to enter into this Amendment to extend the Closing Date for a period of time in order to allow Seller's to fully comply with the requirements of Standard Contract for Sale section 7(c) and to allow Seller and Purchaser to enter into subsequent amendment to the Contract; and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Closing Condition and Closing Date. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in Section 3 of this Amendment below, the Closing Date is hereby extended until January 10, 2026 (the "**First Extended Closing Date**").

3. Further Amendment to the Contract. The Parties hereby agree to further amend the Contract on or before the First Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date.

4. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the Second Amendment Effective Date.

**SELLER**:

ID GwazBhJ35oa47kuyCasyBmQV

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**, a Texas limited partnership

By: Cresson Moon Management, LLC, a Texas limited liability company, General Partner

By: ID eZhryQn2Gr99j7fMso6rN8PB
Richard Smelley, Manager

By: ID 3pE98KhWW988UohRp68xUxCg
Tammy Graham, Manager

By: ID 9PNAG9ooaHKb1JSruwL4HGJg
Deborah Davis, Manager

**SELLER**:

ID eZhryQn2Gr99j7fMso6rN8PB

RICHARD DAVID SMELLEY

ID 28wgymSsAnj7FTc4FcYzFyrs

AMY ELIZABETH SMELLEY

**SELLER**:

ID 9PNAG9ooaHKb1JSruwL4HGJg

DEBORAH RUTH DAVIS

ID kcsS9Gz52QsKSrD8gzTPnqfq

DAVID GLENN DAVIS

**SELLER**:

ID 3pE98KhWW988UohRp68xUxCg

TAMMY MARIE GRAHAM

ID wH2qWdHHhrNBWbdMmH5GPP2h

GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the Second Amendment Effective Date.

**<u>PURCHASER</u>:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By: ______________________________
ID 6fnyo9U8nNyRaFcvSqRuTxWU
John Contrevo, Manager

# eSignature Details

**Signer ID:** **6fnyo9U8nNyRaFcvSqRuTxWU**
Signed by: John Contrevo
Sent to email: john@challengerrealtygroup.com
IP Address: 73.194.171.232
Signed at: Dec 31 2025, 2:07 pm CST

**Signer ID:** **GwazBhJ35oa47kuyCasyBmQV**
Signed by: Bill Sanders, Executor of the Estate of Pearl Sanders Smelley
Sent to email: bsanders@flash.net
IP Address: 108.220.14.20
Signed at: Dec 31 2025, 2:23 pm CST

**Signer ID:** **eZhryQn2Gr99j7fMso6rN8PB**
Signed by: David Smelley
Sent to email: sgd@flash.net
IP Address: 132.147.159.94
Signed at: Dec 31 2025, 4:21 pm CST

**Signer ID:** **9PNAG9ooaHKb1JSruwL4HGJg**
Signed by: Deborah Davis
Sent to email: debbierdavis77@gmail.com
IP Address: 174.244.19.199
Signed at: Dec 31 2025, 4:26 pm CST

**Signer ID:** **kcsS9Gz52QsKSrD8gzTPnqfq**
Signed by: David Davis
Sent to email: davidgdavis1@yahoo.com
IP Address: 108.161.8.130
Signed at: Dec 31 2025, 4:27 pm CST

**Signer ID:** **3pE98KhWW988UohRp68xUxCg**
Signed by: Tammy Graham
Sent to email: tammy@locationsphotography.com
IP Address: 74.221.111.141
Signed at: Dec 31 2025, 6:09 pm CST

**Signer ID:** **wH2qWdHHhrNBWbdMmH5GPP2h**
Signed by: Gregory Graham
Sent to email: ggraham.greg@gmail.com
IP Address: 74.221.111.141
Signed at: Dec 31 2025, 6:09 pm CST

**Signer ID:** **28wgymSsAnj7FTc4FcYzFyrs**
Signed by: Amy Smelley
Sent to email: amy.smelley@icloud.com
IP Address: 132.147.159.73
Signed at: Dec 31 2025, 6:25 pm CST

# THIRD AMENDMENT TO STANDARD CONTRACT OF SALE

This **THIRD AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of January 9, 2026 (the "**Third Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, and Second Amendment to Standard Contract of Sale dated effective as of December 31, 2025, the "**Contract**", concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to the First Extended Closing Date, and (c) the Environmental Report cannot be delivered to Purchaser by the First Extended Closing Date; and

**WHEREAS**, the parties agreed in the Second Amendment to Standard Contract of Sale to enter into a subsequent amendment no later than First Extended Closing Date;

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract prior to the Second Extended Closing Date (defined below) to finalize new extended deadlines for the requirements for sale as per the Standard Contract for Sale.; however, the Parties desire to enter into this Amendment to extend the First Extended Closing Date for a

period of time in order to allow Seller to fully comply with the requirements of Standard Contract for Sale Section 7(c) and to allow Seller and Purchaser to enter into subsequent amendment to the Contract; and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Closing Condition and Closing Date. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in Section 3 of this Amendment below, the Closing Date is hereby extended until January 23, 2026 (the "**Second Extended Closing Date**").

3. Further Amendment to the Contract. The Parties hereby agree to further amend the Contract on or before the Second Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date and otherwise clarify the parameters of the Environmental Report.

4. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the Third Amendment Effective Date.

**SELLER**:

ID YJLmW5j71JkTFxS5HAagN3ub

BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

ID uwDVzJ6qSVRYJctPbwjW2ScD

RICHARD DAVID SMELLEY

ID RtytddcTtv37rx5UjUaUtb2E

AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP,**
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By: ID uwDVzJ6qSVRYJctPbwjW2ScD
Richard Smelley, Manager

By: ID sCfe1oLRR6dnUeKgVMewLa8x
Tammy Graham, Manager

By: ID 5D3qEQeqw43Aju8EJtYF92CK
Deborah Davis, Manager

**SELLER**:

ID 5D3qEQeqw43Aju8EJtYF92CK

DEBORAH RUTH DAVIS

ID aCLThMmFxfmH9KcPiTCs3EfS

DAVID GLENN DAVIS

**SELLER:**

ID sCfe1oLRR6dnUeKgVMewLa8x

TAMMY MARIE GRAHAM

ID 9B1AJeUmr3KS6EmvZW1TGQQj

GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the Third Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

ID xyB7kyRb94uTvednyRRJExtq

By:______________________________
John Contrevo, Manager

# eSignature Details

**Signer ID:** **xyB7kyRb94uTvednyRRJExtq**
Signed by: John Contrevo
Sent to email: john@challengerrealtygroup.com
IP Address: 73.194.171.232
Signed at: Jan 9 2026, 2:56 pm CST

**Signer ID:** **YJLmW5j71JkTFxS5HAagN3ub**
Signed by: Bill Sanders, Executor of the Estate of Pearl Sanders Smelley
Sent to email: bsanders@flash.net
IP Address: 108.220.14.20
Signed at: Jan 9 2026, 3:02 pm CST

**Signer ID:** **uwDVzJ6qSVRYJctPbwjW2ScD**
Signed by: David Smelley
Sent to email: sgd@flash.net
IP Address: 132.147.159.94
Signed at: Jan 9 2026, 3:38 pm CST

**Signer ID:** **5D3qEQeqw43Aju8EJtYF92CK**
Signed by: Debbie Davis
Sent to email: debbierdavis77@gmail.com
IP Address: 174.244.18.9
Signed at: Jan 9 2026, 4:38 pm CST

**Signer ID:** **RtytddcTtv37rx5UjUaUtb2E**
Signed by: Amy Smelley
Sent to email: amy.smelley@icloud.com
IP Address: 132.147.159.73
Signed at: Jan 9 2026, 5:48 pm CST

**Signer ID:** **sCfe1oLRR6dnUeKgVMewLa8x**
Signed by: Tammy Graham
Sent to email: tammy@locationsphotography.com
IP Address: 74.221.111.141
Signed at: Jan 9 2026, 7:08 pm CST

**Signer ID:** **aCLThMmFxfmH9KcPiTCs3EfS**
Signed by: David Davis
Sent to email: davidgdavis1@yahoo.com
IP Address: 174.244.50.7
Signed at: Jan 10 2026, 2:15 pm CST

**Signer ID:** **9B1AJeUmr3KS6FmvZW1TGQQj**
Signed by: Gregory Graham
Sent to email: ggraham.greg@gmail.com
IP Address: 74.221.111.141
Signed at: Jan 10 2026, 3:12 pm CST

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| *Plaintiff,* | § | |
| **v.** | § | **Civil Action No. 4:26-cv-00231-P** |
| **BILL SANDERS, *et al.*,** | § | |
| *Defendants.* | § | |

# DECLARATION OF LACY KIMBALL

I, Lacy Kimball, declare under penalty of perjury as follows:

1. My name is Lacy Kimball. I am an attorney with Lacy Kimball Law in Weatherford, Texas. I represented Defendants—Richard David Smelley and Amy Elizabeth Smelley—in connection with the Standard Contract of Sale dated May 26, 2023 (the "Contract"), between Defendants and Challenger Realty Group, LLC, the predecessor in interest to Plaintiff Challenger Cresson I, LLC (together, "Challenger"), and its amendments. I am over the age of eighteen, and I am competent and authorized to make this declaration. The facts set forth in this declaration, all of which are true and correct, are based on my personal knowledge. My personal knowledge is derived from my personal involvement in the communications discussed in this declaration and my review of the documents discussed in this declaration.

2. Attached hereto as Exhibit B-1 is a true and correct copy of email correspondence among counsel for the parties, on which I am a party, dated December 30 and 31, 2025, concerning the Second Amendment to Standard Contract of Sale (the "Second Amendment").

3. On December 30, 2025, Challenger's counsel, Jeffrey T. Libby, circulated a draft of the Second Amendment that would have committed the parties to a later amendment

addressing, among other things, "the Environmental Report and applicable insurance obligations." On December 31, 2025, I told Mr. Libby that I did "not want to leave the door open to renegotiate any of the requirements that seller already has." Mr. Libby responded that "today is the outside deadline for closing in the contract," and later that day he wrote that "Challenger will agree to sign the revised version." The Second Amendment that the parties signed on December 31, 2025 does not contain the "applicable insurance obligations" language, and it contains no term requiring reliance letters or insurance.

4. On January 9, 2026, I circulated a proposed Third Amendment to Standard Contract of Sale to Mr. Libby and David Spiller, and Mr. Libby returned a revised version that day. Attached hereto as Exhibit B-2 is a true and correct copy of the revised proposed Third Amendment that Mr. Libby sent. The parties executed this document on January 9th and 10th, 2025. Attached hereto as Exhibit A-4 is a true and correct copy of the revised Third Amendment to Standard Contract of Sale.

5. Attached hereto as Exhibit B-3 and produced as DEF000390–DEF000414 is a true and correct copy of email correspondence among counsel for the parties, last dated January 26, 2026, concerning the proposed Third Amendment, a further amendment, and closing. I sent or received the emails in Exhibit B-3 dated January 9 and January 22, 2026.

6. On January 22, 2026, I emailed Mr. Libby and asked, "Where are we with the next amendment?" Later that morning I told him that Defendants' environmental consultant had reported "no issues and no needed remediation," and I offered "an amendment to close by Feb 13th." Mr. Libby replied that he would call me to discuss. He did not send me an amendment, and the parties did not sign one. He did call me and indicated that his clients wanted to just close the deal. He indicated the Buyers would deny any fourth amendment to extend, but wanted to continue forward toward closing as if the contract had not expired and then enter into another amendment when a set closing date was determined.

7. After the Third Amendment, I did not prepare or receive any amendment to the Contract signed by every Defendant and Challenger, and I am not aware of any.

8. Attached hereto as Exhibit B-4 is a true and correct copy of an email that Mr. Libby sent me on February 12, 2026.

9. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Parker County, Texas on this 9th day of November 2026.

Lacy Kimball

Lacy Kimball

**Miller, Jamie**

---

| | |
|---|---|
| **From:** | Jeffrey Libby <jlibby@cbsattorneys.com> |
| **Sent:** | Tuesday, December 30, 2025 9:41 PM |
| **To:** | David Spiller |
| **Cc:** | john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com); Edwin Esposito; Patty Herrera (patty@challengerrealtygroup.com); Lacy Kimball Law; Todd W Tew; Kelly Roach (keroach39@gmail.com); Jake Wilkinson |
| **Subject:** | Interim Contract Amendment; Challenger-Cresson |
| **Attachments:** | Second Amendment to Standard Contract of Sale (Challenger-Cresson) (v2-P).docx |
| **Importance:** | High |

David,

Attached please find the proposed "interim" contract amendment designed to provide the parties with a little breathing room in order to finalize all of the environmental investigation parameters, which can then be incorporated into a more thorough contract amendment.

Please be advised that, in the interest of time, I am simultaneously delivering a copy of the attached amendment to my client and must therefore reserve my client's right to make revisions based upon its review.

Please let me know if you have any questions or comments. I know Seller has a lot of people from whom to obtain signatures, so let's coordinate to have the amendment executed via DocuSign for convenience and expediency.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST
Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** Michael Whitehead <mwhitehead@whiteheades.com>
**Sent:** Monday, December 29, 2025 4:55 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com)

<Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; john@challengerrealtygroup.com
**Subject:** Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David, Jeffrey, and Aaron,

Thanks for the suggestions, we will update our Work Order to include.

**Michael Whitehead**
**Founder**
Whitehead E.S., LLC
906 E. 18th St. Suite 100, Plano, TX 75074
mike@whiteheades.com | Direct (469) 609-8080 Ext. 100 | M (214) 335-3246

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Monday, December 29, 2025 4:49 PM
**To:** David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; Michael Whitehead <mwhitehead@whiteheades.com>; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi David,

Thank you for sending the Phase II proposal, I've added some relatively minor comments and requested changes to the scope of work.
Can you please review & approve?
I believe Jeff is in the process of preparing the contract amendment, which I'm sure he will get over to you as soon as it is available.

Aaron Munsart, P.G.
Senior Geologist, Project Manager
ESE Partners, LLC
amunsart@esepartners.com
281-309-2562

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Monday, December 29, 2025 2:58 PM

**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Aaron,

Attached is the Phase II Proposal. We have not yet acted on it, but will be discussing it today. Also, we have not yet received the proposed amendment from Jeff. Looking forward to receiving it. Let me know if you have any problems or concerns with the attached proposal. Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Monday, December 29, 2025 12:01 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>; David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi David,

Hope y'all had a great Christmas!
Do you have the Phase 2 proposal ready for our review?
Just checking in.

Thanks,

Aaron Munsart, P.G.
Senior Geologist, Project Manager
ESE Partners, LLC
amunsart@esepartners.com
281-309-2562

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Tuesday, December 23, 2025 4:31 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David,

I am preparing the proposed amendment and will get that to you asap.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST
Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Tuesday, December 23, 2025 9:34 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>;

Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Jeff,

Let me know where you are in preparing and sending the proposed amendment to accommodate the completion of the Phase II that we discussed last Friday. We have received a proposal from Michael Whitehead with Whitehead ES and are ready to move forward. Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

---

**From:** David Spiller
**Sent:** Thursday, December 18, 2025 5:30 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Jeff,

Yes. You just name the time. Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447

Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Thursday, December 18, 2025 5:12 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David,

Thank you for your email. We appreciate the spirit in which Seller and Purchaser are working together toward finalizing Seller's environmental assessment and report and believe that the cooperation between the parties' respective environmental engineers will expedite the path to closing.

Speaking of a path to closing, are you available tomorrow (Friday) between 12:00 and 2:00 PM to discuss the proposed contract amendment?

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

325 N. St. Paul Street,
Suite 2300
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Thursday, December 18, 2025 3:18 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Aaron,

Thanks for the email. First, the Sellers are aware of the findings. Sellers paid for the work and report. However, I have not yet heard back from Jeff Libby on behalf of the Buyer. As you can see from my email below, I wanted Jeff to contact me at his earliest convenience so that we may discuss the matter and work toward the anticipated closing of the sale.

To that end, we have requested a proposal (relative to scope of work, anticipated time frame necessary to complete the work, and anticipated range of cost – both if no findings of contamination and remedial steps if there is a finding of contamination) from Whitehead E.S., LLC ("Whitehead"). To answer your specific questions, in the spirit of cooperation and a joint desire to close this transaction as soon as possible:

1. I don't believe we have a problem with sharing the proposal when we receive it. I will need to confirm that issue with Michael Whitehead to make sure there is nothing proprietary in the proposal from Whitehead that would need to be redacted. I doubt that there would be.

2. We do not have a problem with ESE being present when all or part of any work is being done.

Thanks for reaching out. Please contact me with any problems, questions or concerns.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Thursday, December 18, 2025 2:32 PM
**To:** David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** Re: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi Michael & David,

Hope you're both doing well!
Have you had a chance to review your Phase 1 REC findings with the Seller?
If you are moving toward completing the Phase 2 ESA, we have a few requests that would assist the Buyer greatly in this transaction:

- Could you please provide a copy of the Phase 2 ESA proposal for review by the Buyer and/or Buyer's consultant (ESE)? We would just like to review prior to completion to ensure the scope of work is comprehensive to investigate both Seller & Buyer environmental concerns for the Site.

- Buyer would like to have ESE present during the performance of Phase 2 activities. Please let us know when this work is scheduled so that we, ESE, can also be present.

Let me know if you have any questions/concerns on this.

Thank you,

Aaron Munsart, P.G.

Senior Geologist, Project Manager

ESE Partners, LLC

amunsart@esepartners.com

281-309-2562

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Monday, December 15, 2025 4:22 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy

Kimball Law <info@lacykimballlaw.com>; Aaron Munsart, P.G. <amunsart@esepartners.com>; mwhitehead@whiteheades.com <mwhitehead@whiteheades.com>; john@challengerrealtygroup.com <john@challengerrealtygroup.com>
**Subject:** [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres in Ho...

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jeff,

Below is the link to the Buyer's Phase I Environmental Site Assessment to the tract of land the subject of the above referenced contract ("the contract"), being 1,674 acres, more or less, at 7700 Old Granbury Road, Cresson, Texas, prepared by Whitehead E.S., LLC. This report is being provided pursuant to the terms and conditions of the contract.

Cresson Ranch, Cresson, TX - Phase I ESA.pdf

After you and your team have had an opportunity to review it, please contact me at your earliest convenience so that we may discuss the matter and work toward the anticipated closing of the sale. Thanks.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

[ABOTA%20logo.png] American Board of Trial Advocates [AV-Preeminent-Logo-100px.png]

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

---

---

---

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**SECOND AMENDMENT TO STANDARD CONTRACT OF SALE**

Formatted: Font: Not Bold, No underline, Font color: Auto

This **SECOND AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of December 31, 2025 (the "**Second Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, the "**Contract**"), concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to December 31, 2025, the outside Closing Date set forth in the Contract, and (c) the Environmental Report cannot be delivered to Purchaser by the outside Closing Date set forth in the Contract; and

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract after the Second Amendment Effective Date to incorporate the rights and obligations of the Parties with respect to the scope of work in connection with the environmental investigations required for the Environmental Report, the environmental investigations themselves, the Environmental Report and applicable insurance obligations, the Closing Date, and matters related thereto; however, the Parties desire to enter into this Amendment to extend the Closing Date for a period of time in order to allow Seller's environmental engineer to finalize the

Formatted: Font: Times New Roman, 12 pt
Formatted: Border: Bottom: (Single solid line, Auto, 1.5 pt Line width)
Formatted: Font: 12 pt

scope of work in connection with the environmental investigations required for the Environmental Report and to allow Seller and Purchaser to enter into subsequent amendment to the Contract addressing the matters described in this recital; and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Closing Condition and Closing Date. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in Section 3 of this Amendment below, the Closing Date is hereby extended until January 10, 2025 (the "**First Extended Closing Date**").

3. Further Amendment to the Contract. The Parties hereby agree to further amend the Contract on or before the First Extended Closing Date to incorporate the rights and obligations of the Parties with respect to the scope of work in connection with the environmental investigations required for the Environmental Report, the environmental investigations themselves, the Environmental Report and applicable insurance obligations, the Closing Date, and matters related thereto.

4. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Border: Bottom: (Single solid line, Auto, 1.5 pt Line width)

**Formatted:** Font: 12 pt

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the Second Amendment Effective Date.

**SELLER**:

______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

______________________________
RICHARD DAVID SMELLEY

______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:________________________
Richard Smelley, Manager

By:________________________
Tammy Graham, Manager

By:________________________
Deborah Davis, Manager

**SELLER**:

______________________________
DEBORAH RUTH DAVIS

______________________________
DAVID GLENN DAVIS

**SELLER:**

______________________________
TAMMY MARIE GRAHAM

______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

**Formatted:** Font: Times New Roman, 12 pt

**Formatted:** Border: Bottom: (Single solid line, Auto, 1.5 pt Line width)

**Formatted:** Font: 7 pt

EXECUTED by Purchaser as of the Second Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By:____________________________________
John Contrevo, Manager

Formatted: Font: 7 pt

**Miller, Jamie**

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Wednesday, December 31, 2025 11:44 AM
**To:** Lacy Kimball Law
**Cc:** David Spiller; john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com); Edwin Esposito; Patty Herrera (patty@challengerrealtygroup.com); Todd W Tew; Kelly Roach (keroach39@gmail.com); Jake Wilkinson
**Subject:** RE: Interim Contract Amendment; Challenger-Cresson

Lacy,

I believe it is important to leave in the references to the environmental matters that I included in this interim amendment. I have been communicating frequently with Purchaser's environmental engineer, Aaron Musart of ESE Partners, who has been working diligently with Seller's environmental engineer, Mike Whitehead of Whitehead E.S., to establish the parameters of the environmental investigations necessary to enable Mike to prepare an environmental report that will satisfy Seller's contractual obligations.

Although there is a lot more required of the subsequent contract amendment than merely extending the Closing Date, I do not believe that “unpacking” the existing obligation for Seller to deliver the final, clean environmental report results in any obligations that Seller would not already have; the final contract amendment merely needs to clarify all of the existing obligations that are associated with Seller’s current obligations associated with issuing the environmental report - a clarification that benefits both Seller and Purchaser because the path to completion will be clearly identified and should serve to accelerate the path to Closing, not to mention protect Seller from future environmental claims (for example, by including common/market requirements such as requiring the environmental report to be issued to both Seller and Purchaser [entitling both to rely on it] and including Purchaser as an additional insured on Whitehead's and its drilling contractors' insurance policies).

Bottom line: the inclusion of the details surrounding the environmental investigations and the environmental report should not add “new” obligations for Seller. Seller will merely by obligated to cause Seller’s environmental engineer to perform the obligations associated with the investigations and issuance and finalization of the environmental report.

In light of the fact that today is the outside deadline for closing in the contract, coupled with the fact that the engineers have not finalized the scope of work for the environmental investigations, my thought was that we merely extend the closing deadline in this amendment today to allow time to nail down all of these moving parts that are already subsumed in Seller's existing obligation to deliver the final, clean environmental report.

Please confirm.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** Lacy Kimball Law <info@lacykimballlaw.com>
**Sent:** Wednesday, December 31, 2025 9:08 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** David Spiller <David@spillerlaw.net>; john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** Re: Interim Contract Amendment; Challenger-Cresson

Please see my requested edits. I know we will have push back that the only thing at issue is changing the deadlines for Closing etc but not to renegotiate anything further for Seller to do other than what the Contract currently requires.

On Tue, Dec 30, 2025 at 9:40 PM Jeffrey Libby <jlibby@cbsattorneys.com> wrote:

> David,
>
> Attached please find the proposed "interim" contract amendment designed to provide the parties with a little breathing room in order to finalize all of the environmental investigation parameters, which can then be incorporated into a more thorough contract amendment.
>
> Please be advised that, in the interest of time, I am simultaneously delivering a copy of the attached amendment to my client and must therefore reserve my client's right to make revisions based upon its review.
>
> Please let me know if you have any questions or comments. I know Seller has a lot of people from whom to obtain signatures, so let's coordinate to have the amendment executed via DocuSign for convenience and expediency.

Thank you,

Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)

jlibby@CBSAttorneys.com

**NEW ADDRESS**:

325 N. St. Paul Street,

**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** Michael Whitehead <mwhitehead@whiteheades.com>
**Sent:** Monday, December 29, 2025 4:55 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; john@challengerrealtygroup.com
**Subject:** Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of

Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David, Jeffrey, and Aaron,

Thanks for the suggestions, we will update our Work Order to include.

**Michael Whitehead**

**Founder**

Whitehead E.S., LLC

906 E. 18th St. Suite 100, Plano, TX 75074

mike@whiteheades.com | Direct (469) 609-8080 Ext. 100 | M (214) 335-3246

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Monday, December 29, 2025 4:49 PM
**To:** David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; Michael Whitehead <mwhitehead@whiteheades.com>; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi David,

Thank you for sending the Phase II proposal, I've added some relatively minor comments and requested changes to the scope of work.

Can you please review & approve?

I believe Jeff is in the process of preparing the contract amendment, which I'm sure he will get over to you as soon as it is available.

Aaron Munsart, P.G.

Senior Geologist, Project Manager

ESE Partners, LLC

amunsart@esepartners.com

281-309-2562

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Monday, December 29, 2025 2:58 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Aaron,

Attached is the Phase II Proposal. We have not yet acted on it, but will be discussing it today. Also, we have not yet received the proposed amendment from Jeff. Looking forward to receiving it. Let me know if you have any problems or concerns with the attached proposal. Thanks.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Monday, December 29, 2025 12:01 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>; David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi David,

Hope y'all had a great Christmas!

Do you have the Phase 2 proposal ready for our review?

Just checking in.

Thanks,

Aaron Munsart, P.G.

Senior Geologist, Project Manager

ESE Partners, LLC

amunsart@esepartners.com

281-309-2562

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Tuesday, December 23, 2025 4:31 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David,

I am preparing the proposed amendment and will get that to you asap.

Thank you,

Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)

jlibby@CBSAttorneys.com

**NEW ADDRESS**:

325 N. St. Paul Street,

**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Tuesday, December 23, 2025 9:34 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Jeff,

Let me know where you are in preparing and sending the proposed amendment to accommodate the completion of the Phase II that we discussed last Friday. We have received a proposal from Michael Whitehead with Whitehead ES and are ready to move forward. Thanks.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

---

**From:** David Spiller
**Sent:** Thursday, December 18, 2025 5:30 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Jeff,

Yes. You just name the time. Thanks.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Thursday, December 18, 2025 5:12 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David,

Thank you for your email. We appreciate the spirit in which Seller and Purchaser are working together toward finalizing Seller's environmental assessment and report and believe that the cooperation between the parties' respective environmental engineers will expedite the path to closing.

Speaking of a path to closing, are you available tomorrow (Friday) between 12:00 and 2:00 PM to discuss the proposed contract amendment?

Thank you,

Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)

jlibby@CBSAttorneys.com

325 N. St. Paul Street,

Suite 2300
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Thursday, December 18, 2025 3:18 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Aaron,

Thanks for the email. First, the Sellers are aware of the findings. Sellers paid for the work and report. However, I have not yet heard back from Jeff Libby on behalf of the Buyer. As you can see from my email below, I wanted Jeff to contact me at his earliest convenience so that we may discuss the matter and work toward the anticipated closing of the sale.

To that end, we have requested a proposal (relative to scope of work, anticipated time frame necessary to complete the work, and anticipated range of cost – both if no findings of contamination and remedial steps if there is a finding of contamination) from Whitehead E.S., LLC ("Whitehead"). To answer your specific questions, in the spirit of cooperation and a joint desire to close this transaction as soon as possible:

1. I don't believe we have a problem with sharing the proposal when we receive it. I will need to confirm that issue with Michael Whitehead to make sure there is nothing proprietary in the proposal from Whitehead that would need to be redacted. I doubt that there would be.

2. We do not have a problem with ESE being present when all or part of any work is being done.

Thanks for reaching out. Please contact me with any problems, questions or concerns.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Thursday, December 18, 2025 2:32 PM
**To:** David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** Re: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi Michael & David,

Hope you're both doing well!

Have you had a chance to review your Phase 1 REC findings with the Seller?

If you are moving toward completing the Phase 2 ESA, we have a few requests that would assist the Buyer greatly in this transaction:

- Could you please provide a copy of the Phase 2 ESA proposal for review by the Buyer and/or Buyer's consultant (ESE)? We would just like to review prior to completion to ensure the scope of work is comprehensive to investigate both Seller & Buyer environmental concerns for the Site.

- Buyer would like to have ESE present during the performance of Phase 2 activities. Please let us know when this work is scheduled so that we, ESE, can also be present.

Let me know if you have any questions/concerns on this.

Thank you,

Aaron Munsart, P.G.

Senior Geologist, Project Manager

ESE Partners, LLC

amunsart@esepartners.com

281-309-2562

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Monday, December 15, 2025 4:22 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; Aaron Munsart, P.G. <amunsart@esepartners.com>; mwhitehead@whiteheades.com <mwhitehead@whiteheades.com>; john@challengerrealtygroup.com <john@challengerrealtygroup.com>
**Subject:** [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres in Ho...

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jeff,

Below is the link to the Buyer's Phase I Environmental Site Assessment to the tract of land the subject of the above referenced contract ("the contract"), being 1,674 acres, more or less, at 7700 Old Granbury Road, Cresson, Texas, prepared by Whitehead E.S., LLC. This report is being provided pursuant to the terms and conditions of the contract.

Cresson Ranch, Cresson, TX - Phase I ESA.pdf

After you and your team have had an opportunity to review it, please contact me at your earliest convenience so that we may discuss the matter and work toward the anticipated closing of the sale. Thanks.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

[ABOTA%20logo.png] American Board of Trial Advocates [AV-Preeminent-Logo-100px.png]

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

--

**Lacy Kimball**
Lacy Kimball Law
103 York Avenue
Weatherford, Texas 76086

(817) 755-0LAW (0529)
(817) 887-4840 (fax)
info@LacyKimballLaw.com
www.LacyKimballLaw.com
***Please cc my paralegals on all emails:***
***Please cc Linda@LacyKimballLaw.com on all communications.***

--------------------------------------------------------------------------------
THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address. Thank you.

**Miller, Jamie**

| | |
|---|---|
| **From:** | Jeffrey Libby <jlibby@cbsattorneys.com> |
| **Sent:** | Wednesday, December 31, 2025 1:32 PM |
| **To:** | Lacy Kimball Law |
| **Cc:** | David Spiller; john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com); Edwin Esposito; Patty Herrera (patty@challengerrealtygroup.com); Todd W Tew; Kelly Roach (keroach39@gmail.com); Jake Wilkinson |
| **Subject:** | RE: Interim Contract Amendment; Challenger-Cresson |

Lacy - Per our call just now, Purchaser will agree to sign the revised version you circulated earlier today. I understand you have agreed to circulate the amendment for signature via DocuSign.

Please set up the amendment to be signed by John Contrevo (john@challengerrealtygroup.com) and please copy all of the Challenger Realty Group parties copied on this email, as well as Jake, Kelly and me, so that DocuSign emails us a fully-executed copy of the amendment.

Thank you and Happy New Year,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** Lacy Kimball Law <info@lacykimballlaw.com>
**Sent:** Wednesday, December 31, 2025 11:53 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** David Spiller <David@spillerlaw.net>; john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** Re: Interim Contract Amendment; Challenger-Cresson

I agree that we need some sort of a short extension but I do not want to leave the door open to renegotiate any of the requirements that seller already has. That's why simply extending the close date in this first

amendment I think is sufficient. The alternative this weekend just agree an amendment that says that the parties continue to desire to participate in this agreement and therefore the termination date and close date of this agreement are here by suspended until January 10th I love

**Lacy Kimball**
Lacy Kimball Law
103 York Avenue
Weatherford, Texas 76086
(817) 755-0LAW (0529)
(817) 887-4840 (fax)
info@LacyKimballLaw.com
www.LacyKimballLaw.com
***Please cc my paralegals on all emails:***
***Please cc Linda@LacyKimballLaw.com on all communications.***

--------------------------------------------------------------------------------
THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address. Thank you.

On Wed, Dec 31, 2025, 11:43 AM Jeffrey Libby <jlibby@cbsattorneys.com> wrote:

> Lacy,
>
> I believe it is important to leave in the references to the environmental matters that I included in this interim amendment. I have been communicating frequently with Purchaser's environmental engineer, Aaron Musart of ESE Partners, who has been working diligently with Seller's environmental engineer, Mike Whitehead of Whitehead E.S., to establish the parameters of the environmental investigations necessary to enable Mike to prepare an environmental report that will satisfy Seller's contractual obligations.
>
> Although there is a lot more required of the subsequent contract amendment than merely extending the Closing Date, I do not believe that “unpacking” the existing obligation for Seller to deliver the final, clean environmental report results in any obligations that Seller would not already have; the final contract amendment merely needs to clarify all of the existing obligations that are associated with Seller’s current obligations associated with issuing the environmental report - a clarification that benefits both Seller and Purchaser because the path to completion will be clearly identified and should serve to accelerate the path to Closing, not to mention protect

Seller from future environmental claims (for example, by including common/market requirements such as requiring the environmental report to be issued to both Seller and Purchaser [entitling both to rely on it] and including Purchaser as an additional insured on Whitehead's and its drilling contractors' insurance policies).

Bottom line: the inclusion of the details surrounding the environmental investigations and the environmental report should not add "new" obligations for Seller. Seller will merely by obligated to cause Seller's environmental engineer to perform the obligations associated with the investigations and issuance and finalization of the environmental report.

In light of the fact that today is the outside deadline for closing in the contract, coupled with the fact that the engineers have not finalized the scope of work for the environmental investigations, my thought was that we merely extend the closing deadline in this amendment today to allow time to nail down all of these moving parts that are already subsumed in Seller's existing obligation to deliver the final, clean environmental report.

Please confirm.

Thank you,

Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)

jlibby@CBSAttorneys.com

**NEW ADDRESS**:

325 N. St. Paul Street,

**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

APP123



DEF000376

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** Lacy Kimball Law <info@lacykimballlaw.com>
**Sent:** Wednesday, December 31, 2025 9:08 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** David Spiller <David@spillerlaw.net>; john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** Re: Interim Contract Amendment; Challenger-Cresson

Please see my requested edits. I know we will have push back that the only thing at issue is changing the deadlines for Closing etc but not to renegotiate anything further for Seller to do other than what the Contract currently requires.

On Tue, Dec 30, 2025 at 9:40 PM Jeffrey Libby <jlibby@cbsattorneys.com> wrote:

> David,
>
> Attached please find the proposed "interim" contract amendment designed to provide the parties with a little breathing room in order to finalize all of the environmental investigation parameters, which can then be incorporated into a more thorough contract amendment.
>
> Please be advised that, in the interest of time, I am simultaneously delivering a copy of the attached amendment to my client and must therefore reserve my client's right to make revisions based upon its review.
>
> Please let me know if you have any questions or comments. I know Seller has a lot of people from whom to obtain signatures, so let's coordinate to have the amendment executed via DocuSign for convenience and expediency.

Thank you,

Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)

jlibby@CBSAttorneys.com

**NEW ADDRESS**:

325 N. St. Paul Street,

**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** Michael Whitehead <mwhitehead@whiteheades.com>
**Sent:** Monday, December 29, 2025 4:55 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; john@challengerrealtygroup.com
**Subject:** Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David, Jeffrey, and Aaron,

Thanks for the suggestions, we will update our Work Order to include.

**Michael Whitehead**

**Founder**

Whitehead E.S., LLC

906 E. 18th St. Suite 100, Plano, TX 75074

mike@whiteheades.com | Direct (469) 609-8080 Ext. 100 | M (214) 335-3246

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Monday, December 29, 2025 4:49 PM
**To:** David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; Michael Whitehead <mwhitehead@whiteheades.com>; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi David,

Thank you for sending the Phase II proposal, I've added some relatively minor comments and requested changes to the scope of work.

Can you please review & approve?

I believe Jeff is in the process of preparing the contract amendment, which I'm sure he will get over to you as soon as it is available.

Aaron Munsart, P.G.

Senior Geologist, Project Manager

ESE Partners, LLC

amunsart@esepartners.com

281-309-2562

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Monday, December 29, 2025 2:58 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Aaron,

Attached is the Phase II Proposal. We have not yet acted on it, but will be discussing it today. Also, we have not yet received the proposed amendment from Jeff. Looking forward to receiving it. Let me know if you have any problems or concerns with the attached proposal. Thanks.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

APP127



DEF000380

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Monday, December 29, 2025 12:01 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>; David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi David,

Hope y'all had a great Christmas!

Do you have the Phase 2 proposal ready for our review?

Just checking in.

Thanks,

Aaron Munsart, P.G.

Senior Geologist, Project Manager

ESE Partners, LLC

amunsart@esepartners.com

281-309-2562

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Tuesday, December 23, 2025 4:31 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David,

I am preparing the proposed amendment and will get that to you asap.

Thank you,

Jeff

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)

jlibby@CBSAttorneys.com

**NEW ADDRESS**:

325 N. St. Paul Street,

**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Tuesday, December 23, 2025 9:34 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Jeff,

Let me know where you are in preparing and sending the proposed amendment to accommodate the completion of the Phase II that we discussed last Friday. We have received a proposal from Michael Whitehead with Whitehead ES and are ready to move forward. Thanks.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** David Spiller
**Sent:** Thursday, December 18, 2025 5:30 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Jeff,

Yes. You just name the time. Thanks.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Thursday, December 18, 2025 5:12 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David,

Thank you for your email. We appreciate the spirit in which Seller and Purchaser are working together toward finalizing Seller's environmental assessment and report and believe that the cooperation between the parties' respective environmental engineers will expedite the path to closing.

Speaking of a path to closing, are you available tomorrow (Friday) between 12:00 and 2:00 PM to discuss the proposed contract amendment?

Thank you,

Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)

jlibby@CBSAttorneys.com

325 N. St. Paul Street,

Suite 2300
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Thursday, December 18, 2025 3:18 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Aaron,

Thanks for the email. First, the Sellers are aware of the findings. Sellers paid for the work and report. However, I have not yet heard back from Jeff Libby on behalf of the Buyer. As you can see from my email below, I wanted Jeff to contact me at his earliest convenience so that we may discuss the matter and work toward the anticipated closing of the sale.

To that end, we have requested a proposal (relative to scope of work, anticipated time frame necessary to complete the work, and anticipated range of cost – both if no findings of contamination and remedial steps if there is a finding of contamination) from Whitehead E.S., LLC ("Whitehead"). To answer your specific questions, in the spirit of cooperation and a joint desire to close this transaction as soon as possible:

1. I don't believe we have a problem with sharing the proposal when we receive it. I will need to confirm that issue with Michael Whitehead to make sure there is nothing proprietary in the proposal from Whitehead that would need to be redacted. I doubt that there would be.

2. We do not have a problem with ESE being present when all or part of any work is being done.

Thanks for reaching out. Please contact me with any problems, questions or concerns.

David Spiller, Esq.

**SPILLER & SPILLER**

Attorneys and Counselors at Law

P. O. Drawer 447

Jacksboro, Texas 76458

Telephone: (940) 567-6644

Cell Phone: (940) 567-1025

Facsimile: (940) 567-3999

Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Thursday, December 18, 2025 2:32 PM
**To:** David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** Re: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi Michael & David,

Hope you're both doing well!

Have you had a chance to review your Phase 1 REC findings with the Seller?

If you are moving toward completing the Phase 2 ESA, we have a few requests that would assist the Buyer greatly in this transaction:

- Could you please provide a copy of the Phase 2 ESA proposal for review by the Buyer and/or Buyer's consultant (ESE)? We would just like to review prior to completion to ensure the scope of work is comprehensive to investigate both Seller & Buyer environmental concerns for the Site.

- Buyer would like to have ESE present during the performance of Phase 2 activities. Please let us know when this work is scheduled so that we, ESE, can also be present.

Let me know if you have any questions/concerns on this.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

# THIRD AMENDMENT TO STANDARD CONTRACT OF SALE

This **THIRD AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of January 9, 2026 (the "**Third Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, and Second Amendment to Standard Contract of Sale dated effective as of December 31, 2025, the "**Contract**", concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to the First Extended Closing Date, and (c) the Environmental Report cannot be delivered to Purchaser by the First Extended Closing Date; and

**WHEREAS**, the parties agreed in the Second Amendment to Standard Contract of Sale to enter into a subsequent amendment no later than First Extended Closing Date;

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract prior to the Second Extended Closing Date (defined below) to finalize new extended deadlines for the requirements for sale as per the Standard Contract for Sale.; however, the Parties desire to enter into this Amendment to extend the First Extended Closing Date for a

period of time in order to allow Seller to fully comply with the requirements of Standard Contract for Sale Section 7(c) and to allow Seller and Purchaser to enter into subsequent amendment to the Contract; and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

<u>AGREEMENT</u>:

1. <u>Recitals; Defined Terms</u>. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. <u>Closing Condition and Closing Date</u>. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in <u>Section 3</u> of this Amendment below, the Closing Date is hereby extended until January 23, 2026 (the "**<u>Second Extended Closing Date</u>**").

3. <u>Further Amendment to the Contract</u>. The Parties hereby agree to further amend the Contract on or before the Second Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date and otherwise clarify the parameters of the Environmental Report.

4. <u>Reaffirmation</u>. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. <u>Counterparts</u>. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the Third Amendment Effective Date.

**SELLER**:

________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

________________________________
RICHARD DAVID SMELLEY

________________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________________
Richard Smelley, Manager

By:____________________________
Tammy Graham, Manager

By:____________________________
Deborah Davis, Manager

**SELLER**:

________________________________
DEBORAH RUTH DAVIS

________________________________
DAVID GLENN DAVIS

**SELLER:**

________________________________
TAMMY MARIE GRAHAM

________________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the Third Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By:________________________________________
John Contrevo, Manager

**Miller, Jamie**

---

| | |
|---|---|
| **From:** | Jeffrey Libby <jlibby@cbsattorneys.com> |
| **Sent:** | Friday, January 9, 2026 11:31 AM |
| **To:** | Lacy Kimball Law |
| **Cc:** | john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com); Edwin Esposito; Patty Herrera (patty@challengerrealtygroup.com); David Spiller; Todd Tew; Jake Wilkinson |
| **Subject:** | RE: Cresson Extension Amendment |
| **Attachments:** | Third Amendment to Standard Contract of Sale (Challenger-Cresson) (v2-P).docx; Redline - Third Amendment (v2v1-P).pdf |
| **Importance:** | High |

Lacy,

Attached, please find a copy of the amendment containing our few revisions. Please be advised that, in the interest of time, I am simultaneously delivering the attached to my client and must therefore reserve my client's right to make additional changes. I believe this should get us to the place where we can enter into a more formal amendment outlining the requirements for the environmental report and setting a good closing date.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** Lacy Kimball Law <info@lacykimballlaw.com>
**Sent:** Friday, January 9, 2026 8:36 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>; David Spiller <david@spillerlaw.net>; Todd Tew <ttew@trinitytitleoftexas.com>
**Subject:** Cresson Extension Amendment

Please track changes.

--

**Lacy Kimball**
Lacy Kimball Law
103 York Avenue
Weatherford, Texas 76086
(817) 755-0LAW (0529)
(817) 887-4840 (fax)
info@LacyKimballLaw.com
www.LacyKimballLaw.com
***Please cc my paralegals on all emails:***
***Please cc Linda@LacyKimballLaw.com on all communications.***

--------------------------------------------------------------------------------

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address. Thank you.

# THIRD AMENDMENT TO STANDARD CONTRACT OF SALE

This **THIRD AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of January 9, 2026 (the "**Third Amendment Effective Date**"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, and Second Amendment to Standard Contract of Sale dated effective as of December 31, 2025, the "**Contract**", concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to the First Extended Closing Date, and (c) the Environmental Report cannot be delivered to Purchaser by the First Extended Closing Date; and

**WHEREAS**, the parties agreed in the Second Amendment to Standard Contract of Sale to enter into a subsequent amendment no later than First Extended Closing Date;

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract prior to the Second Extended Closing Date (defined below) to finalize new extended deadlines for the requirements for sale as per the Standard Contract for Sale.; however, the Parties desire to enter into this Amendment to extend the First Extended Closing Date for a

period of time in order to allow Seller to fully comply with the requirements of Standard Contract for Sale Section 7(c) and to allow Seller and Purchaser to enter into subsequent amendment to the Contract; and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Closing Condition and Closing Date. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in Section 3 of this Amendment below, the Closing Date is hereby extended until January 23, 2026 (the "**Second Extended Closing Date**").

3. Further Amendment to the Contract. The Parties hereby agree to further amend the Contract on or before the Second Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date and otherwise clarify the parameters of the Environmental Report.

4. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the Third Amendment Effective Date.

**SELLER**:

________________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

________________________________
RICHARD DAVID SMELLEY

________________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:____________________________
Richard Smelley, Manager

By:____________________________
Tammy Graham, Manager

By:____________________________
Deborah Davis, Manager

**SELLER**:

________________________________
DEBORAH RUTH DAVIS

________________________________
DAVID GLENN DAVIS

**SELLER:**

________________________________
TAMMY MARIE GRAHAM

________________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the Third Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By:_______________________________________
John Contrevo, Manager

# THIRD AMENDMENT TO STANDARD CONTRACT OF SALE

This **THIRD AMENDMENT TO STANDARD CONTRACT OF SALE** (this "**Amendment**") is intended to be effective as of January 9, 2026 (the "~~THIRD~~Third Amendment Effective Date"), by and between **BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY** (the "**Smelley Estate**"), **CRESSON MOON PROPERTIES, LP**, a Texas limited partnership ("**CMPLP**"), and the following persons who join in this Contract solely for the purposes of agreeing to grant, sell and convey their respective portion of the Mineral Estate to Purchaser as described in this Contract: **RICHARD DAVID SMELLEY** and **AMY ELIZABETH SMELLEY** (collectively, "**Smelley**"), **TAMMY MARIE GRAHAM** and **GREGORY SCOTT GRAHAM** (collectively, "**Graham**"), and **DEBORAH RUTH DAVIS** and **DAVID GLENN DAVIS** (collectively, "**Davis**") (the Smelley Estate, CMPLP, Smelley, Graham and Davis are collectively, jointly and severally referred to in this Contract as "**Seller**"), and **CHALLENGER REALTY GROUP, LLC**, a Delaware limited liability company, and/or its assigns ("**Purchaser**"). Seller and Purchaser are collectively referred to herein as the "**Parties**" and each individually as a "**Party**".

RECITALS:

**WHEREAS**, Seller and Purchaser previously entered into that certain Standard Contract of Sale dated effective as May 26, 2023 (as amended by that First Amendment to Standard Contract of Sale dated December 4, 2024, and Second Amendment to Standard Contract of Sale dated effective as of December 31, 2025, ~~collectively~~ the "**Contract**", concerning the purchase and sale of that certain property of approximately 1,674 gross contiguous acres of land situated in the extraterritorial jurisdiction of the City of Cresson, Hood County, Texas, and being more particularly described in the Contract (the "**Property**"); and

**WHEREAS**, the Contract requires Seller, prior to Closing, to satisfy certain obligations regarding the environmental condition of the Property including, but not limited to, delivery to Purchaser of a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith (the "**Environmental Report**"); and

**WHEREAS**, Seller's environmental engineer (a) is working to finalize the scope of work in connection with the environmental investigations required for the Environmental Report, (b) the environmental investigations of the Property and issuance of the Environmental Report cannot be completed prior to the First Extended Closing Date, and (c) the Environmental Report cannot be delivered to Purchaser by the First Extended Closing Date; and

**WHEREAS**, the parties agreed in the Second Amendment to Standard Contract of Sale to enter into a ~~THIRD~~subsequent amendment no later than ~~January 10, 2026~~First Extended Closing Date;

**WHEREAS**, Seller and Purchaser acknowledge it is their intention, and they agree, to amend the Contract prior to ~~a FOURTH Amendment Effective~~the Second Extended Closing Date (defined below) to finalize new extended deadlines for the requirements for sale as per the

Standard Contract for Sale.; however, the Parties desire to enter into this Amendment to extend the First Extended Closing Date for a period of time ~~to enter into a subsequent amendment~~ in order to allow Seller~~'s~~ to fully comply with the requirements of Standard Contract for Sale ~~section~~Section 7(c) and to allow Seller and Purchaser to enter into subsequent amendment to the Contract; and

**WHEREAS**, Seller and Purchaser desire to amend the Contract as set forth in this Amendment.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree to amend the Contract as follows:

AGREEMENT:

1. Recitals; Defined Terms. All recitals above are incorporated herein by this reference. Unless otherwise defined herein, capitalized terms used in this Amendment shall have the same meaning given to such terms in the Contract.

2. Closing Condition and Closing Date. Purchaser's receipt of the final Environmental Report in a form satisfactory to Purchaser is a condition to Purchaser's closing obligations under the Contract and, subject to the Parties' agreement in Section 3 of this Amendment below, the Closing Date is hereby extended until January 23, 2026 (the "**Second Extended Closing Date**").

3. Further Amendment to the Contract. The Parties hereby agree to further amend the Contract on or before the Second Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date and otherwise clarify the parameters of the Environmental Report.

4. Reaffirmation. Except as modified hereby, the Contract shall remain in full effect and this Amendment shall be binding upon the Parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Contract and the terms of this Amendment, the terms of this Amendment shall prevail. Each Seller Party hereby expressly ratifies, adopts and confirms the terms and conditions of the Contract (as hereby amended).

5. Counterparts. This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. An electronic copy of this Amendment bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Amendment.

*[Remainder of page is intentionally left blank; Signatures on following pages]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Amendment as of the ~~THIRD~~Third Amendment Effective Date.

**SELLER**:

_______________________________
BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY

**SELLER**:

_______________________________
RICHARD DAVID SMELLEY

_______________________________
AMY ELIZABETH SMELLEY

**SELLER**:

**CRESSON MOON PROPERTIES, LP**,
a Texas limited partnership

By: Cresson Moon Management, LLC,
a Texas limited liability company,
General Partner

By:_______________________________
Richard Smelley, Manager

By:_______________________________
Tammy Graham, Manager

By:_______________________________
Deborah Davis, Manager

**SELLER**:

_______________________________
DEBORAH RUTH DAVIS

_______________________________
DAVID GLENN DAVIS

**SELLER:**

_______________________________
TAMMY MARIE GRAHAM

_______________________________
GREGORY SCOTT GRAHAM

*[Signature pages continue on following page.]*

EXECUTED by Purchaser as of the ~~THIRD~~Third Amendment Effective Date.

**PURCHASER:**

**CHALLENGER REALTY GROUP, LLC,**
a Delaware limited liability company

By:________________________________________
John Contrevo, Manager

Document comparison by Workshare Compare on Friday, January 9, 2026 11:21:22 AM

| **Input:** | |
|---|---|
| Document 1 ID | file://C:\Users\jlibby\CBS Dropbox\CBS Team Folder\Transactional Section\Clients\Challenger Realty Group\LSWS Client Folders\9054 - Purchase of 1,674 Acres, Cresson, TX\PSA & LOI_DRAFTS\Third Amendment to Standard Contract of Sale (Challenger-Cresson) v1-S.docx |
| Description | Third Amendment to Standard Contract of Sale (Challenger-Cresson) v1-S |
| Document 2 ID | file://C:\Users\jlibby\CBS Dropbox\CBS Team Folder\Transactional Section\Clients\Challenger Realty Group\LSWS Client Folders\9054 - Purchase of 1,674 Acres, Cresson, TX\PSA & LOI_DRAFTS\Third Amendment to Standard Contract of Sale (Challenger-Cresson) (v2-P).docx |
| Description | Third Amendment to Standard Contract of Sale (Challenger-Cresson) (v2-P) |
| Rendering set | Standard |

| **Legend:** | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| **Statistics:** | |
|---|---|
| | Count |

| | |
|---|---|
| Insertions | 16 |
| Deletions | 13 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 29 |

**Miller, Jamie**

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Friday, January 9, 2026 12:05 PM
**To:** David Spiller
**Cc:** Lacy Kimball Law; john@challengerrealtygroup.com; Charles Gallub; Edwin Esposito; Patty Herrera; Todd Tew; Jake Wilkinson
**Subject:** Re: Cresson Extension Amendment

The report will have to be verified by our environmental engineer, your engineer needs to add Purchaser as additional insured on its policies, which is typical, and your engineer needs to agree to provide reliance letters in connection with the report. Those are the types of things that we need to clarify and which, frankly, will protect the seller, as well.

**Jeffrey T. Libby**
Partner
Calhoun Bhella & Sechrest

214.395.3303 (cell)
214.833.2187 (direct)

jlibby@CBSAttorneys.com

325 N. Saint Paul St.,
Suite 2300
Dallas, Texas 75201
www.CBSAttorneys.com

On Jan 9, 2026, at 9:56 AM, David Spiller <David@spillerlaw.net> wrote:

Jeff and Lacy,

Thank you both. I only have one concern. What is the purpose of the additionally language in Paragraph 3, "and otherwise clarify the parameters of the Environmental Report."? What parameters of the report would need to be clarified and in what respect? And why would the parties need to clarify the parameters of an engineering firm's report. The scope of the work has been identified and is being addressed and completed. The report will be issued. After it's issued, what would need to be clarified?

To me, this just sets up a basis for a nebulous, vague and ambiguous standard that should otherwise be very clear.

David Spiller, Esq.

**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net
<image002.png>

<image003.jpg>

<image004.png>

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Friday, January 9, 2026 11:31 AM
**To:** Lacy Kimball Law <info@lacykimballlaw.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; David Spiller <David@spillerlaw.net>; Todd Tew <ttew@trinitytitleoftexas.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** RE: Cresson Extension Amendment
**Importance:** High

Lacy,

Attached, please find a copy of the amendment containing our few revisions. Please be advised that, in the interest of time, I am simultaneously delivering the attached to my client and must therefore reserve my client's right to make additional changes. I believe this should get us to the place where we can enter into a more formal amendment outlining the requirements for the environmental report and setting a good closing date.

Thank you,
Jeff

<image005.png>

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this

communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** Lacy Kimball Law <info@lacykimballlaw.com>
**Sent:** Friday, January 9, 2026 8:36 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>; David Spiller <david@spillerlaw.net>; Todd Tew <ttew@trinitytitleoftexas.com>
**Subject:** Cresson Extension Amendment

Please track changes.

--
**Lacy Kimball**
Lacy Kimball Law
103 York Avenue
Weatherford, Texas 76086
(817) 755-0LAW (0529)
(817) 887-4840 (fax)
info@LacyKimballLaw.com
www.LacyKimballLaw.com
***Please cc my paralegals on all emails:***
***Please cc Linda@LacyKimballLaw.com on all communications.***

<image006.jpg>

--------------------------------------------------------------------------------
THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address. Thank you.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**Miller, Jamie**

| | |
|---|---|
| **From:** | Jeffrey Libby <jlibby@cbsattorneys.com> |
| **Sent:** | Friday, January 9, 2026 2:24 PM |
| **To:** | David Spiller; Lacy Kimball Law |
| **Cc:** | john@challengerrealtygroup.com; Charles Gallub; Edwin Esposito; Patty Herrera; Todd Tew; Jake Wilkinson |
| **Subject:** | RE: Cresson Extension Amendment |

Lacy - Can you please circulate the clean copy of the amendment I sent you for signature to everyone via DocuSign?

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Friday, January 9, 2026 1:49 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Lacy Kimball Law <info@lacykimballlaw.com>; john@challengerrealtygroup.com; Charles Gallub <Charles@challengerrealtygroup.com>; Edwin Esposito <Ed@challengerrealtygroup.com>; Patty Herrera <patty@challengerrealtygroup.com>; Todd Tew <ttew@trinitytitleoftexas.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** RE: Cresson Extension Amendment

Understood. Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644

Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Friday, January 9, 2026 12:05 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** Lacy Kimball Law <info@lacykimballlaw.com>; john@challengerrealtygroup.com; Charles Gallub <Charles@challengerrealtygroup.com>; Edwin Esposito <Ed@challengerrealtygroup.com>; Patty Herrera <patty@challengerrealtygroup.com>; Todd Tew <ttew@trinitytitleoftexas.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** Re: Cresson Extension Amendment

The report will have to be verified by our environmental engineer, your engineer needs to add Purchaser as additional insured on its policies, which is typical, and your engineer needs to agree to provide reliance letters in connection with the report. Those are the types of things that we need to clarify and which, frankly, will protect the seller, as well.

**Jeffrey T. Libby**
Partner
Calhoun Bhella & Sechrest

214.395.3303 (cell)
214.833.2187 (direct)

jlibby@CBSAttorneys.com
325 N. Saint Paul St.,
Suite 2300
Dallas, Texas 75201
www.CBSAttorneys.com

On Jan 9, 2026, at 9:56 AM, David Spiller <David@spillerlaw.net> wrote:

Jeff and Lacy,

Thank you both. I only have one concern. What is the purpose of the additionally language in Paragraph 3, "and otherwise clarify the parameters of the Environmental Report."? What parameters of the report would need to be clarified and in what respect? And why would the parties need to clarify the parameters of an engineering firm's report. The scope of the work has

been identified and is being addressed and completed. The report will be issued. After it's issued, what would need to be clarified?

To me, this just sets up a basis for a nebulous, vague and ambiguous standard that should otherwise be very clear.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net
<image002.png>
<image003.jpg>
<image004.png>

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Friday, January 9, 2026 11:31 AM
**To:** Lacy Kimball Law <info@lacykimballlaw.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; David Spiller <David@spillerlaw.net>; Todd Tew <ttew@trinitytitleoftexas.com>; Jake Wilkinson <jake@mwrealestate.com>
**Subject:** RE: Cresson Extension Amendment
**Importance:** High

Lacy,

Attached, please find a copy of the amendment containing our few revisions. Please be advised that, in the interest of time, I am simultaneously delivering the attached to my client and must therefore reserve my client's right to make additional changes. I believe this should get us to the place where we can enter into a more formal amendment outlining the requirements for the environmental report and setting a good closing date.

Thank you,
Jeff

<image005.png>

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,

**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

**From:** Lacy Kimball Law <info@lacykimballlaw.com>
**Sent:** Friday, January 9, 2026 8:36 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>; David Spiller <david@spillerlaw.net>; Todd Tew <ttew@trinitytitleoftexas.com>
**Subject:** Cresson Extension Amendment

Please track changes.

--
**Lacy Kimball**
Lacy Kimball Law
103 York Avenue
Weatherford, Texas 76086
(817) 755-0LAW (0529)
(817) 887-4840 (fax)
info@LacyKimballLaw.com
www.LacyKimballLaw.com
***Please cc my paralegals on all emails:***
***Please cc Linda@LacyKimballLaw.com on all communications.***

<image006.jpg>

--------------------------------------------------------------------------------
THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address. Thank you.

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**Miller, Jamie**

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Thursday, January 22, 2026 4:09 PM
**To:** Lacy Kimball Law; David Spiller; Kelly Roach (keroach39@gmail.com)
**Subject:** RE: Cresson

Thanks, Lacy. I received your emails. I will call you as soon as I can to discuss. Hopefully this afternoon, but tomorrow morning at the latest.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST
Chambers SPOTLIGHT TX 2025

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201
www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230

---

**From:** Lacy Kimball Law <info@lacykimballlaw.com>
**Sent:** Thursday, January 22, 2026 9:24 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>; David Spiller <david@spillerlaw.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>
**Subject:** Re: Cresson

I just got a call back from our Env Guy. He thought he would finish report today later after his day is done. But he said that there were no issues and no needed remediation. He said he and Aaron had worked together on it so I think Aaron is in the loop with Mike on their findings.

So with that- do you want to just do an amendment to close by Feb 13th. We get report to you by Jan 28th (that gives a week in case Mike gets caught up and doesn't get done. Then you close by Feb 13th which is 16 days after we deliver report?

On Thu, Jan 22, 2026 at 8:58 AM Lacy Kimball Law <info@lacykimballlaw.com> wrote:

> Where are we with the next amendment? Have you heard anything from your env guy on timelines from him?

--
**Lacy Kimball**
Lacy Kimball Law
103 York Avenue
Weatherford, Texas 76086
(817) 755-0LAW (0529)
(817) 887-4840 (fax)
info@LacyKimballLaw.com
www.LacyKimballLaw.com
***Please cc my paralegals on all emails:***
***Please cc Linda@LacyKimballLaw.com on all communications.***

--------------------------------------------------------------------------------
THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address. Thank you.

--
**Lacy Kimball**
Lacy Kimball Law
103 York Avenue
Weatherford, Texas 76086
(817) 755-0LAW (0529)
(817) 887-4840 (fax)
info@LacyKimballLaw.com
www.LacyKimballLaw.com
***Please cc my paralegals on all emails:***
***Please cc Linda@LacyKimballLaw.com on all communications.***

--------------------------------------------------------------------------------

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address. Thank you.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**Miller, Jamie**

---

| | |
|---|---|
| **From:** | Jeffrey Libby <jlibby@cbsattorneys.com> |
| **Sent:** | Tuesday, January 27, 2026 3:55 PM |
| **To:** | David Spiller |
| **Cc:** | john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com); Edwin Esposito; Patty Herrera (patty@challengerrealtygroup.com); Jake Wilkinson; Todd W Tew; Kelly Roach (keroach39@gmail.com); Lacy Kimball Law; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. |
| **Subject:** | RE: Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres |

Thank you, David. We are reviewing the report. I am still "iced in" and should be back in the office tomorrow.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2025

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201
www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Monday, January 26, 2026 1:26 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres

Jeff,

Attached is the completed and final Phase II Environmental Report that I just received regarding the above referenced property. Based on the report, the Sellers are ready to close on the transaction. Please get with me at your earliest convenience – weather permitting – and let's coordinate a closing. Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

**Blake Brownshadel**

**Subject:** FW: Environmental matters; Smelley Tract

**Importance:** High

---

**From:** Jeffrey Libby
**Sent:** Thursday, February 12, 2026 1:27 PM
**To:** Lacy Kimball (info@LacyKimballLaw.com) <info@LacyKimballLaw.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Scott Deatherage (scott@sdeatheragelaw.com) <scott@sdeatheragelaw.com>; david@spillerlaw.net; Todd W Tew <todd.2@verizon.net>
**Subject:** Environmental matters; Smelley Tract
**Importance:** High

Lacy,

Seller delivered the Phase II ESA Report (the **ESA Report**) on or about January 26, 2026, which we appreciate. However, the ESA Report indicates that multiple requirements of the PSA have not been satisfied.

In light of the fact that this transaction involves a significant amount of money and land (approximately $33 million and over 1,600 acres), Purchaser has retained Texas environmental counsel to advise Purchaser regarding environmental matters pertaining to the Property, including a review of the ESA Report, and the following comments and questions are, in large part, a result of such consultation.

First, the ESA Report indicates that Seller's environmental representation in Section 6(i) of the PSA was inaccurate when made and remains inaccurate. Accordingly, Seller is in breach of Section 6(i). Section 6(i) provides that "[n]o Hazardous Substances . . . have been incorporated, used, manufactured, stored, or disposed of in, on, under, or about the Property." The ESA Report indicates that Hazardous Substances are present at the Property. In addition, under Section 8(b) of the PSA, it is a condition precedent to Closing that Seller's representations and warranties be true and correct as of Closing.

Second, Section 7(c) of the PSA requires that Seller remove from the Property, no later than fifteen (15) days prior to Closing, "all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on or about the Property." Based on the ESA Report, the required removal of environmental contamination and hazardous materials has not occurred. In addition, Seller has not provided satisfactory evidence that all underground equipment or piping associated with the above-ground storage tanks has been removed from the Property.

Third, the ESA Report does not include the specific confirmation required by the PSA. Section 7(c) requires that Seller provide an environmental report "by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property." Based on our review, the ESA Report does not include this confirmation and therefore does not satisfy Section 7(c).

The requirements and language of Sections 6(i) and 7(c) were specifically drafted by Purchaser and agreed to by Seller to address environmental contamination and Hazardous Substances at the Property. These requirements were and remain material to the transaction, particularly in light of the purchase price to be paid at Closing.

Based on the foregoing, Purchaser does not believe Section 6(i) or Section 7(c) have been satisfied or that the applicable conditions precedent to Closing have been met.

From Purchaser's perspective, it would be premature to discuss a closing date until the environmental matters outlined above are fully and clearly resolved. In addition to revising the ESA Report to include the contractually required confirmation, Purchaser also requires - and we understand Seller's engineer has agreed to provide - the following:

- An express right for Purchaser to rely on the ESA Report (whether by reliance letter or by naming Purchaser as an intended recipient in the report). The ESA Report expressly prohibits anyone other than Seller from relying upon the ESA Report; and
- Purchaser to be named as an additional insured on the environmental engineer's and drilling contractor's CGL and Contractors Pollution Liability policies, with limits appropriate for a $33 million transaction. Additionally, those policies must be "occurrence-based policies" and not "claims-made policies." The policies and insurance must survive into the future for obvious reasons.

Finally, all environmental contamination at the Property must be removed in accordance with the PSA.

Purchaser remains committed to working cooperatively to finalize these items. Once Sections 6(i) and 7(c) have been fully satisfied, Purchaser will be in a much better position to have a constructive discussion about next steps, including Closing timing.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2025

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

NEW ADDRESS:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201
www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:26-cv-00231-P** |
| | § | |
| **BILL SANDERS, *et al.*,** | § | |
| ***Defendants.*** | § | |

**DECLARATION OF MICHAEL WHITEHEAD**

I, Michael Whitehead, declare under penalty of perjury as follows:

1. My name is Michael Whitehead. I am the Founder of Whitehead E.S., LLC ("Whitehead ES") in Plano, Texas. I am over the age of eighteen, and I am competent and authorized to make this declaration. The facts set forth in this declaration, all of which are true and correct, are based on my personal knowledge or knowledge that I have acquired by virtue of my position at Whitehead ES. My personal knowledge is derived from my personal involvement in Whitehead ES's environmental work on the property at 7700 Old Granbury Road, Cresson, Texas (the "Property") and my review of the documents discussed in this declaration.

2. I am a custodian of records for Whitehead ES with respect to its work on the Property. Attached hereto as Exhibits C-1 through C-3 are records of Whitehead ES. These documents are true and correct copies of the originals. These records are kept by Whitehead ES in the regular course of business, and it was the regular course of business for an employee or representative of Whitehead ES, with knowledge of the act, event, condition, or opinion recorded, to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.

3. Attached hereto as Exhibit C-1 is a true and correct copy of email correspondence among Whitehead ES, ESE Partners, LLC ("ESE"), counsel for the parties, and others, dated December 15, 2025 through January 26, 2026, concerning the Phase II Investigation of the Property.

4. ESE was the environmental consultant for Plaintiff Challenger Cresson I, LLC and its predecessor (together, "Purchaser"). Before the Phase II fieldwork, Aaron Munsart, P.G. of ESE reviewed Whitehead ES's Phase II proposal and requested changes to the scope of work. On January 8, 2026, I sent Mr. Munsart and William Day, P.G. of ESE the revised Work Order for the Phase II Investigation. Whitehead ES performed the Phase II fieldwork on January 9, 2026, and ESE provided third-party oversight of that fieldwork for Purchaser.

5. Before Whitehead ES issued its Phase II report, no one from ESE, Purchaser, or Purchaser's counsel told me that a report sealed by a Professional Geoscientist would not be acceptable or that Whitehead ES lacked a license or credential needed to perform the work.

6. Attached hereto as Exhibit C-2 is a true and correct copy of the Limited Phase II Investigation that Whitehead ES issued for the Property on January 26, 2026 (the "Whitehead Report"). I signed the Whitehead Report. Amanda Pechacek, P.G., a Texas-licensed Professional Geoscientist (License No. 15423) with Whitehead ES, signed and sealed it.

7. Attached hereto as Exhibit C-3 is a true and correct copy of the Certificate of Geoscience Firm Registration No. 50600 that the Texas Board of Professional Geoscientists issued to Whitehead ES.

8. Attached hereto as Exhibits C-4 and C-5 are true and correct copies of my Expert Report dated July 3, 2026 and my First Supplemental Expert Report dated September 9, 2026. I prepared both reports. The facts stated in them are true and correct, and the opinions stated in them are my opinions.

9. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Collin County, Texas on this 9th day of November 2026.

Michael Whitehead

Outlook

**Fw: Project Coordination: 7700 Old Granbury Road, Cresson, TX**

**From** Michael Whitehead <mwhitehead@whiteheades.com>
**Date** Mon 6/29/2026 7:16 AM
**To** Danielle Fehrenbach <dfehrenbach@whiteheades.com>

1 attachment (217 KB)
Cresson Ranch - Phase II Investigation - Work Order.pdf;

**Michael Whitehead** | Founder
**Whitehead Environmental Solutions, LLC**
906 E. 18th Street, Suite 100, Plano, Texas 75074
**O** (469) 609-8080 Ext. 100 | **M** (214) 335-3246
**mike@whiteheades.com**
final-logo-direction-aug-25.png

---

**From:** Michael Whitehead
**Sent:** Thursday, January 8, 2026 3:04 PM
**To:** William Day, P.G. <william@esepartners.com>
**Cc:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Catherine Kobylinski <Catherine@whiteheades.com>
**Subject:** Project Coordination: 7700 Old Granbury Road, Cresson, TX

William and Aaron, here is the revised Work Order for the Phase II Investigation in Cresson tomorrow. We will start at the north well pad at 9:00 tomorrow.

Thanks,
**Michael Whitehead**
**Founder**
Whitehead E.S., LLC
906 E. 18th St. Suite 100, Plano, TX 75074
mike@whiteheades.com | Direct (469) 609-8080 Ext. 100 | M (214) 335-3246

---

**From:** William Day, P.G. <william@esepartners.com>
**Sent:** Thursday, January 8, 2026 11:34 AM
**To:** Michael Whitehead <mwhitehead@whiteheades.com>
**Subject:** Project Coordination: 7700 Old Granbury Road, Cresson, TX

Hey Michael!

Challenger Realty Group has authorized ESE Partners to provide third-party oversight for the Phase II ESA scheduled for tomorrow at 7700 Old Granbury Road. I wanted to connect with your field representative to confirm meeting time and on-site access arrangements.

Additionally, would you please share a copy of the proposal you presented to your client for our records?

Thank you in advance, and please let me know who I should coordinate with on your end.

Respectfully,

**William Day, P.G. |** *Project Environmental Geologist*
**Corrective Action**
400 East Royal Lane, Suite 203, Irving, Texas 75039
**C:** 469.407.5203 | **O:** 469.983.8600

TEXAS' MOST TRUSTED ENVIRONMENTAL EXPERTS
COMPREHENSIVE BY DESIGN

**Request your proposals HERE**

Outlook

## RE: [EXTERNAL] Project Coordination: 7700 Old Granbury Road, Cresson, TX - Cathy

**From** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Date** Fri 1/9/2026 1:28 PM
**To** Michael Whitehead <mwhitehead@whiteheades.com>; William Day, P.G. <william@esepartners.com>
**Cc** Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Catherine Kobylinski <Catherine@whiteheades.com>

Hi Michael,

Per our discussion, if the TMWs don't make water the same day as drilled, you don't need to leave them in place overnight.

Aaron Munsart, P.G.
Senior Geologist, Project Manager
ESE Partners, LLC
amunsart@esepartners.com
281-309-2562

---

**From:** Michael Whitehead <mwhitehead@whiteheades.com>
**Sent:** Thursday, January 8, 2026 3:29 PM
**To:** William Day, P.G. <william@esepartners.com>
**Cc:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Catherine Kobylinski <Catherine@whiteheades.com>
**Subject:** [EXTERNAL] Project Coordination: 7700 Old Granbury Road, Cresson, TX - Cathy

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Cathy Kobylinski at 512-923-4322

Thanks,
**Michael Whitehead**
**Founder**
Whitehead E.S., LLC
906 E. 18th St. Suite 100, Plano, TX 75074
mike@whiteheades.com | Direct (469) 609-8080 Ext. 100 | M (214) 335-3246

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

**Sign Up for our Newsletter!**

---

**From:** William Day, P.G. <william@esepartners.com>
**Sent:** Thursday, January 8, 2026 3:11 PM
**To:** Michael Whitehead <mwhitehead@whiteheades.com>

**Cc:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Catherine Kobylinski <Catherine@whiteheades.com>
**Subject:** Re: [EXTERNAL] Project Coordination: 7700 Old Granbury Road, Cresson, TX

Thank you, Michael!

Do you mind providing a phone number for the field representative?

**William Day, P.G. |** *Project Environmental Geologist*
**Corrective Action**
400 East Royal Lane, Suite 203, Irving, Texas 75039
**C:** 469.407.5203 | **O:** 469.983.8600

---

**From:** Michael Whitehead <mwhitehead@whiteheades.com>
**Sent:** Thursday, January 8, 2026 3:04 PM
**To:** William Day, P.G. <william@esepartners.com>
**Cc:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Catherine Kobylinski <Catherine@whiteheades.com>
**Subject:** [EXTERNAL] Project Coordination: 7700 Old Granbury Road, Cresson, TX

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

William and Aaron, here is the revised Work Order for the Phase II Investigation in Cresson tomorrow. We will start at the north well pad at 9:00 tomorrow.

Thanks,
**Michael Whitehead**
**Founder**
Whitehead E.S., LLC
906 E. 18th St. Suite 100, Plano, TX 75074
mike@whiteheades.com | Direct (469) 609-8080 Ext. 100 | M (214) 335-3246

---

**From:** William Day, P.G. <william@esepartners.com>
**Sent:** Thursday, January 8, 2026 11:34 AM
**To:** Michael Whitehead <mwhitehead@whiteheades.com>
**Subject:** Project Coordination: 7700 Old Granbury Road, Cresson, TX

Hey Michael!

Challenger Realty Group has authorized ESE Partners to provide third-party oversight for the Phase II ESA scheduled for tomorrow at 7700 Old Granbury Road. I wanted to connect with your field representative to confirm meeting time and on-site access arrangements.

Additionally, would you please share a copy of the proposal you presented to your client for our records?

Thank you in advance, and please let me know who I should coordinate with on your end.

Respectfully,

**William Day, P.G. |** *Project Environmental Geologist*
**Corrective Action**
400 East Royal Lane, Suite 203, Irving, Texas 75039
**C:** 469.407.5203 | **O:** 469.983.8600

**Request your proposals HERE**

Outlook

**Re: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...**

**From** Danielle Fehrenbach <dfehrenbach@whiteheades.com>
**Date** Mon 1/26/2026 12:34 PM
**To** David Spiller <David@spillerlaw.net>; ggraham.greg@gmail.com <ggraham.greg@gmail.com>
**Cc** Michael Whitehead <mwhitehead@whiteheades.com>

1 attachment (15 MB)
Cresson Moon Properties - Phase II - FINAL PG.pdf;

Good Afternoon,

Please see the attached completed Final Phase II report.

Please feel free to reach out with any questions or concerns.

Best,

**Dani Fehrenbach** | Project Manager
**Whitehead Environmental Solutions, LLC**
906 E. 18th Street, Suite 100, Plano, Texas 75074
**O** (469) 609-8080 Ext. 102 | **M** (979) 221-8480
brandi@whiteheades.com

---

**From:** Danielle Fehrenbach <dfehrenbach@whiteheades.com>
**Sent:** Friday, January 23, 2026 11:46 AM
**To:** David Spiller <David@spillerlaw.net>; ggraham.greg@gmail.com <ggraham.greg@gmail.com>
**Cc:** Michael Whitehead <mwhitehead@whiteheades.com>
**Subject:** Re: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Good morning,

Please see the attached DRAFT Phase II report for Cresson Moon Properties.

If you have any trouble viewing the report, please let me know! If you have any questions of concerns, please feel free to reach out to Michael.

Always a pleasure working with you,

**Dani Fehrenbach** | Project Manager
**Whitehead Environmental Solutions, LLC**
906 E. 18th Street, Suite 100, Plano, Texas 75074
**O** (469) 609-8080 Ext. 102 | **M** (979) 221-8480
brandi@whiteheades.com

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Thursday, January 8, 2026 10:28 AM
**To:** Michael Whitehead <mwhitehead@whiteheades.com>; David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com <john@challengerrealtygroup.com>; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; john@challengerrealtygroup.com <john@challengerrealtygroup.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi Mike,

Can you confirm your planned start time is still tomorrow morning at 10am for this Phase 2?
Additionally, could you please send me a final version of the Phase 2 proposal?
Thanks!

Aaron Munsart, P.G.
Senior Geologist, Project Manager
ESE Partners, LLC
amunsart@esepartners.com
281-309-2562

**From:** Michael Whitehead <mwhitehead@whiteheades.com>
**Sent:** Monday, December 29, 2025 4:55 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Danielle Fehrenbach <dfehrenbach@whiteheades.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; john@challengerrealtygroup.com
**Subject:** [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

David, Jeffrey, and Aaron,

Thanks for the suggestions, we will update our Work Order to include.

**Michael Whitehead**
**Founder**
Whitehead E.S., LLC
906 E. 18th St. Suite 100, Plano, TX 75074
mike@whiteheades.com | Direct (469) 609-8080 Ext. 100 | M (214) 335-3246

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Monday, December 29, 2025 4:49 PM
**To:** David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; Michael Whitehead <mwhitehead@whiteheades.com>; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi David,

Thank you for sending the Phase II proposal, I've added some relatively minor comments and requested changes to the scope of work.
Can you please review & approve?
I believe Jeff is in the process of preparing the contract amendment, which I'm sure he will get over to you as soon as it is available.

Aaron Munsart, P.G.
Senior Geologist, Project Manager
ESE Partners, LLC
amunsart@esepartners.com
281-309-2562

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Monday, December 29, 2025 2:58 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Aaron,

Attached is the Phase II Proposal. We have not yet acted on it, but will be discussing it today. Also, we have not yet received the proposed amendment from Jeff. Looking forward to receiving it. Let me know if you have any problems or concerns with the attached proposal. Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

[ABOTA%20logo.png] American Board of Trial Advocates [AV-Preeminent-Logo-100px.png]

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Monday, December 29, 2025 12:01 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>; David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson

<jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi David,

Hope y'all had a great Christmas!
Do you have the Phase 2 proposal ready for our review?
Just checking in.

Thanks,

Aaron Munsart, P.G.
Senior Geologist, Project Manager
ESE Partners, LLC
amunsart@esepartners.com
281-309-2562

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Tuesday, December 23, 2025 4:31 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David,

I am preparing the proposed amendment and will get that to you asap.

Thank you,
Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

**NEW ADDRESS**:
325 N. St. Paul Street,
**Suite 2900**
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Tuesday, December 23, 2025 9:34 AM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Jeff,

Let me know where you are in preparing and sending the proposed amendment to accommodate the completion of the Phase II that we discussed last Friday. We have received a proposal from Michael Whitehead with Whitehead ES and are ready to move forward. Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell
AV PREEMINENT
Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** David Spiller
**Sent:** Thursday, December 18, 2025 5:30 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera

(patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Jeff,

Yes. You just name the time. Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

---

**From:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Sent:** Thursday, December 18, 2025 5:12 PM
**To:** David Spiller <David@spillerlaw.net>
**Cc:** john@challengerrealtygroup.com; Charles Gallub (Charles@challengerrealtygroup.com) <Charles@challengerrealtygroup.com>; Edwin Esposito <ed@challengerrealtygroup.com>; Patty Herrera (patty@challengerrealtygroup.com) <patty@challengerrealtygroup.com>; Jake Wilkinson <jake@mwrealestate.com>; Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com; Aaron Munsart, P.G. <amunsart@esepartners.com>
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

David,

Thank you for your email. We appreciate the spirit in which Seller and Purchaser are working together toward finalizing Seller's environmental assessment and report and believe that the cooperation between the parties' respective environmental engineers will expedite the path to closing.

Speaking of a path to closing, are you available tomorrow (Friday) between 12:00 and 2:00 PM to discuss the proposed contract amendment?

Thank you,

Jeff

CALHOUN BHELLA & SECHREST

Chambers SPOTLIGHT TX 2024

**Jeffrey T. Libby**
Partner

214.833.2187 (Direct)
214.395.3303 (Cell)
jlibby@CBSAttorneys.com

325 N. St. Paul Street,
Suite 2300
Dallas, Texas 75201

www.cbsattorneys.com

IMPORTANT\CONFIDENTIAL: This message contains information from the law firm of Calhoun Bhella & Sechrest PLLC that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 981-9200.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Thursday, December 18, 2025 3:18 PM
**To:** Aaron Munsart, P.G. <amunsart@esepartners.com>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** RE: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Aaron,

Thanks for the email. First, the Sellers are aware of the findings. Sellers paid for the work and report. However, I have not yet heard back from Jeff Libby on behalf of the Buyer. As you can see from my email below, I wanted Jeff to contact me at his earliest convenience so that we may discuss the matter and work toward the anticipated closing of the sale.

To that end, we have requested a proposal (relative to scope of work, anticipated time frame necessary to complete the work, and anticipated range of cost – both if no findings of contamination and remedial steps if there is a finding of contamination) from Whitehead E.S., LLC ("Whitehead"). To answer your specific questions, in the spirit of cooperation and a joint desire to close this transaction as soon as possible:

1. I don't believe we have a problem with sharing the proposal when we receive it. I will need to confirm that issue with Michael Whitehead to make sure there is nothing proprietary in the proposal from Whitehead that would need to be redacted. I doubt that there would be.

2. We do not have a problem with ESE being present when all or part of any work is being done.

Thanks for reaching out. Please contact me with any problems, questions or concerns.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

American Board of Trial Advocates

Martindale-Hubbell AV PREEMINENT Peer Rated for Highest Level of Professional Excellence 2019

---

**From:** Aaron Munsart, P.G. <amunsart@esepartners.com>
**Sent:** Thursday, December 18, 2025 2:32 PM
**To:** David Spiller <David@spillerlaw.net>; Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; mwhitehead@whiteheades.com; john@challengerrealtygroup.com
**Subject:** Re: [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres i...

Hi Michael & David,

Hope you're both doing well!
Have you had a chance to review your Phase 1 REC findings with the Seller?
If you are moving toward completing the Phase 2 ESA, we have a few requests that would assist the Buyer greatly in this transaction:

- Could you please provide a copy of the Phase 2 ESA proposal for review by the Buyer and/or Buyer's consultant (ESE)? We would just like to review prior to completion to ensure the scope of work is comprehensive to investigate both Seller & Buyer environmental concerns for the Site.

- Buyer would like to have ESE present during the performance of Phase 2 activities. Please let us know when this work is scheduled so that we, ESE, can also be present.

Let me know if you have any questions/concerns on this.

Thank you,

Aaron Munsart, P.G.
Senior Geologist, Project Manager
ESE Partners, LLC
amunsart@esepartners.com

281-309-2562

---

**From:** David Spiller <David@spillerlaw.net>
**Sent:** Monday, December 15, 2025 4:22 PM
**To:** Jeffrey Libby <jlibby@cbsattorneys.com>
**Cc:** Todd W Tew <todd.2@verizon.net>; Kelly Roach (keroach39@gmail.com) <keroach39@gmail.com>; Lacy Kimball Law <info@lacykimballlaw.com>; Aaron Munsart, P.G. <amunsart@esepartners.com>; mwhitehead@whiteheades.com <mwhitehead@whiteheades.com>; john@challengerrealtygroup.com <john@challengerrealtygroup.com>
**Subject:** [EXTERNAL] Contract of Sale dated May 26, 2023,as amended, between Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, et al., as Seller, and Challenger Realty Group, LLC, as Buyer, covering 1,674 acres in Ho...

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jeff,

Below is the link to the Buyer's Phase I Environmental Site Assessment to the tract of land the subject of the above referenced contract ("the contract"), being 1,674 acres, more or less, at 7700 Old Granbury Road, Cresson, Texas, prepared by Whitehead E.S., LLC.  This report is being provided pursuant to the terms and conditions of the contract.

Cresson Ranch, Cresson, TX - Phase I ESA.pdf

After you and your team have had an opportunity to review it, please contact me at your earliest convenience so that we may discuss the matter and work toward the anticipated closing of the sale.  Thanks.

David Spiller, Esq.
**SPILLER & SPILLER**
Attorneys and Counselors at Law
P. O. Drawer 447
Jacksboro, Texas 76458
Telephone: (940) 567-6644
Cell Phone: (940) 567-1025
Facsimile: (940) 567-3999
Email: david@spillerlaw.net

SPILLER & SPILLER
ATTORNEYS AND COUNSELORS AT LAW

[ABOTA%20logo.png] American Board of Trial Advocates [AV-Preeminent-Logo-100px.png]

This email has been scanned for spam an viruses by Proofpoint Essentials. C ick here to report this email as spam.

January 26, 2026

Mr. Greg Graham
Cresson Moon Property LLC
12601 Cleburne Highway
Cresson, Texas 76035

Re: Limited Phase II Investigation
7700 Old Granbury Road
Cresson, Texas
Whitehead E. S. Project: 379.001

Dear Mr. Graham:

Whitehead Environmental Solutions, LLC (Whitehead E. S.) conducted a Limited Phase II Investigation (soil only since groundwater not encountered) of the property located at 7700 Old Granbury Road in Cresson, Hood County, Texas (Site). The Site is 1,674-acres consisting of a private residence with two gas well pads in a primarily undeveloped area of Cresson. The Site location is provided in **Figure 1**, and the Site layout is provided in **Figure 2**.

**SITE BACKGROUND**

Whitehead E. S. conducted a Phase I Environmental Site Assessment (ESA) of the Site on December 12, 2025, and reviewed a Phase I ESA conducted by Environmental Science and Engineering (ESE) Partners on December 18, 2023.

According to aerial photographs and Railroad Commission of Texas (RRC) records, two gas wells were installed on-Site in 2006 and were plugged in 2025. A former pit associated with each well was observed from aerial photographs along the southern side of the northern well pad and the south side of the southern well pad by 2010 and both appeared to be dry by 2018. The presence of pits associated with the wells were identified as recognized environmental conditions (RECs) in the Phase I ESA conducted by Whitehead E. S. Additionally, aboveground storage tanks (ASTs) associated with the wells were observed by ESE Partners during their Site reconnaissance, as well as in historical aerial photographs. At the time of the Whitehead E. S. Site reconnaissance in 2025, the ASTs were no longer on the Site. Lastly, an off-Site well pad was identified near the southwestern portion of the Site.

Based on the identified RECs, Whitehead E. S. proposed a Phase II Investigation to assess the potential environmental concerns, namely the historical oil & gas activities on the Site including the two gas well pads (north and south) along with the one off-Site well pad to the southwest (adjacent to property).

**SUBSURFACE INVESTIGATION**

On January 9th, 2026, Whitehead E. S. mobilized to the Site to conduct soil and groundwater sampling. The purpose of the investigation was to evaluate potential chemicals of concern (COCs) in the soil and groundwater related to the former on-Site gas wells and associated pits/ASTs and the off-Site presence of natural gas wells. Potential COCs were identified as non-specific total petroleum hydrocarbon (TPH) fractions, volatile organic compounds (VOCs), barium, and chloride.

Six soil borings were advanced on the Site and three were converted to temporary monitoring wells. Soil samples were collected and analyzed for TPH fractions by Texas Method TX 1005, benzene, toluene, ethylbenzene, and xylenes (BTEX)/methyl tert-butyl ether (MTBE) or the full suite of VOCs by U. S. Environmental Protection Agency (EPA) Method 8260. Additionally, selected samples were analyzed for barium by EPA Method 6020, chloride via EPA Method 300.0, and pH by EPA Method 9045D. A single sample was analyzed for polyaromatic hydrocarbons (PAHs) by EPA Method 8270 due to the diesel range TPH fractions that were detected at low concentrations. Photographs of the field investigation are presented in **Attachment A.**

**Soil Sampling and Analysis**

Soil borings SB-01 through SB-06 were advanced using a track-mounted Geoprobe rig utilizing a combination of direct-push technology and solid stem augers with a five-foot probe rod and core samplers. Borings were installed using direct-push sampling system until refusal was encountered or the desired depths were reached. Refusal using direct push was encountered at the Site between 5.5 and 10.0 feet below ground surface (bgs) due to the shallow limestone. Solid stem augers were used to reach deeper depths for temporary monitoring wells. Depths of the soil borings and/or temporary monitoring wells ranged from 7.0 to 24.0 feet bgs. Soil boring SB-01/TMW-01 was advanced on the south side of the north well pad in the footprint of the former pit. Soil boring SB-02 was advanced to the east of the north well pad and SB-03 was advanced northwest of the north well pad near the former AST locations. Soil boring SB-04/TMW-02 was advanced to the north of an off-Site natural gas well pad. Soil boring/temporary monitoring well SB-05/TMW-03 and SB-06 were advanced near the south well pad in the footprint of the former pit and near the former AST locations. The lithology encountered generally consisted of a mix of medium stiff, moist, reddish yellowish brown silty clay and dry, loose, chalky white weathered limestone with some sand lenses.

Soil samples were screened in the field for potential COCs including observations for dark staining and/or fill materials, odors, pH, and measurements of organic vapors using a photoionization detector (PID). No dark staining was observed in any of the soil borings. Soil borings SB-01, SB-02, SB-05 and SB-06 had very low PID readings (0.0 to 0.6 parts per million [ppm]) which are considered background readings not indicative of an environmental impact. Soil borings SB-03 and SB-04 had maximum PID readings of 2.9 ppm and 9.2 ppm, respectively. Furthermore, pH ranges were reported between 7.1 and 9.0.

A total of 13 soil samples were collected from the borings in accordance with EPA Method 5035 (plunger that directly inserts into volatile organic analysis [VOA] vials). Samples were collected in laboratory-supplied containers, immediately placed on wet ice in insulated coolers, and delivered to Eurofins Environment Testing (Eurofins) in Dallas, Texas, for analysis of non-specific TPH fractions, VOCs, barium, chloride, and/or pH. Additionally, one sample [SB-01 (3-4')] was analyzed for PAHs due to the detection of diesel range TPH fractions ($C_{12}$-$C_{28}$).

**Groundwater Sampling and Analysis**

Soil borings SB-01, SB-04, and SB-05 were converted to temporary monitoring wells TMW-01, TMW-02, and TMW-03 respectively, and were installed to total depths of 19.0 feet, 24.0 feet, and 11.0 feet bgs, respectively. Each monitoring well was constructed using a one-inch diameter Schedule 40 PVC. Blank (unslotted) PVC extended from the ground surface to depths of 3.5 feet (TMW-01), 8.5 feet (TMW-02), and 0.5 feet (TMW-03) feet bgs, and machine-slotted PVC screen extended from the base of the riser to the bottom of the borehole. None of the temporary monitoring wells produced groundwater within the timeframe of the investigation therefore could not be sampled.

The corresponding boring logs and monitoring well diagrams are provided in **Attachment B**.

**Soil Sampling Results**

Whitehead E. S. compared the soil analytical data to their respective default TCEQ Texas Risk Reduction Program (TRRP) Tier 1 Residential Protective Concentration Levels (PCLs). Samples analyzed for barium were additionally compared to their Texas-Specific Soil Background Concentration (TSBC), with the lower of the PCL or TSBC used as the assessment level. Samples analyzed for chloride were compared to the RRC Regulatory Protection Limit. Soil sampling results are presented in **Table 1A** and **Table 1B**, with the complete laboratory analytical data package provided in **Attachment C**.

Diesel range ($C_{12}$-$C_{28}$) TPH fractions were detected at one location, SB-01 (3-4'), with a low concentration of $35.5^J$ mg/kg, below the TRRP PCL of 200 mg/kg. A "J" qualifier indicated an estimated concentration above adjusted method detection limit and below the adjusted reporting limit. Due to the presence of diesel range TPH fractions, PAHs were analyzed, and all analytes were below laboratory sample detection limits (SDLs).

Ethylbenzene was detected in three samples (SB-02, SB-03, and SB-04) at very low concentrations ranging from $0.000545^J$ mg/kg to $0.00169^J$ mg/kg, all well below the TRRP PCL of 7.6 mg/kg. Total xylenes were detected at four locations (SB-01, SB-02, SB-03, and SB-04) at low concentrations ranging from $0.000657^J$ mg/kg to 0.0129 mg/kg, all well below the TRRP PCL of 120 mg/kg. Barium was detected at all sample locations analyzed with a maximum detection of 148 mg/kg at SB-05, all below the TRRP PCL of 440 mg/kg. Lastly, chloride was detected at four sample locations (SB-01, SB-03, SB-04, and SB-06) with values between $5.71^J$ mg/kg and 250 mg/kg, well below the RRC Regulatory Protection Limit of 3,000 mg/kg. All other analytes were detected below laboratory SDLs.

**Quality Assurance/Quality Control (QA/QC)**

Whitehead E. S. reviewed the QA/QC data provided with the laboratory report and case narrative. A Trip Blank was included on the chain of custody (C-O-C) for the laboratory and put on hold. Soil samples were received by the laboratory at 0.1 degrees Centigrade (within proper temperature range). There were no other data qualifiers from the laboratory. Overall, the laboratory data appears to be accurate, reproducible, and acceptable for use in evaluating potential impacts to the Site.

**FINDINGS AND CONCLUSIONS**

Whitehead E. S. conducted a Limited Phase II Investigation at the Site. The assessment was considered "limited" since groundwater was not encountered. A summary of our findings and conclusions is presented below:

- Previous Phase I ESAs conducted in 2023 and 2025 indicated the presence of two on-Site well pads with associated pits and ASTs. The two gas wells were installed on-Site in 2006 and were plugged in 2025. The associated pits appeared by 2010 and were both dry by 2018. Soil sampling was performed to determine if soil was impacted by potential COCs including TPH fractions, VOCs, barium, and chloride. Groundwater was not encountered at the Site for sample analysis.

- Six soil borings were installed on the Site. The lithology encountered generally consisted of a mix of medium stiff, moist, reddish yellowish brown silty clay and dry, loose, chalky white weathered limestone with some sand lenses. No dark staining was observed in any of the soil cores. Soil borings SB-03 and SB-04 had low PID reading of 2.9 and 9.2 ppm, respectively. Three of the six soil borings were converted into temporary monitoring wells that did not produce any groundwater within the timeframe of the field investigation and were subsequently plugged.

- Soil analytical results identified only low concentrations of diesel range TPH in one sample and ethylbenzene and total xylenes in four of the nine samples. The concentrations of TPH, ethylbenzene, and total xylenes were well below their applicable TRRP Residential PCLs.

- Barium was detected above laboratory its SDL in all soil samples analyzed ranging from 16.7 mg/kg to 148 mg/kg with all samples well below its TRRP PCL of 440 mg/kg. Chloride was detected above laboratory SDLs in four soil samples below applicable RRC screening levels.

In conclusion, Whitehead E. S. conducted a Phase II Investigation to evaluate potential COCs in the soil and groundwater from the former on-Site well pads and off-Site active natural gas pad. The sampling did not indicate any COCs associated with oil & gas activities above their respective TRRP Residential PCLs and/or RRC Limits for soil. Groundwater was not encountered in the temporary monitoring wells on the Site and was not subsequently sampled. Soil sampling data did not identify any COCs in the Areas of Concern on the Site noted in the previous Phase I ESAs. Based on the Whitehead E. S. Phase II Investigation, there is no evidence of any impact to the Site, and no further investigation is warranted at this time.

**QUALIFICATIONS**

This technical report was prepared for the sole use of Cresson Moon Property LLC and shall not be relied upon by any other party without the express prior written consent of Cresson Moon Property LLC and Whitehead E. S. This document was developed by employing generally accepted methods and customary practices of the environmental profession.

Whitehead E. S. appreciates the opportunity to be of service to you on this project. If you have any questions or need additional information regarding the assessment, please contact Michael at (214) 335-3246.

Sincerely,

**WHITEHEAD E. S., LLC**

Michael Whitehead
Senior Consultant

Catherine Kobylinski
Environmental Scientist

Amanda Pechacek, P.G.
Professional Geoscientist



**FIGURES**




Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

**LEGEND**

Approximate Site Boundary




APPROXIMATE SCALE
(in feet)
0 2000 4000

# Figure 1
## Site Location

**Cresson Moon Property, LLC**
**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
U.S.G.S. Topographic Map Series,
Chapin, Texas (2022)

| DRAFTED BY: | CHECKED BY: |
|---|---|
| EM | AP |
| PROJECT NUMBER: | DATE: |
| 379.001 | 01/2026 |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
(469) 609-8080

## LEGEND

| | |
|---|---|
| Approximate Site Boundary | (red line) |
| Pipeline | (green line) |
| Horizontal Well | (black line) |
| Gas Well | ⊕ (black) |
| Soil Boring | ⊕ (green) |
| Temporary Monitoring Well | (cyan) |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

NOTES:

Figure is not to scale.

# Figure 2
# Site Layout

**Cresson Moon Property, LLC**
**7700 Old Granbury Road**
**Cresson, Texas**

SOURCE:
Google Earth Mapping Service, Imagery Date: 11/20/2024

| DRAFTED BY: | CHECKED BY: |
|---|---|
| DG | AP |
| PROJECT NUMBER: 379.001 | DATE: 01/2026 |

**TABLES**

# TABLE 1A
## SOIL ANALYTICAL SUMMARY - TPH, VOCs, BARIUM, CHLORIDE

*Cresson Moon Property LLC*
*7700 Old Granbury Road*
*Cresson, Texas*

| Sample ID[1] | Sample Date | Total Petroleum Hydrocarbons[2] (mg/kg) | | | Volatile Organic Compounds[3] (mg/kg) | | | | Barium | Chloride |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $C_6$ - $C_{12}$ | $C_{12}$ - $C_{28}$ | $C_{28}$ - $C_{35}$ | Benzene | Toluene | Ethylbenzene | Total Xylenes | | |
| **SB-01 (3-4')** | 1/9/2026 | <21.6 | **35.5[J]** | <21.6 | <0.000459 | <0.000512 | <0.000354 | **0.000657[J]** | **36.8** | **5.71[J]** |
| **SB-02 (3-4')** | 1/9/2026 | <25.7 | <25.7 | <25.7 | <0.000641 | <0.000715 | **0.00127[J]** | **0.0104** | **24.0** | <5.98 |
| **SB-03 (3-4')** | 1/9/2026 | <21.5 | <21.5 | <21.5 | <0.000397 | <0.000443 | <0.000306 | <0.000316 | **30.0** | **250** |
| **SB-03 (5-6')** | 1/9/2026 | <23.2 | <23.2 | <23.2 | <0.000413 | <0.000460 | **0.000545[J]** | **0.00379** | --- | --- |
| **SB-04 (3-4')** | 1/9/2026 | <22.2 | <22.2 | <22.2 | <0.000438 | <0.000489 | **0.00169[J]** | **0.0129** | **31.1** | **5.74[J]** |
| **SB-05 (2-3')** | 1/9/2026 | <18.4 | <18.4 | <18.4 | <0.000559 | <0.000624 | <0.000431 | <0.000445 | **148** | <5.82 |
| **SB-05 (8-9')** | 1/9/2026 | <21.5 | <21.5 | <21.5 | <0.000577 | <0.000644 | <0.000445 | <0.000460 | --- | --- |
| **SB-06 (2-3')** | 1/9/2026 | <20.0 | <20.0 | <20.0 | <0.000555 | <0.000620 | <0.000428 | <0.000443 | --- | --- |
| **SB-06 (6-7')** | 1/9/2026 | <26.8 | <26.8 | <26.8 | <0.000495 | <0.000553 | <0.000382 | <0.000395 | **16.7** | **184** |
| **TRRP Tier 1 Residential $^{GW}Soil_{Ing}$ PCL[4] (mg/kg)** | | **65** | **200** | **200** | **0.026** | **8.2** | **7.6** | **120** | **440** | --- |
| **Texas-Specific Soil Background Conentrations[5] (mg/kg)** | | --- | --- | --- | --- | --- | --- | --- | **300** | --- |
| **RRC Regulatory Protection Limits[6]** | | **10,000** | | | **0.026** | **8.2** | **7.6** | **120** | --- | **3,000** |

**Notes:**
[1]Samples collected by Whitehead E. S. and analyzed by Eurofins Environment Testing in Dallas, Texas.
[2]Total Petroleum Hydrocarbons (TPH) analyzed by Texas Method TX1005.
[3]Volatile organic compounds (VOCs) analyzed by U.S. Environmental Protection Agency (EPA) Method 8260.
[4]Texas Risk Reduction Program (TRRP) Residential Soil to Groundwater Ingestion Protective Concentration Levels (PCLs).
[5]Texas Commission on Environmental Quality (TCEQ) Texas-Specific Soil Background Concentrations (TSBCs).
[6] Railroad Commision of Texas (RRC) Class 1 and Class 2 Soil-to-Groundwater Regulatory Protection Limits.
**Bold values indicate that chemical of concern (COC) was detected above the sample detection limit (SDL).**
**Bold and shaded values indicate applicable action level for each COC.**
**Bold and highlighted values indicate the COC exceeds the lowest applicable action level.**
(<) Indicates the value was not detected above the laboratory SDL.
[J]Estimated concentration above the adjusted method detection limit and below the adjusted reporting limit.
--- Not analyzed or not applicable
Only select analytes are presented in this table. All other analytes remaining are below their applicable PCLs.

**TABLE 1B**
**SOIL ANALYTICAL SUMMARY - PAHs**

***Cresson Moon Property LLC***
***7700 Old Granbury Road***
***Cresson, Texas***

| Sample ID[1] | | SB-01 (3-4') | TRRP Tier 1 Residential $^{GW}Soil_{Ing}$ PCL[3] (mg/kg) | TRRP Tier 1 Residential $^{Tot}Soil_{Comb}$ PCL[4] (mg/kg) |
|---|---|---|---|---|
| Sample Date | | 1/9/2026 | | |
| PAHs[2] | Acenaphthene | <0.00222 | **240** | **3,000** |
| | Acenaphthylene | <0.00154 | **410** | **3,800** |
| | Anthracene | <0.00214 | **6,900** | **18,000** |
| | Benzo[a]anthracene | <0.00163 | **130** | **41** |
| | Benzo[a]pyrene | <0.00210 | **7.6** | **4.1** |
| | Benzo[b]fluoranthene | <0.00230 | **440** | **42** |
| | Benzo[g,h,i]perylene | <0.00205 | **46,000** | **1,800** |
| | Benzo[k]fluoranthene | <0.00209 | **4,500** | **420** |
| | Chrysene | <0.00195 | **11,000** | **4,100** |
| | Dibenz(a,h)anthracene | <0.00217 | **15** | **4** |
| | Fluoranthene | <0.00267 | **1,900** | **2,300** |
| | Fluorene | <0.00205 | **300** | **2,300** |
| | Indeno[1,2,3-cd]pyrene | <0.00297 | **1,300** | **42** |
| | Naphthalene | <0.00308 | **31** | **220** |
| | Phenanthrene | <0.00332 | **420** | **1,700** |
| | Pyrene | <0.00239 | **1,100** | **1,700** |

**Notes:**

[1]Samples collected by Whitehead E. S. and analyzed by Eurofins Environment Testing in Dallas, Texas.

[2]Polycyclic aromatic hydrocarbons (PAHs) analyzed by U. S. Environmental Protection Agency (EPA) Method 8270.

[3]Texas Risk Reduction Program (TRRP) Residential Soil to Groundwater Ingestion Protective Concentration Levels (PCLs).

[3]TRRP Residential Total Soil Combined PCLs.

**Bold values indicate that chemical of concern (COC) was detected above the sample detection limit (SDL).**

**Bold and shaded values indicate applicable action level for each COC.**

**Bold and highlighted values indicate the COC exceeds the lowest applicable action level.**

(<) Indicates the value was not detected above the laboratory SDL.

**PHOTOGRAPHIC LOG**

**ATTACHMENT A**

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 1.**View of installation of SB-01/TMW-01 south of northern well pad. Photo taken facing southeast.



**Photograph 2.** Soil representative of lithology of 0.0' to 5.5' in SB-01/TMW-01.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 3.**View of installation of SB-02 located east of northern well pad. Photo taken facing east.



**Photograph 4.**View of installation of SB-03 located northwest of northern well pad. Photo taken facing north.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 5.** Soil representative of lithology of 0.0’ to 6.0’ in SB-03.



**Photograph 6.** View of installation of SB-04/TMW-02 located north of an off-Site well pad. Photo taken facing south.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 7.** View of completed temporary monitoring well SB-04/TMW-02. Photo taken facing southeast.



**Photograph 8.** View of remnants of pit liner located near SB-05/TMW-03 southeast of the southern well pad.

**Photo Log**
**7700 Old Granbury Road**
**Cresson, Texas**
**Project #379.001**



**Photograph 9.** Soil representative of lithology of 0.0' to 10.0' in SB-05/TMW-03.



**Photograph 10.** View of installation of SB-06 located northwest of the southern well pad. Photo taken facing east.

**BORING LOGS/WELL DIAGRAMS**

**ATTACHMENT B**

# Boring Log: SB-01/TMW-01

**Project Name:**
Cresson Moon Property
7700 Old Granbury Road, Cresson, Texas

Whitehead E.S. Project No. 379.001

| | | | |
|---|---|---|---|
| Completion Date: | 1/9/2026 | Refusal? | Yes |
| Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| Driller's License: | 59562 | Ground Elevation (ft): | 1098 |
| Logged By: | CK/EM | Latitude: | 32.537023° |
| Sampling Method: | PVC Liners | Longitude: | -97.659090° |
| Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | Casing | | 3.5/5.0 | | CL | SILTY CLAY: stiff, moist, gray with yellow to reddish yellow brown mottling. 0.25 to 1 inch limestone pieces throughout. |
| 1 | Casing | 0 | | | CL | |
| 2 | Casing | 0 | | | CL | |
| 3 | Casing / Screen (from 3.5) | 0 | | SB-01 (3-4') | LS | VERY WEATHERED LIMESTONE: stiff but friable, dry, light yellowish brown. |
| 4 | Screen | 0 | | | LS | |
| 5 | Screen | 0 | 0.5/0.5 | | LS | DPT refusal @ ~5.5', switched to SSA and cutting observed |
| 6 | Screen | | 0.0/0.0 | | LS | WEATHERED LIMESTONE: stiff but friable, dry, light yellowish brown. |
| 7 | Screen | | | | LS | |
| 8 | Screen | | | | LS | |
| 9 | Screen | | | | LS | |
| 10 | Screen | | | | LS | |
| 11 | Screen | | | | LS | |
| 12 | Screen | | | | LS | |
| 13 | Screen | | | | LS | |
| 14 | Screen | | | | LS | |
| 15 | Screen | | | | LS | |
| 16 | Screen | | | | LS | |
| 17 | Screen | | | | LS | |
| 18 | Screen / End Cap (from 18.5) | | | | LS | |
| 19 | | | | | | |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

**Annular Materials**
N/A

**Well Materials**
(0.0 - 3.5) Casing 1" Sch 40 PVC Riser
(3.5 - 18.5) Screen, 1" Sch 40 PVC 0.010" slot
(18.5 - 19.0) End Cap

**Initial Well Details**
Total Depth (ft): 19
Initial Water Level (ft.): DRY
Date Measured: 1/9/2026

# Boring Log: SB-02

| Project Name: | Completion Date: | 1/9/2026 | Refusal? | Yes |
|---|---|---|---|---|
| Cresson Moon Property | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 4" |
| 7700 Old Granbury Road, Cresson, Texas | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1097 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.536822° |
| | Sampling Method: | PVC Liners | Longitude: | -97.658318° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | | | | | VERY WEATHERED LIMESTONE: stiff but friable, moist, tan to yellow brown. Few 0.25 to 1 inch limestone pieces throughout |
| 1 | 0.6 | | | | |
| 2 | 0.6 | | | | |
| 3 | 0 | 3.5/5.0 | SB-02 (3-4') | LS | |
| 4 | 0.4 | | | | |
| 5 | 0 | | | | DPT refusal @ ~7', switched to SSA and cutting observed |
| 6 | 0.1 | 2.0/2.0 | | LS | VERY WEATHERED LIMESTONE: stiff , moist, gray with yellow-brown mottling with few 0.25 to 1 inch limestone pieces throughout, compentency increasing with depth |
| 7 | | | | | WEATHERED LIMESTONE: dry, loose, chalky white with few 0.25 to 0.5 inch limestone pieces throughout |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | 0.0/0.0 | | LS | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**

Total Depth (ft): 15

Soil boring completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers.

Soil boring plugged the same day as installation with bentonite chips.

# Boring Log: SB-03

| Project Name: | Completion Date: | 1/9/2026 | Refusal? | Yes |
|---|---|---|---|---|
| Cresson Moon Property<br>7700 Old Granbury Road, Cresson, Texas | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1098 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.536727° |
| | Sampling Method: | PVC Liners | Longitude: | -97.658720° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | | | | LS | VERY WEATHERED LIMESTONE: stiff, moist, yellow-brown with few 0.25 to 1 inch limestone pieces throughout, compentency increasing with depth |
| 1 | 0 | | | | |
| 2 | 0 | 4.0/5.0 | | | |
| 3 | 2.9 | | SB-03 (3-4') | | |
| 4 | 0.1 | | | | |
| 5 | 2.3 | 1.5/1.5 | SB-03 (5-6') | CL | SILTY CLAY: stiff, moist, gray with yellow-brown to reddish yellowish-brown mottling with frequent 0.25 to 1 inch limestone pieces throughout<br><br>DPT refusal @ ~6.5', switched to SSA and cutting observed |
| 6 | 1.3 | | | | |
| 7 | | 0.0/8.5 | | LS | WEATHERED LIMESTONE: loose, dry, chalky white 0.25 to 0.5 inch limestone pieces |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |




WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**

Total Depth (ft): 15

Soil boring completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers.

Soil boring plugged the same day as installation with bentonite chips.

# Boring Log: SB-04/TMW-02

| | | | | |
|---|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: | 1/9/2026 | Refusal? | Yes |
| | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 1076 |
| Whitehead E.S. Project No. 379.001 | Logged By: | CK/EM | Latitude: | 32.518527° |
| | Sampling Method: | PVC Liners | Longitude: | -97.673633° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | | 6.7 | | | | SILTY CLAY: very stiff, dry to moist, reddish yellowish-brown with gray mottling with frequent 0.25 to 1 inch limestone pieces throughout |
| 2 | | 9.2 | 4.0/5.0 | | CL | |
| 3 | | 1.1 | | SB-04 (3-4') | | |
| 4 | | 0.1 | | | | |
| 5 | | 0.5 | | | | SILTY CLAY: stiff, moist, reddish yellowish-brown with gray mottling, with few 0.25 to 1 inch limestone pieces throughout |
| 6 | | 0.5 | 1.5/1.5 | | CL | |
| 6.5 | | | | | | SILTY CLAY TO CLAY: moist, reddish yellowish-brown with few 0.25 to 0.5 inch limestone pieces throughout<br>DPT refusal @ ~6.5', switched to SSA and cuttings observed |
| 8 | | | | | | |
| 10 | | | | | | |
| 12 | | | | | CL | |
| 14 | | | 0.0/0.0 | | | |
| 16 | | | | | | |
| 18 | | | | | | |
| 20 | | | | | | SILTY CLAY TO CLAY: moist, dark gray with few limestone pieces throughout |
| 22 | | | | | CL | |
| 24 | | | | | | |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

| Annular Materials | Well Materials | Initial Well Details |
|---|---|---|
| N/A | (0.0 - 8.5) Casing 1" Sch 40 PVC Riser | Total Depth (ft): 24 |
| | (8.5 - 23.5) Screen, 1" Sch 40 PVC 0.010" slot | Initial Water Level (ft.): DRY |
| | (23.5 - 24.0) End Cap | Date Measured: |

# Boring Log: SB-05/TMW-03

| Project Name: | Completion Date: | 1/9/2026 | Refusal? | Yes |
|---|---|---|---|---|
| Cresson Moon Property | Drilling Company: | Savage Drilling | Borehole Diameter (in): | 1" & 4" |
| 7700 Old Granbury Road, Cresson, Texas | Driller Name: | Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: | 59562 | Ground Elevation (ft): | 982 |
| | Logged By: | CK/EM | Latitude: | 32.516597° |
| Whitehead E.S. Project No. 379.001 | Sampling Method: | PVC Liners | Longitude: | -97.657512° |
| | Drilling Method: | DPT & SSA | Source: | Google Earth Pro |

| Depth (ft) | Well Materials | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|---|
| 0 | | | | | | SILTY CLAY: stiff, moist, dark brown with few 0.25 to 1 inch limestone pieces and pea-sized gravels throughout |
| 1 | | 0 | | | | |
| 2 | | 0 | | | | |
| 3 | | 0 | 4.0/5.0 | SB-05 (2-3') | CL | |
| 4 | | 0 | | | | |
| 5 | | 0 | | | | SILTY CLAY: stiff, moist, gray with reddish yellowish-brown mottling grading to predominately orange-brown with gray mottling |
| 6 | | 0 | | | CL | |
| 7 | | 0 | | | | GRAVELLY SAND TO SAND: dense, moist, reddish yellowish-brown with gray mottling, with small pea-sized gravels at 8.5 feet |
| 8 | | 0 | 3.5/5.0 | SB-05 (8-9') | SP | |
| 9 | | 0 | | | | DPT refusal @ ~10', switched to SSA and cuttings observed |
| 10 | | 0 | | | | WEATHERED LIMESTONE: dry, loose, chalky white limestone pieces throughout |
| 11 | | | 0.0/0.0 | | LS | |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**
Temporary monitoring well completed via track-mounted Geoprobe utilizing direct push technology and solid stem augers. Temporary monitoring well plugged the same day as installation with bentonite chips.

| Annular Materials | Well Materials | Initial Well Details |
|---|---|---|
| N/A | (0.0 - 0.5) Casing 1" Sch 40 PVC Riser<br>(0.5 - 10.5) Screen, 1" Sch 40 PVC 0.010" slot<br>(10.5 - 11.0) End Cap | Total Depth (ft): 11<br>Initial Water Level (ft.): DRY<br>Date Measured: 1/9/2026 |

# Boring Log: SB-06

| | | | |
|---|---|---|---|
| **Project Name:** Cresson Moon Property, 7700 Old Granbury Road, Cresson, Texas | Completion Date: 1/9/2026 | Refusal? | Yes |
| | Drilling Company: Savage Drilling | Borehole Diameter (in): | 2" |
| | Driller Name: Eric Hutton | TOC Elevation (ft): | N/A |
| | Driller's License: 59562 | Ground Elevation (ft): | 990 |
| Whitehead E.S. Project No. 379.001 | Logged By: CK/EM | Latitude: | 32.516610° |
| | Sampling Method: PVC Liners | Longitude: | -97.658474° |
| | Drilling Method: DPT | Source: | Google Earth Pro |

| Depth (ft) | PID (ppm-v) | Recovery (ft/ft) | Sample | USCS | Lithologic Description |
|---|---|---|---|---|---|
| 0 | 0 | | | CL | SILTY CLAY: stiff, moist, red-brown to dark brown |
| 0.4 | | | | | |
| 0.8 | | | | | |
| | 0 | | | | |
| 1.2 | | | | | |
| 1.6 | | | | | |
| 2 | 0 | | | | |
| 2.4 | | 4.0/5.0 | SB-06 (2-3') | | |
| 2.8 | | | | | |
| | 0 | | | SP | GRAVELLY SAND TO SAND: loose, moist, red-brown to reddish yellowish-brown |
| 3.2 | | | | | |
| 3.6 | | | | | |
| 4 | 0 | | | | |
| 4.4 | | | | | |
| 4.8 | | | | | |
| | 0 | | | | |
| 5.2 | | | | | |
| 5.6 | | | | | |
| 6 | 0.5 | 2.0/2.0 | | | |
| 6.4 | | | SB-06 (6-7') | | |
| 6.8 | | | | | |
| | 0.2 | | | | |

STATE OF TEXAS
1.26.2026
AMANDA PECHACEK
GEOLOGY
15423
LICENSED
PROFESSIONAL GEOSCIENTIST

WHITEHEAD E. S.
ENVIRONMENTAL SOLUTIONS FOR REAL ESTATE
Whitehead E. S., LLC
906 E. 18th Street
Plano, TX 75074
Tel (469) 609 -8080

**Notes**

Total Depth (ft): 7

Soil boring completed via track-mounted Geoprobe utilizing direct push technology.

Soil boring plugged the same day as installation with bentonite chips.

**LABORATORY ANALYTICAL DATA PACKAGES**

**ATTACHMENT C**

eurofins | Environment Testing

# ANALYTICAL REPORT

## PREPARED FOR

Attn: Danielle Fehrenback
Whitehead ES LLC
906 18th St
Plano, Texas 75074

Generated 1/21/2026 4:10:11 PM

## JOB DESCRIPTION

Cresson Moon Props
379.001

## JOB NUMBER

870-43022-1

APP212

Eurofins Dallas
9701 Harry Hines Blvd
Dallas TX 75220

See page two for job notes and contact information.

# Eurofins Dallas

## Job Notes

This report may not be reproduced except in full, and with written approval from the laboratory. The results relate only to the samples tested. For questions please contact the Project Manager at the e-mail address or telephone number listed on this page.

Analytical test results meet all requirements of the associated regulatory program (i.e., NELAC (TNI), DoD, and ISO 17025) unless otherwise noted under the individual analysis.

## Authorization

Generated
1/21/2026 4:10:11 PM

Authorized for release by
Mike Kimmel, Project Manager
Mike.Kimmel@et.eurofinsus.com
(214)902-0300

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

# Table of Contents

Cover Page . . . . . 1
Table of Contents . . . . . 3
Definitions/Glossary . . . . . 4
Case Narrative . . . . . 6
Client Sample Results . . . . . 7
Surrogate Summary . . . . . 22
QC Sample Results . . . . . 24
QC Association Summary . . . . . 36
Lab Chronicle . . . . . 40
Certification Summary . . . . . 45
Method Summary . . . . . 46
Sample Summary . . . . . 47
Chain of Custody . . . . . 48
Receipt Checklists . . . . . 51
State Forms . . . . . 53
    DCS Report . . . . . 53
    TRRP Checklist . . . . . 55

# Definitions/Glossary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Qualifiers

### GC/MS VOA

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| N1 | MS, MSD: Spike recovery exceeds upper or lower control limits. |
| U | Analyte was not detected at or above the SDL. |

### GC/MS Semi VOA

| Qualifier | Qualifier Description |
|---|---|
| U | Analyte was not detected at or above the SDL. |

### GC Semi VOA

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| U | Analyte was not detected at or above the SDL. |
| X | Surrogate recovery exceeds control limits |

### HPLC/IC

| Qualifier | Qualifier Description |
|---|---|
| J | Result is less than the MQL but greater than or equal to the SDL and the concentration is an estimated value. |
| U | Analyte was not detected at or above the SDL. |

### Metals

| Qualifier | Qualifier Description |
|---|---|
| U | Analyte was not detected at or above the SDL. |

## Glossary

| Abbreviation | These commonly used abbreviations may or may not be present in this report. |
|---|---|
| ☼ | Listed under the "D" column to designate that the result is reported on a dry weight basis |
| %R | Percent Recovery |
| CFL | Contains Free Liquid |
| CFU | Colony Forming Unit |
| CNF | Contains No Free Liquid |
| DER | Duplicate Error Ratio (normalized absolute difference) |
| Dil Fac | Dilution Factor |
| DL | Detection Limit (DoD/DOE) |
| DL, RA, RE, IN | Indicates a Dilution, Re-analysis, Re-extraction, or additional Initial metals/anion analysis of the sample |
| DLC | Decision Level Concentration (Radiochemistry) |
| EDL | Estimated Detection Limit (Dioxin) |
| LOD | Limit of Detection (DoD/DOE) |
| LOQ | Limit of Quantitation (DoD/DOE) |
| MCL | EPA recommended "Maximum Contaminant Level" |
| MDA | Minimum Detectable Activity (Radiochemistry) |
| MDC | Minimum Detectable Concentration (Radiochemistry) |
| MDL | Method Detection Limit |
| ML | Minimum Level (Dioxin) |
| MPN | Most Probable Number |
| MQL | Method Quantitation Limit |
| NC | Not Calculated |
| ND | Not Detected at the reporting limit (or MDL or EDL if shown) |
| NEG | Negative / Absent |
| POS | Positive / Present |
| PQL | Practical Quantitation Limit |
| PRES | Presumptive |
| QC | Quality Control |
| RER | Relative Error Ratio (Radiochemistry) |
| RL | Reporting Limit or Requested Limit (Radiochemistry) |
| RPD | Relative Percent Difference, a measure of the relative difference between two points |

# Definitions/Glossary



## Glossary (Continued)

| Abbreviation | These commonly used abbreviations may or may not be present in this report. |
|---|---|
| SDL | Sample Detection Limit |
| TEF | Toxicity Equivalent Factor (Dioxin) |
| TEQ | Toxicity Equivalent Quotient (Dioxin) |
| TNTC | Too Numerous To Count |

# Case Narrative

Client: Whitehead ES LLC
Project: Cresson Moon Props

Job ID: 870-43022-1

**Job ID: 870-43022-1** **Eurofins Dallas**

**Job Narrative**
**870-43022-1**

The analytical test results presented in this report meet all requirements of the associated regulatory program listed on the Accreditation/Certification Summary Page, unless otherwise noted. Data qualifiers and/or narrative comments are included to explain any exceptions, if applicable. Regulated compliance samples (e.g. SDWA, NPDES) must comply with associated agency requirements/permits.

- Matrix-specific batch QC (e.g., MS, MSD, SD) may not be reported when insufficient sample volume is available or when site-specific QC samples are not submitted. In such cases, a Laboratory Control Sample Duplicate (LCSD) may be analyzed to provide precision data for the batch.
- For samples analyzed using surrogate and/or isotope dilution analytes, any recoveries falling outside of established acceptance criteria are re-prepared and/or re-analyzed to confirm results, unless the deviation is due to sample dilution or otherwise explained in the case narrative.

**Receipt**
The samples were received on 1/10/2026 9:15 AM. Unless otherwise noted below, the samples arrived in good condition, and, where required, properly preserved and on ice.

**Receipt Exceptions**

**GC/MS VOA**
Method 8260C: The matrix spike (MS) recoveries for preparation batch 870-34798 and analytical batch 870-34789 were outside control limits. Non-homogeneity is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Hydrocarbons**
Method TX_1005: Surrogate recovery for the following sample was outside the upper control limit: SB-05 (8'-9') (870-43022-11). This sample did not contain any target analytes; therefore, re-extraction and/or re-analysis was not performed.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**HPLC/IC**
No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**Metals**
Method 6020B: The matrix spike / matrix spike duplicate (MS/MSD) recoveries for preparation batch 860-287918 and analytical batch 860-288184 were outside control limits. Sample matrix interference is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.

No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

**General Chemistry**
No additional analytical or quality issues were noted, other than those described above or in the Definitions/ Glossary page.

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-01 (3'-4')

**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-1**
**Matrix: Solid**
**Percent Solids: 89.5**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000459 | U | 0.00183 | 0.000459 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromobenzene | <0.000737 | U | 0.00183 | 0.000737 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromochloromethane | <0.000578 | U | 0.00183 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromodichloromethane | <0.000598 | U | 0.00183 | 0.000598 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromoform | <0.000820 | U | 0.00183 | 0.000820 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Bromomethane | <0.00107 | U | 0.00458 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2-Butanone | <0.00706 | U | 0.0458 | 0.00706 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| n-Butylbenzene | <0.000307 | U | 0.00183 | 0.000307 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| sec-Butylbenzene | <0.000490 | U | 0.00183 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| tert-Butylbenzene | <0.000469 | U | 0.00183 | 0.000469 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Carbon tetrachloride | <0.000405 | U | 0.00183 | 0.000405 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chlorobenzene | <0.000464 | U | 0.00183 | 0.000464 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloroethane | <0.000415 | U | 0.00183 | 0.000415 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloroform | <0.000434 | U | 0.00183 | 0.000434 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Chloromethane | <0.000502 | U | 0.00183 | 0.000502 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2-Chlorotoluene | <0.000249 | U | 0.00183 | 0.000249 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 4-Chlorotoluene | <0.000556 | U | 0.00183 | 0.000556 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00128 | U | 0.00458 | 0.00128 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dibromochloromethane | <0.000159 | U | 0.00183 | 0.000159 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000996 | U | 0.00458 | 0.000996 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dibromoethane | <0.000566 | U | 0.00183 | 0.000566 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dibromomethane | <0.000287 | U | 0.00183 | 0.000287 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichlorobenzene | <0.000361 | U | 0.00183 | 0.000361 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3-Dichlorobenzene | <0.000457 | U | 0.00183 | 0.000457 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,4-Dichlorobenzene | <0.000454 | U | 0.00183 | 0.000454 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Dichlorodifluoromethane | <0.000498 | U | 0.00183 | 0.000498 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloroethane | <0.000519 | U | 0.00183 | 0.000519 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichloroethane | <0.000336 | U | 0.00183 | 0.000336 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloroethene | <0.000417 | U | 0.00183 | 0.000417 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| cis-1,2-Dichloroethene | <0.000463 | U | 0.00183 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| trans-1,2-Dichloroethene | <0.000423 | U | 0.00183 | 0.000423 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2-Dichloropropane | <0.000536 | U | 0.00183 | 0.000536 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3-Dichloropropane | <0.000306 | U | 0.00183 | 0.000306 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 2,2-Dichloropropane | <0.000542 | U | 0.00183 | 0.000542 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1-Dichloropropene | <0.000282 | U | 0.00183 | 0.000282 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| cis-1,3-Dichloropropene | <0.000566 | U | 0.00183 | 0.000566 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| trans-1,3-Dichloropropene | <0.000467 | U | 0.00183 | 0.000467 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Ethylbenzene | <0.000354 | U | 0.00183 | 0.000354 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Hexachlorobutadiene | <0.000504 | U | 0.00183 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Isopropylbenzene | <0.000345 | U | 0.00183 | 0.000345 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Methylene Chloride | <0.00121 | U | 0.00458 | 0.00121 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| MTBE | <0.000536 | U | 0.00183 | 0.000536 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Naphthalene | <0.000613 | U | 0.00183 | 0.000613 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| N-Propylbenzene | <0.000472 | U | 0.00183 | 0.000472 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Styrene | <0.000473 | U | 0.00183 | 0.000473 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000421 | U | 0.00183 | 0.000421 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000626 | U | 0.00183 | 0.000626 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Tetrachloroethylene | <0.000416 | U | 0.00183 | 0.000416 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Toluene | <0.000512 | U | 0.00183 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |

# Client Sample Results



## Client Sample ID: SB-01 (3'-4')

**Date Collected: 01/09/26 10:05**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-1

**Matrix: Solid**
**Percent Solids: 89.5**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000414 | U | 0.00183 | 0.000414 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,4-Trichlorobenzene | <0.000660 | U | 0.00183 | 0.000660 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,1-Trichloroethane | <0.000458 | U | 0.00183 | 0.000458 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,1,2-Trichloroethane | <0.000619 | U | 0.00183 | 0.000619 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Trichloroethene | <0.000422 | U | 0.00183 | 0.000422 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Trichlorofluoromethane | <0.000770 | U | 0.00183 | 0.000770 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,3-Trichloropropane | <0.000535 | U | 0.00183 | 0.000535 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,2,4-Trimethylbenzene | <0.000513 | U | 0.00183 | 0.000513 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| 1,3,5-Trimethylbenzene | <0.000507 | U | 0.00183 | 0.000507 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| **m,p-Xylenes** | **0.000657** | **J** | 0.00183 | 0.000209 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| o-Xylene | <0.000366 | U | 0.00183 | 0.000366 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| **Xylenes, Total** | **0.000657** | **J** | 0.00183 | 0.000366 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |
| Vinyl chloride | <0.00175 | U | 0.00458 | 0.00175 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 22:16 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *106* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *4-Bromofluorobenzene (Surr)* | *109* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *Dibromofluoromethane (Surr)* | *99* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |
| *Toluene-d8 (Surr)* | *106* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 22:16* | *1* |

### Method: SW846 8270E - Semivolatile Organic Compounds (GC-MS/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | <0.00222 | U | 0.0107 | 0.00222 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Acenaphthylene | <0.00154 | U | 0.0107 | 0.00154 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Anthracene | <0.00214 | U | 0.0107 | 0.00214 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[a]anthracene | <0.00163 | U | 0.00537 | 0.00163 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[a]pyrene | <0.00210 | U | 0.00537 | 0.00210 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[b]fluoranthene | <0.00230 | U | 0.0107 | 0.00230 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[g,h,i]perylene | <0.00205 | U | 0.0107 | 0.00205 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Benzo[k]fluoranthene | <0.00209 | U | 0.0107 | 0.00209 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Chrysene | <0.00195 | U | 0.0107 | 0.00195 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Dibenz(a,h)anthracene | <0.00217 | U | 0.00537 | 0.00217 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Fluoranthene | <0.00267 | U | 0.0107 | 0.00267 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Fluorene | <0.00205 | U | 0.0107 | 0.00205 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Indeno[1,2,3-cd]pyrene | <0.00297 | U | 0.0107 | 0.00297 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Naphthalene | <0.00308 | U | 0.0107 | 0.00308 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Phenanthrene | <0.00332 | U | 0.0107 | 0.00332 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |
| Pyrene | <0.00239 | U | 0.0107 | 0.00239 | mg/Kg | ☼ | 01/19/26 04:51 | 01/19/26 15:39 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *2-Fluorobiphenyl* | *73* | | *37 - 130* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |
| *Nitrobenzene-d5 (Surr)* | *58* | | *36 - 131* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |
| *p-Terphenyl-d14 (Surr)* | *93* | | *40 - 130* | *01/19/26 04:51* | *01/19/26 15:39* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| **>C12-C28 Range Hydrocarbons** | **35.5** | **J** | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| >C28-C35 Range Hydrocarbons | <21.6 | U | 43.2 | 21.6 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 00:04 | 1 |
| **Total Petroleum Hydrocarbons (C6-C35)** | **35.5** | **J** | 43.2 | 21.6 | mg/Kg | | | 01/14/26 00:04 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-01 (3'-4')
Lab Sample ID: 870-43022-1
Date Collected: 01/09/26 10:05
Matrix: Solid
Date Received: 01/10/26 09:15
Percent Solids: 89.5

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *117* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 00:04* | *1* |
| *o-Terphenyl (Surr)* | *120* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 00:04* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **5.71** | **J** | 11.2 | 5.58 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 20:57 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **36.8** | | 2.15 | 0.736 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:47 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.1** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.3** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-02 (3'-4')
Lab Sample ID: 870-43022-3
Date Collected: 01/09/26 11:00
Matrix: Solid
Date Received: 01/10/26 09:15
Percent Solids: 82.8

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000641 | U | 0.00255 | 0.000641 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromobenzene | <0.00103 | U | 0.00255 | 0.00103 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromochloromethane | <0.000806 | U | 0.00255 | 0.000806 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromodichloromethane | <0.000833 | U | 0.00255 | 0.000833 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromoform | <0.00114 | U | 0.00255 | 0.00114 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Bromomethane | <0.00150 | U | 0.00638 | 0.00150 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2-Butanone | <0.00985 | U | 0.0638 | 0.00985 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| n-Butylbenzene | <0.000427 | U | 0.00255 | 0.000427 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| sec-Butylbenzene | <0.000683 | U | 0.00255 | 0.000683 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| tert-Butylbenzene | <0.000655 | U | 0.00255 | 0.000655 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Carbon tetrachloride | <0.000565 | U | 0.00255 | 0.000565 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chlorobenzene | <0.000647 | U | 0.00255 | 0.000647 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloroethane | <0.000578 | U | 0.00255 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloroform | <0.000605 | U | 0.00255 | 0.000605 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Chloromethane | <0.000700 | U | 0.00255 | 0.000700 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2-Chlorotoluene | <0.000347 | U | 0.00255 | 0.000347 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 4-Chlorotoluene | <0.000776 | U | 0.00255 | 0.000776 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00178 | U | 0.00638 | 0.00178 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dibromochloromethane | <0.000222 | U | 0.00255 | 0.000222 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00139 | U | 0.00638 | 0.00139 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dibromoethane | <0.000789 | U | 0.00255 | 0.000789 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dibromomethane | <0.000401 | U | 0.00255 | 0.000401 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichlorobenzene | <0.000504 | U | 0.00255 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3-Dichlorobenzene | <0.000637 | U | 0.00255 | 0.000637 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,4-Dichlorobenzene | <0.000633 | U | 0.00255 | 0.000633 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Dichlorodifluoromethane | <0.000694 | U | 0.00255 | 0.000694 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1-Dichloroethane | <0.000723 | U | 0.00255 | 0.000723 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichloroethane | <0.000468 | U | 0.00255 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-02 (3'-4')
**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-3**
**Matrix: Solid**
**Percent Solids: 82.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,1-Dichloroethene | <0.000582 | U | 0.00255 | 0.000582 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| cis-1,2-Dichloroethene | <0.000646 | U | 0.00255 | 0.000646 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| trans-1,2-Dichloroethene | <0.000589 | U | 0.00255 | 0.000589 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2-Dichloropropane | <0.000748 | U | 0.00255 | 0.000748 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3-Dichloropropane | <0.000426 | U | 0.00255 | 0.000426 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 2,2-Dichloropropane | <0.000755 | U | 0.00255 | 0.000755 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1-Dichloropropene | <0.000393 | U | 0.00255 | 0.000393 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| cis-1,3-Dichloropropene | <0.000789 | U | 0.00255 | 0.000789 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| trans-1,3-Dichloropropene | <0.000651 | U | 0.00255 | 0.000651 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **Ethylbenzene** | **0.00127** | **J** | 0.00255 | 0.000494 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Hexachlorobutadiene | <0.000703 | U | 0.00255 | 0.000703 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Isopropylbenzene | <0.000481 | U | 0.00255 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Methylene Chloride | <0.00169 | U | 0.00638 | 0.00169 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| MTBE | <0.000748 | U | 0.00255 | 0.000748 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Naphthalene | <0.000855 | U | 0.00255 | 0.000855 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| N-Propylbenzene | <0.000658 | U | 0.00255 | 0.000658 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Styrene | <0.000660 | U | 0.00255 | 0.000660 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000587 | U | 0.00255 | 0.000587 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000873 | U | 0.00255 | 0.000873 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Tetrachloroethylene | <0.000581 | U | 0.00255 | 0.000581 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Toluene | <0.000715 | U | 0.00255 | 0.000715 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,3-Trichlorobenzene | <0.000577 | U | 0.00255 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,4-Trichlorobenzene | <0.000920 | U | 0.00255 | 0.000920 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,1-Trichloroethane | <0.000638 | U | 0.00255 | 0.000638 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,1,2-Trichloroethane | <0.000863 | U | 0.00255 | 0.000863 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Trichloroethene | <0.000588 | U | 0.00255 | 0.000588 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Trichlorofluoromethane | <0.00107 | U | 0.00255 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,3-Trichloropropane | <0.000746 | U | 0.00255 | 0.000746 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,2,4-Trimethylbenzene | <0.000716 | U | 0.00255 | 0.000716 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| 1,3,5-Trimethylbenzene | <0.000707 | U | 0.00255 | 0.000707 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **m,p-Xylenes** | **0.00748** | | 0.00255 | 0.000291 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **o-Xylene** | **0.00295** | | 0.00255 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| **Xylenes, Total** | **0.0104** | | 0.00255 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |
| Vinyl chloride | <0.00244 | U | 0.00638 | 0.00244 | mg/Kg | ☼ | 01/12/26 12:25 | 01/12/26 23:20 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *111* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *4-Bromofluorobenzene (Surr)* | *101* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 23:20* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| >C12-C28 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| >C28-C35 Range Hydrocarbons | <25.7 | U | 51.4 | 25.7 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:30 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <25.7 | U | 51.4 | 25.7 | mg/Kg | | | 01/14/26 01:30 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-02 (3'-4')

**Lab Sample ID: 870-43022-3**

**Date Collected: 01/09/26 11:00**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 82.8**

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *119* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:30* | *1* |
| *o-Terphenyl (Surr)* | *114* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:30* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.98 | U | 12.0 | 5.98 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:06 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **24.0** | | 2.32 | 0.795 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:43 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.6** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.9** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 88.9**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000397 | U | 0.00158 | 0.000397 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromobenzene | <0.000637 | U | 0.00158 | 0.000637 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromochloromethane | <0.000500 | U | 0.00158 | 0.000500 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromodichloromethane | <0.000516 | U | 0.00158 | 0.000516 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromoform | <0.000709 | U | 0.00158 | 0.000709 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Bromomethane | <0.000928 | U | 0.00395 | 0.000928 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2-Butanone | <0.00611 | U | 0.0395 | 0.00611 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| n-Butylbenzene | <0.000265 | U | 0.00158 | 0.000265 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| sec-Butylbenzene | <0.000423 | U | 0.00158 | 0.000423 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| tert-Butylbenzene | <0.000406 | U | 0.00158 | 0.000406 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Carbon tetrachloride | <0.000350 | U | 0.00158 | 0.000350 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chlorobenzene | <0.000401 | U | 0.00158 | 0.000401 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloroethane | <0.000358 | U | 0.00158 | 0.000358 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloroform | <0.000375 | U | 0.00158 | 0.000375 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Chloromethane | <0.000434 | U | 0.00158 | 0.000434 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2-Chlorotoluene | <0.000215 | U | 0.00158 | 0.000215 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 4-Chlorotoluene | <0.000481 | U | 0.00158 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00111 | U | 0.00395 | 0.00111 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dibromochloromethane | <0.000138 | U | 0.00158 | 0.000138 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000860 | U | 0.00395 | 0.000860 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dibromoethane | <0.000489 | U | 0.00158 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dibromomethane | <0.000248 | U | 0.00158 | 0.000248 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichlorobenzene | <0.000312 | U | 0.00158 | 0.000312 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3-Dichlorobenzene | <0.000395 | U | 0.00158 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,4-Dichlorobenzene | <0.000392 | U | 0.00158 | 0.000392 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Dichlorodifluoromethane | <0.000430 | U | 0.00158 | 0.000430 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1-Dichloroethane | <0.000448 | U | 0.00158 | 0.000448 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichloroethane | <0.000290 | U | 0.00158 | 0.000290 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |

# Client Sample Results



## Client Sample ID: SB-03 (3'-4')

**Lab Sample ID: 870-43022-5**

**Date Collected: 01/09/26 11:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 88.9**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,1-Dichloroethene | <0.000361 | U | 0.00158 | 0.000361 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| cis-1,2-Dichloroethene | <0.000400 | U | 0.00158 | 0.000400 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| trans-1,2-Dichloroethene | <0.000365 | U | 0.00158 | 0.000365 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2-Dichloropropane | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3-Dichloropropane | <0.000264 | U | 0.00158 | 0.000264 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 2,2-Dichloropropane | <0.000468 | U | 0.00158 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1-Dichloropropene | <0.000244 | U | 0.00158 | 0.000244 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| cis-1,3-Dichloropropene | <0.000489 | U | 0.00158 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| trans-1,3-Dichloropropene | <0.000403 | U | 0.00158 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Ethylbenzene | <0.000306 | U | 0.00158 | 0.000306 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Hexachlorobutadiene | <0.000436 | U | 0.00158 | 0.000436 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Isopropylbenzene | <0.000298 | U | 0.00158 | 0.000298 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Methylene Chloride | <0.00105 | U | 0.00395 | 0.00105 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| MTBE | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Naphthalene | <0.000530 | U | 0.00158 | 0.000530 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| N-Propylbenzene | <0.000408 | U | 0.00158 | 0.000408 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Styrene | <0.000409 | U | 0.00158 | 0.000409 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000364 | U | 0.00158 | 0.000364 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000541 | U | 0.00158 | 0.000541 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Tetrachloroethylene | <0.000360 | U | 0.00158 | 0.000360 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Toluene | <0.000443 | U | 0.00158 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,3-Trichlorobenzene | <0.000357 | U | 0.00158 | 0.000357 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,4-Trichlorobenzene | <0.000570 | U | 0.00158 | 0.000570 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,1-Trichloroethane | <0.000395 | U | 0.00158 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,1,2-Trichloroethane | <0.000535 | U | 0.00158 | 0.000535 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Trichloroethene | <0.000365 | U | 0.00158 | 0.000365 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Trichlorofluoromethane | <0.000666 | U | 0.00158 | 0.000666 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,3-Trichloropropane | <0.000463 | U | 0.00158 | 0.000463 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,2,4-Trimethylbenzene | <0.000444 | U | 0.00158 | 0.000444 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| 1,3,5-Trimethylbenzene | <0.000438 | U | 0.00158 | 0.000438 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| m,p-Xylenes | <0.000180 | U | 0.00158 | 0.000180 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| o-Xylene | <0.000316 | U | 0.00158 | 0.000316 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Xylenes, Total | <0.000316 | U | 0.00158 | 0.000316 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |
| Vinyl chloride | <0.00151 | U | 0.00395 | 0.00151 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:02 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *114* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |
| *Toluene-d8 (Surr)* | *98* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 00:02* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| >C12-C28 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| >C28-C35 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 01:51 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <21.5 | U | 43.0 | 21.5 | mg/Kg | | | 01/14/26 01:51 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

Lab Sample ID: 870-43022-5

Date Collected: 01/09/26 11:20
Date Received: 01/10/26 09:15

Matrix: Solid
Percent Solids: 88.9

| Surrogate | %Recovery | Qualifier | Limits | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *108* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:51* | *1* |
| *o-Terphenyl (Surr)* | *105* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 01:51* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **250** | | 11.2 | 5.58 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:15 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **30.0** | | 2.16 | 0.741 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:40 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.3** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.6** | | | | Celsius | | | 01/13/26 14:00 | 1 |

## Client Sample ID: SB-03 (5'-6')

Lab Sample ID: 870-43022-6

Date Collected: 01/09/26 11:30
Date Received: 01/10/26 09:15

Matrix: Solid
Percent Solids: 91.8

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000413 | U | 0.00164 | 0.000413 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| Toluene | <0.000460 | U | 0.00164 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **Ethylbenzene** | **0.000545** | **J** | 0.00164 | 0.000318 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **m,p-Xylenes** | **0.00268** | | 0.00164 | 0.000187 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **o-Xylene** | **0.00111** | **J** | 0.00164 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| **Xylenes, Total** | **0.00379** | | 0.00164 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |
| MTBE | <0.000482 | U | 0.00164 | 0.000482 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 00:23 | 1 |

| Surrogate | %Recovery | Qualifier | Limits | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *111* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *4-Bromofluorobenzene (Surr)* | *98* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 00:23* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| >C12-C28 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| >C28-C35 Range Hydrocarbons | <23.2 | U | 46.3 | 23.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:12 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <23.2 | U | 46.3 | 23.2 | mg/Kg | | | 01/14/26 02:12 | 1 |

| Surrogate | %Recovery | Qualifier | Limits | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *110* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:12* | *1* |
| *o-Terphenyl (Surr)* | *107* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:12* | *1* |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Client Sample ID: SB-04 (3'-4')

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-8

**Matrix: Solid**
**Percent Solids: 95.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000438 | U | 0.00175 | 0.000438 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromobenzene | <0.000703 | U | 0.00175 | 0.000703 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromochloromethane | <0.000552 | U | 0.00175 | 0.000552 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromodichloromethane | <0.000570 | U | 0.00175 | 0.000570 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromoform | <0.000783 | U | 0.00175 | 0.000783 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Bromomethane | <0.00103 | U | 0.00437 | 0.00103 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2-Butanone | <0.00674 | U | 0.0437 | 0.00674 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| n-Butylbenzene | <0.000293 | U | 0.00175 | 0.000293 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| sec-Butylbenzene | <0.000467 | U | 0.00175 | 0.000467 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| tert-Butylbenzene | <0.000448 | U | 0.00175 | 0.000448 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Carbon tetrachloride | <0.000387 | U | 0.00175 | 0.000387 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chlorobenzene | <0.000443 | U | 0.00175 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloroethane | <0.000396 | U | 0.00175 | 0.000396 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloroform | <0.000414 | U | 0.00175 | 0.000414 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Chloromethane | <0.000479 | U | 0.00175 | 0.000479 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2-Chlorotoluene | <0.000238 | U | 0.00175 | 0.000238 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 4-Chlorotoluene | <0.000531 | U | 0.00175 | 0.000531 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00122 | U | 0.00437 | 0.00122 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dibromochloromethane | <0.000152 | U | 0.00175 | 0.000152 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.000950 | U | 0.00437 | 0.000950 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dibromoethane | <0.000540 | U | 0.00175 | 0.000540 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dibromomethane | <0.000274 | U | 0.00175 | 0.000274 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichlorobenzene | <0.000345 | U | 0.00175 | 0.000345 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3-Dichlorobenzene | <0.000436 | U | 0.00175 | 0.000436 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,4-Dichlorobenzene | <0.000433 | U | 0.00175 | 0.000433 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Dichlorodifluoromethane | <0.000475 | U | 0.00175 | 0.000475 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloroethane | <0.000495 | U | 0.00175 | 0.000495 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichloroethane | <0.000321 | U | 0.00175 | 0.000321 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloroethene | <0.000398 | U | 0.00175 | 0.000398 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| cis-1,2-Dichloroethene | <0.000442 | U | 0.00175 | 0.000442 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| trans-1,2-Dichloroethene | <0.000403 | U | 0.00175 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2-Dichloropropane | <0.000512 | U | 0.00175 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3-Dichloropropane | <0.000292 | U | 0.00175 | 0.000292 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 2,2-Dichloropropane | <0.000517 | U | 0.00175 | 0.000517 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1-Dichloropropene | <0.000269 | U | 0.00175 | 0.000269 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| cis-1,3-Dichloropropene | <0.000540 | U | 0.00175 | 0.000540 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| trans-1,3-Dichloropropene | <0.000445 | U | 0.00175 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **Ethylbenzene** | **0.00169** | **J** | 0.00175 | 0.000338 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Hexachlorobutadiene | <0.000481 | U | 0.00175 | 0.000481 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Isopropylbenzene | <0.000329 | U | 0.00175 | 0.000329 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Methylene Chloride | <0.00115 | U | 0.00437 | 0.00115 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| MTBE | <0.000512 | U | 0.00175 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Naphthalene | <0.000585 | U | 0.00175 | 0.000585 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| N-Propylbenzene | <0.000451 | U | 0.00175 | 0.000451 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Styrene | <0.000452 | U | 0.00175 | 0.000452 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000402 | U | 0.00175 | 0.000402 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000597 | U | 0.00175 | 0.000597 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Tetrachloroethylene | <0.000397 | U | 0.00175 | 0.000397 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Toluene | <0.000489 | U | 0.00175 | 0.000489 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-04 (3'-4')

**Date Collected: 01/09/26 12:20**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-8

**Matrix: Solid**
**Percent Solids: 95.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000395 | U | 0.00175 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,4-Trichlorobenzene | <0.000630 | U | 0.00175 | 0.000630 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,1-Trichloroethane | <0.000437 | U | 0.00175 | 0.000437 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,1,2-Trichloroethane | <0.000590 | U | 0.00175 | 0.000590 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Trichloroethene | <0.000403 | U | 0.00175 | 0.000403 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Trichlorofluoromethane | <0.000735 | U | 0.00175 | 0.000735 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,3-Trichloropropane | <0.000511 | U | 0.00175 | 0.000511 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,2,4-Trimethylbenzene | <0.000490 | U | 0.00175 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| 1,3,5-Trimethylbenzene | <0.000484 | U | 0.00175 | 0.000484 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **m,p-Xylenes** | **0.00907** | | 0.00175 | 0.000199 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **o-Xylene** | **0.00383** | | 0.00175 | 0.000349 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| **Xylenes, Total** | **0.0129** | | 0.00175 | 0.000349 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |
| Vinyl chloride | <0.00167 | U | 0.00437 | 0.00167 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:06 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *114* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |
| *Toluene-d8 (Surr)* | *100* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 01:06* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| >C12-C28 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| >C28-C35 Range Hydrocarbons | <22.2 | U | 44.3 | 22.2 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 02:34 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <22.2 | U | 44.3 | 22.2 | mg/Kg | | | 01/14/26 02:34 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *127* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:34* | *1* |
| *o-Terphenyl (Surr)* | *121* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 02:34* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **5.74** | **J** | 10.4 | 5.22 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:24 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **31.1** | | 1.91 | 0.654 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:36 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.7** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.4** | | | | Celsius | | | 01/13/26 14:00 | 1 |

Eurofins Dallas

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (2'-3')

**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-10

**Matrix: Solid**
**Percent Solids: 86.0**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000559 | U | 0.00223 | 0.000559 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromobenzene | <0.000896 | U | 0.00223 | 0.000896 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromochloromethane | <0.000704 | U | 0.00223 | 0.000704 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromodichloromethane | <0.000727 | U | 0.00223 | 0.000727 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromoform | <0.000998 | U | 0.00223 | 0.000998 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Bromomethane | <0.00131 | U | 0.00557 | 0.00131 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2-Butanone | <0.00860 | U | 0.0557 | 0.00860 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| n-Butylbenzene | <0.000373 | U | 0.00223 | 0.000373 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| sec-Butylbenzene | <0.000596 | U | 0.00223 | 0.000596 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| tert-Butylbenzene | <0.000571 | U | 0.00223 | 0.000571 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Carbon tetrachloride | <0.000493 | U | 0.00223 | 0.000493 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chlorobenzene | <0.000565 | U | 0.00223 | 0.000565 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloroethane | <0.000504 | U | 0.00223 | 0.000504 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloroform | <0.000528 | U | 0.00223 | 0.000528 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Chloromethane | <0.000611 | U | 0.00223 | 0.000611 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2-Chlorotoluene | <0.000303 | U | 0.00223 | 0.000303 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 4-Chlorotoluene | <0.000677 | U | 0.00223 | 0.000677 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00156 | U | 0.00557 | 0.00156 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dibromochloromethane | <0.000194 | U | 0.00223 | 0.000194 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00121 | U | 0.00557 | 0.00121 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dibromoethane | <0.000688 | U | 0.00223 | 0.000688 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dibromomethane | <0.000350 | U | 0.00223 | 0.000350 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichlorobenzene | <0.000440 | U | 0.00223 | 0.000440 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3-Dichlorobenzene | <0.000556 | U | 0.00223 | 0.000556 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,4-Dichlorobenzene | <0.000552 | U | 0.00223 | 0.000552 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Dichlorodifluoromethane | <0.000606 | U | 0.00223 | 0.000606 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloroethane | <0.000631 | U | 0.00223 | 0.000631 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichloroethane | <0.000409 | U | 0.00223 | 0.000409 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloroethene | <0.000508 | U | 0.00223 | 0.000508 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| cis-1,2-Dichloroethene | <0.000563 | U | 0.00223 | 0.000563 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| trans-1,2-Dichloroethene | <0.000514 | U | 0.00223 | 0.000514 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2-Dichloropropane | <0.000652 | U | 0.00223 | 0.000652 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3-Dichloropropane | <0.000372 | U | 0.00223 | 0.000372 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 2,2-Dichloropropane | <0.000659 | U | 0.00223 | 0.000659 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1-Dichloropropene | <0.000343 | U | 0.00223 | 0.000343 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| cis-1,3-Dichloropropene | <0.000688 | U | 0.00223 | 0.000688 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| trans-1,3-Dichloropropene | <0.000568 | U | 0.00223 | 0.000568 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Ethylbenzene | <0.000431 | U | 0.00223 | 0.000431 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Hexachlorobutadiene | <0.000614 | U | 0.00223 | 0.000614 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Isopropylbenzene | <0.000420 | U | 0.00223 | 0.000420 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Methylene Chloride | <0.00147 | U | 0.00557 | 0.00147 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| MTBE | <0.000652 | U | 0.00223 | 0.000652 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Naphthalene | <0.000746 | U | 0.00223 | 0.000746 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| N-Propylbenzene | <0.000575 | U | 0.00223 | 0.000575 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Styrene | <0.000576 | U | 0.00223 | 0.000576 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000512 | U | 0.00223 | 0.000512 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000762 | U | 0.00223 | 0.000762 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Tetrachloroethylene | <0.000507 | U | 0.00223 | 0.000507 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Toluene | <0.000624 | U | 0.00223 | 0.000624 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (2'-3')
**Date Collected: 01/09/26 13:50**
**Date Received: 01/10/26 09:15**

## Lab Sample ID: 870-43022-10
**Matrix: Solid**
**Percent Solids: 86.0**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1,2,3-Trichlorobenzene | <0.000503 | U | 0.00223 | 0.000503 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,4-Trichlorobenzene | <0.000803 | U | 0.00223 | 0.000803 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,1-Trichloroethane | <0.000557 | U | 0.00223 | 0.000557 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,1,2-Trichloroethane | <0.000753 | U | 0.00223 | 0.000753 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Trichloroethene | <0.000513 | U | 0.00223 | 0.000513 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Trichlorofluoromethane | <0.000938 | U | 0.00223 | 0.000938 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,3-Trichloropropane | <0.000651 | U | 0.00223 | 0.000651 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,2,4-Trimethylbenzene | <0.000625 | U | 0.00223 | 0.000625 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| 1,3,5-Trimethylbenzene | <0.000617 | U | 0.00223 | 0.000617 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| m,p-Xylenes | <0.000254 | U | 0.00223 | 0.000254 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| o-Xylene | <0.000445 | U | 0.00223 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Xylenes, Total | <0.000445 | U | 0.00223 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |
| Vinyl chloride | <0.00213 | U | 0.00557 | 0.00213 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 01:48 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *112* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *4-Bromofluorobenzene (Surr)* | *107* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |
| *Toluene-d8 (Surr)* | *102* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 01:48* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| >C12-C28 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| >C28-C35 Range Hydrocarbons | <18.4 | U | 36.9 | 18.4 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:16 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <18.4 | U | 36.9 | 18.4 | mg/Kg | | | 01/14/26 03:16 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *111* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:16* | *1* |
| *o-Terphenyl (Surr)* | *111* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:16* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.82 | U | 11.6 | 5.82 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:33 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **148** | | 2.12 | 0.724 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:33 | 5 |

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **7.6** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.4** | | | | Celsius | | | 01/13/26 14:00 | 1 |

Eurofins Dallas

# Client Sample Results





## Client Sample ID: SB-05 (8'-9')
**Lab Sample ID: 870-43022-11**

**Date Collected: 01/09/26 13:55** **Matrix: Solid**
**Date Received: 01/10/26 09:15** **Percent Solids: 86.8**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000577 | U | 0.00230 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Toluene | <0.000644 | U | 0.00230 | 0.000644 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Ethylbenzene | <0.000445 | U | 0.00230 | 0.000445 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| m,p-Xylenes | <0.000262 | U | 0.00230 | 0.000262 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| o-Xylene | <0.000460 | U | 0.00230 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| Xylenes, Total | <0.000460 | U | 0.00230 | 0.000460 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |
| MTBE | <0.000674 | U | 0.00230 | 0.000674 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:09 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *119* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *Dibromofluoromethane (Surr)* | *104* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |
| *Toluene-d8 (Surr)* | *97* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:09* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| >C12-C28 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| >C28-C35 Range Hydrocarbons | <21.5 | U | 43.0 | 21.5 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:38 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <21.5 | U | 43.0 | 21.5 | mg/Kg | | | 01/14/26 03:38 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *132* | *X* | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:38* | *1* |
| *o-Terphenyl (Surr)* | *129* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:38* | *1* |

## Client Sample ID: SB-06 (2'-3')
**Lab Sample ID: 870-43022-12**

**Date Collected: 01/09/26 14:10** **Matrix: Solid**
**Date Received: 01/10/26 09:15** **Percent Solids: 86.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000555 | U | 0.00221 | 0.000555 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Toluene | <0.000620 | U | 0.00221 | 0.000620 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Ethylbenzene | <0.000428 | U | 0.00221 | 0.000428 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| m,p-Xylenes | <0.000252 | U | 0.00221 | 0.000252 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| o-Xylene | <0.000443 | U | 0.00221 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| Xylenes, Total | <0.000443 | U | 0.00221 | 0.000443 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |
| MTBE | <0.000648 | U | 0.00221 | 0.000648 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:31 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *117* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *4-Bromofluorobenzene (Surr)* | *98* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |
| *Toluene-d8 (Surr)* | *97* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:31* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |
| >C12-C28 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |
| >C28-C35 Range Hydrocarbons | <20.0 | U | 39.9 | 20.0 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 03:59 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001



## Client Sample ID: SB-06 (2'-3')

**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.2**

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Total Petroleum Hydrocarbons (C6-C35) | <20.0 | U | 39.9 | 20.0 | mg/Kg | | | 01/14/26 03:59 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *105* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:59* | *1* |
| *o-Terphenyl (Surr)* | *107* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 03:59* | *1* |

## Client Sample ID: SB-06 (6'-7')

**Lab Sample ID: 870-43022-13**
**Date Collected: 01/09/26 14:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 90.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000495 | U | 0.00197 | 0.000495 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromobenzene | <0.000794 | U | 0.00197 | 0.000794 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromochloromethane | <0.000624 | U | 0.00197 | 0.000624 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromodichloromethane | <0.000644 | U | 0.00197 | 0.000644 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromoform | <0.000884 | U | 0.00197 | 0.000884 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Bromomethane | <0.00116 | U | 0.00493 | 0.00116 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2-Butanone | <0.00762 | U | 0.0493 | 0.00762 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| n-Butylbenzene | <0.000331 | U | 0.00197 | 0.000331 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| sec-Butylbenzene | <0.000528 | U | 0.00197 | 0.000528 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| tert-Butylbenzene | <0.000506 | U | 0.00197 | 0.000506 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Carbon tetrachloride | <0.000437 | U | 0.00197 | 0.000437 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chlorobenzene | <0.000500 | U | 0.00197 | 0.000500 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloroethane | <0.000447 | U | 0.00197 | 0.000447 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloroform | <0.000468 | U | 0.00197 | 0.000468 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Chloromethane | <0.000542 | U | 0.00197 | 0.000542 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2-Chlorotoluene | <0.000268 | U | 0.00197 | 0.000268 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 4-Chlorotoluene | <0.000600 | U | 0.00197 | 0.000600 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00138 | U | 0.00493 | 0.00138 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dibromochloromethane | <0.000172 | U | 0.00197 | 0.000172 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00107 | U | 0.00493 | 0.00107 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dibromoethane | <0.000610 | U | 0.00197 | 0.000610 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dibromomethane | <0.000310 | U | 0.00197 | 0.000310 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichlorobenzene | <0.000390 | U | 0.00197 | 0.000390 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3-Dichlorobenzene | <0.000492 | U | 0.00197 | 0.000492 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,4-Dichlorobenzene | <0.000490 | U | 0.00197 | 0.000490 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Dichlorodifluoromethane | <0.000537 | U | 0.00197 | 0.000537 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloroethane | <0.000560 | U | 0.00197 | 0.000560 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichloroethane | <0.000362 | U | 0.00197 | 0.000362 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloroethene | <0.000450 | U | 0.00197 | 0.000450 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| cis-1,2-Dichloroethene | <0.000499 | U | 0.00197 | 0.000499 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| trans-1,2-Dichloroethene | <0.000456 | U | 0.00197 | 0.000456 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2-Dichloropropane | <0.000578 | U | 0.00197 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3-Dichloropropane | <0.000330 | U | 0.00197 | 0.000330 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 2,2-Dichloropropane | <0.000584 | U | 0.00197 | 0.000584 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1-Dichloropropene | <0.000304 | U | 0.00197 | 0.000304 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| cis-1,3-Dichloropropene | <0.000610 | U | 0.00197 | 0.000610 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| trans-1,3-Dichloropropene | <0.000503 | U | 0.00197 | 0.000503 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-06 (6'-7')

**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-13**
**Matrix: Solid**
**Percent Solids: 90.2**

### Method: SW846 8260C - Volatile Organic Compounds by GC/MS (Continued)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Ethylbenzene | <0.000382 | U | 0.00197 | 0.000382 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Hexachlorobutadiene | <0.000544 | U | 0.00197 | 0.000544 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Isopropylbenzene | <0.000372 | U | 0.00197 | 0.000372 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Methylene Chloride | <0.00130 | U | 0.00493 | 0.00130 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| MTBE | <0.000578 | U | 0.00197 | 0.000578 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Naphthalene | <0.000661 | U | 0.00197 | 0.000661 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| N-Propylbenzene | <0.000509 | U | 0.00197 | 0.000509 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Styrene | <0.000510 | U | 0.00197 | 0.000510 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000454 | U | 0.00197 | 0.000454 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000675 | U | 0.00197 | 0.000675 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Tetrachloroethylene | <0.000449 | U | 0.00197 | 0.000449 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Toluene | <0.000553 | U | 0.00197 | 0.000553 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,3-Trichlorobenzene | <0.000446 | U | 0.00197 | 0.000446 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,4-Trichlorobenzene | <0.000712 | U | 0.00197 | 0.000712 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,1-Trichloroethane | <0.000493 | U | 0.00197 | 0.000493 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,1,2-Trichloroethane | <0.000667 | U | 0.00197 | 0.000667 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Trichloroethene | <0.000455 | U | 0.00197 | 0.000455 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Trichlorofluoromethane | <0.000831 | U | 0.00197 | 0.000831 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,3-Trichloropropane | <0.000577 | U | 0.00197 | 0.000577 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,2,4-Trimethylbenzene | <0.000554 | U | 0.00197 | 0.000554 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| 1,3,5-Trimethylbenzene | <0.000547 | U | 0.00197 | 0.000547 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| m,p-Xylenes | <0.000225 | U | 0.00197 | 0.000225 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| o-Xylene | <0.000395 | U | 0.00197 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Xylenes, Total | <0.000395 | U | 0.00197 | 0.000395 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |
| Vinyl chloride | <0.00189 | U | 0.00493 | 0.00189 | mg/Kg | ☼ | 01/12/26 12:25 | 01/13/26 02:52 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *115* | | *73 - 131* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *4-Bromofluorobenzene (Surr)* | *99* | | *75 - 132* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *Dibromofluoromethane (Surr)* | *101* | | *65 - 135* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* | *01/12/26 12:25* | *01/13/26 02:52* | *1* |

### Method: TCEQ TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| >C12-C28 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| >C28-C35 Range Hydrocarbons | <26.8 | U | 53.6 | 26.8 | mg/Kg | ☼ | 01/12/26 15:58 | 01/14/26 04:20 | 1 |
| Total Petroleum Hydrocarbons (C6-C35) | <26.8 | U | 53.6 | 26.8 | mg/Kg | | | 01/14/26 04:20 | 1 |

| *Surrogate* | *%Recovery* | *Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *129* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 04:20* | *1* |
| *o-Terphenyl (Surr)* | *123* | | *70 - 130* | *01/12/26 15:58* | *01/14/26 04:20* | *1* |

### Method: EPA 300.0 - Anions, Ion Chromatography

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Chloride** | **184** | | 11.0 | 5.50 | mg/Kg | ☼ | 01/13/26 15:44 | 01/13/26 21:42 | 1 |

### Method: SW846 6020B - Metals (ICP/MS)

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **Barium** | **16.7** | | 2.01 | 0.690 | mg/Kg | ☼ | 01/13/26 17:29 | 01/14/26 13:30 | 5 |

# Client Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-06 (6'-7')

**Lab Sample ID: 870-43022-13**

**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Matrix: Solid**
**Percent Solids: 90.2**

### General Chemistry - Soluble

| Analyte | Result | Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| **soil pH measured in water at deg C (SW846 9045D)** | **9.0** | | | | S.U. | | | 01/13/26 14:00 | 1 |
| **Temperature (SW846 9045D)** | **20.6** | | | | Celsius | | | 01/13/26 14:00 | 1 |

# Surrogate Summary



1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | | | |
|---|---|---|---|---|---|
| | | DCA | BFB | DBFM | TOL |
| Lab Sample ID | Client Sample ID | (73-131) | (75-132) | (65-135) | (78-138) |
| 870-43022-1 | SB-01 (3'-4') | 106 | 109 | 99 | 106 |
| 870-43022-1 MS | SB-01 (3'-4') | 115 | 100 | 106 | 98 |
| 870-43022-3 | SB-02 (3'-4') | 111 | 101 | 103 | 99 |
| 870-43022-5 | SB-03 (3'-4') | 114 | 99 | 102 | 98 |
| 870-43022-6 | SB-03 (5'-6') | 111 | 98 | 102 | 99 |
| 870-43022-8 | SB-04 (3'-4') | 114 | 99 | 102 | 100 |
| 870-43022-10 | SB-05 (2'-3') | 112 | 107 | 102 | 102 |
| 870-43022-11 | SB-05 (8'-9') | 119 | 99 | 104 | 97 |
| 870-43022-12 | SB-06 (2'-3') | 117 | 98 | 103 | 97 |
| 870-43022-13 | SB-06 (6'-7') | 115 | 99 | 101 | 99 |
| LCS 870-34798/1-A | Lab Control Sample | 103 | 101 | 102 | 99 |
| LCSD 870-34798/2-A | Lab Control Sample Dup | 103 | 100 | 103 | 99 |
| MB 870-34798/3-A | Method Blank | 99 | 100 | 97 | 102 |

**Surrogate Legend**

DCA = 1,2-Dichloroethane-d4 (Surr)
BFB = 4-Bromofluorobenzene (Surr)
DBFM = Dibromofluoromethane (Surr)
TOL = Toluene-d8 (Surr)

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | | |
|---|---|---|---|---|
| | | FBP | NBZ | TPHd14 |
| Lab Sample ID | Client Sample ID | (37-130) | (36-131) | (40-130) |
| 860-122968-J-3-B MS | Matrix Spike | 68 | 75 | 77 |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | 71 | 78 | 80 |
| 870-43022-1 | SB-01 (3'-4') | 73 | 58 | 93 |
| LCS 860-288981/2-A | Lab Control Sample | 82 | 93 | 78 |
| LCSD 860-288981/3-A | Lab Control Sample Dup | 84 | 88 | 80 |
| LCSD 860-288981/5-A | Lab Control Sample Dup | 82 | 88 | 76 |
| MB 860-288981/1-A | Method Blank | 73 | 59 | 72 |

**Surrogate Legend**

FBP = 2-Fluorobiphenyl
NBZ = Nitrobenzene-d5 (Surr)
TPHd14 = p-Terphenyl-d14 (Surr)

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | |
|---|---|---|---|
| | | 1CO | OTPH |
| Lab Sample ID | Client Sample ID | (70-130) | (70-130) |
| 870-43022-1 | SB-01 (3'-4') | 117 | 120 |
| 870-43022-1 MS | SB-01 (3'-4') | 106 | 101 |
| 870-43022-1 MSD | SB-01 (3'-4') | 102 | 100 |
| 870-43022-3 | SB-02 (3'-4') | 119 | 114 |
| 870-43022-5 | SB-03 (3'-4') | 108 | 105 |
| 870-43022-6 | SB-03 (5'-6') | 110 | 107 |

# Surrogate Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Matrix: Solid** **Prep Type: Total/NA**

| | | Percent Surrogate Recovery (Acceptance Limits) | |
|---|---|---|---|
| | | 1CO | OTPH |
| Lab Sample ID | Client Sample ID | (70-130) | (70-130) |
| 870-43022-8 | SB-04 (3'-4') | 127 | 121 |
| 870-43022-10 | SB-05 (2'-3') | 111 | 111 |
| 870-43022-11 | SB-05 (8'-9') | 132 X | 129 |
| 870-43022-12 | SB-06 (2'-3') | 105 | 107 |
| 870-43022-13 | SB-06 (6'-7') | 129 | 123 |
| LCS 870-34808/1-A | Lab Control Sample | 103 | 101 |
| LCSD 870-34808/2-A | Lab Control Sample Dup | 104 | 101 |
| MB 870-34808/3-A | Method Blank | 106 | 103 |

**Surrogate Legend**

1CO = 1-Chlorooctane (Surr)
OTPH = o-Terphenyl (Surr)

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Lab Sample ID: MB 870-34798/3-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000500 | U | 0.00199 | 0.000500 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromobenzene | <0.000802 | U | 0.00199 | 0.000802 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromochloromethane | <0.000629 | U | 0.00199 | 0.000629 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromodichloromethane | <0.000650 | U | 0.00199 | 0.000650 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromoform | <0.000892 | U | 0.00199 | 0.000892 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Bromomethane | <0.00117 | U | 0.00498 | 0.00117 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2-Butanone | <0.00769 | U | 0.0498 | 0.00769 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| n-Butylbenzene | <0.000334 | U | 0.00199 | 0.000334 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| sec-Butylbenzene | <0.000533 | U | 0.00199 | 0.000533 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| tert-Butylbenzene | <0.000511 | U | 0.00199 | 0.000511 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Carbon tetrachloride | <0.000441 | U | 0.00199 | 0.000441 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chlorobenzene | <0.000505 | U | 0.00199 | 0.000505 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloroethane | <0.000451 | U | 0.00199 | 0.000451 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloroform | <0.000472 | U | 0.00199 | 0.000472 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Chloromethane | <0.000547 | U | 0.00199 | 0.000547 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2-Chlorotoluene | <0.000271 | U | 0.00199 | 0.000271 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 4-Chlorotoluene | <0.000606 | U | 0.00199 | 0.000606 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| p-Cymene (p-Isopropyltoluene) | <0.00139 | U | 0.00498 | 0.00139 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dibromochloromethane | <0.000173 | U | 0.00199 | 0.000173 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dibromo-3-Chloropropane | <0.00108 | U | 0.00498 | 0.00108 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dibromoethane | <0.000616 | U | 0.00199 | 0.000616 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dibromomethane | <0.000313 | U | 0.00199 | 0.000313 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichlorobenzene | <0.000393 | U | 0.00199 | 0.000393 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3-Dichlorobenzene | <0.000497 | U | 0.00199 | 0.000497 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,4-Dichlorobenzene | <0.000494 | U | 0.00199 | 0.000494 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Dichlorodifluoromethane | <0.000542 | U | 0.00199 | 0.000542 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloroethane | <0.000565 | U | 0.00199 | 0.000565 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichloroethane | <0.000366 | U | 0.00199 | 0.000366 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloroethene | <0.000454 | U | 0.00199 | 0.000454 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| cis-1,2-Dichloroethene | <0.000504 | U | 0.00199 | 0.000504 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| trans-1,2-Dichloroethene | <0.000460 | U | 0.00199 | 0.000460 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2-Dichloropropane | <0.000584 | U | 0.00199 | 0.000584 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3-Dichloropropane | <0.000333 | U | 0.00199 | 0.000333 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 2,2-Dichloropropane | <0.000590 | U | 0.00199 | 0.000590 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1-Dichloropropene | <0.000307 | U | 0.00199 | 0.000307 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| cis-1,3-Dichloropropene | <0.000616 | U | 0.00199 | 0.000616 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| trans-1,3-Dichloropropene | <0.000508 | U | 0.00199 | 0.000508 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Ethylbenzene | <0.000385 | U | 0.00199 | 0.000385 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Hexachlorobutadiene | <0.000549 | U | 0.00199 | 0.000549 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Isopropylbenzene | <0.000375 | U | 0.00199 | 0.000375 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Methylene Chloride | <0.00132 | U | 0.00498 | 0.00132 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| MTBE | <0.000584 | U | 0.00199 | 0.000584 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Naphthalene | <0.000667 | U | 0.00199 | 0.000667 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| N-Propylbenzene | <0.000514 | U | 0.00199 | 0.000514 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Styrene | <0.000515 | U | 0.00199 | 0.000515 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,1,2-Tetrachloroethane | <0.000458 | U | 0.00199 | 0.000458 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,2,2-Tetrachloroethane | <0.000681 | U | 0.00199 | 0.000681 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Tetrachloroethylene | <0.000453 | U | 0.00199 | 0.000453 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: MB 870-34798/3-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Toluene | <0.000558 | U | 0.00199 | 0.000558 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,3-Trichlorobenzene | <0.000450 | U | 0.00199 | 0.000450 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,4-Trichlorobenzene | <0.000718 | U | 0.00199 | 0.000718 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,1-Trichloroethane | <0.000498 | U | 0.00199 | 0.000498 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,1,2-Trichloroethane | <0.000673 | U | 0.00199 | 0.000673 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Trichloroethene | <0.000459 | U | 0.00199 | 0.000459 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Trichlorofluoromethane | <0.000839 | U | 0.00199 | 0.000839 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,3-Trichloropropane | <0.000583 | U | 0.00199 | 0.000583 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,2,4-Trimethylbenzene | <0.000559 | U | 0.00199 | 0.000559 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| 1,3,5-Trimethylbenzene | <0.000552 | U | 0.00199 | 0.000552 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| m,p-Xylenes | <0.000227 | U | 0.00199 | 0.000227 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| o-Xylene | <0.000398 | U | 0.00199 | 0.000398 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Xylenes, Total | <0.000398 | U | 0.00199 | 0.000398 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |
| Vinyl chloride | <0.00190 | U | 0.00498 | 0.00190 | mg/Kg | | 01/12/26 12:25 | 01/12/26 21:34 | 1 |

| *Surrogate* | *MB %Recovery* | *MB Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *99* | | *73 - 131* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *Dibromofluoromethane (Surr)* | *97* | | *65 - 135* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |
| *Toluene-d8 (Surr)* | *102* | | *78 - 138* | *01/12/26 12:25* | *01/12/26 21:34* | *1* |

**Lab Sample ID: LCS 870-34798/1-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Benzene | 0.0506 | 0.05131 | | mg/Kg | | 101 | 70 - 130 |
| Bromobenzene | 0.0506 | 0.05362 | | mg/Kg | | 106 | 70 - 130 |
| Bromochloromethane | 0.0505 | 0.05170 | | mg/Kg | | 102 | 70 - 130 |
| Bromodichloromethane | 0.0507 | 0.05642 | | mg/Kg | | 111 | 70 - 130 |
| Bromoform | 0.0507 | 0.05641 | | mg/Kg | | 111 | 70 - 130 |
| Bromomethane | 0.0504 | 0.05173 | | mg/Kg | | 103 | 70 - 130 |
| 2-Butanone | 0.503 | 0.4996 | | mg/Kg | | 99 | 70 - 130 |
| n-Butylbenzene | 0.0507 | 0.05645 | | mg/Kg | | 111 | 70 - 130 |
| sec-Butylbenzene | 0.0506 | 0.05618 | | mg/Kg | | 111 | 70 - 130 |
| tert-Butylbenzene | 0.0506 | 0.05529 | | mg/Kg | | 109 | 70 - 130 |
| Carbon tetrachloride | 0.0506 | 0.06290 | | mg/Kg | | 124 | 70 - 130 |
| Chlorobenzene | 0.0505 | 0.05230 | | mg/Kg | | 104 | 70 - 130 |
| Chloroethane | 0.0503 | 0.04873 | | mg/Kg | | 97 | 70 - 130 |
| Chloroform | 0.0504 | 0.05908 | | mg/Kg | | 117 | 70 - 130 |
| Chloromethane | 0.0505 | 0.04426 | | mg/Kg | | 88 | 70 - 130 |
| 2-Chlorotoluene | 0.0505 | 0.05379 | | mg/Kg | | 106 | 70 - 130 |
| 4-Chlorotoluene | 0.0506 | 0.05495 | | mg/Kg | | 109 | 70 - 130 |
| p-Cymene (p-Isopropyltoluene) | 0.0506 | 0.05566 | | mg/Kg | | 110 | 70 - 130 |
| Dibromochloromethane | 0.0506 | 0.05804 | | mg/Kg | | 115 | 70 - 130 |
| 1,2-Dibromo-3-Chloropropane | 0.0506 | 0.05935 | | mg/Kg | | 117 | 70 - 130 |
| 1,2-Dibromoethane | 0.0506 | 0.05368 | | mg/Kg | | 106 | 70 - 130 |
| Dibromomethane | 0.0505 | 0.05279 | | mg/Kg | | 104 | 70 - 130 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCS 870-34798/1-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| 1,2-Dichlorobenzene | 0.0504 | 0.05274 | | mg/Kg | | 105 | 70 - 130 |
| 1,3-Dichlorobenzene | 0.0505 | 0.05319 | | mg/Kg | | 105 | 70 - 130 |
| 1,4-Dichlorobenzene | 0.0507 | 0.05240 | | mg/Kg | | 103 | 70 - 130 |
| Dichlorodifluoromethane | 0.0502 | 0.06062 | | mg/Kg | | 121 | 70 - 130 |
| 1,1-Dichloroethane | 0.0505 | 0.05018 | | mg/Kg | | 99 | 70 - 130 |
| 1,2-Dichloroethane | 0.0506 | 0.05261 | | mg/Kg | | 104 | 70 - 130 |
| 1,1-Dichloroethene | 0.0507 | 0.05466 | | mg/Kg | | 108 | 70 - 130 |
| cis-1,2-Dichloroethene | 0.0505 | 0.05215 | | mg/Kg | | 103 | 70 - 130 |
| trans-1,2-Dichloroethene | 0.0507 | 0.05371 | | mg/Kg | | 106 | 70 - 130 |
| 1,2-Dichloropropane | 0.0505 | 0.04908 | | mg/Kg | | 97 | 70 - 130 |
| 1,3-Dichloropropane | 0.0506 | 0.05134 | | mg/Kg | | 101 | 70 - 130 |
| 2,2-Dichloropropane | 0.0506 | 0.05739 | | mg/Kg | | 113 | 70 - 130 |
| 1,1-Dichloropropene | 0.0506 | 0.05363 | | mg/Kg | | 106 | 70 - 130 |
| cis-1,3-Dichloropropene | 0.0503 | 0.05351 | | mg/Kg | | 106 | 70 - 130 |
| trans-1,3-Dichloropropene | 0.0505 | 0.05370 | | mg/Kg | | 106 | 70 - 130 |
| Ethylbenzene | 0.0506 | 0.05490 | | mg/Kg | | 109 | 70 - 130 |
| Hexachlorobutadiene | 0.0506 | 0.05429 | | mg/Kg | | 107 | 70 - 130 |
| Isopropylbenzene | 0.0505 | 0.05517 | | mg/Kg | | 109 | 70 - 130 |
| Methylene Chloride | 0.0505 | 0.05444 | | mg/Kg | | 108 | 70 - 130 |
| MTBE | 0.0505 | 0.04943 | | mg/Kg | | 98 | 70 - 130 |
| Naphthalene | 0.0506 | 0.05515 | | mg/Kg | | 109 | 70 - 130 |
| N-Propylbenzene | 0.0506 | 0.05523 | | mg/Kg | | 109 | 70 - 130 |
| Styrene | 0.0506 | 0.05450 | | mg/Kg | | 108 | 70 - 130 |
| 1,1,1,2-Tetrachloroethane | 0.0506 | 0.05612 | | mg/Kg | | 111 | 70 - 130 |
| 1,1,2,2-Tetrachloroethane | 0.0507 | 0.05229 | | mg/Kg | | 103 | 70 - 130 |
| Tetrachloroethylene | 0.0506 | 0.05756 | | mg/Kg | | 114 | 70 - 130 |
| Toluene | 0.0506 | 0.05130 | | mg/Kg | | 101 | 70 - 130 |
| 1,2,3-Trichlorobenzene | 0.0506 | 0.05395 | | mg/Kg | | 107 | 70 - 130 |
| 1,2,4-Trichlorobenzene | 0.0505 | 0.05678 | | mg/Kg | | 112 | 70 - 130 |
| 1,1,1-Trichloroethane | 0.0503 | 0.05650 | | mg/Kg | | 112 | 70 - 130 |
| 1,1,2-Trichloroethane | 0.0504 | 0.05062 | | mg/Kg | | 100 | 70 - 130 |
| Trichloroethene | 0.0507 | 0.05453 | | mg/Kg | | 108 | 70 - 130 |
| Trichlorofluoromethane | 0.0502 | 0.05976 | | mg/Kg | | 119 | 70 - 130 |
| 1,2,3-Trichloropropane | 0.0506 | 0.05262 | | mg/Kg | | 104 | 70 - 130 |
| 1,2,4-Trimethylbenzene | 0.0505 | 0.05634 | | mg/Kg | | 111 | 70 - 130 |
| 1,3,5-Trimethylbenzene | 0.0505 | 0.05532 | | mg/Kg | | 110 | 70 - 130 |
| m,p-Xylenes | 0.0502 | 0.05368 | | mg/Kg | | 107 | 70 - 130 |
| o-Xylene | 0.0505 | 0.05446 | | mg/Kg | | 108 | 70 - 130 |
| Vinyl chloride | 0.0505 | 0.05166 | | mg/Kg | | 102 | 70 - 130 |

| *Surrogate* | *LCS %Recovery* | *LCS Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *103* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *101* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *102* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* |

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCSD 870-34798/2-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | 0.0503 | 0.04450 | | mg/Kg | | 89 | 70 - 130 | 14 | 25 |
| Bromobenzene | 0.0503 | 0.04558 | | mg/Kg | | 91 | 70 - 130 | 16 | 25 |
| Bromochloromethane | 0.0502 | 0.04490 | | mg/Kg | | 89 | 70 - 130 | 14 | 25 |
| Bromodichloromethane | 0.0504 | 0.04818 | | mg/Kg | | 96 | 70 - 130 | 16 | 25 |
| Bromoform | 0.0503 | 0.04781 | | mg/Kg | | 95 | 70 - 130 | 16 | 25 |
| Bromomethane | 0.0501 | 0.05369 | | mg/Kg | | 107 | 70 - 130 | 4 | 25 |
| 2-Butanone | 0.500 | 0.4066 | | mg/Kg | | 81 | 70 - 130 | 21 | 25 |
| n-Butylbenzene | 0.0504 | 0.04839 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| sec-Butylbenzene | 0.0503 | 0.04816 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| tert-Butylbenzene | 0.0503 | 0.04757 | | mg/Kg | | 94 | 70 - 130 | 15 | 25 |
| Carbon tetrachloride | 0.0503 | 0.05382 | | mg/Kg | | 107 | 70 - 130 | 16 | 25 |
| Chlorobenzene | 0.0502 | 0.04512 | | mg/Kg | | 90 | 70 - 130 | 15 | 25 |
| Chloroethane | 0.0500 | 0.05358 | | mg/Kg | | 107 | 70 - 130 | 9 | 25 |
| Chloroform | 0.0501 | 0.05216 | | mg/Kg | | 104 | 70 - 130 | 12 | 25 |
| Chloromethane | 0.0502 | 0.04900 | | mg/Kg | | 98 | 70 - 130 | 10 | 25 |
| 2-Chlorotoluene | 0.0502 | 0.04604 | | mg/Kg | | 92 | 70 - 130 | 16 | 25 |
| 4-Chlorotoluene | 0.0503 | 0.04655 | | mg/Kg | | 93 | 70 - 130 | 17 | 25 |
| p-Cymene (p-Isopropyltoluene) | 0.0503 | 0.04806 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| Dibromochloromethane | 0.0502 | 0.04853 | | mg/Kg | | 97 | 70 - 130 | 18 | 25 |
| 1,2-Dibromo-3-Chloropropane | 0.0503 | 0.04775 | | mg/Kg | | 95 | 70 - 130 | 22 | 25 |
| 1,2-Dibromoethane | 0.0503 | 0.04522 | | mg/Kg | | 90 | 70 - 130 | 17 | 25 |
| Dibromomethane | 0.0502 | 0.04500 | | mg/Kg | | 90 | 70 - 130 | 16 | 25 |
| 1,2-Dichlorobenzene | 0.0501 | 0.04463 | | mg/Kg | | 89 | 70 - 130 | 17 | 25 |
| 1,3-Dichlorobenzene | 0.0502 | 0.04566 | | mg/Kg | | 91 | 70 - 130 | 15 | 25 |
| 1,4-Dichlorobenzene | 0.0503 | 0.04463 | | mg/Kg | | 89 | 70 - 130 | 16 | 25 |
| Dichlorodifluoromethane | 0.0499 | 0.06346 | | mg/Kg | | 127 | 70 - 130 | 5 | 25 |
| 1,1-Dichloroethane | 0.0502 | 0.04414 | | mg/Kg | | 88 | 70 - 130 | 13 | 25 |
| 1,2-Dichloroethane | 0.0503 | 0.04584 | | mg/Kg | | 91 | 70 - 130 | 14 | 25 |
| 1,1-Dichloroethene | 0.0504 | 0.04747 | | mg/Kg | | 94 | 70 - 130 | 14 | 25 |
| cis-1,2-Dichloroethene | 0.0502 | 0.04518 | | mg/Kg | | 90 | 70 - 130 | 14 | 25 |
| trans-1,2-Dichloroethene | 0.0504 | 0.04726 | | mg/Kg | | 94 | 70 - 130 | 13 | 25 |
| 1,2-Dichloropropane | 0.0502 | 0.04290 | | mg/Kg | | 85 | 70 - 130 | 13 | 25 |
| 1,3-Dichloropropane | 0.0503 | 0.04388 | | mg/Kg | | 87 | 70 - 130 | 16 | 25 |
| 2,2-Dichloropropane | 0.0503 | 0.05013 | | mg/Kg | | 100 | 70 - 130 | 13 | 25 |
| 1,1-Dichloropropene | 0.0503 | 0.04663 | | mg/Kg | | 93 | 70 - 130 | 14 | 25 |
| cis-1,3-Dichloropropene | 0.0500 | 0.04530 | | mg/Kg | | 91 | 70 - 130 | 17 | 25 |
| trans-1,3-Dichloropropene | 0.0502 | 0.04601 | | mg/Kg | | 92 | 70 - 130 | 15 | 25 |
| Ethylbenzene | 0.0503 | 0.04731 | | mg/Kg | | 94 | 70 - 130 | 15 | 25 |
| Hexachlorobutadiene | 0.0503 | 0.04640 | | mg/Kg | | 92 | 70 - 130 | 16 | 25 |
| Isopropylbenzene | 0.0502 | 0.04777 | | mg/Kg | | 95 | 70 - 130 | 14 | 25 |
| Methylene Chloride | 0.0502 | 0.04777 | | mg/Kg | | 95 | 70 - 130 | 13 | 25 |
| MTBE | 0.0502 | 0.04231 | | mg/Kg | | 84 | 70 - 130 | 16 | 25 |
| Naphthalene | 0.0503 | 0.04478 | | mg/Kg | | 89 | 70 - 130 | 21 | 25 |
| N-Propylbenzene | 0.0503 | 0.04701 | | mg/Kg | | 93 | 70 - 130 | 16 | 25 |
| Styrene | 0.0503 | 0.04674 | | mg/Kg | | 93 | 70 - 130 | 15 | 25 |
| 1,1,1,2-Tetrachloroethane | 0.0502 | 0.04809 | | mg/Kg | | 96 | 70 - 130 | 15 | 25 |
| 1,1,2,2-Tetrachloroethane | 0.0504 | 0.04302 | | mg/Kg | | 85 | 70 - 130 | 19 | 25 |
| Tetrachloroethylene | 0.0503 | 0.04900 | | mg/Kg | | 97 | 70 - 130 | 16 | 25 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: LCSD 870-34798/2-A**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | | | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Toluene | | | 0.0503 | 0.04377 | | mg/Kg | | 87 | 70 - 130 | 16 | 25 |
| 1,2,3-Trichlorobenzene | | | 0.0503 | 0.04458 | | mg/Kg | | 89 | 70 - 130 | 19 | 25 |
| 1,2,4-Trichlorobenzene | | | 0.0502 | 0.04815 | | mg/Kg | | 96 | 70 - 130 | 16 | 25 |
| 1,1,1-Trichloroethane | | | 0.0500 | 0.04909 | | mg/Kg | | 98 | 70 - 130 | 14 | 25 |
| 1,1,2-Trichloroethane | | | 0.0501 | 0.04336 | | mg/Kg | | 86 | 70 - 130 | 15 | 25 |
| Trichloroethene | | | 0.0504 | 0.04709 | | mg/Kg | | 93 | 70 - 130 | 15 | 25 |
| Trichlorofluoromethane | | | 0.0499 | 0.06317 | | mg/Kg | | 127 | 70 - 130 | 6 | 25 |
| 1,2,3-Trichloropropane | | | 0.0503 | 0.04330 | | mg/Kg | | 86 | 70 - 130 | 19 | 25 |
| 1,2,4-Trimethylbenzene | | | 0.0502 | 0.04772 | | mg/Kg | | 95 | 70 - 130 | 17 | 25 |
| 1,3,5-Trimethylbenzene | | | 0.0502 | 0.04698 | | mg/Kg | | 94 | 70 - 130 | 16 | 25 |
| m,p-Xylenes | | | 0.0499 | 0.04602 | | mg/Kg | | 92 | 70 - 130 | 15 | 25 |
| o-Xylene | | | 0.0502 | 0.04652 | | mg/Kg | | 93 | 70 - 130 | 16 | 25 |
| Vinyl chloride | | | 0.0502 | 0.05723 | | mg/Kg | | 114 | 70 - 130 | 10 | 25 |

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *103* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *103* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *99* | | *78 - 138* |

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | <0.000459 | U | 0.0501 | 0.05164 | | mg/Kg | ☼ | 103 | 70 - 130 |
| Bromobenzene | <0.000737 | U | 0.0501 | 0.05252 | | mg/Kg | ☼ | 105 | 70 - 130 |
| Bromochloromethane | <0.000578 | U | 0.0501 | 0.05894 | | mg/Kg | ☼ | 118 | 70 - 130 |
| Bromodichloromethane | <0.000598 | U | 0.0503 | 0.05945 | | mg/Kg | ☼ | 118 | 70 - 130 |
| Bromoform | <0.000820 | U | 0.0502 | 0.06468 | | mg/Kg | ☼ | 129 | 70 - 130 |
| Bromomethane | <0.00107 | U | 0.0500 | 0.05398 | | mg/Kg | ☼ | 108 | 70 - 130 |
| 2-Butanone | <0.00706 | U | 0.498 | 0.5915 | | mg/Kg | ☼ | 119 | 70 - 130 |
| n-Butylbenzene | <0.000307 | U | 0.0502 | 0.04366 | | mg/Kg | ☼ | 87 | 70 - 130 |
| sec-Butylbenzene | <0.000490 | U | 0.0502 | 0.04813 | | mg/Kg | ☼ | 96 | 70 - 130 |
| tert-Butylbenzene | <0.000469 | U | 0.0502 | 0.04981 | | mg/Kg | ☼ | 99 | 70 - 130 |
| Carbon tetrachloride | <0.000405 | U | 0.0502 | 0.06029 | | mg/Kg | ☼ | 120 | 70 - 130 |
| Chlorobenzene | <0.000464 | U | 0.0501 | 0.05175 | | mg/Kg | ☼ | 103 | 70 - 130 |
| Chloroethane | <0.000415 | U | 0.0498 | 0.04536 | | mg/Kg | ☼ | 91 | 70 - 130 |
| Chloroform | <0.000434 | U | 0.0500 | 0.06164 | | mg/Kg | ☼ | 123 | 70 - 130 |
| Chloromethane | <0.000502 | U | 0.0501 | 0.04151 | | mg/Kg | ☼ | 83 | 70 - 130 |
| 2-Chlorotoluene | <0.000249 | U | 0.0501 | 0.04971 | | mg/Kg | ☼ | 99 | 70 - 130 |
| 4-Chlorotoluene | <0.000556 | U | 0.0501 | 0.04924 | | mg/Kg | ☼ | 98 | 70 - 130 |
| p-Cymene (p-Isopropyltoluene) | <0.00128 | U | 0.0501 | 0.04728 | | mg/Kg | ☼ | 94 | 70 - 130 |
| Dibromochloromethane | <0.000159 | U | 0.0501 | 0.06310 | | mg/Kg | ☼ | 126 | 70 - 130 |
| 1,2-Dibromo-3-Chloropropane | <0.000996 | U | 0.0501 | 0.07196 | N1 | mg/Kg | ☼ | 144 | 70 - 130 |
| 1,2-Dibromoethane | <0.000566 | U | 0.0501 | 0.06191 | | mg/Kg | ☼ | 123 | 70 - 130 |
| Dibromomethane | <0.000287 | U | 0.0501 | 0.06090 | | mg/Kg | ☼ | 122 | 70 - 130 |
| 1,2-Dichlorobenzene | <0.000361 | U | 0.0500 | 0.04916 | | mg/Kg | ☼ | 98 | 70 - 130 |

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34789**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34798**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| 1,3-Dichlorobenzene | <0.000457 | U | 0.0501 | 0.04701 | | mg/Kg | ☼ | 94 | 70 - 130 |
| 1,4-Dichlorobenzene | <0.000454 | U | 0.0502 | 0.04622 | | mg/Kg | ☼ | 92 | 70 - 130 |
| Dichlorodifluoromethane | <0.000498 | U | 0.0498 | 0.04997 | | mg/Kg | ☼ | 100 | 70 - 130 |
| 1,1-Dichloroethane | <0.000519 | U | 0.0500 | 0.05242 | | mg/Kg | ☼ | 105 | 70 - 130 |
| 1,2-Dichloroethane | <0.000336 | U | 0.0502 | 0.05978 | | mg/Kg | ☼ | 119 | 70 - 130 |
| 1,1-Dichloroethene | <0.000417 | U | 0.0503 | 0.05498 | | mg/Kg | ☼ | 109 | 70 - 130 |
| cis-1,2-Dichloroethene | <0.000463 | U | 0.0501 | 0.05484 | | mg/Kg | ☼ | 110 | 70 - 130 |
| trans-1,2-Dichloroethene | <0.000423 | U | 0.0503 | 0.05424 | | mg/Kg | ☼ | 108 | 70 - 130 |
| 1,2-Dichloropropane | <0.000536 | U | 0.0501 | 0.05176 | | mg/Kg | ☼ | 103 | 70 - 130 |
| 1,3-Dichloropropane | <0.000306 | U | 0.0502 | 0.05877 | | mg/Kg | ☼ | 117 | 70 - 130 |
| 2,2-Dichloropropane | <0.000542 | U | 0.0502 | 0.05600 | | mg/Kg | ☼ | 112 | 70 - 130 |
| 1,1-Dichloropropene | <0.000282 | U | 0.0502 | 0.05382 | | mg/Kg | ☼ | 107 | 70 - 130 |
| cis-1,3-Dichloropropene | <0.000566 | U | 0.0498 | 0.05614 | | mg/Kg | ☼ | 113 | 70 - 130 |
| trans-1,3-Dichloropropene | <0.000467 | U | 0.0501 | 0.05729 | | mg/Kg | ☼ | 114 | 70 - 130 |
| Ethylbenzene | <0.000354 | U | 0.0501 | 0.05322 | | mg/Kg | ☼ | 106 | 70 - 130 |
| Hexachlorobutadiene | <0.000504 | U | 0.0502 | 0.03236 | N1 | mg/Kg | ☼ | 64 | 70 - 130 |
| Isopropylbenzene | <0.000345 | U | 0.0501 | 0.05254 | | mg/Kg | ☼ | 105 | 70 - 130 |
| Methylene Chloride | <0.00121 | U | 0.0501 | 0.05932 | | mg/Kg | ☼ | 118 | 70 - 130 |
| MTBE | <0.000536 | U | 0.0501 | 0.05975 | | mg/Kg | ☼ | 119 | 70 - 130 |
| Naphthalene | <0.000613 | U | 0.0502 | 0.05327 | | mg/Kg | ☼ | 106 | 70 - 130 |
| N-Propylbenzene | <0.000472 | U | 0.0501 | 0.04956 | | mg/Kg | ☼ | 99 | 70 - 130 |
| Styrene | <0.000473 | U | 0.0502 | 0.05384 | | mg/Kg | ☼ | 107 | 70 - 130 |
| 1,1,1,2-Tetrachloroethane | <0.000421 | U | 0.0501 | 0.05805 | | mg/Kg | ☼ | 116 | 70 - 130 |
| 1,1,2,2-Tetrachloroethane | <0.000626 | U | 0.0502 | 0.05970 | | mg/Kg | ☼ | 119 | 70 - 130 |
| Tetrachloroethylene | <0.000416 | U | 0.0502 | 0.05358 | | mg/Kg | ☼ | 107 | 70 - 130 |
| Toluene | <0.000512 | U | 0.0502 | 0.04981 | | mg/Kg | ☼ | 99 | 70 - 130 |
| 1,2,3-Trichlorobenzene | <0.000414 | U | 0.0501 | 0.03724 | | mg/Kg | ☼ | 74 | 70 - 130 |
| 1,2,4-Trichlorobenzene | <0.000660 | U | 0.0501 | 0.03890 | | mg/Kg | ☼ | 78 | 70 - 130 |
| 1,1,1-Trichloroethane | <0.000458 | U | 0.0499 | 0.05708 | | mg/Kg | ☼ | 114 | 70 - 130 |
| 1,1,2-Trichloroethane | <0.000619 | U | 0.0500 | 0.05792 | | mg/Kg | ☼ | 116 | 70 - 130 |
| Trichloroethene | <0.000422 | U | 0.0503 | 0.05469 | | mg/Kg | ☼ | 109 | 70 - 130 |
| Trichlorofluoromethane | <0.000770 | U | 0.0498 | 0.05611 | | mg/Kg | ☼ | 113 | 70 - 130 |
| 1,2,3-Trichloropropane | <0.000535 | U | 0.0502 | 0.06113 | | mg/Kg | ☼ | 122 | 70 - 130 |
| 1,2,4-Trimethylbenzene | <0.000513 | U | 0.0501 | 0.05004 | | mg/Kg | ☼ | 100 | 70 - 130 |
| 1,3,5-Trimethylbenzene | <0.000507 | U | 0.0501 | 0.04923 | | mg/Kg | ☼ | 98 | 70 - 130 |
| m,p-Xylenes | 0.000657 | J | 0.0498 | 0.05115 | | mg/Kg | ☼ | 101 | 70 - 130 |
| o-Xylene | <0.000366 | U | 0.0501 | 0.05314 | | mg/Kg | ☼ | 106 | 70 - 130 |
| Vinyl chloride | <0.00175 | U | 0.0500 | 0.04658 | | mg/Kg | ☼ | 93 | 70 - 130 |

| *Surrogate* | *MS %Recovery* | *MS Qualifier* | *Limits* |
|---|---|---|---|
| *1,2-Dichloroethane-d4 (Surr)* | *115* | | *73 - 131* |
| *4-Bromofluorobenzene (Surr)* | *100* | | *75 - 132* |
| *Dibromofluoromethane (Surr)* | *106* | | *65 - 135* |
| *Toluene-d8 (Surr)* | *98* | | *78 - 138* |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Lab Sample ID: MB 860-288981/1-A**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | <0.00207 | U | 0.0100 | 0.00207 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Acenaphthylene | <0.00143 | U | 0.0100 | 0.00143 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Anthracene | <0.00199 | U | 0.0100 | 0.00199 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[a]anthracene | <0.00151 | U | 0.00500 | 0.00151 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[a]pyrene | <0.00195 | U | 0.00500 | 0.00195 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[b]fluoranthene | <0.00214 | U | 0.0100 | 0.00214 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[g,h,i]perylene | <0.00191 | U | 0.0100 | 0.00191 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Benzo[k]fluoranthene | <0.00195 | U | 0.0100 | 0.00195 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Chrysene | <0.00182 | U | 0.0100 | 0.00182 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Dibenz(a,h)anthracene | <0.00202 | U | 0.00500 | 0.00202 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Fluoranthene | <0.00248 | U | 0.0100 | 0.00248 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Fluorene | <0.00191 | U | 0.0100 | 0.00191 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Indeno[1,2,3-cd]pyrene | <0.00276 | U | 0.0100 | 0.00276 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Naphthalene | <0.00286 | U | 0.0100 | 0.00286 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Phenanthrene | <0.00309 | U | 0.0100 | 0.00309 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |
| Pyrene | <0.00223 | U | 0.0100 | 0.00223 | mg/Kg | | 01/19/26 04:51 | 01/20/26 15:28 | 1 |

| *Surrogate* | *MB %Recovery* | *MB Qualifier* | *Limits* | *Prepared* | *Analyzed* | *Dil Fac* |
|---|---|---|---|---|---|---|
| *2-Fluorobiphenyl* | *73* | | *37 - 130* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |
| *Nitrobenzene-d5 (Surr)* | *59* | | *36 - 131* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |
| *p-Terphenyl-d14 (Surr)* | *72* | | *40 - 130* | *01/19/26 04:51* | *01/20/26 15:28* | *1* |

**Lab Sample ID: LCS 860-288981/2-A**
**Matrix: Solid**
**Analysis Batch: 289133**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.100 | 0.08470 | | mg/Kg | | 85 | 60 - 130 |
| Acenaphthylene | 0.100 | 0.07639 | | mg/Kg | | 76 | 41 - 130 |
| Anthracene | 0.100 | 0.08005 | | mg/Kg | | 80 | 45 - 130 |
| Benzo[a]anthracene | 0.100 | 0.08655 | | mg/Kg | | 87 | 42 - 130 |
| Benzo[a]pyrene | 0.100 | 0.08098 | | mg/Kg | | 81 | 42 - 130 |
| Benzo[b]fluoranthene | 0.100 | 0.09297 | | mg/Kg | | 93 | 50 - 130 |
| Benzo[g,h,i]perylene | 0.100 | 0.09717 | | mg/Kg | | 97 | 40 - 130 |
| Benzo[k]fluoranthene | 0.100 | 0.1021 | | mg/Kg | | 102 | 40 - 130 |
| Chrysene | 0.100 | 0.08728 | | mg/Kg | | 87 | 43 - 130 |
| Dibenz(a,h)anthracene | 0.100 | 0.1002 | | mg/Kg | | 100 | 44 - 130 |
| Fluoranthene | 0.100 | 0.08295 | | mg/Kg | | 83 | 55 - 130 |
| Fluorene | 0.100 | 0.08243 | | mg/Kg | | 82 | 50 - 130 |
| Indeno[1,2,3-cd]pyrene | 0.100 | 0.08565 | | mg/Kg | | 86 | 43 - 130 |
| Naphthalene | 0.100 | 0.07984 | | mg/Kg | | 80 | 49 - 130 |
| Phenanthrene | 0.100 | 0.07969 | | mg/Kg | | 80 | 50 - 130 |
| Pyrene | 0.100 | 0.08562 | | mg/Kg | | 86 | 55 - 130 |

| *Surrogate* | *LCS %Recovery* | *LCS Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *82* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *93* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *78* | | *40 - 130* |

# QC Sample Results

Client: Whitehead ES LLC | Job ID: 870-43022-1
Project/Site: Cresson Moon Props | SDG: 379.001

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS)

**Lab Sample ID: LCSD 860-288981/3-A** | **Client Sample ID: Lab Control Sample Dup**
**Matrix: Solid** | **Prep Type: Total/NA**
**Analysis Batch: 289133** | **Prep Batch: 288981**

| Analyte | | | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | | | 0.100 | 0.08790 | | mg/Kg | | 88 | 60 - 130 | 4 | 30 |
| Acenaphthylene | | | 0.100 | 0.07510 | | mg/Kg | | 75 | 41 - 130 | 2 | 30 |
| Anthracene | | | 0.100 | 0.08511 | | mg/Kg | | 85 | 45 - 130 | 6 | 30 |
| Benzo[a]anthracene | | | 0.100 | 0.08742 | | mg/Kg | | 87 | 42 - 130 | 1 | 30 |
| Benzo[a]pyrene | | | 0.100 | 0.07672 | | mg/Kg | | 77 | 42 - 130 | 5 | 30 |
| Benzo[b]fluoranthene | | | 0.100 | 0.08811 | | mg/Kg | | 88 | 50 - 130 | 5 | 30 |
| Benzo[g,h,i]perylene | | | 0.100 | 0.09383 | | mg/Kg | | 94 | 40 - 130 | 3 | 30 |
| Benzo[k]fluoranthene | | | 0.100 | 0.09826 | | mg/Kg | | 98 | 40 - 130 | 4 | 30 |
| Chrysene | | | 0.100 | 0.08778 | | mg/Kg | | 88 | 43 - 130 | 1 | 30 |
| Dibenz(a,h)anthracene | | | 0.100 | 0.09688 | | mg/Kg | | 97 | 44 - 130 | 3 | 30 |
| Fluoranthene | | | 0.100 | 0.08415 | | mg/Kg | | 84 | 55 - 130 | 1 | 30 |
| Fluorene | | | 0.100 | 0.08286 | | mg/Kg | | 83 | 50 - 130 | 1 | 30 |
| Indeno[1,2,3-cd]pyrene | | | 0.100 | 0.08840 | | mg/Kg | | 88 | 43 - 130 | 3 | 30 |
| Naphthalene | | | 0.100 | 0.07892 | | mg/Kg | | 79 | 49 - 130 | 1 | 30 |
| Phenanthrene | | | 0.100 | 0.08269 | | mg/Kg | | 83 | 50 - 130 | 4 | 30 |
| Pyrene | | | 0.100 | 0.08551 | | mg/Kg | | 86 | 55 - 130 | 0 | 30 |

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *84* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *88* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *80* | | *40 - 130* |

**Lab Sample ID: LCSD 860-288981/5-A** | **Client Sample ID: Lab Control Sample Dup**
**Matrix: Solid** | **Prep Type: Total/NA**
**Analysis Batch: 289133** | **Prep Batch: 288981**

| *Surrogate* | *LCSD %Recovery* | *LCSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *82* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *88* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *76* | | *40 - 130* |

**Lab Sample ID: 860-122968-J-3-B MS** | **Client Sample ID: Matrix Spike**
**Matrix: Solid** | **Prep Type: Total/NA**
**Analysis Batch: 289497** | **Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.00539 | J | 0.106 | 0.09342 | | mg/Kg | ☼ | 83 | 60 - 130 |
| Acenaphthylene | 0.00230 | J | 0.106 | 0.09518 | | mg/Kg | ☼ | 88 | 41 - 130 |
| Anthracene | 0.0102 | J | 0.106 | 0.09541 | | mg/Kg | ☼ | 81 | 45 - 130 |
| Benzo[a]anthracene | 0.0249 | | 0.106 | 0.1151 | | mg/Kg | ☼ | 85 | 42 - 130 |
| Benzo[a]pyrene | 0.0149 | | 0.106 | 0.1010 | | mg/Kg | ☼ | 82 | 42 - 130 |
| Benzo[b]fluoranthene | 0.0129 | | 0.106 | 0.1045 | | mg/Kg | ☼ | 87 | 50 - 130 |
| Benzo[g,h,i]perylene | 0.00987 | J | 0.106 | 0.1027 | | mg/Kg | ☼ | 88 | 40 - 130 |
| Benzo[k]fluoranthene | 0.00394 | J | 0.106 | 0.09868 | | mg/Kg | ☼ | 90 | 40 - 130 |
| Chrysene | 0.0418 | | 0.106 | 0.09997 | | mg/Kg | ☼ | 55 | 43 - 130 |
| Dibenz(a,h)anthracene | 0.00384 | J | 0.106 | 0.1015 | | mg/Kg | ☼ | 93 | 44 - 130 |
| Fluoranthene | 0.0215 | | 0.106 | 0.1110 | | mg/Kg | ☼ | 85 | 55 - 130 |
| Fluorene | 0.00934 | J | 0.106 | 0.09117 | | mg/Kg | ☼ | 78 | 50 - 130 |

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8270E - Semivolatile Organic Compounds (GC-MS/MS) (Continued)

**Lab Sample ID: 860-122968-J-3-B MS**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Indeno[1,2,3-cd]pyrene | 0.00580 | J | 0.106 | 0.1078 | | mg/Kg | ☼ | 97 | 43 - 130 |
| Naphthalene | 0.00426 | J | 0.106 | 0.07767 | | mg/Kg | ☼ | 70 | 49 - 130 |
| Phenanthrene | 0.0215 | | 0.106 | 0.09516 | | mg/Kg | ☼ | 70 | 50 - 130 |
| Pyrene | 0.0470 | | 0.106 | 0.1183 | | mg/Kg | ☼ | 68 | 55 - 130 |

| *Surrogate* | *MS %Recovery* | *MS Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *68* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *75* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *77* | | *40 - 130* |

**Lab Sample ID: 860-122968-J-3-C MSD**
**Matrix: Solid**
**Analysis Batch: 289497**

**Client Sample ID: Matrix Spike Duplicate**
**Prep Type: Total/NA**
**Prep Batch: 288981**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Acenaphthene | 0.00539 | J | 0.106 | 0.09650 | | mg/Kg | ☼ | 86 | 60 - 130 | 3 | 30 |
| Acenaphthylene | 0.00230 | J | 0.106 | 0.09869 | | mg/Kg | ☼ | 91 | 41 - 130 | 4 | 30 |
| Anthracene | 0.0102 | J | 0.106 | 0.09815 | | mg/Kg | ☼ | 83 | 45 - 130 | 3 | 30 |
| Benzo[a]anthracene | 0.0249 | | 0.106 | 0.1180 | | mg/Kg | ☼ | 88 | 42 - 130 | 2 | 30 |
| Benzo[a]pyrene | 0.0149 | | 0.106 | 0.1029 | | mg/Kg | ☼ | 83 | 42 - 130 | 2 | 30 |
| Benzo[b]fluoranthene | 0.0129 | | 0.106 | 0.1065 | | mg/Kg | ☼ | 89 | 50 - 130 | 2 | 30 |
| Benzo[g,h,i]perylene | 0.00987 | J | 0.106 | 0.1066 | | mg/Kg | ☼ | 92 | 40 - 130 | 4 | 30 |
| Benzo[k]fluoranthene | 0.00394 | J | 0.106 | 0.1007 | | mg/Kg | ☼ | 92 | 40 - 130 | 2 | 30 |
| Chrysene | 0.0418 | | 0.106 | 0.09983 | | mg/Kg | ☼ | 55 | 43 - 130 | 0 | 30 |
| Dibenz(a,h)anthracene | 0.00384 | J | 0.106 | 0.1051 | | mg/Kg | ☼ | 96 | 44 - 130 | 3 | 30 |
| Fluoranthene | 0.0215 | | 0.106 | 0.1125 | | mg/Kg | ☼ | 86 | 55 - 130 | 1 | 30 |
| Fluorene | 0.00934 | J | 0.106 | 0.09159 | | mg/Kg | ☼ | 78 | 50 - 130 | 0 | 30 |
| Indeno[1,2,3-cd]pyrene | 0.00580 | J | 0.106 | 0.1111 | | mg/Kg | ☼ | 100 | 43 - 130 | 3 | 30 |
| Naphthalene | 0.00426 | J | 0.106 | 0.07896 | | mg/Kg | ☼ | 71 | 49 - 130 | 2 | 30 |
| Phenanthrene | 0.0215 | | 0.106 | 0.09655 | | mg/Kg | ☼ | 71 | 50 - 130 | 1 | 30 |
| Pyrene | 0.0470 | | 0.106 | 0.1186 | | mg/Kg | ☼ | 68 | 55 - 130 | 0 | 30 |

| *Surrogate* | *MSD %Recovery* | *MSD Qualifier* | *Limits* |
|---|---|---|---|
| *2-Fluorobiphenyl* | *71* | | *37 - 130* |
| *Nitrobenzene-d5 (Surr)* | *78* | | *36 - 131* |
| *p-Terphenyl-d14 (Surr)* | *80* | | *40 - 130* |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Lab Sample ID: MB 870-34808/3-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| >C12-C28 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |
| >C28-C35 Range Hydrocarbons | <24.6 | U | 49.1 | 24.6 | mg/Kg | | 01/12/26 15:58 | 01/13/26 23:42 | 1 |

## QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

### Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Lab Sample ID: MB 870-34808/3-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Method Blank**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Surrogate | MB %Recovery | MB Qualifier | Limits | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|
| *1-Chlorooctane (Surr)* | *106* | | *70 - 130* | *01/12/26 15:58* | *01/13/26 23:42* | *1* |
| *o-Terphenyl (Surr)* | *103* | | *70 - 130* | *01/12/26 15:58* | *01/13/26 23:42* | *1* |

**Lab Sample ID: LCS 870-34808/1-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 967 | 977.5 | | mg/Kg | | 101 | 75 - 125 |
| >C12-C28 Range Hydrocarbons | 970 | 968.9 | | mg/Kg | | 100 | 75 - 125 |

| Surrogate | LCS %Recovery | LCS Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *103* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: LCSD 870-34808/2-A**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 953 | 1003 | | mg/Kg | | 105 | 75 - 125 | 3 | 20 |
| >C12-C28 Range Hydrocarbons | 956 | 977.2 | | mg/Kg | | 102 | 75 - 125 | 1 | 20 |

| Surrogate | LCSD %Recovery | LCSD Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *104* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: 870-43022-1 MS**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 831 | 889.9 | | mg/Kg | ☼ | 107 | 75 - 125 |
| >C12-C28 Range Hydrocarbons | 35.5 | J | 833 | 858.9 | | mg/Kg | ☼ | 99 | 75 - 125 |

| Surrogate | MS %Recovery | MS Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *106* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *101* | | *70 - 130* |

**Lab Sample ID: 870-43022-1 MSD**
**Matrix: Solid**
**Analysis Batch: 34830**

**Client Sample ID: SB-01 (3'-4')**
**Prep Type: Total/NA**
**Prep Batch: 34808**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | <21.6 | U | 831 | 851.2 | | mg/Kg | ☼ | 102 | 75 - 125 | 4 | 20 |
| >C12-C28 Range Hydrocarbons | 35.5 | J | 833 | 850.2 | | mg/Kg | ☼ | 98 | 75 - 125 | 1 | 20 |



1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

# QC Sample Results



## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC) (Continued)

**Lab Sample ID: 870-43022-1 MSD**
**Client Sample ID: SB-01 (3'-4')**
**Matrix: Solid**
**Prep Type: Total/NA**
**Analysis Batch: 34830**
**Prep Batch: 34808**

| Surrogate | MSD %Recovery | MSD Qualifier | Limits |
|---|---|---|---|
| *1-Chlorooctane (Surr)* | *102* | | *70 - 130* |
| *o-Terphenyl (Surr)* | *100* | | *70 - 130* |

## Method: 300.0 - Anions, Ion Chromatography

**Lab Sample ID: MB 860-287869/1-A**
**Client Sample ID: Method Blank**
**Matrix: Solid**
**Prep Type: Total/NA**
**Analysis Batch: 287702**
**Prep Batch: 287869**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | <5.00 | U | 10.0 | 5.00 | mg/Kg | | 01/13/26 15:44 | 01/13/26 18:59 | 1 |

**Lab Sample ID: LCS 860-287869/2-A**
**Client Sample ID: Lab Control Sample**
**Matrix: Solid**
**Prep Type: Total/NA**
**Analysis Batch: 287702**
**Prep Batch: 287869**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Chloride | 100 | 100.7 | | mg/Kg | | 101 | 90 - 110 |

**Lab Sample ID: LCSD 860-287869/3-A**
**Client Sample ID: Lab Control Sample Dup**
**Matrix: Solid**
**Prep Type: Total/NA**
**Analysis Batch: 287702**
**Prep Batch: 287869**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 100 | 102.3 | | mg/Kg | | 102 | 90 - 110 | 2 | 20 |

**Lab Sample ID: 820-22982-D-1-B MS**
**Client Sample ID: Matrix Spike**
**Matrix: Solid**
**Prep Type: Total/NA**
**Analysis Batch: 287702**
**Prep Batch: 287869**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MS Result | MS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|---|---|
| Chloride | 528 | J | 9900 | 10930 | | mg/Kg | | 105 | 90 - 110 |

**Lab Sample ID: 820-22982-D-1-C MSD**
**Client Sample ID: Matrix Spike Duplicate**
**Matrix: Solid**
**Prep Type: Total/NA**
**Analysis Batch: 287702**
**Prep Batch: 287869**

| Analyte | Sample Result | Sample Qualifier | Spike Added | MSD Result | MSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Chloride | 528 | J | 9900 | 10840 | | mg/Kg | | 104 | 90 - 110 | 1 | 15 |

## Method: 6020B - Metals (ICP/MS)

**Lab Sample ID: MB 860-287918/1-A**
**Client Sample ID: Method Blank**
**Matrix: Solid**
**Prep Type: Total/NA**
**Analysis Batch: 288184**
**Prep Batch: 287918**

| Analyte | MB Result | MB Qualifier | MQL (Adj) | SDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Barium | <0.137 | U | 0.400 | 0.137 | mg/Kg | | 01/13/26 17:28 | 01/14/26 12:40 | 1 |



1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

# QC Sample Results

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 6020B - Metals (ICP/MS) (Continued)

**Lab Sample ID: LCS 860-287918/2-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Lab Control Sample**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | Spike Added | LCS Result | LCS Qualifier | Unit | D | %Rec | %Rec Limits |
|---|---|---|---|---|---|---|---|
| Barium | 10.0 | 10.02 | | mg/Kg | | 100 | 80 - 120 |

**Lab Sample ID: LCSD 860-287918/3-A**
**Matrix: Solid**
**Analysis Batch: 288184**

**Client Sample ID: Lab Control Sample Dup**
**Prep Type: Total/NA**
**Prep Batch: 287918**

| Analyte | Spike Added | LCSD Result | LCSD Qualifier | Unit | D | %Rec | %Rec Limits | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|---|
| Barium | 10.0 | 10.10 | | mg/Kg | | 101 | 80 - 120 | 1 | 20 |

## Method: 9045D - pH

**Lab Sample ID: 870-43022-13 DU**
**Matrix: Solid**
**Analysis Batch: 34848**

**Client Sample ID: SB-06 (6'-7')**
**Prep Type: Soluble**

| Analyte | Sample Result | Sample Qualifier | DU Result | DU Qualifier | Unit | D | RPD | RPD Limit |
|---|---|---|---|---|---|---|---|---|
| soil pH measured in water at deg C | 9.0 | | 9.1 | | S.U. | | 1 | 20 |
| Temperature | 20.6 | | 20.5 | | Celsius | | 0.5 | 20 |

Eurofins Dallas



APP246

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## GC/MS VOA

### Analysis Batch: 34789

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | 8260C | 34798 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 8260C | 34798 |
| MB 870-34798/3-A | Method Blank | Total/NA | Solid | 8260C | 34798 |
| LCS 870-34798/1-A | Lab Control Sample | Total/NA | Solid | 8260C | 34798 |
| LCSD 870-34798/2-A | Lab Control Sample Dup | Total/NA | Solid | 8260C | 34798 |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | 8260C | 34798 |

### Prep Batch: 34798

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | 5035 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 5035 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 5035 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | 5035 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | 5035 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 5035 | |
| MB 870-34798/3-A | Method Blank | Total/NA | Solid | 5035 | |
| LCS 870-34798/1-A | Lab Control Sample | Total/NA | Solid | 5035 | |
| LCSD 870-34798/2-A | Lab Control Sample Dup | Total/NA | Solid | 5035 | |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | 5035 | |

## GC/MS Semi VOA

### Analysis Batch: 288963

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 8270E | 288981 |

### Prep Batch: 288981

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 3546 | |
| MB 860-288981/1-A | Method Blank | Total/NA | Solid | 3546 | |
| LCS 860-288981/2-A | Lab Control Sample | Total/NA | Solid | 3546 | |
| LCSD 860-288981/3-A | Lab Control Sample Dup | Total/NA | Solid | 3546 | |
| LCSD 860-288981/5-A | Lab Control Sample Dup | Total/NA | Solid | 3546 | |
| 860-122968-J-3-B MS | Matrix Spike | Total/NA | Solid | 3546 | |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 3546 | |

### Analysis Batch: 289133

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| LCS 860-288981/2-A | Lab Control Sample | Total/NA | Solid | 8270E | 288981 |
| LCSD 860-288981/3-A | Lab Control Sample Dup | Total/NA | Solid | 8270E | 288981 |
| LCSD 860-288981/5-A | Lab Control Sample Dup | Total/NA | Solid | 8270E | 288981 |

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

# QC Association Summary



## GC/MS Semi VOA

### Analysis Batch: 289497

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| MB 860-288981/1-A | Method Blank | Total/NA | Solid | 8270E | 288981 |
| 860-122968-J-3-B MS | Matrix Spike | Total/NA | Solid | 8270E | 288981 |
| 860-122968-J-3-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 8270E | 288981 |

## GC Semi VOA

### Prep Batch: 34808

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX_1005_S_Prep | |
| MB 870-34808/3-A | Method Blank | Total/NA | Solid | TX_1005_S_Prep | |
| LCS 870-34808/1-A | Lab Control Sample | Total/NA | Solid | TX_1005_S_Prep | |
| LCSD 870-34808/2-A | Lab Control Sample Dup | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |
| 870-43022-1 MSD | SB-01 (3'-4') | Total/NA | Solid | TX_1005_S_Prep | |

### Analysis Batch: 34830

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX 1005 | 34808 |
| MB 870-34808/3-A | Method Blank | Total/NA | Solid | TX 1005 | 34808 |
| LCS 870-34808/1-A | Lab Control Sample | Total/NA | Solid | TX 1005 | 34808 |
| LCSD 870-34808/2-A | Lab Control Sample Dup | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-1 MS | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |
| 870-43022-1 MSD | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | 34808 |

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## GC Semi VOA

### Analysis Batch: 34876

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | TX 1005 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | TX 1005 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | TX 1005 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | TX 1005 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | TX 1005 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | TX 1005 | |

## HPLC/IC

### Analysis Batch: 287702

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 300.0 | 287869 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 300.0 | 287869 |
| MB 860-287869/1-A | Method Blank | Total/NA | Solid | 300.0 | 287869 |
| LCS 860-287869/2-A | Lab Control Sample | Total/NA | Solid | 300.0 | 287869 |
| LCSD 860-287869/3-A | Lab Control Sample Dup | Total/NA | Solid | 300.0 | 287869 |
| 820-22982-D-1-B MS | Matrix Spike | Total/NA | Solid | 300.0 | 287869 |
| 820-22982-D-1-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 300.0 | 287869 |

### Prep Batch: 287869

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 300_Prep | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 300_Prep | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 300_Prep | |
| MB 860-287869/1-A | Method Blank | Total/NA | Solid | 300_Prep | |
| LCS 860-287869/2-A | Lab Control Sample | Total/NA | Solid | 300_Prep | |
| LCSD 860-287869/3-A | Lab Control Sample Dup | Total/NA | Solid | 300_Prep | |
| 820-22982-D-1-B MS | Matrix Spike | Total/NA | Solid | 300_Prep | |
| 820-22982-D-1-C MSD | Matrix Spike Duplicate | Total/NA | Solid | 300_Prep | |

## Metals

### Prep Batch: 287918

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 3051A | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 3051A | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 3051A | |
| MB 860-287918/1-A | Method Blank | Total/NA | Solid | 3051A | |
| LCS 860-287918/2-A | Lab Control Sample | Total/NA | Solid | 3051A | |

# QC Association Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Metals (Continued)

### Prep Batch: 287918 (Continued)

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| LCSD 860-287918/3-A | Lab Control Sample Dup | Total/NA | Solid | 3051A | |

### Analysis Batch: 288184

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | 6020B | 287918 |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | 6020B | 287918 |
| MB 860-287918/1-A | Method Blank | Total/NA | Solid | 6020B | 287918 |
| LCS 860-287918/2-A | Lab Control Sample | Total/NA | Solid | 6020B | 287918 |
| LCSD 860-287918/3-A | Lab Control Sample Dup | Total/NA | Solid | 6020B | 287918 |

## General Chemistry

### Analysis Batch: 34815

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-3 | SB-02 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-5 | SB-03 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-6 | SB-03 (5'-6') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-8 | SB-04 (3'-4') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-10 | SB-05 (2'-3') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-11 | SB-05 (8'-9') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-12 | SB-06 (2'-3') | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-13 | SB-06 (6'-7') | Total/NA | Solid | Moisture - 2540 | |
| MB 870-34815/1 | Method Blank | Total/NA | Solid | Moisture - 2540 | |
| 870-43022-13 DU | SB-06 (6'-7') | Total/NA | Solid | Moisture - 2540 | |

### Leach Batch: 34843

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-3 | SB-02 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-5 | SB-03 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-8 | SB-04 (3'-4') | Soluble | Solid | DI Leach | |
| 870-43022-10 | SB-05 (2'-3') | Soluble | Solid | DI Leach | |
| 870-43022-13 | SB-06 (6'-7') | Soluble | Solid | DI Leach | |
| 870-43022-13 DU | SB-06 (6'-7') | Soluble | Solid | DI Leach | |

### Analysis Batch: 34848

| Lab Sample ID | Client Sample ID | Prep Type | Matrix | Method | Prep Batch |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-3 | SB-02 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-5 | SB-03 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-8 | SB-04 (3'-4') | Soluble | Solid | 9045D | 34843 |
| 870-43022-10 | SB-05 (2'-3') | Soluble | Solid | 9045D | 34843 |
| 870-43022-13 | SB-06 (6'-7') | Soluble | Solid | 9045D | 34843 |
| 870-43022-13 DU | SB-06 (6'-7') | Soluble | Solid | 9045D | 34843 |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-01 (3'-4')
**Lab Sample ID: 870-43022-1**
**Date Collected: 01/09/26 10:05**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 00:04 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.03 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.03 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-01 (3'-4')
**Lab Sample ID: 870-43022-1**
**Date Collected: 01/09/26 10:05**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 89.5**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.107 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/12/26 22:16 | MC | EET DAL |
| Total/NA | Prep | 3546 | | | 5.2 g | 5 mL | 288981 | 01/19/26 04:51 | TH | EET HOU |
| Total/NA | Analysis | 8270E | | 1 | 1 mL | 1 mL | 288963 | 01/19/26 15:39 | DB | EET HOU |
| Total/NA | Prep | TX_1005_S_Prep | | | 12.948 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 00:04 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.01 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 20:57 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:47 | DP | EET HOU |

## Client Sample ID: SB-02 (3'-4')
**Lab Sample ID: 870-43022-3**
**Date Collected: 01/09/26 11:00**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 01:30 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.02 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.02 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-02 (3'-4')
**Lab Sample ID: 870-43022-3**
**Date Collected: 01/09/26 11:00**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 82.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 4.731 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/12/26 23:20 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.733 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 01:30 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.05 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:06 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:43 | DP | EET HOU |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-03 (3'-4')

Lab Sample ID: 870-43022-5
Date Collected: 01/09/26 11:20
Matrix: Solid
Date Received: 01/10/26 09:15

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 01:51 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.06 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.06 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-03 (3'-4')

Lab Sample ID: 870-43022-5
Date Collected: 01/09/26 11:20
Matrix: Solid
Date Received: 01/10/26 09:15
Percent Solids: 88.9

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 7.113 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 00:02 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 13.068 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 01:51 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.04 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:15 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.52 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:40 | DP | EET HOU |

## Client Sample ID: SB-03 (5'-6')

Lab Sample ID: 870-43022-6
Date Collected: 01/09/26 11:30
Matrix: Solid
Date Received: 01/10/26 09:15

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 02:12 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-03 (5'-6')

Lab Sample ID: 870-43022-6
Date Collected: 01/09/26 11:30
Matrix: Solid
Date Received: 01/10/26 09:15
Percent Solids: 91.8

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.627 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 00:23 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.76 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 02:12 | AGB | EET DAL |

## Client Sample ID: SB-04 (3'-4')

Lab Sample ID: 870-43022-8
Date Collected: 01/09/26 12:20
Matrix: Solid
Date Received: 01/10/26 09:15

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 02:34 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.08 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.08 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |

# Lab Chronicle

Client: Whitehead ES LLC — Job ID: 870-43022-1
Project/Site: Cresson Moon Props — SDG: 379.001

## Client Sample ID: SB-04 (3'-4') — Lab Sample ID: 870-43022-8

**Date Collected: 01/09/26 12:20** — **Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-04 (3'-4') — Lab Sample ID: 870-43022-8

**Date Collected: 01/09/26 12:20** — **Matrix: Solid**
**Date Received: 01/10/26 09:15** — **Percent Solids: 95.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 6.015 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 01:06 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 11.85 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 02:34 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.03 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:24 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:36 | DP | EET HOU |

## Client Sample ID: SB-05 (2'-3') — Lab Sample ID: 870-43022-10

**Date Collected: 01/09/26 13:50** — **Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:16 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.08 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.08 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-05 (2'-3') — Lab Sample ID: 870-43022-10

**Date Collected: 01/09/26 13:50** — **Matrix: Solid**
**Date Received: 01/10/26 09:15** — **Percent Solids: 86.0**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.224 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 01:48 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 15.774 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:16 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.00 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:33 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:33 | DP | EET HOU |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Client Sample ID: SB-05 (8'-9')
**Lab Sample ID: 870-43022-11**
**Date Collected: 01/09/26 13:55**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:38 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-05 (8'-9')
**Lab Sample ID: 870-43022-11**
**Date Collected: 01/09/26 13:55**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.8**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.01 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:09 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 13.38 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:38 | AGB | EET DAL |

## Client Sample ID: SB-06 (2'-3')
**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 03:59 | CC | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

## Client Sample ID: SB-06 (2'-3')
**Lab Sample ID: 870-43022-12**
**Date Collected: 01/09/26 14:10**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**
**Percent Solids: 86.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.241 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:31 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 14.521 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 03:59 | AGB | EET DAL |

## Client Sample ID: SB-06 (6'-7')
**Lab Sample ID: 870-43022-13**
**Date Collected: 01/09/26 14:20**
**Matrix: Solid**
**Date Received: 01/10/26 09:15**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Analysis | TX 1005 | | 1 | | | 34876 | 01/14/26 04:20 | CC | EET DAL |
| Soluble | Leach | DI Leach | | | 25.04 g | 25 mL | 34843 | 01/13/26 12:41 | CJH | EET DAL |
| Soluble | Analysis | 9045D | | 1 | 25.04 g | 25 mL | 34848 | 01/13/26 14:00 | CJH | EET DAL |
| Total/NA | Analysis | Moisture - 2540 | | 1 | | | 34815 | 01/12/26 17:06 | TM | EET DAL |

# Lab Chronicle

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

**Client Sample ID: SB-06 (6'-7')**
**Date Collected: 01/09/26 14:20**
**Date Received: 01/10/26 09:15**

**Lab Sample ID: 870-43022-13**
**Matrix: Solid**
**Percent Solids: 90.2**

| Prep Type | Batch Type | Batch Method | Run | Dil Factor | Initial Amount | Final Amount | Batch Number | Prepared or Analyzed | Analyst | Lab |
|---|---|---|---|---|---|---|---|---|---|---|
| Total/NA | Prep | 5035 | | | 5.614 g | 5 mL | 34798 | 01/12/26 12:25 | MC | EET DAL |
| Total/NA | Analysis | 8260C | | 1 | 5 mL | 5 mL | 34789 | 01/13/26 02:52 | MC | EET DAL |
| Total/NA | Prep | TX_1005_S_Prep | | | 10.339 g | 10 mL | 34808 | 01/12/26 15:58 | AGB | EET DAL |
| Total/NA | Analysis | TX 1005 | | 1 | 1 uL | 1 uL | 34830 | 01/14/26 04:20 | AGB | EET DAL |
| Total/NA | Prep | 300_Prep | | | 5.041 g | 50 mL | 287869 | 01/13/26 15:44 | CT | EET HOU |
| Total/NA | Analysis | 300.0 | | 1 | | | 287702 | 01/13/26 21:42 | RJD | EET HOU |
| Total/NA | Prep | 3051A | | | 0.55 g | 50 mL | 287918 | 01/13/26 17:29 | PB | EET HOU |
| Total/NA | Analysis | 6020B | | 5 | | | 288184 | 01/14/26 13:30 | DP | EET HOU |

**Laboratory References:**

EET DAL = Eurofins Dallas, 9701 Harry Hines Blvd, Dallas, TX 75220, TEL (214)902-0300

EET HOU = Eurofins Houston, 4145 Greenbriar Dr, Stafford, TX 77477, TEL (281)240-4200

# Accreditation/Certification Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15

## Laboratory: Eurofins Dallas

Unless otherwise noted, all analytes for this laboratory were covered under each accreditation/certification below.

| Authority | Program | Identification Number | Expiration Date |
|---|---|---|---|
| Texas | NELAP | T104704295 | 06-30-26 |

The following analytes are included in this report, but the laboratory is not certified by the governing authority. This list may include analytes for which the agency does not offer certification.

| Analysis Method | Prep Method | Matrix | Analyte |
|---|---|---|---|
| 9045D | | Solid | Temperature |
| Moisture - 2540 | | Solid | Percent Moisture |

## Laboratory: Eurofins Houston

The accreditations/certifications listed below are applicable to this report.

| Authority | Program | Identification Number | Expiration Date |
|---|---|---|---|
| Texas | NELAP | T104704215 | 06-30-26 |

# Method Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

| Method | Method Description | Protocol | Laboratory |
|---|---|---|---|
| 8260C | Volatile Organic Compounds by GC/MS | SW846 | EET DAL |
| 8270E | Semivolatile Organic Compounds (GC-MS/MS) | SW846 | EET HOU |
| TX 1005 | Texas - Total Petroleum Hydrocarbon (GC) | TCEQ | EET DAL |
| 300.0 | Anions, Ion Chromatography | EPA | EET HOU |
| 6020B | Metals (ICP/MS) | SW846 | EET HOU |
| 9045D | pH | SW846 | EET DAL |
| Moisture - 2540 | Percent Moisture | SM | EET DAL |
| 300_Prep | Anions, Ion Chromatography, 10% Wt/Vol | EPA | EET HOU |
| 3051A | Preparation, Metals, Microwave Assisted | SW846 | EET HOU |
| 3546 | Microwave Extraction | SW846 | EET HOU |
| 5035 | Closed System Purge and Trap | SW846 | EET DAL |
| DI Leach | Deionized Water Leaching Procedure | ASTM | EET DAL |
| TX_1005_S_Prep | Extraction - Texas Total petroleum Hyrdocarbons | TCEQ | EET DAL |

**Protocol References:**

ASTM = ASTM International
EPA = US Environmental Protection Agency
SM = "Standard Methods For The Examination Of Water And Wastewater"
SW846 = "Test Methods For Evaluating Solid Waste, Physical/Chemical Methods", Third Edition, November 1986 And Its Updates.
TCEQ = Texas Commission of Environmental Quality

**Laboratory References:**

EET DAL = Eurofins Dallas, 9701 Harry Hines Blvd, Dallas, TX 75220, TEL (214)902-0300
EET HOU = Eurofins Houston, 4145 Greenbriar Dr, Stafford, TX 77477, TEL (281)240-4200

# Sample Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

| Lab Sample ID | Client Sample ID | Matrix | Collected | Received | Sample Origin |
|---|---|---|---|---|---|
| 870-43022-1 | SB-01 (3'-4') | Solid | 01/09/26 10:05 | 01/10/26 09:15 | Texas |
| 870-43022-3 | SB-02 (3'-4') | Solid | 01/09/26 11:00 | 01/10/26 09:15 | Texas |
| 870-43022-5 | SB-03 (3'-4') | Solid | 01/09/26 11:20 | 01/10/26 09:15 | Texas |
| 870-43022-6 | SB-03 (5'-6') | Solid | 01/09/26 11:30 | 01/10/26 09:15 | Texas |
| 870-43022-8 | SB-04 (3'-4') | Solid | 01/09/26 12:20 | 01/10/26 09:15 | Texas |
| 870-43022-10 | SB-05 (2'-3') | Solid | 01/09/26 13:50 | 01/10/26 09:15 | Texas |
| 870-43022-11 | SB-05 (8'-9') | Solid | 01/09/26 13:55 | 01/10/26 09:15 | Texas |
| 870-43022-12 | SB-06 (2'-3') | Solid | 01/09/26 14:10 | 01/10/26 09:15 | Texas |
| 870-43022-13 | SB-06 (6'-7') | Solid | 01/09/26 14:20 | 01/10/26 09:15 | Texas |

eurofins | Environment Testing

# Chain of Custody

Houston, TX (281) 240-4200, Dallas, TX (214) 902-0300
Midland, TX (432) 704-5440, San Antonio, TX (210) 509-3334
EL Paso, TX (915) 585-3443, Lubbock, TX (806) 794-1296
Hobbs, NM (575) 392-7550, Carlsbad, NM (575) 988-3199
Little Rock, AR (501) 224-5060

Work Order No: ____________

Page 1 of 2

| | | | |
|---|---|---|---|
| Project Manager: | Danielle Fehrenbach | Bill to: (if different) | Tera Burns |
| Company Name: | Whitehead ES | Company Name: | → |
| Address: | 906 E 18th St, Ste 100 | Address: | → |
| City, State ZIP: | Plano, TX 75074 | City, State ZIP: | → |
| Phone: | (469) 609-8080 | Email: | tburns@whiteheades.com |

**Work Order Comments**

Program: UST/PST ☐ PRP ☐ Brownfields ☐ RRC ☐ Superfund ☐
State of Project:
Reporting: Level II ☐ Level III ☐ PST/UST ☐ TRRP ☒ Level IV ☐
Deliverables: EDD ☒ ADaPT ☐ Other:

| | | | |
|---|---|---|---|
| Project Name: | Cresson Moon Props | Turn Around | ☐ Routine ☑ Rush |
| Project Number: | 379.001 | | |
| Project Location: | Cresson, TX | Due Date: | 1/14/26 |
| Sampler's Name: | CK / EM | TAT starts the day received by the lab, if received by 4:30pm | |
| PO #: | | | |

| SAMPLE RECEIPT | Temp Blank: | Yes No | Wet Ice: | Yes No |
|---|---|---|---|---|
| Samples Received Intact: | Yes No | Thermometer ID: | | |
| Cooler Custody Seals: | Yes No N/A | Correction Factor: | | |
| Sample Custody Seals: | Yes No N/A | Temperature Reading: | | |
| Total Containers: | | Corrected Temperature: | | |

ANALYSIS REQUEST — Pres. Code: Me + Ct + Di →

**Preservative Codes**

None: NO DI Water: $H_2O$
Zn Acetate+NaOH: Zn
NaOH+Ascorbic Acid: SAPC

870-43022 Chain of Custody

| Sample Identification | Matrix | Date Sampled | Time Sampled | Depth | Grab/ Comp | # of Cont | TPH TX1005 | VOCs 8260 | BTEX 8260 | PAH 8270 | Ba 6010/6020 | Cl 300.0 | pH 9045D | Sample Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SB-01 (3'-4') | S | 1/9 | 10:05 | 3-4 | G | 8 | X | X | | Hold | X | X | X | Hold trip blank |
| SB-01 (19') | ↓ | ↓ | 10:35 | 14' | ↓ | 8 | Hold → | | | | | | | Hold all samples |
| SB-02 (3'-4') | | | 11:00 | 3-4' | | 8 | X | X | | | X | X | X | for PAH |
| SB-02 (8-9') | | | 11:10 | 8-9' | | 8 | Hold → | | | | | | | Hold SB-01 (19'), |
| SB-03 (3-4') | | | 11:20 | 3-4' | | 8 | X | X | | | X | X | X | SB-03 (15'), |
| SB-03 (5-6') | | | 11:30 | 5-6' | | 7 | X | [illegible] | X | | | | | SB-02 (8-9'), |
| SB-03 (15') | | | 11:40 | 15' | | 7 | Hold → | | | | | | | SB-04 (24') |
| SB-04 (3-4') | | | 12:20 | 3-4' | | 8 | X | X | | | X | X | X | SB-03 (5-6') run |
| SB-04 (24') | | | 13:00 | 24' | | 7 | Hold → | | | | | | | for BTEX, not full suite |
| SB-05 (2-3') | | | 13:50 | 2-3' | ↓ | 8 | X | X | | ↓ | X | X | X | |

EM NFE 1/9/26

Total 200.7 / 6010 200.8 / 6020: 8RCRA 13PPM Texas 11 Al Sb As Ba Be B Cd Ca Cr Co Cu Fe Pb Mg Mn Mo Ni K Se Ag $SiO_2$ Na Sr Tl Sn U V Zn
Circle Method(s) and Metal(s) to be analyzed TCLP / SPLP 6010: 8RCRA Sb As Ba Be Cd Cr Co Cu Pb Mn Mo Ni Se Ag Tl U Hg: 1631 / 245.1 / 7470 / 7471

Notice: Signature of this document and relinquishment of samples constitutes a valid purchase order from client company to Eurofins Xenco, its affiliates and subcontractors. It assigns standard terms and conditions of service. Eurofins Xenco will be liable only for the cost of samples and shall not assume any responsibility for any losses or expenses incurred by the client if such losses are due to circumstances beyond the control of Eurofins Xenco. A minimum charge of $85.00 will be applied to each project and a charge of $5 for each sample submitted to Eurofins Xenco, but not analyzed. These terms will be enforced unless previously negotiated.

| Relinquished by: (Signature) | Received by: (Signature) | Date/Time | Relinquished by: (Signature) | Received by: (Signature) | Date/Time |
|---|---|---|---|---|---|
| 1 [signature] | [signature] | 1/10 @ 09:15 | 2 [signature] | [signature] | 1/10/26 9:15 |
| 3 | | | 4 | | |
| 5 | | | 6 | | |

THM-035 c/f -0.1 4.8/4.7

Revised Date: 08/25/2020 Rev. 2020.2




1/21/2026

eurofins | Environment Testing

# Chain of Custody

Houston, TX (281) 240-4200, Dallas, TX (214) 902-0300
Midland, TX (432) 704-5440, San Antonio, TX (210) 509-3334
EL Paso, TX (915) 585-3443, Lubbock, TX (806) 794-1296
Hobbs, NM (575) 392-7550, Carlsbad, NM (575) 988-3199
Little Rock, AR (501) 224-5060

Work Order No: ______

Page 2 of 2

| | | | |
|---|---|---|---|
| Project Manager: | D. Fehrenbach | Bill to: (if different) | Tera Burns |
| Company Name: | Whitehead ES → | Company Name: | → |
| Address: | 900 E 18th St, Ste 100 → | Address: | → |
| City, State ZIP: | Plano, TX 75074 → | City, State ZIP: | → |
| Phone: | (469) 609-8080 | Email: | tburns@whiteheades.com |

**Work Order Comments**

Program: UST/PST ☐ PRP ☐ Brownfields ☐ RRC ☐ Superfund ☐
State of Project:
Reporting: Level II ☐ Level III ☐ PST/UST ☐ TRRP ☒ Level IV ☐
Deliverables: EDD ☒ ADaPT ☐ Other:

| | | | |
|---|---|---|---|
| Project Name: | Cresson Moon Prop | Turn Around | ☐ Routine ☑ Rush |
| Project Number: | 379.001 | Pres. Code | Me+C+Di → |
| Project Location: | Cresson, TX | Due Date: | 1/14/26 |
| Sampler's Name: | CK/EM | TAT starts the day received by the lab, if received by 4:30pm | |
| PO #: | | | |

| SAMPLE RECEIPT | Temp Blank: | Yes No | Wet Ice: | Yes No |
|---|---|---|---|---|
| Samples Received Intact: | Yes No | Thermometer ID: | | |
| Cooler Custody Seals: | Yes No N/A | Correction Factor: | | |
| Sample Custody Seals: | Yes No N/A | Temperature Reading: | | |
| Total Containers: | | Corrected Temperature: | | |

**ANALYSIS REQUEST** (Parameters)

| Sample Identification | Matrix | Date Sampled | Time Sampled | Depth | Grab/ Comp | # of Cont | TPH TX1005 | VOCs 8260 | BTEX 8260 | PAH 8270 | Ba 6010/6020 | Cl 300.0 | pH 9045D | Sample Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SB-05 (8-9') | S | 1/9 | 13:55 | 8-9' | G | 7 | X | | X | Hold | | | | |
| SB-06 (2-3') | ↓ | ↓ | 14:10 | 2-3' | ↓ | 8 | X | | X | ↓ | | | | Hold trip blank |
| SB-06 (6-7') | ↓ | ↓ | 14:20 | 6-7' | ↓ | 7 | X | X | | ↓ | X | X | X | Hold all samples for PAH |
| Trip Blank | | — | — | — | — | 2 | Hold → | | | | | | | |

NFE EM 1/9/26

**Preservative Codes**

None: NO — DI Water: $H_2O$
Cool: Cool — MeOH: Me
HCL: HC — $HNO_3$
$H_2SO_4$: $H_2$ — NaOH: Na
$H_3PO_4$: HP
$NaHSO_4$: NABIS
$Na_2S_2O_3$: $NaSO_3$
Zn Acetate+NaOH: Zn
NaOH+Ascorbic Acid: SAPC

Total 200.7 / 6010 200.8 / 6020: 8RCRA 13PPM Texas 11 Al Sb As Ba Be B Cd Ca Cr Co Cu Fe Pb Mg Mn Mo Ni K Se Ag $SiO_2$ Na Sr Tl Sn U V Zn
Circle Method(s) and Metal(s) to be analyzed TCLP / SPLP 6010: 8RCRA Sb As Ba Be Cd Cr Co Cu Pb Mn Mo Ni Se Ag Tl U Hg: 1631 / 245.1 / 7470 / 7471

**Notice: Signature of this document and relinquishment of samples constitutes a valid purchase order from client company to Eurofins Xenco, its affiliates and subcontractors. It assigns standard terms and conditions of service. Eurofins Xenco will be liable only for the cost of samples and shall not assume any responsibility for any losses or expenses incurred by the client if such losses are due to circumstances beyond the control of Eurofins Xenco. A minimum charge of $85.00 will be applied to each project and a charge of $5 for each sample submitted to Eurofins Xenco, but not analyzed. These terms will be enforced unless previously negotiated.**

| | Relinquished by: (Signature) | Received by: (Signature) | Date/Time | | Relinquished by: (Signature) | Received by: (Signature) | Date/Time |
|---|---|---|---|---|---|---|---|
| 1 | Elena Muir | [signature] | 1/10; 09:15 | 2 | | [signature] | 1/10/26 9:15 |
| 3 | | | | 4 | | | |
| 5 | | | | 6 | | | |

Revised Date: 08/25/2020 Rev. 2020.2



APP260

**Eurofins Dallas**
9701 Harry Hines Blvd
Dallas, TX 75220
Phone: 214-902-0300

# Chain of Custody Record

eurofins | Environment Testing

| | | | | |
|---|---|---|---|---|
| **Client Information (Sub Contract Lab)** | Sampler: N/A | Lab PM: Kimmel, Mike M | Carrier Tracking No(s): N/A | COC No: 870-9754.1 |
| Client Contact: Shipping/Receiving | Phone: N/A | E-Mail: Mike.Kimmel@et.eurofinsus.com | State of Origin: Texas | Page: Page 1 of 2 |
| Company: Eurofins Environment Testing South Centr | | Accreditations Required (See note): NELAP Texas | | Job #: 870-43022-1 |
| Address: 4145 Greenbriar Dr | Due Date Requested: 1/14/2026 | **Analysis Requested** | | Preservation Codes: |
| City: Stafford | TAT Requested (days): N/A | | | |
| State, Zip: TX, 77477 | | | | |
| Phone: 281-240-4200(Tel) | PO #: N/A | | | |
| Email: N/A | WO #: N/A | | | |
| Project Name: Cresson Moon Props | Project #: 87000328 | | | Other: N/A |
| Site: N/A | SSOW#: N/A | | | |

| Sample Identification Client ID (Lab ID) | Sample Date | Sample Time | Sample Type (C=Comp, G=grab) | Matrix (W=water S=solid, O=waste/oil, BT=Tissue, A=Air) | Field Filtered Sample (Yes or No) | Perform MS/MSD (Yes or No) | 8270E_QQQ/3546(MOD) Polycyclic Aromatic Hydrocarbons ( (Hold) | 6020B/3051A(MOD) 6020- Pb | 300_ORGFM_28D/300_PrepChloride-E300 | 6020B/3051A(MOD) 6020- Pb (Hold) | 300_ORGFM_28D/300_PrepChloride-E300 (Hold) | Total Number of containers | Special Instructions/Note: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Preservation Code: | | | | | | | | | | |
| SB-01 (3'-4') (870-43022-1) | 1/9/26 | 10:05 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-01 (19') (870-43022-2) | 1/9/26 | 10:35 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-02 (3'-4') (870-43022-3) | 1/9/26 | 11:00 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-02 (8'-9') (870-43022-4) | 1/9/26 | 11 10 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-03 (3'-4') (870-43022-5) | 1/9/26 | 11:20 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-03 (5'-6') (870-43022-6) | 1/9/26 | 11:30 Central | G | Solid | | | X | | | | | 1 | |
| SB-03 (15') (870-43022-7) | 1/9/26 | 11:40 Central | G | Solid | | | X | | | X | X | 1 | |
| SB-04 (3'-4') (870-43022-8) | 1/9/26 | 12:20 Central | G | Solid | | | X | X | X | | | 1 | |
| SB-04 (24') (870-43022-9) | 1/9/26 | 13:00 Central | G | Solid | | | X | | | X | X | 1 | |

Note: Since laboratory accreditations are subject to change, Eurofins Environment Testing South Central, LLC places the ownership of method, analyte & accreditation compliance upon our subcontract laboratories. This sample shipment is forwarded under chain-of-custody. If the laboratory does not currently maintain accreditation in the State of Origin listed above for analysis/tests/matrix being analyzed, the samples must be shipped back to the Eurofins Environment Testing South Central, LLC laboratory or other instructions will be provided. Any changes to accreditation status should be brought to Eurofins Environment Testing South Central, LLC attention immediately. If all requested accreditations are current to date, return the signed Chain of Custody attesting to said compliance to Eurofins Environment Testing South Central, LLC.

| | | | |
|---|---|---|---|
| *Possible Hazard Identification* Unconfirmed | | *Sample Disposal ( A fee may be assessed if samples are retained longer than 1 month)* ☐ *Return To Client* ☐ *Disposal By Lab* ☐ *Archive For ____ Months* | |
| Deliverable Requested: I, II III, IV Other (specify) | Primary Deliverable Rank: 2 | Special Instructions/QC Requirements: | |
| Empty Kit Relinquished by: [signature] | Date: | Time: | Method of Shipment: |
| Relinquished by: | Date/Time: / Company | Received by: DS | Date/Time: 1/13 / Company |
| Relinquished by: | Date/Time: / Company | Received by: | Date/Time: / Company |
| Relinquished by: | Date/Time: 01/12/26 - 1710 / Company | Received by: | Date/Time: / Company |
| Custody Seals Intact: Δ Yes Δ No | Custody Seal No. | Cooler Temperature(s) °C and Other Remarks: HOU369 2.0 | |

Ver: 10/10/2024



APP261

# Login Sample Receipt Checklist

Client: Whitehead ES LLC

Job Number: 870-43022-1
SDG Number: 379.001

**Login Number: 43022**
**List Number: 1**
**Creator: Virani, Tycho L**

**List Source: Eurofins Dallas**

| Question | Answer | Comment |
|---|---|---|
| The cooler's custody seal, if present, is intact. | N/A | |
| Sample custody seals, if present, are intact. | N/A | |
| The cooler or samples do not appear to have been compromised or tampered with. | True | |
| Samples were received on ice. | True | |
| Cooler Temperature is acceptable. | True | |
| Cooler Temperature is recorded. | True | |
| COC is present. | True | |
| COC is filled out in ink and legible. | True | |
| COC is filled out with all pertinent information. | True | |
| Is the Field Sampler's name present on COC? | True | |
| There are no discrepancies between the containers received and the COC. | True | |
| Samples are received within Holding Time (excluding tests with immediate HTs) | False | Refer to Job Narrative for details. |
| Sample containers have legible labels. | True | |
| Containers are not broken or leaking. | True | |
| Sample collection date/times are provided. | True | |
| Appropriate sample containers are used. | True | |
| Sample bottles are completely filled. | True | |
| Sample Preservation Verified. | True | |
| There is sufficient vol. for all requested analyses, incl. any requested MS/MSDs | True | |
| Containers requiring zero headspace have no headspace or bubble is <6mm (1/4"). | True | |

# Login Sample Receipt Checklist

Client: Whitehead ES LLC

Job Number: 870-43022-1
SDG Number: 379.001

**Login Number: 43022**
**List Number: 2**
**Creator: Silva, Daniel**

**List Source: Eurofins Houston**
**List Creation: 01/13/26 09:27 AM**

| Question | Answer | Comment |
|---|---|---|
| The cooler's custody seal, if present, is intact. | True | |
| Sample custody seals, if present, are intact. | N/A | |
| The cooler or samples do not appear to have been compromised or tampered with. | True | |
| Samples were received on ice. | True | |
| Cooler Temperature is acceptable. | True | |
| Cooler Temperature is recorded. | True | |
| COC is present. | True | |
| COC is filled out in ink and legible. | True | |
| COC is filled out with all pertinent information. | True | |
| Is the Field Sampler's name present on COC? | True | |
| There are no discrepancies between the containers received and the COC. | True | |
| Samples are received within Holding Time (excluding tests with immediate HTs) | True | |
| Sample containers have legible labels. | True | |
| Containers are not broken or leaking. | True | |
| Sample collection date/times are provided. | True | |
| Appropriate sample containers are used. | True | |
| Sample bottles are completely filled. | True | |
| Sample Preservation Verified. | True | |
| There is sufficient vol. for all requested analyses, incl. any requested MS/MSDs | True | |
| Containers requiring zero headspace have no headspace or bubble is <6mm (1/4"). | True | |

# Detection Check Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 5035-Closed System Purge and Trap**
**Instrument: A375** **Detector: MSD/0** **Column: DB-624-20m**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Benzene | 0.00101 | 0.000991 | J | mg/Kg | 0.00200 | 0.000502 | 09/11/2025 | 870-31690 |
| tert-Butylbenzene | 0.00101 | 0.000912 | J | mg/Kg | 0.00200 | 0.000513 | 09/11/2025 | 870-31690 |
| Carbon tetrachloride | 0.00101 | 0.000718 | J | mg/Kg | 0.00200 | 0.000443 | 09/11/2025 | 870-31690 |
| MTBE | 0.00101 | 0.00108 | J | mg/Kg | 0.00200 | 0.000586 | 09/11/2025 | 870-31690 |
| Chlorobenzene | 0.00101 | 0.000937 | J | mg/Kg | 0.00200 | 0.000507 | 09/11/2025 | 870-31690 |
| Chloroethane | 0.00100 | 0.000780 | J | mg/Kg | 0.00200 | 0.000453 | 09/11/2025 | 870-31690 |
| Chloroform | 0.00100 | <0.000474 | U | mg/Kg | 0.00200 | 0.000474 | 07/21/2025 | 870-30229 |
| Chloromethane | 0.00100 | 0.000940 | J | mg/Kg | 0.00200 | 0.000549 | 09/11/2025 | 870-31690 |
| 2-Chlorotoluene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000272 | 09/11/2025 | 870-31690 |
| 4-Chlorotoluene | 0.00101 | 0.000982 | J | mg/Kg | 0.00200 | 0.000608 | 09/11/2025 | 870-31690 |
| p-Cymene (p-Isopropyltoluene) | 0.00101 | <0.00140 | U | mg/Kg | 0.00500 | 0.00140 | 09/11/2025 | 870-31690 |
| Dibromochloromethane | 0.00101 | 0.000861 | J | mg/Kg | 0.00200 | 0.000174 | 09/11/2025 | 870-31690 |
| Bromobenzene | 0.00101 | 0.000870 | J | mg/Kg | 0.00200 | 0.000805 | 09/11/2025 | 870-31690 |
| Toluene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000560 | 09/11/2025 | 870-31690 |
| 1,2-Dibromo-3-Chloropropane | 0.00101 | <0.00109 | U | mg/Kg | 0.00500 | 0.00109 | 09/11/2025 | 870-31690 |
| 1,2-Dibromoethane | 0.00101 | 0.00106 | J | mg/Kg | 0.00200 | 0.000618 | 09/11/2025 | 870-31690 |
| Dibromomethane | 0.00101 | 0.00113 | J | mg/Kg | 0.00200 | 0.000314 | 09/11/2025 | 870-31690 |
| 1,2-Dichlorobenzene | 0.00100 | 0.000997 | J | mg/Kg | 0.00200 | 0.000395 | 09/11/2025 | 870-31690 |
| 1,3-Dichlorobenzene | 0.00101 | 0.000997 | J | mg/Kg | 0.00200 | 0.000499 | 09/11/2025 | 870-31690 |
| 1,4-Dichlorobenzene | 0.00101 | 0.00110 | J | mg/Kg | 0.00200 | 0.000496 | 09/11/2025 | 870-31690 |
| Dichlorodifluoromethane | 0.00101 | <0.000544 | U | mg/Kg | 0.00200 | 0.000544 | 09/11/2025 | 870-31690 |
| 1,1-Dichloroethane | 0.00101 | 0.000895 | J | mg/Kg | 0.00200 | 0.000567 | 09/11/2025 | 870-31690 |
| 1,2-Dichloroethane | 0.00101 | 0.00104 | J | mg/Kg | 0.00200 | 0.000367 | 09/11/2025 | 870-31690 |
| 1,1-Dichloroethene | 0.00101 | 0.000640 | J | mg/Kg | 0.00200 | 0.000456 | 09/11/2025 | 870-31690 |
| Bromochloromethane | 0.00101 | 0.000886 | J | mg/Kg | 0.00200 | 0.000632 | 09/11/2025 | 870-31690 |
| Ethylbenzene | 0.00101 | 0.00104 | J | mg/Kg | 0.00200 | 0.000387 | 09/11/2025 | 870-31690 |
| cis-1,2-Dichloroethene | 0.00101 | <0.000506 | U | mg/Kg | 0.00200 | 0.000506 | 09/11/2025 | 870-31690 |
| trans-1,2-Dichloroethene | 0.00101 | 0.000862 | J | mg/Kg | 0.00200 | 0.000462 | 09/11/2025 | 870-31690 |
| 1,2-Dichloropropane | 0.00101 | 0.000956 | J | mg/Kg | 0.00200 | 0.000586 | 09/11/2025 | 870-31690 |
| 1,3-Dichloropropane | 0.00101 | 0.000994 | J | mg/Kg | 0.00200 | 0.000334 | 09/11/2025 | 870-31690 |
| 2,2-Dichloropropane | 0.00101 | 0.000880 | J | mg/Kg | 0.00200 | 0.000592 | 09/11/2025 | 870-31690 |
| 1,1-Dichloropropene | 0.00101 | 0.000863 | J | mg/Kg | 0.00200 | 0.000308 | 09/11/2025 | 870-31690 |
| cis-1,3-Dichloropropene | 0.00100 | 0.000974 | J | mg/Kg | 0.00200 | 0.000618 | 09/11/2025 | 870-31690 |
| trans-1,3-Dichloropropene | 0.00101 | 0.000843 | J | mg/Kg | 0.00200 | 0.000510 | 09/11/2025 | 870-31690 |
| Hexachlorobutadiene | 0.00101 | 0.000632 | J | mg/Kg | 0.00200 | 0.000551 | 09/11/2025 | 870-31690 |
| Bromodichloromethane | 0.00101 | 0.000813 | J | mg/Kg | 0.00200 | 0.000653 | 09/11/2025 | 870-31690 |
| m,p-Xylenes | 0.00100 | 0.000539 | J | mg/Kg | 0.00200 | 0.000228 | 09/11/2025 | 870-31690 |
| Isopropylbenzene | 0.00101 | 0.000902 | J | mg/Kg | 0.00200 | 0.000377 | 09/11/2025 | 870-31690 |
| Methylene Chloride | 0.00101 | 0.00141 | J | mg/Kg | 0.00500 | 0.00132 | 07/21/2025 | 870-30229 |
| Naphthalene | 0.00101 | 0.00115 | J | mg/Kg | 0.00200 | 0.000670 | 09/11/2025 | 870-31690 |
| N-Propylbenzene | 0.00101 | 0.000860 | J | mg/Kg | 0.00200 | 0.000516 | 09/11/2025 | 870-31690 |
| Styrene | 0.00101 | 0.00114 | J | mg/Kg | 0.00200 | 0.000517 | 09/11/2025 | 870-31690 |
| 1,1,1,2-Tetrachloroethane | 0.00101 | 0.000933 | J | mg/Kg | 0.00200 | 0.000460 | 09/11/2025 | 870-31690 |
| 1,1,2,2-Tetrachloroethane | 0.00101 | 0.00106 | J | mg/Kg | 0.00200 | 0.000684 | 09/11/2025 | 870-31690 |
| Tetrachloroethylene | 0.00101 | <0.000455 | U | mg/Kg | 0.00200 | 0.000455 | 09/11/2025 | 870-31690 |
| Bromoform | 0.00101 | <0.000896 | U | mg/Kg | 0.00200 | 0.000896 | 09/11/2025 | 870-31690 |
| o-Xylene | 0.00101 | 0.000872 | J | mg/Kg | 0.00200 | 0.000400 | 09/11/2025 | 870-31690 |
| 1,2,3-Trichlorobenzene | 0.00101 | 0.00102 | J | mg/Kg | 0.00200 | 0.000452 | 09/11/2025 | 870-31690 |

# Detection Check Summary

Client: Whitehead ES LLC
Project/Site: Cresson Moon Props

Job ID: 870-43022-1
SDG: 379.001

## Method: 8260C - Volatile Organic Compounds by GC/MS (Continued)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 5035-Closed System Purge and Trap**
**Instrument: A375** **Detector: MSD/0** **Column: DB-624-20m**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| 1,2,4-Trichlorobenzene | 0.00101 | 0.000974 | J | mg/Kg | 0.00200 | 0.000721 | 09/11/2025 | 870-31690 |
| 1,1,1-Trichloroethane | 0.00100 | 0.000881 | J | mg/Kg | 0.00200 | 0.000500 | 09/11/2025 | 870-31690 |
| 1,1,2-Trichloroethane | 0.00100 | 0.00109 | J | mg/Kg | 0.00200 | 0.000676 | 09/11/2025 | 870-31690 |
| Trichloroethene | 0.00101 | 0.000877 | J | mg/Kg | 0.00200 | 0.000461 | 09/11/2025 | 870-31690 |
| Trichlorofluoromethane | 0.00100 | <0.000842 | U | mg/Kg | 0.00200 | 0.000842 | 09/11/2025 | 870-31690 |
| 1,2,3-Trichloropropane | 0.00101 | 0.000956 | J | mg/Kg | 0.00200 | 0.000585 | 09/11/2025 | 870-31690 |
| 1,2,4-Trimethylbenzene | 0.00101 | <0.000561 | U | mg/Kg | 0.00200 | 0.000561 | 09/11/2025 | 870-31690 |
| 1,3,5-Trimethylbenzene | 0.00101 | 0.000912 | J | mg/Kg | 0.00200 | 0.000554 | 09/11/2025 | 870-31690 |
| Bromomethane | 0.00101 | <0.00117 | U | mg/Kg | 0.00500 | 0.00117 | 09/11/2025 | 870-31690 |
| Xylenes, Total | 0.00201 | 0.00141 | J | mg/Kg | 0.00200 | 0.000400 | 09/11/2025 | 870-31690 |
| Vinyl chloride | 0.00101 | <0.00191 | U | mg/Kg | 0.00500 | 0.00191 | 09/11/2025 | 870-31690 |
| 2-Butanone | 0.0101 | 0.00802 | J | mg/Kg | 0.0500 | 0.00772 | 09/11/2025 | 870-31690 |
| n-Butylbenzene | 0.00101 | 0.000804 | J | mg/Kg | 0.00200 | 0.000335 | 09/11/2025 | 870-31690 |
| sec-Butylbenzene | 0.00101 | 0.000802 | J | mg/Kg | 0.00200 | 0.000535 | 09/11/2025 | 870-31690 |

## Method: TX 1005 - Texas - Total Petroleum Hydrocarbon (GC)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: TX_1005_S_Prep-Extraction - Texas Total petroleum Hyrdocarbons**
**Instrument: A305** **Detector: FID/0** **Column: RXI1-MS**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| C6-C12 Range Hydrocarbons | 25.1 | <25.0 | U | mg/Kg | 50.0 | 25.0 | 09/12/2025 | 870-31693 |
| >C12-C28 Range Hydrocarbons | 25.1 | <25.0 | U | mg/Kg | 50.0 | 25.0 | 09/12/2025 | 870-31693 |

## Method: 300.0 - Anions, Ion Chromatography

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 300_Prep-Anions, Ion Chromatography, 10% Wt/Vol**
**Instrument: A263** **Detector: IC/0** **Column: AS-18**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Chloride | 5.00 | 5.19 | J | mg/Kg | 10.0 | 5.00 | 09/25/2025 | 860-264099 |

## Method: 6020B - Metals (ICP/MS)

**Matrix: Solid** **Prep Type: Total/NA**
**Prep Method: 3051A-Preparation, Metals, Microwave Assisted**
**Instrument: A364** **Detector: MSD/0**

| Analyte | Spike Added | Result | Qualifier | Unit | RL | MDL | Analysis Date | Analysis Batch |
|---|---|---|---|---|---|---|---|---|
| Barium | 0.300 | 0.28 | J | mg/Kg | 0.40 | 0.14 | 09/25/2025 | 860-264482 |

# Appendix A
# Laboratory Data Package Cover Page - Page 1 of 4



This data package is for Eurofins Dallas job number 870-43022-1 and consists of:

- ☑ R1 - Field chain-of-custody documentation;
- ☑ R2 - Sample identification cross-reference;
- ☑ R3 - Test reports (analytical data sheets) for each environmental sample that includes:
  - a. Items consistent with NELAC Chapter 5,
  - b. dilution factors,
  - c. preparation methods,
  - d. cleanup methods, and
  - e. if required for the project, tentatively identified compounds (TICs).
- ☑ R4 - Surrogate recovery data including:
  - a. Calculated recovery (%R), and
  - b. The laboratory's surrogate QC limits.
- ☑ R5 - Test reports/summary forms for blank samples;
- ☑ R6 - Test reports/summary forms for laboratory control samples (LCSs) including:
  - a. LCS spiking amounts,
  - b. Calculated %R for each analyte, and
  - c. The laboratory's LCS QC limits.
- ☑ R7 - Test reports for project matrix spike/matrix spike duplicates (MS/MSDs) including:
  - a. Samples associated with the MS/MSD clearly identified,
  - b. MS/MSD spiking amounts,
  - c. Concentration of each MS/MSD analyte measured in the parent and spiked samples,
  - d. Calculated %Rs and relative percent differences (RPDs), and
  - e. The laboratory's MS/MSD QC limits
- ☑ R8 - Laboratory analytical duplicate (if applicable) recovery and precision:
  - a. The amount of analyte measured in the duplicate,
  - b. The calculated RPD, and
  - c. The laboratory's QC limits for analytical duplicates.
- ☑ R9 - List of method quantitation limits (MQLs) and detectability check sample results for each analyte for each method and matrix.
- ☑ R10 - Other problems or anomalies.

The Exception Report for each "No" or "Not Reviewed (NR)" item in Laboratory Review Checklist and for each analyte, matrix, and method for which the laboratory does not hold NELAC accreditation under the Texas Laboratory Accreditation Program.

**Release Statement:** I am responsible for the release of this laboratory data package. This laboratory is NELAC accredited under the Texas Laboratory Accreditation Program for all the methods, analytes, and matrices reported in this data package except as noted in the Exception Reports. The data have been reviewed and are technically compliant with the requirements of the methods used, except where noted by the laboratory in the Exception Reports. By my signature below, I affirm to the best of my knowledge all problems/anomalies observed by the laboratory have been identified in the Laboratory Review Checklist, and no information affecting the quality of the data has been knowingly withheld.

| Mike Kimmel | [signature] | 1/21/2026 |
|---|---|---|
| Name (printed) | Signature | Date |

Project Manager
Official Title (printed)

# Laboratory Review Checklist: Reportable Data - Page 2 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| #[1] | A[2] | Description | Yes | No | NA[3] | NR[4] | ER#[5] |
|---|---|---|---|---|---|---|---|
| **R1** | OI | **Chain-of-custody (C-O-C)** | | | | | |
| | | Did samples meet the laboratory's standard conditions of sample acceptability upon receipt? | X | | | | |
| | | Were all departures from standard conditions described in an exception report? | X | | | | |
| **R2** | OI | **Sample and quality control (QC) identification** | | | | | |
| | | Are all field sample ID numbers cross-referenced to the laboratory ID numbers? | X | | | | |
| | | Are all laboratory ID numbers cross-referenced to the corresponding QC data? | X | | | | |
| **R3** | OI | **Test reports** | | | | | |
| | | Were all samples prepared and analyzed within holding times? | | X | | | R03A |
| | | Other than those results < MQL, were all other raw values bracketed by calibration standards? | X | | | | |
| | | Were calculations checked by a peer or supervisor? | X | | | | |
| | | Were all analyte identifications checked by a peer or supervisor? | X | | | | |
| | | Were sample detection limits reported for all analytes not detected? | X | | | | |
| | | Were all results for soil and sediment samples reported on a dry weight basis? | X | | | | |
| | | Were % moisture (or solids) reported for all soil and sediment samples? | X | | | | |
| | | Were bulk soils/solids samples for volatile analysis extracted with methanol per SW846 Method 5035? | X | | | | |
| | | If required for the project, are TICs reported? | | | X | | |
| **R4** | O | **Surrogate recovery data** | | | | | |
| | | Were surrogates added prior to extraction? | X | | | | |
| | | Were surrogate percent recoveries in all samples within the laboratory QC limits? | | X | | | R04B |
| **R5** | OI | **Test reports/summary forms for blank samples** | | | | | |
| | | Were appropriate type(s) of blanks analyzed? | X | | | | |
| | | Were blanks analyzed at the appropriate frequency? | X | | | | |
| | | Were method blanks taken through the entire analytical process, including preparation and, if applicable, cleanup procedures? | X | | | | |
| | | Were blank concentrations < MQL? | X | | | | |
| **R6** | OI | **Laboratory control samples (LCS):** | | | | | |
| | | Were all COCs included in the LCS? | X | | | | |
| | | Was each LCS taken through the entire analytical procedure, including prep and cleanup steps? | X | | | | |
| | | Were LCSs analyzed at the required frequency? | X | | | | |
| | | Were LCS (and LCSD, if applicable) %Rs within the laboratory QC limits? | X | | | | |
| | | Does the detectability check sample data document the laboratory's capability to detect the COCs at the MDL used to calculate the SDLs? | X | | | | |
| | | Was the LCSD RPD within QC limits? | X | | | | |
| **R7** | OI | **Matrix spike (MS) and matrix spike duplicate (MSD) data** | | | | | |
| | | Were the project/method specified analytes included in the MS and MSD? | X | | | | |
| | | Were MS/MSD analyzed at the appropriate frequency? | X | | | | |
| | | Were MS (and MSD, if applicable) %Rs within the laboratory QC limits? | | X | | | R07C |
| | | Were MS/MSD RPDs within laboratory QC limits? | X | | | | |
| **R8** | OI | **Analytical duplicate data** | | | | | |
| | | Were appropriate analytical duplicates analyzed for each matrix? | X | | | | |
| | | Were analytical duplicates analyzed at the appropriate frequency? | X | | | | |
| | | Were RPDs or relative standard deviations within the laboratory QC limits? | X | | | | |
| **R9** | OI | **Method quantitation limits (MQLs):** | | | | | |
| | | Are the MQLs for each method analyte included in the laboratory data package? | X | | | | |
| | | Do the MQLs correspond to the concentration of the lowest non-zero calibration standard? | X | | | | |
| | | Are unadjusted MQLs and DCSs included in the laboratory data package? | X | | | | |
| **R10** | OI | **Other problems/anomalies** | | | | | |
| | | Are all known problems/anomalies/special conditions noted in this LRC and ER? | X | | | | |
| | | Was applicable and available technology used to lower the SDL to minimize the matrix interference effects on the sample results? | X | | | | |
| | | Is the laboratory NELAC-accredited under the Texas Laboratory Accreditation Program for the analytes, matrices and methods associated with this laboratory data package? | X | | | | |

1. Items identified by the letter "R" must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter "S" should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if "NR" or "No" is checked).

# Laboratory Review Checklist: Supporting Data - Page 3 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| #[1] | A[2] | Description | Yes | No | NA[3] | NR[4] | ER#[5] |
|---|---|---|---|---|---|---|---|
| S1 | OI | **Initial calibration (ICAL)** | | | | | |
| | | Were response factors and/or relative response factors for each analyte within QC limits? | X | | | | |
| | | Were percent RSDs or correlation coefficient criteria met? | X | | | | |
| | | Was the number of standards recommended in the method used for all analytes? | X | | | | |
| | | Were all points generated between the lowest and highest standard used to calculate the curve? | X | | | | |
| | | Are ICAL data available for all instruments used? | X | | | | |
| | | Has the initial calibration curve been verified using an appropriate second source standard? | X | | | | |
| S2 | OI | **Initial and continuing calibration verification (ICV and CCV) and continuing calibration blank (CCB):** | | | | | |
| | | Was the CCV analyzed at the method-required frequency? | X | | | | |
| | | Were percent differences for each analyte within the method-required QC limits? | X | | | | |
| | | Was the ICAL curve verified for each analyte? | X | | | | |
| | | Was the absolute value of the analyte concentration in the inorganic CCB < MDL? | X | | | | |
| S3 | O | **Mass spectral tuning** | | | | | |
| | | Was the appropriate compound for the method used for tuning? | X | | | | |
| | | Were ion abundance data within the method-required QC limits? | X | | | | |
| S4 | O | **Internal standards (IS)** | | | | | |
| | | Were IS area counts and retention times within the method-required QC limits? | X | | | | |
| S5 | OI | **Raw data (NELAC Section 5.5.10)** | | | | | |
| | | Were the raw data (for example, chromatograms, spectral data) reviewed by an analyst? | X | | | | |
| | | Were data associated with manual integrations flagged on the raw data? | X | | | | |
| S6 | O | **Dual column confirmation** | | | | | |
| | | Did dual column confirmation results meet the method-required QC? | | | X | | |
| S7 | O | **Tentatively identified compounds (TICs)** | | | | | |
| | | If TICs were requested, were the mass spectra and TIC data subject to appropriate checks? | | | X | | |
| S8 | I | **Interference Check Sample (ICS) results** | | | | | |
| | | Were percent recoveries within method QC limits? | X | | | | |
| S9 | I | **Serial dilutions, post digestion spikes, and method of standard additions** | | | | | |
| | | Were percent differences, recoveries, and the linearity within the QC limits specified in the method? | X | | | | |
| S10 | OI | **Method detection limit (MDL) studies** | | | | | |
| | | Was a MDL study performed for each reported analyte? | X | | | | |
| | | Is the MDL either adjusted or supported by the analysis of DCSs? | X | | | | |
| S11 | OI | **Proficiency test reports** | | | | | |
| | | Was the laboratory's performance acceptable on the applicable proficiency tests or evaluation studies? | X | | | | |
| S12 | OI | **Standards documentation** | | | | | |
| | | Are all standards used in the analyses NIST-traceable or obtained from other appropriate sources? | X | | | | |
| S13 | OI | **Compound/analyte identification procedures** | | | | | |
| | | Are the procedures for compound/analyte identification documented? | X | | | | |
| S14 | OI | **Demonstration of analyst competency (DOC)** | | | | | |
| | | Was DOC conducted consistent with NELAC Chapter 5? | X | | | | |
| | | Is documentation of the analyst's competency up-to-date and on file? | X | | | | |
| S15 | OI | **Verification/validation documentation for methods (NELAC Chapter 5)** | | | | | |
| | | Are all the methods used to generate the data documented, verified, and validated, where applicable? | X | | | | |
| S16 | OI | **Laboratory standard operating procedures (SOPs)** | | | | | |
| | | Are laboratory SOPs current and on file for each method performed? | X | | | | |

1. Items identified by the letter "R" must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter "S" should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if "NR" or "No" is checked).

# Laboratory Review Checklist: Exception Reports - Page 4 of 4

| | | | |
|---|---|---|---|
| Laboratory Name: | Eurofins Dallas | LRC Date: | 1/21/2026 |
| Project Name: | Cresson Moon Props | Laboratory Job Number: | 870-43022-1 |
| Reviewer Name: | Mike Kimmel | | |

| ER #[1] | Description |
|---|---|
| R03A | The following sample(s) was received with insufficient time remaining to freeze within 48 hours, as required for samples collected in water preserved TerraCores: all samples. The sample(s) was collected on 1/9/26. The sample(s) was received on Saturday 1/10/26 at 9:15 and placed in the freezer on 1/12/26 at 11:15 . |
| R04B | Method TX 1005: Surrogate recovery for the following sample was outside the upper control limit: SB-05 (8'-9') (870-43022-11). This sample did not contain any target analytes; therefore, re-extraction and/or re-analysis was not performed. |
| R07C | Method 6020B: The matrix spike / matrix spike duplicate (MS/MSD) recoveries for preparation batch 860-287918 and analytical batch 860-288184 were outside control limits. Sample matrix interference is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits.<br><br>Method 8260C: The matrix spike (MS) recoveries for preparation batch 870-34798 and analytical batch 870-34789 were outside control limits. Non-homogeneity is suspected because the associated laboratory control sample (LCS) recovery was within acceptance limits. |

1. Items identified by the letter “R” must be included in the laboratory data package submitted in the TRRP-required report(s). Items identified by the letter “S” should be retained and made available upon request for the appropriate retention period.
2. O = organic analyses; I = inorganic analyses (and general chemistry, when applicable);
3. NA = Not applicable;
4. NR = Not reviewed;
5. ER# = Exception Report identification number (an Exception Report should be completed for an item if “NR” or “No” is checked).

THE STATE OF TEXAS · TEXAS BOARD OF PROFESSIONAL GEOSCIENTISTS · 2001

# Texas Board of Professional Geoscientists
## Certificate of Geoscience Firm Registration

It is Hereby Acknowledged That

# WHITEHEAD E. S., LLC

Has fulfilled the requirements of the State of Texas to offer and perform geosciences services in the State of Texas and is issued

**Firm Registration No. 50600**

In witness whereof I have hereunto set my hand and affixed the seal of the Board, this November 20, 2018.

C. T. Hallmark

C. Thomas Hallmark, PhD, PG, TBPG Chairman

Texas map courtesy of the Bureau of Economic Geology, The University of Texas at Austin

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHALLENGER CRESSON I, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 4:26-cv-00231-P |

EXPERT REPORT OF MICHAEL WHITEHEAD

I, Michael Whitehead, M.S., have been retained by Defendants to provide opinion testimony in connection with Case No. 4:26-cv-00231-P, now pending in the United States District Court for the Northern District of Texas, Fort Worth Division. My opinions are based on my education, training, and experience in environmental remediation; my first-hand knowledge of facts regarding this matter; and my review of the documents, data, and materials identified in this report.

## I. Opinion Statements, Bases, and Reasons:

**Opinion 1:** The on-site and off-site RECs identified in the ESE and Whitehead E. S. Phase I ESAs were adequately addressed by the Limited Phase II Investigation conducted by Whitehead E. S. The basis for this opinion is that historical aerial photographs, LiDAR imagery, Google Earth satellite imagery, and the approved work plan were used to identify the former reserve pits, former

AST areas, the two on-site well pads, and the adjacent off-site well pad for targeted investigation. Whitehead E. S. utilized historical aerial photographs to identify the locations of the former reserve pits and ASTs on the well pads so that sampling locations correlated to these potential environmental concerns. Soil boring/temporary monitoring well SB-01/TMW-01 was advanced on the south side of the north well pad in the footprint of the former reserve pit. Soil boring SB-02 was advanced to the east of the north well pad, and soil boring SB-03 was advanced northwest of the north well pad near the former AST locations. Soil boring/temporary monitoring well SB-04/TMW-02 was advanced north of an off-site natural gas well pad. Soil boring/temporary monitoring well SB-05/TMW-03 and soil boring SB-06 were advanced near the south well pad in the footprint of the former reserve pit and near the former AST locations. Cresson Moon Property, LLC and ESE approved the proposed work plan and sampling locations, and ESE provided third-party oversight during the investigation.

**Opinion 2:** The field observations from the Limited Phase II Investigation did not show field indicators of potential COCs. The basis for this opinion is that the soil samples and borings showed no dark staining or odors, and PID readings were low, ranging from 0.0 to 9.2 ppm. Soil samples from the six soil-boring locations were placed onto clean, dedicated plastic sheeting and screened in the field for potential COCs, including observations for dark staining and/or fill materials, odors, pH, and measurements of organic vapors using a MiniRae Lite PID. No dark staining was observed in any of the soil samples or borings. Soil borings SB-01, SB-02, SB-05, and SB-06 had very low PID readings of 0.0 to 0.6 ppm, which are considered background readings potentially from the drill rig or surrounding equipment and not indicative of an environmental impact. Soil borings SB-03 and SB-04 had maximum PID readings of only 2.9 ppm and 9.2 ppm,

respectively. These PID readings were considered low and not indicative of a release. The pH ranges of the soil were reported between 7.1 and 9.0.

**Opinion 3:** The soil analytical data did not identify COCs associated with historical oil and gas activities above applicable TRRP Residential PCLs, TSBCs, or RRC Regulatory Protection Limits. The basis for this opinion is that TPH fractions, VOCs/BTEX, barium, chloride, and PAHs were either not detected or detected at low concentrations below the applicable regulatory criteria discussed in this report. The concentrations of all potential COCs, including TPH fractions, VOCs/BTEX, barium, and chloride, were either not detected below their sample detection limits or were detected at low concentrations well below their TRRP RALs or RRC Regulatory Protection Limits. For the TPH fractions, TPH in the diesel range (C12-C28) was detected in only one sample, SB-01 (3-4'), at a low concentration of 35.5J mg/kg. This concentration is well below the TRRP Tier 1 Default PCL/RAL of 200 mg/kg. This sample was further analyzed for PAHs, and all analytes were below their laboratory SDLs. No other TPH fractions were detected in any of the samples analyzed.

The only VOCs/BTEX compounds detected in four soil samples were low concentrations of ethylbenzene and total xylenes in samples SB-01 (3–4'), SB-02 (3-4'), SB-03 (5-6'), and SB-04 (3-4'). These concentrations of ethylbenzene and total xylenes were well below their respective RALs. Ethylbenzene was detected in three samples, SB-02, SB-03, and SB-04, at very low concentrations ranging from 0.000545J mg/kg to 0.00169J mg/kg, all well below the TRRP PCL of 7.6 mg/kg. Total xylenes were detected at four locations, SB-01, SB-02, SB-03, and SB-04, at low concentrations ranging from 0.000657J mg/kg to 0.0129 mg/kg, all well below the TRRP PCL of 120 mg/kg. No other VOCs were detected above their respective SDLs. Barium was detected in all six samples analyzed with concentrations ranging from 16.7 mg/kg to 148 mg/kg, all below

the TRRP PCL of 440 mg/kg. Chloride was detected in four samples, SB-01, SB-03, SB-04, and SB-06, with concentrations between 5.71J mg/kg and 250 mg/kg, well below the RRC Regulatory Protection Limit of 3,000 mg/kg. All other analytes were below their laboratory SDLs.

**Opinion 4:** Groundwater was not encountered in the three temporary monitoring wells, and therefore no groundwater samples were collected or analyzed. The basis for this opinion is that the boreholes and temporary monitoring wells were dry at completion and at the end of the workday, and the wells were plugged and abandoned the same day as drilling. Three temporary monitoring wells were installed on the subject property in locations agreed to by both parties. The temporary monitoring wells were installed to depths of approximately 19.0 feet, 24.0 feet, and 11.0 feet bgs. The boreholes were dry at completion, and the temporary monitoring wells were dry at completion and at the end of the workday. No groundwater samples were therefore collected or analyzed.

**Opinion 5:** Based on the Limited Phase II Investigation, there is no evidence of impact to the Site, and no further assessment is recommended at this time. The basis for this opinion is the targeted sampling of the AOCs, absence of field indicators, analytical results below the applicable regulatory criteria, absence of PAH detections in the follow-up PAH analysis, and absence of shallow groundwater encountered in the temporary monitoring wells.

In conclusion, Whitehead E. S. conducted a Limited Phase II Investigation to evaluate potential COCs in soil and to assess whether groundwater would be encountered for sampling from the former on-site well pads and off-site active natural gas well pad. Sampling included only soil samples because the three temporary monitoring wells were dry and did not yield any groundwater. Based on observations during the sampling, including visual inspection for dark staining, odor, and PID readings, there were no field indicators of potential COCs. Analysis of soil samples did

not indicate any COCs associated with oil and gas activities, including TPH fractions, BTEX, barium, and/or chloride, because their concentrations were either not detected or were well below their respective TRRP Residential PCLs and/or RRC Limits for soil. Soil sampling data did not identify any COCs in the Areas of Concern (AOCs) on the Site noted in the previous Phase I ESAs and agreed to for the Phase II Investigation. Based on the Whitehead E. S. Phase II Investigation, there is no evidence of any impact to the Site, and no further investigation is warranted at this time. The Phase II Investigation conducted by Whitehead E. S. with oversight provided by ESE indicated that the soil was not impacted by any of the suspected COCs associated with historical oil and gas activities and that there was no evidence of shallow groundwater in the three AOCs on the Site. The AOCs included two well pads on the subject property, the north and south pads, and one off-site well pad along the southwest property boundary that were identified as potential RECs in the Phase I ESAs. The sampling locations were based on aerial photographs that clearly showed the locations of former reserve pits and ASTs. The low diesel range TPH fractions in only one sample, 35.5J mg/kg, the absence of any PAHs, and the absence of any VOCs, including BTEX components above their TRRP RALs, indicated that the soils in the three AOCs were not impacted. The only hazardous substances detected at the Site were ethylbenzene, total xylenes, and barium. The concentrations of ethylbenzene, total xylenes, and barium were low and well below their criteria under TRRP to be considered COCs to the subject property, as discussed in RG-649, Determining Which Releases are Subject to TRRP. Based on my assessment, it is my professional opinion that the subject property is not impacted and no further assessment is recommended.

## II. Facts or Data Considered in Forming Opinions:

### A. Assignment and Scope

I prepared a summary assessment/evaluation of the environmental assessments conducted at the 1,674-acre undeveloped property located at 7700 Old Granbury Road in Cresson, Hood County, Texas, referred to in this report as the subject property or Site, related to the historical use of oil/gas operations on-Site. The assessment included a summary of the Phase I Environmental Site Assessment conducted by ESE dated December 18, 2023, a complete Phase I ESA from ESE Partners, LLC dated December 11, 2025, a Phase I ESA conducted by Whitehead E. S. dated December 12, 2025, and a Limited Phase II Investigation conducted by Whitehead E. S. dated January 26, 2026. The Phase II Investigation was identified as "limited" based on the use of temporary versus permanent monitoring wells as agreed to by both parties.

My opinions are based on first-hand experience with the investigations, specifically those conducted by Whitehead E.S., as well as my professional review of the Phase I ESAs conducted by ESE. I was involved in discussions with ESE on findings from the Phase I ESAs, general Site information, scope for the Phase II sampling, data review, report development, and ultimately as Senior Reviewer and Environmental Professional for the Phase I ESA and Phase II Investigation completed by Whitehead E. S. The Professional Geoscientist for the Phase II Investigation was Amanda Pechacek, P.G. #15423, with Whitehead E.S.

Other resources used in forming these opinions included evaluation of the Texas Risk Reduction Program Protective Concentration Limits, revised February 6, 2025, and Texas-Specific Soil Background Concentrations presented in 30 TAC § 350.51(m), as used by TCEQ and RRC as Regulatory Action Levels or PCLs. I reviewed aerial photographs obtained from Texas Database LLC for the well pads on the Site from 2007 and 2011. These aerial photographs were

utilized to develop the scope of work and sampling locations for the Phase II Investigation because they more clearly showed the former aboveground storage tanks and suspected reserve pits noted as RECs.

**B. ESE Phase I ESA Information**

Whitehead E. S. initially received a Phase I ESA conducted by ESE dated December 18, 2023 for Challenger Cresson I, LLC. This Phase I ESA was limited to the Executive Summary, selected sub-sections, and Figure 2. It did not include the majority of the text report, appendices, or an evaluation of potential RECs, CRECs, HRECs, VECs, or BERs. The Phase I ESA did note five natural gas pipelines, three natural gas wells, two dry holes, and one abandoned well location. The three natural gas wells were in operation at the time of the reporting, and three of the natural gas pipelines were in service. During the Site reconnaissance conducted on December 10, 2025, approximately 30 drums of oil-based products, one 500-gallon AST, and 10 containers of oil were observed on the property by ESE.

At Whitehead E.S.'s request, ESE sent Whitehead E. S. the completed Phase I ESA on December 15, 2025, which was conducted in accordance with ASTM E1527-21. This ESA report was dated December 11, 2025. According to the report, five natural gas gathering pipeline easements were identified on-Site, three of which were in service. No visible evidence of a release was noted, such as discolored soil, stressed/stained vegetation, or unusual odors. Additionally, three gas wells, two dry holes, and one abandoned well location were reported in the Texas RRC Public Geographic Information System database.

ESE stated that no evidence of reserve pits, surface impoundments, or releases were visible during their Site reconnaissance on December 10, 2025, or in historical aerial photographs dated 1948, 1953, 1959, 1981, 1995, 2005, 2016, and 2022. The subject property was not listed in any

TCEQ or U.S. Environmental Protection Agency databases. Furthermore, two ponds were observed during the Site reconnaissance; however, the ponds appeared to be utilized as stock ponds for livestock, and there were no surface sheens or other evidence of hazardous substances noted. LiDAR and Google Earth satellite imagery identified ASTs and potential former reserve pits on the gas well pads. In review of the LiDAR imagery obtained from the USGS National Map 3D Elevation Program dated January 2, 2025, slight topographical changes could be observed at the locations of the potential reserve pits. It was the opinion of ESE that the former ASTs and the potential reserve pits associated with well pad stations constituted a REC to the subject property. ESE noted that further investigation would be required to confirm or deny the presence of COCs associated with the identified REC.

**C. Whitehead E. S. Phase I ESA Information**

Whitehead E. S. conducted a Phase I ESA of the subject property for Challenger Realty Group, LLC. The Phase I ESA Site reconnaissance was conducted on December 3, 2025, and the report was issued on December 12, 2025. According to my review, two natural gas wells, API #22131145 and #22131003, were installed on the subject property in 2005 and 2006 and were plugged in 2025.

According to aerial photographs obtained by the EDR report dated December 8, 2025, a potential reserve pit was identified south of the northern well pad, API #22131145, in 2010 and 2014 and appeared to be dry by 2018. Additionally, evidence of a potential reserve pit was observed associated with the southern well pad, API #22131003, in the 2010 and 2014 aerial photographs. Additional aerial photographs obtained from Texas Database for the two on-Site well pads dated 2007 and 2011 more clearly showed the former ASTs and reserve pits. Due to the

presence of the ASTs and reserve pits, Whitehead E. S. identified each area as a REC to the subject property.

One off-Site REC was identified due to the presence of a natural gas well pad southwest of the Site with oil and gas operations and a reserve pit observed in the 2010, 2014, 2018, and 2022 aerial photographs obtained from EDR. However, it was my professional opinion that any potential impacts from the off-Site source would be the responsibility of the off-Site property owner for future assessment and/or response actions, if needed.

During the Site reconnaissance conducted by Whitehead E. S. on December 3, 2025, Whitehead E. S. did not observe any ASTs, drums, or containers during the Site reconnaissance, nor was there any evidence of dark staining, stressed vegetation, or odors within the vicinity of the reported ASTs and/or drums. Therefore, these items did not represent a REC in connection with the subject property in the Whitehead E. S. Phase I ESA.

According to the EDR database report dated December 8, 2025, the subject property was identified in the Tier 2, Air New Source Permits #111774 and #111777, and Compliance History RN106844418 and RN106844434 databases. Both on-Site well pads were listed in the Tier 2 database, which tracks hazardous chemicals at facilities, ensuring compliance with reporting requirements under the Emergency Planning and Community Right-to-Know Act database. The facility was listed several times between 2005 and 2013 for crude petroleum and natural gas extraction and reported 500 barrels of condensate stored in the northwest and southwest ASTs as the primary chemical stored on-Site in 2010, 2011, 2012, and 2013. Both ASTs were reportedly stored in secondary containment tank berms, and no violations were identified for these listings. The two on-Site well pads were also listed in the Air New Source Permits for active registrations. Both registrations, #111774 and #111777, were initially submitted in 2013 and updated in 2016

and 2020. No violations were identified with either registration. Both on-Site well pads were identified in the TCEQ Compliance History database, and both well pads were rated between 0 and 0.78 in September 2023, indicating they are high to satisfactory performers under 30 TAC § 60.2(g) and have good to excellent environmental compliance.

Whitehead E. S. obtained additional aerial photographs from Texas Database that were not included in the EDR data package due to poor quality and data gaps in the years. Aerial photographs from 2007 and 2011 of the northern and southern well pads were utilized for development of the Phase II Investigation and provided locations of the former reserve pits. For both the northern and southern well pads, a reserve pit on each well pad was more clearly observed in the 2007 aerial and was no longer observed by 2011.

**D. Summary and Evaluation of Phase I ESAs**

Both ESE and Whitehead E. S. identified the same two on-Site well pads as RECs to the subject property. Whitehead E. S. identified an additional REC for the off-Site well pad. The north well pad and the south well pad were considered on-Site RECs associated with the oil and gas operations on the subject property. ESE identified a REC associated with the potential presence of the reserve pits and the observed ASTs, using LiDAR imagery, in its Phase I ESA dated December 11, 2025. Whitehead E. S. identified two on-Site RECs associated with both well pads and the potential presence of reserve pits, as identified in the aerial images from EDR and Texas Database. Whitehead E. S. also identified one off-Site REC to the southwest of the Site due to a bordering well pad with a potential reserve pit.

Based on the aerial photographs obtained from EDR and Texas Database reviewed by Whitehead E. S. and the EDR aerials and LiDAR used by ESE, locations of the reserve pits and ASTs were identified at both well pads on the subject property. Aerial photographs obtained from

Texas Database by Whitehead E. S. showed the reserve pits being utilized in 2007 and dry by 2011. The clearer aerial photographs were used by Whitehead E. S. to determine sampling locations in the Phase II Investigation. A work order was provided to Cresson Moon Property, LLC and ESE for approval prior to the investigation.

**E. Limited Phase II Investigation Scope and Implementation**

Whitehead E. S. was retained by Cresson Moon Property, LLC to conduct a Limited Phase II Investigation of the Site. The purpose of the investigation was to identify potential environmental impacts to the Site based on the identified RECs in the Phase I ESAs conducted by ESE and Whitehead E. S. in December 2025. The on-Site RECs were limited to the two on-Site well pads referred to as the north pad and south pad. Additionally, ESE and Whitehead E. S. concurred that one soil boring would be installed on the Site just north of the off-Site and southwest adjacent well pad.

The scope of work for the Limited Phase II Investigation was developed to address the two on-Site RECs, the north and south well pads, and one southwest off-Site well pad. Whitehead E. S. developed an initial scope for soil and groundwater sampling to address these three RECs and used aerial photographs to identify the location of the reserve pits and the aerials from the ESE and Whitehead E. S. Phase I ESAs for locations of the ASTs. Whitehead E. S. discussed the scope of work and sampling locations with Aaron Munsart of ESE via multiple phone calls and email messages.

The key issues in those discussions included sampling locations and depths, sample parameters for suspected COCs, use of temporary monitoring wells instead of permanent monitoring wells, and time frame to leave temporary monitoring wells on the Site for groundwater sampling. ESE recommended that Whitehead E. S. add barium and chloride in the soil sample

analyses, agreed to the use of temporary versus permanent monitoring wells, and stated that temporary monitoring wells should be plugged the same day of drilling. Temporary monitoring wells can be left on the Site for only 48 hours per 16 TAC § 76.100(f)(5). Subsequently, no groundwater accumulated in the three temporary monitoring wells, and they were plugged and abandoned by the driller on the same day as drilling as agreed upon by Aaron Munsart of ESE.

On January 9, 2026, Whitehead E. S. mobilized to the Site along with William Day of ESE for third-party oversight. ESE did not collect any samples during the investigation; however, the ESE representative suggested taking soil samples from the bottom of the soil borings in the soil cuttings generated from solid stem augers. Whitehead E. S. clarified with Aaron Munsart of ESE on a phone call that samples should not be taken from the soil cuttings or at the bottom of the boring if limestone was present and solid stem augers were used. This was agreed upon by both parties because the depth of a sample cannot be accurately confirmed from soil cutting sampling. Whitehead E. S. subsequently collected soil samples correlating with the highest PID readings and/or at arbitrary depths to assess COC distribution within the silty clay, sand, or very weathered limestone in the soil boring. Arbitrary depths were utilized if a soil boring did not have any PID readings above background levels. Additionally, the property owner, Mr. Greg Graham, filmed Whitehead E. S. during sampling procedures.

**F. Soil Borings, Temporary Monitoring Wells, and Lithology**

Six soil borings, SB-01 through SB-06, were advanced on the Site during the Phase II Investigation. Soil boring/temporary monitoring well SB-01/TMW-01 was advanced on the south side of the north well pad in the footprint of the former potential reserve pit. Soil boring SB-02 was advanced east of the north well pad, and SB-03 was advanced northwest of the north well pad near the former ASTs. Soil boring/temporary monitoring well SB-04/TMW-02 was advanced

north of an off-Site natural gas well pad located on the southwest boundary of the Site. Soil boring/temporary monitoring well SB-05/TMW-03 and soil boring SB-06 were advanced near the south well pad in the footprint of the former potential reserve pit and near the former ASTs.

Soil borings were advanced utilizing a track-mounted Geoprobe with direct push technology and clear acetate liners within a hollow stainless-steel drill rod by a hydraulic-driven hammer. DPT refusal of the soil borings was encountered at 5.5 to 10 feet due to shallow weathered limestone. In these locations, solid stem augers were used to drill to desired depths of 11 to 24 feet. Soil samples were collected from the acetate liners from the DPT and not loose soil cuttings generated from the solid stem augers.

Three of the soil borings, SB-01, SB-04, and SB-05, were converted into temporary monitoring wells, TMW-01, TMW-02, and TMW-03, respectively. Prior to temporary monitoring well installation, solid stem augers were utilized after direct push refusal to achieve the desired depth. Temporary monitoring wells were constructed utilizing one-inch schedule 40 PVC piping riser and one-inch schedule 40 PVC piping with 0.010-inch slots. No groundwater was encountered during the investigation. Furthermore, correspondence with ESE stated that the wells should be plugged the same day as drilling. Temporary monitoring wells were subsequently plugged and abandoned by the driller on the same day as installation with bentonite chips.

Soil boring logs are presented in Appendix 5. Soil boring SB-01, North Pad, south side, consisted of silty clay in the top 3.0 feet of SB-01 underlain by weathered limestone starting at 3.0 feet. The DPT rig encountered refusal at 5.5 feet, and weathered limestone was encountered from 5.5 feet to 19 feet using solid stem augers. Soil boring SB-02, North Pad, east side, consisted of weathered limestone throughout, switching from DPT to solid stem augers at 5.0 feet. Soil boring SB-03, North Pad, northwest area, consisted of weathered limestone at the surface with a clay

seam at 5.0 to 6.5 feet at the bottom of the DPT push. Drilling switched to solid stem augers, and weathered limestone was encountered to 15 feet. Soil boring/temporary monitoring well SB-04/TMW-02, north of the off-Site pad, consisted of silty clay down to 24 feet. DPT refusal was encountered at 6.5 feet, and solid stem augers were used to 24 feet. Soil boring/temporary monitoring well SB-05/TMW-03, South Pad, encountered silty clay down to 7.0 feet that was underlain by gravelly sand/sand to a depth of 10 feet using the DPT rig. Weathered limestone was encountered at 10 to 11 feet. Soil boring SB-06, South Pad, northwest of ASTs, encountered silty clay to approximately 3.0 feet that was underlain by gravelly sand/sand using the DPT rig. PID readings were low throughout all soil borings, ranging from 0.0 to 9.2 ppm. No dark staining or odor was noted in the samples.

**G. Soil Sampling and Laboratory Analysis**

Soil samples selected from each soil boring were analyzed for TPH fractions by Texas Method TX 1005, benzene, toluene, ethylbenzene, and xylenes/methyl tert-butyl ether, or the full suite of VOCs by EPA Method 8260. Soil samples SB-01 (3'-4'), SB-02 (3'-4'), SB-03 (3'-4'), SB-04 (3'-4'), SB-05 (2'-3'), and SB-06 (6'-7') were analyzed for the full list/suite of VOCs, while samples SB-03 (5'-6'), SB-05 (8'-9'), and SB-06 (2'-3') were analyzed for only BTEX/MTBE. Additionally, selected samples were analyzed for barium by EPA Method 6020, chloride via EPA Method 300.0, and pH by EPA Method 9045D. A single sample, SB-01 at 3-4', was analyzed for PAHs by EPA Method 8270 due to the diesel range TPH (C12-C28) fractions that were detected at low concentrations.

A total of 13 soil samples were collected from the borings in accordance with EPA Method 5035. Before sample collection, personnel handling samples donned new gloves and ensured that the work area was clear of materials that could cause cross-contamination, including

decontamination equipment or supplies. Samples were collected in laboratory-supplied containers, cleaned of any residual soil potentially located on the exterior of the VOA, and immediately placed on wet ice in insulated coolers. Site work was completed at 3:30 PM, and the samples were transported to Whitehead E.S.'s office for storage in a clean, dedicated sampling fridge overnight. Samples were delivered to Eurofins Environment Testing in Dallas, Texas, for analysis on January 10, 2026 at 9:15 AM. Samples were preserved with methanol and hydrochloric acid for VOC analysis and maintained in a chilled environment less than six degrees Celsius. No QA/QC issues were identified.

Soil samples collected from the Limited Phase II Investigation were analyzed by Eurofins for TPH fractions, BTEX/MTBE or full suite VOCs, barium, and chloride in accordance with the approved work order agreed upon by the client and ESE. Since TPH in the diesel range was detected in one sample at 35.5 mg/kg with a J qualifier, Whitehead E. S. requested the laboratory to further analyze this sample for PAHs by EPA Method 8270. A "J" qualifier indicated that the concentration was estimated because it was above the adjusted method detection limit and below the adjusted reporting limit. The Eurofins analytical report, dated January 21, 2026, is presented in Appendix 8.

Soil sampling results are summarized in Table 1A, covering TPH, VOCs, barium, and chloride, and Table 1B, covering PAHs. The results were compared to their respective default TCEQ TRRP Tier 1 Residential Protective Concentration Levels, commonly referred to as Residential Assessment Levels (RALs). The Site is subject to RRC rules and regulations due to oil and gas operations at the Site; however, RRC utilizes TRRP PCLs, and therefore they were utilized for this assessment. Barium was additionally compared to its TSBC (300 mg/kg). Since the TSBC was lower, the TRRP PCL (440 mg/kg) was utilized as its default RAL as it was the higher of the

two in accordance with TRRP. Soil samples analyzed for chloride were compared to the RRC Regulatory Protection Limit.

**H. QA/QC and Revised Laboratory Information**

Whitehead E. S. reviewed the laboratory analytical data package dated January 21, 2026 for accuracy and usability of the data presented.

Upon review of the laboratory review checklist exception report, the laboratory noted: "The following sample(s) was [sic] received with insufficient time remaining to freeze within 48 hours, as required for samples collected in water preserved TerraCores: all samples. The sample(s) was collected on 1/9/26. The sample(s) was received on Saturday 1/10/26 at 9:15 and placed in the freezer on 1/12/26 at 11:15." Additionally, details on the temperature measured at the laboratory upon receipt were not documented.

Whitehead E. S. spoke with Mr. Mike Kimmel, the project manager and laboratory review checklist reviewer for Eurofins, via phone on July 2, 2026 to clarify these notes. Mr. Kimmel reviewed internal documentation regarding this matter and confirmed the comment noted in the laboratory review checklist exception report was incorrectly stated and that the samples were chilled within the proper holding time of 48 hours. He also clarified that the temperature measured at the laboratory was documented but written in an incorrect spot, the bottom of the chain of custody, and was 4.7 degrees Celsius after a correction factor of -0.1 degrees Celsius was applied. With these explanations, there were no QA/QC issues identified. A revised laboratory analytical report was issued on July 2, 2026 with an explanation of the discrepancies and corrections listed within the case narrative.

Whitehead E. S. additionally reviewed the laboratory QA/QC sample results reported in the laboratory analytical reports for accuracy and usability of the data presented. Project criteria

were set at 60-140% recovery and 40% reproducibility for organics and 70-130% recovery and 30% reproducibility for inorganics. Surrogate percent recoveries were within project-defined criteria for TPH and VOC analysis. Surrogate percent recovery was below project-defined criteria for nitrobenzene-d5 in client sample SB-01 (3-4') and the method blank for PAH analysis. However, in accordance with TRRP-13, Review and Reporting of COC Concentration Data under TRRP, since the surrogate was outside the percent recovery criteria for one surrogate in a sample with multiple surrogate compounds, no qualification was warranted, and the results were considered acceptable. Analyte 1,2-dibromo-3-chloropropane was above project-defined criteria in the matrix spike for VOC analysis. However, this analyte was not detected in any of the client samples, and therefore there are no applicable qualifiers under TRRP-13.

**I. Documents, Data, and Materials Considered**

The documents, data, and materials considered include, at a minimum, the following:

1. ESE Phase I Environmental Site Assessment dated December 18, 2023.
2. ESE complete Phase I Environmental Site Assessment dated December 11, 2025.
3. Whitehead E. S. Phase I Environmental Site Assessment dated December 12, 2025.
4. Whitehead E. S. Limited Phase II Investigation dated January 26, 2026.
5. Work order provided to Cresson Moon Property, LLC and ESE for approval before the Phase II Investigation.
6. Communications with ESE regarding Phase II scope, sampling locations, sample parameters, and temporary monitoring wells.
7. ESE third-party oversight materials for the January 9, 2026 field investigation.
8. Eurofins analytical report dated January 21, 2026.
9. Revised Eurofins analytical report dated July 2, 2026.

10. EDR database report dated December 8, 2025.
11. Texas Database aerial photographs from 2007 and 2011.
12. LiDAR imagery obtained from USGS National Map 3D Elevation Program dated January 2, 2025.
13. Google Earth satellite imagery.
14. Texas Risk Reduction Program Protective Concentration Limits, revised February 6, 2025.
15. Texas-Specific Soil Background Concentrations presented in 30 TAC § 350.51(m).
16. RRC Regulatory Protection Limits.
17. TRRP-13, Review and Reporting of COC Concentration Data under TRRP.
18. RG-649, Determining Which Releases are Subject to TRRP.
19. Soil boring logs.
20. Field observations, PID readings, pH readings, and sampling records.
21. Table 1A, Soil Analytical Summary for TPH, VOCs, barium, and chloride.
22. Table 1B, Soil Analytical Summary for PAHs.
23. Whitehead E. S. Texas Board of Professional Geoscientists Geoscience Firm Registration

**III. Exhibits That Summarize or Support Opinions:**

The following exhibits, appendices, figures, and tables may be used to summarize or support my opinions:

**A. Figures**

1. **Figures 1 through 4** – Aerial photographs from Texas Database depicting the northern and southern well pads in 2007 and 2011.
2. **Figure 5** – LiDAR imagery identifying ASTs and potential former reserve pits on the gas well pads.

3. **Figure 6** – Soil boring and temporary monitoring well locations used for the Limited Phase II Investigation.

**B. Tables**

1. **Table 1A** – Soil analytical summary for TPH, VOCs, barium, and chloride.
2. **Table 1B** – Soil analytical summary for PAHs.

**C. Appendices**

1. **Appendix 1** – ESE Phase I Environmental Site Assessment dated December 18, 2023.
2. **Appendix 2** – ESE complete Phase I Environmental Site Assessment dated December 11, 2025.
3. **Appendix 3** – Whitehead E. S. Phase I Environmental Site Assessment dated December 12, 2025.
4. **Appendix 4** – Work order provided to Cresson Moon Property, LLC and ESE for approval before the Phase II Investigation.
5. **Appendix 5** – Whitehead E. S. Limited Phase II Investigation and soil boring logs.
6. **Appendix 6** – Communications with ESE regarding Phase II scope, sampling locations, sample parameters, and temporary monitoring wells.
7. **Appendix 7** – ESE third-party oversight materials for the January 9, 2026 field investigation.
8. **Appendix 8** – Eurofins analytical report dated January 21, 2026.
9. **Appendix 9** – Revised Eurofins analytical report dated July 2, 2026.
10. **Appendix 10** – Documents, Data, and Materials Considered.
11. **Appendix 11** – Exhibits and Appendices Schedule.

## IV. Qualifications, Including Authored Publications:

I, Michael Whitehead, have a Master of Science in soil science and over 35 years of environmental and consulting experience for primarily private-sector clients. I have worked on and/or managed over 1,000 projects, including but not limited to Phase I ESAs, Phase II Investigations, Site remediation and removal of Petroleum Storage Tanks, EPA Superfund sites, RRC Voluntary Cleanup Program, TCEQ Voluntary Cleanup Program, Corrective Action, Innocent Owner/Operator Program, and Leaking Petroleum Storage Tank cases. I have worked on and closed many of these cases and worked hand-in-hand with TCEQ staff to do so.

**Professional Licensure:** The reports satisfy requirements by an Environmental Professional (E.P.) and Texas Licensed Professional Geoscientist (P.G.) and were reviewed, signed, and sealed by an E.P. and/or P.G. Additionally, Whitehead E. S. is a Texas Board of Professional Geoscientists registered Geoscience Firm (#50600). No additional licensure or review is required to satisfy requirements as set by ASTM standards.

My career started in Boston, working for CDM sampling Superfund sites in the northeast. I moved with CDM to Dallas to work on Superfund projects like West Dallas Lead for the Dallas Housing Authority and Leadville, Colorado, along with a wider range of projects including Exide Battery and Pemex Mexico sites. I have an excellent working knowledge of TRRP rules and regulations and extensive experience working with TCEQ staff and senior managers along with the RRC VCP.

I have extensive experience with all phases of Phase I ESAs and Phase II Investigations, including Site inspections, review of historical information and aerial photographs, media sampling, QA/QC, evaluation of RECs, CRECs, HRECs, VECs, and OECs. I also have working

knowledge of key environmental regulations, including CERCLA, SARA, RCRA, and the Texas Administrative Code.

I have served as Senior Consultant/Owner of Whitehead E. S. for the last eight years. I previously worked at and owned Whitehead & Mueller, Inc./W&M Environmental Group for 22 years. At Whitehead & Mueller, I worked on all phases of our projects, including site inspections, health and safety, sampling, data review, report writing, including APARs, RAPs, RACRs, and work plans, project management, and final review of ESAs and Phase II Investigations. I have conducted environmental sampling that included a wide range of COCs in soil, groundwater, surface water, sediment, indoor air, outdoor air, tap water, dust, and sub-slab vapor. My on-Site sampling experience has included many Transco/Pipeline compressor stations in Texas and the southeast, Exide Battery facilities, General Cable sites in Bonham and Plano, several Southwestern Bell/AT&T sites, Phelps Dodge, convenience stores, and shopping center/cleaners. I have been and continue to be actively engaged in all aspects of Phase II Investigations at Whitehead E.S., including field inspections, sampling, data review, report development, QA/QC, evaluation of RECs, and final reports.

**Curriculum Vitae:** Attached hereto.

**Publications Authored in the Previous 10 Years:** I have not authored a publication in the last ten (10) years.

## V. Prior Expert Testimony:

I have not testified as an expert at trial or by deposition in the last four (4) years.

## VI. Compensation for Study and Testimony

Study, review, consultation, report preparation, and deposition testimony are billed at $180.00 per hour. Trial testimony is billed at $360.00 per hour.

Respectfully submitted this 3rd day of July, 2026.

Michael Whitehead, M.S.

**Footnotes**

1. *Phase I Environmental Site Assessment Report, Approximately 1,675 Acres, 7700 Old Granbury Road, Cresson, Hood County, Texas, dated December 18, 2023, prepared by ESE Partners, LLC.*
2. *Phase I Environmental Site Assessment Report, Approximately 1,675 Acres, 7700 Old Granbury Road, Cresson, Hood County, Texas, dated December 11, 2025, prepared by ESE Partners, LLC.*
3. *Phase I Environmental Site Assessment Report, 1,674 Acres at 7700 Old Granbury Road, Cresson, TX, dated December 12, 2025, prepared by Whitehead E.S., LLC.*
4. *ASTM E1527-21, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, ASTM International, West Conshohocken, PA.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 4:26-CV-00231-P** |

# FIRST SUPPLEMENTAL EXPERT REPORT OF MICHAEL WHITEHEAD

## I. INTRODUCTION

I, Michael Whitehead, M.S., submit this Supplemental Expert Report ("Supplemental Report") in connection with my designation as Defendants' rebuttal expert witness in *Challenger Cresson I, LLC v. Bill Sanders, Independent Executor of the Estate of Pearl Smelley, et al.*, Cause No. 4:26-cv-00231-P, pending in the United States District Court for the Northern District of Texas, Fort Worth Division.

This Supplemental Report supplements my initial Expert Report, which was previously submitted as Exhibit A to Defendants' Designation of Expert Witnesses, dated August 7, 2026. This Supplemental Report does not replace my initial Expert Report but rather provides additional opinions responsive to the Expert Report of R. Steven George, P.G. of Green Star Environmental ("George Report"), submitted on behalf of Plaintiff and dated August 10, 2026.

## II. SCOPE OF SUPPLEMENTAL REPORT

This Supplemental Report is prepared to respond to the Expert Report of R. Steven George, P.G. of Green Star Environmental, dated and submitted on behalf of Plaintiff ("George Report"). My opinions herein are based on my education, training, experience, first-hand knowledge, and my

review of the George Report and its supporting materials. Mr. George's report raises several criticisms of the Phase II Investigation conducted by Whitehead ES and makes a number of assertions regarding the environmental condition of the Property at 7700 Old Granbury Road, Cresson, Hood County, Texas (the "Property" or "Site"). I address each of his principal contentions below.

## III. REBUTTAL TO CLAIM THAT THE PHASE II INVESTIGATION WAS INSUFFICIENT IN SCOPE

Mr. George states that the Phase II Investigation involved "a limited and insufficient number of soil samples" and did not meet the requirements of Sections 6(i) and 7(c) of the Contract. I disagree with this characterization.

Whitehead ES worked directly with Aaron Munsart of ESE Partners, LLC ("ESE"), the Purchaser's Environmental Professional, to develop the scope of the Phase II Investigation. ESE reviewed and agreed upon the scope to specifically address the Recognized Environmental Conditions ("RECs") identified in the Phase I ESAs. It is my opinion that this collaborative scope development was consistent with the standard of care for environmental investigations of this nature.

ESE reviewed and commented on the proposed scope of work, and ESE's recommended additions — including barium and chloride analysis — were incorporated into the final work plan. The number of samples, locations, and analyses were based on the scope of work agreed upon by ESE. In my professional opinion, this final scope reflected a reasonable and professionally appropriate approach for addressing the identified RECs and was consistent with standard environmental investigation practices for sites of this type.

ESE conducted third-party oversight during the field investigation on January 9, 2026, to ensure that the agreed-upon scope of work was rigorously followed. In my professional opinion, the fact that the Purchaser's own Environmental Professional reviewed, approved, and physically oversaw the investigation is strong evidence that the investigation met the applicable standard of care. Mr. George's after-the-fact criticism that the scope was insufficient is inconsistent with the contemporaneous professional judgment of the Purchaser's own consultant.

## IV. REBUTTAL TO CRITICISM OF SAMPLING LOCATIONS

Mr. George criticizes the placement of soil borings, asserting that they were installed "at a distance from [the] actual well pad" rather than directly on the well pads. This criticism is unfounded.

Sampling locations were identified using high-quality aerial photographs obtained from Texas Database LLC for 2007 and 2011, which clearly depicted the well pads, former aboveground storage tanks ("ASTs"), and associated reserve pits — the key areas of concern ("AOCs"). These

photographs provided superior resolution compared to the Google Earth historical aerials cited by Mr. George. In my professional opinion, this approach — using the best available imagery to target known AOCs — represents sound professional judgment and is consistent with the standard of care for Phase II investigations.

Soil borings SB-01 and SB-02 at the north well pad were installed in the location of the former pond area at the edge of the pad, which was a key AOC, while SB-03 was installed near the ASTs. Soil boring SB-05 was installed in the former pond, and SB-06 was installed adjacent to the ASTs of the south well pad. It is my professional opinion that these boring locations were placed in the most critical areas to assess potential environmental impacts from historical oil and gas operations, and that this targeted approach was more likely to detect contamination, if present, than a random or grid-based approach.

It is my professional opinion that these boring locations were in the most critical positions to detect COCs from the historical oil and gas operations identified by both ESE and Whitehead ES in their respective Phase I ESAs.

## V. REBUTTAL TO CHARACTERIZATION OF ANALYTICAL RESULTS AS "CONTAMINATION"

Mr. George asserts that seven of nine soil samples "appeared to have soil that had been impacted by oil and gas operations" and that the detected concentrations "[e]ach represents environmental contamination." He further opines that "this investigation could only be considered a confirmation of oil and gas operations environmental contamination at the Property." These characterizations are scientifically inaccurate and misleading.

None of the soil samples collected during the Phase II Investigation contained COCs exceeding any regulatory limits under the TCEQ Texas Risk Reduction Program ("TRRP"), including the most conservative Residential Assessment Levels ("RALs"), or under the RRC Regulatory Protection Limits. The Phase II Investigation did not identify any release subject to TRRP, which is the regulatory standard currently used by both the TCEQ and the RRC for evaluating potential contamination from oil and gas operations. In my professional opinion, applying these regulatory frameworks, none of the detected concentrations constitute environmental contamination.

The specific analytical data demonstrate the absence of contamination:

Ethylbenzene was detected at concentrations as low as 0.00127 mg/kg with a J qualifier, which is well below the Residential Assessment Level of 7.6 mg/kg. The J qualifier indicates that the analyte was detected below the laboratory equipment calibration level, meaning the detection is an estimated value at trace concentrations. This is not a concentration of concern by any regulatory standard.

Total xylenes were detected at concentrations ranging from 0.000657J mg/kg to 0.0129 mg/kg --- well below the TRRP Protective Concentration Level ("PCL") of 120 mg/kg. These concentrations are orders of magnitude below any level of regulatory concern.

Total Petroleum Hydrocarbons ("TPH") diesel range was detected in only one sample, SB-01 at 3-4 feet below ground surface, at 35.5J mg/kg --- well below the TRRP PCL of 200 mg/kg. Follow-up Polynuclear Aromatic Hydrocarbon ("PAH") analysis on this sample detected no PAHs, further confirming the absence of significant petroleum impacts.

Barium was detected in all six samples at concentrations ranging from 16.7 to 148 mg/kg --- all below the TRRP PCL of 440 mg/kg.

Chloride was detected in four samples at concentrations ranging from 5.71J to 250 mg/kg --- well below the RRC Regulatory Protection Limit of 3,000 mg/kg.

Field observations during the investigation were consistent with these analytical findings: no dark staining or odors were observed, and PID readings were low, ranging from 0.0 to 9.2 ppm. In my professional opinion, these PID readings are consistent with background conditions and are not indicative of an environmental release. It is scientifically more appropriate to characterize the analytical results as low concentrations of specific analytes detected at levels below their applicable RALs or Tier 1 Default Protective Concentration Levels — not as “environmental contamination” as Mr. George contends.

I do not concur with Mr. George's opinion that the investigation "could only be considered a confirmation of oil and gas operations environmental contamination at the Property." Our findings did not indicate any evidence of environmental contamination.

## VI. REBUTTAL TO ASSERTION THAT ADDITIONAL CHEMICALS SHOULD HAVE BEEN ANALYZED

Mr. George opines that the Phase II Investigation did not analyze a "sufficient suite of chemicals of concern," citing boron, antifreeze/coolant, and Naturally Occurring Radioactive Material ("NORM") as analytes that should have been included.

The analytical parameters for the Phase II Investigation were developed in coordination with ESE, the Purchaser’s consultant. ESE reviewed, commented upon, and approved the scope of work, and ESE’s representative conducted physical oversight during sampling to ensure the approved scope was properly implemented. In my professional opinion, this suite of COCs was sufficient to characterize potential impacts from the identified RECs, and this level of coordination and oversight reflects best practices in the environmental consulting industry.

With respect to the specific analytes identified by Mr. George: boron has a Residential Assessment Level of 16,000 mg/kg — one of the highest thresholds under TRRP. Similarly, ethylene glycol

(the active ingredient in antifreeze) has a Residential PCL of 9,400 mg/kg. Neither the Phase I ESA findings nor process knowledge identified a valid source for these analytes at this Site. In my professional opinion, without an identified source pathway, these analytes would not be included in a reasonably scoped investigation, and their exclusion was consistent with the standard of care for environmental investigations of this nature.

## VII. REBUTTAL TO CRITICISM OF DUE DILIGENCE TIMING

Mr. George opines that the Seller delayed environmental due diligence, noting that the Seller did not retain an environmental professional until December 2025, approximately 2.5 years after executing the Contract. Based on this delay, Mr. George concludes that "the Seller appeared to have no intention of fulfilling its contracted obligation to conduct the required environmental due diligence."

The Phase II Investigation at this Site was scoped, executed, and completed within its intended timeframe, and no COCs were detected above applicable Texas regulatory levels. It is my professional opinion that an investigation of this scope at a site with these characteristics could readily be completed in less than 180 days, and that the investigation was completed competently and thoroughly within a reasonable timeframe.

## VIII. REBUTTAL TO CLAIM REGARDING PROFESSIONAL CREDENTIALS

Mr. George asserts that reports were required to be prepared by a "licensed environmental engineer" pursuant to Section 7(c) of the Contract, and that Whitehead ES, as a P.G. firm, did not satisfy that requirement.

The Phase II Investigation was reviewed and sealed by a Professional Geoscientist of Whitehead ES, and it is the professional opinion of Whitehead ES that there is no environmental contamination on or with respect to the Property. In my professional opinion, the investigation was conducted in accordance with applicable professional standards. Under the relevant ASTM standards governing Phase I ESAs and Phase II Investigations, no additional licensure or review beyond Environmental Professional and Professional Geoscientist credentials is required.

## IX. REBUTTAL TO ASSERTIONS REGARDING ADDITIONAL POTENTIAL IMPACTS

Mr. George identifies a list of additional potential environmental impacts that he asserts require further investigation, including drum spills, buried tires, railroad impacts, agricultural pesticides and herbicides, saltwater impacts along pipelines, and water resource sampling.

The Phase II Investigation was scoped to address the RECs specifically identified in the Phase I ESAs conducted by both ESE and Whitehead ES, and the analytical results confirmed that no

COCs were detected above applicable regulatory criteria. In my professional opinion, the investigation was appropriately scoped, and there is no scientific basis for Mr. George's assertion that additional investigation is necessary to evaluate these speculative potential impacts.

During the Whitehead ES Site reconnaissance conducted on December 3, 2025, no ASTs, drums, containers, dark staining, stressed vegetation, or odors were observed on the Property. In my professional opinion, these field observations are inconsistent with the presence of the widespread contamination Mr. George implies, and his speculative list of additional potential impacts does not undermine the conclusion that no environmental contamination was found on the Property.

## X. SUMMARY OF SUPPLEMENTAL OPINIONS

Based on my review of the materials in this case, including the George Report, I hold the following supplemental opinions:

1. The scope of the Phase II Investigation was proposed to, reviewed by, and agreed upon by ESE Partners, LLC, the Purchaser's own environmental consultant, and was sufficient to address the RECs identified in the Phase I ESAs.

2. Sampling locations were based on high-quality aerial photographs and were placed in critical locations --- including former reserve pits and adjacent to former AST locations --- to determine if COCs were present from historical oil and gas operations. These locations were approved by ESE.

3. None of the soil samples collected during the Phase II Investigation contained COCs exceeding any regulatory limits under TCEQ TRRP, including the most conservative Residential Assessment Levels, or RRC Regulatory Protection Limits. The characterization of the analytical results as "environmental contamination" is scientifically inaccurate and misleading.

4. The Phase II Investigation did not identify any release subject to TRRP. Field observations, including the absence of dark staining, odors, and low PID readings, were consistent with the analytical findings.

5. The suite of chemicals analyzed was sufficient and was developed in coordination with and approved by ESE. The exclusion of boron, antifreeze, and NORM was professionally reasonable given the extremely high regulatory thresholds and absence of identified sources.

6. An investigation of this Site with this scope could readily be completed in less than 180 days, and the investigation was completed competently and thoroughly within the applicable timeframe.

7. The Phase II Investigation was reviewed and sealed by a Professional Geoscientist of Whitehead ES, and no additional licensure beyond E.P. and P.G. credentials is required to satisfy the relevant ASTM standards for Phase I ESAs and Phase II Investigations.

8. Mr. George's speculative list of additional potential environmental impacts does not change the conclusion that no environmental contamination was found on the Property. No ASTs, drums, containers, dark staining, stressed vegetation, or odors were observed during the Whitehead ES Site reconnaissance on December 3, 2025.

9. It is my professional opinion, to a reasonable degree of scientific certainty, that there is no environmental contamination on or with respect to the Property based on the results of the Phase II Investigation and the Phase I ESAs conducted at the Site.

## XI. DOCUMENTS, DATA, AND MATERIALS CONSIDERED

In forming the opinions expressed in this Supplemental Report, I reviewed and considered the following documents, data, and materials, in addition to the documents and materials identified in my initial Expert Report:

1. Expert Report of R. Steven George, P.G., Green Star Environmental, Project No. 26-1851, submitted on behalf of Plaintiff, and all appendices thereto;
2. ESE Partners, LLC, Phase I Environmental Site Assessment Report, dated October 13, 2023;
3. ESE Partners, LLC, Phase I Environmental Site Assessment Report, dated December 18, 2023;
4. ESE Partners, LLC, Phase I Environmental Site Assessment Report, dated December 11, 2025;
5. Whitehead Environmental Solutions, LLC, Phase I Environmental Site Assessment Report, dated December 12, 2025;
6. Whitehead Environmental Solutions, LLC, Work Order for Professional Services, dated January 5, 2026;
7. Whitehead Environmental Solutions, LLC, Limited Phase II Investigation Report, dated January 26, 2026;
8. Certificate of Liability Insurance, ESE to Challenger, dated December 29, 2025;
9. High-resolution aerial photographs obtained from Texas Database LLC (2007 and 2011);
10. TCEQ Texas Risk Reduction Program rules and guidance documents;
11. RRC regulations and Regulatory Protection Limits;

12. Relevant ASTM standards for Phase I ESAs (ASTM E1527-21) and Phase II Investigations;
13. Standard Contract of Sale between Plaintiff and Defendants;
14. Pleadings and discovery materials filed in this action; and
15. All other documents, data, and materials referenced in this Supplemental Report and in my initial Expert Report.

I reserve the right to supplement or amend the opinions expressed in this Supplemental Report based on additional information, documents, testimony, or other materials that may become available.

Respectfully submitted,

**Michael Whitehead, M.S.**
Licensed Professional Geoscientist
Environmental Professional
Whitehead Environmental Solutions, LLC
Geoscience Firm Registration No. 50600
906 18th St., Plano, Texas 75074
(469) 609-8080

Date: September 9, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>*Plaintiff,*<br><br>**v.**<br><br>**BILL SANDERS,** ***et al.*,**<br><br>***Defendants.*** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 4:26-cv-00231-P** |

## DECLARATION OF DAVID SPILLER

I, David Spiller, declare under penalty of perjury as follows:

1. My name is David Spiller. I am an attorney with Spiller & Spiller in Jacksboro, Texas. I represent Defendant Cresson Moon Properties, LP in connection with the Standard Contract of Sale dated May 26, 2023 (the "Contract"), between the Seller parties and Challenger Realty Group, LLC, the predecessor in interest to Plaintiff Challenger Cresson I, LLC (together, "Purchaser"). I am over the age of eighteen, and I am competent and authorized to make this declaration. The facts set forth in this declaration, all of which are true and correct, are based on my personal knowledge. My personal knowledge is derived from my personal involvement in the communications discussed in this declaration and my review of the documents discussed in this declaration.

2. Exhibit B-3 to Defendants' Appendix (App. 129–154) includes emails that I sent and received on January 9 and January 26, 2026. Those emails are true and correct copies of the emails as I sent and received them.

3. On January 26, 2026, at 1:26 p.m., I emailed Purchaser's counsel, Jeffrey T. Libby, the final Limited Phase II Investigation prepared by Whitehead E.S., LLC, a copy of which is Exhibit C-2 to Defendants' Appendix (App. 179–261). In that email I told Mr. Libby that "the Sellers are ready to close on the transaction" and asked him to "coordinate a closing."

4. From January 26, 2026 through February 10, 2026, Purchaser did not propose to me a date to close on the terms of the Contract, and it did not tender the Purchase Price. Purchaser has not done either since.

5. On October 26, 2026, I sent Chad Flores of Flores Law, PLLC, counsel for Purchaser, a letter by electronic mail and by certified mail, return receipt requested (No. 9589 0710 5270 3676 6904 73), confirming that the Contract is no longer in force or effect (the "Termination Notice"). Attached hereto as Exhibit D-2 is a true and correct copy of the Termination Notice.

6. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Jack County, Texas on this 9th day of November 2026.

David Spiller

David Spiller

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| ***Plaintiff*,** | § | |
| **v.** | § | **Civil Action No. 4:26-cv-00231-P** |
| **BILL SANDERS, *et al.*,** | § | |
| ***Defendants*.** | § | |

**DECLARATION OF SCOTT A. WHEATLEY**

I, Scott A. Wheatley, declare under penalty of perjury as follows:

1. My name is Scott A. Wheatley. I am a partner with Jackson Walker LLP and counsel of record for Defendants in this lawsuit. I am over the age of eighteen, and I am competent and authorized to make this declaration. The facts set forth in this declaration, all of which are true and correct, are based on my personal knowledge. My personal knowledge is derived from my representation of Defendants in this lawsuit and my review of the documents discussed in this declaration.

2. Attached hereto as Exhibit E-1 is a true and correct copy of Plaintiff's Objections and Verified Responses to Defendants' First Set of Interrogatories, which Plaintiff served on July 6, 2026, together with the Verification of Patricia Herrera sworn to on July 8, 2026.

3. Attached hereto as Exhibit E-2 is a true and correct copy of Plaintiff's Responsive Expert Designation & Report, which Plaintiff filed on September 8, 2026 (ECF No. 23).

4. Attached hereto as Exhibit E-3 is a true and correct copy of pages 1–14 of the Rebuttal to Expert Report of Michael Whitehead by R. Steven George, P.G., dated September 8, 2026, which Plaintiff filed as ECF No. 23-1.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Tarrant County, Texas on the 9th day of November 2026.

Scott A. Wheatley

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BILL SANDERS, INDEPENDENT EXECUTOR OF THE ESTATE OF PEARL SMELLEY; CRESSON MOON PROPERTIES, LP; RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY; TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM; AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 4:26-CV-00231-P** |

**PLAINTIFF'S OBJECTIONS AND VERIFIED RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

TO: Defendants Bill Sanders, Independent Executor of the Estate of Pearl Smelley; Cresson Moon Properties, LP; Richard David Smelley and Amy Elizabeth Smelley; Tammy Marie Graham and Gregory Scott Graham; and Deborah Ruth Davis and David Glenn Davis, by and through their attorneys of record, Jackson Walker LLP, 777 Main Street, Suite 2100, Fort Worth, Texas 76102.

Plaintiff Challenger Cresson I, LLC, by and through its undersigned counsel, Calhoun Bhella & Sechrest, LLP, hereby submits the following Objections and Verified Responses to Defendants' First Set of Interrogatories. These responses are made in accordance with Federal Rule of Civil Procedure 33. Discovery and investigation are continuing, and Plaintiff reserves the right to supplement, amend, or correct these responses as additional information becomes available.

## GENERAL OBJECTIONS

1. Plaintiff objects to the Definitions and Instructions to the extent they purport to impose obligations beyond those required by the Federal Rules of Civil Procedure or the Court's Scheduling Order.

2. Plaintiff objects to each interrogatory to the extent it seeks information or documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity from discovery. No inadvertent disclosure of privileged or protected material shall constitute a waiver of any privilege or protection.

3. Plaintiff objects to each interrogatory to the extent it calls for the disclosure of confidential, proprietary, or commercially sensitive information including, without limitation, trade secrets, non-public financial data, business strategies, proprietary development plans, and personal identifying information. Plaintiff asserts that such information is entitled to protection from unrestricted dissemination pursuant to Federal Rule of Civil Procedure 26(c)(1)(G). Plaintiff will produce responsive documents and information containing such confidential or proprietary material after the entry of an appropriate protective order—whether stipulated by the parties or ordered by the Court—that adequately governs the use, handling, and disclosure of such information and restricts access to designated individuals. Pending entry of such an order, Plaintiff reserves the right to withhold or redact confidential responsive materials without prejudice to its production obligations.

4. Plaintiff objects to each interrogatory to the extent it is not relevant to any party's claim or defense and not proportional to the needs of the case, considering the importance of the issues at stake, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

5. Plaintiff objects to each interrogatory to the extent it is vague, ambiguous, overly broad, unduly burdensome, or otherwise susceptible to multiple reasonable interpretations such that Plaintiff cannot reasonably determine the information or documents sought.

6. Plaintiff objects to any interrogatory that contains discrete sub-parts and constitutes a compound interrogatory in violation of Federal Rule of Civil Procedure 33(a)(1).

7. Plaintiff objects to each interrogatory to the extent it seeks information equally available to Defendants or within Defendants' own possession, custody, or control.

8. Plaintiff reserves the right to supplement, amend, or correct any response herein as additional information becomes available through the course of discovery and investigation.

## SPECIFIC OBJECTIONS AND VERIFIED RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify and describe the role of each and every Person who was involved in the Contract on behalf of Plaintiff, including the negotiation, drafting, or execution of or any amendment thereto.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine, including communications with legal counsel involved in negotiating or drafting the Contract. Plaintiff further objects that the phrase "involved in the Contract" is vague and overbroad to the extent it seeks information about every person who may have had any tangential involvement.

Subject to and without waiving the foregoing general and specific objections, the following individuals were involved in the Contract on behalf of Plaintiff: Charles Gallub, Edwin Esposito, and John Contrevo (each, a principal of Challenger); Patricia Herrera (employee of Challenger); Jake Wilkinson (Challenger's commercial real estate broker); and Jeff Libby (Challenger's attorney).

**INTERROGATORY NO. 2:** Identify all information and the source thereof that Plaintiff had Regarding the Property before entering into the Contract, including its previous uses and environmental conditions.

**ANSWER:** Plaintiff objects to this Interrogatory as overly broad and unduly burdensome to the extent it seeks "all information" without reasonable limitation as to subject matter or time period. Plaintiff further objects to the extent this Interrogatory seeks information protected by the attorney-client privilege or work product doctrine. Plaintiff further objects that this Interrogatory is compound in that it contains multiple discrete sub-parts (information regarding previous uses, environmental conditions, and sources thereof). Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Prior to entering into the Contract, Plaintiff will supplement this interrogatory with information that it was aware of regarding the Property.

**INTERROGATORY NO. 3:** Identify the contractual provisions Plaintiff contends require each condition, requirement, or demand that Plaintiff communicated to Seller or Seller's agents as a

precondition to Closing that is not expressly stated as a condition precedent in the Contract, including, but not limited to, Plaintiff's insurance requirements and ESA reliance demands.

**ANSWER:** Plaintiff objects to this Interrogatory as argumentative and based on a characterization of events and communications that Plaintiff does not accept. Plaintiff denies that it imposed any conditions, requirements, or demands as "preconditions to Closing" that were not supported by the Contract. Plaintiff further objects that this Interrogatory is compound, containing multiple discrete sub-parts regarding different alleged conditions and demands. Plaintiff further objects to the extent this Interrogatory calls for a legal conclusion regarding the interpretation of contractual provisions. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Plaintiff denies the premise of this Interrogatory and specifically denies that it communicated or imposed any condition, requirement, or demand as a "precondition to Closing" that is not expressly stated in, or reasonably implied from, the Contract. The conditions precedent to Closing are those set forth in Section 8 of the Contract, including that Seller's representations and warranties be true and correct in all material respects as of Closing (Section 8(b)); that all covenants and other obligations of Seller be fully and timely performed in all material respects (Section 8(e)); that Seller have removed all Tires from the Property (Section 8(d)); and that Seller have delivered all Due Diligence Items (Section 8(f)).

With respect to ESA reliance, Plaintiff's position is supported by Section 7(c) of the Contract, which requires Seller to "Not less than fifteen (15) days prior to Closing, Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous

materials and above and/or underground storage tanks located in, on or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith." A report that, by its own terms, prohibits Purchaser from relying upon it is not a report "provide[d] to Purchaser" within the meaning of Section 7(c); Plaintiff's request for an express right of reliance therefore sought nothing more than the benefit of the report Section 7(c) already obligated Seller to deliver. With respect to insurance, Plaintiff did not impose any additional condition to Closing; rather, in the course of good-faith efforts to resolve the deficiencies in Seller's non-conforming environmental report, Plaintiff requested—and Seller's own environmental engineer agreed to provide—that Purchaser be named as an additional insured on the environmental engineer's and drilling contractor's commercial general liability and contractors pollution liability policies. That request was directed at preserving the integrity and reliability of the Section 7(c) report and the benefit of Seller's environmental representations and indemnities under Section 6(i) and the Contract's environmental indemnity provisions, commensurate with the approximately $32,643,000 purchase price. To the extent Defendants characterize any of these communications as extra-contractual "preconditions," Plaintiff disputes that characterization and states that each was supported by or reasonably implied from the Contract.

**<u>INTERROGATORY NO. 4</u>:** State Plaintiff's basis for its contention that the delivered ESA are deficient or otherwise fail to satisfy Seller's obligations under the Contract.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature before the close of fact discovery and expert disclosures. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff

further objects to the extent this Interrogatory seeks information protected by the work product doctrine or expert opinions not yet disclosed. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Subject to the foregoing objections, and based on information presently available prior to the close of fact discovery and expert disclosures, Plaintiff contends that the environmental report delivered by Seller—the Limited Phase II Environmental Site Assessment prepared by Whitehead Environmental Solutions, LLC and delivered on or about January 26, 2026 (the "January 26 ESA")—is deficient and fails to satisfy Seller's obligations under Section 7(c) of the Contract in at least the following respects: (a) the January 26 ESA does not include the certification required by Section 7(c)—namely, a report "prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith"; (b) the January 26 ESA reflects that environmental contamination and hazardous materials have not been removed from the Property, contrary to Section 7(c)'s requirement that Seller remove "any and all environmental contamination, hazardous materials and above and/or underground storage tanks" not less than fifteen (15) days prior to Closing; (c) Seller has not provided satisfactory evidence that all underground equipment or piping associated with the above-ground storage tanks has been removed from the Property; and (d) the January 26 ESA, by its own terms, prohibits any party other than Seller from relying upon it, and therefore does not constitute a report "provide[d] to Purchaser" within the meaning of Section 7(c) of the Contract. The January 26 ESA further confirms that Hazardous Substances are present at the Property, rendering Seller's representation in Section 6(i) of the Contract inaccurate. *See also* Plaintiff's First Amended Complaint at paragraphs 33–46 and 81–86. Plaintiff's contentions regarding the deficiencies of

Seller's environmental investigation and report are also the subject of expert analysis, and Plaintiff reserves the right to supplement this response following the completion of fact and expert discovery.

**INTERROGATORY NO. 5:** Identify all the circumstances surrounding each instance in which Plaintiff sought to reset the Inspection Period, including the reason for any delay in notifying Seller after initial discovery.

**ANSWER:** Plaintiff objects to this Interrogatory as compound in that it seeks information regarding multiple separate instances and multiple categories of information (circumstances, reasons, and delays) for each. Plaintiff further objects to the characterization that Plaintiff "delayed" notifying Seller, which assumes facts not in evidence. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Subject to the foregoing objections, Plaintiff responds as follows: Section 5(a) of the Contract provides that the Inspection Period commences on the Effective Date and continues through the 180th day following the later to occur of (i) the date on which all Tires have been removed from the Property and Seller has notified Purchaser thereof, and (ii) the date on which Seller has delivered all Due Diligence Items to Purchaser (the "IP Commencement Conditions"). Because Seller never satisfied the IP Commencement Conditions, the Inspection Period did not commence. Seller's repeated failures to fulfill these contractual prerequisites—and Seller's pattern of making false representations that it had done so—necessitated the following resets or extensions: (a) On or about June 21, 2023, Seller falsely represented to Purchaser that all Tires had been removed

from the Property. Seller's representation was untrue—numerous Tires in fact remained on the Property. Upon discovering through its continuing due diligence that Seller's representation was false, Purchaser notified Seller by letter dated December 15, 2023, and the parties agreed that the 180-day Inspection Period had not yet begun. (b) On or about January 11, 2024, Seller again falsely represented to Purchaser that all Tires had been removed. Once again, Seller's representation was untrue—Tires still remained on the Property and were unremoved from the Property, and Seller had still failed to deliver required Due Diligence Items. Upon discovering through its continuing due diligence that Seller had again misrepresented the status of its contractual obligations, Purchaser notified Seller by letter dated July 1, 2024. (c) In the First Amendment to Standard Contract of Sale dated December 4, 2024, the parties agreed to extend the Inspection Period through April 7, 2025—further reflecting Seller's ongoing unwillingness to satisfy its obligations. Plaintiff categorically denies that it "delayed" in notifying Seller. To the contrary, Plaintiff acted diligently in each instance: Seller's false representations required Purchaser to independently verify site conditions through its own due diligence efforts before it could identify and document Seller's failures, and Purchaser notified Seller upon confirming that Seller had not, in fact, performed. Any passage of time between Seller's false notifications and Purchaser's responses is attributable solely to the time reasonably required to discover and document Seller's repeated misrepresentations.

**INTERROGATORY NO. 6:** State the complete basis for Plaintiff's contention that Seller failed to satisfy all its required obligations under the Contract, including any covenants, conditions precedent, and representations Plaintiff alleges Seller did not satisfy.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature prior to the completion of discovery. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is overly broad, unduly burdensome, and compound in that it encompasses all of Seller's obligations, covenants, conditions precedent, and representations. *See Lopez v. Don Herring Ltd.*, 327 F.R.D. 567 (N.D. Tex. 2018). Plaintiff further objects to the extent a complete response would require disclosure of attorney work product and mental impressions regarding legal theories. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Seller failed and refused to satisfy its obligations under the Contract in at least the following respects: (a) Seller failed to timely deliver all Due Diligence Items required by Section 4(a) of the Contract and, to this date, has failed and refused to deliver all Due Diligence Items required by the Contract; (b) Seller failed to remove all Tires from the Property as required by Section 7(d); (c) Seller made and maintained a false representation regarding environmental conditions in violation of Section 6(i), in that Hazardous Substances are present at the Property; (d) Seller failed, not less than fifteen (15) days prior to Closing, to remove any and all environmental contamination, hazardous materials, and above and/or underground storage tanks, and failed to deliver a licensed environmental engineer's report certifying that no environmental contamination exists on or with respect to the Property, as required by Section 7(c); (e) Seller failed to satisfy the conditions precedent to Closing set forth in Sections 8(b), 8(d), 8(e), and 8(f); and (f) Seller failed to provide evidence of shut-in payments and supporting documentation within five business days of the First Amendment Effective Date as required by Section 4(b) of the First Amendment. Plaintiff further contends that Seller has repudiated its contractual obligations by declaring not only an intent to

rescind the Contract and market the Property to third parties, but in fact, soliciting and marketing the Property to potential buyers and third parties. Indeed, as recently as February 13, 2026, Seller's broker wrote, "…after all this time, [the Property] is going to be coming back on the market." Plaintiff reserves the right to supplement this response as discovery continues.

**INTERROGATORY NO. 7:** Describe in detail each Due Diligence Item that Plaintiff contends Seller failed to deliver.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent it calls for information that is equally within Defendants' possession, custody, or control, as Defendants are aware of what they did and did not deliver. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Plaintiff contends Seller failed to deliver, within the time required by Section 4(a) of the Contract, Due Diligence Items in Seller's possession or control, including without limitation: (a) documents and information relating to the mineral estate, including the oil and gas lease of record affecting the Property (the "Smelley Lease") and any other oil and gas leases affecting the Property; (b) documents and information relating to the wells and related equipment situated on the Property; (c) documents and information relating to the two gas pipelines traversing the Property that are shown on Purchaser's survey as not located within any recorded easement; (d) evidence of shut-in payments and shut-in payment supporting documentation, including the shut-in royalty checks; and (e) environmental studies, reports, and other materials relating to the Property in Seller's possession or control. Because the identity of Due Diligence Items withheld or not delivered is

uniquely within Defendants' knowledge, Plaintiff reserves the right to supplement this response as discovery continues.

**<u>INTERROGATORY NO. 8</u>:** State the complete factual basis for Plaintiff's contention that it has performed, tendered performance, or was excused from performing each and every one of its contractual obligations under the Contract.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature prior to the close of discovery. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is compound and overly broad in that it encompasses "each and every" contractual obligation. Plaintiff further objects to the extent a complete response would require disclosure of attorney work product. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

Plaintiff performed or tendered performance of all obligations required of it (and exercised certain of its rights) under the Contract, or was excused from performance by Seller's material breaches or Seller's failure to satisfy express conditions precedent to Plaintiff's performance of its obligations. Plaintiff's performance included, but is not limited to: (a) timely depositing the Earnest Money; (b) conducting extensive due diligence in accordance with the Contract and expending in excess of $1,500,000 in connection therewith; (c) communicating in good faith with Seller regarding Contract performance and repeatedly affording Seller the opportunity to cure; (d) offering to assist Defendant in obtaining the release of an oil and gas lease on the Property (that was unenforceable) and obtaining such release; and (e) expressing and maintaining its readiness,

willingness, and ability to close. To the extent any performance by Plaintiff was excused or rendered impossible, such excuse was the direct and proximate result of Seller's material breaches, including Seller's failure to satisfy the environmental obligations and conditions precedent in Sections 6(i), 7(c), and 8 of the Contract, Seller's failure to remove all Tires under Section 7(d), and Seller's failure to deliver all Due Diligence Items under Section 4(a). Plaintiff reserves the right to supplement this response as discovery continues.

**INTERROGATORY NO. 9:** State the complete factual basis for Plaintiff's contention that it was ready, willing, and able to close the transaction contemplated by the Contract, or if Plaintiff contends it was, at any time, unable to close, describe the circumstances that prevented Plaintiff from being ready, willing, and able to close.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature prior to the close of discovery. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is compound in that it contains alternative sub-parts. Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows:

At all relevant times, Plaintiff was ready, willing, and able to close the transaction contemplated by the Contract. Plaintiff was prepared to tender the purchase price of approximately $32,643,000 at Closing, subject to Seller completing all of its contractual obligations, including the removal of all environmental contamination and the delivery of a compliant Required Environmental Report under Section 7(c), the truth of Seller's representations and warranties under Section 6(i), the removal of all Tires under Section 7(d), and the delivery of all Due Diligence Items under Section

4(a). Plaintiff does not contend that it was, at any time, unable to close; rather, Closing did not occur solely because of Seller's material breaches and Seller's failure to satisfy the conditions precedent to Closing. Indeed, Section 8 of the Contract explicitly provided, "In addition to all other conditions set forth herein, it shall be an express condition precedent to Purchaser's obligations under this Contract that, as of the date of Closing, the following conditions have been satisfied or waived in writing by Purchaser, with any waiver to be effective only if the same is executed by an authorized officer of Purchaser, expressly waives a particular condition, and expressly refers to this Section 8 Plaintiff had undertaken substantial preparations for Closing."

**INTERROGATORY NO. 10:** Describe in detail Plaintiff's efforts to prepare the Property for its Intended Use, including zoning, utilities, and business efforts, and the status of those efforts.

**ANSWER:** Plaintiff objects to this Interrogatory as overly broad and unduly burdensome to the extent it seeks detailed information regarding all efforts, without temporal limitation. Plaintiff further objects to the extent this Interrogatory seeks proprietary business information or trade secrets.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff undertook substantial efforts, and expended in excess of $1,500,000, to investigate and prepare the Property for its Intended Use. Those efforts included, without limitation: (a) obtaining an ALTA survey, topographical studies, and existing-conditions assessments; (b) commissioning environmental assessments, geotechnical studies, and civil, water, rail, and sewage engineering analyses; (c) investigating all necessary entitlements and utilities; (d)

commissioning feasibility, permit-matrix, cultural-resources, governmental-affairs, energy-consulting, water/hydrology, and architectural site-planning work; and (e) engaging in discussions and negotiations with potential users. The current status of these efforts is that they have been suspended, impaired, or held in abeyance as a result of Seller's breaches and refusal to close.

**INTERROGATORY NO. 11:** Identify and describe Plaintiff's basis for all damages and remedies it seeks, including its claim of $1.5M in costs, and the unique nature of the Property for purposes of specific performance.

**ANSWER:** Plaintiff objects to this Interrogatory as a contention interrogatory that is premature prior to the close of discovery and expert disclosures. *See* Fed. R. Civ. P. 33(a)(2). Plaintiff further objects that this Interrogatory is compound in that it asks about both damages and the basis for specific performance.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff seeks specific performance of the Contract and, in the alternative, damages, as set forth in its First Amended Complaint. Plaintiff seeks specific performance under Section 11(b) of the Contract because the Property is unique and monetary damages would not adequately compensate Plaintiff for the loss of the benefit of its bargain. The Property is unique in that: (a) it consists of approximately 1,674 gross contiguous acres located at 7700 Old Granbury Road in the extraterritorial jurisdiction of Cresson, Hood County, Texas, approximately 30 miles from downtown Fort Worth; (b) it offers dual transportation access, with approximately 1,300 feet of road frontage and more than two miles of Atchison, Topeka and Santa Fe rail frontage; and (c) its

size, contiguity, location in a rapidly growing corridor, rolling terrain, water features, and absence of restrictions create a rare mixed-use development opportunity that cannot be duplicated by the purchase of other land. There is no adequate substitute property available. In the alternative, and only to the extent specific performance is determined to be unavailable, Plaintiff seeks its actual damages under Section 11(b), including third-party out-of-pocket costs exceeding $1,500,000 incurred in connection with the transaction (consisting of, among other categories, survey, environmental, geotechnical, civil, water, rail, and sewage engineering, feasibility, permitting, and consulting costs, and legal fees directly related to the transaction), together with reasonable and necessary attorneys' fees, pre- and post-judgment interest, and costs of suit. Plaintiff reserves the right to supplement this response following expert disclosures.

**INTERROGATORY NO. 12:** Identify and describe any efforts by Plaintiff to list or resell the Property, including efforts to market or advertise the Property, and Communications to brokers, real estate agents, or potential buyers.

**ANSWER:** Plaintiff objects to this Interrogatory as premature and irrelevant to the extent it assumes Plaintiff has an obligation to mitigate damages by listing or reselling property it does not own and seeks specific performance to acquire. Plaintiff further objects to the extent this Interrogatory seeks information not proportional to the needs of the case.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff seeks specific performance of the Contract and does not currently own the Property. Plaintiff has not listed or attempted to resell the Property because Plaintiff does not own

the Property and continues to seek specific performance of the Contract requiring Seller to convey the Property to Plaintiff. To the contrary, it is Seller—not Plaintiff—who, upon information and belief, has represented through its agent to third parties that the Property would be "coming back on the market." Plaintiff further provides that, upon information and belief, Jake Wilkinson's marketing efforts for potential JV partners/developers and users include posting on social media, sending emails, attending trade shows (SWARS), and making numerous conference calls.

**INTERROGATORY NO. 13:** Identify any other real property that Plaintiff has sought to acquire, or has acquired, at any time since the Effective Date of the Contract, and the circumstances and status of that acquisition.

**ANSWER:** Plaintiff objects to this Interrogatory as irrelevant and not proportional to the needs of the case. Other real property acquisitions by Plaintiff are not relevant to whether Defendants breached the Contract or Plaintiff's entitlement to specific performance of this particular Contract for this particular Property. *See* Fed. R. Civ. P. 26(b)(1). Plaintiff further objects that this Interrogatory is overly broad in seeking information about "any" real property acquisition since May 2023 without limitation as to geographic location, size, or type of property. Plaintiff further objects to the extent this Interrogatory seeks confidential and proprietary business information.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff's acquisition or attempted acquisition of other real property, if any, is irrelevant to whether Defendants breached the Contract and to Plaintiff's entitlement to specific performance of this particular Contract for this particular, unique Property. Without waiving its

objections, Plaintiff states that its other real property activities, if any, do not diminish the unique nature of the Property at issue or Plaintiff's entitlement to specific performance.

**INTERROGATORY NO. 14:** Apart from the information provided in response to Interrogatory No. 12, identify all steps or actions Plaintiff has taken to mitigate its alleged damages.

**ANSWER:** Plaintiff objects to this Interrogatory as premature to the extent it assumes Plaintiff's damages are final or that mitigation is currently at issue given Plaintiff's claim for specific performance. Plaintiff further objects to the characterization of Plaintiff's damages as merely "alleged."

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Plaintiff primarily seeks specific performance of the Contract, and the obligation to mitigate does not require Plaintiff to abandon its contractual rights or to acquire substitute property in place of the unique Property it bargained to purchase. Without waiving its objections, and to the extent any duty to mitigate applies, Plaintiff has acted reasonably to limit its losses, including by continuing to seek conveyance of the Property, affording Seller repeated opportunities to cure its breaches, and refraining from incurring unnecessary additional transaction costs pending resolution of this dispute.

**INTERROGATORY NO. 15:** Identify any other litigation or dispute involving a real property purchase contract to which Plaintiff has ever been a party.

**ANSWER:** Plaintiff objects to this Interrogatory as irrelevant and not proportional to the needs of the case. Prior litigation involving Plaintiff is not relevant to the claims or defenses in this action. *See* Fed. R. Civ. P. 26(b)(1); *Zenith Ins. Co. v. Tex. Inst. for Surgery, L.L.P.*, 328 F.R.D. 153 (N.D. Tex. 2018). Plaintiff further objects that this Interrogatory is overly broad and unduly burdensome in seeking information about any dispute "ever" without temporal limitation. Plaintiff further objects to the extent this Interrogatory seeks information that is publicly available and equally accessible to Defendants.

Subject to and without waiving the foregoing General and Specific Objections, Plaintiff responds as follows: Upon information and belief, Plaintiff has not been a party to other litigation involving a real property purchase contract that is relevant to the claims or defenses in this action. To the extent any such matter exists, it is a matter of public record equally available to Defendants.

**INTERROGATORY NO. 16:** Describe the role and involvement of Jeff Libby in connection with the Property, Contract, and this lawsuit.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Jeff Libby served as legal counsel to Plaintiff in connection with the Contract and this lawsuit, and communications with Mr. Libby are protected from disclosure. *See* Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495 (1947). Plaintiff further objects that this Interrogatory is compound in that it asks about Mr. Libby's role in three separate contexts: the Property, the Contract, and this lawsuit.

Subject to and without waiving the foregoing General and Specific Objections, and specifically without waiving any attorney-client privilege or work product protection, Plaintiff responds as follows: Jeff Libby is an attorney who represented Plaintiff in connection with the negotiation, drafting, and performance of the Contract and who continues to represent Plaintiff in connection with this lawsuit. In a non-privileged capacity, Mr. Libby's involvement included communications and correspondence transmitted to Seller and Seller's representatives on Plaintiff's behalf, including demand and notice letters regarding Seller's obligations under the Contract (such as the letters dated December 15, 2023 and July 1, 2024), and communications with Seller's counsel regarding environmental matters and the parties' performance under the Contract. To the extent this Interrogatory seeks the substance of privileged communications between Plaintiff and its counsel, or counsel's mental impressions, Plaintiff declines to respond on the grounds of attorney-client privilege and work product protection, and will produce a privilege log identifying any documents withheld on such basis.

Respectfully submitted,

*/s/ Blake J. Brownshadel*

Blake J. Brownshadel
State Bar No. 24073969
bbrownshadel@cbsattorneys.com
Christopher A. John
State Bar No. 24110053
cjohn@cbsattorneys.com
Emma C. Jenevein
State Bar No. 24136916
ejenevein@cbsattorneys.com
**CALHOUN BHELLA & SECHREST LLP**
325 N. Saint Paul St., Suite 2900
Dallas, Texas 75201
Telephone: (214) 981-9200

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 6, 2026, the foregoing document was served on all counsel of record in accordance with the Federal Rules of Civil Procedure:

Scott A. Wheatley
swheatley@jw.com
Lee B. Hunt
lhunt@jw.com
Trevor J. Paul
tpaul@jw.com
JACKSON WALKER LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102

*/s/ Blake J. Brownshadel*

Blake J. Brownshadel

In the United States District Court
for the Northern District of Texas
Forth Worth Division

| | | |
|---|---|---|
| Challenger Cresson I, LLC,<br>Plaintiff, | §<br>§<br>§ | |
| v. | § | No. 4:26-CV-00231-P |
| Bill Sanders, et al.,<br><br>Defendants. | §<br>§<br>§<br>§ | |

---

**Plaintiff's Responsive Expert Designation & Report**

Plaintiff Challenger Cresson I, LLC designates the following responsive expert(s) who may be called to testify at the trial of this matter.

## I. Plaintiff's Responsive Expert—R. Steven George

Plaintiff designates R. Steven George of P.G. Green Star Environmental, whose address is P.O. Box 13482 Arlington, Texas 76094-0482. He is a Licensed Professional Geoscientist (Geoscience License No. 5047, State of Texas). He is designated as a responsive expert to address, respond to, and rebut the opinions offered by Defendants' expert, Michael Whitehead, including those set forth in the Expert Report of Michael Whitehead dated July 3, 2026, and the underlying environmental assessments performed by Whitehead E.S., LLC.

Mr. George is expected to testify concerning environmental due diligence, environmental site assessment methodology, and the presence and adequacy of investigation of environmental contamination at the property located at 7700 Old Granbury Road, Cresson, Hood County, Texas (the "Property"), as measured against the environmental obligations of the parties' Standard Contract of Sale, including Sections 6(i) and 7(c) (the "Contract"). The subject matter on which Mr. George is expected to present evidence, and a summary of the facts and opinions to which he is expected to testify, include the following:

1. The Contract governs the scope of environmental due diligence for the sale of the Property. Section 6(i) broadly defines "Hazardous Substances," and Section 7(c) requires the Seller to remove any and all environmental contamination, hazardous materials, and storage tanks and to provide a report by a licensed environmental engineer confirming that no environmental contamination exists on the Property. In Mr. George's opinion, this establishes a "No Environmental Contamination Standard" requiring removal of contamination to naturally occurring background levels.

2. Neither Mr. Whitehead's Expert Report nor any of Whitehead E.S.'s prior work products at the Property applied or referenced the Contract's environmental standard, which in Mr. George's opinion undermines Mr. Whitehead's conclusions regarding the environmental status of the Property.
3. Risk-based regulatory thresholds (including Texas Risk Reduction Program Protective Concentration Levels and Railroad Commission limits) and the ASTM E1527-21 Phase I standard, together with their de minimis, anthropogenic, and off-site-source exclusions, are not sufficient to satisfy the Contract's No Environmental Contamination Standard.
4. The Whitehead Limited Phase II Investigation was inadequate to identify and delineate contamination consistent with the Contract because it used too few soil borings, placed borings at the edges of the well pads and too far from source areas (former reserve pits and aboveground storage tanks), and employed an incomplete suite of analytical parameters.
5. The field and analytical data nonetheless confirm the presence of environmental contamination in Property soils—including petroleum hydrocarbons, chlorides, and barium above background conditions—with photoionization detector readings corroborated by laboratory confirmation at borings SB-02, SB-03, and SB-04.
6. The groundwater investigation was deficient: temporary monitoring wells were left in place for only approximately 1.5 to 4.15 hours, far short of the customary 24-hour accumulation period; existing water-supply wells were not sampled; and shallow groundwater is likely present at the Property.
7. A spilled 55-gallon oil drum with obvious soil impact, depicted in the ESE Phase I ESA (Photograph No. 9), was improperly treated as de minimis and likely constitutes a reportable release that required assessment and removal.

8. Mr. Whitehead's opinions that the identified conditions were adequately addressed and that no further assessment is warranted are incorrect; in Mr. George's opinion, the confirmed presence of Hazardous Substances requires significant additional assessment, delineation, and removal, followed by the licensed-engineer confirmation report, to satisfy the Contract.

The complete statement of Mr. George's opinions, together with the bases and reasons for them, the facts and data he considered, and the exhibits supporting his opinions, is set forth in his report, which is served and filed herewith as Exhibit A and incorporated by reference. Mr. George's qualifications, the facts and data he considered, the bases and reasons for his opinions, and the exhibits he may use are set forth in and accompany the report in accordance with Rule 26(a)(2)(B). *See* Doc. 20-1 at 19-22 (curriculum vitae).

Respectfully submitted,

Chad Flores
Texas Bar No. 24059759
chad@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
Phone: (713) 364-6640
Fax: (832) 645-2496

Counsel for Plaintiff

**REBUTTAL TO EXPERT REPORT OF MICHAEL WHITEHEAD**

*For:*

**Civil Action No. 4:26-cv-00231-P**

**In The United States District Court, For the Northern District of Texas**
**Fort Worth Division**

**Challenger Cresson I, LLC,** Plaintiff
**v.**
**BILL SANDERS, INDEPENDENT, EXECUTOR OF THE ESTATE OF PEARL SMELLEY;**
**CRESSON MOON PROPERTIES, LP;**
**RICHARD DAVID SMELLEY AND AMY ELIZABETH SMELLEY;**
**TAMMY MARIE GRAHAM AND GREGORY SCOTT GRAHAM;**
**AND DEBORAH RUTH DAVIS AND DAVID GLENN DAVIS,** Defendants

*Regarding:*

**Contract Claim**
**1,674 Gross Contiguous Acres**
**7700 Old Granbury Road**
**Cresson, Hood County, Texas 76035 ("Property")**

*Prepared for:*

**Calhoun Bhella Sechrest**
**325 N. St. Paul Street, Suite 2900**
**Dallas, TX 75201**

STATE OF TEXAS
RICHARD S. GEORGE
GEOLOGY
5047
LICENSED
PROFESSIONAL GEOSCIENTIST

*Prepared By:*

**R. Steven George, P.G**

**September 8, 2026**

**Green Star Environmental Project No. 26-1851**

**Green Star Environmental**
**P.O. Box 13482**
**Arlington, Texas 76094-0482**

## Table of Contents

**1.0 Introduction** .......... 1
**2.1 Whitehead Expert Report** .......... 1
**2.2 Purchaser Contract Requirements** .......... 2
**3.0 Specific Response to Opinions in the Whitehead Expert Report** .......... 4
**4.0 Additional Specific Response to Opinions in the Whitehead Expert Report** .......... 8
**5.0 Summary** .......... 11
**6.0 References** .......... 11

### Figures

Figure 1 - North Natural Gas Well Pad Sampling Locations
Figure 2 - South Natural Gas Well Pad Sampling Locations
Figure 3 - Reportable Petroleum Release – On-Property Spilled Oil Drum

### Appendices

Appendix 1 - Expert Report of Michael Whitehead
Appendix 2 - Standard Contract of Sale

# REBUTTAL TO EXPERT REPORT OF MICHAEL WHITEHEAD

**Contract Claim**
**1,674 Gross Contiguous Acres**
**7700 Old Granbury Road**
**Cresson, Hood County, Texas 76035**

**Green Star Environmental Project No. 26-1851**

## 1.0 Introduction

This report is being generated as part of litigation over a sale of 1,674 acres of property located at 7700 Old Granbury Road, Cresson, Hood County, Texas ("Property"). This document is a rebuttal to the Expert Report of Michael Whitehead ("Whitehead Expert Report") dated July 3, 2026. A copy of the Whitehead Expert Report is included as Appendix A.

Mr. Whitehead's company, Whitehead E. S., LLC, ("Whitehead's Company") was retained by the Defendants in this Case as an environmental consultant to conduct a Phase I Environmental Assessment Report ("Whitehead Phase I ESA") published on December 12, 2025. Despite the indication in the report that this work was prepared for Challenger Realty Group, LLC, Whitehead E.S. was not contracted by them. Mr. Whitehead was not a signatory of that report but indicates he was a Senior Reviewer and Environmental Professional for Whitehead E.S. when the Phase I ESA was provided.

In his Expert Report, Mr. Whitehead indicated he reviewed previous Phase I ESAs conducted for the Plaintiff by Environmental Science and Engineering Partners, LLC ("ESE") on December 18, 2023 and December 11, 2025.

Mr. Whitehead's company was subsequently retained by the Defendants to conduct a Limited Phase II Investigation ("Whitehead Limited Phase II") published on January 26, 2026. Mr. Whitehead was a signatory of that report.

## 2.0 Environmental Requirements of Contract

### 2.1 Whitehead Expert Report

In order for an environmental consultant to meet the technical environmental needs of their client, they need to have a clear and specific scope of work detailing the environmental standards to be met. In this case, Mr. Whitehead's Expert Report never reviewed the clear and specific scope of work that was included in the Contract of Sale ("Contract").

A definition for Hazardous Substances and environmental conditions of the Property at closing is outlined in the Contract, which was executed on March 26, 2023. A copy of this Contract is included as Appendix B.

The Contract governs the scope of environmental due diligence for the sale of the Property. It expresses definitions of environmental contamination in Section 6(i), actions that brought

environmental contamination to the Property in Section 6(i), timing of the required environmental removals in Section 7(c), reporting and what it must conclude in Section 7(c), and who must prepare the final report in Section 7(c). The scope of work for the Limited Phase II did not reference the report outlined in Section 7(c) of the Contract or any other aspect of the Contract and is inconsistent with the obligations in Section 7(c).

As is typical in these types of transactions, the Contract specified requirements to be completed 15 days before closing. Despite this, Whitehead ES did not conduct any work with respect to the Property until the end of 2025 and the beginning of 2026.

It is not possible to show how any of the environmental actions under the Contract have been completed by the Seller and their Expert up to July 3, 2026, the date of the Whitehead Expert Report. This report was published over 3 years after both parties executed the Contract on March 26, 2023. An environmental professional could not meet the Contract requirements when none of the environmental work completed is compared to the technical environmental standards in the Contract. Even the previous environmental work of Whitehead's Company provides no reference or mentions the Contract.

These are significant omissions which, in my opinion, colors Mr. Whitehead's expert opinions included in the Whitehead Expert Report. Mr. Whitehead's previous environmental reviews and environmental sampling had no comparison to the "no environmental contamination" as defined in Section 7(c) and essentially invalidate any of his opinions regarding the status of environmental due diligence at the Property.

### 2.2 Purchaser Contract Requirements

To fulfill the work scope specified in Section 7(c) of the Contract, the environmental work applied by the licensed environmental engineer necessary for due diligence would have to include those standards in Sections 6(i) and 7(c). These requirements are known to me as part of my experience in this field. These standards are distinctly different from many of the currently applied risk-based standards developed by State and Federal programs. Portions of key specific environmental provisions are repeated here for convenience:

Section 6 and Section 6 (i), "Seller represents and warrants to Purchaser that:" "(i) No Hazardous Substances have been incorporated, used, generated, manufactured, stored, or disposed of in, on, under, or about the Property or transferred to and from the Property and there are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgements or orders, relating to the use, generation, manufacturing, storage, or disposal of any Hazardous Substances, in, on, under, or about the Property. As used in this Contract, the term "Hazardous Substances" means… [This is followed by a long definition and a summarized collectively as "Environmental Laws."] Please refer to Appendix B for all of Section 6(i).

Section 7(c) also outlines "…Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on, or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith." (For purpose of this report we will use the term "No Environmental Contamination Standard.")

These technical environmental provisions from the Contract in Section 6(i) are repeated here to point out the applicable standards in the Contract. The list of environmental contamination included is a very broad definition of what Hazardous Substances are and how they arrived at the

property. Parties typically define which substances are of concern by agreement, as was done here, and under this Contract, what is considered a Hazardous Substance is very broadly defined.

In my experience as an environmental professional in dealing with environmental remediation cleanup, meeting client goals, dealing with State regulatory agencies, and applying relevant environmental regulations to achieve the "removal of any and all environmental contamination" means removing materials on the Property to naturally occurring levels. Literally, a No Environmental Contamination Standard.

Section 7(c) sets the standard to which the Seller shall remove any and all environmental contamination. Therefore, in my opinion, this Contract requires removal of all environmental contamination or hazardous materials on the Property to naturally-occurring background levels.

From a technical perspective, this means under the environmental provisions of this Contract:

- Environmental contamination standards from a Federal or State of Texas regulatory cleanup program are relevant; however, these are not necessarily sufficient to meet the No Environmental Contamination Standard in the Contract for Property.
- The ASTM environmental assessement standards provide environmental processes and practices that could be useful; however, limitations and exclusions included in the ASTM standards are not sufficient to meet the more broad No Environmental Contamination Standard. For example, this means that exclusions which might necessarily apply to work conducted under ASTM environmental standards could apply to contaminated materials at the Property or environmental work at the Property.
- No "de minimis" judgements apply to quantity, size, or area of environmental impacts at the Property.
- No anthropogenic arguments or offsite source arguments apply to hazardous materials identified that are located at the property.

Therefore, environmental contamination which might be able to be ignored or left in place under certain regulations or the ASTM standard would need to be removed and reported to be removed in a follow-up report prepared by a licensed environmental engineer to close this Sale.

In my opinion and based on my experience, the process required by the No Environmental Contamination Standard, where all non-native impacts are removed, would have to include the following environmental industry work scopes prepared by an appropriate environmental consultant in this case a licensed environmental engineer:

- **Identification** of the land uses and potential environmental contamination caused by those processes under the No Environmental Contamination Standard. This would require significant broadening of a Phase I ESA to include out of scope services to meet the Contract language and extension of the field inspection time allowed to multiple days at such a large Property.

  The United States Environmental Protection Agency ("USEPA") has published a series of documents to provide information regarding environmental issues associated with specific industrial sectors. The following five Sector Notebooks that apply to the Property were identified:

  - Agricultural Crop Production Industry;
  - Agricultural Livestock Production Industry;
  - Agricultural Chemical, Pesticide, and Fertilizer Industry;

- Ground Transportation Industry – Trucking, Railroad, and Pipeline; and
- Oil and Gas Extraction Industry.

Each of these would be a good guide to review in assessing and investigating the Property considering its use involves the activities discussed in the Sector Notebooks.

- **Sampling** and investigation of the potential source area(s) (not near or at the side) with the correct analytical parameters, in addition to knowledge of the process from which they were determined;
- **Delineation** of the extent of the confirmed impacts;
- **Removal** of the confirmed impacted area(s) including documentation that the material transferred was taken to an appropriate off-site disposal facility;
- **Confirmation sampling** of areas adjacent or below removed materials, after the removal, to demonstrate successful removal of environmental contamination.
- **Reporting** of each phase, sampling collected, transport and disposal performed, prepared by a Licensed Environmental Engineer confirming the Property met the No Environmental Contamination Standard.

## 3.0 Specific Response to Opinions in the Whitehead Expert Report

I will repeat the Whitehead Opinions from Section I of the Whitehead Expert Report and provide my comments and opinions thereafter.

**"Section I. Opinions, Statements, Bases and Reasons:**

**"Opinion 1: - The onsite and off-offsite RECs identified in the ESE and Whitehead E. S. Phase I ESAs were adequately addressed by the Limited Phase II Investigation conducted by E. S. Whitehead."**

This statement begins with Mr. Whitehead's basic opinion, then lists documents to find the oil and gas well pad sites, then a specific list of boring and well locations.

In my opinion, the limited Phase I ESAs conducted by ESE and Mr. Whitehead's company do not meet the requirements of the No Environmental Contamination Standard and because the Whitehead cited Recognized Environmental Conditions ("RECs") were limited by the ASTM E1527-21 Standards and Work Scope as well as the actual implementation of the practice by ESE and Whitehead E.C. In addition, the lack of use of industry resources such as the previously cited EPA Sector Notebooks in assessing and investigating the Property also caused that work to not meet the requirements of the No Environmental Contamination Standard.

In my opinion, these previous Phase I ESAs studies have not accurately identified the complete range of potential sources of environmental contamination at the Property. As such, this Whitehead Limited Phase II would potentially have been useful, for a limited portion of some of the necessary environmental work; however, the placement of the sampling locations were too few in number, placed in areas too far from the potential sources to provide adequate identification of the environmental contamination impacts, and had an inadequate suite of chemical analyses.

Please see Figure 1 and Figure 2 in the attachments to my Rebuttal Report showing the drilling locations on Well Pad North and Well Pad South, respectively. These figures show the locations of the Whitehead borings around the two natural gas and oil well pads on the Property. Their limited suite of analytical parameters included total petroleum hydrocarbons ("TPH"), volatile organic compounds ("VOCs"), chlorine, barium, and Polyaromatic Hydrocarbons ("PAHs"). In my

opinion, this suite of chemicals tested for will need to be augmented to include a complete list of analytes from actual spills at oil and gas operations to insure each potential environmental contaminant is included for assessment.

On Figure 1, Well Pad North, borings SB-02 and SB-03, are shown to be at the edges of the well pad in native limestone. Therefore, neither of these borings characterized the fill materials brought in to make, and afterward cover, this well pad or determine if there were spills or releases of environmental contamination during their brine and petroleum transfers. Wells SB-01/TMW1 was located the center of the well pad very close to the wellhead. Both SB-01/TMW-01 and SB-02 are over 60 feet north from the targeted former Reserve Pit. SB-01/TMW-01 had three feet of clay before finding native limestone.

In my opinion, this lithology would have been too shallow to represent the depth of the reserve pit and review of GIS coordinates from the boring/well log confirmed it is not in the footprint of the Reserve Pit show on the 2007 aerial photograph included as his Figure 1. There were only three borings to cover the various potential Hazardous Substances at a 2.5 acre Well Pad. in my opinion, approximately 1 boring/well per acre, is too few for adequate coverage. The distances from the former condensate and produced brine Aboveground Storage Tanks ("ASTs") were 111, 168, and 33 feet from borings SB-01/TMW-01, SB-02, and SB-03, respectively. In my opinion, it is too far to find impacts from the former containment in which both of the ASTs were set. SB-01/TMW-01 was approximately 75 feet north of the Reserve Pit. Therefore, in my opinion that boring/well did not properly characterize the soil and potential fluids in the former Reserve Pit.

Well Pad North was empty of equipment on the date of the Whitehead Phase II drilling field work. In my opinion, at least one boring should have been placed directly under each of these former 300 barrel ("bbl.") ASTs, two should have been placed under the dehydrators to the east of the ASTs, there should have been a minimum four borings actually in the Reserve Pit, on the southeast of the Well Pad, and six to eight shallow soil samples across the remainder of the former Well Pad in shallow soils to look for spills and characterize fill materials brought in before and after the Well Pad active use. Please note, this would be a minimum of a dozen soil borings to do the initial investigation at this single well pad. This does not include the number of delineation boring/wells that might be needed to delineate vertically and horizontally any Hazardous Substances found.

On Figure 2, Well Pad South, borings SB-05/TMW-03 was shown to be on the southeast portion of the Well Pad, and SB-06 was shown to be at the edge off of the Well Pad. According to the boring log, SB-05/TMW-03 was sampled too deep to characterize surface spills and was not in the footprint of the Reserve Pit. According to the boring log, SB-06 was in native clay and sand to 7 feet but was located off the Well Pad. Therefore, that boring would not have characterized the fill materials brought in to make this well pad or if there were spills or releases of environmental contamination during its use. There were only two borings to cover the various potential sources at a 1.65 acre well pad. Approximately 1 boring/well per acre, is too few for adequate coverage. The distance from the Reserve Pit to boring SB-05/TMW-03 was 55 feet. Therefore, in my opinion it was too far and did not properly characterize the soil and potential fluid in the former Reserve Pit. The distance from the containment, which held two condensate and two produced water ASTs, was 40 feet from boring SB-06. In my opinion, it is too far to find impacts from the former containment in which the four 300 bbl. ASTs were set.

Well Pad South was not empty of equipment on the date of the Whitehead Phase II drilling field work. However, it was not operational. In my opinion, at least one hand-auger boring should have been placed directly inside the containment, adjacent to each of the four 300 bbl. ASTs, and two

additional drilled borings should have should have been placed as close as possible to the AST containment. Two hand auger borings should have been placed near to the dehydrators to the east of the ASTs. There should have been a minimum four borings actually in the reserve pit to the southeast of the Well Pad and six to eight shallow soil samples across the remainder of the former Well Pad South shallow soils to look for spills and characterize fill materials brought in before and after the Well Pad active use. Please note, this would be a minimum of 18 soils boring to do the initial investigation at this single well pad. This does not include the number of delineation boring/wells that might be needed to delineate vertically and horizontally any environmental contaminants found.

The boring/well for the Offsite Well Pad, SB-04/TMW-02, near the southwest corner of the property should have been placed as close as possible to the single AST on the offsite well pad. The actual location was approximately 147 feet northwest of the center of the AST containment north of the south fence line. It may have been necessary to make adjustments for the active natural gas gathering line and any potential overhead powerlines in that area. Information on the boring log locations were plotted on Google Earth in order to determine their distances from the Reserve Pits and the ASTs. In my opinion, the distance that the boring/well SB-04/TMW-02 was located too far from the offsite AST to find significant environmental contamination on the Property. However, there were detectable petroleum-based VOCs found. In my opinion, there will need to be additional sampling taken to delineate the environmental contamination potentially from that Offsite Well Pad.

In my opinion, despite mis-positioning the six boring/wells, the sole accomplishment of this only attempt at media sampling by the Sellers by Whitehead E.S. was to confirm the presence of environmental contamination in soil, from oil and gas production and drilling, as defined by this Contract at the Property. This did not sufficiently delineate the area to meet the requirements of the No Environmental Contamination Standard.

**“Opinion 2 – The field observations from the Limited Phase II Investigation did not show field indicators of potential COCs.”**

In my opinion, there are field indications of a petroleum release found by the Whitehead Limited Phase II work.

Mr. Whitehead states in his Expert Report that there were no field indications in the photo-ionization detector (“PID”) of organic vapors in excess of instrument background found at boring SB-01/TMW-01, SB-02, SB-05/TMW-03, and SB-06. In fact, there were indications in the PID organic vapors in excess of instrument background found at boring SB-02, SB-03, SB-04, and SB-06. There was laboratory confirmation of the petroleum in borings SB-02, SB-03, SB-04 at three of the four PID hits. This is a definitive indication of the presence of petroleum environmental contamination in soil. In my opinion, low levels of PID response can be caused by soil moisture; however, in this case where laboratory analyses confirm petroleum and the PID correlate to the same location, this is an obvious release of petroleum at the Property.

The Whitehead opinion that dark staining in soil comes from the release of petroleum is not correct at this Property. The color of petroleum is commonly dependent on the American Petroleum Institute (“API”) gravity of petroleum. High gravity natural gas condensate, as was recovered at the Property from the natural gas wells, can be clear to pale yellow. In my opinion, the Whitehead emphasis on dark staining of soils for there to be a petroleum environmental contamination release at the Property is not well founded at these Well Pads because of the nature of the

petroleum condensate generated at the on-Property natural gas wells. In other words, a release of natural gas condensate could have been released without dark staining of soil.

**"Opinion 3 - The soil analytical data did not identify COCs associated with historical oil and gas activities above applicable TRRP Residential PCLs, TSBCs, or RRC Regulatory Protection Limits."**

As previously stated in Section 2.2 of this Rebuttal Report, the No Environmental Contamination Standard requires the removal of all Hazardous Substances from the property. It is irrelevant if the soil impacts found by the Whitehead Phase II investigation meet a State regulatory threshold. In my opinion, there were field indications and analytical evidence of the Hazardous Substances: petroleum, chlorides, and barium in the soil samples collected at the Property.

**"Opinion 4 - Groundwater was not encountered in the three temporary monitoring wells…"**

In my opinion, the three temporary monitor wells installed at the Property were in the ground for a very limited time. Common industry practice is to leave temporary wells in place overnight (24-hours) to allow for accumulation of sufficient groundwater for sampling. Whitehead E. S. Field Notes in Appendix 10, Item 20 of the Whitehead Expert Report document were reviewed. The three temporary monitoring wells: TMW-01, TMW-02, and TMW-03 were installed at 10:25 am, 12:53 pm, and 1:50 pm, respectively. The wells were subsequently visited and checked for groundwater at 2:40 pm, 2:56 pm and, 3:20 pm, respectively. This means the wells TMW-01, TMW-02, and TMW-03 were allowed to accumulate groundwater in the temporary well for 4.15 hour/minute, 2:03 hour/minutes, and 1:30 hour/minutes. The longest groundwater accumulation time allowed during the Whitehead Limited Phase II investigation would have been one-sixth of the normal 24-hour period. Whether sufficient groundwater would have accumulated is unknown.

In my opinion, at this particular Property and because of the No Environmental Contamination Standard requirements in the Contract, permanent wells should have been employed for this assessment of the shallow groundwater table. In my opinion, the Whitehead conclusion of no groundwater at the temporary monitor well locations at the Property is in error, because of the limited time allowed for moisture to accumulate.

It is my opinion that there are very probably shallow water table groundwater zones at the Property at other locations than the two onsite and one adjacent offsite Well Pad. Those locations would be in areas closer to Fall Creek and the south end of the Property. This is demonstrated by the obvious occurrences of impoundments and lakes at the Property that are persistent and perennial.

In my opinion, there was no indication of any attempt to sample the known groundwater at the Property from the already installed water supply wells discussed in the Whitehead Phase I ESA. Some of those wells that have not been visited or used for years and should, at a minimum, be inspected to ensure they are secure and subsequently be sampled.

**"Opinion 5 – Based upon the Limited Phase II Investigation, there is no evidence of impact to the Site, and no further assessment is recommended at this time."**

As previously discussed, my opinion is that the Phase I ESAs conducted at the Site were inadequate in identifying several potential locations of environmental contamination at the Property that the Contract would require to be removed. Therefore, the choice of Mr. Whitehead to use the limited results of Phase I ASTM E1527-21 standard reports as the basis for his "Areas of Concern" did not meet the requirements of the Contract.

I have already provided opinions that the Whitehead Limited Phase II report did not use an adequate number of soil borings and temporary wells, mislocated the sites of their borings and temporary wells at the on-Property Well Pads, used an inadequate suite of analytical parameters to determine if there was environmental contamination, and did not adequately investigate the presence of shallow groundwater at the limited area Whitehead's company investigated for the Sellers.

However, the Whitehead Limited Phase II report did find field indicators of environmental contamination and confirmed their presence at the Property in the form of TPH, VOCs, chlorine, and barium above the background conditions at the Property.

Section 2 of this Rebuttal Report outlines that any potential regulatory standards applied at the Property cannot show that no further action is necessary. This is because the identified chemicals of concern (COCs) in the soil meet the definition of Hazardous Substances as outlined in Section 6(i) of the Contract. As outlined in Section 7(c) of the Contract, the Seller is to remove these contaminants and prepare a report signed by a licensed environmental engineer that no environmental contamination exists on the Property. In my opinion, the Whitehead Limited Phase II investigation work obviously found the presence of Hazardous Substances and environmental contamination. As a result, a significant amount of delineation of those impacts will need to be fully assessed, delineated and removed to meet the environmental terms of the Contract.

## 4.0 Additional Specific Response to Opinions in the Whitehead Expert Report

I will repeat the Whitehead Opinions from Section II of the Whitehead Expert Report and provide my comments and opinions thereafter.

**"Section II. Facts and Data Considered in Forming Opinions**

**"A.-Assignment and Scope"**

In this section of his Expert Report Mr. Whitehead states that "[He] prepared a summary assessment/evaluation of the environmental assessments at the 1.674-acre property … related to the historical use of oil/gas operations on-Site". In my opinion, it would have been a much more useful effort to have prepared a summary and assessment of all the Hazardous Substances potentially found on the property rather than limit it to a single industry.

Mr. Whitehead then opines that the [Limited] Phase II he conducted was identified as "Limited" because of the use of temporary monitor wells. Yet, in my opinion he chose that type of well when he designed and proposed the study in his Work Order. In my opinion the only environmental investigation work conducted by the Seller was limited for many more reasons:

- An inadequate number of soil borings and temporary wells;
- Mislocating the sites of their borings and temporary wells on the edges of Well Pads sources;
- Using an inadequate suite of analytical parameters to determine if there were Hazardous Substances;
- Not adequately investigating the presence of shallow groundwater at the Well Pads; and
- Importantly, not appling the requirements of the Contract to the investigation.

Mr. Whitehead claimed in this section of the report that he was a Senior Reviewer and Environmental Professional for Whitehead E.S. Phase I ESA. In my opinion, Mr. Whitehead was not a Senior Reviewer or Environmental Professional of his company's Phase I ESA report. He was not a signatory in that report.

**"B.-ESE Phase I ESA Information**

In this Section of the report Mr. Whitehead notes the reference to the Business Environmental Risks ("BERs") included in the 2023 ESE Phase I ESAs at the Property and discussed them. Yet, in the Whitehead Phase I ESA, the report states that these specific BERs no longer to be visible at the Property and, therefore, no longer considered a problem.

One specific picture of the BERs, Photograph No. 9, in Appendix C, in the December 2023 ESE Phase I ESA, shows what was, in my opinion, an REC. If this photograph was observed in the practice of conducting a Phase I ESA it should have been reported as an REC. I have included Photograph No. 9 as Figure 3 of this report. The picture was labeled de minimus in the caption. This picture showed a 55-gallon drum lying on its side with significant and obvious soil impacts from the spilled oil underneath. In my opinion, because of the potential size of the spill and the obvious soil impact, this photograph was probably a reportable release to the State of Texas. In my opinion, Mr. Whitehead improperly ignored this obvious potentially regulated spill on the Property and failed to properly assess it. That is regardless of the fact it was also an obvious Hazardous Substance under the Contract definition and that drum and soil are required to be investigated and any environmental contamination removed under Section 7(c), followed by a report that says the environmental contamination had been removed.

***"C.-ESE Whitehead E. S. Phase I ESA Information"***

As discussed previously in his Expert Report, Mr. Whitehead continues to express the use of ASTM E1527-21 (Phase I ESA protocol) as applicable to the Property under the Contract. From a technical perspective and in the opinion of a practicing environmental consultant, the ASTM E-1527-21 standard for Phase I Environmental Site Assessments was not sufficient without modification to meet the environmental requirements of the Contract for the following reasons:

- It has a limited definition of the COCs.
- It specifically removes some known Hazardous Substances (e.g. Asbestos, emerging contaminants) from the COCs.
- Depends on voluntary interviews and regulatory records review to identify hazardous substances at the property. None of these sources were sufficiently responsive at the Property. The only way to overcome this insufficient response is to include sampling where historical information is not available.
- Phase I ESAs collect no samples and depends completely on visual inspections.

In the middle of this Section of his Expert Report in the second full paragraph, he again expresses that stained soils previously in the vicinity of drums were not showing visible impacts. He concludes, therefore, that these items do not represent an REC and therefore will not be addressed.

However, Whitehead cannot evaluate or discuss the current status of the known spill from the drum without documentation and sampling that would commonly have been done by an environmental professional. This would also include information on the location to which this

material was transferred, as transportation to another location could create future potential liability for the Purchaser.

**"D.-Summary and Evaluation of Phase I ESAs"**

Mr. Whitehead in this Section makes a point to emphasize that his company's Phase I ESA and the ESE consultant have both found RECs for the onsite oil and gas Well Pad at the Property. In my opinion, regardless of how many consultants apply the Phase I ESA practice, none of it will matter if this work is not modified to adjust for the requirements of the Contract including the No Environmental Contamination Standard.

**"E.-Limited Phase II Investigation Scope and Implementation"**

Again, in this Section Mr. Whitehead makes a point to emphasize that his company and ESE agreed to conduct the Limited Phase II Investigation in choice of locations, sampling of specific depths in soil samples, the specific use of the temporary wells, and the sampling parameters.

Regardless of any agreement between these parties, the work and choice were the responsibility of Whitehead E. S. as per their work order. The choice should have taken into consideration the environmental obligations of the Contract including the No Environmental Contamination Standard so this work would meet those obligations.

**"F.-Soil Borings, Temporary Monitor Wells and Lithology"**

This section of the Whitehead Expert Reports repeats its portion of his report on description of the boring locations. My opinions based upon review of the Whitehead boring logs and their GIS locations are:

- The locations for well SB-01/TMW-01 and SB-03 on the boring logs are reversed on the maps in the Limited Phase II Investigation, Figure 2.
- Neither borings SB-01/TMW-01 or SB-05/TMW-03 were located in the footprint of the former Reserve Pits. This is supported by their location in regard to the other Well Pad equipment and the boring log lithology.

**"G.-Soil Sampling and Laboratory Analysis"**

My opinions regarding this section are the same as previous, there was an incomplete analytical suite in regard to environmental contamination analyzed for oil and gas operations at this Site. That included both laboratory and field instrumentation.

**"H.-QA/QC and Revised Laboratory Information"**

I have no specific opinions on this section.

**"I.-Documents, Data, and Materials Considered"**

Mr. Whitehead did not include a copy of the applicable Contract in this section of his Expert Report. Section I purports to show all the documents, data, and material considered in his opinions. There were 23 documents listed but none are the Contract. In addition, the previous work products of Mr. Whitehead's company at the Property have no mention of a property sale or a Contract including the obligation of the No Environmental Contamination Standard. In my opinion, it is not possible to consider the use and reliance of the environmental work conducted

to date without comparing that information to the technical environmental requirements of the Contract.

## 5.0 Summary

The Contract was executed on May 26, 2023. Review of the records provided show that the Sellers did not retain an environmental consultant until December 2025.

In my opinion none of the environmental work conducted by Mr. Whitehead in his Expert Report or his previous work with Whitehead E. S., his company at the Property applied the No Environmental Contamination Standard requirements of the Contract. In fact, a review of each of the four documents created by Whitehead's Company and Mr. Whitehead, the Phase I ESA, the Work Order for the Limited Phase II, the Limited Phase II and the Whitehead Expert Report found no reference to the No Environmental Contamination Standard requirements of the Contract.

The Contract is very specific with regard to environmental matters and environmental reports included as due diligence, which should have guided the work performed by Whitehead E. S. and the report issued by Whitehead E. S. Section 6(i) of the Contract defines what a Hazardous Substance is and including many ways the substance may have gotten to the Property and even been transported off of the Property.

Section 7 (c) also outlines that "…Seller shall remove or cause to be removed from the Property any and all environmental contamination, hazardous materials and above and/or underground storage tanks located in, on, or about the Property, and shall provide to Purchaser a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property in connection therewith."

In my opinion any environmental professional retained to work on this project would have to have known and considered the No Environmental Contamination Standard requirement outlined by the Contract and adjusted their work to meet that standard.

## 6.0 References

ESE Partners, LLC, Phase I Environmental Site Assessment, Approximately 1,675 Acres, 7700 Old Granbury Road, Cresson, Hood County, Texas, Project 23-1094-001, December 18, 2023.

ESE Partners, LLC, Phase I Environmental Site Assessment, Approximately 1,675 Acres, 7700 Old Granbury Road, Cresson, Hood County, Texas, Project 24-1090, Doc No. REP-24-1090-002 REV 0,, December 11, 2025.

United States Environmental Protection Agency (USEPA), Enforcement and Compliant Assurance, EPA Office of Compliance Sector Notebook Project, Profile of the Agricultural Chemical, Pesticide, and Fertilizer Industry, EPA 310-R-00-003, September 2000.

USEPA, Enforcement and Compliant Assurance, EPA Office of Compliance Sector Notebook Project, Profile of the Agricultural Crop Production Industry, EPA 310-R-00-001, September 2000.

USEPA, Enforcement and Compliant Assurance, EPA Office of Compliance Sector Notebook Project, Profile of the Agricultural Livestock Production Industry, EPA 310-R-00-002, September 2000.

USEPA, Enforcement and Compliant Assurance, EPA Office of Compliance Sector Notebook Project, Profile of the Ground Transportation Industry—Trucking, Railroad, and Pipeline, EPA 310-R-97-002, September 1997.

USEPA, Enforcement and Compliant Assurance, EPA Office of Compliance Sector Notebook Project, Profile of the Oil and Gas Extraction Industry, EPA 310-R-00-004, September 2000.

Whitehead E.S., LLC, Limited Phase II Investigation, 7700 Old Granbury Road, Cresson Texas, Project No. 379.001, January 26, 2026.

Whitehead E.S., LLC, Phase I Environmental Site Assessment, 1,674 Acres at 7700 Old Granbury Road, Cresson Texas, Project No. 336.101, December 12, 2025.