**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHALLENGER CRESSON I, LLC,** | § | |
| | § | |
| ***Plaintiff*,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:26-cv-00231-P** |
| | § | |
| **BILL SANDERS, *et al.*,** | § | |
| | § | |
| ***Defendants*.** | § | |
| | § | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


I. Introduction ..... 1

II. Background ..... 2

A. Factual Background ..... 3

1. The Contract Sets Firm Deadlines. ..... 3

2. The Amendments Fix and Then Move the Closing Date. ..... 4

3. Whitehead Prepares the Phase II With Challenger's Consultant. ..... 4

4. The Parties Sign a Third Amendment, and No Further Amendment Follows. ..... 5

5. Defendants Deliver a Clean Report, and Challenger Demands New Terms. ..... 6

B. Procedural Background ..... 6

III. Legal Standard ..... 7

IV. Arguments ..... 7

A. Defendants Are Entitled to Summary Judgment on Their Declaratory-Judgment Counterclaim. ..... 8

1. The Contract Expired by Its Own Terms When the Third Amendment's Closing Date Passed. ..... 9

i. Time Was of the Essence, and Only a Signed Writing Could Move the Closing Date. ..... 9

ii. No Signed Writing Extended Closing Beyond January 23, 2026. ..... 10

iii. The Amendments' Promises to "Further Amend" Are Unenforceable Agreements to Agree. ..... 12

iv. At Most, Section 13(k) Extended the Deadline to Close to February 10, 2026, and Challenger Let That Date Pass Too. ..... 13

v. The Amendments' Satisfaction Clause Does Not Stop the Clock Either. ..... 15

2. Challenger Had No Right to Condition Closing on Reliance Letters and Insurance. ..... 16

i. The Contract Contains No Reliance or Insurance Requirement. ..... 16

ii. Challenger Proposed Those Terms, Lost Them, and Signed Anyway. ..... 17

B. Challenger's Claims Fail as a Matter of Law. ..... 18

1. Challenger Cannot Specifically Enforce a Contract That Has Expired. ..... 19

2. Challenger's Breach-of-Contract Claim Fails. ..... 20

i. Challenger's Own Default Defeats Its Claim. ..... 20

ii. Section 8 Lists Conditions, Not Promises That Defendants Could Breach. ..... 20

iii. The Whitehead Report Satisfied Section 7(c). ..... 21

iv. Challenger's Post-Expiration Theories Fail. .................................23
3. Challenger's Declaratory and Injunctive Requests Fall With Its Claims. .23
V. Conclusion .........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*17090 Parkway, Ltd. v. McDavid*,
80 S.W.3d 252 (Tex. App.—Dallas 2002, pet. denied) .......... 16

*American Airlines, Inc. v. Skiplagged, Inc.*,
No. 4:23-cv-0860-P, 2024 WL 3625314 (N.D. Tex. July 31, 2024) (Pittman, J.) ........ 8, 20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 13

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
590 S.W.3d 471 (Tex. 2019) .......... 17, 18, 19, 20, 21, 22, 23, 28, 30

*Cedyco Corp. v. PetroQuest Energy, LLC*,
497 F.3d 485 (5th Cir. 2007) .......... 29

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 12

*Centex Corp. v. Dalton*,
840 S.W.2d 952 (Tex. 1992) .......... 29

*Chapman v. Olbrich*,
217 S.W.3d 482 (Tex. App.—Houston [14th Dist.] 2006, no pet.) .......... 21, 26

*Clark v. Cotten Schmidt, L.L.P.*,
327 S.W.3d 765 (Tex. App.—Fort Worth 2010, no pet.) .......... 23

*DiGiuseppe v. Lawler*,
269 S.W.3d 588 (Tex. 2008) .......... 24, 25, 26, 27

*Dracopoulas v. Rachal*,
411 S.W.2d 719 (Tex. 1967) .......... 16

*Fischer v. CTMI, L.L.C.*,
479 S.W.3d 231 (Tex. 2016) .......... 17, 24, 28

*Gonzalez v. Denning*,
394 F.3d 388 (5th Cir. 2004) .......... 16, 31, 32

*Gosnell v. Select Portfolio Servicing, Inc.*,
No. 4:19-cv-00671-P, 2020 WL 3440653 (N.D. Tex. June 23, 2020) (Pittman, J.) ... 13, 14, 23, 24, 28

*Greer v. Fowler*,
No. 4:19-cv-1017-P, 2022 WL 394762 (N.D. Tex. Feb. 8, 2022) (Pittman, J.) .......... 7

*Hoefert v. Am. Airlines, Inc.*,
438 F. Supp. 3d 724 (N.D. Tex. 2020) (Pittman, J.) .......... 7

*Internacional Realty, Inc. v. 2005 RP West, Ltd.*,
449 S.W.3d 512 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) .......... 9

*James Constr. Grp., LLC v. Westlake Chem. Corp.*,
650 S.W.3d 392 (Tex. 2022) .......... 14, 15, 17, 23, 29

*Jennings v. Jennings*,
625 S.W.3d 854 (Tex. App.—San Antonio 2021, pet. denied) .......... 25, 28

*Lopez v. Munoz, Hockema & Reed, L.L.P.*,
22 S.W.3d 857 (Tex. 2000) .......... 31

*Malacara v. Garber*,
353 F.3d 393 (5th Cir. 2003) .......... 13

*Mustang Pipeline Co. v. Driver Pipeline Co.*,
134 S.W.3d 195 (Tex. 2004) (per curiam) .......... 14, 16, 17, 20, 24, 26, 28, 31

*Paciwest, Inc. v. Warner Alan Props., LLC*,
266 S.W.3d 559 (Tex. App.—Fort Worth 2008, pet. denied) .......... 15, 21, 25

*Penthol, L.L.C. v. Vertex Energy Operating, L.L.C.*,
149 F.4th 504 (5th Cir. 2025) .......... 31, 32

*Reyes v. U.S. Bank Nat'l Ass'n*,
No. 4:18-cv-00828-P, 2019 WL 7371099 (N.D. Tex. Dec. 31, 2019) (Pittman, J.) ... 23, 27, 33

*Shields Ltd. P'ship v. Bradberry*,
526 S.W.3d 471 (Tex. 2017) .......... 18

*Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*,
327 S.W.3d 104 (Tex. 2010) .......... 23, 29, 30

*SP Terrace, L.P. v. Meritage Homes of Tex., LLC*,
334 S.W.3d 275 (Tex. App.—Houston [1st Dist.] 2010, no pet.) .......... 11

*Spicer v. Maxus Healthcare Partners, LLC*,
616 S.W.3d 59 (Tex. App.—Fort Worth 2020, no pet.) .......... 12

*Tamuno Ifiesimama v. Haile*,
522 S.W.3d 675 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) .......... 19

*Tex. Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.*,
92 S.W.3d 477 (Tex. 2002) .......... 16

*TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*,
570 S.W.3d 749 (Tex. App.—Tyler 2018, pet. denied) .......... 15, 16, 20, 21, 26

*URI, Inc. v. Kleberg Cnty.*,
543 S.W.3d 755 (Tex. 2018)....13, 14, 15, 18, 19, 20, 21, 23, 30

*Valence Operating Co. v. Dorsett*,
164 S.W.3d 656 (Tex. 2005)....15, 18, 20, 23, 30

*Vinson v. Amerihome Mortg. Co.*,
No. 4:22-cv-0928-P, 2023 WL 2895251 (N.D. Tex. Apr. 11, 2023) (Pittman, J.).....24, 28, 31, 33

**Statutes**

Tex. Bus. & Com. Code § 26.01(b)(4) ....11

**Other Authorities**

FED. R. CIV. P. 56....2, 13

RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)....31

# I. INTRODUCTION

This case arises from a dispute between Plaintiff Challenger Cresson I, LLC ("Challenger") and Defendants Bill Sanders, Independent Executor of the Estate of Pearl Smelley, Cresson Moon Properties, LP, Richard David Smelley, Amy Elizabeth Smelley, Tammy Marie Graham, Gregory Scott Graham, Deborah Ruth Davis, and David Glenn Davis (collectively, "Defendants") concerning the sale of about 1,674 acres of ranch land near Cresson, Texas.[1] Challenger plans to develop the land as "a master planned industrial complex served by rail."[2] The parties' Standard Contract of Sale (the "Contract") gave Challenger time to pursue that project, but it also made time "of the essence" as to every provision.[3] And it barred any change to its terms except by "an instrument in writing signed by the Party against whom the enforcement" of the change is sought.[4] When the parties amended the Contract in December 2024, they added the following outside date for the entire transaction.

> Notwithstanding anything contained in the Contract or the Amendment to the contrary, unless otherwise agreed in writing by Seller and Purchaser, the Closing Date shall not extend beyond December 31, 2025.[5]

As that date approached, Defendants' consultant needed more time to finish subsurface testing that Challenger's own consultant had helped design and would oversee. So on the last day of 2025, the parties signed a Second Amendment that moved closing to January 10, 2026.[6] Challenger tried to add insurance obligations to that amendment, but Defendants struck the language, and Challenger signed the amendment without it.[7] As the testing continued, the parties signed a Third Amendment, effective January 9, 2026, that moved closing once more,

---

[1] Ex. A-1, Standard Contract of Sale ("Contract") at 1, App. at 005; ECF No. 9 at 1 n.1.
[2] Ex. A-1, Contract §§ 1(a), 5(e), App. at 005, 011.
[3] Ex. A-1, Contract §§ 5(a), 7(c), 13(k), App. at 009–010, 015, 024.
[4] *Id.* § 13(f), App. at 023.
[5] Ex. A-2, First Amendment to Standard Contract of Sale ("First Am.") § 4, App. at 070.
[6] Ex. A-3, Second Amendment to Standard Contract of Sale ("Second Am.") §§ 2–3, App. at 077.
[7] Ex. B-1, Second Amendment Correspondence, App. at 099, 104, 120; Ex. B, Declaration of Lacy Kimball ("Kimball Decl.") ¶ 3, App. at 086.

to January 23, 2026.[8] No later amendment was ever signed.[9] In late January 2026, Defendants delivered a final Phase II report finding "no evidence of any impact to the Site" and asked Challenger to coordinate a closing.[10]

Challenger did not close. It instead told Defendants that "it would be premature to discuss a closing date" and demanded reliance rights and additional-insured status on pollution policies "with limits appropriate for a $33 million transaction," none of which the Contract requires.[11] Two weeks later, it sued for specific performance.[12] Challenger later asked the Court to bar Defendants from selling the land to anyone else and to order a conveyance only "upon satisfaction or proper waiver of the applicable closing conditions."[13] Those conditions include Challenger's own receipt of "all of the Entitlements" and "Required Utilities" for its industrial project.[14]

Although the Contract allowed Challenger to pursue its approvals before closing, Challenger continues to ignore that the Contract also set deadlines it could not move without Defendants' signature.[15] Those deadlines passed in early 2026 with no closing, no tender, and no signed extension. Challenger now asks for a decree with no closing date at all, which would keep the land off the market until its development plans are ready. As a result, Defendants move for summary judgment under Federal Rule of Civil Procedure 56 on their declaratory-judgment counterclaim and on each of Challenger's claims.

---

[8] Ex. A-4, Third Amendment to Standard Contract of Sale ("Third Am.") § 2, App. at 082.
[9] Ex. A, Declaration of David Glenn Davis ("Davis Decl.") ¶ 5, App. at 002; Ex. B, Kimball Decl. ¶¶ 4, 6–7, App. at 087-088; Ex. B-3, January 2026 Correspondence, App. at 141.
[10] Ex. C-2, Limited Phase II Investigation ("Whitehead Report") at p. 4, App. at 191; Ex. B-3, App. at 154.
[11] Ex. B-4, February 2026 Email ("Demand Email"), App. at 166.
[12] ECF No. 1.
[13] ECF No. 34 at 1; ECF No. 33-1 ¶ 83.
[14] Ex. A-1, Contract § 8(a), App. at 016.
[15] Ex. A-1, Contract §§ 5(b)–(e), 13(f), 13(k), App. at 010–011, 023–024; Ex. A-3, Second Am. § 2, App. at 077;

## II. BACKGROUND

### A. Factual Background

#### *1. The Contract Sets Firm Deadlines.*

The Contract covers about 1,674 acres at 7700 Old Granbury Road in Hood County.[16] Closing was set for the ninetieth day after Challenger's inspection period expired, and Section 13(k) makes time "of the essence" as to "all provisions of this Contract."[17] Section 13(k) also extends the closing date day-for-day if Defendants fail to timely deliver an item the Contract requires.[18] And Section 13(f) bars any amendment or waiver "except by an instrument in writing signed by the Party against whom the enforcement" of the change is sought.[19]

Section 7(c) is the Contract's environmental provision. It requires Defendants, at least fifteen days before closing, to remove "any and all environmental contamination" and to provide "a report prepared by a licensed environmental engineer confirming that no environmental contamination exists on or with respect to the Property."[20] Section 6(i) ties "Hazardous Substances" to substances "regulated under applicable local, state or federal Environmental Laws," and Defendants' indemnity for pre-closing Hazardous Substances survives closing.[21] Nothing in the Contract requires Defendants to furnish reliance letters or to buy insurance of any kind.[22] Section 8 lists conditions to Challenger's duty to close. If they are not met, Challenger has "the right, but not the obligation, to terminate this Contract" and recover its earnest money.[23]

---

[16] Ex. A-1, Contract § 1(a), App. at 005; Ex. A, Davis Decl. ¶ 3, App. at 001.
[17] Ex. A-1, Contract §§ 9(a), 13(k), App. at 017, 024.
[18] *Id.* § 13(k), App. at 024.
[19] *Id.* § 13(f), App. at 023.
[20] Ex. A-1, Contract § 7(c), App. at 015.
[21] *Id.* §§ 6(i), 7(f), App. at 013–014, 016.
[22] *See generally* Ex. A-1, Contract, App. at 005–067.
[23] *Id.* § 8, App. at 016–017.

### 2. *The Amendments Fix and Then Move the Closing Date.*

In December 2024, the parties signed the First Amendment.[24] It added an outside date for the entire transaction, providing that, "unless otherwise agreed in writing by Seller and Purchaser, the Closing Date shall not extend beyond December 31, 2025."[25] It also provides that its terms prevail over any inconsistent term of the Contract.[26]

On December 31, 2025, the parties signed the Second Amendment.[27] It recites that the report "cannot be completed prior to December 31, 2025, the outside Closing Date set forth in the Contract."[28] It moves "the Closing Date . . . until January 10, 2026" and makes Challenger's receipt of the final report "in a form satisfactory to Purchaser" a condition to Challenger's duty to close.[29] Section 3 states that the parties "agree to further amend the Contract on or before the First Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date."[30] It supplies no new date and no method for setting one.

Challenger tried to use the Second Amendment to add terms. Its counsel's draft would have committed the parties to a later amendment covering "applicable insurance obligations," and he pressed for reliance rights and additional-insured status on Whitehead's policies.[31] Defendants' counsel struck that language, and Challenger signed the amendment without it.[32]

### 3. *Whitehead Prepares the Phase II With Challenger's Consultant.*

Challenger's consultant, ESE Partners, LLC ("ESE"), asked to review Whitehead's Phase II scope of work and to attend the fieldwork, and Defendants agreed.[33] ESE requested

---

[24] Ex. A-2, First Am., App. at 068–075; Ex. A, Davis Decl. ¶ 4, App. at 001-002.
[25] Ex. A-2, First Am. § 4, App. at 070.
[26] *Id.* § 5, App. at 070.
[27] Ex. A-3, Second Am., App. at 076–080; Ex. B, Kimball Decl. ¶ 3, App. at 086-087.
[28] Ex. A-3, Second Am. at 1, App. at 076.
[29] *Id.* § 2, App. at 077.
[30] *Id.* § 3, App. at 077.
[31] Ex. B-1, App. at 089, 103; Ex. B, Kimball Decl. ¶ 3, App. at 086-087.
[32] Ex. B-1, App. at 104; Ex. A-3, Second Am., App. at 077–082.
[33] Ex. C-1, Phase II Correspondence, App. at 175–176; Ex. C, Declaration of Michael Whitehead ("Whitehead Decl.") ¶ 4, App. at 168.

changes to the scope, and Whitehead made them.[34] ESE then oversaw the January 2026 fieldwork on site.[35] Neither ESE nor Challenger objected to Whitehead's methods or to the credentials of the professionals who did the work.[36]

***4. The Parties Sign a Third Amendment, and No Further Amendment Follows.***

On the day of the fieldwork, Defendants' counsel circulated a short third amendment that would move closing to January 23, 2026.[37] Challenger's counsel again sought added terms, including reliance letters and additional-insured status, and Defendants' counsel declined them.[38] Effective January 9, 2026, the parties signed the Third Amendment.[39] It extends "the Closing Date . . . until January 23, 2026 (the 'Second Extended Closing Date')," again makes Challenger's receipt of the final report "in a form satisfactory to Purchaser" a condition to its closing obligations, and provides that its terms prevail over any inconsistent term of the Contract.[40] Section 3 states that the parties "agree to further amend the Contract on or before the Second Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date and otherwise clarify the parameters of the Environmental Report."[41] Like Section 3 of the Second Amendment, it supplies no later date and no method for setting one, and the Third Amendment contains no reliance or insurance requirement. Later that month, Defendants' counsel reported that Whitehead had found "no issues and no needed remediation" and offered an amendment to close by mid-February.[42] Challenger's counsel said only that he would call. No one signed a fourth amendment, and no Defendant agreed in writing to extend closing past January 23, 2026.[43]

---

[34] Ex. C-1, App. at 17-73; Ex. C, Whitehead Decl. ¶ 4, App. at 169.
[35] Ex. C, Whitehead Decl. ¶ 4, App. at 169.
[36] Ex. C, Whitehead Decl. ¶ 5, App. at 169.
[37] Ex. B-3, App. at 130; Ex. B-2, Proposed Third Am. § 2, App. at 138
[38] Ex. B-3, App. at 147-48; Ex. B-2, Proposed Third Am. § 3, App. at 138; Ex. B, Kimball Decl. ¶ 4, App. at 087.
[39] Ex. A-4, Third Am. at 1, 3–5, App. at 082.
[40] *Id.* §§ 2, 4, App. at 082.
[41] *Id.* § 3, App. at 082.
[42] Ex. B-3, App. at 161; Ex. B, Kimball Decl. ¶ 6, App. at 087.
[43] Ex. A, Davis Decl. ¶ 5, App. at 002; Ex. B, Kimball Decl. ¶ 7, App. at 088.

#### 5. *Defendants Deliver a Clean Report, and Challenger Demands New Terms.*

On January 26, 2026, Defendants' counsel delivered Whitehead's final Limited Phase II Investigation and asked Challenger's counsel to "coordinate a closing."[44] The Whitehead Report found no chemical of concern above Texas residential protective concentration levels or Railroad Commission limits and concluded that "there is no evidence of any impact to the Site."[45] A Texas-licensed Professional Geoscientist sealed the report, and Whitehead is a registered Texas geoscience firm.[46]

Challenger did not schedule a closing. On February 12, 2026, its counsel wrote that "it would be premature to discuss a closing date" and that Challenger "also requires" reliance rights in the report and additional-insured status on occurrence-based pollution policies "with limits appropriate for a $33 million transaction."[47] Challenger has never closed, tendered the purchase price, or proposed a closing date on the Contract's terms.[48]

### B. Procedural Background

Challenger filed this suit on February 27, 2026, and its live pleading is the First Amended Original Complaint ("Complaint").[49] The Complaint alleges that "the applicable conditions precedent to Closing have not been met" and seeks specific performance, alternative damages, and declaratory relief.[50] Defendants counterclaimed for declarations that Challenger "is not entitled to impose extra-contractual conditions to closing," that it failed to close in the time the Contract required, and that Defendants may pursue their own contractual remedies.[51] On October 31, 2026, Challenger moved for leave to file a Second Amended Complaint and for a preliminary injunction barring Defendants from selling the land or "treating the Contract

---

[44] Ex. B-3, App. at 164-165; Ex. D, Spiller Decl. ¶ 3, App. at 301.
[45] Ex. C-2, Whitehead Report at p. 4, App. at 191.
[46] *Id.*; Ex. C, Whitehead Decl. ¶¶ 6–7, App. at 169; Ex. C-3, Certificate of Geoscience Firm Registration, App. at 270.
[47] Ex. B-4, Demand Email, App. at 167.
[48] Ex. A, Davis Decl. ¶ 6, App. at 002; Ex. D, Spiller Decl. ¶ 4, App. at 302.
[49] ECF Nos. 1, 9.
[50] ECF No. 9 ¶¶ 47, 68, 74, 86.
[51] ECF No. 11, Countercls. ¶¶ 45–46.

as terminated or expired."[52] Its proposed pleading asks for a decree requiring conveyance only "upon satisfaction or proper waiver of the applicable closing conditions."[53,54]

## III. LEGAL STANDARD

Summary judgment is not "a disfavored procedural shortcut" but rather an "integral part of the Federal Rules, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" only if it could change the case's outcome. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material." *Id.* A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Once the summary-judgment burden is met, the Court "need not comb through the record in search of evidence creating a genuine issue of material fact." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

## IV. ARGUMENTS

Defendants move first on their declaratory-judgment counterclaim and then on each of Challenger's claims. The Contract expired by its own terms on January 23, 2026, when the closing date in the Third Amendment passed without a signed extension. To the extent Section 13(k) applies, at most it merely extended the deadline to close to February 10, 2026, and

---

[52] ECF No. 33; ECF No. 34 at 1.

[53] Challenger moved for leave to file a Second Amended Complaint on October 31, 2026, and that motion remains pending. *See* ECF No. 33. Although Defendants do not concede that leave is proper, the Court need not resolve that motion first, because the proposed pleading changes nothing. It rests on the same Contract and amendments and seeks the same relief. ECF No. 33-1 ¶¶ 83, 86. Its Section 13(k) and post-expiration theories fail for the reasons listed in Parts IV.A.1.iv and IV.B.2.iv. When an amendment cannot cure the defect that warrants summary judgment, the amendment is futile and summary judgment should be granted. *See Greer v. Fowler*, No. 4:19-cv-1017-P, 2022 WL 394762, at *7-8 (N.D. Tex. Feb. 8, 2022) (Pittman, J.) (granting summary judgment and denying pending motion for leave to amend as futile); *Hoefert v. Am. Airlines, Inc.*, 438 F. Supp. 3d 724, 731-32 (N.D. Tex. 2020) (Pittman, J.) (resolving summary-judgment motions before a pending class-certification motion because the summary-judgment ruling could render that motion moot). Thus, summary judgment should be granted whichever complaint governs.

[54] ECF No. 33-1 ¶ 83.

Challenger let that date pass too. It also had no right to condition closing on reliance and insurance terms the parties never adopted. Those facts defeat Challenger's claims. A contract that has expired cannot be specifically enforced, and Challenger's breach claim fails because it was itself in default, because Section 8 lists conditions rather than promises, and because the Whitehead Report satisfied Section 7(c). Each ground turns on unambiguous contract language and facts that are not genuinely disputed. *See Gosnell v. Select Portfolio Servicing, Inc.*, No. 4:19-cv-00671-P, 2020 WL 3440653, at *2–3 (N.D. Tex. June 23, 2020) (Pittman, J.); *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018).

### A. Defendants Are Entitled to Summary Judgment on Their Declaratory-Judgment Counterclaim.

Defendants are entitled to summary judgment on their declaratory-judgment counterclaim under two independent contractual and legal bars: (1) the Contract expired by its own terms when the agreed closing date passed without a signed extension; and (2) Challenger had no right to condition closing on extra-contractual reliance letters and insurance.[55] Whether a contract is ambiguous, and what an unambiguous contract means, are questions of law that the Court decides on the documents. *See URI*, 543 S.W.3d at 763 (holding that contract construction and ambiguity are questions of law for the court). Accordingly, when the governing documents and the parties' correspondence under them are undisputed, the Court may enter the requested declarations on summary judgment. *See Gosnell*, 2020 WL 3440653, at *2–3 (Pittman, J.) (granting summary judgment on request for declaratory judgment where uncontroverted loan documents and notices established the borrower's default); *American Airlines, Inc. v. Skiplagged, Inc.*, No. 4:23-cv-0860-P, 2024 WL 3625314, at *1–2 (N.D. Tex. July 31, 2024) (Pittman, J.) (resolving claims on summary judgment based on unambiguous contract terms). That is especially true when a party's rights turn on whether it met written

[55] ECF No. 11, Countercls. ¶¶ 45–46.

deadlines and notice requirements that the contract itself spells out. *See James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 409 (Tex. 2022) (holding that express contractual notice and writing requirements must be enforced as written).

#### ***1. The Contract Expired by Its Own Terms When the Third Amendment's Closing Date Passed.***

##### ***i. Time Was of the Essence, and Only a Signed Writing Could Move the Closing Date.***

Start with the deadline itself. When parties make time of the essence, "timely performance is essential to a party's right to require performance by the other party," and a party that misses the deadline cannot compel the other side to perform. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) (holding that a contractor's failure to finish a pipeline by the agreed date excused the owner's performance without any separate finding of materiality). Real-estate contracts follow the same rule, and a buyer must tender "in strict compliance with the provisions of the contract, within the time allowed by the contract." *TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 768 (Tex. App.—Tyler 2018, pet. denied) (holding that buyer's failure to tender performance within time allowed by contract with time-of-the-essence clause barred specific performance); *see Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 572 (Tex. App.—Fort Worth 2008, pet. denied) (holding that tender within contractual deadline is prerequisite to enforcing contract); *Internacional Realty, Inc. v. 2005 RP West, Ltd.*, 449 S.W.3d 512, 532 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (holding that where contract makes time of the essence, failure to close by the agreed date terminates contract). The Contract makes time of the essence "[w]ith respect to all provisions,"[56] and the First Amendment applied that rule to the whole transaction, providing that "the Closing Date shall not extend beyond December 31, 2025" unless "otherwise agreed in writing by Seller and Purchaser."[57] The Second Amendment then

[56] Ex. A-1, Contract § 13(k), App. at 024.
[57] Ex. A-2, First Am. § 4, App. at 070.

moved that date to January 10, 2026,[58] and the Third Amendment moved it once more, to January 23, 2026.[59] Thus, January 23, 2026 became the closing deadline, and time remained of the essence.

The parties also agreed on the only way that date could move. Section 13(f) bars any modification "except by an instrument in writing signed by the Party against whom the enforcement" of the modification is sought.[60] Texas courts enforce writing requirements as written, and compliance with one "may not be achieved in the absence of a writing." *James Constr.*, 650 S.W.3d at 409 (holding that an owner's oral notices could not satisfy a contract that required written notice before the owner could recover its termination costs). That rule flows from the broader principle that courts "presume parties intend what the words of their contract say" and read every provision together so that none is rendered meaningless. *URI*, 543 S.W.3d at 764 (quotation omitted); *see Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Read together, Section 13(f) and the First Amendment's "agreed in writing" proviso meant that only a signed writing could carry closing past January 23, 2026.

#### ***ii. No Signed Writing Extended Closing Beyond January 23, 2026.***

The parties signed two such writings. The Second Amendment moved "the Closing Date . . . until January 10, 2026,"[61] and the Third Amendment extended it "until January 23, 2026."[62] No Defendant signed any later amendment or agreed in writing to any later closing date.[63] When an agreement's unambiguous terms show that the parties did not intend it to continue past a defined point, it ends at that point as a matter of law. *See Gonzalez v. Denning*, 394 F.3d 388, 395 (5th Cir. 2004) (affirming summary judgment where "the unambiguous language of the agreement" showed that the parties "did not intend for the agreement to

---

[58] Ex. A-3, Second Am. §§ 2, 4, App. at 077.
[59] Ex. A-4, Third Am. §§ 2, 4, App. at 082.
[60] Ex. A-1, Contract § 13(f), App. at 023–024.
[61] Ex. A-3, Second Am. § 2, App. at 079.
[62] Ex. A-4, Third Am. § 2, App. at 082.
[63] Ex. A, Davis Decl. ¶ 5, App. at 003; Ex. B, Kimball Decl. ¶ 7, App. at 085.

continue past the point at which the funds were recovered"). And because tender must occur "within the time allowed by the contract," a buyer who lets the closing date pass loses the right to compel the sale. *TLC Hosp.*, 570 S.W.3d at 768; *see Mustang Pipeline*, 134 S.W.3d at 196. Thus, the Contract expired by its own terms when January 23, 2026 passed without a closing, a tender, or a signed extension.

Defendants tried once more to put a new date in writing. Later in January, their counsel asked where things stood on "the next amendment" and offered to close by mid-February, but Challenger's counsel said only that he would call.[64] No amendment followed, and no Defendant ever signed one.[65] The Contract expired on January 23, 2026, more than a month before Challenger sued.

Nor did the parties' continued negotiations extend closing informally. Although Texas law sometimes allows an oral extension of the time to perform, an extension that moves a date on which other contractual rights and duties turn is a material change that must be in writing. *See* TEX. BUS. & COM. CODE § 26.01(b)(4); *Dracopoulas v. Rachal*, 411 S.W.2d 719, 722 (Tex. 1967) (holding that an oral extension of a termination date that served as "the hinge upon which still other contractual rights and duties turn" required a writing). The same rule forecloses any claim based on an unsigned draft amendment circulated between counsel. *See SP Terrace, L.P. v. Meritage Homes of Tex., LLC*, 334 S.W.3d 275, 282–83 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (holding that an unsigned written extension of a real-estate closing deadline was unenforceable under the statute of frauds and the contract's written-modification clause, even where the parties continued to negotiate toward completing the transaction). The closing date here was that kind of hinge, because Defendants' report deadline ran from it.[66] The parties also went further than the statute of frauds requires. Section 13(f) and the First Amendment each

---

[64]Ex. B-3, App. at 150; Ex. B, Kimball Decl. ¶ 6, App. at 085.
[65]Ex. A, Davis Decl. ¶ 5, App. at 003; Ex. B, Kimball Decl. ¶ 7, App. at 085.
[66]Ex. A-1, Contract § 7(c), App. at 015; Ex. A-3, Second Am. § 2, App. at 079; Ex. A-4, Third Am. § 2, App. at 082.

demand a signed writing, and Texas courts enforce that kind of requirement as written. *See James Constr.*, 650 S.W.3d at 409 (holding that parties are bound by contractual writing requirements). Negotiations that never produced a signed amendment cannot satisfy it. Thus, no course of dealing carried the Contract past January 23, 2026.

#### *iii. The Amendments' Promises to "Further Amend" Are Unenforceable Agreements to Agree.*

Challenger cannot revive the Contract through Section 3 of either the Second or the Third Amendment. The Second Amendment says only that the parties "agree to further amend the Contract on or before the First Extended Closing Date to amend the deadlines for compliance with Section 7(c) and the Closing Date." The Third Amendment repeats that promise, tied to the Second Extended Closing Date, and adds only that the parties will "otherwise clarify the parameters of the Environmental Report."[67] "It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree," and to be enforceable such a promise "must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quotations omitted); *see Spicer v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 121 (Tex. App.—Fort Worth 2020, no pet.) (holding that an agreement to agree on terms in the future is unenforceable as a matter of law). Neither Section 3 supplies a new closing date, a new report deadline, or a formula for setting either, and courts will not "imply a term" or "rewrite the parties' agreement" to fill that kind of gap. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 482, 487 (Tex. 2019) (holding that courts cannot imply terms in unambiguous contracts between sophisticated parties). Those provisions left open only the new deadlines, and those are the very terms the parties never agreed on.

[67] Ex. A-4, Third Am. § 3, App. at 082.

Thus, neither Section 3 can extend the Contract past January 23, 2026.

Challenger's own counsel treated a signed writing as essential. On the last day of 2025, he acknowledged that "today is the outside deadline for closing in the contract," and in January he asked that the next draft be circulated "for signature to everyone via DocuSign."[68] He knew a signed amendment was required, and objective manifestations of intent control over "what one side or the other alleges they intended to say but did not." *URI*, 543 S.W.3d at 763–64 (quotation omitted). Nor can Challenger claim that Defendants waived the deadline, because "[t]here can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 485 (Tex. 2017) (quotation omitted). Section 13(f) also bars any waiver not made in a signed writing, and "nonwaiver provisions are binding and enforceable."[69] *Shields*, 526 S.W.3d at 481. Defendants never signed an extension, pressed for closing before and after the deadline, and expressly reserved their rights.[70] Nothing in the record suggests that they gave up the deadline.

***iv. At Most, Section 13(k) Extended the Deadline to Close to February 10, 2026, and Challenger Let That Date Pass Too.***

Challenger's proposed pleading contends that Section 13(k)'s day-for-day extension for late deliveries keeps the Contract alive because Defendants' report was late or deficient.[71] That theory ignores the Second and Third Amendments. The parties signed each knowing that the report could not be completed by the then-current closing date, and they responded by setting a new Closing Date of January 10, 2026 and then January 23, 2026.[72] Both amendments, like the First Amendment before them, provide that their terms prevail over any inconsistent

[68]Ex. B-1, App. at 103; Ex. B-3, App. at 145.
[69] Ex. A-1, Contract § 13(f), App. at 023.
[70]Ex. B-3, App. at 150, 154.
[71] ECF No. 33-1 ¶ 60.
[72]Ex. A-3, Second Am. at 1 & §§ 2, 4, App. at 077; Ex. A-4, Third Am. at 1 & §§ 2, 4, App. at 082; Ex. A-2, First Am. §§ 4–5, App. at 069-070.

provision of the Contract. Reading Section 13(k) to override a date the parties chose with the report delay squarely in view would make those provisions meaningless and would ignore the presumption that parties "intend what the words of their contract say." *See Valence Operating*, 164 S.W.3d at 662; *URI*, 543 S.W.3d at 764 (quotation omitted). The general extension clause yields to the specific date the parties signed.

Section 13(k) never comes into play if Defendants' December 2025 report satisfied Section 7(c). Defendants delivered Whitehead's Phase I assessment in mid-December 2025, more than fifteen days before the December 31 outside date and both the January 10 and January 23 extended dates.[73] That assessment flagged the former gas-well pads as the areas of concern, and the Phase II then tested those areas and found "no evidence of any impact to the Site."[74] Section 13(k) applies only when Defendants "fail[] to timely deliver" an item "required to be delivered," and courts will not "imply a term" that the parties did not write. *Barrow-Shaver*, 590 S.W.3d at 482; *see URI*, 543 S.W.3d at 764. A timely report triggers no extension, and the closing date stayed fixed at January 23, 2026.

Even if the Phase II was the only qualifying report, Section 13(k) gave Challenger only a few more weeks. Section 13(k) extends the Closing Date "by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser."[75] Section 7(c) required the report "[n]ot less than fifteen (15) days prior to Closing," so with closing set for January 23, 2026, the report was due on January 8, 2026.[76] Defendants delivered the Whitehead Report on January 26, 2026, eighteen days later, which at most moved closing to no later than February 10, 2026.[77] Courts enforce a formula the parties chose and "presume parties intend what the words of their contract say."

[73]Ex. C-1, App. at 117.
[74]Ex. C-4, Expert Report of Michael Whitehead at 8–9, App. at 271–272; Ex. C-2, Whitehead Report at p. 4, App. at 191.
[75] Ex. A-1, Contract § 13(k), App. at 024.
[76]*Id.* § 7(c), App. at 015; Ex. A-4, Third Am. § 2, App. at 082.
[77]Ex. B-3, App. at 153–154; Ex. D, Spiller Decl. ¶ 3, App. at 301; ECF No. 33-1 ¶ 60.

*URI*, 543 S.W.3d at 764 (quotation omitted); *see Barrow-Shaver*, 590 S.W.3d at 491. Under Section 13(k), then, the last possible closing date was February 10, 2026.

Challenger let that date pass too. It did not close, tender, or propose a closing date by February 10, 2026, and two days later its counsel wrote that "it would be premature to discuss a closing date."[78] A buyer must tender "within the time allowed by the contract," and a party that misses a time-of-the-essence deadline cannot compel the other side to perform. *TLC Hosp.*, 570 S.W.3d at 768; *see Mustang Pipeline*, 134 S.W.3d at 196. Nor can Challenger keep the clock running by disputing the report, because Section 13(k) measures delay to the date items are "actually delivered," not the date the buyer approves them.[79] Challenger itself pleads that Defendants delivered the report on January 26, 2026.[80] The Contract expired no later than February 10, 2026, more than two weeks before Challenger filed suit.

***v. The Amendments' Satisfaction Clause Does Not Stop the Clock Either.***

That clause makes Challenger's "receipt of the final Environmental Report in a form satisfactory to Purchaser" a condition to its closing obligation.[81] Read with the rest of the amendments, the clause addresses how the report would be prepared and whether the finished report was delivered. Challenger got both. Its own consultant reviewed and expanded the scope of work, oversaw the fieldwork, and never objected to the methods used, and Defendants delivered the final report on January 26, 2026. Although the clause gave Challenger a voice in the testing, it did not give Challenger a fresh right to reject the report's substance for any reason, because courts read each provision in light of the whole agreement and will not let one clause erase the closing date and time-of-the-essence term the parties signed. *See Valence Operating*, 164 S.W.3d at 662; *URI*, 543 S.W.3d at 764. Under settled Texas law, a contractual satisfaction

[78] Ex. B-4, Demand Email, App. at 166–167; Ex. D, Spiller Decl. ¶ 4, App. at 302.
[79] Ex. A-1, Contract § 13(k), App. at 024.
[80] ECF No. 33-1 ¶ 60; Ex. D, Spiller Decl. ¶ 3, App. at 301.
[81] Ex. A-3, Second Am. § 2, App. at 077; Ex. A-4, Third Am. § 2, App. at 082.

clause is evaluated under an objective standard of reasonableness and cannot be exercised arbitrarily or used as a pretext to impose extra-contractual demands. *Tex. Dep't of Transp. v. Jones Bros. Dirt & Paving Contractors, Inc.*, 92 S.W.3d 477, 481 (Tex. 2002) (holding that a satisfaction clause is governed by an objective reasonableness standard); *see also 17090 Parkway, Ltd. v. McDavid*, 80 S.W.3d 252, 258–59 (Tex. App.—Dallas 2002, pet. denied) (holding that satisfaction conditions in real-estate contracts must be exercised in good faith). And on substance, the report did exactly what Section 7(c) requires, finding no chemical of concern above Texas regulatory limits and "no evidence of any impact to the Site," as shown in Part IV.B.2.iii. Thus, the satisfaction clause neither suspended closing nor excused Challenger's failure to close.

### 2. *Challenger Had No Right to Condition Closing on Reliance Letters and Insurance.*

#### i. *The Contract Contains No Reliance or Insurance Requirement.*

Challenger made reliance and insurance terms a condition of closing. Its counsel wrote that a closing date would be "premature" until Defendants met those demands, and its verified interrogatory answer conditions tender on Defendants first "completing all of its contractual obligations" as Challenger defines them.[82] Defendants are also entitled to a declaration that Challenger "is not entitled to impose extra-contractual conditions to closing."[83] Surrounding facts "cannot be used to augment, alter, or contradict the terms of an unambiguous contract," and courts "may neither rewrite the parties' contract nor add to its language." *URI*, 543 S.W.3d at 758; *Barrow-Shaver*, 590 S.W.3d at 487 (quotation omitted). Section 7(c) requires a report "confirming that no environmental contamination exists," but it says nothing about who may rely on that report.[84] No provision of the Contract or its amendments requires Defendants or

[82] Ex. B-4, Demand Email, App. at 167; Ex. E-1, Plaintiff's Objections and Verified Responses to Defendants' First Set of Interrogatories ("Interrog. Resp.") No. 9, App. at 317-318; ECF No. 11, Countercls. ¶ 45(b).
[83] ECF No. 11, Countercls. ¶ 45(b).
[84] Ex. A-1, Contract § 7(c), App. at 015.

their consultants to carry insurance, much less occurrence-based pollution coverage "with limits appropriate for a $33 million transaction."[85] Challenger already had the protection it bargained for in Defendants' indemnity against pre-closing Hazardous Substances, which survives closing.[86] Thus, Challenger's demands added terms that the Contract does not contain.

A buyer that will not close unless the seller accepts new terms is not performing the contract it signed. A party repudiates when it "manifests, by words or actions, a definite and unconditional intention not to perform the contract according to its terms." *Chapman v. Olbrich*, 217 S.W.3d 482, 491 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citation omitted). And a buyer's tender must be "in strict compliance with the provisions of the contract," not on terms of the buyer's own making. *TLC Hosp.*, 570 S.W.3d at 768 (explaining that actual tender in strict compliance with the contract is "always required" when time is of the essence); *Paciwest*, 266 S.W.3d at 572. Challenger told Defendants that it would not discuss "a closing date" until Defendants met demands the Contract does not contain.[87] It repeated that position under oath, conditioning its willingness to tender on Defendants first "completing all of its contractual obligations" as Challenger defined them.[88] Thus, the Court should declare that Challenger had no right to impose those conditions.

### *ii. Challenger Proposed Those Terms, Lost Them, and Signed Anyway.*

The signed documents are dispositive, and the negotiating history only confirms what they say. Challenger asked to add "applicable insurance obligations" to the Second Amendment, Defendants struck the phrase, and Challenger signed the version without it.[89] Challenger tried again in January with language under which Whitehead would add Challenger "as additional insured" and furnish "reliance letters," but Defendants objected, and the Third

[85] *See id.*, App. at 005–067; Ex. A-2, First Am., App. at 068–075; Ex. A-3, Second Am., App. at 076–080; Ex. A-4, Third Am., App. at 081-085; Ex. B-4, Demand Email, App. at 167.
[86] Ex. A-1, Contract §§ 6(i), 7(f), App. at 013-014, 016.
[87] Ex. B-4, Demand Email, App. at 167.
[88] Ex. E-1, Interrog. Resp. No. 9, App. at 317-318.
[89] Ex. B-1, App. at 076-79, 100-01, 120; Ex. A-3, Second Am., App. at 076–080.

Amendment the parties signed contains no reliance or insurance term.[90] A party that seeks a term, loses it in negotiation, and then signs the agreement without it cannot obtain that term from a court. *See Barrow-Shaver*, 590 S.W.3d at 476, 482–83 (refusing to imply a "shall not be unreasonably withheld" limit on consent after that language was deleted from the drafts and the driller signed anyway). Granting it would "vitiate the parties' express agreement" and "rewrite the parties' agreement." *Id.* at 487. Challenger is asking the Court for terms it agreed to leave out.

Nor does the satisfaction clause in the Second and Third Amendments, which refers to a report "in a form satisfactory to Purchaser," help Challenger.[91] That clause concerns the report itself. It says nothing about reliance rights or insurance policies held by third-party consultants. Reading it to reach those demands would let Challenger add terms after signing, and courts will not rewrite an agreement that way. *See Barrow-Shaver*, 590 S.W.3d at 491; *Valence Operating*, 164 S.W.3d at 662. And because Challenger agreed to drop its insurance terms in the very amendments that contain the satisfaction clause, that clause cannot be read to restore them. *See URI*, 543 S.W.3d at 764. Thus, the satisfaction clause gave Challenger no license to impose new conditions.

### B. Challenger's Claims Fail as a Matter of Law.

Challenger pleads breach of contract, seeks specific performance or alternatively damages, and asks for declaratory relief.[92] None of those claims survives. Specific performance fails because there is no longer a contract to enforce. The claim for breach fails because Challenger never performed its own side of the bargain, and the declaratory and injunctive requests fall with the claims they depend on. *See Gosnell*, 2020 WL 3440653, at *2 (Pittman,

---

[90]Ex. B-2, Proposed Third Am. § 3, App. at 138; Ex. B-3, App. at 081-84; Ex. A-4, Third Am., App. at 081-085; Ex. A, Davis Decl. ¶ 5, App. at 002.
[91]Ex. A-3, Second Am. § 2, App. at 077; Ex. A-4, Third Am. § 2, App. at 082.
[92] ECF No. 9 ¶¶ 62–86.

J.); *Vinson v. Amerihome Mortg. Co.*, No. 4:22-cv-0928-P, 2023 WL 2895251, at *4 (N.D. Tex. Apr. 11, 2023) (Pittman, J.).

***1. Challenger Cannot Specifically Enforce a Contract That Has Expired.***

Specific performance enforces a live contract, and Challenger no longer has one. This is not one of those cases where a seller wrongfully refuses to convey land under an active, enforceable agreement. "[T]o be entitled to specific enforcement of a contract, a party must show that the contract in question is valid and enforceable." *Jennings v. Jennings*, 625 S.W.3d 854, 867 (Tex. App.—San Antonio 2021, pet. denied) (quotation omitted); *see Tamuno Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (holding that specific performance is an equitable remedy available only to enforce valid, existing obligations, not to revive an agreement that has ended). The Contract expired on January 23, 2026, or at the latest on February 10, 2026, as shown in Part IV.A. When time is of the essence, a buyer that does not tender within the time the contract allows loses the right to compel the sale. *See TLC Hosp.*, 570 S.W.3d at 768; *Mustang Pipeline*, 134 S.W.3d at 196. Challenger did not close by either date, and it has never tendered the purchase price. There is nothing left for the Court to order Defendants to perform.

Challenger's requested decree shows the problem. It asks the Court to order a conveyance "upon satisfaction or proper waiver of the applicable closing conditions," with no closing date at all.[93] And Challenger still alleges that those conditions "have not been met."[94] Granting that relief would require the Court to supply the new closing date that the parties left open in the Second and Third Amendments and never agreed on afterward. Courts will not make that agreement for the parties, and a promise to agree on a later date is not enforceable. *See Fischer*, 479 S.W.3d at 237; *Barrow-Shaver*, 590 S.W.3d at 491. Section 11(b) does not

---

[93] ECF No. 33-1 ¶ 83.
[94] ECF No. 9 ¶ 47.

help Challenger either. It gives Purchaser the right to "seek to enforce specific performance,"[95] and that language leaves "open the possibility that [the buyer] may seek to enforce it, but be unable to do so." *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 598 (Tex. 2008). Thus, the Court should grant summary judgment on Challenger's request for specific performance.

***2. Challenger's Breach-of-Contract Claim Fails.***

***i. Challenger's Own Default Defeats Its Claim.***

A breach-of-contract plaintiff must prove "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff because of the defendant's breach," and for that reason "a party to a contract who is [itself] in default cannot maintain a suit for its breach." *Vinson*, 2023 WL 2895251, at *3 (Pittman, J.); *Gosnell*, 2020 WL 3440653, at *2 (Pittman, J.) (quotation omitted); *see also Skiplagged*, 2024 WL 3625314, at *2 (Pittman, J.) (holding that plaintiff's own performance is an indispensable element of a contract claim under Texas law). Challenger never tendered performance and refused to close when Defendants asked, so its claim fails on the second element, just as a party that misses a time-of-the-essence deadline cannot require performance from the other side.[96] *See Vinson*, 2023 WL 2895251, at *3–4 (Pittman, J.); *Mustang Pipeline*, 134 S.W.3d at 196. Challenger's answer that its performance was excused depends on its theories under Sections 7(c) and 8, which fail for the reasons below. Thus, Challenger cannot maintain its contract claim.

***ii. Section 8 Lists Conditions, Not Promises That Defendants Could Breach.***

Challenger alleges that Defendants breached Sections 8(b), 8(d), 8(e), and 8(f) "by failing to satisfy express conditions precedent to Closing."[97] "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex*

[95] Ex. A-1, Contract § 11(b), App. at 020.
[96] Ex. B-4, Demand Email, App. at 166-167; Ex. D, Spiller Decl. ¶ 4, App. at 302.
[97] ECF No. 9 ¶ 65(c).

*Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992); *see Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007). When an express condition is not satisfied, "the party whose performance is conditioned is excused from any obligation to perform," but the failure "simply precludes the noncomplying party from enforcing its conditional right" and is not a breach. *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010); *James Constr.*, 650 S.W.3d at 415. Section 8 labels each item "an express condition precedent to Purchaser's obligations" and supplies the consequence, which is that Challenger "shall have the right, but not the obligation, to terminate this Contract" and recover its earnest money.[98] Challenger never exercised that right, and it chose instead to keep the Contract alive and sue.[99] Thus, Section 8 cannot support a claim for damages.

The Contract's treatment of tires shows how the parties separated promises from conditions. Section 7(d) makes Defendants liable for the cost of removing any tires found after the initial removal period and provides a five-business-day notice-and-cure process before closing, reimbursement after closing, and an indemnity.[100] Section 8(d), by contrast, simply makes tire removal a condition to Challenger's duty to close.[101] Courts give effect to that distinction and harmonize the two provisions "so that none will be rendered meaningless." *Valence Operating*, 164 S.W.3d at 662. Section 8's savings clause preserves Section 11(b) remedies only "if Seller defaults," which requires the breach of a promise rather than the failure of a condition, and courts will not rewrite a condition into a covenant the parties did not make. *See Solar Applications*, 327 S.W.3d at 108; *Barrow-Shaver*, 590 S.W.3d at 491. Thus, Defendants are entitled to summary judgment on Challenger's Section 8 theories.

***iii. The Whitehead Report Satisfied Section 7(c).***

Challenger's environmental theory rests on its expert's view that Section 7(c) requires

---

[98] Ex. A-1, Contract § 8, App. at 016-017.
[99] ECF No. 9 ¶¶ 53, 68.
[100] Ex. A-1, Contract § 7(d), App. at 015.
[101] *Id.* § 8(d), App. at 016.

removal of every constituent "to naturally-occurring background levels."[102] The Contract does not say that, because Section 7(c) requires removal of "environmental contamination" and "hazardous materials," and Section 6(i) ties "Hazardous Substances" to substances "regulated under applicable local, state or federal Environmental Laws."[103] Contract language is read "in its lexical environment" and as a whole, so those terms take their meaning from the regulatory framework the Contract itself invokes. *URI*, 543 S.W.3d at 757–58; *see Valence Operating*, 164 S.W.3d at 662. Even Challenger's expert concedes that "[e]nvironmental contamination standards from a Federal or State of Texas regulatory cleanup program are relevant."[104] The Whitehead Report found no chemical of concern above Texas residential protective concentration levels or Railroad Commission limits and "no evidence of any impact to the Site."[105] Expert opinion cannot "make the language say what it unambiguously does not say." *URI*, 543 S.W.3d at 756 (quotation omitted). Thus, the report met the standard the Contract actually imposes.

Challenger also faults the report because a licensed Professional Geoscientist, rather than an engineer, signed it.[106] Only a material failure excuses the other side's performance, and materiality turns on factors such as "the extent to which the injured party will be deprived of the benefit which he reasonably expected." *Mustang Pipeline*, 134 S.W.3d at 199 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)). Challenger received what it bargained for, which was a report by a licensed professional finding no contamination. Its own consultants and its **only designated environmental expert in this case** hold the same geoscience credential. Quasi-estoppel also bars the objection, because it applies when "it would be unconscionable to allow a person to maintain a position inconsistent with one to which he

---

[102]Ex. E-3, Rebuttal Expert Report of R. Steven George, P.G. at 3, App. at 335-339.
[103] Ex. A-1, Contract §§ 6(i), 7(c), App. at 013-015.
[104]Ex. E-3, App. at 334.
[105] Ex. C-2, Whitehead Report at 4, App. at 191.
[106] ECF No. 33-1 ¶ 40; Ex. C-2, Whitehead Report at 4, App. at 191.

acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000); *see Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 771 (Tex. App.—Fort Worth 2010, no pet.) (holding that quasi-estoppel precludes a party from asserting a position contrary to one in which it previously participated or acquiesced). Challenger's consultant helped set the scope, requested additions that Whitehead adopted, and oversaw the fieldwork without objecting to Whitehead's credentials. Thus, the geoscientist's signature is no basis for liability.

***iv. Challenger's Post-Expiration Theories Fail.***

Challenger's remaining theories rest on events after the Contract expired, including alleged remarketing of the land, a property-access request, and Defendants' post-expiration correspondence.[107] A party cannot breach duties under an agreement that has already ended by its terms. *See Gonzalez*, 394 F.3d at 394–95; *Vinson*, 2023 WL 2895251, at *3 (Pittman, J.). Nor was that correspondence a repudiation, because "[t]o constitute a repudiation, a party to a contract must have absolutely and unconditionally refused to perform the contract without just excuse." *Penthol, L.L.C. v. Vertex Energy Operating, L.L.C.*, 149 F.4th 504, 510 (5th Cir. 2025) (quotation omitted). Recognizing that a contract has expired under its own terms is the opposite of an unexcused refusal to perform. These theories fail as well.

***3. Challenger's Declaratory and Injunctive Requests Fall With Its Claims.***

Challenger's requests for declaratory and injunctive relief fail with its substantive claims, because "injunctive and declaratory relief are forms of relief that depend on the success of underlying claims," a court "cannot grant a declaratory judgment when there is no viable claim for relief," and injunctive relief requires "a substantial likelihood of success on the merits." *Vinson*, 2023 WL 2895251, at *4 (Pittman, J.); *Reyes v. U.S. Bank Nat'l Ass'n*, No. 4:18-cv-00828-P, 2019 WL 7371099, at *6 (N.D. Tex. Dec. 31, 2019) (Pittman, J.) (quotation

[107] ECF No. 33-1 ¶¶ 45–51.

omitted). Challenger asks the Court to declare that Section 7(c) requires an express certification, that the Whitehead Report falls short, that Defendants have not satisfied the conditions to closing, and that Challenger did not default. The analysis above forecloses each of those declarations, and Challenger's proposed injunction rests on the same theories of breach and repudiation.[108] Thus, the Court should dismiss Challenger's declaratory and injunctive requests with prejudice.

## V. CONCLUSION

For these reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment. Defendants ask the Court to declare that the Contract expired by its own terms no later than February 10, 2026, that Challenger failed to close in the time the Contract required, that Challenger was not entitled to impose extra-contractual conditions to closing, and that Defendants are entitled to pursue their contractual remedies, including retention of the earnest money Challenger deposited. Defendants further ask the Court to render judgment that Challenger take nothing on its claims for specific performance, breach of contract, damages, and declaratory and injunctive relief. Defendants also request their reasonable attorneys' fees, costs, and pre- and post-judgment interest as allowed by law, and all other relief to which they are entitled.

[108] ECF No. 9 ¶ 86; ECF No. 34 at 1; ECF No. 36 at 5–7.

Respectfully submitted,

By: *<u>/s/ Scott A. Wheatley</u>*

Scott A. Wheatley
State Bar No. 24013737
swheatley@jw.com
Lee B. Hunt
State Bar No. 24082257
lhunt@jw.com
Trevor J. Paul
State Bar No. 24133388
tpaul@jw.com
JACKSON WALKER LLP
777 Main Street, Suite 2100
Fort Worth, Texas 76102
Phone: (817) 334-7200
Fax: (817) 334-7290

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 9, 2026, a true and correct copy of the above document was served via the ECF Filing System on all counsel of record.

*<u>/s/ Scott A. Wheatley</u>*
Scott A. Wheatley